# Exhibit B - Deposition of witness LVMPD Officer Ashley Lif

```
 1              CERTIFICATE OF COURT REPORTER
 2
     STATE OF NEVADA      )
 3                        )  ss:
     COUNTY OF CLARK      )
 4
 5        I, Kimberly A. Farkas, Certified Court
 6   Reporter licensed by the State of Nevada, do
 7   hereby certify that I reported the deposition of
 8   Officer Ashley Lif, commencing on December 20,
 9   2017, at 1:29 p.m.
10        Prior to being deposed, the witness was duly
11   sworn by me to testify to the truth.  I thereafter
12   transcribed my said stenographic notes, and that
13   the transcript is a complete, true, and accurate
14   transcription, and that a request was made for a
15   review of the transcript.
16        I further certify that I am not a relative,
17   employee, or independent contractor of counsel,
18   nor a person financially interested in the
19   proceeding.
20        IN WITNESS WHEREOF, I have set my hand in my
21   office in the County of Clark, State of Nevada,
22   this January 8th, 2018.
23
24
25            _____
              Kimberly A. Farkas, CCR No. 741
26
```

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * * * * *

ESTATE OF TASHI S. FARMER
a/k/a TASHII FARMER a/k/a
TASHII BROWN, by and through
its Special Administrator,
Elia Del Carmen
Solano-Patricio; TAMARA
BAYLEE KUUMEALI'MAKAMAE
FARMER DUARTE, a minor,
individually and as
Successor-in-Interest, by and
through her legal guardian,
Stevandra Lk Kuanoni; ELIAS
BAY KAIMIPONO DUARTE, a
minor, individually and as
Successor-in-Interest, by and
through his legal guardian,
Stevandra Lk Kuanoni,

      Plaintiffs,

  vs.

Case No. 2:17-CV-01946-JCM-PAL

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, a political
subdivision of the State of
Nevada; OFFICER KENNETH
LOPERA, individually and in
his Official Capacity; and
Does 1 through 50, inclusive,

      Defendants.

---

VIDEOTAPED DEPOSITION OF OFFICER ASHLEY LIF

Las Vegas, Nevada

December 20, 2017

Reported by: Kimberly A. Farkas, RPR, CCR #741

Job: 23498

Page 2

```
 1          Videotaped Deposition of OFFICER ASHLEY
 2   LIF, taken at 330 E. Charleston Blvd. Suite 100,
 3   Las Vegas, Nevada, on Wednesday, December 20, 2017,
 4   at 1:29 p.m., before Kimberly A. Farkas, Certified
 5   Court Reporter in and for the State of Nevada.
 6
 7   APPEARANCES
 8
 9   For the Plaintiffs:
10        FEDERICO C. SAYRE, ESQ.
          DARREN D. DARWISH, ESQ.
11        ABIR COHEN TREYZON SALO, LLP
          1901 Avenue of the Stars, Suite 935
12        Los Angeles, California  90067
          (424) 288-4367
13        ddarwish@actslaw.com
14
15   For the Defendant Las Vegas Metropolitan Police
     Department:
16
17        CRAIG R. ANDERSON, ESQ.
          Marquis Aurbach Coffing
18        10001 Park Run Drive
          Las Vegas, Nevada  89145
19        (702) 382-0711
          canderson@maclaw.com
20
21
22
23
24
25   \\\
```

Page 3

```
 1   APPEARANCES (continued)
 2
 3   For the Defendant Officer Kenneth Lopera:
 4
 5        DANIEL R. McNUTT, ESQ.
          MATTHEW C. WOLF, ESQ.
 6        McNutt Law Firm, P.C.
          625 South Eighth Street
 7        Las Vegas, Nevada  89101
          (702) 384-1117
 8        drm@mcnuttlawfirm.com
 9
10
11   Also present:   Tom Burtney, Videographer
```

Page 4

```
 1        DEPOSITION OF OFFICER ASHLEY LIF
 2              December 20, 2017
 3          Kimberly A. Farkas, CCR No. 741
 4                  * * * * *
 5
 6                    INDEX
 7                                              Page
 8   OFFICER ASHLEY LIF
 9   Examination by Mr. Sayre                     6
10   Examination by Mr. McNutt                   50
11                  * * * * *
```

Page 5

```
 1             LAS VEGAS, NEVADA
 2           Wednesday, December 20, 2017
 3                  1:29 p.m.
 4        DEPOSITION OF OFFICER ASHLEY LIF
 5                  * * * * * *
 6         (The court reporter was relieved of her
 7   duties under NRCP 30(b)4.)
 8         THE VIDEOGRAPHER:  Good afternoon here
 9   begins media no. 1 in the deposition of Ashley Lif
10   in the matter of the Estate of Tashi S. Farmer,
11   et al. versus Las Vegas Metropolitan Police
12   Department, et al.  This case is in the United
13   States District Court, District of Nevada, and the
14   case number is 2:17-CV-01946-JCM-PAL.
15         Today's date is December the 20th, 2017,
16   and the time is 1:29 p.m.  This deposition is
17   taking place at 330 East Charleston Boulevard,
18   Suite 100, in Las Vegas, Nevada.  The videographer
19   is Tom Burtney, appearing on behalf of First Legal
20   Deposition Services.
21         Would counsel please identify yourselves
22   and state whom you represent.
23         MR. SAYRE:  For the plaintiff --
24   plaintiffs, Federico Sayre.
25         MR. DARWISH:  Darren Darwish on behalf
```

Page 6

1  of plaintiffs.
2       MR. McNUTT: Dan McNutt and Matt Wolf on
3  behalf of Ken Lopera.
4       MR. ANDERSON: Craig Anderson on behalf
5  of Las Vegas Metropolitan Police Department.
6       THE VIDEOGRAPHER: The reporter today is
7  Kimberly Farkas.
8       Would the reporter please swear in the
9  witness.
10          OFFICER ASHLEY LIF,
11 having been first duly sworn, was examined and
12 testified as follows:
13          EXAMINATION
14 BY MR. SAYRE:
15    Q.  Officer Lif, would you please state your
16 full name for the record.
17    A.  Ashley Lif.
18    Q.  By whom are you employed?
19    A.  Las Vegas Metropolitan Police
20 Department.
21    Q.  Have you ever had your deposition taken
22 before?
23    A.  No.
24    Q.  You've just been sworn to tell the
25 truth. And although we're sitting here somewhat

Page 7

1  informally, that oath is as binding on you here as
2  if we were in a court of law.
3       Do you understand that?
4    A.  Yes, sir.
5    Q.  Everything that is said here today --
6  excuse me -- will be taken down by the court
7  reporter. She'll later have it typed up into a
8  booklet form, and you'll be given an opportunity
9  to read and review that booklet, and you can make
10 any changes or corrections that you deem
11 appropriate to your testimony.
12      However, if you make any changes or
13 corrections that are material in nature, we can
14 comment upon that fact.
15      Do you understand that?
16   A.  Yes, sir.
17   Q.  So we ask you to make your best answer
18 here today.
19      Will you do that, please?
20   A.  Yes, sir.
21   Q.  I'm here to ask questions about an
22 incident that primarily involved your partner,
23 Kenneth Lopera, although you had some peripheral
24 involvement.
25      Do you understand that?

