# Exhibit F - Deposition of Defendant Travis Crumrine

SERGEANT TRAVISCRUMRINE

December 27, 2017

```
 1              CERTIFICATE OF COURT REPORTER

 2
      STATE OF NEVADA        )
 3                           )  ss:
      COUNTY OF CLARK        )
 4

 5        I, Kimberly A. Farkas, Certified Court

 6  Reporter licensed by the State of Nevada, do

 7  hereby certify that I reported the deposition of

 8  SERGEANT TRAVIS CRUMRINE, commencing on December

 9  27, 2017, at 10:02 a.m.

10        Prior to being deposed, the witness was duly

11  sworn by me to testify to the truth.  I thereafter

12  transcribed my said stenographic notes, and that

13  the transcript is a complete, true, and accurate

14  transcription, and that a request was made for a

15  review of the transcript.

16        I further certify that I am not a relative,

17  employee, or independent contractor of counsel,

18  nor a person financially interested in the

19  proceeding.

20        IN WITNESS WHEREOF, I have set my hand in my

21  office in the County of Clark, State of Nevada,

22  this January 8th, 2018.

23

24

25                Kimberly A. Farkas, CCR No. 741

26
```

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

ESTATE OF TASHI S. FARMER
a/k/a TASHII FARMER a/k/a
TASHII BROWN, by and through
its Special Administrator,
Elia Del Carmen
Solano-Patricio; TAMARA
BAYLEE KUUMEALI'MAKAMAE
FARMER DUARTE, a minor,
individually and as
Successor-in-Interest, by and
through her legal guardian,
Stevandra Lk Kuanoni; ELIAS
BAY KAIMIPONO DUARTE, a
minor, individually and as
Successor-in-Interest, by and
through his legal guardian,
Stevandra Lk Kuanoni,

          Plaintiffs,

               Case No. 2:17-CV-01946-
     vs.                JCM-PAL

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, a political
subdivision of the State of
Nevada; OFFICER KENNETH
LOPERA, individually and in
his Official Capacity; and
Does 1 through 50, inclusive,

          Defendants.

_____

VIDEOTAPED DEPOSITION OF SERGEANT TRAVIS CRUMRINE

Las Vegas, Nevada

December 27, 2017

Reported by: Kimberly A. Farkas, RPR, CCR #741

Job: 24050

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 2

```
 1          Videotaped Deposition of SERGEANT TRAVIS
 2   CRUMRINE, taken at 330 E. Charleston Blvd. Suite 100,
 3   Las Vegas, Nevada, on Wednesday, December 27, 2017,
 4   at 10:02 a.m., before Kimberly A. Farkas,
 5   Certified Court Reporter in and for the State of
 6   Nevada.
 7
 8   APPEARANCES
 9
10   For the Plaintiffs:
11          FEDERICO C. SAYRE, ESQ.
            DARREN D. DARWISH, ESQ.
12          ABIR COHEN TREYZON SALO, LLP
            1901 Avenue of the Stars, Suite 935
13          Los Angeles, California  90067
            (424) 288-4367
14          ddarwish@actslaw.com
15
16   For the Defendant Las Vegas Metropolitan Police
     Department:
17
18          CRAIG R. ANDERSON, ESQ.
            Marquis Aurbach Coffing
19          10001 Park Run Drive
            Las Vegas, Nevada  89145
20          (702) 382-0711
            canderson@maclaw.com
21
22
23
24
25
```

Page 3

```
 1   \\\
 2   APPEARANCES (continued)
 3
 4   For the Defendant Officer Kenneth Lopera:
 5
 6          DANIEL R. McNUTT, ESQ.
            McNutt Law Firm, P.C.
 7          625 South Eighth Street
            Las Vegas, Nevada  89101
 8          (702) 384-1117
            drm@mcnuttlawfirm.com
 9
10
11   Also present:  Tom Burtney, Videographer
12                  Ruth Miller, LVMPD
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   VIDEOTAPED DEPOSITION OF SERGEANT TRAVIS CRUMRINE
 2              December 27, 2017
 3          Kimberly A. Farkas, CCR No. 741
 4                  * * * * *
 5
 6                    INDEX
 7                                                 Page
 8   SERGEANT TRAVIS CRUMRINE
 9   Examination by Mr. Sayre                        6
10   Examination by Mr. McNutt                      79
11   Examination by Mr. Sayre                       90
12   Examination by Mr. McNutt                      92
13              (No exhibits marked)
14                  * * * * *
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          LAS VEGAS, NEVADA
 2      Wednesday, December 27, 2017
 3              10:02 a.m.
 4      DEPOSITION OF SERGEANT TRAVIS CRUMRINE
 5              * * * * * *
 6      (The court reporter was relieved of her
 7   duties under NRCP 30(b)4.)
 8      THE VIDEOGRAPHER:  Good morning.  Here
 9   begins media no. 1 of the deposition of
10   Travis Crumrine in the matter of The Estate of
11   Tashi S. Farmer, et al., versus Las Vegas
12   Metropolitan Police Department, et al.  This case
13   is in the United States District Court, District
14   of Nevada.  The case number is 2:17-CV-01946-
15   JCM-PAL.
16          Today's date is December the 27th, 2017,
17   and the time is 10:02 a.m.  This deposition is
18   taking place at 330 East Charleston Boulevard,
19   Suite 100, in Las Vegas, Nevada.  The videographer
20   is Tom Burtney, appearing on behalf of First Legal
21   Depositions Services.
22          Would counsel please identify yourselves
23   and state whom you represent.
24          MR. SAYRE:  For the plaintiffs,
25   Federico Sayre.
```

SERGEANT TRAVISCRUMRINE

December 27, 2017

1    MR. DARWISH:  Darren Darwish on behalf
2  of plaintiffs.
3    MR. McNUTT:  Dan McNutt on behalf of
4  Ken Lopera.
5    MR. ANDERSON:  Craig Anderson on behalf
6  of the Las Vegas Metropolitan Police Department.
7    THE VIDEOGRAPHER:  Also present is
8  Ruth Miller.
9    The reporter today is Kimberly Farkas.
10    Would the reporter swear in the witness.
11    SERGEANT TRAVIS CRUMRINE,
12  having been first duly sworn, was examined and
13  testified as follows:
14    EXAMINATION
15  BY MR. SAYRE:
16    Q.  Officer Crumrine, my name is Fred Sayre,
17  and I'm going to be asking you some questions
18  concerning an event that you were involved in.
19    Have you ever had your deposition taken
20  before?
21    A.  Yes.
22    Q.  How many occasions?
23    A.  Once.
24    Q.  Okay.  And how long ago was that?
25    A.  Nine years ago.

1    Q.  Okay.  You've been sworn to tell the
2  truth.  And although we're sitting here somewhat
3  informally in this conference room, do you
4  understand that oath is as binding on you here as
5  if you were in a courtroom of law?
6    A.  Yes.
7    Q.  Everything that is stated here today by
8  anyone, including yourself, will be taken down by
9  the court reporter.  She'll later have it typed up
10  into a booklet form, and you'll be given an
11  opportunity to read, review, and you can make
12  changes or corrections to what you've testified to
13  here today.
14    Do you understand that?
15    A.  Yes.
16    Q.  However, if you make a change or
17  correction, you -- that change or correction can
18  be commented upon, and it could prove, at least,
19  embarrassing to you, if not damaging to your
20  employer.
21    Do you understand that?
22    A.  Yes.
23    Q.  So we ask you to give your best response
24  here today.
25    Will you do that, please?

1    A.  Yes.
2    Q.  Please don't answer a question that you
3  don't understand.  Ask me to repeat it, rephrase
4  it, or do something to indicate it wasn't -- it
5  wasn't understood, and I'll do my best to try to
6  make it understandable.
7    Will you do that, please?
8    A.  Yes.
9    Q.  If you answer a question, I'm going to
10  assume that you've understood it.
11    Is that fair enough?
12    A.  Yes.
13    Q.  All right.  Please wait until I've given
14  my question completely before you start your
15  answer, and I'll give you the same courtesy.
16    Besides simply being courteous, it's
17  difficult for two people -- to take down two
18  people who are speaking at the same time, and
19  sometimes the last -- well, the last phrase could
20  change potentially the meaning of my -- my
21  question.
22    Do you understand that?
23    A.  Yes.
24    Q.  I don't expect this to be a lengthy
25  deposition, but at any time, if you wish to take a

1  break, just indicate, and your request will be
2  honored.  The only thing I would ask is if there's
3  a question pending, that you answer the question
4  before we take the break.
5    Will you do that, please?
6    A.  Yes.
7    Q.  I'm going to be asking you questions
8  that have to do with time and potentially
9  distances.  And you may or may not have an exact
10  answer to my questions.  However, even if you
11  don't have an exact answer, you may well have an
12  estimate.  And if you have an estimate, I'm
13  entitled to your best estimate.  But I'm not
14  entitled to just a pure guess.
15    Do you understand that?
16    A.  Yes.
17    Q.  The difference between a guess and an
18  estimate is not always clear.  If I asked you to
19  estimate the length of this table, you have a life
20  experience with feet and inches or meters and
21  centimeters.  You can see the table.  You can
22  probably give a reasonable estimate.
23    If I asked you to estimate the amount of
24  money I have in coins in my pocket, it would have
25  to be a pure guess because you haven't been in my

SERGEANT TRAVISCRUMRINE

December 27, 2017

1  pocket recently.
2      Is that correct?
3      A.  Yes.
4      Q.  All right.  Would you tell me if you
5  have any medications that you've taken which would
6  affect your ability to give your best response or
7  to remember the events in question.
8      A.  No.
9      Q.  Okay.  Now, Officer Crumrine, could you
10  tell me, please, about your educational
11  background, beginning with high school.
12      A.  I went to high school in Quincy,
13  Illinois.  Graduated from there.  Attended
14  John Wood Community College and Northeastern
15  Illinois University in Chicago.
16      Q.  Let me ask you this:  What year did you
17  graduate from high school?
18      A.  1998.
19      Q.  And John Wood, what year did you
20  graduate from that?  I assume you graduated.
21      A.  I didn't graduate.  I transferred to
22  Northeastern from there.
23      Q.  Okay.  Northeastern.  Okay.
24      A.  Yes.
25      Q.  Where is Northeastern located?

1      A.  In Chicago, at St. Louis and Foster.  I
2  think it was 5500 North St. Louis.
3      Q.  That shows you how much I know.  My
4  daughter --
5      A.  If memory serves me.
6      Q.  I'm sorry?
7      A.  If memory serves me correctly.
8      Q.  My daughter is going to Northwestern.
9  She just started.  So I didn't --
10      A.  My sister went to Northwestern.
11      Q.  -- I didn't know where Northeastern is,
12  so now I do.
13          All right.  Did you graduate from
14  Northeastern?
15      A.  No.
16      Q.  Okay.  What was your area of major at
17  Northeastern?
18      A.  Criminal justice.
19      Q.  Okay.  When did you leave Northeastern?
20      A.  That would be 2004, I think.
21      Q.  And when did you move to Las Vegas?
22      A.  August of 2005.
23      Q.  Tell me about your employment history,
24  if any, in Las Vegas prior to becoming a police
25  officer.

