# Exhibit G - Deposition of Defendant Michael Tran

OFFICER MICHAEL TRAN

December 20, 2017

```
 1              CERTIFICATE OF COURT REPORTER

 2

     STATE OF NEVADA      )
 3                        )   ss:
     COUNTY OF CLARK      )
 4

 5         I, Kimberly A. Farkas, Certified Court

 6   Reporter licensed by the State of Nevada, do

 7   hereby certify that I reported the deposition of

 8   Officer Michael Tran, commencing on December 20,

 9   2017, at 9:57 a.m.

10         Prior to being deposed, the witness was duly

11   sworn by me to testify to the truth.  I thereafter

12   transcribed my said stenographic notes, and that

13   the transcript is a complete, true, and accurate

14   transcription, and that a request was made for a

15   review of the transcript.

16         I further certify that I am not a relative,

17   employee, or independent contractor of counsel,

18   nor a person financially interested in the

19   proceeding.

20         IN WITNESS WHEREOF, I have set my hand in my

21   office in the County of Clark, State of Nevada,

22   this January 8th, 2018.

23

24

25                Kimberly A. Farkas, CCR No. 741

26
```

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * * * * *

ESTATE OF TASHI S. FARMER
a/k/a TASHII FARMER a/k/a
TASHII BROWN, by and through
its Special Administrator,
Elia Del Carmen
Solano-Patricio; TAMARA
BAYLEE KUUMEALI'MAKAMAE
FARMER DUARTE, a minor,
individually and as
Successor-in-Interest, by and
through her legal guardian,
Stevandra Lk Kuanoni; ELIAS
BAY KAIMIPONO DUARTE, a
minor, individually and as
Successor-in-Interest, by and
through his legal guardian,
Stevandra Lk Kuanoni,

        Plaintiffs,

           vs.

Case No. 2:17-CV-01946-
JCM-PAL

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, a political
subdivision of the State of
Nevada; OFFICER KENNETH
LOPERA, individually and in
his Official Capacity; and
Does 1 through 50, inclusive,

        Defendants.

_____

VIDEOTAPED DEPOSITION OF OFFICER MICHAEL TRAN

Las Vegas, Nevada

December 20, 2017

Reported by: Kimberly A. Farkas, RPR, CCR #741

Job: 23498

OFFICER MICHAEL TRAN

December 20, 2017

**Page 2**

```
 1          Videotaped Deposition of Officer Michael
 2    Tran, taken at 330 E. Charleston Blvd. Suite 101,
 3    Las Vegas, Nevada, on Wednesday, December 20, 2017,
 4    at 9:57 a.m., before Kimberly A. Farkas, Certified
 5    Court Reporter in and for the State of Nevada.
 6
 7    APPEARANCES
 8
 9    For the Plaintiffs:
10          FEDERICO C. SAYRE, ESQ.
            DARREN D. DARWISH, ESQ.
11          ABIR COHEN TREYZON SALO, LLP
            1901 Avenue of the Stars, Suite 935
12          Los Angeles, California  90067
            (424) 288-4367
13          ddarwish@actslaw.com
14
15          MITCHELL S. BISSON, ESQ.
            CALLISTER LAW
16          330 E. Charleston Blvd. Suite 100
            Las Vegas, Nevada  89104
17          (702) 333-3334
18
19    For the Defendant Las Vegas Metropolitan Police
      Department:
20
21          CRAIG R. ANDERSON, ESQ.
            Marquis Aurbach Coffing
22          10001 Park Run Drive
            Las Vegas, Nevada  89145
23          (702) 382-0711
            canderson@maclaw.com
24
25    \\\
```

**Page 3**

```
 1    APPEARANCES (continued)
 2
 3    For the Defendant Officer Kenneth Lopera:
 4
 5          DANIEL R. McNUTT, ESQ.
            MATTHEW C. WOLF, ESQ.
 6          McNutt Law Firm, P.C.
            625 South Eighth Street
 7          Las Vegas, Nevada  89101
            (702) 384-1117
 8          drm@mcnuttlawfirm.com
 9
10
11    Also present:   Tom Burtney, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1          DEPOSITION OF OFFICER MICHAEL TRAN
 2              December 20, 2017
 3          Kimberly A. Farkas, CCR No. 741
 4                 * * * * *
 5
 6                   INDEX
 7                              Page
 8    OFFICER MICHAEL TRAN
 9    Examination by Mr. Sayre              6
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1          LAS VEGAS, NEVADA
 2      Wednesday, December 20, 2017
 3             9:57 a.m.
 4    DEPOSITION OF OFFICER MICHAEL TRAN
 5             * * * * * *
 6       (The court reporter was relieved of her
 7    duties under NRCP 30(b)4.)
 8       THE VIDEOGRAPHER:  Good morning.  Here
 9    begins media no. 1 of the deposition of
10    Michael Tran in the matter of the Estate of
11    Tashi S. Farmer, et al., versus Las Vegas
12    Metropolitan Police Department, et al.  This case
13    is in the United States District Court, District
14    of Nevada, and the case number is
15    2:17-cv-01946-JCM-PAL.
16       Today's date is December the 20th, 2017,
17    and the time is 9:57 a.m.  This deposition is
18    taking place at 330 East Charleston Boulevard,
19    Suite 100, in Las Vegas, Nevada.  The videographer
20    is Tom Burtney, appearing on behalf of First Legal
21    Deposition Services.
22       Would counsel please identify yourselves
23    and state whom you represent.
24       MR. SAYRE:  For the plaintiffs,
25    Federico Sayre.
```

OFFICER MICHAEL TRAN

December 20, 2017

Page 6

1      MR. DARWISH:  Darren Darwish on behalf
2  of plaintiffs.
3      MR. BISSON:  Mitchell Bisson on behalf
4  of plaintiffs.
5      MR. McNUTT:  Dan McNutt and Matt Wolf on
6  behalf of Officer Ken Lopera.
7      MR. ANDERSON:  Craig Anderson on behalf
8  of Las Vegas Metropolitan Police Department.
9      THE VIDEOGRAPHER:  The court reporter is
10  Kimberly Farkas.
11      Would the reporter please swear in the
12  witness.
13          OFFICER MICHAEL TRAN,
14  having been first duly sworn, was examined and
15  testified as follows:
16          EXAMINATION
17  BY MR. SAYRE:
18      Q.  Officer Tran, my name is Fred Sayre, and
19  I'm representing the children and the Estate of
20  Tashi Farmer-Brown.
21      Do you understand that?
22      A.  Yes.
23      Q.  And you've been called here today to
24  give a deposition regarding the incident that
25  resulted in his death.

Page 7

1      Do you understand that?
2      A.  Yes.
3      Q.  Now, you are not a defendant in this
4  case.
5      Do you understand that?
6      A.  Yes.
7      Q.  You are here just as a witness.
8      You understand that?
9      A.  Yes.
10      Q.  All right.  You've been sworn to tell
11  the truth.  And although we're sitting here
12  somewhat informally in this conference room, do
13  you understand that oath is as binding on you here
14  as if we were in a courtroom of law?
15      A.  Yes.
16      Q.  Everything that is said here today will
17  be taken down by the court reporter.  She'll later
18  have it typed up into a booklet form, and you'll
19  be given an opportunity to read and review it.
20      Do you understand that?
21      A.  Yes.
22      Q.  When you read and review it, you'll be
23  given an opportunity to make any changes or
24  corrections that you deem appropriate in what
25  you've said here today.

Page 8

1      Do you understand that?
2      A.  Yes.
3      Q.  But if you do, that can be commented on.
4      Do you understand that?
5      A.  Yes.
6      Q.  So we ask you to give your best answer
7  here today.
8      Will you do that, please?
9      A.  Yes.
10      Q.  If you don't understand a question,
11  please don't answer it.  Ask me to repeat it or
12  rephrase it or in some way indicate that you'd
13  like me to say it again.
14      Will you do that, please?
15      A.  Yes.
16      Q.  If you answer a question, I'm going to
17  assume you've understood it.
18      Is that fair enough?
19      A.  Yes.
20      Q.  Please wait until I finish my question
21  before you start your answer.  And I'll give you
22  the same courtesy; I'll wait until you've finished
23  your answer before I start my next question.
24      Besides being courteous, it's very
25  difficult for the court reporter to take down two

Page 9

1  people who are speaking at the same time.
2      Do you understand that?
3      A.  Yep.
4      Q.  At any time during the deposition, if
5  you wish to take a break, just let me know, and
6  your request will be honored.  The only thing I
7  would ask is if there's a question pending, will
8  you please answer the question before you take the
9  break?
10      A.  Yes.
11      Q.  If you -- during the course of the
12  deposition, I may ask you questions that have to
13  do with feet, inches, meters, centimeters, or some
14  other measure.  I also may ask you questions
15  having to do with time or some other type of
16  distance.
17      All right.  Now, you may or may not have
18  an exact answer to the question, but if you don't
19  have an exact answer, you may have an estimate.
20  If you have an estimate, I'm entitled to your best
21  estimate.
22      Do you understand that?
23      A.  Yes.
24      Q.  However, if it's just a guess, I'm not
25  entitled to a guess.

OFFICER MICHAEL TRAN

December 20, 2017

Page 10

1        That's not always clear, what the
2   difference is between a guess and an estimate.
3   But if I asked you to estimate the length of the
4   table that we're sitting at, you can see the table
5   and you can give me a reasonable estimate based
6   upon your life experience with feet and inches or
7   meters and centimeters.
8        However, if I asked you to estimate the
9   length of my dining room table in my home in
10  Irvine, California, you would have to be a pure
11  guess because you've never been there.
12       Do you understand that?
13   A.  Yes.
14   Q.  All right.  Are you under any kind of
15  medication that would prevent you from giving your
16  best testimony here today, either by recollection
17  or by articulation?  Do you understand that?
18   A.  Yes.  No, I'm not on any medication.
19   Q.  Okay.  All right.  All right.  If at any
20  time you have a question regarding the
21  proceedings, please consult your attorney, and
22  then we can proceed forward.  Okay?
23   A.  Um-hum.
24   Q.  All right.  And that's -- thank you.
25  You reminded me.

Page 11

1        You just did "uh-huh" or -- and nodded
2   your head.
3        In a deposition, you need to speak out
4   loud.  "Yes," "no," or whatever your articulated
5   answer is.  Such common expressions as "uh-huh"
6   and "huh-uh" are not something that we want you to
7   do, because then I have to ask you questions like,
8   "Do you mean 'yes' or do you mean 'no'?"
9        Similarly, with nods of the head or
10  shakes of the head, I can see it, I can interpret
11  it, but just to be sure, I would have to ask you,
12  "Do you mean 'yes' or do you mean 'no'?"
13       Do you understand that?
14   A.  Yes.
15   Q.  So please avoid those kinds of
16  responses.
17       Now, Officer Tran, what is your present
18  occupation?
19   A.  I'm a police officer with Las Vegas
20  Metro Police Department.
21   Q.  Okay.  Could you give me the extent of
22  your formal education, beginning with high school.
23   A.  Graduated high school.  I went to
24  college at UNLV and obtained a bachelor's degree
25  in kinesiology.

Page 12

1   Q.  What year did you graduate high school?
2   A.  2002.
3   Q.  And what year did you get your college
4   degree from UNLV?
5   A.  2007.
6   Q.  Did you go immediately into the police
7   department, or did you have another occupation
8   before that?
9   A.  No, I did not.  I went to -- I was a
10  personal trainer.
11   Q.  Okay.  And how long did you do that?
12   A.  Until 2014-ish.  Right before I joined
13  Metro.
14   Q.  Okay.  So do I understand from that
15  answer that you joined the Metropolitan Police
16  Department in 2014?
17   A.  I joined in -- April 2015 was my
18  official date.
19   Q.  All right.  And did you go through an
20  academy?
21   A.  Yes.
22   Q.  And what -- where did you attend that
23  academy?
24   A.  It was the Northwest Area Command in
25  Cheyenne and 215.  I don't know the exact address.

