# Exhibit H - Deposition of Defendant Michael Flores

OFFICER MICHAEL FLORES

February 08, 2018

```
 1                  REPORTER'S CERTIFICATE
 2
 3      STATE OF NEVADA )
                       ) ss
 4      COUNTY OF CLARK )
 5
 6           I, Margie L. Carlson, CCR No. 287, do hereby
 7      certify:
 8           That I reported the taking of the deposition
 9      of the witness, OFFICER MICHAEL FLORES, commencing
10      on February 8, 2018, at the hour of 1:59 p.m.
11           That prior to being examined, the witness was
12      duly sworn to testify to the truth and that I
13      thereafter transcribed said stenotypy notes and said
14      deposition is a complete, true, and accurate
15      transcription of said stenotypy notes taken down at
16      said time.
17           The witness and/or a party has requested to
18      read and sign the deposition transcript.
19           I further certify that I am not a relative or
20      employee of any party involved in said action, nor a
21      person financially interested in the action.
22           Dated at Las Vegas, Nevada, this 20th day
23      of February, 2018.         [signature: Margie L. Carlson]
24
                                   Margie L. Carlson
25                                 CCR No. 287
```

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ESTATE OF TASHI S. FARMER a/k/a TASHII FARMER a/k/a TASHII BROWN, by and through its Special Administrator, Elia Del Carmen Solano-Patricio; TAMARA BAYLEE KUUMEALI'MAKAMAE FARMER DUARTE, a minor, individually and as Successor-in-Interest, by and through her legal guardian, Stevandra Lk Kuanoni; ELIAS BAY KAIMIPONO DUARTE, a minor, individually and as Successor-in-Interest, by and through his legal guardian, Stevandra Lk Kuanoni,<br><br>　　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a political subdivision of the State of Nevada; OFFICER KENNETH LOPERA, individually and in his Official Capacity; and Does 1 through 50, inclusive,<br><br>　　　　　　　　Defendants. | Case No.:<br>2:17-cv-01946-JCM-PAL |

VIDEOTAPED DEPOSITION OF OFFICER MICHAEL FLORES

Reported by: Margie L. Carlson, C.C.R. No. 287

Job: 25100

**Page 2**

1  VIDEOTAPED DEPOSITION OF OFFICER MICHAEL FLORES
2  Taken at the Law Offices of Callister & Associates
3  330 East Charleston Boulevard, Suite 100
4  Las Vegas, Nevada
5
6  On Thursday, February 8, 2018
7  At 1:59 p.m.

**Page 3**

1  APPEARANCES:
2  For the Plaintiffs: FEDERICO C. SAYRE, ESQ.
   Abir Cohen Treyzon Salo, LLP
3  1901 Avenue of the Stars
   Suite 935
4  Los Angeles, CA  90067
   310 407-7888 telephone
5  424 288-4368 fax
   fsayre@actslaw.com
6
7  For the Defendants: CRAIG R. ANDERSON, ESQ.
   (LVMPD)              Marquis Aurbach Coffing
8                       10001 Park Run Drive
                        Las Vegas, Nevada  89145
9                       702 382-0711 telephone
                        702 382-5816 fax
10                      canderson@maclaw.com
11 (Officer             DANIEL R. McNUTT, ESQ.
12 Kenneth Lopera)      McNutt Law Firm
                        625 South Eighth Street
13                      Las Vegas, Nevada  89101
                        702 384-1170 telephone
14                      702 384-5529 fax
                        drm@mcnuttlawfirm.com
15
16 (Officer             PETER M. ANGULO, ESQ.
   Michael Flores)      Olson, Cannon, Gormley,
17                        Angulo & Stoberski
                        9950 West Cheyenne Avenue
18                      Las Vegas, Nevada  89129
                        702 384-4012 telephone
19                      702 383-0701 fax
                        pangulo@ocgas.com
20
21 Also present:        NANCY HEFFERNAN, Videographer
22
23                      * * * * *

**Page 4**

1                    I N D E X
2
3  WITNESS                                        PAGE
4  OFFICER MICHAEL FLORES
5      Examination by Mr. Sayre                     6
6      Examination by Mr. Anderson                 49
7      Further Examination by Mr. Sayre            58
8      Examination by Mr. McNutt                   59
9
10 EXHIBITS                                     MARKED
11 Plaintiff's:
12    Exhibit 1   Las Vegas Metropolitan
                  Police Department
13                Employee Statement              62

**Page 5**

1        THE VIDEOGRAPHER:  On the record.  This
2  begins Media No. 1 of the deposition of
3  Officer Michael Flores in the matter of Estate of
4  Tashi S. Farmer, et al., versus Las Vegas
5  Metropolitan Police Department, et al.  This case is
6  in the United States District Court, District of
7  Nevada, and the Case No. is 2:17-cv-01946-JCM-PAL.
8  Today's date is February 8, 2017 (sic), and the time
9  is 1:59.  This deposition is taking place at 330
10 East Charleston Boulevard, Las Vegas, Nevada.  The
11 videographer is Nancy Heffernan, appearing on behalf
12 of First Legal.
13       Will counsel please introduce yourself
14 and state who you represent.
15       MR. SAYRE:  For the plaintiffs Federico
16 Sayre.
17       MR. McNUTT:  Dan McNutt on behalf of
18 Officer Ken Lopera.
19       MR. ANDERSON:  Craig Anderson on behalf
20 of Las Vegas Metropolitan Police Department.
21       MR. ANGULO:  Peter Angulo appearing on
22 behalf of Officer Flores.
23       MR. SAYRE:  Officer --
24       THE VIDEOGRAPHER:  The reporter is Margie
25 Carlson with First Legal.

Page 6

1  Will the reporter please swear in the
2  witness.
3
4  Whereupon,
5        OFFICER MICHAEL FLORES,
6  having been first duly sworn to testify to the
7  truth, the whole truth and nothing but the truth,
8  was examined and testified as follows:
9
10              EXAMINATION
11 BY MR. SAYRE:
12    Q.  Officer Flores, have you ever had your
13 deposition taken before?
14    A.  No.
15    Q.  I am representing the estate and the
16 children of a decedent by the name of Tashi Farmer
17 Brown.  Mr. Farmer died in an incident back in May
18 of 2017, and you were present during part of what
19 occurred between himself and Officer Lopera, so I'm
20 going to be asking you some questions concerning
21 those events.  You've been sworn to tell the truth,
22 and although we're sitting here somewhat informally,
23 you understand that oath is as binding on you here
24 as if we were in a courtroom of law?
25    A.  Yes, sir.

Page 7

1     Q.  Everything that is said here today will
2  be taken down by the court reporter.  She'll later
3  have it typed up into a booklet form in a couple
4  weeks, and you'll be given a copy to read and
5  review, and you can make any changes or corrections
6  that you deem appropriate.  However, if you make any
7  changes or corrections either myself or some other
8  attorney can make comment upon that fact.  Do you
9  understand that?
10    A.  Yes, sir.
11    Q.  Just as you've been doing up, nicely up
12 to now please continue to answer out loud.  Such
13 common expressions as uh-huh, huh-uh, or nods of the
14 head or shakes of the head, are too difficult for
15 the court reporter to interpret, so please continue
16 to answer out loud.  Will you do that, please?
17    A.  Yes, sir.
18    Q.  If you don't understand a question that
19 I've asked you, please tell me to repeat it,
20 rephrase it, or in some way indicate that you did
21 not understand the question, and I'll do my best to
22 make it more understandable.
23        If you answer a question I'm going to
24 assume that you've understood it.  Is that fair?
25    A.  Yes, sir.

