# Exhibit I - Deposition of Plaintiffs' police practices expert, Scott DeFoe

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF NEVADA   )
                       ) ss
 3   COUNTY OF CLARK   )

 4
               I, Lori-Ann Landers, a duly commissioned
 5   Notary Public, Clark County, State of Nevada, do hereby
     certify:
 6
               That I reported the taking of the deposition
 7   of the witness, SCOTT A. DEFOE, at the time and place
     aforesaid;
 8
               That prior to being examined, the witness
 9   was by me duly sworn to testify to the truth, the whole
     truth, and nothing but the truth;
10
               That I thereafter transcribed my shorthand
11   notes into typewriting and that the typewritten
     transcript of said deposition is a complete, true and
12   accurate transcription of my said shorthand notes taken
     down at said time to the best of my ability.
13
               I further certify that I am not a relative
14   or employee of an attorney or counsel of any of the
     parties, nor a relative or employee of any attorney or
15   counsel involved in said action, nor a person financially
     interested in the action; and that transcript review NRCP
16   30(e) was requested.

17             IN WITNESS WHEREOF, I have hereunto set my
     hand in the County of Clark, State of Nevada, this 21st
18   day of August 2018.

19                         LORI-ANN LANDERS, CCR 792, RPR

20

21

22

23

24

25
```

Scott A. DeFoe        Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

## Page 1

1     UNITED STATES DISTRICT COURT

2       DISTRICT OF NEVADA

3   ESTATE OF TASHI S.    )
    FARMER a/k/a TASHII    )
4   FARMER a/k/a TASHII    )
    BROWN, by and through    ) Case No.
5   its Special          ) 2:17-cv-01946-JCM-PAL
    Administrator, Elia Del    )
6   Carmen Solano-Patricio;    )
    TAMARA BAYLEE       ) VIDEO DEPOSITION OF:
7   KUUMEALI'MAKAMAE FARMER   ) SCOTT A. DEFOE
    DUARTE, a minor,      )
8   individually and as     ) Taken on:
    Successor-in-Interest,    ) Tuesday, August 21, 2018
9   by and through her     )
    legal guardian,       )
10   Stevandra Lk Kuanoni;    )
    ELIAS BAY KAIMIPONO     )
11   DUARTE, a minor,      )
    individually and as     )
12   Successor-in-Interest,    )
    by and through his     )
13   legal guardian,       )
    Stevandra Lk Kuanoni,    )
14                  )
       Plaintiffs,      )
15                  )
      vs.          )
16                  )
17   LAS VEGAS METROPOLITAN   )
    POLICE DEPARTMENT, a     )
18   political subdivision     )
    of the State of Nevada;    )
19   OFFICER KENNETH LOPERA,   )
    individually and in his    )
20   Official Capacity;      )
    SERGEANT TRAVIS       )
21   CRUMRINE, individually    )
    and in his Official     )
22   Capacity; OFFICER      )
    MICHAEL TRAN,        )
23   individually and in his    )
    Official Capacity;      )
24   OFFICER MICHAEL FLORES,   ) Reported by:
    individually and in his    ) Lori-Ann Landers, CCR 792,
25   Official Capacity; and    ) RPR

## Page 2

1   DOES 1 through 50,     )
    inclusive,         )
2                  )
3        Defendants.      )
4

5

6     VIDEO DEPOSITION of SCOTT A. DEFOE

7        Taken on Tuesday, August 21, 2018

8          At 10:48 a.m.

        At 400 South 7th Street

         Las Vegas, Nevada

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Reported by: Lori-Ann Landers, CCR 792, RPR

25   Oasis Job Number 29121

## Page 3

1   A P P E A R A N C E S:

2   For the Plaintiffs:

3     FEDERICO C. SAYRE, ESQ.
    Abir Cohen Treyzon Salo, LLP
4     1901 Avenue of the Stars, Suite 935
    Los Angeles, California 90067
5     Email: fsayre@actslaw.com

6   For the Defendants LVMPD, Crumrine, Tran and Flores:

7     CRAIG R. ANDERSON, ESQ.
    Marquis Aurbach Coffing
8     10001 Park Run Drive
    Las Vegas, Nevada 89145
9     Email: canderson@maclaw.com

10   For the Defendant Officer Kenneth Lopera:

11     DANIEL R. MCNUTT, ESQ.
    MATTHEW C. WOLF, ESQ.
12     McNutt Law Firm, P.C.
    625 South Eighth Street
13     Las Vegas, Nevada 89101
    Email: drm@mcnuttlawfirm.com
14     mcw@mcnuttlawfirm.com

15   ALSO PRESENT: JOSEPH CAMP, VIDEOGRAPHER
16             RUTH MILLER, ESQ.

17

18

19

20

21

22

23

24

25

## Page 4

1           I N D E X

2   WITNESS              PAGE

    SCOTT DEFOE
3

4   Examination by Mr. McNutt          6
    Examination by Mr. Anderson    182, 215
5   Examination by Mr. Sayre      213

6

7         EXHIBIT INDEX

    DEFENDANTS'
    EXHIBIT    DESCRIPTION          PAGE
8

9   1    Scott DeFoe's CV, Fee Schedule,    5
       Record of Trial
10      Testimony/Depositions, and Report

11   2    Plts Initial Disclosures 000005    5
       through 000012
12

13   3    Plts Initial Disclosures 000056   179
       through 000057 and LVMPD 1469

14

15

16

17

18

19

20

21

22

23

24

25

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 5

1       PROCEEDINGS
2       (Defendants' Exhibit 1, Scott DeFoe's CV, Fee
3   Schedule, Record of Trial Testimony/Depositions, and
4   Report, was marked for identification as of this date.)
5       (Defendants' Exhibit 2, Plts Initial Disclosures
6   000005 through 000012, was marked for identification as
7   of this date.)
8       THE VIDEOGRAPHER: Good morning. Today is
9   August 21st, 2018. This begins the videotaped deposition
10  of Scott DeFoe. The time is approximately 10:48 a.m. My
11  name is Joseph Camp, court videographer of Las Vegas
12  Legal Video, and your court reporter is Lori Landers of
13  Oasis Reporting Services.
14      This is United States District Court, District
15  of Nevada, Case No. 2:17-cv-01946-JCM-PAL, titled Estate
16  of Tashi S. Farmer, a/k/a Tashii Farmer, a/k/a Tashii
17  Brown, by and through its special administrator, Elia Del
18  Carmen Solano-Patricio, et al., plaintiffs, versus
19  Las Vegas Metropolitan Police Department, a
20  political subdivision of the State of Nevada,
21  et al., defendants. This deposition is requested
22  by the attorneys for the defendants.
23      Would counsel present please identify
24  yourselves for the record, and the court reporter will
25  then administer the oath.

Page 6

1       MR. McNUTT: Dan McNutt and Matt Wolf for
2   Officer Ken Lopera.
3       MR. ANDERSON: Craig Anderson on behalf of the
4   Las Vegas Metropolitan Police Department and Officers
5   Crumrine, Tran, and Flores, and with me is a department
6   representative, Ruth Miller, assistant legal general
7   counsel.
8       MR. SAYRE: Federico Sayre for the plaintiffs.
9       (Witness sworn.)
10      SCOTT DEFOE,
11      having been first duly sworn, was examined and
12      testified as follows:
13      EXAMINATION
14  BY MR. McNUTT:
15      Q.  Mr. DeFoe, my name is Dan McNutt. We met a
16  little earlier before we went to court.
17      How are you doing this morning?
18      A.  I'm well, sir. Thank you.
19      Q.  You've been in quite a few depositions?
20      A.  I have.
21      Q.  You know why you're here?
22      A.  Yes.
23      Q.  Your attorney's explained the deposition
24  process?
25      A.  Yes, sir.

Page 7

1       Q.  Do you have any questions?
2       A.  I do not.
3       Q.  Ready to get started?
4       A.  I am.
5       Q.  Is trespassing a crime in Nevada?
6       A.  Yes.
7       Q.  Do you know what the NRS citation for that is?
8       A.  I do not.
9       Q.  Is trespassing a crime in California?
10      A.  Yes.
11      Q.  Is being under the influence of illegal
12  narcotics a crime in Nevada?
13      A.  It is.
14      Q.  Is it illegal in California?
15      A.  It is.
16      Q.  Is running away from a police officer considered
17  reasonable suspicion?
18      A.  It can be.
19      Q.  Do you know whether Tashi Farmer initiated
20  contact with Officer Lopera or vice versa?
21      A.  Tashi Farmer initiated a contact.
22      Q.  Do you have an expert opinion as to what point
23  Tashi Farmer was detained by Officer Lopera?
24      A.  At the time of the initial tasing.
25      Q.  At no time before?

Page 8

1       A.  No.
2       Q.  Was there a seizure at any time before the
3   initial tasing?
4       A.  I don't believe so, no.
5       Q.  If Officer Lopera knew for a fact -- just
6   assuming for argument, if Officer Lopera knew for a fact
7   that Tashi Farmer was mentally ill and not under the
8   influence of illegal narcotics, and he ran into an
9   employee-only area at the Venetian, should Officer Lopera
10  have pursued him?
11      A.  Yes.
12      Q.  Did Officer Lopera know at the time, as you now
13  believe, that Mr. Farmer wasn't a threat to anyone?
14      A.  I don't know what he knew at the time.
15      Q.  Do you know if Mr. Farmer had been involved in
16  any crimes or hurt anyone earlier that evening?
17      A.  I do not know.
18      Q.  If Officer Lopera was not resisting, meaning
19  active resistance or anything higher on the force -- the
20  use of force scale -- do you understand that -- what I
21  mean by that?
22      A.  Were you saying if Mr. Farmer was not resisting?
23      Q.  Yes. If -- if Mr. Farmer was not resisting, why
24  did it take three officers to handcuff him?
25      A.  I don't know.

Scott A. DeFoe                     Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 9

1    Q.  Would you find that to be reasonable if he
2    wasn't resisting?
3    A.  It depends.  A lot of times with use of force,
4    it depends how concerted the effort is.  Sometimes it
5    takes more than one, and that may be depending on the
6    fact that they don't communicate during the use of force
7    or the application of force, which could create some
8    issues as to getting that person handcuffed.
9    Q.  When you say, "how concerted the effort," you
10   mean the officers acting in concert with each other?
11   A.  In communicating throughout the use of force, to
12   have a systematic approach to the handcuffing technique.
13   Q.  As opposed to the focused effort of resistance?
14   A.  Right.  Without any --
15   Q.  Of the suspect?
16   A.  Without any communication, yes.
17   Q.  Was Metro wrong for teaching Officer Lopero that
18   he could use the LVNR as a low-force option?
19   A.  I think, in hindsight, yes.  I believe that it
20   should not have been at that level.  I believe it's an
21   intermediate use of force, and it should have been
22   that -- the entire time.
23   Q.  Are you aware that it has changed since this
24   incident?
25   A.  Effective September 21, 2017, I believe, there

Page 10

1    was a directive that was generated by Las Vegas
2    Metropolitan Police Department, thus advising that it's
3    now no longer lower-level use of force.
4    Q.  And you think it should have been that way since
5    the LVNR was adopted by Metro?
6    A.  Yes, sir.
7    Q.  Why do you think that?
8    A.  Because in the course of using an upper body
9    control hold or a neck restraint or whatever it may be,
10   the person's moving at times.  And with that movement can
11   create additional application of force.  And that
12   incident can become prolonged.  And with that, it's hard
13   at times to determine -- you can't stop that use of force
14   at times once you have it applied.
15   So unless you've -- once the force becomes
16   unreasonable or the force is no longer necessary, I think
17   that, in the way I was trained, it's at least an
18   intermediate use of force.  Many departments, it's a
19   lethal use of force, an upper body control hold.  I know
20   with my former department, Los Angeles Police Department,
21   an upper body control hold was parallel with use of a
22   firearm.
23   Q.  Okay.  I understand that you're, you've been
24   designated in this case as a use of force expert.  Is
25   that the correct characteristic of your expert opinion?

Page 11

1    A.  I think that, as well as police procedures,
2    everything from the planning to communication, as I
3    mentioned earlier; to the application of force; to the --
4    what transpires after the force -- that could be from the
5    use of force investigation to the review process and the
6    use of force -- any recommendations as it relates to
7    issues that may involve ratification, things such as
8    that.
9    Q.  Do you have an opinion as to why Metro
10   reclassified the LVNR to intermediate use of force?
11   A.  I do not know.
12   Q.  Do you believe that Metro should ban the use of
13   all neck restraints?
14   A.  No.  I think neck restraints are an appropriate
15   use of force, obviously, if it meets that threshold.  I
16   think that it's imperative that they train, at least on a
17   quarterly basis.  It's imperative -- these are perishable
18   skills, so for an officer not to be trained, like any
19   other less lethal force option or even legal use of force
20   option, they shouldn't use that or deploy in the field
21   unless they've been properly trained.
22   Q.  Have you reviewed Metro's training procedures
23   for the use of the LVNR?
24   A.  I have.
25   Q.  And do you think they are adequate?

Page 12

1    A.  When you say "adequate," I'm -- it just says,
2    "Defensive Tactics Training."  Like on -- on -- for
3    instance, on Officer Lopera's training record, it doesn't
4    indicate if, during that defensive tactics, was it
5    weaponless retention techniques?  Was it ground fighting?
6    Was it something other than?
7    It doesn't specifically say that during that
8    course of that block that LVNR was, in fact, taught.  So
9    there's no way for me to discern if, during that
10   quarterly training, which I think is appropriate and I
11   think that's aggressive posture in a sense of training --
12   it's no way for me to determine if, in fact, he received
13   that training.  I know just a couple months preceding
14   this incident.
15   Q.  Do you have an opinion as to how much training
16   an officer should receive on an annual basis in the LVNR
17   specifically?
18   A.  I don't.  Each state, obviously, through their
19   POST standards or CALEA standards, are going to determine
20   the level of training.  It's a perishable skill.  With
21   that, it just can be the respective -- with each
22   respective agency.
23   Q.  Are you familiar with the National Law
24   Enforcement Training Center?
25   A.  Yes.

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 13

1   Q.   NLETC?
2   A.   Yes.
3   Q.   What's your familiarity with that organization?
4   A.   It's like an agency like PERF.  They do a lot of
5   oversight in police training and police liability and
6   recommended best practices.
7   Q.   Are you affiliated in any way with NLETC?
8   A.   I am not.
9   Q.   Do you know anybody that is affiliated with
10  NLETC, like their adjunct instructors or full-time
11  instructors?
12  A.   I don't.
13  Q.   Have you reviewed -- well, do you have an
14  understanding that the NLETC standards are what has been
15  adopted by Las Vegas Metropolitan Police Department with
16  respect to the LVNR?
17  A.   I believe so.
18  Q.   Okay.  Do you have any criticism of Metro
19  adopting, in whole or in part, the NLETC standards?
20  A.   No.  I don't have any opinions on Metro's
21  posture in their training at all in this matter.
22  Q.   Okay.  Other than the fact that you think that
23  the LVNR should have been always classified as
24  intermediate level or higher?
25  A.   That's correct.

Page 14

1   Q.   Okay.  So with that qualification, you don't
2   have any other --
3   A.   Well, as I mentioned, I can't discern looking --
4   looking at someone's training record as to what the
5   training entailed.
6   Q.   Well, I'm -- and I'm sorry, I'm not asking about
7   Ken Lopera's training specifically on that question.
8   I mean do you have any qualms about -- or issues
9   or criticisms of Metro adopting, as an organization, the
10  standards from NLETC?
11  A.   I have no opinion on that at all.
12  Q.   Okay.  Is an LVNR a chokehold?
13  A.   Yes.
14  Q.   What kind of chokehold?
15  A.   Blood.
16  Q.   Do you know how many times the Taser was cycled?
17  A.   Seven times.
18  Q.   How do you know that?
19  A.   Based on the Taser printout.
20  Q.   And not based upon watching the video?
21  A.   No.  Just by the Taser download printout that I
22  have with me here today that I've reviewed in the
23  course of this -- my work in this matter.
24  Q.   And are those the Taser pulse graphs?
25  A.   No.  I just looked at the Taser deployments,

Page 15

1   that there were several -- several -- seven separate
2   Taser deployments totaling 39 seconds.
3   Q.   So the summary chart?
4   A.   Yes.
5   Q.   Okay.  So every place in your report where it
6   references that there were that many cycles or that many
7   seconds, you took that from the printout report that
8   Metro provided in this case?
9   A.   Yes.  It's also mentioned in their -- in
10  their -- their FIT report as well that they -- that they
11  conducted.
12  Q.   And all I'm trying to determine is that -- where
13  you got that information from, that this was not
14  something that you derived from raw data sources or that
15  you had access to the Taser or the software, et cetera,
16  but you took that information from another report that
17  we've received through this litigation.
18  A.   Yeah, directly through the Taser evidence sync
19  log that depicts -- on Page 25.
20  Q.   Do you have an -- do you know what NMI is?
21  A.   Neuromuscular incapacitation.
22  Q.   And do you have an opinion as to how many times
23  NMI was achieved, if any?
24  A.   I don't.  I read in the record -- it might have
25  been Borden's report -- I believe they said there was two

Page 16

1   that were -- actually achieved, the initial one and then
2   one other one.  I don't know if, in fact -- I did not
3   look at the pulse graph to determine if there were more
4   than -- than -- than the initial.
5   Based on my review of the video, it seemed that
6   there was at least one that I could see.  From looking on
7   that, it seemed like it worked as designed.  Target area
8   was back, as we know.  The way in which he fell, it
9   seemed that NMI was achieved during the initial Taser.
10  Q.   You said target in the back, and that's the
11  proper place to shoot someone with a Taser?
12  A.   The best place for a number of reasons.  A, you
13  get greater probe spread.  Shirts are tighter on the
14  back.  A larger muscle group.  Inability for someone to
15  grab and remove probes, typically.
16  Q.   Avoid the eyes, avoid soft tissues?
17  A.   Groin, all of that, yes.
18  Q.   Are you qualified -- and we'll get to your Taser
19  experience and things of that -- later.  Are you
20  qualified to be able to read the Taser pulse graphs and
21  explain to me what they mean?
22  A.   I should be.
23  Q.   Okay.  Tell me, what is your Taser instructor
24  level or your Taser experience?
25  A.   Obviously, I went through -- every year annually

Scott A. DeFoe      Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 17

1 we go through Taser certification.
2     Q. That would qualify you as a user; correct?
3     A. User. And then when I went to Metropolitan
4 Division in 2000 as a K-9 sergeant, I became an
5 instructor, and then I went to SWAT in 2005 as a
6 sergeant. I became a Taser instructor through Taser
7 International.
8     We train the people just within our 60-officer
9 SWAT team on an annual basis. And basically -- so
10 basically, from 2000 to 2010. When I left the Los
11 Angeles Police Department in 2010, I maintained a Level 1
12 reserve status. And throughout that time, I was,
13 obviously, trained on the Taser on an annual basis as
14 well.
15     Q. As a user or as an instructor?
16     A. As a user.
17     Q. Were you ever a master instructor? My
18 understanding is there was the four categories of
19 qualifications.
20     A. I was only a -- a primary instructor, not a
21 master instructor.
22     Q. What's the difference?
23     A. A master instructor is additional certification
24 levels.
25     Q. But what does it do?

Page 18

1     A. It allows you to teach, I guess, more on a
2 broad-based level than you can just to the individual
3 officer.
4     Q. So you -- as an instructor, you were -- kind of
5 trained the trainer in terms of your own department; as a
6 master instructor, you could train other departments?
7     A. You could.
8     Q. Okay. What is your understanding of the purpose
9 of NMI?
10     A. It's basically to override the central and motor
11 nerves -- your system, obviously, to be able to put your
12 body into somewhat of a lock and where you cannot,
13 obviously, move to that point and ultimately to be able
14 to hand -- effect a handcuffing technique.
15     Q. How long does NMI last?
16     A. Typically the length of the duration of the --
17 of the -- of the time in which that person's tased.
18     Q. So when the charge is released -- by that, I
19 mean the electrical charge being transferred from the
20 Taser. When that is turned off, the subject can resume
21 normal activity?
22     A. Typically. After that five-second cycle, they
23 should at that time reassess and, obviously, see if
24 that -- give that person a reasonable opportunity to
25 comply. And if they do, then you can effect a

Page 19

1 handcuffing technique or you can effect a handcuffing
2 technique under power, to be able to do that while the
3 trigger is depressed the entire time.
4     Q. And there -- you said a five-second cycle?
5     A. Yes.
6     Q. Is that based upon -- what?
7     A. That's what the standard is. Each time you pull
8 the trigger, there's a five-second cycle that occurs.
9     Q. So by design of the Taser itself, the X26?
10     A. That's correct.
11     Q. Are you aware of other Tasers that have a
12 30-second cycle for one trigger pull?
13     A. I do not know.
14     Q. Okay. Have you ever deployed a Taser in your
15 time as a police officer?
16     A. Yes.
17     Q. Hopefully not in your time as an expert?
18     A. No. Not at depositions either.
19     Q. Good. Good.
20     A. No. Yes, I have.
21     MR. SAYRE: Going to make an exception.
22     MR. McNUTT: Today may be a first.
23     Q. How many times have you deployed a Taser?
24     A. I don't know. Several times.
25     Q. Was it the X26 version that you've opined on in

Page 20

1 your expert report?
2     A. Yes. The last was, I believe -- the last time I
3 deployed a Taser was the X26. We have different
4 variations. When I came into law enforcement in 1988, so
5 I believe LAPD -- I don't know the year we transitioned
6 to the X26. I know we had the N26 for a period of time.
7 We had the X2, I believe, as well.
8     Q. You've said in your report that you've -- you've
9 investigated approximately 100 or more use of force
10 incidents as a police officer?
11     A. Yes.
12     Q. Were you part of a CIRT or a FIT team like we
13 have here in Las Vegas? And do you know what I mean by
14 those acronyms, force investigation team, critical
15 incident review team?
16     A. We have what's called Force Investigation
17 Division. I've never worked that division. We could
18 take -- as a sergeant in, say, Metro, K-9, or SWAT or
19 even a sergeant working -- running a gang detail or a
20 vice unit where I've worked before, you can conduct an --
21 anything that was not considered a categorical use of
22 force such as a head strike or, obviously, a shooting.
23     But anything from the -- from Taser, dog bite,
24 baton strikes, other -- unless it required suturing or
25 hospitalization, I, as a sergeant, could -- could

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 21

1  complete that entire use of force investigation.
2      Q.  Okay.  So just let me -- I want to just make
3  sure I understand the line where someone from the -- the
4  task force, specific organization would have to come in.
5          If there were no sutures -- so there was no --
6  obviously no lethal force was involved, you could
7  investigate your own team's use of force?
8      A.  Unless I was a percipient witness or unless I
9  was involved in the use of force.  And that involvement
10 may involve planning as well by formulating the plan.
11 And then if use of force was, in fact -- did, in fact,
12 occur, then we'd have to bring in a noninvolved sergeant
13 to handle the use of force.
14     Q.  What constitutes a use of force that had to be
15 reported at LAPD?  And I presume you're talking about
16 LAPD.
17     A.  Any use of force, other than handcuffing
18 technique or a twist lock.  And wrist locks were not
19 considered anything where -- anything from basically --
20 from above the level of pepper spray and above -- if you
21 took someone to the ground would be considered a use of
22 force, a leg sweep.
23         But a typical wrist lock, twist lock, control
24 hold to effect a handcuffing technique was not reportable
25 at that time unless there was injury.

Page 22

1      Q.  Okay.  How many times have you seen a Taser
2  deployed, even if you didn't do it, in terms of -- not in
3  training, but on the street when you were a patrolman or
4  in any other capacity as a police officer?
5      A.  Probably 50.
6      Q.  Okay.  Have you ever seen a Taser deployed on
7  someone under the effects of illegal narcotics?
8      A.  Yes.
9      Q.  What kind of illegal narcotics?
10     A.  Primarily CNS stimulants.  Earlier on, PCP
11 was -- was quite common in South Central Los Angeles
12 where I worked most of my career.
13     Q.  Do suspects on illegal narcotics react the same
14 as suspects that are not on illegal narcotics when hit
15 with a Taser?
16     A.  It depends.  It depends on the duration of the
17 tasing.  It depends on what the substance is.  It depends
18 on that person's level of intoxication.  It -- it just
19 depends on the individual.
20     Q.  Have you ever been in a hand-to-hand fight with
21 someone on illegal narcotics?
22     A.  Yes, sir.
23     Q.  And is it your experience that they exert more
24 or less strength than normal?
25     A.  I don't know if it's more or less strength.  I

Page 23

1  think there's a higher level of agitation, especially if
2  it's a CNS stimulant like methamphetamine or cocaine.
3  With that, could -- behavior may be more irrational
4  during the course of the fight, where they're not
5  listening in the sense --
6      Q.  I'm sorry, irrational or rational?
7      A.  Irrational.
8      Q.  Thank you.
9      A.  Where they may be not listening to what you are
10 saying or complying with your verbal commands.
11     Q.  Does that make it harder for the officer to
12 apprehend or deal with the suspect?
13     A.  It can.
14     Q.  Is a police officer -- is he reactionary to a
15 suspect's actions, or is he proactive?
16     A.  Depends.  Typically reacts.
17     Q.  Have you ever seen it necessary to use a Taser
18 on someone that was under the influence of
19 methamphetamine?
20     A.  Yes.
21     Q.  Because they would not comply?
22     A.  Because their actions were aggressive and/or
23 combative.
24     Q.  Is it ever -- have you ever seen an incident
25 when a suspect's words did not equal -- equate to his

Page 24

1  actions?
2      A.  How do you mean?
3      Q.  Have you ever seen a suspect say that he will
4  comply but his actions indicated to you, the trained
5  officer, that he was not complying?
6      A.  Yes.
7      Q.  What matters more to you, his actions or his
8  words?
9      A.  His actions.
10     Q.  Why, because those are lethal or can be?
11     A.  Just because you're -- I mean, you -- there
12 could be -- I'm looking for actions.  There could be a
13 language barrier.  There could be -- some could be deaf.
14 They could be under the influence.  There's a myriad of
15 reasons.
16     Q.  Or they could be lying?
17     A.  They could be lying.
18     Q.  When you were a patrol officer, were you able to
19 discern when someone was under the influence of illegal
20 narcotics?
21     A.  I was a drug recognition expert on the Los
22 Angeles Police Department.
23     Q.  As a patrolman?
24     A.  As patrol officer.
25     Q.  Okay.  When you first became an officer, you

1  were?
2      A.  Not first.  I think in like 1994 I was certified
3  before I went to -- started working narcotics.
4      Q.  Do you think patrol officers are generally
5  taught today to look for signs of someone being under the
6  influence?
7      A.  It depends.  I think they're looking,
8  obviously -- most officers go through what -- you know, a
9  drug recognition class.  They may not go through the
10  expert certification, but you're looking for behavioral
11  cues that may indicate to that officer that a person may
12  be impaired, under the influence of -- could be a CNS
13  stimulant, alcohol, whatever it may be.
14      Q.  You have an opinion as to whether Officer Lopera
15  had the ability or the training to determine and see
16  those cues as to whether someone was exhibiting signs of
17  being under the influence?
18      A.  I don't know.
19      Q.  Okay.  You don't know because you haven't seen
20  anything in the record or you've seen stuff in the record
21  and you can't make a determination?
22      A.  I don't recall.  I looked at his training
23  record, and I believe there was some training in there
24  that coincides with that, but I don't know if, during his
25  initial interaction and/or a time in which he began a

1  foot pursuit of Mr. Farmer, that at any time he knew that
2  he was under the influence of anything at that time.
3      Q.  Can a patrol officer confuse someone that's
4  mentally ill with being under the influence of drugs and
5  alcohol?
6      A.  It depends.
7      Q.  What does it depend on?
8      A.  Well, it depends if they're exhibiting certain
9  signs and behaviors.  It might be something related to
10  the eyes.  It might be the way in which their mannerisms
11  may be.  It may be a compilation of both, that maybe
12  someone might be mentally ill -- mentally ill and under
13  the influence of narcotics.
14      Q.  Does it depend on how long the officer has to
15  assess and make that determination?
16      A.  It's that.  It depends on lighting conditions.
17  It depends on the environment that they're in.  It
18  depends on information derived, maybe from the source of
19  the call if it's a call that they're -- they're generated
20  to.  It depends on a number of factors.
21      Q.  So if you had a five-second exposure to somebody
22  that just walked in the room, could you be able to tell
23  in this lighting, in this area whether or not they were
24  on drugs or whether they were mentally ill?
25      A.  Well, I think we all know what mentally ill

1  looks like.  I mean, you see someone --
2      Q.  I don't.
3      A.  You see someone on the corner.  I'm talking
4  extreme mental illness, where you see the person on the
5  corner, they're maybe flailing arms or the transient,
6  unfortunately, that may be in front of a Starbucks that
7  may be talking to him- or herself.  I think that's
8  apparent when we see that.
9          You know, if someone's bipolar or paranoid
10  schizophrenic or off psychotropic medication, there's no
11  way to determine that initially, once again, unless you
12  have information from the onset that that person is under
13  the influence or mentally ill.
14      Q.  Have you reviewed videos of this incident?
15      A.  Yes.
16      Q.  And by "this incident," you know what I'm
17  discussing; right?
18      A.  Yes, sir.
19      Q.  Okay.  What videos -- I'm not interested in the
20  other officer's body-worn cameras that maybe showed up
21  after the fact.  What videos have you reviewed, whether
22  they were produced in this case or whether you reviewed
23  them online?
24      A.  I have reviewed the full video which was of
25  LVM -- LVMPD, the media briefing which is 20 minutes

1  and 58 seconds.  Within that briefing, there was
2  obviously -- there was videos that were shown.  The
3  merged video at four minutes and three seconds.
