# Exhibit J - Deposition of LVMPD investigating officer Det. Trevor Alsup

DETECTIVE TREVOR ALSUP

June 15, 2018

```
 1                    REPORTER'S CERTIFICATE

 2

 3     STATE OF NEVADA      )
                            )   ss.
 4     COUNTY OF CLARK      )

 5

 6          I, KENDALL KING-HEATH, CCR No. 475, a
       Certified Court Reporter for the State of Nevada,
 7     do hereby certify:

 8          That I reported the taking of the
       deposition of the witness, DETECTIVE TREVOR ALSUP,
 9     commencing on the 15th day of June, 2018, at the
       hour of 10:12 a.m.

10

11          That prior to being examined, the witness
       was duly sworn by me to testify to the truth, the
       whole truth, and nothing but the truth.

12

13          That I thereafter transcribed my said
       shorthand notes into typewriting and that the
       typewritten transcript of said deposition is a
14     complete, true and accurate transcription of my
       said shorthand notes taken down at said time, and
15     that a request has been made to review the
       transcript.

16          I further certify that I am not a relative
17     or employee of an attorney or counsel of any of the
       parties, nor a relative or employee of any attorney
18     or counsel involved in said action, nor a person
       financially interested in the action.

19          IN WITNESS WHEREOF, I have hereunto
20     set my signature this 2nd day of June, 2018.

21

22

23          _____
                 KENDALL KING-HEATH
24                  CCR No. 475

25
```

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

ESTATE OF TASHI S. FARMER          )
a/k/a TASHII FARMER a/k/a          )
TASHII BROWN, by and through       )
its Special Administrator,         )
Lorin Michelle Taylor,             )
et al.,,                           )
                                   )
          Plaintiffs,              )
                                   )
     vs.                           )     Case No.
                                   )     2:17-cv-01946-JCM-PAL
                                   )
LAS VEGAS METROPOLITAN POLICE      )
DEPARTMENT, a political            )
subdivision of the State of        )
Nevada; OFFICER KENNETH            )
LOPERA, individually and in        )
his Official Capacity;             )
SERGEANT TRAVIS CRUMRINE,          )
individually and in his            )
Official Capacity; OFFICER         )
MICHAEL TRAN, individually         )
and in his Official Capacity;      )
OFFICER MICHAEL FLORES,            )
individually and in his            )
Official Capacity; and             )
Does 1 through 50, inclusive,      )
                                   )
          Defendants.              )
_____    )

VIDEO DEPOSITION OF

DETECTIVE TREVOR ALSUP

FRIDAY, JUNE 15, 2018

LAS VEGAS, NEVADA

Reported by:   KENDALL KING-HEATH, NV. CCR No. 475
               CA. CSR No. 11861

Job: 28457

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 2

```
 1           UNITED STATES DISTRICT COURT
 2              DISTRICT OF NEVADA
 3
    ESTATE OF TASHI S. FARMER    )
 4  a/k/a TASHII FARMER a/k/a    )
    TASHII BROWN, by and through  )
 5  its Special Administrator,   )
    Lorin Michelle Taylor,       )
 6  et al.,,                     )
                                 )
 7        Plaintiffs,            )
                                 )
 8        vs.                    )  Case No.
                                 )  2:17-cv-01946-JCM-PAL
 9                               )
    LAS VEGAS METROPOLITAN POLICE )
10  DEPARTMENT, a political      )
    subdivision of the State of  )
11  Nevada; OFFICER KENNETH      )
    LOPERA, individually and in  )
12  his Official Capacity;       )
    SERGEANT TRAVIS CRUMRINE,    )
13  individually and in his      )
    Official Capacity; et al.,   )
14                               )
          Defendants.           )
15  _____)
16
17       DEPOSITION Of DETECTIVE TREVOR ALSUP,
18  taken on behalf of Plaintiff, commencing
19  on Friday, June 15, 2018, at 10:12 a.m. at
20  the offices of Callister Law Group, 330
21  East Charleston Boulevard, Suite 101, Las
22  Vegas, Nevada, taken before Kendall
23  King-Heath, Certified Court Reporter,
24  Certificate No. 475, in and for the State
25  of Nevada.
```

Page 3

```
 1  APPEARANCES OF COUNSEL:
 2  For the Plaintiff:
 3       FEDERICO C. SAYRE, ESQ.
         ABIR COHEN TREYZON SALO, LLP
 4       1901 Avenue of the Stars
         Suite 935
 5       Los Angeles, CA 90067
         (424) 288-4367
 6       fsayre@actslaw.com
 7
 8  For the Defendants
    Las Vegas Metropolitan
 9  Police Department,
    Sergeant Travis Crumrine,
10  Officer Michael Tran, and
    Officer Michael Flores:
11
         CRAIG R. ANDERSON, ESQ.
12       MARQUIS, AURBACH, COFFING
         10001 Park Run Drive
13       Las Vegas, Nevada 89145
         (702) 382-0711
14       canderson@maclaw.com
15
16  For the Defendant:
    Officer Kenneth Lopera:
17
         DANIEL R. McNUTT, ESQ.
18       MATTHEW WOLF, ESQ.
         McNUTT LAW FIRM, P.C.
19       625 South Eighth Street
         Las Vegas, NV 89101
20       (702) 384-1170
         drm@mcnuttlawfirm.com
21
22
23  ALSO PRESENT:
24       Tom Burtney, Court Videographer
25
```

Page 4

```
 1                 INDEX
 2
               EXAMINATION
 3
    WITNESS                             PAGE
 4
    DETECTIVE TREVOR ALSUP
 5
         By Mr. Sayre ..................... 6
 6
         By Mr. McNutt .................... 77
 7
         Further By Mr. Sayre ............. 125
 8
         Further By Mr. McNutt ........... 131
 9
10
11
12               EXHIBITS
13  Exhibit    Description            Page
14  Exhibit A   Arrest Report           16
15
16
17  INFORMATION TO BE PROVIDED     PAGE LINE
18                                 55  10
19
20
21
22
23
24
25
```

Page 5

```
 1              LAS VEGAS, NEVADA
 2           FRIDAY, JUNE 15, 2018
 3                  -oOo-
 4        THE VIDEOGRAPHER:  Good morning.  Here
 5   begins media No. 1 of the deposition of Las Vegas
 6   Metropolitan Police Department Detective Trevor
 7   Alsup, in the matter of The Estate of Tashii S.
 8   Farmer, et al., et cetera, versus Las Vegas
 9   Metropolitan Police Department, et al.  This case
10   is in the United States District Court, District of
11   Nevada.  The case number is 2:17-cv-01946-JCM-PAL.
12        Today's date is June the 15th, 2018, and
13   the time is 10:12 a.m.  This deposition is taking
14   place at 330 East Charleston Boulevard, Suite 100,
15   in Las Vegas, Nevada.
16        The videographer is Tom Burtney,
17   appearing on behalf of First Legal Deposition
18   Services.  Would counsel please identify yourselves
19   and state whom you represent.
20        MR. SAYRE:  For the plaintiffs, Federico
21   Sayre.
22        MR. McNUTT:  Dan McNutt and Matt Wolf on
23   behalf of Ken Lopera.
24        MR. ANDERSON:  Craig Anderson on behalf
25   of Las Vegas Metropolitan Police Department,
```

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 6

1  Sergeant Travis Crumrine, Officer Tran, and Officer
2  Flores.
3        THE VIDEOGRAPHER:  The reporter today is
4  Kendall Heath with First Legal Deposition Services.
5        Would the reporter please swear in the
6  witness.
7  Thereupon,
8        DETECTIVE TREVOR ALSUP,
9     called as a witness by the Plaintiff
10    having been duly sworn, testified as
11    follows:
12          EXAMINATION
13  BY MR. SAYRE:
14    Q.  Detective Alsup, my name is Fred Sayre.
15  I introduced myself prior to the deposition to you,
16  and I also gave you a copy of an arrest report;
17  correct?
18    A.  Correct.
19    Q.  And I indicated that I would be asking
20  you questions about that arrest report here today.
21  You understood that?
22    A.  Yes, sir.
23    Q.  All right.  You've just been sworn to
24  tell the truth by the court reporter, who is
25  authorized to administer that oath by the court.

Page 7

1        Although we're sitting here somewhat
2  informally in this conference room, do you
3  understand that oath is as binding on you here as
4  if we were in a courtroom of law?
5    A.  Yes, sir.
6    Q.  Everything that is said here today will
7  be taken down by the court reporter, and in a
8  couple of weeks she'll have it typed up into a
9  booklet form.  And you'll be given the opportunity
10  to read, review, and if you wish, make any changes
11  or corrections to your testimony here today.  Do
12  you understand that?
13    A.  Yes, sir.
14    Q.  However, I caution you that to use that
15  sparingly, if you would.  Try to give your best
16  responses here today.  Will you do that, please?
17    A.  Yes, sir.
18    Q.  If you don't understand a question that
19  I've asked you, please don't answer it.  Ask me to
20  repeat it, rephrase it, or in some way indicate
21  that it wasn't understood.
22        If you understand a question -- if you
23  answer it, I'm going to assume you've
24  understood it.  Is that fair enough?
25    A.  Yes, sir.

Page 8

1    Q.  Please wait until I've finished my
2  question before you start your answer.  And I'll
3  give you the same courtesy, I'll wait until you
4  finish your answer before I start my next question.
5  It's too difficult for the court reporter to take
6  down two people who are speaking at the same time.
7  Do you understand that?
8    A.  Yes, sir.
9    Q.  Just as you've been doing very nicely up
10  until now, please continue to answer out loud.
11  Such common expressions such as uh-huh, uh-uh, or
12  nods of the head or shakes of the head are too
13  difficult to interpret, so please avoid those.
14  Will you do that, please?
15    A.  Yes, sir.
16    Q.  This is not expected to be a lengthy
17  deposition; however, if at any time you wish to
18  take a break, please just indicate you do, and your
19  request will be honored.  Will you do that,
20  please?
21    A.  Yes, sir.
22    Q.  During the course of deposition I may ask
23  you questions that have to do with time or
24  distance.  You may or may not have an exact answer
25  to the question, but you may have an estimate.  If

Page 9

1  you don't have an exact answer, but you do have an
2  estimate, I'm entitled to your best estimate.
3  However, I'm not entitled to have you guess; so if
4  it is a guess, you should refrain from doing that.
5        The difference between a guess and an
6  estimate is not always clear.  To give you an
7  example, the length of this table is something that
8  you can see.  You have a life experience with feet
9  and inches or meters and centimeters, you could
10  give a reasonable estimate of the table.
11        If I asked you to estimate the length of
12  my table in my home in Irvine, California, you've
13  never been there, so it would be a pure guess.  Do
14  you understand that?
15    A.  Yes, sir.
16    Q.  That more or less is the difference
17  between a guess and an estimate.  An estimate is
18  something you have a basis for giving an estimate
19  about.  You understand?
20    A.  Yes, sir.
21    Q.  Have you taken any kind of medication
22  that would affect your ability to remember or to
23  respond to questions here today?
24    A.  No, sir.
25    Q.  Detective Alsup, could you tell me please

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 10

1  about your educational background, beginning with
2  high school?
3      A.  Went to high school here in Las Vegas,
4  graduated.  Entered the military.  Conducted
5  several professional schools related to my field
6  while in the military.  After I exited the
7  military, began going to college until I was hired
8  by the Department.
9      Q.  What was your military occupational
10  specialty?
11      A.  I was in the medical field.
12      Q.  A paramedic?
13      A.  Yes.  I was a field medic for the
14  Marines.
15      Q.  Field medic, all right.
16          Mr. McNUTT and I also were both
17  Marines.
18          MR. McNUTT:  But he was in the Navy.
19          MR. SAYRE:  Well, he was a Navy
20  corpsman --
21          THE WITNESS:  Correct.
22          MR. SAYRE:  -- but he worked with
23  Marines.  We were like corpsmen, so ...
24          THE WITNESS:  I was Marine Corps raised,
25  too, so --

Page 11

1          MR. SAYRE:  Right.
2      Q.  Now, could you tell me, please, about
3  your college background?
4      A.  Studied just general-education courses,
5  geared more towards biology and the medical field
6  at that point.
7      Q.  Did you achieve a degree?
8      A.  No.
9      Q.  Did you have any full-time employment
10  prior to becoming employed by the Police
11  Department?
12      A.  Yes, I did.
13      Q.  And what was that, please?
14      A.  I was -- while I was going to school, I
15  was an apprentice in the Plumbers and Pipefitters
16  Union.
17      Q.  When did you become employed by the Las
18  Vegas Metropolitan Police Department?
19      A.  1998.
20      Q.  And you went through an academy?
21      A.  Yes, sir.
22      Q.  What was your first assignment?
23      A.  I was a patrol officer.
24      Q.  Any particular area?
25      A.  It was called the Southwest Area Command.

Page 12

1  It's been broken up into different area commands
2  since then.
3      Q.  How long were you in that first
4  occupation or task?
5      A.  Approximately four years.
6      Q.  What's the next assignment?
7      A.  Well, I'll break that down a little more.
8  While I was at Southwest Area Command, I held
9  various assignments.  I was a patrol officer.  I
10  was a field training officer.  I was in the
11  community-oriented policing office for a little
12  while, followed by the problem-solving unit for a
13  couple of years.  So there were various assignments
14  while I was assigned to that area command.
15      Q.  What is -- what were your
16  responsibilities in the community office?
17      A.  That was working with different citizens
18  groups, just trying to make residence in different
19  areas in the Southwest Area Commands safer
20  places.
21      Q.  What about the problem-solving group?
22  What did you do there?
23      A.  That was --
24      Q.  I mean, obviously it sounds like it, but
25  --

Page 13

1      A.  It was investigative.
2      Q.  Did you receive any kind of training --
3  particularized training -- besides what you
4  received in the academy, to perform in the
5  problem-solving department?
6      A.  Just various classes throughout my career
7  that -- we have to take so many classes per year,
8  and then if you want to go into a certain field or
9  a certain area of expertise for investigations, you
10  take various classes for those.
11      Q.  How many investigation classes do you
12  think that -- or investigation-oriented classes do
13  you think you've taken?
14      A.  Honestly --
15      Q.  I don't --
16          (Court reporter requests clarification.)
17          MR. SAYRE:  He's thinking.
18          THE WITNESS:  Forty to sixty.
19  BY MR. SAYRE:
20      Q.  Is it fair to say that your career has
21  substantially been oriented towards
22  investigation?
23      A.  Yes, sir.
24      Q.  All right.  How long were you part of the
25  problem-solving group?

DETECTIVE TREVOR ALSUP

June 15, 2018

1    A.   Approximately two years.
2    Q.   And what type of problems were you called
3 upon to solve?
4    A.   Our team conducted investigations.  It
5 could be from a shooting to a robbery to a
6 burglary.  There was no -- that unit, we would take
7 investigations right after they happened and do the
8 follow-up before it was transferred to a detective
9 bureau and the detective would take the case.  So
10 if we could solve it reasonably quick, we would do
11 that.
12    Q.   So after those four years as a patrolman
13 with the various responsibilities you've talked
14 about, what's your next assignment?
15    A.   From there I went to the violent-crime
16 section.
17    Q.   And how long were you in that position?
18    A.   I was actually in that position twice.
19 The first time was approximately four to five
20 years.  And then the next time was another -- I
21 believe it was four years.
22    Q.   Were they consecutive or was there
23 something in between?
24    A.   No, there was a break in between, where I
25 was a motor officer, and that was approximately two

1 years.
2    Q.   In the violent-crime section, did you
3 function as a detective?
4    A.   Yes, sir.
5    Q.   So that's where you were actually given
6 the title of detective?
7    A.   Yes, sir.
8    Q.   And that would be both stretches in the
9 violent crimes?
10    A.   Yes, sir.
11    Q.   During the two years as a motor officer,
12 I take it you were not a detective during that
13 time?
14    A.   No.
15    Q.   When did you finish your second four
16 years in the violent-crime section?
17    A.   2014.
18    Q.   Now, what was your assignment after the
19 second tour in the violent-crime section?
20    A.   From there I went to the IOCP Bureau, and
21 that's internal oversight and Constitutional
22 policing.  And I was initially assigned to the
23 CIRT, which is the Critical Incident Review Team;
24 and then from there, to the Force Investigation
25 Team.

1    Q.   And in that position you would be called
2 upon to investigate instances in which there had
3 been a violent encounter with a citizen?
4    A.   That's correct.
5        MR. SAYRE:  Now, there's an arrest record
6 report here, which I'll mark as Plaintiff's A for
7 identification for this deposition.
8        (Exhibit A was marked for
9        identification and is attached
10        hereto.)
11 BY MR. SAYRE:
12    Q.   Did you author this report?
13    A.   Yes, sir, I did.
14    Q.   All right.  And this was pursuant to an
15 investigation that you were assigned to conduct
16 regarding the incident that resulted in the death
17 of Tashii Farmer?
18    A.   Yes, sir.
19    Q.   Prior to this investigation, can you
20 estimate how many times you had been called upon
21 since 2014 to investigate something that related to
22 either force investigation or CRT?
23    A.   An approximate number?
24    Q.   Yes, sir.
25    A.   Fifty to sixty.

