# Exhibit N - Expert report of LVMPD defendants' police practice expert Jack Ryan

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| ESTATE OF TASHI S. FARMER a/k/a TASHII FARMER a/k/a TASHII BROWN, by and through its Special Administrator, Elia Del Carmen Solano-Patricio; TAMARA BAY LEE KUUMEALI'MAKAMAE FARMER DUARTE, a minor, individually and as Successor-in-Interest, by and through her legal guardian, Stevandra Lk Kuanoni; ELIAS BAY KAIMIPONO DUARTE, a minor, individually and as Successor-in-Interest, by and through his legal guardian, Stevandra Lk Kuanoni, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) No.2:17-cv-01946-JCM-PAL ) |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a political subdivision of the State of Nevada; OFFICER KENNETH LOPERA, individually and in his Official Capacity; and Does 1 through 50, inclusive, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

---

**Expert Report of John J. Ryan**

1. My name is John Ryan.  I have been actively involved in police practices and law enforcement since 1981.  I was an active police officer for twenty years.  In

the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island;  a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island.  In that capacity I was responsible for graduate courses on Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. Since 2000, I have written several manuals for use by police officers.  Two of these manuals are extensively used by Rhode Island Law Enforcement agencies.  These manuals are:  Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000.  The other manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees.  These manuals are: Legal and Liability Issues in the Public Schools, 2001; Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law

2

Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005, Arrest Search and Seizure, 2005, and Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation 2007, 2010, 2013 and 2016 editions, Legal and Liability Risk Management Manual Guide-The Law and Best Practices of Successful Jail/corrections Operations 2009 and 2016 editions.

5.  I also author an annual publication for law enforcement officers titled, Case Law for Critical Tasks in Law Enforcement. This field guide provides officers with a legal update on critical tasks such as search, seizure, use of force, pursuit, investigations and interrogations. This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6.  I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter. In that capacity I author and edit the institute's legal update service for law enforcement. This update service and an archive of all articles that I have written can be found at www.patc.com and www.llrmi.com. Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

3

7. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States. These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations. As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

8. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges. I have provided training in the following areas:

    a. Policy development for public safety agencies.

    b. Legal Issues in police use of force.

    c. Legal Issues in internal affairs investigations.

    d. Police misconduct/civil liability.

    e. Legal/Liability Issues in Narcotics Operations.

    f. Arrest, Search and Seizure, & Interrogation.

    g. Racial profiling.

    h. Legal issues in public schools.

    i. Media relations for public safety agencies.

    j. Constitutional update for law enforcement officers.

    k. Basic training for detectives.

l.  Law enforcement officers' bill of rights/due process in administrative investigations.

m.  Legal/policy and decision-making factors in law enforcement pursuits including use of force/intervention tactics.

n.  Legal and policy Issues for hostage negotiators.

o.  Legal and liability issues for SWAT operations

p.  Legal and liability issues for jails

q.  High Risk Critical Tasks/Best Practices in Law Enforcement Operations.

9.  I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002.  During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of the Department's Administrative Staff.  During most of my career I also took an active role in researching and authoring department policy.

10. Since my retirement in June of 2002 I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal

5

affairs officers.   Participants in these courses have come from thousands of law enforcement agencies around the United States.   Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands.   These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

11. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

12. The program on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence;  Off-Duty  Conduct;  Sexual  Harassment,  Discrimination,  and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

13. As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to

6

high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill.  In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

14. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

15. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

16. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

17. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

18. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk managers and attorneys representing police departments.  One of the trainings involved use of force while the second covered the high liability areas in law

7

enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

19. I have been a featured speaker annually, to include the 2011 session, of Georgetown Law Center's annual §1983 Civil Rights Litigation program. I have regularly presented materials related to law enforcement policy, training and supervisory practices as well as use of force. In 2009 I presented materials for two sessions one of which was on the use of TASER and one which was a panel discussion on strip searches. I have been published annually in materials from Georgetown Law Center related to this program. The 2011 session was focused on reviewing current law enforcement practices and civil liability related to TASER.

20. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

21. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

22. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, including a November of 2006 presentation for the Georgia Bar Association's ICLE program.

23. In 2007 I was a featured speaker at the annual conference for the International Municipal Lawyers Association.

24. In 2007, 2008, 2009, 2012 and 2013, I was a featured speaker at the Practising Law Institute's Annual Section 1983 Civil Rights Litigation program. My 2007

8

presentation in this program resulted in a law review article in the Touro Law Review (Volume 24, Number 3, pages 569-600) "Recent Developments in the Use of Excessive Force by Law Enforcement" Karen Blum/Jack Ryan.   It is noted that my materials have been included in their annual publication related to this program.

25. In 2008 I was a featured speaker at the annual conference for the Association of American Law Schools, Civil Rights section, where I presented material on law enforcement policy, training, and generally accepted practices in pursuits and use of force.

26. In 2009 I was a featured speaker for the national conference for public risk managers.

27. In 2009 I conducted executive level training on law enforcement pursuit operations for the Utah Highway Patrol.

28. In 2009 I was certified with TASER by the Muncie Indiana Police Department by a TASER certified instructor.

29. In 2009, I was a featured speaker at the Annual Kentucky Tactical Officers' Association Conference where I lectured on high risk tasks in tactical operations including high risk entries.

