# Exhibit O - Expert report of Plaintiffs' police practices' expert Scott DeFoe

## On-Scene Consulting

April 16, 2018

Mr. Darren D. Darwish, Esq.
Abir Cohen Treyzon Salo, LLP
1901 Avenue of the Stars, Suite 935
Los Angeles, California 90067

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**ESTATE OF TASHI S. FARMER a/k/a TASHII BROWN, by and through its Special Administrator, Elia Del Carmen Solano-Patricio; TAMARA BAYLEE KUUMEALI' FARMER DUARTE, a minor, individually and as Successor-in-Interest, by and through her legal guardian, Stevandra Lk Kuanoni; ELIAS BAY KAIMIPONO DUARTE, a minor, individually and as Successor-in-Interest, by and through his legal guardian, Stevandra Lk Kuanoni, Plaintiffs,**
vs.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a political subdivision of the State of Nevada; OFFICER KENNETH LOPERA, INDIVIDUALLY and in his Official Capacity; and Does 1 through 50, inclusive, Defendants.**
**(Case No. 2:17-CV-01946-JCM-PAL).**

Dear Mr. Darwish,

Thank you for retaining me to analyze and render opinions regarding the May 14, 2017, In-Custody Death of Mr. Tashi S. Farmer by Las Vegas Metropolitan Police Department (LVMPD) Police Officer Kenneth Lopera at the Venetian Resort Hotel Casino located at 3355 Las Vegas Boulevard, South, Las Vegas, Nevada, 89109. Pursuant to the requirements of Rule 26, I have studied reports, photographs, videos, Las Vegas Metropolitan Police Department Documents, Transcriptions of Digitally Recorded Interviews and Depositions, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case.

Please be advised that if any additional documents related to this matter, are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

## On-Scene Consulting

**Materials Reviewed:**
1. Complaint for Damages, Case No. 2:17-CV-01946-JCM-PAL.
2. LVMPD Policy 6/002.00: Use of Force Policy in effect on date of subject incident, (<u>LVMPD 0001-0040</u>).
3. LVMPD Policy 5/108.16: Defensive Tactics Policy in effect on date of subject incident, (<u>LVMPD 0041-0044</u>).
4. LVMPD Convention Center Area Command Flex Team Manual, (<u>LVMPD 0045-0069</u>).
5. LVMPD Advanced Officer Skills Training Defensive Tactics Manual in effect on date of subject incident, (<u>LVMPD 0070-0272</u>).
6. LVMPD Ethical Use of Force Course, (<u>LVMPD 0273-0572</u>).
7. LVMPD Academy Defensive Tactics Curriculum Syllabus, (<u>LVMPD 0573-0574</u>).
8. LVMPD Standardized Lesson Plan titled, Lateral Vascular Neck Restraint, (<u>LVMPD 0575-0586</u>).
9. Lateral Vascular Neck Restraint System Training Manual, (<u>LVMPD 0587-0720</u>).
10. LVMPD Lateral Neck Restraint Basic Certification and Recertification Course, (<u>LVMPD 0721-0750</u>).
11. LVMPD Taser Training Course, (<u>LVMPD 0751-0957</u>).
12. LVMPD Taser Training Materials, (<u>LVMPD 0958-1014</u>).
13. LVMPD Taser Recertification Course in effect at that time of the subject incident, (<u>LVMPD 1015-1026</u>).
14. LVMPD Patrol Procedures-Pedestrian Stops Training Materials, (<u>LVMPD 1027-1057</u>).
15. LVMPD CALEA documents, (<u>LVMPD 1058-1062</u>).
16. LVMPD Office of Internal Oversight Use of Force Statistical Analysis 2011-2015, Deadly and Non-Deadly Use of Force Report, (<u>LVMPD 1063-1088</u>).
17. LVMPD Office of Internal Oversight Use of Force Statistical Analysis 2012-2016, Deadly and Non-Deadly Use of Force Report, (<u>LVMPD 1089-1118</u>).
18. Officer Lopera's LVMPD Training History, (<u>LVMPD 1119-1126</u>).
19. LVMPD Unit Log by Incident No. for Incident LLV170514000228, (<u>LVMPD 1525-1540</u>).
20. LVMPD Quality Assurance Critical Incident Call Review for Event No. LLV170514000228, (<u>LVMPD 1541-1543</u>).
21. Clark County Autopsy Report for Tashi S. Brown and Toxicology Report, (<u>LVMPD 1544-1556</u>).
22. LVMPD Autopsy Report, (<u>LVMPD 1553</u>).
23. LVMPD Crime Scene Investigation Report by Officer Alsup, P#8289 for Event No. 170514-0228, (<u>LVMPD 1554-1556</u>).
24. LVMPD Crime Scene Report by Officer J. Patton, P#8289 for Event No. 170514-0228, (<u>LVMPD 1557-1558</u>).
25. Taser Report print-out for Event No. LLV170514000228, (<u>LVMPD 1559-1583</u>).
26. CD Rom of dispatch recordings for Event No. LLV170514000228.
27. CD Rom of audio statements taken by LVMPD's Force Investigation Team.
28. FIT transcribed statement of Sergeant Shakeel Abdal-Karim, (<u>LVMPD 1584-1587</u>).
29. FIT transcribed statement of Officer Michael Amburgey, (<u>LVMPD 1588-1597</u>).
30. FIT transcribed statement of Carolyn Becic, (<u>LVMPD 1598-1614</u>).
31. FIT transcribed statement of Sergeant Travis Crumrine, (<u>LVMPD 1615-1621</u>).
32. FIT transcribed statement of Officer Michael Flores, (<u>LVMPD 1622-1635</u>).
33. FIT transcribed statement of Ronnie Guy, (<u>LVMPD 1636-1644</u>).
34. FIT transcribed statement of Erik Hopkins, (<u>LVMPD 1645-1659</u>).
35. FIT transcribed statement of Peter Infantino, (<u>LVMPD 1660-1669</u>).

## On-Scene Consulting

36. FIT transcribed statement of Cody Kollar, (LVMPD 1670-1686).
37. FIT transcribed statement of Officer Ashley Lif, (LVMPD 1687-1694).
38. FIT transcribed statement of Jonathan Pierce, (LVMPD 1695-1711).
39. FIT transcribed statement of Officer James Rybacki, (LVMPD 1712-1718).
40. FIT transcribed statement of Officer Michael Tran, (LVMPD 1719-1725).
41. FIT transcribed statement of Marcelino Vibas, (LVMPD 1726-1736).
42. FIT transcribed statement of Witness No. 1, (LVMPD 1737-1751).
43. LVMPD Photographs, (LVMPD 1752-2546).
44. LVMPD Use of Force Statistics 2012-2017, (LVMPD 2547).
45. LVMPD Discipline for Excessive Force Involving Neck Area, (LVMPD 2548-2552).
46. CONFIDENTIAL CIRT transcribed statement of Sergeant Travis Crumrine, (CONFIDENTIAL 0001-0100).
47. CONFIDENTIAL CIRT transcribed interview statement of Officer Ashley Lif, (CONFIDENTIAL 0101-0204).
48. CONFIDENTIAL CIRT transcribed statement of Officer Michael Amburgey, (CONFIDENTIAL 0205-0239).
49. CONFIDENTIAL CIRT transcribed statement of Officer Michael Flores, (CONFIDENTIAL 0240-0317).
50. CONFIDENTIAL CIRT transcribed statement of Officer Michael Tran, (CONFIDENTIAL 0318-0387).
51. CONFIDENTIAL CIRT transcribed statement of Officer Theron Young, (CONFIDENTIAL 0388-0438).
52. Tashi Farmer's criminal records from the Honolulu Police Department relating to Incident Report No. 99-169-106, (LVMPD 2553-2695).
53. Tashi Farmer's criminal records from the Honolulu Police Department relating to Incident Report No. 00-100-306, (LVMPD 2696-2795).
54. Certified Record of Tashi Farmer's summary of criminal charges in the State of Hawaii, (LVMPD 3101-3105).
55. NMS Toxicology Report regarding Tashi Farmer, (3106-3112).
56. Defendant Officer Kenneth Lopera's Rule 26 (A) (1) Initial Disclosures, Case No. 2:17-CV-01946-JCM-PAL, (Lopera 00001-38).
57. Deposition Transcript of Officer Ashley Lif taken on December 20, 2017.
58. Deposition Transcript and Exhibit of Sergeant Michael Bland taken on December 21, 2017.
59. Plaintiff's Initial Disclosures, Arrest Report of Kenneth Lopera, (000001-13).
60. Deposition Transcript of Sergeant Travis Crumrine taken on December 27, 2017.
61. Deposition Transcript of Officer Michael Flores taken on February 8, 2018.
62. Deposition Transcript of Chief John McGrath taken on December 27, 2017.
63. Deposition Transcript of Peter Infantino taken on December 21, 2017.
64. Deposition Transcript of Officer Michael Tran taken on December 20, 2017.
65. Deposition Transcript of Marcelino Vibas taken on December 21, 2017.
66. Recorded Interview of Carolyn Becic, 170514-0228, (22:53).
67. Recorded Interview of Cody Kollar, 170514-0228, (22:35).
68. Recorded Interview of Eric Hopkins, 170514-0228, (18:48).
69. Recorded Interview of Jonathan Pierce, 170514-0228, (22:21).
70. Recorded Interview of Marcelino Vibas, 170514-0228, (11:57).
71. Recorded Interview of Officer Ashley Lif, 170514-0228, (9:24).
72. Recorded Interview of Officer James Rybacki, 170514-0228, (9:53).
73. Recorded Interview of Officer Michael Amburgey, 170514-0228, (10:39).

