Exhibit P - Deposition of
LVMPD Defendants' police
practices expert Jack Ryan

99

1              C E R T I F I C A T E

2

3         I, DENISE A. WEBB, a Notary Public in and for
   the State of Rhode Island, duly commissioned and
   qualified to administer oaths, do hereby certify that
4  the foregoing Deposition of JOHN J. RYAN, an EXPERT
   WITNESS in the above-entitled cause, was taken before
5  me on behalf of the PLAINTIFFS at the offices of
   Allied Court Reporters, Inc., 115 Phenix Avenue,
6  Cranston, Rhode Island on October 19, 2018 at
   3:00 p.m.; that previous to examination of said EXPERT
7  WITNESS who was of lawful age, he was first sworn by
   me and duly cautioned to testify to the truth, the
8  whole truth, and nothing but the truth, and that he
   thereupon testified in the foregoing manner as set out
9  in the aforesaid transcript.

10        I further certify that the foregoing Deposition
   was taken down by me in machine shorthand and
11 transcribed by computer, and that the foregoing
   Deposition is a true and accurate record of the
12 testimony of said EXPERT WITNESS.

13        Pursuant to Rules 5(d) and 30(f) of the Federal
   Rules of Civil Procedure, original transcripts shall
14 not be filed in Court; therefore, the original is
   delivered to and retained by Plaintiff's Attorney,
15 Federico C. Sayre.

16        Reading and signing of the transcript was not
   requested by the Deponent or by any Parties involved
17 upon completion of the Deposition.

18        IN WITNESS WHEREOF, I have hereunto set my hand
   and seal this 2nd day of November, 2018.
19

20

21

22       _Denise A. Webb, RPR_
         _Notary Public_

23

24 _____
         DENISE A. WEBB, CSR/RPR/NOTARY PUBLIC
25       MY COMMISSION EXPIRES APRIL 7, 2022

**In The Matter Of:**

*Estate of Tashi S. Farmer vs*
*Las Vegas Metropolitan Police Department*

---

*John J. Ryan*
*October 19, 2018*

---



**ALLIED**
COURT REPORTERS, INC.
—AND—
VIDEO CONFERENCE CENTERS

*Min-U-Script® with Word Index*

**Estate of Tashi S. Farmer vs**
**Las Vegas Metropolitan Police Department**

**John J. Ryan**
**October 19, 2018**

---

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
 2

 3

 4   ESTATE OF TASHI S. FARMER
     a/k/a TASHII FARMER a/k/a
 5   TASHII BROWN, by and through
     its Special Administrator,
 6   Lorin Michelle Taylor; TAMARA
     BAYLEE KUUMEALI MAKAMAE
 7   FARMER DUARTE, a minor, individually
     and as Successor-in-Interest, by
 8   and through her legal guardian,
     Stevandra Lk Kuanoni; ELIAS BAY
 9   KAIMIPONO DUARTE, a minor, individually
     and as Successor-in-Interest, by and
10   through his legal guardian,
     Stevandra Lk Kuanoni

11            Plaintiffs
          VS.          C.A. No. 2:17-cv-01946-JCM-PAL
12
     LAS VEGAS METROPOLITAN POLICE
13   DEPARTMENT, a political subdivision
     of the State of Nevada; OFFICER KENNETH
14   LOPERA, individually and in his Official
     Capacity; SERGEANT TRAVIS CRUMRINE,
15   individually and in his Official Capacity;
     OFFICER MICHAEL TRAN, individually and
16   in his Official Capacity;
     OFFICER MICHAEL FLORES, individually
17   and in his Official Capacity; and
     Does 1 through 50, inclusive,
18
             Defendants.
19

20

21            DEPOSITION of JOHN J. RYAN, an EXPERT WITNESS
     in the above-entitled cause, taken on behalf of the
22   PLAINTIFFS, pursuant to notice, before Denise A. Webb,
     a Registered Professional Reporter and Notary Public
23   in and for the State of Rhode Island, at the offices
     of Allied Court Reporters, Inc., 115 Phenix Avenue,
24   Cranston, Rhode Island, on October 19, 2018, at
     3:00 p.m.
25
```

---

**Page 2**

```
 1                    APPEARANCES:

 2

 3

 4

 5

 6   FOR THE PLAINTIFFS..... ABIR COHEN TREYZON SALO, LLP
                              1901 AVENUE OF THE STARS,
 7                            SUITE 935
                              LOS ANGELES, CALIFORNIA  90067
 8                        BY: FEDERICO C. SAYRE, ESQUIRE

 9   FOR THE DEFENDANT...... MARQUIS AURBACH COFFING
     (LVMPD, CRUMRINE       10001 PARK RUN DRIVE
10   and FLORES)            LAS VEGAS, NEVADA  89145
                        BY: CRAIG R. ANDERSON, ESQUIRE
11

12   FOR THE DEFENDANT..... MCNUTT LAW FIRM, P.C.
13   (LOPERA)               625 SOUTH EIGHT STREET
                            LAS VEGAS, NEVADA  89101
14                      BY: DANIEL R. MCNUTT, ESQUIRE