Page 8

1    A.  Yes.
2    Q.  You're not a defendant here today.
3  You're a witness.
4       Do you understand that?
5    A.  Yes.
6    Q.  Could you tell me the extent of your
7  formal education, beginning with high school.
8    A.  High school. Just general education.
9  And I have -- I had some classes at UNLV, and
10 finished my bachelor's in criminal intelligence
11 out of Mercyhurst University in Erie,
12 Pennsylvania.
13   Q.  I'm sorry?
14   A.  Mercyhurst University.
15   Q.  Mercyhurst.
16   A.  It's in Erie, Pennsylvania. And I have
17 a master's in intelligence analysis terrorism.
18   Q.  Is that through the same institution?
19   A.  No, sir.
20   Q.  Where is that from?
21   A.  It's a public university. It's mostly
22 done online. They have a physical campus in
23 Charlestown, West Virginia.
24   Q.  What are they called?
25   A.  American Public University, but it's the

Page 9

1  branch of American military that I got it through.
2    Q.  Okay. What year did you receive your
3  bachelor's degree?
4    A.  It was 2010.
5    Q.  And what year did you receive your
6  master's?
7    A.  I got commenced in 2014.
8    Q.  Commenced?
9    A.  Graduated. When I got my degree.
10   Q.  Oh, your commencement. I see.
11      Okay. Now, during the course of this
12 deposition, I'm going to be asking you a number of
13 questions. You may or may not know the answer to
14 those questions.
15      What I do wish you to do is tell me if
16 there's a question that I ask you which you don't
17 understand, and I'll repeat it or do what's
18 necessary to rephrase it.
19      If you -- if you answer a question, I'm
20 going to assume that you've understand understood
21 it. Is that fair?
22   A.  That's fair.
23   Q.  Please wait until I've finished my
24 question, and I'll wait until you've finished your
25 answer before I start my next question.

Page 10

1    Besides simply being courteous, it's
2    difficult for her to take down two people who are
3    speaking at the same time. Pardon me.
4        Are you taking any kind of medication
5    that would affect your ability to give your best
6    response here today?
7    A.  No.
8    Q.  During the course of the deposition, I
9    may ask you questions which have to do with
10   measurements or time, and you may or may not have
11   an exact answer to my question. But even if you
12   don't have an exact answer, you may well have an
13   estimate.
14       If you have an estimate, I'm entitled to
15   your estimate. However, if it's just a guess, I'm
16   not entitled to have you guess.
17       The difference between a guess and an
18   estimate is not always clear. If I asked you to
19   estimate the length of this table, you see the
20   table. You have a life experience with feet and
21   inches or meters and centimeters. You could
22   probably give a reasonable estimate. If I asked
23   you to give me an estimate of my dining room in
24   Irvine, California, it would have to be a complete
25   guess because you've never been there.

Page 11

1    Do you understand?
2    A.  Correct.
3    Q.  You need to answer out loud. Such
4    common expressions as "uh-huh" or "huh-uh" or nods
5    of your head or shakes of your head are not --
6    can't be interpreted by the court reporter. So
7    I'd have to follow-up with questions like, "Do you
8    mean 'yes' or do you mean 'no'?" So to avoid
9    that, please answer out loud.
10       Will you do that, please?
11   A.  Yes.
12   Q.  Okay. It sounds like you were in the
13   military at some point because you're -- you were
14   connected with this American Public institution,
15   whatever -- American Public University?
16   A.  They're separate, yes. But I am in the
17   military as well.
18   Q.  You are in the military now?
19   A.  Correct.
20   Q.  Are you a National Guard?
21   A.  Reserve.
22   Q.  Reserve. Army Reserve?
23   A.  Yes.
24   Q.  When did you start serving in the
25   military?

Page 12

1    A.  I signed in 2013.
2    Q.  And was that in the Army -- Army
3    Reserve?
4    A.  Correct. Yes.
5    Q.  So you did a six-month training?
6    A.  Approximately.
7    Q.  Okay. And now you have a certain
8    obligation that you still follow on a monthly
9    basis?
10   A.  Correct.
11   Q.  Okay. That doesn't interfere with your
12   duties as an officer, I take it?
13   A.  No.
14   Q.  When did you start working for the
15   Las Vegas Municipal Police Department?
16   A.  I was hired in July of 2015.
17   Q.  And you went through an academy?
18   A.  Correct.
19   Q.  Where was the academy located?
20   A.  I don't remember the exact address.
21   Isaac Newton and Metro Academy Way.
22   Q.  Okay. It's an academy that's run by the
23   Metropolitan Police Department?
24   A.  Correct.
25   Q.  Okay. And then you went through a

Page 13

1    period of field training?
2    A.  Correct.
3    Q.  And that ended when?
4    A.  August of 2016.
5    Q.  When did that start?
6    A.  As soon as I graduated from the academy,
7    which was -- or I'm sorry. It was 2017, and I
8    graduated the academy in 2016, late January.
9    Q.  Okay. So your field training ended
10   August of 2017?
11   A.  Correct.
12   Q.  Now, this incident occurred in May of
13   2017. So I assume that means that you were still
14   involved in field training at that time?
15   A.  Yes. I'm not a hundred percent sure on
16   the date that I had gotten out of field training.
17   Q.  Okay. On May 14th of 2017, do you have
18   a recollection of whether you were still involved
19   in field training or whether you had graduated
20   from it?
21   A.  I believe I was still in -- in field or
22   on a probationary basis.
23   Q.  Okay. All right. Would you take a look
24   now at your ACT test there.
25       Take a look at 000005. It's at the