1      A.  I have no other employment history here.
2      Q.  Okay.  So you went to an academy
3  sponsored by Metropolitan Police Department, I
4  assume?
5      A.  Correct.
6      Q.  Okay.  And when were you commissioned as
7  a police officer?
8      A.  February 8th, 2006.
9      Q.  Okay.  And could you tell me what your
10  first position was with the police department?
11      A.  Patrol officer at South Central Area
12  Command.
13      Q.  And what were your responsibilities in
14  that position?
15      A.  Respond to calls for service, conduct
16  proactive police activity, patrolling mostly the
17  Las Vegas strip and the area south of the airport.
18      Q.  All right.  And how long were you in
19  that position?
20      A.  Well, I changed stations, but I became a
21  detective in April of 2012.
22      Q.  And how did you become a detective?
23  Meaning, did you take some type of exam?  How
24  did -- how did --
25      A.  It's an oral board.

1      Q.  And how did your responsibilities change
2  when you became a detective?
3      A.  I was assigned to vice enforcement
4  section.
5      Q.  Were you promoted to sergeant at that
6  time or was that later?
7      A.  No, sir.
8      Q.  Okay.  All right.  How long did you
9  remained in vice enforcement?
10      A.  Until August 27th of 2016.
11      Q.  Okay.  When were you promoted to
12  sergeant?
13      A.  August 27th, 2016.
14      Q.  And in order to become a sergeant, did
15  you have to take an exam?
16      A.  Yes.
17      Q.  Written?  Oral?
18      A.  It was a written test, a practical exam,
19  and an oral board at that time.
20      Q.  Okay.  What were your responsibilities
21  as a sergeant after August 27, 2016?
22      A.  I supervised the squad patrol officers
23  at the Convention Center Area Command.
24      Q.  Did you conduct roll call, that sort of
25  thing?

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 14

1    A.   Yes.
2    Q.   All right.  All right.  Did you
3  participate in Safe Strip, the program Safe Strip?
4    A.   Not specifically, because Safe Strip was
5  dealt with by other squads.  When I was initially
6  assigned to a patrol squad, at that time, Safe
7  Strip was handled with overtime officers and
8  patrol squads, and that was handled by my
9  lieutenant and some other sergeants working either
10  on duty or overtime.
11    Q.   Up to the point where this event
12  occurred, and I'll represent to you it occurred in
13  May, the night of May the 13th and the morning of
14  May the 14th, 2017, who was your lieutenant?
15    A.   On that particular day?
16    Q.   I see.
17    A.   Sorry.
18    Q.   It changed depending upon the
19  assignment.  Okay.
20         Well, let's take that day and -- or that
21  night and early morning question.
22    A.   Okay.
23    Q.   What time did you start your shift?
24    A.   We started our shift at 8:00 p.m.
25    Q.   What was your assignment that night?

Page 15

1    A.   We were Safe Strip that night.  I had
2  changed squads.
3    Q.   Okay.  When you say you changed squads,
4  what -- when did the change take place?
5    A.   As a close guess, about March 11th, I
6  want to say.
7    Q.   Okay.  Is that your best estimate?
8    A.   Yeah.
9    Q.   March 11, 2017?
10    A.   Yes, sir.
11    Q.   Okay.  And what squad had you been in
12  just before making that change?
13    A.   I had graveyard patrol squad, and then I
14  changed to a graveyard -- what they call a flex
15  squad.
16    Q.   The graveyard patrol -- graveyard patrol
17  squad that you changed from, where was that
18  assignment geographically located?
19    A.   Still Convention Center on the Strip.
20    Q.   Okay.  And you changed to the Strip.
21         How did your responsibilities change, if
22  at all?
23    A.   Flex squad is responsible for proactive
24  enforcement on the Strip.  They're not
25  specifically responsible for responding to calls

Page 16

1  for service.
2    Q.   Okay.  What do you mean by "proactive
3  enforcement"?
4    A.   We patrol the Strip and deal with your
5  quality-of-life issues, issues that impact
6  tourism, traffic flow, pedestrian flow.
7    Q.   You respond to things that you encounter
8  as you're patrolling?  Is that the idea?
9    A.   Yes.
10    Q.   All right.  Okay.  Now, that shift that
11  began at eight o'clock, how long were you
12  intending to conduct that shift?  What was the
13  length of the shift?
14    A.   Until 6:00 a.m., 10 hours.
15    Q.   So I take it that you were on 4/10?
16    A.   Yes.
17    Q.   How many officers were under your
18  control and supervision that night and morning?
19    A.   I had -- let's see here.  I had my flex
20  squad and the other flex squad.  Their sergeant
21  was off that night.  He had 16 officers on the
22  books, but he only had, I think, 11 that night.  I
23  think he had five or six off.  So 10 or 11 from
24  his squad.  And my squad had 12 on it.  I'm not
25  sure if everyone was working.  It could have had

Page 17

1  two off, so somewhere around 20 officers.
2    Q.   Okay.  Was Officer Lopera under your
3  supervision and control that evening?
4    A.   Yes.
5    Q.   What about Officer Tran?
6    A.   Yes.
7    Q.   Was that your -- normally your members
8  of your squad, or were they members of another
9  squad that you were --
10    A.   Officer Tran is the member of the other
11  squad that I was covering for the other sergeant.
12    Q.   And who was the other sergeant that was
13  not on duty that night?
14    A.   Francois Obasi.  I'll spell his last
15  name for you if you'd like.
16    Q.   Please.
17    A.   O-B-A-S-I.
18    Q.   It was easy.  Okay.  All right.
19         So he was off because of a vacation day
20  or --
21    A.   His daughter was graduating from college
22  or something.
23    Q.   Okay.  So Tran and Flores were on --
24  under his supervision normally?
25    A.   Correct.

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 18

1    Q.   But that night they were under yours?
2    A.   Yes.
3    Q.   All right.  And Lopera was normally
4  under your supervision and control?
5    A.   Yes.
6    Q.   So that means that Officer Lif -- Lif --
7  L-I-F --
8    A.   Lif.
9    Q.   -- Lif -- would have been under your
10  supervision and control?
11    A.   Yes.
12    Q.   All right.  Now, at some point, you were
13  drawn to a location outside the Venetian where
14  Officer Lopera was involved with a subject;
15  correct?
16    A.   Correct.
17    Q.   Where had you been just before that?
18    A.   Just before that, I was at our Safe
19  Strip -- excuse me -- Safe Strip briefing.
20    Q.   Okay.  Now, I've learned, I guess, that
21  that Safe Strip briefing takes place at
22  12 midnight; is that true?
23    A.   Correct.
24    Q.   Okay.  So did you conduct the Safe Strip
25  briefing?

Page 19

1    A.   I did.  Myself, a sergeant working
2  overtime, and my lieutenant.
3    Q.   Okay.  And who was the sergeant working
4  overtime?
5    A.   I believe it was Bill Jones or
6  William Jones.
7    Q.   Okay.  And who was the lieutenant?
8    A.   Steve Summers.
9    Q.   So in terms of authority, would he have
10  been your supervisor that evening?
11    A.   Yes.
12    Q.   And did he give you a specific
13  assignment that evening?
14    A.   The assignments are already pretty well
15  set.  We have our hotel properties that we're
16  responsible for covering, and then as a sergeant,
17  I assign my officers to those properties.  And
18  there's not a huge amount of new information that
19  takes place at Safe Strip briefings.
20    Q.   Okay.  What properties did your squad
21  have responsible for that evening?
22    A.   This is going to be my best estimate.
23    Q.   All right.
24    A.   Let's see here.  My squad or both squads
25  that I was covering?

Page 20

1    Q.   Well, let's start with your squad.
2    A.   Okay.  Hawaiian Marketplace, Paris,
3  Bally's, Treasure Island, Mirage, and I sent an
4  officer to the jail.  That would be my squad.
5    Q.   Okay.  So I presume there must have been
6  maybe two officers per location?
7    A.   Correct.
8    Q.   All right.  And did they stand a post,
9  or did they circulate?  How does that work?
10    A.   They have a property they're assigned
11  to.  They can work all around the property.
12  Mostly they're going to be out on Las Vegas
13  Boulevard, on the sidewalks there, making contact
14  with citizens.
15    Q.   Okay.
16    A.   Making stops if necessary.
17    Q.   And did you have a particular post or
18  location where you were assigned?
19    A.   No.  I would generally flow all the way
20  up and down the Strip --
21    Q.   Okay.
22    A.   -- checking on my officers.
23    Q.   All right.  Now, what about the other
24  squad?  Where were they covering?
25    A.   So they would have Encore, Wynn,

Page 21

1  Venetian, Palazzo, Flamingo, Harrah's, Cromwell,
2  Caesars Palace, Bellagio.  That's about it.  And
3  then the rest of the hotels on the Strip would be
4  covered by overtime officers.
5    Q.   Okay.  Now, as I understood it,
6  Officer Lopera was a member of your squad?
7    A.   Yes.
8    Q.   But he and Officer Lif were actually
9  located in the Venetian when this starts?
10    A.   Correct.
11    Q.   How did that occur?
12    A.   Because the other squad had let,
13  honestly, too many people off.  I had to
14  supplement their spots with my officers.  So I had
15  initially assigned Officer Lif and Officer Lopera
16  to the Hawaiian Marketplace, I believe.  And then
17  at the last minute, I texted them and told them to
18  move to the Venetian.
19    Q.   All right.  So would it be fair to say
20  that normally Officer Lopera would not have been
21  patrolling the Venetian?
22    A.   Correct.
23    Q.   Do you know if he had ever patrolled the
24  Venetian before that evening?
25    A.   I'm pretty sure that he had not.

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 22

1    Q.   So, among other things, he would not be
2  that knowledgeable about the different aspects of
3  the Venetian?
4    A.   Correct.
5    Q.   Geographically?
6    A.   Correct.
7    Q.   Okay.  So at some point, you got some
8  type of notice or call telling you that something
9  was going on?
10    A.   Correct.
11    Q.   And how did you get that?
12    A.   I was traveling west on Sands, just east
13  of Koval, and there was some garbled radio
14  traffic.  And the dispatcher called out a code red
15  for Venetian 1.
16    Q.   All right.  And does this mean you were
17  in a car?
18    A.   Yes.
19    Q.   Okay.
20    A.   Sorry.
21    Q.   And were you by yourself?
22    A.   Yes.
23    Q.   Okay.  And "code red" means what?
24    A.   That an emergency exists on the channel.
25    Q.   Okay.  And did they tell you where you

Page 23

1  needed to respond to?
2    A.   No.
3    Q.   Okay.  Where did you go?
4    A.   I started heading for the Venetian.  I
5  mean, we know by the call sign where the officers
6  generally should be located.  If it's Venetian 1
7  calling out that code red, it was a pretty good
8  chance that they're on that property.
9    Q.   Okay.  So Venetian 1 would be one of the
10  two officers, and venetian 2 would be the other?
11    A.   No.  Venetian 1 is a two-man unit.
12  They're -- they're all going to be -- each call
13  sign is a two-man.
14    Q.   Okay.  So Venetian 1 would have been
15  Lopera and Lif?
16    A.   Correct.
17    Q.   Okay.  So you headed over to the
18  Venetian.
19        How far was the Venetian from your
20  location when you got the call?
21    A.   Three blocks, depending on the size of
22  your blocks, I guess.
23    Q.   Okay.  And I assume you parked
24  someplace?
25    A.   No.