Page 13

1   Q.  In Las Vegas?
2   A.  Yes.
3   Q.  Was it conducted by the Metropolitan
4   Police Department?
5   A.  Yes.
6   Q.  How long was that?
7   A.  It was at least six months of academy
8   time, and then probably another six months of
9   field training time.
10   Q.  When did you begin your field training?
11   A.  I graduated October 22nd.  There's a
12  month after that.  Because there's some classes we
13  had to take before field training started.
14   Q.  October 22nd, 2015?
15   A.  Yes.  That was my official commission
16  date.
17   Q.  Okay.  And then you did your field
18  training after that?
19   A.  Yes.
20   Q.  All right.  So that extended until what
21  time?
22   A.  February 2016.
23   Q.  Were you supervised by any particular
24  person in your field training?
25   A.  I guess my field training officer, and

OFFICER MICHAEL TRAN

December 20, 2017

1 then my direct sergeant of the squad.
2      Q.   Okay.  What was his or her name?  Field
3 officer first.  Field training officer.
4      A.   The first one?  Because we had -- we had
5 a bunch.
6      Q.   Okay.  You didn't have one assigned
7 field training officer?
8      A.   No.  We had -- we cycled through field
9 training officers every two, three weeks.
10      Q.   Okay.  And how about your sergeant?  Did
11 you have more than one sergeant also?
12      A.   Yes.
13      Q.   Okay.  So in February of 2015, you were
14 officially a police officer with the Las Vegas
15 Police Department -- Metropolitan Police
16 Department?
17      A.   I guess -- I guess however you see it.
18 But the commission date, I was technically a
19 Police Officer I.  After field training, I'm
20 just -- I passed the program, I guess, and can go
21 out on my own.
22      Q.   Okay.  What did your field training
23 consist of?
24      A.   Day-to-day activities of police work.
25 How to do reports.  How to respond to calls.

1 Safety.
2      Q.   When you completed your field training,
3 what was your first assignment?
4      A.   I was stationed at Convention Center
5 Area Command.
6      Q.   What did you do there?
7      A.   Police -- police work.
8      Q.   Okay.  Well, can you be more specific?
9      A.   Respond to calls for service on the
10 boulevard, at the casinos, disturbance calls.
11      Q.   And how long did you remain in that
12 position?
13      A.   I'm still there currently.
14      Q.   So that is your ongoing responsibility
15 at this point?
16      A.   Yes.
17      Q.   Okay.  That has not varied since you
18 started?
19      A.   I was on a different squad, and I had a
20 different motive, I guess.  It was more of a
21 proactive squad.  We would be on the boulevard
22 more and crush crime on the boulevard.
23      Q.   Did you have a supervisor at that time?
24      A.   Yes.
25      Q.   And what was his or her name?

1      A.   Sergeant Obasi.
2      Q.   Spell it, please.
3      A.   B-A -- O-B-A-S-I.
4      Q.   O-B-A-S-I?
5      A.   Yes.
6      Q.   Is that a he or a she?
7      A.   It's a he.
8      Q.   And then when you went to this new
9 squad, you said it's not as proactive?
10      A.   It's more of a proactive squad.  You
11 don't do calls for service.
12      Q.   That one was?
13      A.   Yes, correct.
14      Q.   What about this one?
15      A.   The one I'm currently on is a calls for
16 service squad.
17      Q.   Okay.  And who is your sergeant?
18      A.   Steinmetz, S-T-E-I-N-M-E-T-Z.
19      Q.   Is that sergeant?
20      A.   Yes.
21      Q.   He or she?
22      A.   He.
23      Q.   All right.  So let me show you some
24 exhibits.  I'm going to give you one.  Your
25 counsel one.

1           MR. SAYRE:  Sorry.  I don't have any
2 more.  But for the record, it is the arrest report
3 of the incident involving Officer Lopera and
4 Tashi Farmer-Brown.  I'm just using both names
5 because at various times he's used one name or the
6 other, and I just thought it would be easier to
7 put it together.
8      Q.   All right.  Now, have you seen this
9 arrest report before?
10      A.   Yes, I have.
11      Q.   Have you read it thoroughly?
12      A.   Not thoroughly, no.
13      Q.   Okay.  How many times have you read it?
14      A.   Just once.
15      Q.   When was that?
16      A.   Whenever the -- whenever the incident
17 happened.  It was on Fox 5 news, and they had a
18 copy of it, and I just skimmed through it.
19      Q.   So it was close in time to the incident
20 itself?
21      A.   Correct.
22      Q.   Have you -- you haven't -- have you read
23 it recently in preparation for your deposition?
24      A.   No, I didn't have a copy of it.
25      Q.   Okay.  Have you read any documents in

OFFICER MICHAEL TRAN

December 20, 2017

Page 18

1  preparation for your deposition?
2      A.  No.
3      Q.  Okay.  You seemed to hesitate about
4  that.
5      A.  Well, I don't know what -- I have my
6  CIRT review document, but that's from the
7  department.
8      Q.  CIRT review?
9      A.  CIRT review, correct.
10     Q.  Could you tell me what that -- the full
11  name for that is?
12     A.  Critical Incident Review Team.
13     Q.  And is that a document that talks about
14  the incident or talks about you or both?
15     A.  It's -- it's a document that has my
16  recorded statements to them when I had my
17  interview.
18     Q.  Is that the only thing that you reviewed
19  in the CIRT review, was your own statement?
20     A.  Yes.
21         MR. SAYRE:  Okay.  Has that been
22  produced to us?
23         MR. ANDERSON:  No, it hasn't.  It's a
24  part of the CIRT file, so it's a copy of his
25  statement that he gave to the Critical Incident

Page 19

1  Review Team.
2         MR. SAYRE:  Okay.  Is that -- are you
3  taking privilege on that?
4         MR. ANDERSON:  Yeah.
5         MR. SAYRE:  Okay.
6         MR. ANDERSON:  Until after it becomes
7  public in the criminal matter.
8         MR. SAYRE:  Okay.  All right.  So we'll
9  get it at that time?
10        MR. ANDERSON:  Yeah.
11        MR. SAYRE:  I would just state that it
12  is my intention to complete Officer Tran's
13  deposition today; however, if I see something when
14  it becomes available, I reserve it the right to
15  redepose him as to that additional material.
16        MR. ANDERSON:  Understood.
17  BY MR. SAYRE:
18     Q.  All right.  So just take a look at
19  this -- let me draw your attention to -- there's
20  five zeros and a 5 at the bottom of the page.
21  It's a Bates stamp.
22         Do you see that?
23     A.  Yes.
24     Q.  It says "Arrest Report" on top?
25     A.  Yes.

Page 20

1      Q.  Okay.  All right.  It says this incident
2  occurred on May 14th, 2017, at 1:16 hours, which
3  would be 1:16 a.m.; correct?
4      A.  Yes.
5      Q.  All right.  And does that square with
6  your recollection of when this occurred?
7      A.  Yes.
8      Q.  And what was your post at the time?
9      A.  I was -- me and my -- partner and I were
10  supposed to be at The LINQ Hotel.
11     Q.  Okay.  And who was your partner that
12  night?
13     A.  Officer Flores.
14     Q.  First name?
15     A.  Michael.
16     Q.  Was he a regular partner of yours at
17  that time?
18     A.  Yes.
19     Q.  Were you -- were you with the squad that
20  was proactive or the one that --
21     A.  The proactive squad.
22     Q.  The proactive squad.  Okay.
23         What time did you go to work, I guess,
24  that morning or the morning before?
25     A.  Our start time was --

Page 21

1      Q.  Sorry.  The night before.  Excuse me.
2      A.  Our start time was 20:00, so 8:00 p.m.
3      Q.  And how long a shift were you supposed
4  to work?
5      A.  10 hours.  So we were -- would be off
6  6:00 a.m.
7      Q.  Okay.  And at 8:00 p.m., did you -- at
8  the start of your shift, was there a roll call?
9      A.  Yeah, I suppose.  It's not like they
10  call everybody's name, but the sergeant goes
11  through and assigns partners and call signs.
12     Q.  Okay.  All right.  So it's a brief roll
13  call, but it's basically -- it's conducted, I
14  assume --
15     A.  Yes, we have a briefing.
16     Q.  Okay.  It's conducted at the station?
17     A.  During shift.  It's conducted per squad,
18  per shift.
19     Q.  Okay.  Where was this roll call, I'll
20  call it, conducted?
21     A.  At Convention Center Area Command.
22     Q.  Okay.  So at the location?
23     A.  Correct.
24     Q.  Is there a police office there?  You
25  said "Convention Center Area Command."

OFFICER MICHAEL TRAN

December 20, 2017

Page 22

1      A.   Correct.  That's our police station.
2      Q.   Okay.  So there is a station, then?
3      A.   Yes.
4      Q.   Okay.  And that's where it was
5  conducted?
6      A.   Yes.
7      Q.   And then from there, you and Officer
8  Flores assumed your position at The LINQ Hotel?
9      A.   Our post didn't start until midnight.
10  So after briefing, we go get food and do a couple
11  proactive stops.
12      Q.   Okay.  So at midnight, you took your
13  post at The LINQ Hotel?
14      A.   Correct.
15      Q.   Okay.  Now, when were you first made
16  aware of this incident, approximately?
17      A.   I remember after the briefing -- we have
18  a midnight briefing for Safe Strip.  After the
19  briefing, we were en route to The LINQ.  Right
20  after we parked the car at The LINQ garage, I
21  heard somebody on the radio ask for a code red
22  Venetian 1.
23      Q.   Okay.  Let me just make sure I
24  understand.
25           Midnight briefing for Safe Strip, what

Page 23

1  does that mean?
2      A.   It's a -- the casinos pay for an
3  overtime officers to be on post at every casino on
4  the Strip, and they just named it Safe Strip.  We
5  were supplementing the other half.  So all of it
6  was overtime officers, and our squad was the other
7  half.  So we would supplement Safe Strip.
8           So we would be at a post on -- at The
9  LINQ that we were assigned.  At midnight, we had a
10  short briefing just to go over where everyone was
11  supposed to be, what to do, things like that.  So
12  that was -- that's our Safe Strip.
13      Q.   Who conducted that briefing?  Do you
14  recall?
15      A.   I can't recall.
16      Q.   Okay.  Is it usually a sergeant?
17      A.   Usually a lieutenant.
18      Q.   Okay.  Do you remember the name of the
19  lieutenant that would have been your lieutenant
20  that night?
21      A.   I don't recall who it was that night,
22  but if it would have been a lieutenant, it would
23  have been Summers.
24      Q.   Summers, S-U-M-M-E-R-S?
25      A.   Yes.