Page 8

1     Q.  Please wait until I finish my question
2  before you start your answer.  I'll wait until
3  you've finished your answer before I start my next
4  question.  Besides simply being courteous, it's also
5  difficult for the court reporter to take down
6  two people who are speaking at the same time.  Do
7  you understand that?
8     A.  Yes, sir.
9     Q.  I don't expect this to be a lengthy
10 deposition.  However, at any time if you wish to
11 take a break, use the facilities, talk to your
12 lawyer, whatever you want to do, just let me know
13 and your request will be honored.  The only thing I
14 would ask is if there is a question pending please
15 answer the question before we take a break.  Will
16 you do that, please?
17    A.  Yes, sir.
18    Q.  Have you taken any kind of medication or
19 any kind of substance that would affect your ability
20 to give your best deposition here today, meaning
21 that it would affect your recollection or your
22 ability to enunciate, anything like that?
23    A.  No.
24    Q.  Officer Flores, could you please tell me
25 about your educational background beginning with

Page 9

1  high school?
2     A.  I have a high school degree from Taft
3  High School located in Chicago, Illinois.  I have a
4  bachelor's degree from Northern Illinois
5  University.  I have a master's degree from Western
6  Illinois University.
7     Q.  What year did you receive your high
8  school diploma?
9     A.  2001.
10    Q.  And what was your bachelor's degree in?
11    A.  Criminal justice.
12    Q.  And what year, please?
13    A.  2005.
14    Q.  And your master's, please?
15    A.  Law enforcement and justice
16 administration in 2008.
17    Q.  Beginning in 2008 did you take any
18 employment positions prior to taking your employment
19 with the Metropolitan Police Department?
20    A.  In what regards of employment?
21    Q.  Any kind of employment.
22    A.  Yes, I had several jobs.
23    Q.  Okay.  Starting after your master's
24 degree what was your first employment?
25    A.  I worked at CDW.

Page 10

1  Q. What is that?
2  A. That's a company that sells electronics
3  over the phone. I was an account manager.
4  Q. Was that in Chicago?
5  A. That's correct, Vernon Hills, Illinois,
6  right outside of Chicago.
7  Q. How long did you do that job?
8  A. Approximately a year.
9  Q. What was your next position?
10 A. Let's see. I worked at Chase Bank as a
11 bank teller.
12 Q. Was that still in Chicago?
13 A. I moved out here in 2010 to apply to the
14 police department. They were on a freeze, so I
15 began at Chase Bank here in Henderson, Nevada, and
16 then I transferred back to Chicago, so it was half
17 here for about six months, Chicago for a year.
18 Q. In both locations as a teller?
19 A. That's correct.
20 Q. After that did you join the police
21 department?
22 A. I did.
23 Q. And what year was that now, please?
24 A. It was the Chatanooga Police Department,
25 and that was I believe 2012, January of 2012.

Page 11

1  Q. And that's certainly not in Chicago I
2  assume?
3  A. Absolutely not, Tennessee.
4  Q. All right. How long were you with the
5  Chatanooga Police Department?
6  A. Approximately a year and a half.
7  Q. Were you a patrolman?
8  A. I was.
9  Q. Did you go through an academy when you
10 joined the Chattanooga Police Department?
11 A. Yes.
12 Q. All right. When did you join the
13 Metropolitan Police Department in Las Vegas?
14 A. That would be November 3rd, 2014.
15 Q. Did you go through an academy here in
16 Las Vegas?
17 A. Yes.
18 Q. And after your academy you were on
19 probation for a period of time?
20 A. Correct.
21 Q. Until sometime around November of 2016;
22 is that correct?
23 A. I believe it was November, 2015.
24 Q. Okay.
25 A. Could have been 2016. I'm trying to --

Page 12

1  yeah, it's a year and a half after you start.
2  Q. Okay, so if you started in '14 then --
3  A. I think that's correct, 2016.
4  Q. You gave an interview to the Critical
5  Incident Review Team on May 30th, 2017; is that
6  correct?
7  A. That's correct.
8     MR. SAYRE: Let me give you a copy. I
9  don't have enough for everybody, but perhaps if your
10 counsel could share it with you, and I have one for
11 you two fine gentlemen.
12    MR. ANDERSON: I have one.
13    MR. SAYRE: It's CIRT, yes, not the FIT
14 Team.
15 Q. As I recall in that interview you said
16 that you came off of probation about November of
17 2016.
18 A. That's correct.
19 Q. So this incident happened in May of 2017,
20 approximately seven or eight months later, correct?
21 A. Yes.
22 Q. Now, when you first went to work for the
23 Metropolitan Police Department in Las Vegas what was
24 your first position?
25 A. I was in the academy.

Page 13

1  Q. Right.
2  A. I was a recruit.
3  Q. Right, and then?
4  A. And then I was a PO1.
5  Q. Police Officer 1?
6  A. Correct.
7  Q. Uh-huh, and where did you, were you
8  assigned to a particular location?
9  A. As a PO1 I was assigned to northeast with
10 an FTO and then southeast with an FTO.
11 Q. And that FTO is a training officer?
12 A. Yes.
13 Q. And you were, responsibilities were as a
14 patrol person, patrolman?
15 A. Correct.
16 Q. At some point you were assigned to a Flex
17 Team?
18 A. Correct.
19 Q. And when was that?
20 A. That was approximately February of 2017.
21 Q. Okay. And had you been working on the
22 Strip at all prior to February of 2017?
23 A. Yes.
24 Q. And what was your, when did you start
25 working on the Strip?

Page 14

1    A.  That would have been I would say a year
2  prior to that. I would say around January, February
3  of 2016, I believe.
4    Q.  Okay, and tell me what was your area of
5  responsibility prior to February of 2017 with
6  regards to the Strip?
7    A.  I was a patrol officer, and I worked
8  graves, and my area of responsibility was the Strip,
9  so Russell Road all the way up to Sahara, Paradise
10 to the 15.
11    Q.  So you were not assigned to a specific
12 casino?
13    A.  No.
14    Q.  At any point in time were you ever
15 assigned to a specific casino?
16    A.  Before the Flex Team?
17    Q.  Before the Flex Team.
18    A.  No.
19    Q.  Once you became a member of the Flex Team
20 were you assigned to a specific casino?
21    A.  When we had Safe Strip, yes.
22    Q.  Okay, and tell me about Safe Strip,
23 please.
24    A.  Safe Strip was to do proactive work on
25 the Strip to prevent violent crimes from occurring,

Page 15

1  so we had two officers stand in front of casinos as
2  a deterrence and to prevent violent crimes from
3  happening.
4    Q.  Okay, what was the difference between
5  Safe Strip and the Flex Team?
6    A.  Safe Strip you were specifically
7  dedicated to one casino where you walked around the
8  area, the premises, to prevent violent crimes, and
9  when we were doing patrol it was more so the whole
10 entire Strip. We would take calls and go handle
11 situations that casinos came up with or if something
12 came out on our own we would handle it, but we were
13 not dedicated to a specific casino.
14    Q.  When you were a part of Safe Strip what
15 casino or casinos were you assigned to?
16    A.  Linq 1, or that was our call sign I
17 apologize, Linq, there's a couple that switched,
18 Treasure Island once, maybe twice. Different
19 casinos.
20    Q.  Okay. And you would be stationary at
21 that casino during the course of your, your, your
22 ten hours or so?
23    A.  Correct.
24    Q.  Have you always worked 10-4?
25    A.  At this department, yes.

Page 16

1    Q.  All right. Besides your training in the
2  academy have you prior to May of 2017 received any
3  kind of specialized training?
4    A.  Not that I can recall.
5    Q.  I'd like to draw your attention to the
6  night of May the 13th and the morning of May the
7  14th. This is the night that there was an incident
8  between Officer Lopera and Mr. Tashi Farmer. Do you
9  recall that night?
10    A.  Yes.
11    Q.  All right. And what was your assignment
12 that night?
13    A.  My partner and myself were assigned to
14 Linq for Safe Strip.
15    Q.  And your partner that night was Michael
16 Tran?
17    A.  Yes.
18    Q.  How long had he been your partner?
19    A.  He has been my partner since I joined the
20 Flex Team.
21    Q.  And you joined the Flex Team in February
22 of 2017?
23    A.  I believe so, yes.
24    Q.  Do you know that Officer Tran has been
25 deposed in this case?