4          And then there was a a -- video of Tashi Farmer:
5  Body Cam Shows Unarmed Black Man Fatally Tased and Choked
6  to Death By Cop.  That was a 2-minute, 19-second videos.
7      Q.  All produced in this litigation?
8      A.  Yes.
9      Q.  And have you reviewed any videos that were
10  opened online?
11      A.  I don't believe so, no.
12      Q.  Have you reviewed a video that shows, from the
13  perspective of Officer Lopera's body-worn camera the
14  initial interaction with Tashi Farmer?
15      A.  Yes.
16      Q.  Do you recall how long Mr. Farmer and Mr. Lopera
17  interacted before Mr. Farmer began running?
18      A.  Seconds.
19      Q.  Okay.  Do you think that's long enough to make a
20  determination as to whether that was mental illness or he
21  was under the influence of illegal narcotics?
22      A.  To make that determination, to do -- someone's
23  under the influence takes -- it's a 12-step process to --
24  to make that determination.  But the things I did see on
25  video would make a reasonable officer believe that there

Scott A. DeFoe          Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

| Page 29 | Page 31 |
|---------|---------|
| 1 was something going on with Mr. Farmer. | 1 taking the person's pulse; obviously, searching the |
| 2    Q.   Something including the potential that he was | 2 person; doing a field sobriety test, blood alcohol. |
| 3 under the influence of illegal narcotics? | 3 There's a number of -- of things that go into that |
| 4    A.   Under the influence, mentally ill, or both. | 4 process. |
| 5 There was something that was transpiring, that he -- | 5    Q.   So it's not a 12-step process necessarily |
| 6 obviously, he was anxious and showed some anxiety, | 6 sequentially; it's -- there are 12 things that would -- |
| 7 appeared to be sweating, and his mannerisms would, I | 7 you would optimally look for.  Is that -- am I |
| 8 think, make a reasonable officer believe that there was | 8 understanding that correctly? |
| 9 something occurring at that time that -- that -- I don't | 9    A.   Correct.  And that's if you're going to be |
| 10 know. | 10 looking to book someone under the influence of a narcotic |
| 11    Q.   As it turned out, are you aware that Mr. Farmer | 11 or under the influence of alcohol. |
| 12 was under the influence of illegal methamphetamines? | 12    Q.   Okay. |
| 13    A.   I am aware of that. | 13    A.   That's typically what the standardized training |
| 14    Q.   You've stated a couple times in your report, | 14 is for DREs.  Officers in the field can make a reasonable |
| 15 broadly, that Officer Lopera did not properly assess the | 15 assumption based on actions and mannerisms, and then with |
| 16 suspect. | 16 that, obviously, bring in the DRE to do that evaluation, |
| 17        Do you remember that? | 17 maybe back at the station. |
| 18    A.   Yes. | 18    Q.   When you say "DRE," what is that? |
| 19    Q.   Do you think -- do you have an opinion that | 19    A.   A drug recognition expert. |
| 20 Officer Lopera did not properly assess the suspect at | 20    Q.   Okay.  Are patrol officers in Las Vegas Metro |
| 21 their initial interaction? | 21 expected to be drug recognition experts? |
| 22    A.   No.  I think the -- I think the assessment | 22    A.   They are expected, I think, through their |
| 23 occurs, obviously, throughout the incident, but what he | 23 training.  I think it's consistent with standardized |
| 24 did see or what I saw on video, I don't -- can't speak to | 24 training that they're -- are to recognize when someone is |
| 25 what his thoughts or opinions were, but what I did see is | 25 under the influence, maybe of alcohol.  It could be of a |

| Page 30 | Page 32 |
|---------|---------|
| 1 during the course of that force, leading up to the tasing | 1 CNS stimulant or depressant.  Depending on what, you |
| 2 and then the subsequent force after that, is that he | 2 know, that person's doing at the time. |
| 3 should have considered at that point that either | 3    Q.   So that's -- I apologize, but maybe I didn't ask |
| 4 Mr. Farmer was mentally ill and/or experiencing a mental | 4 you a good question because your answer is nonresponsive. |
| 5 crisis and possibly under the influence. | 5 Are they expected -- are patrol officers expected to be a |
| 6    Q.   And you said earlier that even if he was | 6 drug recognition expert as you've testified here? |
| 7 strictly under the influence of mental illness -- strike | 7    A.   Expected to be an expert, no. |
| 8 that. | 8    Q.   Okay.  Is it your opinion that most LAPD |
| 9        You said earlier that if it was true that | 9 officers are drug recognition experts that are assigned |
| 10 Mr. Farmer was simply mentally ill, that Mr. -- Officer | 10 to a patrol unit? |
| 11 Lopera should have pursued him; correct? | 11    A.   They are not, no. |
| 12    A.   Yes, based on where he went, I believe, down to | 12    Q.   Okay.  Is it your opinion that Las Vegas |
| 13 that corridor, that was not -- it was not accessed, other | 13 Metropolitan patrol officers are expected to be drug |
| 14 than for employees.  I -- I don't have a problem with the | 14 recognition experts when assigned to a patrol unit? |
| 15 initial following of him. | 15    A.   Most likely not. |
| 16    Q.   You talked about a 12-step process to assess | 16    Q.   Okay.  You've reviewed quite a bit of testimony |
| 17 someone's situation. | 17 in preparation for providing your expert opinion.  I |
| 18    A.   Right. | 18 think I saw that you reviewed transcribed FIT reports; |
| 19    Q.   Can you explain that 12-step process. | 19 correct? |
| 20    A.   That's a -- it's a DRE process, everything | 20    A.   Yes. |
| 21 from -- that you go through when you take someone into -- | 21    Q.   Transcribed CIRT reports; correct? |
| 22 into custody.  And that's basically from the initial | 22    A.   Yes. |
| 23 conversation, collecting information, conducting a myriad | 23    Q.   You've reviewed various deposition testimony; |
| 24 of investigations. | 24 correct? |
| 25        That could be low light, darkroom examinations; | 25    A.   That's correct. |

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 33

1    Q. Did you -- when reviewing all those statements
2  and sworn testimony, did you give anyone's testimony more
3  credibility than anyone else's testimony?
4    A. No. I don't make credibility determinations at
5  all.
6    Q. Why not?
7    A. As an -- as an expert, I need to be objective.
8    Q. Does it matter to you whether one of the people
9  providing testimony was actually there versus hearing
10 about the incident later or seeing the videotape later?
11   A. Well, it depends. Even eyewitness testimony
12 sometimes --
13   Q. Sure.
14   A. -- people are looking at things that can be
15 completely off as to what -- what really transpired.
16   Q. But the question stands, and I'll give you an
17 example: Officer Lif, Officer Lopera's partner, arrived
18 at the scene after officer -- or, excuse me, Tashi Farmer
19 was already in custody; is that your understanding?
20   A. Yes.
21   Q. Okay. So could she -- could her testimony have
22 any real influence as to, you know, how the takedown
23 occurred, the tasing, the cycles, the LVNR, et cetera?
24   A. No.
25   Q. Okay.

Page 34

1    A. Other than what would be reasonable within her
2  department standards, based -- if she was given the
3  information, would -- as she testified, would, you know,
4  seven cycles of a Taser be reasonable or would --
5    Q. Well, that's a policy question, and I'm talking
6  about percipient witness information.
7        MR. SAYRE: Maybe you could let him finish his
8  answer, please.
9        MR. McNUTT: And I'm clarifying my question
10 because he's going on a tangent.
11   Q. So that -- that's a policy question, and that's
12 a separate issue. Anybody can be asked those things
13 after the fact. And my question was simply directed
14 towards what could Officer Lif testify about, based upon
15 her percipient knowledge? That's the question.
16       MR. SAYRE: I -- I object to your interrupting
17 his answer. If it -- if he's going astray, as you
18 believe, at least let him finish his answer, and then you
19 can point that out to him.
20       Did you finish your answer?
21       THE WITNESS: I did, I believe.
22   Q. Okay. Now can you answer my question?
23   A. Can you repeat it, please.
24   Q. Sure. So my -- I understand the per -- well, I
25 understand the after-the-fact policy questions. That's

Page 35

1  fine. Anyone can be asked those, and anyone can provide
2  an answer as -- based on their understanding and
3  foundation.
4        My question is when you read all this testimony
5  and you were reading the information of a person that was
6  not present during either the tasing or the -- the use of
7  the LVNR or the cuffing, did you still give that person's
8  testimony as much weight as, say, Sergeant Crumrine who
9  was there for most of the events?
10   A. Well, I don't know if I would give it any more
11 weight as I would, I think, the percipient witness,
12 someone that's there who's seeing this situation, you
13 know, unfold. So, of course, I'm going to take that
14 person's testimony, not any more credible, but being the
15 fact that they were there is -- I think would -- more
16 significance.
17   Q. So someone that wasn't there for, say, the
18 tasing or the use of the LVNR or the handcuffing,
19 their -- their opinion about those events is really no
20 better than yours or mine, reviewing it after the fact;
21 is that correct?
22   A. I think that's fair.
23   Q. Okay. When a police officer asks a civilian
24 bystander for help, does that indicate to you that he has
25 the situation under control?

Page 36

1    A. No. I think if you solicit assistance from a
2  bystander or citizen, I think you're asking for help
3  because you may perceive you need help.
4    Q. Have you ever asked a citizen, bystander for
5  help in apprehending a suspect?
6    A. I don't recall. I know citizens have intervened
7  and assisted me at times, but LAPD, we're typically a
8  two-officer unit, so we're -- typically have a partner.
9  But people have -- you know, unsolicited, have assisted
10 me, but I -- you know, I may have asked for help.
11   Q. In any of the use of forces that you
12 investigated, did any of those officers request help from
13 a civilian bystander?
14   A. I don't recall.
15   Q. What training did you have to investigate use of
16 force for LAPD? So once you become a sergeant or a
17 supervisor, is there -- is that part of your training to
18 achieve that position?
19   A. Yes. You go through basic sergeant school which
20 is a month long. Within that, there's, I think, a couple
21 days of use of force investigations, go through periodic
22 updates on use of force investigations, as well as -- I
23 think there's a segment of the West Point Leadership
24 Academy that I went to that we discussed use of force
25 investigations. And then the annual training I would

Scott A. DeFoe      Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

**Page 37**

1 receive as a sergeant my last 14 years.

2    Q.  How long did the average use of force

3 investigation that you conducted -- of those 100 that you

4 talk about in your resume, how long did it take you to

5 do?

6    A.  It depends.  Typically, with K-9 bites, we're a

7 little bit longer because there's always a follow-up.  A

8 lot of times due to the injuries, we wouldn't get a

9 statement right away from that person.  But typically use

10 of a baton or a Taser, pepper spray, we get it done that

11 day -- you get it done before you go home.

12    Q.  You investigate -- the officer says, "Look, I --

13 he was resisting.  I leg swept him, we went down, we

14 rolled around, I got him in a -- my partner came up, and

15 we cuffed him."

16      Is that a use of force you would've

17 investigated?

18    A.  That and I'd need to interview any witnesses,

19 look for any video, and scan the area for any potential

20 witnesses to the event, any evidence.  You interview,

21 obviously, the individual who the force is used on.

22    Q.  Have you ever, as a police officer,

23 interviewed -- investigated a use of force as significant

24 as this one that we're talking about in this case?

25      MR. SAYRE:  By that, do you mean death?

**Page 38**

1      MR. McNUTT:  No.  By that, I mean the use of a

2 Taser, the use of the LVNR, any of those things.

3    A.  No.  As I mentioned, the use of -- we call it a

4 carotid hold, upper body control hold, that would be

5 something that Force Investigation Division from LAPD

6 would investigate because it paralleled lethal force.

7    Q.  Okay.  Do those investigators have more training

8 than just the -- the hours that you got in the sergeant

9 school?

10    A.  Well, their job -- we have an entire Force

11 Investigation Division that do nothing but investigate

12 force, so obviously, they're better trained and better

13 equipped to investigate those type of events.

14    Q.  Can you define "reasonable suspicion."

15    A.  A reasonable officer with similar training and

16 experience would believe that a person is connected to

17 some type of crime.

18    Q.  Is the reasonable suspicion standard more or

19 less stringent than probable cause?

20    A.  It's less.

21    Q.  Does reasonable suspicion require common sense

22 judgment about human behaviors or perfect certainty?

23    A.  Common sense.

24    Q.  Can unprovoked flight give rise to reasonable

25 suspicion?

**Page 39**

1    A.  Yes.

2    Q.  What about nervous, evasive, or erratic

3 behavior?

4      THE REPORTER:  What about nervous what?

5      MR. McNUTT:  Evasive, erratic behavior.

6    A.  It can.

7    Q.  Do you consider a suspect running -- running

8 away from police to be merely going about one's business?

9    A.  It depends on what preceded him running away or

10 her running away.

11    Q.  Okay.  What is your understanding of the

12 testimony of Officer Crumrine, sometimes referred to as

13 Sergeant Crumrine?  Have you reviewed his FIT report?

14    A.  I have.

15    Q.  Have you reviewed his CIRT report?

16    A.  I have.

17    Q.  Have you reviewed his deposition transcript?

18      MR. ANDERSON:  When you say "report," you mean

19 statement?

20      MR. McNUTT:  Yes, that's right.  I'm sorry.

21      It comes as a written -- we think of it as a

22 report, but it's a statement.

23      MR. ANDERSON:  Is it a report or statement?

24 Just making sure.

25    Q.  And -- did you answer the question?  I don't

**Page 40**

1 know -- I just didn't hear you.  Did you review his

2 deposition transcript?

3    A.  I reviewed all of his statements, yes.

4    Q.  Are you aware of how he characterized the neck

5 restraint that Officer Lopera used?

6    A.  As an LVNR.

7    Q.  Okay.  In all three of those statements?

8    A.  I believe he did.  He had -- he characterized it

9 as a -- "had Farmer in a back lying LVNR."

10    Q.  Okay.  Do you disagree with his characterization

11 of what the neck restraint being utilized was?

12    A.  I don't know if it was a rear naked choke or an

13 LVNR.

14    Q.  Do you accept his testimony as true?

15    A.  I'm -- I'm -- base it off what I've reviewed on

16 the video and what the statements were.  Though, based on

17 Officer Lopera's statements that he used a rear naked

18 choke or "I rear naked choked his ass," the statements he

19 made is what I went off of.  But for me to look at the

20 video over and over again, I can't discern if it's an

21 LVNR or a rear naked choke.

22    Q.  And that's a good point.  Let's talk about that.

23 Are you qualified to delineate between an LVNR versus a

24 rear naked choke or any other choke by -- by training or

25 expertise?

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

**Page 41**

1  A.  In what respect?

2  Q.  Do you have any martial arts training?

3  A.  I do.

4  Q.  What is it?

5  A.  Brown belt in Kempo Karate.  I trained Brazilian

6  jiujitsu for about three years up to a purple belt.  I

7  was part of the LAPD's initial transition team when we

8  were looking at our ground fighting team in the -- I

9  think it was 1996.

10      We were looking at ground fighting and

11  weaponless retention where we had a cadre of people come

12  in to training, a -- training division and develop the

13  arrest and control school that currently exists.  I was

14  one of, I think, 14 or so people that assisted with

15  that -- that training.

16  Q.  Do you think you are qualified as an expert in

17  the area of combatives or officer defensive tactics?  I'm

18  not sure what phrase you would prefer to use.

19  A.  Within reason, yes.

20  Q.  Okay.  What's -- what are the -- what are the

21  qualifications in --

22  A.  I can't make a med -- I can't make a medical

23  determination as to what the result of someone's death

24  was, was it based on a, you know, blood choke, an air

25  choke, depending on what transpired.  But I can look at

**Page 42**

1  basic common ground fighting tactics to see if that

2  coincides or comports with training on departments they

3  may have received.

4  Q.  Okay.  In Kenbo (sic) Karate -- was that the

5  first one you referenced?

6  A.  Yes.

7  Q.  What terminology does that discipline use for a

8  neck restraint?

9  A.  Choke.

10  Q.  Just a choke.  Are there any other phrases,

11  synonyms that they use?

12  A.  A choke.

13  Q.  Okay.  Do they -- and what does a choke in Kenbo

14  Karate mean, in terms of is it a blood choke, an air

15  choke, or does that phrase encompass all types of chokes?

16  A.  Obviously, it's Kempo, and the reason -- it's

17  primarily -- obviously, we discern -- differentiate

18  between a blood choke, obviously, for the carotid

19  arteries to a neck choke that obviously limits or

20  restricts air through the trachea.

21      So there is very much a difference between the

22  two.  And we're trained as there is a difference due to

23  the fact that there is a potential death involved,

24  obviously, as relates to air choking someone because you

25  can crush the trachea.

**Page 43**

1      So part of the training involved is that -- to

2  be mindful of not to, obviously, use force to the front

3  of the trachea.  And that's the same as what I received

4  in LAPD as well.

5  Q.  Okay.  May I stop you there?

6  A.  Sure.

7  Q.  You can certainly finish, but I just want to

8  break that down a little bit because you confused me.

9  We're just talking about Kenbo Karate which is a civilian

10  discipline; correct?

11  A.  Yes.

12  Q.  Okay.  And that -- so that wasn't through LAPD?

13  A.  No.  That was growing up.

14  Q.  Okay.  Great.  And so the term -- the term

15  "choke" in karate -- and I just want to get definitions

16  so we aren't confusing and the transcript is clear.

17      The term "choke" in karate incorporates multiple

18  types of chokes; is that true?

19  A.  It does, because with karate, you're not just --

20  unlike a naked choke which is without a gi or without

21  any -- you're naked, we use a gi in karate, so a lot of

22  the chokes involve the use of the actual gi during the

23  choke.

24  Q.  Okay.  And you may have said this, but I just

25  didn't catch it.  Does that term "choke" include air and

**Page 44**

1  blood chokes in Kenbo Karate?

2  A.  It's Kempo, and yes.

3  Q.  Kempo?

4  A.  Yes.

5  Q.  Okay.  Are both types of chokes authorized, for

6  lack of a better term, in Kempo Karate?

7  A.  Well, it's no -- really authorization.  You're

8  not held to the standard as you would be in law

9  enforcement.  It's -- it would be in -- obviously in --

10  in a situation in your private life where you believe

11  that someone's actions were aggressive and/or combative

12  and you needed to utilize a choke.

13  Q.  Sure.  But are there competitions in Kempo

14  Karate?

15  A.  There are, but it's basically on katas and

16  pinans which are movements and not based on choking.

17  Q.  Okay.  Let's talk about the Brazilian jiujitsu.

18  When did you train in Brazilian jiujitsu?

19  A.  1994 through '97 and then intermittently since

20  that time.

21  Q.  Okay.  Are you familiar with the terminology

22  that is utilized through the Brazil -- the discipline of

23  Brazilian jiujitsu related to a neck restraint?

24  A.  Yes.  I mean, they -- they use the term "choke."

25  They use the term -- you know, the word "rear naked

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 45

1  choke" really came about during the MMA time, the MMA
2  circuit.
3       That's when that became a -- you know, we as
4  people that were involved in that discipline, that really
5  became -- you know, they were trying to identify each
6  movement and then they obviously used that.  When you
7  were not using your gi and it was naked, they -- they
8  developed that term over "rear naked choke."
9       Q.  And can you explain to me what a rear naked
10 choke is under the Brazilian jiujitsu discipline?
11      A.  It's similar to what the -- a rear naked choke
12 is.  Under MMA is that obviously you're -- you're
13 utilizing restraint on the neck through the carotid
14 arteries to cut off the blood.  Typically, 7 to 12
15 seconds is going to put someone out.
16      You're basically using your off hand to connect
17 with your bicep and you're depressing, obviously, the
18 sides of the person's neck and putting them, obviously,
19 in a restraint that's going to cut off the blood and put
20 them to -- put them out.
21      Q.  Do you ever define a rear naked choke in any of
22 your disciplines that you're familiar with to include an
23 air choke?
24      A.  No.
25      Q.  Okay.  Tell me what the difference if -- well,

Page 46

1  is there a difference between a rear naked choke and a
2  LVNR, a lateral vascular neck restraint?
3      A.  Typically, the hands are clasped to the side in
4  an LVNR.  You wouldn't go to a full, which we would use a
5  full carotid by, obviously, attaching to the back of the
6  bicep to do that.  You just -- you're depressing,
7  obviously, the sides of the neck and then cutting off the
8  blood.
9       The end result is -- is the same, but with the
10 rear naked choke, you're controlling the head more, in
11 the sense where you're controlling the head and the back
12 of the neck much more so than you are during an LVNR.
13      Q.  Okay.  Let's talk about some principles or some
14 elements, if you will, of a rear naked choke versus a
15 LVNR.  They're both blunt chokes; correct?
16      A.  That's right.
17      Q.  They both have an -- an arm that encircles the
18 subject's neck; correct?
19      A.  Yes.
20      Q.  They both intend to compress the carotid
21 arteries; correct?
22      A.  Obviously, the ones to the side, not to the
23 rear.
24      Q.  Okay.  And they both have a pocket in the
25 encircling elbow in which the suspect's throat is

Page 47

1  supposed to be protected; is that fair?
2      A.  That's correct.
3      Q.  Okay.  What are the differences between the LVNR
4  and the rear naked choke?
5      A.  Just the way in which the right arm connects to
6  the bicep or the off arm connects to the bicep and -- and
7  applies the pressure.
8      Q.  So is it your opinion that you can obtain more
9  pressure on the neck from a rear naked choke versus --
10 than you can with a lateral vascular neck restraint?
11      A.  It depends on who's applying it.  Depends on
12 their level of proficiency.  Depends on the level of
13 resistance.  There's a number of things that factor into
14 the effectiveness of the -- of the whole.
15      Q.  Okay.  So can someone achieve control over a
16 suspect by utilizing a rear naked choke and an LVNR?
17      A.  Yes, sir.
18      Q.  Can someone cause unconsciousness through an
19 LVNR and a rear naked choke?
20      A.  Yes.
21      Q.  Through a blood choke?
22      A.  That's correct.
23      Q.  Are you aware of the reason why the trainers or
24 the developers of the LVNR specify that they want the
25 hands to be clasped together?

Page 48

1      A.  I don't.
2      Q.  Do you have any expert opinion on that at all?
3      A.  To keep the head -- keep -- obviously, to be
4  able to pry -- apply the pressure and keep the head
5  situated where it is.
6      Q.  Would you be surprised if I showed you in their
7  training manual where they say that the reason for the
8  hand clasp is in order to exert maximum, quote, pressure
9  on the neck?
10      A.  No.  I wouldn't be surprised.
11      Q.  You wouldn't be surprised?
12      A.  I would not.
13      Q.  Okay.  Does that imply to you that they want --
14 they think that the hand placement can get more pressure
15 on the neck and not less?
16      A.  By -- by using an LVNR in lieu of a rear naked
17 choke?
18      Q.  Or just by that hand placement.
19      A.  No.  You're looking for -- you're looking for
20 maximum pressure to put that person out as quick as you
21 can to stop their behavior.
22      Q.  Perfect.  I didn't have that -- I didn't even
23 have to ask why.  The goal is to render the suspect under
24 control as quickly as possible; right?
25      A.  That's correct.

**Page 49**

1　Q.　And is it better or worse for the suspect's
2　health if he's rendered -- let's say he's going to be
3　rendered unconscious at some point.　Is it better or
4　worse for the suspect's health if it happens quickly and
5　then he's revived quickly or if it takes a long time and
6　there's a long struggle before he's rendered unconscious?
7　　A.　That's a medical opinion.　A common sense is
8　that least amount of struggle; having that person come
9　out; revive that person within a couple seconds;
10　obviously, hopefully, have them handcuffed; not have a
11　prolonged incident is the desired result.
12　　That's why there's parameters based on the use
13　of it that, you know, you should not be using it over a
14　certain period of time.　And that's why, obviously, we're
15　critical of Officer Lopera in this matter.
16　　Q.　When you trained with a rear naked choke or an L
17　-- have you ever trained in an LVNR?
18　　A.　We called it an upper body control hold.　It's
19　the -- the move is identical; we just termed it something
20　different.
21　　Q.　You just -- you just don't pay Jim Lindell for
22　his copyrighted technique?
23　　A.　That -- that's correct.　We surely don't.　We --
24　we called it a full carotid -- is what LAPD still terms
25　it today.

**Page 50**

1　Q.　Is -- is the hand placement the same in the full
2　carotid L -- LAPD hold as the LVNR for Metro?
3　　A.　It is.　It's clasped to the side.　It's the
4　same.
5　　Q.　Are there any distinctions?
6　　A.　The full -- the modified is hands clasped.　The
7　full is similar to what the rear naked choke is; your arm
8　comes through to the bicep, you control the head, and you
9　apply the -- apply the -- apply the hold.
10　　Q.　I'm sorry, I was following your hands and --
11　　A.　I'm sorry.
12　　Q.　Would you repeat -- no, it -- it's helpful.
13　Would you repeat that.
14　　A.　The -- there's two different kinds, or there was
15　when I left the Los Angeles Police Department.　If
16　they've changed that since, I don't know.　There was a
17　modified carotid and a full.　Modified --
18　　Q.　And please explain the modified.
19　　A.　Yeah.　Modified is similar to what we have in
20　the LVNR here, is that the hands were clasped, maximum
21　pressure to the side of the neck.　The full, which once
22　again, is on the same parallel of lethal force, is used
23　similar to what we see in a rear naked choke; the arm
24　comes through, grabs on to the bicep, controlling the
25　head, and obviously the same desired effect of depressing

**Page 51**

1　the side of the carotid with maximum pressure.
2　　The placement of the elbow is the same on both
3　to allow, obviously, some -- some relief to the trachea
4　area and then putting that person, you know, unconscious
5　or to stop their behavior.
6　　Q.　So LAPD has an authorized neck restraint in
7　which the officer's hand -- he would have one encircling
8　arm, and the other hand would be placed on the back of
9　the suspect's head?
10　　A.　It would -- back of the head is solely to
11　control the head --
12　　Q.　Sure.
13　　A.　-- at that time to make sure that you don't get
14　head butted.　It's just to control the head, back of the
15　neck when you have that -- when you're locked in in
16　that -- in that hold.
17　　Q.　Did you see in the video any evidence that Ken
18　Lopera either had an LVNR or had a rear naked choke, by
19　your definitions?
20　　A.　I couldn't tell.
21　　Q.　You couldn't tell?
22　　A.　I could not.
23　　Q.　Could you tell in the videos or through any
24　other evidence that -- how long Ken Lopera was exerting
25　pressure on Tashi Farmer's neck?

**Page 52**

1　A.　Pressure, I couldn't tell that.
2　　Q.　Could you tell -- are you aware that there's
3　three levels of LVNR in Metro's use of force policy?
4　　A.　There was at the time.　I believe there's only
5　two now.
6　　Q.　Okay.　LVR -- at the time LVNR 1, 2 and 3, are
7　you familiar with those?
8　　A.　Yes.
9　　Q.　Do you know the differences between LVNR 1, 2,
10　and 3?
11　　A.　I don't.
12　　Q.　Okay.　Have you reviewed the testimony of
13　Sergeant Michael Bland?
14　　A.　I have.
15　　Q.　And do you know what his position was and why
16　he's been test -- or why he has been deposed in this
17　case?
18　　A.　He's a PMK for force.
19　　Q.　Okay.
20　　A.　For LVM.
21　　Q.　I'm sorry?
22　　A.　For Las Vegas Metro.
23　　Q.　Okay.　Have you ever met Officer Bland?
24　　A.　I have not.
25　　Q.　Actually, have you met any of the officers

Scott A. DeFoe                     Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

**Page 53**

1  involved any -- in any of this, whether they're
2  percipient witnesses, whether they were actually
3  involved?  You don't know any of the Metro officers in
4  this case?
5      A.  Just the -- I -- I met the chief.  That's --
6  that's it.
7      Q.  McGrath?
8      A.  No.  Lombardo.
9      Q.  Oh, the sheriff?
10     A.  Yes, sheriff.  Pardon me.
11     Q.  Did you talk to him about the case?
12     A.  No.  I haven't spoke to him since we took a trip
13  a few years back.
14     Q.  So your last communication with him was prior to
15  the incidents we're talking about in May of 2017?
16     A.  Yes.  I haven't spoke to him in probably eight
17  or nine years.
18     Q.  Okay.  Sergeant Michael Bland is -- have you
19  reviewed his qualifications to be the PMK for Las Vegas
20  Metro?
21     A.  I may have.  I didn't -- I didn't look at his
22  qualifications.  I may have.
23     Q.  Do you -- would -- well, based on that, he's a
24  fourth degree Brazilian jiujitsu practitioner.  Would --
25  what -- my question is are you more qualified to opine on

**Page 54**

1  things related to the LVNR and the RNC, or would Sergeant
2  Bland be?
3      A.  I'm significantly less qualified than he is.
4      Q.  As a practitioner of the things?
5      A.  As it relates to the -- obviously, Brazilian
6  jiujitsu and ultimately holds.  He's a fourth degree
7  black belt.  I'm -- my background doesn't -- it pales in
8  comparison to that.
9      Q.  Okay.  Was there anything in Sergeant Bland's
10  testimony that sticks out to you that you -- you remember
11  disagreeing with?
12     A.  No.
13     Q.  Okay.
14     A.  Not that I recall.
15     Q.  You've reviewed the FIT transcript or FIT
16  statement for Officer Flores?
17     A.  I have.
18     Q.  And have you reviewed the CIRT transcript for
19  Officer Flores?
20     A.  I have.
21     Q.  And have you reviewed the deposition transcript
22  for Officer Flores?