1    Q.   Now, in this particular investigation you
2 were accompanied by Officer Colon?
3    A.   Correct.
4    Q.   Was he a regular partners of yours or was
5 this just for this particular investigation?
6    A.   No, he is my partner.
7    Q.   How long had you been a partner of
8 Officer Colon?
9    A.   He and I have worked together since
10 approximately 2008 in various assignments.
11    Q.   What is Officer Colon's first name?
12    A.   Marc.
13    Q.   Now, in performing this investigation,
14 did you split up the responsibilities between
15 yourself and Officer Colon?
16    A.   They were actually split up between us
17 and our entire team.
18    Q.   When you say your entire team, who would
19 that consist of?
20    A.   He have a group of six investigators and
21 a sergeant.  So typically when we go to a scene,
22 each investigator will take -- the case agent kind
23 of splits out responsibilities for who will take
24 care of interviews, documentation of the scene, and
25 so forth.

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 18

1    Q.   When you say case agent, what does that
2  mean?
3    A.   The primary investigator assigned to the
4  call.
5    Q.   And who was the primary investigator
6  assigned to this call?
7    A.   I was.
8    Q.   And who assigned you to be the primary
9  investigator?
10    A.   It's just a rotation that we go
11  through.
12    Q.   It just was your time was up?
13    A.   Correct.
14    Q.   Who is the sergeant of the team?
15    A.   Jerry McDonald.
16    Q.   Did Sergeant McDonald participate in the
17  investigation?
18    A.   Yes, sir.
19    Q.   In what way?
20    A.   He's our sergeant.  He supervises
21  everything that we do.  He reviews documents before
22  they're submitted.
23    Q.   Now, I take it that part of your job as
24  investigator is to interview witnesses?
25    A.   That's correct.

Page 19

1    Q.   Did Sergeant McDonald participate in
2  interviewing any witnesses?
3    A.   No.
4    Q.   Did he assist --
5    A.   Well, let me --
6    Q.   Go ahead.  Sorry.
7    A.   Typically not.  Without reviewing every
8  interview that was done on this case, the most
9  likely answer would be no.  He may have sat in on
10  an interview, but I would say probably not.
11    Q.   So mainly he's in a supervisory role
12  insofar as your investigation team?
13    A.   That's correct.
14    Q.   Who else was a member of your
15  investigation team for this particular
16  investigation?
17    A.   It would have been Detective Joe Patton,
18  Detective Jason Leavitt.  I'm sorry, we've had some
19  turnover in the last few -- I'm trying to remember
20  exactly who was --
21    Q.   Take your time.  Don't worry about it.
22    A.   -- on the team at that point.
23    Q.   The best you can recall.
24    A.   Those would be the ones I know for sure.
25    Q.   Okay.  Now, how would you as the primary

Page 20

1  investigator split up the responsibility for the
2  investigation?
3    A.   Basically what I would do as the primary
4  investigator, I know I'm going to -- my task is
5  primarily going to be the scene.  So from there, I
6  would just typically -- I don't really care how my
7  team members split up the interviews, I just ask
8  them to complete the interviews.
9    Q.   All right.  So the idea is you interview
10  any and all witnesses that you can find?
11    A.   That's correct.
12    Q.   All right.  Is that what you -- your team
13  did?
14    A.   Yes, sir.
15    Q.   And when you say you're primarily
16  involved with the scene, what does that mean?
17    A.   Just the documentation of the scene and
18  the evidence, working along with our CSIs to make
19  sure all evidence is identified and collected.
20    Q.   And the CSI is a person that would
21  respond to look for whatever kinds of nonverbal
22  evidence they could encounter; is that correct?
23    A.   That's correct.
24    Q.   Did the CSI respond to this scene?
25    A.   Yes, sir.

Page 21

1    Q.   Do you know what, if anything, they
2  collected?
3    A.   Photographs, and then I know that there
4  were -- they're called CHADS, and they're part of
5  the discharged case or cartridge.  So there were
6  numerous chads that were on the ground that were
7  collected --
8    Q.   Sure.
9    A.   -- and then just processing of the
10  scene.
11    Q.   When you say just processing the scene,
12  what does that mean?  Surveying the scene --
13    A.   Surveying the scene, taking photographs,
14  collecting that evidence.
15    Q.   The photographs that were taken of the
16  scene, where would they be maintained?
17    A.   In the case file.
18    Q.   And where is the case file maintained?
19    A.   There's a digital copy, and then there's
20  a hard copy.  So I actually have the hard copy.
21  The digital copy is in our computer files.
22    Q.   Do you have the hard copies with you?
23    A.   I do not.
24    Q.   Where do you maintain the hard copy?
25    A.   It's currently sitting on my desk.

DETECTIVE TREVOR ALSUP

June 15, 2018

1    Q.   Have you been asked to produce the hard
2  copy to anybody in this -- as far as you know -- in
3  this case?
4    A.   A complete copy of the case file was
5  given to the district attorney's office.
6    Q.   In a general sense, can you tell me what
7  type of material is contained within the case
8  file?
9    A.   It's our TCR, temporary custody record,
10  the declaration of arrest, the arrest report,
11  copies of all the transcribed statements from all
12  the interviews, the autopsy report, the documents
13  provided us by the coroner to support the autopsy
14  report.  A copy of the CSI paperwork, anything that
15  they produced as far as evidence collection, a copy
16  of the photographs, copies of video.
17    Q.   What videos?
18    A.   There was body-worn camera and
19  surveillance video from the Venetian.
20    Q.   Okay.  The body-worn camera of
21  Officer Lopera?
22    A.   Of any of the officers who had activated
23  body camera during the event.
24    Q.   All right.  There were -- Officer Lif had
25  a body-worn camera, for example?

1    A.   Correct.
2    Q.   Who else?
3    A.   I know that Officer Tran did.  And you're
4  going to have to excuse me, I don't -- off the top
5  of my head, which officers' were activated.
6    Q.   Sure.
7    A.   I believe Sergeant Crumrine, but I don't
8  know the exact -- the exact point at which he
9  activated his, I don't remember off the top of my
10  head.
11    Q.   Right.  How about Officer Flores, was
12  there --
13    A.   I believe so.
14    Q.   And then the Venetian security cameras?
15    A.   Yes, sir.
16    MR. SAYRE:  Let me go off the record for
17  just a second.
18    THE VIDEOGRAPHER:  Off the record.  The
19  time is 10:32 a.m.
20    (Discussion off the record.)
21    THE VIDEOGRAPHER:  Back on the record.
22  The time is 10:35 a.m.
23    MR. SAYRE:  Off the record I just had a
24  conversation with Mr. Anderson, and he doesn't have
25  the file either, so we may be making a joint

1  request for the file.
2    Q.   And I mentioned that I expect to finish
3  your deposition today without a doubt, but if
4  something comes out of the file, I may call you
5  back later just to talk about those things.  Okay?
6  Just so you're aware of that.
7    A.   Yes, sir.
8    Q.   So just keep your file at ready.  All
9  right.  Thank you, sir.
10    So what did Officer Colon do?  What were
11  his responsibilities in this investigation?
12    A.   He assisted me with the documentation of
13  the scene.  And basically as my partner he would
14  just complete any task that I might ask him to do.
15    Q.   And the other two gentlemen that you
16  mentioned, did they have similar roles, that is,
17  you would direct them as needed to do things in the
18  investigation?
19    A.   That's correct.
20    Q.   Now, in looking at this report, was it
21  entirely authored by you?
22    A.   Yes, sir.
23    Q.   So nobody else wrote any portion of it?
24    A.   No, sir.
25    Q.   Well, let's take a look at, I guess it

1  would be -- it looks like it would be 1 of 8,
2  although it doesn't say it.  At the top it says
3  "Arrest report."  Do you see that?
4    A.   Yes, sir.
5    Q.   Now, the information that begins under
6  "Circumstances of arrest," did you obtain that
7  information from Sergeant Abdal-Karim?
8    A.   Yes, sir.
9    Q.   So that is his rendition of the facts as
10  he had come to understand them?
11    A.   That's correct.
12    Q.   Did you at any time believe that Sergeant
13  Abdal-Karim was himself a percipient witness to any
14  of these facts?
15    A.   No, sir.
16    Q.   So is it fair to say your understanding
17  was all of the facts that he was relating to you
18  were things which had been told to him?
19    A.   Yes, sir.
20    Q.   Do you know who told him any of the
21  facts?
22    A.   I do not.
23    Q.   Let me be specific.  In the third
24  paragraph, in I think about the second sentence, it
25  says -- no, let's try the first sentence -- "During

DETECTIVE TREVOR ALSUP

June 15, 2018

1  the foot pursuit, Officer Lopera observed
2  Farmer" --
3      MR. McNUTT:  Where you starting?
4      MR. SAYRE:  Third paragraph.
5      MR. McNUTT:  Third paragraph, okay.
6      MR. SAYRE:  Yeah.
7      Q.  "During the foot pursuit, Officer Lopera
8  observed Farmer near a white truck and believed he
9  attempted to open the tailgate of the truck in his
10  attempt to flee."
11      Do you know who gave that information to
12  Sergeant Abdal-Karim?
13      A.  No, sir.
14      Q.  Do you believe that that is not
15  information that Sergeant Abdal-Karim saw
16  himself?
17      A.  I do not believe he saw it himself.
18      Q.  Okay.  Then the next sentence, "Officer
19  Lopera then observed Farmer approach the driver's
20  door of the white truck, and believed Farmer was
21  going to attempt to take the vehicle by force."
22      Do you know who told that to Sergeant
23  Abdal-Karim?
24      A.  No, sir.
25      Q.  Then it says that "Officer Lopera

1  discharged the ECD, striking Farmer with both
2  probes and Farmer fell to the ground.  Farmer
3  attempted to pull the ECD probes out and attempted
4  to grab the ECD from Officer Lopera's hand."
5      Do you know who gave that information to
6  Sergeant Abdal-Karim?
7      A.  No, sir.
8      Q.  All right.  Now, you've observed the
9  tapes, the body-worn camera, you've observed the
10  security.  Did you ever see Mr. Farmer attempt to
11  grab the ECD from Officer Lopera's hand?
12      MR. McNUTT:  Objection, form.
13  BY MR. SAYRE:
14      Q.  You can answer.
15      A.  Okay.  In the body-worn camera, it
16  appears as if Farmer makes contact with the ECD
17  while it's in Officer Lopera's hand.  To say that
18  he was trying to grab it, I couldn't say that.
19      Q.  Did you ever, in either the body-worn
20  camera or the security tapes, observe Farmer
21  attempting to open the tailgate of the truck?
22      MR. McNUTT:  Objection, form.
23      THE WITNESS:  He -- what it appeared to
24  me is that he grabbed onto the tailgate of the
25  truck as he ran by it.  It did not appear to me

1  that he tried to open the tailgate.
2  BY MR. SAYRE:
3      Q.  Did you at any time in the tapes observe
4  Farmer attempting to open the driver's door of the
5  white truck?
6      A.  No, sir.
7      Q.  In looking at the entirety of tapes, did
8  you at any time reach the conclusion that
9  Mr. Farmer was attempting to carjack the truck?
10      A.  No, sir.
11      Q.  Now, the next paragraph in this document,
12  it says, "Security guards from the Venetian
13  responded and attempted to help take Farmer into
14  custody.  Officer Lopera then performed the lateral
15  vascular neck restraint, LVNR, and rendered Farmer
16  unconscious."
17      Do you know who told Sergeant Abdal-Karim
18  that Lopera performed a lateral vascular neck
19  restraint on Mr. Farmer?
20      A.  No, sir, I don't.
21      Q.  Did you observe at any time -- are you
22  able to say from your own observation of the tape
23  and the security camera that you saw Officer Lopera
24  employ a lateral vascular neck restraint?
25      A.  Based on the video that I watched, which

1  is the body cam and the Venetian security cam, I do
2  not believe that it was an LVNR.
3      Q.  Why not?
4      A.  My main basis for that is hand placement.
5  In the LVNR, it's very specific on where the arm
6  encircles the neck and your hand placement as far
7  as your other hand.
8      And during the video, you can see that
9  Officer Lopera's hand is on Farmer's head, and that
10  is not consistent with the LVNR.
11      Q.  You've been trained in applying lateral
12  vascular neck restraints?
13      A.  Yes, sir.
14      Q.  Have you been trained in applying rear
15  naked chokes?
16      A.  No, sir.
17      Q.  Have you been trained how to escape from
18  a rear naked choke?
19      A.  Yes, sir.
20      Q.  And as a part of that training, did you
21  become aware of how a rear naked choke is
22  applied?
23      A.  Yes, sir.
24      Q.  And that was training provided to you by
25  the Metropolitan Police Department?

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 30

1    A.  Yes, sir.
2    Q.  Are you able to determine, based upon
3  your observation of the body-worn camera and/or the
4  security camera of the Venetian, whether or not
5  Officer Lopera was employing a rear naked choke?
6    A.  I do not know.
7    Q.  What causes you to be unable to determine
8  whether it was a rear naked choke?
9    A.  So because of this event, I had to kind
10  of understand what the rear naked choke was, and
11  the similarities or differences between an LVNR.
12  So from what I learned is the LVNR and the rear
13  naked choke physiologically do the same thing.
14  They are --
15    Q.  The blood choke?
16    A.  Correct, carotid restraints, that are not
17  supposed to cause or restrict breathing.
18        So in watching the tapes and being
19  present at the autopsy, I'm not an expert on LVNR,
20  rear naked choke, but going through the training
21  that I have, the hand placement for the LVNR is
22  what makes it the LVNR.
23    Q.  And would you explain that, please?
24    A.  So when you perform the LVNR, you have
25  one arm that encircles the neck and basically comes

Page 31

1  around the neck to where the windpipe is in the
2  crook of the elbow so that there's no pressure on
3  the windpipe.  And then the forearm and bicep are
4  used to compress the arteries, which is basically
5  the same as the rear naked choke.
6        However, in the LVNR, we're told that
7  after you encircle, the hands come together and
8  clasp, and that's how you apply the varying degrees
9  of pressure.
10    Q.  First, second, third degree of
11  pressure?
12    A.  Yes, sir.  So at no point are we taught
13  for the LVNR that your hand goes on the person's
14  head.
15    Q.  You mean the back hand?
16    A.  Correct.
17    Q.  So because you saw the back hand on the
18  person's head at the same time that the other arm
19  is encircling the neck and applying the pressure to
20  the side of the throat, you did not believe that
21  you were seeing an LVNR placement?
22    A.  That's correct.
23    Q.  And is that -- can you say definitively,
24  that is, conclusively, that what you saw was not an
25  LVNR hold?

Page 32

1    A.  Based on the hand on top of the head,
2  yes.
3    Q.  Can you tell whether it was simply a bad
4  placement or an improper placement of an LVNR?
5    A.  No.
6    Q.  Meaning, you don't believe it was an
7  improper placement of an LVNR?
8    A.  What I mean by that is I don't believe it
9  was an LVNR.
10    Q.  Okay.  Why are you unable -- well, let me
11  ask you this.  And you -- we'll come to it in a
12  bit, but in the tape recordings you list five times
13  that Officer Lopera told other officers, I think
14  four different officers, that he employed a choke,
15  or at one point he actually says a rear naked
16  choke.  I think he says that to Officer Lif.  And
17  we'll come to it, as I said.
18        Why are you not able to say whether or
19  not it was a rear naked choke by your observation?
20    A.  Due to the fact that with the camera
21  angles you can't see exactly how arms are placed,
22  except for, like I said, you see one hand on top of
23  the head.  You see that consistently.  But I've
24  never been trained for a rear naked choke, so I
25  don't know if that's exactly what it was as far as

Page 33

1  the placement.
2        But also during the autopsy the doctor
3  performing the autopsy told me that it appeared
4  that he had been choked.
5    Q.  What did you understand that to mean?
6    MR. McNUTT:  Objection, form.
7  BY MR. SAYRE:
8    Q.  That he had been choked, what did you
9  understand that to mean?
10    A.  That there was loss of airway.
11    Q.  Now, loss of airway would mean pressure
12  on the trachea or --
13    A.  That his airflow was restricted.
14    Q.  Right, airflow was restricted.  Okay.
15        Now, is it correct to say that your
16  understanding of the rear naked choke is not that
17  it is a -- puts pressure on the trachea or air pipe
18  -- windpipe --
19    A.  Right.
20    Q.  -- it also is a blood choke?
21    A.  Correct.
22    Q.  So, well, go ahead.  I didn't mean to --
23    A.  I don't know if -- again, this is my
24  understanding.  I don't know if blood choke is the
25  correct term --

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 34

1    Q.   Okay.
2    A.   -- but it restricts blood flow.
3    Q.   Fair enough.  I don't -- didn't mean to
4  use the shorthand, but ...
5         I don't know if you know this, my expert
6  witness says that a lateral vascular neck restraint
7  will inhibit or stop 80 to 85 percent of the blood
8  flow to the brain, but the rear naked choke stops
9  100 percent of the blood flow to the brain.  Do you
10  know that to be true?
11    A.   No, sir.
12    Q.   But my expert also tells me that neither
13  the rear naked choke or the lateral vascular neck
14  restraint is meant to inhibit the airflow through
15  the trachea.  Do you know that to be true?
16    A.   Yes, sir.
17    Q.   So did you ask the coroner what she meant
18  by he had been choked?
19    A.   No, I did not.
20    Q.   But you took that to mean that he had had
21  some kind of an air choke?
22    A.   Correct.
23    Q.   And an air choke would indicate to you
24  that -- if that's so, an air choke would indicate
25  to you that either lateral vascular neck restraint