30. In 2009 I was the featured speaker at the Alabama Attorney General's annual "Law Enforcement Summit" where I lectured on high risk critical tasks in law enforcement to include use of force, pursuit, arrest, search and care, custody and control of prisoners.

9

31. In 2010, I was a featured speaker at the annual national conference for PRIMA where I presented a law enforcement risk management program titled: "Promoting Professionalism while Reducing Liability; The Impact of Policy, Training, and Supervision and Auditing Strategies."

32. In 2010, I was a featured speaker at the National Internal Affairs Investigators Association annual conference held in Indianapolis, Indiana where I lectured on Bias Free Law Enforcement/Profiling.

33. In 2010, I was a featured speaker at the annual conference of the National Council of County Association Executives, where I spoke on law enforcement liability and strategies to reduce liability by increasing professionalism.

34. In 2012 I developed a training program for law enforcement and attorneys dealing with use of force; electronic control devices; and sudden custody death. This program, which I am presenting throughout the United States is accompanied by a text manual which I wrote and is also being distributed nationwide.  As part of this program I have trained thousands of officers with respect to the expected and appropriate response in dealing with persons who have been injured or otherwise shown physical distress during the subdual process.

35. In 2012, I was a featured speaker at the National Internal Affairs Investigators Association Annual Conference where I spoke on Use of Force and Sudden In-Custody Death.

36. In 2012 I was a featured speaker at the Texas Commission of Law Enforcement Officers Standards and Education where I presented to law enforcement trainers

10

from throughout the State of Texas on training liability and the need for training in the high risk critical tasks in law enforcement.

37. In 2013, I was a featured speaker and panel member in a program titled "Policing in Trying Times" at Suffolk University Law School in Boston Massachusetts.

38. In 2013, I was a featured speaker at "Police K-9" magazine's national Handler Instructor Training Seminar, an annual conference for K-9 handlers and trainers. This presentation focused on the law and best practices for use of law enforcement K-9s as a tool of apprehension.

39. In 2015, I was a featured speaker at the spring conference as well as the annual conference of the International Municipal Lawyer's Association.   The presentation topic was officer involved shootings and qualified immunity post Plumhoff.

40. In 2015, I was a featured speaker for the annual conference of IADLEST, International Association of Directors of Law Enforcement Standards and Training.   My topics included "Training Liability" and "Emerging Liability Trends."

41. In 2015, I was a featured speaker at the Georgia Jail Association's Annual Conference in Savannah, Georgia where I presented topics relating to high-risk critical tasks in the jail operation.

42. In 2015, I was a featured speaker at the Arkansas Association of Chiefs of Police annual meeting where I presented materials on the Law and Best Practices for Policing in Trying Times.

11

43. In 2015, I was a featured speaker at the South Carolina Municipal Association's Annual Meeting for Elected Officials where I presented materials on Law Enforcement in Trying Times as well as covering issues related to law enforcement body cameras.

44. In 2015, I was a featured speaker for the Texas Commission on Law Enforcement where I provided training for 750 law enforcement trainers from throughout the State of Texas covering topics related to law enforcement liability and proper training.

45. In 2015, I was a featured speaker at the National Internal Affairs Investigators' Annual Conference where I presented training on emerging trends in law enforcement liability and the interplay of the Internal Affairs process with agency liability.

46. In 2016, I was a featured speaker at the annual conference of the Defense Research Institute in Austin, Texas.

47. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation.  I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

48. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

49. I have reviewed the following materials to date regarding this case:

12

1. Plaintiff's First Amended Complaint
2. LVMPD Defendants' Answer to Plaintiff's First Amended Complaint
3. Plaintiff's Initial Disclosure of Witnesses and Exhibits (PLTF 1-59)
4. Plaintiff's First Supplemental Disclosure (PLTF 1-429)
5. LVMPD's Initial Disclosure of Witnesses and Exhibits (LVMPD 1-1126)
6. LVMPD's First Supplemental Disclosure (LVMPD 1525-2511; LVMPD 2547-2522; and CONFIDENTIAL 1-438)
7. LVMPD's Second Supplemental Disclosure (LVMPD 2553-2869)
8. LVMPD's Third Supplemental Disclosure (LVMPD 2870-3100)
9. LVMPD's Fourth Supplemental Disclosure Statement (LVMPD 3101-3112)
10. LVMPD's Fifth Supplemental Disclosure Statement (LVMPD 3113-3363)
11. LVMPD's Responses to Plaintiff's Requests for Production of Documents (LVMPD 1127-1524)
12. Estate's Answers to LVMPD's Interrogatories
13. Minor E.B. Duarte's Answers to LVMPD's Interrogatories
14. Minor T.B. Duarte's Answers to LVMPD's Interrogatories
15. Minor T.B. Duarte's Responses to LVMPD's Requests for Production of Documents
16. Estate's Responses to LVMPD's Requests for Production of Documents
17. Minor E.B. Duarte's Responses to LVMPD's Requests for Production of Documents
18. Plaintiff's Initial Disclosure of Expert Witness Information
19. LVMPD's Initial Expert Witness Disclosure
20. Deposition Transcription of Officer Lif
21. Deposition Transcription of Officer Tran
22. Deposition Transcription of Sergeant Bland
23. Deposition Transcription of Peter Infantino
24. Deposition Transcription of Marcelino Vibas
25. Deposition Transcription of Sergeant Crumrine
26. Deposition Transcription of Chief McGrath
27. Deposition Transcription of Officer Flores
28. Deposition Transcription of Stevandra Kuanoni
29. Deposition Transcript of Jonathan Pierce
30. CD Rom of dispatch recordings for Event No. LLV170514000228
31. CD Rom of audio statements taken by LVMPD's Force Investigation Team
32. Deposition Transcript – Trinita Farmer
33. LVMPD Defendants Seventh Supplemental Disclosure Statement
34. LVMPD's Responses to Plaintiff's Estate of Farmer's Requests for Admissions
35. LVMPD's Responses to Plaintiff's Estate of Farmer's Requests for Production of Documents
36. Bate Stamped Documents 3378-3595
37. Deposition Transcript of Elias Bay Kaimipono Duarte
38. Deposition Transcript of Sandra Morton
39. Deposition Transcript of Tamara Baylee Kuumeali'Makamae Farmer Duarte

13

40. Deposition Transcript of Detective Trevor Alsup
41. Plaintiff's Initial Expert Witness Disclosure
42. Defendant Lopera's Initial Expert Witness Disclosure
43. Videos

50. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses. In the event that additional material is produced I shall be prepared to supplement this report.

51. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

52. The law enforcement event reviewed in this report occurred on May 14, 2017 at approximately 1:16 a.m. and involves the interaction between members of the Las Vegas Metropolitan Police Department and Tashi Farmer which concluded with the death of Mr. Farmer. This report reviews the actions of officers and the supervisor who responded to assist Officer Kenneth Lopero, who had pursued and was attempting to take custody of Mr. Farmer.

14

Deposition of Officer Ashley Lif

53. Officer Lif explained that on May 14th 2017 shortly after 1 in the morning she was working what is referred to as Safe Strip where here squad was put on the resort corridor for tourist safety. (14).  Lif indicated that she was assigned to the Venetian along with a partner, Officer Lopera.  (14-15).  Officer Lif described that she and Lopera got a coffee at the Coffee Bean and then began heading to the main part of the casino. (21).  Lif testified that they were approached by Mr. Farmer who she described as "tall in stature.  He was slim.  He didn't look overweight. He was appropriately dressed for the weather.  He was in dark clothing. (21).   Lif said Farmer was sweating and asked where the drinking fountain was. (22). Lif recounted: "He just asked where a drinking or water fountain was.  And then I recall him asking if we could escort him down to valet, as he said that he was being followed, and he ran across the Strip. (22). Lif said that when Farmer spoke, he turned toward Lopera and directed toward Lopera so Lopera took the lead and she stepped away.  (22-23).   Lif said she thought that Farmer might possibly be suffering from mental illness. (23).

54. Officer Lif said that she was holding both coffees as Lopera spoke with Farmer. Lif testified that she set the coffees down on the ground "And when I stand up, they had already started making their way down through the hall." (26). Lif said that Farmer was moving at a fast walk approximately 5 feet ahead of Lopera. Lif indicated that the hallway that they were in was an employees only hallway. (27). Lif said at some point she lost sight of Farmer and Lopera and was unsure where she was in the back hallway and had to ask an employee to get her back

to the security office. (29). Lif said that when she found her way to security she was told there was an incident going on in the back right parking lot. (29). Lif said that when she got to the lot multiple other officers were there. (30). Lif reported that when she arrived Lopera was standing by the scene away from the larger group of officers and Farmer was on the ground handcuffed. (31). Officer Lif noted that when she came to the scene officers were administering CPR to Mr. Farmer. (49).

55. Officer Lif acknowledged that cycling the TASER seven times would be outside of policy. (39). Officer Lif acknowledged that she saw surveillance video from the Venetian depicting Lopera striking Farmer 10-12 times in the head and agreed that she did not see any justification for doing so. (40). Lif acknowledged that Officer Lopera came up to her and reported that he done a "rear naked choke" on Farmer and Lopera's statement was captured on Lif's body worn camera. (41).