## On-Scene Consulting ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

74. Recorded Interview of Peter Infantino, 170514-0228, (14:17).
75. Recorded Interview of Sergeant Travis Crumrine, 170514-0228, (9:54).
76. Recorded Interview of Ronnie Guy, 170514-0228, (11:41).
77. Recorded Interview of Sergeant Shakeel Abdal-Karim, 170514-0228, (4:17).
78. Recorded Interview of Officer Michael Flores, 170514-0228, (13:47).
79. Recorded Interview of Witness #1, 170514-0228, (14:01).
80. LVMPD Use of Force Policy & Related Documents, (LVMPD 1127-1444).
81. LVMPD, Neck Restraint Research through Major City Chiefs Association; (LVMPD 1145-1468).
82. LVMPD Memorandum dated 11/28/17, Subject: LVNR Lesson Plan Information, (LVMPD 1469-1524).
83. Full Video of LVMPD Media Briefing after Tashi (Brown) Farmer Murder, (20:58).
84. Merged Video, (4:03).
85. Video: Tashi Farmer, Body Cam Shows Unarmed Black Man Fatally Tased and Choked to Death by Cop, (2:19).
86. State of Nevada, Department of Health and Human Services, Certificate of Death, Tashi Sebastian Farmer.
87. Defendant LVMPD's Answer to Plaintiff's Complaint, Case No. 2:17-CV-01946-JCM-PAL.
88. Defendant Officer Kenneth Lopera's Answer and Affirmative Defenses, Case No. 2:17-CV-01946-JCM-PAL.
89. Defendant LVMPD's Fourth Supplemental Disclosure of Witnesses and Exhibits, Case No. 2:17-CV-01946-JCM-PAL.

**The Below Listed Information is derived from Las Vegas Metropolitan Police Department Arrest Report, ID/Event #2791941, approved by LVMPD Sergeant J. Mac Donald, P#4660, (Plaintiff's Initial Disclosures 000005-12).**

On May 14, 2017 at 0116 hours, detectives with the LVMPD Force Investigation Team (FIT) were notified of an in-custody death that occurred at the Venetian Hotel. Detectives responded to the scene and were briefed by Sergeant Abdal-Karim. Sergeant Abdal-Kari related the following:

Officers Lopera and Lif were inside the Venetian Hotel getting a cup of coffee. The officers were approached by a black male adult, (Tashi Farmer) who was sweating profusely and stated that he was being chased. Farmer then ran from the officers and was chased by Officer Lopera.

During the foot pursuit, Officer Lopera observed Farmer near a white truck and believed he attempted to open the tailgate of the truck in his attempt to flee. Officer Lopera then observed Farmer approach the drivers' door of the white truck and believed Farmer was going to take the vehicle by force. Officer Lopera discharged his ECD, striking Farmer with both probes and Farmer fell to the ground. Farmer attempted to pull the ECD probes out and attempted to grab the ECD from Officer Lopera's hand,

Security guards from the Venetian Hotel responded and attempted to help take Farmer into custody. Officer Lopera then performed the Lateral Vascular Neck Restraint, (LVNR) and rendered Farmer unconscious.

## On-Scene Consulting

Officers requested medical personnel and were attempting to revive Farmer when they observed he was not breathing. Officers began Cardio Pulmonary Resuscitation (CPR) and continued until relieved by medical personnel. Farmer was transported to Sunrise Hospital where he was pronounced deceased at 0139 hours.

Sergeant Abdal-Karim provided detectives with the names of several to include LVMPD officers and civilians. Sergeant Abdal-Karim also relayed that video surveillance was available from the Venetian hotel and also Officer Lopera's Body Worn Camera (BWC).

Detectives with FIT then assumed investigative responsibility. Sergeant MacDonald took control of Officer Lopera's BWC and maintained control of the camera until the video footage was viewed and downloaded by detectives.

During the walkthrough, which was started at the point when he exited the hotel, Officer Lopera stated he observed a security officer and asked if the officer has seen anyone running. The security officer pointed to the south and Officer Lopera observed Farmer running south in the middle of the street. Farmer approached a white truck that was travelling west. Farmer attempted to open the tailgate of the truck and Officer Lopera believed that Farmer was going to take the vehicle by force. Officer Lopera deployed and discharged his ECD resulting in Farmer falling to the ground. The walkthrough was then stopped as advised by LVPPA Attorney John Aldrich.

After viewing surveillance footage from the Venetian Hotel, detectives were able to retrieve the numbers and letters of the license plate for the white truck which Farmer approached. An interview was conducted with the registered owner of the vehicle. The following is a summary of the interview and is not verbatim: Jonathan Pierce was stopped in traffic as he approached the parking garage of the Venetian. His friend, "Joanne" was in the passenger seat and drew Jonathan Pierce's attention to an officer (Officer Lopera), running towards his truck on the rear passenger side. Jonathan Pierce then noticed a black male (Farmer) near the driver's side of his truck who Pierce believed Officer Lopera was chasing.

Officer Lopera told Farmer to "Stop" and "I'm going to Tase you." Pierce saw Officer Lopera Tase Farmer, who fell near the rear of Pierce's truck. Pierce saw and heard Officer Lopera "Tase" Farmer several times. During this time, Farmer was not complying and appeared to be trying to get away. Officer Lopera and Farmer moved away from Pierce's truck and Pierce began to drive away.

As Pierce drove away, he continued to watch Officer Lopera and Farmer in his mirror. Farmer was on the ground and Officer Lopera "mounted" Farmer and aggressively struck Farmer in the face. Prior to pulling into the garage, Pierce saw that an officer had Farmer in a rear naked choke. Pierce was unsure if Officer Lopera was the officer who was applying the rear naked choke, but he believed that it was. Pierce stated Farmer did not attempt to open his driver's door, however, Pierce said Farmer's erratic behavior made him nervous, so he locked his doors prior to observing Farmer being "Tased" by Officer Lopera.

Pierce said Officer Lopera gave Farmer several verbal commands during the incident, and Farmer was not complying. Pierce did not see Farmer try to hit anyone, and it appeared that he did not want to be arrested.

## On-Scene Consulting ────────────────────────────

At 0425 hours, Officer Lif was interviewed by detectives. The following is a summary of the interview. Officers Lif and Lopera were inside the Venetian Hotel getting a cup of coffee when Farmer approached them. Farmer was sweating profusely and asked the officers if they knew where a drinking fountain was located. The officers told Farmer they did not know but if he walked around, he would probably find one.

Officer Lopera then asked Farmer why he was sweating so badly, and Farmer stated that he had just ran across the street because people were following him. Farmer asked if the officers could escort him down to valet and the officers agreed. Farmer then began to walk away and Officer Lopera attempted to get Farmer to come back and talk to them. Officer Lopera handed his coffee to Officer Lif and started walking after Farmer. Farmer then began to run down the hallway and Officer Lopera followed him. Officer Lif lost track of Officer Lopera and Farmer and did not see them again until Farmer was in custody outside the hotel.