15

16

17   ** ALL ATTORNEYS APPEARED VIA VIDEOCONFERENCE **

18

19

20

21

22

23

24

25
```

---

**Page 3**

```
 1            I N D E X

 2

 3

 4   WITNESS:                            PAGE

 5   JOHN J. RYAN

 6       EXAMINATION BY MR. SAYRE  . . . . . . . . . .5

 7

 8

 9

10

11

12

13            E X H I B I T S

14

15

16       THERE WERE NO EXHIBITS OFFERED IN THIS DEPOSITION.

17

18

19

20

21

22

23

24

25
```

---

**Page 4**

1   (DEPOSITION COMMENCED AT 3:46 P.M.)
2   THE VIDEOGRAPHER: We're on the record.
3   My name is William White. I am the videographer.
4   Today's date is October 19, 2018. The time on
5   the video is 15:47.
6   We're in Cranston, Rhode Island in the
7   matter of the Estate of Tashi Farmer, et al.
8   versus Las Vegas Metropolitan Police Department,
9   United States District Court for the District of
10  Nevada, CA Number 2:17-CV-01946-JCM-PAL.
11  Would the attorneys please identify
12  themselves for the record.
13  MR. SAYRE: Representing the
14  Plaintiffs, Federico Sayre.
15  MR. ANDERSON: Representing the Las
16  Vegas Police Department, Officers Crumrine, Tran,
17  and Flores, Craig Anderson.
18  MR. McNUTT: For Officer Lopera, Dan
19  McNutt.
20  THE VIDEOGRAPHER: Could you swear the
21  witness, please.
22  JOHN J. RYAN
23  Being duly sworn, deposes and testifies as follows:
24  THE REPORTER: Would you please state
25  your name for the record.

---

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 5

1  THE WITNESS: John J. Ryan, R-Y-A-N.
2    EXAMINATION BY MR. SAYRE:
3  Q.  Mr. Ryan, I mentioned to you prior to the
4  beginning of this deposition that my name is Fred
5  Sayre, and I am the attorney representing the
6  children of Tashi Farmer and the estate of Tashi
7  Farmer in this matter.  I'm going to be asking
8  you some questions concerning your role as an
9  expert witness on behalf of the Defendants in
10 this case.  You understand that?
11 A.  Yes, sir.
12 Q.  Have you had your deposition taken before?
13 A.  Many, many times.
14 Q.  Okay.  Is it all right with you if I dispense
15 with the normal admonitions in light of the fact
16 that you are experienced in the giving of
17 depositions?
18 A.  Absolutely.
19 Q.  Mr. Ryan, my understanding is, at least as you as
20 indicated to me, that your occupation is, you're
21 a part of Legal Liability Risk Management
22 Institute; is that correct?
23 A.  I'm an independent contractor that does work
24 for LLRMI, yes.
25 Q.  Okay.  And tell me, please, what is the nature of

Page 6

1  the work that you do for Legal Liability Risk
2  Management Institute?
3  A.  Well, one of the major things I do is I train
4  law enforcement, I train lawyers, and I do a bulk
5  of that -- I also do some training, for example,
6  for city officials with respect to liability
7  issues related to the law enforcement place.
8    Just this week I trained well over a
9  thousand people.  I was in Missouri Monday and
10 Tuesday, I was in Texas Wednesday and Thursday
11 training -- I trained 900 trainers in Texas that
12 train -- are required to go through my training
13 every couple of years in order to be a training
14 coordinator for the State of Texas.  So I do a
15 lot of training.
16    In addition to that, I do audits.  So a
17 couple of weeks ago I was up in New Hampshire
18 doing an audit of a police department that's had
19 a number of issues.  And, apparently, I found out
20 yesterday or today that the Chief was terminated
21 and a result of my audit that I did two weeks ago
22 because of problems in that agency.
23    I also write policy in a
24 number of states for probably -- and, again, I
25 don't have a clear number, because I write models

Page 7

1  for each of the states that I do them, and then I
2  don't necessarily have a clear number of how many
3  departments adopt them.  But I think it would be
4  safe to say thousands of departments I've written
5  policies for that have either adopted in whole or
6  have adopted in part throughout the United
7  States.
8    And then I get involved in litigation
9  matters like this where I look at cases.
10 Sometimes I'm asked to write a report; sometimes
11 I'm asked to write a report and testify.  All
12 depends on the nature of my review.
13 Q.  Thank you for that information.  My understanding
14 of risk management is that this is an agency
15 normally within an entity that deals with claims
16 or lawsuits against that entity.  Would that be
17 your understanding?
18 A.  No, that wouldn't be my understanding at all.
19 That's probably just the opposite.
20 Q.  Tell me what your understanding is.
21 A.  Yeah.  Proper risk management loss control is
22 to avoid or diminish the likelihood that the
23 lawsuit ever happens through professionalization
24 of the agency.  That's what we strive for.  And,
25 you know, so that's really what we do.

Page 8

1    We spend less time looking at claims and
2  more time doing risk management to avoid claims
3  from ever happening through professionalization.
4  Q.  All right.  So the job of risk management, as you
5  instructed, is to try to avoid claims; is that a
6  fair statement?
7  A.  Through professionalization.  Again, not to
8  avoid claims through some, you know, nefarious
9  means or anything like that.  But to avoid claims
10 by having proper training, proper training.
11 All of the things that go into professionalizing
12 an agency.
13 Q.  Sure.  I didn't mean anything nefarious by saying
14 that you were involved in the process of avoiding
15 claims.  I was actually just using a word that
16 you used.  Now, the people who come to you, are
17 they risk management people for different police
18 departments?
19 A.  They may be.  It may be police agencies.  For
20 example, I wrote the policies for Texas
21 Department of Public Safety.  So it may be a
22 state level agency.  I've got involved in cases
23 for the Federal government, so it could be even
24 the Federal agency.  I train a lot of Federal
25 people, as well.

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 9

1    But sometimes it's actually insurance pools.
2  So the insurance pool. I wrote policies for the
3  State of South Dakota for the State of South
4  Dakota Attorney General's Office, initially. So
5  it depends. It varies from state to state.
6  Q. But normally speaking, if I understand correctly,
7  it is on the side of the Defendant; would that be
8  a fair statement?
9  A. Well, I don't think the Plaintiffs get
10  involved in risk management for law enforcement,
11  so, yeah, of course it would be on -- that
12  portion of the business would be on the side
13  of -- however, you know, we have an awful lot of
14  people that do litigation consultation, and many
15  of them, Lou Reiter, for example, who I know you
16  know, Tim Longo, for example, who actually do
17  more work for Plaintiffs than they do for law
18  enforcement on the defense side.
19  Q. Sure. And I think I advised you that Lou Reiter
20  was a consultant when I represented Rodney King
21  against the City of Los Angeles.
22  A. Correct.
23  Q. And we both have a mutual friend, John Burres
24  (phonetic), who was involved in that process, as
25  well?

Page 10

1  A. Absolutely.
2  Q. From your standpoint, when you consult with
3  lawyers, can you tell me what percentage of the
4  time that you consult with defense lawyers,
5  insurance interests, and the like as opposed to
6  Plaintiff work? I mean you personally.
7  A. Yeah. I think my numbers run differently
8  because of a policy that LLRMI has. Because I
9  wrote policies in a number of different states, I
10  don't take Plaintiffs cases in those states. So
11  my numbers run probably somewhere around
12  80 percent. But don't hold me to it. I don't
13  track them, personally.
14    But you just mentioned John Burres. I'm on
15  a bunch of cases with John Burres in California.
16  Q. 80 percent for the Defendants?
17  A. I believe so. I think that's a fair number.
18  Q. And that would be true, also, of your testimony
19  at trial?
20  A. I don't know about that. You know, I don't
21  know that I could put a number on that because I
22  don't track that. Again, I've been told by
23  attorneys that have tracked cases that I've done
24  that I run about 80 percent defense, but I don't
25  know that they're relying on just trials.

Page 11

1  Q. What percentage of your income comes from
2  consulting with attorneys or testifying for
3  attorneys in litigated matters?
4  A. I would say probably a little less than half.
5  Q. Now, is it true that you have not been a sworn
6  officer for 16 years?
7  A. Correct. Since 2002.
8  Q. Were you a Sergeant at some point?
9  A. I was a Sergeant at some point.
10  Q. When was the last time that you were -- you had
11  the rank of Sergeant?
12  A. Can I look at my CV, because I don't
13  remember?
14  Q. Of course.
15  A. It would have been in the '80s when I was a
16  Sergeant.
17  Q. This is not a test.
18  A. So I was a Sergeant from '88 to '92.
19  Q. So it's been 26 years since you were a Sergeant?
20  A. Correct.
21  Q. Now, I'd like to have you turn your attention to
22  a document that you prepared, as I understand it,
23  to conform with Rule 26 in this case. It is your
24  Expert Report of John J. Ryan.
25  A. Okay.

Page 12

1  Q. Do you have a copy of that?
2  A. I did. I brought a copy.
3  Q. Okay. Could you please turn over to page 16 of
4  that report.
5    (WITNESS COMPLIES)
6  A. Okay.
7  Q. Number 55, do you have that before you?
8  A. Yes.
9  Q. All right. Now, as I understand it, this is part
10  of the information that you garnered from reading
11  material in this case, true?
12  A. Yes.
13  Q. And this specific paragraph 55, this is
14  information that came from the deposition or
15  perhaps the statement, also, of Officer Lif?
16  A. Correct.
17  Q. It says, "Officer Lif acknowledged that cycling
18  the taser seven times would be outside of
19  policy."
20  A. Correct.
21  Q. Do you agree with that?
22  A. Do I agree that it's outside of policy for
23  the Las Vegas Metro Police Department?
24  Q. Yes.
25  A. Again, I'd have to put the policy in front of

**Page 13**

1 me. I'm sure I probably looked at it at the
2 time. And I think that more than one officer
3 testified to that, that after so many deployments
4 they're expected to try something else. But
5 that's a policy issue of the Las Vegas
6 Metropolitan Police Department, so, yeah, I don't
7 disagree that that's their policy.
8 Q. Okay. So would that constitute -- use of a taser
9 seven times, would that constitute excessive
10 force?
11 A. Absolutely not. Not standing on those facts
12 alone, it wouldn't constitute excessive force.
13 I've had cases, in fact, I had a case in South
14 Dakota, defense verdict, where Officer Dupeck
15 (phonetic) tased Mr. Tweet (phonetic) 23 times.
16 Q. Now, it also says that Officer Lif acknowledged
17 that she saw surveillance video from the Venetian
18 depicting Lopera striking Farmer 10 to 12 times
19 in the head and agreed that she did not see any
20 justification for doing so. Did you see the
21 surveillance video from the Venetian?
22 A. I'm sure I looked at it. Again, I was not --
23 my focus in this report, as I've said in the
24 report, was the three officers who arrived
25 afterwards. Again, I did see the video. I did

**Page 14**

1 not focus on how many punches there were or if we
2 could even tell if there were 10 to 12 punches.
3 Q. Do you agree with Officer Lif that Lopera
4 striking Farmer 10 to 12 times in the head that
5 she didn't see any justification for doing that?
6 MR. McNUTT: Object to the form.
7 Goes --
8 (INTERRUPTION BY THE COURT REPORTER)
9 MR. McNUTT: Objection. Form.
10 Q. Do you have the question, Mr. Ryan?
11 A. Yeah. So I agree that that's what she
12 testified to.
13 Q. Well, no. I'm asking you if under the
14 circumstances of this case Officer Lopera
15 striking Farmer 10 to 12 times in the head, do
16 you agree that there was no justification for
17 doing that?
18 A. That's a different question, because the
19 first time it did include her. But, again, my
20 focus was not on Lopera. I didn't draw any
21 opinions with respect to his conduct. I made
22 that clear right from the outset of this report.
23 So, again, without looking at the video again, I
24 couldn't give you an answer to it.
25 There are circumstances where officers, 10

**Page 15**

1 to 12 strikes would be absolutely reasonable.
2 But I don't recall seeing 10 to 12, if there were
3 that many, I do agree that that's what the
4 officer testified to. I have no reason to
5 dispute her testimony.
6 Q. Right. You don't think she's being untruthful?
7 MR. McNUTT: Object, form.
8 A. I have no reason to dispute her testimony or
9 her opinion. I just don't have any mechanism to
10 do that because I was not focused on that in my
11 review.
12 Q. Do you have the competency to say whether or not
13 in this situation, 10 to 12 strikes to the head
14 of Mr. Farmer by Officer Lopera were excessive
15 force or not?
16 A. I would absolutely have the competency if
17 that had been my focus. And if I went back and
18 reviewed the video and reviewed all the
19 statements with the focus on that
20 competency-wise. I did not do that, so I did not
21 render any opinions on it.
22 Q. So you don't have an opinion as to whether 10 to
23 12 strikes on the head of Mr. Farmer by Officer
24 Lopera constituted excessive force?
25 A. I do not because I did not look at the

**Page 16**

1 materials with a focus on Lopera's actions. I
2 was specifically looking at the scope of the
3 officers who showed up on the scene after the
4 fact.
5 Q. So are you unable to agree or disagree with
6 Officer Lif that she saw no justification for
7 Lopera striking Farmer 10 to 12 times on the
8 head?
9 A. You know, I think I said a few minutes ago
10 that I certainly can't dispute it because I
11 didn't make a count. I don't think the video is
12 that clear anyway. I'm not sure I could see it
13 on the video. And I certainly was not there
14 present when it happened.
15 So I have no way to dispute her opinion that
16 she saw 10 to 12. I have no way to dispute her
17 opinion. Although, I don't know that she's an
18 expert witness that can offer opinion that it was
19 excessive force.
20 Q. Well, have you been provided with the statement
21 of Captain Sonny Lynch.
22 A. I'm sure I was. I mean, I have a whole load
23 of documents that I have listed and a number of
24 date stamped documents that included all the
25 investigation into this case. I don't recall it

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 17

1 specifically. Certainly if you want to present
2 it to me I'd be happy to look at it again.
3 Q. Well, do you know who Captain Lynch is?
4 A. I don't recall specifically what role he
5 played in this, no.
6 Q. Well, let me just advise you that he, like you,
7 is an expert witness retained by the Defendants
8 in this case. He's the Deputy Chief of Police of
9 Clinton, Missouri.
10 A. Then he was probably in my class this week.
11 Q. Well, that could be. But my question is, do you
12 know who that is?
13 A. I don't recall Captain Lynch, no, I don't.
14 Q. Have you been provided with Captain Lynch's
15 Rule 26 report?
16 A. You know, I'd have to go back and look at my
17 list.
18 Q. Would you do that, please.
19    (WITNESS COMPLIES)
20 A. Yes, I must have, because if he was in the
21 initial Expert Witness Disclosure, then I must
22 have read his report.
23 Q. Well, then, do you remember Captain Lynch
24 indicating in his report that Mr. Lopera used, in
25 his estimation, a rear naked choke?

Page 18

1 A. I remember the rear naked chokehold being
2 used throughout the materials. I don't recall if
3 Captain Lynch used that terminology or not.