Page 14
1  bottom of the page. It's a Bates stamp. That's
2  it.
3      Now, it talks about this event occurring
4  at May 14th, 2017, at 1:16 hours, which would be
5  1:16 a.m.; correct?
6    A.  Correct.
7    Q.  Now, what was your area of
8  responsibility that day or -- and the night
9  before?
10   A.  Excuse me. On that evening, on the
11 13th --
12   Q.  Okay.
13   A.  On the 13th, we -- at midnight, we start
14 what's called Safe Strip. And it's -- our squad
15 will be put to the resort corridor for tourist
16 safety. He and I were together that night. And
17 our property was to be the Venetian that we were
18 supposed to be at.
19      We had initially, after we had left the
20 Safe Strip briefing, we went to the Hawaiian
21 Market, because that's where we were the night
22 before, and then we got a message from our
23 sergeant, and he said, "Go to the Venetian," and
24 so that's where.
25   Q.  Okay. You said "he." I assume you

Page 15
1  meant Officer Lopera?
2    A.  That he and I were together?
3    Q.  Yeah. Right.
4    A.  Correct.
5    Q.  Okay. And you said that after you
6  finished the briefing -- Safe Street briefing, you
7  went to the Hawaiian Market?
8    A.  Correct.
9    Q.  What is the Hawaiian Market?
10   A.  It's a property that has multiple
11 stores. I'm not sure why it's called the Hawaiian
12 Market. That's just how I know it.
13   Q.  Okay. All right. And is it a casino
14 property?
15   A.  It's outside of other casino properties.
16 I'm not sure if there's any gambling in that area.
17   Q.  All right. And how long had you been
18 partnered with Officer Lopera?
19   A.  That night or in totality?
20   Q.  In totality.
21   A.  Since, I think, the middle of April. I
22 had just gotten back from some military training
23 and was partnered with him.
24   Q.  Okay.
25   A.  Sporadically. Not consistently.

Page 16
1    Q.  Okay. Meaning that you were, on
2  occasion, partnered with other people?
3    A.  Correct.
4    Q.  Were you predominantly partnered with
5  him?
6    A.  Yes.
7    Q.  Do you know Officer Tran?
8    A.  Not outside of him being on the sister
9  squad at that time.
10   Q.  That's what I mean.
11   A.  Yes.
12   Q.  You know who he is?
13   A.  Yes.
14   Q.  All right. And you know Officer Flores?
15   A.  Yes.
16   Q.  He and Officer Tran were partners that
17 evening, I'm told.
18      Do you know that to be a fact?
19   A.  Just from what was put out in the media.
20 I didn't know that prior.
21   Q.  Okay. Officer Tran said that on
22 Saturday, you sometimes -- he would overlap his
23 shift with shifts that were being worked by
24 Officer Lopera.
25      Do you know that to be a fact or not?

Page 17
1    A.  I don't know that.
2    Q.  Okay. Now, what time did your shift
3  start the night before?
4    A.  Our normal scheduled shift started at
5  2000. And our Safe Strip briefing starts at
6  midnight.
7    Q.  What do they cover in the Safe Strip
8  briefing?
9    A.  Safe Strip? Target -- target areas. If
10 there were any previous crimes throughout the day
11 that we should be aware of. I guess, who's going
12 to be partnered with whom. Who's on shift. Who's
13 on overtime.
14   Q.  Okay. Do you know if Officer Tran and
15 officer Flores attended that Safe Strip briefing?
16   A.  I cannot recall. On that night I don't
17 think Lopera and I were at that because we got
18 stuck in traffic. We were on the one the night
19 previously.
20   Q.  You're saying that you did not attend
21 the Safe Strip briefing that night?
22   A.  That evening, correct. I think that's
23 where our late text or message came from, to
24 switch from Hawaiian market to Venetian.
25   Q.  You meanwhile you were still in your car

Page 18
1  in traffic, you got a message to switch to --
2      A.  We were out of our car.
3      Q.  You were out of your car?
4      A.  Correct.
5      Q.  And where were you parked?
6      A.  At the Hawaiian Market.
7      Q.  Okay.  And you received a radio call?
8      A.  It was a message in some fashion.  It
9  went to Ken.
10     Q.  Okay.  Ken Lopera?
11     A.  Correct.
12     Q.  And what did it say, if you know.
13     A.  I'm not sure what it said.  He told me
14 that we were instructed to go to the Venetian.
15     Q.  Did he tell you why?
16     A.  No.
17     Q.  And did you respond to the Venetian?
18     A.  Correct.
19     Q.  By car?
20     A.  Yes.
21     Q.  How far is it?
22     A.  I'd say -- an estimate would probably be
23 a couple miles.  Two miles, three miles.
24     Q.  And where did you park when you arrived?
25         At the Venetian?

Page 19
1      Q.  Yes.
2      A.  In the -- I'm not sure how to describe
3  it.  It's a -- like an enclave on -- to get into
4  the security office.  I'm not sure how to describe
5  it.  It's specifically for workers, and Metro
6  parks there.
7      Q.  Okay.  So it's a -- it's kind of an
8  employee parking; is that the idea?
9      A.  It's not even an employee parking.  It's
10 maybe tools or vehicles that they'll use on shift.
11 Not personally owned vehicles.
12     Q.  Okay.  So it's like the hotel's
13 vehicles?
14     A.  Yes.  Some of them, yes.
15     Q.  All right.  Approximately what time did
16 you arrive at that parking location?
17     A.  I cannot recall.
18     Q.  Do you have an estimate?
19     A.  I'd say it wouldn't be far after
20 midnight, but I can't give you a definite.
21     Q.  Okay.  Sometime between 12:00 and 1:00?
22     A.  Yeah.
23     Q.  All right.  Closer to 12:00?
24     A.  Yeah, I believe so.
25     Q.  All right.  So did you receive any other

Page 20
1  explanation from Officer Lopera as to why you'd
2  been called to that location while you were
3  traveling to the location?
4      A.  No.
5      Q.  When you got there, I assume you exited
6  the vehicle?
7      A.  Correct.
8      Q.  And then what did you do?
9      A.  Walked in through the security doors as
10 we always do.
11     Q.  And where does that leave you once you
12 get through the security doors?
13     A.  What do you mean?
14     Q.  Where are you in the hotel?
15     A.  In the basement of the hotel.
16     Q.  And where did you go from there?
17     A.  We walked through the hallways, which
18 would pass the EDR, and walked into the main part
19 of the casino.
20     Q.  Had Officer Lopera told you as of that
21 point why you were called to that location?
22     A.  No.  And I don't -- I didn't think
23 anything of it that I can recall.  It's our --
24 it's our job on those evenings to do Safe Strip
25 and to be assigned to specific properties.