Page 24

1    Q.   Where did you go?
2    A.   So as I -- I turned south on Koval, west
3  into the service drive that comes into the back of
4  the Venetian.  And as I'm driving up, rolling
5  code, because I don't know at all where they are
6  on the property, I see Lopera and Farmer-Brown on
7  the ground in front of me as I'm driving up.
8    Q.   Okay.  The service drive is sometimes --
9  I think -- I've heard it referred to by the
10  security people as north-south road.
11    A.   Okay.
12    Q.   You don't know that?
13    A.   No.
14    Q.   All right.  But it's -- you're pretty
15  sure that's the road that you -- that they were on
16  and you rode in on, I guess, from --
17    A.   It runs east-west, so it would be weird
18  that it's called north-south, but okay.
19    Q.   Never been there.
20        In any event, it's the road that runs --
21  it's a service road?
22    A.   Yes.
23    Q.   Okay.  And as you were driving, were you
24  underneath the Venetian or behind the Venetian?
25    A.   No.  It's open air.  We're coming along

Page 25

1  the back between the Sands Expo Center and the
2  north side of the Harrah's property.  This road
3  runs -- there's an employee Venetian -- Venetian
4  employee garage on the south side.  So it was open
5  air, and they're on the ground, just as you're
6  going to come under the --
7    Q.   I see.  Okay.  So now I understand.
8    A.   -- parking garage.
9    Q.   The service -- there's another road, I
10  think, that's probably north --
11    A.   The north-south is probably the one that
12  cuts down where they actually bring in the trucks
13  from the delivery.
14    Q.   The east-west one is the one that you
15  can see in the Venetian security video?
16    A.   Yes.
17    Q.   Okay.  Very good.
18        Okay.  So you drove up to the scene --
19    A.   Um-hum.
20    Q.   -- I take it?
21    A.   Yes.
22    Q.   Is that a "yes"?  Okay.  I forgot to
23  tell you --
24    A.   Sorry.  Yes.
25    Q.   -- you've got to say audible.

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 26

1     And you get up to the scene, and you
2   parked?
3     A.  Yes.
4     Q.  How far you were you from Officer Lopera
5   and Mr. Ford [sic] when you parked your vehicle?
6     A.  This is going to be an estimate.  30 to
7   50 feet --
8     Q.  Okay.
9     A.  -- when I parked.
10     Q.  Could you see any activity by
11   Officer Lopera prior to you parking, simply as
12   you're driving up?
13     A.  As I'm driving up, all I can see,
14   Officer Lopera has his back to me.  I can see that
15   the back of his thighs and his buttocks are wet.
16   And -- one thing that went through my mind was,
17   did he, like -- did he urinate on himself or
18   defecate himself.  But it was just his back to me;
19   I couldn't see what exactly was occurring.
20     Q.  Sure.  Could you see Mr. Farmer as you
21   drove up?
22     A.  I could see a person.
23     Q.  Okay.  Could you see what Mr. Farmer was
24   doing, if anything?
25     A.  No.

Page 27

1     Q.  Could you see what Officer Lopera was
2   doing, if anything, as you drove up?
3     A.  No.
4     Q.  All right.  After you parked, could you
5   see anything that Officer Lopera was doing?
6     A.  After I parked, I didn't really look
7   again until I'm getting out -- getting around my
8   door, and Lopera is going into a neck restraint.
9     Q.  Okay.  Now, did you see Officer Lopera
10   strike Mr. Farmer with his fist?
11     A.  No, I never did.
12     Q.  Did you see Officer Lopera tase
13   Mr. Farmer?
14     A.  No.
15     Q.  So when you came up, was his taser, his
16   ECD, already holstered?
17     A.  I don't remember.
18     Q.  At least it wasn't being used?
19     A.  Yeah, it wasn't.
20     Q.  All right.
21     A.  Correct.
22     Q.  Okay.  All right.  I'm going to give you
23   a copy of the police report.
24     MR. SAYRE:  And I have one for each of
25   you gentlemen.  I know, Craig, you've been working

Page 28

1   on your reading skills, so I brought it.
2   BY MR. SAYRE:
3     Q.  All right.  Could you turn over, please,
4   to page 3 of 8.  It's at the bottom.  Just keep
5   turning from there.  You'll see 3 of 8.  Okay.
6     Now, if you notice, it starts, "The
7   camera was activated."  It starts at 00 at the top
8   of the page.
9     You see that?  Is that a "yes"?
10     A.  Yes.
11     Q.  Okay.  Now, would you turn over, please,
12   to page 5 of 8.  And it says --
13     THE WITNESS:  I apologize.  I'm going to
14   get some Kleenex.
15     MR. SAYRE:  Go right ahead.  Sure.
16     THE VIDEOGRAPHER:  Watch your
17   microphone.
18     MR. SAYRE:  Yeah.  There's --
19     THE REPORTER:  Microphone.
20     THE WITNESS:  Oh.
21     MR. SAYRE:  Take your time.  Okay.
22   Ready?
23     THE WITNESS:  Yes.
24   BY MR. SAYRE:
25     Q.  All right.  Looking at page 5 of 8,

Page 29

1   please look at the notation 2:58.  And that is two
2   minutes and 58 seconds since the activation of the
3   body camera.  Okay?
4     A.  Okay.
5     Q.  All right.  Now, it says,
6   "Officer Lopera appeared to put Farmer in some
7   type of neck restraint."
8     You saw that?
9     A.  Yes.
10     Q.  Okay.  How far away were you from them
11   when you saw him apply the neck restraint?
12     A.  I mean, I was closing the distance
13   between my car and them, so 20 feet.
14     Q.  Okay.  Was there anyone else next to
15   them or close by them?
16     A.  There were two Venetian security
17   officers somewhere nearby, but they kind of
18   vacated as I walked up.
19     Q.  Okay.  Did you see either one of the
20   Venetian security officers with ahold of
21   Mr. Farmer, grabbing Mr. Farmer, or in touch with
22   Mr. Farmer?
23     A.  Not that I remember.
24     Q.  All right.  So they sort of parted away
25   as you approached?

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 30

1    A.  Yes.
2    Q.  Okay.  Were there any other police
3 officers present besides Officer Lopera as you
4 approached?
5    A.  No.
6    Q.  Now, you've been trained in the
7 application of the lateral vascular neck
8 restraint; correct?
9    A.  Yes.
10    Q.  Could you tell if Officer Lopera had
11 applied a lateral vascular neck restraint?
12    A.  No.
13    Q.  Okay.  You could not tell or he hadn't?
14    A.  I wouldn't --
15    Q.  Let me ask a better question.
16    A.  Okay.
17    Q.  Start again.
18        Tell me how you would -- how you'd been
19 trained to apply a lateral vascular neck
20 restraint.
21    A.  So you have a front encircling arm, and
22 the elbow should be in line with the subject's
23 chin.  That arm is going to be used to accomplish
24 the Valsalva maneuver, pushing down on the chest.
25 And then you've got your hands clasped like so.

Page 31

1 And then the arm in the rear, when doing a
2 standing LVNR, should be kicked out like so.  And
3 then there are different degrees of pressure or
4 different degrees as you apply the technique.
5    Q.  And the arm is supposed to be up against
6 the side of the neck?  Is that the idea?
7    A.  The -- here?
8    Q.  That arm.
9    A.  Yes.  Correct.
10    Q.  You're left-handed, I take it?
11    A.  I'm right-handed.
12    Q.  You're right-handed.  Okay.
13    A.  Yeah.
14    Q.  So you apply it with the left arm?
15    A.  With the left.
16    Q.  Okay.
17    A.  Because you want your gun side generally
18 away from the subject.
19    Q.  Okay.  All right.  You can apply it with
20 either arm?
21    A.  You can, yes.
22    Q.  All right.  Okay.  So you do it with
23 your left arm to keep your gun side available in
24 case it's needed?  Is that the idea?
25    A.  Just to keep it away.  You don't want

Page 32

1 your gun up against the subject.
2    Q.  You don't want anybody to grab it.
3    A.  Okay.
4    Q.  Okay.  So can you describe the -- the
5 neck hold that you saw Officer Lopera applying?
6    A.  Since the direction I was approaching,
7 their feet were towards me.  They were on their
8 backs, I could only see his front encircling arm.
9 I couldn't see his back arm --
10    Q.  I understand.
11    A.  -- in the brief --
12    Q.  The front arm looked like the position
13 it would be in if you were applying a lateral
14 vascular neck restraint?
15    A.  Yes, sir.
16    Q.  Okay.  And you couldn't tell whether it
17 was any other kind of hold?
18    A.  Correct.
19    Q.  Okay.  So you assumed he was applying a
20 lateral vascular neck restraint?
21    A.  Correct.
22    Q.  All right.  Now, take a look at the --
23 it's not a transcript exactly.  What it is, it's
24 an officer who watched the video, making notations
25 at certain times.  Okay?

Page 33

1    A.  Yes.
2    Q.  All right.  It says, at 3:01, three
3 minutes and one second, "Officer Crumrine arrived
4 and stated 'Put your fucking hands behind your
5 back.'"
6        Now, that's easy -- you can easily hear
7 that on the tape; correct?
8    A.  Yes.
9    Q.  And you've seen the -- you've watched
10 the tape?
11    A.  Yes.
12    Q.  All right.  So you recall your -- you
13 stating that, if you will?
14    A.  Yes.
15    Q.  All right.  And was it within about
16 three seconds of the time that Officer Lopera
17 applied the neck restraint?
18    A.  Yes.
19    Q.  Okay.  And besides making that
20 statement, what else did you do, if anything?
21    A.  I made several other statements.  This
22 transcript or this timeline is wrong.
23    Q.  Well, we'll get to that.
24    A.  Okay.
25    Q.  Let's kind of just walk it through.