Page 24

1      Q.   Did he give you any particular
2  instructions -- that is, you and your partner --
3  or was it a general --
4      A.   It's a general, general briefing.
5      Q.   All right.  So you drove to The LINQ,
6  and -- yeah, there's a briefcase under there.
7  Don't worry about it.  It's okay.
8           You drove to The LINQ, and you parked
9  your vehicle in The LINQ parking lot?
10      A.   In the LINQ parking garage.
11      Q.   Parking garage.  And then you heard a
12  call?
13      A.   Correct.
14      Q.   Over the police radio?
15      A.   Correct.
16      Q.   About what time was this?
17      A.   I don't -- I don't recall.  It had to
18  have been around midnight-thirty, 1:00.  Because,
19  like I said, we had briefing at midnight, and then
20  for the time to drive to The LINQ and park.
21      Q.   How long, estimate?
22      A.   It was probably around 1:00 a.m.
23      Q.   Okay.  And you said you heard a code
24  red.  What did that mean?
25      A.   A code red is what we say on the air if

Page 25

1  we have an emergency.
2      Q.   Did you receive any other information
3  from that call other than there was a code red?
4      A.   I did not.
5      Q.   What did you do to determine where the
6  code red was supposed to be taking -- taking
7  place?
8      A.   I recall hearing the call sign "Venetian
9  1."  For Safe Strip, the property we're assigned
10  to, we take the name of the property.  I was "LINQ
11  1," and I heard "Venetian 1, give me a red."  So I
12  just knew that it was at the Venetian, but I
13  didn't know a specific location.
14      Q.   Sure.  And how far was the Venetian from
15  where you were located when you heard the call?
16      A.   It was just one property north of us.
17      Q.   Okay.  So close by?
18      A.   Very close.
19      Q.   Did you know who Venetian 1 was?
20      A.   I did not.
21      Q.   Okay.  How long did it take you to
22  respond to that location?
23      A.   My estimate would be a minute.
24      Q.   And was Officer Flores with you?
25      A.   Yes.

Page 26

```
1     Q.   Did you locate Venetian 1 when you
2  responded?
3     A.   Yes.
4     Q.   And did you recognize who Venetian 1
5  was?
6     A.   I did not, not at the time.
7     Q.   All right.  What did you see when you
8  came upon the scene?
9     A.   As I pulled my vehicle towards the rear
10 of the Venetian, I observed another patrol
11 vehicle, a Crown Vic, to my left.  I parked on the
12 right side of it.  As I exited the vehicle, I'm
13 running towards -- running forward, towards the
14 front of the Crown Vic.  I observe two officers on
15 the ground with a suspect or unknown person.  And
16 they're up against a concrete barrier.
17    Q.   Did you recognize the two officers?
18    A.   I recognized one officer that was on the
19 unknown subject's feet, feet area, but I did
20 not -- I could not see the other officer.
21    Q.   The officer that you recognized, what --
22 what is his or her identity?
23    A.   It was Sergeant Crumrine.
24    Q.   Did you know Sergeant Crumrine from
25 previous situations?
```

Page 27

```
1     A.   Yes.
2     Q.   And how was that?
3     A.   He's -- I guess he's, like, our sister
4  squad.  They work our days off.  And we overlap on
5  Saturdays with them, so I knew who he was.
6     Q.   So you had worked with him at least on a
7  Saturday at some point?
8     A.   Correct.
9     Q.   Okay.  And what was Officer Crumrine
10 doing?  What did you observe?
11    A.   I didn't -- I didn't observe -- I wasn't
12 focused on what he was doing.  I know he was at
13 his feet, at the unknown subject's feet.
14    Q.   So I take it this occurred inside the
15 parking garage of the Venetian?
16    A.   Not quite the parking garage.  It wasn't
17 the parking garage.  It was -- I guess it's the
18 back of the house of the Venetian, where the
19 recycling and all the semi-trucks go through.
20    Q.   All right.  And you saw another
21 officer --
22    A.   Correct.
23    Q.   -- correct?
24         What was he -- was it a he?
25    A.   At the time I did not know who it was.
```

Page 28

```
1     Q.   Okay.  What was the other officer doing
2  when you first saw -- saw that officer?
3     A.   I know -- all I observed was the officer
4  laying on the floor or on the ground with the
5  unknown male or subject.
6     Q.   When you say "laying on the ground," was
7  the officer to the side of the subject or on top
8  of the subject, or just how was his attitude?
9     A.   I would guess, from my recollection, the
10 subject was on his side, and the officer was
11 directly behind the subject, on the -- their left
12 side.
13    Q.   All right.  Your answer was just fine,
14 except you used the word "guess."  And I assume
15 this was your best observation at the time?
16    A.   From what -- from what I recall, based
17 on that --
18    Q.   The word "guess" is a dirty word, so
19 that was all.
20         I assume that was your best observation
21 at the time?
22    A.   Yes.
23    Q.   All right.  And did the officer have
24 ahold of the subject person, the one who was
25 also -- I guess it was to the rear or behind the
```

Page 29

```
1  subject?
2     A.   Yes.
3     Q.   Did he have ahold of him at the time
4  when you first saw him?
5     A.   Yes, he was holding him.
6     Q.   Where was he holding him?
7     A.   I don't recall.
8     Q.   Okay.  What did you do after you first
9  saw this scene?
10    A.   My first reaction was to attempt to take
11 the subject into custody.  My partner and I began
12 to grab ahold of arms, his hands, to try to
13 handcuff the subject.  That was my main focus, was
14 just trying to take him into custody.
15    Q.   All right.  Now, the subject was on his
16 side.
17         Where were his arms?
18    A.   I recall the -- his left arm was wedged
19 between the officer and the subject's own back.
20 His right arm was, I guess, free, was not being
21 held.
22    Q.   Could you tell whether the officer had
23 ahold of his left arm where it was located behind
24 the subject's back?  Do you understand what I'm
25 saying?
```

OFFICER MICHAEL TRAN

December 20, 2017

1    A.   Can you clarify?

2    A.   Sure.

3         One of the things that an officer will

4   do in trying to handcuff a person is to pull their

5   arm behind their back; correct?

6    A.   Correct.

7    Q.   Did it appear to you that the officer

8   had pulled his arm behind his back, the subject's

9   back?

10   A.   Did it appear to me that it was?  Yes.

11   Q.   Okay.  And the right hand was free?

12   A.   Yes.

13   Q.   Did it appear to you that the officer

14  had ahold of the left arm of the subject?

15   A.   No.

16   Q.   Okay.  So the left arm was behind his

17  back, but not being held by the officer?

18   A.   No.

19   Q.   Okay.  When you determined -- at some

20  point did you determine that the officer had his

21  hands on some part of the subject's body?

22   A.   At what point?

23   Q.   At some point.

24   A.   Yes.

25   Q.   Okay.  And when was that?

1    A.   From my recollection, after we took the

2   subject into custody and when I looked down at the

3   subject is when I observed an elbow around the

4   subject's neck.

5    Q.   Okay.  Now, when you say when you took

6   the subject into custody, does that mean you

7   handcuffed the subject?

8    A.   Yes.

9    Q.   All right.  So did you grab hold of the

10  subject's left arm?

11   A.   We -- my partner and I, yes, we did.  We

12  were trying to put a -- handcuff his hands

13  together.

14   Q.   Okay.  How did that work?  Did you grab

15  one arm and your partner grabbed the other, or

16  how -- how did it go?

17   A.   I can't recall.

18   Q.   Okay.  Did -- did each of you share in

19  the handcuffing of this subject?

20   A.   Yes.

21   Q.   All right.  So is it fair to say one of

22  you probably grabbed one arm and the other

23  probably grabbed the other?

24   A.   I can't recall.

25   Q.   Okay.  Do you remember handcuffing the

1   subject's arms together?

2    A.   Yes.

3    Q.   All right.  And were they handcuffed

4   behind his back?

5    A.   Yes.

6    Q.   All right.  And did you do the

7   handcuffing?

8    A.   Yes.

9    Q.   All right.  With your handcuffs, I

10  assume?

11   A.   It was Officer Flores's handcuffs.

12   Q.   Officer Flores.  Okay.

13        He handed them to you and you -- you

14  handcuffed him?

15   A.   It was more of a joint, mutual.

16   Q.   Okay.  And that's when you say you had

17  taken him into custody?

18   A.   Yes.

19   Q.   All right.  And what does that mean to

20  you?

21   A.   That the subject's handcuffed, and we do

22  a cursory pat down, make sure he has no weapons

23  and the scene is safe.

24   Q.   Right.  Does it mean that subject is

25  under control?

1    A.   Yes.

2    Q.   All right.  Had -- when you saw the

3   elbow, where was it located relative to the

4   subject?  I assume -- pardon me for -- I shouldn't

5   do this.

6         The elbow was the officer's elbow?  Is

7   that what you determined?

8    A.   Yes.

9    Q.   Okay.  Where was the elbow located when

10  you first saw it or first notified it?

11   A.   Directly until front of the subject's

12  throat.

13   Q.   All right.  Now, had you done a pat down

14  of the subject yet when you saw the elbow located

15  in front of the throat of the --

16   A.   I had not.

17   Q.   Okay.  What you had done is you had

18  controlled him by placing handcuffs on him;

19  correct?

20   A.   Right.

21   Q.   And was the subject struggling?

22   A.   I do not recall the subject struggling.

23   Q.   Okay.  Meaning, he wasn't struggling?

24   A.   He was not.

25   Q.   Did the subject struggle when you put

OFFICER MICHAEL TRAN

December 20, 2017

1   handcuffs on him?
2       A.  No, he did not.
3       Q.  Okay.  Take a look, please, at the --
4   I'm going to ask you to take a look at page five
5   zeros and a 7.  Just -- it's one over.  It has a
6   series of times.
7           Do you see that?
8       A.  Yes.
9       Q.  Okay.  And then there's statements that
10  have been attributed to that particular period of
11  time.
12          You follow that?
13      A.  Yes.
14      Q.  All right.  Now, by the way, these --
15  this report appears to have been prepared by
16  either Officer Alsup or Officer Kolon or both.
17          Do you see that in the front?
18      A.  Yes.
19      Q.  Okay.  Do you know either one of those
20  officers?
21      A.  I do not.
22      Q.  All right.  Now, have you seen a video,
23  on YouTube or otherwise, of the events in question
24  that evening, one that purports to be a video of
25  Officer Lopera's body camera?

1       A.  Yes.
2       Q.  Okay.  Have you seen a video of the
3   events that evening that purports to be footage
4   from the security cameras at the Venetian?
5       A.  Yes.
6       Q.  Have you seen the two sync'd together?
7       A.  Yes.
8       Q.  Okay.  Now, take a look at page 000009.
9   And there's a reference to 2:58.  That's two
10  minutes and 58 seconds from the time that the body
11  camera was turned on.
12          You have the reference, sir?
13      A.  Yes.
14      Q.  Okay.  And it says that Officer Lopera
15  appeared to put Farmer in some type of neck
16  restraint.  Okay.
17          Now, when you saw the elbow located to
18  the front of the subject, did you recognize that
19  restraint as a lateral vascular neck restraint?
20      A.  Yes.
21      Q.  You had been trained in the use of a
22  lateral vascular neck restraint?
23      A.  Yes.
24      Q.  Okay.  Now, do you see the reference at
25  3:01, to Sergeant Crumrine stating, "Put your

1   fucking hands behind your back"?
2           You see that reference?
3       A.  Yes.
4       Q.  Did you hear Officer Crumrine say that?
5       A.  I did not.
6       Q.  Okay.  At 3:13, "Officer Lopera asks,
7   'Is he out yet?'"
8           Did you hear that?
9       A.  No.
10      Q.  At 3:15, "Farmer gasps."
11          Did you hear the subject gasp?
12      A.  No.
13      Q.  At 3:18, "Officer Lopera asked, 'Is he
14  out yet?'"
15          Did you hear that?
16      A.  No.
17      Q.  At 3:19, "Officer Lopera asks, 'Is he
18  out yet?'"
19          Did you hear that?
20      A.  No.
21      Q.  Besides Officer Crumrine, who else, if
22  anybody, was close to the subject and Officer
23  Lopera?  I assume eventually you identified the
24  person that belonged to the elbow as Officer
25  Lopera?