Page 17

1    A.  I don't know.
2    Q.  Did he talk to you about being deposed?
3    A.  No.
4    Q.  Are you still partners with him today?
5    A.  No.
6    Q.  When did you stop?
7    A.  I left the Flex Team in July of 2017 and
8  went to day shift.
9    Q.  On the Strip or some other location?
10    A.  Still on the Strip.
11    Q.  Okay. Now, as I understand it you were
12 purchasing a home so you didn't start your shift at
13 9 o'clock that night, the night of the 13th?
14    A.  That sounds right.
15    Q.  And so you were picked up from the
16 station by Officer Tran about 11, 11:30 or so?
17    A.  To my acknowledgment, yes.
18    Q.  And you did attend the Safe Strip
19 briefing which occurs at midnight?
20    A.  I recall I did, yes.
21    Q.  Now who would normally have been your
22 sergeant that night?
23    A.  Sgt. Obasi.
24    Q.  How long had he functioned as your
25 sergeant?

Page 18
1   A.  Since I joined Flex Team in February.
2   Q.  Okay.  But Sgt. Obasi was not present
3   that night, correct?
4   A.  Correct.
5   Q.  So who was the sergeant that was your
6   sergeant that night?
7   A.  Sgt. Crumrine.
8   Q.  Had you ever had Sgt. Crumrine as a
9   supervisor before that night?
10  A.  Not that I could recall, no.
11  Q.  I'm pretty sure you haven't since,
12  correct?
13  A.  No.
14  Q.  Now, do you recall that you and
15  Officer Tran were approaching the Linq to begin your
16  responsibilities there that night?
17  A.  Yes.
18  Q.  And you got a red call from Venetian,
19  correct?
20  A.  That's correct.
21  Q.  And what did that mean to you?
22  A.  Officer Tran and myself were in the
23  parking lot of Linq Casino.  We were just about to
24  step out of our patrol vehicle and walk inside.  We
25  heard, "Venetian, give me a red," and dispatch

Page 19
1   asked, "Where's, what's your location?" because
2   Venetian's a big property, so I remember looking at
3   Officer Tran and myself and said, "Let's go right
4   over there" because they are neighboring properties,
5   and it sounded like an officer was in trouble.  All
6   we heard was yelling, "Venetian, give me a red."
7   Q.  And you responded to the Venetian?
8   A.  That's correct.
9   Q.  In your vehicle?
10  A.  Yes.
11  Q.  Where did you park?
12  A.  When we got to the Venetian?
13  Q.  Correct.
14  A.  So we headed towards the rear of Venetian
15  over by the security, and when we approached the
16  Venetian property I seen a Crown Vic with the lights
17  on, and we parked next to that Crown Vic.
18  Q.  Crown Vic meaning?
19  A.  The police vehicle.
20  Q.  Police vehicle?
21  A.  Correct.
22  Q.  What street were you on?
23  A.  The rear of Venetian.  It's Sands, and it
24  turns into a street that Venetian connects to it.  I
25  don't know the part where Venetian is.

Page 20
1   Q.  Okay, and you were the passenger in the
2   vehicle?
3   A.  That's correct.
4   Q.  Officer Tran was driving?
5   A.  Yes.
6   Q.  And you came to a stop alongside the
7   Crown Vic that you saw with the lights on?
8   A.  That's correct.
9   Q.  Now, from your location you were able to
10  see Sgt. Crumrine?
11  A.  I believe so.
12  Q.  And you saw a person who, although not
13  immediately, you later recognized as Officer Lopera?
14  A.  Correct.
15  Q.  And you saw a gentleman who you later
16  came to understand was named Farmer?
17  A.  That's correct.
18  Q.  Okay.  And that was before you got out of
19  the vehicle?
20  A.  Yes.
21  Q.  Now, when you first saw Officer Lopera,
22  is it correct that he was on his back?
23  A.  Yes.
24  Q.  And he had at least one of his arms
25  encircling the neck of Mr. Farmer?

Page 21
1   A.  Yes.
2   Q.  And his legs were encircling Mr. Farmer's
3   body?
4   A.  That's correct.
5   Q.  What part of Mr. Farmer's body were his
6   legs encircling?
7   A.  I believe his waist area, around his
8   hips.
9   Q.  Were you able to identify whether or not
10  when you first saw Officer Lopera, whether he had
11  applied a lateral vascular neck restraint to
12  Mr. Farmer as opposed to a rear-naked choke?
13  A.  No.
14  Q.  Now, you've been trained in how to escape
15  from a rear-naked choke, correct?
16  A.  Rear-naked choke, I don't recall a
17  rear-naked choke.
18  Q.  Okay.  Take a look at your, at your
19  statement if you would, please.
20  A.  What page is it?
21  Q.  Yeah, take a look at page 67.  Look at
22  line 20, please.
23  A.  (Witness complies.)
24  Q.  To the end of the page.  You notice the
25  officer asked you if you've ever, in training have

Page 22

1  you ever done the escape from the rear-naked choke,
2  and you answer I believe so.
3      A.  Oh, I see below everything.
4      Q.  Does that refresh your recollection?
5      A.  Yes.
6      Q.  And as a part of your training you knew
7  what a rear-naked choke was, correct?
8      A.  Part of the training in the academy?
9      Q.  That's right.
10     A.  Yes.
11     Q.  Okay. And could you describe please the
12 rear-naked choke?
13     A.  Rear-naked choke would be when you put
14 your arm around a person's neck cutting off the
15 oxygen supply to their, to their body.
16     Q.  That's your understanding of a rear-naked
17 choke?
18     A.  The basis of it, yes.
19     Q.  Do you know what the trachea is?
20     A.  Correct.
21     Q.  Do you know what it is?
22     A.  Yes.
23     Q.  Where, where is it located?
24     A.  Right here (indicating).
25     Q.  So you're saying a rear-naked choke

Page 23

1  involves placing the arm across the trachea?
2      A.  A rear-naked choke to my understanding,
3  yes.
4      Q.  Is that how you were trained in the
5  academy?
6      A.  No.
7      Q.  Did they -- where did you learn about a
8  rear-naked choke?
9      A.  I would say more so 'cuz we didn't learn
10 that in the academy necessarily. I mean I would say
11 more so from MMA fighting, TV.
12     Q.  Do you recall that a rear-naked choke
13 actually involves the elbow being placed in front of
14 the trachea, not on it, with pressure being applied
15 to the rear of the neck in addition to pressure
16 along the side of the carotid?
17     A.  No.
18     Q.  Okay. Now, when they were teaching you
19 how to escape from a rear-naked choke in the
20 academy, are you saying that what they applied was a
21 choke hold to the trachea?
22     A.  No.
23     Q.  Okay.
24     A.  Not to my recollection.
25     Q.  Well, were you trained in escaping from a

Page 24

1  rear-naked choke in the academy?
2      A.  Yes, we were trained, but it was -- I
3  don't remember in the academy specifically someone
4  putting their forearm against my trachea cutting off
5  the oxygen supply.
6      Q.  Right. Let me represent to you that's
7  not a rear-naked choke is to put the forearm across
8  the trachea. Do you recall how they applied a
9  rear-naked choke in the academy?
10     A.  I want to say it was the same way we
11 learned the LVNR.
12     Q.  Similar, right. Do you remember how it
13 differed from an LVNR?
14     A.  From my understanding a rear-naked choke
15 is you'd be cutting off the supply, hitting into the
16 trachea. LVNR you are not. Your bones are set up
17 on the sides of your neck, the carotid artery, and
18 you still have an area right here (indicating) where
19 your little fold is in your elbow so you're able to
20 not put any pressure on the trachea.
21     Q.  So you could breathe?
22     A.  Correct.
23     Q.  Okay. Do you recall that when they
24 applied a rear-naked choke in the academy that you
25 could still breathe?