23     A.  I have.
24     Q.  And Officer Flores testified in all three of
25  those transcripts that he believed it was an LVNR that

**Page 55**

1  was being utilized by Officer Lopera.
2          Do you remember that?
3      A.  Yes.
4      Q.  Do you disagree with his testimony?
5      A.  Once again, I don't know.  I -- I made my own
6  determination.  I don't know, based on -- I -- my
7  reviewing of the video, if it was a rear naked choke or
8  an LVNR.
9      Q.  If you were arguing with either Sergeant
10  Crumrine or Officer Lopera to try to convince them that
11  what you saw was something different than an LVNR, what
12  would you say?
13     A.  I wouldn't argue with them over that.  I wasn't
14  there.
15     Q.  Okay.  And so you would believe their testimony
16  that that they saw was an LVNR?
17     A.  No, unless I could discern from either the video
18  or through the training, once again, the training that
19  will come from Las Vegas Metro to, i.e., Sergeant Bland,
20  the PMK.  Obviously, he's going to be much more
21  conversant in that hold because he's trained his staff on
22  that.
23          So if there's a variation or deviation of that
24  LVNR, now it's a -- what he would consider to be a rear
25  naked choke, he would be better suited to -- to give that

**Page 56**

1  testimony.
2      Q.  If -- do you have an opinion as to whether or
3  not -- if an officer is intending to use an LVNR but, for
4  whatever reason, they can not complete the hand clasp, so
5  they've got the encircling arm, they've got the larynx or
6  the throat protected in the elbow area, but that, for
7  whatever reason, they simply cannot get the hands clasped
8  together, in your opinion, are they still employing an
9  LVNR, or is it not an LVNR?
10         MR. SAYRE:  Objection.  Incomplete hypothetical.
11     Q.  You can answer.
12     A.  It depends.
13     Q.  On what?
14     A.  It depends on where the arms are positioned.  It
15  depends on if the hold is actually -- if he's acquired
16  appropriate hold.
17     Q.  So assume that the -- there's no problem with
18  the encircling arm.  Let's assume that there's an
19  allegation that the officer, a Metro officer, not an LAPD
20  officer, has -- instead of his hand clasped, he has a
21  hand on the back of the suspect's head.
22         Does that, by default, make it not an LVNR?
23     A.  It would still make it -- according to the
24  policies that I -- it would still -- the attempt to try,
25  that you tried to use it, it's almost like the parallel,

Page 57

1 the use of deadly force of shooting your gun, if you
2 don't hit anyone, it's still the use of deadly force.
3 It's the same that -- a deadly force application was
4 applied at that time. The effectiveness is not related
5 to how it would be investigated.
6    Q. Okay. Have you seen the transcripts of the
7 security guards at the Venetian?
8    A. I have.
9    Q. And do you recall them discussing the resistance
10 level of Mr. Farmer?
11    A. Which -- which --
12    Q. For -- for example, Security Officer Infantino
13 discussed how strong Tashi Farmer was and that he
14 believed that he was on something to be that strong.
15       Do you recall that?
16    A. Let me refresh my notes. I -- I don't recall if
17 he did or he didn't. I don't recall if he -- if he
18 actually said that or not.
19    Q. Okay. Do you recall seeing in anything in the
20 videos you reviewed or any other evidence that would --
21 that you would point to to disagree or to undermine his
22 testimony?
23       MR. SAYRE: I'm sorry, vague and ambiguous as to
24 what you mean by "his testimony."
25    Q. Do you understand my question?

Page 58

1    A. At what point?
2    Q. Well, he -- at the point that he was involved.
3 He said -- do you recall that Officer Infantino -- and
4 when I say "officer" there, Security Guard Infantino --
5 attempted to assist Officer Lopera?
6    A. Yes.
7    Q. Okay. And do you remember him talking about
8 attempting to grab Officer -- excuse me, Tashi Farmer's
9 left arm?
10    A. I believe so, yes.
11    Q. Do you remember him discussing that he could not
12 control Tashi Farmer's left arm?
13    A. I don't recall if he testified to that or not.
14    Q. Okay. Have you been to the Venetian to review
15 the scene where this incident took place?
16    A. As of now, no.
17    Q. Okay. So you haven't been inside or to the
18 outside area where the --
19    A. As of today --
20    Q. -- struggle took place?
21    A. I have not, as of today.
22    Q. Okay. Do you intend to go?
23    A. I most likely will -- if we go to trial.
24    Q. You'll -- so what will you do when you go to the
25 Venetian?

Page 59

1    A. Probably just walk the route, if I can, if I can
2 get access to walk that route from where the initial
3 encounter, consensual encounter, happened up and to the
4 point where he was initially tased.
5    Q. Does it matter to you to walk through the
6 employee area only where Officer Lopera was simply
7 pursuing Mr. Farmer and there was no interaction between
8 the two, or are you -- are you talking about where they
9 exited the Venetian and pursued into the street?
10    A. No, all of it. Just because of -- of him going
11 down the stairs after falling down, you know, on the
12 water. I'd like to be able to get access to all of it if
13 I could.
14    Q. Okay. What would that do to inform your
15 opinion?
16    A. Just really give me an idea of the duration of
17 the -- of the foot pursuit, the distance. It's better to
18 get, you know, obviously, eyes on it rather than see
19 it -- you know, you can only see so much on video. The
20 initial, obviously, confrontation, you don't -- doesn't
21 pick up again, so I'd like to know the distance of -- and
22 I'd also like to know where Officer Lif went when she had
23 left and why she didn't -- where she went from there
24 that -- that ultimately allowed her to show up after the
25 event at that time. So I'd like to see her route of

Page 60

1 travel as well.
2    Q. Do you have an opinion on what her route of
3 travel was?
4    A. I don't know. I know she didn't follow them
5 down the hallway, I believe.
6    Q. Same general questions, you've reviewed officer
7 Tran's FIT transcript, CIRT transcript, and depo tran --
8 depo transcript; correct?
9    A. That's right.
10    Q. Do you have any different opinion than you gave
11 related to Officers Flores and Crumrine regarding his
12 observations, that he believed it was a LVNR that Officer
13 Lopera was employing?
14    A. I don't have any difference of opinions, no.
15    Q. Are you familiar with Security Guard Vibas or
16 Vibas? I'm not sure how we pronounce it.
17    A. I'm -- I read his interview.
18    Q. Okay. Do you have an opinion as to whether
19 Officer Lopera was in or out of policy when he gave
20 verbal warnings to Tashi Farmer?
21    A. At what point?
22    Q. At any point.
23    A. Prior to the -- are you talking about
24 specifically prior to the tasing?
25    Q. I'll take it anywhere you want to go.

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

| Page 61 | Page 63 |
|---|---|

**Page 61**

1  A. If he was going to be using the Taser, then he
2  should give a warning, obviously, when feasible.
3  Q. Did he?
4  A. I've heard -- I've read two different -- I've
5  heard that, "I'm going to tase you" and then I heard,
6  "Taser, Taser, Taser." There's been two different
7  versions of what I've read.
8  Q. And, I'm sorry, where did you read that?
9  A. Somewhere within the record.
10  Q. Did you hear that on the videos you watched?
11  A. I heard the, "Taser, Taser, Taser," I believe,
12  in the -- in the video.
13  Q. You never heard him tell Tashi Farmer to stop?
14  A. Yes. I heard that.
15  Q. Before he said, "Stop or I'm going to tase you,"
16  you don't recall hearing that?
17  A. I believe I did, yes.
18  Q. Okay. So is that a warning that would comply
19  with Metro's policies and procedures?
20  A. If the force is deemed reasonable, but to warn
21  someone prior to using force that may not be reasonable,
22  a warning wouldn't be necessary.
23  Q. Well, isn't a warning just that? If there was
24  compliance to the warning, we never get to the force
25  equation, do we?

**Page 62**

1  A. But if the force in itself even with a warning
2  is deemed objectionably unreasonable, then there's no
3  need to warn.
4  Q. That's circular. So take the force out of the
5  equation. If I warn you as a suspect that, "Stop or I'm
6  going to tase you" and the suspect complies by stopping,
7  we never get to the force question, do we?
8  A. Hopefully not.
9  Q. Well, I mean, I don't understand the adverb.
10  Hopefully or not hopefully, if the suspect complies with
11  verbal commands, then the officer doesn't have to use any
12  further force at that time; correct?
13  A. Hopefully not. I -- once again, I've seen,
14  investigated, worked on matters where even when people
15  were verbally -- they were compliant, force was still
16  used, so...
17  Q. Okay. And verbally compliant -- and let me add
18  that they were physically compliant because I don't want
19  to get into the discussion we had earlier, which was a
20  good distinction, regarding someone's words versus their
21  actions.
22      So if somebody physically complies with your
23  commands as an officer, do you still at that point get to
24  the use of force equation?
25  A. Hopefully not.

**Page 63**

1  Q. Okay. So back to the -- the simple question of
2  whether or not -- based on your review and listening to
3  the audios, is it your opinion that Ken Lopera did, in
4  fact, give the appropriate warning to Tashi Farmer, or do
5  you disagree with that?
6  A. If he was going to use force, yeah. He did, in
7  fact, give a warning. The question is is the force
8  reasonable?
9  Q. Fair. And obviously, your opinion on whether
10  the force is reasonable is what?
11  A. Which force?
12  Q. The Taser.
13  A. I believe the Taser is unreasonable.
14  Q. Why?
15  A. Because there's no aggressive act of resistance
16  at that time. You're simply fleeing. He had not
17  committed a crime. He didn't need to stop. It was a
18  consensual encounter.
19      I don't see the connection of the reasonable
20  suspicion that he had done anything unless Officer
21  Lopera -- ultimately purview for the jury -- could
22  articulate that -- and once again, I've not read his
23  statement because there hasn't been any -- that he could
24  articulate that he reasonably believed that Mr. Farmer
25  was going to carjack the white vehicle.

**Page 64**

1      At that point, he could use the Taser. Other
2  than that, the initial deployment of the Taser would be
3  deemed unreasonable.
4  Q. Okay. You just said in that narrative that
5  Officer -- or excuse me, that Tashi Farmer had not
6  committed a crime.
7  A. That's correct.
8  Q. My first two questions today, you told me that
9  trespassing was a crime in Nevada and California, and you
10  told me that being under the influence of
11  methamphetamines was a crime in Nevada and California.
12      So how is it you sit here now and say that Tashi
13  Farmer had not committed a crime?
14  A. You didn't ask me if Tashi Farmer committed a
15  crime. You asked me was that, in itself, a crime, and I
16  answered yes.
17  Q. Okay. Tashi -- and Tashi Farmer ran into a
18  employee area only which is not authorized for civilian
19  access or customer access.
20      So does that not qualify as a trespass in your
21  view of the law?
22  A. Well, that trespass would have to be affected by
23  the owner of the Venetian at that time to say that they
24  warned that person not to be there and obviously have the
25  Las Vegas Metro effect that arrest for trespassing.

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 65

1   Q.   Now, I --
2        MR. SAYRE:  Wait.  He's not through.
3        MR. McNUTT:  Easy, Fred.  I just was saying I'm
4   sorry, I didn't realize he was not finished.
5   Q.   Carry on.
6   A.   As -- as it relates to the actual -- I lost my
7   train of thought.  Can you repeat the question.
8   Q.   We can read it back.
9   A.   Sure.
10       (Record read.)
11  A.   Yeah.  Only, once again, if -- if you warn
12  someone, typically, that you're trespassing and then,
13  obviously, they don't comply with that warning.  The fact
14  that he entered that location -- and what was the purpose
15  of trespassing?  Was it to simply leave?  Could he have
16  deemed that it was an exit outside of the building?  I
17  don't know that at the time.
18       So maybe he could have detained him with a
19  warning for trespassing.  Maybe he could have stopped
20  him, but ultimately the -- my understanding would be the
21  Venetian would have to, obviously, effect that arrest for
22  trespassing.
23  Q.   And you're saying that under Nevada law, Officer
24  Lopera could not have arrested him for trespass?
25  A.   He'd have to deem that that area is, in fact, an

Page 66

1   area that, by going in that area, would -- he would
2   actually be breaking the law by trespassing.
3   Q.   I noticed that the Nevada Revised Statutes were
4   not part of what you reviewed for this expert report.  Is
5   there a reason for that?
6   A.   No.
7   Q.   Did you review the Nevada Revised Statutes?
8   A.   I believe I did.
9   Q.   So are you familiar with what statute covers
10  trespass?
11  A.   I'm not.
12  Q.   How about the general chapter?
13  A.   No.
14  Q.   Okay.  You testified that being under the
15  influence of illegal narcotics, in this case,
16  methamphetamines, was a crime.  Remember that?
17  A.   It is.
18  Q.   Okay.  And we now know, as you testified, that
19  you've seen evidence that Officer -- or excuse me, Tashi
20  Farmer was, in fact, under the influence of
21  methamphetamines.  Remember that?
22  A.   But I also remember that your question was --
23  Q.   Yeah.  I know.  That was a yes or no.
24  A.   -- was within a five-second rule.  You said,
25  "Could someone determine someone's mental illness or

Page 67

1   being under the influence if they just saw them for a
2   brief couple of seconds and then they ran?"  And I said,
3   "No, they could not."
4        So at that point there would be no way for
5   Officer Lopera to know, in fact, that Mr. Farmer was
6   under the influence of methamphetamine during that
7   initial reaction based on your question.
8   Q.   Are you done not answering my question?
9        MR. SAYRE:  You know, why don't you be --
10  instead of being argumentative, why don't you be polite
11  and ask him another question.
12       MR. McNUTT:  Mr. Sayre, I appreciate your
13  running dialogue, but actually I don't.
14  Q.   So when you testified earlier that being under
15  the influence of illegal methamphetamines was a crime, do
16  you stand by that testimony?
17  A.   If you can make that determination.
18  Q.   No, sir.  Is that fact a crime under Nevada law?
19  A.   If it's determined that you're under the
20  influence, that's a crime.
21  Q.   Okay.  Are you familiar with Nevada law on that
22  point?
23  A.   I believe I am, yes.
24  Q.   What chapter just generally governs that?
25  A.   I don't know.

Page 68

1   Q.   Okay.  Now, you then testified that you were
2   aware that Tashi Farmer was, in fact, under the influence
3   of methamphetamines.  Remember that?
4   A.   Yes.
5   Q.   Okay.  So now let's fast forward.  At the time
6   that Officer Lopera and Tashi Farmer exited the Venetian,
7   isn't it true that Officer Lopera's instincts and
8   reactions and physical cues that Off -- that Tashi Farmer
9   was under the influence were, in fact, true, we now know
10  that; right?
11  A.   It's facts known at the time, and there's no way
12  that -- for -- for Officer Lopera to know at that time
13  that, in fact, Mr. Farmer was under the influence of
14  anything, if he was -- maybe he was behaving that way
15  because he was off psychotropic medication.  Maybe he was
16  mentally ill.
17       Maybe there's a number of things, but he didn't
18  know until the -- we didn't know; all of us didn't know
19  until the toxicology came back, so there would be no way
20  for Mr. -- Officer Lopera, pardon me, to be able to know
21  at the time, especially during that couple brief seconds
22  before he ran down the hallway.
23  Q.   Does Officer -- so I believe you're confusing
24  two standards, so I'll break it down.
25       Does Officer Lopera have to know with certainty?

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 69

1  Because you testified earlier that reasonable suspicion
2  was not 100 percent certain.  So Officer Lopera -- we all
3  heard it -- he thought he was on drugs.  As it turned
4  out, he was correct; isn't that true?
5      A.  He was correct, based on the toxicology.
6      Q.  So he pursued Tashi Farmer, based upon his
7  police belief that he was under the influence and that,
8  in fact, turned out to be a crime.
9          MR. SAYRE:  Objection.  Assumes a fact not in
10 evidence, that he pursued him on that basis.
11     Q.  You can answer the question.
12     A.  All I know is that the toxicology revealed that
13 Mr. Farmer was under the influence of methamphetamine at
14 the time of his death.
15     Q.  So do you stand by the prior testimony that at
16 the time, just prior to the deployment of the Taser, that
17 Tashi Farmer had not, in fact, committed two crimes, one
18 of trespass and one of being under the influence of
19 illegal narcotics?
20     A.  Yes.
21     Q.  Even though you know he, in fact, entered an
22 employee-only area that was -- he was not authorized to
23 enter and you now know that he was under the influence of
24 illegal narcotics, you say that, today, he had not
25 committed a crime.

Page 70

1          MR. SAYRE:  Objection.  Argumentative.
2      A.  Right, because it's facts the officers know at
3  the time when the force was used.
4      Q.  To justify what, the use of force or reasonable
5  suspicion?
6      A.  Both.
7      Q.  You think that the facts the officer knew at the
8  time go to all of it?
9      A.  Well, it has -- it's part of it.  I mean, if
10 you've not committed a crime, the reasonableness of the
11 force, it could be based on what transpired prior to the
12 use of force.  Within that officer's decisions to use
13 force are going to be predicated on what they knew at the
14 time.
15     Q.  And at the time, Officer Lopera believed that he
16 was under the influence and he was trespassing.  Is that
17 not sufficient to pursue Tashi Farmer?
18         MR. SAYRE:  Objection.
19     Q.  You said earlier it was.
20         MR. SAYRE:  Assumes facts not in evidence.
21     A.  If he reasonably believed, but based on the --
22 the hypothetical that you posed that within a few
23 seconds -- you just can't have it both ways.  You can't
24 not understand that he's possibly mentally ill and -- but
25 only differentiate that he's under the influence of a

Page 71

1  drug and have it both ways.  You need to consider all --
2  all issues at that time.
3      Q.  You testified on my third question, that, even if
4  he was -- Tashi Farmer was not under the influence of
5  drugs and he was simply mentally ill, that Officer Lopera
6  had reasonable suspicion to pursue him?
7      A.  I'm perfectly fine with the pursuit.
8      Q.  Okay.  So -- and then do you just discard the
9  fact when we get to the use of force of what the officer
10 believed at the time?
11     A.  Well, the reasonable of the -- the
12 reasonableness of the force can be based on what he did.
13 The fact that he ran down the hall and out the building,
14 that -- that behavior in itself, based on Las Vegas Metro
15 policy, is not aggressive behavior that's going to
16 warrant the use of a Taser, based on their own policy.
17         So based on their own policy, it states that you
18 have to be able to articulate that the subject has the
19 intent to cause you harm, someone else, or themselves and
20 the use of the ECD is reasonable.  And that's Las Vegas
21 Metro PD 1020.
22         So at the time of the use of Tasers, what's
23 important -- I'm perfectly fine with the running after
24 him, not knowing where he's going, what he's doing.  Is
25 he mentally ill?  Is he under the influence?  And to

Page 72

1  follow him, I think was reasonable.  When he ran out the
2  building, at that point you don't really -- you don't
3  have a crime at that point.
4      Q.  That's your opinion.  But let's assume that the
5  officer believed that those two crimes had occurred.  And
6  now the officer is pursuing Tashi Farmer outside the
7  building and he further believes that carjacking is about
8  to occur.
9          So with those three sequences of crimes, do you
10 think that amounts to any use of force to detain the
11 suspect?
12     A.  Well, if he reasonably believes that someone is
13 being carjacked, if that's his reasonable belief at the
14 time of the force, then that would be reasonable.
15     Q.  Okay.  And he could articulate that and we would
16 go about our business; right?
17     A.  And a judge or jury can determine that that was
18 reasonable, based on the set of facts, and that would be
19 reasonable.
20     Q.  And your opinion is that it was reasonable?
21     A.  If he reasonably believes that that -- that
22 car -- that he was being -- someone was being carjacked,
23 in conjunction with the other things that you mentioned,
24 obviously, under the influence and running, if he
25 reasonably believes that, then that use of the Taser may

Scott A. DeFoe       Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

## Page 73

1   be appropriate.

2     Q.   Do you think there's any evidence or facts in

3   this case that you reviewed that would indicate that his

4   perception was not reasonable, "his" being Ken Lopera?

5     A.   I can't speak to his perception.

6     Q.   Okay. Do you think there's any objective facts

7   that you reviewed in this case that indicate that force

8   was not warranted, based upon the sequence of events

9   we've just discussed?

10     A.   Well, witnesses, including Pierce, stated that

11   he didn't reasonably believe that he was trying to get

12   into his truck. He didn't feel he was going to be a

13   victim of a carjacking based on Mr. Farmer's actions. I

14   think that would be important. I think that's credible

15   because he is, in fact -- was in the truck at the time

16   when Mr. Farmer approached, prior to the initial tasing.

17      So I think he's a very important part of this

18   because he was there. It was his vehicle that was

19   ultimately -- was potentially going to be carjacked, if

20   you go with what Officer Lopera was saying. So I think

21   that he's in a better position than I am, based on those

22   actions, to make that determination.

23     Q.   Did Mr. Pierce lock his doors?

24     A.   He did.

25     Q.   When Tashi Farmer approached?

## Page 74

1     A.   Yes.

2     Q.   Why?

3     A.   He was probably concerned.

4     Q.   Do you recall him using the word "fear," he was

5   fearful in his interview?

6     A.   I do recall that.

7     Q.   Okay. When someone's fearful, are they fearful

8   of, you know, positive actions happening to them, or are

9   they fearful of a crime?

10      MR. SAYRE: Objection. Vague. Ambiguous.

11     A.   Well --

12     Q.   What do you think he was fearful of?

13     A.   Well, I worked in -- when I would leave the

14   station in, say, 77th division, I would -- when I'd get

15   to a stoplight in South Central LA, I would lock my

16   doors, and by the mere fact of where I was -- where I was

17   at. I live in Huntington Beach; I don't lock my doors.

18      So it depends on -- when I'm in my car, it

19   depends on where you're at. And that level of fear could

20   be based on whatever's happening at the time. You see

21   someone running up behind you and you lock your doors.

22     Q.   Do you think that the parking area, valet

23   security area outside the Venetian is equivalent to the

24   77th division you just referenced?

25     A.   I don't, but I also -- to speak on the fear, he

## Page 75

1   may have been -- he saw commotion or -- behind him and

2   took appropriate action and -- and locked the door. The

3   locking of the door doesn't mean he reasonably believed

4   he was going to be carjacked. He was just fearful and

5   had a concern, so he locked his door.

6     Q.   Goes to his state of mind about what he thought

7   was going to happen, though; correct?

8     A.   It could.

9     Q.   Okay. So you give Pierce's testimony a lot of

10   weight in this case?

11     A.   I give all of the statements I've read -- Pierce

12   specifically, because he didn't reasonably believe that

13   he was being carjacked at the time, which was kind of the

14   onset of this -- the series of events. So I think that

15   was important because he was in the vehicle at the time.

16   So I think that was -- I think that was important.

17     Q.   Are you familiar with the US Supreme Court

18   precedent regarding use of force and the standards?

19     A.   The Graham v. Connor?

20     Q.   Amongst others.

21     A.   Yes.

22     Q.   Is it your opinion that cops have to deploy

23   force perfectly each and every time?

24     A.   The standards objective -- the objective

25   reasonable standard.

## Page 76

1     Q.   Yeah. And what does that mean to you in this

2   scenario? What do you think Ken Lopera should have done?

3     A.   At what point?

4     Q.   At any point.

5     A.   I think that once Mr. Farmer ran out -- Farmer

6   ran out of the building, he should have just let him go.

7     Q.   To where?

8     A.   Wherever he went.

9     Q.   Just off, someone else's problem at this point?

10     A.   Wherever he went. People run -- run all the

11   time, and the reason why they run, we don't know. You

12   don't have a crime to stop him at that time unless, once

13   again, you can articulate that you believe that he was

14   carjacking that white truck. Other than that, you just

15   let him go.

16     Q.   Do you know what Project -- or Operation Safe

17   Strip is in Las Vegas?

18     A.   It's what they were assigned to that night.

19     Q.   But do you know what it is?

20     A.   I think it deals with transients and drug --

21   drug sales, and -- and they work in conjunction with the

22   hotels on providing, you know, force protection and high

23   visibility and -- and quality-of-life issues and crime

24   and things such as that.

25     Q.   It's a dedicated task force to protect the

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 77

1  tourism of the Strip; is that fair?
2      A.  That sounds fair.
3      Q.  Okay.  Do you think an officer assigned to
4  Operation Safe Strip is supposed to let somebody else's
5  problem, when he thinks he's committed crimes -- whether
6  you find that reasonable or not, do you think it's -- he
7  should let that individual go and just kick him down --
8  kick that can down the road, so to speak?
9      A.  You got to look at the seriousness of the
10 offense, what happened at the time, what happened that's
11 going to cause you to articulate the reason to use force
12 at the time.  What -- what transpired?  What you had is
13 you had a guy run down a hallway and outside of a
14 building.
15     Q.  That's on drugs.
16     A.  Once again, facts known at the time.  That
17 determination is not made at that time.  You could
18 reasonably believe, but we don't run after everybody
19 that's on drugs in downtown Vegas or in downtown
20 anywhere, because you'd be running the entire day,
21 because a good part of the population, unfortunately, is
22 under the influence.
23     Q.  So do arrests occur because of what the officer
24 thinks he knew when he initiated the response, or do
25 arrests occur because of the totality of information that

Page 78

1  he has once he's detained someone, conduct -- maybe
2  conducted a search, or gotten more information?
3      A.  It's based on totality of the circumstances.
4      Q.  Okay.  Because you keep saying -- and I keep
5  disagreeing, and I want to bring that to a head so I can
6  I understand your position.  You keep saying, "What he
7  knew at the time" as if to discount his belief that we
8  now know is true, that Mr. Farmer was, in fact, under the
9  influence of illegal narcotics.  And that's what I'm just
10 not quite understanding about your criticism of that
11 decision cycle.
12         Is that -- do you understand my confusion?
13     A.  We talk about beliefs, we're talking about
14 credibility.  And I'm not making credibility
15 determinations against Officer Lopera for anything that
16 he did.  I don't make those credibility -- if he believed
17 something, and that's his belief system, I'm not going to
18 be critical of that.  I'm -- I'm not making that
19 determination based on what he believed or what he
20 thought.  I'm solely looking at what he did.
21     Q.  But if it turns out to be true -- if his belief
22 turns out to be true empirically, you kind of got to go
23 with what he believed; right?
24     A.  The fact -- once again, the fact that someone
25 who may be under the influence -- that you find out after

Page 79

1  the fact in itself is not going to justify use of force.
2      MR. SAYRE:  Can we take a break, please.
3      MR. McNUTT:  In a few minutes unless it's an
4  emergency.
5      MR. SAYRE:  Well, pretty soon.
6      MR. McNUTT:  Fred, I acquiesce to your age.
7      MR. SAYRE:  Thank you.
8      THE VIDEOGRAPHER:  The time is approximately
9  12:07 p.m.  We are going off the record.
10     (Whereupon, a recess was taken at this time.)
11     THE VIDEOGRAPHER:  The time is 12:13 p.m.  We
12 are back on the record.
13 BY MR. McNUTT:
14     Q.  Mr. DeFoe, we're back on the record.  Are you
15 ready to go?
16     A.  Yes, sir.
17     Q.  Okay.  Let's talk globally for a minute.  Do you
18 care whether the choke is -- the neck restraint that was
19 used was a rear naked choke or an LVNR, in your opinion?
20     A.  I think it's important for officers to follow
21 policy of their department.  I think it's important that
22 they follow their training.  I think as long as they --
23 there shouldn't be a departure from training, if that
24 training, in fact, was given.  I think that's important
25 that we don't deviate a whole lot outside of what we're

Page 80

1  taught for a number of reasons.
2      Q.  Okay.  Do you think that Officer Lopera deviated
3  from his training in this case?
4      A.  If it's determined that he, in fact, used a rear
5  naked choke, then that would be a deviation, as Las Vegas
6  does not teach rear naked chokes; they teach LVNRs.
7      Q.  Okay.  But you don't have an opinion, one way or
8  another, whether he did attempt to complete an LVNR or
9  whether he attempted to use a rear naked choke?
10     A.  I do not.
11     Q.  Okay.  So other than the policy, you said --
12 obviously, you think officers should follow the policy of
13 their department.  I don't think anyone would argue with
14 that.
15         Is violation of a policy a crime, or is it an
16 administrative problem for the officer?
17     A.  Administrative problem.
18     Q.  Okay.  Do you --
19     A.  I mean, it could -- excuse me, it could be a
20 crime.  I mean, you could -- you violate your pursuit
21 policy, you violate your use of force policy and now it
22 results in a death or a pursuit policy results in a
23 collision, it could -- it could -- it could -- there
24 could be criminal liability.
25     Q.  Have you reviewed evidence in this case or

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

**Page 81**

1  discovery in this case regarding other officers' use of
2  neck restraints that was produced?  Do you recall that?
3  I don't remember seeing it as one of the documents you
4  looked at.
5     A.  I don't believe so.
6     Q.  Okay.  Are you aware of what the penalty would
7  be for using an unauthorized neck restraint in Metro?
8     A.  I have no idea.
9     Q.  Okay.  Have you reviewed the report of
10 Dr. Smock?
11    A.  I believe I have, yes.
12    Q.  Do you know who Dr. Smock is?  He's plaintiff's
13 expert.
14    A.  Yes.
15    Q.  Okay.  Do you -- is your opinion -- do you agree
16 with Dr. Smock's opinion?
17    A.  Which opinion?
18    Q.  Where he opines that a rear naked choke was
19 used.  Do you think he can tell whether a rear naked
20 choke was used versus an LVNR?
21    A.  I don't know.
22    Q.  Okay.  Based upon your long career as a police
23 officer and reviewing or investigating use of force
24 incidents, have you ever investigated neck restraints or
25 chokeholds, be they by officers or by civilians in

**Page 82**

1  crimes?