Page 35

1  or rear naked choke was used?
2    A.   Yes, sir.
3    Q.   Do you understand that a rear naked choke
4  involves pressure to the back of the neck with the
5  other arm?
6    A.   Yes, sir.
7    Q.   Is there any hold that is taught by the
8  Metropolitan Police Department that provides for an
9  air choke that is to the trachea or windpipe?
10    A.   No, sir.
11    Q.   In your observation of the neck restraint
12  employed by Officer Lopera, did you at any time see
13  him putting pressure on the trachea or windpipe?
14    A.   No, sir.
15    Q.   When the coroner told you that Mr. Farmer
16  had been choked, is it fair to say that you don't
17  really know exactly what she meant by using the
18  word choked?
19    A.   Yes.
20    Q.   Okay.
21    A.   Can I further that?
22    Q.   Of course.
23    A.   She did -- when she was doing the
24  examination, she did show us and provide -- I'm not
25  a medical expert, so I have no idea -- but when she

Page 36

1  was doing the examination of the neck area, she
2  said that there was bruising consistent with being
3  choked.
4    Q.   What part of the neck was bruised?
5    A.   I would have to look at her report.
6    Q.   The coroner's report?
7    A.   Yes, sir.
8    Q.   I think there's bruising all around the
9  neck, as well; but we're both -- without the
10  coroner's report, we don't have any ...
11         But she showed you bruising around the
12  neck?
13    A.   Yes, sir.
14    Q.   Was any of that bruising in the area of
15  the windpipe or trachea?
16    A.   Yeah, I have -- without looking at the
17  report that she authored, I don't remember.
18    Q.   Sure.  Was the bruising in more than one
19  spot around the neck?
20    A.   I believe so.
21    Q.   Do you know if a lateral vascular neck
22  restraint leaves bruising from application?
23    A.   I guess the only way that I can answer
24  that is that from what we are taught, you're
25  only -- it's only putting pressure on the carotid

Page 37

1  arteries.
2    Q.   It's actually the carotid, jugular, and
3  vagus nerves; correct?
4    A.   Correct.
5    Q.   And that's alongside the neck?
6    A.   Yes, sir.
7    Q.   Does that mean that -- well, if you know,
8  does that pressure, from your experience, produce
9  any bruising along the side of the neck?
10    A.   I don't have experience in that.
11    Q.   Is that lateral vascular neck restraint
12  pressure only applied along one side of the neck?
13    A.   No, it's on both sides.
14    Q.   Both sides.
15         But a lateral vascular neck restraint
16  does not call for pressure in the front, where the
17  trachea or windpipe is; correct?
18    A.   Correct.
19    Q.   And it doesn't call for pressure in the
20  back of the neck?
21    A.   There is actually pressure placed in the
22  back of the head, and that's by the officer's head.
23  The officer's head is turned to the side and
24  pressed up against the back of the suspect's
25  head.

DETECTIVE TREVOR ALSUP

June 15, 2018

1    Q.  Did you see that?
2    A.  No, sir.
3    Q.  All right.  And let's go back to the
4  page, please.  The next to the last paragraph, it
5  says, "Sergeant Abdal-Karim provided detectives
6  with the names of several witnesses to include
7  LVMPD officers and civilians.  Sergeant Abdal-Karim
8  also relayed that video surveillance was available
9  from the Venetian Hotel and also Officer Lopera's
10  body-worn camera."
11       Then it says, "Detectives with FIT then
12  assumed investigative responsibility."
13       Now, would that be you?
14    A.  Our team, yes, sir.
15    Q.  "Sergeant McDonald took control of
16  Officer Lopera's EWC and maintained control of the
17  camera until the video footage was viewed and
18  downloaded by detectives."
19    A.  Yes, sir.
20    Q.  Now, let's go over to the next page.  It
21  says, first paragraph, "During the walk-through" --
22  now, is this walk-through something that you
23  observed?
24    A.  Yes, sir.
25    Q.  "During the walk-through, which was

1  started at the point to when he exited the hotel,
2  Officer Lopera stated he observed a security
3  officer and asked if the officer had seen anyone
4  running.  The security officer pointed to the south
5  and Officer Lopera observed Farmer running south in
6  the middle of the street."
7       Which street was that?
8    A.  So at the Venetian Hotel, where they
9  exited -- I'm sorry, I don't -- I know the -- I
10  don't remember the exact name of the street.
11    Q.  That's fine.
12    A.  But where they exited the hotel, there's
13  a small street that runs north and south.
14    Q.  Right.  On the Venetian property.
15    A.  Well, it's still the Venetian property,
16  but there's park- -- there's -- where the parking
17  garage is, and then it travel- -- the east-west
18  street runs into where the valet area is.
19    Q.  Okay.  And then it goes on to say,
20  "Farmer approached a white truck that was traveling
21  west.
22       Now, how does that relate to the street
23  that you start out running on?
24    A.  So the street they're running on, where
25  they're running southbound, comes to a T with the

1  street that runs east and west.
2    Q.  Okay.
3    A.  The street that goes east and west, that
4  truck, it goes to a parking garage in the valet
5  area in the Venetian.
6    Q.  Do you know the name of the street that
7  goes east and west?
8    A.  Off the top of my head, I don't
9  remember.
10    Q.  Okay.  In the security videos, they're
11  focusing on a street.  Is that the east-west
12  street?
13    A.  There's two different views.  That's one
14  -- there's an overhead that catches Farmer and
15  Lopera running south.  And then there's another
16  camera angle, that's actually from valet, that
17  would be facing east, that captures the struggle on
18  the ground.
19    Q.  Now, the overhead, I'm not sure I've ever
20  seen that.  But the one -- the struggle on the
21  ground is on a street which runs east and west.  So
22  that's the east-west street?
23    A.  Yes, sir.
24    Q.  All right.  And then it goes on to say,
25  "Farmer approached a white truck who was traveling

1  west.  Farmer attempted to open the tailgate of the
2  truck, and Officer Lopera believed that Farmer was
3  going to attempt to take the vehicle by force."
4       Now, is this statement being made by
5  Officer Lopera?
6    A.  Yes, sir.
7    Q.  Is every statement that is in this
8  paragraph, that is a statement made by Officer
9  Lopera?
10    A.  This top paragraph?
11    Q.  Yes.
12    A.  Yes, sir.
13    Q.  Did he say what he meant when he said
14  that "Farmer was attempting to open the
15  tailgate"?
16       MR. McNUTT:  I'm sorry, what was the
17  question, Frank?
18  BY MR. SAYRE:
19    Q.  The question is, did he say what he meant
20  when he said, "Farmer attempted to open the
21  tailgate of the truck"?
22    A.  No, sir, that was his statement.
23    Q.  Okay.  And you observed the video and did
24  not see Farmer attempting to open the tailgate of
25  the truck?

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 42

1   A.   That's correct.
2      Q.   When you looked at the video, did you
3   look at it with other members of your team?
4      A.   Yes, sir.
5      Q.   And that would have been Colon?
6      A.   Yes, sir.
7      Q.   And the other two gentlemen who you
8   named; correct?
9      A.   We all viewed it.
10     Q.   All right.   Did Sergeant McDonald view
11   it?
12     A.   Yes, sir.
13     Q.   Any one of the five of you believe that
14   you saw Mr. Farmer attempting to open the tailgate
15   of the truck?
16        MR. McNUTT:   Objection, form.
17        THE WITNESS:   I don't know that that was
18   specifically ever discussed between us.
19   BY MR. SAYRE:
20     Q.   All right.   Did anybody tell you, of
21   those four gentlemen, besides yourself, that they
22   agreed with Farmer that -- I'm sorry -- that they
23   agreed with Lopera that Farmer was attempting to
24   open the tailgate of the truck?
25        MR. McNUTT:   Objection, form.

Page 43

1        THE WITNESS:   Nobody said that.
2   BY MR. SAYRE:
3      Q.   Did any of the four gentlemen, besides
4   you, tell you that they did not believe that Farmer
5   was attempting to open the tailgate of the truck?
6        MR. McNUTT:   Objection, form.
7        THE WITNESS:   No, sir.
8   BY MR. SAYRE:
9      Q.   Did you believe the -- the next
10   sentence -- or the next statement is that "Officer
11   Lopera believed that Farmer was going to attempt to
12   take the vehicle by force."   Do you see that?
13     A.   Yes, sir.
14     Q.   Did you believe that a reasonable,
15   objective officer, from what you observed in the
16   tape, would believe that Farmer was going to
17   attempt to take the vehicle by force?
18        MR. McNUTT:   Objection, form.
19        THE WITNESS:   My vantage point compared
20   to what his vantage point would have been are two
21   completely different things.   And I don't really
22   know what his vantage point was, as he observed it.
23        From my overhead view, I couldn't say
24   what his perception would have been.   That what he
25   saw, I would say that that could have been a

Page 44

1   possibility, as his perception.
2   BY MR. SAYRE:
3      Q.   At that point, the walk-through was
4   stopped by attorney John Aldrich?
5      A.   Yes, sir.
6      Q.   So he didn't allow Officer Lopera to
7   continue to tell you what had happened?
8      A.   That's correct.
9      Q.   So you were never able to get his
10   statement about why he tased him seven times?
11     A.   That is correct.
12     Q.   You were never able to get his statement
13   about why he struck him on the face or head about
14   10 to 12 times?
15     A.   That's correct.
16     Q.   And you were never able to get his
17   statement about why he applied whatever neck hold
18   or neck restraint he applied?
19     A.   That's correct.
20     Q.   In this report, did you conclude that if
21   Mr. Farmer had lived, he would not have been
22   charged with attempting to carjack the truck?
23     A.   That's correct.
24     Q.   And how did you come to that
25   conclusion?

Page 45

1      A.   The driver of the truck, I believe in his
2   statement, said that he did not feel threatened by
3   Farmer.
4        And from the vantage point of the
5   overhead video, it did not appear to us that Farmer
6   tried to make entry into the vehicle at any point
7   or make contact with the driver.
8      Q.   Let me ask you to turn to page 7 and 8,
9   please.   It says at the top, "On May 31, 2017, I
10   received the autopsy report from the Clark County
11   Office of the Coroner and Medical Examiner.   The
12   autopsy was conducted by Dr. Alane Olson on
13   5/14/17, at 1255 hours.   Dr. Olson opined that the
14   cause of death was," quote, "'Asphyxia due to
15   police restraint,'" closed quote, "and the manner
16   of death was homicide.   According to Dr. Olson,
17   during the autopsy she found hemorrhaging in the
18   neck which could be consistent with being choked."
19        Is that what you were referring to
20   previously about bruising?
21     A.   Yes, sir.
22     Q.   So she -- the report uses the word
23   "hemorrhaging."   Is that, to you, synonymous with
24   bruising?
25     A.   Bruising is a result of hemorrhaging,

Page 46

1 correct, yes, sir.
2     Q.  Then the second paragraph, "According to
3 her statement, Officer Lif believed the contact
4 between the officers and Farmer was a consensual
5 encounter.  Farmer had approached the officers and
6 asked if they knew where a drinking fountain was
7 located.  After a short conversation with Officer
8 Lopera, Farmer began walking away from the officers
9 and towards a hallway which was marked with an
10 illuminated exit sign.  Farmer walked into a chain
11 which was suspended by two yellow caution cones.
12 Lopera reached out with both arms in an attempt to
13 grab Farmer.  Farmer then turned around and ran
14 down the hallway, chased by Officer Lopera.  LVMPD
15 policy states an officer may initiate a foot
16 pursuit of any individual the officer reasonably
17 believes is about to engage in, is engaging in, or
18 has engaged in criminal activity.  As
19 Officer Lopera began to chase Farmer, he had no
20 reasonable suspicion or probable cause to believe
21 that Farmer had been involved in any criminal
22 conduct."
23         Okay.  Now, a consensual encounter is
24 encounter between an officer and a civilian in
25 which the officer wishes to obtain some information

Page 47

1 by talking to the person, if the person will
2 voluntarily talk to the officer; correct?
3     A.  Correct.
4     Q.  It does not require any kind of
5 reasonable suspicion of wrong-doing to have a
6 consensual encounter?
7     A.  Correct.
8     Q.  A civilian is free to not talk to the
9 officer if he or she wishes; correct?
10     A.  Correct.
11     Q.  A civilian, in fact, is free to leave the
12 presence of the officer if they wish?
13     A.  Yes, sir.
14     Q.  All right.  Was it your opinion, as
15 you've listed in the report, that there was no
16 justification for Officer Lopera to chase
17 Mr. Farmer?
18     A.  Yes, sir.
19     Q.  Was it your opinion -- is it your opinion
20 that there was no justification for Officer Lopera
21 to tase Mr. Farmer?
22     A.  Based on Officer Lopera's perception that
23 he stated to us during the walk-through, that he
24 thought that Farmer was going to attempt to take
25 the vehicle by force, I would say that the first

Page 48

1 tase deployment was reasonable.
2     Q.  In your opinion, was any Taser deployment
3 after the first deployment reasonable?
4     A.  The second and third could have been;
5 however, based on our policy, after three times the
6 Taser is to be deemed not working and go to a
7 different tool.
8     Q.  So after three tasings, the officer
9 should have deemed the Taser to be ineffective and
10 ceased using the Taser on Mr. Farmer?
11     A.  Yes, sir.
12     Q.  So Tasers five -- or four, five, six, and
13 seven, would all be out of policy?
14     A.  Yes, sir.
15     Q.  That means unreasonable behavior?
16     A.  Yes, sir.
17         MR. McNUTT:  Objection to form.
18 BY MR. SAYRE:
19     Q.  And the last Taser was nine seconds in
20 length; do you recall that?
21     A.  Yes, sir.
22     Q.  And the Department only allows a tasing
23 for up to five seconds in length?
24     A.  Yes, sir.
25     Q.  So nine seconds in length, whether it was

Page 49

1 the first or the last tasing, would be out of
2 policy?
3         MR. McNUTT:  Objection, form.
4         THE WITNESS:  Well, I guess that's kind
5 of hard for me to say because whether it's a --
6 some kind of malfunction with the Taser itself,
7 because the cycle is supposed to be five seconds;
8 or the trigger was pulled again to initiate a
9 second cycle as the first cycle ended, I'm not an
10 expert on how the Taser -- how that happened.
11 BY MR. SAYRE:
12     Q.  Have you used a Taser?
13     A.  Yes, sir.
14     Q.  Do you know that you can just keep your
15 finger down and it'll go past the five seconds, if
16 you just keep your finger down?
17         MR. McNUTT:  Objection, form.
18         THE WITNESS:  I believe that depends on
19 the model that's being used.
20 BY MR. SAYRE:
21     Q.  All right.  Do you know what model was
22 being used?
23     A.  I believe it's X26, but I'm not sure.
24     Q.  But is there any doubt in your mind that
25 as a seventh tasing, going nine seconds, this would

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 50

1  be out of policy?
2        MR. McNUTT:  Objection, form.
3        THE WITNESS:  It's not within what is
4  written in our policy.
5  BY MR. SAYRE:
6        Q.  And therefore, that's unreasonable
7  behavior?
8        MR. McNUTT:  Objection, form.
9        THE WITNESS:  Yes.
10  BY MR. SAYRE:
11        Q.  All right.  Now, did you see in looking
12  at the videos, including the Venetian security
13  video, that Officer Lopera struck Mr. Farmer in the
14  head or face 10 to 12 times?
15        A.  Yes, sir.
16        Q.  All right.  Did you see any justification
17  for striking him in the head or face?
18        A.  No, sir, I did not.
19        Q.  All right.  And the reason for that is
20  that you did not see Mr. Farmer at any time
21  aggressively resisting?
22        MR. McNUTT:  Objection, form.
23        THE WITNESS:  Yes, sir.
24  BY MR. SAYRE:
25        Q.  Now, aggressive resistance means that a

Page 51

1  person, the subject, is attempting to do something
2  to harm the officer?
3        A.  Yes, sir.
4        Q.  Did you ever see Mr. Farmer attempting to
5  harm the officer?
6        A.  No, sir.
7        Q.  Would the 10 to 12 blows that you saw
8  delivered by Officer Lopera be outside of policy?
9        A.  In this circumstance?
10        Q.  Yes.
11        A.  Yes, sir.
12        Q.  And would you say that they were
13  excessive force?
14        MR. ANDERSON:  Objection, form.
15        THE WITNESS:  I would say it's
16  unreasonable.
17  BY MR. SAYRE:
18        Q.  Unreasonable force?
19        A.  Right.
20        Q.  Did you see any justification for
21  applying a lateral vascular neck restraint?
22        A.  No, sir.
23        Q.  Would you consider the application, if it
24  had been a lateral vascular neck restraint, to have
25  been excessive force?