56. Officer Lif testified that she is certified in Crisis Intervention. (47).

Deposition of Sergeant Travis Crumrine

57. Sergeant Crumrine testified that both Officer Tran, Officer Lif, and Officer Lopera were under his supervision on May 13-14, 2017. (17-18). Crumrine reported that normally the Venetian is handled by the other squad but due to shortages he texted Lif and Lopera and moved them to the Venetian. (21). Sergeant Crumrine described that he was traveling on Sands when the dispatcher called out a code red, meaning an emergency exists, at Venetian 1. (22). Crumrine was aware that Venetian 1 was Lopera and Lif. (23). Sergeant

16

Crumrine said that although he did not know where the emergency was taking place, when he entered the service drive that comes to the back of the Venetian, he saw Lopera and Farmer on the ground in front of his car as he drove up. (24). Crumrine estimated that he parked within thirty to fifty feet of Farmer and Lopera. (26). Crumrine described: "As I'm driving up, all I can see, Officer Lopera has his back to me. I can see the back of his thighs and his buttocks are wet. And—one thing that went through my mind was, did he, like—did he urinate on himself or defecate himself. But it was just his back to me; I couldn't see exactly what was occurring." (26). Crumrine said that as he was getting out and around the door of his car, Lopera was "going into a neck restraint." (27). Crumrine estimated he was twenty feet away when he saw Lopera applying the neck restraint. (29). Crumrine said that it appeared to him, only seeing Lopera's front arm, that Lopera was doing the LVNR. (32). Crumrine acknowledged that it was him on the recording stating "put your fucking hands behind your back." (33). Crumrine acknowledged that his verbal command was within three seconds of Lopera applying the neck restraint. (33).

58. Sergeant Crumrine said the then grabbed Farmer's left wrist to put a handcuff on him but Farmer pulled it away breaking Crumrine's grip. (34). Crumrine reported that he grabbed Farmer's wrist a second time and was able to get a handcuff on him. (34). Crumrine testified that he was then trying to get them to roll over so he could complete the handcuffing. (34). Crumrine said that he did not remember Lopera asking at 3:13 on tape: "Is he out yet?" Nor did he hear Farmer gasp at 3:15. (34). Crumrine did not remember hearing Lopera repeat

17

his question as to whether or not Farmer was out yet at 3:19. (35).   Sergeant Crumrine testified that he told Lopera twice to let Farmer go. (35).   Crumrine believed that the first time he told Lopera to let Farmer go was between 3:01 and 3:13 and that the second time was at 3:25 which had been previously identified as Officer Tran telling Lopera to let Farmer go. (36).   Crumrine reported that he never knew Farmer was unconscious until they were able to get two sets of handcuffs on him and turn him over face up. (37).   Sergeant Crumrine also said that it was him that responded to Lopera at 3:26 when Lopera said, Are you sure? And Crumrine responded: "yeah." (37).   Crumrine described that when Lopera said: "Don't grab my fucking legs" he was addressing Tran, Flores, and Crumrine because Lopera had his legs wrapped around Farmer so they needed to be untangled first or Lopera would be injured when the other officers rolled Farmer over. (38-39).   Crumrine acknowledged that at 3:30 Lopera said "Roll him to the other side. Get the other arm, too." (39).   Crumrine acknowledged that those statements were made during the handcuffing process. (39).   Crumrine indicated that while Lopera had hold of Farmer, Crumrine was focused mostly on Farmer's arms. (42).   Crumrine described that he could not see whether Farmer was conscious or not testifying: "No. I wasn't—I wasn't how do I explain?   I wasn't really busying myself with whether he was conscious.   I was trying to get them rolled over so we could get him in handcuffs.   Does that make sense." (42).

59. Sergeant Crumrine acknowledged that LVMPD trains that the a properly applied Lateral Vascular Neck Restraint (LVNR) should make a person unconscious in

7-14 seconds. (43).  Crumrine noted that he told Lopera twice to release Farmer and that Lopera followed that…" Until we get him into handcuffs, and then I can check, which I do." (43).    Crumrine indicated that he expected Lopera to release the LVNR no later than 3:26. (44).  When confronted with the fact that Lopera did not release Farmer until 4:11, Crumrine noted that the 4:11 was when Lopera "finally completely takes his arm away from the subject." (44).  Crumrine explained: "I did not physically check.  I would not expect my officer, who is in a back-lying position, with a subject on top of him, to just completely put his arms out to the sides. He needs to still maintain some control of a person who is on top of him.  So I had expected that he had relaxed the hold, but he still needs to hold onto that person until we get that person rolled over and released there to get the handcuffs together." (44-45).  Sergeant Crumrine testified that he did not have time to physically check whether Lopera had released the hold in the 45 or seconds between 3:25/3:26 and 4:11 because he was maintaining control of Farmer's arm. (45). Sergeant Crumrine acknowledged that at 4:11 on the recording, Lopera released the hold on Farmer.  (46).  Sergeant Crumrine indicated that when he walked up to Lopera at 5:03, other officers were attending to Farmer. (47).   Sergeant Crumrine testified that it took four officers to get Farmer handcuffed. (92).

60. Sergeant Crumrine testified that one of the internal disciplinary charges that he faced as result of Mr. Farmer's death was the failure to intervene in the use of force [neck restraint] by Lopera. (50).  Crumrine testified that the Review Board did not sustain the charge of failing to intervene. (51-52).  Crumrine's explained

19

that with the back-lying neck restraint, it is difficult to see the officer's arm and the manner in which the officer's elbow is held to determine the level of the hold. (54). Crumrine said that he did not ask Lopera what level he was using because Crumrine had already told Lopera to let go. (56). Additionally, Crumrine had received confirmation from Lopera when Lopera responded: "Are you sure?" and Crumrine responded to Lopera's question affirmatively. (57).