At 0434 hours, Officer Tran was interviewed by detectives. Below is a summary of the interview. When he arrived at the rear of the Venetian, Officer Tran observed a LVMPD vehicle in the street and an officer in a green uniform with a suspect on the ground. When he exited his vehicle and approached it appeared that the officer had the suspect in the LVNR, and a handcuff on one hand. When he looked at the suspect, he appeared to be unconscious. Officer Tran told Officer Lopera to "Let go." When Officer Lopera loosened up on the LVNR, the suspect was able to be placed in handcuffs. The suspect appeared to be unresponsive and Officer Tran was unable to find a pulse. Medical was requested and Officer Amburgey began CPR.

During the subsequent investigation, I viewed the footage uploaded from Officer Lopera's BWC. The camera was activated at 00:54:14 on 05-14-17. The following annotations were identified along with the time each event occurred. The time noted is from the activation of the BWC.

00:00-The camera was activated, and Farmer approached Officers Lopera and Lif

00:09-Officer Lopera began walking towards Farmer.

00:13-Farmer walked through a chained off area into an employee only area.

00:14-Officer Lopera reached out to grab Farmer. Farmer turned and ran down a hallway. Officer Lopera ran after Farmer.

00:52-Officer Lopera reached a stairwell and began descending down the stairs.

01:18-Officer Lopera exited the hotel.

01:19-Officer Lopera asked a security guard if he observed anyone running.

01:21-Officer Lopera ran south.

01:30-Farmer observed by a white vehicle.

01:34-Officer Lopera yelled, "Stop don't move. You're going to get tased."

## On-Scene Consulting

<u>01:36</u>-Officer Lopera yelled, "Taser, Taser, Taser."  Farmer then fell backwards onto the street.

<u>01:38</u>-Officer Lopera yelled, "Taser, Taser."  Farmer held his hands up and a cell phone is visible in his left hand.

<u>01:39</u>-Officer Lopera yelled, "Don't move."
Farmer replied, "OK."
Officer Lopera yelled, "Don't move."

<u>01:43</u>-Officer Lopera pointed in the direction of the white truck and yelled, "Stop right there."

<u>01:45</u>-Officer Lopera yelled, "Get on your stomach."
Farmer replied, "I will.  I will. Please."  Farmer fell backward to the ground.

<u>01:49</u>-Officer Lopera broadcasted over the radio, Control Venetian 1, Give me a red."
Farmer is heard saying, "Please."

<u>01:51</u>-Officer Lopera yelled, "Don't move.  Get on your stomach."

<u>01:53</u>-Farmer attempted to put his left shoe on again.

<u>01:54</u>-Officer Lopera yelled, "Get on your stomach."
Farmer was rolling on his right side.

<u>01:55</u>-Farmer replied, "I will" then yelled, "I will."

<u>01:56</u>-Farmer reached to his lower back.

<u>01:57</u>-Officer Lopera yelled, "Get on your stomach."

<u>02:00</u>-Farmer rolled onto his stomach, then to his back.

<u>02:01</u>-Officer Lopera yelled, "Get on your stomach."
Farmer replied, "I will."

<u>02:03</u>-Officer Lopera yelled, "Get on your stomach.  Do it now."

<u>02:04</u>-Farmer rolled to his stomach.  Officer Lopera grabbed Farmer's left arm.

<u>02:07</u>-Farmer replied, "OK, OK, Ok Sir."

<u>02:09</u>-Officer Lopera yelled, "Get on your stomach."
Farmer replied, "I will."

<u>02:13</u>-Officer Lopera stated, "Stop, you're gonna get it again.  Get it again.  Help me out."

<u>02:18</u>-Farmer said, "No, no, no."

## On-Scene Consulting

02:20-Venetian Hotel Security arrived.  They gave Farmer verbal commands and a guard grabbed onto Farmers' arms.
Farmer said, "I will."

02:22-Secuirty gave commands to "Stop, turn around."
Farmer replied, "I will."  Farmer then sat up.

02:24-Officer Lopera told Farmer, "Get on the ground."

02:27-Farmer replied, "OK sir."

02:29-Officer Lopera told Farmer, "Don't move."

02:30-Officer Lopera repeated the command, "Don't move."

02:33-Officer Lopera holstered his ECD and told Farmer, "Hands behind your back."
Farmer replied, "I'm trying to."

02:35-Officer Lopera told Farmer, "On your stomach."

02:36-Officer Lopera straddled Farmers lower back.

02:37-Officer Lopera put both of his hands-on Farmers head.

02:40-Officer Lopera told Farmer, "Get on your stomach."
Farmer was observed lying on his stomach.

02:42-Officer Lopera told Farmer, "Get on your stomach."
Farmer was observed lying on his stomach.

02:45-Security was observed grabbing Farmer's arms.

02:47-Officer Lopera told Farmer, "Get on your stomach."
Farmer was observed lying on his stomach.

02:50- Officer Lopera told Farmer, "Get on your stomach."
Farmer was observed lying on his stomach.

02:52- Officer Lopera told Farmer, "Get on your stomach."
Farmer was observed lying on his stomach.

02:53-Officer Lopera told Farmer, "Let me see your hands."

02:58-Officer Lopera appeared to put Farmer in some type of neck restraint.

03:01-Sergeant Crumrine arrived and stated, "Put your fucking hands behind your back."

## On-Scene Consulting

<u>03:13</u>-Officer Lopera asked, "Is he out yet?

<u>03:15</u>-Farmer gasps.

<u>03:18</u>- Officer Lopera asked, "Is he out yet?

<u>03:19</u>- Officer Lopera asked, "Is he out yet?

<u>03:25</u>-Officer Tran arrived and said, "Let him go Ken." *(According to Sergeant Crumrine, he made the comment "Let him go Ken," and according to Officer Michael Tran, he denies that he made the comment).*

<u>03:26</u>-Officer Lopera asked, "Are you sure?"
Officer Tran replied, "Yeah."

<u>03:27</u>-Officer Lopera stated, "Roll him to…Hold on.  Don't grab my fucking legs."
Officer Tran stated, "We're on top of him."

<u>03:30</u>-Officer Lopera stated, "Roll him to the other side.  Get the other arm too!"

<u>03:36</u>-Officer Lopera placed the palm of his hand on Farmer's forehead.

<u>03:38</u>-Officer Lopera asked, "You got the other one?"

<u>03:50</u>-Farmer Gasps.

<u>04:11</u>-Officer Lopera released the hold on Farmer.

<u>04:17</u>-Officer Lopera stated, "He tried to carjack somebody."

<u>04:36</u>-Officer Lopera stated, "I Tased him."

<u>04:38</u>-Officer Lopera stated, "Roll medical."

<u>05:03</u>-Sergeant Crumrine approached Officer Lopera.  Officer Lopera told Sergeant Crumrine, he was getting coffee when he was approached by a guy who said someone was following him. Officer Lopera then stated the male ran away from the officers and outside the hotel.  As Officer Lopera was chasing the male, he attempted to gain access into the bed of a truck at which time, Officer Lopera tased him.  Farmer attempted to pull the ECD wires out and Officer Lopera said, "I choked him out."

<u>05:44</u>-Officer Lopera told the other officers he needed to obtain a voluntary statement from the driver of the white truck.

<u>06:38</u>-Officer Lopera told Officer Flores and Rybacki what happened.  During the conversation he stated, *"I start wailing on this dude then I rear mounted and choked him out."*

## On-Scene Consulting

<u>07:02</u>-Officer Lopera told Officer Lif, "He tried to get in somebody's truck. *"So, I Tased him and choked him out."*

<u>07:20</u>-Officer Lopera asked, "Sarge, is he OK? He's breathing?" Officer Lopera then gave a thumbs-up sign and said, "Thank you."

<u>07:27</u>-Officer Lopera asked if he should expedite medical.