4 Q. Well, I'm representing to you that that's what he
5 said. You got that in mind?
6 A. Sure.
7 Q. Okay. Is the rear naked choke excessive force
8 based upon being outside the policy of the
9 Metropolitan Police Department?
10    MR. McNUTT: Objection to the form.
11 A. Yeah. I guess that's two questions. So I
12 think there's some testimony and materials that
13 it was certainly outside of policy, I believe.
14 However, a rear naked chokehold is not
15 necessarily excessive force. There could be many
16 circumstances where an officer could use that.
17 And an officer may even be trained to that use,
18 depending on what the training is of the
19 particular agency.
20 Q. Do you have an opinion of this situation, whether
21 the use of a rear naked choke by Officer Lopera
22 was excessive force or not?
23    MR. McNUTT: Objection.
24 A. You know, again, as I said and it's in my
25 report, I did not draw opinions based on Lopera's

Page 19

1 actions. I absolutely stayed within the scope of
2 looking at the officers who arrived at the scene
3 after Lopera. I certainly read everything. I
4 know that other people have opinions on Lopera.
5 I know the agency took investigative action on
6 Lopera. But as far as having opinions, I don't
7 have any opinions on Lopera.
8 Q. Well, what are the situations in which the rear
9 naked choke would not be excessive force?
10 A. Well, let's suppose that some subject was
11 grabbing on officer's gun and you couldn't
12 release the gun. So another officer got behind
13 him and did a rear naked chokehold, because
14 deadly force would be justified. That would
15 clearly be one. I could probably think of a
16 hundred more if you want to sit here for a few
17 hours. There's probably hundreds. But that
18 would be a perfect example.
19 Q. Do you know any facts in this case that would
20 suggest to you that a rear naked choke was
21 justified in being used by Officer Lopera?
22 A. Again, I didn't draw any opinions on Lopera's
23 actions, but I don't know of any particular facts
24 that would say that any particular tactic by
25 Lopera was either justified or not justified. I

Page 20

1 mean, the facts are what they are.
2 Q. You said you know of hundreds of situations in
3 which the rear naked choke would be justified.
4 I'm asking you, you've read all the facts in this
5 situation, could you tell me what facts you've
6 seen in this situation that would justify the use
7 of the rear naked choke?
8 A. Yeah, and, again, as I said, I don't have any
9 opinions on Lopera, I'm not going to give any
10 opinions on Lopera, because I didn't -- although,
11 I know the facts, because obviously I read all
12 the materials, I did not draw any conclusions
13 because I moved specifically quickly to the three
14 other officers involved.
15    So, again, do I know any facts to support
16 it? No. But I don't know any facts that Lopera
17 might have reported, you know, if he was running
18 out of gas, if it was something that he thought
19 was appropriate under the circumstances. I
20 didn't focus on those issues, because I was not
21 looking at Lopera. I was looking at the other
22 officers.
23 Q. What are the other ways in which you believe a
24 rear naked choke could be justified? Did you see
25 any of those situations in the facts of this

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

**Page 21**

1  case?
2      MR. McNUTT: Objection.  Form?
3  A.   Again, it's the same answer.  I was not
4  focused on the facts as they related to Lopera.
5  If he at any point felt that he was losing the
6  fight, he's certainly in close proximity to the
7  subject.
8      We know that 15 percent of officers
9  feloniously killed in this country are killed
10  with their own weapon.  One of the most dangerous
11  things officers can do is ground fight with a
12  subject.  So all of those things might have
13  justified him taking extreme action under the
14  circumstances.
15      Again, without focusing on those issues and
16  whether or not that was projected by him in any
17  of the statements, then, you know, I can't draw
18  an opinion that I specifically did not draw as I
19  was reading the materials because I was focused
20  on the other three officers.
21  Q.   You read an extensive amount of materials
22  concerning what happened in this case; correct?
23  A.   Absolutely.
24  Q.   And can you tell me one fact that you saw in your
25  reading that in your experience based upon the

**Page 22**

1  hundreds of ways in which a rear naked choke
2  would be justified that would justify a rear
3  naked choke in this situation?
4      MR. ANDERSON: Objection.  Form.
5  A.   Again, it's the same answer.  The one fact or
6  the several facts would be the idea that the
7  officer is ground fighting with the subject.  And
8  any time an officer ground fights with a subject,
9  it's an extremely dangerous situation.  It can
10  rise to the level of deadly force because the
11  subject is in close proximity to the officer's
12  weapon.
13      15 percent of officers killed in this
14  country are killed with their own weapon.  And in
15  this particular case, there's absolutely no
16  question based on the video that there was ground
17  fighting going on.  And even the testimony in
18  this case, when the other officers pull up and
19  they see the two -- both Mr. Farmer and the
20  officer on the ground.
21  Q.   So you believe that the rear naked choke was
22  justified in this case because there was ground
23  fighting involved?
24      MR. ANDERSON: Objection.  Form.
25  A.   Again, you asked me -- the question was, do I

**Page 23**

1  know one fact that would possibly justify the
2  rear naked chokehold, and I've just given you
3  several.  That was your question.
4      As I said at the beginning, I did not offer
5  opinions on Officer Lopera.  But those are facts
6  that in many cases, when there's ground fighting
7  going on, the officer can take his actions or her
8  actions to a higher level of force because of the
9  dangerous nature of ground fighting that is well
10  recognized in law enforcement.
11  Q.   So my question was, because there was ground
12  fighting going on in this situation, in your
13  mind, does that justify the use of the rear naked
14  choke?
15      MR. ANDERSON: Objection.  Form.
16  Harassing.
17  A.   And, again, same answer.  It certainly could,
18  particularly when -- until the other officers
19  arrive, Lopera is also by himself.  So, again, it
20  could certainly justify it.  I'm not saying it
21  does in this case, because I didn't focus on
22  those issues.  But I certainly can see where it
23  could be justified, even if a department didn't
24  train it, even if it violated a department's
25  policy.

**Page 24**

1  Q.   Are you planning on giving an opinion at trial
2  that the ground fighting in this situation
3  justified the use of a rear naked choke?
4  A.   Well, I mean now that you've brought it up in
5  deposition, I think it's fair game for me to give
6  such an opinion, since you brought it up in
7  deposition.  And it will be up to Mr. Anderson
8  and Mr. McNutt, I think it is, if they decide to
9  try to ask me those questions.  But you opened
10  the door to it.  I didn't have anything about
11  that in my report.
12  Q.   Well, I understand it's not in your report.
13  That's why I'm asking, are you planning to give
14  that opinion at trial?
15  A.   Well, I mean, at this point, since there's
16  been so many questions on it, I may just give
17  that opinion, that I may talk about the
18  dangerousness of ground fighting and 15 percent
19  of all officers are killed with their own weapon.
20  Q.   Okay.  Well, so I should expect you to give that
21  opinion at trial?
22  A.   Well, I don't think you can rule it out if
23  the attorneys decide to ask me the question.  And
24  I've had this come up before where questions are
25  asked outside the four corners of my report, and

**Estate of Tashi S. Farmer vs**
**Las Vegas Metropolitan Police Department**

**John J. Ryan**
**October 19, 2018**

Page 25

1 every federal judge who's been faced with it has
2 allowed me to testify to it. So we'll just have
3 to wait and see what happens.
4 Q. Well, we'll have to do that. You have an opinion
5 regarding the behavior of Sergeant Crumrine. And
6 let me ask you to turn to page 30 of your report.
7 It would be paragraph 84.
8 A. Yes.
9    MR. SAYRE: I should tell you gentlemen
10 that something has come up on the screen that's
11 blocking my view of Craig Anderson. It's not
12 going to affect my ability to ask these
13 questions. But it's some kind of massive --
14    MR. ANDERSON: Is it a purple dot?
15    MR. SAYRE: No. It says Farmer
16 deposition, deposition of Plaintiff's expert, and
17 stuff like that.
18    THE WITNESS: That might be at your
19 end.
20    MR. SAYRE: I can't see Craig.
21    (INTERRUPTION BY THE COURT REPORTER)
22    (OFF THE RECORD)
23    THE VIDEOGRAPHER: Back on the record.
24 Q. Page 30, number 84.
25 A. Yes.

Page 26

1 Q. "It is my opinion, based upon my specialized
2 background training, experience, and education,
3 as well as my continued research, authoring,
4 auditing, consulting, and training on law
5 enforcement practices nationwide that Sergeant
6 Crumrine acted consistently with generally
7 accepted policies, practices, training, and legal
8 mandates trained to officers for application in
9 field operations with respect to command and
10 control of the scene." That's your opinion;
11 correct?
12 A. Absolutely.
13 Q. And is that another way of saying that he acted
14 in the highest levels of the profession?
15 A. He certainly acted within the generally
16 accepted practice. You know, some agencies may
17 have more restrictive policies with respect to
18 command and control, but he did everything we
19 would expect.
20    He immediately went to the officer's aid to
21 try to control the suspect. He immediately tried
22 to accomplish restraint of the suspect. He
23 actually gave verbal direction to the officers.
24 He did all of the things that we would expect to
25 see a supervisor do at a scene like this.

Page 27

1 Q. All right. Now, let me read to you from the memo
2 to the Sheriff, Joseph Lombardo. This is from
3 the Tactical Review Board, and it's 3779, under
4 Summary of Findings concerning Travis Crumrine.
5    "Sergeant Crumrine was the first to respond
6 to Officer Lopera's location. As a supervisor on
7 the scene he failed to do the following:
8 Accurately assess the situation to include life
9 safety, incident stabilization, property
10 preservation; establish on-scene command by
11 implementing ICS; establishing an incident
12 command post and name it; establish staging
13 areas; establish a perimeter control plan;
14 consider the need for additional resources;
15 determine and maintain ingress/egress routes for
16 first responders." Do you disagree with those
17 findings of the Tactical Review Board?
18 A. Absolutely. I disagree with the application
19 of many of those findings as it relates to this
20 situation. And, again, they can interpret their
21 policy in a more restrictive manner, and that's
22 fine. But can you imagine that -- try to put
23 this within the generally accepted practice
24 within law enforcement throughout the United
25 States when most agencies have less than 25

Page 28

1 officers, almost 75 percent of agencies in the
2 country have less than 75 officers. Talk
3 about -- you know, and again, this situation,
4 what's the need for a command post? What's the
5 need for -- to do all of these things.
6    And, again, that laundry list that you just
7 gave, I don't have the document in front of me,
8 but most of those items in the laundry list don't
9 apply to the situation when we're dealing with a
10 single individual and a single use of force.
11 Otherwise, we'd be calling those folks out every
12 single night. We'd have to have a thousand more
13 officers in the Las Vegas Metro Police Department
14 to accomplish that.
15    So I don't know, again, how the reviewer is
16 making that determination and why he thinks it's
17 applicable to this situation where you're dealing
18 with a single suspect.
19 Q. Well, the reviewers are the Tactical Review
20 Board, the Assistant Sheriff Tim Kelly as the
21 Chair, Deputy Chief John McGrath as a Board
22 Member, Captain John Pelletier as a Board Member,
23 Sergeant Ryan Evans, Tactical Expert, Sergeant
24 José Hernandez, Peer Member, and Detective Travis
25 Ivie, Peer Member. I asked you before if you

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 29

1 received this report and you told me you had; is
2 that correct?
3 A.  Absolutely.  I've read the report.
4 Q.  All right.  It goes on to say, "Sergeant Crumrine
5 failed to recognize Officer Lopera was an
6 involved officer in an in-custody death; Officer
7 Lopera required monitor officer who was not
8 involved in the incident; and Officer Lopera's
9 BWC was still activated and recording as he was
10 making statements referencing his actions."  Now,
11 I take it you disagree with these criticisms or
12 findings from the Tactical Review Board?
13 A.  Well, again, those are all policy findings.
14 And by the way, that explains -- kind of explains
15 away some of it, because that's all
16 after-the-fact stuff.  Every one of those things
17 is after the fact.  They have nothing to do with
18 the initial response to the scene, and they have
19 nothing to do with, you know, Lopera's use of
20 force and how it affected Mr. Farmer.  They're
21 all after the fact.  Every one of those things
22 that you just cited is after the fact.
23 Q.  Okay.  You know what CIRT is?
24 A.  What's that.
25 Q.  CIRT?

Page 30

1 A.  I think it's the Crisis Intervention Response
2 Team.  Most agencies just call it CRT.
3 Q.  Okay.  CIRT concluded that by failing to ensure
4 Officer Lopera release the neck restraint after
5 being ordered to do so, Sergeant Crumrine was in
6 neglective duty as the supervisor.  In addition,
7 in reviewing supervisory responses, CIRT
8 concluded, Officer Crumrine's response was not
9 within the standardized LVMPD tactics, training,
10 and policy.  Do you disagree with that?
11 A.  That it's within or not within policy?  I
12 mean, ultimately, they're the, you know,
13 reviewers of their own policy.  It's -- certainly
14 his actions were within the generally accepted
15 practice in law enforcement in the industry
16 standard because he was attempting to accomplish
17 the restraint of the subject.
18     He was taking physical action to intervene,
19 he was taking verbal action to intervene, he was
20 doing everything that we would expect a law
21 enforcement officer to do.  I can't disagree that
22 it may violate some particular training that they
23 gave that's more restrictive than the generally
24 accepted practice.
25 Q.  Well, it says he was neglective of his duties as

Page 31

1 a supervisor.  Do you disagree with that?
2 A.  Well, you have to read the rest of the
3 sentence the way you read it to me the first
4 time, because --
5 Q.  I'll read it again.  CIRT concluded by failing to
6 ensure Officer Lopera release the neck restraint
7 after being ordered to do so, Sergeant Crumrine
8 was in neglective duty as a supervisor.
9 A.  No, finish, because you went on after that.
10 Q.  In addition, in reviewing supervisory response,
11 CIRT concluded Sergeant Crumrine's response was
12 not within the standardized LVMPD tactics,
13 training, and policy.
14 A.  Correct.  Within the LVMPD tactics and
15 training.  It certainly was within the generally
16 accepted practice.
17 Q.  Well, it said he was in neglective duty as
18 supervisor.
19 A.  Well, that's all within their training and