Page 21
1      Q.  Okay.  And once you got into the casino,
2  then where did you go?
3      A.  We walked through the casino.  We were
4  looking for somewhere to get coffee.
5      Q.  Okay.  And did you get the coffee?
6      A.  We did.
7      Q.  And then what happened?
8      A.  We started to make our way from the
9  Coffee Bean and walk into another main part of the
10 casino, like, more of an open floor.
11     Q.  All right.  Up to this point, had there
12 been any unusual incidents of any kind of?
13     A.  No.
14     Q.  Then what happens next?
15     A.  We were approached by Mr. Farmer.
16     Q.  Now, at the time I assume you didn't
17 know his name?
18     A.  Correct.
19     Q.  You were approached by an
20 African-American man?
21     A.  Yes.
22     Q.  How would you describe him?
23     A.  He was tall in stature.  He was slim.
24 He didn't look overweight.  He was appropriately
25 dressed for the weather.  He was in dark clothing.

Page 22

1  Q.  Did you notice anything unusual about
2  him?
3  A.  Oh, that he was sweating, and he did ask
4  for where the drinking fountain was.
5  Q.  To the best of your recollection, what
6  did he say about asking for the drinking fountain?
7  A.  He just asked where a drinking or water
8  fountain was. And then I recall him asking if we
9  could escort him down to valet, as he said that he
10 was being followed, and he ran across the Strip.
11 Q.  Did you ask -- did either you or
12 Officer Lopera ask him why he thought he was being
13 followed?
14 A.  I can't recall. But I would assume that
15 we would have asked him why he felt like he was
16 being followed.
17 Q.  You just don't remember that?
18 A.  I do not.
19 Q.  All right. Do you know if
20 Officer Lopera was the person taking the lead in
21 talking to him as opposed to you?
22 A.  It wasn't predetermined of who was going
23 to take the lead on the conversation. But at that
24 time Mr. Farmer turned his shoulders and directed
25 it towards Ken, and respectfully, I'll step away.

Page 23

1  To me, I interpret that as he doesn't want to
2  speak with me.
3  Q.  Okay. Besides sweating, did you notice
4  anything else unusual about his behavior?
5  A.  Not -- not necessarily. Not that
6  anything would spark a concern for, I guess,
7  anything more than maybe mental illness, but I'm
8  not sure how to describe that.
9  Q.  Did you think that he might be suffering
10 from mental illness?
11 A.  Possibly.
12 Q.  What was it about him that caused you to
13 possibly think that?
14 A.  That he said that he ran across --
15 across the boulevard. It's not, I guess, a common
16 thing, for someone to just run across the
17 boulevard.
18 Q.  Did he appear to be agitated?
19 A.  I don't recall, no. He just asked for
20 help. He just asked for the drinking fountain.
21 Asked to be escorted to valet.
22 Q.  Did he appear to be frightened or
23 afraid?
24 A.  Not that -- not that I can recall. I
25 mean, he was asking for help, and we were more

Page 24

1  than willing to help him. So it's -- I don't know
2  if he was afraid or frightened at that time.
3  Q.  Did he tell you why he wanted to be
4  escorted to the valet?
5  A.  No.
6  Q.  Did you assume that it had something to
7  do with his statement that he was being followed?
8  A.  I'm not sure. It's -- he asked just to
9  be escorted, so it's -- I know I didn't ask him,
10 so I'm not sure.
11 Q.  Now, have you received training through
12 the Metropolitan Police Department regarding
13 mental illnesses?
14 A.  Yes.
15 Q.  Okay. What type of training is that?
16 A.  The crisis intervention team.
17 Q.  What is that?
18 A.  It's a class that will be put on for
19 officers to take to be able to identify some
20 mental illnesses or some traits of them.
21 Q.  Okay. And did that come into your mind
22 as you were viewing Mr. Farmer?
23 A.  Not at that time. It would be more for
24 the legal 2000s in that time. To me, he didn't
25 meet any of the criterias that would fit, like, a

Page 25

1  mental illness hold or a safety to himself hold.
2  Q.  Meaning a danger to himself or others?
3  A.  That's correct.
4  Q.  All right. He just appeared to be
5  showing some signs of potentially mental illness?
6  A.  It's not a crime to be mentally ill,
7  though.
8  Q.  Of course not.
9     And what are you trained to do when you
10 encounter a person that's showing some behavioral
11 symptoms of mental illness?
12 A.  Talk to them. Offer medical assistance
13 if they need it. See what's going on. Possibly
14 if they've been diagnosed with anything.
15 Q.  Did you have that conversation with him?
16 A.  No.
17 Q.  How come?
18 A.  I'm not sure. I stepped away from both
19 of them when they had started talking.
20 Q.  Could you hear the conversation between
21 Officer Lopera and Mr. Farmer?
22 A.  I could not.
23 Q.  What happened next?
24 A.  I took Officer Lopera's coffee from him,
25 and I had both of our coffees in our hand and

Page 26

1  stepped back from their conversation to set the
2  coffees down.
3     Q. And did they appear to be conversing?
4     A. From what I can recall, yes.
5     Q. Okay. But you couldn't hear it?
6     A. Correct.
7     Q. Okay. Then what happens after that?
8     A. I set the coffees down on the ground.
9     Q. And then?
10    A. And when I stand up, they had already
11 started making their way down through the hall.
12    Q. And was this a hall that would end up at
13 the valet?
14    A. I'm not sure.
15    Q. Were they side by side, or was one in
16 advance of the other?
17    A. I believe Mr. Farmer was in advance from
18 Ken.
19    Q. How far in advance?
20    A. Approximately five feet.
21    Q. Was Mr. Farmer walking or more like
22 running?
23    A. It's more at a walk.
24    Q. Fast walk or slow walk?
25    A. Say a fast walk.