Page 34

1    A.  Okay.
2    Q.  What's the next thing you did besides
3  making the statement that we just talked about?
4  What else did you do next?
5    A.  Chronologically, I'm not totally sure,
6  but I grabbed Farmer's left wrist --
7    Q.  Okay.
8    A.  -- to put it in a -- to handcuff.
9    Q.  Right.
10    A.  He pulled it away.
11    Q.  Okay.
12    A.  Broke my grip.  I grabbed it again.  Got
13  the handcuff on.
14    Q.  Okay.
15    A.  And then I was trying to get them to
16  roll over to accomplish handcuffing.
17    Q.  Okay.  Now, it says here in the -- it
18  says at 3:13, "Officer Lopera asked, 'Is he out
19  yet?'"
20         Did you hear him say that?
21    A.  I don't remember hearing him say that.
22    Q.  It says, at 3:15, "Farmer gasps."
23         Did you hear that?
24    A.  No.
25    Q.  Okay.  At 3:18, it says, "Officer Lopera

Page 35

1  asked, 'Is he out yet?'"
2         Did you hear Officer Lopera say that?
3    A.  I don't remember.
4    Q.  At 3:19, it says, "Officer Lopera asked,
5  'Is he out yet?'"
6         Did you hear him say that?
7    A.  Not specifically.
8    Q.  Okay.  Now, at 3:25, it says,
9  "Officer Tran arrived and said, 'Let him go,
10  Ken.'"
11         Now, it's my understanding that
12  Officer Tran didn't say that.  You did.
13    A.  Correct.
14    Q.  All right.  Did Officer Tran arrive at
15  that point in time?
16    A.  I don't believe so.
17    Q.  Okay.  And -- but you did say at that
18  point, approximately, "Let him go, Ken"?
19    A.  I actually said, "Let him go," I
20  believe, before the -- I'd have to watch the
21  video --
22    Q.  Okay.
23    A.  -- but I say "let him go" twice.
24    Q.  Okay.  Can you estimate -- now, looking
25  at the time, it's 2:58 is when the -- it says the

Page 36

1  neck restraint was applied.  And it says that
2  Officer Tran, which we now know is you, at 3:25,
3  "Let him go, Ken."
4         Now, can you estimate how much before
5  that you first told Officer Lopera to let him go?
6    A.  I think, looking at this timeline and
7  not having the video with me, that it's between
8  the 3:01 and 3:13.
9    Q.  Okay.  So between 3:01 and 3:13, you
10  believe for the first time you said, "Let him go,
11  Ken"?
12    A.  It was either "let go" or "let him go."
13    Q.  And did you say that because he was
14  unconscious?
15    A.  No.
16    Q.  Why did you say that?
17    A.  I said that because I had that handcuff
18  on finally, and it was time to accomplish
19  handcuffing.
20    Q.  Okay.  So it says here -- did you again
21  say that within that period of time from 3:01 to
22  3:13, or was the second time you said it at 3:25?
23    A.  The second time I said it was at 3:25.
24    Q.  All right.  Okay.  So you said, "Let him
25  go, Ken."

Page 37

1         Now, at that point, could you tell that
2  Mr. Farmer was unconscious?
3    A.  No.
4    Q.  Okay.  Did you ever notice that
5  Mr. Farmer had become unconscious?
6    A.  When we had finally gotten two sets of
7  handcuffs on Farmer and rolled him back over face
8  up, it was clear that he was unconscious.  That
9  was the first time it was clear to me.
10    Q.  All right.  So let's go through this.
11         All right.  At 3:26, it says,
12  "Officer Lopera asked, 'Are you sure?'"
13         And it has Officer Tran replying,
14  "Yeah."
15         Was that actually you?
16    A.  That was me.
17    Q.  Okay.  And you did -- he did say that?
18    A.  Yes.
19    Q.  And you did say, "Yeah"?
20    A.  Correct.
21    Q.  All right.  All right.  It's -- then
22  Officer Lopera, it says, stated, "Roll him to --
23  hold on."  And then it says, "'Don't grab my
24  fucking legs.'  Officer Tran stated, 'We're on top
25  of him.'"

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 38

1      Now, was that stated by Officer Tran?
2      A.  I'm not sure.
3      Q.  Okay.  What -- did Lopera state, "Roll
4  him to" -- did he state that?
5      A.  I think he said, "Stop."  I believe he
6  yelled "Stop," twice, and then he said, "Don't
7  grab my fucking legs."
8      Q.  Okay.  You're talking about around that
9  time he said, "Stop"?
10      A.  Yes.
11      Q.  And was he addressing Mr. Farmer?
12      A.  No.  He was addressing us.
13      Q.  Okay.  "Us" being you and whom?
14      A.  Myself, Tran, and Flores.
15      Q.  Okay.  So by that time, Tran and Flores
16  had arrived?
17      A.  Yes.
18      Q.  And they were assisting with rolling him
19  over?
20      A.  Yes.
21      Q.  Okay.  Okay.  Now, why was -- do you --
22  if you know, why was he yelling "Stop"?
23      A.  Well, he's in a back-lying neck
24  restraint.  And when you do a back-lying neck
25  restraint, your legs are wrapped around the

Page 39

1  subject.  And they were having this tendency to
2  roll towards -- if you look on the video, there's,
3  like, a little jersey wall, a little short
4  concrete well.  And they were just gravitating
5  toward that wall, and we were just trying to get
6  them untangled.  And I think he was trying to not
7  hurt himself rolling over.
8      Q.  Now, it says, "Officer Lopera said,
9  'Don't grab my fucking legs.'"
10      Was he addressing you, Officer Tran, and
11  Officer Flores?
12      A.  Yes.
13      Q.  And, again, do you know why?
14      A.  Not specifically.  I'm just assuming it
15  was because he didn't want to get hurt rolling
16  over.
17      Q.  Uh-huh.  Okay.  Then it says, at 3:30,
18  "Officer Lopera stated, 'Roll him to the other
19  side.  Get the other arm, too.'"
20      Do you remember him saying that?
21      A.  Not really.
22      Q.  Does that indicate that it was the
23  process of handcuffing him?
24      A.  Yes.
25      Q.  All right.  It says, at 3:36, "Lopera

Page 40

1  placed the palm of his hand on Farmer's forehead."
2      Do you remember that occurring?
3      A.  No.
4      Q.  Why would he do that, if you know?
5      A.  You want a guess or --
6      Q.  No, I don't.  But I want to know if
7  you -- if you have any knowledge from your
8  knowledge, training, and experience why he would
9  do that.
10      A.  No.
11      Q.  Was he trying to determine whether
12  Farmer was conscious or unconscious?
13      A.  That wouldn't be what I would do to
14  determine if he was conscious.
15      Q.  Okay.  You said, "Do you want a guess?"
16  I'm going to ask you what it -- what was your
17  thought that caused you to -- to ask me that
18  question.
19      A.  Well, the way I was trained with LVNR,
20  if -- now, the timeline here, getting proper head
21  placement, if you don't have the person's chin
22  lined up right in the elbow, then -- it wouldn't
23  be so much with forehead, but you would maybe take
24  the back of their head and move it into the
25  correct position to get the right -- the right

Page 41

1  position.
2      Q.  So --
3      A.  That was a thought.
4      Q.  -- if you were trying to position him
5  into a properly applied LVNR, you might use your
6  palm of your hand, but in the back of the head?
7      A.  Yeah.
8      Q.  Back or top of the head?
9      A.  Yeah.
10      Q.  But not necessarily the front of the
11  head?
12      A.  Not necessarily.
13      Q.  So you really don't know why he would
14  have placed --
15      A.  I really don't know.
16      Q.  -- his hand.
17      Okay.  Do you know -- now, as this is
18  going on, when Lopera says, "Roll him to the other
19  side.  Get the other arm, too," is he --
20  Mr. Farmer rolled onto his stomach?
21      A.  At this point, Mr. Farmer is still on
22  his back, on top of Lopera.
23      Q.  Okay.  I'm sorry.  He's -- Farmer is on
24  his back, on top of Lopera, who is face up?
25      A.  Correct.

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 42

1    Q.   So Lopera is behind him, with the hold?
2    A.   Correct.
3    Q.   Farmer is in front of Lopera and would
4  have been visible to you in the -- as you looked
5  down; correct?
6    A.   Which part?
7    Q.   If Lopera is on his back and has his
8  hold around Farmer, who's face up, you can see
9  Farmer; correct?
10   A.   Well, there -- I can see parts of him,
11  yes.
12   Q.   Okay.  What parts of him can you see?
13   A.   Mostly focused on his arms at this
14  point.
15   Q.   Yeah.  Well, can you see if he's
16  unconscious or not?
17   A.   No.  I wasn't -- I wasn't -- how do I
18  explain?  I wasn't really busying myself with
19  whether or not he was conscious.  I was trying to
20  get them rolled over so we could get him in
21  handcuffs.
22        Does that make sense?
23   Q.   All right.  Now, you were the sergeant
24  in charge of Lopera; correct?
25   A.   Yes.

Page 43

1    Q.   And one of the things that you're
2  supposed to do is you're supposed to advise and
3  counsel people under your supervision and control;
4  correct?
5    A.   Yes.
6    Q.   And one of the things that the
7  Metropolitan Police Department teaches is that a
8  correctly applied carotid hold or lateral vascular
9  neck restraint should make a person unconscious in
10  about 7 to 14 seconds; is that correct?
11   A.   Correct.
12   Q.   All right.  So by this time, at 3:30,
13  the hold has now been on for over 30 seconds.
14   A.   Okay.
15   Q.   Shouldn't you be checking, as the
16  superior officer on the scene, to determine if the
17  person is unconscious or not?
18   A.   Well, I -- on this -- if we're going by
19  this timeline, at 3:26, I have confirmed with him
20  for the second time that I want him to let go.
21   Q.   Okay.
22   Q.   So I'm assuming that he's followed that.
23   Q.   Okay.  You assumed he's followed that?
24   A.   Until we get him into handcuffs, and
25  then I can check, which I do.

Page 44

1    Q.   All right.  So you expected him to let
2  go of the lateral carotid neck restraint no later
3  than 3:26?
4    A.   Yes.
5    Q.   All right.  So is it my understanding
6  you did not thereafter check to see if he had let
7  go?
8    A.   Well, he did let go.
9    Q.   Well, yeah, but he didn't let go until
10  4:11.
11   A.   If we are talking about when he finally
12  completely takes his arm away from the subject,
13  yes.
14   Q.   Well, okay.  Let's -- let's put this
15  way:  From 3:26 to 4:11, a period of 40 -- 45
16  seconds, did you check during that period of time
17  to see if Officer Lopera had let go or released
18  the lateral vascular neck restraint?
19   A.   I did not physically check.  I would not
20  expect my officer, who is in a back-lying position
21  with a subject on top of him, to just completely
22  put his arms out to the sides.  He needs to still
23  maintain some control of a person who is on top of
24  him.
25        So I had expected that he had relaxed

Page 45

1  the hold, but he still needs to hold onto that
2  person until we get that person rolled over and
3  released there to get those handcuffs together.
4        Does that make sense?
5    Q.   No, not really.  Let me ask you a little
6  bit further.
7        When you told him at 3:25, and again at
8  3:26, to "let him go," you were telling him to
9  let -- to release the lateral vascular neck
10  restraint or whatever neck restraint that he had
11  on him?
12   A.   Yes.
13   Q.   Did you check at any time prior to 4:11
14  to see if he had released the lateral vascular
15  neck restraint or whatever restraint that he had
16  on the neck?
17   A.   I didn't really have the opportunity to
18  check, so, no.
19   Q.   You didn't look?  You didn't look?
20   A.   No.  I was maintaining control of
21  Farmer's arm.
22   Q.   Okay.  Now, you had three -- three
23  officers that were trying to maintain control of
24  Farmer's arm:  Officer Tran, Officer Flores, and
25  yourself.