1       A.  Eventually, yes.
2       Q.  Who else besides Officer Crumrine was
3   close to Officer Lopera and the subject?
4       A.  Nobody.
5       Q.  It says, at 3:25, "Officer Tran arrived
6   and said, 'Let him go, Ken.'"
7           Do you remember saying that?
8       A.  No, I did not say that.
9       Q.  You did not say that?
10      A.  I did not say that.
11      Q.  Okay.  And then at 3:26, the person
12  who's listening to the tape says, "Officer Lopera
13  asked, 'Are you sure?'"
14          "And Officer Tran replies, 'Yeah.'"
15          Did you say that?
16      A.  I did not.
17      Q.  Okay.  Did you say -- do you remember
18  Officer Lopera saying, "Are you sure?"
19      A.  I do not.
20      Q.  Okay.  When you saw the person, the
21  subject, and the elbow was in front of him, was he
22  conscious?
23      A.  He was not.
24      Q.  Okay.  Did you say anything to
25  Officer Lopera at any time while he continued to

OFFICER MICHAEL TRAN

December 20, 2017

Page 38

1  maintain the lateral vascular neck restraint?
2      A.   After we took him into custody, I peered
3  down at the subject, and observed that he was out
4  and there was an elbow.  And I stated to
5  Officer Lopera, "Loosen up.  Loosen up.  He is
6  out."  And Officer Lopera released the hold on the
7  subject.
8      Q.   Are you saying that at the moment that
9  you said -- well, I'm saying "moment," but upon
10  your saying "Loosen up.  Loosen up.  He is out,"
11  Officer Lopera released the subject?
12      A.   Yes.
13      Q.   How long after you said that did he
14  release the subject?
15      A.   Immediately.
16      Q.   Okay.  Now, how long did the -- from the
17  time that you saw the subject for the first
18  time -- strike that.
19           From the time that you saw the elbow in
20  front of the subject for the first time,
21  approximately what period of time passed before
22  you said, "Loosen up.  Loosen up.  He is out"?
23      A.   It was immediate.
24      Q.   Immediate.
25           Now, when you've listened to the tape,

Page 39

1  have you heard yourself saying, "Let him go, Ken"?
2      A.   No, I did not say that.
3      Q.   Okay.  So that's -- this person is
4  incorrect when he says that you said, at three
5  minutes and 25 seconds into the tape, "Let him go,
6  Ken"?
7      A.   Yes.  That's incorrect.
8      Q.   Okay.  And then when he reportedly says,
9  "Officer Lopera asks, 'Are you sure,'" and you
10  replied, "Yeah," you're saying that would be -- he
11  would be incorrect in that?
12      A.   That's incorrect.
13      Q.   Okay.  So when you saw him in the --
14  when you saw that there was an elbow around him,
15  around his -- what, it was in front of the throat?
16      A.   Yes.
17      Q.   Okay.  Are you saying that you
18  immediately told him, Officer Lopera, "To loosen
19  up.  Loosen up"?
20      A.   Yes, as soon as I observed the elbow and
21  the subject was not responsive, he looked
22  unconscious, I stated to Lopera to let him go --
23  to loosen up.
24      Q.   Okay.  And Lopera immediately loosened
25  up?

Page 40

1      A.   Yes.
2      Q.   Okay.  So it says here that Lopera
3  released the hold on Farmer at 4 minutes and 11
4  seconds.
5           You see that?
6      A.   Yes.
7      Q.   Okay.  How long did you observe the hold
8  being applied to Mr. Farmer until it was loosened
9  up?
10      A.   From the time I observed the elbow, I
11  immediately stated to Lopera to loosen up, and
12  Lopera immediately released the hold.
13      Q.   Okay.  What period of time transpired
14  from the time where you saw the elbow until Lopera
15  released the person?
16      A.   Three to five seconds.  Three seconds.
17      Q.   When you heard the tape, did -- at any
18  time did you hear Officer Lopera say, "Is he out
19  yet," as this person who has transcribed this says
20  he asks three times?  Did you ever hear him say,
21  "Is he out yet"?
22      A.   No.
23      Q.   The time -- the way this tape reads,
24  that the hold was placed at 2 minutes and 58
25  seconds until 4 minutes and 11 seconds.  That's a

Page 41

1  period of 113 seconds, or, sorry, one minute, 13
2  seconds.
3           You're saying that you saw him in the
4  hold for three to five seconds?
5      A.   Yes.
6      Q.   Okay.  And when you saw him, he was
7  unconscious?
8      A.   Yes.
9      Q.   How long did it take you to handcuff
10  him?
11      A.   20, 30 seconds.
12      Q.   And there was absolutely no resistance
13  from him?
14      A.   I did not observe any resistance.
15      Q.   Did you observe, during that 20 to 30
16  seconds, that he was unconscious?
17      A.   I did not.
18      Q.   Did you observe that he was conscious
19  during that 20 to 30 seconds?
20      A.   I did not.
21      Q.   Did you check to see whether he was
22  conscious or not during that 20 to 30 seconds?
23      A.   No.
24      Q.   Have you and Officer Flores spoken about
25  this since it occurred other than in the presence

OFFICER MICHAEL TRAN

December 20, 2017

Page 42

1  of your attorney?  Do you understand what I'm
2  saying?  In other words, if you had a conversation
3  in front of your attorney X, I'm not permitted to
4  know.  But have you and Officer Flores, your
5  partner, had a conversation about this at any time
6  since this occurred?
7      A.  Yes.
8      Q.  All right.  And what did you talk about?
9      A.  We talked about the incident.
10      Q.  Well, I understand that, but what did
11  you say?
12      A.  I don't recall.
13      Q.  You recall nothing about what you said?
14      A.  We spoke about each other's perspective
15  on the incident and what we both observed.
16      Q.  And what did you tell him?
17      A.  I don't recall.
18      Q.  No recollection at all?  Nothing at all?
19      A.  I -- pretty much everything I've told
20  you.
21      Q.  And what did he tell you?
22      A.  The same thing.
23      Q.  What do you mean, "the same thing"?
24      A.  I don't know -- I can't remember.  I
25  don't -- we're not partners anymore.  We haven't

Page 43

1  been partners for over six months.
2      Q.  Well, did Officer Flores tell you that
3  he saw that Mr. Farmer-Brown was unconscious while
4  you were handcuffing him?
5      A.  He didn't say that, no.
6      Q.  Did he say that he was showing any
7  resistance during the time that you and -- were --
8  you and Officer Flores were handcuffing him?
9      A.  I didn't ask him that, no.  He never
10  stated that to me.
11      Q.  Did he tell you whether or not he saw
12  the lateral vascular neck restraint being applied
13  by Officer -- by Officer Lopera before you did?
14      A.  No.
15      Q.  What did he say about that?
16      A.  Can you clarify the question?
17      Q.  Yeah, sure.
18          You said that you saw the elbow.
19      A.  Correct.
20      Q.  You noticed that Mr. Farmer-Brown was
21  unconscious.  And you told Officer Lopera to
22  loosen, loosen the hold.
23      A.  Yes.
24      Q.  Right.  Did Officer Flores tell you that
25  he heard you say that?

Page 44

1      A.  Yes.
2      Q.  And did he say whether he had seen the
3  hold being applied to -- on Mr. Farmer before you
4  saw the hold being applied?
5      A.  No.
6      Q.  Did he say the first time he saw the
7  hold being applied was when you said loosen it up?
8      A.  Yes.
9      Q.  Did you know Officer Lopera?
10      A.  Yes.
11      Q.  How did you know him?
12      A.  Through -- he -- like I said, he's on
13  the sister squad, so we overlap and work one day
14  together.
15      Q.  All right.  So you had spent time with
16  him together on the job at least on Saturdays?
17      A.  Yes.
18      Q.  Did you know him well enough to call him
19  Ken?
20      A.  I called him Lopera.
21      Q.  You never called him Ken?
22      A.  No.  I didn't know his first name at the
23  time.
24      Q.  How many times do you think you and he
25  worked together on a Saturday?

Page 45

1      A.  I couldn't give you an exact -- I never
2  worked with him personally.  He works the same
3  shift timeframe-wise, and then on that Saturday.
4  But he's not on my squad, so I never worked with
5  him work with him.
6      Q.  All right.  And you mentioned that your
7  times overlapped on Saturdays?
8      A.  Yes.
9      Q.  All right.  How many times did your
10  times overlap on a Saturday together before this
11  occurred?
12      A.  Probably for four months-ish.
13      Q.  Every Saturday?
14      A.  Yes.
15      Q.  Had you ever gone for drinks with him
16  after work?
17      A.  No.
18      Q.  Ever done any socializing with him?
19      A.  No.
20      Q.  Have you and Officer Flores ever
21  socialized together?
22      A.  No.
23      Q.  Ever gone for drinks?
24          (Interruption by telephone.)
25          (Discussion off the record.)

OFFICER MICHAEL TRAN

December 20, 2017

1      MR. SAYRE:  Do you want to take a break?
2      MR. McNUTT:  No.
3  BY MR. SAYRE:
4      Q.  All right.  Do you know how to apply a
5  lateral vascular neck restraint?
6      A.  Yes.
7      Q.  How do you do it?
8      A.  You approach from the rear.  You shoot
9  your -- it doesn't matter.  We learned it both
10 ways.  But you shoot one arm forward, past the
11 subject's head, and then pull the arm back,
12 your -- clasp the arm.  You attempt to place
13 the -- your elbow directly in front of the
14 subject, and then you clasp your rear hand back
15 together.
16      And depending on the level of
17 resistance, you start at zero degrees and move up
18 from there, depending on the subject's actions.
19      Q.  When you say "you start at zero degrees
20 and move up," you're talking about applying more
21 pressure?
22      A.  Correct.
23      Q.  Okay.  And where was the hold at the
24 time that you saw it?
25      A.  The -- on -- that Officer Lopera was

1  applying?
2      Q.  Yeah.
3      A.  It was -- his elbow was directly in
4  front of the subject's throat, neck.
5      Q.  But you said that you could move the
6  hand up depending --
7      A.  Correct.
8      Q.  All right.  And that's what I'm asking
9  about.
10     A.  I don't -- I did not see the rear elbow.
11     Q.  You didn't look at the rear elbow?
12     A.  I did not.
13     Q.  I see.
14     All right.  So do you know what a naked
15 rear choke is?
16     A.  Yes.
17     Q.  How do you know?
18     A.  From watching UFC fights, MMA fights.
19     Q.  Did they train you in -- at the academy
20 or afterwards in what a naked rear choke is?
21     A.  No.
22     Q.  You were not trained in how to get out
23 of a naked rear choke?
24     A.  We were never taught the rear naked
25 choke.

1      Q.  Okay.  And how does the rear naked choke
2  differ, if you know, from a lateral vascular neck
3  restraint?
4      A.  From what I know, the rear hand is
5  placed directly behind the subject's head and
6  clasped together and pushing forward on the
7  subject's head.
8      Q.  Do you know, from your observation,
9  whether this hold was a lateral vascular neck
10 restraint or a rear naked choke?
11     A.  No.
12     Q.  You don't know either way?
13     A.  It appeared to be LVNR.
14     Q.  Why do you say that?
15     A.  Because I observed the elbow in front of
16 the subject's neck.
17     Q.  Well, would it be different with a rear
18 naked choke?  Would the elbow placement be
19 different?
20     A.  It would not.
21     Q.  So why do you think that it looked like
22 it was a lateral vascular neck restraint?
23     A.  Because that's what we're taught in the
24 academy.  I assume that Lopera would use an LVNR.
25     Q.  Okay.  So you don't know because you

1  didn't look at the back end, is that what you're
2  telling me?
3      A.  Correct.
4      Q.  So it could have been a rear naked
5  choke?
6      A.  It could have.  Could have.
7      Q.  Okay.  Did you see -- in the tase -- in
8  the video that you observed, did you see that
9  Officer Lopera tased Mr. Farmer-Brown multiple
10 times?
11     A.  Yes.
12     Q.  Do you know how many times?
13     A.  I don't recall.
14     Q.  Was it more than three?
15     A.  Yes.
16     Q.  And that's out of policy; correct?
17     A.  Yes.
18     Q.  The Metropolitan Police Department only
19 allows you to tase three times, and then
20 discontinue the use of the taser?
21     A.  Yes.  Correct.
22     Q.  So Officer Lopera was out of policy when
23 he tased -- if he tased him as many as seven
24 times?
25     A.  Yes.