Page 25

1      A.  Yes.
2      Q.  Okay. Do you remember that the
3  rear-naked choke differed from the lateral vascular
4  neck restraint in that the rear-naked choke there
5  was pressure placed on the back of the neck in
6  addition to along the sides of the neck?
7      A.  I don't remember.
8      Q.  Okay. Isn't it correct that you thought
9  it was possible that what Officer Lopera was
10 applying was a rear-naked choke that night?
11     A.  At the time being I seen one hand from
12 Officer Lopera around Tashi Farmer's neck, and I did
13 not believe at the time it was a rear-naked choke.
14     Q.  Would you take a look at page 68, line
15 13 through line 17.
16     A.  (Witness complies.) It says in here that
17 it's possible, but I don't remember seeing that, I
18 did not think -- at the time I could not see what
19 the placement of his arm to see what kind of hold he
20 had him in.
21     Q.  Do you recall that in the interview you
22 said it was possible that he placed a rear-naked
23 choke?
24     A.  I don't recall it, but after looking at
25 this, this is what I said, but I wasn't sure upon

Page 26

1  it.
2      Q.  Okay.  Is it correct, is your
3  understanding, is it correct that your understanding
4  that a rear-naked choke is out of policy?  It is not
5  an appropriate hold for an officer of the Las Vegas
6  Metropolitan Police Department to use?
7      A.  Yes.
8      Q.  And if a person, police officer is using
9  a rear-naked choke on a subject, would you as an
10  officer have a duty to intervene to stop that hold
11  from being used?
12      A.  Yes.
13      Q.  Including, if necessary, pulling the
14  hands away from the person's neck?
15      A.  Yes.
16      Q.  Now, you recall that when you first
17  looked at Officer Lopera through the window the
18  passenger side of your vehicle you noticed that he
19  had a neck hold applied?
20      A.  Yes.
21      Q.  Which could have been a lateral vascular
22  neck restraint, correct?
23      A.  Correct.
24      Q.  All right.  You don't know how long he
25  had had that lateral vascular neck restraint applied

Page 27

1  prior to your looking through the window and seeing
2  him?
3      A.  Correct.
4      Q.  But you do remember that during the time
5  that you were there at the scene he had the lateral
6  vascular neck restraint applied for a minute?
7      A.  After I arrived to the scene he had it
8  applied for a minute?
9      Q.  Yes.
10      A.  It could have been, I don't remember a
11  minute.  Maybe 30 seconds.  I can't recall the exact
12  time.
13      Q.  Take a look at page 61, and lines
14  7 through 11.
15      A.  (Witness complies.)  I said no more than
16  a minute.
17      Q.  Right.  You recall saying that?
18      A.  Yes.
19      Q.  Were you being truthful when you said
20  that?
21      A.  Yes.
22      Q.  Okay, so you believe that it was no more
23  than a minute, correct?
24      A.  Yes.
25      Q.  But near a minute, correct?

Page 28

1      A.  Yes.
2      Q.  All right.  Now, your understanding was
3  at the time that the application of a lateral
4  vascular neck restraint should only go on until
5  there is compliance but in no event more than
6  15 seconds, correct?
7          Go ahead and read page 61 to the bottom
8  of the page.
9      A.  (Witness complies.)  Yes.
10      Q.  Right, and to maintain the lateral
11  vascular neck restraint for longer than 15 seconds
12  would be out of policy, correct?
13      A.  You have to get them, the individual into
14  custody.  Depends on the circumstances.
15      Q.  Well, when you said no more than
16  15 seconds were you being truthful?
17      A.  Yes, I believe so.
18      Q.  All right, so once you saw that
19  Officer Lopera had a lateral vascular neck restraint
20  applied to Mr. Lopera -- I'm sorry, to Mr. Farmer
21  for more than 15 seconds, you knew that he was out
22  of policy, correct?
23      A.  In hindsight about everything.  I don't
24  recall going there and counting exactly 15 seconds.
25      Q.  Okay.  At any time after he had had the

Page 29

1  lateral vascular neck restraint applied for
2  15 seconds did you do anything to intervene?
3          MR. ANGULO:  Let me just lodge an
4  objection to being an incomplete hypothetical as to
5  how the lateral neck restraint is being applied and
6  how much pressure is being used.
7          MR. SAYRE:  I think that's an improper
8  objection under Nevada rules.  You can object to
9  form, but that's it.  No speaking objections are
10  allowed, sir.
11          MR. ANGULO:  I didn't think it was.  I
12  was just objecting to the form of the question.
13          MR. SAYRE:  No, you were being, giving a
14  speaking objection, which is improper.
15          MR. ANGULO:  I disagree with you.
16          MR. SAYRE:  All right.
17      Q.  Officer Flores, at any time after
18  15 seconds had passed that you observed the lateral
19  vascular neck restraint applied to Mr. Farmer, did
20  you do anything to intervene to stop the application
21  of the lateral vascular neck restraint?
22      A.  I didn't, I didn't honestly when we got
23  there seeing he had an LVNR on him I believe was but
24  I'm on the lower part of Tashi Farmer's body trying
25  to make him compliant, and I did not count

Page 30

1  15 seconds.
2      Q.  Officer, at anytime during the minute
3  that you observing the lateral vascular neck
4  restraint applied to the neck of Tashi Brown as you
5  have testified --
6      A.  Yes.
7      Q.  -- did you do anything to intervene to
8  stop it?
9          MR. McNUTT:  Objection, form.
10         MR. ANDERSON:  Objection, form.
11         MR. ANGULO:  Okay, that mischaracterizes
12 his testimony.
13         MR. SAYRE:
14     Q.  Your answer?
15     A.  Yes.
16     Q.  You did do something to intervene to stop
17 it.  What did you do to intervene to stop it?
18     A.  I remember we had, I heard an officer
19 say, "Let him go," and I got him into custody as
20 well.  There was one hand that had a handcuff on it,
21 another one that wasn't, and Lopera I believe let
22 go.
23     Q.  Sir, you got him into custody in
24 30 seconds; isn't that correct?
25     A.  I believe so, yes.

Page 31

1      Q.  Right, then what did you do after you got
2  him into custody, if anything, to intervene to try
3  to stop Officer Lopera from continuing to apply the
4  lateral vascular neck restraint on Mr. Farmer?
5      A.  From what I recall he let go, and we
6  stood Tashi Farmer -- we stand him up and went ahead
7  and gave him a firm pat on the back to try to revive
8  him and called for medical.
9      Q.  Okay, you've testified that it took you
10 30 seconds to, to basically gain compliance of
11 Mr. Farmer by handcuffing him, correct?
12     A.  Yes.
13     Q.  All right, then if the lateral vascular
14 neck restraint was in place for 60 seconds, what did
15 you do for the remaining 30 seconds to stop
16 Officer Lopera from applying the lateral vascular
17 neck restraint?
18         MR. ANGULO:  Objection, mischaracterizes
19 his testimony.
20         MR. ANDERSON:  Objection, form.
21     A.  You're saying what I specifically did to
22 get, I just, after he was in custody he let go.  If
23 you're asking me if I did anything --
24         MR. SAYRE:
25     Q.  Yes.