2     A.  I was assigned to the Rampart Corruption Task
3  Force, and part of -- one of my duties there was to look
4  at use of force divisions that occurred within a bureau
5  at a time.  Myself and two or three other sergeants
6  looked at force, including all the way up to shootings at
7  that time.
8        So -- but that was more in a holistic approach.
9  We were looking for, obviously, boilerplate language and
10 other things that were possibly in those reports, but
11 that was the only time, and that was in 1999.
12    Q.  So little different than what I was looking for.
13 As an officer, did you ever investigate domestic violence
14 or any other crime where a choke of any sort was used on
15 the victim?
16    A.  Yes.
17    Q.  Okay.  And based on your experience and your
18 expert opinion, can you determine -- as an officer, not
19 as a medical person looking at it after the fact, but as
20 an officer, how do you go about investigating the type of
21 choke that was used or anything like that?
22    A.  You're looking for marks.  You're looking for
23 bruising.  I never worked homicide, so you're going to be
24 looking for, obviously, you know, hemorrhaging, things
25 such as that, that occur -- that's found through the

**Page 83**

1  autopsy results.
2        But I worked a major crimes table, so I worked
3  as a detective that handles domestic violence calls and
4  follows up -- activities on that, but that's just
5  determining if there's probable cause to arrest for
6  domestic violence and then, obviously, documenting
7  injuries and presenting that information to the district
8  attorney or the city attorney for filing.
9     Q.  Are you familiar with Metro's Taser policy?
10    A.  Yes.
11    Q.  What are the circumstances under which a Taser
12 could be deployed, can be deployed?
13    A.  Be able to articulate the subject has intent to
14 cause harm to you, someone else, or themselves and that
15 the use of the Taser is reasonable.
16    Q.  If a carjacking were taking place, would an
17 officer be authorized to use a Taser?
18    A.  If an actual carjacking was occurring, do I
19 think it's reasonable?  I think that would be reasonable.
20    Q.  Okay.  Do you understand Metro's policy
21 regarding how many times a Taser can be deployed?
22    A.  Three times.
23    Q.  Okay.  What happens after three times?
24    A.  You should transition to another force option.
25    Q.  Such as?

**Page 84**

1     A.  Could be an impact weapon.  Could be open-hand
2  strikes.  Could be kicks.  Could be pepper spray.  It
3  could be anything other than the Taser.
4     Q.  Okay.  Is that a hard-and-fast rule, or is that
5  a conditional rule by Metro?
6     A.  It says "unless you can justify."
7     Q.  Doesn't it say "unless there are exigent
8  circumstances"?
9     A.  Yes.
10    Q.  What are -- can you define "exigent
11 circumstances"?
12    A.  It states, "Deemed ineffective and another use
13 of force option will be considered unless exigent
14 circumstances exist."  That could be, obviously,
15 something where someone's life's in peril.  They need to
16 use that device as such that by not using it, it could
17 create an -- you know, dire circumstances for that
18 officer or a citizen or someone else.
19    Q.  Do you think an officer on the fourth cycling of
20 the Taser, if he believes that the Taser had not operated
21 properly -- do you think he would be within policy to
22 cycle it again?
23    A.  The policy doesn't state that, doesn't --
24    Q.  No, I'm asking your opinion.
25    A.  I think after three applications or 15 seconds

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 85

1  that you should transition because if -- if it worked or
2  didn't work, if you achieved neuromuscular incapacitation
3  or not, the prolonged use of that Taser, exposure to it,
4  it's ineffective for the officer, and it may be,
5  obviously, harmful to the -- to the individual. So it's
6  time to transition.
7      Q.  Okay.  What do you think Officer Lopera should
8  have transitioned to in this case, what use of force?
9      A.  Well, I don't agree that he should have tased at
10  that point, so to concede that he should transition to
11  anything --
12     Q.  I wasn't looking for you to concede anything.
13  I'm simply saying since he did, in fact, deploy the
14  Taser, and your position is that Metro, after -- policy
15  requires after three cycles that he should transition,
16  what should he have transitioned to?
17     A.  Once again, it would be depending upon what the
18  person's actions are at the time, on what he's going to
19  transition to.  If the person is compliant, you
20  transition to nothing.  If you give that person a command
21  and there's a reasonable opportunity to comply, then you
22  would effect a handcuffing technique.  If the act --
23  person's actions were assaultive or aggressive or
24  combative, then obviously, you would use the appropriate
25  force option to stop that person's actions.

Page 86

1      Q.  If you deployed a Taser or any officer deploys a
2  Taser and the suspect -- after the cycle had concluded,
3  the suspect appeared to reach to remove a prong, would
4  you feel justified in giving him another cycle?
5      A.  Well, it depends.  If they're going to take the
6  prong out, then I would transition to drive stun at that
7  point.
8      Q.  Okay.  But if you perceive that they're
9  attempting to move it out, but they haven't removed the
10  prong, would you be justified or any officer be justified
11  in cycling the Taser again?
12     A.  I think that would be reasonable if the reason
13  for the tasing -- using the Taser from the onset was
14  reasonable and then you gave that person -- you know, if
15  you gave that person a command and -- and a reasonable
16  opportunity to comply and they did not, then the
17  utilization of the Taser would be appropriate.
18     Q.  If after tasing an individual one time, they
19  were on their back and you told them to -- not to move
20  and then they proceeded to sit up, would you be justified
21  to give them another Taser?
22     A.  No.
23     Q.  Why?
24     A.  Because it doesn't meet within the parameters of
25  what their policy is.  The fact that someone's not --

Page 87

1      Q.  The police --
2      A.  The fact that someone's not compliant is that
3  you'd have to reasonably articulate that that person is
4  still intending to cause you harm in some way.  The fact
5  that someone's sitting up could be for a number of
6  reasons.  They could be drunk.  They could be whatever.
7  The fact that -- their actions still need to be
8  aggressive at that point, and that second or third or
9  subsequent tasing cycle needs to be evaluated with each
10  subsequent cycle to make sure that that person's actions
11  at that time of that subsequent deployment are, in fact,
12  aggressive.
13     Q.  Is there a -- do you have a rule in your mind in
14  terms of how long the officer is supposed to assess that
15  compliance in terms of time?
16     A.  Well, it's a reasonable opportunity -- is that,
17  once again, it gets into a person's state of mind at the
18  time.  What are you looking for that person to do?  If
19  you're looking simply to, obviously, administer pain,
20  then that's not going to work.
21         If you're telling that person to turn around so
22  you can place handcuffs on them -- it just depends on
23  what that person's doing at the time in which the Taser's
24  applied.
25     Q.  Have you ever seen personally someone fight

Page 88

1  through a Taser -- Taser exposure?
2      A.  Not when NMI is achieved.  I've not seen them --
3  I've seen -- we call the physiology of the struggle
4  where, as a result of being tased during that five-second
5  or prolonged duration, that person will flail arms, kick
6  their legs, move their body.  Officer's perception is
7  that they're resisting that force option.
8         The reality of it is they're responding to the
9  fact that they're being, in fact, tased.  And so -- and
10  so, once again, more force is applied and the reality of
11  it is -- is that this physiology of the struggle is such
12  that the person's only responding to that pain threshold
13  that they're receiving at the time.
14         You see that with K-9 bites.  People move around
15  and they'll flail.  They're not resisting at that point.
16  They're simply responding to the fact that they're being
17  bitten.
18     Q.  Is Metro's policy about three uses of the
19  Taser -- is that a nationwide policy, or do departments
20  have different internal policies and things that they
21  allow with respect to a Taser?
22     A.  That's consistent with -- Taser International
23  standards are.
24     Q.  Okay.  And Taser International standards is a
25  private company?

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 89

1    A. They're a private company.
2    Q. Okay. And so does a police force have to adopt
3 those standards?
4    A. No, but they're best practices, based on all the
5 data that they've received from departments as to what --
6 what's going on at that time. And I think that's the
7 threshold they've created that most departments follow.
8    Q. Are you aware of any departments that don't
9 follow that?
10   A. I'm not.
11   Q. Have you ever worked for Beverly Hills?
12   A. I have driven through Beverly Hills; I never
13 worked there.
14   Q. Okay. So you're not aware of -- of other
15 departments in Southern California where you worked that
16 have -- have a different policy that simply say as long
17 as the officer can articulate the use or the use of
18 force, there's no arbitrary number, three, four, five?
19   A. I'm not aware of that.
20   Q. Okay.
21   A. I need to brief -- that question you just asked.
22 If there's a reason --
23   Q. I'm sorry, you need to re-answer the question?
24   A. Yeah. I just want to add something, if I may.
25 I think I misspoke. If there's a reason to use a Taser

Page 90

1 beyond the three times, you need to articulate why that
2 is, and that being the person's actions are aggressive,
3 they're combative, they meet the threshold of that
4 respective agency's policy that a subsequent -- beyond
5 three deployments occurs.
6    Q. You don't mention the pulse graphs in your
7 report. That's why I asked you about them earlier. You
8 said you are qualified to read the pulse graphs; is that
9 true?
10   A. I believe so. I've looked at pulse graphs. I
11 don't know if -- when you would say "qualified," I --
12   Q. Well, remember the four instructor levels or
13 certification levels of a Taser we talked about?
14   A. Right.
15   Q. I think they were user and instructor and then
16 master and advanced. Do you remember those?
17   A. I do, and I think master and advanced are people
18 that really delve into the -- the downloading of the
19 Taser and that information. I mean, we download the
20 Taser as a sergeant after someone deploys it because we
21 use it for the force, but we don't really get that
22 information other than what you get on the report.
23   Q. So if we look at the -- at the -- at the pulse
24 graphs, I mean, can you explain them to us or to a jury?
25   A. No.

Page 91

1    Q. Okay. You just looked at the summary part that
2 said "This is how long the Taser was cycled" and things
3 of that nature?
4    A. And the duration of time between the cycles as
5 well.
6    Q. Right. Okay. So there's -- there's -- there's
7 no point in me handing you the pulse graphs and
8 questioning you on those; correct?
9    A. That's perfect. No. No, thank you.
10   Q. Okay. Generally, is attempting to defeating the
11 Taser a legitimate reason to apply an additional cycle?
12   A. It depends.
13   Q. On what?
14   A. It depends on the person's actions at that time.
15 And then by "defeating a Taser," I don't understand. Are
16 you pulling out a barb, or what -- in what way trying to
17 defeat the Taser?
18   Q. Or the perception that the individual's able to
19 fight through the Taser and so you give them another
20 cycle.
21   A. Once again, that goes back to what I stated a
22 moment ago, is that if that person's reacting to being
23 tased, you have to take into consideration that those
24 actions, arms flailing, body moving, may be as a result
25 of being tased, so you wouldn't continue to tase, because

Page 92

1 you're going to get the same exact result.
2    Q. Is an officer being in a fight alone exigent
3 circumstances that would justify a force triggering of
4 the Taser?
5    A. It depends what -- what's going on in that fight
6 at the time. Is that person's actions being aggressive
7 and/or combative?
8    Q. But it could be? I mean, being alone could be
9 an exigent circumstance?
10   A. Alone in itself, no. It's based on that
11 person's behavior at that time. Plenty of officers deal
12 with people alone. They drive in L units.
13   Q. Alone and -- and needing to use force. Let me
14 give you an example. Sergeant Bland testified that it's
15 not out of department policy to cycle the Taser four or
16 five times if you're an officer alone in a fight without
17 any backup and especially if you -- if the individual is
18 larger than you and you perceive the transitioning to
19 something else would be detrimental.
20      Do you disagree with that opinion?
21   A. If that person's behavior at that -- the fact
22 that they're large or their -- the behavior still has to
23 be aggressive and assaultive at that time when you would
24 go beyond that third Taser deployment, as I mentioned a
25 moment ago.

Scott A. DeFoe                Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 93

1   So the fact that you're by yourself, it doesn't
2   mean you can continue to deploy the Taser. The policy is
3   such -- it doesn't really differentiate between two
4   officers or one. You need to articulate that if you
5   needed to use it beyond the three, that the
6   reasonableness of -- you would have to articulate that
7   there was a reasonable -- there's a necessity to do so.
8       Q. Do you have experience, as a police officer, as
9   an expert, with any officers who have transitioned from a
10  Taser to a higher use of force, meaning a more
11  significant use of force such as lethal force with a
12  firearm?
13      A. Oh, many of -- many of the cases I've taken,
14  they involved a Taser and a shooting as well.
15      Q. Okay. When an officer transitions from a Taser,
16  is there a general next step, meaning there's either --
17  he uses a Taser and there's either compliance or he uses
18  a Taser if he goes to a more significant use of force.
19      What is that more significant use of force?
20      A. Well, if it's more significant, it depends on
21  what that respective agency's policy is at the time.
22  Some agencies look at a Taser on a different threshold
23  than they do an impact weapon such as a baton or an ASP.
24  So that may be the transition, once again, depending on
25  the person's behavior. If they transition to a lethal

Page 94

1   force option such as a pistol, it would have to be only
2   in immediate defense of life at that time.
3       Q. Do you have an opinion as to what Officer Lopera
4   transitioned to after the use of the Taser?
5       A. An LVNR.
6       Q. Okay. And is an LVNR --
7       A. Correction. Head strikes prior to LVNR.
8       Q. Okay. And head strikes and -- well, not head
9   strikes, but strikes and an LVNR are -- are they higher-
10  or lower-level uses of force than a Taser?
11      A. It depends on --
12      Q. Based on Metro's policy, not your experience.
13      A. Let me check. They fall under aggressive. I
14  mean, I -- based on their old policy, what I have is
15  that, you know, LVNR Level 1 was inactive resistance, and
16  that's typically tensing, bracing, or running away. That
17  would be someone running away, pushing away from an
18  officer, not striking the officer. It's typically what
19  inactive -- now, obviously, we know it's at aggressive
20  and aggravated aggressive levels.
21      But it depends. Within their -- their -- their
22  continuum, they've got numerous, obviously, options
23  within each. And it's just letting the officer know,
24  even though it's aggressive, you can still utilize or
25  deploy OC spray. Doesn't mean you can't do that.

Page 95

1       Q. Your report, you mention that -- and I'm going
2   to quote it -- Several law enforcements, e.g., IACP,
3   PERF, COP, and DOJ, have established 15 seconds of CEW
4   exposure, which we'll refer to as Taser exposure, as a
5   significant safety point.
6       Do you remember writing that?
7       A. Yes.
8       Q. Why do you think 15 seconds is a significant
9   safety point?
10      A. I took that -- I took that directly from the
11  material I received from -- from Las Vegas. I took that
12  directly from there. It's one of -- one of the
13  directives. It's just prolonged exposure.
14      I mean, you've got issues, obviously, with --
15  with -- depends on where the -- the darts are deployed.
16  If they're in the chest, you've got issues with
17  preexisting heart conditions, you've got tachycardia
18  issues if someone is under the influence of a CNS
19  stimulant. There's a number of things at that point
20  that -- that would cause a reasonable officer to not go
21  beyond that 15-second --
22      Q. And do you agree --
23      A. -- threshold.
24      Q. I'm sorry, go ahead.
25      A. I'm through.

Page 96

1       Q. Do you agree with that, or do you think there
2   are depart -- if departments say that you can use a Taser
3   for longer than 15 seconds, would you criticize those
4   departments?
5       A. I think it -- I think -- I'm not being critical
6   of other departments. Once again, it's -- it's based on
7   the totality of the circumstances. If someone's in
8   immediate defense of life situation at that point, then a
9   prolonged use beyond that 15 seconds may be reasonable,
10  based on the set of facts in that matter.
11      Q. Okay. Do you know if chokeholds are defined in
12  the Nevada Revised Statutes?
13      A. I don't know.
14      Q. Okay. Let's talk about the LVNR a little bit
15  more. How -- you've mentioned earlier -- I think you
16  said 7 to 12 seconds in order to render a subject
17  unconscious through an LVNR or a chokehold, a rear naked
18  choke?
19      A. There's different schools of thought.
20  Typically 7. I've heard 7 to 12, 10 to 15 seconds. A
21  lot of it's going to be dependent on, obviously, the
22  person putting on the chokehold, obviously, how
23  proficient they are with it.
24      Secondly is going to be the level of resistance,
25  the size of the subject, the size of the officer, the

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 97

1  terrain in which they're -- they're -- maybe could be on
2  the ground; it could be -- depending on where they're at,
3  there's a myriad of different factors that come in to
4  make what would be a reasonable time frame.
5      Q.  When Officer Lopera transitioned from the Taser
6  to physical contact with Tashi Farmer -- do you remember
7  reviewing that in the videos?
8      A.  Yes.
9      Q.  Do you have an opinion as to whether Tashi
10  Farmer was actively resisting him at that point or not?
11     A.  I think he was resisting.  He was moving in a
12  sense, moving his body and not being compliant at that
13  time.
14     Q.  Do you recall a scenario right before Officer
15  Lopera transitions where he was attempting to get a
16  handcuff on Tashi Farmer's left wrist and Tashi Farmer
17  was on his stomach and Tashi Farmer, a few seconds later,
18  was on his back and fighting Officer Lopera?
19     A.  I believe so, but I can't recall.
20     Q.  Okay.  Would that justify the use of hand
21  strikes?
22     A.  Once again, it depends on what would be
23  reasonable at that time.  The purpose of hand strikes at
24  that point would -- wouldn't be reasonable because if
25  you're ultimately looking to effect the handcuffing

Page 98

1  technique -- is that you want to control the handcuffs
2  and control the arms to do that.
3      Once again, by striking someone, especially in
4  this matter, 10 to 13 times in the face and head area, is
5  not going to help you accomplish what you're -- you're
6  looking to do.  People are going to put their arms up to
7  defend.  They're going to move around, as I mentioned
8  earlier, in the physiology of the struggle.  By doing so,
9  you're going to maybe consider that's more resistance
10  because you believe that person is, in fact, resisting --
11  or more force because you believe that person is
12  resisting.
13      So ultimately you want to try to control the
14  arms and the wrists to effect the handcuffing technique,
15  and head strikes or any strikes may be counterproductive
16  to what you're doing.
17     Q.  So if you were the arresting officer and you had
18  someone on their stomach and you were attempting to put a
19  handcuff on their left wrist and they rolled back over to
20  their back and put their hands up, what would your
21  appropriate reaction be?
22     A.  I may even get off them at that time.  I may get
23  off -- come off them for that -- if I can't get them in a
24  control hold where I can mobilize that wrist, I -- I
25  don't want to stay in that position for a number of

Page 99

1  reasons, obviously, weapon retention issues.  I don't
2  want to roll around on the ground with that person at
3  that point.
4      Q.  How -- I'm sorry.
5      A.  I may step off that person.  I may transition to
6  pepper stray while that person's on the ground -- to
7  pepper spray and I may deploy an impact weapon such as
8  a -- a baton or an ASP and then provide some warnings to
9  that person.
10      And if that person's still aggressive, then I
11  may deploy, you know, a strike to the leg or something
12  that -- that -- it would be appropriate at that time,
13  with an impact weapon.
14     Q.  So all of those are options?
15     A.  They're all options.  I mean, you're going to
16  look at -- it's based on the totality of the
17  circumstances, based on your hypothetical.
18     Q.  So how do you gain control to get the person
19  into cuffs?  Do you think hitting them with pepper spray
20  would gain their compliance and allow them to be cuffed?
21     A.  No, but it may, obviously, assist in that
22  factor.  I mean, you -- it may assist in the sense that
23  now you've impaired that person's ability to see, if that
24  person's still looking to fight.  It just depends on
25  what's happening at that time.

Page 100

1      But I may not want to be, you know -- you know,
2  mounted on top of that person, conducting downward
3  strikes on that person, because the end result is you're
4  looking to handcuff that person anyway.  And so the
5  purpose of the strikes, unless that person is -- is
6  aggressive and assaultive at that time, the strikes
7  aren't going to be reasonable.
8      Q.  Why do you think Tashi Farmer did not comply
9  with Officer Lopera's commands from the very beginning
10  when he ran down the unauthorized hallway to outside when
11  he said, "Stop.  Don't move"?
12      Do you have an opinion as to why he didn't just
13  stop and don't move?
14     MR. SAYRE:  Objection.  Calls for speculation.
15     A.  It could be a number of reasons.  He could have
16  been mentally ill, could be under the influence.  He
17  could be just noncompliant.  There's a number of reasons
18  that he could have done like he did.  I don't know.
19     Q.  But had he, we never would have gotten to any
20  other force issues; correct?
21     A.  Had he stopped?
22     Q.  Yes.
23     A.  Hopefully not.
24     Q.  You've been involved -- sounds like a lot of or
25  fairly a lot of combatives.  I'll just refer to

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 101

1  combatives. Is that okay phraseology? I'll -- I'll
2  include your LAPD time, your private sector training as
3  well; is that okay?
4      A.  Yes.
5      Q.  Okay. So you've got dozens and dozens of hours,
6  annual certifications for that type of training; right?
7      A.  That's correct.
8      Q.  When you're training in a police setting, you're
9  using fellow officers; right?
10     A.  Yes.
11     Q.  So one acts as the suspect, and one acts as the
12  officer; correct?
13     A.  Yes.
14     Q.  Are you familiar with Metro's training in that
15  regard, how they conduct their LVNR or their combatives
16  training?
17     A.  I'm not.
18     Q.  Okay. Sergeant Bland testified that when you've
19  got two officers that essentially know the training that
20  is supposed to be conducted, it isn't exactly real-life
21  scenario, because I know the moves you're about to put on
22  me, you know the moves you're about to conduct, and, of
23  course, everybody wants to avoid pain.
24        Do you understand what I'm discussing in the
25  training environment?

Page 102

1      A.  I do.
2      Q.  Okay. Have you seen that in your own experience
3  in the training environment?
4      A.  I have.
5      Q.  Okay. So do you think that if Metro doesn't
6  train their officers with a suspect, the training suspect
7  that is actively resisting when the officer is attempting
8  to employ an LVNR, do you think that's wrong?
9      A.  No, because you have to be reasonable in your
10 training because you can't get officers hurt. So you --
11 you try to replicate the best environment you can, but
12 you have to be mindful that you -- people have to go to
13 work the next day. And there's always the one or two in
14 the class that are overzealous during these times that
15 get guys' shoulders popped out and other things occur.
16       So we will be mindful of the fact that people
17 still need to work. We don't want any workers'
18 compensation claims that -- that come out of that. But
19 you try to create an environment the best you can. I
20 know we're using RedMan suits and other things that we
21 would use for baton strikes. We would try to create the
22 best environment you could.
23       I was, you know, working a lot with SWAT's
24 defensive tactics cadre. We would have -- and people
25 would get hurt all the time. People would get hurt.

Page 103

1  You'd have people that -- you know, that -- are older
2  guys and you get your -- your shoulders hurt or wrists
3  hurt.
4        So I'm not critical of that training opportunity
5  at all. It's just got to be -- make sure that officers
6  aren't being complacent during the training is what
7  supervisors and trainers should be looking out for.
8      Q.  Do you think there's any training that you've
9  seen that Metro claims to conduct that is insufficient to
10 prepare their officers for the street with respect to
11 combatives?
12     A.  I don't have any opinions on that.
13     Q.  Okay. Have you ever heard the phrase "bleeding
14 training so as not to die in war"?
15     A.  Yes.
16     Q.  Do you think that Metro should use more
17 aggressive combative training to prepare their officers
18 for the street, or they -- should they be worried about
19 the workers' comps claims that you discussed?
20     A.  I think they should make good scenario-based
21 situational-based training that's as real life as you
22 can -- you can replicate without getting officers hurt.
23 I think that's important.
24        And that can be in a number of different
25 training opportunities, but it's not the fact of -- I

Page 104

1  didn't mention the fact of workers' compensation to be a
2  deterrent to train hard, and I agree people should train
3  hard, but when you're dealing with ground fighting and
4  weaponless retention techniques and utilization of less
5  lethal force options, you have to be mindful that people
6  can get hurt.
7      Q.  If you're attempting to employ an LVNR and you
8  lose compression on the neck, do you have an opinion as
9  to whether you literally have to start the -- if we're
10 putting you on a clock and we're going 4 to 7 seconds or
11 we're going 7 to 15 seconds, as you testified earlier,
12 and you lose the compression on the neck because there's
13 a active resistance of any sort, you're rolling around,
14 do you have an opinion as to whether you have to
15 essentially start the hold over again from a time
16 perspective?
17     A.  I think it's -- it's -- it's based on cumulative
18 time. So that being that if the -- if you've -- break it
19 and you reapply it again, it would be cumulative from
20 that starting point all over again. It wouldn't be the
21 fact you did three seconds here, four seconds here, wait
22 a minute. I only have a few seconds left. I think it's
23 based on once that technique is applied, that it's --
24 that's when the clock begins.
25     Q.  So once it's applied and continuous until

Scott A. DeFoe                Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 105

1    success; correct?
2        A.   Yeah -- so --
3        Q.   Meaning you -- I'm sorry.  Meaning you can't
4    have two or three seconds of compression, the hold gets
5    broken for two or three seconds, and then you have two or
6    three seconds more, and that accumulates to success and
7    the subject's unconscious.  That doesn't work is what I'm
8    saying.
9        A.   That's correct.
10       Q.   Okay.  Have you seen any evidence in any of the
11   training materials for Metro that indicates that they do,
12   in fact, train their officers to employ an LVNR against
13   an actively resisting suspect or a subject?
14       A.   I didn't.  I did not see that.
15       Q.   Okay.  You -- are you offering any medical
16   opinions in this case?
17       A.   I am not.
18       Q.   Are you offering any psychiatric opinions in
19   this case?
20       A.   I am not.
21       Q.   Do you have an opinion on how long a chokehold
22   would have to be applied for someone to die as -- of
23   asphyxia?
24       A.   No.
25       Q.   Can you define a police restraint?

Page 106

1        A.   In what -- what sense?
2        Q.   Do you remember in the coroner's report where it
3    said "asphyxiated with police restraint"?
4        A.   Right.
5        Q.   Did you see the coroner's report?
6        A.   I did.
7        Q.   I believe it was in one of the documents, you
8    said; right?
9        A.   I have it right here.
10       Q.   What's your understanding of what that means, or
11   do you have an understanding of asphyxia due to police
12   restraint?
13       A.   That the person was restrained at the time in
14   which they died.  I believe that's where it -- it comes
15   down to.
16       Q.   Okay.  Have you reviewed the defense medical
17   experts in this case, Dr. Vilke, Dr. Ly?
18       A.   I don't know if I've received those documents.
19       Q.   I don't recall that you did, but...
20       A.   I don't believe I have.
21       Q.   Okay.  And your counsel is shaking his head, so
22   I presume you would have gotten them from him.
23       A.   And there were four additional documents that I
24   received after the submission of my Rule 26 report, the
25   second one in July, and they're right here.

Page 107

1        Q.   And can you read those into the record, please.
2        A.   Sure.  The Case Review and Analysis Expert
3    Opinions by James Borden; the Force Investigation Team
4    Report in Custody Death Event -- that's LVMPD Bates No.
5    3783-3817; the LVMPD interoffice memo, dated 8/24/17,
6    which is the Tactical Review Board, LVMPD 3769 through
7    3782; and the Critical Incident Review Process, dated
8    August 24th, 2017 -- that's LVMPD 3783 to 3817.
9        Q.   Okay.  Let's look at your report.  We premarked
10   it as Exhibit 1.  And just for clarity, you've produced
11   two reports in this case.  One was dated, I think, May
12   25th, and there was one dated July 12, 2008 (sic).  And
13   prior to going on the record, we kind of discussed which
14   one is the most relevant, and I think your testimony --
15   but please answer on the record.
16            The July 12, 2018, Rule 26 report is the report
17   that you intend to offer if called to testify at trial?
18       A.   That's correct.
19       Q.   Okay.  Is there anything in the July report that
20   was deleted from the May report or the earlier report?
21       A.   There were no deletions, no.
22       Q.   What are the -- what's the difference and the
23   reason for the difference between the earlier report and
24   the July report?
25       A.   Primarily the -- the additions.  I can turn to

Page 108

1    it.  It's -- I believe -- not having both copies here,
2    but I believe Opinions 14, 15 --
3        Q.   The Duty to Intervene section?
4        A.   Yeah.  So -- as well as the command and control
5    issues involving Sergeant Travis Crumrine I picked up
6    on 14, so...
7        Q.   Have any of the opinions with respect to Officer
8    Lopera changed from the two reports?
9        A.   They have not.
10       Q.   Okay.  On-Scene Consulting is your consulting
11   company?
12       A.   It is.
13       Q.   Are you the sole owner, or are there other
14   people that provide services through that enterprise?
15       A.   I had a partner, but he's no longer in the
16   company.
17       Q.   Okay.  I want to look at what's been marked by
18   you Page 5 of 32.  And it says "The Below Listed
19   Information is derived from LVMPD."
20            Do you see that at the top?
21       A.   Yes.
22       Q.   So just from an overview perspective, if we go
23   to Page 12 and looking up from the bottom, everything
24   between -- on Page 5 through Page 12, but not including
25   where it starts "Opinions," is that taken verbatim from

**Page 109**

1   the Metro arrest report?

2    A.   I think it is verbatim direct -- directly --

3   directly verbatim.

4    Q.   It looked to me like it was, but I just wanted

5   to verify that that's -- all of that information, you

6   took just directly from the Metro report, so whether

7   we're reviewing the arrest report or your expert report,

8   as far as those pages, it's consistent?

9    A.   That's the same thing.

10    Q.   Okay. So you -- did you do anything, other than

11   take this verbatim report for those pages, to

12   independently verify the statements made in here?

13    A.   I don't understand the question.

14    Q.   I'll give you an example. So did you sit

15   through the videos -- so if we go to Page 7 where we

16   start at "The camera," it says time stamp, "00:00-The

17   camera was activated, and Farmer approached officers

18   Lif -- Lopera and Lif."

19      Do you see that?

20    A.   Yes.

21    Q.   So my -- it's just a general question. Did you

22   sit through the videos and verify all those time stamps,

23   or did you accept Metro's investigation on that -- those

24   topics?