Page 52

1        A.  Yes, sir.
2        Q.  And have you been trained in what is or
3  is not a Fourth Amendment violation?
4        A.  Yes.
5        Q.  Would the use of the lateral vascular
6  neck restraint, if it had been a lateral vascular
7  neck restraint, in this situation have been a
8  violation of the Fourth Amendment?
9        MR. McNUTT:  Objection, form.
10        MR. ANDERSON:  Objection, form.
11        THE WITNESS:  Yes, sir.
12  BY MR. SAYRE:
13        Q.  Do you believe that the use of whatever
14  choke hold was used by Officer Lopera constituted
15  excessive force?
16        MR. ANDERSON:  Objection, form.
17        THE WITNESS:  Yes, sir.
18  BY MR. SAYRE:
19        Q.  And whatever choke hold was used by
20  Officer Lopera, did you consider that to be a
21  violation of the Fourth Amendment?
22        A.  Yes, sir.
23        MR. McNUTT:  Objection, form.
24  BY MR. SAYRE:
25        Q.  All right.  Let's go back to -- please,

Page 53

1  to page 2.  By tracing the license plate of the
2  white truck, you were able to determine that the
3  owner was Jonathan Pierce, of Flagstaff, Arizona?
4        A.  Yes, sir.
5        Q.  And Jonathan Pierce was interviewed by a
6  member of your team?
7        A.  Yes, sir.
8        Q.  Not you?
9        A.  No.
10        Q.  And is that -- the summary of that
11  interview is stated on page 2 of 8?
12        A.  Yes, sir.
13        Q.  And besides this summary, there's an
14  actual transcript of an interview with Jonathan
15  Pierce?
16        A.  Yes, sir.
17        Q.  And in that --
18        A.  Let me clarify that.
19        Q.  Of course.
20        A.  If I recall correctly, that interview was
21  conducted over the phone.
22        Q.  Right.
23        A.  So there's a summary by the detective
24  that did the interview --
25        Q.  Okay.

DETECTIVE TREVOR ALSUP

June 15, 2018

1    A.  -- but there wouldn't be a transcript.
2    Q.   Seems like I've seen an actual transcript
3  of --
4       MR. McNUTT:  I have too.
5       MR. SAYRE:  All right.
6       MR. McNUTT:  We used it --
7       THE WITNESS:  We did.  And I do
8  apologize.  With my current assignment and the
9  call-out over the last couple days, I didn't get a
10  chance to review everything, and that's what I
11  would have wanted to.
12  BY MR. SAYRE:
13    Q.   Not a problem.  I wouldn't expect you to
14  remember, not at all.  Don't worry about it.
15       So Mr. Pierce did not feel threatened by
16  Mr. Farmer during the course of this incident; is
17  that a fair statement?
18       MR. McNUTT:  Objection, form.
19       THE WITNESS:  Correct.
20  BY MR. SAYRE:
21    Q.   And he did relate that he believed that
22  what he saw was a rear naked choke?
23    A.  Yes, sir.
24    Q.   Your understanding was that Mr. Pierce
25  had some experience in martial arts?

1    A.  I believe he told the interviewing
2  detective that he had a limited background in mixed
3  martial arts.
4    Q.   Take a look at the last paragraph on
5  page 2.  It says that "At 0434 hours, Officer Tran
6  was interviewed by detectives.  Among other things,
7  he states when he exited the vehicle and approached
8  it, it appeared the officer had the suspect in the
9  LVNR and a handcuffed on one hand.  When he looked
10  at the suspect, he appeared to be unconscious."
11       Did Officer Tran tell you why he thought
12  that Officer Lopera had the suspect in an LVNR?
13    A.  I was not the one that interviewed
14  Officer Tran.
15    Q.   All right.  Who did that interview?
16    A.  I would have to go -- I would have to
17  look at the case file to find out.
18    Q.   Okay.  Did you ever talk to Officer
19  Tran?
20    A.  No, sir.
21    Q.   If we leave a blank in the deposition
22  booklet for the name of the officer who talked to
23  Officer Tran, could you fill that in, please?
24    A.  I can find out who did the interview.
25       MR. ANDERSON:  We'll put it in the

1  transcript.
2       MR. SAYRE:  Okay.
3  INFORMATION REQUESTED:
4  _____
5  _____
6  _____.
7  BY MR. SAYRE:
8    Q.   This information was simply related to
9  you by whichever officer did the interview of
10  Officer Tran?
11    A.  Yes, sir.
12    Q.   So the information that's stated, that
13  when he first saw him, Officer Lopera, that he had
14  the suspect in the LVNR, that was related to you by
15  this other officer?
16    A.  That's correct.
17    Q.   And that when he looked at the suspect,
18  he appeared to be unconscious, that was related to
19  you by the other officer?
20    A.  Yes, sir.
21       MR. McNUTT:  By which officer?
22       MR. SAYRE:  The other officer, the one we
23  don't --
24       MR. McNUTT:  Oh, the other -- the
25  interviewing officer.

1       MR. SAYRE:  The interviewing officer.
2    Q.   Now, Officer Tran told Lopera to, quote,
3  "Let go," closed quote.  Okay.  That was related to
4  you by the other officer?
5    A.  That's correct.
6    Q.   Okay.  All right.
7       MR. McNUTT:  Fred, how much more you got?
8       MR. SAYRE:  Oh, probably half an hour,
9  45 minutes.
10       MR. McNUTT:  Take a break?
11       MR. SAYRE:  Sure.  No problem.
12       THE VIDEOGRAPHER:  We are off the record
13  at 11:21 a.m.
14       (Break taken.)
15       THE VIDEOGRAPHER:  Back on the record.
16  The time is 11:30 a.m.
17  BY MR. SAYRE:
18    Q.   All right.  Let me ask you to turn to 3
19  of 8, please.
20    A.  Yes, sir.
21    Q.   Now, this has a series of times, and then
22  there are statements made after the times?
23    A.  Yes, sir.
24    Q.   Now, the times -- is it correct to say
25  that these are the times from the start of the --

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 58

1   in the first case -- the body-worn camera of
2   Officer Lopera?
3       A.  Yes, sir.
4       Q.  And then you put in the verbiage, if you
5   will?
6       A.  Yes, sir.
7       Q.  Now, are these things that you heard in
8   each of these time frames?
9       A.  Yes, sir.
10      Q.  Okay.
11      A.  Heard or observed.
12      Q.  Heard or observed.  Okay.
13          Now, can I turn you over, please, to
14  page 5 of 8.  Looking at 3 minutes and 25 seconds,
15  it says, "Officer Tran arrived and said, 'Let him
16  go, Ken.'"
17          Now, let me represent to you that
18  Sergeant Crumrine was deposed and said that was
19  actually him that said, "Let him go, Ken," at 3:25.
20          And Officer Tran said he did not say, at
21  3:25, "Let him go, Ken."
22          Did you arrive at the opinion that it was
23  Officer Tran that was saying that in part because
24  of the interview of Officer Tran, which is on the
25  last paragraph of page 2 of 8?

Page 59

1       A.  Yes, sir.
2       Q.  So you put that statement that Officer
3   Tran in the interview said "Let go" -- you put that
4   together with the -- what you heard on the tape at
5   3:25, that said, "Let him go, Ken"?
6       A.  Yes, sir.
7       Q.  Do you now believe that it was in fact
8   Officer Crumrine that said that, or do you know?
9       A.  I don't know.  But if that's what their
10  statement was, I would say it's accurate.
11      Q.  Okay.  In the summary, if you will, of
12  Officer Tran's interview, it says, "When he exited
13  his vehicle and approached, it appeared that
14  officer -- the officer had the suspect in the LVNR
15  and handcuff on one hand.  When he looked at the
16  suspect, he appeared to be unconscious."
17          Did you understand that to mean when he
18  arrived at the location where Officer Lopera was
19  applying the LVNR, that the suspect was
20  unconscious?
21      A.  Yes, sir.
22      Q.  Is there any justification, based upon
23  what tactics are taught by the Metropolitan Police
24  Department, to continuance an LVNR after a suspect
25  is unconscious?

Page 60

1           MR. ANDERSON:  Objection, form.
2           THE WITNESS:  You're taught that you use
3   the amount of force necessary to make that person
4   comply.  Once that person complies with the
5   technique that's being used, the person is placed
6   into custody and then it's stopped -- the force is
7   stopped.
8   BY MR. SAYRE:
9       Q.  Does compliance include rendering
10  somebody unconscious?
11      A.  If that's the point that you have to take
12  the LVNR to, yes.
13      Q.  All right.  So if, in fact, the hold was
14  maintained after Mr. Farmer was unconscious, that
15  would be excessive force?
16      A.  Wrong.
17          MR. McNUTT:  Objection to form.
18          THE WITNESS:  What you're taught is once
19  that person begins to comply, and whether or not it
20  is because that person is unconscious, the hold is
21  loosened until the person is placed in the
22  handcuffs, and then you seek medical attention.
23  BY MR. SAYRE:
24      Q.  Okay.  If the person is unconscious, if
25  you continue to maintain an LVNR, that would be

Page 61

1   excessive force?
2       A.  Not exactly in the terms you're putting
3   it, because you're still holding -- you're still --
4   until that person is in custody, you're still
5   maintaining the hold; you're releasing the
6   pressure.
7       Q.  Was there some indication that after
8   officer -- whoever said it at 3:25, after Ken
9   Lopera was told, "Let him go, Ken," that he
10  released the pressure of whatever hold he had on
11  Mr. Farmer?
12      A.  I could not tell that through the video.
13      Q.  Is there any indication from 3:25 until
14  4:11, that Officer Lopera ever released the hold
15  after he was told to, quote, "Let him go, Ken"?
16      A.  Again, hard to tell through the video.
17      Q.  Well --
18      A.  You said release the pressure or release
19  the hold?
20      Q.  Release the hold.
21      A.  He still maintained -- according to the
22  video, the hold was still maintained.
23      Q.  And you can't tell whether he relieved
24  pressure or not?
25      A.  Correct.

DETECTIVE TREVOR ALSUP

June 15, 2018

1      Q.  If he didn't relieve pressure, would that
2  be considered excessive force?
3      A.  Yes, sir.
4      Q.  And a violation of the Fourth
5  Amendment?
6      A.  Yes, sir.
7      Q.  Take a look at 3:27.  "Officer Lopera
8  stated," quote, "'Roll him to -- hold on, don't
9  grab my fucking legs,'" close quote.  "Officer Tran
10  stated, 'We're on top of him.  We're'" -- quote,
11  "'We're on top of him,'" closed quote.
12         Do you have confidence that Officer Tran
13  said that?
14      A.  It's very possible that it could have
15  been another officer on the scene.  I was basing
16  that as it sounded to me to be the same voice as
17  the person that said, "Let him go, Ken."
18      Q.  Could you tell whether at 3:27 Officer
19  Tran was present adjacent to where Officer Lopera
20  and Mr. Farmer were?
21      A.  Yes.
22      Q.  He was?
23      A.  Yes.
24      Q.  Was officer Flores also adjacent at that
25  time?

1      A.  I would have to review the video to see
2  exactly where.
3      Q.  All right.  Now, would it be fair to
4  state that at 3:01, it says, "Sergeant Crumrine
5  arrived at and directed," quote, "'Put your fucking
6  hands behind your back,'" close quote, that Officer
7  Crumrine was present that point in time forward?
8      A.  Yes, sir.
9      Q.  And that would be immediately adjacent to
10  Officer Lopera and Mr. Farmer?
11      A.  Yes, sir.
12      Q.  Within range, that if he wanted to he
13  could have reached in and actually pulled his hands
14  away from the neck of Mr. Farmer?
15      A.  In my -- I guess this would be my
16  opinion, at that point the first arriving officer,
17  which would have been Sergeant Crumrine at the
18  time, would -- his main concern would have been to
19  place Farmer into custody.
20      Q.  I understand that, but I'm saying that he
21  was close enough that if he wished to for some
22  reason, he could have reached out and pulled
23  Officer Lopera's hands away from Mr. Farmer's
24  throat?
25      A.  Yes, sir.

1      Q.  And Officer Tran was close enough that if
2  he wished to for whatever reason, he could have
3  reached over and pulled Officer Lopera's hands away
4  from Mr. Farmer's throat?
5      A.  Yes, sir.
6      Q.  And Officer Flores was close enough that
7  if he wished to for whatever reason, he could have
8  reached over and pulled Officer Lopera's hands away
9  from Mr. Farmer's throat?
10      A.  If he was there at that time, yes.
11      Q.  You just don't remember about
12  Officer Flores?
13      A.  Correct.
14      Q.  Okay.  At 3:36, it says, "Officer Lopera
15  placed the palm of his hand on Farmer's forehead."
16         Is that what you are saying, he placed
17  his hand on his head; or was it some other
18  placement of the hand on the head?
19      A.  What that time annotated right there, the
20  only thing I could tell you is that according to
21  the video, I observed that.  I don't know why it
22  was done, and I'd have to look at that video again
23  to really be able to answer your question
24  completely.
25      Q.  All right.  You do recall that you saw

1  his -- the non-encircling arm placed on the head of
2  Mr. Farmer?
3      A.  Yes, sir.
4      Q.  You just don't remember if that is what
5  you saw or something else?
6      A.  Correct.
7      Q.  So it could have been to the back of his
8  head?
9      A.  Yes, sir.
10      Q.  All right.  You just don't remember?
11      A.  Yes, sir.
12      Q.  The palm on the forehead is, as you
13  understand it, inconsistent with the application of
14  a lateral vascular neck restraint?
15      A.  Yes, sir.
16      Q.  Take a look at the bottom of the page 5
17  of 8.  It says -- it's an interview, or discussion,
18  if you will, between Officer Lopera and Sergeant
19  Crumrine; is that correct?
20      A.  Yes, sir.
21      Q.  And Officer Lopera states that he was --
22  he states, "He was getting coffee when he was
23  approached by a guy who said someone was following
24  him.  Officer Lopera then stated the male ran away
25  from the officers and outside the hotel.  As

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 66

1  Officer Lopera was chasing the male, he attempted
2  to gain access into the bed of a truck, at which
3  time Officer Lopera tased him.  Farmer attempted to
4  pull the ECD wires out, and Officer Lopera said,"
5  quote, "'I choked him out,'" closed quote.
6        Now, the words "I choked him out" are in
7  quotation marks.  Is that because you heard them
8  stated by Officer Lopera in that interview?
9     A.  Yes, sir.
10    Q.  Now, did Officer Lopera at any time
11  explain to Sergeant Crumrine in that conversation
12  why he chased the guy after he ran away from him?
13  Not prior to the time of the -- he says he
14  attempted to hijack or carjack the truck, but just
15  chased him.  Did he ever --
16    A.  No, sir.
17    Q.  -- explain that?  Okay.
18        At 6:38, "Officer Lopera told Officer
19  Flores and Officer Rybacki during the conversation
20  he stated," quote, "'I started wailing on the dude,
21  and then I rear mounted and choked him out,'" close
22  quote.
23        Those statements are in quotation marks
24  on either side.
25        Did you hear him -- "him" being

Page 67

1  Officer Lopera -- state those words on the tape?
2     A.  Yes, sir.
3     Q.  Then at 7:02, "Officer Lopera told
4  Officer Leaf," quote, "'He tried to get in
5  somebody's truck, so I tased him and choked him
6  out'" --
7     A.  Yes, sir.
8     Q.  -- close quotes.
9        Those words are in quotation marks.  Did
10  you hear Officer Lopera state those on the tape?
11    A.  Yes, sir.
12    Q.  At 7:41, it says, "Officer Lopera tells
13  another officer," quote, "I tased him, fought a
14  little bit and choked him out," close quote.
15        Those are in quotation marks, those
16  words, "I tased, fought a little bit and choked him
17  out."  Are those in quotation marks because you
18  heard Officer Lopera say those things?
19    A.  Yes, sir.
20    Q.  Do you know who the other officer was
21  that he was talking to?
22    A.  I do not.
23    Q.  At 9:34, which is 9 minutes and 34
24  seconds after the start of the body-worn camera, it
25  says, "Officer Lopera talked to Officer Lif again.

Page 68

1  During the conversation, Officer Lopera told her,"
2  quote, "'I started punching him.  Rear nakeded his
3  ass.  He went out,'" close quote.
4        Now, those words are in quotation marks.
5  Is that because you heard Officer Lopera state
6  those on the tape?
7     A.  Yes, sir.
8     Q.  And by "rear nakeding his ass," did you
9  understand that to mean a rear naked choke?
10    A.  Yes, sir.
11    Q.  At 11:25, "Officer Rybacki approached
12  Officers Tran and Flores.  One of the officers
13  stated," quote, "'He was out when we got here,'"
14  close quote, referring to Farmer.
15        Did you hear the officer say that on the
16  tape?
17    A.  Yes, sir.
18    Q.  Now, Officer Flores has said that he made
19  that statement.  You couldn't tell whether it was
20  Tran or Flores --
21    A.  No, sir.
22    Q.  -- who made the statement?
23        Let me direct you, please, back to 4 of
24  8.  At 2:37, it says, "Officer Lopera put both his
25  hands on Farmer's head."

Page 69

1        Did you see that?
2     A.  Yes, sir.
3     Q.  Where did he place both of the hands?
4     A.  If you're looking for very specific
5  positioning, I'd have to look at the tape again.
6  But I remember that as he was on Farmer's back, it
7  was almost like to hold him down, both hands were
8  placed on Farmer's head.
9     Q.  Jumping forward to the next page, it says
10  at 2:58, "Officer Lopera appeared to put Farmer in
11  some type of neck restraint."
12    A.  Yes, sir.
13    Q.  That's your observation, when you say
14  "some type of neck restraint"?
15    A.  Yes, sir.
16    Q.  But if I understood your previous
17  testimony, you did not believe it was a lateral
18  vascular neck restraint?
19    A.  Yes, sir.
20    Q.  From 2:58 until 4:11, at any time did you
21  see Officer Lopera put and use his head to put his
22  pressure up against the head of Mr. Farmer, as you
23  would do in employing a lateral vascular neck
24  restraint?
25    A.  No, sir.