61. Crumrine could not say whether Lopera disobeyed his order testifying: "Well, like I explained before, what we're talking about is I don't—when I tell him to let go, I don't expect him to take his arm completely away from this person. I expect him to completely release his grip on this person's chest, neck, head. I don't expect him to go out—to just put his arms out to the side with the person laying on top of him. He still needs to maintain some level of control. So it was my perception at that time that he had completely relaxed the hold. He can still hold onto the person until we roll him over to his stomach, and then he lets go. I would never expect him to let go, just lay there with a person on top of him." (59). Crumrine said that his perception that Lopera had relaxed the hold between 3:26 and 4:11 was based on the back and forth conversation between he and Lopera. (59). Crumrine believed that Farmer was still conscious at 3:26 because Crumrine was holding Farmer and Farmer was not limp and was moving. (60). Crumrine described that he did not realize Farmer was unconscious until they turned him back over face-up and he observed that Farmer's eyes were closed. (61).

62. Crumrine said that he never saw Lopera deploy his TASER on Farmer or strike Farmer with his fists. (27).

63. Sergeant Crumrine testified that he was also put before the review board for an Incident Command failure for failing to take control of the scene in the aftermath of the incident, (67). Crumrine said that this allegation was not directed at his performance during the incident. (67). Crumrine said that the ICS charge and a charge for failing to activate his BWC were sustained. (68). Crumrine acknowledged that he was demoted from his position as probationary sergeant as the result of the two findings. (68).

64. Sergeant Crumrine acknowledged that based on his review of Lopera's BWC video, [including events that occurred before his arrival], he saw no conduct by Mr. Farmer that would justify the use of the TASER, head strikes, or the LVNR. (73). Crumrine testified that based on his understandings of LVMPD policies, striking Mr. Farmer ten to twelve times in the head would have been outside policy and deploying the TASER seven times would have been outside policy. (76-77).

Deposition of Officer Michael Tran

65. Officer Tran indicated that he and his partner, Officer Michael Flores were assigned to the LINQ Hotel on May 14, 2017. (20). Tran testified that right after he and Flores parked at the LINQ garage, he heard someone ask for code red Venetian 1. (22). Tran reported that it took only about a minute for he and Flores to get to the Venetian. (25). Officer Tran described what he observed when he arrived testifying: "As I pulled my vehicle towards the rear of the

Venetian, I observed another patrol vehicle, a Crown Vic, to my left. I parked on the right side of it. As I exited the vehicle, I'm running towards—running forward, towards the front of the Crown Vic. I observed two officers on the ground with a suspect or unknown person. And they're up against a concrete barrier... I recognized one officer that was on the unknown subject's feet, feet area, but I did not—I could not see the other officer." (26). Tan said the officer he recognized was Sergeant Crumrine. (26).

66. Officer Tran testified: "My first reaction was to attempt to take the subject into custody. My partner and I began to grab ahold of arms, his hands, to try to handcuff the subject. That was my main focus, was just trying to take him into custody... I recall the—his left arm was wedged between the officer and the subject's own back. His right arm was, I guess, free, was not being held." (29). In describing when he realized Lopera had Farmer around the neck, Tran testified: "From my recollection, after we took the subject into custody and when I looked down at the subject is when I observed an elbow around the subject's neck." (31).

67. Officer Tran denied that it was him that said: "let him go, Ken" on the video at 3:25. (37). Tran also denied that it was he who responded to Lopera when Lopera asked if the person "was sure." (37). In describing what he said to Lopera, Tran testified: "After we took him into custody, I peered down at the subject, and observed that he was out and there was an elbow. And I stated to Officer Lopera, 'Loosen up. Loosen up. He is out.' And Officer Lopera released the hold on the subject." (38). Tran said that Lopera immediately released

Farmer when Tran spoke to Lopera. (38).   Tran made clear that as soon as he saw Lopera's elbow and Farmer was not responsive and looked unconscious, he immediately told "Lopera to let him go-to loosen up." (39). Tran estimated that from the time he saw Lopera's elbow until the time Farmer was released was "three to five seconds. Three seconds." (40).   Tran estimated that it took twenty to thirty seconds to get Farmer handcuffed and that he did not observe any resistance or whether Farmer was unconscious at that time. (41).

68. Officer Tran testified that Sergeant Crumrine remained by Farmer's feet during the handcuffing process. (54). Tran described what he did after Lopera released his hold testifying: "I recall checking to see if the subject was conscious or not. I did a sternum rub, to see if he had any reaction to the sternal rub.   The I checked for a pulse...I did not find a pulse, so I sat up Mr. Farmer and began lower back taps to see if I can get him to start breathing again.   I radioed dispatch to roll medical." (54-55).   Tran estimated that an ambulance was on the scene in three to five minutes. (58).   Tran reported that another officer began CPR. (58).

69. I would note that Officer Tran was asked about California POST training and it was suggested by counsel that POST training is universal, but it comes from the—California.   While I am thoroughly familiar with the California POST Learning Domains, these modules are used only in California and are unknown outside of California.