<u>07:41</u>-Officer Lopera tells another officer, *"I tased him, fought a little bit and choked him out."*

<u>09:34</u>-Officer Lopera talked to Officer Lif again. During the conversation, Officer Lif told her, *"I started punching him, Rear nakeded his ass. He went out."*

During the subsequent investigation, I viewed the footage uploaded from Officer Rybacki's BWC. The camera was activated at <u>01:04:16 on 05-14-17</u>. The following annotations were identified along with the time of each event occurred. The time noted is from the time stamp on the video.

<u>0056:40</u>-Officer Lopera holstered his ECD.

<u>00:56:40-00:57:03</u>-*Officer Lopera struck Farmer in the head approximately 10-12 times.*

<u>00:57:03-00:58:16</u>-Officer Lopera held Farmer in a choke hold.

During the investigation, both Officer Lopera's BWC and the video surveillance from the Venetian Hotel were synced so they would play together. The following times are according to the time stamp on the Venetian Hotel surveillance with the BWC synced.

<u>00:57:30</u>-Officer Tran told Officer Lopera to let go of Farmer.

<u>00:58:16</u>: Officer Lopera released Farmer.

An analysis report was generated for Taser X26P, Serial Number X12002RP4, which was assigned to Officer Lopera. According to the time stamp on Officer Lopera's ECD, it was armed at <u>00:54:10</u>. The ECD was activated by a trigger pull at <u>00:54:12</u> for five seconds, <u>00:54:21</u> for five seconds, 00:54:31 for five seconds, <u>00:54:37</u> for five seconds, <u>00:54:46</u> for five seconds; <u>00:54:51</u> for five seconds; and <u>00:54:59</u> for nine seconds. The ECD was rendered safe at <u>00:55:10</u>.

On 05-31-17, I received the Autopsy Report from the Clark County Office of the Coroner Medical Examiner. The autopsy was conducted by Dr. Alane Olson on 05-14-17 at 1255 hours. Dr. Olson opined that the cause of death was "Asphyxia due to police restraint" and the manner of death was homicide. According to Dr. Olson during the autopsy, she found hemorrhaging in the neck which would be consistent with being choked.

According to her statement, Officer Lif believed the contact between the officers and Farmer was a consensual encounter. Farmer had approached the officers and asked if they knew where a drinking fountain was located. After a short conversation with Officer Lopera, Farmer began to

## On-Scene Consulting

walk away from the officers and towards a hallway which was marked with an illuminated exit sign. Farmer walked into a chain which was suspended by two yellow caution cones. Officer Lopera reached out with both arms in an attempt to grab Farmer. Farmer then turned around and ran down the hallway chased by Officer Lopera.

LVMPD policy states an officer may initiate a foot pursuit of any individual(s) the officer reasonably believes is about to engage in, is engaging in, or has engaged in criminal activity. As Officer Lopera began to chase Farmer, he had no reasonable suspicion or probable cause to believe that Farmer had been involved in any criminal conduct.

Officer Lopera continued to follow Farmer outside of the hotel and observed him near a white truck. Officer Lopera stated he believed Farmer attempted to gain access into the bed of the white truck and began walking towards the driver's side of the truck. Officer Lopera believed Farmer was going to attempt to take the vehicle by force and deployed his ECD. The driver of the white truck, Jonathan Pierce stated that he did not believe Farmer was a threat. Officer Lopera pulled the trigger of his ECD. Both probes struck Farmer in the back resulting in neuromuscular incapacitation. Farmer fell to the ground and landed on his back.

Officer Lopera began issuing verbal commands to Farmer however the longest times between cycles of the ECD was six seconds. Officer Lopera told Farmer to get on his stomach several times but never gave Farmer a reasonable opportunity to comply with commands before cycling the ECD again. Officer Lopera's verbal commands also contradicted each other, telling Farmer "don't move" followed by a command to "get on your stomach."

LVMPD policy states after the initial five second cycle, the officer will evaluate the need to apply an additional five second cycle after providing the subject a reasonable opportunity to comply. Policy further states that after a subject has been exposed to three cycles the ECD shall be deemed ineffective and another force option will be considered.

After cycling the ECD seven times, Officer Lopera holstered his ECD. With Farmer lying on his stomach, Officer Lopera straddled Farmer's back and struck him approximately 10-12 times in the head while giving Farmer verbal commands to "Get on your stomach." According to LVMPD policy, officers should only use hand strikes when a subject is displaying aggressive resistance. Aggressive resistance is defined as that which has the potential to cause injury or substantial pain. Based upon Officer Lopera's BWC and surveillance obtained by the Venetian Hotel, Farmer was laying on his stomach attempting to keep from being handcuffed. As Officer Lopera began to strike him, Farmer appeared to be protecting his face from being hit. Farmer did not appear to be displaying aggressive resistance.

After striking Farmer in the head, Officer performed what he described as a "rear naked choke." This technique is not approved by or taught by the LVMPD. The LVMPD employs the Lateral Vascular Neck Restraint, (LVNR). The LVNR is a neck restraint which can render a subject unconscious by stopping blood flow to the brain by compressing the carotid arteries and does not restrict a subject's air flow. *Officer Lopera held the "rear naked choke" for one minute and thirteen seconds. Officer Lopera also held the "rear naked choke" for forty-four seconds after being told to let go by Officer Tran.* The LVMPD policy states that the LVNR will only be used in accordance with policy and department training.

## On-Scene Consulting

Due to the fact that Officer Lopera, who was on duty and acting in his official capacity as a Police Officer, attempted to detain Farmer inside the Venetian Hotel without sufficient legal authority for the detention, initiated a foot pursuit of Farmer which resulted in Farmer being detained and using force outside his training and department policy which resulted in Farmer's death, the crime of Oppression Under the Color of Office was committed. The force used consisted of the ECD, empty hand strikes to the head, and a choke hold.

Although Officer Lopera did not provide a statement to criminal investigators, it is reasonable to believe that he did not intend to cause death to Farmer. However, Officer Lopera used his ECD, empty hand strikes, and a choke hold all of which were outside department policy and his training. According to Dr. Olson, Farmer died as a result of asphyxiation due to police restraint. Officer Lopera referred to the restraint as a "rear naked choke" which is not authorized by the LVMPD. Therefore, Officer Lopera committed the crime of Involuntary Manslaughter.

**Opinions:**

1. It is my opinion that LVMPD Police Officer Kenneth Lopera failed to initially determine that Mr. Tashi Farmer was mentally ill or experiencing a mental crisis. Throughout the United States and in Nevada, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Farmer who might be suffering from a mental illness or experiencing a mental crisis. Such contacts are extremely common in police work, and inappropriate tactics frequently lead to bad results, as they did here. The objective is to avoid unnecessary injury and or death. The underlying principle is reverence for human life. These correct and reasonable include methods such as: recognize cues and other indicators to make appropriate decisions regarding intervention strategies, time to assess the situation, calm the situation, request additional and equipment, provide reassurance that the officers are there to help, give the person time to calm down, move slowly, eliminate emergency lights and reduce environmental distractions. These correct and reasonable methods are well known and proven effective for the safety and welfare of both Peace Officers and the public. In addition, I base my opinion on my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. Lastly, I base my opinion on my review of the facts in this matter:

- It is the policy of the Las Vegas Metropolitan Police Department to respect the rights of the mentally ill and will protect the basic rights to be left alone unless they present a danger to themselves or others, (CIRT 2017-015, Lif, Page 23).
- According to Crisis Intervention Training (CIT) Officer Ashley Lif, she believed that Mr. Farmer was mentally ill, (Confidential 0121).
- According to CIT Officer Ashley Lif, Mr. Farmer did not show any signs of aggression towards Officer Lopera, (Confidential 0123).
- According to CIT Officer Ashley Lif, she didn't believe that a foot pursuit was a valid option, (Confidential 0129).

## On-Scene Consulting   ————————————————————

According to CIT Officer Ashley Lif, she believed that Mr. Farmer was possibly suffering from a mental illness, (Deposition Transcript of Officer Ashley Lif, Page 23).