20 policy, if you read the explanation for it.  Not
21 within the generally accepted practice.
22 Q.  You do disagree with that?
23 A.  I disagree that his actions were in any way
24 in violation of generally accepted practices,
25 yes.  He did exactly what we would expect a

Page 32

1 supervisor would do responding to that scene.
2 Q.  Okay.  It says, "A board member said, he is a
3 weak Sergeant, he performed weakly, and his
4 officer didn't listen to him."  I take it you
5 disagree with that?
6 A.  I'm not sure what the basis of that is.  I'd
7 have to go back and look at the report.
8 Q.  Well, he told the guy to release the hold twice
9 and he didn't release it.  He just said, Are you
10 sure, are you sure?
11     MR. McNUTT: Objection.  Form.
12 A.  Well, my memory is -- my memory --
13 Q.  You read that evaluation of Officer -- of
14 Sergeant Crumrine?
15 A.  My memory is that he did tell the officer to
16 release twice, my memory is that at some point
17 the officer said, Are you sure, my memory is that
18 he further responded and said, Yes.  So he's
19 giving proper direction.  But at the same time,
20 you know, I disagree that that's necessarily the
21 evidence shows he was a weak Sergeant, based on
22 my understanding of the evidence that shows that
23 at the same time he was trying to accomplish the
24 restraint and trying to stabilize the situation
25 which is the first thing you have to do to

**Estate of Tashi S. Farmer vs**
**Las Vegas Metropolitan Police Department**

**John J. Ryan**
**October 19, 2018**

Page 33

1  diminish the likelihood that further injury
2  happens to both the subject and the officer.
3      So, again, there's a lot of different
4  focuses going on in the midst of this struggle
5  that's taking place.  So I disagree that just
6  based on that evidence standing alone that he's a
7  weak Sergeant.  If there's some other evidence
8  that goes with it, again, I don't have the report
9  sitting in front of me.
10  Q.   The Board Member said, "Due to Sergeant
11  Crumrine's actions, his troop ended up killing
12  someone and still did not admit he could have
13  done more."  Do you disagree?
14  A.   Again, we would have to have the basis.
15  These are opinions by each of the Board
16  members --
17  Q.   Yeah.
18  A.   -- that are offering opinions.
19  Q.   This is the Tactical Review Board findings.
20  A.   I know it's the Tactical Review Board
21  findings.  I understand.  You don't have to keep
22  reminding me of that.  But the fact of the matter
23  is, I've reviewed his actions, and I believe he
24  acted consistently with all generally accepted
25  practices with respect to responding both as a

Page 34

1  police officer and as a supervisor to accomplish
2  the restraint of the individual, which even your
3  expert admits, is the primary responsibility of
4  the Sergeant who responds to the scene.
5  Q.   "A Board member said, Sergeant Crumrine could
6  have intervened and stopped the excessive force."
7  Do you disagree?
8  A.   Absolutely.  I don't think that
9  intervention -- I think he did intervene, and I
10  think I've just cited it again.  He both verbally
11  intervened and he physically intervened.  He
12  physically intervened by attempting to accomplish
13  restraint, which is the primary responsibility,
14  which even your expert admits to.
15  Q.   "A Board member said, Sergeant Crumrine could
16  have stopped it.  It could have been stopped the
17  first time he said, let go.  It could have
18  possibly saved Farmer's life."  Do you disagree?
19  A.   I think that's somebody's opinion.  And,
20  again, had Lopera -- I'm not a doctor.  I don't
21  know exactly when death occurred or when the
22  mechanics of death occurred, and I'm not going to
23  offer certainly opinions on medical issues.  I
24  don't think that Board member should be doing so
25  either.  I don't know how he would have the basis

Page 35

1  for knowing that any action by anybody would have
2  stopped the death in this case.
3  Q.   Okay.  Go ahead.
4  A.   But I can tell you that I do disagree,
5  because the Sergeant took a number of actions
6  including what the primary responsibility was in
7  restraining this individual to avoid further
8  injury.  The accomplishment of restraint is the
9  first necessary component.
10  Q.   All right.  This is continuing on the findings of
11  fact from the Review Board.  "Almost three months
12  after this tragic event, Sergeant Crumrine still
13  does not understand it was his responsibility to
14  prevent Officer Lopera from continuing to apply a
15  neck restraint once he gave direction for Officer
16  Lopera to release the restraint.  Instead of
17  exerting his authority and demanding Officer
18  Lopera release the hold, he allowed Officer
19  Lopera to maintain the neck restraint for an
20  additional 50 seconds.  As a Sergeant, it is
21  critical to understand your role and
22  responsibilities as a first-line supervisor; the
23  men and women we lead and the citizens we serve
24  in the community deserve it.  Based on the
25  entirety of what occurred in this incident, it

Page 36

1  appears that Sergeant Crumrine does not
2  understand his role and responsibilities as a
3  first-line supervisor."  Do you agree or
4  disagree.
5  A.   And, again, I agree that that's the opinion
6  that's written in there, but I disagree that the
7  Sergeant made any mistakes whatsoever with
8  respect to what he was doing.
9      First off, the Sergeant did give direction,
10  the Sergeant did give -- take physical action to
11  intervene in this entire thing, the Sergeant is
12  coming onto a chaotic scene where an officer has
13  called for assistance, the Sergeant is not
14  required to reinvestigate that, the Sergeant is
15  not required to release a subject who is still
16  physically struggling so that the Sergeant can
17  then attempt to figure out what degree of
18  pressure the officer has on, the Sergeant can
19  believe, and I think there's testimony in this
20  case, that the Sergeant believed that the
21  pressure was released initially.  So, again, I
22  just don't see -- have the same opinion as one
23  person sitting on that Board.
24  Q.   Well, you understand what the Tactical Review
25  Board is?

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 37

1  A.  Of course.  I've written policies for
2  Tactical Review Boards all over the country.  And
3  I've been involved --
4  Q.  Have you --
5  A.  -- I've trained many Las Vegas officers on a
6  regular basis, including some of the highest
7  ranking officers in the agency.  So --
8  Q.  All right.  Well, thank you for that.  What is
9  the Tactical Tactical Review Board?
10 A.  They review the entire incident in this -- in
11 custody death.  They review use of force
12 incidents, major use of force incidents.
13 Q.  You understand this is the official position of
14 the Metropolitan Police Department?
15 A.  Based on their policies and their particular
16 training.  Yes, of course I understand that.
17 Q.  And it's a report to the Sheriff, the head of the
18 Metropolitan Police Department?
19 A.  That's correct.  Who also has the authority
20 to accept or reject their report?
21 Q.  All right.  And did you find out whether the
22 Sheriff accepted or rejected this report?
23 A.  I think he accepted some parts and rejected
24 others.
25 Q.  On what do you base that?

Page 38

1  A.  You know, I don't know if it was the
2  testimony of the Sergeant himself.  I think
3  there's some testimony about -- in fact, I think
4  I have it in my report, that certain aspects of
5  the tactical review process went further and
6  certain aspects did not.
7  Q.  Do you know what Sheriff Lombardo's position was
8  with regard to this report of the Tactical Review
9  Board?
10 A.  You know, I don't recall a deposition of
11 Lombardo.  Although if it was taken I'm sure I
12 read it.  I'd have to go back to my list.
13 Q.  Okay.  Would it be important for you to know what
14 Sheriff Lombardi's position was with a regard to
15 this report of the Tactical Review Board?
16 A.  It wouldn't be important to any expert,
17 because the Sheriff, as the lead executive in the
18 agency, can be much more restricted than the
19 generally accepted practice and can be completely
20 more restrictive than the actual standard of care
21 for officers throughout the United States.
22     So no, because the Sheriff could have said,
23 Hey, you know what, I'm going to fire this guy
24 and that's going to be the end of it, even if
25 every expert in the field decided that the

Page 39

1  officer did everything right.
2  Q.  Well, he wasn't fired, he was reduced in rank
3  from Sergeant to police officer.  Do you know
4  that?
5  A.  Well, I don't think he was reduced in rank.
6  I think he was only an acting Sergeant to begin
7  with, if my memory of the material serves me
8  correctly.  So he was reduced from the acting
9  position back to his regular position.  So he was
10 never --
11 Q.  Well --
12 A.  I'm not finished.  Can I finish?
13 Q.  Go ahead.
14 A.  He was never promoted to Sergeant.  He was an
15 acting Sergeant who was then reduced back to his
16 regular rank, which is not unusual when we have
17 acting positions.
18 Q.  Are you finished, sir?
19 A.  Yes.
20 Q.  All right.  Well, you understand that the
21 Tactical Review Board recommended that he be
22 non-confirmed as a Sergeant and returned to the
23 rank of police officer?
24 A.  Yes.
25 Q.  All right.  And that was a discipline; right?

Page 40

1  A.  I don't know -- I don't recall if they
2  classified that as a discipline or not.  I'm not
3  positive whether they do or they don't, but I
4  suspect that certainly the Sergeant would have
5  seen it that way and not getting --
6  Q.  Well, don't you think that the Tactical Review
7  Board saw it as a demotion?
8  A.  Well, I don't know that you could ever
9  classify it as a demotion, because he was never
10 in the full-time position.  But I think they
11 certainly saw it as something that they thought
12 would be remediation of this incident.
13 Q.  So is it my understanding that you just didn't
14 take into account any of the findings of the
15 Tactical Review Board in arriving in your
16 opinions and conclusions in this case?
17 A.  Not at all.  That would be a total
18 mischaracterization of everything that I did.
19 Q.  Well, then tell me how you used the findings of
20 the Tactical Review Board in arriving at your
21 opinions and conclusions in this case?
22 A.  Well, because I recognize, as any expert
23 should, anybody that has any knowledge of the
24 field, that policies are internal and that
25 officers can be held accountable internally for

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 41

1 more specific policies.
2    As an expert in the field, a national expert
3 who's been recognized by courts all over this
4 country, I testify to the generally accepted
5 practice in law enforcement throughout the United
6 States.
7    So the fact that the department applies a
8 more restrictive standard to their officers,
9 which they have every right to do, does not
10 change the facts that the officer acted
11 consistently with generally accepted practices.
12 Q.  When they say that he could have stopped the
13 excessive force, in what way is that applying the
14 policies of the Metropolitan Police Department?
15 A.  Because the Metropolitan Police Department
16 can define excessive force differently than this
17 general standard of care, different than the
18 generally accepted practice, because they have
19 particular standards that say, for example, and
20 we started out with one, you can only use the
21 taser X amount of times. Anything beyond that
22 under their policies would be excessive.
23    Yet, we know that departments all over the
24 country don't have such a standard, and we know
25 that courts have held that multiple deployments

Page 42

1 does not necessarily violate any standard of
2 care. So that's just an example that came up in
3 the beginning of this case.
4 Q.  Now, you have legal training; correct?
5 A.  Of course.
6 Q.  You went to law school?
7 A.  Yes.
8 Q.  And have you passed the Bar in any state?
9 A.  Yes. I passed the Bar immediately first time
10 in Rhode Island, and I've been an active member
11 of the Bar ever since. Rhode Island --
12 Q.  Okay.
13 A.  -- is one of the few states -- I'm not
14 done -- one of the few states that has a Federal
15 Bar, as well, and I also passed the Federal Bar
16 in Rhode Island.
17 Q.  Okay. So you know that generally speaking,
18 excessive force is defined as a Fourth Amendment
19 violation; correct?
20 A.  Excessive force in these cases is defined
21 when we get into Federal Court it is, but an
22 agency can define excessive force by policy in a
23 different manner or by training.
24    So, for example, a department could have a
25 case, a training mechanism that says never hit

Page 43

1 somebody in the head with a flashlight. Yet, an
2 officer does hit somebody in the head with a
3 flashlight and the department finds that that was
4 excessive force under their training and under
5 their policies. Yet, a court looks at the case
6 and determines that it was not excessive force.
7    So, again, you've got to look at both the
8 excessive force under the Fourth Amendment and
9 the excessive force under policy and training.
10 Q.  If a rear naked choke was used on Mr. Farmer and
11 it went on for too long a period of time
12 resulting in his death, wouldn't that be
13 considered a Fourth Amendment violation?
14    MR. ANDERSON: Objection to form.
15    MR. McNUTT: Form.
16 A.  Again, it depends on the particular facts.
17 If the officer had justification to use deadly
18 force, then no, it would not be a situation that
19 would be excessive force. Even though it
20 would violate --
21 Q.  If you --
22 A.  -- even though -- again, I don't know why you
23 keep cutting me off. I'm not doing that to you.
24 And I apologize, I'm not trying to be
25 argumentative, but the stenographer is trying to

Page 44

1 take this down and you keep jumping in on me.
2 So, again, go ahead, because now you've cut my
3 train of thought.
4 Q.  Sir, I'm not trying to interrupt you. You paused
5 and I think you stopped, and I apologize.
6 A.  I think it must be the technology, because I
7 think, if anything --
8 Q.  Certainly --
9 A.  Here we go again. You did the same thing
10 again. Here's the stenographer, and I think she
11 would tell you that I'm not pausing. If anything
12 I'm probably going too fast.
13 Q.  Okay. I'll try to be as careful as I can and not
14 cut you off. Okay?
15 A.  Thank you.
16 Q.  Sure. Do you know one fact in this case that
17 justifies the use of lethal force on Mr. Farmer?
18 A.  Again, my focus in this case was never on
19 Lopera. I have not offered any opinions on
20 Lopera. But I will go back to say that if the
21 officer in any way felt that the ground fighting
22 had reached a point where Lopera had access to
23 his weapon, for example, or any of that. But I
24 don't know that there's anybody that says that in
25 this case. I'll be fair to you. I don't know

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 45

1 that anybody says that.
2 Q.  So is it fair to say that you know of not one
3 fact in this case that would justify use of
4 deadly force on Mr. Farmer?
5    MR. ANDERSON: Objection to form.
6 A.  You know, again, it's the same answer.  I
7 mean, there are facts in this case.  An officer
8 by himself ground fighting with an individual,
9 and there's even caseload to support this, can,
10 in some instances, use deadly force.  So I'm not
11 going to say there's not one fact in this case,
12 because the ground fighting fact is one standing