Page 27

1     Q. And Officer Lopera was following?
2     A. Yes.
3     Q. Okay. At some point, did you see
4  Mr. Farmer begin to run?
5     A. I cannot recall. I know that the --
6  that hallway that they had gone down was, like, an
7  employees hall or like a -- I guess an employees
8  access only. And it turns off into an angle at
9  the end. I don't recall the running portion.
10    Q. When it turns off into an angle, did you
11 lose sight of Mr. Farmer?
12    A. Yes. I lost sight of both of them.
13    Q. Right. And then Officer Lopera followed
14 him, and you lost sight of Officer Lopera?
15    A. That's correct.
16    Q. All right. Had you seen Mr. Farmer
17 looking back as he went down the hall?
18    A. I don't recall. The floor was -- was
19 being worked on by two janitors or maintenance
20 workers, and it was slippery. And when I had got
21 onto that slippery portion, I was looking
22 downward. So I didn't look up.
23    Q. Sure.
24       Did Officer Lopera say anything to you
25 about what he was intending to do?

Page 28

1     A. No.
2     Q. And then after you lost sight of both of
3  them, what did you do?
4     A. I couldn't hear anything. I couldn't
5  hear yelling or -- whether it was in person or on
6  the radio. I was trying to open any door that I
7  could, any open door, there would be another door,
8  and I'd try and open that.
9        I remember I walked back to where I had
10 started to figure out where I was or if maybe he
11 would have come back. I don't know where that
12 hall ended. I don't know if it encircled at some
13 point. I didn't hear anything.
14    Q. Right. And you said you tried to open
15 some doors?
16    A. Correct.
17    Q. And then --
18    A. Most of them were locked. Some of them
19 were open that would lead into -- into offices,
20 and it clearly was not where they were.
21    Q. Right. So what did you do after you
22 made this attempt to open doors?
23    A. I continued to open doors and try to
24 look for somebody --
25    Q. Okay.

Page 29

1     A. -- who possibly saw someone who was
2  wearing the same uniform as I was.
3     Q. Sure. That was unsuccessful, I take it?
4     A. Eventually, I found a worker. I don't
5  recall if he said that he saw someone wearing the
6  same uniform that I was, but I asked to get me to
7  security.
8     Q. You asked him to get you security?
9     A. I believe I asked him to get me to
10 security. I had no idea where I was in those back
11 halls, and there was still no sounds, no noises.
12    Q. Right. So did -- did he call security
13 for you?
14    A. I'm not sure. I didn't -- I don't
15 recall him getting on his radio, if he even had
16 one.
17    Q. Sure. Did any security officers respond
18 to your location?
19    A. Not to my location. I kept making my
20 way through the halls, getting into an elevator
21 and going down. And there was security right
22 there. And said there was an incident going on in
23 the back right parking lot, and he pointed me out.
24 And I exited the property into -- excuse me, onto
25 a -- like a dock, like a slanted dock.

Page 30

1    And by the time I had gotten out,
2    multiple other cops were there. Lights were on.
3    And I ran up the dock, and that was --
4    Q.  Okay. So you descended in an elevator?
5    A.  That's correct.
6    Q.  And there was a security guard at the
7    bottom of where the elevator stopped?
8    A.  At the bottom. I don't think he was
9    aware of me being there looking -- he wasn't
10   saying, "Hey, there you are."
11   Q.  Did he in any way say, "I saw another
12   officer here previously and I sent him over
13   there"?
14   A.  I don't recall. I asked if there's an
15   incident -- or he said, "There's an incident in
16   the back right." I just can't remember the
17   conversation on how he directed me out.
18   Q.  Okay. And you followed his direction?
19   A.  Correct.
20   Q.  Right. And you said you got there, and
21   there were a number of cops there?
22   A.  Correct.
23   Q.  Did you see your partner?
24   A.  I did.
25   Q.  What was he doing?

Page 31

1    A.  He was just standing by the scene, away
2    from the larger group of police.
3    Q.  Did you see Mr. Farmer?
4    A.  Yes.
5    Q.  Where was he?
6    A.  On the ground, on the pavement.
7    Q.  What was he doing?
8    A.  He was handcuffed, laying on the ground.
9    Q.  What was Officer Lopera doing when you
10   came up on the scene?
11   A.  He was just standing off to the -- to
12   the side.
13   Q.  Doing what?
14   A.  Walking around.
15   Q.  Was he talking?
16   A.  I can't recall.
17   Q.  Did he talk to you?
18   A.  Now that I saw the media briefings and
19   the body camera, I know that he talked to me. But
20   at that time I don't remember that he had spoke to
21   me.
22   Q.  Okay. So you've reviewed the body
23   camera of doctor -- of Officer Lopera?
24   A.  Portions of it that was given to me in
25   an administrative capacity.

Page 32

1    Q.  What do you mean, "in an administrative
2    capacity"?
3    A.  In the CIRT interviews.
4    Q.  Now, there's -- in the arrest report, if
5    you look for a moment, on page 2 of 8, it's Bates
6    stamp 000006. It says, at -- about two-thirds of
7    the way down the page, it begins the paragraph,
8    "At 4:25 hours, Officer Lif was interviewed by
9    detectives."
10       Do you see that?
11   A.  Yes.
12   Q.  "The following is a summary of the
13   interview."
14       Now, first of all, was that interview
15   taped?
16   A.  Yes.
17       MR. SAYRE: Okay. And is that something
18   you're taking privilege on at the present time?
19       MR. ANDERSON: Yes, during the criminal.
20       MR. SAYRE: So, again, subject to the
21   same thing as a -- once it's revealed in court,
22   then we'll get a copy of it?
23       MR. ANDERSON: It will be produced.
24       MR. SAYRE: Is this separate from the
25   CIRT?

Page 33

1        MR. ANDERSON: They're the same and
2    different. There's the FIT report and the CIRT.
3    FIT is what did the arrest report and
4    determined -- you know.
5        MR. SAYRE: Okay.
6        MR. ANDERSON: CIRT is the internal
7    investigation. But CIRT -- CIRT stops its
8    investigation once the criminal charges were
9    brought.
10       MR. SAYRE: Okay. But --
11       MR. ANDERSON: The statements would be
12   the same.
13       MR. SAYRE: They'd be the same
14   statement. All right. So, in any event, those
15   two will become available once they become public
16   in the criminal?
17       MR. ANDERSON: Will be produced.
18       MR. SAYRE: Okay. So the same point is,
19   I certainly hope to finish Officer Lif's
20   deposition today. But in the event that once it's
21   produced, there's something from the interview
22   that cases me to want to depose her on that
23   subject, I would reserve my right to depose her at
24   that time.
25       MR. ANDERSON: Understood.