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 46

1    A.  Yes.
2    Q.  And within that period of time, from
3  3:26 to 4:11, you never looked to see if Lopera
4  had released the hold; correct?
5    A.  Correct.
6    Q.  All right.  At 3:38, it says, "Lopera
7  asked, 'You got the other one?'"
8      I assume that means the other arm?
9    A.  I assume so.
10   Q.  Was -- was he talking to you or one of
11  the other officers?  Do you know?
12   A.  I don't know.
13   Q.  Did you hear him say that?
14   A.  I don't remember.
15   Q.  Okay.  At 3:50, "Farmer gasps."
16     Did you hear that?
17   A.  I don't remember.
18   Q.  And then at 4:11, "Officer Lopera
19  released the hold on Farmer."
20     Did you see him release the hold on
21  Farmer?
22   A.  Yes.
23   Q.  So you were looking at that time?
24   A.  Yes.
25   Q.  Okay.  Is that the first time that you

Page 47

1  had looked to see that he had released the hold
2  since you told him last to release the hold at
3  3:26?
4    A.  Yes.
5    Q.  All right.  Now, at 5:03, if you
6  continue down to the last entry, it says you
7  approach Officer Lopera.
8      What does that mean?
9    A.  I walked up to him.  He was standing at
10  the side of the scene.
11   Q.  Okay.  So by this point, he doesn't have
12  ahold of Mr. Farmer?
13   A.  Correct.
14   Q.  Okay.  What's he doing?
15   A.  He's standing there, catching his
16  breath, checking his equipment.
17   Q.  Did you ever see Lopera check to see if
18  Mr. Farmer had a pulse?
19   A.  No.  Other officers were attending to
20  Mr. Farmer.
21   Q.  How do you know that?
22   A.  Because I was standing over them.
23   Q.  You watched them?
24   A.  Yes.
25   Q.  Okay.  And that would have been

Page 48

1  important for you to watch and make sure --
2    A.  Yes.
3    Q.  -- that the officers were checking to
4  see if he was breathing?
5    A.  Yes.
6    Q.  And would it be important at all times
7  for you to make sure that Mr. Farmer was
8  breathing?
9    A.  Yes.
10   Q.  And you would be an appropriate person
11  to supervise that because you were the sergeant
12  that was in charge of Officer Lopera,
13  Officer Tran, and Officer Flores that night?
14   A.  Yes, sir.
15   Q.  And it was your responsibility to make
16  sure that those officers performed within the
17  policies of the Metropolitan Police Department?
18   A.  Yes.
19   Q.  And, among other things, it would be
20  your responsibility to make sure that
21  Officer Lopera did not choke Mr. Farmer to death?
22     MR. ANDERSON:  Objection.  Form.
23  BY MR. SAYRE:
24   Q.  Is that true?
25     MR. ANDERSON:  You can answer.

Page 49

1      THE WITNESS:  I'm sorry.  Can you
2  restate the question.
3  BY MR. SAYRE:
4    Q.  Sure.
5      Among other things, it would be your
6  responsibility to make sure that Officer Lopera
7  did not choke Mr. Farmer to death?
8    A.  Yes.
9      MR. ANDERSON:  Same objection.
10     Go ahead.
11     THE WITNESS:  Yes.
12  BY MR. SAYRE:
13   Q.  Okay.  Now, you're no longer a sergeant?
14   A.  Correct.
15   Q.  That means you've been demoted?
16   A.  I was non-confirmed from my probationary
17  status as a sergeant.
18   Q.  Okay.  Tell me about that, please.
19   A.  The department sustained me for my --
20  for -- the policy violations were major incident
21  and all hazard plan and body-worn camera.  They
22  sustained me for those.  And the Sheriff
23  non-confirmed my appointment to sergeant.
24   Q.  Okay.  Let's -- let's kind of go through
25  these one by one.  Okay?

SERGEANT TRAVISCRUMRINE

December 27, 2017

1    A.   Okay.
2    Q.   All right.  What were you accused of
3 doing?
4    A.   I was accused of not intervening on a
5 use of force.
6    Q.   Okay.  Let's stop there for a minute.
7    A.   Okay.
8    Q.   Now, the Metropolitan Police Department
9 teaches, instructs its officers, that if they see
10 a fellow officer engaged in excessive force, that
11 they have a responsibility to intervene; correct?
12    A.   Correct.
13    Q.   Is that what they were accusing you of?
14    A.   Correct.
15    Q.   That they were saying that
16 Officer Lopera was engaged in excessive force, and
17 you, as his commanding officer, failed to
18 intervene?
19    A.   Correct.
20    Q.   And the excessive force was the
21 excessive application of a neck restraint hold?
22    A.   Yes.
23    Q.   Did they say that you should have done
24 something after you told Officer Lopera to "Let
25 him go, Ken," to have made sure that

1 Officer Lopera released the neck restraint that he
2 had on Mr. Farmer?
3    A.   You might have to restate the question.
4         Are you saying initially did they say
5 that?  Because it was ultimately overturned.
6    Q.   Okay.  Well, let's go one by one.
7    A.   Okay.
8    Q.   You were charged with failing to -- or
9 not intervening regarding a use of force?
10    A.   Yes.
11    Q.   And the use of force was the excessive
12 application of a neck restraint hold?
13    A.   Yes.
14    Q.   All right.  So that was the accusation
15 that was made against you.
16         Was a board of rights conducted?  Is
17 that what happened?
18    A.   Review board, yes.
19    Q.   Review board.  Okay.
20         And were you represented by counsel at
21 that?
22    A.   Yes.
23    Q.   So are you saying that they did not find
24 that ultimately was correct?
25    A.   Correct.

1    Q.   Okay.  Tell me about that.
2    A.   I just explained that due to the fact
3 that didn't -- I had zero information as to what
4 crime had occurred, that the force that I observed
5 being used was not clearly beyond objectively
6 reasonable for the circumstances because I had
7 zero information on those circumstances.
8    Q.   What force did you see being observed
9 that you thought was objectively reasonable?
10         MR. ANDERSON:  Objection.  Form.
11         Go ahead.
12         THE WITNESS:  The neck restraint.
13 BY MR. SAYRE:
14    Q.   And what did you believe permitted
15 Officer Lopera to utilize the neck restraint?
16    A.   I trust my officer, that if he's using
17 force, that I have zero information or zero time
18 to address with him what cause he has to use that
19 force, I have to trust that he's using that force
20 lawfully in the moment.
21    Q.   Okay.  The -- what type of crime would
22 Mr. Farmer have had to have committed in order to
23 have allowed Officer Lopera to use a neck
24 restraint on him?  Or let me put it this way.  Let
25 me re-ask the question.

1         What level of force would Mr. Farmer
2 have had to have exhibited in order to allow
3 Officer Lopera to use the lateral vascular neck
4 restraint on him?
5    A.   At that time, under that current use of
6 force policy, I believe he would have had to have
7 been in active level of resistance to go into
8 level 1 with LVNR.  Without -- without referencing
9 it right at the moment.
10    Q.   All right.  Now, could you tell whether
11 or not Officer Lopera was using level 1 lateral
12 vascular neck restraint?
13    A.   No.
14    Q.   Had you can you determine whether an
15 officer is using level 1, level 2, or level 3?
16    A.   I mean, other than sticking your hand in
17 between their arm and the person's neck or
18 verbally confirming with them what level they're
19 in.
20         It's especially hard in a back-lying
21 LVNR because you have to put your back -- the rear
22 arm behind the person so you don't see those
23 levels of angles to show you what level or how
24 much pressure they're putting on.
25    Q.   You -- you raised your -- or sort of

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 54

1  cocked your elbow; is that correct?
2      A.  Yes.
3      Q.  And that's one of the ways that you can
4  determine that a different level of LVNR is being
5  used; correct?
6      A.  Yes.
7      Q.  All right.  So tell me about how do you
8  determine by looking at some -- an officer's
9  elbow, whether a first or second or third level of
10  LVNR is being utilized?
11      A.  I mean, it was going to be different
12  probably for the stature of the officer, the
13  height of the subject.  But just as their elbow
14  goes up, then the front elbow is going to go down,
15  and the more pressure is being applied.
16      Q.  Right.  But at what degree does it go
17  from 1 to 2?
18      A.  Oh, it was, like, 0, 20 and 45, I think.
19      Q.  Okay.  All right.  And you couldn't
20  determine what level the elbow was by looking?
21      A.  No.  Because when you're in a
22  back-lying -- I mean, number one, I'm facing the
23  wrong direction because I'm looking at him, facing
24  him, so I can't even see his back arm really.
25          And in a back-lying, you don't do that.

Page 55

1  You tuck the elbow underneath the person.  That's
2  the way I was trained.
3      Q.  So you expected that he would have the
4  elbow tucked underneath the person?
5      A.  That's what I would have -- would have
6  expected.
7      Q.  Now, everything I've seen talks about
8  the elbow being cocked upwards for different
9  levels of LVNR.
10      A.  In a standing LVNR, yes.
11      Q.  All right.  So in a back LVNR, you would
12  tuck it below --
13      A.  That's the way I was -- I was -- because
14  when you go -- because you -- the way it's
15  supposed to happen is you start from standing, you
16  go down to kneeling, and then you go to
17  back-lying.
18          That's not the way it happened in this
19  case.  They were already on the ground.  But as
20  you go down, your -- to -- for the officer's own
21  safety, so you don't hit your elbow on the ground,
22  you tuck your elbow so your forearm is along the
23  person's back.
24      Q.  Okay.  And you -- you couldn't see his
25  elbow, is that what you --

Page 56

1      A.  Correct.
2      Q.  Right.  So the only way that you could
3  have known what level of LVNR he was utilizing was
4  to ask him?
5      A.  Correct.
6      Q.  And you didn't ask him?
7      A.  Correct.
8      Q.  Why not?
9      A.  Because I already told him to let go.
10      Q.  Well, at any time did you believe that
11  you had a responsibility, as his commanding
12  officer in the chain of command, to determine what
13  level of LVNR he was using?
14      A.  In the post-incident investigation, yes.
15      Q.  What does that mean?
16      A.  Well, this -- had this not had this
17  outcome, I would have done a use of force
18  investigation on the officer.
19      Q.  I'm sorry.  You mean the person died?
20      A.  Correct.
21      Q.  Okay.  So tell me -- you would have done
22  that after he died?
23      A.  No, sir.  Had he not died, then I would
24  have had conducted the investigation into his use
25  of force.