OFFICER MICHAEL TRAN

December 20, 2017

Page 50

1    Q.   Now, you're only allowed to use the
2 five-second cycle when you tase; correct?
3    A.   Yes.
4    Q.   All right.  That's how you've been
5 trained?
6    A.   Yes.
7    Q.   And if Officer Lopera used a nine-second
8 cycle on his last tasing, that would be outside of
9 policy?
10    A.   Yes.
11    Q.   And "outside of policy" means
12 unreasonable; correct?
13       MR. ANDERSON:  Objection.  Form.
14       Go ahead and answer.
15       THE WITNESS:  Yes.
16 BY MR. SAYRE:
17    Q.   Now, did you see -- in looking at the
18 video, either video, did you see Officer Lopera
19 striking Mr. Brown in the head?
20    A.   Yes.
21    Q.   How many times?
22    A.   I don't recall.
23    Q.   Do you remember it was, like, 10 to 12
24 times?
25    A.   I wasn't counting.

Page 51

1    Q.   Okay.  From your training, was he
2 justified in striking him in the head?
3    A.   I wasn't there at the time of -- based
4 on the facts and circumstances that Lopera had, I
5 wasn't there to determine that.
6    Q.   Well, but you saw the video.
7    A.   So are you asking me to answer based on
8 what I saw in the video?
9    Q.   I am.
10    A.   I don't know what Lopera was feeling at
11 the time, but based on the video, no.
12    Q.   All right.  Now, striking someone in the
13 head is potentially deadly force; correct?
14       MR. ANDERSON:  Objection.  Form.
15       Answer.
16       THE WITNESS:  I suppose.
17 BY MR. SAYRE:
18    Q.   And you're not allowed to strike people
19 in the head with your fist unless you're faced
20 with deadly force; right?
21       MR. ANDERSON:  Objection.  Form.
22       Go ahead.
23 BY MR. SAYRE:
24    Q.   That's how you've been trained?
25    A.   No, it doesn't -- does not have to be

Page 52

1 deadly force.
2    Q.   Okay.
3    A.   If the subject's -- displays an attempt
4 to do harm on an officer or another, we may use
5 empty hand strikes or strikes to the subject.
6    Q.   When you were present there and
7 handcuffing Mr. Farmer-Brown, did you at any time
8 see Officer Lopera strike him in the head?
9    A.   No.
10    Q.   Did you at any time see him tase him?
11    A.   No.
12    Q.   Do you understand as an officer of the
13 Metropolitan Police Department, that once a person
14 is rendered unconscious by any kind of a choke
15 hold, whether it be lateral vascular neck
16 restraint or any other, that you're required to
17 discontinue the hold?
18    A.   Yes.
19    Q.   And to not fail to discontinue the hold
20 is excessive force?
21       MR. ANDERSON:  Objection.  Form.
22       Go ahead.
23       THE WITNESS:  Yes.
24 BY MR. SAYRE:
25    Q.   And an officer like yourself, who sees a

Page 53

1 person unconscious and still in a lateral vascular
2 neck restraint or any other choke hold, is
3 required by your training to intervene; correct?
4    A.   Yes.
5    Q.   And what are you supposed to do when
6 that happens, if you see that happening?
7    A.   When it's safe to do so, intervene and
8 stop the officer from doing --
9    Q.   Okay.  Now, if this is correct, that at
10 3 minutes and 25 seconds, you said, "Let him go,
11 Ken," and Officer Lopera continued to hold onto
12 him for 47 more seconds in that hold, with him
13 unconscious, you would have failed in your duty as
14 an officer to intervene; correct?
15       MR. ANDERSON:  Objection.  Form.
16       THE WITNESS:  I didn't -- I did not say,
17 "Let him go, Ken."
18 BY MR. SAYRE:
19    Q.   Okay.  Well, if -- if you saw him
20 unconscious at 3 minutes and 25 seconds, and
21 Officer Lopera continued for another 47 seconds to
22 continue that hold on him, would you have been
23 required to intervene and stop Officer Lopera from
24 applying that hold?
25       MR. ANDERSON:  Same objection.

OFFICER MICHAEL TRAN

December 20, 2017

Page 54

1        THE WITNESS:  If I -- if I observed
2   Lopera holding the subject and he was already out,
3   I would intervene and tell him to let go of the
4   hold.
5   BY MR. SAYRE:
6        Q.   Okay.  Now, on the tape do you hear
7   yourself saying, "Loosen up, Ken" or "Loosen up.
8   He's out"?
9        A.   Yes.
10       Q.   Now, during the time that you were
11  handcuffing Mr. Farmer-Brown, was Sergeant
12  Crumrine still down by the feet?
13       A.   Yes.
14       Q.   Did he ever leave that position until
15  after Officer Lopera released the hold?
16       A.   No.
17       Q.   After Officer Lopera released the hold,
18  what did you do?
19       A.   We --
20       Q.   Not we.  You.  What did you do?
21       A.   I recall checking to see if the subject
22  was conscious or not.  I did a sternal rub, to see
23  if he had any reaction to the sternal rub.  Then I
24  checked for a pulse.
25       Q.   Anything else?

Page 55

1        A.   I did not find a pulse, so I sat up
2   Mr. Farmer and began lower back taps to see if I
3   can get him to start breathing again.
4            I radioed for dispatch to roll medical.
5        Q.   All right.  Let's take -- the first
6   thing is how did you check to see if he was
7   conscious or not?
8        A.   I did -- I conducted the sternal rubs on
9   the subject.
10       Q.   That's how you checked to see whether he
11  was conscious?
12       A.   It's -- it's a -- it's a way to see if
13  they can feel -- if they feel the pain, then most
14  of the times they'll -- they'll react to it.
15       Q.   But I'm trying to understand, because
16  you had said first you -- you checked to see if he
17  was conscious, then you conducted the sternal rub.
18           Was that one and the same thing?
19       A.   That's my method of checking to see if
20  he was conscious.
21       Q.   Tell me how you did that.
22       A.   I used my -- I guess, my index knuckle
23  and placed it on his chest and just pressed down
24  on it to see if he felt any pain or a reaction
25  from it.

Page 56

1        Q.   And did he react?
2        A.   He did not.
3        Q.   And how long did the sternal rub last?
4        A.   Two seconds.  It's a quick -- it's a
5   quick check.
6        Q.   Then you said you checked for a pulse?
7        A.   Correct.
8        Q.   How did you do that?
9        A.   I put my fingers underneath his, I
10  guess, neck or on his neck, on his right side.
11       Q.   And you didn't feel a pulse, I take it?
12       A.   I did not.
13       Q.   How long did you hold your fingers
14  there?
15       A.   Five seconds.
16       Q.   Okay.  And then you -- you sat him up?
17       A.   Correct.
18       Q.   And then what did you do?
19       A.   I made a -- with my hand I did some palm
20  strikes on the -- on his lower back.
21       Q.   How many?
22       A.   Three.
23       Q.   And what was the purpose of that?
24       A.   It's a -- we were taught in the academy,
25  if you render a subject unconscious, that you

Page 57

1   deliver some lower back taps to get the person to
2   start -- or wake up, get some blood flow or
3   breathing to start again.
4        Q.   All right.  And how long did that take?
5        A.   Three seconds.
6        Q.   So in a period of 10 seconds you did a
7   sternal rub, you checked for a pulse, and you hit
8   his back three times in the lower back?
9        A.   Yes.
10       Q.   Pretty fast.
11           During this time, what was
12  Officer Lopera doing?
13       A.   I did not see him.
14       Q.   Was he -- was he near Mr. Farmer-Brown?
15       A.   I don't recall.
16       Q.   Did he check to see if he was conscious?
17       A.   No.
18       Q.   Did he check to see if he had a pulse?
19       A.   No.
20       Q.   Did he sit him up and tap his back to
21  see if he could arouse him?
22       A.   No.
23       Q.   And did you conduct any -- after you had
24  done this, you said you called dispatch and asked
25  them to roll an ambulance?

OFFICER MICHAEL TRAN

December 20, 2017

Page 58

1    A.   Yes.
2    Q.   All right.  How long did it take to get
3  an ambulance there?
4    A.   I don't recall.
5    Q.   Estimate.
6    A.   Three minutes.
7    Q.   Pretty fast.
8    A.   Three to five.  I don't know.
9    Q.   Okay.  So -- and during this time, while
10  you were waiting for the ambulance, did you
11  conduct cardiopulmonary resuscitation?
12    A.   I did not.
13    Q.   Why not?
14    A.   Another officer that arrived began CPR.
15    Q.   And who was that?
16    A.   Officer -- I don't know how to spell his
17  last name -- Amburgey.
18    Q.   Okay.  And Officer Lopera, where is he?
19    A.   I don't know.
20    Q.   Did you ever look to see where he went?
21    A.   No.
22    Q.   Did you hear him talking?
23    A.   I do recall -- I don't know who he was
24  talking to, but I do recall him saying that the
25  subject was trying to carjack somebody.

Page 59

1    Q.   Did you see whether he was addressing
2  Sergeant Crumrine?
3    A.   I did not see who he was talking to.
4    Q.   While you were doing the various things
5  to try to determine the consciousness of
6  Mr. Farmer-Brown, where was Officer Crumrine?
7    A.   I don't know.
8    Q.   Where was Officer Flores?
9    A.   He was -- he was next to me.  I don't
10  know if he was directly next to me, but I know he
11  was around.
12    Q.   I'm sorry.  I may have asked you this
13  before.
14        What's Officer Flores's first name?
15    A.   Michael.
16    Q.   And you said that you and he are no
17  longer partners?
18    A.   That's correct.
19    Q.   When did you stop being partners?
20    A.   Either in June or July.
21    Q.   And why was that?  Just different
22  assignment or what?
23    A.   I transferred to a different squad,
24  different shift.
25    Q.   Okay.  And where is Officer Flores?

Page 60

1    A.   He's a -- he transferred to day shift.
2    Q.   Day shift on the Strip?
3    A.   Correct.  Same -- same station.
4    Q.   Did you -- you looked through the
5  entirety of the video.
6        Did you see any attempts being made by
7  Tashi Farmer-Brown to carjack a vehicle?
8        MR. ANDERSON:  Can I just object on
9  foundation?  Did we establish he watched all the
10  video?  I apologize.
11        MR. SAYRE:  He said -- I went through
12  both of them.  He said he had watched both.  He
13  also said he watched them sync'd, as I recall.
14        THE WITNESS:  I'm sorry.  What was the
15  question?
16  BY MR. SAYRE:
17    Q.   The question was in looking at the
18  videos, either one or both together, did you see
19  any attempt made by Tashi Farmer-Brown to hijack a
20  vehicle?
21    A.   In the video, he approached a white
22  pickup truck.  But through -- based on the video,
23  I did not see him attempt to hijack a vehicle.
24    Q.   All right.  Did you read the report, the
25  arrest report?