Page 32

1      A.  -- to Lopera, I can't recall.
2      Q.  All right, you can't recall doing
3  anything?
4      A.  To Lopera specifically?
5      Q.  Yes.
6      A.  No, I don't believe it, no.
7      Q.  All right.  You felt that Officer Lopera
8  was applying the lateral vascular neck restraint for
9  too long, correct?
10     A.  At the time, no, I don't believe so.
11     Q.  Take a look at page 62 of your
12 interview.
13     A.  (Witness complies.)  What line?
14     Q.  Okay.  Take a look at line 4 and then
15 your response at line 5 and 6.  Shall I read it for
16 you?
17     A.  Oh, I see.
18     Q.  The question is, "Um, did you feel at any
19 time it was on too long?  MF:" That would be you.
20 "Uh, th-yes.  Um, I remember when, uh, my partner
21 Tran's, like, 'Loosen up.' Cause we had him . . ."
22 "Okay." ". . .cuffed dudes.  Yes." Do you
23 remember that testimony?
24     A.  This refreshes my memory.
25     Q.  So were you being truthful when you said

Page 33

1  you thought that Lopera had the, was applying the
2  lateral vascular neck restraint for too long?
3      A.  Yes.
4      Q.  All right, and did you do you anything to
5  stop him from applying the lateral vascular neck
6  restraint when you decided he was applying it for
7  too long?
8      A.  No.
9      Q.  You knew you had a duty to do that?
10         MR. ANDERSON:  Objection, form.
11         MR. SAYRE:
12     Q.  Correct?
13     A.  If I felt as if he was then, yes, I would
14 have.
15     Q.  And not only would that be a violation of
16 the Las Vegas Metropolitan Police standards, but
17 it's a violation of the Fourth Amendment, isn't it,
18 as you're trained?
19         MR. ANDERSON:  Objection.
20         MR. ANGULO:  Objection, calls for a legal
21 conclusion.
22         MR. SAYRE:
23     Q.  You're trained in the Fourth Amendment in
24 the academy, aren't you?
25     A.  Yes.

Page 34
1  Q. And the Fourth Amendment means you are
2  not allowed to engage in excessive force, correct?
3  A. Correct.
4  Q. And if you see an officer engaged in
5  excessive force you as an officer have a duty to
6  intervene if necessary to prevent that officer from
7  engaging in excessive force under the Fourth
8  Amendment as you're trained?
9  A. Yes.
10  Q. Right, and you didn't do that, did you?
11     MR. ANDERSON: Objection, form.
12  A. I don't feel as if at the time being like
13  this, I felt as if there was excessive force
14  happening, then, yes, I would have stopped him.
15     MR. SAYRE:
16  Q. If he was applying the lateral vascular
17  neck restraint for too long, isn't that excessive
18  force?
19     MR. ANDERSON: Objection, form.
20     MR. ANGULO: Join the objection.
21  A. Yes.
22     MR. SAYRE: Okay.
23  Q. You felt that among the things that went
24  wrong that early morning was that once Mr. Farmer
25  was cuffed that Officer Lopera should have been

Page 35
1  separated from him, correct?
2  A. What page is that?
3  Q. 75.
4  A. And what number is that?
5  Q. Let me get there, and I'll help you.
6     MR. McNUTT: Would you repeat the
7  question, please?
8     MR. SAYRE: Of course, I'll be happy to
9  do that.
10     It's 75 over to 76.
11  Q. Your answer at the bottom of 75. The
12  question is among the things that you felt went
13  wrong that night is that once Mr. Loper --
14  Mr. Farmer was cuffed that there should have been a
15  separation of Officer Lopera from him?
16  A. Yes, correct.
17  Q. And you attribute that for the need for
18  better communications?
19  A. That's correct.
20  Q. Okay. Another thing that you felt was
21  that with four officers there, Officer Lopera should
22  have been told to release his hold because you had
23  enough officers there to control Mr. Farmer?
24  A. I believe he was told to release his
25  hold.

Page 36
1  Q. And he failed to release his hold, isn't
2  that right?
3     MR. ANDERSON: Objection, form.
4     MR. ANGULO: Calls for speculation.
5  A. I believe at the time he did.
6     MR. SAYRE:
7  Q. Okay, when you arrived with
8  Officer Tran --
9  A. Yes.
10  Q. -- already present was Sgt. Crumrine?
11  A. That's correct.
12  Q. And Officer Lopera.
13  A. That's correct.
14  Q. So once the four of you were there there
15  were four officers, and you were confident with
16  four officers you could take Mr. Farmer into
17  custody?
18  A. Yes.
19  Q. And therefore it was unnecessary for
20  Officer Lopera to continue his hold once there were
21  four officers there, correct?
22  A. Yes.
23  Q. All right. Is it correct that you felt
24  that Sgt. Crumrine never took charge of the events
25  that were going on there?

Page 37
1  A. I remember I think he did take some
2  charge, but everything that was needed with
3  Sgt. Crumrine.
4  Q. Take a look at page 63. The question is
5  at line 15. Your response is at line 16 and 17.
6  A. I said I can't remember if he at that
7  time.
8  Q. Right, you said, "I can't remember him
9  taking charge. I can't remember if he said
10  anything."
11  A. That's correct.
12  Q. Were you being truthful when you said
13  that?
14  A. Yes.
15  Q. So in fact it wasn't until about
16  five minutes later that another sergeant arrived who
17  took charge of the scene, correct?
18  A. Yes.
19  Q. That was Officer Zach, Sgt. Zach?
20  A. I can't remember the sergeant's name.
21  Q. Sure, but there was another sergeant that
22  came up about five minutes later and took charge of
23  the scene?
24  A. Yes, right.
25  Q. Up until then it was pretty chaotic,

OFFICER MICHAEL FLORES

February 08, 2018

Page 38
1  correct?
2      A.  Yes.
3      Q.  On page 64 I think you mentioned
4  Officer Zach's name or maybe I don't have it --
5      A.  I don't think it was Shaq.
6      Q.  On page 65.  You say --
7      A.  I think it was Officer Shaq.
8      Q.  Zach, Z-a-c-h?
9      A.  I think that's it.
10     Q.  You said Zach, the newer sergeant?
11     A.  I believe his name is Shaq.
12     Q.  How do you spell it?
13     A.  S-h-a -- I don't know the rest, but I
14  believe it's Shaq.
15     Q.  Okay, like Shaquille O'Neal?
16     A.  Similar, it sounds.
17     Q.  You heard your partner tell
18  Officer Lopera to loosen up on Mr. Farmer?
19     A.  I believe I heard someone say that.
20     Q.  Take a look at 62.
21     A.  Yes, Tran, my partner Tran, loosen up.
22     Q.  Yes, 'cuz you had him cuffed, correct?
23     A.  Yes.
24     Q.  And what was going through your mind at
25  the time was, "Hey, we've got compliance.  If he's

Page 39
1  telling you to loosen up there is no longer a need
2  to do anything to try to gain compliance 'cuz he's
3  already handcuffed"?
4      A.  Yes.
5      Q.  But Officer Lopera continued to maintain
6  the lateral vascular neck restraint for some period
7  of time?
8          MR. ANDERSON:  Objection, form.
9      A.  I don't remember.
10         MR. SAYRE:  Okay.
11         I'm almost done.
12     Q.  Now, when you came up on the scene you
13  got out of your car.  Officer Tran got out of his
14  car.  He actually got out first?
15     A.  Officer Tran did, yes.
16     Q.  And you went basically up to the head
17  area to see if you could help in gaining control or
18  compliance of Mr. Farmer?
19     A.  Yes.
20     Q.  But it was already busy up there because
21  Lopera was there and Tran had gone there?
22     A.  Yes.
23     Q.  So you went down to the legs?
24     A.  Correct.
25     Q.  All right.  Now, you saw that

Page 40
1  Officer Lopera was on his back and had his chest up
2  against the back of Mr. Farmer?
3      A.  Yes.
4      Q.  He was, he had a neck hold on him and he
5  had his legs around his mid section approximately?
6      A.  Yes.
7      Q.  And you saw that Sgt. Crumrine was down
8  at the feet of Mr. Farmer facing looking into
9  Mr. Farmer?
10     A.  Yes.
11     Q.  Okay, so Mr. Farmer was face up towards
12  Officer Crumrine?
13     A.  That's correct.
14     Q.  And Officer Crumrine was faced down, if
15  you will, towards Mr. Farmer, correct?
16     A.  Yes.
17     Q.  All right.  So Officer Crumrine, there
18  was nothing in the way of him being able to see when
19  Mr. Farmer went unconscious?
20         MR. McNUTT:  Vague and ambiguous.
21         MR. ANGULO:  Objection, calls for
22  speculation.
23     A.  I don't know what Sgt. Crumrine was
24  seeing at that point.
25         MR. SAYRE:

Page 41
1      Q.  Understand, but there was nothing
2  physically in the way between Crumrine looking
3  towards Mr. Farmer, Farmer looking up towards
4  Sgt. Crumrine?
5      A.  Correct.
6          MR. ANDERSON:  Objection, form.
7          MR. SAYRE:
8      Q.  Farmer was not physically fighting
9  Lopera, correct?
10     A.  I don't -- at the time being I thought he
11  was.
12     Q.  Well, you didn't, he wasn't throwing any
13  punches?
14     A.  No.
15     Q.  He wasn't doing any kicks?
16     A.  No.
17     Q.  And when you got a hold of him you were
18  surprised at how little resistance he was having to
19  your seeking to grab his arms?
20     A.  I went towards his leg.  I do believe I
21  felt some resistance.  I don't know at the time
22  being I thought it was Tashi Farmer.  I don't know
23  if everyone was just grabbing, you know, everyone
24  was just wrestling around, but go back to your
25  question with cuffs?

Page 42

1   Q.  Well, when you were seeking to cuff him
2  you were surprised at how little resistance
3  Mr. Brown, Mr. Farmer was expressing?
4       A.  I believe I did feel a little resistance.
5       Q.  Well, he was not punching or kicking,
6  correct?
7       A.  Correct.
8       Q.  And you segmented him by putting one leg
9  over the other to gain compliance?
10      A.  Correct.
11      Q.  Right, and he wasn't kicking at all while
12 you were doing that?
13      A.  No.
14      Q.  Farmer's legs were heavy, but they were
15 not kicking?
16      A.  Correct.
17      Q.  You felt that some of the movement was
18 likely because there were three officers and a
19 sergeant that were basically moving around?
20      A.  Some movement, yes.
21      Q.  Your partner said, "Ease up, ease up on
22 him"; do you remember that?
23      A.  I remember the loosen up.  Where does it
24 say ease up?
25      Q.  Page 31.

Page 43

1       A.  What line is it?
2       Q.  Let's see.
3       A.  Oh, on the bottom, 22.
4       Q.  Right.
5       A.  Yes.
6       Q.  "Ease up on him," and at that point you
7  already had him cuffed, correct?
8       A.  Yes.
9       Q.  Also was stated, "You could get off him"?
10      A.  Yes.
11      Q.  Okay.  And Lopera continued to hold him
12 in the lateral vascular neck restraint?
13      A.  I believe so.
14      Q.  Can you look at 32 if it refreshes.  You
15 said, I'm assuming he still had him in the lateral
16 vascular neck restraint.
17      A.  What number is that?
18      Q.  Line 4.
19      A.  Yes.
20      Q.  You heard somebody say, "Get off of my
21 fucking legs"?
22      A.  Yes.
23      Q.  Right, and it sounded like Lopera to you?
24      A.  I don't recall who it sounded like.
25      Q.  Okay.

Page 44

1       A.  I wasn't sure who that was coming from.
2       Q.  Right.  Page 72, take a look at that.
3       A.  "I don't remember, at the time, who it
4  was coming from."  That's correct.  I don't remember
5  at the time who it was coming from.
6       Q.  Right, you thought it was coming from
7  Lopera?
8       A.  I thought it was either.  It sounded like
9  Lopera a little bit.
10      Q.  Right, and you acknowledge that if the
11 lateral vascular neck restraint had been properly
12 applied Farmer wouldn't have been able to speak?
13      A.  Yes.
14      Q.  So your conclusion would be it would have
15 to be Lopera?
16          MR. ANGULO:  Objection.
17          MR. ANDERSON:  Objection, form.
18          MR. SAYRE:
19      Q.  Correct?
20      A.  That, I don't know at the time.
21      Q.  At least it did sound like Lopera?
22      A.  Yes.
23      Q.  All right.  But on, you also did say that
24 you were aware that Lopera had him in the lateral
25 vascular neck restraint over a minute?

Page 45

1           MR. ANDERSON:  Objection, form.
2           MR. ANGULO:  Objection, asked and
3  answered, mischaracterizes --
4           MR. SAYRE:  Page 73.  Line 6 is the
5  question.  The response is line 8.
6           MR. ANGULO:  Counsel, if you could while
7  I'm making my objection, if you would let me finish
8  my objection that would be great.
9           MR. SAYRE:  Sure.
10          THE WITNESS:  Can you repeat the
11 question?
12          MR. SAYRE:  Yeah.
13      Q.  Isn't it correct that you state that
14 Lopera had the lateral vascular restraint for over a
15 minute?
16      A.  And you're saying on line 8?
17      Q.  Yeah.
18      A.  I wouldn't say over a minute.
19      Q.  Look at line 13.
20      A.  It seemed like 30 seconds.  I guess I
21 said at the time being I felt like it was over a
22 minute.
23      Q.  Yeah, that's what you said.  Were you
24 being truthful when you said that?
25          MR. McNUTT:  Objection, that misstates

Page 46

1  the transcript.
2       MR. SAYRE:  No, page 13 -- line 13 does
3  not misstate.
4       MR. McNUTT:  Well, if you go back up to
5  11.
6       MR. SAYRE:  He said he feel like it was
7  over a minute.
8       MR. McNUTT:  I don't feel like it's over
9  a minute.
10      A.  Yeah, he's saying, 11, it continues, but
11 I don't feel like it was over a minute.
12      MR. SAYRE:
13      Q.  All right, so it was somewhere near a
14 minute?
15      MR. ANGULO:  Objection, asked and
16 answered.
17      A.  Somewhere under a minute.
18      MR. SAYRE:
19      Q.  Close to a minute?
20      MR. ANDERSON:  Objection, form.
21      MR. McNUTT:  Objection, form.
22      MR. ANGULO:  Same objection.
23      A.  Sometime under a minute possibly.
24      MR. SAYRE:  Okay.
25      Q.  You had an interview with

Page 47

1  Officer Rybacki, correct?
2       A.  An interview?
3       Q.  Discussion.
4       A.  Yes, I believe so.
5       Q.  Right, and you told Officer Rybacki that
6  "He was definitely out when we got there."  Take a
7  look at page 45.
8       A.  Yes.
9       Q.  And you also said, "Especially with what
10 Lopera was saying"?
11      A.  I don't remember saying that, but --
12      Q.  That he was acting really sporadic.
13      MR. ANGULO:  Objection, vague and
14 ambiguous.
15      A.  I don't remember saying that.
16      MR. SAYRE:
17      Q.  Does it refresh your recollection?
18      A.  Not saying that, no.
19      Q.  Well, did you say, "Oh, he was definitely
20 out when we got there"?
21      A.  I do believe I, I believe so, yes.
22      Q.  And did you say that he, Lopera, hit him
23 in the eye?
24      A.  I don't remember saying that.
25      Q.  The only reason that you felt that Farmer

Page 48

1  was actively resisting was because Lopera was
2  holding him around the neck?
3       A.  At the time being are you saying that's
4  why I felt like that Tashi Farmer was actively
5  resisting?
6       Q.  That's right.
7       A.  I did not know at the time, no.
8       Q.  Okay, take a look at page 56, the bottom
9  of the page.
10      A.  "So my train of thought is he's still
11 actively resisting."
12      Q.  Right.
13      A.  Correct.
14      Q.  And over to the next page.  "Because the
15 fact that Lopera's still holding onto him."
16      A.  Correct.
17      Q.  That was your thinking at the time?
18      A.  Correct.
19      Q.  When you grabbed a hold of Farmer he
20 didn't feel sweaty to you, correct?
21      A.  What page is that?  I don't recall.
22      Q.  Page 60.
23      MR. ANDERSON:  Sorry, Fred, what page?
24      MR. SAYRE:  60.
25      A.  I was not able to tell.  I don't

Page 49

1  remember.
2       MR. SAYRE:  Okay.  I think I'm done.
3       I have nothing further.
4       MR. ANDERSON:  Okay, can you hear okay
5  without a microphone?  And does that work?
6       THE COURT REPORTER:  Sure.
7
8            EXAMINATION
9  BY MR. ANDERSON:
10      Q.  So, Officer Flores, let me, let me take
11 this chronologically.  When you and Officer Tran
12 arrive in the vehicle tell me, you get out of the
13 car and you, you go to Lopera and Mr. Brown,
14 correct?
15      A.  Correct.
16      Q.  Okay, so when you get there what do you
17 do?
18      A.  When I got there I remember I was on the
19 radio giving our location of where we were at.  I
20 believe I said in the rear parking lot of Venetian.
21      Q.  And what information did you have on what
22 was going on between Officer Lopera and Mr. Brown
23 when you arrived?
24      A.  Limited to none.  It was just a red.
25      Q.  And what does just a red mean?