25    A.   I went through -- I sifted through the videos

**Page 110**

1   for consistency, but I -- I went off of their time

2   stamps.

3    Q.   And that's -- that's fine. I just wanted to

4   know if you sat there and if you disagreed with any of

5   those time stamps or if you disagreed with any of the

6   descriptions of what occurred during those time

7   sequences.

8    A.   I don't -- no -- no disagreements.

9    Q.   Okay. So you agree with everything that's in

10   the arrest report, and that's why it's incorporated into

11   your report.

12    A.   I believe so, yes.

13    Q.   Okay. Your -- your -- you agree that Officer

14   Lopera and Officer Lif were at their appropriate assigned

15   post inside the Venetian as part of Operation Safe Strip;

16   correct?

17    A.   Yes.

18    Q.   Okay. We already talked about the mission of

19   Safe Strip, and you agreed with me on that.

20      Are you familiar with Pierce's testimony

21   relative to the type of hold or neck restraint that

22   Officer Lopera allegedly used?

23    A.   Whose testimony?

24    Q.   Pierce, Jonathan -- I think Jonathan Pierce, the

25   individual in the white Toyota pickup truck.

**Page 111**

1    A.   He stated it was a rear naked choke.

2    Q.   Okay. Did you read his various transcribed

3   statements?

4    A.   I did.

5    Q.   Okay. Are you familiar with how he viewed the

6   events?

7    A.   Through the rearview mirror of his -- of his --

8   I guess his side window.

9    Q.   The left rearview mirror of his Toyota Tacoma?

10    A.   That's right.

11    Q.   Are you familiar with how far away he was when

12   Officer Lopera transitioned to the LVNR?

13    A.   I believe about 85 to 90 feet.

14    Q.   Okay. Do you accept that as true -- where did

15   you get that information from?

16    A.   Somewhere within the -- the record.

17    Q.   Our expert, Jamie Borden, testified that it

18   was -- I forget if he put it in feet or yards, but I

19   remember it in yards -- somewhere around 30 to 33 yards.

20      Is that consistent? So that would be 90 to --

21    A.   It's about 85 to 90 feet.

22    Q.   Okay.

23    A.   About right. Or 90 feet plus.

24    Q.   Okay. Do you think someone can accurately

25   depict events on the ground behind them in -- in a small

**Page 112**

1   rearview mirror from a Toyota Tacoma while driving in the

2   opposite direction with the degree of specificity to

3   determine what type of chokehold was being employed?

4    A.   I don't know.

5    Q.   Are you familiar with the fact that Jonathan

6   Pierce testified that he did not know what an LVNR was?

7    A.   I believe he did testify to that.

8    Q.   Okay. So the only phrase he had in his

9   wheelhouse, based on his marginal martial arts training

10   was rear naked choke; is that fair?

11    A.   Yes.

12    Q.   Okay. So do you give any weight to his

13   description that it was one or the other?

14    A.   No. The only weight I gave it is what I saw on

15   video, and I can't make the determination if it's a rear

16   naked choke or an LVNR.

17    Q.   Okay.

18    A.   And as well as Officer Lopera's statements

19   himself, that he several times said he "rear naked choked

20   his -- his ass."

21    Q.   Let's talk about that for a minute. Do you have

22   any problem with Officer Lopera saying that he choked him

23   out?

24    A.   The term "choked him out"?

25    Q.   Yeah.

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

### Page 113

1   A.  When you say a problem, I --

2   Q.  I mean does that indicate anything to you?  Is

3   that a general term?  Is that a term of art?

4   A.  That's a term that is used both in the martial

5   arts or self-defense community as well as jargon that

6   officers would use when they would choke someone out.

7   Q.  If somebody said that, "I choked him out," would

8   you assume that it was one type of choke or another?  For

9   example, would you assume it was an LVNR versus an RNC?

10   A.  I would look at it that they choked out a guy

11   who's unconscious, and how they did that, they choked him

12   out.

13   Q.  Okay.  And would you make any delineation

14   between an air choke versus a blood choke, just based on

15   the statement that, "I choked him out?"

16   A.  Just that they were choked out.

17   Q.  Okay.  Now, if someone said, "I rear naked-ed

18   his ass," would you make any indication as to whether

19   that was a blood choke or an air choke?

20   A.  That would lead me to believe that that person

21   may have some martial arts training because they

22   described that -- that hold specifically.  And then

23   knowing that, it would obviously be a blood choke.

24   Q.  Do you think it was indicative of anything that

25   Officer Lopera said, "I rear naked-ed his ass"?  Was that

### Page 114

1   slang, jargon used loosely after a significant event?

2   He's out of breath.

3        In my opinion, LVNR doesn't exactly roll off the

4   tongue, but do you have an opinion as to what that meant?

5   A.  Well, he said it more than once, so that's the

6   only thing that's concerning.  He didn't just say it one

7   time.  He said it several times to different people

8   throughout -- after the -- the event, so this made me

9   believe that, in fact, he had done it, just based on his

10   own -- his own statements.

11   Q.  When you were training in Brazilian jiujitsu and

12   Kempo Karate, and then also -- I think you said Kempo

13   Karate was when you were young, before you were a police

14   officer?

15   A.  I was in my late teens, early 20s.

16   Q.  Okay.  And so maybe you were in the Army

17   Reserves at that point?

18   A.  I had just gone in, I think.

19   Q.  Did you ever use the wrong terminology from

20   civilian training when you were in the LAPD or vice

21   versa, referred to the same thing differently in the

22   wrong context?

23   A.  I may have.

24   Q.  Okay.  Is that uncommon?  Would you find that

25   uncommon?

### Page 115

1   A.  That's not uncommon.

2   Q.  Let's go to Page 7.  Do you see at 1:34,

3   "Officer Lopera yelled, 'Stop don't move.  You're going

4   to get tased.'"  We talked about that a little bit

5   earlier.

6        That would be the warning that Metro requires to

7   be given before Taser is deployed; correct?

8   A.  What's the time frame?

9   Q.  I --

10   A.  I see.

11   Q.  -- 1:34.

12   A.  I got you.  Yes.  That would be -- "You're going

13   to get tased.  Stop."  That's a -- he's letting him know.

14   He -- that's -- he's providing a warning at that point.

15   Q.  Yep.  Okay.  And so, obviously, Tashi Farmer

16   could have complied at that point, but did not.

17        Do you agree with that?

18   A.  That he didn't comply?

19   Q.  Correct.

20   A.  Yes.

21   Q.  Okay.  And then at 1:38, "Officer Lopera yelled,

22   'Taser, Taser.'  Farmer held his hands up and a cell

23   phone visible in his left hand."

24        Do you remember seeing that on the video?

25   A.  Yes.

### Page 116

1   Q.  Okay.  "'Don't move.'  Farmer replied, 'OK.'"

2   "Don't move."  Now, there's been some discussion about

3   conflicting verbal commands in your report by Officer

4   Lopera.  Do you remember that?

5   A.  What do you mean?

6   Q.  In your report, you said that Officer Lopera

7   gave conflicting verbal commands.

8   A.  Yeah.  I said that as well as that Las Vegas

9   Metro came back in their criticisms as well and said that

10   he gave, you know, two different commands simultaneously

11   that meant to do two different things which were

12   conflicting with one another.

13   Q.  Okay.  Can you show me in -- in the timeline

14   what you point to to indicate that he gave conflicting

15   commands?

16   A.  1:51, "Don't move.  Get on your stomach."

17   Q.  And so the -- the conflicting commands are

18   you're looking at "Don't move," period, as if to state

19   perfectly still versus "I want you to turn over and get

20   on your stomach"; is that the conflict?

21   A.  Yeah.  You're telling someone not to move, and

22   then you're telling them to get on their stomach.  You're

23   telling them not to move and get on your -- not to --

24   don't move, but to get on your stomach.

25   Q.  Can it be sequential?

Scott A. DeFoe                Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 117

1    A.  I don't understand.
2    Q.  Well, can I tell you to stop moving and then
3  give you a subsequent command to get on your stomach?
4    A.  You could.
5    Q.  Okay.  Any other places that you think his
6  verbal commands conflict?
7    A.  Let me look.
8    MR. McNUTT:  How are we doing on tape?
9    MR. SAYRE:  2.40.
10    MR. McNUTT:  Oh, okay.  I'm sorry, I didn't hear
11  that, Fred.  What?
12    MR. SAYRE:  2.40.
13    MR. McNUTT:  Oh, you're suggesting to him the
14  answers to the question?
15    MR. SAYRE:  That's right.
16    MR. McNUTT:  Oh, okay.
17    A.  2.40.  "Officer Lopera told Farmer, 'Get on your
18  stomach.'"  And he was already on his stomach at the
19  time.
20    Q.  Okay.  Is it common for officers to repeat
21  commands in high-stress situations?
22    A.  It depends on the officer and depends on the
23  situation and depends on the level of stress.
24    Q.  Okay.  And so what is the conflict?  I mean,
25  Fred pointed you to that testimony or suggested the

Page 118

1  testimony to you by pointing 2.40 out to you.
2    What does that conflict with?
3    A.  Well, there's several.  It's not just 2.40.
4  It's 2 --
5    Q.  I'm asking all.  Tell me.
6    A.  Well, just, you know, the officer's excitability
7  at that time.  They're telling him to do something that
8  he's already doing, giving him commands that he's already
9  doing, so if -- if you're laying on your stomach and
10  someone's yelling at you to get on your stomach, it may
11  create some confusion to that person that you're yelling
12  to, especially when you're yelling it to him several
13  times in a row.
14    Q.  Is it your testimony that between 2:40 and, say,
15  2:52 that Farmer was laying perfectly flat on his
16  stomach, not rolling on his side, not rolling over to his
17  back?
18    A.  I'm not testifying to that.
19    Q.  Okay.  So what are you testifying to?
20    A.  That he was observed laying on his stomach.
21    Q.  Okay.  That's what the Metro arrest report said.
22  Do you agree with that for that whole time span?
23    A.  I'd have to look -- if you want to show me the
24  tape.  I would have to look at the tape.
25    Q.  Okay.  We'll get to it.  Go to 3:13.  "Officer

Page 119

1  Lopera asks 'Is he out yet?'"
2    Do you see that?
3    A.  Yes.
4    Q.  Did you hear that on the video?
5    A.  Yes.
6    Q.  Okay.  What does that indicate to you about what
7  Officer Lopera knows about the condition of the suspect?
8    A.  He doesn't know.
9    Q.  Right.  He doesn't know.  That's why he's asking
10  Sergeant Crumrine; right?
11    A.  That's correct.
12    Q.  He then asks twice more the same question.  Does
13  that indicate to you that he still is not knowledgeable
14  about the condition of the suspect?
15    A.  Seems to be.
16    Q.  Okay.  Does that indicate to you that Officer
17  Lopera wants to know the condition of the suspect?
18    A.  Yes.
19    Q.  Would that indicate to you that Officer
20  Lopera's, you know, going to release the hold if -- if
21  the suspect is out, in fact, out?
22    A.  I don't know what he's going to do.  I know he's
23  just asking if he's out yet.
24    Q.  Okay.  Does he -- at what point does he get
25  indication, based on anything in this timeline or other

Page 120

1  information you may have, that he should let go?
2    A.  Well, at 3:25 Tran -- and I know that might be a
3  conflict if it's Tran or Crumrine.  I know there's some
4  conflicting statements as to -- said, "Let him go."  And
5  then at 3:26, "Officer Lopera asked, 'Are you sure?'"
6  And then "Tran replied, 'Yeah,'" if it's, in fact, Tran.
7    Q.  Okay.  So the part at 3:25 that's in
8  parentheses, italics, and boldened, that's your comment
9  about the -- there's been different testimony about who
10  actually said that; right?
11    A.  That's correct.
12    Q.  That wasn't in the original arrest report.
13    A.  That's right.
14    Q.  That's the only change; right?
15    A.  Yes, sir.
16    Q.  Okay.  And so one second later, him saying, "Are
17  you sure?"  Officer Tran or Crumrine says, "Yeah."  Do
18  you have an opinion as to whether the hold was released
19  or not at that point?  And by the way, when I say "hold,"
20  I mean the pressure, not that the encircling arm was
21  removed from around the neck.
22    A.  I believe it was released right around that
23  time.
24    Q.  Okay.  Are you aware that Sergeant Crumrine said
25  his perception was that Ken Lopera immediately released?

Scott A. DeFoe                     Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 121

1    A.   Sergeant Crumrine, he had the hold on while
2  Sergeant Crumrine was there for well over a minute.  And
3  I know that Tran and Flores were there for 46 seconds
4  while that hold was still applied to -- to Mr. Farmer.
5    Q.   That's a broader question.  We'll get to it in a
6  minute.  My question was simply that -- are you aware
7  that Sergeant Crumrine testified in his deposition that
8  when he said -- because the testimony is that -- I think
9  it's pretty well vetted.  We all agree that it was
10 Sergeant Crumrine who said, "Let him go, Ken."  Tran
11 testified, "That wasn't me."  Crumrine, I think,
12 testified that it was him.
13      Are you aware that in his deposition, Crumrine
14 also testified that, yes, his perception was that Ken
15 did, in fact, release the hold?
16   A.   Yes, he stated that.
17   Q.   When a suspect is in an LVNR, when you think of
18 releasing the hold or -- does that imply to you -- have
19 you ever in your report thought that releasing the hold
20 means removing the encircling arm from around the neck or
21 simply releasing the pressure around the neck and keeping
22 the encircling arm in place?
23   A.   Remove the hold.  That's take the arm from
24 around the neck.
25   Q.   Okay.  So is that consistent with LVMPD policies

Page 122

1  on that point?
2    A.   I don't know.
3    Q.   So if an officer has a suspect in an LVNR and
4  the suspect goes out, what is supposed to happen at that
5  point, per LVMPD policy?
6    A.   The person's going to, obviously, be woken up,
7  and then, obviously, they're going to get medical
8  treatment.
9    Q.   Is he supposed to be putting cuffs first?
10   A.   Yes.
11   Q.   Okay.  And does the officer that's deploying the
12 LVNR remove his encircling arm before the individual's
13 placed in cuffs?
14   A.   I believe he's -- maintains the hold until the
15 handcuffs are put on.
16   Q.   So he maintains the encircling arm even though
17 he's released the pressure?
18   A.   Right.
19   Q.   Okay.  Are you familiar with -- of the
20 deposition testimony of Kasey Kirkegard, Officer Kasey
21 Kirkegard?
22   A.   No.
23   Q.   Okay.  She was one of the FIT detectives --
24 excuse me, CIRT detectives, and she testified very
25 clearly that the LVNR is supposed to be -- remain in

Page 123

1  place, as far as the encircling arm, until the individual
2  is in cuffs.  Sergeant Bland also testified to that
3  point.
4        Would you defer to their opinions, or do you
5  have a different opinion?
6    A.   I defer to their opinions.
7    Q.   So when we go back and look at your report and
8  you use the language that -- that the plaintiffs have
9  used in this case about how long the hold was maintained,
10 is it your opinion that that hold period simply means the
11 encircling arm was in place, or are you testifying that
12 there was pressure put on Tashi Farmer's body or neck
13 that entire time?
14   A.   I can't discern what level of pressure was on
15 his neck at any time.
16   Q.   Okay.  So when you talked briefly -- because you
17 segued into -- Crumrine was there for how many seconds
18 prior to the holding release?
19   A.   Two to three seconds after it was initially
20 applied, Sergeant Crumrine was on scene.
21   Q.   Okay.  And what is your criticism of -- of that?
22   A.   He should have immediately interceded and -- and
23 had him remove the -- hold if he failed to do, so he
24 should have physically done that.
25   Q.   Why should he have immediately interceded?

Page 124

1    A.   Because there's no reason at that point --
2  Mr. Farmer wasn't displaying any aggressive
3  inter-combative actions at that time that would
4  necessitate a hold.
5    Q.   Okay.  So take me to the timeline on Page 9 or
6  any other page you'd like to go to.
7    A.   Okay.  As to what?
8    Q.   Tell me at what point here Sergeant Crumrine had
9  a duty to intervene, as your counsel puts it.
10   A.   This is the initial statement.
11   Q.   Page 9 of your report --
12   A.   Right.
13   Q.   -- is the timeline taken from the arrest report?
14   A.   Right.  It would be right at 3:01.
15   Q.   So 3:01 -- I'll just read it.  It says "Sergeant
16 Crumrine arrived and said 'Put your'" -- curse word --
17 "'hands behind your back.'"  I don't understand your
18 connection.
19        He's obviously trying to get Tashi Farmer's hand
20 in cuffs; correct?
21   A.   Right.
22   Q.   So what was -- what -- how does that connect to
23 his duty to intervene immediately at this point?
24   A.   He was there for a minute and 10 seconds while
25 it was applied, and --

**Page 125**

1     Q. Before this 3:01 or after this 3 --

2     A. No. From the time -- he was there for a minute

3  and 10 seconds during the application process. So if it

4  was applied for a minute and 13 seconds, he was present

5  during the application for a minute and 10 seconds.

6     Q. Right. And I'm asking you to show me what that

7  looks like in the timeline here. When did Officer

8  Crumrine show up on this timeline?

9     A. According to this timeline, it shows at 3:01 is

10  when he arrived.

11     Q. He arrived, okay. And so you're saying at

12  3:01 -- your testimony was that's when Sergeant Crumrine

13  had an immediate duty to intervene; correct?

14     A. According to this timeline, yes.

15     Q. Is there a different timeline that I'm --

16     A. My understanding, based on my review, is that he

17  arrive -- in looking at the video, he arrives three

18  seconds into this tase -- I mean to the LV -- application

19  of the LVNR or rear naked choke and was present for a

20  minute and 10 seconds of that time, of the minute --

21  total of the minute and 13 seconds that was applied.

22     Q. Okay. What would prompt Sergeant Crumrine to

23  have a duty to intervene?

24     A. He's a supervisor. There's force that's being

25  applied that's unreasonable at that time and unnecessary,

**Page 126**

1  that Mr. Farmer's actions did not necessitate the use of

2  a lethal hold at that time, and he should have intervened

3  in -- he had a duty to intercede at that time.

4     Q. Okay. How would he know whether it was a lethal

5  hold or not?

6     A. Well, it's going to be based on the person's

7  actions at the time, what -- their level of resistance at

8  that time. And based on my review of the video and

9  review of the record in this matter, that his level of

10  resistance was not such to be able to justify that use to

11  have -- applied for a minute and 13 seconds.

12     Q. Okay. But Officer Lopera, he clearly doesn't

13  know what the situation is with the suspect; right? So

14  the duty to intervene is strictly related to Sergeant

15  Crumrine?

16     A. No. I mean, Lopera should have released the

17  hold. The fact that he's wondering if he's out yet or

18  not is going to be depending on the level of resistance.

19  So why is he concerned if he's out if Farmer, based on

20  review of the video, is not doing anything that would

21  necessitate the use of the hold from the onset?

22     Q. Doesn't that indicate to you that he doesn't

23  believe Farmer is done resisting?

24     A. No. I didn't ask that. Believes -- to me that

25  he's wondering if -- by applying the hold, if the

**Page 127**

1  person's out yet.

2     Q. And you testified earlier that that indicates he

3  clearly doesn't know the condition. The only reason an

4  officer would need the -- the suspect to go out would be

5  because he believes he's actively resisting; correct?

6     A. But the only reason that you'd -- you'd put

7  someone out is if they were actively resisting. Based on

8  my review of the tape, he was not actively resisting, so

9  the -- the reason to have the hold on at any time, I -- I

10  believe was unreasonable.

11     And then having it on for that period of time,

12  as I mentioned, when someone else is present, they should

13  have had a duty to intercede. So the fact that he has it

14  on and he's questioning, "Is he out yet?" he should have

15  not had it on in the first place.

16     Q. But once he had it on -- okay. Strike that.

17     How would Sergeant Crumrine know that he had --

18  well, explain to me what a duty to intervene is, broadly.

19     A. If I see you as an officer involved in a force

20  that I deem or reasonably believe is excessive at that

21  time or not consistent with what the subject's actions

22  are, levels of resistance, that I need to verbally tell

23  you to stop. I can direct somebody to stop you, or I can

24  intervene and stop you myself.

25     Q. And so it could be an otherwise legitimate use

**Page 128**

1  of force that is excessive or it could be an unauthorized

2  type of force being used? Does it apply to both of those

3  scenarios?

4     A. Could be any force, unauthorized, legitimate, or

5  not. If you reasonably believe at that point that that

6  force is excessive, you have a duty to go ahead and

7  intercede -- intervene to stop that force or direct

8  somebody to do so.

9     Q. And you think Sergeant Crumrine's immediate duty

10  to intervene starts at 3:01?

11     A. Right when he arrives.

12     Q. Okay. So an officer responding to another

13  officer that's in distress, code red -- do you remember

14  that Officer Lopera called for a code red to open up the

15  radio lines and things of that nature?

16     A. Yes.

17     Q. Okay. Does an officer's -- is his first

18  reaction, under policy, to detain the suspect and then

19  figure the situation out, or is it to go -- to run into

20  the sus -- the situation and determine whether his fellow

21  officer is within policy?

22     A. No. It's what the -- what the subject's actions

23  are at the time when they arrive. You're not looking at

24  policy determinations. You're looking at what the level

25  of resistance is by the subject at the time in which you

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 129

1  first see that. And then you obviously need to intercede
2  if you reasonably believe that that force is excessive at
3  the time.
4      Q. Okay. I want to make sure that one thing is
5  clear because I think we've answered a couple different
6  ways twice. With respect to anything in here where it
7  says "the hold was released," how do you interpret that,
8  that the -- there was pressure released from Tashi
9  Farmer's neck, or do you interpret that as the encircling
10 arm should have been removed?
11     A. I believe that it's -- it's the pressure. It's
12 that -- that -- that the hold. If you have someone in a
13 hold and you -- there's no pressure there, then the
14 hold's not applied.
15     Q. If I simply have my encircling arm around your
16 neck and I'm not applying pressure, is that unreasonable
17 or excessive force?
18     A. Without pressure, no.
19     Q. Okay. Are you aware that Sergeant Tran also
20 testified that he believed that Officer Lopera
21 immediately released the hold when Crumrine said to
22 release the hold?
23     A. Well, Tran was there for 46 seconds while the
24 hold was applied, so I don't know what point --
25     Q. So how do you know the hold was applied for 46

Page 130

1  seconds? Can you tell that from the video?
2      A. Yes. You can tell -- I don't know if there's
3  pressure being applied, but I can tell the hold is
4  applied.
5      Q. Okay. That's what I'm getting at. So there's
6  an encircling arm in place, but you can't tell whether
7  there was one ounce of pressure or 500 pounds of pressure
8  on Tashi Farmer's neck, can you?
9      A. Right, but you would think that the fact that
10 he's questioning him, "Is he out?" at that time would
11 make a reasonable officer believe that he had been
12 applying pressure the whole time, because if he hadn't
13 been, he wouldn't be asking, "Is he out yet?"
14        He wouldn't be asking if he's out if there was
15 no pressure on the neck. If he just simply had his arm
16 around his neck, it would only be because he had pressure
17 on the neck and he applied the hold.
18     Q. Or another reasonable interpretation is that
19 the -- the suspect is still resisting and he's -- the
20 officer's hoping that he's out so he can release the
21 hold.
22        Isn't that a reasonable interpretation?
23     A. That didn't make sense, because if the person's
24 resisting, you wouldn't be asking, "Are they out?" You'd
25 know they're not out because they're resisting.

Page 131

1      Q. Well, so does somebody go lights out, or is
2  there a waning of resistance?
3      A. No. If you're resisting, I'm not going to ask
4  if you're out, because I'm going to know, based on your
5  movements and actions, that you're not out. I'm going to
6  ask if you're out -- is that I have no movement from you
7  at that time or minimal movement from you and I believe
8  that you're out at that point. That's why he's going to
9  ask that.
10     Q. How does Ken Lopera know that all of a sudden
11 Tashi Farmer just was -- didn't start complying? How
12 does he know whether he's out or whether he's just merely
13 started complying? He can't see him; right?
14     A. He can tell if he's resisting, based on -- he's
15 got his body --
16     Q. No, complying. I didn't say "resisting"; I said
17 "complying."
18     A. Well, if he's not resisting, then he would be
19 complying.
20     Q. Okay. So I think we're going around in a little
21 bit of a circle here. So your position is that he was
22 still resisting and that's why Tashi -- or excuse me,
23 your position is Tashi Farmer was still resisting and
24 that's why Ken Lopera was asking whether he's out yet?
25     A. No. I think that he was already out at that

Page 132

1  time, and I think he was probably already out when he had
2  asked that, but he can't see the front part of his face
3  to see if, in fact, he's out, so he's asking that.
4      Q. And that's a legitimate question; right?
5      A. It's a legitimate question, right, but you
6  wouldn't be asking that if there was any level of
7  resistance because I would know, if I have you in that
8  hold, that your kind of lifeless at that point.
9      Q. And my question is this: How -- does Ken Lopera
10 know whether Tashi Farmer is out or if he's merely
11 started complying? So Sergeant Crumrine, looking at
12 Tashi Farmer's face, would be the one to tell him, "He's
13 out" or "He's -- he's not out, but he's complying. Relax
14 the hold."
15        I mean, those are two logical results of the
16 question, "Is he out yet?" Correct?
17     A. It could be.
18     Q. Okay. I think we were crossing lines there on
19 something that we didn't intend to.
20     A. Okay.
21        MR. SAYRE: Can we take a break?
22        MR. McNUTT: Sure.
23        THE VIDEOGRAPHER: The time is 1:16 p.m. We are
24 going off the record.
25        (Whereupon, a recess was taken at this time.)

Scott A. DeFoe                 Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 133

1    THE VIDEOGRAPHER: The time is 1:21 p.m. We are
2  back on the record.
3  BY MR. McNUTT:
4    Q. Let's talk about the hand strikes for a minute.
5  Are you aware of testimony by the security guards that
6  were right there at the scene that testified that the 10
7  to 12 strikes that were alleged that Mr. Farmer -- excuse
8  me, Mr. Lopera threw did not all connect? Are you aware
9  of that testimony?
10    A. I'm aware of that. Just seems inconsistent with
11  the injuries.
12    Q. What injuries?
13    A. To Mr. Farmer.
14    Q. What specifically?
15    A. LVMPD 3801. Bruising on the back of left
16  shoulder, back of left arm, and inside upper lip.
17  Lacerations to exterior upper lip. Multiple lacerations
18  and swelling around the right eye. Laceration to the
19  bridge of the nose. Laceration under the left eye.
20  Swelling under the left eye. Abrasion under his right
21  ear. Abrasion, inner right knee. Abrasion, left bicep.
22  Abrasion to back left shoulder. Injure" --
23    Q. Let me ask you something?
24    A. "Injured upper back."
25    Q. Are you reading from the document that you're

Page 134

1  referring to as LVMPD 3801?
2    A. Yes. That's Page 19 of 35.
3    Q. Okay. Of your report?
4    A. No. It's of the Force Investigation Team
5  report.
6    Q. Oh, got you. Okay. So is that your medical
7  opinion about the results from that -- is that from a
8  photo?
9    A. That's just from the report. I'm not giving any
10  medical opinions. It just seems consistent with someone
11  who's getting struck.
12    Q. Have you seen the coroner's photos of
13  Mr. Farmer's face?
14    A. I believe so, yes.
15    Q. Have you seen any bruising around his left eye
16  or lacerations around his left eye?
17    A. I don't recall.
18    Q. Okay. It didn't strike you that that was
19  inconsistent with what the report said?
20    A. It didn't.
21    Q. Okay. Page 19 of your report, you say "I base
22  my opinion" -- it's right at the top. "I base my opinion
23  on the fact that Mr. Tashi S. Farmer was never an
24  imminent threat of death or serious bodily injury to
25  LVMPD Police Officer Ken Lopera or anyone else and

Page 135

1  Mr. Tashi Farmer did not commit any crime that would
2  necessitate arrest."
3    Even though you've testified here today that
4  trespass is a crime, being under the influence of illegal
5  narcotics is a crime, and that you acknowledge that
6  Officer Lopera believed there was carjacking about to
7  occur, do you stand by that opinion?
8    A. Yes.
9    Q. None of those facts change your mind at all?
10    A. No. As I mentioned earlier, that -- the
11  trespass, we don't know if it was a trespass, the fact
12  that you walk down a hallway that he shouldn't have
13  walked down or ran down.
14    The issue with the -- under the influence was
15  facts known at the time. We didn't -- none of us knew
16  until the toxicology report came -- came out.
17    And -- and then I mentioned earlier that if he
18  reasonably believed that a carjacking occurred, that
19  would be appropriate for the initial use of force, but
20  based on the person who was in the car, they never would
21  have arrested Tashi Farmer for the carjacking, because
22  Mr. Pierce would have said that, "I never felt that I was
23  a victim of a carjacking."
24    Q. Did Mr. -- Officer Lopera know Mr. Pierce's
25  testimony when he was perceiving Tashi Farmer's conduct?