DETECTIVE TREVOR ALSUP

June 15, 2018

1    Q.   And that's in part why you believe that
2  it was not a lateral vascular neck restraint?
3    A.   From the video angle that we have, as far
4  as placement of the head, that's very hard to
5  determine whether or not the hand was using
6  pressure or not.
7      My main reasoning for not believing that
8  it was an LVNR was hand placement.
9    Q.   Right.  Okay.  As you stated
10  previously?
11    A.   Yes, sir.
12    Q.   Did you believe Officer Lopera's five
13  statements that he made, that he was -- choked him
14  out?
15    A.   Yes, sir.
16    Q.   That he himself believed that he was
17  employing a rear naked choke?
18    A.   Yes, sir.
19      MR. McNUTT:  Objection to form.
20  BY MR. SAYRE:
21    Q.   Okay, please, back to page 4 of 8,
22  please.
23      At 2:40, "Officer Lopera told Farmer,"
24  quote, "'Get on your stomach,'" close quote.
25      And you observed, or state, "Farmer was

1  observed laying on his stomach.  He appeared to be
2  in compliance."
3    A.   Yes, sir.
4    Q.   At 2:42, "Officer Lopera told Farmer,
5  'Get on your stomach.'"
6      And you again state, "Farmer was observed
7  lying on his stomach.  He appeared to be
8  complying."
9      Was he tasing him during this time?
10      Apparently not, because at 2:33, it says,
11  "Officer Lopera holstered his ECD," so I just
12  answered my own question.
13      (Court reporter requests clarification.)
14      MR. SAYRE:  At 2:33, "Officer Lopera
15  holstered his ECD."
16      THE WITNESS:  The way that I would have
17  to answer that question is based on this.  I would
18  have to compare it to other documents that we have,
19  to say exactly.
20      I believe that a lot of this was in
21  between the cycles; but to say definitively, right
22  now, without supporting documentation, I don't
23  know.
24  BY MR. SAYRE:
25    Q.   Okay.  Then at 2:45 -- sorry, going over

1  to the next page, 2:47, "Officer Lopera told
2  Farmer, 'Get on your stomach.'  Farmer was," as
3  your comment, "was observed laying on his stomach";
4  is that correct?
5    A.   Yes, sir.
6    Q.   At 2:15, "Officer Lopera told Farmer,
7  'Get on your stomach.'"
8      And you again state, "Farmer was observed
9  laying on his stomach."
10      2:52, "Officer Lopera told Farmer, 'Get
11  on your hand -- 'Get on your stomach.'"
12      And again you state, "Farmer was observed
13  lying on his stomach"; correct?
14    A.   Yes, sir.
15    Q.   Let me direct you, please, to page 7 of
16  8.  It states, fifth paragraph down, "Officer
17  Lopera began issuing verbal commands to Farmer;
18  however, the longest time between cycles of the ECD
19  was six seconds.  Officer Lopera told Farmer to get
20  on his stomach several times, but never gave Farmer
21  a reasonable opportunity to comply with commands
22  before cycling the ECD again.  Officer Lopera's
23  verbal commands also contradicted each other,
24  telling Farmer," quote, "'Don't move,'" close
25  quote, "followed by a command to," quote, "'Get on

1  your stomach,'" close quote.  These are your
2  observations?
3    A.   Yes, sir.  Right.
4    Q.   And would these conflicting commands be
5  contrary to policy?
6      MR. ANDERSON:  Objection, form.
7      THE WITNESS:  I don't know, contrary to
8  policy --
9  BY MR. SAYRE:
10    Q.   Yeah.
11    A.   -- but some of his commands contradicted
12  themselves.
13    Q.   Is that poor tactics?
14    A.   Yes, sir.
15    Q.   Are they tactics that are outside of
16  policy?
17      MR. ANDERSON:  Objection, form.
18      Go ahead and answer.
19      THE WITNESS:  Well, I don't know if
20  specifically outside of policy.  The commands
21  are -- they're reasonable commands.  But when he
22  was giving the command to "Get on your stomach"
23  several times, Farmer was already on his stomach.
24  And then he would tell him, "Don't move" or "Stop,"
25  but then tell him to place his hands behind his

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 74

1  back. So the commands just contradicted
2  themselves.
3  BY MR. SAYRE:
4      Q.   It made it impossible for the civilian to
5  appropriately respond to the commands?
6      A.   I believe so.
7      Q.   The last paragraph says on this page,
8  "After striking Farmer in the head, Officer Lopera
9  performed what he described as a," quote, "'rear
10  naked choke,'" closed quote. "This technique is
11  not taught or approved by the LVMPD. The LVMPD
12  employs the lateral vascular neck restraint. The
13  LVNR is a neck restraint which can render a subject
14  unconscious by stopping blood flow to the brain by
15  compressing the carotid arteries and does not
16  restrict the subject's airflow. Officer Lopera
17  held the," quote, "'rear naked choke,'" closed
18  quote, "for one minute and 13 seconds. Officer
19  Lopera also held the," quote, "'rear naked choke,'"
20  closed quote, "for 44 seconds, after being told to
21  let go by Officer Tran. LVMPD's policy states that
22  LVNR will only be used in accordance with policy
23  and department training."
24           Now, you have quotation marks around
25  "rear naked choke." Is that because you're using

Page 75

1  it to indicate that's what Officer Lopera said he
2  was using?
3      A.   Yes, sir.
4      Q.   Not that it was your conclusion he was
5  using it?
6      A.   Yes, sir.
7      Q.   Because you have not come to an opinion
8  about whether or not he was using a rear naked
9  choke?
10      A.   Yes, sir.
11      Q.   You have come to a conclusion that, based
12  upon your knowledge, training, and experience, and
13  your observations, he was not using a lateral
14  vascular neck restraint?
15      A.   Yes, sir.
16      Q.   Next page -- last page -- "Due to the
17  fact that Officer Lopera, who was on duty and
18  acting in the official capacity of a Police
19  Officer, attempted to detain Farmer inside the
20  Venetian Hotel without sufficient legal authority
21  for the detention, initiated a hot foot pursuit of
22  Farmer, resulted in Farmer being detained, using
23  force outside his training and Department policy,
24  which resulted in Farmer's death, the crime of
25  Oppression Under the Color of Office," I guess,

Page 76

1  "was committed. The force used consisted of the
2  ECD, empty hand strikes to the head and a choke
3  hold."
4           That is a statement of your conclusions;
5  correct?
6      A.   Yes, sir.
7      Q.   First thing is, he did not have
8  sufficient authority for a detention?
9      A.   Yes, sir.
10      Q.   Right. He did not -- secondly, he
11  initiated a foot pursuit without sufficient reason
12  to do so?
13      A.   Yes, sir.
14      Q.   Thirdly, he detained Farmer without
15  sufficient basis for doing so?
16      A.   Yes, sir.
17      Q.   Fourthly, he used force outside his
18  training and Department policy, which resulted in
19  Farmer's death?
20      A.   Yes, sir.
21           MR. McNUTT:  Objection, form.
22  BY MR. SAYRE:
23      Q.   And the form -- sorry -- and the form
24  included Taser?
25      A.   Yes, sir.

Page 77

1      Q.   Hand strikes to the head?
2      A.   Yes, sir.
3      Q.   And the choke hold?
4      A.   Yes, sir.
5      Q.   Whatever the choke hold was?
6      A.   Yes, sir.
7      Q.   And in the final paragraph, you say,
8  "Officer Lopera referred to the restraint as a,"
9  quote, "'rear naked choke,'" close quote, "which is
10  not authorized by the LVMPD, and, therefore,
11  Officer Lopera committed the crime of involuntarily
12  manslaughter."
13           So you sent a recommendation to the
14  district attorney to criminally prosecute Officer
15  Lopera?
16      A.   Yes, sir.
17      Q.   Okay. And --
18      A.   That wasn't based just on the hold,
19  though; it was the event in totality.
20      Q.   In the totality of circumstances?
21      A.   Yes, sir.
22      Q.   Now, you -- I'm not asking what you
23  testified in, but I just want to know, you have
24  testified in the grand jury proceedings?
25      A.   Yes, sir.

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 78

1     Q.   Okay.
2          MR. SAYRE:  And that's all.  I've got
3   nothing further.
4          MR. McNUTT:  I got a few questions for
5   you, unless you need to take a break or anything.
6          THE WITNESS:  No, I'm good.
7                EXAMINATION
8   BY MR. McNUTT:
9     Q.   You have been partners with Detective
10  Colon; is that correct?  Colon --
11    A.   Colon.
12    Q.   And you're both detectives; correct?
13    A.   Yes, sir.
14    Q.   Does he work for you or you're equal?
15    A.   We're equal.
16    Q.   So if something gets assigned to you,
17  either one of you can figure out to divide up the
18  work?
19    A.   Yes, sir.
20    Q.   But you were the lead on this
21  investigation?
22    A.   Yes, sir.
23    Q.   So is there anything that Officer Colon
24  will know that you don't know?
25    A.   There may be small -- something small

Page 79

1   that he specifically remembers that I don't, but I
2   would say that we are both -- we both had a hand in
3   the investigation.
4     Q.   Were there any tasks that he specifically
5   did that you were not involved in, such as
6   interviewing people or something like that?
7     A.   I specifically don't recall.
8     Q.   Do you know who Sergeant Michael Bland
9   is?
10    A.   Yes, sir.
11    Q.   How do you know him?
12    A.   He's a -- he used to be a trainer for use
13  of force for the department, before his promotion.
14  I don't know if he still acts in that capacity or
15  not.
16    Q.   Do you know him just through work or do
17  you know him personally as well?
18    A.   Just through work.
19    Q.   Have you ever trained with him?
20    A.   No, sir, I have not.  Well, I -- he's
21  been a part of training staff when I've attended
22  training; as far as him -- actually going through
23  training with him, I honestly don't recall.
24    Q.   Who would be more knowledgeable about the
25  type of choke hold that was used or the neck

Page 80

1   restraint that was used in this case, you or
2   Officer Bland?
3          MR. SAYRE:  Objection.  Lack of
4   foundation.
5          THE WITNESS:  Honestly don't know how to
6   answer that question --
7   BY MR. McNUTT:
8     Q.   Okay.
9     A.   -- due to the fact that -- do you want me
10  to continue?
11    Q.   Yeah, sure, go ahead.
12    A.   -- due to the fact that I would say we're
13  both reviewing videos to try to determine that.
14    Q.   Okay.  Let me ask it a different way.
15         Do you have any martial-arts training?
16    A.   No, sir.
17    Q.   Do you hold any belts in any type of
18  martial arts at all?
19    A.   No, sir.
20    Q.   What is the extent of your training in
21  the lateral vascular neck restraint?
22    A.   The training I received on the
23  Department.
24    Q.   And is that four hours a year?
25    A.   I don't know the specific amount of hours

Page 81

1   that it's supposed to be, but whatever that amount
2   is.
3     Q.   When is the last time you participated in
4   training with Metro regarding the lateral vascular
5   neck restraint?
6     A.   The last time it was on the curriculum
7   for training.
8     Q.   How long ago was that?
9     A.   I know it was during -- I believe it's
10  every -- I believe the LVNR is on the training
11  every quarter, so it would be four times a year.
12    Q.   And so you've done it twice so far this
13  year?
14    A.   Yes, sir.
15    Q.   You've had training blocks, so that
16  included that twice this year?
17    A.   Yes, sir.
18    Q.   Are you aware of Officer Bland's
19  background in martial arts or his qualifications to
20  teach use of force for Metro?
21    A.   I know it's extensive.
22    Q.   Would you think that -- between you or
23  him, who knows more about martial arts or the
24  lateral vascular neck restraint?
25    A.   Him.

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 82

1        MR. SAYRE:  Objection, calls for
2    speculation.
3    BY MR. McNUTT:
4        Q.  Your position is -- I'm sorry, what was
5    the answer?
6        A.  Would be Sergeant Bland.
7        Q.  From your perspective, reviewing the
8    videos, and whether it was the overhead video --
9    and when I say videos, I mean cumulatively, all the
10   videos.  You understand that?
11       A.  Yes, sir.
12       Q.  -- can you tell how much pressure Officer
13   Lopera applied to the suspect?
14       A.  No, sir.
15       Q.  And when I say pressure, I'm talking
16   about with respect to the neck restraint.  Did you
17   understand that?
18       A.  Yes, sir.
19       Q.  Can you tell when he began to apply
20   pressure, from watching the videos?
21       A.  No, sir.
22       Q.  Can you tell whether or not he applied
23   pressure the entire time that, as you testified, he
24   had the hold in place?
25       A.  No, sir.

Page 83

1        Q.  Can you determine the angle of his elbow,
2    which indicates that it's an LVNR 1, 2, or 3 --
3        A.  No, sir.
4        Q.  -- from the videos?
5        A.  No, sir.
6        Q.  Now, you testified that the reason you
7    believe it was not an LVNR is due to the hand
8    placement that was on the head; is that correct?
9        A.  Just for the LVNR, the hands are clasped
10   together, and that was not observed in the video.
11       Q.  Is it possible that it was an improperly
12   applied LVNR?
13       MR. SAYRE:  Objection, calls for
14   speculation.
15       THE WITNESS:  I honestly don't know.  But
16   based on the hand placement, the hand placement is
17   key for what the Department teaches as far as the
18   LVNR.  And not seeing the hands clasped and the
19   other hand on the forehead, that's not technically
20   what is taught as an LVNR.
21   BY MR. McNUTT:
22       Q.  Isn't it true that a lateral vascular
23   neck restraint restricts the blood flow to the
24   head?
25       A.  Yes, sir.

Page 84

1        Q.  Isn't it true that a rear naked choke, in
2    your opinion and your understanding, a restricted
3    blood flow into the head?
4        A.  Yes, sir.
5        Q.  And neither one are designed, in your
6    opinion or your knowledge, to restrict airway?
7        A.  Correct.
8        Q.  Have you ever investigated any other
9    officers that have deployed or utilized a choke
10   hold of any kind?
11       A.  No, sir.
12       Q.  Including the LVNR?
13       A.  No, sir.
14       Q.  So this is the first time you've
15   investigated the officer use of an LVNR?
16       A.  Yes, sir.
17       Q.  Do civilians use the LVNR?
18       A.  I don't know.
19       Q.  Is the LVNR a -- do you know if the LVNR
20   is a trademark or specific technique taught to law
21   enforcement?
22       A.  I believe it is.
23       Q.  Have you ever heard of a gentleman named
24   Jim Lindell --
25       A.  No, sir.

Page 85

1        Q.  -- as the founder of -- Metro's documents
2    are that he's the founder of this technique.
3            You testified earlier in response to
4    Mr. Sayre's questioning regarding that you learned
5    escapes from a rear naked choke; is that correct?
6        A.  Yes, sir.
7        Q.  But you do not learn an escape technique
8    from the lateral vascular neck restraint --
9        A.  I guess --
10       Q.  -- is that right?
11       A.  -- my comment may have been a little too
12   specific.
13           We are taught escapes from somebody
14   holding you in a hold from the rear, so it may not
15   be specifically rear naked choke, LVNR; but it's a
16   -- from -- an escape from being held from the rear.
17       Q.  So if you only learn one technique to
18   escape a choke hold from the rear, is it safe to
19   say that the rear naked choke and the lateral
20   vascular neck restraint are similar enough that you
21   only have to learn one technique to escape the
22   hold?
23       A.  Not being a mixed martial arts person, I
24   couldn't answer that.
25       Q.  But nonetheless, Metro only teaches you

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 86

1 one method to escape either a rear naked choke or a
2 lateral vascular neck restraint; correct?
3     A.  I wouldn't say that's true.  I would say
4 over the course of training, over 20 years, there's
5 -- you're taught different ways to escape it.  I
6 wouldn't say there's one way to escape that hold.
7     Q.  Is the escape similar?
8     A.  Yes, sir.
9     Q.  Do you remember which arm Officer Lopera
10 had encircling the neck of the suspect?
11    A.  Based on video, left arm.
12    Q.  Do you think Officer Lopera had an intent
13 to apply a neck restraint other than the LVNR?
14    A.  I can only base that on statements that
15 he made, which were that it was a rear naked
16 choke.
17    Q.  Did he ever say that actual phrase, "I
18 utilized a rear naked choke," as it's in quote --
19 and we'll come to that later -- or are you
20 interpreting, when he says, "I choked him out," as
21 you're interpreting that as a rear naked choke?
22    A.  That's interpretation based on his
23 statements, consistent throughout.
24    Q.  Okay.  We'll come to those later.
25         When applying an LVNR, do suspects -- is

Page 87

1 it your understanding that suspects always comply?
2     A.  No.
3     Q.  Do you know any officers who have -- not
4 necessarily you investigated, because you said you
5 haven't investigated any -- but do you know any
6 officers who have utilized the LVNR or any neck
7 restraint on a suspect?
8     A.  Yes.
9     Q.  How many?
10    A.  Handful.
11    Q.  Have you ever talked to them about their
12 experience?
13    A.  No, sir.
14    Q.  Were they friends of yours or just
15 acquaintances?
16    A.  Just people I've worked with in the
17 past.
18    Q.  And you discussed this with Mr. Sayre,
19 but you don't recall -- is it your testimony --
20 just tell me what your testimony is about bruising
21 around the neck.  Do you know whether it's typical
22 to have bruising around the neck area if an LVNR is
23 used?
24    A.  I don't know.
25    Q.  You testified that when utilizing an LVNR

Page 88

1 there is pressure from the officer's head to the
2 back of the suspect's neck.  Do you remember
3 that?
4     A.  Back of his head.
5     Q.  Back of his head.  So you remember
6 that?
7     A.  Yes, sir.
8     Q.  Since you corrected me, you definitely
9 remember; right?
10    A.  Yes, sir.
11    Q.  What's the distinction between using your
12 head to put pressure on the back of a suspect's
13 head versus using your hand if there was pressure
14 utilized from the hand?  What's the distinction?
15    A.  That's just the way that the LVNR is
16 taught.
17    Q.  But the LVNR is taught to utilize the
18 officer's head to put pressure on the back of the
19 suspect's head?
20    A.  Yes, sir.
21    Q.  And that is to -- strike that.
22         You testified that after the tasing did
23 not work, you said something to the effect, He
24 should utilize a different tool.  Do you remember
25 that?