23

Deposition of Officer Michael Flores

70. Officer Flores described how he became involved in the events surrounding Mr. Farmer testifying: "Officer Tran and myself were in the parking lot of the Linq Casino.  We were just about to step out of our patrol vehicle and walk inside. We heard, 'Venetian give me a red,' and dispatch asked, 'Where's, what's your location?' because Venetian's a big property, so I remember looking at Officer Tran and myself and said, 'Let's go right over there' because they are neighboring properties, and it sounded like an officer was in trouble. All we heard was yelling, 'Venetian, give me a red.'" (19).  Flores continued: "So we headed towards the rear of Venetian over by the security, and when we approached the Venetian property I seen a Crown Vic with the lights on, and we parked next to that Crown Vic." (19).

71. Officer Flores acknowledged that when he saw Lopera, Lopera was on his back with at least one arm around Farmer's neck and his legs wrapped around Farmer's waist or hip area. (20-21).

72. Officer Flores acknowledged that in his statement after the even he said that Lopera had LVNR applied for no more than a minute. (27).  Flores agreed that it was near a minute. (27-28).  In response to whether he had taken any action to stop Lopera's LVNR, which Flores acknowledged by policy should be no longer than fifteen seconds, Flores explained: "I didn't, I didn't honestly when we got there seeing he had an LVNR on him I believe but I'm on the lower part of Tashi Farmer's body trying to make him compliant, and I did not count 15 seconds." (29-30).   When asked if he had intervened, Flores testified: "I

24

remember we had, I heard an officer say, 'Let him go,' and I got him into custody as well.  There was one hand that had a handcuff on it, another one that wasn't, and Lopera I believe let go." (30). Officer Flores testified that at the time he did not think that Lopera applied the LVNR for too long and acknowledged that in his statement he was asked: "Um did you feel at any time it was too long?" to which Flores responded: "Uh, the-yes. Um, I remember when, uh, my partner Tran's like, 'Loosen up.' Cause we had him... 'Okay.' ' ... cuffed dudes. Yes.' (32).  Flores indicated that if he had felt it was too long "then, yes, I would have [stopped Lopera]. (33).

73. Officer Flores testified that when he and Tran arrived at the Venetian the only information that he had was that it was a red, meaning an emergency. (49-50). Flores described that his initial goal was to get Farmer in custody. (50).  Flores had no recollection of seeing Farmer's head, thus he did not know Farmer's state of consciousness. (50).  Flores said he was reacting based on what he was observing at the time. (50).  Flores said: "I went up towards the subject, Tashi Farmer's head, and my partner was there, Tran, and Sgt. Crumrine was around his waist area I believe, so I went down to his legs, and I heard someone say, 'Get off my fucking legs.' (50-51).   Flores said that it was his perception that Farmer was resisting based on: "All the commotion, moving back and forth, seemed as if there was a wrestling match going on." (51).  Flores testified that he thought Farmer was still conscious and moved toward Farmer legs to accomplish "segmenting" as he was taught in the academy. (51). Flores described segmenting as "to gain compliance by going towards different

sections of a person's body in order for him to neutralize and gain compliance to get him into custody." (51).   Flores described: "I went towards his legs and segmented his legs and went ahead and tried to get him into compliance or custody of him I should say." (52).   Flores stated: "I remember we were able to see one arm that was cuffed, his left arm, and the right arm I could not see so I went ahead and reached for my cuffs to get his other arm attached to the one cuff that was swinging around." (53).   Flores estimated that from the time he arrived until Farmer was cuffed was thirty seconds to a minute, though Flores acknowledged he was not actually timing anything. (53).   Flores testified that Farmer was released by Lopera within a couple of seconds of being handcuffed. (55).   Flores reported that he learned that Mr. Farmer Brown was unconscious when they turned him over. (56-57).   Flores agreed that during this chaotic scene he never thought Lopera was using excessive force while they were trying to get Farmer handcuffed. (57).

74. Officer Flores acknowledged that there are three levels of the LVNR based on the degree of pressure being used which is the result of the angle of the hold. (60).   Flores explained: "LVNR 1 where you're just trying to gain compliance. 2 would be I believe at 45 degrees, and 3 is 90 degrees against him." (60). Flores acknowledged that he could not tell what level LVNR Lopera was employing at the time. (60).   Flores acknowledged that Lopera had his arms in the LVNR position, but Flores did not know what if any pressure he was placing on Farmer. (60-61).

75. It is my opinion, based upon my specialized background, education, experience, and training, as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that Sergeant Crumrine, Officer Tran, and Officer Flores did not act inconsistently with generally accepted law enforcement policies, practices, training, or legal mandates trained to officers for application in field operations with respect to a duty to intervene in the force being used by Officer Lopera.

76. At the outset I note that it is well known in law enforcement that each responding officer takes the scene as they find it and their actions are judged by what that officer knew at the time. While I offer no opinions on the actions of Lopera, I note that Crumrine, Flora, and Tran all responded to a code red, an emergency call where an officer is asking for assistance. As such, these officers are judged on the generally accepted law enforcement practices for an assistance call and not based on any conduct which preceded their knowledge or arrival at the call.