2. It is my opinion that a reasonable officer acting consistent with standard police practices would not have believed that Mr. Tashi S. Farmer was going to "carjack" Mr. Jonathan Pierce's white truck. I base my opinion on my review of the videos in this incident where at no time does it depict that Mr. Tashi Farmer attempted to "carjack" Mr. Jonathan Pierce's vehicle or any other vehicle. In addition, I base my opinion on my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. Lastly, I base my opinion on my review of the facts in this matter:

- The driver of the white truck, Jonathan Pierce stated that he did not believe Mr. Farmer was a threat, (Las Vegas Metropolitan Police Department Continuation Report, ID/Event #2791941, Page 7 of 8).
- According to Jonathan Pierce, he stated, "I never felt like he was trying to get into the bed of the truck," (LVMPD 1702).

3. It is my opinion that a reasonable officer acting consistent with standard police practices would not have deployed their Electronic Control Device, Taser X26P, striking Mr. Tashi Farmer in the back and causing him to fall to the ground. It is my opinion that LVMPD Police Officer Kenneth Lopera's actions elevated his contact with Mr. Tashi Farmer from a Consensual Encounter to a Detention without legal justification and unnecessarily escalated the situation. A Consensual Encounter is a face-face encounter with a person under circumstances which would cause a reasonable person to believe they are free to leave or otherwise not cooperate. A lawful Detention requires reasonable suspicion of criminal activity. A temporary detention or stop is an assertion of authority by a peace officer that would cause a reasonable person to believe that they are not free to leave. Such a belief may result from physical restraint, unequivocal verbal commands, or other conduct by an officer. A detention of a person is limited in scope, intensity and duration. It is less than an arrest and more substantial than a consensual encounter.

In addition, I base my opinion on Las Vegas Metropolitan Police Department Standardized Lesson Plan, Patrol Procedures-Pedestrian Stops (PARTS I-IV), Date Reviewed July 29, 2013 (LVMPD 1033-1034), states, an Officer's ability to perform pedestrian stops within the confines of the law hinges on their understanding of the levels of Police contact. The following definitions are per LVMPD Policy 5/200.00.

Consensual Encounter: A completely voluntary interaction with members of the public, requiring no legal justification for the interaction, where a reasonable person would feel free to disregard the police and go about their business.

Investigative Detention: Also known as a "Terry Stop," is a seizure of a person for no more than 60 minutes, with the limited scope and purpose of conducting an investigation and for which a police officer must have reasonable suspicion that a person is committing, has committed or is about to commit a crime. In addition, I base my opinion on my review of the facts in this matter

## On-Scene Consulting ────────────────────────

to include my review of the videos in this matter where at no time did Mr. Tashi S. Farmer commit crime that would necessitate a detention.

In addition, I base my opinion on my opinion on my twenty-eight-year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

4. It is my opinion that LVMPD Police Officer Kenneth Lopera used excessive and unnecessary force when he deployed his Electronic Control Device (ECD), Taser X26P, striking Mr. Tashi Farmer in the back and causing him to fall to the ground. I base my opinion on my review of the video and the facts in this matter. In addition, I base my opinion on <u>Las Vegas Metropolitan Police Department Standardized Lesson Plan, ECD Recertification 2016</u>, Date Revised 07-31-2016, Resistance Levels: You have to be able to articulate that the subject has the intent to cause harm to you, someone else of themselves, and that the use of the ECD is reasonable, (<u>LVMPD 1020</u>).

In addition, it is my opinion that LVMPD Police Officer Kenneth Lopera violated <u>LVMPD 6/002.01-Use of Force Procedure</u>, (<u>LVMPD 0001-0040</u>).

A. <u>Officers may use reasonable force</u>:

1. To protect themselves.

2. To protect others.

3. To affect a lawful detention.

4. To affect a lawful arrest.

5. To protect a lawful search.

IV. <u>LEVELS OF CONTROL</u>

<u>Intermediate Force</u>-a level of force that has the potential to cause injury or substantial pain and is greater than lower force.

Based on my review of the aforementioned <u>LVMPD 6/002.01-Use of Force Procedure</u>, at no time did Mr. Tashi Farmer commit a crime or an act that would necessitate the use of an Electronic Control Device (<u>ECD</u>) at any time during this incident. The basis in determining whether force is "unreasonable" shall be consistent with the Supreme Court decision of Graham v. Connor, 490 U.S. 386 (<u>1989</u>).

In addition, I base my opinion on <u>Taser International Smart Use Considerations, 2015 Taser International Inc.</u>, (<u>LVMPD 0837</u>), <u>When Reasonable</u>:
- Use the minimum force necessary to accomplish lawful objectives.
- Use force only on those "actively resisting" or higher.

## On-Scene Consulting   ─────────────────────────

- Give a verbal warning before the use of force.

In addition, I base my opinion on my opinion on my twenty-eight-year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

5.  It is my opinion that LVMPD Police Officer Kenneth Lopera used excessive and unnecessary force when he deployed his Electronic Control Device (ECD), Taser X26P, seven times.  Based on my review of the videos and an analysis report that was generated for Taser X26P, Serial Number X12002RP4, which was assigned to Officer Lopera.  According to the time stamp on Officer Lopera's ECD, it was armed at <u>00:54:10</u>.  The ECD was activated by a trigger pull at <u>00:54:12</u> for five seconds, <u>00:54:21</u> for five seconds, 00:54:31 for five seconds, <u>00:54:37</u> for five seconds, <u>00:54:46</u> for five seconds; <u>00:54:51</u> for five seconds; and <u>00:54:59</u> for nine seconds. The ECD was rendered safe at <u>00:55:10</u>.

In addition, I base my opinion on <u>Las Vegas Metropolitan Police Department Standardized Lesson Plan, ECD Recertification 2016, Date Revised 07-31-2016, Resistance Levels</u>: You have to be able to articulate that the subject has the intent to cause harm to you, someone else of themselves, and that the use of the ECD is reasonable, <u>(LVMPD 1020)</u>.

In addition, it is my opinion that LVMPD Police Officer Kenneth Lopera violated <u>LVMPD 6/002.01-Use of Force Procedure, (LVMPD 0001-0040)</u>.
A. <u>Officers may use reasonable force</u>:

1.  To protect themselves.

2.  To protect others.

3.  To affect a lawful detention.

4.  To affect a lawful arrest.

5.  To protect a lawful search.

IV.  <u>LEVELS OF CONTROL</u>

<u>Intermediate Force</u>-a level of force that has the potential to cause injury or substantial pain and is greater than lower force.

VIII. <u>ELECTRONIC CONTROL DEVICE</u> (ECD)

<u>Tactical Considerations</u>: When deploying an ECD, officers will: Use the standard ECD five (5) second cycle, and then the officer will evaluate the need to apply a second five (5) second cycle after providing the subject with a reasonable opportunity to comply.  Each subsequent five second cycle requires separate justification based upon the "objectively reasonable" standard of Graham v. Connor, 490 U.S. 386 (1989).  Once the subject has been exposed to three (3) cycles,

## On-Scene Consulting ──────────────────────────

the ECD will be deemed ineffective and another use of force option will be considered unless exigent circumstances exist.  In addition, it is my opinion that all (7) of the ECD deployments in this matter were excessive and unreasonable based on the facts in this matter.  In addition, based upon my review of the videos in this matter, LVMPD Officer Kenneth Lopera did not allow Mr. Tashi Farmer a reasonable opportunity to comply prior to each subsequent deployment of the ECD.

In addition, I base my opinion on Taser International Smart Use Considerations, 2015 Taser International Inc., (LVMPD 0837), When Reasonable:
- Use the minimum force necessary to accomplish lawful objectives.
- Use force only on those "actively resisting" or higher.
- Give a verbal warning before the use of force.


In addition, I base my opinion on Taser International Smart Use Considerations, 2015 Taser International Inc., (LVMPD 0842/852):
- Avoid multiple, repeated, prolonged, extended, or continuous CEW exposures unless necessary to counter reasonably perceived threat(s) and its justifiable.
- Several law enforcement groups, (e.g. IACP, PERF, COPS, DOJ) have established 15 seconds of CEW exposure (multiple applications or continuous) as a significant safety point.

Based on my review of the facts in this matter, Mr. Tash Farmer was exposed to the Taser X26P for 39 seconds over a 57 second time-period, which far exceeds the above-mentioned safety threshold.