13 by itself that may in some instances justify
14 deadly force if, in fact, the officer is by
15 himself.
16    So I'm not going to say there's not, but,
17 again, I don't know that anybody has articulated
18 that, when I say that, I mean Lopera or anybody
19 else, has articulated that.  And I don't know if
20 there's been any change, but I don't think when I
21 wrote my report that Lopera had ever been deposed
22 in this case.
23 Q.  Is it correct -- well, first of all, Officer
24 Lopera did give some statements; correct?
25 A.  He gave some very brief statements, sure.

Page 46

1 Yeah.  I read them.
2 Q.  Among them, he indicated to Officer Lif that he
3 used a rear naked choke on Mr. Farmer; correct?
4 A.  Well, I think that's -- I think that's on
5 Lif's -- maybe captured on her body one camera.
6 Q.  Correct.  And he also mentioned to other officers
7 using a choke on Mr. Farmer; correct?
8 A.  Again, I think there's officers that make
9 statements to that effect.  I'm not sure that
10 Lopera has confirmed those, number one.  And,
11 number two, more importantly is I'm not sure that
12 Lopera has -- any of those officers have
13 information where Lopera articulated why he felt
14 he needed to do that.
15 Q.  Well, one of the reasons why -- but you have not
16 heard from anybody that Officer Lopera was in
17 fear of his life; correct?
18 A.  Well, I don't think there's anybody that
19 offered any information of articulation as to why
20 Lopera thought he needed to use that degree of
21 force.  I don't know that that's offered in
22 anything that we have to date.
23 Q.  Well, did you read the deposition of Chief
24 McGrath?
25 A.  Yes.

Page 47

1 Q.  Referring you to page 28 of Chief McGrath --
2 A.  Do you have a copy of it for me?
3 Q.  I sent it, actually, to Mr. Anderson to send to
4 you.
5 A.  Okay.
6 Q.  I don't know if he gave it to you or not.
7 A.  The Court Reporter has them -- has some
8 documents.
9 Q.  Okay.
10 A.  Page 28?
11 Q.  Yes, sir.  Let me draw your attention to what I'd
12 like to ask you about.  On page 28 at line 21 it
13 says, the question, it's a hypothetical, "A
14 Sergeant of an officer tells his officer to
15 release a hold, twice.  Does that Sergeant have a
16 duty thereafter, having asked him twice to
17 release the hold, to check and make sure he's
18 released the hold?"  And the witness, this is
19 Chief McGrath, says, "Yes.  That's what a duty to
20 intervene is."  Do you agree or disagree with
21 Chief McGrath.
22 A.  Without the fact that there's a struggle
23 taking place and an officer has called for
24 assistance and that they can see the officer
25 fighting with the guy on the ground and so we've

Page 48

1 got a situation where an officer is just choking
2 somebody as it says in the hypothetical, yes, I
3 would agree with McGrath, if that's the
4 incomplete hypothetical.  But that's not what's
5 happening in this case.
6 Q.  All right.  Then it goes on to the next question,
7 "Right.  And if he fails to intervene, to check
8 to see if he's released the hold after he's told
9 him twice to release the hold, is that a
10 violation of Metropolitan policy?"  And Chief
11 McGrath says, "Yes."  Do you agree with that?
12 A.  Well, again, if we take the fact that the
13 hypothetical doesn't mention that there's been an
14 assistance call, that an officer is on the ground
15 fighting with somebody, that the Sergeant has got
16 to help restrain the subject, if we take all
17 those facts out of it, then I'm sure it must be a
18 violation of their policy, because it would be a
19 disregard of an order.  It would be a policy
20 violation in most places.
21    But if you add all the other facts in, which
22 the hypothetical doesn't do, this is a completely
23 different situation that Captain McGrath was even
24 asked about.
25 Q.  All right.  If you know that force that is being

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 49

1  exerted on a person is excessive and you don't
2  intervene, is that a Fourth Amendment violation?
3      MR. ANDERSON: Objection. Form.
4  A.  Of course.
5  Q.  In fact, I think you say, if I'm not mistaken,
6  that you have a duty to intervene if there's
7  excessive force or if there's misconduct?
8  A.  Again, of course. And there's some elements
9  to that that I train officers all over the
10  country. It's not just automatic. There's other
11  elements to it, as well, and I think I put those
12  in the report.
13  Q.  All right. If the Metropolitan police officer
14  says there was absolutely no justification of
15  using a rear naked choke and the rear naked choke
16  is outside of policy, cannot be used by officers
17  in the Metropolitan Police Department, would that
18  be misconduct to use a rear naked choke?
19  A.  Not necessarily. Again, I've already talked
20  about the fact that there's circumstances where
21  an officer can use all kinds of things that are
22  outside of policy.
23      Officer can hit somebody with a car, for
24  example. That's certainly not something that's
25  in policy under certain circumstances. So it's

Page 50

1  going to depend on the particular facts of what's
2  taking place at a particular time. You can't
3  answer that in a vacuum. And --
4  Q.  Well, the facts I've asked you to assume are that
5  the rear naked choke, the Metropolitan police
6  officer in part says there was no justification
7  for using it, and, secondly, that the rear naked
8  choke is outside policy.
9  A.  Okay. First off, just so the record is
10  clear, you just totally cut off my last answer.
11  I was not even --
12  Q.  Sir --
13  A.  I was not even through my last answer
14  halfway --
15  Q.  Okay.
16  A.  -- and you totally cut me off.
17  Q.  Sorry. Go ahead.
18  A.  So again -- well, I mean this is a problem
19  both for me and for the stenographer. And what I
20  would like to do is you're going to have to start
21  back that last question you just asked. I've
22  lost my train of thought on the question that I
23  was trying to answer before you interrupted. I'm
24  trying to be very professional here, I will tell
25  you, maybe it's a technology issue, I'm not sure,

Page 51

1  but you really need to let me finish my answers.
2  Q.  All right. I'll do my best, and sorry if I
3  interrupted you but I thought you were done.
4      My question was, I've asked you to assume
5  two facts: Fact number one, that the
6  Metropolitan Police Department thought there was
7  no justification for using a rear naked choke on
8  Mr. Farmer. Number two, that a rear naked choke
9  was out of policy, were used by a Metropolitan
10  police officer. You have those two facts in
11  mind.
12  A.  Yes.
13  Q.  Based upon those two facts, would it be
14  misconduct for an officer to use a rear naked
15  choke on Mr. Farmer?
16      MR. ANDERSON: Object to form.
17  A.  Well, first off, we would have to know who
18  had the opinion and what their expertise was for
19  their opinion that it was not justified and
20  whether they knew all the facts as known to
21  Lopera at the time. Because we know we have to
22  judge use of force by the facts known to the
23  officer at the time.
24      So, again, the fact that there's been very
25  little information from Lopera, I'm not sure how

Page 52

1  you completely draw that opinion that it was
2  unjustified. I'm not sure how you do that
3  without a full hearing by Lopera himself as to
4  what his articulation of the need was for that
5  particular tactic.
6      It would clearly be in violation policy if
7  the agency does not allow the rear naked
8  chokehold. So it would be internal misconduct.
9  It wouldn't necessarily be external misconduct.
10  Q.  What's the difference between internal and
11  external misconduct?
12  A.  Well, I think it's common sense. A
13  department could decide that you can't even have
14  a gun at work, if they chose to. That could be
15  the policy of the Metropolitan Police Department.
16  And an officer brings a gun to work, well, it's
17  not unconstitutional and it's not a violation of
18  the generally accepted practice for an officer to
19  have a gun in the United States, but yet, it
20  would be misconduct in the agency because the
21  agency doesn't allow guns. So that's just an
22  example. It's an extreme example, but I think
23  it's common sense.
24  Q.  Well, in a situation using a rear naked choke,
25  what is the difference between internal and

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 53

1 external policies (inaudible) rear naked choke?
2 A. Well, again, I mean, I've asked and answered
3 this several times at the beginning of the
4 deposition. But an officer can certainly use a
5 rear naked chokehold when they can justify it as
6 a reasonable use of force based on what they're
7 dealing with at the time.
8    A department may say, we don't allow the
9 rear naked chokehold. So it would be a violation
10 of the internal policy, but it certainly wouldn't
11 violate generally accepted practices, generally
12 accepted training, and it certainly wouldn't
13 violate any standard of care.
14 Q. So officers within the Metropolitan Police
15 Department are free to use the rear naked choke
16 if they think it's justified?
17    MR. ANDERSON: Objection. Form.
18 A. Not under department policy, but if it was
19 objectively reasonable under the facts that they
20 faced and the circumstances they faced, then they
21 could certainly use it consistently with
22 generally accepted practices, without a doubt,
23 without a question, and that's the way every
24 department in the country in the United States
25 runs.

Page 54

1 Q. So every department, including the Metropolitan
2 police officers -- department, Las Vegas permits
3 the use of the rear naked choke if it's
4 justified?
5 A. Total mischaracterization of my testimony.
6 Do you want me to read the last answer back,
7 because I'll say the same thing again. An
8 officer can act consistently with generally
9 accepted practices, policies, and training with
10 respect to the law enforcement field. That can
11 be in violation of a department policy where the
12 department policy restricts the officers from
13 doing that, because every law enforcement officer
14 in the country is trained that a department can
15 be more restrictive than the generally accepted
16 practice, the generally accepted policies, the
17 generally accepted training, or the legal
18 standard or the general standard of care.
19 Q. Does the Metropolitan Police Department train
20 officers in how to use a rear naked choke?
21 A. No.
22 Q. How would an officer then reasonably be able to
23 use a rear naked choke if he's not trained to do
24 so?
25 A. The same way an officer can reasonably use a

Page 55

1 car to run somebody over who's shooting at them.
2 They're not trained to use the car to run
3 somebody over, but it's certainly reasonable
4 under a given set of facts.
5    So, of course, an officer can use it
6 reasonably and consistent with generally accepted
7 policies, practices, and training, as well as the
8 legal standard under any circumstance.
9 Q. And what justifies the use of a rear naked choke?
10 A. It could be, you know, again, going back to,
11 and I think now this is the fifth time I've
12 answered this question, the dangerousness of
13 ground fighting, an officer -- the subject having
14 access to the officer's weapons during ground
15 fighting, because 15 percent of officers are
16 feloniously killed and killed with their own
17 weapon.
18    So, again, we can cut and paste it from the
19 beginning of the deposition, but that's about the
20 fifth time I've answered on a topic that I didn't
21 even offer opinions on in the report.
22 Q. And is there anything about this case that
23 suggests to you that there would be a
24 justification for using a rear naked choke?
25    MR. ANDERSON: Objection. Form. Asked

Page 56

1 and answered.
2 A. Again, for the sixth time or seventh time
3 maybe the eighth time, yes, the ground fighting
4 alone. There's cases in this country that
5 authorize officers to use deadly force as opposed
6 to grappling with a violent subject.
7    So, yes, there is a justification that I
8 could point to in the materials. The fact that
9 the officer is ground fighting, the fact that
10 Mr. Farmer is first noncompliant with the
11 officers present. So let's go down the list so
12 we have it for the jury in case I end up
13 testifying to this.
14    Lopera had established officer presence. He
15 did that back inside the casino. Mr. Lopera had
16 gone down an aisle or a corridor that was for
17 employees only, which any reasonable officer
18 would understand would justify both a stop and
19 possibly an arrest based on trespass.
20    When he tried to stop this individual, this
21 individual went over by a pickup truck that was
22 pulling out of the parking lot. The officer's
23 perception may have been, because I think there
24 is at least some thought by Lopera, that this was
25 going to be a carjacking. That was his

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 57

1 perception. Whether that's reasonable or not,
2 that's something maybe a jury may have to decide.
3    But the officer is giving verbal commands,
4 so that's one level force. He's got officer
5 presence, he's in his full uniform. He attempts
6 to use the taser, so he uses intermediate
7 weapons. Nothing is working. He does some hard
8 hand strikes. Still not under control. He has
9 to call for assistance. Officers don't easily
10 call for assistance. He had to call for
11 assistance of other officers to try to control
12 the situation, and now he's ground fighting on
13 the ground with a subject who now is in such
14 close proximity that he has access to the
15 officer's weapons.
16    So all of those factors would help support
17 the idea that now the officer has got to use more
18 force in order to control the situation. All of
19 those factors may justify the officer going
20 outside the normal armament of this particular
21 agency to take steps to control the situation.
22 Q.  Are you planning to give an opinion in this case
23 that Officer Lopera was justified in using a rear
24 naked choke?
25 A.  I may, based on these questions and the fact

Page 58

1 that we've opened the door to all of this. I may
2 give exactly what I just said just now.
3 Q.  Do you understand how a Rule 26 statement works?
4 A.  Yes, I do. But as I said before, that once
5 Plaintiff's attorney, and this has happened many
6 times to me, opens the door in deposition that
7 that attorney is now stuck with a testimony that
8 I've given, and I can tell you that several
9 federal judges have ruled on that in cases that
10 I've been involved in, and then allowed me to
11 testify to it.
12 Q.  Okay. We'll see.
13 A.  Absolutely.
14 Q.  How long have you been practicing law?
15 A.  I don't practice law. But I do train lawyers
16 on Section 1983 with one of the top academics in
17 the country, Karen Blum, who's a very close
18 friend of mine.
19    I've done the Georgetown program for about
20 15 years until they shut it down. The Practicing
21 Law Institute, I've done it several times. And I
22 continue to train lawyers on Section 1983. It's
23 a topic that very few know much about, even those
24 that have been practicing it for a long time.
25 Q.  I'd like to read an additional passage for you of

Page 59

1 Chief McGrath's deposition.
2 A.  Sure.
3    MR. ANDERSON: What page is this?
4    MR. SAYRE: Page 35, line 8 to line 19.
5 Q.  The question, "Was it outside of policy to strike
6 Mr. Farmer on the head or about the head?
7 Answer: It's not outside of policy to strike
8 someone on the head. It's -- what was outside of
9 policy is the combination of tasing, striking in