Page 34

1   MR. SAYRE: All right.
2   Q. You understand what I'm saying?
3   A. Yes.
4   Q. It says, "Officer Lif and Lopera were
5  inside the Venetian Hotel, getting a cup of
6  coffee, when Farmer approached them. Farmer
7  was" --
8   A. I'm just trying to read word for word
9  with you.
10   Q. Oh, okay.
11   MR. ANDERSON: He started right here.
12  BY MR. SAYRE:
13   Q. I'm sorry. I should have started at the
14  beginning.
15   "Farmer was sweating profusely" --
16   Now, is that your description of him?
17   A. There were noticeable beads of sweat,
18  but my interpretation of "profusely" is, I guess,
19  sweat-saturated clothing.
20   Q. Were his -- was his clothing sweat
21  saturated?
22   A. I don't recall. I just saw the beads
23  around his hairline.
24   Q. Beads of sweat. Okay.
25   -- "and asked the officers if they knew

Page 35

1  where a drinking fountain was located. The
2  officers told Farmer they did not know, but told
3  him if he walked around, he would probably find
4  one."
5   And then it says, "Officer Lopera then
6  asked Farmer why he was sweating so badly."
7   Do you remember that conversation or
8  that statement?
9   A. I do not. I think I had stepped back.
10   Q. "And Farmer stated he had just run
11  across the street because people were following
12  him."
13   I think you said that you did remember
14  that.
15   A. To hear that, yeah. He was -- he was
16  speaking a little louder than we were because
17  there was the noises of the casino and music going
18  on as well.
19   Q. Sure.
20   "Farmer asked if the officers could
21  escort him down to valet, and the officers agreed.
22  Farmer then began to walk away, and Officer Lopera
23  attempted to get Farmer to come back and talk to
24  them."
25   Do you remember that?

Page 36

1   A. That he'd started to walk away?
2   Q. And that Lopera tried to get him to come
3  back and talk to you.
4   A. I remember taking Officer Lopera's
5  coffee prior to that.
6   Q. "Officer Lopera handed his coffee to
7  Officer Lif, started walking after Farmer. Farmer
8  then began to run down the hallway, and
9  Officer Lopera followed him."
10   So did you see Farmer begin to run?
11   A. I did not.
12   Q. Did you see --
13   A. They were walking -- he was walking
14  fast, and that's when I was getting onto that
15  slippery floor.
16   Q. And did you see Lopera begin to run?
17   A. I did not.
18   Q. "Officer Lif lost track of
19  Officer Lopera and Farmer and did not see them
20  again until Farmer was in custody outside of the
21  hotel."
22   Now, you've said that you remember, as
23  you came up on the scene, that you saw Farmer
24  handcuffed.
25   A. Correct.

Page 37

1   Q. Is that what you meant by "being in
2  custody"?
3   A. Yes.
4   Q. And Lopera was standing to one side?
5   A. Yes.
6   Q. All right. Did you ask Lopera what
7  happened?
8   A. I don't recall.
9   Q. Because you said that you reviewed the
10  tape.
11   Did that refresh your recollection at
12  all?
13   A. But that's been multiple months since
14  then.
15   Q. When is the last time that you saw the
16  tape?
17   A. When I had my CIRT interview.
18   Q. And that would have been when?
19   A. Approximately 11 or 12 days after the
20  incident.
21   Q. Okay. Since that time, have you seen
22  the tape again?
23   A. No.
24   Q. Have you read anything in preparation
25  for your deposition?

OFFICER ASHLEY LIF

December 20, 2017

Page 38
1  A. I've looked at my FIT and CIRT
2  statement, but that was over a month or so ago.
3  Q. Were you curious as to what happened
4  between Mr. Farmer and Officer Lopera?
5  A. Absolutely.
6  Q. And wouldn't you have asked him what
7  happened?
8  A. Yeah.
9  Q. And do you have a recollection of what
10 he told you?
11 A. At that I don't -- I don't recall. On
12 the body camera, I can vaguely remember him saying
13 that he tased him.
14 Q. Yeah. Anything else?
15 A. On the body camera, he said that he
16 choked him.
17 Q. Okay. Now, take a look at page 7 of 8.
18 The third paragraph from the bottom, it says,
19 "LVMPD policy states that after the initial
20 five-second cycle," referring to an ECD, "the
21 officer will evaluate the need to apply an
22 additional five-second cycle after providing the
23 subject a reasonable opportunity to comply."
24     Is that the way that you were trained?
25 A. Yes, trained.

Page 39
1  Q. All right. "Policy further states,
2  after a subject has been exposed to three cycles,
3  the ECD shall be deemed ineffective and another
4  force option will be considered."
5     Is that the way you've been trained?
6  A. Yes.
7  Q. All right. It says, "After cycling the
8  ECD seven times, Lopera holstered his ECD."
9     Did Officer Lopera ever tell you that he
10 tased Mr. Farmer seven cycles?
11 A. No.
12 Q. Okay. That would have been out of
13 policy; correct?
14 A. Yes.
15 Q. It says that "Officer Lopera holstered
16 his ECD. With Farmer laying on his stomach,
17 Officer Lopera straddled Farmer's back and struck
18 him approximately 10 to 12 times in the head,
19 while giving Farmer verbal commands to 'get on
20 your stomach.'"
21     Did you see that in either of the
22 videos?
23 A. Just -- what are the videos?
24 Q. That Officer Lopera struck him in the
25 head 10 to 12 times?

Page 40
1  A. The surveillance video.
2  Q. The Venetian.
3  A. Correct.
4  Q. Did you see any justified reason for
5  striking in the head 10 to 12 times?
6     MR. McNUTT: Objection. Form.
7     MR. ANDERSON: You can answer.
8     THE WITNESS: I can answer?
9     MR. ANDERSON: Yeah.
10    THE WITNESS: Okay. No.
11 BY MR. SAYRE:
12 Q. It says, "According to LVMPD policy,
13 officers should only use hand strikes when a
14 subject is displaying aggressive resistance.
15 Aggressive resistance is defined as that which has
16 the potential to cause injury or substantial pain.
17    "Based upon Officer Lopera's BWC,"
18 that's his body camera, "and surveillance obtained
19 by the Venetian hotel, Farmer was lying on his
20 stomach, attempting to keep from being handcuffed,
21 and Officer Lopera began to strike him. Farmer
22 appeared to be protecting his face from being hit.
23 Farmer did not appear to be displaying aggressive
24 resistance."
25    Do you agree with that statement?