Page 57

1      Q.  Okay.  So you -- you would not conduct
2  an investigation of a use of force until after the
3  events occurred?
4      A.  Correct.
5      Q.  So you would not in any way attempt to
6  determine whether the officer was using level 1,
7  level 2, or level 3 while he's actually applying
8  the LVNR in your presence?
9      A.  In that moment, I've told him twice to
10  let go.  I haven't had an issue with this officer
11  not following a command or an order or a direction
12  in the past.  He's always been very receptive to
13  directions.  So I assume that he had done what I
14  had told -- I mean, this is a conversation here.
15  When I say, "Let him go."
16          He says, "Are you sure?"
17          And I say, "Yeah."  We just had a
18  conversation.  I confirmed -- he confirmed that he
19  heard what I said and asked am I sure.  I said,
20  "Yeah."  Confirm.
21      Q.  Okay.
22      A.  As far as I'm concerned, it's done.
23      Q.  So because you told him at 3:26 in
24  response to his question, "Are you sure," you
25  said, "Yeah," you assumed, therefore, he would

Page 58

1   release the hold?
2         MR. McNUTT: Objection. Form.
3         THE WITNESS: Yes.
4   BY MR. SAYRE:
5         Q. And you never did check to see if he had
6   released the hold until he actually released the
7   hold?
8         A. Correct.
9         Q. All right. Now, have you seen the
10  video, the body camera video?
11        A. Yes.
12        Q. And have you noticed that he never
13  released the hold --
14        MR. McNUTT: Objection. Form.
15  BY MR. SAYRE:
16        Q. -- until 4:11?
17        A. Correct.
18        Q. So he violated your order?
19        MR. McNUTT: Objection. Form.
20  BY MR. SAYRE:
21        Q. Correct?
22        A. I have no idea.
23        Q. Well, if you ordered him to release the
24  hold, he didn't release it until 45 seconds later,
25  isn't that a violation of your order?

Page 59

1         MR. McNUTT: Objection. Form.
2         THE WITNESS: Well, like I explained
3   before, what we're talking about is I don't --
4   when I tell him to let go, I don't expect him to
5   take his arm completely away from this person. I
6   expect him to completely release his grip on this
7   person's chest, neck, head.
8         I don't expect him to go out -- to just
9   put his arms out to the side with the person
10  laying on top of him. He still needs to maintain
11  some level of control. So it was my perception at
12  that time that he had completely relaxed the hold.
13        He can still hold onto the person until
14  we roll him over to his stomach, and then he lets
15  go. I would never expect him to let go, just lay
16  there with a person on top of him.
17  BY MR. SAYRE:
18        Q. Did you have a perception, between 3:26
19  and 4:11, that Officer Lopera had relaxed the
20  hold?
21        A. Yes.
22        Q. And how did you arrive at that?
23        A. Because we had that conversation.
24        Q. Well, that's different than a
25  perception. I mean, "perception" to me means you

Page 60

1   looked and saw.
2         Did you look and see between, 3:26 and
3   4:11, whether he had relaxed the hold?
4         A. No.
5         MR. ANDERSON: Objection. Form.
6         THE WITNESS: Sorry. No.
7   BY MR. SAYRE:
8         Q. You just assumed that he would relax the
9   hold?
10        A. Yes.
11        Q. At the time that you told him to let go,
12  at 3:26, could you tell whether or not Mr. Farmer
13  was unconscious at that moment?
14        A. It was my perception that he was still
15  conscious.
16        Q. Okay. And what was it about him that
17  caused you to believe that he was still conscious?
18        A. I was still holding onto his body, and
19  to me it was not limp. It was -- he was still
20  moving.
21        Q. Okay. When did you let go of his body?
22        A. I'm not sure.
23        Q. Well, was it sometime within the 46
24  seconds that Officer Lopera continued to have a
25  neck restraint on him?

Page 61

1         A. Without looking at the video, at
2   sometime around 4:11.
3         Q. Okay. And during the time, is it your
4   testimony that Mr. Farmer never went unconscious
5   while you were holding him?
6         A. It was not -- well, I guess it was not
7   clear to me that he was unconscious until we
8   turned him back over, face up.
9         Q. Okay. What was it that caused you to be
10  clear -- have a clear understanding that he was
11  unconscious?
12        A. When we turned him back over face up,
13  his eyes were closed, and I -- officers were still
14  on the ground with him. While I was still on the
15  ground, I requested medical. Stood up. Officers
16  checked. Said he was breathing and had a pulse.
17        Q. Well, was it the fact that his eyes were
18  closed? Is that what caused you to believe that
19  he was unconscious?
20        A. Yes, sir. Initially.
21        Q. All right. When was he placed with his
22  face down? Because you said that you turned him
23  back over face up. When was he placed with
24  face down?
25        A. Right there where it says,

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 62

1  "Officer Lopera released the hold," that's when
2  he's face down.
3      Q.  No, no.  I understand that.
4          How long before that was he placed face
5  down?
6      A.  Not very long.
7      Q.  Well, what does that mean?
8      A.  I'm not sure.
9      Q.  Well, estimate, please.
10     A.  A few seconds.
11     Q.  How many seconds?
12     A.  I don't know.
13     Q.  You have no estimate?  Five?  Ten?
14     A.  Five or ten.
15     Q.  Five or ten.
16         Okay.  Who placed him over on his
17  stomach?
18     A.  All of us, really.  It was kind of a
19  team effort.  Officer Lopera rolls.  Officers
20  Tran, Flores and myself roll Farmer onto his
21  stomach.  We used two sets of handcuffs to
22  handcuff him and then immediately roll him face
23  up.
24     Q.  So he was face down as long as it took
25  you to put on two sets of handcuffs?

Page 63

1      A.  Yes, sir.
2      Q.  By two sets, you mean a handcuff on each
3  wrist?  Or actually --
4      A.  Two pairs of handcuffs joined in the
5  middle.
6      Q.  Two pairs of handcuff.
7          Okay.  And who -- whose handcuffs were
8  they, do you know?
9      A.  One of them was mine.
10     Q.  Okay.  And the other one?
11     A.  I'm not sure.
12     Q.  Who actually attached the two cuffs
13  together?
14     A.  I'm not sure.
15     Q.  Okay.  So was he struggling while you
16  attached the handcuffs?
17     A.  I don't remember because I'm not sure I
18  attached them.
19     Q.  Okay.  Who attached -- your handcuff was
20  on which arm?
21     A.  Left.
22     Q.  And who attached it to the left arm?
23     A.  Me.
24     Q.  Okay.  When you attached the left arm,
25  was he face up or face down?

Page 64

1      A.  He was face up.
2      Q.  Okay.  And did you look to see if he was
3  unconscious at that time?
4      A.  No, because he was pulling his arm away
5  from me, so...
6      Q.  All right.  And then the other handcuff,
7  do you know who attached that to the other arm?
8      A.  No.
9      Q.  All right.  And then he was -- were both
10  handcuffs attached to both of his arms before he
11  was placed face down?
12     A.  I'm not sure if the other one was.
13     Q.  Okay.  So he was placed face down.  One
14  arm was pulled over to the back.  The other arm
15  was pulled over next to it.  And the two handcuffs
16  were cuffed together and attached?
17     A.  Correct.
18     Q.  Okay.  And you believe that that took
19  five to ten seconds?
20     A.  I believe so.
21     Q.  Who was principally doing the
22  handcuffing?
23     A.  Officers Flores and Tran.
24     Q.  So is it fair to say during the time he
25  was being handcuffed, you don't know if he was --

Page 65

1  there was any sign of resistance?
2      A.  I don't know.
3      Q.  And you don't know if there was any sign
4  of consciousness during that same period of time?
5      A.  Correct.
6      Q.  Okay.  So going back to your situation,
7  originally you were charged with failing to
8  intervene; is that it?  And what did they find
9  regarding that?
10     A.  They overturned it.
11     Q.  Who is "they"?
12     A.  The review board.
13     Q.  Do you know who that consisted of?
14     A.  An assistant sheriff, a deputy chief, a
15  captain, a sergeant.  I think that's it.
16     Q.  Who is the deputy chief?
17     A.  McGrath.
18     Q.  The captain, assistant sheriff, and a
19  sergeant?
20     A.  Yes.
21         MR. ANDERSON:  Which McGrath?  There's
22  three brothers.
23         THE WITNESS:  Sorry.  The one that's the
24  deputy chief.  I believe it was Dan McGrath.
25

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 66

1  BY MR. SAYRE:
2      Q.  Now, so somebody levied the charge at
3  you initially.
4          Was that internal affairs?
5      A.  Yes.
6      Q.  Okay.
7      A.  It was our Critical Incident Review
8  Team.
9      Q.  Do you know who the head of that was?
10     A.  Captain Kelly McMahill.
11     Q.  Captain Kelly -- last name?
12     A.  McMahill.  M-C-M-A-H-I-L-L.
13     Q.  Did he -- did Captain McMahill testify
14  at the proceeding?
15     A.  No.
16     Q.  Okay.  Did he have a report?
17     A.  Yes.
18     Q.  Okay.  And did you testify at the
19  proceeding?
20     A.  Yes.
21     Q.  Did anyone else?
22     A.  Yes.
23     Q.  Who else testified?
24     A.  Tran.  Flores.
25     Q.  Were they charged also?

Page 67

1      A.  Yeah.  Not with that, no.
2      Q.  No.  What were they charged with?
3      A.  Failure to activate their body-worn
4  cameras.
5      Q.  Were they found -- was that sustained?
6      A.  Yes.
7      Q.  Was that the only charge against them?
8      A.  I believe so.
9      Q.  What other charges were levied against
10  you besides that one?
11     A.  Major incident and all hazard plan,
12  sometimes more commonly known as ICS or incident
13  command system.
14     Q.  What does that mean?
15     A.  Basically means taking control of the
16  incident after the fact, the aftermath.  Setting
17  up a command post and a staging area and briefing
18  for detectives, traffic plan, perimeter.
19     Q.  That's after the incident?
20     A.  Correct.
21     Q.  Did it have anything to do with your
22  performance during the incident?
23     A.  Correct.
24     Q.  Did not or did?
25     A.  It did not.

Page 68

1      Q.  And was -- that was sustained?
2      A.  Yes.
3      Q.  And other charges?
4      A.  And body-worn camera.
5      Q.  And was that sustained?
6      A.  Yes.
7      Q.  Okay.  So what happened is because you
8  were still in a probationary period as a sergeant,
9  they basically terminated the probation and left
10  you as a patrolman, is that it?
11     A.  Correct.
12     Q.  Was that -- did you consider that a
13  demotion?
14     A.  Yes.
15     Q.  To your observation, at any time did
16  Officer Tran attempt to intervene to get
17  Officer Lopera to remove his hands from the neck
18  of Mr. Farmer?
19          MR. ANDERSON:  Objection.  Form.
20          THE WITNESS:  No, I didn't observe
21  anything.
22  BY MR. SAYRE:
23     Q.  To your observation, at any time did
24  Officer Flores attempt to intervene to remove
25  Officer Lopera's hands from the neck of

Page 69

1  Mr. Farmer?
2      A.  No.
3      Q.  At any time after you told
4  Officer Lopera to let him go, did you ever think
5  of intervening to stop him from applying pressure
6  to the throat of Mr. Farmer?
7      A.  No.
8          MR. McNUTT:  Objection.  Form.
9          THE WITNESS:  Sorry.
10          MR. ANDERSON:  Go ahead.
11          THE WITNESS:  No.
12          Sorry.  I have to blow my nose again.
13          MR. SAYRE:  You want to take a break?
14          THE WITNESS:  No.  I just have to blow
15  my nose.
16          MR. McNUTT:  Is my color better?
17          MR. SAYRE:  You still look a little bit
18  flushed.
19          MR. ANDERSON:  You should get checked.
20          MR. SAYRE:  Somebody should check your
21  oil.
22          MR. McNUTT:  Must be --
23          MR. SAYRE:  I just had my oil changed.
24          MR. McNUTT:  Must be that L.A. -- L.A.
25  lawyer issue I have.