Page 61

1    A.   This one in front of me?
2    Q.   Yeah.
3    A.   I just briefly skimmed through it when
4  it first came out.
5    Q.   Did you see that the person who was
6  driving the truck was interviewed?
7    A.   In this report?
8    Q.   Yeah.
9    A.   I don't recall, no.
10    Q.   It's on page 2 of 8.
11    A.   208?
12    Q.   2 of 8.
13        MR. ANDERSON:  6 is the bottom.
14        THE WITNESS:  Okay.  No.
15  BY MR. SAYRE:
16    Q.   So you didn't read him say that he
17  didn't think there was -- anybody was trying to
18  carjack his vehicle?
19    A.   No, I did not.
20    Q.   Did you read where the officer said if
21  he had -- Mr. Farmer-Brown had survived, he would
22  not have been facing any charges for carjacking?
23    A.   No.
24    Q.   Now, let's look at page 2 of 8.  Okay.
25  It says at 0434 hours, which is 4:34 a.m., I

OFFICER MICHAEL TRAN

December 20, 2017

Page 62

1  assume, Officer Tran was interviewed by
2  detectives.
3       Do you recall that?
4       A.  Yes, I remember the interview.
5       Q.  Okay.  Where did the interview take
6  place?
7       A.  Maybe a hundred feet away from the
8  scene, in the Metro vehicle.
9       Q.  Was it recorded?
10      A.  Yes.
11      Q.  Do you know who the two detectives were
12  or whether -- assuming there were two?
13      A.  No.
14      Q.  Did you know either detective?
15      A.  No.  I know I had my union rep with me.
16      Q.  Okay.  What's his name?
17      A.  I'm trying to -- I don't know.
18      Q.  Okay.  Then it says -- this is a summary
19  of the interview.
20      "When he arrived to the rear of the
21  Venetian, Officer Tran observed an LVMPD vehicle
22  in the street and an officer in a green uniform,
23  with a suspect on the ground."
24      That's what you've told us previously;
25  right?

Page 63

1       A.  Yes.
2       Q.  "When he exited his vehicle and
3  approached it, it appeared the officer had the
4  suspect in the LVNR and handcuffed in one hand."
5       Now, is that what you told them, that he
6  appeared to have them -- him in an LVNR?
7       A.  Yes.
8       Q.  Okay.  And why did you say that?
9       A.  Because after we took him into custody,
10  I saw the elbow and assumed the subject was in the
11  LVNR.
12      Q.  Okay.  And then it says -- and it says
13  that the officer had a handcuffed in one hand.
14      A.  The officer had a handcuff in one hand?
15      Q.  Seems to be.
16      Are you saying that the suspect had a
17  handcuff in one hand?
18      A.  Correct.  He had a handcuff on his left
19  hand.
20      Q.  Oh, okay.  So the suspect had a handcuff
21  on one hand, his left hand?
22      A.  Yes.
23      Q.  All right.  And that was the hand that
24  was behind his back?
25      A.  Yes.

Page 64

1       Q.  So all you had to do was hook up the
2  other hand?
3       A.  Yes.
4       Q.  The other arm, rather.  Okay.
5       Then it says, "When he looked at the
6  suspect, he appeared to be unconscious"; right?
7       A.  Yes.
8       Q.  Doesn't say anything about you
9  handcuffing him and then looking at him.  What it
10  says is you came up.  He appeared to be
11  unconscious.
12      A.  Yes.
13      Q.  "Officer Tran told Lopera to let go."
14      Now, you've denied saying that; right?
15      A.  Yes.
16      Q.  So is this officer being untruthful with
17  what he says you said?
18      MR. ANDERSON:  Objection.  Form.
19      THE WITNESS:  I told -- I told the
20  detective, I said, "Loosen up."  I never said,
21  "Let go."
22  BY MR. SAYRE:
23      Q.  Okay.  Now, over here on 3:25, on
24  page 000009, the officer who listened to the tape
25  says, "Officer Tran arrived and said, 'Let him go,

Page 65

1  Ken.'"
2       You've denied that he said that -- that
3  you said that?
4       A.  I did not say that.
5       Q.  Have you listened to a tape of your
6  interview?
7       A.  No.
8       Q.  But you've listened to the two tapes,
9  the sync'd tapes?
10      A.  I watched the videos.
11      Q.  Video.  Have you listened to the audio?
12      A.  It was playing while the video was
13  playing.
14      Q.  And you're saying you never heard the
15  audio say, "Let him go"?
16      A.  I heard the -- I heard that statement,
17  but it was not me that said it.
18      Q.  Okay.  Who said it?
19      A.  I'm assuming it was Sergeant Crumrine
20  that said it.
21      Q.  Did you -- did you hear him say, "Let
22  him go, Ken"?
23      A.  I only heard all the statements on the
24  video.  The statements were said prior to my
25  arrival.  After I arrived, I didn't hear any

OFFICER MICHAEL TRAN

December 20, 2017

Page 66

1  statements.
2      Q.   Okay.  But you heard on the video a
3  statement by somebody saying, "Let him go, Ken"?
4      A.   Yes.
5      Q.   And you believe that that was Officer
6  Crumrine?
7      A.   Yes.
8      Q.   Not you?
9      A.   It was not me.
10      Q.   Now, after Officer Crumrine said, "Let
11  him go, Ken," is that when you went about
12  handcuffing him?
13      A.   I don't know.
14      Q.   You don't know whether you heard that
15  and then you started handcuffing him?
16      A.   The statements were said before I
17  arrived.  I don't --
18      Q.   Okay.
19      A.   I didn't hear any statements when I
20  arrived.
21      Q.   So when you arrived, you didn't hear any
22  statement?
23      A.   I did not.
24      Q.   Did you ever talk to Officer Flores
25  about having heard on the tape Officer Crumrine

Page 67

1  saying, "Let him go, Ken"?
2      A.   I don't recall.
3      Q.   It says, "When Officer Lopera loosened
4  up on the LVNR, the suspect was able to be placed
5  in handcuffs."
6          So to the detectives you said you placed
7  him in handcuffs after the LVNR was loosened up.
8      A.   That's correct.  After reviewing the
9  videos -- this interview was immediately that
10  night.  After reviewing the videos, I determined
11  that my recollection of the events were different.
12          That night I thought that since we
13  couldn't get the left arm out, that I looked down
14  and observed Farmer unconscious, and I stated to
15  him loosen up.  That's when I was able to handcuff
16  his arms.
17          But after reviewing the tapes or the
18  video, it was the opposite.  We handcuffed him
19  first, and then I told him to loosen up.
20      Q.   When you listened to the video, could
21  you hear you saying, "Loosen up"?
22      A.   Yes.
23      Q.   Okay.  And that was just before he
24  actually loosened up the -- the hold?
25      A.   Yes.

Page 68

1      Q.   When you listened to the tape, from the
2  time that you heard Crumrine say, "Let him go,
3  Ken," to the time that you said "loosen up," how
4  much time passed?
5      A.   I don't know.
6      Q.   Well, here it says that you -- maybe
7  they're wrong, but it says that you said, at 3
8  minutes and 25 seconds, "Let him go, Ken."
9          Let's assume that that -- from what you
10  say, that that was Crumrine.  And then it's
11  another 47 seconds before Lopera releases the
12  hold.
13          Are you saying you told Lopera, just
14  before he released the hold, "Loosen up, Ken"?
15      A.   That's correct.
16      Q.   Okay.  So it would be more like 40-some
17  seconds from the time that Crumrine says, "Let him
18  go, Ken," to when you say loosen up the hold;
19  right?
20      A.   Yes.
21      Q.   Did you hear Crumrine, in the video,
22  saying, "Let him go, Ken"?
23      A.   In the video, yes.
24      Q.   And did you hear Lopera saying, "Are you
25  sure?"

Page 69

1      A.   Yes.
2      Q.   And did you hear Crumrine saying,
3  "Yeah"?
4      A.   I don't recall that.
5      Q.   But you remember Lopera immediately,
6  after Crumrine said, "Let him go, Ken," saying,
7  "Are you sure?"
8      A.   Yes.
9      Q.   But you don't remember hearing a
10  response?
11      A.   Not from the video.  I haven't seen the
12  video in a while.
13      Q.   Okay.  It then says, at 3:27, "Roll him
14  to -- hold on.  Don't grab my fucking legs."
15          Did you hear him say that?
16      A.   Yes, I heard -- I heard Lopera say,
17  "Don't grab my fucking legs."
18      Q.   And who was grabbing his fucking legs?
19      A.   I don't -- it was either myself or
20  Officer Flores, but I don't recall.
21      Q.   Okay.  And then it says, "Officer Tran
22  stated, 'We're on top of him.'"
23          Did you state that?
24      A.   I don't recall stating that.
25      Q.   Did you hear it?

OFFICER MICHAEL TRAN

December 20, 2017

Page 70

1    A.   On the video, I don't recall, no.
2    Q.   Okay.  And then it says, at 3:00,
3  "Officer Lopera stated, 'Roll him to the other
4  side.  Get the other arm, too.'"
5        Sounds like you're trying to handcuff
6  him.
7    A.   Correct.
8    Q.   And do you remember Officer Lopera
9  saying that?
10   A.   I don't.
11   Q.   Do you remember hearing it on the tape?
12   A.   I don't.
13   Q.   3:36, "Officer Lopera placed the palm of
14  his hand on Farmer's forehead."
15       Did you see that happen?
16   A.   No.
17   Q.   Did you see it on the tape?
18   A.   I don't recall now.
19   Q.   Okay.  Officer -- at 3:38,
20  "Officer Lopera asked, 'You got the other one?'"
21       You remember him saying that?
22   A.   No.
23   Q.   Do you remember that he was trying to
24  help you with the handcuffing of Mr. Farmer-Brown?
25   A.   Yes.

Page 71

1    Q.   So you were there during this time when
2  Mr. Farmer-Brown is unconscious?
3    A.   Yes.
4    Q.   And it says, at 3:50, "Farmer gasps."
5        Did you hear him gasp?
6    A.   No.
7    Q.   And then at 4:11, "Lopera released the
8  hold on Farmer."
9        You were there when that happened?
10   A.   Yes.
11   Q.   Then it says, at 4:17, six seconds
12  later, "Lopera stated he tried to carjack
13  somebody."
14       Did you hear Lopera say that?
15   A.   Yes.
16   Q.   Where was he located when he said that?
17   A.   I don't recall.
18   Q.   Is it fair to say that Officer Lopera,
19  once he released the hold, did nothing further to
20  try to determine the medical condition of
21  Tashi Farmer-Brown?
22       MR. McNUTT:  Objection.  Form.
23       THE WITNESS:  I wasn't focused on
24  Lopera, but I don't recall him doing anything.
25

Page 72

1  BY MR. SAYRE:
2    Q.   You didn't see him approach
3  Mr. Farmer-Brown after he released the hold?
4    A.   I don't recall that.
5    Q.   You didn't see him attempt to determine
6  whether he had a pulse?
7    A.   No.
8    Q.   You didn't see him attempt to do any
9  resuscitation?
10   A.   No.
11   Q.   Then it says, at 4 minutes and 36
12  seconds, "Officer Lopera stated, 'I tased him.'"
13       Did you hear him say that?
14   A.   No.
15   Q.   Then at 4:38, "Officer Lopera stated,
16  'Roll medical.'"
17   A.   I didn't hear him say that.
18   Q.   Okay.  You didn't rolled medical yet at
19  that point, had you?  You hadn't asked for it to
20  be rolled?
21   A.   I don't know the exact timeframe, but I
22  cleared -- I cleared the red, which is -- it opens
23  up the channel.
24   Q.   Right.
25   A.   And I said, "Roll medical."  But I don't

Page 73

1  recall what timeframe or when -- when that was.
2    Q.   Okay.
3    A.   It was immediately after the incident,
4  after taking him into custody.
5    Q.   Now, do you hear -- there's this
6  sequence here at 5 minutes 3 seconds.  "Sergeant
7  Crumrine approached Officer Lopera.
8  Officer Lopera told Sergeant Crumrine he was
9  getting coffee when he was approached by a guy who
10  said someone was following him.  Officer Lopera
11  then stated the male ran away from the officers
12  and outside the hotel.  As Officer Lopera was
13  chasing the male, he attempted to gain access into
14  the bed of a truck, at which time Officer Lopera
15  tased him.  Farmer attempted to pull the ECD wires
16  out, and Lopera said, 'I choked him out.'"
17       Did you hear that conversation?
18   A.   No.
19   Q.   Did you hear it when you listened to the
20  tape?
21   A.   I do recall a statement similar.
22   Q.   Did it sound like Officer Lopera was --
23  was being boastful about having choked him out?
24       MR. McNUTT:  Objection.  Form.
25       THE WITNESS:  Boastful?