Page 50

1    A.   That there is an emergency.
2    Q.   So as you get to the scene, what's your
3  initial goal?
4    A.   To get the subject at the time in
5  custody.
6    Q.   So you go to Mr. Brown and
7  Officer Lopera, and where do you initially focus
8  your attention?
9    A.   I go to the top, towards Mr. Brown's
10 head.
11   Q.   And do you have any recollection of
12 visualizing Mr. Brown's head?
13   A.   I can't remember.
14   Q.   Do you know if he was conscious or
15 unconscious at that time?
16   A.   I could not tell.
17   Q.   And were you given orders as to what to
18 do or were you just deciding what to do based upon
19 what you were observing?
20   A.   Based upon what I was observing.
21   Q.   Okay, so what did you do next?
22   A.   I went up towards the subject,
23 Tashi Farmer's head, and my partner was there, Tran,
24 and Sgt. Crumrine was around his waist area I
25 believe, so I went down to his legs, and I heard

Page 51

1  someone say, "Get off my fucking legs."
2    Q.   Did you ever hear Sgt. Crumrine say
3  anything to Lopera about the LVNR hold?
4    A.   No, I can't recall, not to my knowledge.
5    Q.   At that time was it your perception, was
6  Mr. Brown, Farmer Brown, resisting or not resisting?
7    A.   My perception was he was resisting.
8    Q.   And what was that based upon?
9    A.   All the commotion, moving back and forth,
10 seemed as if there was a wrestling match going on.
11   Q.   So at that time your perception was he
12 was still conscious?
13   A.   That's correct.
14   Q.   And so what do you do next?
15   A.   I went towards his legs to go towards
16 segmenting, which they taught us in the academy.
17   Q.   Okay, tell me what segmenting is.
18   A.   It's to gain compliance by going towards
19 different sections of a person's body in order for
20 him to neutralize and gain compliance to get him
21 into custody.
22   Q.   Okay, was it your understanding that the
23 officers were just trying to handcuff him, that was
24 the goal to get him into handcuffs?
25   A.   Yes.

Page 52

1    Q.   Okay, and so what did you do next?
2    A.   I went towards his legs and segmented his
3  legs and went ahead and tried to help get him into
4  compliance or custody of him I should say.
5    Q.   When you say you segmented his legs, what
6  does that mean?  Are you grabbing his legs?
7    A.   I grab his legs.  I fold his legs over.
8  I use the leverage of my body, my legs, to put
9  pressure on his legs, so --
10   Q.   Did you -- go ahead.
11   A.   So he doesn't move around.
12   Q.   From your perception was he still
13 attempting to move around?  Did you feel resistance?
14   A.   I remember I did feel resistance at the
15 time.
16   Q.   And so it was your perception he was
17 still struggling?
18   A.   That's correct.
19   Q.   Is anyone issuing any verbal commands at
20 this time?
21   A.   I believe so, but I can't recall exactly
22 what was said.
23   Q.   Okay.  And so when you segment his legs
24 what happens next?
25   A.   I remember we were able to see one arm

Page 53

1  that was cuffed, his left arm, and the right arm I
2  could not see so I went ahead and reached for my
3  cuffs to get his other arm attached to the one cuff
4  that was swinging around.
5    Q.   Okay, so did you personally see a
6  handcuff swinging around?
7    A.   I seen a handcuff.  I believe his left
8  hand.
9    Q.   Okay, and so you took out your own cuffs?
10   A.   Yes.
11   Q.   With the goal of doing what?
12   A.   Getting the handcuff on the hand I
13 couldn't see and attaching the two cuffs.
14   Q.   Okay, so you double link him?
15   A.   Correct.
16   Q.   Were you able to successfully do that?
17   A.   Yes.
18   Q.   Okay.  And how much time passed from the
19 time that you arrived at his head until you were
20 able to get him cuffed?
21   A.   I would say approximately 30 seconds,
22 maybe a minute.
23   Q.   Now, when you give time estimates were
24 you timing this with a watch or anything?
25   A.   No.

Page 54

1  Q. Okay, so you're just going by
2  recollection?
3  A. That's correct.
4  Q. So after you get him into cuffs, so now
5  he's cuffed, what is your recollection as to how
6  long until Tran said, "Loosen up, loosen up"?
7  A. Could have been approximately 30 seconds
8  or right away he was cuffed.
9  Q. So it's somewhere between right away and
10 30 seconds?
11 A. Correct.
12 Q. If I could get you to turn to page 36 of
13 your statement. And if you would start, just start
14 at line 11 and read down to 22.
15 A. (Witness complies.) So like a couple
16 seconds later he released him altogether.
17 Q. Okay, so when you were speaking on
18 page 36 it was your recollection that after he was
19 cuffed he was released after just a couple of
20 seconds; is that correct?
21 A. Correct.
22 Q. And then if you would turn to
23 page 73, which we were already on, and read lines 8
24 to 11 to yourself.
25 A. (Witness complies.) It would be like

Page 55

1  five seconds after.
2  Q. So there you estimated it was about
3  five seconds after he was cuffed that he was
4  released?
5  A. That's correct.
6  Q. And then on page 74 on lines 9 and 10 you
7  agreed with the interviewing officer that it was a
8  few seconds after the handcuffing that he was
9  released, correct?
10 A. Yes.
11 Q. So when you gave your statement you
12 stated that Officer Lopera released the neck
13 restraint anywhere from a couple of seconds and
14 then -- but it was less than a minute was your
15 estimate, right?
16 A. Yes.
17 Q. Okay. As you sit here today do you have
18 an opinion as to how long after the cuffing until he
19 was released?
20 A. It was shortly after -- when he was
21 cuffed how long it took to release?
22 Q. Yes, after the handcuffing was complete,
23 how long until Officer Lopera released the LVNR?
24 A. A couple seconds.
25 Q. And was that based upon Tran making those

Page 56

1  comments?
2  A. I believe so, yes.
3  Q. Now, you testified that you didn't make
4  any commands. Was Tran your supervisor?
5  A. No.
6  Q. Okay, were you equal?
7  A. Yes.
8  Q. How does it work in giving commands to
9  other officers, do you both give commands or just
10 one?
11 A. Negative, one, one officer gives a
12 command.
13 Q. So after Tran gave his command did you
14 feel like you needed to give a further command?
15 A. No.
16 Q. And did you ever hear Officer or Sgt.,
17 Sgt. Crumrine ever give any commands personally?
18 A. I believe I do remember. I don't believe
19 so. I can't recall.
20 Q. When did you learn personally that
21 Mr. Farmer Brown was unconscious?
22 A. After the release was, the hold was
23 released, and Tashi Farmer was turned I did notice
24 that his nose I believe was bleeding and his mouth
25 had some foam on it I believe, and then I realized