Page 136

1    A. No, but that's not what you asked me. You asked
2  me based on -- that's why I said that the reasonable
3  belief that Officer Lopera may have had when he
4  approached the truck, would have been reasonable, if he
5  reasonably believed that a carjacking was -- occurred, to
6  use the initial deployment of the Taser.
7    Q. If Officer Lopera did not reasonably believe all
8  those things, trespass, under the influence of illegal
9  drugs or alcohol, and that a carjacking was going to take
10  place, why did he use force to detain Tashi Farmer?
11    A. I don't know.
12    Q. I mean, do you think he did it out of some
13  malice towards Tashi Farmer?
14    A. I -- that's not for me to answer.
15    Q. Well, I'm asking in your expert opinion to posit
16  a different reason for why he would use force to detain
17  this subject?
18    MR. SAYRE: Objection. Calls for speculation.
19    A. That would bring up credibility determinations,
20  and I'm not making any of those against Officer Lopera.
21    Q. Aren't you making credibility determinations
22  based on reasonableness?
23    A. I am, based on the fact that --
24    Q. Okay. Let's go to Page 20, paragraph 7. "It is
25  my opinion that a reasonable officer acting consistent

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 137

1  with standard police practices would not have used lethal
2  force in this situation.  It is my opinion that LVMPD --
3  I guess there's no "Officer" in there -- "Kenneth Lopera
4  used excessive and unnecessary deadly force when he
5  admitted using the 'Rear Naked Choke Hold' for 1 minute
6  and 13 seconds."
7       Where did Officer Lopera admit that he used a
8  rear naked chokehold for one minute and 13 seconds?
9       A.  When he stated he "rear naked choked his ass."
10      Q.  Okay.  And was there something I missed in the
11  video where he says, "for one minute and 13 seconds"?
12      A.  No.  No, he didn't say that.  He --
13      Q.  So he didn't admit that?
14      A.  No.  And that's why I only put in what he stated
15  in parentheses, that being "rear naked chokehold."
16      Q.  Okay.  I don't want to get into grammar too far,
17  but "admitted" is a verb, and the sentence -- the
18  sentence comes to an end after "for one minute and 13
19  seconds."  So your grammatical error is noted.  You do
20  not mean to imply that Officer Lopera admitted that he
21  employed any choke for a minute and 13 seconds.
22      He never made those statements; correct?
23      A.  That's correct.  And I think I missed the word
24  "term."  I should have put -- when he'd been using the
25  term or phrase "rear naked choke," but he at no time

Page 138

1  admitted using it for the minute and 13 seconds.
2       Q.  He made no statements that I'm aware of about
3  how long anything was utilized.
4       A.  That's correct.
5       Q.  Okay.  So if you could do this over again, you'd
6  change that aspect to make it a little more clear?
7       A.  I would.
8       Q.  Okay.  Are there any other -- is it just simply
9  that Officer Lopera used the phrase, "I rear naked-ed his
10  ass," whether he used that phrase one or -- once or twice
11  is immaterial to me.
12      Is that the facts or evidence that you're
13  pointing to to suggest that he knowingly used a
14  nondepartment hold?
15      A.  Just as I mentioned earlier, just based on his
16  own admission that he used it and nothing other than
17  that.
18      Q.  Right.  But I'm just asking, that's it, the fact
19  that he said, "I rear naked-ed his ass" is what informs
20  this opinion for you?
21      A.  From my perspective, yes.  That might be --
22  other people give different opinions, but I don't have an
23  opinion on was it an LVNR or a rear naked choke.
24      Q.  Okay.  According to -- right below that,
25  according to Dr. Olson, during the autopsy, she found

Page 139

1  hemorrhaging in the neck that would be consistent with
2  being choked.
3       Do you read that as being choked by a rear naked
4  choke or choked by an LVNR?
5       A.  That's a medical opinion I'm not going to give.
6  I just made the statement that it was consistent with
7  being choked.  It coincides with -- with Officer Lopera
8  state -- stating he rear naked choked him.  That would be
9  Mr. --
10      Q.  But you don't have a problem, as a use of force
11  expert, if, in fact, Ken Lopera used the rear naked
12  choke; it was -- it was the fact that he used any choke.
13      Is that -- am I understanding your testimony?
14      A.  Well, it would violate their department policy.
15  It would be outside of the department policy, and I
16  would -- that wouldn't be an opinion for me because I
17  would look at it that he went outside of his policy and
18  it's -- it's -- it's a move or a hold that's not trained
19  by Las Vegas Metro.
20      Q.  But that's an administrative remedy, as you
21  testified earlier, for being outside of policy, not
22  something that would just justify a lawsuit; right?
23      A.  Well, it depends.  A lot of times, most of the
24  opinions in the cases I look at, did they violate the
25  department policy? or I believe based on the department

Page 140

1  policy.  So he would have violated department policy on
2  the use of the hold because it was nonauthorized by Las
3  Vegas Metro.
4       Q.  Okay.  Let's go to 21.  Towards the bottom where
5  it says, "Lastly, I base my opinion on my review of the
6  facts in this matter" and then there's some timeline
7  stuff -- do you see that?
8       A.  Oh --
9       Q.  Do you see --
10      A.  Yes.
11      Q.  Where the time starts and it says 6:38?
12      A.  Yes.
13      Q.  "Officer Lopera told Officer Flores and Rybacki
14  what happened.  During the conversation he stated, quote,
15  I start wailing on this dude then I rear mounted and
16  choked him out."
17      Why did you include that in your report?  What's
18  the importance of that, if any?
19      A.  Because it -- it coincides with -- it supports
20  the opinion that I gave on No. 7, based on the fact that
21  he's rear mounted him and he choked him out.
22      Q.  And what does "rear mount," to you, mean?
23      A.  Getting behind him and choke him out.
24      Q.  And that's applicable to an LVNR or a rear naked
25  choke or many other types of moves, right, in martial

Scott A. DeFoe          Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 141

1    arts?
2        A.  Could be.
3        Q.  Including completely authorized LVMPD training?
4        A.  Yes, sir.
5        Q.  Okay.  So you don't have a problem with that
6    statement, then; correct?
7        A.  Well, it's just showing admission that he, in
8    fact, choked him out.
9        Q.  Okay.  But is there any -- but you testified
10   earlier, I thought, that you didn't have a problem with
11   the word "choke."  It was simply the "rear naked-ed his
12   ass" that indicated to you that he was outside of
13   department policy?
14       A.  Right.  And the term "choke" is used quite
15   frequently in different --
16       Q.  So you don't have a problem with that?
17       A.  I don't have a word -- problem with the word
18   "choke."
19       Q.  Okay.  So what -- what do you have a problem
20   with in terms of this sentence?  What's inaccurate about
21   that, or what -- why did you feel you needed to include
22   that?
23       A.  It just supports it.  It supports what I was
24   stating, that -- that he mounted him and choked him out,
25   that the fact the active choking out still, in fact,

Page 142

1    occurred.
2        Q.  Okay.  You say "According to Jonathan Pierce,
3    you can't choke someone that long," right down below
4    there.  Do you give Jonathan -- first off, does Jonathan
5    Pierce offer an opinion as to how long pressure was
6    applied to Tashi Farmer's neck?
7        A.  Pressure, no.  I think he just -- duration.
8        Q.  Well, I mean, a choke without pressure really
9    isn't a choke.  You would agree with me; right?
10       A.  I agree with that.
11       Q.  More like a hug?
12       A.  I don't know if it falls in the hug category,
13   but it's --
14       Q.  Well --
15       A.  -- it's not a choke.
16       Q.  -- I'm not offering to -- I'm not offering to
17   demonstrate either.
18           So we're really talking about pressure to the
19   neck to make it a choke; right?  Otherwise, we just have
20   an encircling arm.
21       A.  That's correct.
22       Q.  Okay.  And Pierce testified at his deposition --
23   did you review his deposition?
24       A.  I did.
25       Q.  He testified he couldn't tell whether it was --

Page 143

1    a chokehold was applied or pressure was applied for one
2    second or a hundred seconds.  Are you familiar with that?
3        A.  Yes.
4        Q.  Okay.  So why do you feel like you've include --
5    what support to your opinion does this statement,
6    "According to Jonathan Pierce, you can't choke someone
7    that long"?
8        A.  Well, it supports the -- the -- the time that I
9    mentioned, for one minute and 13 seconds.  When the
10   threshold's 15 seconds, he's a little bit under a minute
11   over that.  And he admits that the result of that one
12   minute and 13 seconds is that he choked him out, which
13   means it -- what he intended on doing actually, in fact,
14   occurred.
15       Q.  Well, once again, he didn't admit anything about
16   time; right?
17       A.  That's correct.
18       Q.  Okay.  And Pierce has no clue as to how long any
19   pressure was applied to Tashi Farmer's neck; correct?
20       A.  That's correct.
21       Q.  So how does that support -- I mean, this a broad
22   statement; "Can you choke -- should you choke someone for
23   a minute and 13 seconds?" to which everyone would say,
24   "No"; right?  I mean, continuously choke someone for a
25   minute, 13 seconds, would -- does anybody agree that

Page 144

1    that's correct?  Obviously not.
2            But I'm asking you, do you read his deposition
3    and do you believe that Jonathan Pierce is suggesting
4    that Ken Lopera actually applied pressure for that long
5    to Tashi Farmer's neck?
6        A.  I don't know what -- there's no way for him to
7    know if -- if the pressure was applied during that time.
8        Q.  Okay.  So why do you include this as
9    justification in your report?
10       A.  Because the hold was applied for a minute and 13
11   seconds in itself.
12       Q.  The encircling arm was present for a minute
13   and 13 seconds.
14       A.  But it -- obviously, it had its desired result,
15   because, in fact, he was choked out.  So the point of
16   time of how long that pressure was, I don't know.  We
17   know that when Tran arrived, that he was already -- he
18   believed he was already unconscious.  And he still
19   maintained the choke the entire time that Tran was there
20   until he -- ultimately he released it.
21       Q.  Let's take your timeline.  If, in fact, Officer
22   Lopera was attempting to gain compliance by utilizing an
23   LVNR for a minute and 13 seconds, but he was only
24   effective in the last 10 seconds, are you going to
25   testify as an expert that a chokehold was applied for a

Page 145

1   minute, 13?

2     A. No.

3     Q. Because you can't.

4     A. That's correct.

5     Q. So you don't know whether or not the state of

6   unconsciousness was achieved at the minute and 13 second

7   or at second number one in that minute, 13 count; do you?

8     A. Well, Officer Tran will be able to -- when he

9   arrived, he stated that he was already out and he still

10   maintained that hold for 46 seconds after that.

11     Q. Officer Tran -- where do you recall Officer Tran

12   stating that?

13     A. Well, both he and Flores were present for 46

14   seconds while the -- while the chokehold was applied.

15     Q. What do you base that on?

16     A. My review of the facts. He arrive -- Officer

17   Tran and Flores arrived at 3 -- at 3:25.

18     Q. That's what I'm asking. Are you going to the

19   arrest report or -- you know, in terms of a timeline?

20     A. 3:25. I believe it's on the arrest report.

21     Q. Officer -- Officer Tran arrived and said, "Let

22   him go, Ken."

23     A. At 3 -- what --

24     Q. Okay. Page 9 of your report.

25     A. Yeah, at 3:25. And then he doesn't release the

Page 146

1   hold until -- 4:11 is when he released the hold, so

2   that's 46 seconds.

3     Q. Are you -- are you aware that Officer Kasey

4   Kirkegard testified that 4:11 means that that's when Ken

5   Lopera removed his arm from around his neck, not when he

6   released the pressure on Tashi Farmer's neck?

7     A. I don't know.

8     Q. Are you interpreting this to mean that Ken

9   Lopera put pressure on Tashi Farmer's neck for that whole

10   time?

11     A. I don't know.

12     Q. So you don't know?

13     A. I don't know. I just know he released the hold

14   at that time.

15     Q. So what does that mean to you?

16     A. I don't know at what point how much pressure was

17   applied, just the fact that when Tran arrived along with

18   Flores that he was already out and he still maintained

19   that hold for 46 seconds after that.

20     Q. Okay. Let's define "hold." Okay. You've said

21   that a choke without pressure is not a hold; right?

22     A. Right. As long as it's not -- as long as you

23   have no pressure on the carotid arteries or --

24     Q. Right. So you can't testify regard -- about

25   whether or not there was pressure at any point during

Page 147

1   this timeline; correct?

2     A. That's correct.

3     Q. Okay. So how -- how do you then make the non

4   sequitur statement that he -- Officer Lopera does not

5   release the hold, implying that it's pressure, until 46

6   seconds later? That's what I don't understand.

7     A. Well, I didn't say that -- and the report

8   doesn't say it. "Released the hold on Farmer"; it

9   doesn't say, "Released the pressure."

10     Q. So go on to the Duty to Intervene. Is it your

11   opinion that -- that the officers were violative of the

12   duty to intervene if they -- if they knew -- their

13   perception was that the pressure was released on Tashi

14   Farmer's neck, but that merely Ken Lopera had not removed

15   his encircling arm, that they violated their duty to

16   intervene?

17     A. Yes.

18     Q. Oh, okay. I did not understand that. Thank

19   you. What harm does an encircling arm around a suspect's

20   neck that is not applying pressure cause?

21     A. I -- I just mentioned it. I don't know what

22   harm it caused, and I don't know the level of pressure he

23   had when he had his arm on. I'm looking at just the

24   timeline that is on the report and was on the body cam

25   video, body-worn camera video, that the time in which it

Page 148

1   was applied to the time in which it was removed and

2   Flores and Tran were present for the last 46 seconds

3   until it was removed. And Crumrine was present for the

4   entire time, other than three seconds.

5     Q. If Tashi Farmer was mentally ill, should Officer

6   Lif, who was a crisis intervention officer -- should she

7   have taken the lead?

8     A. If she would have recognized from the start that

9   she believed -- like she testified to, that she believed

10   him to be mentally ill, she should have, yes. I think

11   she should have interjected that.

12     I think if -- if Officer Lopera didn't know that

13   and being that she's CIT training, she should have told

14   Officer Lopera, "Hey, come here for a second. I think

15   this guy's got something going on. Based on my training,

16   I believe he's mentally ill." I think he owed Officer

17   Lopera that, to do that.

18     Q. Do you recall her testimony as to whether or not

19   she had time to make that assessment on Tashi Farmer?

20     A. I don't know. I don't recall what she said.

21   She said she believed he was mentally ill, is what she

22   stated. I can look up the...

23     Q. If an officer detains someone for, let's say, 60

24   minutes and it turns out that that individual has not

25   committed a crime, has the officer done anything wrong

Page 149

1   under the Fourth Amendment or the Constitution?

2    A.   For no more than? Are you talking about for an

3   investigative stop?

4    Q.   Sure.

5    A.   No.

6    Q.   So the officer doesn't have to be right in order

7   to initiate a detention of an individual, do they?

8    A.   Reasonable.

9    Q.   Okay. Reasonable. Reasonable suspicion?

10    A.   Right.

11    Q.   Right. Which is a lower standard than probable

12   cause?

13    A.   That's correct.

14    Q.   Okay.

15    A.   And the answer to your question earlier --

16    Q.   Which question earlier?

17    A.   The one I'm going to respond on. According

18   to -- according to Officer Ashley Lif, she believed that

19   Mr. Farmer was mentally ill -- that's on Confidential

20   Document 0121 -- and also stated in her deposition on

21   Page 23 that she believed that Mr. Farmer was possibly

22   suffering from a mental illness.

23    Q.   Did she violate her duty to intervene?

24    A.   As relates to force, no, because she got there

25   after the fact.

Page 150

1    Q.   What about as it relates to making this

2   after-the-fact diagnosis on Tashi Farmer in the few

3   seconds that they -- that she had a window?

4    A.   I don't know if there's -- not a duty, but I

5   think there's a responsibility, if you're trained in

6   something, to let a partner officer know that you believe

7   something is going on. I think that's -- I think that's

8   important.

9    Q.   If -- if Tashi Farmer would have complied after

10   the tasing, would you still have said the tasing was

11   excessive force?

12    A.   Only if -- if Officer Lopera stated, "I did it

13   because I had reason to believe he was going to -- the

14   guy ran. I thought he was going to carjack someone. I

15   deployed the Taser, put him in handcuffs and that --

16   that's it." I -- that's what he stated as a reasonable

17   belief, then I would think that would be appropriate.

18    Q.   If Officer Lopera was one of your officers back

19   when you were on active duty as a sergeant and this whole

20   event went down, with the exception that Mr. Farmer did

21   not die, the exact same interaction to the initiate --

22   where Tashi Farmer initiated contact with the officers,

23   the pursuit, the belief that the guy had trespassed, the

24   belief that he was under influence of narcotics, the

25   belief that that there was a carjacking about to take

Page 151

1   place, and your officer tased the individual in the exact

2   same manner, utilized hand strikes in the exact same

3   manner, effected a neck restraint in the exact same

4   manner, except the suspect did not die, what would you --

5   what would you counsel that officer, if anything?

6    A.   I think it would be well beyond -- beyond

7   counseling. I think it would meet -- exceed that

8   threshold to counseling.

9    Q.   Would you bring him up on charges?

10    A.   I wouldn't do that as a sergeant. You mean

11   criminal charges?

12    Q.   Yes.

13    A.   Do I think that if someone didn't die in this

14   matter would someone be brought up on criminal charges?

15    Q.   Yes.

16    A.   No.

17    Q.   So his conduct would have been fine but for the

18   fact that --

19    A.   I don't know if conduct would have been fine.

20   It may have violated all -- policy enough that they

21   may -- may have terminated him, based on using -- and

22   head strikes and multiple Taser applications. Well, I

23   wouldn't foresee that anyone would have been charged with

24   murder if the person didn't die.

25    Q.   Do you expect officers, after they've been

Page 152

1   involved in the use of force, any type of force, to be

2   perfectly articulate in terms of how they describe that

3   right after the event, or do you give a little leeway to

4   how someone describes the events?

5    A.   Leeway.

6    Q.   Do you think the fact that Ken Lopera said, "I

7   rear naked-ed his ass" has any legal import?

8      MR. SAYRE: Calls for a legal conclusion. Lack

9   of foundation.

10    Q.   You can answer.

11    A.   I don't know. I don't know if the -- the rear

12   naked -- or I think they're -- legally, it's going to be

13   was the force excessive? I don't think the manner in

14   which it was excessive is going to matter.

15    Q.   Okay. You talk briefly in your report about the

16   failure of Crumrine and I think Lif, maybe one other or

17   two, activate their body-worn cam. Does that have any

18   bearing on your opinion about the use of force by Ken

19   Lopera?

20    A.   Sure. I think it -- for both sides. I think

21   it's important that for both the benefit of Officer

22   Lopera and as well as for the matter -- is that when we

23   have cameras that are -- are worn and -- and used as they

24   should be, that it gives a -- it gives, obviously, the

25   department a better opportunity to look at all the

**Page 153**

1 evidence that's available to them when they make their
2 determination.
3    Q.  But you're not holding that against Officer
4 Lopera.  It wasn't his fault that they did not activate
5 their body-worn camera; correct?
6    A.  No.  I agree with -- with the Metro's assessment
7 on that, that they themself found it to be a violation.
8 And -- and, you know, they felt that they should have
9 done that as well.
10    Q.  Okay.
11      MR. McNUTT:  Fred, I'd like to go to the video.
12 And what I would think would be helpful, like we did it
13 in the other conference room, if I came over to the side.
14 Obviously, we still want to keep the witness on the
15 video.  I don't need to be on the video, but I'll set up
16 my laptop in front of him.
17      If maybe we could switch seats or you could --
18 obviously, maybe you just want to be behind so you can
19 see what we're looking at.
20      Is that acceptable to you?
21      MR. SAYRE:  Sure.  Is that all right?
22      THE WITNESS:  Works for me.
23    Q.  And we're still under the agreement that no
24 one's demonstrating hugs.
25    A.  I'm good with that.

**Page 154**

1    Q.  Anything else.
2    A.  I'm good with it.
3      MR. McNUTT:  Just go off the record for just a
4 second.  I'll get set up.
5      THE VIDEOGRAPHER:  The time is 1:47 p.m.  We are
6 going off the record.
7      (Whereupon, a recess was taken at this time.)
8      THE VIDEOGRAPHER:  The time is 1:51 p.m.  We are
9 back on the record.
10 BY MR. McNUTT:
11    Q.  We're back on the record.  Scott, have you seen
12 this -- we're at the start of a video I'm about to play.
13 Have you seen this start of a video before?
14    A.  I believe so, yes.
15    Q.  Okay.  So at -- at any time when I ask you a
16 question, if you want to go back and see it -- because
17 I'm going to be, you know, asking you between what the
18 conduct is in the video versus the time stamp.  So if we
19 need to go back, we'll -- it's a little imprecise with
20 this mouse, but we'll work with it as best we can.
21      So the first thing I -- I'm going to ask you is
22 give me an approximate -- first off, do you recognize
23 this as being the body-worn camera view from Ken Lopera?
24    A.  First view, yes.
25    Q.  Okay.  This -- the testimony was -- or I think

**Page 155**

1 Officer Lif said they had been outside The Coffee Bean.
2 They had gotten coffee; right?
3    A.  Right.
4    Q.  Okay.  So -- and -- so let's -- if you want to
5 look at your report, tell me whether you agree at 00:00,
6 this is where the camera is activated.
7    A.  I agree.
8    Q.  Do you recognize Tashi Farmer there?
9    A.  Yes.
10    Q.  Okay.  Now, watch where Tashi Farmer -- he falls
11 through the chains, and now he appears to be running down
12 the hallway we talked about that was employee access
13 only; right?  Remember that?
14    A.  Yes.
15    Q.  Okay.  Now there's no sound.  And there's Ken
16 Lopera falling.  Dropped his flashlight.  There's no
17 sound until when -- after the body-worn camera is
18 activated.
19    A.  Okay.
20    Q.  Thirty seconds.  Have you seen all this video
21 before?
22    A.  I have.
23      MR. McNUTT:  Fred, have you seen this --
24      MR. SAYRE:  I have.
25      MR. McNUTT:  So this is all I've seen, other

**Page 156**

1 than -- this and the merge.
2      And Craig, is that what's on what you gave us
3 today?
4      MR. ANDERSON:  This is what's produced, yes.
5    Q.  So let me ask you this:  Do you have any idea
6 where Officer Lif is at this point?
7    A.  No.
8    Q.  Do you understand why she's not on his hip?
9    A.  I don't know why she wouldn't be.
10    Q.  Okay.  Should she be?
11    A.  Yes.
12    Q.  Do you still understand that he's inside the
13 Venetian at this point?
14    A.  I do, sir.
15    Q.  Now we're outside the --
16    A.  That's correct.
17    Q.  And that was the comment made to the security
18 officer; right?
19    A.  That's right.
20    Q.  Okay.  So is -- that's 1:19, "Officer Lopera
21 asked a security guard if he observed anyone running,"
22 but it's not in quotes.
23      THE REPORTER:  But?
24      MR. McNUTT:  But it's not in quotes.
25    Q.  Now, we're outside the Venetian at this point.

Scott A. DeFoe        Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 157

1  What should Officer Lopera have done?
2    A.  Get on the air and broadcast that he's in foot
3  pursuit.
4    Q.  Should he have continued to pursue Tashi Farmer?
5    A.  Within reason.  He should be taking containment
6  at that point.
7    Q.  Okay.
8    A.  If he believes he has a crime.
9    Q.  Okay.  Is -- is letting him go an option, just
10 quitting pursuing?
11   A.  Sure.
12   Q.  Okay.  "Stop.  Don't move."  Did you hear that?
13   A.  I did.
14   Q.  Okay.  And is that a warning consistent with
15 Metro's policies, prior to using a Taser?
16   A.  "Stop.  Don't move" is a command.
17   Q.  Okay.
18   A.  He's not at the warning phase yet.
19   Q.  Okay.  What's a warning phase to you?
20   A.  If you don't do something, like for instance,
21 "Stop or I'm going to -- stop" --
22   Q.  "You're going to get tased"?
23   A.  "You're going to get tased."
24   Q.  Got you.  Sorry, I didn't mean to talk over each
25 other.  My fault.

Page 158

1      So is that the warning?
2    A.  There it is.
3    Q.  Okay.  So the Taser has struck Mr. Farmer in the
4  back at this point; correct?  And we're at 1:39, and
5  Mr. Farmer's laying on his back with his head very near
6  to the white truck.
7      Would you agree with me?
8    A.  That's correct.
9    Q.  Okay.  And do you think NMI has been achieved at
10 this point?
11   A.  We're at 1:37, and I do believe NMI is achieved,
12 based on the video.
13   Q.  Okay.  Which is -- and what indicates that to
14 you?
15   A.  The way his body is positioned.  He's locked up.
16 He's on the ground.  He fell directly to the ground.
17   Q.  Muscular contraction?
18   A.  Yes.
19   Q.  Now, the "Stop right there," if you look at the
20 transcript, it reads a little differently than it appears
21 on the video.  Because on -- on the transcript, it says
22 "Pointed in the direction of the white truck and yelled
23 'Stop right there.'"
24     Now, you agree with me that Officer Lopera is
25 directing the driver of the truck to stop right there?

Page 159

1    A.  Appears to be.
2    Q.  Okay.  So in your opinion, when you say there's
3  contradicting commands, that's not one of the things
4  you're criticizing Officer Lopera about?
5    A.  No.  He's telling the driver instructions, so --
6    Q.  And that's fair, and sometimes these situations
7  are confusing; right?
8    A.  It is.  I don't know why he would have said
9  that.  He would want him to drive away.  But nonetheless,
10 he told the -- the driver to stop right there.
11   Q.  Okay.  That's a reasonable call.  It could have
12 gone either way?
13   A.  Sure.
14   Q.  Okay.  So since the 1:37 when Tashi -- where we
15 stopped and we were looking at Tashi Farmer laying there
16 and you said there was NMI.  We're now at 1:43, and
17 there's been no further Taser use; correct?
18   A.  Doesn't appear to be.
19   Q.  Okay.  So at this point, we're at 1:43, and
20 Tashi Farmer is now sitting up.  Do you see that?
21   A.  That's correct.
22   Q.  Does that indicate to you that Tashi Farmer is
23 complying with Officer Lopera?
24   A.  What is he telling him to do at that point?
25   Q.  Well, go back to your timeline.  So Officer

Page 160

1  Lopera has -- at this point he's already said, "Stop.
2  Don't move.  You're going to get tased."  He's yelled,
3  "Taser, Taser, Taser."  Yells, "Taser, Taser" again.  He
4  said, "Don't move" and then "Don't move" again.  And so
5  at that point, we're -- we're at 1:43.
6    A.  Ah-huh.
7    Q.  Has Tashi Farmer agreed or complied by not
8  moving when he's sitting up?
9    A.  No.
10   Q.  If a suspect remains prone on the ground after
11 having NMI and just laid there, would that have been
12 compliance to you?
13   A.  Yes.
14   Q.  Okay.  So tell me when Officer Lopera uses the
15 Taser again.
16   A.  Right there.
17   Q.  Okay.  So there was about a 10-second window
18 between --
19   A.  Based on the Taser download, there's a
20 three-second window from the first deployment to the
21 second deployment.
22   Q.  Okay.  But we just went through and we looked
23 at -- we were at 1:36; right?  "Taser, Taser, Taser."
24 That was when he was falling there.  And here's 1:46 and
25 it -- it just went again.  And you stated there were --

Page 161

1   at 1:43, I said, "There's been no further Taser usage,"
2   and you agreed with me.
3    A.   That's a result of the Taser. You can go back a
4   little bit. I -- I wasn't really looking for that.
5    Q.   Where do you want me to go?
6    A.   Go to, like, 1:40, if you could.
7    Q.   How about 1:39?
8    A.   That's perfect.
9    Q.   Okay. So Tashi's on the ground. He's got the
10   one Taser on; right? So another Taser goes at 1:46.
11    A.   Right.
12    Q.   So there was a 10-second window, based on what
13   you just saw in the video, between Taser strikes; right?
14    A.   Appears to be, yes.
15    Q.   Okay. Is a 10-second window enough for Ken
16   Lopera to assess Tashi Farmer's reactions?
17    A.   Yeah, but it still doesn't meet the threshold at
18   that time to deploy the second Taser, because the actions
19   are such that they -- they're not aggressive, according
20   to their policy, that subject attempt to cause harm to
21   you or someone else, according to LVMPD's policies, so --
22    Q.   Little different question I asked. I was just
23   asking whether that 10-second window is enough within
24   which an officer can assess the -- reaction of the
25   suspect.

Page 162

1    A.   Yeah. 10 seconds --
2    Q.   Ten seconds a long time; right?
3    A.   It can be.
4    Q.   So your criticisms that he did not assess, do
5   you still think they're accurate, based on the fact that
6   he was looking at Tashi Farmer on the ground; Tashi
7   Farmer did not comply with his commands to not move; and
8   all of a sudden, 10 seconds later or into that 10
9   seconds, Tashi Farmer's -- it looks to me like he's
10   attempting to get back up?
11        You -- would you view that as compliance by the
12   suspect?
13    A.   Maybe not complying, but still doesn't meet the
14   threshold of what the policy is on deployment -- the
15   subsequent Taser deployment.
16    Q.   Okay. Okay. You heard that, "I will. I will"?
17    A.   Yes.
18    Q.   Okay. We agree that's Tashi Farmer?
19    A.   Yes.
20    Q.   Okay. So he's saying, "Don't move. Get over on
21   your stomach." You testified earlier that was a
22   contradicting statement. I said it was -- could be
23   sequential.