Page 89

1     A.  Yes, sir.
2     Q.  At what point, in your opinion, should
3 Officer Lopera have utilized a different tool, and
4 what is that tool?
5     A.  Well, the only thing that I can base that
6 off of is policy, which states that after three
7 cycles of the Taser, the officer should deem that
8 tool ineffective and move to a different tool.
9         I was not there, so I couldn't say what I
10 think he should have done.  I can just base that
11 off of what policy says.
12    Q.  Do you have an opinion as to what tool he
13 should have went to?
14    A.  No, sir.
15    Q.  Was it unreasonable for him to make
16 physical contact with the suspect as one of the
17 tools?
18    A.  No, sir.
19    Q.  It was not unreasonable; correct?
20    A.  Well, based on whatever his perception
21 was, and I don't know that because he didn't give
22 us a statement, but he obviously felt he needed to
23 take that person into custody.
24         In order to take that person into
25 custody, at some point you're going to have to make

DETECTIVE TREVOR ALSUP

June 15, 2018

1  physical contact with that person.
2      Q.  Do you understand that Metro's policies
3  are a hard-and-fast rule that can never be
4  violated, or they can be modified in special
5  situations?
6          MR. SAYRE:  Objection, ambiguous as to
7  which policies.
8          THE WITNESS:  There are --
9  BY MR. McNUTT:
10     Q.  Use of force policies?
11     A.  -- exceptions for policies.
12     Q.  Officer Bland -- Sergeant Bland testified
13  that one instance where someone could utilize an
14  ECD or a Taser more than the Department policy is
15  if it's an officer that was by themselves with no
16  back-up and was significantly outsized by the
17  suspect.  And he said it would not be a problem for
18  them to continue to utilize the Taser under that
19  scenario.
20         Do you disagree with that?
21     A.  No, sir.
22     Q.  When Officer Lopera was utilizing the
23  Taser in this instance, did he have any back-up
24  with him at that time?
25     A.  From Metro?

1      Q.  From Metro.
2      A.  No.
3      Q.  Did he have any assistance from anyone at
4  that time?
5      A.  Security guards for the Venetian.
6      Q.  Do you remember when the security guards
7  from the Venetian approached him or made it to his
8  location where he and Tashii Farmer were in the
9  struggle?
10     A.  If I recall correctly from the video, at
11  some point during the ECD cycles, security guards
12  were around.  To say specifically at exactly what
13  moment that was, off the top of my head I don't
14  remember.
15     Q.  Did you think the Venetian security
16  guards were very helpful to Officer Lopera?
17         MR. SAYRE:  Ambiguous as to very helpful.
18  BY MR. McNUTT:
19     Q.  Do you understand what I mean?
20     A.  Based on the video, I don't know.
21     Q.  Is it your opinion that hotel security
22  guards are very useful when Metro is apprehending
23  someone?
24         MR. SAYRE:  Objection, lacks
25  foundation.

1          THE WITNESS:  Do you want me to answer
2  it?
3          MR. SAYRE:  Yeah.
4          THE WITNESS:  I can tell you that in my
5  experience they have been helpful and they have not
6  been helpful.  It depends on the guard.  It depends
7  on the circumstances.
8  BY MR. McNUTT:
9      Q.  If a suspect runs away from an officer,
10  is it permitted for the officer to pursue the
11  suspect?
12     A.  I guess, is it permitted?  Yes, with
13  sufficient legal justification.
14         It's not normal for somebody that you
15  make contact with to just run away from the police.
16  But at the same time, if you have no legal, lawful
17  reason to detain that person ...
18     Q.  What if you believe the person was under
19  the influence of illegal narcotics, and the person
20  ran away from you, would that be justification to
21  pursue?
22         I'm looking for a yes or no here.
23     A.  No.
24     Q.  Why not?
25     A.  Well, I guess --

1      Q.  Are you familiar with the Supreme Court
2  case Illinois v. Wardlow?
3      A.  At what point do you know that somebody
4  is under the influence of a controlled substance?
5      Q.  Well, do you have a reasonable belief, as
6  an officer on the street with experience?  If
7  that's your reasonable belief and perception, and
8  that the person flees, do you have the right to
9  pursue, as a Metro officer?
10     A.  Yes.
11     Q.  Are you familiar with Illinois v.
12  Wardlow?
13     A.  I'm not.
14     Q.  If --
15         MR. SAYRE:  Neither is Bland.
16  BY MR. McNUTT:
17     Q.  If the --
18         MR. SAYRE:  Five minutes.  We're going to
19  give you five minutes.
20  BY MR. McNUTT:
21     Q.  If the officer perceived or believed that
22  the suspect was on drugs, the suspect ran away from
23  him, and the suspect went into an unauthorized area
24  of an hotel not open to civilians or nonhotel
25  employees, would that also give rise to the right

DETECTIVE TREVOR ALSUP

June 15, 2018

1  of the officer to pursue the suspect?
2      A.  Yes.
3      Q.  Are you aware that -- do you remember
4  Officer Leaf testifying or being interviewed and
5  discussing the fact that Tashii Farmer was sweating
6  profusely?
7      A.  Yes.
8      Q.  Do you remember her discussing anything
9  about the belief that he was on drugs?
10     A.  I do not.
11     Q.  Do you remember any of the other officers
12  stating either to you in an interview or on body
13  cams that he was, quote/unquote, on something?
14     A.  There was a statement by one of the
15  officers towards the conclusion of the event that
16  he was on something, but it's never really
17  specifically said who that person was talking
18  about.
19     Q.  Are you aware of whether or not
20  Mr. Farmer had methamphetamines or amphetamines in
21  his system, now, sitting here today?
22     A.  Yes.
23     Q.  What did he have in his system?
24     A.  I believe it was methamphetamine
25  metabolites, but without looking at the toxicology

1  report, I don't remember levels or specifically
2  what it was.
3      Q.  Do you recall that Mr. Farmer fled into
4  what some people refer to as the back of the house
5  of the casino or employee-only area?
6      A.  I couldn't say that it was an
7  employee-only area.  All I know is that it was a
8  stairwell marked with an exit sign.
9      Q.  Have you been to the Venetian and
10  traveled the route that Officer Lopera and Tashii
11  Farmer went through the hotel?
12     A.  The night of the incident, we went up
13  there.
14     Q.  And was it your opinion that that area
15  was available to civilians, to nonhotel
16  employees?
17     A.  Again, it was marked with an illuminated
18  exit sign.
19     Q.  And is that an emergency exit sign or is
20  that an exit for all hotel guests?
21     A.  The sign that was illuminated above the
22  door didn't say emergency exit, it just said exit.
23     Q.  Do exit signs always say emergency exit
24  if they're an emergency?
25         MR. SAYRE:  Lack of foundation.

1          THE WITNESS:  I couldn't answer that
2  question.
3  BY MR. McNUTT:
4      Q.  You did not interview -- well, did you
5  interview Jonathan Pierce?
6      A.  No, sir.
7      Q.  The gentleman driving the white Toyota
8  pickup truck?
9      A.  No, sir.
10     Q.  Did you review -- we had some discussion,
11  there is a transcript of his phone interview,
12  apparently.  We used it in his deposition.
13         Have you read that, now that you've kind
14  of been refreshed that there is one?
15     A.  I don't remember it specifically; but if
16  there is a transcript, I did read it.
17     Q.  You would have reviewed it in the course
18  of --
19     A.  Yes, sir.
20     Q.  -- preparing the arrest report?
21     A.  Yes, sir.
22     Q.  Do you recall him stating anything about
23  locking the doors of his truck when he saw Tashii
24  Farmer approaching?
25     A.  I believe I remember that.

1      Q.  Why did he do that, if you recall?
2      A.  If I remember correctly, it was because
3  he said he was nervous.
4      Q.  Isn't it true that he said he was
5  fearful?
6      A.  I'd have to review the transcript.
7      Q.  I'll read the transcript -- I'll read it
8  to you.
9          THE VIDEOGRAPHER:  Counsel, I've got
10  about a minute left.
11         MR. McNUTT:  Sure, let's take a break --
12         THE VIDEOGRAPHER:  Yeah, thank you.
13         MR. McNUTT:  -- and switch it up.
14         THE VIDEOGRAPHER:  This marks the end of
15  media 1 of the deposition of Detective Trevor
16  Alsup.  And we are off record at 12:19 p.m.
17         (Break taken.)
18         THE VIDEOGRAPHER:  We are back on the
19  record at 12:22 p.m., and this marks the beginning
20  of media 2 of the deposition of Detective Trevor
21  Alsup.
22  BY MR. McNUTT:
23     Q.  Detective, you know, I'm going to go
24  ahead and read from Jonathan Pierce's interview
25  that he gave to Metro.  And I'm reading from the

DETECTIVE TREVOR ALSUP

June 15, 2018

1  bottom of page -- Bates-marked LVMPD1696, and we'll
2  go over to 1697.
3       He says, "I don't know if he was trying
4  to get in or what he was, if he was just running.
5  But I locked my door out of, I guess, fear of the
6  guy trying to come in because of all the
7  excitement."
8       Do you remember reading that, now that
9  I've read that out loud?
10  A.  Vaguely.
11  Q.  But in your arrest report, you reduced
12  his word of being fearful to nervous.  Is there a
13  reason you think those are synonyms?
14  A.  What is the date of that interview?
15  Q.  5/16.  So May 16th, at 1830 hours, which
16  is two days after the incident?
17  A.  So he was talked to the night of the
18  incident, or shortly after the incident; and then
19  another interview was conducted.  So what's in this
20  report is based on the initial conversation; that's
21  a subsequent interview.
22  Q.  So someone from your team interviewed him
23  the night of the incident?
24  A.  I don't remember exactly when.  It was
25  shortly after.

1  Q.  Okay.  The same day or the same --
2  A.  Yes.
3  Q.  -- 24 hours?
4  A.  So anything that's in my arrest report
5  would be based on knowledge that was -- when this
6  was authored, and this --
7  Q.  And --
8  A.  Sorry.
9  Q.  -- when was this authored?
10  A.  I think I just misspoke on something.
11       (Witness reviewing document.)
12       To answer your question, I guess in one
13  part he said "nervous," in another part he said
14  "fearful."  I don't have a definitive answer for
15  your question.
16  Q.  Okay.  The other question was actually
17  pending.  When was the arrest report prepared?
18  A.  That was in June.
19  Q.  So at the time you prepared the arrest
20  report, you would have had the benefit of the --
21  A.  Yes, sir.
22  Q.  -- transcript as well?
23  A.  Yes, sir.
24  Q.  The 5/16.
25       Let's go through the arrest report, and I

1  have a few follow-ups of some original questions, I
2  think.
3       You referenced Sergeant Abdal-Karim, and
4  he is the individual that briefed you when you
5  arrived, and your team?
6  A.  Yes, sir.
7  Q.  Did he brief the whole team or just you?
8  A.  The whole team.
9  Q.  Who is he?  Why was he there?
10  A.  Typically what happens when we arrive on
11  a scene, we'll get a briefing from somebody that
12  has done as much of a preliminary investigation as
13  they can before we get there, just gathering facts
14  for us.
15  Q.  Is he a patrol officer?
16  A.  I believe he's a patrol sergeant.
17  Q.  Okay.  So he was just a guy that got to
18  the scene and started to assess the situation?
19  A.  Yes.
20  Q.  And so he was the point of contact.  Does
21  anyone appoint him the point of contact to you guys
22  or how do --
23  A.  Typically it's -- what happens is the
24  person with the most knowledge, besides somebody
25  that's involved, just starts gathering information

1  and presents us that information.
2  Q.  And that was my next question.  Why would
3  it have not been Sergeant Crumrine?
4  A.  Because Sergeant Crumrine would have been
5  involved.
6  Q.  Okay.  So let's go down to the fourth
7  paragraph.  "Security guards from the Venetian
8  Hotel responded and attempted to take Farmer into
9  custody. Officer Lopera then performed the lateral
10  vascular neck restraint, LVNR" --
11       (Court reporter requested clarification.)
12       MR. McNUTT:  I'm sorry.  "Officer Lopera
13  then performed the lateral vascular neck restraint
14  and rendered Farmer unconscious."
15  Q.  Do you see that?
16  A.  Yes, sir.
17  Q.  Why did you put that he -- utilize the
18  phrase "lateral vascular neck restraint" at this
19  point in the arrest report?
20  A.  Because that's the information that
21  Sergeant Abdal-Karim gave to us.
22  Q.  So the bottom paragraph, "Detectives with
23  FIT then assume investigative responsibility."
24       At that point, that's your scene?
25  A.  Yes, sir.

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 102

1    Q.   Does everybody else -- what do you do at
2  that point, once you take over a scene?
3    A.   Basically at that point we've learned who
4  our witnesses are, so other members of my team
5  began interviewing witnesses.  And that's when I
6  basically took over controlling the scene, along
7  with CSI, or the crime scene investigators.
8    Q.   Did you formulate any opinions that
9  night, 5/14/17, as to whether Officer Lopera
10 utilized an LVNR, or a rear naked choke, or some
11 other neck restraint?
12        MR. SAYRE:  Compound question.
13 BY MR. McNUTT:
14    Q.   Yes, do you understand my question?
15    A.   Well, upon watching the video -- how much
16 of the video -- or the body-worn camera, we knew
17 that some type of neck restraint was attempted or
18 used; but as far as what that restraint was, no,
19 that was over the next few days.
20    Q.   Do you remember the names of any of the
21 security guards for the Venetian?
22    A.   I know the -- I don't know them off the
23 top of my head.
24    Q.   There was a gentleman named Officer
25 Infantino.  Does that ring any bells?

Page 103

1    A.   Sounds familiar.
2    Q.   Did you interview him at all?
3    A.   I did not.
4    Q.   If Officer Lopera was in fear for his
5  life, could he use an unauthorized neck
6  restraint?
7    A.   Yes.
8    Q.   If he was in fear for his life, could he
9  utilize an ECD device outside of Department
10 policy?
11    A.   Yes.
12    Q.   Could he utilize hand strikes outside the
13 Department policy?
14    A.   Yes.
15    Q.   Are you aware -- can you tell from the
16 video whether or not any of the hand strikes landed
17 on Mr. Farmer -- Mr. Farmer's head?
18    A.   Yes.
19    Q.   How many?  Do you know how many?
20    A.   Ten to twelve.  I don't know the specific
21 number, because of just when you slow things down
22 and angles and how the video works, but at one
23 point we counted 10, at one point we counted 12.
24    Q.   And your testimony is you could see those
25 hand strikes connect with his head as opposed to

Page 104

1  just him, his body in general?
2    A.   In the head area, yes.
3    Q.   Security guard Infantino testified that
4  he thought the strikes connected more along
5  Tashii Farmer's shoulder area.  Do you disagree
6  with that?
7    A.   Based on what I observed and the evidence
8  present, yes.
9    Q.   Let's look at page 5 of 8 of the arrest
10 report.
11        Do you see at -- so at 3:01
12 Sergeant Crumrine is clearly there at that point.
13 "Sergeant Crumrine arrived and stated, 'Put your
14 hands behind your back.'"
15        At 3:13, "Officer Lopera asks," quote,
16 "'Is he out yet,'" end quote.  You see that?
17    A.   Yes, sir.
18    Q.   And you put that in quotes because you
19 heard that on the video?
20    A.   Yes.
21    Q.   Does that indicate to you that Officer
22 Lopera does not know the status of Tashii Farmer?
23    A.   Yes, sir.
24    Q.   When you're training in the LVNR, do you
25 have anybody indicating to you the status of --

Page 105

1  well, let me back up.
2        When you trained with the LVNR, do you
3  actually put each other out?
4    A.   Not intentionally.
5    Q.   But it does happen occasionally?
6    A.   Yes, sir.
7    Q.   Is there a coach or instructor there to
8  monitor those types of situations?
9    A.   Yes, sir.
10    Q.   Isn't it true that the person employing
11 the LVNR often doesn't know the status of the
12 suspect --
13    A.   Yes.
14    Q.   -- or the person around which is being
15 deployed to -- deployed on?
16    A.   Yes.
17    Q.   At 3:18, "Officer Lopera asks, 'Is he out
18 yet,'" quote, end quote.  See that?
19    A.   Yes, sir.
20    Q.   And you put that in your report because
21 that was a direct quote you heard off the video;
22 correct?
23    A.   Yes, sir.
24    Q.   Does that indicate to you that Officer
25 Lopera did not know the status of Tashii Farmer?