77. In the case of Flores, Crumrine, and Tran, the officers were responding to an assistance call. When they arrived they observed an officer on the ground trying to gain custody of a subject. Crumrine, who was on the scene the longest before custody was accomplished, was present for only about one minute and ten seconds. Flores and Tran were on the scene for only 46 seconds until restraint was accomplished.

78. All officers are trained that when they observe excessive force or other misconduct against citizens, they have a duty to intervene on behalf of the

27

Deposition of Officer Michael Flores

70. Officer Flores described how he became involved in the events surrounding Mr. Farmer testifying: "Officer Tran and myself were in the parking lot of the Linq Casino.  We were just about to step out of our patrol vehicle and walk inside. We heard, 'Venetian give me a red,' and dispatch asked, 'Where's, what's your location?' because Venetian's a big property, so I remember looking at Officer Tran and myself and said, 'Let's go right over there' because they are neighboring properties, and it sounded like an officer was in trouble. All we heard was yelling, 'Venetian, give me a red.'" (19).  Flores continued: "So we headed towards the rear of Venetian over by the security, and when we approached the Venetian property I seen a Crown Vic with the lights on, and we parked next to that Crown Vic." (19).

71. Officer Flores acknowledged that when he saw Lopera, Lopera was on his back with at least one arm around Farmer's neck and his legs wrapped around Farmer's waist or hip area. (20-21).

72. Officer Flores acknowledged that in his statement after the even he said that Lopera had LVNR applied for no more than a minute. (27).  Flores agreed that it was near a minute. (27-28).  In response to whether he had taken any action to stop Lopera's LVNR, which Flores acknowledged by policy should be no longer than fifteen seconds, Flores explained: "I didn't, I didn't honestly when we got there seeing he had an LVNR on him I believe but I'm on the lower part of Tashi Farmer's body trying to make him compliant, and I did not count 15 seconds." (29-30).  When asked if he had intervened, Flores testified: "I

24

remember we had, I heard an officer say, 'Let him go,' and I got him into custody as well.  There was one hand that had a handcuff on it, another one that wasn't, and Lopera I believe let go." (30). Officer Flores testified that at the time he did not think that Lopera applied the LVNR for too long and acknowledged that in his statement he was asked: "Um did you feel at any time it was too long?" to which Flores responded: "Uh, the-yes. Um, I remember when, uh, my partner Tran's like, 'Loosen up.' Cause we had him... 'Okay.' ' ... cuffed dudes. Yes.' (32).  Flores indicated that if he had felt it was too long "then, yes, I would have [stopped Lopera]. (33).

73. Officer Flores testified that when he and Tran arrived at the Venetian the only information that he had was that it was a red, meaning an emergency. (49-50). Flores described that his initial goal was to get Farmer in custody. (50).  Flores had no recollection of seeing Farmer's head, thus he did not know Farmer's state of consciousness. (50).  Flores said he was reacting based on what he was observing at the time. (50).  Flores said: "I went up towards the subject, Tashi Farmer's head, and my partner was there, Tran, and Sgt. Crumrine was around his waist area I believe, so I went down to his legs, and I heard someone say, 'Get off my fucking legs.' (50-51).  Flores said that it was his perception that Farmer was resisting based on: "All the commotion, moving back and forth, seemed as if there was a wrestling match going on." (51).  Flores testified that he thought Farmer was still conscious and moved toward Farmer legs to accomplish "segmenting" as he was taught in the academy. (51). Flores described segmenting as "to gain compliance by going towards different

sections of a person's body in order for him to neutralize and gain compliance to get him into custody." (51).   Flores described: "I went towards his legs and segmented his legs and went ahead and tried to get him into compliance or custody of him I should say." (52).   Flores stated: "I remember we were able to see one arm that was cuffed, his left arm, and the right arm I could not see so I went ahead and reached for my cuffs to get his other arm attached to the one cuff that was swinging around." (53).   Flores estimated that from the time he arrived until Farmer was cuffed was thirty seconds to a minute, though Flores acknowledged he was not actually timing anything. (53).   Flores testified that Farmer was released by Lopera within a couple of seconds of being handcuffed. (55).   Flores reported that he learned that Mr. Farmer Brown was unconscious when they turned him over. (56-57).   Flores agreed that during this chaotic scene he never thought Lopera was using excessive force while they were trying to get Farmer handcuffed. (57).

74. Officer Flores acknowledged that there are three levels of the LVNR based on the degree of pressure being used which is the result of the angle of the hold. (60).   Flores explained: "LVNR 1 where you're just trying to gain compliance. 2 would be I believe at 45 degrees, and 3 is 90 degrees against him." (60).   Flores acknowledged that he could not tell what level LVNR Lopera was employing at the time. (60).   Flores acknowledged that Lopera had his arms in the LVNR position, but Flores did not know what if any pressure he was placing on Farmer. (60-61).

75. It is my opinion, based upon my specialized background, education, experience, and training, as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that Sergeant Crumrine, Officer Tran, and Officer Flores did not act inconsistently with generally accepted law enforcement policies, practices, training, or legal mandates trained to officers for application in field operations with respect to a duty to intervene in the force being used by Officer Lopera.