In addition, I base my opinion on my opinion on my twenty-eight-year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

Lastly, I base my opinion on my review of the facts in this matter:
- Officer Lopera's verbal commands also contradicted each other, telling Farmer "don't move" followed by a command to "get on your stomach."
- In use of force incidents, the officer will transition, to differing degrees or types of force, including attempts to de-escalate.  Force situations are dynamic and require an officer to continually assess the subject's actions to ensure an "objectively reasonable" response. Officers shall modify their level of control in relation to the amount of resistance offered by a subject, (LVMPD 1131-1132).
- Sergeant Crumrine agreed that Officer Lopera's use of the Taser seven times and the last being used for nine seconds was out of policy, (Deposition Transcript of Sergeant Travis Crumrine).
- According to Officer Ashley Lif, tasing Mr. Farmer seven times would be out of policy, (Deposition Transcript of Officer Ashley Lif, Page 39).
- According to Officer Tran, tasing more than three times is out of policy, (Deposition Transcript of Officer Michael Tran, Page 49).
- According to PMK Sergeant Michael Bland, cycling the ECD seven times is outside of policy, (Deposition Transcript of Sergeant Michael Bland, Page 32).

## On-Scene Consulting ────────────────────────────

- According to PMK Sergeant Michael Bland, the 9 second deployment of the ECD was outside of policy, (Deposition Transcript of Sergeant Michael Bland, Page 33).

6. It is my opinion that LVMPD Police Officer Kenneth Lopera used excessive and unnecessary force when he struck Mr. Tashi Farmer (10-12) times in the head. I base my opinion on the facts in this matter that after cycling the ECD seven times, LVMPD Police Officer Kenneth Lopera holstered his ECD. With Mr. Tashi Farmer lying on his stomach, LVMPD Police Officer Kenneth Lopera straddled Mr. Farmer's back and struck him approximately (10-12) times in the head while giving Farmer verbal commands to "Get on your stomach." According to LVMPD policy, officers should only use hand strikes when a subject is displaying aggressive resistance. Aggressive resistance is defined as that which has the potential to cause injury or substantial pain. Based upon Officer Lopera's BWC and surveillance obtained by the Venetian Hotel, Farmer was laying on his stomach attempting to keep from being handcuffed. As Officer Lopera began to strike him, Mr. Farmer appeared to be protecting his face from being hit. Mr. Farmer did not appear to be displaying aggressive resistance.

In addition, it is my opinion that the (10-12) strikes delivered from LVMPD Officer Kenneth Lopera could have caused Great Bodily Injury or Death to Mr. Tashi Farmer. It is my opinion that a reasonable officer acting consistent with standard police practices would not have used lethal force in this situation. The basis in determining whether force to cause "unreasonable" shall be consistent with the Supreme Court decision of Graham v. Connor, 490 U.S. 386 (1989).

When an officer uses deadly force in self-defense, standard police practices and most agencies polices dictate that the officer must be facing what is reasonably believed to be an imminent or immediate threat of death or serious bodily injury.

In addition, it is my opinion that LVMPD Police Officer Kenneth Lopera violated LVMPD 6/002.01-Use of Force Procedure, (LVMPD 0001-0040).
A. Officers may use reasonable force:

1. To protect themselves.

2. To protect others.

3. To affect a lawful detention.

4. To affect a lawful arrest.

5. To protect a lawful search.

IV. LEVELS OF CONTROL

Intermediate Force-a level of force that has the potential to cause injury or substantial pain and is greater than lower force which includes Empty Hand Tactics, (takedown with injury, strikes, kicks).

## On-Scene Consulting ─────────────────────────

<u>Deadly Force</u>-the degree of force which is likely to produce death or serious bodily injury. Deadly force can also result from force being improperly applied.

<u>Parameters for Use of Deadly Force</u>-an officer may use deadly force upon another person only when it is "objectively reasonable" to:

A.  Protect themselves or others from what is reasonably believed to be an imminent threat of death or serious bodily injury.

B.  Prevent the escape of a fleeing felon who the officer has probable cause to believe has committed a violent felony crime and is an imminent threat to human life if escape should occur. Officers will give some warning, if feasible before the use of deadly force.

I base my opinion on the fact that Mr. Tashi S. Farmer was never an imminent threat of death or serious bodily injury to LVMPD Police Officer Kenneth Lopera or anyone else and Mr. Tashi S. Farmer did not commit any crime that would necessitate an arrest.

### Considerations Regarding the Use of Deadly Force

The use of force that can prove lethal is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by *the reverence for human life* and, used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which the decision to use force rests.  Deadly force, including the use of techniques that can kill, is always the last resort used in the direst of circumstances.  The authority to use such force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate."

In addition, I base my opinion on my opinion on my twenty-eight-year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

<u>Lastly, I base my opinion on my review of the facts in this matter</u>:
- <u>00:56:40-00:57:03</u>-*Officer Lopera struck Farmer in the head approximately 10-12 times.*
- According to Jonathan Pierce, he could see the officer on top of him and he was punching him in the face severely and he believed it was excessive, (<u>LVMPD 1697</u>).
- According to Jonathan Pierce, he never saw the man trying to hit anybody, but the officer was striking him in the face aggressively, (<u>LVMPD 1697</u>).

## On-Scene Consulting

- According to Officer Ashley Lif, she watched the video and did not see any justified reason for striking Mr. Farmer in the head 10-12 times, (Deposition Transcript of Officer Ashley Lif, Page 40).
- According to Officer Tran, he stated that based on his review of the video, there was no justification to strike Mr. Farmer 10-12 times in the head, (Deposition Transcript of Officer Michael Tran, Page 78).

7. It is my opinion that a reasonable officer acting consistent with standard police practices would not have used lethal force in this situation. It is my opinion that LVMPD Kenneth Lopera used excessive and unnecessary deadly force when he admitted using the "Rear Naked Choke Hold" for 1 minute and 13 seconds. I base my opinion on my review of the video and facts in this matter to include that this technique is not approved by or taught by the LVMPD. The LVMPD employs the Lateral Vascular Neck Restraint, (LVNR). The LVNR is a neck restraint which can render a subject unconscious by stopping blood flow to the brain by compressing the carotid arteries and does not restrict a subject's air flow. Officer Lopera held the "rear naked choke" for one minute and thirteen seconds. Officer Lopera also held the "rear naked choke" for forty-four seconds after being told to let go by Officer Tran or Sergeant Crumrine. The LVMPD policy states that the LVNR will only be used in accordance with policy and department training.

In addition, I base my opinion on Clark County Nevada, Medical Examiner, Coroner Alane M. Olson, M.D. Pathologist, who opined that Tashi S. Brown died as a result of asphyxia due to police restraint procedures and the manner of death was Homicide. According to Dr. Olson during the autopsy, she found hemorrhaging in the neck which would be consistent with being choked.

In addition, it is my opinion that LVMPD Police Officer Kenneth Lopera violated LVMPD 6/002.01-Use of Force Procedure, (LVMPD 0001-0040),

Deadly Force-the degree of force which is likely to produce death or serious bodily injury. Deadly force can also result from force being improperly applied.

Parameters for Use of Deadly Force-an officer may use deadly force upon another person only when it is "objectively reasonable" to:

A. Protect themselves or others from what is reasonably believed to be an imminent threat of death or serious bodily injury.

B. Prevent the escape of a fleeing felon who the officer has probable cause to believe has committed a violent felony crime and is an imminent threat to human life if escape should occur. Officers will give some warning, if feasible before the use of deadly force.

I base my opinion on the fact that Mr. Tashi S. Farmer was never an imminent threat of death or serious bodily injury to LVMPD Police Officer Kenneth Lopera or anyone else and Mr. Tashi Farmer did not commit any crime that would necessitate an arrest.

## On-Scene Consulting

The basis in determining whether force is "unreasonable" shall be consistent with the Supreme Court decision of Graham v. Connor, 490 U.S. 386 (1989).

When an officer uses deadly force in self-defense, standard police practices and most agencies polices dictate that the officer must be facing what is reasonably believed to be an imminent or immediate threat of death or serious bodily injury. Lastly, I base my opinion on my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Considerations Regarding the Use of Deadly Force

The use of force that can prove lethal is the most serious decision a peace officer may ever have to make. Such a decision should be guided by *the reverence for human life* and, used only when other means of control are unreasonable or have been exhausted. Reverence for life is the foundation on which the decision to use force rests. Deadly force, including the use of techniques that can kill, is always the last resort used in the direst of circumstances. The authority to use such force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously. In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate."