10 the head, LVNR. Question: Okay. So the entire
11 administration of force as a whole, including
12 taser, striking, and the lateral vascular neck
13 restraint were excessive force? Answer: Based
14 on the reason for the stop, which was not
15 justified." Do you agree or disagree?
16 A.  Well, first off, obviously, the whole
17 question is premised on policy again. So I'm not
18 going to disagree with his interpretation of the
19 Las Vegas Metropolitan Police Department policy.
20 That's up to them to decide what their
21 interpretation is going to be, and whether it's
22 excessive under their policies.
23    I do disagree on the issues of the stop, and
24 apparently so does your expert. I've read his
25 deposition, and even he seems to agree there's

Page 60

1 justification for the stop.
2 Q.  Page 77, line 3 to line 9. Question: So this
3 situation, is it true there was nothing that you
4 saw on the tape that could have caused Officer
5 Lopera to apprehend Mr. Farmer. The witness: I
6 didn't see anything, if I was him, that I would
7 stop him for. Do you disagree with that?
8 A.  Well, again, it's his opinion, and he
9 premises it with, "if I was him." He doesn't
10 premise it on no reasonable officer would make a
11 stop (sic).
12    I will tell you that I do all of the
13 training for the local casinos here in Rhode
14 Island, and if somebody goes down a hallway
15 that's for employees only, the State Police, and
16 in the case of Twin River, the Lincoln Police, in
17 the case of the new Twin River down in Tiverton,
18 the Tiverton Police, are not only going to stop,
19 they're in all likelihood going to arrest for
20 trespass in that employee only area.
21 Q.  Does trespassing justify the use of a neck
22 restraint?
23 A.  Excuse me?
24 Q.  Does trespassing justify the use of a neck
25 restraint?

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 61

1  A.  Not if the person complies with -- if the
2  officer gives an order to stop and to submit and
3  the person complies with that order, then of
4  course not.  No force is justified when a person
5  complies.
6      You can't answer that question in a
7  hypothetical.  It's a good trick question, but
8  you can't answer it in a hypothetical.  Pepper
9  spray would never be allowed if the person
10  submitted.
11      But when you have a person who's
12  noncompliant that runs towards a truck in a
13  parking lot that has already disregarded officer
14  presence and verbal commands, who then doesn't
15  respond to -- and continues to struggle and
16  resist and doesn't respond to a taser, doesn't
17  respond to hard hand control tactics, then, in
18  fact, you know, a neck restraint may be
19  justified, particularly when you're ground
20  fighting with the subject.
21      And, remember, the officer is under the
22  stress of this whole situation, too.  And anybody
23  that's been in a fight, I don't know if you ever
24  have, but certainly members of the jury may have
25  been in a fight, after 20 seconds you're out of

Page 62

1  gas.  So, again, you realize the dangers of
2  ground fighting.
3      So, again, these are areas that certainly
4  we'll see if the judge lets me go into them, but
5  certainly I could offer testimony on, and I think
6  a jury would understand it.
7  Q.  Does trespassing justify hitting someone on the
8  head 10 to 12 times?
9  A.  Again, these are good trick questions.  But
10  the fact of the matter is we got to go to all the
11  facts and include them.  If you got somebody who
12  trespasses and they simply respond to the officer
13  and comply with the officer, no force would be
14  justified beyond the simple officer presence,
15  verbal commands, and handcuffing.  Nothing else
16  would be justified.
17  Q.  If Mr. Farmer was tased several times and six of
18  them were five second intervals and the seventh
19  one was nine seconds, do you think there was
20  enough time for Mr. Farmer to have responded to
21  the tasing?
22  A.  We'd have to --
23  Q.  (Inaudible)
24  A.  We would have to look at the time frame in
25  between each deployment to make that

Page 63

1  determination.  We'd also have to look at whether
2  or not the deployments were effective.  In other
3  words, did he go down to the ground; did he lock
4  up?
5      So, again, it's all going to be
6  determinative not by how many times he was tased,
7  not for how many seconds he was tased, but on the
8  duration between each deployment that would have
9  given him an opportunity to comply.
10  Q.  Well, isn't a person incapacitated during the
11  time of an effective tasing?
12  A.  Just during that short period of time.  And,
13  again, in the probe mode; not in the drive stun
14  mode, just so the record is clear.
15  Q.  Well, this was done in the probe mode, wasn't it?
16  A.  My understanding is yes, it was.
17  Q.  All right.  And did you see where there were
18  multiple times that Officer Lopera ordered
19  Mr. Farmer to get on his stomach and he was
20  actually on his stomach?
21  A.  It may have been.  I don't recall that
22  particularly in looking at the video.  But it
23  could very well have been.
24  Q.  That was the observation of the investigating
25  officers, about five or six times over 12

Page 64

1  seconds.  Do you remember that?
2  A.  That was their observation, five or six times
3  over 12 seconds or that --
4  Q.  Correct.
5  A.  I don't understand the question.  I
6  apologize.  The investigators looked at it five
7  or six times over 13 seconds?  Is that what
8  you're saying?  Or it happened over five or six
9  times over 12 seconds?
10  Q.  Beginning at 240, do you have in front of you the
11  force investigation team report --
12  A.  I'm sure it's one of the other documents that
13  they said not to let me see it.  Again, what
14  page?
15  Q.  It's page 9 of 35.  Bates stamp is 3791 LVMPD.
16  A.  Got it.
17  Q.  Okay.  At 240 it says, Officer Lopera told
18  Farmer, Get on your stomach.  And the officer,
19  who's the investigating officer said, Farmer is
20  observed lying on his stomach.  242, Officer
21  Lopera told Farmer, Get on your stomach.  Farmer
22  is observed lying on his stomach.  247, Officer
23  Lopera told Farmer, Get on your stomach.  Farmer
24  is observed lying on his stomach.  250, Officer
25  Lopera told Farmer, Get on your stomach.  Farmer

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 65

1  is observed lying on his stomach.  252, Officer
2  Lopera told Farmer, Get on your stomach.  Farmer
3  is observed lying on his stomach.
4      So that's a period of 12 seconds, one, two,
5  three, four, five times he told him to get on his
6  stomach, and according to the investigating
7  officer, he was on his stomach.
8  A.  Again, the investigating officer, is he
9  looking at a two-dimensional fixed perspective of
10  the video?  He's not necessarily seeing what the
11  officer is seeing.  The officer could have saw
12  (sic) movement, and what he means by get on your
13  stomach is to stay on your stomach.  So I don't
14  see anything -- any inconsistency there.
15  Q.  You think --
16  A.  I'm not sure --
17  Q.  -- the investigating officer is being untruthful?
18  A.  Absolutely not.  I don't know if you've ever
19  taken a class on how to interpret video, but I
20  have.
21      Seth Stoughton, one of the top experts in
22  the country out of the University of South
23  Carolina, has done extensive research in this
24  area that shows that the video may not capture
25  what the officer is seeing because the officer is

Page 66

1  viewing it in three dimensions.
2      In addition, even digital video and
3  streaming video has refresh rates in it that make
4  you miss certain movements.  So I don't think the
5  investigator is lying at all.  I just don't think
6  that the video necessarily portrays what the
7  officer is seeing on the ground and what the
8  officer is necessarily -- this officer could be
9  deposed at some point and tell us that what he's
10  saying is, get on your stomach means stay on your
11  stomach, you know, because of movement that he
12  was seeing by the subject.  So again --
13  Q.  Aren't you just speculating about that, sir?
14  A.  I'm sorry.
15  Q.  Aren't you just speculating?
16  A.  Not at all.  Not at all.  As I said, I've
17  taken courses with Seth Stoughton on more than
18  one occasion where I think that an interpretation
19  of the video by an investigator is the
20  speculation; not what I'm saying.
21      I'm giving you this alternative in saying
22  that I don't think the investigator is lying.
23  It's what he thinks he sees on the video.  But
24  it's not necessarily what the officer is seeing
25  at the time.

Page 67

1  Q.  Well, have you seen any evidence whatsoever that
2  the officer was seeing something different than
3  the investigator?
4  A.  Well, I think the -- remember, this is a
5  contemporaneous statement by the officer who's
6  there at the time with boots on the ground at the
7  scene.  I think that's evidence in and of itself.
8  The officer's statement blatantly contradicts
9  what the investigator's interpretation of the
10  video is.
11  Q.  You're just not willing to say that this officer
12  did anything wrong; right?
13  A.  Hey, you're the one who's asking me to give
14  new opinions that were not in my Rule 26.  And
15  you're asking me hypotheticals and you're asking
16  me questions based on opinions of other people
17  who I don't even know that they've ever qualified
18  as an expert in court.
19      I'm just giving you answers that are very
20  technical, and you don't like the answers.  So,
21  no, I am -- I'm giving you opinions that I didn't
22  have before that you've asked me them, you opened
23  the door to them, and I guess we'll see if the
24  judge allows me to testify to them.
25  Q.  Well, I haven't opened any doors.  But I get an

Page 68

1  opportunity to discuss the length and breadth of
2  your knowledge, and it appears that you basically
3  have opinions that differ from the Tactical
4  Review Board?
5      MR. ANDERSON: Object to form.
6  A.  Well, again, I think --
7  Q.  How much are you paid for your testimony?
8  A.  First off, $6,000, not from testimony, $6,000
9  for my review of the case and my written report.
10  Which if you start doing hourly on a case like
11  this, is probably less than $200 an hour.
12      So I'm probably making less than your expert
13  is making and certainly less than you make on
14  cases.  I think you told me before we went on
15  line that you've already made $11 million this
16  week.  So I'm certainly --
17  Q.  No --
18  A.  -- I'm certainly --
19  Q.  -- that's an --
20  A.  -- making less than you.
21  Q.  -- untruthful statement.
22  A.  What's that?
23  Q.  I told you two decisions that my firm received.
24  That doesn't mean I made it.
25  A.  Well, that's not the way you said it.  You

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

**Page 69**

1  told me you settled a case for 2.5 million and
2  you won a jury verdict for 9.1 million this week
3  before --
4  Q.  I understand --
5  A.   So we all get paid a reasonable rate in this
6  business and I get that.  But the fact of the
7  matter is, you've asked me questions, I've
8  answered the questions, I've given the breadth of
9  my knowledge, including my knowledge of video.
10     And you're offering -- you keep going back
11  to this use of force review by the Tactical
12  Review Board Review Board, and it seems to me
13  that you don't have a clear understanding that
14  they're looking at internal policy and internal
15  training.  They're not looking at the generally
16  accepted practice or the standard of care that
17  applies in these cases.
18  Q.  How much have you been paid so far in this case?
19  A.   $6,000.
20  Q.  Have you billed anything additional?
21  A.  I have not and there won't be any bills in
22  addition, other than the deposition, which you
23  know the way it works generally is you'll be
24  paying for that.
25  Q.  Right.  How much do you charge per hour?

**Page 70**

1  A.  I don't charge by hour.  I charge by the day,
2  because I get paid by the day.  Every day that I
3  go to work and train, the company charges $2,500
4  for my time.  The first day of training is 3,500.
5  So I have to book out a whole day for deposition,
6  whether it starts at 3:00 in the afternoon or
7     3:00 in the morning.
8     I booked out a whole day, so the company
9  will charge 2,500 for a deposition, because
10  there's some prep time involved, obviously.  They
11  pay me $2,000 for the deposition.
12  Q.  I'm sorry.  You're charging 2,000 for the
13  deposition?
14  A.  Flat fee.  Correct.  Well, the company
15  charges 2,500; I get 2,000 of that.
16  Q.  All right.  Well, we'll have to work on that.
17  A.  Well, others have tried.  We'll see if you're
18  successful.  You'll be the first if there are --
19  if not, the company will change Mr. Anderson, and
20  I'll be paid either way.  So it doesn't matter
21  how the motion comes out.
22  Q.  I'm sure you'll be paid.  What are you charging
23  the Defendant for your testimony at trial?
24  A.  Same thing.  The company charges $2,500 per
25  day.  There will be a thousand dollars for travel

**Page 71**

1  day plus expenses, and then every day that I'm
2  there, it's 2,500 of which I see $2,000.
3  Q.  How many cases are you hearing currently as an
4  expert witness?
5  A.  I don't have any idea.  I don't track that.
6  Q.  Do you have an estimate?
7  A.  No, I don't.
8  Q.  Well, is it more than 100?
9  A.  You know, the problem is in trying to answer
10  the question is attorneys, both Plaintiffs and on
11  the defense side, never call when the case is
12  closed.  I'll tell you that most of the defense
13  cases close on summary judgment qualified
14  immunity that I'm involved in, so there's
15  probably tons of cases that are sitting on a
16  server somewhere back at LLRMI that I don't keep
17  on my computer that they don't know if they're
18  closed or not.
19     I just told my assistant to start calling
20  attorneys and closing out some of the files,
21  because they're taking up so much space.  I don't
22  have any idea.  If you want to pay me the hourly
23  rate of $250 an hour, I'll be happy to have my
24  assistant try to sort that out for you.
25  Q.  How long have you been serving as an expert

**Page 72**

1  witness?  How many years?
2  A.  Since 2001, 2002 I took my first case alone.
3  However, I did work, background work for Lou
4  Reiter for a number of years prior to that while
5  I was still a police officer.
6  Q.  Okay.  About how many cases a year do you handle?
7  A.  Again, I don't track that.  Early on -- and
8  certainly I don't know the difference between
9  early on -- and, again, you know, one of the
10  things, the question too is, how many do you
11  handle.  I probably get ten calls a week on
12  cases.  I obviously don't take ten cases a week.
13     I tell a lot of Plaintiff's attorneys they
14  have no case.  I tell a lot of defense attorneys
15  that they better write a check based on an
16  initial phone call.  I review cases that I
17  sometimes do the same thing.
18     After a review of several hours, I have to
19  tell one side or the other that either, A, you
20  don't have a case or, B, you better write a
21  check.  So I don't track those numbers, quite
22  frankly, at all.
23  Q.  Out of the ten calls you get a week, about how
24  many cases does that (inaudible)?
25  A.  Does that what?

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 73

1  Q.  Out of the ten calls (inaudible) end up being
2  cases that you have?
3  A.  I'm not getting the end.  I'm sorry.  You're
4  saying, out of the ten --