Page 41
1  A. From the surveillance video, yes.
2  Q. After striking Farmer in the head,
3  Officer Lopera performed what he described as a
4  rear naked choke.
5     Did Officer Lopera tell you that he had
6  performed a rear naked choke?
7  A. It was on my body camera.
8  Q. Meaning you --
9  A. My body camera was still on, and he had
10 come up and said "rear naked choke."
11 Q. That's what he said to you?
12 A. Yeah. That's what was caught on the
13 body camera. At that time I don't remember him
14 telling me that, but it clearly happened. It was
15 on body camera.
16 Q. I understand.
17    But seeing your body camera or the tape
18 from your body camera, it refreshed your
19 recollection?
20 A. It happened. I still to this day don't
21 remember that conversation, but it clearly
22 happened.
23 Q. Right. Now, besides saying that he
24 performed a rear naked choke, did he say anything
25 else, according to your body camera?

Page 42

1  A.  I can't remember from the body camera.
2      MR. SAYRE:  Okay.  Have we been supplied
3  with Officer Lif's body camera?
4      MR. ANDERSON:  I don't think.  I don't
5  think I've seen it either.  I don't have it.  I
6  think it's part of that still.
7      MR. SAYRE:  Are you taking the privilege
8  on that?
9      MR. ANDERSON:  I will take a privilege
10  on that.
11      MR. SAYRE:  Okay.  Same idea, that once
12  it's produced for the criminal trial, that we'll
13  be able to get it?
14      MR. ANDERSON:  Yes.  Once it's been used
15  for the criminal --
16      MR. SAYRE:  Okay.  Same advisement as I
17  made.
18      MR. ANDERSON:  Understand.
19  BY MR. SAYRE:
20  Q.  Okay.  Now, have you been trained in the
21  use of a rear naked choke?
22  A.  No.
23  Q.  Okay.  Have you been trained in how to
24  escape a rear naked choke?
25  A.  Yeah.  Just through the department or a

Page 43

1  choke hold through, yes.
2  Q.  That's what I'm referring to.
3      What is the difference between a lateral
4  vascular neck restraint and a rear naked choke?
5  If you know.
6  A.  LVNR would be to stop the blood flow to
7  the brain.  It should only take a couple of
8  seconds.
9  Q.  Maybe 7 to 15 seconds, something like
10  that?
11  A.  Approximately.
12  Q.  Yeah.  And then what's the rear naked
13  choke?  What is the difference?
14  A.  I'm not sure.  I'm not trained in it.
15  Q.  Okay.  So do you know that the rear
16  naked choke is also a blood choke?
17  A.  It could be.  I'm not familiar with it.
18  Q.  Do you know how you apply a rear naked
19  choke?
20  A.  I do not.  I know it's different than
21  the LVNR.
22  Q.  Okay.  How do you apply an LVNR?
23  A.  Encircle the neck, the -- I guess the
24  center part.  Your airway would still be able to
25  work because it's in the bend of your elbow, and

Page 44

1  your forearm and your bicep would be on each side
2  of the jugular.
3  Q.  Pressing the carotid, jugular and vagus
4  nerves?
5  A.  Correct.
6  Q.  The front part that you don't push
7  pressure on is the trachea?
8  A.  Trachea, yeah.
9  Q.  Okay.  And you don't know the difference
10  in how you put on a --
11  A.  I don't recall ever doing an intentional
12  rear naked.  I've never choked anybody, so...
13  Q.  Have you ever utilized a lateral
14  vascular neck restraint?
15  A.  No.
16  Q.  Have you had it applied to you?
17  A.  Through training.
18  Q.  It says that "Officer Lopera held the
19  rear naked choke for one minute and 13 seconds."
20      Do you know anything about that?
21  A.  I do not.  I wasn't there.
22  Q.  I understand.
23      It says, "Officer Lopera also held the
24  rear naked choke for 44 seconds after being told
25  to let go by Officer Tran."

Page 45

1      Do you know anything about that?
2  A.  I wasn't there, and it's come out
3  through the administrative portions, through the
4  CIRT.
5  Q.  Sorry.  What's come out?
6  A.  The -- just the video of Officer Tran
7  telling Lopera to let go.
8  Q.  You saw that in a video?
9  A.  I heard it.
10  Q.  Heard it in the video?
11  A.  It was in the body cams.
12  Q.  Okay.  You heard that on -- on
13  Officer Lopera's body camera?
14  A.  I don't know whose body camera it was.
15  Q.  But it was a body camera?
16  A.  Correct.
17  Q.  How do you know it was Officer Tran?
18  A.  I guess I don't know it was
19  Officer Tran.
20  Q.  Okay.  Do you know Officer -- Sergeant
21  Crumrine?
22  A.  He's my sergeant.
23  Q.  Okay.  Do you know whether he was
24  present there at the time that these events were
25  unfolding?

Page 46
1   A.  Through the surveillance video, that he
2   had shown up.
3   Q.  The Venetian?
4   A.  Correct.
5   Q.  Now, at any time since this incident,
6   have you had a conversation with Officer Lopera
7   about what happened?
8   A.  I've not spoke with him.
9   Q.  You did speak to him that night?
10  A.  Briefly.  But it wasn't about, I guess,
11  the incident that happened.  We were separated
12  fairly quickly, but we were together.  But I don't
13  recall any conversation being had that was not
14  caught on body camera.
15  Q.  Meaning, your body camera?
16  A.  That is correct.
17  Q.  Okay.  When you encounter behavioral
18  indications that may be generally associated with
19  people affected by mental illness, what are you
20  supposed to do?
21  A.  Offer them help.
22  Q.  Are you supposed to call -- do you have
23  a crisis team that you can call?
24  A.  That's what I'm certified in.
25  Q.  You personally?