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 70

1      MR. SAYRE:  Yeah.  Well, unfortunately,
2  it's not me because I'm not an L.A. lawyer.  I'm
3  an Orange County lawyer.  I just try cases in L.A.
4      Q.  All right.  So what I'd like to do now
5  is show you the film, the body camera film, which
6  has actually been sync'd with the Venetian film.
7          Have you seen the Venetian film?
8      A.  Yes.
9      Q.  Have you seen them together?
10     A.  I think so.  I'm not sure.
11     Q.  Okay.  We're going to show you that in a
12  second.
13         I'm going to go stand behind you.
14     A.  Okay.
15     Q.  I don't mean anything by it.  Don't
16  worry about it.  My voyeur days are long over.
17         MR. McNUTT:  Are you going to attempt an
18  LVNR?
19         MR. SAYRE:  No.  No.  I'd screw it up,
20  to be sure.  I was a Marine a lifetime ago.
21         THE VIDEOGRAPHER:  Angle okay?
22  BY MR. SAYRE:
23     Q.  Now, what I'm going to ask you to do is
24  see if you can indicate when you first arrived at
25  the scene by looking at the tape.  Okay?

Page 71

1      A.  Okay.
2          (Whereupon, the videotape was played for
3  the witness.)
4          THE WITNESS:  So this is me.
5  BY MR. SAYRE:
6      Q.  Okay.  With the light?
7      A.  Yep.
8      Q.  All right.
9      A.  And I'm out.
10     Q.  And that's you speaking?
11     A.  Yes.
12     Q.  That's you holding his legs?
13     A.  I'm holding his arm.
14     Q.  Arm?  Okay.  That was you?
15     A.  Yes.
16     Q.  Tran and Flores are there now?
17     A.  Yes.
18     Q.  Now, at that point he's released, huh?
19     A.  Yes.
20     Q.  And you -- you'll come up in just a
21  minute.
22         That's you coming up?
23     A.  Yes.
24     Q.  Do you remember wearing glasses?
25     A.  Yes.

Page 72

1          (Whereupon, the videotape was ended.)
2  BY MR. SAYRE:
3      Q.  Okay.  Now, you've looked at the video
4  more than one time?
5      A.  Yes.
6      Q.  All right.  Have you, at any time in
7  looking at the body camera video, seen Mr. Farmer
8  actively resisting?
9      A.  No.
10     Q.  Such that it would justify him being
11  tased?
12     A.  No.
13     Q.  Such that it would justify him being hit
14  on the head 10 to 12 times?
15         MR. McNUTT:  Objection.  Form.
16         THE WITNESS:  No.
17  BY MR. SAYRE:
18     Q.  Such that it would justify a lateral
19  vascular neck restraint?
20     A.  No.
21     Q.  Now, in looking at this -- I call it a
22  transcript, it's not really, but you know what I
23  mean -- he says that -- well, "Lopera says he
24  attempted to gain access into the bed of a truck."
25         Did you at some point learn whether or

Page 73

1  not he had attempted to gain access to the bed of
2  a truck?
3      A.  I set security about reviewing video in
4  trying to locate that truck and the owner.  That's
5  it.
6      Q.  Okay.  Now, there's -- if you look
7  back -- first of all, let me ask you this.
8          There is -- on -- it's, like, the fourth
9  page, fifth page, it says, "Arrest Report."  It
10  has the name of the arresting officer, T. Alsup.
11     A.  Okay.
12     Q.  Do you see that name?
13     A.  Yes.
14     Q.  Do you know him?
15     A.  No.
16     Q.  And it has another name, M. Colon.
17     A.  Yes.
18     Q.  Do you know him?
19     A.  No.
20     Q.  Okay.  Do you know who they are?  I
21  mean, in other words, what is their
22  responsibility?
23     A.  Yeah.  They're detectives with the force
24  investigation team.
25     Q.  All right.  And then it says it was

SERGEANT TRAVISCRUMRINE

December 27, 2017

1  approved -- this report was approved by Sergeant
2  Jay McDonald.
3       Do you know Sergeant McDonald?
4    A.  Yes.
5    Q.  And who is he?
6    A.  He's a sergeant with the force
7  investigation team.
8    Q.  All right.  Take a look at page 2 of 8,
9  the second paragraph.
10       "After viewing surveillance footage from
11  the Venetian hotel, detectives were able to
12  retrieve the numbers and letters of the license
13  plate for the white truck which Farmer approached.
14  An interview was conducted with the registered
15  owner of the vehicle.  The following is a summary
16  of the interview and is not verbatim."
17       Then it has -- blanked out -- "was
18  stopped in traffic.  As he approached the parking
19  garage of the Venetian, his friend" -- blanked
20  out -- "was in the passenger's seat and drew his
21  attention to an officer," it has in parentheses,
22  "Officer Lopera" -- "running towards his truck on
23  the rear passenger's side.  Blank then noticed a
24  black male, Farmer, near the rear driver's seat
25  side of his truck who blank believed

1  Officer Lopera was chasing."
2       Now, looking down, two paragraphs down,
3  it says, "Blank saw that an officer had Farmer in
4  a rear naked choke."
5       Do you have any idea how a civilian
6  would know whether or not it was a rear naked
7  choke or a lateral vascular neck restraint?
8       MR. ANDERSON:  Objection.  Form.
9       THE WITNESS:  I do not know.
10  BY MR. SAYRE:
11    Q.  Okay.  It's not easy to determine the
12  difference between the two, is it?
13    A.  No.
14    Q.  Okay.  He stated -- "Blank stated Farmer
15  did not attempt to open the tailgate of his truck
16  or get into the truck bed.  Blank also stated
17  Farmer did not attempt to open his driver's door.
18  However, Blank said Farmer's erratic behavior made
19  him nervous, so he locked his doors prior to him
20  observing Farmer being tased by Officer Lopera."
21       You've read this police report
22  previously?
23    A.  No.
24    Q.  Oh, you have not.  Okay.
25       Have you -- has anyone told you -- don't

1  tell me anything your attorney has told you.
2       Other than your attorney, has anyone
3  told you that there's any evidence that Mr. Farmer
4  attempted to carjack the vehicle?
5    A.  All I saw was that overhead camera video
6  from the Venetian as he runs around the truck.
7    Q.  Okay.
8    A.  That's all I've seen.
9    Q.  And that didn't show any evidence?
10    A.  I mean, if you're asking for my opinion,
11  I could understand -- if I'm in Officer Lopera's
12  position, I can understand his confusion and how
13  he might construe that as a person who's trying to
14  get into that vehicle.  It's clear when you take
15  that bird's eye view that that's not actually
16  occurring.  He's actually trying to determine
17  where he's going to run next.
18    Q.  Okay.  Did you see anything in the two
19  videos, whether it was the body camera video or
20  the Venetian video, that justified the application
21  of a lateral vascular neck restraint?
22    A.  No.
23    Q.  Now, I've been advised that in this
24  report -- and it says in this report that
25  Officer Lopera used -- he cycled his taser seven

1  times, the last time nine seconds in length.
2       Do you understand that to be out of
3  policy?
4    A.  Yes.
5       MR. McNUTT:  Objection.  Form.
6  BY MR. SAYRE:
7    Q.  Could you see the -- Officer Lopera in
8  the video striking Mr. Farmer 10 to 12 times?
9    A.  On the video, yes.
10    Q.  And did you consider that to be out of
11  policy?
12    A.  Yes.
13       MR. McNUTT:  Objection.  Form.
14       MR. SAYRE:  All right.  I have
15  nothing -- oh, let me make sure.
16    Q.  Did we cover all the charges that were
17  alleged against you?
18    A.  The body-worn camera?
19    Q.  Yeah.  The camera we did.  And that was
20  sustained?
21    A.  Yes.
22    Q.  And the major incident and all hazard
23  plan, that was sustained?
24    A.  Yes.
25    Q.  But the failure to intervene was not

Page 78

1 sustained?
2 A. It was overturned.
3 Q. Overturned.
4 When you say "overturned," what doing
5 that mean?
6 A. It means basically that my -- my
7 explanation was such that the board voted and
8 determined that I didn't have a duty to intervene.
9 Q. Did they at any time accuse you of
10 failing to supervise Officer Lopera as he
11 maintained the lateral vascular neck restraint or
12 whatever neck restraint on Mr. Farmer after you
13 had told him to stop?
14 A. I'm not sure I understand.
15 Q. Sure.
16 Were any of the charges that you failed
17 to supervise adequately Officer Lopera after you
18 told him to stop, to let go, of his lateral
19 vascular neck restraint?
20 A. Yes, that charge.
21 Q. Which was that?
22 A. It included that. The duty to
23 intervene.
24 Q. Okay. So -- but it wasn't just the duty
25 to intervene, but it was also a duty to supervise

Page 79

1 him in letting go --
2 A. Oh, you mean as a supervisor?
3 Q. Yes.
4 A. No, it wasn't really like that.
5 Q. Okay. So they never charged you with
6 failing to supervise Officer Lopera after -- after
7 you told him to let go of the neck restraint?
8 A. No.
9 MR. SAYRE: All right. I have nothing
10 further.
11 MR. McNUTT: I have a few questions.
12 Why don't we take a real quick break and --
13 MR. SAYRE: Sure.
14 THE VIDEOGRAPHER: Is 45 minutes enough
15 for you, Counsel?
16 MR. McNUTT: Oh, yeah. Yeah.
17 THE VIDEOGRAPHER: Okay. We are off the
18 record. The time is 11:27 a.m.
19 (Whereupon, a recess was taken.)
20 THE VIDEOGRAPHER: Back on the record.
21 The time is 11:34 a.m.
22 EXAMINATION
23 BY MR. McNUTT:
24 Q. Officer Crumrine, my name is Dan McNutt.
25 I represent Ken Lopera. Thanks for your time here

Page 80

1 today.
2 Q. How long have you known Ken Lopera?
3 A. Since sometime in February or March of
4 this year, 2017.
5 Q. Is that when he started working for you
6 or you started working together?
7 A. When I was going to transfer to that
8 flex squad, I was given his name by somebody else
9 as a possible candidate for the squad.
10 Q. Would you describe your relationship as
11 professional or personal?
12 A. Professional.
13 Q. Did you have any sort of personal
14 relationship with him other than through the job?
15 A. No.
16 Q. You talked a little bit about Ken had
17 always previously been receptive to your
18 instructions or something like that.
19 Do you recall that?
20 A. Yes.
21 Q. Can you explain that a little bit? Did
22 you ever have an incident where you talked to Ken
23 about something, and he responded in a positive
24 manner?
25 A. Absolutely. I mean, he was a very

Page 81

1 proactive officer. He was always willing to work.
2 He always took a short lunch to go out and do more
3 work.
4 I remember being on stops with him and
5 giving him advice, whether it was on search and
6 seizure or just general tactics, and he was always
7 very receptive.
8 Q. Ken was -- would you describe Ken as a
9 good officer?
10 A. Yes.
11 Q. Would you work with Ken again?
12 A. Yes.
13 Q. Let's talk about the LVNR.
14 You initially described the hold that
15 Officer Lopera had as an LVNR; correct?
16 A. I think I said "neck restraint," but,
17 yes.
18 Q. Okay. How would you describe it today?
19 With everything you remember from the incident and
20 seeing the videotape, how would you describe that
21 hold? Is it LVNR, or is it something else?
22 A. I still -- looking at those videos, I
23 still can't tell you for certain what it is. And
24 I'm not an expert in those -- in restraints. I'm
25 not a defensive tactics instructor or a fighter.