OFFICER MICHAEL TRAN

December 20, 2017

Page 74

1  BY MR. SAYRE:
2      Q.  Yeah.  He was proud --
3      A.  Like he was proud of it?
4      Q.  Yeah.
5      A.  No.
6      Q.  Take a look at page 000010.  It says, at
7  6:38, "Officer Lopera told Officer Flores and
8  Ribacky what happened."
9          Now, Flores is your partner --
10     A.  Correct.
11     Q.  -- right?
12         That was the only Flores there that
13 night?
14     A.  Yes.
15     Q.  Who is Ribacky, do you know?
16     A.  He's another officer that was on our
17 squad.
18     Q.  Okay.  Do you know when he arrived at
19 the scene?
20     A.  I do not.
21     Q.  "During the conversation, he stated, 'I
22 start whaling on the dude, and then I rear-mounted
23 and choked him out.'"
24         Did you hear Lopera say that?
25     A.  No.

Page 75

1      Q.  Okay.  At 7:41, "Officer Lopera tells
2  another officer, 'I tased him, fought a little
3  bit, and choked him out.'"
4          Did you hear him say that?
5      A.  No.
6      Q.  Did you ever see Mr. Farmer-Brown
7  fighting?
8      A.  I did not see any resistance.
9      Q.  Okay.  Including when you looked at the
10 tape, you didn't see him fighting?
11         MR. McNUTT:  Objection.  Form.
12 BY MR. SAYRE:
13     Q.  Did you see any fighting?
14     A.  He wasn't complying to officers'
15 commands.
16     Q.  I understand.
17         But did you see him fighting?
18         MR. McNUTT:  Objection.  Form.
19         THE WITNESS:  I don't recall.
20 BY MR. SAYRE:
21     Q.  He kept saying, "I will, I will," almost
22 crying; right?
23         MR. ANDERSON:  Objection.  Form.
24         MR. McNUTT:  Join.
25         THE WITNESS:  Yes, I recall that.

Page 76

1  BY MR. SAYRE:
2      Q.  Okay.  All right.  Then at 9:34, "Lopera
3  talked to Officer Leaf."
4          Is that spelled "Leaf" again?
5          MR. ANDERSON:  Is it Lif?
6          THE WITNESS:  Lif.
7  BY MR. SAYRE:
8      Q.  "During the conversation, Officer Lopera
9  told her, 'I start punching him, rear nakeded his
10 ass. He went out.'"
11         Did you hear that conversation?
12     A.  No.
13     Q.  Okay.  At 11:25, "Officer Rybacki
14 approached Officers Tran and Flores.  One of the
15 officers stated, 'He was out when we got here,'
16 referring to Farmer.  Rybacki responded, 'Oh, he
17 was definitely on something.'"
18         Now, do you remember having the
19 conversation with Rybacki?
20     A.  I remember that specific moment, yes.  I
21 remember Rybacki and Flores.
22     Q.  Rybacki and Flores?
23     A.  Yes.
24     Q.  Is it Flores who said, "He was out when
25 we got here?"

Page 77

1      A.  I don't know.  I didn't --
2      Q.  You didn't say it?
3      A.  I didn't say it, no.
4      Q.  Do you remember Flores saying it?
5      A.  I don't recall.  I know it was said.
6      Q.  Well, there was only you and Flores
7  talking to Rybacki.
8      A.  Correct.  Yes.
9      Q.  So if it wasn't you --
10     A.  It was probably Flores.
11     Q.  All right.  During the time -- from the
12 time that you got there until the time that -- I
13 assume Officer Flores got there the same time you
14 did --
15     A.  Yes.
16     Q.  -- correct?
17         From the time that you got there until
18 the time that Officer Lopera released the hold,
19 did Flores do anything whatsoever to intervene?
20     A.  No.  We were trying to take him into
21 custody.
22     Q.  Right.  During the time from the time
23 that you got there until the time that Lopera
24 released the hold, did you see Sergeant Crumrine
25 do anything to intervene?

OFFICER MICHAEL TRAN

December 20, 2017

Page 78

1    A.   No.
2    Q.   All right.   Now, take a look at --
3  further on page 6 of 8.   It says that this officer
4  viewed the footage from the Venetian Hotel.   And
5  it says, at 56:40, "Officer Lopera holstered his
6  ECD."
7         And then from 56:40 to 57:03, that's a
8  period of 23 seconds, "Lopera struck Farmer in the
9  head approximately 10 to 12 times."
10        Did you see that on the tape?
11   A.   Yes.
12   Q.   Was there any justification for that
13  occurring?
14        MR. ANDERSON:   Objection.   Form.
15        Go ahead.   Based upon what he saw?
16        MR. SAYRE:   Right.   He saw.
17        THE WITNESS:   Based on the video, no.
18  BY MR. SAYRE:
19   Q.   Okay.   Now, he says, when he looks at
20  the video from the Venetian -- or actually from
21  the sync'd videos, he says that at 57:30, "Officer
22  Tran told Officer Lopera to let go of Farmer."
23        You deny that you said that?
24   A.   I don't know what timeframe it was.   I
25  didn't -- my statement was not "Let go."   My

Page 79

1  statement was, "Loosen up.   Loosen up.   He is
2  out."
3    Q.   Okay.
4    A.   So I don't know what he's referring to,
5  the detective in this.
6    Q.   And then it says, at 58:16, 46 seconds
7  later, after you said whatever you said to Lopera,
8  "Officer Lopera released Farmer."
9         You see that?
10   A.   Yes.
11   Q.   Is that the correct period of time
12  that -- after you told him to loosen up, or
13  whatever you told him, did 46 seconds pass before
14  Lopera actually released the hold?
15        MR. McNUTT:   Objection.   Form.
16        THE WITNESS:   No.   That's incorrect.
17  After I stated to Lopera he was out --
18        MR. SAYRE:   Okay.
19        THE WITNESS:   -- Lopera immediately
20  released the hold.
21        MR. SAYRE:   All right.
22        MR. McNUTT:   Fred, maybe at 1130-ish,
23  we'll take a break?
24        MR. SAYRE:   Yeah.   Yeah.   I'm almost
25  done, but I can take a break, too.

Page 80

1         MR. ANDERSON:   Well, then if that's the
2  case --
3         MR. SAYRE:   I can take a break too.
4         MR. ANDERSON:   No.   Carry on.
5         MR. SAYRE:   All right.
6    Q.   All right.   Now, from the time that you
7  heard Crumrine say, "Let him go, Ken," until
8  Officer Lopera released Farmer, was that
9  approximately 46 seconds?
10   A.   Are you referring to the video?
11   Q.   Yes, sir.
12   A.   I -- I don't know.
13   Q.   Is that your best estimate?
14   A.   I would say 30 seconds, yeah.
15   Q.   Okay.   And you didn't see in that 30
16  seconds Officer Crumrine do anything to intervene
17  with Officer Lopera?
18   A.   No.
19        MR. SAYRE:   Why don't we take a break.
20  I may be done.   I just have to look over a couple
21  things.
22        THE VIDEOGRAPHER:   Half an hour is okay
23  to leave the video on, or should I change the
24  video, Counsel?
25        MR. SAYRE:   No.   Half an hour will be

Page 81

1  good.   I won't need that.
2         THE VIDEOGRAPHER:   Okay.   We are off the
3  record at 11:26 a.m.
4         (Whereupon, a recess was taken.)
5         THE VIDEOGRAPHER:   Back on the record.
6  The time is 11:31 a.m.
7  BY MR. SAYRE:
8    Q.   Part of the training, or at least the
9  way I read it in the manual, says that the
10  Metropolitan Police Department trains its officers
11  how to escape from a rear naked choke.
12        Did you get that training?
13   A.   Yes.
14   Q.   Okay.   Well, so you have to know how a
15  rear naked choke is applied, presumably, in order
16  to be able to escape from it; right?
17        MR. McNUTT:   Objection.   Form.
18        THE WITNESS:   Not necessarily.   We know
19  how the LVNR is applied, and we're taught how to
20  fight off the first -- the front arm.
21  BY MR. SAYRE:
22   Q.   Okay.   So in a rear naked choke, is it
23  the same type of maneuver, you fight off the first
24  arm?
25   A.   In the academy, we called it headlock

OFFICER MICHAEL TRAN

December 20, 2017

Page 82

1  defense, not necessarily LVNR defense or rear
2  naked choke defense.  But we do -- we do try to
3  fight off that first initial encircling arm.
4      Q.  Okay.  Did you ever have a conversation
5  with Officer Flores about whether or not the hold
6  that Officer Lopera had around the neck of
7  Mr. Farmer-Brown was a lateral vascular neck
8  restraint or a rear naked choke hold?
9      A.  We both agreed that we didn't know what
10  it was.
11      Q.  Okay.  You said that you did not see
12  where -- tell me again.
13          How much of the hold did you see?
14      A.  I saw the -- the -- Lopera's elbow
15  around Farmer's neck, and his -- the point of
16  Lopera's elbow was directly in front of his
17  throat.
18      Q.  Right.  So as to not put pressure on the
19  trachea --
20      A.  Correct.
21      Q.  -- right?
22          And then where were the hands or the
23  rest of the arm?
24      A.  I did not see that part.
25      Q.  Okay.  Now, the LVNR requires that the

Page 83

1  point of the elbow be in front of the throat so
2  it's not an air choke?
3      A.  Correct.  Right.
4      Q.  But then you have to have the arm
5  alongside the neck; correct?
6      A.  The side of the neck.
7      Q.  Right.  The -- so that it puts pressure
8  on the nerves in the side of the neck, right?
9      A.  The carotid artery.
10      Q.  The carotid, vagus.  It is a blood
11  choke, right?
12      A.  Correct.
13      Q.  But you're not supposed to -- in an
14  LVNR, you're not supposed to put pressure on the
15  back of the neck?
16      A.  No.
17      Q.  Do you know why?
18      A.  Injury to the neck or spine.
19      Q.  Well, what they say is that 20 percent
20  of the blood going to the brain goes up through
21  the vertebral area.  So you still have blood going
22  to the brain.
23          So the difference is if you put the
24  pressure on the rear, then that's -- that's the
25  naked rear choke, because then you're cutting off

Page 84

1  close to 100 percent of the blood.
2      Q.  Do you know that?
3      A.  I do not.
4          MR. ANDERSON:  Objection.  Form.
5  BY MR. SAYRE:
6      Q.  Have you ever had the lateral vascular
7  neck restraint applied to you?
8      A.  Yes.
9      Q.  Did you go unconscious?
10      A.  No.
11      Q.  Did you tap out?
12      A.  We were in training.  No.
13      Q.  The -- there has been a change in the
14  policy of the police department regarding the use
15  of the lateral vascular neck restraint.
16          Have you been trained in that?
17      A.  Yes.
18      Q.  And what have you been trained?
19      A.  We were -- the use of force model was
20  updated, where the LVNR level 1 has moved from a
21  low-level control to an intermediate use of force.
22      Q.  And what has happened, if anything, with
23  regard to the LVNR level 2?
24      A.  I believe it's remained the same.
25      Q.  And how about LVNR level 3?