Page 57

1  then Officer Tran and myself should sit him up, try
2  to revive him, give him a slap on the back, and then
3  that's when we called for medical. It was after he
4  was turned, after --
5  Q. And he would have been handcuffed at that
6  point?
7  A. Correct.
8  Q. So prior to the handcuffing being
9  completed did you have any information or visualize
10 anything that would have led you to believe that
11 Mr. Farmer Brown was unconscious?
12 A. No.
13 Q. And then you immediately called medical?
14 A. Correct.
15 Q. When you were in the middle of the scene
16 would you agree that the scene was chaotic?
17 A. Yes.
18 Q. While you were attempting to handcuff did
19 you ever perceive during the handcuffing event that
20 Officer Lopera was using what you believed to be
21 unreasonable force?
22 A. No.
23 Q. And so prior to the handcuffing did you
24 have any reason to believe that Officer Lopera was
25 acting improperly based upon how you understood the

OFFICER MICHAEL FLORES

February 08, 2018

Page 58
1  situation?
2      A.  No.
3          MR. ANDERSON:  I have nothing further.
4          MR. McNUTT:  I just have a couple
5  questions, but if you want to follow up.
6          MR. SAYRE:  Yes, just a little bit.
7
8          FURTHER EXAMINATION
9  BY MR. SAYRE:
10     Q.  Take a look at page 73, please.  The
11 person who is conducting the interview at this
12 point, his initials are KK, and he says at line 14,
13 So th- um, so because, when Greg asked you about how
14 long you think Officer Lopera had Farmer in the
15 LVNR, you said about over a minute, and you
16 answered, correct, I would say maybe around that
17 time, approximately.  Were you being truthful when
18 you said that?
19     A.  Yes.
20     Q.  "Okay," he says, "so 30 seconds to get
21 him into custody and another 30 seconds in the
22 LVNR?" and you said, "It seemed that way.  I don't
23 remember - oh, do you mean, 'til he completely let
24 go?" "Yeah." Is that --" "How long until he
25 let --" "Um." " -- go of the LVNR completely?"

Page 59
1  "Uh, I would say he got anywhere between that
2  30 seconds and a minute.  We're, like, 'Hey, you can
3  let up, um, to get him cuffed.'  I can't recall
4  exactly." What you said there, was that truthful?
5      A.  Yes.
6          MR. SAYRE:  I have nothing further.
7          MR. McNUTT:  Officer Flores, I have a
8  couple questions for you.  I represent Ken Lopera.
9
10         EXAMINATION
11 BY MR. McNUTT:
12     Q.  So during the period of time when you
13 showed up were, where were Ken's arms in relation to
14 Mr. Farmer?
15     A.  I seen one of Ken's arms around Tashi
16 Farmer's neck.  I could not see the other hand at
17 all.
18     Q.  And it was your perception at the time
19 that he was using a LVNR technique?
20     A.  That is correct, yes.
21     Q.  Are you familiar with -- you're trained
22 in the LVNR?
23     A.  Yes.
24     Q.  And you have recurring training in the
25 LVNR?

Page 60
1      A.  Yes.
2      Q.  Are there different levels of the LVNR
3  technique?
4      A.  Yes.
5      Q.  How many levels are there?
6      A.  Three.
7      Q.  Levels, what are they?
8      A.  There's 1, 2, and 3.  They are different
9  levels of pressure you would apply.
10     Q.  And what, so explain the different --
11 what is an LVNR No. 1?  What type of pressure would
12 you apply?
13     A.  You would have your arms at zero
14 degrees.  This (indicating) is an LVNR 1 where
15 you're just trying to gain compliance.  2 would be I
16 believe at 45 degrees, and 3 is 90 elevated against
17 him.
18     Q.  Do you know which LVNR technique
19 Mr. Lopera was using at the time?
20     A.  I could not tell at the time.
21     Q.  When Mr. Lopera had his right arm around
22 Mr. Farmer's head, neck, chest area, is that
23 correct?
24     A.  Yes.
25     Q.  Is that the way you demonstrated it, and

Page 61
1  was that the way it was?
2      A.  Yes.
3      Q.  Do you know how much pressure he was
4  applying or he was applying any pressure?
5      A.  No.
6      Q.  So when you say that he had the suspect
7  in an LVNR, isn't it what you really mean is he had
8  his arms in the LVNR position, but you don't know if
9  pressure was applied?
10     A.  That's correct.
11     Q.  So whether it was 30 seconds or a minute
12 or 90 seconds, you don't know if he had pressure
13 applied for 10 of those seconds or the whole time,
14 correct?
15     A.  I could not tell at all if he had
16 pressure on him, correct.
17     Q.  Isn't it true that when you are rolling
18 around with somebody that is actively resisting it's
19 very difficult to keep an LVNR pressure applied?
20     A.  Yes.
21     Q.  So isn't it possible that during that
22 struggle that the LVNR was not applied the whole
23 time?
24         MR. SAYRE:  Objection, calls for
25 speculation, lack of foundation.

Page 62

1  A.  Yes.
2      MR. McNUTT:  Thank you, no further
3  questions.
4      MR. SAYRE:  No questions.
5      MR. ANDERSON:  No questions.
6      MR. SAYRE:  Okay then, shall we stipulate
7  that we'll send, we'll send the original to you.
8  You'll have the witness examine it, make any changes
9  or corrections 30 days and advise me of any changes
10 or corrections, if any, and the fact that he signs
11 it under penalty of perjury?
12     MR. ANDERSON:  Fair enough.
13     MR. SAYRE:  Do you want to maintain the
14 original or do you want to send it back to me?
15     MR. ANDERSON:  I'll probably have you
16 maintain it.
17     MR. SAYRE:  Okay, that's fine.  Send it
18 back to me.
19          (Whereupon, Plaintiff's
20          Exhibit No. 1 was marked for
21          identification.)
22     THE VIDEOGRAPHER:  And just one more off
23 the record, the time is 3:09.
24          (Whereupon, the videotaped
25          deposition concluded at 3:09 p.m.)

Page 63

1           DECLARATION OF DEPONENT
2  PAGE   LINE   CHANGE            REASON
3
...
15                *****
16     I, OFFICER MICHAEL FLORES, deponent herein,
   do hereby declare the within and foregoing
17 transcription to be my deposition in said action;
   that I have read, corrected and do hereby affix my
18 signature to said deposition.
19
20     _____
           OFFICER MICHAEL FLORES
21         Deponent
22     Dated by me this ____ day of
   2018.

Page 64

1           REPORTER'S CERTIFICATE
2
3  STATE OF NEVADA )
                   ) ss
4  COUNTY OF CLARK )
5
6      I, Margie L. Carlson, CCR No. 287, do hereby
7  certify:
       That I reported the taking of the deposition
8
9  of the witness, OFFICER MICHAEL FLORES, commencing
10 on February 8, 2018, at the hour of 1:59 p.m.
11     That prior to being examined, the witness was
12 duly sworn to testify to the truth and that I
13 thereafter transcribed said stenotypy notes and said
14 deposition is a complete, true, and accurate
15 transcription of said stenotypy notes taken down at
16 said time.
17     The witness and/or a party has requested to
18 read and sign the deposition transcript.
19     I further certify that I am not a relative or
20 employee of any party involved in said action, nor a
21 person financially interested in the action.
22     Dated at Las Vegas, Nevada, this 20th day
23 of February, 2018.     *Margie L. Carlson* (signature)
24
                              Margie L. Carlson
25                            CCR No. 287

Page 65

1  Errata Sheet
2
3  NAME OF CASE: ESTATE OF TASHI S. FARMER vs LAS VEGAS METRO P.D.
4  DATE OF DEPOSITION: 02/08/2018
5  NAME OF WITNESS: Officer Michael Flores
6  Reason Codes:
7      1. To clarify the record.
8      2. To conform to the facts.
9      3. To correct transcription errors.
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____