24        But the question is now he's telling Tashi
25   Farmer to get on his stomach; correct?

Page 163

1    A.   That's correct.
2    Q.   And we're at 1:53. And so we've got Tashi
3   Farmer replied, "I will," then yelled, "I will."
4    A.   Right. And that's at 1:57, according to the
5   timeline here.
6    Q.   1:55.
7    A.   But "Get on your stomach" is at 1:57.
8    Q.   Okay. Back up to the prior piece, please.
9   1:54, "Get on your stomach."
10    A.   That's correct.
11    Q.   1:51, "Get on your stomach."
12    A.   That's correct.
13    Q.   So at 1:51, so Farmer -- you know, it reads
14   "Farmer attempted to put his shoe on again."
15   Alternatively, you could read it Farmer is attempting to
16   get up.
17        Do you have an opinion of whether he's putting
18   on his shoe or attempting to get up?
19    A.   I think he's putting on his shoe.
20    Q.   Okay. An officer that's in the heat of the
21   fight, how would that appear to him? Could -- could he
22   potentially think that he was reaching for a weapon?
23    A.   I think he looks like he's putting on his shoe.
24    Q.   Okay. In slow motion, now that the -- the frame
25   is frozen, it looks like that. Do you think you would

Page 164

1   see that as an officer in the middle of a fight?
2    A.   I think that I would -- if that's the case, if I
3   had that concern, I'd move to position of cover, at least
4   behind the truck, and then let -- it looks like he's
5   putting on his shoe.
6    Q.   So he's saying, "I will." You see his left hand
7   moving behind his back where the Taser is?
8    A.   Yes.
9    Q.   Does that indicate to you or would you -- would
10   a reasonable officer think that he's trying to defeat the
11   Taser by pulling out a probe?
12    A.   Well, he's also responding to the pain of,
13   obviously, the deployment, so as I mentioned earlier, he
14   could be looking to reach out to take the probe out.
15    Q.   It could be either way; right?
16    A.   Sure.
17    Q.   Okay. We don't know.
18    A.   Right.
19    Q.   You don't know.
20    A.   That's correct.
21    Q.   Okay. So he's -- he's yelled, "Get on your
22   stomach" many, many times at this point. You'd agree
23   with me?
24    A.   Yes.
25    Q.   Okay. Now, at this point we're at 2:01. So why

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 165

1  don't you flip your page so that we can see. In the
2  2:01, Officer Lopera yells, "Get on your stomach."
3  Farmer says, "I will."
4       Okay. We're at 2:05. Do you agree with me that
5  Officer Lopera is in contact with him?
6       A. Yes.
7       Q. Okay. And what is he doing with Tashi Farmer,
8  or what is he trying to do?
9       A. Control his left arm.
10      Q. Okay.
11      A. Or wrist.
12      Q. What position is Tashi Farmer in right now?
13      A. Appears to be on his -- going onto his stomach.
14      Q. So he's on his stomach?
15      A. Yes.
16      Q. And Officer Lopera has his left arm?
17      A. Appears to, yes.
18      Q. And what time hack are we at?
19      A. 2:06.
20      Q. Why is Tashi Farmer on his side at 2:10?
21      A. Well, he's responding to being tased.
22      Q. Now he's on his back.
23      A. Responding to being tased.
24      Q. Okay. None of this is resistance? This is all
25  response to being tased?

Page 166

1       A. It's either/or. He's either resisting or
2  responding to being tased. It's no doubt that he's
3  moving and flailing because he's being tased.
4       Q. Okay. "Help me out," he yelled to the Venetian
5  security guard. Do you agree with me on that?
6       A. I agree with you.
7       Q. Does that indicate to you that he needs
8  assistance or he has the situation well at hand?
9       A. He needs help.
10      Q. Okay. So do you -- do you know who this officer
11  is? Can you tell from the video?
12      A. No.
13      Q. But we would agree that -- would you agree with
14  me that's a Venetian security guard?
15      A. Appears to be.
16      Q. And what -- and what's he trying to do?
17      A. Control his -- his arm.
18      Q. Left arm. Now, if Tashi Farmer had simply
19  stayed on his stomach, what would have happened?
20      A. Well, the issue, once again, it goes back to
21  the -- the Tase -- Taser deployment's continued
22  throughout, so it's causing him to move, you know -- and
23  once again, if you run a tase again, you should warn
24  again and then, secondly, give a reasonable opportunity
25  to comply prior to, you know, tasing again.

Page 167

1       Q. So Tashi Farmer is sitting up at 2:22; agree?
2       A. Appears to be.
3       Q. Do you have that "Okay, sir"?
4       A. Yes.
5       Q. Who is that?
6       A. Sounds like Tashi -- Tashi Farmer.
7       Q. You think that sounds like Tashi Farmer?
8       A. I think it sounds like -- can we play it again
9  for me.
10      Q. I want you to look at -- can you back up one
11  page. "Venetian Hotel Security arrived. They gave
12  Farmer verbal commands and a guard grabbed onto Farmers'
13  arms. Farmer says, 'I will.'" That's at 2:20, and we're
14  at 2:15. I want you to listen. You heard kind of this
15  high-pitched, "I will. I will"?
16      A. Ah-huh.
17      Q. Kind of almost with a southern accent. I don't
18  know where he hailed from.
19      A. Ah-huh.
20      Q. And then I want you to listen to the "Okay, sir"
21  and tell me if you think it's the same voice.
22          Heard that "turn around"?
23      A. Ah-huh.
24      Q. You think that's Tashi Farmer?
25      A. No.

Page 168

1       Q. Okay. You hear that "Okay, sir. Okay, sir"?
2       A. Ah-huh.
3       Q. Do you think that's the Venetian security guard,
4  or do you think that's Tashi Farmer?
5       A. I don't think it's Tashi Farmer. I don't know
6  who it is.
7       Q. Right. It's not Tashi Farmer, based clearly on
8  listening to his voice; right?
9       A. Doesn't appear to be.
10      Q. So that's an error in the arrest report; isn't
11  it?
12      A. Where?
13      Q. Where it says Farmer replied, "Okay, sir," 2:29
14  and 2:29.
15      A. It's actually 2:27. He says, "Okay, sir." That
16  says 2:29.
17      Q. Okay. Well, do you want to go back to 2:27 and
18  listen to it again? Do you agree that this is not Farmer
19  saying, "Okay, sir"?
20      A. It doesn't appear to be.
21      Q. Okay. We're at 2:33. You agree he's holstering
22  his ECD?
23      A. Yes.
24      Q. Did you see Tashi Farmer kick or hit Officer
25  Lopera at that point?

Scott A. DeFoe     Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

## Page 169

1   A. I saw something come back. If you can replay
2 that for me.
3   Q. Okay. I may go back a little farther than that.
4 Does that look good?
5   A. Yes.
6   Q. So we're at 2:28, going forward. Holster his
7 ECD. Boom. See that?
8   A. Yes.
9   Q. Was that a kick or a strike by Tashi Farmer?
10   A. I don't know.
11   Q. But it was Tashi Farmer striking Officer Lopera?
12   A. It was movement. I don't know if he actually
13 struck him or not.
14   Q. You didn't -- you didn't hear the punch? You
15 didn't hear the impact?
16   A. I heard it. I didn't hear impact.
17   Q. You didn't hear impact? Let me play it for you
18 again.
19   A. Play it again.
20   Q. Boom. You heard the impact that time?
21   A. Yes.
22   Q. Okay. So is that active resistance?
23   A. That's active resistance at that point.
24   Q. Tashi Farmer is actively resisting?
25   A. Appears to be.

## Page 170

1   Q. See Officer Lopera's hand over the right side of
2 Tashi Farmer's head?
3   A. Right.
4   Q. Attempt to gain control. Would you agree with
5 that?
6   A. Trying to gain control, yes.
7   Q. I mean, I'm not saying he's doing a good job or
8 an effective job, but that's what he's trying to do;
9 right?
10   A. Seems to be.
11   Q. Could that have accounted for the lacerations
12 and bruising that you read off the page on the left side
13 of Tashi Farmer's face where his face is down next to the
14 concrete?
15   A. I don't know.
16   Q. I mean, have you ever seen that in your
17 experience?
18   A. I've seen abrasions on -- from concrete, but I
19 don't know if that would be attributed to that. That
20 would be more a medical opinion.
21   Q. So you -- can you tell whether -- the
22 lacerations, the bruising that you read off and said
23 these were his injuries on the left side of Tashi
24 Farmer's face, can you tell whether those were from a
25 hand strike or from the concrete?

## Page 171

1   A. No, just that Officer Lopera's comments about he
2 was wailing down on him would -- made me believe that he
3 was -- those were punches that caused that injury.
4   Q. Bravado is not a crime; right?
5     THE REPORTER: What was it?
6     MR. McNUTT: Bravado is not a crime; right?
7   A. It doesn't appear to be, no, unless it's
8 factual.
9   Q. Okay. You see Tashi Farmer continued to resist.
10 We see an arm come down. Do you know whose arm that is?
11 Not by name, but is that a security officer from the
12 Venetian, or is that a Metro officer at this point?
13 We're at 2:45.
14   A. Security.
15   Q. Security officer was --
16   A. According to -- according to this. I don't know
17 whose it is.
18   Q. According to the arrest report; right?
19   A. Right.
20   Q. We'll all stipulate that's not a Metro uniform,
21 but that's neither here nor there. So you agree that if
22 that is -- if that is Security Guard Infantino, that he
23 did, in fact, attempt to grab hold of Tashi Farmer's arm;
24 right?
25   A. Well, he grabbed his arm. I don't know what he

## Page 172

1 was trying to do with it.
2   Q. Well, his testimony is that he tried to grab his
3 arm to assist in gaining compliance of the suspect.
4   A. Okay.
5   Q. Did you see how unsteady the body-worn camera is
6 at this point?
7   A. Yes, sir.
8   Q. Very difficult to watch; right?
9   A. It is.
10   Q. Does that imply to you that Tashi Farmer is
11 actively resisting?
12   A. It doesn't, one way or the other.
13   Q. Okay. If he was complying, would Officer Lopera
14 have been that shaky with his body-worn camera?
15   A. Can you go back for me, please.
16   Q. To how far?
17   A. Like, 10 seconds. I just want to see that
18 again.
19   Q. That was -- that was a long way.
20   A. That's good. Right there's fine.
21   Q. Is that good?
22   A. Yeah.
23   Q. Okay. At this point, the body-worn camera gets
24 occluded; right? Let's look at the arrest report, the
25 timeline. So I think -- would you agree with me that at

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 173

1  this point Ken Lopera has either started to apply a neck
2  restraint because he's behind Tashi Farmer at that
3  point --
4  A.  Appears to be.
5  Q.  Okay.  What I'm going to do now is I want to
6  switch the video to the merged video so that we can see
7  from above, because, quite frankly, staring at a black
8  screen doesn't help much; right?
9  A.  Yes, sir.
10  Q.  Okay.  A skinny...
11  A.  Wow, you served.  Thank you for your service.
12  Q.  Yeah.
13  A.  Wow.
14  Q.  I practice, but I'm really not that good.
15  A.  Wow.
16  Q.  Hold on.  Let me get back to -- so the merged
17  video -- well, I don't want it that far -- so what I --
18  but that's okay.  What I want to do is I want to put it
19  to where Ken -- you know, to be consistent, where Ken
20  goes to the -- okay.  So I want to initially focus on the
21  left side here, the left side of the -- of the video,
22  because I want to look at what you can tell, if anything,
23  from this Venetian -- the building-mounted camera.
24      So let's look at this.  We'll just roll it from
25  here.  And what I want to do is I want to ask you this:

Page 174

1  I want you to tell me at what time stamp you think Ken
2  Lopera has put a neck restraint on Tashi Farmer.  And
3  then we'll ask some subsequent questions then.  But take
4  that initial time hack on it.
5      So we agree that -- well, Ken just got occluded
6  there, but that there are -- based on the two videos, at
7  this point Ken is not in a neck restraint.  We're at 54
8  seconds on this video; right?
9  A.  Okay.
10  Q.  Well, you agree with that?
11  A.  I do.
12  Q.  Okay.  We're at -- just for reference, we're at
13  one minute, 15 seconds.  Is Ken Lopera in a neck
14  restraint at all yet?
15  A.  As of now, it doesn't appear to be.
16  Q.  Okay.  Tell me when he's going?
17  A.  That's it.  No, still no.  Right there.
18  Q.  Now?
19  A.  Yes.
20  Q.  Okay.  So some form of neck restraint is
21  attempted at 1:22.  You agree with that?
22  A.  Okay.
23  Q.  Yes or no?
24  A.  Yes, sir.
25  Q.  Okay.

Page 175

1      MR. SAYRE:  1:22 is from the -- the Venetian.
2      MR. McNUTT:  Well, 1:22 is from the merged video
3  that's been produced in this case.
4      MR. SAYRE:  All right.
5  Q.  Okay.  So from this video, can you tell --
6  either one of them, can you tell if there's any pressure
7  being applied to Tashi Farmer's neck or -- I mean, just
8  strictly from the video?
9  A.  No.
10  Q.  And you -- can you tell if Ken Lopera has an
11  LVNR or a rear naked choke or some other hold?
12  A.  No.
13  Q.  Or if he's just bear-hugging him?
14  A.  I can't tell.
15  Q.  Can't tell from this video; right?
16  A.  That's correct.
17  Q.  I believe that Sergeant Crumrine -- I think that
18  bears out that at a minute 24, Sergeant Crumrine appears
19  on scene or somewhere around there; right?
20  A.  Right.
21  Q.  Okay.  Now, watch Sergeant Crumrine.  What's he
22  doing?
23  A.  Applying body weight.
24  Q.  Okay.  And what's -- what are his hands doing?
25  Is he trying to -- what's he trying to do to Tashi

Page 176

1  Farmer?  Can you tell?
2  A.  I can't.
3  Q.  What should he be doing?
4  A.  What he should be doing is having him release
5  that hold at that point and then get him on his stomach,
6  now that he's there, and both put him in some handcuffs.
7  Q.  Okay.  It's your expert opinion that he should
8  not have secured the suspect at that point?
9  A.  There's no reason to choke him out to apply
10  restraint at that point.  Simply let him know he's there,
11  roll him onto his stomach, have him release the hold, put
12  the hands in the small of the back, and place handcuffs
13  on him.
14  Q.  And if he -- if he's handcuffed, then obviously
15  the hold can be released; right?  I mean -- and what I'm
16  asking is -- is -- does one necessarily have to come
17  before the other?
18  A.  It does.  You need to put him on his stomach.
19  The problem here is -- that we can see is that there's no
20  coordinated effort.  I mentioned this in the first part
21  of the deposition.  There's no communication.  There's
22  obviously, clearly no leadership.  There's no one taking
23  control there of letting Lopera know, "I'm here with you.
24  Release.  Let's get him on his stomach."
25      He can't do that in a position they're in right

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 177

1  now.  As you can see, he's trying to do some unique thing
2  of trying to -- maybe trying to control his arms, only
3  fighting against the very thing that Officer Lopera is
4  trying to do.
5      Q.  Okay.  And so you were saying Crumrine is trying
6  to control his arms, which is fighting against what
7  Officer Lopera is trying to do?  Was that --
8      A.  It seems there's no coordinated effort on what
9  they -- what's occurring right now on video.
10     Q.  I just want to make sure I understood.  Okay.
11 So they're still rolling around, and he's asking, "Is he
12 out yet?"  Does that change your perspective about what
13 Ken knew or should have known at that point?
14     A.  I don't see him rolling around.  Maybe you can
15 show me where he's rolling around.
16     Q.  Sure.  I'll just back it up.  Right there.
17     A.  Only moving I see is Crumrine trying to do some
18 unique thing with his arm.  I don't see Mr. Farmer moving
19 or rolling around anywhere.
20     Q.  So now how many Metro officers are there at this
21 point, three?
22     A.  Appears to be, yes.
23     Q.  Okay.
24     A.  Three total.
25     Q.  If Tashi Farmer was not resisting at this point,

Page 178

1  three guys to arrest or put handcuffs on one guy would be
2  a pretty simple task; right?
3      A.  Well, I'm not saying anything's simple.  I'm
4  saying it's reasonable, and I think, as I mentioned --
5      Q.  So can you tell from this angle of any --
6  anything about the hold, anything you can tell what's
7  going on?
8      A.  He appears to be -- obviously, appears to be on
9  in his back.  He appears to still have the hold in, and
10 then the --
11     Q.  Meaning the encircling arm around Tashi Farmer?
12     A.  And once again, I don't know how much pressure
13 is being -- being applied.  He earlier asked -- on, "Is
14 he out?"  So he would assume if he's out, he would apply
15 pressure in the interim, because he wouldn't assume he's
16 out if he wasn't -- had not applied pressure.  I just see
17 them in one big group, and I really can't discern who's
18 doing what.
19     Q.  Could an objective, reasonable investigator
20 determine that this is a rear naked choke with certainty
21 versus a lateral vascular neck restraint with certainty?
22     A.  Based on that frame, what you're showing me
23 right now?
24     Q.  Based upon this video I've showed you.
25     A.  I can't.  Once again, there's people that

Page 179

1  have -- would be more qualified than I am to look at
2  that, like Sergeant Bland, that's going to look at that
3  and see if that's something that -- based on his
4  training.  I can't tell.
5      Q.  I actually don't think I have any more questions
6  on this.  Let me just check one thing.  What are we at,
7  2:08?  We're good on that.
8          MR. McNUTT:  Why don't we take a five-minute
9  break, and I will wrap up.
10         MR. SAYRE:  Sure.
11         THE VIDEOGRAPHER:  The time is approximately
12 2:20 p.m.  We are going off the record.
13         (Whereupon, a recess was taken at this time.)
14         (Defendants' Exhibit 3, Plts Initial Disclosures
15 000056 through 000057 and LVMPD 1469, was marked for
16 identification as of this date.)
17         THE VIDEOGRAPHER:  The time is 2:30 p.m.  We are
18 back on the record.
19 BY MR. McNUTT:
20     Q.  Mr. DeFoe, I've handed you -- or the court
21 reporter's handed you a couple of documents which we're
22 cumulatively going to mark Exhibit 3.  Please let me know
23 when you've had a chance to review those.
24     A.  I'm ready.
25     Q.  Okay.  Have you seen these documents before, the

Page 180

1  September 21, 2017, For Immediate Release and then the
2  11/28/17 internal memorandum?
3      A.  I believe just the -- the announcement on
4  September 21st.
5      Q.  Okay.  And you recognize this as the
6  announcement where they're changing -- that the LVNR will
7  no longer be categorized as a low-level option in the
8  updated policy; right?
9      A.  Yes.
10     Q.  And are you rendering an expert opinion that
11 today -- and this is a yes or no -- as to whether or not
12 it never should have been a low-level force option to
13 officers?
14     A.  No.
15     Q.  You're not rendering that opinion today?
16     A.  No.
17     Q.  That -- that has nothing to do with your
18 opinions rendered today?
19     A.  No.
20     Q.  Okay.  And you have not seen, if I understand
21 correctly, the 11/28/17 internal memorandum which appears
22 to justify or provide some reasoning behind the change?
23     A.  I've not seen that, no.
24     Q.  Okay.  But now that you've seen it, does it
25 impact your report, one way or another?

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 181

1   A. No.
2   Q. Okay. I'm not pretending you're a medical
3   expert; I know you're not either. But to the extent you
4   can answer the following question, please do.
5       Do you have any knowledge, experience, or
6   training which would indicate to you or would give you an
7   understanding of a difference between a full carotid, a
8   carotid choke, which was a phrase that has been used
9   today, versus a rear naked choke versus an LVNR, in terms
10  of practical effect on the subject?
11  A. No.
12  Q. Okay. They're all blood chokes, and they all
13  can render an individual unconscious?
14  A. That's correct.
15  Q. Okay. And you agree with me, the timing in
16  which the individual can be rendered unconscious depends
17  on the levels of resistance, the suspect's physical
18  fitness, the officer's physical fitness, and things of
19  that nature?
20  A. Yes.
21  Q. Okay. After we reviewed those videos a few
22  minutes ago, do you agree with me that there was
23  resistance by Tashi Farmer when Ken Lopera was attempting
24  to gain compliance from him?
25  A. At what point?

Page 182

1   Q. At any point. Just a general question.
2   A. Yes. At one point I did see resistance.
3   Q. Okay.
4       MR. McNUTT: I may have some follow-up, but what
5   I'm going to do now is turn the witness over to Craig
6   Anderson.
7       Do you want to switch seats?
8       THE VIDEOGRAPHER: He has a microphone.
9       MR. McNUTT: Okay. And then if I have any
10  follow-up, they'll be --
11      THE WITNESS: Yes, sir.
12      MR. McNUTT: -- very, very brief.
13  EXAMINATION BY
14  MR. ANDERSON:
15  Q. Mr. DeFoe, as I've been introduced, my name is
16  Craig Anderson, and I represent the police department,
17  Crumrine, Tran, and Flores in this lawsuit.
18      Do you understand that?
19  A. Yes, sir.
20  Q. Okay. In your consulting work, do you ever do
21  training of departments?
22  A. I've been vetted with the State Department to
23  train out of country for out-of-country departments.
24  I've got a couple trips that are pending to the Mideast,
25  but in way of municipalities, no, other -- not since my

Page 183

1   retirement.
2   Q. Okay. Does any part of your consulting involve
3   policy drafting for municipalities?
4   A. No.
5   Q. In your consulting work, do you do both
6   plaintiff and defense or just plaintiff?
7   A. Both.
8   Q. Do you currently have any open defense cases?
9   A. For premise liability and security matters, I'm
10  at about 50/50. For plaintiff matters involving
11  municipalities and government entities, I'm at 100
12  percent plaintiff.
13  Q. Okay. So for police misconduct cases, you're
14  currently 100 percent plaintiff?
15  A. That's correct.
16  Q. Do any of your current cases involve the use of
17  a neck restraint, besides this one?
18  A. No.
19  Q. Have you ever testified in a trial involving a
20  use of force case that involved an LVNR or a -- another
21  neck restraint?
22  A. No.
23  Q. Have you ever testified in a trial that involved
24  a duty to intervene issue?
25  A. Yes.

Page 184

1   Q. Which case was that?
2   A. Oh, in trial. I need to look. I don't know --
3   in fact, I'm retracting. I don't know if it was actually
4   a trial. I know by way of deposition. You guys have my
5   trial testimony?
6   Q. Yeah.
7   A. I just need to take a look at it if I can.
8       MR. SAYRE: Here (handing).
9   A. There's one current. I think there's -- let me
10  see. I believe the -- the Trial Federal Court on --
11  which is No. 50 on the -- on my testimony, August 2nd,
12  the Cindy Michelle Hahn matter versus City of Carlsbad, I
13  believe that had some duty to intervene components to it.
14  Q. Okay.
15  A. It was -- it was a -- just a moderate use of
16  force, didn't involve a -- any neck restraint.
17  Q. Okay.
18  A. No, other than that.
19  Q. Okay. I notice that in your report, there's
20  various cites to Supreme Court and -- and other case law.
21  As part of your practice, do you attempt to keep up on
22  recent Supreme Court case law?
23  A. I try to.
24  Q. Do you review Ninth Circuit decisions?
25  A. Yes.

**Page 185**

1    Q.   Okay.

2    A.   Some.

3    Q.   Do you subscribe to any journals that keep you

4 abreast of changes in police misconduct law?

5    A.   AELE.

6    Q.   In your report, there -- there's references to

7 policies and policy violations. Do you understand the

8 distinction between a policy violation and a

9 constitutional violation?

10    A.   Yes.

11    Q.   Okay. Would you agree to me that a department's

12 policies can exceed the Constitution?

13    A.   Yes.

14    Q.   Okay. So the fact that an officer violates a

15 policy does not automatically mean that that officer has

16 also violated the Constitution?

17    A.   That's correct.

18    Q.   So let me see if I can clean some stuff up here.

19 With respect to the Metropolitan Police Department, are

20 you rendering any opinions that their written policies

21 are improper in this case?

22    A.   No.

23    Q.   Did you agree with the majority of the written

24 policies you read?

25    A.   Yes.

**Page 186**

1    Q.   Okay. Did they appear to be within the

2 standards set forth by the leading law enforcement

3 agencies?

4    A.   Yes.

5    Q.   Are you rendering any opinions in this case

6 regarding the Las Vegas Metropolitan Police Department's

7 training, that it was sub -- substandard?

8    A.   No.

9    Q.   Did you agree with the training that you've seen

10 in this case?

11    A.   Yes.

12    Q.   You also reviewed portions or all of Las Vegas

13 Metropolitan Police Department's internal investigation

14 into the Ken Lopera matter; is that correct?

15    A.   Yes.

16    Q.   Okay. Do you intend to render any negative

17 criticisms of the internal investigation of the police

18 department?

19    A.   No.

20    Q.   Did you agree with the police department's

21 internal investigation?

22    A.   Yes.

23    Q.   Do you intend to offer any opinions at trial

24 regarding ratification in this case, that they ratified

25 any of the -- improperly ratified any of the officers'

**Page 187**

1 behavior?

2    A.   I don't know if anything surfaced regarding --

3 or have I read anything regarding the duty to intercede

4 involving Sergeant or Officer Crumrine, Flores, or Tran,

5 as it relates to the duty to intercede. I saw that there

6 was issues regarding not wearing body -- body cameras,

7 and there was some comments from the board regarding, you

8 know, separating by Officer Lif. But I didn't see that

9 that was addressed by the Las Vegas Metropolitan Police

10 Department.

11    Q.   Okay. And you would have liked to -- you

12 believe that should have been addressed?

13    A.   Yes, sir.

14    Q.   Okay. Then we'll talk about it a little later.

15 Now, with respect to your criticisms in this case,

16 starting with the body-worn cameras, that was a violation

17 of internal Las Vegas Metropolitan Police Department

18 policy; correct?

19    A.   That's correct.

20    Q.   Do you believe that there was a constitutional

21 right held by Tashi Farmer that the officers turn on

22 their body cameras?

23    A.   Constitutional right?

24    Q.   Yes.

25    A.   No.

**Page 188**

1    Q.   And you would agree that the officers' failures

2 to turn on their body cameras did not, in any way,

3 contribute to Mr. Farmer's death; is that fair?

4    A.   That's correct.

5    Q.   And then you also have some opinions in

6 paragraph 14 on Sergeant Crumrine and his handling of the

7 scene.

8    A.   Yes.

9    Q.   Okay. Now, all of your opinions with respect to

10 Sergeant Crumrine's handling of the scene involve his

11 actions after Mr. Farmer was put in handcuffs; is that

12 correct?

13    A.   No, from the time that he -- from the time of

14 which he arrived up until the time that Mr. Farmer was --

15 was handcuffed.

16    Q.   Okay. And I understand your duty to intervene

17 allegations against Mr. Crumrine -- Officer Crumrine. On

18 Page 24 of your report, under paragraph 14, you state,

19 "It is my opinion based on my review of the facts in this

20 matter, LVMPD Sergeant Travis Crumrine failed to take

21 Command and Control of the scene."

22      Do you see that?

23    A.   Yes.

24    Q.   And then underneath that paragraph, you have

25 bullet points; is that correct?

Scott A. DeFoe                           Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 189

1    A.  Yes.
2    Q.  And all of those bullet points involve actions
3  he took after Farmer was handcuffed; is that fair?
4    A.  Those do, yes.  Those -- those are respective --
5  No. 14 is respective to what he -- what he did after the
6  fact, in the way of scene management and command and
7  control issues.
8    Q.  Okay.  And again, those are criticisms of
9  Officer Crumrine violating internal policies and not the
10  Constitution; is that fair?
11    A.  Yes.
12    Q.  And you would agree that those actions he took
13  after the handcuffing, they didn't contribute in any way
14  a to Mr. Farmer's death?
15    A.  That's correct.
16    Q.  Okay.  So let's move on to the duty to
17  intervene.  And I know that Mr. McNutt asked you a
18  definition, but can you define for me again what you
19  consider to be "intervention."
20    A.  Coming and taking some type of action or
21  directing some type of action for behavior that is either
22  deemed to be inappropriate or excessive or unreasonable,
23  based on the set of facts.
24    Q.  And according to your report, intervention can
25  take form in one or more of the following ways: strongly

Page 190

1  caution the other officer, physically restrain the
2  officer, and immediately report the incident; is that
3  fair?
4    A.  Yes.
5    Q.  And where did you get those three criteria?
6    A.  I don't recall.
7    Q.  Did you just make them up or --
8    A.  I think I may have, or they may come from
9  California POST Training.
10    Q.  Okay.  Are you aware of any Supreme Court or
11  Ninth Circuit case law that sets forth those three forms
12  of intervention?
13    A.  I don't know if the Koon matter or Cunningham
14  matter specifically discussed those three or not.
15    Q.  And when you use the term, and I quote,
16  strongly caution, does that mean give an order?
17    A.  It would be, yes.
18    Q.  Okay.  So if an officer gives an order, he is
19  intervening?
20    A.  He could be if that order is directing somebody
21  to intervene, if that -- if the order is to -- stop
22  your behavior.
23    Q.  So giving an order to someone to stop their
24  behavior could be a form of intervention.
25    A.  Sure.

Page 191

1    Q.  Now, are you aware of any legal authority that
2  says that an officer has a duty to physically intervene
3  when they see an unconstitutional act taking place?
4    A.  Once again, I don't know if either of those two
5  cases I just mentioned, Koon or Cunningham, specifically
6  outline if there's a -- necessary to physically intervene
7  or not.
8    Q.  Okay.  Now, just if you have, have you ever
9  heard -- let me back up.
10      Have you ever received any training in the duty
11  to intervene?