DETECTIVE TREVOR ALSUP

June 15, 2018

1    A.   Yes, sir.
2    Q.   Meaning he did not know whether he was or
3   was not conscious?
4    A.   Yes, sir.
5    Q.   Do you have any reason to believe that
6   from 3:01 to 3:18, Tashii Farmer was not resisting?
7   Can you tell from the video whether he is or is
8   not? Can you tell what Officer Lopera is
9   perceiving?
10    A.   No, sir.
11    Q.   At 3:19, "Officer Lopera asks again,"
12   quote, "'Is he out yet,'" end quote.  See that?
13    A.   Yes, sir.
14    Q.   And again, that's a quote you took from
15   the video; correct?
16    A.   Yes, sir.
17    Q.   And does that indicate to you that again,
18   or still, Officer Lopera does not know whether
19   Tashii Farmer is or is not conscious; correct?
20    A.   Yes, sir.
21    Q.   Then at 3:25, "Officer Tran arrives and
22   says -- and said, 'Let him go, Ken.'"
23         And separate and apart from whether
24   that's Officer Tran or Crumrine, again, that's a
25   quote -- "Let him go, Ken," is a quote that you

1   heard off the video; correct?
2    A.   Yes, sir.
3    Q.   Officer Lopera asks one second later,
4   "Are you sure," quote.  See that?
5    A.   Yes, sir.
6    Q.   Does that indicate to you that this is
7   probably the first time that Officer Lopera
8   understands that he is free to release the hold?
9    A.   Yes.
10    Q.   Is him releasing the hold at that point
11   unreasonable?  Let me ask a different way.
12         If Officer Lopera, in fact, held whatever
13   kind of neck restraint -- an LVNR, rear naked
14   choke -- up until he was told to let him go, is
15   that reasonable up until that point?
16    A.   In terms of a hold, yes.
17    Q.   Yeah, just the hold, that's all we're
18   talking about.
19         You testified that it was the totality of
20   the circumstances, the use of the Taser, the hand
21   strikes, the hold, et cetera.
22         And I am asking you a hypothetical.  If
23   we took away the ECD use and the hand strikes, if
24   it was just this hold, would you care whether it
25   was an LVNR or an RNC, a rear naked choke?

1    A.   Yes.
2    Q.   Why?
3    A.   We only get involved if it results in
4   substantial bodily injury or death.  So if the end
5   result is death, it's not going to matter the hold
6   that was used, but it's going to be our job to
7   investigate it.
8    Q.   Okay.  Are Metro police officers required
9   to, or obligated to perform their duties with
10   perfection?
11    A.   No.
12    Q.   That's a standard that's unattainable;
13   correct?
14    A.   Yes, sir.
15    Q.   Not every shot fired out of a gun from
16   Metro hits the mark, does it?
17    A.   No.
18         MR. SAYRE:  I didn't know this was a
19   shooting case.
20   BY MR. McNUTT:
21    Q.   Not every fist strike hits the mark, does
22   it?
23    A.   No.
24    Q.   Not every ECD Taser works correctly, does
25   it?

1    A.   No.
2    Q.   When you're training at Metro, use of
3   force, the LVNR, do people refer to it as the LVNR
4   or the lateral vascular neck restraint or do they
5   refer to it as something else?
6    A.   They usually -- I would say probably
7   98 percent of the time it's LVNR or lateral
8   vascular neck restraint.
9    Q.   No one says, We're going to train in neck
10   restraints today?
11    A.   No, not that I'm familiar with.
12    Q.   No one says, We're going to work on choke
13   holds today?
14    A.   No.
15    Q.   Would you agree with me that LVNR doesn't
16   exactly roll off the tongue?
17         MR. SAYRE:  What does that mean?
18         THE WITNESS:  I would disagree with that.
19   BY MR. McNUTT:
20    Q.   It's an easy phrase to say?
21    A.   I believe so.
22    Q.   Okay.  After an officer's been involved
23   in a life-threatening encounter, do you think the
24   use of the phrase, "I choked him out," should
25   confirm liability as opposed to using the proper

DETECTIVE TREVOR ALSUP

June 15, 2018

1  tech- -- you know, phrase of lateral vascular neck
2  restraint?
3      MR. SAYRE:  Incomplete --
4      THE WITNESS:  This is my opinion; right?
5  BY MR. McNUTT:
6    Q.  Yeah, of course.
7    A.  I would say that I would expect most
8  officers revert to LVNR, due to the fact that
9  that's how we're trained from day one in the
10 academy.
11   Q.  But if he used the phrase, I tased him,
12 which is also shorthand, he didn't say, I deployed
13 my ECD; correct?  Is that incorrect?
14   A.  Well, technically, now, yes, it is.
15       When they were first in use, they were
16 called Tasers.  And now they're specifically
17 referred to as ECDs.
18       The LVNR has always been the LVNR.
19   Q.  Let's go back to page 5 of 8.  3:26,
20 "Officer Lopera asks, 'Are you sure?'"
21       "Officer Tran replies 'Yeah.'"
22       Again, those are quotes from the video;
23 correct?
24   A.  Yes.
25   Q.  And at that point, the hold was released

1  and they commenced to cuff him.  Well, actually,
2  the hold was not released, but that's the point
3  where they rolled him on his side to put him in
4  handcuffs?
5    A.  Yes.
6    Q.  Okay.
7    A.  Shortly after that.
8    Q.  Okay.  Let's go to page 6 of 8.
9  Actually, I'm sorry, stay on the -- stay on that
10 page.
11       At the bottom, 503, the last sentence,
12 "Farmer attempted to pull the ECD wires out and
13 Officer Lopera said," quote, "'I choked him out.'"
14 See that?
15   A.  Yes, sir.
16   Q.  Can you tell from that statement whether
17 Officer Lopera meant he utilized an LVNR to choke
18 him out or whether he used some other neck
19 restraint to choke him out?
20   A.  No, sir.
21   Q.  You would agree with me that it could be
22 either?
23   A.  I would just say that his statement was,
24 "I choked him out."  I don't know what he meant by
25 that.

1    Q.  Let's go to the next page, 638.  And you
2  have a quote.  It ends with, "then I rear-mounted
3  him and choked him out."
4        Again, you don't know what Officer Lopera
5  meant by that, whether he would intend to say he
6  used an LVNR or some other technique?
7    A.  No.
8    Q.  Same question for the "so I tased him and
9  choked him out," at 7:02.  You see that?
10   A.  Yes.
11   Q.  You don't know what Officer Lopera meant
12 by that; correct?
13   A.  No.
14   Q.  At 7:41, Officer Lopera tells another
15 officer, "I tased him, fought a little bit, and
16 choked him out."  And, again, you don't know what
17 Officer Lopera meant by that; correct?
18   A.  No.
19   Q.  Did you ever attempt to ask Officer
20 Lopera what he meant by that?
21   A.  We went through his attorney to ask him
22 if he would give us a statement and he refused.
23   Q.  Okay.  And did you -- were you
24 participating in the walk-through?
25   A.  Yes.

1    Q.  You personally were there?
2    A.  Yes.
3    Q.  Did you ask any questions of him before
4  the LVMPD attorney stopped the walk-through?
5    A.  We asked questions -- in the beginning we
6  asked if we were going to be allowed to ask certain
7  questions.  And we were told that the walk-through
8  would be led by the attorney and that they would
9  not answer any questions.
10   Q.  And so when it's led by the attorney, was
11 anybody speaking or was Ken Lopera talking?
12   A.  He didn't.
13   Q.  7:41, "I tased him, fought a little bit,
14 choked him out," again, you don't know what he
15 meant by that.
16       9:34, "Officer Lopera tells Officer Lif,"
17 quote, "'I started punching him, rear-naked his
18 ass.  He went out,'" end quote.
19       And again, that was something you heard
20 from the video?
21   A.  Yes, sir.
22   Q.  And you don't know what Officer Lopera
23 meant by that statement; correct?
24   A.  No.
25   Q.  11:25, "Officer Rybacki" -- do you know

DETECTIVE TREVOR ALSUP

June 15, 2018

1  him or her?
2      A.  I know who he is.  I don't know him
3  personally.
4      Q.  -- okay -- "approached Officers Tran and
5  Flores.  One of the officers stated, 'He was out
6  when we got here,' referring to Farmer.  Officer
7  Rybacki responded, 'Oh, he was definitely on
8  something,'" quote.
9          Because that's in quotes, can we infer
10  that you heard that directly from the video?
11      A.  Yes, sir.
12      Q.  And did you ever talk to Officer Rybacki
13  about whey he said that?
14      A.  I did not speak to Officer Rybacki.
15      Q.  Why not?
16      A.  He was interviewed by somebody else.
17      Q.  Are you familiar with what he was
18  interviewed about?
19      A.  The interview was conducted immediately
20  after the incident.  And as we started going
21  through the body cam, that was several days that we
22  went through to pull stuff out, so that was -- this
23  information was gleaned after his interview.
24      Q.  Did he ever expand on his statement, "Oh,
25  he was definitely on something"?

1      A.  No.
2      Q.  Do you have an understanding of what that
3  means?
4      A.  In general?
5      Q.  Yes.
6      A.  That the person is -- a person could be
7  on some type of medication, narcotic, it could mean
8  a number of different things.
9      Q.  And we get down a couple more lines, it's
10  0057.03.  And that's a time, that's not the --
11  right?  That's 56 minutes after midnight.  Is that
12  what we're looking at, 56.40 to --
13      A.  This is the time --
14      Q.  -- 57 --
15      A.  Sorry.  This would be the time stamp
16  according to the video -- the Venetian video.
17      Q.  Right.  Okay.  So at 57:03, it says,
18  "Officer Lopera held Farmer in a choke hold."  Do
19  you see that?
20      A.  Yes.
21      Q.  You wrote that; correct?
22      A.  I did.
23      Q.  Why did you not say neck restraint?
24      A.  That would have just been based on
25  information that we had from the coroner, and our

1  observation that it was not an LVNR.
2      Q.  But you don't say it's not an LVNR.  You
3  say it's a choke hold.  And a choke hold is a
4  pretty generic term; isn't that true?
5          MR. SAYRE:  Objection, vague and
6  ambiguous as to what is meant by generic term.
7          THE WITNESS:  I would say that a choke
8  hold could mean a number of different things.
9  BY MR. McNUTT:
10      Q.  Right.
11      A.  And I don't know that there's specific
12  terms for the different things that would choke a
13  person.
14      Q.  What did the coroner say was the cause of
15  death?
16      A.  Asphyxiation due to police restraint.
17      Q.  Why didn't you say police restraint?
18      A.  That was not an approved police
19  restraint.  Based on observations from the video,
20  that was -- the only neck restraint that we are
21  taught is an LVNR.  And based on observations from
22  the video, it did not appear to us that that was a
23  proper LVNR, or an LVNR.
24      Q.  So tell me how you know it's not a -- it
25  was not just an incomplete attempt to employ the

1  LVNR technique?  How -- can you tell that?
2      A.  Well, the hand placement wasn't
3  correct.
4      Q.  Right.  But what if he just messed up and
5  he didn't get the hand placement because he
6  couldn't get the hand placement correct?
7      A.  We didn't get a statement from him, so we
8  don't know.
9      Q.  Yeah, that's where I'm going with that.
10  You know, is the LVNR -- it's only an LVNR if it's
11  perfectly employed each and every time?  That's
12  what I'm trying to understand.
13      A.  Well, based on the conversation with the
14  coroner is that if an LVNR is completed or is
15  placed correctly, and based on -- same as I've
16  heard from training staff, if an LVNR is placed
17  completely, you're not going to have the damage in
18  the neck area, because that's not where the
19  pressure is being placed.  The pressure is being
20  placed on the artery area and not the
21  trachea/windpipe/esophagus area.
22      Q.  What if the suspect is resisting and
23  moving around, isn't it possible that the trachea
24  area moves within the crease of the elbow?
25      A.  Well, from my understanding is part of

DETECTIVE TREVOR ALSUP

June 15, 2018

1  the purpose of the LVNR and the placement in the
2  crook of the elbow is so that even if there is
3  slight movement, it's still not going to cut off
4  air circulation or air movement.
5      Q.   So that's good for slight movement, but
6  what if there's a lot of movement?  Depends how big
7  the elbow --
8      A.   I could not --
9      Q.   -- area is; right?
10     A.   I couldn't answer that.
11         MR. SAYRE:  Incomplete hypothetical.
12 BY MR. McNUTT:
13     Q.   So let's go to 7 of 8.  At the bottom,
14 the last paragraph, "After striking Farmer in the
15 head, Officer Lopera performed what he described as
16 a," quote, "'rear naked choke,'" end quote.
17         Can you show me or tell me where
18 Officer Lopera described what he did as a "rear
19 naked choke"?
20     A.   That's going to be based on the
21 statements he made that were on body cam.
22     Q.   Okay.  So all those statements said, "I
23 choked him out," with the exception of one, where
24 he said, "I rear nakeded his ass"; is that -- do
25 you agree with that?  I mean, those are the

1  statements we just went through?
2      A.   Correct.
3      Q.   So -- but because he said, "I," quote,
4  rear nakeded his ass," that's where you put in
5  quotes that it was a "rear naked choke," you drew
6  from that?
7      A.   Correct.
8      Q.   So that's not a quote that Officer Lopera
9  utilized.  That's what you're saying it was and
10 that's why you're putting it in quotes?
11     A.   Correct.
12     Q.   And the same goes for a couple lines
13 later, you do it again.  "Officer Lopera held the,"
14 quote, "'rear naked choke,'" end quote, "for one
15 minute and 13 seconds.  Officer Lopera also held
16 the," quote, "'rear naked choke' for 44 seconds."
17 Do you see that?
18     A.   Correct.
19     Q.   And so that's you determining that it was
20 a rear naked choke; not Officer Lopera having made
21 a statement that "I admit it was a rear naked
22 choke"; correct?
23     A.   I didn't make a determination on what the
24 hold was.
25     Q.   Then why does it say "rear naked

1  choke"?
2      A.   That would be based on his statements on
3  the body cam.
4      Q.   And that was strictly the rear nakeded
5  his ass."  Are there any others one?
6      A.   The rear nakeded his ass" and "choked him
7  out."
8      Q.   But even you used the phrase "choke
9  hold"; isn't that --
10         MR. SAYRE:  Objection, argumentative.
11 BY MR. McNUTT:
12     Q.   I'm not being argumentative with you.
13     A.   I don't understand what your question is.
14     Q.   You used the phrase in the report, "choke
15 hold."
16     A.   Uh-huh.
17     Q.   So is anytime someone uses the phrase
18 "choke hold," does that automatically mean "rear
19 naked choke"?
20     A.   No.
21     Q.   You say, "Officer Lopera held the rear
22 naked choke for one minute and 13 seconds."
23         Do you know how much pressure, if any, he
24 was utilizing for that one minute and 13 seconds?
25     A.   No.

1      Q.   So you don't know if he had a little bit
2  of pressure, a lot of pressure, or no pressure;
3  correct?
4      A.   The only thing I know is there is enough
5  pressure to create damage inside the neck area.
6      Q.   So the answer is "No," you don't know if
7  it's a little pressure, a lot of pressure, or no
8  pressure; correct?
9      A.   No.
10     Q.   You don't know if Mr. Farmer is easy to
11 bruise or hard to bruise, do you?
12     A.   No.
13     Q.   "Officer Lopera also held the rear naked
14 choke for 44 seconds after being told to let go by
15 Officer Tran."
16         Can you expand on that?  Do you mean he
17 had the hold in place or are you trying to say he
18 was putting pressure on Mr. Farmer as well?
19     A.   The hold was in place.
20     Q.   So you don't know if he had any pressure
21 on Mr. Farmer at that point?
22     A.   I don't.
23     Q.   Okay.  So on the last page, 8 of 8, the
24 second paragraph, next-to-last sentence, it says,
25 "Officer Lopera referred to the restraint as a,"

DETECTIVE TREVOR ALSUP

June 15, 2018

1   quote, "'rear naked choke,'" end quote.
2       Why is that "rear naked choke" in quotes?
3       A.   The only way that I can answer that is a
4   misuse of the quotation marks by me.
5       Q.   Okay.  Because that wasn't a quote by
6   Officer Lopera; correct?
7       A.   No.
8       Q.   Any other misuses of the quotation marks
9   that we've reviewed?
10      A.   No.  Well, besides what we've gone over,
11  where the "rear naked choke" was in quotes --
12      Q.   Uh-huh?
13      A.   -- no.
14      MR. McNUTT:  Let's take a break.
15      THE WITNESS:  Sure.
16      THE VIDEOGRAPHER:  Off the record at
17  12:52 p.m.
18      (Break taken.)
19      THE VIDEOGRAPHER:  Back on the record.
20  The time is 12:59 p.m.
21  BY MR. McNUTT:
22      Q.   Detective Alsup, I just have a few final
23  questions.
24      But what did you do to become familiar
25  with the rear naked choke technique, if anything?