76. At the outset I note that it is well known in law enforcement that each responding officer takes the scene as they find it and their actions are judged by what that officer knew at the time.  While I offer no opinions on the actions of Lopera, I note that Crumrine, Flora, and Tran all responded to a code red, an emergency call where an officer is asking for assistance.  As such, these officers are judged on the generally accepted law enforcement practices for an assistance call and not based on any conduct which preceded their knowledge or arrival at the call.

77. In the case of Flores, Crumrine, and Tran, the officers were responding to an assistance call.  When they arrived they observed an officer on the ground trying to gain custody of a subject.  Crumrine, who was on the scene the longest before custody was accomplished, was present for only about one minute and ten seconds. Flores and Tran were on the scene for only 46 seconds until restraint was accomplished.

78. All officers are trained that when they observe excessive force or other misconduct against citizens, they have a duty to intervene on behalf of the

27

citizen. Such intervention may include a verbal desist order or physical intervention where necessary. Officers are also taught that they have a duty to report misconduct as soon as practical. Another component of the duty to intervene that is trained to all officers is that this duty arises when two things come together, first, the officer must have notice of the excessive force or other misconduct and second there must be an opportunity to intervene. For example, an officer who sees another officer delivering multiple blows to a compliant or incapacitated individual would clearly have notice and as the blows continue would have opportunity to intervene.

79. I note that the underlying basis for Mr. DeFoe's opinion is simply that the three officers were on the scene at the time that Officer Lopera had his arm around Mr. Farmer's neck for in Sergeant Crumrine's case, 70 seconds, and in the case of Tran and Flores around 46 seconds and thus they should have stopped Lopera.

80. The fact of the matter is that these responding officers responded to an assistance call and observed an officer on the ground on his back trying to take custody of Farmer. While all of the officers recognize the short duration for an LVNR, none of the officers knew how much or whether Lopera was putting any pressure on Farmers neck at that time. With respect to Sergeant Crumrine, it is clear based on the audio from Lopera's BWC and the testimony of the officers that Crumrine told Lopera soon after his arrival to release Farmer. As noted, that would not necessarily mean letting go of Farmer, who was on top of

28

Crumrine, completely, but releasing all pressure on Farmer's neck.   Lopera's response verified for Crumrine that Lopera had received the directive.

81. Crumrine as well as Flores and Tran all recognized on their arrival the immediate need to accomplish custody and restraint of Farmer.  In fact, a great deal of law enforcement training makes clear that the sooner restraint can be accomplished, the greater the chance that injury and sudden-in-custody death will occur.  One of the suggested practices is segmenting as detailed by Officer Flores.   Segmenting allows individual officers to control quadrants of the subject's body so that no officer has to put body weight on the subject and restraint can be accomplished quickly.  Based on the video and testimony of the officers, they recognized that this was a priority and Flores, Crumrine, and Tran were all working for this short period of time to accomplish restraint by taking different positions on Farmer's body to gain control/

82. It is well known in law enforcement that when an officer is undertaking a specific task with respect to a subject, the officer's focus is on the task and the subject and not what other officers are doing at the time.  Thus, while trying to quickly accomplish restraint, Sergeant Crumrine, Officer Tran, and Officer Flores were not acting contrary to any generally accepted policy, practice, training, or legal mandate trained to officers for application in field operations by failing to watch the movements or Officer Lopera.

83. It should be noted that there is no evidence in the material that Crumrine, Tran, and Flores knew or had reason to know that Lopera may have committed

29

misconduct before their arrival and that Lopera was possibly doing a rear naked choke hold and continued to maintain it.

84. It is my opinion, based upon my specialized background, training, experience and education as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that Sergeant Crumrine acted consistently with generally accepted policies, practices, training and legal mandates trained to officers for application in field operations with respect to command and control of the scene.

85. I note that Crumrine was the first officer on the scene to an officer needing assistance call.  On his arrival he observed an officer on the ground attempting to take custody of an unknown individual.    Sergeant Crumrine had no information as to what crime this subject committed or what levels of resistance Lopera had faced or even if there were weapons involved.  Consistent with all generally accepted policies, practices, training and legal mandates trained to officer for application in field operations Crumrine's primary responsibility was to assist Lopera in accomplishing restraint and custody of Farmer.  It is clear from the video as well as the testimony of he and Tran, that Crumrine did provide direction to Lopera while assisting Lopera.  It is also clear that Crumrine's involvement in what was quickly recognized as an in-custody death also made it apparent that he should not be involved in the aftermath of the event.  Any involvement in the aftermath would have been outside the generally accepted policies, practices, and training in law enforcement.  Officers who have

been involved in the use of force or restraint of a subject who dies is never placed in command of the incident.

86. At this stage of my review I do not know if I may be asked to review additional documents. Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

87. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

88. My fees for these professional services are outlined in the attached retainer agreement.

This report is signed under penalty of perjury on this 29th day of August 2018, in Greenville, R.I.

*s/John J. Ryan*
John J. Ryan