In addition, I base my opinion on my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

Lastly, I base my opinion on my review of the facts in this matter:

- 06:38-Officer Lopera told Officer Flores and Rybacki what happened. During the conversation he stated, "*I start wailing on this dude then I rear mounted and choked him out.*"
- 07:02-Officer Lopera told Officer Lif, "He tried to get in somebody's truck. "*So, I Tased him and choked him out.*"
- 07:41-Officer Lopera tells another officer, "*I tased him, fought a little bit and choked him out.*"
- 09:34-Officer Lopera talked to Officer Lif again. During the conversation, Officer Lopera told her, "*I started punching him, Rear nakeded his ass. He went out.*"
- 00:57:03-00:58:16-Officer Lopera held Farmer in a choke hold.
- According to Jonathan Pierce, it looked like a "Rear Naked Choke" and he remembers he was choking him for a really long time. Mr. Pierce stated that he has been taking Jiu Jitsu five days per week for two years, (LVMPD 1697-1698).
- According to Jonathan Pierce, you can't choke someone that long, (LVMPD 1707).

## On-Scene Consulting

- According to Sergeant Crumrine, LVMPD teaches that if applied correctly, a carotid hold or LVNR should make a person unconscious in about 7-14 seconds, (Deposition Transcript of Sergeant Travis Crumrine).
- According to Sergeant Crumrine after reviewing video, he does not see Mr. Farmer actively resisting that would justify him being Tased or justify him being hit 10-12 times in the head or justify a Lateral Vascular Neck Restraint, (Deposition Transcript of Sergeant Travis Crumrine, Page 72).
- According to Officer Michael Flores, a "Rear Naked Choke" is not approved by the Department, (Confidential 0307).
- According to Officer Michael Flores, he agrees that a "Rear Naked Choke" is out of policy and not an appropriate hold a LVMPD Officer can use, (Deposition Transcript of Officer Michael Flores, Page 26).
- 05:03-Sergeant Crumrine approached Officer Lopera. Officer Lopera told Sergeant Crumrine, he was getting coffee when he was approached by a guy who said someone was following him. Officer Lopera then stated the male ran away from the officers and outside the hotel. As Officer Lopera was chasing the male, he attempted to gain access into the bed of a truck at which time, Officer Lopera tased him. Farmer attempted to pull the ECD wires out and Officer Lopera said, "I choked him out."

8. It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident. It is also my opinion that there was a departure of from Use of Force and Use of Deadly Force Training. It is my expert opinion that a similarly trained Las Vegas Metropolitan Police Department Police Officer would not have considered Mr. Tashi Farmer to be a lethal threat in this set of facts. As such, it is my opinion LVMPD Police Officer Kenneth Lopera's actions constituted unreasonable, excessive, and deadly force, which did not comply with established training and standards. Lastly, I base my opinion on my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

9. It is my opinion that LVMPD Police Officer Kenneth Lopera failed to consider the following before he used lethal force causing the death of Mr. Tashi Farmer:

- Highest level of force an Officer can use.
- The individual's actions must be life threatening, Immediate Defense of Life.
- Must be a last resort before using lethal force.
- Must be the direst of circumstances.
- Deadly force is likely to cause great bodily injury or death.
- Must show a reverence for human life.
- There are no other reasonable measures available.
- All other reasonable measures were exhausted.
- Warnings when feasible that deadly force will be used.
- Subjective Fear is insufficient.
- Over reaction is excessive force.

## On-Scene Consulting

Lastly, I base my opinion on my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**Considerations Regarding the Use of Deadly Force**

The use of force that can prove lethal is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by *the reverence for human life* and, used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which the decision to use force rests.  Deadly force, including the use of techniques that can kill, is always the last resort used in the direst of circumstances.  The authority to use such force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate."

10.  It is my opinion based on my review of the facts in this matter, LVMPD Sergeant Travis Crumrine, P#8881, failed to activate his Body Worn Camera (BWC) prior to his arrival to the incident.  It is my opinion that this failure was critical as I believe the audio and video recordings would have ensured transparency and a record of what transpired.  I addition, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.  Lastly, I base my opinion on my review of the facts in this matter:
   *  Sergeant Crumrine admits he should have activated his BWC as soon as he is on an incident and while driving Code-3, (Confidential 0069).

11.  It is my opinion based on my review of the facts in this matter, LVMPD Police Officer Ashley Lif, P#15392, failed to activate her Body Worn Camera (BWC) prior to her arrival to the incident.  It is my opinion that this failure was critical as I believe the audio and video recordings would have ensured transparency and a record of what transpired.  Lastly, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

12.  It is my opinion based on my review of the facts in this matter, LVMPD Police Officer Michael Flores, P#15098, failed to activate his Body Worn Camera (BWC) prior to his arrival to the incident.  It is my opinion that this failure was critical as I believe the audio and video recordings would have ensured transparency and a record of what transpired.  Lastly, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

13.  It is my opinion based on my review of the facts in this matter, LVMPD Police Officer Michael Tran, P#15221, failed to activate his Body Worn Camera (BWC) prior to his arrival to

## On-Scene Consulting

the incident. It is my opinion that this failure was critical as I believe the audio and video recordings would have ensured transparency and a record of what transpired. Lastly, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. <u>Lastly, I base my opinion on my review of the facts in this matter</u>:

- According to Officer Tran, he turned off his camera when he was standing around waiting for medical, (<u>Confidential 0345</u>).

14. It is my opinion based on my review of the facts in this matter, LVMPD Sergeant Travis Crumrine, P#8881, failed to take Command and Control of the scene. Based on my review of the testimony and the facts in this matter, Sergeant Travis Crumrine failed to establish the objectives of the incident, continually re-evaluate the situation, assess available resources to best achieve incident objectives. In addition, I base my opinion on my opinion on my twenty-eight-year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. <u>Lastly, I base my opinion on my review of the facts in this matter</u>:

- The prospect of a favorable outcome is often enhanced when supervisors become involved in the management of an overall response to potentially violent encounters by coordinating resources and officer's tactical actions. Supervisors should possess a good knowledge of tactics and ensure that officers under their supervision perform a standard, (<u>LVMPD 1134</u>).
- Sergeant Crumrine went to his police vehicle while officers were potentially doing CPR, so he could run the subject on his Mobile Digital Terminal, (<u>Confidential 0036</u>).
- Sergeant Crumrine failed to assign a monitoring officer to Officer Lopera immediately after the incident, (<u>Confidential 0075</u>).
- According to Sergeant Crumrine, he never initiated a "Major Incident and All Hazards Plan," (<u>Deposition Transcript of Sergeant Travis Crumrine, Page 67</u>).
- According to Officer Michael Flores, he can't remember Sergeant Crumrine taking charge and couldn't remember if he said anything, (<u>Confidential 0302</u>).

15. It is my opinion based on my review of the facts in this matter, LVMPD Sergeant Travis Crumrine, P#8881, failed his Duty to Intervene and violated <u>LVMPD 6/002.01-Use of Force Procedure</u>, (<u>LVMPD 0001-0040</u>)

## II. <u>DUTY TO INTERVENE</u>
Any commissioned officer present and observing another officer using force that is clearly beyond that which is "objectively reasonable" under the circumstances will, when in position to do so, safely intercede to prevent the use of excessive force. Officers will promptly report these observations to a supervisor. I base my opinion on the facts and testimony in this matter to include:

- <u>02:58</u>-Officer Lopera appeared to put Farmer in some type of neck restraint.
- <u>03:01</u>-Sergeant Crumrine arrived and stated, "Put your fucking hands behind your back."
- <u>04:11</u>-Officer Lopera released the hold on Farmer.

Sergeant Crumrine was present (3) seconds after LVMPD Police Officer Kenneth Lopera placed an unauthorized "Rear Naked Choke" on Mr. Tashi Farmer and was present for 1 minute and 10

## On-Scene Consulting

seconds after it was applied.  It is my opinion that Sergeant Crumrine's Failure to Intervene contributed to the death of Mr. Tashi Farmer.

The community expects that its peace officers will use reasonable force, and peace officers will intervene if reasonable force is exceeded.  For the community and officer's protection, the officer must know the laws pertaining to intervention.