5  Q.  Okay.  You get ten calls a week.  How many of
6  those become cases?
7     THE WITNESS:  Do you know what he's
8  saying?
9     THE REPORTER:  How many become cases?
10  A.  Well, they're all cases for the attorney that
11  has them that calls me.
12  Q.  No, no.  How many do you become an expert witness
13  on?
14  A.  Oh, well, it all depends.  I mean. some weeks
15  I don't take any of them.  Some weeks I refer,
16  you know, nine of the ten to somebody else.
17  Sometimes, you know, it's an area outside of my
18  expertise.  I had somebody call me about field
19  sobriety testing the other day.  So it all
20  depends.
21     Some weeks I might take two.  Some weeks I
22  might take five.  Some weeks I don't take any.
23  So, again, I don't have a number for you at the
24  end of the year because there is no average.
25     MR. SAYRE:  Could we take a break, a

Page 74

1  short break?
2     THE WITNESS:  Sure.
3     THE VIDEOGRAPHER:  We're off.
4     (BRIEF RECESS)
5     THE VIDEOGRAPHER:  Back on the record.
6  Q.  Mr. Ryan, have you been trained in the use of the
7  rear naked choke?
8  A.  I have not.
9  Q.  Have you -- so have you ever applied one?
10  A.  I've had to apply a chokehold one time from
11  the rear, but I don't know that it would qualify
12  as a rear naked chokehold.  It was all I had
13  left.
14  Q.  Have you been trained in the application of a
15  lateral vascular neck restraint?
16  A.  Yes.  Many years ago.
17  Q.  Have you utilized a lateral vascular neck
18  restraint in your police work?
19  A.  You know, I never had an opportunity where I
20  had to use it.  But I did have an opportunity
21  where I had to really choke somebody, and it was
22  deadly force when I did it.  I knew it was deadly
23  force when I did it, and fortunately, they gave
24  up and gave out before it was fatal.
25  Q.  I'm going to read to you a portion of the report

Page 75

1  to Sheriff Lombardo.  This is on page three.  It
2  says, "CIRT's review showed Officer Lopera had
3  tased Farmer 7 times for a total duration of 39
4  seconds.  He struck Farmer in the face 13 times.
5  Review of the camera showed Farmer had his hands
6  up in a protective manner around his face, while
7  Officer Lopera maintained a dominant position
8  over Farmer.  Officer Lopera instructed Farmer to
9  get on his stomach numerous times without
10  realizing Farmer was on his stomach.  Officer
11  Lopera was also told several times to let go,
12  however, the Venetian surveillance video showed
13  more than one minute 12 second had elapsed from
14  the time Officer Lopera initiated the neck
15  restraint and the time Farmer was released from
16  the neck restraint.  Farmer's behavior or
17  resistance level never appeared to be aggressive
18  as described by Officer Lopera."
19     Do you have an opinion as to whether or not
20  Farmer showed an aggressive resistance?
21  A.  Again, you know, I've told you from the
22  outset that I didn't offer any opinions on
23  Lopera's actions.  You opened the door.
24  Q.  I'm interrupting because (inaudible).
25  A.  No.  Lopera's actions.  You don't have to

Page 76

1  change my testimony.  I told you from the
2  beginning that I didn't offer any opinions on
3  Lopera's actions.  You opened the door to several
4  opinions.
5     I've looked at the video.  Certainly the
6  officer was in a ground fight on the ground.
7  Certainly Farmer did not comply with verbal
8  commands.  Certainly he did not -- the taser did
9  not accomplish the task of controlling him.
10     Again, I can't tell what his actions are on
11  the ground without more information because of
12  the fixed dimensions of a camera, without more
13  information from Lopera himself.
14     And, again, the report speaks for itself.
15  It says what it says.  But, again, that's
16  somebody's opinion based on -- and it's second or
17  third hand probably based on the interpretation
18  of the investigators of the video.
19  Q.  Section 1133 of the Metropolitan Police
20  regulations defines aggressive resistance as
21  follows:  The subject displays the intent
22  (inaudible) officers themselves or another
23  person, and prevents an officer from placing the
24  subject into custody with taking control.  The
25  aggression may manifest itself through

Min-U-Script®

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 77

1 (inaudible) the fighting stance, punching,
2 kicking, striking, (inaudible) or other actions
3 presented eminent threat of physical harm to the
4 officer or others.  Do you understand that to be
5 the definition of aggressive resistance?
6 A.   That's the definition by the Metropolitan
7 Police Department.  Most departments don't define
8 it that way.  In fact, most departments don't
9 define aggressive resistance at all.  They
10 distinguish active versus passive resistance.
11     So, again, that's a policy definition that
12 you've given.  And I've read it before; I'm
13 familiar with it, absolutely.
14 Q.   Is it correct to say you didn't see any evidence
15 of aggressive resistance by Mr. Farmer?
16 A.   No, I think just the opposite.  Again,
17 because there is active resistance, and again,
18 how they define it within the Metropolitan Police
19 Department, they can interpret that however they
20 chose.
21     But, again, that leaves out the fact, that
22 at least from Lopera's position, it looked to
23 him, his perception was, and, again, this is
24 something he's going to have to articulate in a
25 deposition or testimony at trial, that he was

Page 78

1 moving toward the truck in a manner that Lopera
2 thought he was going to try to hijack the truck
3 or carjack the truck.
4     Whether or not that was going to take place
5 or not or whether anybody else interpreted it
6 that way, the question is, you know, will a jury
7 believe that Lopera's perception was reasonable.
8 That would qualify under the definition you just
9 gave me, that in itself.
10     Then we have the noncompliance with a number
11 of lesser degrees of force that Lopera absolutely
12 applied.  So, again, it's not agree or disagree.
13     I mean, the Metropolitan Police Department
14 can have a hundred definitions in their policies.
15 They can interpret those definitions how they
16 chose.  In fact, they can define it how they
17 chose.  But it doesn't change the generally
18 accepted practice.  And, again, we have a number
19 of areas of noncompliance that are quite obvious,
20 and that can't be disputed.
21 Q.   Did you see any evidence of a fighting stance by
22 Mr. Farmer?
23 A.   No, I don't think I saw --
24     MR. McNUTT:  What was that?  Repeat the
25 question.

Page 79

1     MR. SAYRE:  I can't hear you.
2     MR. ANDERSON:  Would you repeat the
3 question, please?
4     THE WITNESS:  Repeat the question,
5 please.
6 Q.   Okay.  Did you see any evidence of a fighting
7 stance by Mr. Farmer?
8 A.   I don't think I recall him taking a bladed
9 stance or, you know, putting his fists up or
10 anything like that.  I don't recall seeing that,
11 if that's what you're defining as a fighting
12 stance.
13 Q.   Did you see any evidence of punching, kicking, or
14 striking by Mr. Farmer?
15 A.   You certainly can't see what's going on on
16 the ground.  I mean, it's very difficult to see
17 on the video.  So, no, I can't tell whether he
18 was or he wasn't.
19 Q.   Did you see any attacks with weapons or other
20 actions which presented eminent threat; physical
21 harm to the officer?
22 A.   No, I didn't see any attacks with weapons.
23 But certainly there's an eminent threat of
24 physical harm any time an officer is ground
25 fighting with somebody.  So certainly that -- any

Page 80

1 time there's ground fighting and resistance on
2 the ground and the officer has got to be in close
3 physical contact, there is eminent threat to the
4 officer.  So that one, yes.
5 Q.   I'd like to read to you from Chief McGrath's
6 deposition, page 61, line 22 through 62, line 11.
7     "Question: Are you aware that after the two
8 individuals got outside, that there was also
9 testimony that there was a belief that Mr. Farmer
10 intended to carjack the vehicle?  Answer:  That
11 was part of what was stated by Officer Lopera;
12 however, I didn't think that that was accurate.
13 Question: Based on what?  Answer:  The video.
14 Question:  What specific video?  Answer:  The
15 video that showed the truck that Officer -- I
16 mean Mr. Farmer approached, that Officer Lopera
17 said he thought he was going to carjack someone
18 from the truck.  It didn't appear like that was
19 what was happening to me."  Do you agree or
20 disagree with that?
21 A.   Well I agree that that's what he says.  But
22 that's his opinion and his interpretation of the
23 video.  Again, I'm not sure he's qualified not
24 being there at the scene having a subject run out
25 into the parking lot, approach the truck, I don't

**Page 81**

1  know that he can substitute his perception for
2  that of an officer.  Would every reasonable
3  officer believe that there was not a carjacking
4  taking place?  I don't know if that's true.
5     And, again, until we have a deposition from
6  Lopera, I'm sure we can understand what his
7  particular perception was.  But when you've got a
8  subject who's noncompliance, fleeing, going
9  towards a truck in that manner, I'm not sure
10  that, you know, McGrath -- that I wouldn't
11  disagree with McGrath's interpretation.
12  Q.   Did you see what you considered to be carjacking?
13  A.   I certainly see him go towards the truck, and
14  we know that people all the time, experienced
15  officers with a lot of street experience know
16  that people do try to get into trucks to escape
17  and cars to escape.
18     So, again, I think it's perfectly reasonable
19  based on the facts that an officer could perceive
20  he was going to go try to escape through means of
21  this vehicle.
22  Q.   Did you see a portion of the arrest record that
23  said that if Mr. Farmer had survived, he would
24  not have been arrested for carjacking?
25  A.   Well, that may be true, because 20/20

**Page 82**

1  hindsight is easy, right, and that's why we don't
2  take it into account when we evaluate an
3  officer's actions.
4     So yeah, a 20/20 hindsight might be that he
5  would have not been arrested for carjacking.  But
6  that doesn't change that an officer could have
7  that perception out at the scene, and it doesn't
8  necessarily in any way obviate the officer's
9  valid perception out at the scene.
10  Q.   Did you read the depositions of the various
11  people who I asked if they saw any evidence by
12  looking at the video of carjacking?
13  A.   No.  And, again, you're talking to people who
14  are looking at the video and drawing their own
15  interpretations from the video.
16  Q.   Right.  And none of them said they saw my
17  evidence of carjacking.
18  A.   Well, and, again, I would tell any lawyer
19  that they -- in fact, because he does a lot of
20  legal programs for lawyers, that they should take
21  Seth Stoughton's course on interpreting a video.
22  Every officer that looked at this -- I tell
23  officers to take that course, too, because the
24  video doesn't always tell the story.
25  Q.   Are you saying that because Mr. Farmer was

**Page 83**

1  heading in the direction of the truck that
2  Officer Lopera had probable cause to say he was
3  carjacking the truck?
4  A.   Well, I never said he had probable cause.  I
5  said he might have reason to believe.  Two
6  different things.  Again, he wasn't charging him
7  at that point.  He's trying to stop him at that
8  point.  But he certainly could feel that he
9  presented a danger to the people in the truck, as
10  he approached that truck.  And the officer would
11  have an obligation to protect the people in the
12  truck, as well.
13  Q.   Did you read the deposition of Jonathan Pierce?
14  A.   If it's on my list, I read it.  I don't
15  recall what his role is at this point in time.
16  Q.   Well, he was the owner of the truck.
17  A.   Oh, absolutely.  Yes, I did.
18  Q.   Now, Mr. Pierce said that he didn't think that he
19  was in danger of having his car carjacked.
20  A.   Again, that was his opinion based on what he
21  was observing at the time.  Did he not have the
22  background that the officer had to know that
23  Mr. Farmer had just fled from an officer through
24  an employee hallway in a hotel after making
25  statements to the officer that would lead the

**Page 84**

1  officer to believe that maybe there was an issue
2  with this subject and didn't know that Mr. Farmer
3  had disregarded the officer's verbal commands.
4  So he has a completely different knowledge base
5  than the officer.
6     Plus, he doesn't have the experience and
7  training of an officer who might know that people
8  who are trying to escape from the police do
9  carjack vehicles and do try to make their escape
10  through vehicles that might be out there.
11     So he has a totally different frame of
12  reference --
13  Q.   Excuse me.  Go ahead.  Sorry.
14  A.   -- thank you -- on which to base his opinion
15  that he didn't feel in danger.  Whereas the
16  officer may have a totally different perception
17  based on his experience and based on all the
18  background leading up to the totality of
19  circumstances leading up to that point in time.
20  Q.   Do you think that Officer Lopera could be being
21  untruthful as a way of justifying his attack on
22  Mr. Farmer?
23     MR. ANDERSON: Objection.
24  A.   I think anybody can be untruthful.
25  Q.   Right.  Are you going to give an opinion as to

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 85

1  whether or not a rear naked choke or lateral
2  vascular neck restraint was applied?
3  A.  Well, I think I've included testimony, you
4  know, in my report that would talk about the fact
5  that Lopera said to at least Officer Lif that he
6  did a rear naked chokehold.
7     I think it was interpreted by others as a
8  lateral vascular neck restraint.  I think I have
9  that in my report.  So I think, you know, I will
10  certainly be available to offer an opinion that
11  there was a neck restraint applied.
12  Q.  Right.  That wasn't the question.  The question
13  was whether you're going to give an opinion as to
14  whether it was a rear naked choke or lateral
15  vascular neck restraint?
16  A.  No, I'm not going to give an opinion to
17  distinguish what it was, because I can't tell
18  from the video which one it was.
19  Q.  Okay.  The CIRT report concluded that Officer
20  Lopera's tactics during the foot pursuit were not
21  within standardized LVMPD tactics, standards, and
22  policy.  You're not going to give an opinion
23  about that, true?
24  A.  Well, you know, I don't know.  Certainly, I
25  could give an opinion on whether his tactics were

Page 86

1  consistent based on the deposition.  I had no
2  intention of, but based on the deposition today
3  and all this talk about what Lopera did as
4  opposed to what my report was about, certainly I
5  could give an opinion where his tactics were
6  consistent with generally accepted practices.
7     Whether or not they violated LVMPD policies,
8  I've done a lot of work training around the LVMPD
9  for many, many years now and LVMPD officers.  It
10  may be that they came to that conclusion and they
11  interpret their policies the way they interpret
12  them.
13     But as far as generally accepted practices,
14  certainly an officer who is confronted with an
15  individual in a casino who is saying that people
16  are following him who then flees from an officer
17  down a hallway that's closed to the general
18  public and leads the officer out to the parking
19  lot, disregards commands to stop when the officer
20  has reason to make a stop, and I think as I said,
21  even your expert agrees with that, certainly
22  tactically I think the officer is well within the
23  generally accepted practices to do that.
24  Q.  All right.  One of the summaries of findings says
25  that due to the lack of communication by Officer

Page 87

1  Lopera, Officer Lif assumed -- walked away to
2  escort Farmer down to valet (inaudible).  CIRT
3  concluded that Officer Lopera's failure to
4  communicate with Officer Lif resulted in an
5  inability to formulate a plan that ultimately led
6  to a cascade of events that were not within
7  standardized LVMPD tactic and training policies.
8  Do you agree or disagree?
9  A.  You know, and, again, I think that's
10  somebody's interpretation.  I think within
11  generally accepted practices, anybody would say
12  this thing happened so fast, Lif was standing
13  right next to him as it developed, and it was one
14  of those quickly evolving situations that there
15  was certainly no need to develop a plan or no
16  ability to develop a plan.
17     You can't develop a plan when somebody is
18  running down a hallway and flees with no
19  provocation by the officers whatsoever.  So,
20  again, I don't necessarily agree with that
21  interpretation of what occurred here.
22  Q.  If CIRT found that by Officer Lopera's decision
23  to pursue he failed to broadcast (inaudible) by
24  radio, failed to consider the officer's safety
25  concerns, failed to consider the risks, and

Page 88

1  failed to transition to containment only, do you
2  agree or disagree?
3  A.  Hey, it may be that he violated a foot
4  pursuit policy of the Las Vegas Police
5  Department, a policy that most agencies in the
6  country don't even have.  Many officers work by
7  themselves.  So they could be broadcasting all
8  day long, but they'd never be able to pursue
9  anybody.
10     So, again, the generally accepted practice,
11  no, I don't think he violated.  I don't know that
12  we know, for example, if he tried to broadcast
13  and was unable to because of the construction in
14  the casino itself, you know, he's down in this
15  hallway.  He certainly broadcasted when he needed
16  help outside, so he was broadcasting at that
17  point.
18     So I don't know what he will tell us
19  somewhere down the line or what he will tell the
20  jury.  But, again, most agencies don't even have
21  such a foot pursuit policy or constraints on foot
22  pursuits that require these things that the
23  Metropolitan Police Department require.
24  Q.  (Attorney reading) CIRT concluded Officer
25  Lopera's use of the neck restraint was not within

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 89

1 standardized LVMPD tactics, training, and policy.
2 I assume you're not going to have an opinion
3 about that?
4 A.  Well, again, it may be that it's not within
5 their policy, but their policy and training can
6 be more restrictive.  I mean, we've said that
7 right from the beginning of the deposition.
8 Q.  Well, are you going to have an opinion at trial
9 about whether or not Officer Lopera's use of the
10 neck restraint was not within the standardized
11 LVMPD tactics, training, and policy?
12 A.  No.  My opinion would be related to the
13 generally accepted policy and training through
14 the United States.  Not necessarily a more
15 restrictive policy through the Metropolitan
16 Police Department.
17 Q.  Are you planning to give an opinion at trial that
18 his use of the neck restraint was appropriate?
19 A.  Depending on his articulation of why it was
20 used and based on opening the door today if the
21 judge lets me, then I probably will.
22 Q.  Well, what opening the door occurred here because
23 I've asked you if you have an opinion.
24 A.  Well, instead of sticking to the four corners
25 of my report, you've spent three-quarters of this

Page 90

1 deposition asking me about Lopera's tactics and
2 what he did and why he did it, instead of
3 sticking to the four corners of the report, which
4 is what the three officers did who responded.
5     I didn't have anything about what Lopera did
6 in my report.  So if you had stuck to those four
7 corners, then I wouldn't be offering any
8 opinions.
9     Now I've offered all kinds of opinions today
10 in this deposition that I will tell, and I know
11 your experience is great, but my experience is,
12 when an attorney opens a door like that, then the
13 judge allows me to testify to it, and it's
14 happened to me several times.  So that's the door
15 that's been opened.
16     And I will tell you that if Lopera takes the
17 stand in his trial and articulates the fact that
18 he was in a ground fight in close proximity to
19 his weapons, he was fearful of serious bodily
20 harm or death based on that ground fight, and
21 knowing what we know in law enforcement
22 experience, about 15 percent of officers
23 feloniously killed with their own weapon, then if
24 that testimony comes out or something like that
25 comes out, then I will offer an opinion that at

Page 91

1 that point the officer is justified in using this
2 neck restraint.
3     Yes, I will offer that opinion, if the judge
4 allows me --
5 Q.  You will need the testimony of Lopera to give
6 that opinion; correct?
7 A.  Well, you know at the time of trial, you know
8 at the time of trial that the expert is --
9 doesn't testify to the depositions, he's
10 presented with what the actual trial testimony
11 is, because that's what the jury has heard.
12     So, again, we don't know, Lopera has not
13 been -- has not been deposed yet, so we don't
14 know what he'll say, what his articulation is of
15 that particular tactic.
16 Q.  Okay.  But without any information from Lopera,
17 you're not going to give that opinion; is that
18 right?
19 A.  Well, if Lopera doesn't offer testimony,
20 then, you know, the only thing I could say is if
21 I was asked a hypothetical, and I guess I could
22 be now, based on your hypotheticals, if I were
23 asked a hypothetical on whether or not it was --
24 it would be appropriate under any circumstances
25 for an officer to use that restraint under

Page 92

1 circumstances as is here, then I would have to
2 say yes.  If the officer is in a ground fight, if
3 the officer has tried all these other tactics, if
4 the officer is armed with all this information,
5 not just with what the car driver was armed with,
6 but the information going back to when Mr. Farmer
7 approached him to begin with, and then traveling
8 all the way through the casino and out to that
9 parking lot, then I would certainly be available
10 to offer opinions about that.
11 Q.  (Attorney reading) The Tactical Review Board
12 concluded that as a result of the above
13 conclusions, the (inaudible) threat assessment,
14 Officer Lopera's actions during the incident
15 amounts to inappropriate use of force.  I take it
16 you're not going to offer an opinion about that?
17 A.  And, again, I just -- I think it's the same
18 answer to the question I just gave.  Certainly,
19 that is an interpretation of their policies,
20 because that's what the review board does.
21 That's an internal matter.
22     Externally, if there's evidence that the
23 officer was in fear based on the fact that he's
24 ground fighting, based on the fact that his
25 weapons are in close proximity to Mr. Farmer,

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

Page 93

1  based on the fact that he's tried all of these
2  other tactics, based on fact that it's his
3  perception, again, it would be up to the jury to
4  decide if it's a reasonable perception that the
5  car was being carjacked. Then I would offer an
6  opinion that it certainly would be opposite of
7  that conclusion.
8     But, again, that conclusion is based on
9  their policies. It's not based on the generally
10 accepted practice or the standard of care or the
11 legal standard of care.
12 Q.  Well, how does the generally accepted practice
13 differ from the Metropolitan Police Department
14 policies?
15 A.  Well, because -- and, again, this has been
16 answered about 30 times. Because the
17 Metropolitan Police Department can say, No rear
18 naked chokeholds under any circumstances. That
19 can be the policy. If the officer does the rear
20 naked chokehold, that is a gross violation. They
21 can reach that conclusion.
22    But if the officer is in fear of his life,
23 for example, because he's in a ground fight and
24 his weapons are acceptable by the subject and the
25 officer is running out of gas because he's been

Page 94

1  by himself, then certainly the officer can take
2  action consistent with generally accepted
3  practices to protect himself from that eminent or
4  immediate threat caused by that ground fight. So
5  in that case, it can be consistent with generally
6  accepted practice but a gross violation of the
7  department policies.
8  Q.  Do you agree that the use of a rear naked choke
9  amounts to lethal force?
10 A.  If it did, then all of these MMA fighters and
11 whatnot would not be using it, because they would
12 be charged with murder probably every time they
13 held one of these MMA fights. So no, I don't
14 agree that it's always lethal force. And, in
15 fact, I think that the fact the proof is in the
16 pudding that some of these groups use it.
17 Q.  Are you saying that you could use a rear naked
18 choke in response to lethal force?
19 A.  You could absolutely use it in response to
20 lethal force. Of course you could.
21 Q.  Can you use it for less than lethal force that
22 you're facing?
23 A.  You may very well be able to, because we know
24 it's not necessarily lethal force.
25 Q.  What does that mean, may very well be able to?

Page 95

1  What does that mean?
2  A.  Well, based on a particular fact pattern. So
3  if the particular fact pattern is the officer is
4  in a ground fight, running out of gas, but he
5  doesn't feel that he's at the level of lethal
6  force yet, he could still use a rear naked
7  chokehold in a manner that's consistent with
8  what, for example, MMA fighters use that doesn't
9  kill anybody and doesn't create -- remember,
10 deadly force, lethal force by law enforcement,
11 almost every department in the country defines it
12 this way, is force which creates, quote, a
13 substantial risk of serious bodily harm or death.
14 It doesn't create a substantial risk of serious
15 bodily harm or death, because in most cases, a
16 rear naked chokehold doesn't cause death. So
17 it's not lethal force.
18 Q.  Well, you understand --
19 A.  It simply doesn't fit the definition of
20 lethal force. It's not only used by most
21 agencies, but by the way, it's used by every
22 federal circuit in the country.
23 Q.  I'm sorry. By whom?
24 A.  Every federal circuit in the country.
25 Q.  Every federal circuit uses rear naked choke?

Page 96

1  A.  You know, I hope you're joking.
2  Q.  No, I'm not. I'm trying to understand.
3  A.  Okay. So what I said was, every department,
4  virtually, not everyone, but most departments in
5  the country defined deadly or lethal force as
6  force which creates a substantial likelihood of
7  serious body harm or death.
8     We know that the rear naked chokehold is
9  used by MMA fighters, for example. It doesn't
10 cause death in most cases; therefore, it does not
11 create a substantial likelihood of serious bodily
12 harm or death when done properly.
13    I also said that not only does every --
14 almost every law enforcement agency use that
15 definition, but every federal circuit does use
16 that definition. Force which creates a
17 substantial likelihood of serious bodily harm or
18 death. Therefore, the rear naked chokehold, by
19 definition, doesn't meet the lethal force, is not
20 lethal force.
21 Q.  What threw me for a minute is you said every
22 federal circuit uses the rear naked choke. Is
23 that --
24 A.  No. I think if we go back and check with the
25 stenographer, I didn't say anything like that.

Estate of Tashi S. Farmer vs
Las Vegas Metropolitan Police Department

John J. Ryan
October 19, 2018

**Page 97**

1 So that had to be either your hearing, your
2 joking, or the technology.
3 Q.  But I wasn't sure.  If anything (inaudible).  I
4 agree that's possible.  You're not saying every
5 federal circuit allows the use of the rear naked
6 choke?
7 A.  I never said that.  What I said was, every
8 federal circuit defines deadly force as force
9 which creates a substantial likelihood of serious
10 bodily harm or death, as do most law enforcement
11 agencies in the country.
12 Q.  Okay.  Do you agree that the rear naked choke can
13 cause death?
14 A.  Anybody can cause death.  A lateral vascular
15 neck restraint done improperly can cause death.
16 A police canine that accidently -- or reaches out
17 to bite and hold and grabs a subject by the neck
18 can cause death.  But, again, they're not lethal
19 force, because they don't fit the definition that
20 both law enforcement has adopted and the federal
21 courts have adopted.  They don't create a
22 substantial likelihood of serious bodily harm or
23 death, so they're not deadly force.
24    But many mechanisms that law enforcement
25 uses can cause death.  I've seen cases where an

**Page 98**

1 arm bar causes death.  I've seen situations where
2 a takedown causes death.  So that doesn't turn
3 them into lethal force by law enforcement.  That
4 doesn't make them require a deadly force
5 situation to use them.
6 Q.  Do you know why the Metropolitan Police
7 Department does not permit use of the rear naked
8 choke?
9 A.  I don't recall why.
10 Q.  Have you ever talked to them?
11 A.  You know, I've talked to them about use of
12 force on a number of occasions.  I've had
13 meetings with them about use of force at times,
14 but I don't recall ever discussing the rear naked
15 chokehold.
16    MR. SAYRE: I have nothing further.
17    MR. McNUTT: I have nothing.
18    MR. ANDERSON: I have nothing.
19    THE VIDEOGRAPHER: This concludes the
20 deposition.  The time is 1749.
21    (DEPOSITION CLOSED AT 5:49 P.M.)
22
23
24
25

**Page 99**

1          C E R T I F I C A T E
2
3       I, DENISE A. WEBB, a Notary Public in and for
   the State of Rhode Island, duly commissioned and
   qualified to administer oaths, do hereby certify that
4  the foregoing Deposition of JOHN J. RYAN, an EXPERT
   WITNESS in the above-entitled cause, was taken before
5  me on behalf of the PLAINTIFFS at the offices of
   Allied Court Reporters, Inc., 115 Phenix Avenue,
6  Cranston, Rhode Island on October 19, 2018 at
   3:00 p.m.; that previous to examination of said EXPERT
7  WITNESS who was of lawful age, he was first sworn by
   me and duly cautioned to testify to the truth, the
8  whole truth, and nothing but the truth, and that he
   thereupon testified in the foregoing manner as set out
9  in the aforesaid transcript.

10      I further certify that the foregoing Deposition
   was taken down by me in machine shorthand and
11 transcribed by computer, and that the foregoing
   Deposition is a true and accurate record of the
12 testimony of said EXPERT WITNESS.

13      Pursuant to Rules 5(d) and 30(f) of the Federal
   Rules of Civil Procedure, original transcripts shall
14 not be filed in Court; therefore, the original is
   delivered to and retained by Plaintiff's Attorney,
15 Federico C. Sayre.

16      Reading and signing of the transcript was not
   requested by the Deponent or by any Parties involved
17 upon completion of the Deposition.

18      IN WITNESS WHEREOF, I have hereunto set my hand
   and seal this 2nd day of November, 2018.
19
20
21
22
23
24 _____
25      DENISE A. WEBB, CSR/RPR/NOTARY PUBLIC
        MY COMMISSION EXPIRES APRIL 7, 2022