Page 47
1   A.  Yes.
2   Q.  Are certified in being the crisis
3   person?
4   A.  Correct.
5   Q.  Based on your training and experience,
6   what is the best way to speak to a person who has
7   a mental disorder and/or experiencing a mental
8   crisis?
9   A.  Ask what's wrong, if they need help, if
10  I can help them in any way.
11  Q.  Have you ever interacted with a mentally
12  ill person or an individual experiencing a mental
13  crisis on the job?
14  A.  Yes.
15  Q.  Should you threaten that person with
16  arrest or threaten them in any other manner?
17      MR. ANDERSON:  Objection.  Form.
18      Go ahead and answer.
19      THE WITNESS:  No.  From my experience,
20  it scares them.  Sometimes it's necessary, but it
21  scares them if you threaten them with it.
22  BY MR. SAYRE:
23  Q.  After this incident, have you ever been
24  partnered with Officer Lopera again?
25  A.  No.

Page 48
1   Q.  Was it just a couple months that you
2   were partnered -- sorry.
3       MR. ANDERSON:  Break time already?
4       (Interruption by telephone.)
5       MR. SAYRE:  I'm very sorry.  Apologize
6   to everybody.  I used to have my phone in a way
7   that it didn't ring, but then I never answered it.
8   So people would kvetch at me for not answering my
9   phone, especially my wife.  I don't mind anybody
10  else, but when my wife complains, I listen.  I've
11  learned in many years of marriage that that's one
12  person you pay attention to.
13  Q.  All right.  So you had spent about two
14  months with Officer Lopera; is that correct?
15  A.  I'd even say less than that, because I
16  got back from military training, I think,
17  mid-April and worked four days a week, and there
18  were some days that I know he and I weren't
19  partnered because we worked with other people on
20  the squad.
21  Q.  During the time that you were paired or
22  partnered with Officer Lopera, was there ever an
23  instance where he engaged in physical violence
24  with regard to a suspect?
25      MR. McNUTT:  Objection.  Form.

Page 49
1       THE WITNESS:  No.
2   BY MR. SAYRE:
3   Q.  Had you ever seen him utilize a lateral
4   vascular neck restraint prior to the evening --
5   A.  No.  I'm sorry for cutting you off.
6   Q.  That's all right.  That's another thing
7   my wife does all the time, too.
8   A.  Well, she can get away with it.
9   Q.  She can.
10      When you came upon the scene, you said
11  that you saw a number of officers; correct?
12  A.  Correct.
13  Q.  You saw Mr. Farmer in custody, meaning
14  handcuffed.  Saw Officer Lopera standing off to
15  the side.
16      Did you ever see him interact with
17  Mr. Farmer at all while you were there?
18  A.  No.
19  Q.  What, if anything, did you do with
20  regard to Mr. Farmer when you came upon the scene?
21  A.  When I came up, they were -- they -- I
22  don't know who, what officers, the officers were
23  administering CPR.  I went over there, and I know
24  giving CPR is very tiring.  So I had put my gloves
25  on just in case that they needed to be tapped out

Page 50

1  so I could come in.
2     Q.  Sure.
3     A.  But I never needed to. I never placed
4  hands on Mr. Farmer.
5     Q.  Did you see Officer Tran there?
6     A.  I don't recall seeing him there.
7     Q.  How about Officer Flores?
8     A.  I don't recall seeing him either.
9     Q.  Would you know Officer Flores by sight?
10    A.  Yes.
11    Q.  And Officer Tran?
12    A.  Yes.
13       MR. SAYRE: I have nothing further.
14       MR. ANDERSON: I have no questions.
15       MR. McNUTT: I have just a couple
16  questions.
17              EXAMINATION
18  BY MR. McNUTT:
19    Q.  What is your MOS in the military?
20    A.  Military police.
21    Q.  And you testified that Mr. Farmer was
22  sweating; correct?
23    A.  Yes.
24    Q.  And do you think he was sweating more
25  than the conditions would call for generally?

Page 51

1     A.  No. I remember at that time even I was
2  sweating, and I don't know if it's just because I
3  had my vest and belt on. So it didn't seem
4  unusual.
5     Q.  Were you in an air-conditioned facility
6  when you first encountered Mr. Farmer?
7     A.  Yes.
8     Q.  You said that Mr. Farmer was wearing
9  dark clothing?
10    A.  Um-hum.
11    Q.  And that your definition of profusely
12  sweating would indicate that his -- he had soaked
13  through his clothing; is that correct?
14    A.  That's correct.
15    Q.  Could you tell that with dark clothing?
16    A.  Yes, I could.
17    Q.  Do you recall whether he had or had not?
18    A.  I don't recall.
19    Q.  When the foot pursuit of Mr. Farmer
20  occurred, where did he -- where did Mr. Farmer go
21  to within the casino?
22    A.  To an employees-only area hall or, I
23  guess, service hall.
24    Q.  So when you say "employees only," the
25  general public was not permitted to go in that

Page 52

1  area; is that correct?
2     A.  Correct.
3       MR. McNUTT: Okay. No further
4  questions.
5       MR. SAYRE: Nothing. Let me -- do you
6  stipulate?
7       MR. McNUTT: I'm going to cough.
8       MR. SAYRE: Oh, okay. I thought you
9  were going to laugh.
10       Let me tell you what we do, and then you
11  tell me if you think it's okay or not okay or
12  whatever.
13       We offer to stipulate that the court
14  reporter may be relieved of her statutory
15  obligation. The deposition can be signed under
16  penalty of perjury, meaning that the original is
17  sent to the deponent.
18       The deponent has a certain amount of
19  time, maybe 30 days, to read and review it, make
20  any changes or corrections they deem appropriate,
21  and then sign it and return it to you.
22       You can then maintain it if you wish.
23  And then I say something like, if not, signed and
24  corrections provided, a certified copy may be used
25  as if it was the original for all purposes.

Page 53

1       MR. ANDERSON: Yeah, we don't do what
2  they do in California here. I think we're
3  provided a copy. If we don't make any changes in
4  30 days, you get the original. That's fine.
5       MR. SAYRE: That's fine.
6       You know, same thing happens in Northern
7  California. They look at me with this blank stare
8  when I do that little song and dance.
9       MR. ANDERSON: I just always have that
10  stare.
11       MR. SAYRE: A lot of people with a blank
12  stare.
13       THE VIDEOGRAPHER: Very well. This
14  concludes the deposition of Ashley Lif. And the
15  number of media used was one. We are off the
16  record at 2:23 p.m.
17       (Whereupon, the deposition concluded
18       at 2:23 p.m.)