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 82

1    Q.   Okay.  From looking at the video, can
2  you tell how long Ken had compression tight
3  against the neck as in actively employing an LVNR
4  technique from looking at the video?
5    A.   No.
6    Q.   From your percipient present tense
7  impressions when you were at the scene, could you
8  tell how long Ken was actively compressing the
9  carotid arteries on the neck?
10   A.   No.
11   Q.   Why not?
12   A.   Because without -- I mean, it was really
13  something -- number one, I was actively involved
14  in taking Farmer into custody.  And, number two,
15  it's not something that you could really tell,
16  especially in a back-lying position, that you
17  could tell just by looking.
18   Q.   No one can tell just by looking; is that
19  correct?
20   A.   As far as when it comes down to pressure
21  on the sides of the neck, no.  It would only be
22  the officer.
23   Q.   And I think you answered this question
24  to Mr. Sayre earlier, but did -- was the LVNR
25  technique that was used, was it a level 1, a level

Page 83

1  2, a level 3, or do you know?
2    A.   I do not know.
3    Q.   And, likewise, you do not know what
4  angle Ken had on his rear arm; correct?
5    A.   Correct.
6    Q.   You don't know if it was zero degrees,
7  20 degrees or 45 degrees?
8        Correct.
9    Q.   Do you recall being interviewed shortly
10  after this incident by your superiors or by anyone
11  at Las Vegas Metro?
12   A.   Yes.
13   Q.   Do you remember who interviewed you?
14   A.   I think it was Jason Leavitt.
15   Q.   And was -- when did that interview
16  occur?
17   A.   A few hours later.
18   Q.   So the same night, just literally right
19  after this?
20   A.   Yes.
21   Q.   Do you know if that statement was
22  recorded that you gave?
23   A.   I'm sure it was.
24       (Interruption by telephone)
25       MR. McNUTT:  Fred, you're six for six.

Page 84

1        MR. SAYRE:  I'm a bad boy.
2        MR. McNUTT:  And, Fred, your color just
3  flushed a little.
4        MR. SAYRE:  Yeah, not like yours.  But
5  that's because I'm young.
6        MR. McNUTT:  Youthful at heart.
7        MR. SAYRE:  My heart is youthful.
8    Q.   So we were talking about the -- the
9  interview that you gave to -- is he Sergeant
10  Leavitt?  Detective Leavitt?  Lieutenant Leavitt?
11   A.   Detective.
12   Q.   Okay.  And was that -- why did you give
13  that interview, first of all?
14   A.   The -- they're with the force
15  investigation team, and that was on the advice of
16  counsel.
17   Q.   Would your memory be better back in May
18  about the incidents that just occurred a few hours
19  earlier, or would it be better sitting here today,
20  some six, seven months later?
21   A.   Then.
22   Q.   You answered a few questions about the
23  strikes that you said you saw Ken deliver to
24  Tashi Farmer.
25       Do you remember that?

Page 85

1    A.   I saw no strikes.
2    Q.   So you didn't see any strikes?
3    A.   Correct.
4    Q.   But did you say you could see the
5  strikes in the video?
6    A.   Yes.
7    Q.   So the strikes hadn't occurred when you
8  were there on scene?
9    A.   Correct.
10   Q.   Okay.  Could you tell from the video
11  where the strikes landed on Mr. Farmer?
12   A.   No.
13   Q.   Let's talk about Mr. Farmer when you
14  were there on scene.
15       You said you grabbed his left arm to get
16  him into a handcuffs; correct?
17   A.   Yes.
18   Q.   First off, why did you end up using two
19  sets of handcuffs?
20   A.   He's a bigger guy.  And if you look at
21  our policy, we generally, to maintain someone's
22  comfort and not to hurt them, put them in two sets
23  of handcuffs.
24   Q.   Okay.
25   A.   It's a little bit easier, especially on

SERGEANT TRAVIS CRUMRINE

December 27, 2017

Page 86

1  a bigger person, to join two pairs together than
2  it is to try to get their wrists together.
3      Q.  Sure.  How would you describe -- well,
4  first off, was Mr. Farmer resisting Ken when you
5  approached?
6      A.  He was certainly not complying with
7  going into handcuffs or going -- being taken into
8  custody.
9      Q.  Did you ever tell Mr. Farmer to stop
10 resisting or to comply?
11     A.  All I told him was on there, "Get your
12 fucking hands behind your back."
13     Q.  Okay.  When you put your hands on
14 Mr. Farmer's arm -- is that correct, was it on his
15 arm?
16     A.  Yes.
17     Q.  Did you touch him in any other spot?
18     A.  I'm sure I did.
19     Q.  Okay.  But you recall grabbing his arm?
20     A.  Yes.
21     Q.  How would you describe Mr. Farmer's
22 strength?
23     A.  Pretty strong.
24     Q.  So he was actively resisting you?
25     A.  He was pulling away.  He was passively

Page 87

1  resisting by pulling away from my grip, breaking
2  my grip.
3      Q.  How do you passively resist?
4      A.  By pulling away.  That's how our policy
5  lays it out, is that breaking an officer's grip is
6  passive, because you're not intending to harm --
7  because the subject is not intending to harm me.
8      Q.  So if you had a suspect that you had
9  your hands on, and he was breaking the grip to run
10 away, that's passive?
11     A.  According to our policy, yes.
12     Q.  Okay.  Did you ever at any point
13 describe Mr. Farmer as actively resisting?
14     A.  Yes.
15     Q.  When?
16     A.  I'm not sure, but I'm sure I have.
17     Q.  Excuse me?
18     A.  I'm sure that I have.  He was actively
19 resisting Officer Lopera.
20     Q.  Okay.  But he was not actively resisting
21 you?  Is that the distinction you're making?
22     A.  Yes.
23     Q.  Okay.  So you said Mr. Farmer was --
24 what was your word?  "Strong" was how --
25     A.  Yes.

Page 88

1      Q.  And what did it take for you to gain
2  control of him?
3      A.  Just to increase my level of strength in
4  grabbing his arm.
5      Q.  Okay.  And then were you able to do
6  that?
7      A.  Yes.
8      Q.  And did Mr. Farmer resist being
9  handcuffed the whole way through the handcuffing
10 procedure?
11     A.  It was my perception that he was still
12 resisting.
13     Q.  And what happened once you got him into
14 handcuffs?
15     A.  We turned him back over, face up.
16     Q.  And was he no longer resisting at that
17 point?
18     A.  Correct.
19     Q.  And it was your testimony that
20 Mr. Lopera, Ken, released -- released the LVNR
21 when you asked him to?
22     A.  Yes.
23     Q.  Who did you talk to other than your
24 lawyer before today about your deposition?
25     A.  No one.

Page 89

1      Q.  And I mean not the night of.  You
2  obviously talked to Ken that night.  You obviously
3  talked to Detective or Sergeant Leavitt.
4      A.  Detective Leavitt.
5      Q.  But since then, what have you done to
6  prepare for your deposition other than meeting
7  with your lawyer?
8      A.  Nothing.
9      Q.  When is the last time you've spoken to
10 Ken Lopera?
11     A.  It was probably September.
12     Q.  When is the last time you spoke to
13 Officer Tran?
14     A.  I think I saw him at Officer Hartfeld's
15 funeral in October.
16     Q.  Do you know still work with Officer
17 Tran?
18     A.  No.
19     Q.  Do you work with Officer Lif?
20     A.  No.
21     Q.  How about Flores?
22     A.  No.
23     Q.  Did you ever interview the Venetian
24 security guards after this incident?
25     A.  No.

SERGEANT TRAVISCRUMRINE

December 27, 2017

Page 90

1   Q.  Do you know if they were interviewed
2   after this incident?
3      A.  I don't know.
4         MR. McNUTT:  I have no further
5   questions.
6         CONTINUED EXAMINATION
7   BY MR. SAYRE:
8      Q.  What did Officer Lopera say to you in
9   September?
10     A.  He called me, asked me how I was doing.
11     Q.  That's it?
12     A.  Yeah.  Basically.
13     Q.  Did you ask him about criminal charges
14  or anything like that?
15     A.  No.  I just asked about his family.
16     Q.  Besides the night when you and
17  Officer Lopera had a conversation about what had
18  occurred, have you ever had any other
19  conversations with Officer Lopera after that, on
20  some other occasions, about what occurred?
21     A.  I served him with his notice of relief
22  of duty later that day.  And, let's see, he came
23  in -- I got moved to day shift, and sometime later
24  he came in to turn in his credentials.  And I
25  spoke with him briefly, just said hello, gave him

Page 91

1   a hug.  And I talked to him in September.
2      Q.  What does a notice of relief of duty
3   mean?
4      A.  It means that the person is being put on
5   admin leave.  When I did it, it was paid admin
6   leave, right there, pending the investigation.
7      Q.  Okay.  So what is his status today, if
8   you know?
9      A.  I believe he is separated from the
10  department.
11     Q.  Has he been fired?
12     A.  I don't know.
13     Q.  When you mean "separated," what does
14  that mean?
15     A.  He's no longer employed with the Las
16  Vegas Metropolitan Police Department.
17     Q.  As of when?
18     A.  I'm not sure.
19     Q.  How do you know he's no longer employed
20  by Las Vegas Metropolitan police?
21     A.  I was told by -- I'm not sure who told
22  me, honestly.
23     Q.  Okay.  If it was your lawyer, don't tell
24  me.  If it was somebody else, tell me.  Plenty of
25     A.  I honestly am not sure.  Plenty of

Page 92

1   people know that he's not --
2      Q.  Okay.  Is he no longer employed because
3   of this incident?
4      A.  I believe so.
5         MR. SAYRE:  Okay.  I have no further.
6   Thank you.
7         MR. McNUTT:  One follow-up.
8         CONTINUED EXAMINATION
9   BY MR. McNUTT:
10     Q.  How many officers total did it take to
11  get Mr. Farmer handcuffed?
12     A.  At least four.
13     Q.  Would you describe any event where four
14  officers were involved in handcuffing someone as
15  passive resistance?
16     A.  No.
17        MR. McNUTT:  Thanks.
18        THE VIDEOGRAPHER:  We done?
19        MR. SAYRE:  Yeah.
20        MR. ANDERSON:  Yes.  I have no
21  questions.
22        THE VIDEOGRAPHER:  This concludes
23  today's deposition of Travis Crumrine.  The number
24  of media used was one.  We are off the record at
25  11:47 a.m.

Page 93

1   (Whereupon, the deposition concluded
2   at 11:47 a.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25