Page 85

1      A.  It's still remained the same.
2      Q.  And what is the LVNR level 3 level as
3  far as the use of force?
4      A.  It's intermediate use of force or deadly
5  force.
6      Q.  Okay.  So it could be either
7  intermediate use of force or deadly force.
8          What's the difference between the LVNR
9  level 1 and the LVNR level 2?
10      A.  The level 1 is a zero-degree hold, where
11  you're just restraining the subject.  As you go up
12  in levels, you're applying more pressure and the
13  angle of the LVNR.
14      Q.  Well, what's the angle that it becomes
15  in LVNR 2?
16      A.  20 degrees.
17      Q.  And how do you effectively do a
18  20-degree angle?
19      A.  You -- are you asking how do you bring
20  it to a 20-degree?
21      Q.  Yeah.
22      A.  Your rear arm is lifted 20 degrees.
23      Q.  Now, you can't do that with any
24  mathematical precision; right?
25      A.  No, I suppose not.

OFFICER MICHAEL TRAN

December 20, 2017

1    Q.   So it's just kind of an estimate?
2    A.   Yes.
3    Q.   All right.  And then to go from an LVNR
4  2 to an LVNR 3, what's that difference?
5    A.   That's a -- level 3 is a 45-degree.
6    Q.   Okay.  And, again, you have to lift your
7  arm so it's at a 45-degree angle?
8    A.   Correct.
9    Q.   And, again, there's no mathematical
10  precision about that; right?
11   A.   Half of 90 degrees.
12   Q.   Right.  But it's just an estimate on the
13  part of the officer?
14   A.   Yes.
15   Q.   Are you given any training on how to
16  determine what the difference is between an LVNR 2
17  and an LVNR 3?
18   A.   Yes.
19   Q.   What's that?
20   A.   In the academy, we practiced all the
21  angles.  I don't know the amount of hours, but we
22  went through all the levels.
23   Q.   All right.  How many hours did you train
24  on the LVNR?
25   A.   I don't know.  If I had to estimate, at

1  least 40 hours -- 30, 40 hours.
2    Q.   Okay.
3    A.   It was a lot of hours.
4    Q.   And have you had to recertify or retrain
5  on a yearly basis?
6    A.   Yes.
7    Q.   How many hours?
8    A.   Two hours this year.
9    Q.   When did those occur?
10   A.   Our defensive tactics, our quarterly.
11  So I don't know.  I couldn't tell you.
12   Q.   When is the last time that you certified
13  on the LVNR prior to May of 2017?
14   A.   Certified?
15   Q.   Retrained.
16   A.   I don't recall.  Every quarter is not
17  the same exact training.  So I do recall doing it
18  this year, but I don't -- I don't know prior to
19  May.
20   Q.   Okay.  Has it always been two years or
21  two hours a year?
22   A.   I believe so.
23   Q.   Okay.  Are you POST-certified?
24   A.   Yes.
25   Q.   Okay.  So are you familiar with Learning

1  Domain 20 and Learning Domain 33?
2    A.   No.
3    Q.   Not by numbers.
4        Have you --
5    A.   I've never heard of Learning Domain.
6    Q.   You've never heard of the word "Learning
7  Domain"?
8    A.   I don't believe so.
9    Q.   Take a look at this book, please.
10       MR. SAYRE:  And maybe you can look on
11  with him.  I've got one other for counsel.
12       MR. McNUTT:  Thank you.
13       MR. SAYRE:  That's my bad, as my son
14  would say.  I should have had one more.
15  BY MR. SAYRE:
16   Q.   Take a look at 61 -- 0616 down at the
17  bottom.  It has a copyright of James Lindell.
18       Do you know who James Lindell is?
19   A.   No, I don't.
20   Q.   Okay.  Well, he's the father of the
21  lateral vascular neck restraint, or at least one
22  of them, anyway.
23       It says, in the middle, if you look at
24  about a third of the way down, "The two greatest
25  problems with police neck restraint are that

1  officers are often not taught how to regulate
2  control of a subject by the neck and when to stop
3  compression on a subject's neck."
4        What training have you been -- have you
5  received from the Metropolitan Police Department
6  as to when to stop compression on a subject's
7  neck?
8    A.   The LVNR -- are you referring to in the
9  LVNR training?
10   Q.   Yes, sir.  Either in it or outside of
11  it.  But it has to do with the lateral vascular
12  neck restraint.
13       What training have you received as to
14  when to stop compression on a subject's neck?
15   A.   When the subject's resistance is over
16  and if he's unconscious.
17   Q.   Okay.  So either he's not resisting or
18  he's unconscious, in which case he's not
19  resisting.
20   A.   Can be the same.
21   Q.   Right.  Okay.  So how can you tell if a
22  subject is unconscious?
23   A.   I would think when he's not responding
24  to your commands, if he's not moving, if he's not
25  resisting.

OFFICER MICHAEL TRAN
December 20, 2017

Page 90

1    Q.   Okay.  Now, do you have any idea why
2  Officer Lopera would be saying, "Is he out yet?
3  Is he out yet?"
4    A.   I believe he was possibly trying to put
5  him out, to render him unconscious.
6    Q.   Why wouldn't he know whether he was
7  unconscious or not?
8      MR. ANDERSON:  Objection to form.
9      THE WITNESS:  I don't know.
10 BY MR. SAYRE:
11   Q.   What training have you received from the
12 Metropolitan Police Department to ascertain
13 whether somebody is unconscious?  How do you do
14 it?
15   A.   Like I said earlier, if they're not
16 resisting and they're not responding to your
17 commands or questions.
18   Q.   Now, Mr. Farmer wasn't resisting during
19 any time that you were handcuffing him; right?
20   A.   No.
21   Q.   So during the time you were handcuffing
22 him, he should not have been having a neck
23 restraint placed on his neck; right?
24   A.   I wasn't there.  I don't know what
25 transpired prior to my arrival.  But based on the

Page 91

1  video, I believe -- I guess not.
2    Q.   Okay.  Now, take a look at 0617.
3  There's the first full paragraph.  It says,
4  "Officers also learn to respond to a subject's
5  submission and relax compression as soon as
6  resistance ceases."
7      So is that it?  When the resistance
8  ceases, you relax compression on the neck?
9    A.   Correct.
10   Q.   Is that how you're trained by the
11 Metropolitan Police Department?
12   A.   Yes.  If they're not resisting, there's
13 no need to raise the level of the LVNR.
14   Q.   Well, if they're not resisting, there's
15 no reason to even have the compression hold on the
16 neck; right?
17   A.   Well, depends on the circumstances.
18   Q.   Okay.  Under what circumstances would it
19 be okay, based upon your training, to maintain a
20 compression hold on a neck if the subject is not
21 resisting?
22   A.   To -- if the subject was in a physical
23 fight with a person or trying to harm another
24 person, until we have the subject in custody, the
25 level 1 can be used to control the subject.

Page 92

1    Q.   Well, but you said you had him in
2  custody once he's handcuffed.
3    A.   Correct.
4    Q.   So there's no reason to maintain the
5  compression hold once he's handcuffed.
6    A.   Yes.  And he released the hold as soon
7  as I let him know.
8    Q.   Take a look at Basic Coursework Book
9  Series Learning Domain 20.  It's at the back of
10 your booklet.  Sorry.  That's not Bates stamped.
11 It's in the excerpts from the California POST
12 training.
13     MR. ANDERSON:  Has this been produced in
14 the litigation?
15     MR. SAYRE:  I don't think so, but I
16 will.
17     MR. ANDERSON:  Okay.  No, that's fine.
18 But it's California police standards?
19     MR. SAYRE:  It is, yeah.  Right.  My
20 understanding is it's -- POST training is
21 universal, but it comes from the -- California.
22   Q.   All right.  The first page, it says,
23 "Unreasonable force occurs when the type, degree,
24 and duration of force employed was not necessary
25 or appropriate."

Page 93

1      Do you agree with that?
2    A.   Yes.
3    Q.   So if a compression hold is maintained
4  on the neck of a person after he has been rendered
5  unconscious, that would be unreasonable force,
6  correct, by this definition?
7    A.   Yes.
8    Q.   Okay.  Then the next page, if you look
9  at 6-7, "The community expects its peace officers
10 will use reasonable force and peace officers will
11 intervene if reasonable force is exceeded.  For
12 the community and officers' protection, the
13 officer must know the laws pertaining to
14 intervention."
15     Do you agree with that?
16   A.   Yes.
17   Q.   Okay.  "Intervention is the act of
18 attempting to prevent or attempting to stop the
19 inappropriate or unlawful behavior of another."
20     Do you agree with that?
21   A.   Yes.
22   Q.   "If a compression hold is maintained on
23 the neck after a subject has been rendered
24 unconscious, an adjacent officer has a duty to
25 intervene to stop that force being applied";

OFFICER MICHAEL TRAN

December 20, 2017

Page 94

1  correct?
2      A.  Yes.
3      Q.  Take a look at 6-8.  Fourth Amendment
4  Protection.
5          "The United States Constitution protects
6  an individual from unlawful actions of peace
7  officers.  The officer who fails to intervene for
8  whatever reason is also held accountable by the
9  United States Code."
10         You agree with that?
11     A.  Yes.
12     Q.  And that's how you've been trained?
13     A.  Yes.
14     Q.  Take a look at the next section from --
15  this is from Learning Domain 33, and it is
16  Chapter 4, page 10.
17         Do you have that?
18     A.  Yes.
19     Q.  All right.  It says, "If the carotid
20  restraint control hold is not properly applied,
21  the risk of injury to the subject increases.  The
22  following charts illustrate some of the possible
23  dangers of an improperly applied hold.  Improper
24  action.  Maintaining compression after subject has
25  been rendered unconscious."

Page 95

1          Do you agree that that is a potential
2  danger of applying a carotid restraint control
3  hold?
4      A.  Yes.
5      Q.  It's something that an officer has to be
6  very careful about; right?
7      A.  Yes.
8      Q.  Next page, 411.  Under "Release The
9  Hold," do you see that?
10     A.  Yes.
11     Q.  "Rationale.  Maintaining the hold beyond
12  the time subject loses consciousness can lead to
13  physical complications for the subject."
14         Do you agree with that?
15     A.  Yes.
16     Q.  For example, a person can die?
17     A.  Yes.
18         MR. SAYRE:  I have nothing further.
19         MR. ANDERSON:  I have no questions.
20         THE VIDEOGRAPHER:  Nothing?
21         Okay.  This concludes today's deposition
22  of Michael Tran.  The number of media used was
23  one.  We are off the record at 11:51 a.m.
24         (Whereupon, the deposition concluded
25           at 11:51 a.m.)

Page 96

                CERTIFICATE OF DEPONENT
2  PAGE    LINE    CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13              *   *   *   *   *
14     I, OFFICER MICHAEL TRAN, deponent herein,
   do hereby certify and declare the within and
15 foregoing transcription to be my deposition in said
   action; that I have read, corrected, and do hereby
16 affix my signature to said deposition under penalty
   of perjury.
17
18         _____
       OFFICER MICHAEL TRAN, Deponent
19
20
21
22
23
24
25

Page 97

                CERTIFICATE OF COURT REPORTER
2
   STATE OF NEVADA      )
                        )  ss:
3  COUNTY OF CLARK      )
4
5      I, Kimberly A. Farkas, Certified Court
6  Reporter licensed by the State of Nevada, do
7  hereby certify that I reported the deposition of
8  Officer Michael Tran, commencing on December 20,
9  2017, at 9:57 a.m.
10     Prior to being deposed, the witness was duly
11 sworn by me to testify to the truth.  I thereafter
12 transcribed my said stenographic notes, and that
13 the transcript is a complete, true, and accurate
14 transcription, and that a request was made for a
15 review of the transcript.
16     I further certify that I am not a relative,
17 employee, or independent contractor of counsel,
18 nor a person financially interested in the
19 proceeding.
20     IN WITNESS WHEREOF, I have set my hand in my
21 office in the County of Clark, State of Nevada,
22 this January 8th, 2018.
23
24
25 Kimberly A. Farkas, CCR No. 741
26