12    A.  Yes.
13    Q.  And where did you receive that training?
14    A.  In the police academy, I believe.  Obviously,
15  through field training officer update when I was a field
16  training officer.  When I went to basic detective school,
17  and when I went to basic sergeant school, and then
18  intermittently throughout my career with LAPD.
19    Q.  Okay.  Have you ever heard of the duty to
20  intervene also being called bystander liability?
21    A.  Yes.
22    Q.  How do you define the word "bystander"?
23    A.  Someone who is in a position to see what's
24  transpiring at that time, someone who -- I think
25  bystander's a little bit broad-based, where it doesn't

Page 192

1  specific -- discuss -- discuss, you know,
2  superior-subordinate relationships.  I think it's
3  primarily just based on someone who's present when
4  something transpires.
5    Q.  If I could get you to turn to Page 9 of your
6  report which is the timeline we've been going over.
7      Are you there?
8    A.  Yes.
9    Q.  Okay.  We've been over this a few times, but
10  according to the report, Officer Lopera placed his arms
11  in Mr. Farmer's neck area at 2:58.
12      Do you agree with that?
13    A.  Yes.
14    Q.  Okay.  And about three seconds later, Sergeant
15  Crumrine arrived on scene.  Do you agree with that?
16    A.  Yes.
17    Q.  Now, when Crumrine arrived, based upon your
18  review of the record, had all of the tasings and punches
19  already occurred?
20    A.  It appears to be, yes.  There's a lot I can't
21  see from the video.  It doesn't depict if there were
22  additional strikes by anybody.
23    Q.  Okay.  But do -- Officer Crumrine testified
24  that, when he arrived, he didn't see any punches or
25  tasings.

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 193

1    Would you have any reason to disagree with that?
2    A.  I'm not making credibility determinations.
3    Q.  Okay.  So would you agree with me that when
4  Officer Crumrine arrived, what he saw was Mr. Brown and
5  Mr. Lopera on the ground with Mr. Lopera's arms around
6  Mr. Farmer's neck area?
7    A.  Yeah, and some type of restraint hold.  Appears
8  to be.
9    Q.  Based upon your review of the record, what
10  information did Officer Crumrine read -- receive before
11  he arrived on scene?
12    A.  I don't recall.  I know that they -- he had put
13  out, "Give me a red."  So emergency help call would be --
14  I think he would know that it was something related to
15  help.
16    Q.  So what he knew upon arrival was that there was
17  an officer in some sort of trouble, at least the officer
18  was representing that.
19    A.  Yes, sir.
20    Q.  Okay.  Would you agree that that's very little
21  information about what had occurred prior?
22    A.  It is.
23    Q.  Okay.  Would you agree that Officer Crumrine
24  encountered what police would call a dynamic situation?
25    A.  Yes.  I mean, it was evolving when he was still

Page 194

1  there.
2    Q.  Okay.  And when an officer encounters a dynamic
3  situation like this with very little background
4  information, what should their initial focus be when they
5  get on scene?
6    A.  Officer and community safety.
7    Q.  Okay.  Now are they -- is -- was Officer
8  Crumrine entitled to assume that Officer Lopera had acted
9  constitutionally and within policy up to that point?
10    A.  Wouldn't know, one way or the other.
11    Q.  But an officer is allowed to assume that other
12  officers have acted within policy when they arrive?
13    A.  That's -- that's fair.
14    Q.  Would it be unreasonable -- was it unreasonable
15  for Officer Crumrine when he arrived for his first task
16  to be to attempt to get Mr. Farmer into handcuffs?
17    A.  No.  I think that was reasonable.
18    Q.  In fact, that's what training would tell to you
19  do; is that fair?
20    A.  That's correct.
21    Q.  So when Officer Crumrine arrived, his initial
22  focus was to get Mr. Farmer into handcuffs, and that
23  would be reasonable; correct?
24    A.  Yeah.  I think that would be reasonable.
25    Q.  Okay.  Because officers are trained that when

Page 195

1  they -- when they arrive on such a dynamic scene, their
2  first task is to make the scene safe; is that fair?
3    A.  Yes.
4    Q.  Okay.  And the best way to make the scene safe
5  is to get the -- the suspect into custody.
6    A.  That's fair.
7    Q.  Okay.  Now, when Officer Crumrine arrived, he
8  shouted an order as he was joining the fracas, saying,
9  "Get your fucking hands behind your back"; is that fair?
10    A.  That's correct.
11    Q.  And that was directed at Mr. Farmer, do you
12  believe?
13    A.  I'm hoping, yes.
14    Q.  Okay.  And based upon your review of the record,
15  did Mr. -- did Officer Crumrine immediately go hands-on
16  and become involved in the struggle?
17    A.  Couldn't really tell what he was doing.  He was
18  kind of, like, bending over, and looked like he tried to
19  grab and really -- is -- it didn't -- couldn't really
20  tell what he was trying to do.
21    Q.  Okay.  But he became involved in it physically?
22    A.  Appeared to be, yes.
23    Q.  Okay.  He didn't stand off to the side and watch
24  for any period of time?
25    A.  Not according to the video I watched, no.

Page 196

1    Q.  Okay.  Did you see any actions by Officer
2  Crumrine that you would consider to be passive?
3    A.  Passive wouldn't be the word.  I think
4  ineffective would be a better way to determine it.
5    Q.  And I understand that, but he was actively
6  involved in the struggle to get Mr. Brown into handcuffs.
7  Would you agree with that?
8    A.  I think there was an attempt to get Mr. --
9  Mr. Brown into handcuffs -- excuse me, Mr. Farmer into
10  handcuffs.
11    Q.  And 20 seconds after Officer Crumrine arrived,
12  he gave Lopera the order to, "Let him go, Ken"; is that
13  correct?
14    A.  Yes.
15    Q.  And I know that your report and Metro's report
16  all says that Officer Tran said that.  Do -- do you have
17  a problem or a disagreement, because everyone has
18  testified to this, that that was actually Sergeant
19  Crumrine that said, "Let him go"?
20      THE REPORTER:  Sergeant who?
21      MR. ANDERSON:  Crumrine.
22    A.  I don't understand your question.
23    Q.  Okay.  It was a horrible question.  According to
24  your report and Metro's arrest report, Officer Tran
25  arrived and said, "Let him go, Ken," at 3:25.

Scott A. DeFoe                              Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 197

1  Do you see that?
2  A. Yes.
3  Q. Do you have any disagreement with changing that
4  to Sergeant Crumrine based upon the deposition
5  testimonies you've read and the other evidence you've
6  seen?
7  A. No, I do not.
8  Q. Okay. And immediately after Sergeant Crumrine
9  said, "Let him go, Ken," Officer Lopera asked, "Are you
10 sure?" And I'll tell you again; it's Sergeant Crumrine
11 that replied, "Yeah."
12 Do you see that?
13 A. Yes.
14 Q. Okay. And during this exchange, Crumrine was
15 hands-on, attempting to assist with the handcuffing; is
16 that fair?
17 A. I don't want to say hands-on assisting. It
18 looked like he was trying to do something. I don't know
19 what that was.
20 Q. Okay. Now, when Crumrine gave Mr. -- gave
21 Officer Lopera the order to let him go, would it be
22 reasonable for Crumrine to assume that Officer Lopera
23 would follow that order?
24 A. Yes.
25 Q. And with Officer Crumrine at Mr. Brown's feet,

Page 198

1  would Mr. -- would Officer Crumrine be in a position to
2  tell how much pressure was being applied to Mr. Brown's
3  neck?
4  A. He may be if he could see what his -- you know,
5  his face and be able to see. You know, he should be able
6  to see from that -- from that viewpoint.
7  Q. Now, so do you agree that when Officer -- when
8  Sergeant Crumrine gave the order to, "Let him go, Ken,"
9  that he intervened?
10 A. It's one phase of intervention, yes.
11 Q. Now, do you consider Sergeant Crumrine becoming
12 involved in the struggle -- although I know you disagree
13 with -- with what he did, but the fact that he became
14 involved, is that intervention?
15 A. Not as -- not regarding the use of excessive
16 force, but the fact that you're assisting, he's assisting
17 the officer. So there's an intervention there, but it's
18 not intervention as relates to the duty to intervene.
19 Q. Okay. Maybe I didn't follow you. Can you
20 explain what you mean by --
21 A. Sure. I mean if I'm effecting -- helping you
22 effect a handcuffing technique or take someone into
23 custody, I'm assisting you with that handcuffing. I
24 wouldn't use the word "intervention" at that time, as it
25 relates to the facts in this case.

Page 199

1  I think the intervention is -- is that you see
2  something that's outside what would be reasonable and now
3  you're intervening by, you know, giving verbal commands
4  or physically restraining the person.
5  Q. Okay. So I -- let me back up. So you would
6  agree with me, based on your prior testimony, that when
7  Sergeant Crumrine arrived on scene, he could assume that
8  Officer Lopera's neck restraint was reasonable at that
9  moment, the moment he arrived, because he has no
10 preexisting knowledge as to what happened.
11 A. He wouldn't know. Unless there's information
12 that he received on the way that I did not read in the
13 record.
14 Q. Okay. And so he would have no reason to know
15 that that was excessive force at that time?
16 A. That's fair.
17 Q. Okay. He then joins the struggle and in 24
18 seconds gives an order to "Let him go, Ken," which is a
19 form of intervention; is that correct?
20 A. Yes.
21 Q. And he is entitled to believe that his officer
22 will follow that command; is that correct?
23 A. Officer should follow the command, yes.
24 Q. Okay. So from that point forward, Officer --
25 Sergeant Crumrine was justified in believing that Officer

Page 200

1  Lopera had at least loosened the hold; is that fair?
2  A. I don't know. I -- I don't know if he's
3  monitoring the hold or monitoring the pressure put on by
4  the hold, so I don't know.
5  Q. Okay. But you can see from the video that
6  Sergeant Crumrine remains actively involved in assisting
7  with getting him into custody.
8  A. He's there, yes.
9  Q. So with respect to Sergeant Crumrine, what more
10 do you think he should have done after he gave the order
11 to "Let him go, Ken" before handcuffing was complete?
12 A. Take -- take the hold off of him. The minute --
13 the moment that Officer Lopera did not remove the hold,
14 any form of hold around the neck at that point, he should
15 have removed that hold himself if he -- if he did not --
16 if Officer Lopera did not comply with his request or
17 order.
18 Q. Okay. So he should have physically removed his
19 arms?
20 A. Yes.
21 Q. Okay. But you testified that Sergeant Crumrine
22 would be justified in believing that Ken had loosened the
23 hold based upon his order, that he had ceased applying
24 pressure. So is that correct?
25 A. I don't believe I -- I testified to that.

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 201

1    Q.  Okay.  You testified that Sergeant Crumrine
2    would be justified in believing that Officer Lopera
3    followed his command.
4    A.  Well, no.  I -- I -- he's standing right there,
5    so there's no -- he either followed or he didn't, he let
6    go of the hold or he didn't.  He's not -- he's not doing
7    it from any real distance; he's right about there by his
8    feet.  So the minute that -- or the second that he told
9    him to let go and he didn't let go, he should have
10   intervened and -- and forcibly removed his arms if he
11   needed to.
12   Q.  Okay.  So when you -- so when -- when Sergeant
13   Crumrine told Officer Lopera, "Let him go, Ken," is it
14   your testimony that Officer Lopera should have spread his
15   arms to the side and released any touching of Mr. Farmer?
16   A.  As I mentioned, when Sergeant Crumrine arrived,
17   he should have assisted Officer Lopera by communicating
18   with him and letting him know, "We're going to put you on
19   your stomach.  We're going to put him on the stomach.
20   Let it go.  Go ahead and -- we're going to go ahead and
21   handcuff him."
22       Based on my review of the facts, that didn't
23   happen.  And -- and then once he gave him the order to
24   let him go, he should have -- at that point, he's -- he
25   must have told him to let him go because either he

Page 202

1    believed it was excessive or Mr. Farmer was in -- was,
2    you know, in dire straits at that point.  I don't know
3    what he saw at that time.  But if he needed to, make
4    him -- force him to let go of that hold.
5    Q.  Okay.  But Sergeant Crumrine said, "Let him go,
6    Ken," and at that point he was justified in believing
7    that Officer Lopera would follow that command; correct?
8    A.  Yes, but he didn't follow the command.
9    Q.  Okay.  But Officer Lopera could have followed
10   the command by releasing pressure on the neck and just
11   keeping his arms in the neck area; is that fair?
12   A.  He could have, if -- if -- once again, if he's
13   monitoring him to see if, in fact, that pressure's on the
14   neck and, in fact, that Mr. Farmer is in distress, all of
15   that.  But still, based on that, you're going to want to
16   at least get him out of that hold if you think he's out
17   or he's unconscious, whatever it is, and, obviously,
18   render some type of aid.
19   Q.  Okay.  But first you'd want Mr. Farmer
20   handcuffed; is that correct?
21   A.  That's correct.
22   Q.  And that's what the officers were doing, was
23   attempting to get Mr. Farmer into handcuffs; is that
24   correct?
25   A.  At what point?

Page 203

1    Q.  At the point after he says, "Let him go, Ken."
2    The focus is still to get Mr. Farmer into handcuffs.
3    A.  I believe so, yes.
4    Q.  And so we're kind of going around here, but
5    Sergeant Crumrine was justified in believing that Officer
6    Lopera could have released the hold but kept his arms in
7    the neck area, but released any pressure on the neck
8    which we've established that would be using no force?
9    A.  If he could see that there was no force being
10   applied, then there would -- at that point, just look to
11   effect the handcuffing technique, if he could see that.
12   Q.  Okay.  And we don't know whether Sergeant
13   Crumrine could see that or not?
14   A.  Not that I read in the record.
15   Q.  So in your opinion, would it be a good police
16   practice for Sergeant Crumrine, who -- do you agree with
17   me? -- is at Mr. Farmer's feet, doing something?
18   A.  Well, the feet aren't the issue right now.  We
19   need to get him handcuffed, so --
20   Q.  I just want to get him in the location.  You
21   would agree with me that Sergeant Crumrine is at the
22   feet --
23   A.  Yes.
24   Q.  -- when he gives that order?  Okay.
25       So you think it would be a good police practice

Page 204

1    to leave the feet of an unrestrained suspect and come up
2    and check the pressure being applied to the neck?
3    A.  I think we'd want to get him on his stomach, get
4    the -- the hold off of Mr. Farmer, and get him in
5    handcuffs without delay.
6    Q.  Yes.  And so the most important thing at this
7    point in time is to get Mr. Farmer in the handcuffs?
8    A.  That's correct.
9    Q.  Okay.  And when Flores and Tran arrive,
10   Mr. Farmer was still not in handcuffs; is that fair?
11   A.  That's right.
12   Q.  And they arrive within a few seconds of Sergeant
13   Crumrine arriving.
14   A.  That's correct.
15   Q.  And similar to my questioning regarding
16   Officer -- or Sergeant Crumrine, when Tran and Flores
17   arrived, all the tasing and punches had already occurred?
18   A.  Appeared to be, yes.
19   Q.  Yeah.  There's nothing in the record that they
20   witnessed any of that; is that fair?
21   A.  That's fair.
22   Q.  So when Tran and Flores arrived, what they saw
23   was Mr. Brown and Lopera on the ground with Sergeant
24   Crumrine somewhere around Mr. Brown's feet.
25   A.  Yes.

Scott A. DeFoe          Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 205

1  Q.  And similar to Sergeant Crumrine, both Tran and
2  Flores had very little information beyond the fact that a
3  code red was called prior to their arrival; is that fair?
4  A.  Yes.
5  Q.  So when they arrived, they could also reasonably
6  assume that all of the actions taken up to the point of
7  their arrival were constitutional and within policy?
8  A.  Yes.
9  Q.  And you would agree, similar to Sergeant
10 Crumrine, when they arrived, their initial focus would be
11 to get Mr. Brown into handcuffs.
12 A.  That's correct.
13 Q.  And when Officers Tran and Flores arrived, they
14 also immediately went hands-on in the situation.
15 A.  They appear to be, yes.
16 Q.  Okay.  Did you see in the video either Officer
17 Flores or Tran standing around or watching for any period
18 of time prior to handcuffing?
19 A.  No, not that I recall.
20 Q.  And from the moment Officers Tran and Flores
21 arrived, their focus was to get Mr. Brown in handcuffs.
22 Is that your understanding of the record?
23 A.  Yes.
24 Q.  And do you agree or disagree that attempting to
25 get a suspect into handcuffs is a form of intervention?

Page 206

1  A.  It's a form of assistance.
2  Q.  And it could be -- could it be a form of
3  intervention to get someone to stop the force they were
4  using?
5  A.  Yes.
6  Q.  Now, do you -- is it your opinion that when
7  officers Flores and Tran arrived, at what point is it
8  your opinion that it would be obvious to a reasonable
9  officer that Officer Lopera was using excessive,
10 unconstitutional force?
11 A.  Well, when Tran arrived, he stated that -- that
12 the suspect appeared to be out, unconscious, and that was
13 at L -- LVMPD 1722.  Tran also stated, when he arrived,
14 "The suspect was not moving at any point and there was no
15 resistance from the subject at any point once he
16 arrived."  And that's confidential 337.
17 Q.  Okay.  So -- and Officer Flores testified that
18 he believed that Mr. Farmer was still resisting when they
19 arrived.  Do you remember seeing that?
20 A.  I don't recall that testimony.
21 Q.  Okay.  Well, let's stick, then, with Officer
22 Tran.  Okay.  So Officer Tran arrives.  He says it's his
23 perception that Mr. Farmer may be unconscious already.
24 So an officer at that point, their first task would be to
25 get Mr. Farmer into handcuffs.

Page 207

1  A.  That's right.
2  Q.  And that's what these two officers did.
3  A.  Yes.
4  Q.  And these officers would not have been able to
5  tell what pressure, if any, was being applied to
6  Mr. Brown's neck?
7  A.  Yeah, but even with -- Flores stated with four
8  officers present, they could take Mr. Farmer into
9  custody, and therefore it was unnecessary for Officer
10 Lopera to continue his hold once there were four
11 officers.  And that's on his deposition, Page 36.
12 Q.  Yes.  What he testified was that there were four
13 officers there.  It would not be appropriate to continue
14 to apply pressure to Mr. Brown's neck; is that correct?
15 A.  He didn't say, "pressure."  He said, "continue
16 his hold."
17 Q.  But did -- okay.  So maybe I misunderstood.  Did
18 we agree that a hold involves some pressure to the neck?
19 A.  It does, but once again, if you're looking to
20 handcuff him and you've got someone from the rear with
21 that hold on, it's counterproductive to handcuff him,
22 because now I'm holding that person.  We ultimately want
23 to put that person on their stomach to be able to
24 handcuff them.  We can't do that when someone has a hold
25 on them, even if they're applying pressure or not.

Page 208

1  Q.  And these officers -- sorry, Tran, Flores, and
2  Crumrine were telling Officer Lopera to roll him on his
3  side so they could facilitate handcuffing; is that
4  correct?
5  A.  I believe so, yes.
6  Q.  So they were giving Officer Lopera instructions
7  to facilitate the handcuffing?
8  A.  I believe so, but the issue with the
9  intervention is he's not letting go of the hold.  It's
10 counterproductive to what they're trying to do.  He's not
11 doing that, and they have to take some type of action
12 to -- to get him out of that hold so they can do what
13 they're -- the intended thing to do is put him in
14 handcuffs.
15 Q.  Okay.  And we agree that the most important
16 thing is getting Mr. Brown into handcuffs.
17 A.  Yes.
18 Q.  Okay.  Now, according to your review of the
19 record, did you ever see where Officer Tran gave any
20 orders or instruction to Officer Lopera regarding the
21 hold?
22 A.  I don't recall.
23 Q.  Do you recall in Officer Tran's deposition and
24 in some of the police department reports that once
25 handcuffing was complete, once it was completed, Officer

Scott A. DeFoe                Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 209

1  Tran said, "Loosen up"?
2       Do you recall seeing that?
3    A.  I believe so, yes.
4    Q.  Okay.  And I believe the testimony was that
5  within a couple of seconds of handcuffing being complete,
6  at that point Officer Lopera removed his arms from the
7  neck area.
8    A.  Right.
9    Q.  Okay.  And you would agree as you've already
10  testified, when Mr. McNutt was testifying you, that the
11  policy of the Las Vegas Metropolitan Police Department is
12  that you maintain some form of hold until handcuffing is
13  complete; correct?
14    A.  I don't recall if it's a policy.
15    Q.  Or training.
16    A.  A training directive.
17    Q.  And so once the handcuffing was complete,
18  Officer Tran followed policy by telling Officer Lopera to
19  loosen up, signifying to him that handcuffing was
20  complete; is that fair?
21    A.  It is, but we've harkened back to when he
22  arrived, for the 46 seconds that when we arrived before
23  it was released -- is that he stated that he offered no
24  form of resistance.  He appeared to be unconscious.  And
25  then you wait until after; now he's -- for another 46

Page 210

1  seconds and then tell him to loosen it up when the
2  "loosen up" comment should have happened right when he
3  had made the observation that he had him in a neck
4  restraint and he appeared to be unconscious and was
5  offering no form of resistance.
6    Q.  And do you recall whether Officer Tran testified
7  that he heard Sergeant Crumrine say, "Let him go, Ken"?
8    A.  Yes.
9    Q.  Okay.  And so as far as Officer Tran knew, that
10  order had been given?
11    A.  Order had been given, but that doesn't negate
12  the officer's responsibility to take some kind of action
13  in the event that the order is not followed through with.
14    Q.  And so the action the officers were supposed to
15  be taking was to get handcuffs on Mr. -- Mr. Brown.
16    A.  Yes.
17    Q.  And these officers did that.  That was their
18  focus.
19    A.  Go back to the action they were supposed -- I
20  believe they were supposed to do is ensure that the hold
21  was taken off of Mr. Farmer and ultimately have him
22  handcuffed.
23    Q.  Okay.  But now, when the officers arrived -- and
24  so if Officer Tran arrives and sees what -- what he
25  believes may be an unconscious suspect, would he have any

Page 211

1  way of knowing that it would still take 45 seconds to get
2  him handcuffed?
3    A.  Then that's a great point, and that's the reason
4  why you have him release the hold.  Because release --
5  keeping the hold on while you're trying to effect the
6  handcuffing technique's just prolonging it.  He's
7  unconscious apparently, according to Tran.  He's not
8  offering any form of resistance.
9       Just roll him on his stomach and handcuff him
10  and then -- let Lopera immediately know to let go and to
11  roll him on his stomach and handcuff him so he doesn't
12  keep it on for that additional 46 seconds while they're
13  there.
14    Q.  Okay.  And so when Officer Tran arrives, he
15  hears Sergeant Crumrine say, "Let him go, Ken," and as
16  we've already stated, the officers are entitled to
17  believe that Officer Lopera will follow that command, and
18  so then their next focus should be to get Mr. Farmer into
19  handcuffs.
20    A.  Well, if he's not following the command, as he
21  wasn't, that they heard from Sergeant Crumrine, is for
22  them to take action around that failure to follow the
23  command.
24    Q.  Okay.  So let me back up to another question,
25  because how would they know that Officer Lopera did not

Page 212

1  follow that command?  So again, I asked you this
2  question, and you kind of answered a different question.
3       Was Officer Lopera required to throw his arms to
4  the side and release any contact with Mr. Farmer?
5    A.  I don't know if he's required to do so, but I
6  think that the prudent thing to do if you're trying to
7  handcuff someone is to let go of the person who has them
8  in their restraint, holding him, so you can put him on
9  his stomach and then handcuff him.
10    Q.  Okay.  And so it's your position that Officer
11  Lopera should have ceased any contact with Mr. Farmer?
12    A.  Just roll him over and handcuff him.  When you
13  say "cease contact," when you -- let go, roll him over,
14  let go -- let -- you have three other officers.  Lopera's
15  already been in this for long enough.  Relieve Lopera in
16  the sense so at least he can assist, but roll him onto
17  his stomach -- especially when you say that when you
18  arrive he is unconscious and offering no form of
19  resistance, just roll him on his stomach and put him in
20  handcuffs.  It's just that simple.
21    Q.  And that's what the officers were saying.  They
22  were telling Officer Lopera to roll him to his side.
23    A.  The point is it took 46 seconds from someone who
24  was not struggling with you to roll them on their stomach
25  which should take one or two seconds to put them in

Scott A. DeFoe                    Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

---

Page 213

1  handcuffs.
2      Q.  But you would agree that the moment handcuffing
3  was complete, Officer Tran gave the order to Officer
4  Lopera to loosen up?
5      A.  I agree with that.
6      Q.  Okay.  And at that point, do you agree -- at
7  that point Officer Lopera released any contact with the
8  neck area of Mr. Brown?
9      A.  Yes.
10     Q.  Okay.
11         MR. ANDERSON:  That's all I have.
12         THE WITNESS:  Thank you.
13         MR. SAYRE:  I have a couple of questions.
14  EXAMINATION BY
15  MR. SAYRE:
16     Q.  After Sergeant Crumrine gave the order to, "Let
17  go, Ken," did he have a duty to make sure that the
18  pressure was released on the neck?
19     A.  Yes.
20     Q.  And failing to do so would be -- he would be
21  participating in the unreasonable, excessive force?
22     A.  Yes.
23     Q.  Now, I'm going to represent to you that Officer
24  Flores testified in his deposition that at the time he
25  and Tran came up, that Mr. -- Mr. Farmer was out, as he

---

Page 214

1  put it.
2         Now, once a subject is out from a restraint,
3  neck restraint hold, is there any justification to
4  continue to apply a restraint pressure on the neck?
5      A.  No.
6      Q.  In fact, is it dangerous to do so?
7      A.  Yes.
8      Q.  Now, did Flores have a duty, irrespective of
9  Sergeant Crumrine, to make sure that that hold was
10  released when he came up and saw that Farmer was
11  unconscious?
12     A.  Yes.
13     Q.  And failing to do so, he would be participating
14  in the excessive force of Officer Lopera?
15     A.  Yes.
16     Q.  Officer Tran testified that Mr. Farmer was
17  making no resistance movements when he came up.  Is one
18  of the purposes of a neck restraint, whether it be a
19  lateral vascular neck restraint or a rear naked choke, to
20  reach the point where the subject is not making any
21  resistance movement?
22     A.  Yes.
23     Q.  And at that point, is it necessary to ensure
24  that a hold is released so no additional pressure is
25  being placed on the neck?

---

Page 215

1      A.  Yes.
2      Q.  And failing to do so would mean that they -- if
3  they failed to do that, they would be participating in
4  the excessive force regarding Mr. Farmer.
5      A.  Yes.
6         MR. SAYRE:  I have nothing further.
7  FURTHER EXAMINATION BY
8  MR. ANDERSON:
9      Q.  Let me just follow up on that a little bit.  So
10  we went through the training and we went through the --
11  the three things that you consider to be intervention.
12         What legal authority would have told Sergeant
13  Crumrine that, once he gave the order to "Let him go,
14  Ken," that he then had a further duty before handcuffing
15  was complete to check to make sure that order was
16  followed?
17     A.  I don't know what legal authority.
18     Q.  Okay.  Are you aware of any Ninth Circuit case
19  law or Supreme Court case law that says that an officer
20  has a constitutional duty to physically intervene after
21  giving an order to stop?
22     A.  No.
23     Q.  Okay.
24         MR. ANDERSON:  Thank you.
25         MR. SAYRE:  No questions.

---

Page 216

1         THE VIDEOGRAPHER:  This concludes the videotaped
2  deposition of Scott DeFoe on August 21st, 2018.  The
3  original media from today's testimony will remain in the
4  custody of Las Vegas Legal Video.  The time is 3:16 p.m.
5  We are going off the record.
6         THE REPORTER:  Electronic?
7         MR. SAYRE:  I do want a copy.
8         MR. McNUTT:  PDF.
9         MR. ANDERSON:  Regular and a mini.
10
11         -oOo-
12         (Whereupon, the deposition of SCOTT A.
13  DEFOE was concluded at 3:16 p.m.)
14
15
16         SCOTT A. DEFOE
17
18
19
20
21
22
23
24
25

---

Scott A. DeFoe          Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

Page 217

1        CERTIFICATE OF DEPONENT

2 PAGE  LINE  CHANGE       REASON

3

4

5

6

7

8

9

10

11

12

13

14

15       * * * * *

16

17      I, SCOTT A. DEFOE, deponent herein, do hereby certify and declare under penalty of perjury the within

18 and foregoing transcription to be my deposition in said action; that I have read, corrected and do hereby affix my signature to said deposition.

19

20      SCOTT A. DEFOE

      Deponent

21

22      Subscribed and sworn to before me the day of _____ 2018.

23

24      Notary Public

25

Page 218

1       REPORTER'S CERTIFICATE

2 STATE OF NEVADA  )

                 ) ss

3 COUNTY OF CLARK  )

4

5      I, Lori-Ann Landers, a duly commissioned Notary Public, Clark County, State of Nevada, do hereby

6 certify:

7      That I reported the taking of the deposition of the witness, SCOTT A. DEFOE, at the time and place

8 aforesaid;

9      That prior to being examined, the witness was by me duly sworn to testify to the truth, the whole

10 truth, and nothing but the truth;

11      That I thereafter transcribed my shorthand notes into typewriting and that the typewritten

12 transcript of said deposition is a complete, true and accurate transcription of my said shorthand notes taken

13 down at said time to the best of my ability.

14      I further certify that I am not a relative or employee of an attorney or counsel of any of the

15 parties, nor a relative or employee of any attorney or counsel involved in said action, nor a person financially

16 interested in the action; and that transcript review NRCP 30(e) was requested.

17      IN WITNESS WHEREOF, I have hereunto set my hand in the County of Clark, State of Nevada, this 21st

18 day of August 2018.

19       LORI-ANN LANDERS, CCR 792, RPR

20

21

22

23

24

25