1       A.   Talked to training officers on the
2   department.
3       Q.   Anyone in particular?
4       A.   Just whoever was on training staff at
5   that time.  Off the top of my head, I don't
6   remember names.
7       Q.   Was it Sergeant Bland?
8       A.   He was actually -- right after this
9   incident, there were discussions with training
10  staff, and I know that at one point he was in the
11  room while this was being discussed.
12      Q.   He was in the room?
13      A.   Yes, sir.
14      Q.   What's your understanding of how the rear
15  naked choke is applied?
16      A.   One arm encircles the neck and the other
17  arm, you secure it.  You secure the hold with your
18  arm and your other hand and then pressure is placed
19  on the back of the head.
20      Q.   The encircling arm is employed the same
21  way as the LVNR though?
22      A.   Correct.
23      Q.   Did you discuss different neck restraints
24  with the coroner, like the LVNR or the rear naked
25  choke?

1       A.   No.
2       Q.   Why not?
3       A.   I don't understand the question.
4       Q.   Why did you not -- did it not come up or
5   not part of your investigation?
6       A.   Well, the only thing that I can remember
7   specifically with the coroner is she asked the
8   details of the call.  So we told her that a neck
9   restraint was used, but as far as specifically
10  LVNR, rear naked choke, no, it was never said with
11  her.
12      Q.   So you simply told the coroner that some
13  type of neck restraint was employed?
14      A.   Yes, sir.
15      Q.   Are you-all allowed to modify the LVNR
16  in -- the LVNR technique if, for example, the
17  suspect is utilizing his head to head-butt the
18  officer?
19      A.   Well, that's the reason why pressure is
20  placed with the head is to control the head, that
21  way you don't have that movement.
22      Q.   So do you know whether or not you would
23  be allowed to modify the position of the other hand
24  to prevent you from getting head-butted?
25      A.   I've never been taught that.

1       Q.   If you were in fear for your life, would
2   you be allowed to modify that?
3       A.   Yes.
4       Q.   Do you know if Tashii Farmer resisted
5   Officer Lopera?
6       A.   Do I know if he did?
7       Q.   Yes, from watching the videos and your
8   investigation?
9       A.   It did not appear so.
10      Q.   Did the coroner watch any of the
11  videos?
12      A.   She was given everything that we -- she
13  was given all the video that we had.
14      Q.   Do you know if she watched them though?
15      A.   I don't know.
16      Q.   Did you talk to the coroner at all about
17  Mr. Farmer's enlarged heart?
18      A.   Yes, it was part of her findings.
19      Q.   And what do you understand to be her
20  findings with respect to his heart?
21      A.   I didn't speak to her specifically about
22  it.  I guess what I should have said was I saw that
23  in the autopsy report.  So my talking to her was
24  during the autopsy, and then her autopsy report
25  comes to our office once it's finished.

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 126

1    Q.   Do you have an understanding of what
2  causes an enlarged heart?
3    A.   I'm sure there's several factors.
4    Q.   Like what?
5    A.   I don't know specifically.
6        MR. SAYRE:  Objection, lack of
7  foundation.  Medical.
8  BY MR. McNUTT:
9    Q.   I'm sorry, I didn't hear.
10   A.   I don't know specifically.
11   Q.   When you said, I'm sure there's several
12  factors, I thought you knew some of those
13  factors?
14   A.   I -- no.
15   Q.   Did you discuss with the coroner whether
16  or not Tashii Farmer had drugs in his system?
17   A.   I know that he did, based on the
18  toxicology results.
19   Q.   But you didn't discuss that with the
20  coroner?
21   A.   No.
22   Q.   Did the coroner indicate that there was
23  anything other than the police restraint that
24  caused the death?
25   A.   I believe she listed mitigating factor of

Page 127

1  the enlarged heart.  And I think there might have
2  been something else, but without looking at the
3  report I don't remember off the top of my head.
4        MR. McNUTT:  Okay.  I have no further
5  questions.
6        FURTHER EXAMINATION
7  BY MR. SAYRE:
8    Q.   When you read or heard the statement
9  that, "I rear nakeded his ass," did you just take
10  that to mean that it was sort of a vulgar way of
11  saying that he used the rear naked choke?
12   A.   Yes, sir.
13   Q.   There's no way, in your mind, that rear
14  nakeding his ass" could have anything to do with
15  the lateral vascular neck restraint?
16       MR. McNUTT:  Objection to form.
17       THE WITNESS:  No, sir.
18  BY MR. SAYRE:
19   Q.   You said that it was reasonable to employ
20  a lateral vascular neck restraint up until 3:25,
21  when they said -- or 3:26, when they said, "Let him
22  go," and then at 3:26, "Are you sure," and they
23  said "Yeah."
24       I thought you said it wasn't in these
25  circumstance -- given the totality of the

Page 128

1  circumstances, it was not reasonable to employ a
2  lateral vascular neck restraint?
3    A.   I think the question was actually worded
4  a little bit different.
5    Q.   Sure.
6    A.   It's my belief that an LVNR, or any other
7  type of hold, would not have been reasonable in
8  this situation.
9    Q.   In looking at page 5 of 8, Lopera, as was
10  pointed out to you, says at 3:13, "Is he out yet?"
11  Again at 3:18, he says, "Is he out yet?"  3:19, "Is
12  he out yet?"
13       And then at 3:25, it says, "Officer Tran
14  arrived and says, 'Let him go, Ken.'"
15       Did you understand that to mean he was
16  out?
17       MR. McNUTT:  Objection, form.
18       MR. ANDERSON:  Join.
19       THE WITNESS:  When it says, "Let him go,
20  Ken"?
21  BY MR. SAYRE:
22   Q.   Yeah.
23   A.   I take that to mean that he's no longer
24  considered a threat, or it could mean a number of
25  different things.

Page 129

1    Q.   Okay.  Now --
2    A.   For whatever reason, I just -- another
3  officer telling him to "Let him go."  What that
4  observation was, I have no idea.
5    Q.   All right.  Now, you said that, if I
6  understood correctly, the person applying the LVNR
7  often doesn't know the status of the person who
8  he's applying the LVNR to, meaning he doesn't know
9  if the person is conscious or unconscious;
10  correct?
11   A.   And I guess I could follow that up.
12   Q.   You nodded your head "Yes," but --
13   A.   I can follow that up a little bit.
14   Q.   Okay.  Is that a "yes," first of all?
15   A.   That I said that?
16   Q.   Yeah.
17   A.   Yes.
18   Q.   Okay.
19   A.   Obviously, you're going to know whether
20  or not that person is still resisting you.
21       But when that person decides to stop the
22  resistance, I guess he could just be complying at
23  that point; or it could be because he has been
24  rendered unconscious.  And I don't really --
25  having -- there's so much speculation here.

DETECTIVE TREVOR ALSUP

June 15, 2018

1 Whether or not that person just began to comply or
2 they went unconscious for a couple of moments, the
3 officer is not going to know which one it is.
4     Q.   Sure.  And obviously from 3:13 through
5 3:19, Officer Lopera was questioning whether he was
6 unconscious?
7     A.   Yes.
8     Q.   And nobody ever answered him?
9     A.   Correct.
10    Q.   So would it be fair to say that one of
11 the dangers of applying a lateral vascular neck
12 restraint is that you may be continuing to apply it
13 after somebody has gone unconscious?
14    A.   The way we were taught is that once the
15 resistance stops, you release pressure.
16    Q.   My question is a little broader than
17 that.  Isn't it correct that one of the potential
18 dangers of applying a lateral vascular neck
19 restraint is that you may be continuing to apply
20 neck pressure after a person has gone unconscious
21 and you don't know it?
22    A.   I think the officer should realize that.
23 Whether it be because the person becomes compliant
24 or because they have been rendered unconscious,
25 you're going to know that they have begun to comply

1 with the instructions; therefore, you're supposed
2 to loosen the pressure.
3     Q.   I understand that, but isn't it fair to
4 say that for at least six seconds there, Lopera is
5 asking somebody around there to tell him whether
6 Tashii Farmer had gone unconscious?
7     A.   I would say that for whatever reason,
8 it's speculation Officer Lopera did not realize
9 what was happening.
10    Q.   And one of the dangers of using a lateral
11 vascular neck restraint is that if you continue to
12 apply it after somebody's gone unconscious, it can
13 kill that person if you maintain it long enough?
14    A.   I would have to look at studies.  I know
15 that all that -- I know from the LVNR and the
16 training we received that it's supposed to restrict
17 blood flow, not the airflow.  I don't know how long
18 it would take to potentially kill a person with a
19 properly applied LVNR; that's not my expertise.  I
20 don't know.
21    Q.   Sure.  I understand.
22        One thing that it seems to be clear is
23 that enough pressure was applied from whatever type
24 of hold -- neck hold was applied -- that it killed
25 Tashii Farmer?

1         MR. McNUTT:  Objection, form.
2         MR. ANDERSON:  Join.
3         THE WITNESS:  Well, I don't know that
4 that pressure -- it's -- the coroner said that it
5 wasn't from a restriction of blood flow, but it was
6 from asphyxiation.  So that leads me to believe
7 that it was an improperly applied -- if it was
8 supposed to be an LVNR, it was improperly applied;
9 and it didn't restrict the blood flow, it was the
10 airflow.
11 BY MR. SAYRE:
12    Q.   Well, if it was improperly applied, that
13 would be negligent on the part of Officer Lopera,
14 wouldn't it?
15        MR. McNUTT:  Objection to form.
16        THE WITNESS:  I believe so.
17 BY MR. SAYRE:
18    Q.   Okay.  And whatever hold he utilized,
19 whether it was an improperly applied LVNR or a rear
20 naked choke or something else, that hold killed
21 Tashii Farmer.
22        MR. McNUTT:  Objection, form.
23        MR. ANDERSON:  Join.
24        THE WITNESS:  According to the coroner,
25 it was asphyxiation.

1 BY MR. SAYRE:
2     Q.   Isn't that death?
3     A.   Yes.
4     Q.   So the hold applied by Officer Lopera
5 killed Tashii Farmer?
6     A.   Yes.
7     Q.   So however much pressure he was applying
8 from 2:58 to 4:11, resulted in the death of
9 Tashii Farmer?
10    A.   Yes.
11        MR. McNUTT:  I have one follow-up.
12        FURTHER EXAMINATION
13 BY MR. McNUTT:
14    Q.   At the time of the incident, was the use
15 of the LVNR -- what level of force was it
16 authorized for -- to be used in?
17    A.   I knew this question was coming, and
18 you're going to have to apologize, because I'm
19 actually --
20    Q.   You knew it was coming, but I have to
21 apologize?
22    A.   No, I'm apologizing.
23    Q.   Oh.
24    A.   I said I apologize.
25    Q.   Oh.

DETECTIVE TREVOR ALSUP

June 15, 2018

Page 134

1    A.  3 through 5, so --
2    Q.  I'm sorry, I don't understand the
3  response, "3 through 5."
4    A.  So the use-of-force scale is -- it's a
5  ascending and descending scale.  So you start out,
6  your lowest part is the lowest level of force,
7  working your way up to deadly force.
8    MR. McNUTT:  I'm just going to hand you
9  -- we can make this an exhibit, I just don't have
10  an extra copy.  It's the --
11    MR. SAYRE:  You want him to learn how to
12  answer your question?
13    MR. McNUTT:  Well, I'm going to ask him
14  to --    MR. SAYRE:  Well, you want him to
15  learn how to answer your question?
16    MR. McNUTT:  No, Fred.  You mean like you
17  were trying to educate him off record about
18  Illinois v. Wardlow?
19    MR. SAYRE:  No, actually, he wasn't here.
20  I was educating you about Illinois versus Wardlow.
21  BY MR. McNUTT:
22    Q.  Have you ever seen that --
23    MR. SAYRE:  I didn't ask him any legal
24  questions.
25    MR. McNUTT:  Fred, let's just --

Page 135

1    MR. SAYRE:  All right.
2  BY MR. McNUTT:
3    Q.  Have you ever seen that document
4  before?
5    A.  Yes.
6    Q.  And what is it?
7    A.  It's an update to our policy manual --
8    Q.  Okay.
9    A.  -- regarding the LVNR.
10    Q.  Look at the last paragraph that I have
11  yellow highlighted --
12    A.  Uh-huh.
13    Q.  -- you see that it says that they're --
14  Metro is changing its policy, that the LVNR was
15  previously authorized for a low-level force option.
16    Does that refresh your recollection that
17  it was allowed to be used for low levels of force?
18    A.  Yes.
19    Q.  Do you know why Metro changed in
20  September of 2017 to not allow the LVNR to be used
21  for low levels of force?
22    A.  I can only -- I'm not involved in the
23  policy-making of the Department.
24    Q.  Then the answer is "No," and that's fine.
25  Okay.  Thank you.

Page 136

1    So back to my original question:  At the
2  time of the incident, LVNR was authorized for low
3  levels of force?
4    A.  Okay.  Here's the problem with what
5  you're -- how you're saying it.
6    Q.  Okay.  Educate me.
7    A.  So for a compliant person, you ask them
8  to do something, that person does it, that's
9  compliance.  And then based on their level of
10  resistance is where things go.
11    So at the time, LVNR could be used in the
12  third step, which basically means that a person is
13  displaying some type of resistance besides just,
14  you know, Turn around and put your hands behind
15  your back.  No, I'm not going to do that.  They're
16  doing something else to make it a little more
17  aggressive than that.
18    So I can't just walk up to you and say,
19  Sir, turn around and put your hands behind your
20  back.  You say, No, and just stand there, and I put
21  you in LVNR.
22    Q.  Okay.
23    A.  There has to be some other form of
24  resistance to make me think that you're a threat.
25    Q.  Fair enough.  Thank you.

Page 137

1    MR. SAYRE:  I have no further questions.
2    Shall we stipulate that the court
3  reporter may be relieved of her statutory
4  obligation.  The deposition may be signed under
5  penalty of perjury; thirty days to read, review,
6  and make any changes or corrections, if any, and
7  sign under penalty of perjury.
8    The deposition transcript will be
9  maintained by Mr. Anderson and produced for some
10  reasonable purpose during the litigation or lodged
11  with the court at the time of trial.
12    And if not signed or corrections
13  provided, certified copy may be used as if it were
14  the original for all purposes.
15    MR. ANDERSON:  Agreed.
16    MR. McNUTT:  Fine with me.
17    MR. SAYRE:  All it means is she'll
18  produce this deposition in about two weeks.  She'll
19  send it to Craig, he'll give it to review.  And
20  then if you want to, you can make any corrections
21  and then sign it under penalty of perjury.
22    THE WITNESS:  Okay.
23    THE VIDEOGRAPHER:  This concludes today's
24  deposition of Detective Trevor Alsup.  The number
25  of media used was two.  We are off the record at

DETECTIVE TREVOR ALSUP

June 15, 2018

<table>
<tr><td>

Page 138

```
1    1:15 p.m.
2         MR. ANDERSON:  I'd like a regular, the
3    mini.  Paper, mini, and regular.
4         MR. McNUTT:  I'd like a condensed and a
5    regular PDF.  E-trans only.
6         MR. SAYRE:  Paper for my copy.
7         (Whereupon the deposition was
8         concluded at 1:16 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

</td><td>

Page 140

```
1              REPORTER'S CERTIFICATE
2
3    STATE OF NEVADA    )
                        )  ss.
4    COUNTY OF CLARK    )
5
6         I, KENDALL KING-HEATH, CCR No. 475, a
     Certified Court Reporter for the State of Nevada,
7    do hereby certify:
8         That I reported the taking of the
     deposition of the witness, DETECTIVE TREVOR ALSUP,
9    commencing on the 15th day of June, 2018, at the
     hour of 10:12 a.m.
10
11        That prior to being examined, the witness
     was duly sworn by me to testify to the truth, the
12   whole truth, and nothing but the truth.
13        That I thereafter transcribed my said
     shorthand notes into typewriting and that the
14   typewritten transcript of said deposition is a
     complete, true and accurate transcription of my
15   said shorthand notes taken down at said time, and
     that a request has been made to review the
16   transcript.
17        I further certify that I am not a relative
     or employee of an attorney or counsel of any of the
18   parties, nor a relative or employee of any attorney
     or counsel involved in said action, nor a person
19   financially interested in the action.
20        IN WITNESS WHEREOF, I have hereunto
     set my signature this 2nd day of June, 2018.
21
22
23              Kendall King-Heath
                KENDALL KING-HEATH
24              CCR No. 475
25
```

</td></tr>
<tr><td colspan="2">

Page 139

```
1    RE:  ESTATE OF TASHII S. FARMER v LVMPD, et al.
2              CERTIFICATE OF DEPONENT
3    PAGE    LINE     CHANGE            REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16
17              * * * * *
18        I, DETECTIVE TREVOR ALSUP, deponent
     herein, do hereby certify and declare under penalty
19   of perjury the within and foregoing transcription
     to be my deposition in said action; that I have
20   read, corrected, and do hereby affix my signature
     to said deposition.
21
22
23
     _____
24        DETECTIVE TREVOR ALSUP
                  Deponent
25
```

</td></tr>
</table>