This intervention may take the form of one or more of the following actions:
- Strongly caution the other officer.
- Physically restrain the other officer.
- Immediately report the incident.

An officer may face both criminal or civil liability and disciplinary action if they fail to intervene and prevent other officers from violating anyone's constitutional rights if they had reason to know and an opportunity to act. *US v. Koon, 34F.3d 1416 at 1447 (9ᵗʰ Cir., 1994); Cunningham v. Gates, 229F.3d 1271 at 1289-1290 (9ᵗʰ Cir. 2000).* The failure to intervene was in violation of Mr. Farmer's Fourth Amendment Civil Rights.
Lastly, I base my opinion on my review of the facts in this matter:
- Sergeant Crumrine stated he saw them on the ground and he knew he had him in a LVNR, (LVMPD 1617).
- Sergeant Crumrine stated from 3:26-4:11, he never looked to see if Lopera released the hold, (Deposition Transcript of Travis Crumrine, Page 46).
- Sergeant Crumrine stated that he never observed Officers Tran or Flores attempt to intervene and remove Lopera's hands from the neck of Mr. Farmer, (Deposition Transcript of Sergeant Travis Crumrine, Pages 68-69).
- According to Officer Tran, from the time that he got there until the time that Officer Lopera released the hold, he did not see Sergeant Crumrine do anything to intervene, (Deposition Transcript of Officer Michael Tran, Page 77).

16.  It is my opinion based on my review of the facts in this matter, LVMPD Police Officer Michael Flores, P#15098, failed his Duty to Intervene and violated LVMPD 6/002.01-Use of Force Procedure, (LVMPD 0001-0040)

## II. DUTY TO INTERVENE

Any commissioned officer present and observing another officer using force that is clearly beyond that which is "objectively reasonable" under the circumstances will, when in position to do so, safely intercede to prevent the use of excessive force.  Officers will promptly report these observations to a supervisor.  I base my opinion on the facts and testimony in this matter to include:
- 03:25-Officers Tran and Flores arrived.
- 04:11-Officer Lopera released the hold on Mr. Farmer.

Police Officer Michael Flores was present for 46 seconds while LVMPD Police Officer Kenneth Lopera maintained an unauthorized "Rear Naked Choke" on Mr. Tashi Farmer.  It is my opinion that Officer Michael Flores' Failure to Intervene contributed to the death of Mr. Tashi Farmer.

## On-Scene Consulting ────────────────────────────

The community expects that its peace officers will use reasonable force, and peace officers will intervene if reasonable force is exceeded. For the community and officer's protection, the officer must know the laws pertaining to intervention.

This intervention may take the form of one or more of the following actions:
- Strongly caution the other officer.
- Physically restrain the other officer.
- Immediately report the incident.

An officer may face both criminal or civil liability and disciplinary action if they fail to intervene and prevent other officers from violating anyone's constitutional rights if they had reason to know and an opportunity to act. *US v. Koon, 34F.3d 1416 at 1447 (9th Cir., 1994): Cunningham v. Gates, 229F.3d 1271 at 1289-1290 (9th Cir. 2000)*. Their failure to intervene was in violation of Mr. Farmer's Fourth Amendment Civil Rights.

Lastly, I base my opinion on my review of the facts in this matter:
- According to Officer Flores, he saw that Lopera had Farmer in a LVNR and Sergeant Crumrine had his lower legs, (LVMPD 1626).
- According to Officer Michael Flores, he stated that it was 30 seconds to 1 minute until Lopera let go of the LVNR completely, (Confidential 0312-313).
- According to Officer Michael Flores, if a person is using an "Rear Naked Choke" on a subject, he would have the duty to intervene, (Deposition Transcript of Officer Michael Flores, Page 26).
- According to Officer Michael Flores, if necessary pulling the hands away from a person's neck, (Deposition Transcript of Officer Michael Flores, Page 26).
- According to Officer Michael Flores, he agrees that the application of a LVNR should only go until there is compliance, but in no event longer than 15 seconds, (Deposition Transcript of Officer Michael Flores, Page 27).
- According to Officer Michael Flores, he agrees that applying the LVNR too long is excessive force and that he did not do anything to intervene and stop officer Lopera, (Deposition Transcript of Officer Michael Flores, Pages 32/34).
- According to Officer Michael Flores, with (4) Officers, they could take Mr. Farmer into custody and therefore it was unnecessary for Officer Lopera to continue his hold once there were (4) Officers, (Deposition Transcript of Officer Michael Flores, Page 36).

17. It is my opinion based on my review of the facts in this matter, LVMPD Police Officer Michael Tran, P#15221, failed his Duty to Intervene and violated LVMPD 6/002.01-Use of Force Procedure, (LVMPD 0001-0040)

## II. DUTY TO INTERVENE

Any commissioned officer present and observing another officer using force that is clearly beyond that which is "objectively reasonable" under the circumstances will, when in position to do so, safely intercede to prevent the use of excessive force. Officers will promptly report these observations to a supervisor. I base my opinion on the facts and testimony in this matter to include:
- 03:25-Officers Tran and Flores arrived.
- 04:11-Officer Lopera released the hold on Farmer.

## On-Scene Consulting

Police Officer Michael Tran was present for 46 seconds while LVMPD Police Officer Kenneth Lopera maintained an unauthorized "Rear Naked Choke" on Mr. Tashi Farmer. It is my opinion that Officer Michael Tran Failure to Intervene contributed to the death of Mr. Tashi Farmer.

The community expects that its peace officers will use reasonable force, and peace officers will intervene if reasonable force is exceeded. For the community and officer's protection, the officer must know the laws pertaining to intervention.

This intervention may take the form of one or more of the following actions:
- Strongly caution the other officer.
- Physically restrain the other officer.
- Immediately report the incident.

An officer may face both criminal or civil liability and disciplinary action if they fail to intervene and prevent other officers from violating anyone's constitutional rights if they had reason to know and an opportunity to act. *US v. Koon, 34F.3d 1416 at 1447 (9th Cir., 1994); Cunningham v. Gates, 229F.3d 1271 at 1289-1290 (9th Cir. 2000).* Their failure to intervene was a violation of Mr. Farmer's Fourth Amendment Civil Rights.

Lastly, I base my opinion on my review of the facts in this matter:
- According to Officer Tran, when he arrived, the suspect appeared to be out, like unconscious, (LVMPD 1722).
- According to Officer Tran, when he arrived, the suspect was not moving at any point and there was no resistance from the subject at any point once he arrived, (Confidential 0337).
- According to Officer Tran, he agrees that when an officer sees a person unconscious and is still in a LNVR or any other choke hold, per his training, he is required to intervene, (Deposition Transcript of Officer Michael Tran, Pages 52-53).

**My Qualifications for Reviewing this Case:**

My opinions are based on my education, training and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811. Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader. Upon my graduation from the LAPD Academy, I was assigned to 77th Division. In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail). I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

## On-Scene Consulting

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. I received the Purple Heart in 2010. Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division. I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basis Detective School. Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division. Prior to my assignment, I attended mandated Basic Supervisor School. In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training. The training focused on team building, leadership, and decision making. While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include: Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training. I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents. I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance. While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group. I directly supervised (14) Police Officers and Detectives assigned to the Unit. Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division. I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives. As a Unit, we prepared and served numerous search warrants. I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the service. I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section. I investigated personnel complaints that were too large in scope for a geographical Division. At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police. I completed numerous in-depth staff projects for review by the Chief of Police. In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

## On-Scene Consulting ——————————————————

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised ten undercover officers and four uniformed officers. I provided all facets of training to the officers assigned to Vice at that time to include: Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School.   While at K9, I investigated and completed K9 contacts, personnel investigations, Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. *I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.*

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers. I conducted and facilitated all facets of SWAT training to include: Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team. I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training. In addition, I was assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counter-Terrorism following the terrorist attack in November 2008. I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

## On-Scene Consulting ──────────────────────────────

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents. Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include: on-site security personnel, local law enforcement, medical and fire rescue and relevant investigative agencies. Conducted all facets of security training for the company and employees. Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include: calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.

## On-Scene Consulting

Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies.  Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats.  Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants.  Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe