# Exhibit Q - Deposition of LVMPD Defendants' police practices expert Sonny Lynch

```
 1              C E R T I F I C A T E

 2

 3         I, Jane A. Blackerby, a Certified Court

 4    Reporter of the State of Missouri, do hereby

 5    certify:

 6         That prior to being examined the witness

 7    was by me duly sworn;

 8         That said deposition was taken down by

 9    me in shorthand at the time and place

10    hereinbefore stated and was thereafter reduced to

11    writing under my direction;

12         That I am not a relative or employee or

13    attorney or counsel of any of the parties, or a

14    relative or employee of such attorney or counsel,

15    or financially interested in the action.

16         WITNESS my hand and seal this 1st day

17    of November, 2018.

18

19

20

21

22

23

24    _____

25        JANE A. BLACKERBY, CCR No. 877

                                        Page 83
```

```
1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS
2     ESTATE OF TASHII S.        )
      FARMER d/b/a TASHII        )
3     FARMER a/k/a TASHII        )
      BROWN, by and through      )
4     its Special               )
      Administrator, Lorin       )
5     Michelle Taylor; TAMARA    )
      BAYLEE KUUMEALI'MAKAMAE    )
6     FARMER DUARTE, a minor,    )
      individually and as        )
7     Successor-in-             )
      Interest, by and through   )
8     her legal guardian,        )
      Stevandra Lk Kuanoni;      )
9     ELIAS BAY KAIMIPONO        )
      DUARTE, a minor,           )
10    individually and as        )
      Successor-n-              )
11    Interest, by and through   )
      his legal guardian,        )
12    Stevandra Lk Kuanoni,      )
              Plaintiffs,        )
13    v.                         )  Case No.
      LAS VEGAS METROPOLITAN     )  2:17-cv-01946
14    POLICE DEPARTMENT, a       )
      political subdivision of   )
15    the State of Nevada;       )
      OFFICE KENNETH LOPERA,     )
16    individually and in his    )
      Official Capacity;         )
17    SERGEANT TRAVIS            )
      CRUMRINE, individually     )  Date: October 18, 2018
18    and in his Official        )
      Capacity; OFFICER          )
19    MICHAEL TRAN,              )
      individually and in his    )
20    Official Capacity;         )
      OFFICER MICHAEL FLORES,    )
21    individually and in his    )
      Official Capacity; and     )
22    Does 1 through 50,         )
      inclusive,                 )
23            Defendants.        )
      _____
24          VIDEOTAPE TELEPHONIC DEPOSITION OF
             CAPTAIN LAWRENCE G. LYNCH, III
25    Pages 1 - 83

                                        Page 1
```

**Page 2**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11        VIDEOTAPE TELEPHONIC DEPOSITION OF
12   CAPTAIN LAWRENCE G. LYNCH, III, a Witness, taken
13   on behalf of the Plaintiffs, before Jane A.
14   Blackerby, MO CCR #877, KS CCR #1369, pursuant to
15   Notice on October 18, 2018, at The Hampton Inn,
16   900 Kansas, Clinton, Missouri.
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                    I N D E X
 2   WITNESS:                          PAGE:
 3     CAPTAIN LAWRENCE G. LYNCH, III
 4     Examination by Mr. Sayre          6
 5     Examination by Mr. McNutt        53
 6     Examination by Mr. Sayre         79
 7
 8
 9
10
11              E X H I B I T S
12   NO.:      DESCRIPTION:           MARKED:
13   Exhibit 1  Disk of video recording    37
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1          A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3     Mr. Federico C. Sayre
        ABIR COHEN TREYZON SALO, LLP
 4       1901 Avenue of the Stars
         Suite 935
 5       Los Angeles, California 90067
         310.407.7888
 6       fsayre@actslaw.com
 7
 8   FOR THE DEFENDANT LAS VEGAS METROPOLITAN POLICE
 9   DEPARTMENT, SERGEANT TRAVIS CRUMRINE, OFFICER
     MICHAEL TRAN AND OFFICER MICHAEL FLORES:
10     Mr. Craig R. Anderson
11     MARQUIS AURBACH COFFING
         10001 Park Run Drive
12       Las Vegas, Nevada 89145
13       702.382.0711
14       canderson@maclaw.com
15
16   FOR THE DEFENDANT OFFICER KENNETH LOPERA:
17     Mr. Daniel R. McNutt
18     MCNUTT LAW FIRM
         625 South Eight Street
19       Las Vegas, Nevada 89101
20       702.384.1170
21       drm@mcnuttlawfirm.com
22
23   THE VIDEOGRAPHER:
24     Ms. Kimberlee Lauer
25     VERITEXT LEGAL SOLUTIONS
```

**Page 5**

```
 1      (Deposition commenced at 2:13 p.m.)
 2         THE VIDEOGRAPHER:  Good afternoon.
 3   We're going on the record at 2:13 p.m. on      00:00:01
 4   Thursday, October 18th, 2018.  Please note that  00:00:04
 5   the microphones are sensitive and may pick up   00:00:08
 6   whispering, private conversations and cellular   00:00:11
 7   interference.  Please turn off all cell phones or  00:00:15
 8   place them away from the microphones as they can  00:00:17
 9   interfere with the deposition audio.  Audio and  00:00:19
10   video recording will continue to take place      00:00:22
11   unless all parties agree to go off the record.  00:00:24
12         This is media unit 1 of the video      00:00:27
13   recorded deposition of Captain Lawrence G. Lynch,  00:00:29
14   III taken by counsel for the Plaintiff in the   00:00:33
15   matter of the Estate of Tashii S. Farmer, et al.  00:00:34
16   versus Las Vegas Metropolitan Police Department,  00:00:38
17   et al., filed in the United States District      00:00:42
18   Court, District of Nevada.  This deposition is   00:00:43
19   being held at the Hampton Inn located at 900     00:00:46
20   Kansas Avenue in Clinton, Missouri.             00:00:50
21         My name is Kimberlee Lauer from the firm  00:00:53
22   Veritext Legal Solutions, and I'm the           00:00:56
23   videographer.  Our court reporter is Jane       00:00:57
24   Blackerby, also from Veritext.  I am not        00:01:00
25   authorized to administer an oath.  I am not     00:01:03
```

**Page 6**

1 related to any party in this action, nor am I   00:01:05
2 financially interested in the outcome.  Counsel   00:01:08
3 and all attending remotely will now please state   00:01:11
4 their appearances and affiliations for the   00:01:15
5 record, and if there are any objections to   00:01:18
6 proceeding, please state them at the time of your   00:01:20
7 appearance, beginning please with the noticing   00:01:22
8 attorney.   00:01:24
9   MR. SAYRE:  Representing the   00:01:29
10 children of Tashii Farmer, the Plaintiffs, Fred   00:01:30
11 Sayre.   00:01:35
12   MR. ANDERSON:  Craig Anderson on   00:01:36
13 behalf of the Las Vegas Metropolitan Police   00:01:37
14 Department and Officer Crumrine, Tran and Flores.   00:01:37
15   MR. MCNUTT:  Daniel McNutt on   00:01:37
16 behalf of Officer Kenneth Lopera.   00:01:47
17   THE VIDEOGRAPHER:  If our court   00:01:47
18 reporter would then please swear in the witness.   00:01:51
19   CAPTAIN LAWRENCE G. LAWRENCE, III,   00:01:51
20 a Witness, being first duly sworn, testified   00:01:51
21 under oath as follows:   00:01:51
22   EXAMINATION   00:01:51
23 BY MR. SAYRE:   00:02:01
24   Q.  Captain Lynch, my name is Fred Sayre,   00:02:01
25 and I filed a lawsuit against the Metropolitan   00:02:12

**Page 7**

1 Police Department and several individual   00:02:17
2 officers, and I understand that you have been   00:02:19
3 designated as an expert witness by the   00:02:22
4 Metropolitan Police Department and by Officer   00:02:25
5 Lopera.  Is that correct?   00:02:30
6   A.  Yes.   00:02:30
7   Q.  Could you tell me, please, your present   00:02:31
8 profession or occupation.   00:02:37
9   A.  I'm the Deputy Chief of Police in   00:02:37
10 Clinton, Missouri.  I'm also a trainer.  Sorry.   00:02:41
11   Q.  Sorry.   00:02:52
12   A.  I'm also a trainer.  I teach.  I travel   00:02:53
13 around and do seminars, and I teach at the   00:02:56
14 University of Central Missouri at the police   00:02:58
15 academy.  But my main job is I'm the Deputy Chief   00:03:00
16 here in Clinton.   00:03:07
17   Q.  Now, you've been listed as Captain   00:03:08
18 Lynch.  Should I be referring to you as chief   00:03:13
19 Lynch?   00:03:17
20   A.  No, captain is fine.  That's -- that's   00:03:17
21 kind of a weird rank system here, but yeah,   00:03:20
22 that's my rank.   00:03:24
23   Q.  Your rank is captain, but you're the   00:03:25
24 Deputy Chief of Police?   00:03:28
25   A.  Yeah.  That's my job, my duties.   00:03:29

**Page 8**

1   Q.  Okay.  I take it that you are employed   00:03:31
2 by the Clinton Police Department?   00:03:40
3   A.  Yes.   00:03:42
4   Q.  How long have you been employed by them?   00:03:43
5   A.  Almost 29 years.   00:03:47
6   Q.  Have you worked for any other law   00:03:48
7 enforcement agencies?   00:03:54
8   A.  I was in the military police corps for   00:03:56
9 three years, and I was a detention facility   00:03:59
10 officer for the Kansas City, Missouri Police   00:04:03
11 Department for two years.   00:04:06
12   Q.  Now, you have provided a statement   00:04:07
13 pursuant to Rule 26 concerning your opinions in   00:04:19
14 this case.  Do you have a copy of that statement?   00:04:25
15   A.  I do.  I have my report here.   00:04:27
16   Q.  All right.  And you have, as I   00:04:29
17 understand it, eight opinions.  Is that correct?   00:04:35
18   A.  Yes.   00:04:39
19   Q.  All right.  Are there any other opinions   00:04:41
20 that you have developed to provide in this case   00:04:46
21 other than 1 through 8 which are listed in this   00:04:50
22 report?   00:04:53
23   A.  No.   00:04:54
24   Q.  How many depositions have you given as   00:05:01
25 an expert witness?   00:05:04

**Page 9**

1   A.  This is the first one.   00:05:05
2   Q.  How many times have you testified in   00:05:07
3 court as an expert witness?   00:05:16
4   A.  I have not.   00:05:19
5   Q.  How did you come up with $2,000 a day   00:05:20
6 for giving a deposition?   00:05:28
7   A.  I just -- I have a friend who does it,   00:05:31
8 and he provided me his course fee or his fee   00:05:34
9 schedule.   00:05:38
10   Q.  And what type of expert is that friend?   00:05:38
11   A.  He's an -- he does use of force cases   00:05:45
12 and, you know, policy cases and stuff like that.   00:05:51
13 He's a major on the Kansas City, Missouri Police   00:05:56
14 Department.   00:06:00
15   Q.  So is it fair to say that you've never   00:06:00
16 charged anybody ever $2,000 a day to give your   00:06:08
17 deposition?   00:06:13
18   A.  No.  I have not.   00:06:13
19   MR. SAYRE:  Mr. Anderson, I -- you   00:06:27
20 and I need to discuss this.  I'm prepared to pay   00:06:29
21 a reasonable rate.  I do not consider $2,000 a   00:06:32
22 day to be a reasonable rate.  It carries with it   00:06:35
23 a time that I'm not certainly going to use or   00:06:39
24 that Mr. McNutt is going to use to question   00:06:42
25 Captain Lynch, but we'll go forward simply   00:06:44

3 (Pages 6 - 9)

1  indicating that I dispute the fee. I think it's   00:06:48
2  an unreasonable fee. Do you understand my   00:06:50
3  position?                         00:06:53
4         MR. ANDERSON: We'll see how long   00:06:53
5  it goes. We'll talk.                00:06:54
6     Q. (By Mr. Sayre) Okay. Now, Captain,   00:06:56
7  when were you first contacted with regard to this   00:07:01
8  case?                            00:07:03
9     A. I believe it was in April possibly.   00:07:03
10    Q. April of what year?            00:07:10
11    A. Well, let's see. Let's go back. I did   00:07:13
12 -- it wasn't April. It would have been in   00:07:18
13 December of last year. I believe that was when I   00:07:20
14 first was contacted.                00:07:23
15    Q. December of 2000 -- I'm sorry.     00:07:24
16    A. Yeah, 20 -- it was 2017.        00:07:27
17    Q. Okay.                      00:07:29
18    A. I didn't mean to interrupt.      00:07:29
19    Q. Okay. All right. Let me -- let me just   00:07:30
20 kind of give you some ground rules for the   00:07:33
21 deposition that may be helpful to you. You're   00:07:38
22 sworn to tell the truth, and although we're in   00:07:41
23 different cities and in sort of informal   00:07:45
24 circumstances, you understand that oath is   00:07:48
25 binding on you as if you were in a court of law?   00:07:52

*Page 10*

1     A. Yes.                       00:07:56
2     Q. Everything that is said by everybody at   00:07:57
3  anytime today will be taken down by the court   00:07:59
4  reporter. The court reporter will then have it   00:08:01
5  typed up into a booklet form in a couple of   00:08:05
6  weeks, and you'll be given an opportunity to read   00:08:08
7  and review that booklet form. And at the time   00:08:11
8  that you read and review it, you could actually   00:08:16
9  change anything that you said during the course   00:08:19
10 of the deposition. Do you understand that?   00:08:22
11    A. Yes.                       00:08:23
12    Q. However, if you change something that's   00:08:24
13 of material importance, either myself or some   00:08:29
14 other attorney can comment upon that fact, and it   00:08:33
15 could prove embarrassing to you if not damaging   00:08:36
16 to your client's case. Do you understand that?   00:08:39
17    A. I do.                      00:08:41
18    Q. So we ask you to give your best response   00:08:41
19 here today. Will you do that, please?   00:08:46
20    A. Yes, I will.                 00:08:48
21    Q. Now, just as you've been doing nicely up   00:08:48
22 until now, please continue to answer out loud.   00:08:53
23 Such common expressions as uh-huh, huh-uh or nods   00:08:56
24 of the head or shakes of the head are too   00:09:01
25 difficult for the court reporter to interpret, so   00:09:03

*Page 11*

1  I would have to follow up with questions like do   00:09:07
2  you mean yes or do you mean no. So in order to   00:09:10
3  avoid that, please continue to answer out loud.   00:09:13
4  Will you do that, please?           00:09:15
5     A. Yes.                       00:09:16
6     Q. If you don't understand a question,   00:09:17
7  don't answer it. Tell me you don't understand   00:09:20
8  it, ask me to repeat it or rephrase it or in some   00:09:23
9  way indicate it was not understood, and I'll do   00:09:28
10 my best to frame it in a way that's   00:09:30
11 understandable. If you answer a question, I'm   00:09:32
12 going to assume that you've understood it. Is   00:09:36
13 that fair enough?                  00:09:39
14    A. Yes.                       00:09:39
15    Q. Please wait until I finish my question   00:09:40
16 before you start your answer, and I'll wait and   00:09:45
17 give you the same courtesy. I'll wait until you   00:09:49
18 finish your answer before I start my next   00:09:52
19 question. Besides simply being courteous, it's   00:09:55
20 difficult for the court reporter to take down two   00:09:59
21 people who are speaking at the same time. Do you   00:10:02
22 understand that?                   00:10:04
23    A. Yes.                       00:10:05
24    Q. Okay. I don't expect this to be a   00:10:05
25 lengthy deposition, at least my portion of it,   00:10:14

*Page 12*

1  but if at anytime that you should wish to take a   00:10:18
2  break, use the facilities, what have you, just   00:10:22
3  let me know and your request will be honored. Do   00:10:25
4  you understand?                    00:10:29
5     A. I do.                      00:10:29
6     Q. I would only ask that if there is a   00:10:30
7  question pending, that you answer the question   00:10:33
8  before we take the break. Will you do that,   00:10:36
9  please?                          00:10:38
10    A. Yes.                       00:10:39
11    Q. Have you taken any kind of alcohol, any   00:10:39
12 kind of medication, any kind of intoxicant in the   00:10:47
13 last 24 hours that would affect your ability to   00:10:51
14 give your best response here today?   00:10:54
15    A. No.                        00:10:57
16    Q. During the course of the deposition I   00:11:01
17 may ask you questions that have to do with time,   00:11:03
18 dates or perhaps instances and you may or may not   00:11:09
19 have an exact answer to my question. But even if   00:11:15
20 you don't have an exact answer, you may have a   00:11:19
21 reasonable estimate. Please understand that if   00:11:21
22 you don't have an exact answer to my question, I   00:11:25
23 am still entitled to your best estimate. Will   00:11:29
24 you give your best estimate if you don't have an   00:11:32
25 exact answer to the question?         00:11:36

*Page 13*

4 (Pages 10 - 13)

**Page 14**

1    A.  Yes.                          00:11:37
2    Q.  However, if it is a guess, I'm not    00:11:38
3  entitled to have you guess.  The difference    00:11:44
4  between a guess and an estimate are not always    00:11:47
5  clear, but one well used example is if I ask you    00:11:50
6  to estimate the length of the table that you're    00:11:55
7  sitting at where you are located in the Hampton    00:11:59
8  Inn in Clinton, Missouri, you can see the table.    00:12:03
9  You have a life experience with feet and inches    00:12:06
10  or meters and centimeters.  You could probably    00:12:09
11  give a reasonable estimate of the length of the    00:12:11
12  table, but if I ask you to give an estimate of my    00:12:13
13  dining room table in Irvine, California, it would    00:12:18
14  have to be a pure guess because you've never been    00:12:23
15  in my home.  Do you understand?        00:12:25
16    A.  Yes.                          00:12:26
17    Q.  So estimates good, guesses bad.  You    00:12:27
18  understand that?                   00:12:32
19    A.  I do.                         00:12:33
20    Q.  Okay.  Do you have any questions before    00:12:34
21  we start the questioning in your deposition?    00:12:39
22    A.  I do not.                      00:12:42
23    Q.  Okay.  You said no, but I didn't quite    00:12:43
24  hear it.                          00:12:48
25    A.  I do not have any questions.      00:12:48

**Page 15**

1    Q.  Okay.  Thank you.  All right.  Captain    00:12:49
2  Lynch, in looking at your opinion No. 1, if I    00:13:04
3  could draw your attention to that, please.    00:13:09
4    A.  Okay.                         00:13:10
5    Q.  You utilize a Graham versus Connor    00:13:11
6  analysis in discussing the constitutionality of    00:13:17
7  the use of force.  Is that correct?      00:13:22
8    A.  The use of force policy is what I was    00:13:24
9  talking about.                     00:13:29
10    Q.  Right.  Use of force policy?      00:13:30
11    A.  Yeah.                         00:13:31
12    Q.  And Graham versus Connor, are you    00:13:33
13  familiar with that case?             00:13:36
14    A.  I am.                         00:13:37
15    Q.  All right.  It contains a number of    00:13:37
16  factors in determining whether or not the force    00:13:41
17  used in a certain situation was objectively    00:13:46
18  reasonable.  Correct?               00:13:51
19    A.  Correct.                      00:13:52
20    Q.  All right.  Now, another way of saying    00:13:52
21  it is if the force used is not objectively    00:14:01
22  reasonable, it is a violation of the Fourth    00:14:06
23  Amendment to the Constitution of the United    00:14:10
24  States.  Correct?                  00:14:12
25    A.  Yes.                          00:14:13

**Page 16**

1    Q.  So is it fair to say that if something    00:14:13
2  is excessive force, it is a Fourth Amendment    00:14:19
3  violation?                        00:14:25
4    A.  Well, I think there might be more things    00:14:26
5  to consider than just that, but yeah, I would    00:14:28
6  agree with that in general.           00:14:33
7    Q.  Okay.  Now, let me ask you to turn to    00:14:34
8  your opinion No. 8.                 00:14:42
9    A.  Okay.                         00:14:51
10    Q.  All right.  Your opinion is that the    00:14:52
11  neck restraint that was used by Officer Kenneth    00:14:59
12  Lopera was not a lateral vascular neck restraint.    00:15:03
13  Is that correct?                   00:15:09
14    A.  Yes, that's correct.           00:15:10
15    Q.  All right.  You believe that it was a    00:15:11
16  rear naked choke.  Is that correct?     00:15:17
17    A.  Yes.                          00:15:20
18    Q.  Right.  Well, let's discuss a moment    00:15:20
19  your background with regard to a rear naked    00:15:26
20  choke.  Tell me, please, what training or    00:15:30
21  education you have received concerning a rear    00:15:36
22  naked choke.                      00:15:41
23    A.  Well, I started my -- my education in    00:15:41
24  ground defense control tactics in the early    00:15:46
25  Nineties with a trainer out of Rhode Island.  His    00:15:49

**Page 17**

1  name is Brad Inman.  He's a national trainer for    00:15:52
2  the National Law Enforcement Training Center that    00:15:55
3  I'm currently president of.  His ground defense    00:15:58
4  control tactics system is one of our -- our    00:16:01
5  systems that we certify people as trainers in.    00:16:04
6        As part -- part of my education around    00:16:07
7  Brad Inman and the development of that program,    00:16:11
8  he showed me on numerous occasions several    00:16:17
9  different types of neck restraints, and we were    00:16:19
10  -- we went over several different types of neck    00:16:23
11  restraints that he used in his programs out in    00:16:26
12  Rhode Island, and compared them to the lateral    00:16:28
13  vascular neck restraint system which was part of    00:16:33
14  the National Law Enforcement Training Center.    00:16:35
15  Eventually, you know, his -- his program morphed    00:16:38
16  into one of our instructor trainer programs that    00:16:41
17  does include the LVNR.              00:16:44
18        However, during those days and since    00:16:46
19  I've been exposed to a rear naked choke in    00:16:49
20  different grappling sessions informal with --    00:16:54
21  with other trainers and officers.  So I'm    00:16:59
22  familiar with the rear naked choke, and in    00:17:02
23  addition to that, I've -- I've been around it in    00:17:05
24  social media, as far as programming goes with    00:17:09
25  MMA.  It's a very highly recognizable and common    00:17:14

5 (Pages 14 - 17)

| | |
|---|---|
| 1 technique in that -- in that genre, and I'm 00:17:21 | 1 was that most confrontations end up on the ground 00:19:56 |
| 2 familiar with it from that. 00:17:25 | 2 and go to the ground. So with that being a 00:20:00 |
| 3 Q. Recently there was a well publicized 00:17:36 | 3 reality for law enforcement, different training 00:20:04 |
| 4 match with a fellow name Connor in MMA. Are you 00:17:39 | 4 organizations began to develop ground defense 00:20:08 |
| 5 aware of that? 00:17:43 | 5 control tactics programs so that they could 00:20:10 |
| 6 A. I know that it occurred. I didn't see 00:17:44 | 6 better control subjects on the ground. 00:20:13 |
| 7 it, though. I heard he lost. 00:17:45 | 7 Q. Okay. And to your knowledge, was the 00:20:15 |
| 8 Q. Okay. He lost because there was 00:17:47 | 8 rear naked choke ever a permissible hold as a 00:20:22 |
| 9 application of a rear naked choke which caused 00:17:51 | 9 part of ground defense control tactics? 00:20:27 |
| 10 him to tap out. Are you aware of that? 00:17:53 | 10 A. No. The application of it has not been 00:20:30 |
| 11 A. I was not. I'm not shocked by it, 00:17:55 | 11 a part of ours. The escape from it has been a 00:20:34 |
| 12 though. 00:17:58 | 12 part of ours, and I -- 00:20:36 |
| 13 Q. Okay. Now, could you tell me, please, 00:17:58 | 13 Q. When you say ours, what are you 00:20:40 |
| 14 when you were first trained to apply a rear naked 00:18:05 | 14 referring to? 00:20:42 |
| 15 choke? 00:18:10 | 15 A. Well, for the National Law Enforcement 00:20:42 |
| 16 A. That would probably have been around 00:18:10 | 16 Training Center for our -- for our program. I 00:20:44 |
| 17 1993. 00:18:12 | 17 can only speak to that. We do not -- we do not 00:20:47 |
| 18 Q. And that's by this gentleman, Mr. Inman? 00:18:14 | 18 instruct people to apply it. We do show a 00:20:51 |
| 19 A. Uh-huh. 00:18:19 | 19 counter to that and an escape from that, because 00:20:55 |
| 20 Q. Is that a yes? 00:18:20 | 20 it is a common tactic. 00:20:58 |
| 21 A. Yes. Sorry. Yes. 00:18:22 | 21 Q. When you say a common tactic, what are 00:20:59 |
| 22 Q. Uh-huh. And I'm sorry, what was 00:18:23 | 22 you referring to? 00:21:06 |
| 23 Mr. Inman's background in the application of rear 00:18:27 | 23 A. I'm just saying with the emergence into 00:21:06 |
| 24 naked chokes? 00:18:31 | 24 the mixed martial arts world that we see in our 00:21:08 |
| 25 A. Mr. Inman is a Jujitsu, it's called soke 00:18:32 | 25 society today and, you know, even you talking 00:21:11 |
| Page 18 | Page 20 |

| | |
|---|---|
| 1 ni. It's called the next to carry on the system, 00:18:40 | 1 about a Connor MacGregor fight, you know, it's 00:21:13 |
| 2 and he has a couple different Dojos out in the 00:18:43 | 2 pretty much an abundant program out there. We 00:21:17 |
| 3 Warwick, Rhode Island area, and so he's primarily 00:18:48 | 3 see people who go to gyms and just anybody, a 00:21:20 |
| 4 a martial artist. He was a Kent County deputy 00:18:50 | 4 common person out here on the -- in our community 00:21:25 |
| 5 for several years, and -- and still is a law 00:18:54 | 5 that might go and train on it. So it's not 00:21:28 |
| 6 enforcement officer out in Rhode Island. 00:18:57 | 6 uncommon to see those type of techniques employed 00:21:31 |
| 7 Q. So you were in Rhode Island when he 00:19:00 | 7 against law enforcement officers, so we try to 00:21:34 |
| 8 showed you how to apply a rear naked choke? 00:19:05 | 8 make sure that officers know how to escape from 00:21:37 |
| 9 A. No, I was in Kansas City. 00:19:07 | 9 that. 00:21:39 |
| 10 Q. Missouri? 00:19:09 | 10 Q. Have you actually applied the rear naked 00:21:42 |
| 11 A. Uh-huh, yes. 00:19:11 | 11 choke? 00:21:44 |
| 12 Q. And his connection with Kansas City was 00:19:12 | 12 A. I have in training. I have never 00:21:45 |
| 13 the national center? 00:19:14 | 13 applied it to anyone in a professional setting, 00:21:48 |
| 14 A. National Law Enforcement Training 00:19:15 | 14 in a law enforcement setting. 00:21:52 |
| 15 Center. He came out and was a student there, and 00:19:16 | 15 Q. Can you estimate how many times you've 00:21:53 |
| 16 then in the early Nineties, ground -- ground 00:19:19 | 16 applied the rear naked choke in training? 00:21:58 |
| 17 defense control tactics began to make its way 00:19:22 | 17 A. You know, just to demonstrate it, 00:22:01 |
| 18 into law enforcement. 00:19:26 | 18 probably over a hundred times. I'd say that's 00:22:05 |
| 19 Q. What do you mean by ground control 00:19:28 | 19 not out of line. Of course, to teach someone how 00:22:08 |
| 20 defense control tactics? 00:19:37 | 20 to escape from it I have to demonstrate it, so. 00:22:14 |
| 21 A. Primarily prior to 1990 most law 00:19:39 | 21 Q. Sorry. I apologize. Go ahead. I 00:22:17 |
| 22 enforcement agency and training centers trained 00:19:42 | 22 didn't mean to cut you off. 00:22:21 |
| 23 in control techniques that all relied on officers 00:19:46 | 23 A. I just said that, you know, to teach 00:22:21 |
| 24 standing up on their own two feet, you know, 00:19:49 | 24 someone how escape it from you have to 00:22:23 |
| 25 and -- in that fashion, but the reality of it was 00:19:52 | 25 demonstrate it, so I've demonstrated it on 00:22:25 |
| Page 19 | Page 21 |

6 (Pages 18 - 21)

Page 22

```
 1  numerous occasions.                    00:22:29
 2     Q.  And can you tell us, please, the steps   00:22:29
 3  that go into applying a rear naked choke?   00:22:36
 4     A.  Well, the first thing that you need to   00:22:39
 5  accomplish is you need to be chest to back with   00:22:43
 6  your opponent.  You need to be behind them to get   00:22:46
 7  that -- to get that accomplished.  Then the   00:22:49
 8  encirclement of the neck.  It could be your left   00:22:54
 9  arm or your right arm.  As you encircle the   00:22:57
10  subject's neck you attempt to line up your elbow   00:23:00
11  with their chin, so that pressure's not being   00:23:02
12  applied to their airway.               00:23:08
13        And as the encircling arm comes around,   00:23:10
14  it makes contact usually with the biceps of the   00:23:15
15  non-encircling arm.  The hand of the   00:23:19
16  non-encircling arm goes to the back of the   00:23:23
17  subject's head.  Some people do palm to head,   00:23:25
18  some people do back of the -- back of the hand to   00:23:28
19  head.  Once that's accomplished, you know, you're   00:23:30
20  going to compress and pull your elbows in to   00:23:34
21  apply bilateral compression to the sides of your   00:23:38
22  opponent's neck.                       00:23:42
23     Q.  The rear naked choke is similar to the   00:23:42
24  lateral vascular neck restraint in that both are   00:23:56
25  blunt chokes.  Correct?                00:24:01
```
Page 22

Page 23

```
 1     A.  Yeah, that term would be agreeable.   00:24:03
 2  It -- both of them affect the circulatory system   00:24:08
 3  and you -- and apply bilateral compression to the   00:24:12
 4  sides of the neck and reduce blood flow through   00:24:17
 5  the veins and arteries.                00:24:20
 6     Q.  The idea is to put pressure on the   00:24:22
 7  carotid, the jugular and the vagus nerves?   00:24:28
 8     A.  Yes.  You know, some of those are   00:24:32
 9  affected.  It just depends on how much   00:24:34
10  compression you're applying, but certainly the --   00:24:36
11  the arteries and the veins are affected.   00:24:40
12     Q.  Okay.  Have you ever rendered somebody   00:24:42
13  unconscious by the use of the rear naked choke?   00:24:48
14     A.  No.                            00:24:51
15     Q.  Have you ever rendered somebody   00:24:54
16  unconscious by the use of the lateral vascular   00:24:56
17  neck restraint?                        00:24:58
18     A.  Yes.                           00:24:59
19     Q.  On how many occasions?           00:24:59
20     A.  I've got a 32 year career.  1 -- you   00:25:03
21  know, in training it's been an accidental thing   00:25:10
22  on two occasions, so I do remember those.  As far   00:25:12
23  as my law enforcement career, probably around a   00:25:16
24  dozen, a dozen times.                  00:25:19
25     Q.  How long does it take to render somebody   00:25:21
```
Page 23

Page 24

```
 1  unconscious by the use of the lateral vascular   00:25:28
 2  neck restraint?                        00:25:31
 3     A.  Well, you know, all of our studies have   00:25:32
 4  we've done at the National Law Enforcement   00:25:35
 5  Training Center tell us about four to seven   00:25:37
 6  seconds.  That's an average.  But you know,   00:25:40
 7  things can vary depending upon, you know, a lot   00:25:43
 8  of different variables when you're grappling with   00:25:46
 9  somebody.  But about four to seven seconds.   00:25:49
10     Q.  Do you know how long -- I'm sorry,   00:25:53
11  pardon me.                             00:25:54
12     A.  About four to seven seconds is -- is how   00:25:55
13  long it takes.                         00:25:57
14     Q.  All right.  How long does it take to   00:25:57
15  render somebody unconscious by the use of the   00:26:00
16  rear naked choke?                      00:26:02
17     A.  I don't know.                   00:26:04
18     Q.  Is it longer or shorter than the lateral   00:26:04
19  vascular neck restraint?               00:26:11
20     A.  I just really couldn't give you an   00:26:13
21  accurate -- an accurate answer on that.  I don't   00:26:15
22  have any empirical data on a rear naked choke,   00:26:18
23  and I do -- I do have empirical data on the LVNR,   00:26:21
24  but not on a rear naked choke.  I think --   00:26:25
25     Q.  All right.                      00:26:28
```
Page 24

Page 25

```
 1     A.  I know there's some -- there's some   00:26:28
 2  Japanese research that was done.  I did see one   00:26:30
 3  study, and it was essentially a rear naked choke   00:26:33
 4  that was being applied, and I believe that their   00:26:37
 5  results were a little bit longer.  It was in the   00:26:42
 6  5 to 20 second range, but I could be -- I could   00:26:44
 7  be wrong about that, but I think that's -- that's   00:26:50
 8  what I saw from the Japanese research study that   00:26:53
 9  was done back in the 1950s.            00:26:56
10     Q.  All right.  So let's -- let's kind of   00:26:58
11  look at the two of them together, the rear naked   00:27:03
12  choke and the lateral vascular neck restraint.   00:27:05
13  Both of them share the common characteristics   00:27:09
14  that they put bilateral pressure on both sides of   00:27:12
15  the neck.  True?                       00:27:15
16     A.  True.                          00:27:16
17     Q.  Both of them do not put pressure on the   00:27:16
18  trachea.  True?                        00:27:23
19     A.  True.                          00:27:24
20     Q.  All right.  So where is the difference   00:27:25
21  in the application between the lateral vascular   00:27:31
22  neck restraint and the rear naked choke?   00:27:34
23     A.  The difference lies in -- in the safety   00:27:37
24  features of the lateral vascular neck restraint   00:27:42
25  system.  We have a system in our methodology in   00:27:45
```
Page 25

7 (Pages 22 - 25)

```
 1  place that -- that greatly discourages the      00:27:50
 2  technique deteriorating into a bar arm choke.    00:27:55
 3      Q.  And what do you mean by that?            00:27:58
 4      A.  Primarily it's what we refer to in the   00:28:05
 5  lateral vascular neck restraint system as the    00:28:09
 6  neck brace principle.  When a subject's neck is  00:28:12
 7  encircled and their chin is aligned with the     00:28:17
 8  practitioner's elbow or the officer's elbow,     00:28:20
 9  that -- that ensures bilateral compression on the 00:28:24
10  sides of the neck.  The officer's encircling hand 00:28:28
11  is palm down, and then it's joined by the        00:28:32
12  officer's rear hand.  The side of the officer's  00:28:34
13  head is placed against the back of -- of the     00:28:38
14  subject's head.                                  00:28:41
15      As the officer pulls to the rear and has     00:28:44
16  that two handed grip that's essentially behind   00:28:47
17  the subject's head at that point, it creates a   00:28:50
18  biomechanical cervical collar, if you will, or a 00:28:55
19  C collar.  People are familiar with this.  You   00:29:00
20  see them if you get in a car wreck and, you know, 00:29:01
21  they suspect that you might have hurt your neck,  00:29:04
22  they put that on you.  What that does is it stops 00:29:07
23  the side to side action of your head as if you   00:29:11
24  were shaking your head no.  It doesn't allow that 00:29:14
25  movement of your cervical vertebrae.             00:29:17
                                                      Page 26
```

```
 1      In the same sense, the neck brace           00:29:22
 2  principle does the same thing.  It makes it very 00:29:24
 3  difficult for that side to side movement of the  00:29:27
 4  head.  So it stabilizes the neck.  It locks the  00:29:31
 5  cervical vertebrae in place and holds it still   00:29:35
 6  and safe while bilateral compression is applied  00:29:39
 7  to the sides of the neck.  The airway is         00:29:42
 8  protected in front of or behind the officer's    00:29:47
 9  elbow, and that's why you don't get pressure to  00:29:52
10  the front of the airway.                         00:29:55
11      The neck brace principle is one of the       00:29:56
12  things that we credit.  We give a great deal of  00:29:59
13  credit to the neck brace principle for the LVNR  00:30:06
14  safety record.  We believe that's one of the     00:30:09
15  things that makes it a very safe, teachable      00:30:11
16  technique and usable on the street.              00:30:14
17      Q.  Now, without this neck brace principle,  00:30:18
18  you believe there's a danger that a rear naked   00:30:29
19  choke could deteriorate into a what?             00:30:32
20      A.  We believe that it could deteriorate     00:30:37
21  into a bar arm choke.  A bar arm choke is --     00:30:41
22      Q.  What do you mean by that?                00:30:44
23      A.  A bar arm choke is when the subject's -- 00:30:45
24  the front structures of the throat are in line   00:30:48
25  with the -- the officer's forearm.  So the       00:30:52
                                                      Page 27
```

```
 1  forearm is placed across the front of the throat 00:30:58
 2  and the pressure is applied to the front         00:31:00
 3  structures of the throat instead of the sides of 00:31:03
 4  the neck.                                        00:31:06
 5      Q.  So that would be pressure on the         00:31:06
 6  trachea?                                         00:31:11
 7      A.  Yes, and larynx.                         00:31:11
 8      Q.  And larynx.  And that potentially leads  00:31:13
 9  to asphyxia.  Correct?                           00:31:17
10      A.  It can lead to asphyxiation.  It can     00:31:19
11  lead to other damages, fractures to the -- to the 00:31:22
12  structures in the front of the throat.           00:31:25
13      Q.  Have you reviewed -- well, let's talk    00:31:26
14  about what you reviewed.  What have you reviewed 00:31:38
15  in preparing your opinions in this case?         00:31:40
16      A.  Well, I, of course, reviewed the         00:31:42
17  policies that I rendered an opinion on.  All of  00:31:46
18  the policies that I rendered opinion on, the use 00:31:49
19  of force policy and the arrest policy.  I looked 00:31:51
20  at their training policies.  I reviewed all of   00:31:55
21  the video that -- that we had access to, and     00:31:59
22  Officer Lopera's body camera.  You know, then    00:32:04
23  there was an overhead video at the Venetian Hotel 00:32:09
24  and then there was a video that was shot         00:32:13
25  underneath, you know, the parking area there.  I 00:32:17
                                                      Page 28
```

```
 1  read some different articles and news items      00:32:24
 2  pertaining to this case, too.  Watched some local 00:32:28
 3  news video from out in Las Vegas, things like    00:32:31
 4  that.                                            00:32:36
 5      Q.  Did you review -- sorry.  Pardon me for  00:32:37
 6  interrupting you.                                00:32:40
 7      A.  No, that's it.                           00:32:40
 8      Q.  Did you review the arrest report?        00:32:43
 9      A.  I don't believe I did.                   00:32:45
10      Q.  Was it --                                00:32:52
11      A.  You mean, as far as -- you mean the      00:32:52
12  incident report?  The written?                   00:32:54
13      Q.  The incident report.                     00:32:56
14      A.  The written incident report, yes.        00:32:58
15      Q.  Okay.  I think they call it, I don't     00:33:00
16  know why, but they call it arrest report in this 00:33:04
17  situation.                                       00:33:07
18      A.  Okay.                                    00:33:07
19      Q.  And it has a series of timelines         00:33:08
20  beginning from the time that the neck restraint  00:33:12
21  was applied until it was released.  Do you know  00:33:16
22  what I'm referring to?                           00:33:20
23      A.  Yes.                                     00:33:21
24      Q.  And it also has a number of statements   00:33:22
25  in it that are attributed to Officer Lopera, when 00:33:28
                                                      Page 29
```

8 (Pages 26 - 29)

1 he's describing what he did in terms of what   00:33:32
2 type, apparently what type of a hold he applied.   00:33:36
3 Do you know what I'm referring to?   00:33:39
4   A.  Yes.   00:33:41
5   Q.  Okay.  Have you reviewed any   00:33:41
6 depositions?   00:33:46
7   A.  Yes.  I reviewed depositions.   00:33:47
8   Q.  What depositions?   00:33:49
9   A.  I reviewed -- I don't have a whole list   00:33:52
10 of them that I've read.  I've got -- I've gotten   00:33:58
11 several of them, and I've reviewed Bland,   00:34:01
12 Sergeant Bland, and I don't have a list of names   00:34:08
13 here with me.  I'm sorry.   00:34:14
14   Q.  It's all right.  Do you have a list or   00:34:15
15 no --   00:34:20
16   A.  I do not.   00:34:20
17   Q.  -- you don't remember?   00:34:21
18   A.  I don't.  I reviewed Mr. Lopera's expert   00:34:22
19 witness's -- I can't recall his name, but he   00:34:26
20 worked in -- in Nevada.  He was a police officer   00:34:31
21 in Nevada, reviewed his.   00:34:34
22   Q.  Okay.  Did you review Frank Mir?  He's a   00:34:38
23 martial arts guy.   00:34:43
24   A.  Yes.   00:34:44
25   Q.  Okay.  Do you remember Mr. Mir saying   00:34:45

Page 30

1 that he didn't think that the hold that was   00:34:53
2 applied by Officer Lopera was either a lateral   00:34:56
3 vascular neck restraint or a rear naked choke?   00:35:00
4   A.  Yes.   00:35:04
5   Q.  Okay.  Do you agree or disagree with   00:35:04
6 that?   00:35:09
7   A.  You know, I can only tell you that I   00:35:09
8 know what it is.  I feel like I can.  I disagree.   00:35:14
9 I disagree with you, know, if he says that it's   00:35:17
10 an LVNR, I disagree with that, absolutely.   00:35:22
11   Q.  Right.  Tell me, please, what you saw in   00:35:24
12 the videos that caused you to believe that   00:35:34
13 Officer Lopera was applying a rear naked choke.   00:35:38
14   A.  Well, the thing that caused me to   00:35:41
15 believe that he was applying a rear naked choke   00:35:46
16 was the video that was taken.  The view of the   00:35:48
17 camera is from the top of the head down, from   00:35:51
18 Mr. Lopera -- or Officer Lopera and Mr. Farmer.   00:35:57
19 So that's -- that's the view of the camera.  In   00:36:00
20 -- in that, it's clear to me that a rear naked   00:36:03
21 choke is being applied.   00:36:06
22       The reason that it's clear to me is   00:36:07
23 because the hallmarks of an LVNR, the neck brace   00:36:10
24 principle, doesn't exist in that video.  It's   00:36:14
25 simply not there.  I can see that Officer Lopera   00:36:17

Page 31

1 has encircled Mr. Farmer's neck with his left   00:36:23
2 arm, and the hand placement of his right hand is   00:36:27
3 behind Mr. Farmer's head.  That -- that is clear   00:36:34
4 to me because of the placement of his forearm and   00:36:38
5 elbow.  Officer Lopera's forearm and elbow are in   00:36:40
6 front of his face.   00:36:44
7       It's physically impossible to do a   00:36:47
8 lateral vascular neck restraint and have your   00:36:48
9 arm, your forearm and elbow be in front of your   00:36:51
10 face.  However, if you're doing a rear naked   00:36:54
11 choke, that's exactly where they're going to be.   00:36:57
12 So that's what I saw in the video.   00:37:00
13   Q.  Okay.  Let me stop you there for a   00:37:02
14 second because I'm not sure I understand.   00:37:04
15   A.  Uh-huh.   00:37:06
16   Q.  All right.  You saw the one arm encircle   00:37:07
17 the neck.  True?   00:37:11
18   A.  Yes, the left arm.   00:37:12
19   Q.  Right.  And was the elbow placed in   00:37:14
20 front of the trachea so there's no pressure on   00:37:19
21 the trachea?   00:37:21
22   A.  I couldn't tell that.  I don't know   00:37:23
23 where the placement was.  The video was not up   00:37:25
24 close and the quality of it didn't allow for that   00:37:28
25 type of an examination.  I can only tell you the   00:37:30

Page 32

1 placement of the arms.   00:37:33
2   Q.  I'm sorry.  How far away was the -- how   00:37:34
3 far away was the video?   00:37:39
4   A.  I don't know.  I mean, it didn't look   00:37:40
5 like it was very far away, but I mean, you know,   00:37:41
6 I can't tell you how -- you mean, how far away   00:37:45
7 was the person who was shooting it?   00:37:48
8   Q.  That's right.   00:37:50
9   A.  Yeah, I don't know.   00:37:51
10   Q.  Can you estimate?   00:37:52
11   A.  If I was standing there on the ground   00:37:55
12 and that camera was my eyes, I'd say I'd probably   00:37:59
13 be about 25 feet from him, something like that.   00:38:02
14   Q.  Okay.  Was this a body camera, if you   00:38:06
15 know, or was it a part of the Venetian video?   00:38:09
16   A.  I don't know.   00:38:12
17   Q.  Okay.  All right.  Did you ever -- were   00:38:13
18 you able -- do you have that video?   00:38:16
19   A.  I do.   00:38:18
20   Q.  All right.   00:38:19
21       MR. SAYRE:  Craig, I'd like to mark   00:38:24
22 that video for identification, if you know which   00:38:25
23 videos he's referring to.   00:38:29
24       MR. ANDERSON:  I assume he's   00:38:31
25 referring to the overhead Venetian video, but I'm   00:38:36

Page 33

9 (Pages 30 - 33)

```
 1  not sure.                          00:38:39
 2        THE WITNESS: It is.          00:38:40
 3     MR. ANDERSON: Okay.             00:38:41
 4        THE WITNESS: I guess that was from   00:38:43
 5  a hotel camera. Correct?           00:38:44
 6     MR. ANDERSON: Yeah, the hotel   00:38:47
 7  camera.                            00:38:48
 8        THE WITNESS: Okay.           00:38:48
 9     MR. SAYRE: All right. Is there a    00:38:51
10  way to -- for us to mark that for identification?   00:38:53
11     MR. ANDERSON: Did you have it with   00:38:57
12  you, Captain?                      00:39:01
13        THE WITNESS: Do I have the video?   00:39:02
14  Yeah, I have it back at my office. I do. I   00:39:04
15  don't have it here with me. I'm sorry.   00:39:08
16     MR. ANDERSON: I mean, I produced   00:39:10
17  the Venetian video and the body cam. He's   00:39:13
18  talking about the Venetian video that we've used   00:39:19
19  throughout the litigation, if you want another   00:39:19
20  copy.                              00:39:21
21     MR. SAYRE: Well, I just want to   00:39:23
22  mark it for identification, because he's relying   00:39:24
23  upon that view, and I think it's important to   00:39:27
24  mark what he's relying upon.       00:39:29
25     MR. ANDERSON: Fred?            00:39:31
                                          Page 34
```

```
 1     MR. SAYRE: Yeah.               00:39:37
 2     MR. MCNUTT: If he says this, I   00:39:37
 3  missed it, but if you wouldn't mind, I'd ask   00:39:38
 4  Captain Lynch, in the video that you watched was   00:39:41
 5  it one view of the action on the ground or were   00:39:44
 6  there side by side views of different cameras?   00:39:50
 7  For example, there's one video that has been   00:39:53
 8  produced where it shows the static view that I   00:39:56
 9  think you're talking about from the Venetian, and   00:40:00
10  then simultaneously on the screen it shows a body   00:40:02
11  cam, a body worn cam angle as well. Can you   00:40:06
12  describe the video that you saw?   00:40:10
13        THE WITNESS: You know, I've seen   00:40:13
14  both of those, but it seems like one of them was   00:40:14
15  a -- a -- you know, posted on a law enforcement   00:40:19
16  site. I believe the one that -- that -- that I   00:40:22
17  was sent is just the -- just the camera angle.   00:40:30
18     MR. MCNUTT: The static, on the --   00:40:37
19        THE WITNESS: The static overhead,   00:40:40
20  yeah, right. There's been three videos. There's   00:40:41
21  the static from the overhead, and then there's   00:40:46
22  the body cam and then there's a pretty grainy   00:40:48
23  shot that's high up on the hotel, it looks like,   00:40:53
24  or high up on a structure that's shooting down   00:40:57
25  that shows Mr. Farmer run underneath of the, you   00:41:00
                                          Page 35
```

```
 1  know, run under the parking area there, and then   00:41:07
 2  Officer Lopera's in pursuit of him. And those   00:41:10
 3  are the three that I've seen.      00:41:14
 4     MR. MCNUTT: What I'd like to do,   00:41:17
 5  Craig, is with your permission and with Captain   00:41:19
 6  Lynch's permission, is, I'd like to have him   00:41:22
 7  identify -- I know he doesn't have it with him   00:41:24
 8  today, but identify for the court reporter the   00:41:26
 9  video that he's relying upon and provide it to   00:41:30
10  the court reporter so it can be marked for   00:41:33
11  identification as Plaintiffs' 1 to this   00:41:36
12  deposition. Is that all right?     00:41:39
13        MR. ANDERSON: That's all right.   00:41:42
14  It will have to be copies. I think that's the   00:41:43
15  only copy he has.                  00:41:45
16     MR. SAYRE: That's fine.        00:41:47
17        MR. ANDERSON: Okay. We can figure   00:41:48
18  it out.                            00:41:49
19     Q. (By Mr. Sayre) Do you understand,   00:41:50
20  Captain?                           00:41:51
21     A. Yeah.                       00:41:52
22     Q. I'd like to be able to take -- have you   00:41:52
23  make a copy of that video, the one that you're   00:41:54
24  relying upon, provide it to the court reporter,   00:41:58
25  who will attach it as an exhibit to the   00:42:00
                                          Page 36
```

```
 1  deposition.                        00:42:02
 2     Q. Okay.                       00:42:03
 3     Q. Okay. Thank you.            00:42:03
 4        (Lynch Exhibit 1 was marked for   00:42:03
 5     identification by the reporter.)   00:42:06
 6     Q. (By Mr. Sayre) So let's go back to what   00:42:06
 7  you recall seeing. The neck was encircled with   00:42:11
 8  one arm, and that would be true of either a   00:42:17
 9  lateral vascular neck restraint or a rear naked   00:42:19
10  choke. Correct?                    00:42:22
11     A. Yes.                        00:42:23
12     Q. And the elbow was placed, aligned in   00:42:23
13  front of the trachea so there's no pressure on   00:42:31
14  the trachea, and that would be the same whether   00:42:34
15  it's a lateral vascular neck restraint or rear   00:42:37
16  naked choke. True?                 00:42:40
17     A. Ideally it would be the same. I don't   00:42:41
18  know if -- I don't know where it was aligned, you   00:42:44
19  know, in the case of --            00:42:46
20     Q. That's right. You told me you couldn't   00:42:48
21  see if it was aligned or not.      00:42:49
22     A. No.                         00:42:50
23     Q. Okay. Then what was important to you   00:42:51
24  that told you was the hallmarks, if you will, of   00:42:54
25  the rear naked choke, was that the right hand was   00:42:57
                                          Page 37
```

1 behind his head?                          00:43:02
2    A.  Right hand was in front of his head, in   00:43:06
3 front of Officer Lopera's head.           00:43:09
4    Q.  Right hand in front of him?        00:43:11
5    A.  Uh-huh.  Yes.                       00:43:14
6    Q.  Okay.  And why is that indicative of a   00:43:15
7 rear naked choke?                         00:43:21
8    A.  The hand would be in front of your face   00:43:22
9 if you were applying pressure to the back of the   00:43:27
10 head with your hand.                     00:43:29
11    Q.  Okay.  And the back -- applying pressure   00:43:32
12 to the back of the head with your hand is what   00:43:37
13 you would do with a lateral vascular neck   00:43:39
14 restraint?                               00:43:41
15    A.  Nope.  With a lateral vascular neck   00:43:42
16 restraint you're going to use the neck brace   00:43:45
17 principle, so the side of your head is going to   00:43:47
18 be against the subject's head.  Your hands are   00:43:49
19 going to be collapsed out to the side and to the   00:43:51
20 rear of the subject's head.              00:43:55
21    Q.  So here there was no head to head   00:43:58
22 contact?                                 00:44:03
23    A.  I didn't see any head to head contact.   00:44:04
24 I just saw that the hand was in front of Officer   00:44:06
25 Lopera's face.  You can tell that, also, by his   00:44:10

Page 38

1 forearm.  His -- his right forearm is almost   00:44:13
2 vertical in the video.  With a -- with a lateral   00:44:18
3 vascular neck restraint it would have been   00:44:24
4 horizontal in that side mount position that he   00:44:26
5 was in.                                  00:44:29
6    Q.  All right.  Anything else that      00:44:30
7 distinguished this as being a rear naked choke as   00:44:40
8 opposed to a lateral vascular neck restraint, in   00:44:43
9 your view?                               00:44:44
10    A.  In the video?                     00:44:46
11    Q.  Yes.                             00:44:49
12    A.  The admission from -- from Officer   00:44:49
13 Lopera that he used a rear naked choke.   00:44:55
14    Q.  Okay.  We'll come to that in a second,   00:44:57
15 but in terms of your observations, the neck brace   00:45:00
16 principle was not there, and that's a key thing   00:45:08
17 to you.  Correct?                        00:45:12
18    A.  Yes.                             00:45:13
19    Q.  It says in your opinion, the back of the   00:45:13
20 hand of the non-encircling arm is usually placed   00:45:41
21 against the back of the subject's head as the   00:45:46
22 encircling arm encircles the neck.  Is that   00:45:48
23 correct?                                 00:45:52
24    A.  Yes.                             00:45:52
25    Q.  Did you see that?                 00:45:52

Page 39

1    A.  Yes, I saw that -- I saw that the hand   00:45:55
2 was in front of Officer Lopera's face.  The   00:46:00
3 video's rather dark, but it appears to be   00:46:04
4 against the back of the head of the person there.   00:46:06
5    Q.  Okay.  As the neck is encircled, the   00:46:11
6 hand of the encircling arm is usually passed   00:46:14
7 underneath the forearm of the non-encircling arm   00:46:17
8 in an attempt to grab the biceps of the   00:46:21
9 non-encircling arm.  Is that correct?    00:46:24
10    A.  Yes.  If that can be accomplished,   00:46:25
11 you've got, you know, a superior lock there.  It   00:46:28
12 can't always be done because of body mechanics,   00:46:31
13 and you know, people are different sizes and   00:46:34
14 shapes, but ideally, that's what you're looking   00:46:36
15 for.                                     00:46:39
16    Q.  Did you see that in the video?     00:46:39
17    A.  No.  I couldn't tell if he had grabbed   00:46:42
18 his own biceps or not.                   00:46:46
19    Q.  By pulling both elbows tightly into the   00:46:47
20 chest and pushing against the back of the head   00:46:55
21 with the back of the hand, pressure is then   00:46:58
22 applied to the back of the subject's head forcing   00:47:00
23 it forward while bilateral pressure is applied to   00:47:04
24 the side of the subject's neck.  Did you see   00:47:09
25 that?                                    00:47:13

Page 40

1    A.  Which part?                       00:47:13
2    Q.  Well, any part of it.             00:47:19
3    A.  I could tell that there was a hand   00:47:20
4 applied to the back of the head and that the left   00:47:22
5 arm had encircled the subject's neck.    00:47:24
6    Q.  Okay.  So it looked to you like what, as   00:47:26
7 far as you could see, that what Officer Lopera   00:47:33
8 was doing was a rear naked choke?        00:47:37
9    A.  Yes.                             00:47:39
10    Q.  Okay.  It definitely did not look to you   00:47:40
11 like he was using a lateral vascular neck   00:47:45
12 restraint?                              00:47:48
13    A.  No, it did not.                  00:47:49
14    Q.  All right.  Would you agree that the   00:47:50
15 application of a rear naked choke in this   00:47:55
16 situation would constitute excessive force?   00:47:59
17    A.  I don't -- you know, I don't know.  I   00:48:02
18 didn't look into that's not -- into that   00:48:05
19 particular area.  It's not something I examined   00:48:06
20 or rendered an opinion on.              00:48:08
21    Q.  Why is the -- my understanding of the   00:48:09
22 reason why -- why not a rear naked choke is that   00:48:16
23 it basically just has one speed, if you will.   00:48:22
24 Maximum pressure or it isn't applied.  Correct?   00:48:24
25    A.  Well, it would depend on, you know,   00:48:27

Page 41

11 (Pages 38 - 41)

Page 42

```
 1  whatever somebody's policy was to that. I mean,   00:48:30
 2  you can regulate pressure with a rear naked        00:48:34
 3  choke. However, in -- you know, most               00:48:36
 4  practitioners who use it in competition settings,  00:48:38
 5  they do not do that. They apply it, and it's an    00:48:41
 6  all or nothing proposition.                        00:48:44
 7      Q.  And that's what you say in your opinion.   00:48:45
 8  Correct?                                           00:48:49
 9      A.  Yes.                                       00:48:50
10      Q.  All right. And in this situation, a        00:48:50
11  rear naked choke could be potentially fatal.       00:48:58
12  Correct?                                           00:49:00
13      A.  If it deteriorates into a bar arm choke,   00:49:01
14  you know, any -- any neck restraint could be       00:49:06
15  potentially fatal, but yes.                        00:49:07
16      Q.  Can you tell whether it's deteriorated     00:49:09
17  into a bar arm choke in this situation?            00:49:15
18      A.  I could not.                               00:49:17
19      Q.  All right. Is the fact that -- first of    00:49:18
20  all, using the Graham -- the Graham factors, did   00:49:24
21  you determine whether it was appropriate or not    00:49:33
22  to use a rear naked choke?                         00:49:36
23      A.  No. You know, I didn't look into the --    00:49:37
24  the case on that level or render any opinion       00:49:41
25  about, you know, whether his force was excessive.  00:49:44
```

Page 43

```
 1      Q.  If Officer Lopera was using a rear naked   00:49:48
 2  choke, would the three officers who were standing  00:49:54
 3  within three feet of him, Sergeant Crumrine,       00:49:57
 4  Officer Flores and Officer Winn, have a duty to    00:50:03
 5  stop him from using a rear naked choke?            00:50:11
 6      A.  You know, I don't know. I don't know       00:50:13
 7  what the policy -- you know, what their policy     00:50:17
 8  says about that. I don't -- I didn't look into     00:50:20
 9  like an intervention policy or anything like that  00:50:25
10  with the Las Vegas PD.                             00:50:28
11      Q.  Well, would any officer have a duty to     00:50:30
12  intervene if excessive force were using on         00:50:35
13  Mr. Farmer?                                        00:50:40
14      A.  Yes.                                       00:50:41
15          MR. ANDERSON: Objection, form.            00:50:42
16      Q.  (By Mr. Sayre) And if the rear naked       00:50:44
17  choke is considered excessive force, the officers  00:50:46
18  would have a duty to intervene to stop it.         00:50:50
19  Correct?                                           00:50:53
20      A.  Yes.                                       00:50:54
21          MR. ANDERSON: Objection, form.            00:50:54
22      A.  If it was considered to be excessive       00:50:55
23  force, then they would have a duty to protect the  00:50:57
24  person that was being controlled.                  00:50:59
25      Q.  (By Mr. Sayre) Did you read the FIT        00:51:03
```

Page 44

```
 1  report concerning the incident?                    00:51:13
 2      A.  Yes.                                       00:51:15
 3      Q.  Okay. Do you have any opinions             00:51:16
 4  regarding the behavior of Sergeant Crumrine?       00:51:24
 5      A.  No. You know -- was it Sergeant            00:51:28
 6  Crumrine who said let him go, Ken? Is that --      00:51:33
 7  was it --                                          00:51:36
 8      Q.  Yes.                                       00:51:37
 9      A.  Okay. You know, I thought it was           00:51:38
10  appropriate. I didn't see anything wrong with      00:51:40
11  telling him let him go. In fact, I, you know,      00:51:43
12  could kind of consider that an intervention at     00:51:47
13  that point, in him directing to let the person     00:51:50
14  go. The officer asked is he out, and you know,     00:51:52
15  they said yes, let him go, which is when they      00:51:56
16  ended up unwrapping him, you know, from the neck   00:52:00
17  restraint and putting him in some handcuffs.       00:52:03
18      Q.  Well, actually, was he maintained in the  00:52:05
19  neck restraint for another 46 seconds?             00:52:10
20      A.  Was it 46 seconds?                         00:52:12
21          MR. MCNUTT: Object to form.               00:52:14
22      A.  Was that the time they were handcuffing    00:52:16
23  him?                                               00:52:17
24      Q.  (By Mr. Sayre) Well, from the time they    00:52:19
25  said let him go, it says in the timeline that he   00:52:21
```

Page 45

```
 1  wasn't released until 46 seconds later.            00:52:26
 2          MR. MCNUTT: Objection, form.              00:52:28
 3          MR. ANDERSON: Objection, form.            00:52:30
 4      Q.  (By Mr. Sayre) Did you read that?          00:52:31
 5      A.  Yeah, but I have no idea what type of      00:52:32
 6  compression was being applied to anybody during   00:52:34
 7  that time. It would be impossible to tell from     00:52:36
 8  looking at a videotape or even if you were         00:52:41
 9  standing there.                                    00:52:43
10      Q.  If it was a rear naked choke, as you       00:52:44
11  said, it's either maximum pressure or nothing.     00:52:48
12  Right?                                             00:52:50
13      A.  Well, it would be until someone either     00:52:50
14  complied or passed out, but I don't know. I        00:52:54
15  mean, you can stop pressure at anytime you wish,   00:52:57
16  so I don't know how much, at what time or for how  00:52:59
17  long. It's impossible for me to tell you           00:53:03
18  anything like that. I don't know.                  00:53:05
19      Q.  Did Sergeant Crumrine have a duty to       00:53:06
20  make sure that Officer Lopera relieved the         00:53:12
21  pressure on the neck restraint?                    00:53:15
22      A.  I don't know how he would be able to       00:53:16
23  know that. It's very difficult. Unless you're      00:53:18
24  applying the technique, you don't know how much    00:53:20
25  pressure is being applied.                         00:53:23
```

12 (Pages 42 - 45)

**Page 46**

```
 1    Q.  Well, if it's a rear naked choke you    00:53:25
 2  know how much pressure is being applied.  Right?   00:53:30
 3       MR. MCNUTT:  Objection, form.    00:53:32
 4    A.  No, I would not know how much is being    00:53:35
 5  applied.  It would be up to the person applying    00:53:37
 6  the technique.    00:53:39
 7    Q.  (By Mr. Sayre)  Well, I thought you said    00:53:39
 8  a rear naked choke you provide maximum pressure    00:53:41
 9  or you don't provide -- or is there no hold?    00:53:44
10       MR. MCNUTT:  Objection, form.    00:53:46
11    A.  No, that's not what I meant by that at    00:53:49
12  all.    00:53:51
13    Q.  (By Mr. Sayre)  Okay.  Tell me what you    00:53:51
14  meant.    00:53:53
15    A.  What I mean is that when you apply    00:53:53
16  the technique, you apply it with maximum    00:53:55
17  pressure.  That's usually how it's applied, but    00:53:59
18  you can still regulate.  That doesn't preclude    00:54:02
19  you from regulating pressure.  You can still do    00:54:05
20  that.  That's another difference with the lateral    00:54:08
21  vascular neck restraint.  We teach three levels    00:54:12
22  of control and -- to match the subject's    00:54:15
23  resistance.  With a rear naked choke there aren't    00:54:18
24  three levels of control usually that are    00:54:23
25  instructed to people.    00:54:25
```

**Page 47**

```
 1    Q.  Right.  So there's no way to control the    00:54:26
 2  pressure other than you either have the maximum    00:54:30
 3  pressure applied or you release it.  Correct?    00:54:34
 4    A.  Well, you can still regulate pressure.    00:54:37
 5    Q.  Well, but the police department doesn't    00:54:39
 6  teach people how to regulate pressure when they    00:54:43
 7  use the rear naked choke.  Correct?    00:54:46
 8    A.  Police department doesn't teach a rear    00:54:48
 9  naked choke.    00:54:50
10    Q.  Well, therefore, the police department    00:54:51
11  doesn't teach people how to regulate the pressure    00:54:54
12  of a rear naked choke.  Right?    00:54:56
13    A.  No, I don't guess they would if they    00:54:58
14  don't teach the technique.    00:55:00
15    Q.  I guess so.  Take a look at your --    00:55:02
16  Page 7 of your report.  It's under the area    00:55:25
17  called The Basis for Opinion 4.    00:55:36
18    A.  Okay.    00:55:47
19    Q.  Last paragraph on that page.  "Many neck    00:55:49
20  restraints that are practiced in the mixed    00:55:56
21  martial arts community are an all or nothing    00:55:59
22  proposition, in the sense that when they are    00:56:02
23  applied, maximum compression is immediately    00:56:04
24  applied to the sides of the neck until the person    00:56:08
25  it is being applied to is rendered unconscious."    00:56:11
```

**Page 48**

```
 1  Do you agree with that?    00:56:16
 2    A.  Yes.    00:56:17
 3    Q.  That would be true of the rear naked    00:56:17
 4  choke.  Right?    00:56:22
 5    A.  It can or it cannot be.  You can still    00:56:22
 6  regulate pressure.  My statement doesn't imply    00:56:26
 7  that you can't regulate pressure that's applied    00:56:29
 8  to the sides of the somebody's neck.  It just    00:56:31
 9  implies that in the mixed martial arts community    00:56:35
10  many times that's -- that's how they are taught    00:56:38
11  and that's how they're applied, especially in    00:56:40
12  competition settings.    00:56:43
13    Q.  But you would agree with me that the    00:56:44
14  Metropolitan Police Department does not teach    00:56:48
15  people how to regulate the pressure of a rear    00:56:50
16  naked choke?    00:56:53
17    A.  Correct.  They don't teach the rear    00:56:54
18  naked choke at all, to my knowledge.    00:56:57
19    Q.  So Officer Lopera would have no    00:56:59
20  knowledge about how to, as instructed by the    00:57:02
21  lateral -- by the Metropolitan Police Department,    00:57:05
22  about how to regulate the pressure on the neck of    00:57:08
23  Mr. Farmer if he was using a rear naked choke?    00:57:11
24    A.  I guess not.    00:57:15
25       MR. MCNUTT:  Objection.    00:57:18
```

**Page 49**

```
 1    A.  He's not taught a rear naked choke by    00:57:19
 2  the police department, so I guess that's not    00:57:22
 3  what -- what he'd know.    00:57:24
 4    Q.  (By Mr. Sayre)  All right.  Did you read    00:57:26
 5  the deposition of Officer Winn?    00:57:29
 6       MR. MCNUTT:  You mean Tran?    00:57:34
 7       MR. ANDERSON:  You mean Tran?    00:57:36
 8    Q.  (By Mr. Sayre)  Tran, sorry.    00:57:37
 9    A.  Yes, I did.    00:57:38
10    Q.  Okay.  Do you recall Officer Tran saying    00:57:40
11  that from the time that he got there Mr. Farmer    00:57:44
12  was providing no resistance?    00:57:47
13    A.  Yes.    00:57:51
14    Q.  Okay.  Take a look at your Page 10.  It    00:57:53
15  would be the basis for opinion 6.    00:58:00
16    A.  Okay.    00:58:11
17    Q.  In the middle of the last paragraph it    00:58:12
18  says -- when it's talking about the guidelines of    00:58:18
19  using the lateral vascular neck restraint as set    00:58:20
20  forth by the Metropolitan Police Department.    00:58:24
21    A.  Okay.    00:58:29
22    Q.  It says, "This particular guideline    00:58:29
23  requires an officer applying the LVNR to a    00:58:32
24  subject cease all compression on the sides of the    00:58:35
25  subject's neck once resistance has concluded."    00:58:40
```

13 (Pages 46 - 49)

Page 50

1  Do you agree with that?                    00:58:43
2    A.  Yes.                                 00:58:44
3    Q.  So if Officer Tran says that he was  00:58:44
4  applying no resistance, should Officer Lopera   00:58:51
5  have ceased any kind of neck restraint at that  00:58:56
6  point?                                     00:58:59
7        MR. MCNUTT:  Objection, form.        00:59:01
8    A.  Well, that's -- that's not quite     00:59:01
9  correct.  We -- we train officers if they're   00:59:04
10  applying the lateral vascular neck restraint that  00:59:07
11  when somebody stops resisting that they should  00:59:10
12  reduce their level of control to what we call  00:59:13
13  level one minus.  A level one minus, the minus  00:59:15
14  refers to minus compression.  So it's a position  00:59:19
15  of control, not a level of control, and you  00:59:25
16  maintain your neck encirclement, you maintain  00:59:29
17  your head to head contact, but you don't compress  00:59:33
18  the sides of the neck.                     00:59:36
19    Q.  All right.  Did you see Officer Lopera  00:59:37
20  assume that position at anytime during the course  00:59:44
21  of the time that he had his arm encircling the  00:59:48
22  neck of Mr. Farmer?                        00:59:52
23    A.  It would be impossible to -- I can't  00:59:53
24  tell you what level of control he was at because  00:59:55
25  he wasn't doing an LVNR.  Whether or not he was  00:59:58

Page 51

1  still compressing the sides of the neck, there's  01:00:01
2  no way to know that, either.               01:00:03
3    Q.  Okay.  Now, you also heard or you read  01:00:04
4  in the arrest report a number of statements that  01:00:15
5  were attributed to Officer Lopera concerning what  01:00:19
6  type of a neck restraint he was employing?  01:00:24
7    A.  Yes.                                 01:00:27
8    Q.  Okay.  Now, did you actually listen to  01:00:28
9  the tapes and hear those or did you just read  01:00:32
10  them in the arrest report?                 01:00:35
11    A.  Both.                               01:00:36
12    Q.  Okay.  And what was it about those   01:00:36
13  statements that impressed you in terms of your  01:00:41
14  opinion about whether he was using a lateral  01:00:46
15  vascular neck restraint or a rear naked choke?  01:00:48
16    A.  You know, just him saying that I had to  01:00:52
17  rear naked his ass, you know, and I also knew  01:00:57
18  from just reading about Officer Lopera that he  01:00:59
19  was a -- he's a mixed martial arts guy.  He's  01:01:02
20  done some training.  I don't know if he's a  01:01:05
21  Jujitsu guy or Judo guy or what he does, but I  01:01:09
22  think that would probably be part of his  01:01:12
23  vernacular when he's talking about a neck  01:01:14
24  restraint.  So I figured that he probably knows  01:01:17
25  what that is.                              01:01:20

Page 52

1    Q.  All right.  So is it fair to say that  01:01:20
2  your opinion that he used a rear naked choke on  01:01:26
3  Mr. Farmer is in part based upon your  01:01:31
4  observations of the video.  Correct?       01:01:37
5    A.  Yeah, it's a hundred percent based on my  01:01:39
6  observations of the video.  The fact that he  01:01:42
7  verbalized it afterwards just, you know, adds  01:01:44
8  another layer to it, I guess, of confirmation.  01:01:48
9    Q.  So the other part of it is that you  01:01:52
10  perceived him as having made admissions that he  01:01:56
11  used a rear naked choke by Mr. Lopera by the  01:01:59
12  things that he said to the other officer?  01:02:02
13    A.  Yes, that's what he said.            01:02:04
14        MR. MCNUTT:  Objection, form.        01:02:06
15    Q.  (By Mr. Sayre)  I'm sorry, I couldn't  01:02:07
16  hear your answer.                          01:02:09
17    A.  Yes, that was that he said on the -- on  01:02:09
18  the video.                                 01:02:12
19    Q.  Okay.  But if I understand correctly,  01:02:13
20  you didn't need those admissions for you to come  01:02:17
21  to the conclusion that he was using a rear naked  01:02:20
22  choke.  You did that all by itself with regard to  01:02:23
23  your observations?                         01:02:27
24    A.  Correct.                            01:02:27
25        MR. SAYRE:  All right.  Thank you.   01:02:31

Page 53

1  I have nothing further.                    01:02:32
2        MR. MCNUTT:  Want to take a five-     01:02:33
3  minute break?                              01:02:36
4        MR. SAYRE:  Sure.                     01:02:38
5        THE VIDEOGRAPHER:  All right.  It     01:02:39
6  is 3:16.  We're off the record at the end of our  01:02:41
7  first media.                               01:02:43
8        (Recess.)                            01:08:03
9        THE VIDEOGRAPHER:  It is 3:21.        01:08:03
10  We're back on the record at the beginning of our  01:08:16
11  second media.                             01:08:18
12        EXAMINATION                          01:08:18
13  BY MR. MCNUTT:                             01:08:20
14    Q.  Captain Lynch, I introduced myself    01:08:20
15  earlier.  I'm the lawyer for Officer Lopera.  How  01:08:23
16  you are?                                   01:08:27
17    A.  Fine, sir.  Doing good.             01:08:28
18    Q.  Good.  I've got a few questions about  01:08:29
19  your report, but I'll start with a couple   01:08:31
20  follow-up questions to Mr. Sayer's questioning a  01:08:33
21  little earlier.  You said that you had, in fact,  01:08:39
22  reviewed the deposition of Sergeant Michael Bland  01:08:43
23  for Las Vegas Metro.  Correct?            01:08:46
24    A.  Yes.                               01:08:48
25    Q.  As well as you reviewed my expert, Frank  01:08:48

14 (Pages 50 - 53)

1 Mir's deposition transcript. Is that correct?   01:08:54
2   A.  Yeah.  Yes.                          01:08:55
3   Q.  Yeah.  Please audibalize your answers.  01:08:57
4 I can see you nod your head.              01:09:02
5   A.  Sure.                               01:09:04
6   Q.  Do you know who Frank Mir is?       01:09:04
7   A.  No, I'm not familiar with him.      01:09:06
8   Q.  Okay.  Are you aware of Mr. -- Sergeant  01:09:07
9 Bland's background and training?          01:09:14
10  A.  Only what I read in the deposition  01:09:16
11 there.                                    01:09:18
12  Q.  Okay.  Would Sergeant Bland have more  01:09:20
13 information or less information than you with  01:09:26
14 respect to the differences between an LVNR and a  01:09:29
15 rear naked choke?                         01:09:33
16  A.  I don't know what he knows.         01:09:34
17      MR. Sayre:  Objection, calls for    01:09:38
18 speculation.                              01:09:38
19  A.  I don't know.                       01:09:40
20  Q.  (By Mr. McNutt)  Are you aware of the  01:09:40
21 fact that Sergeant Bland said that the neck   01:09:42
22 restraint utilized by Officer Lopera was, in his  01:09:45
23 opinion, neither an LVNR nor was it a rear naked  01:09:50
24 choke?                                    01:09:54
25  A.  Yes, I did read that.               01:09:54

Page 54

1   Q.  And you differ with his opinion?    01:09:57
2   A.  I do, yeah.                         01:10:00
3   Q.  And why do you differ with his opinion?  01:10:02
4   A.  I differ with his opinion because I --  01:10:04
5 it just has all the clear hallmarks of a rear  01:10:07
6 naked choke, you know.  The placement of the  01:10:10
7 arms.  You know, whether or not -- what I can do  01:10:12
8 for you, I can clearly define what an LVNR is,   01:10:17
9 but in definition of a rear naked choke there's  01:10:21
10 certain hallmarks to it.  The placement.  You  01:10:25
11 know, of course, there's the encirclement of the  01:10:28
12 arm, but there's also the way that compression is  01:10:31
13 applied and the placement of the hands, and from  01:10:35
14 the video that I examined I can clearly see that,  01:10:38
15 you know, the hand is on the back of Mr. Farmer's  01:10:42
16 head, and that there are no elbows behind Officer  01:10:44
17 Lopera's head.  It just looks to me like it's a  01:10:49
18 rear naked choke.  I don't have any trouble  01:10:51
19 identifying it.                           01:10:54
20  Q.  In your opinion, what is the purpose of  01:10:57
21 the LVNR techniques requirement that the hands  01:11:02
22 are clasped together?                     01:11:04
23  A.  Well, the hand group is to ensure    01:11:06
24 alignment of the forearms, and it aids you in  01:11:08
25 pulling to the rear and applying compression.  01:11:11

Page 55

1   Q.  And isn't it true that the training  01:11:14
2 techniques and policies that the Las Vegas  01:11:21
3 Metropolitan Police Department utilizes states   01:11:27
4 that the reason for the hands being clasped is so  01:11:33
5 that you can obtain maximum pressure --   01:11:36
6   A.  Yes.                                01:11:38
7   Q.  -- on the neck?  And isn't it true that  01:11:38
8 those policies and procedures are largely, if not  01:11:42
9 completely, adopted from the National Law  01:11:46
10 Enforcement -- National Law Enforcement Training  01:11:50
11 Center?                                   01:11:54
12  A.  Yes.                                01:11:54
13  Q.  And that's the organization that     01:11:54
14 licenses or is responsible for the training of  01:12:00
15 the LVNR?                                 01:12:04
16  A.  Yes.                                01:12:05
17  Q.  If you are laying on your right side,  01:12:05
18 let's just assume that it's the same body angles  01:12:13
19 as in the incident we're talking about, and  01:12:16
20 Officer Lopera is -- got his left arm as the  01:12:20
21 encircling arm --                         01:12:24
22  A.  Yes.                                01:12:25
23  Q.  -- and they're back to chest.  If they  01:12:25
24 are -- if they are laying, both the subject and  01:12:27
25 Officer Lopera are laying on the right side, is  01:12:30

Page 56

1 it possible for Officer Lopera to connect his  01:12:34
2 arms, or excuse me, connect his hands?     01:12:38
3   A.  It would be possible with the LVNR for  01:12:41
4 him to connect his hands.  Like I said, there are  01:12:44
5 variances in bodies and different things.  People  01:12:48
6 have long arms, short arms, big necks, little  01:12:52
7 necks, but yes, he would be able to, if he  01:12:55
8 encircled with his left hand, he would be able to  01:12:58
9 complete the LVNR hand grip off to the -- to the  01:13:01
10 side and to the rear of his opponent's head.  01:13:05
11  Q.  Even if he's laying on his right side?  01:13:08
12  A.  Yes.  If he's -- if he's lying on his  01:13:12
13 right side and Mr. Farmer is on his left side or  01:13:17
14 are you talking about both people lying on -- on  01:13:20
15 their left side?                          01:13:23
16  Q.  If they're both lying on their right  01:13:25
17 side, but Officer Lopera had his encircling arm  01:13:27
18 with his left arm?                        01:13:32
19  A.  Yes.  If he was -- lying on their right  01:13:33
20 side.  Well, you would have to have your arm out  01:13:36
21 from underneath yourself, but.           01:13:39
22  Q.  Makes it more difficult.  Right?    01:13:42
23  A.  It would be, yes.                   01:13:44
24  Q.  Is it possible that when -- a 32 year  01:13:45
25 career, I presume you've been in one or two  01:13:50

Page 57

15 (Pages 54 - 57)

1    combative situations with a suspect?          01:13:56
2       A.   Yes.                    01:13:59
3       Q.   Have you ever attempted to employ any    01:13:59
4    type of ground combative technique and it did not    01:14:04
5    go as planned?                  01:14:08
6       A.   Yes.   Many times.          01:14:09
7       Q.   Is the standard of objectively    01:14:10
8    reasonable, does that require 100 percent      01:14:15
9    perfection in the techniques that law enforcement   01:14:18
10   officers use?                  01:14:21
11      A.   Well, you know, the reasonable --   01:14:21
12   reasonable force refers to not only your      01:14:25
13   technique, but your decision making, but I mean,   01:14:28
14   I -- yes, you don't have to be right.   You have   01:14:30
15   to be reasonable is the gist of that.        01:14:32
16      Q.   Reasonable for Officer Lopera to not   01:14:36
17   have perfectly executed the LVNR if the -- if the   01:14:41
18   suspect is actively resisting and/or moving his    01:14:48
19   head and connecting his head with Officer Lopera?   01:14:53
20      A.   Yes.   It would be reasonable to say that   01:14:57
21   that could happen, but the thing that -- to      01:14:59
22   remember is is that, you know, many, many things    01:15:02
23   can foil an attempted LVNR, but there are certain   01:15:05
24   things that must be present for it to be an LVNR.   01:15:09
25   I mean, all cars have four wheels, but you know,   01:15:12

Page 58

1    they're not all Ferraris.   So you have, you know,   01:15:14
2    certain things that make an LVNR an LVNR.      01:15:18
3    Bilateral compression of the sides of the neck,    01:15:22
4    the neck brace principle, those things are -- are   01:15:24
5    things that must be present for it to be an LVNR,   01:15:27
6    and if they're not, it's something else.        01:15:30
7       Q.   I understand.   Quick question on that.   01:15:31
8    Is there a -- I can go to you or the National Law   01:15:36
9    Enforcement Training Center to get the definitive   01:15:41
10   definition of an LVNR.   Correct?          01:15:43
11      A.   Yes.                    01:15:45
12      Q.   Where do I go to find the same      01:15:46
13   definitive definition of a rear naked choke?      01:15:48
14      A.   You know, I think there are a lot of   01:15:52
15   sources.   I couldn't tell you one specific      01:15:55
16   source, and that's what's problematic about the    01:15:57
17   rear naked choke.   It's something that's -- it's   01:15:59
18   not a definitive system that's out there, a      01:16:04
19   comprehensive system that is, you know,        01:16:07
20   universally known.   There are variances in      01:16:11
21   schools where it's taught, you know, different    01:16:14
22   lines of thought from different trainers and      01:16:17
23   things, so I don't -- I don't know where you get   01:16:20
24   that.                        01:16:22
25      Q.   So let's talk about what you've      01:16:24

Page 59

1    testified already in terms of the similarities    01:16:26
2    between the LVNR and what Officer Lopera did.      01:16:28
3    Okay?                        01:16:32
4       A.   Okay.                    01:16:33
5       Q.   So he had his left arm encircling the   01:16:33
6    neck.   He had the elbow lined up with the chin.   01:16:37
7    Correct?                      01:16:40
8       A.   I don't know if he was lined up or not.   01:16:40
9    I couldn't see that.              01:16:42
10      Q.   Okay.   So you can't tell either way    01:16:45
11   whether or not it was or was not?          01:16:48
12      A.   No.   There wasn't -- wasn't any      01:16:50
13   angle that showed that, so I don't know.      01:16:53
14      Q.   Okay.   If -- if his elbow would not have   01:16:55
15   been lined up with the chin as it should be with   01:16:59
16   an LVNR, wouldn't there be some damage to the      01:17:02
17   throat area because wouldn't he have slipped into   01:17:06
18   an arm bar that you're concerned about?        01:17:10
19      A.   There could be some damage to the front   01:17:11
20   structures of the throat, you know, and if that's   01:17:14
21   a cause of death, absolutely, you would see that.   01:17:18
22      Q.   Are you aware of any damage to Tashii   01:17:21
23   Farmer's throat structures in this case?        01:17:25
24      A.   I don't know if there was or not.   It   01:17:26
25   wasn't --                      01:17:30

Page 60

1       Q.   That's not part of anything you --      01:17:30
2       A.   No.                    01:17:32
3       Q.   -- reviewed or are giving an opinion on?   01:17:32
4       A.   No, it's not.              01:17:36
5       Q.   Okay.   Are the -- do you know if the   01:17:37
6    physiological effects of an LVNR are the same as   01:17:43
7    a rear naked choke, because -- let me rephrase    01:17:48
8    that.   You earlier testified that both were blunt   01:17:52
9    chokes when Mr. Sayre asked you that.        01:17:56
10      A.   Uh-huh.   Yeah, they would be the same.   01:17:57
11   Essentially it would be the same.          01:18:01
12      Q.   So in this -- in the technique that      01:18:02
13   Officer Lopera employed where he did not have his   01:18:10
14   hands connected in the LVNR technique, would he   01:18:14
15   have been able to observe more or less pressure    01:18:18
16   with just his left arm encircling, because      01:18:21
17   essentially he's doing a biceps curl at that      01:18:25
18   point to gain compression.   Correct?        01:18:28
19      A.   I don't know.   I mean, it would depend   01:18:29
20   on how strong he is, and I don't know.   I mean --   01:18:31
21      Q.   Well, let me ask you this.   Can you --   01:18:35
22   can you gain more compression like this or like   01:18:37
23   this (indicating)?                01:18:40
24      A.   Well, you can gain more compression if   01:18:41
25   you, you know, are applying some sort of pressure   01:18:43

Page 61

16 (Pages 58 - 61)

**Page 62**

1  to the back of the head, whether it's your hand   01:18:46
2  or your head, and you're pulling hard to the rear   01:18:48
3  and then compressing the sides of the neck.  It's   01:18:51
4  kind of a -- you know, those three things   01:18:54
5  combined to give you the most pressure that you   01:18:56
6  can get.  We -- you know, with just the single   01:18:59
7  arm encirclement and then whatever you can get   01:19:03
8  from a biceps curl, as you described it, you   01:19:05
9  know, just applying -- forcing that forearm   01:19:08
10 toward the stationary biceps, you're going to get   01:19:12
11 what you're going to get, depending on what your   01:19:15
12 strength level is, you know.   01:19:17
13    Q.  And I'm asking you, do you think that's   01:19:18
14 -- that technique can afford an officer more   01:19:23
15 pressure or less pressure on the neck than with   01:19:27
16 the LVNR?   01:19:31
17    A.  I think it would be less pressure.  If   01:19:33
18 you just had a one arm encirclement and you're   01:19:35
19 just relying on moving your forearm towards your   01:19:38
20 biceps, you're going to get less pressure than if   01:19:41
21 you were to apply pressure to the back of the   01:19:44
22 head as in a rear naked choke or if you were to   01:19:45
23 clasp your hands like an LVNR and push forward   01:19:50
24 with your head.   01:19:52
25    Q.  Okay.  Relative to your opinion six, and   01:19:53

**Page 63**

1  I don't need you to look at it for just a minute,   01:19:59
2  can -- you don't have -- well, do you have any   01:20:02
3  evidence that the Officer Lopera did not release   01:20:07
4  the pressure on the neck when he was directed to   01:20:15
5  by Sergeant Crumrine?   01:20:17
6    A.  No.   01:20:19
7    Q.  Can anyone look at the video and tell   01:20:21
8  that?   01:20:23
9    A.  No.   01:20:23
10    Q.  Does the fact that Officer Lopera kept   01:20:26
11 his encircling arm around Mr. Farmer's neck while   01:20:30
12 they were controlling him and handcuffing him,   01:20:34
13 does that indicate to you that there was pressure   01:20:38
14 or no pressure?   01:20:40
15    A.  It doesn't indicate that there was   01:20:41
16 pressure or no pressure.  You know, you can't   01:20:43
17 tell.   01:20:46
18    Q.  Isn't it true that Metro's policies and   01:20:46
19 procedures dictate that an officer in Ken   01:20:51
20 Lopera's position maintain the encircling arm   01:20:58
21 until his partners can control the suspect and   01:21:01
22 get him into handcuffs?   01:21:04
23    A.  Yes.  In LVNR training they would have   01:21:05
24 been trained that level one minus would be the   01:21:08
25 fall back after a subject stops resisting.  You   01:21:11

**Page 64**

1  would not apply pressure to the sides of the   01:21:14
2  neck, but you would maintain your encirclement   01:21:16
3  until you could gain control and get handcuffs   01:21:19
4  applied to the subject.   01:21:23
5    Q.  And you testified earlier that you had   01:21:24
6  seen the timeline in either the arrest report or   01:21:27
7  in the FIT report with respect to the words that   01:21:30
8  were said at what point on the body cam?   01:21:34
9    A.  Yes.   01:21:37
10    Q.  And Mr. Sayre asked you if you recall a   01:21:38
11 section where -- and he referenced some point 44   01:21:42
12 or 46 seconds later that the hold was released.   01:21:45
13 Do you remember that?   01:21:48
14    A.  Yes.   01:21:49
15    Q.  Do you have an opinion as to whether the   01:21:50
16 hold being released was Ken Lopera removing his   01:21:56
17 arm from Tashii Farmer or whether that meant he   01:22:00
18 was releasing pressure around his neck?   01:22:04
19    A.  Well, like I said, you have no idea --   01:22:07
20 you have no way to tell whether or not he was   01:22:11
21 compressing the sides of the neck while he was --   01:22:13
22 while he was sill encircling.  There's no way to   01:22:16
23 know that.  Certainly when he releases, you know,   01:22:21
24 takes his arm from Mr. Farmer's neck there's no   01:22:24
25 more contact, so there's absolutely no pressure,   01:22:28

**Page 65**

1  but as far as how he was regulating that pressure   01:22:30
2  or if he had ceased all pressure at that point, I   01:22:34
3  don't know.   01:22:38
4    Q.  You testified -- you stated earlier, I   01:22:38
5  think, that you've never testified in court   01:22:47
6  relative to use of force?   01:22:50
7    A.  Right.  I have not.   01:22:52
8    Q.  And this is your first -- did you mean   01:22:54
9  that in a -- like a civil case, or have you never   01:22:57
10 testified even in a criminal case in your   01:23:01
11 professional capacity?   01:23:03
12    A.  Oh, I've testified in a lot of criminal   01:23:04
13 cases, and I've testified in cases where I've   01:23:06
14 used force and other officers have used force,   01:23:08
15 but I've never testified in a -- in a civil   01:23:12
16 capacity or as an expert witness before.   01:23:17
17    Q.  Understood.  It would have been shocking   01:23:19
18 to me if you hadn't testified in your   01:23:24
19 professional capacity.  I understand now.   01:23:26
20    A.  Sure.   01:23:27
21    Q.  Have you ever investigated use of force   01:23:28
22 within your own department or within another   01:23:33
23 department?   01:23:36
24    A.  Yes.  That's one of the things I'm   01:23:36
25 tasked with here at the Clinton Police   01:23:38

17 (Pages 62 - 65)

1  Department, I investigate all use of force        01:23:39
2  complaints.                                        01:23:42
3      Q.  And have you ever investigated a use of  01:23:45
4  force complaint with respect to a lateral         01:23:50
5  vascular neck restraint?                           01:23:53
6      A.  No.                                        01:23:54
7      Q.  Have you ever investigated a use of      01:23:56
8  force complaint with respect to any choke hold or 01:23:58
9  neck restraint?  Kind of, you know, broad          01:24:01
10 ambiguous language there.                          01:24:05
11     A.  No.  Not on -- I have not.                 01:24:06
12     Q.  So in 32 years, no police officer in      01:24:08
13 Clinton, Missouri has ever had a complaint         01:24:13
14 related to a neck restraint?                        01:24:17
15     A.  No, and we just started using LVNR in    01:24:19
16 Clinton about ten years ago, and we're a small     01:24:22
17 town and we don't have a lot of occurrences.  The  01:24:27
18 ones we've had, no one's complained about it.       01:24:30
19     Q.  It's my understanding that -- let me ask 01:24:33
20 what you're not giving an opinion about.  You're    01:24:36
21 not giving an opinion about whether Tashii Farmer   01:24:38
22 should have been stopped, should not have been     01:24:43
23 stopped, things like that?                          01:24:45
24     A.  Right.  I'm not.                           01:24:47
25     Q.  Okay.  You're not giving an opinion and  01:24:48

Page 66

1  will not give an opinion related to any crimes or 01:24:52
2  alleged crimes that Tashii Farmer had committed    01:24:55
3  or was perceived to commit?                        01:24:59
4      A.  No.                                        01:25:01
5      Q.  Is that because you weren't asked to     01:25:05
6  provide those opinions, or was there something     01:25:07
7  that you didn't feel comfortable about providing   01:25:09
8  those opinions?                                     01:25:12
9      A.  No, I just wasn't asked to do that.       01:25:12
10 That wasn't part of my job.                         01:25:14
11     Q.  Okay.  How often does your organization, 01:25:15
12 the National Law Enforcement Training Center,       01:25:25
13 require officers to train in the utilization of    01:25:29
14 the LVNR in order to be authorized to use the       01:25:35
15 LVNR?                                               01:25:38
16     A.  We recommend that officers train every   01:25:39
17 year.                                               01:25:41
18     Q.  If officers don't train every year,      01:25:42
19 would your organization, would it pull the         01:25:46
20 authorization and say you're no longer authorized  01:25:52
21 to use LVNR in our name?                            01:25:56
22     A.  We don't monitor, obviously, I mean, on  01:25:58
23 national -- on a national basis who's doing that   01:26:02
24 or not doing it.  We certify you as a trainer.     01:26:05
25 We give you our texts, our guidelines and our      01:26:08

Page 67

1  recommendations and send you out the door, and    01:26:10
2  then at your agency that's your responsibility to  01:26:11
3  take care of that.  And if you don't, then, you    01:26:16
4  know, we stand by -- we can just tell you that,    01:26:21
5  you know, that's what we recommend.  That's been   01:26:24
6  our experience that -- our best practices, if you  01:26:27
7  will, for training and maintenance.                01:26:30
8      Q.  Do you consider it your best practices   01:26:33
9  to require four hours of refresher training every 01:26:37
10 year?                                               01:26:39
11     A.  It is.                                     01:26:39
12     Q.  And isn't it true that LVMPD does not     01:26:40
13 conduct four hours of training every year?  Isn't  01:26:45
14 it the testimony in this case?                      01:26:48
15     A.  That's what I read, is that they conduct  01:26:49
16 two hours.                                          01:26:51
17     Q.  And so that's against the best practices  01:26:51
18 of your organization.  Right?                       01:26:56
19     A.  We recommend four hour recertify every   01:26:58
20 year.  We do realize that, you know, some          01:27:02
21 agencies don't have that kind of time and -- to    01:27:05
22 dedicate to those kind of things, and it's just    01:27:07
23 been -- you know, it's not anything that we        01:27:11
24 prohibit.  It's just that we have these            01:27:13
25 recommendations, and we -- we recommend four       01:27:15

Page 68

1  hours.                                             01:27:18
2      Q.  So I mean, a 50 percent production in     01:27:18
3  training time, that seems significant to me.  Is   01:27:25
4  that not significant to LVMPD?                      01:27:27
5      A.  Well, you know, it is, but it would       01:27:30
6  depend on how the training was conducted.  I can   01:27:34
7  tell you being an academy trainer since 1999, you  01:27:36
8  know, what I do in service stuff, depends on how   01:27:40
9  the training's structured and how it's -- how      01:27:43
10 it's conducted, and you know, the big thing for    01:27:46
11 me is that they have a remedial program.  So if    01:27:50
12 the two hours would not be adequate for the Las    01:27:53
13 Vegas PD or any other agency that has -- that is   01:27:57
14 doing less than four hours, there's an apparatus   01:28:00
15 to deal with that.  So if the officer leaves       01:28:04
16 there, concludes the training and they're not      01:28:08
17 operating at an adequate level, then that's        01:28:10
18 addressed in policy, and the officer has to go to  01:28:15
19 remedial training until they are doing -- trained  01:28:19
20 to standard.                                        01:28:21
21     Q.  How does an agency become approved to    01:28:22
22 say they use the LVNR?                              01:28:30
23     A.  Well, you need to have a certified        01:28:32
24 trainer at your agency.  We generally don't do     01:28:34
25 end user training.  We are nonprofit, and our      01:28:38

Page 69

18 (Pages 66 - 69)

1  goal is to create trainers to -- to be embedded   01:28:42
2  in police departments. We believe that an agency   01:28:47
3  that has its own trainers on staff is a better   01:28:50
4  trained agency and has more opportunities to   01:28:54
5  train. So we, in general, don't provide end user   01:28:57
6  training. We do instructor training.   01:29:00
7  Q. I'm sorry, but when you say end user,   01:29:02
8  you mean the actual patrol officers?   01:29:04
9  A. Yes. The actual patrol officers.   01:29:06
10  Q. You're train -- you're a trainer   01:29:09
11  organization?   01:29:11
12  A. We are, and so you would send an   01:29:12
13  officer, if you were a -- you know, running a   01:29:14
14  training academy or you're a police   01:29:17
15  administrator, you would send an officer to us to   01:29:19
16  become a certified trainer. We meet annually in   01:29:22
17  Kansas City in July, and we have a six day   01:29:25
18  seminar there, or you could host a seminar and we   01:29:28
19  would come there and -- and conduct a seminar.   01:29:32
20  And your officers at your agency could attend,   01:29:35
21  and you know, it could be a regional training and   01:29:38
22  they would become certified as a trainer. The   01:29:42
23  certification is for three years, and at the end   01:29:45
24  of the three year period or before, you know, we   01:29:49
25  would, you know, expect you to recertify if   01:29:53

Page 70

1  you're going to continue using the system.   01:29:55
2  Q. How much does it cost for me to send a   01:29:57
3  trainer to NLETC to become authorized to train   01:30:00
4  the LVNR?   01:30:06
5  A. Five hundred twenty-five dollars.   01:30:06
6  Q. And how long is that training for?   01:30:07
7  A. Sixteen hours.   01:30:10
8  Q. So I send -- I send a trainer for 16   01:30:11
9  hours, two eight hours days?   01:30:17
10  A. Uh-huh. Yes.   01:30:18
11  Q. And then that trainer can train as many   01:30:19
12  end users, as you say, as he wants?   01:30:27
13  A. Yes. At their own agency.   01:30:29
14  Q. Right. Can that trainer go out and   01:30:30
15  train other agencies?   01:30:35
16  A. No. They would need to become an   01:30:36
17  advanced trainer. So they would need to take the   01:30:41
18  course, I believe, a total of five times, you   01:30:42
19  know, and have that training experience. Be able   01:30:45
20  to show that they've -- they've taught other   01:30:48
21  officers at their -- their agency before they   01:30:50
22  could go out and then train other agencies.   01:30:55
23  Q. What is the difference between a trainer   01:30:57
24  training someone at his own agency versus   01:31:01
25  training -- we're here in Las Vegas. So if the   01:31:04

Page 71

1  trainer comes from Metro and becomes an   01:31:07
2  authorized trainer, why can he not train someone   01:31:11
3  from Henderson or North Las Vegas Police   01:31:15
4  Department?   01:31:17
5  A. I don't know. That's just Mr. Lindell   01:31:18
6  who owned NLETC, those have been his standards   01:31:21
7  for a long time. I don't know.   01:31:25
8  Q. So I mean --   01:31:26
9  A. Theoretically they could, and you know,   01:31:29
10  I know that chiefs direct their trainers to train   01:31:31
11  other people, and they have people come to their   01:31:34
12  agency to train and certify people, so you know,   01:31:36
13  I don't know why they couldn't do that.   01:31:41
14  Q. Are you compensated as the president of   01:31:44
15  NLETC?   01:31:48
16  A. No, not until I teach a class. So if I   01:31:48
17  go --   01:31:51
18  Q. Is Mr. --   01:31:52
19  A. I'll be in Seattle. Like next month I   01:31:54
20  go to Seattle and I'll teach an LVNR class there,   01:31:57
21  and I get paid for that.   01:32:02
22  Q. Okay. And does Mr. Lindell get paid by   01:32:04
23  NLETC?   01:32:11
24  A. He's retired and he gets a portion of --   01:32:11
25  a percentage of the money that NLETC makes. I   01:32:13

Page 72

1  think it's 15 percent, something like that, of   01:32:17
2  what he gets from all of our proceeds.   01:32:20
3  Q. How is it that NLETC is not for profit   01:32:22
4  then?   01:32:29
5  A. We just have a volunteer board, and I'm   01:32:30
6  not -- I don't know. It's a --   01:32:32
7  Q. Good question, though?   01:32:36
8  A. Yeah. It just -- it happened about ten   01:32:41
9  years ago, something like that, when Mr. Lindell   01:32:41
10  retired. I think the main reason it's a   01:32:43
11  nonprofit is because he wanted the business to   01:32:45
12  continue to operate after he died. He's 87 years   01:32:48
13  old now, and he just wanted it to continue on.   01:32:52
14  Q. Do you know whether Metro when they   01:32:56
15  trained their officers or their end users in the   01:33:02
16  LVNR, do you know if they trained it from a   01:33:04
17  ground position or if the training is solely   01:33:06
18  standing?   01:33:09
19  A. The lateral vascular neck restraint   01:33:10
20  would be trained standing, kneeling and lying on   01:33:15
21  the ground.   01:33:17
22  Q. Well, that's what -- that's what NLETC   01:33:18
23  says should happen. Right?   01:33:22
24  A. Yes, but as far as what they do in their   01:33:23
25  classroom, I don't know. I haven't -- I do not   01:33:25

Page 73

19 (Pages 70 - 73)

**Page 74**

1  know.                              01:33:25
2    Q.  Fair enough.  Is it true that there's  01:33:29
3  never been any litigation related to the lateral  01:33:46
4  vascular neck restraint?           01:33:50
5    A.  There's not been any successful  01:33:51
6  litigation against the lateral vascular neck  01:33:54
7  restraint, as I understand it.     01:33:58
8    Q.  Is it true that there's never been a  01:34:01
9  death or injury related to the use of a lateral  01:34:03
10  vascular neck restraint?          01:34:06
11    A.  Well, when you say lateral vascular neck  01:34:08
12  restraint, it's a registered trademark.  We --  01:34:12
13  you know, and it's not the technique so much as  01:34:16
14  methodology and our training.  So it is, you  01:34:19
15  know, an exclusive thing.  The term, the term is  01:34:23
16  thrown about anymore, kind of like everybody  01:34:26
17  calls a tissue a Kleenex, but it's true that we  01:34:29
18  haven't had any deaths from anyone certified by  01:34:33
19  the National Law Enforcement Training Center in  01:34:36
20  the lateral vascular neck restraint system.  01:34:38
21  That's true.  We haven't had any deaths directly  01:34:41
22  attributed to that.                01:34:45
23    Q.  Except for this one.  Right?  01:34:47
24    A.  Well, I don't believe Officer Lopera did  01:34:49
25  an LVNR, so I wouldn't count this.  01:34:54

**Page 75**

1    Q.  And as the president of NLETC, isn't it  01:34:57
2  in your own interest to say that this wasn't an  01:35:00
3  LVNR?                              01:35:05
4    A.  No.  It wouldn't affect, you know, me or  01:35:05
5  anything one way or another.  I don't -- I like I  01:35:08
6  said, we're an all volunteer board, and I don't  01:35:11
7  get paid to do any of the things --  01:35:16
8    Q.  But you get paid when you -- when you  01:35:18
9  teach classes.                     01:35:20
10    A.  Right, but I teach a lot of different  01:35:20
11  subjects, so I wouldn't --         01:35:22
12    Q.  And you're the president of NLETC.  01:35:24
13  Right?                             01:35:28
14    A.  Yep, I am.                   01:35:28
15    Q.  And it would be -- it would undercut  01:35:29
16  your curriculum vitae, your resume, if your  01:35:33
17  organization you were with, you know, their  01:35:37
18  marketing campaign was refuted.  Right?  01:35:39
19    A.  No, I don't think so.  I mean, I think  01:35:42
20  it would still be a valid system.  If someone  01:35:46
21  died because of it, it would still be the lateral  01:35:50
22  vascular neck restraint system.    01:35:53
23    Q.  Let's look on Page 7 of your report.  01:35:55
24    A.  Okay.                       01:35:58
25    Q.  It's the last paragraph, about the third  01:36:03

**Page 76**

1  sentence from the bottom, and I'll start to read.  01:36:10
2  Let me know if you can't find it.  It says, "In  01:36:14
3  this position all compression of the sides to the  01:36:16
4  neck is immediately relaxed.  However" -- you see  01:36:20
5  where I'm reading?                 01:36:24
6    A.  So it's -- you said it's opinion 4?  01:36:25
7    Q.  Page 7 of your report.       01:36:31
8    A.  Yeah, I don't think mine are matched up  01:36:33
9  with yours.  Do you know which opinion it's  01:36:35
10  under?                             01:36:37
11    Q.  So it's -- yes.  It's under opinion 4.  01:36:37
12    A.  Okay.                       01:36:44
13    Q.  On my -- starts on the bottom of Page 5.  01:36:44
14    A.  Okay.  Okay.  I found it.  Go ahead.  01:36:47
15    Q.  So it says, "In this position, all  01:36:55
16  compression to the sides of the neck is  01:36:58
17  immediately relaxed.  However, encirclement of  01:36:59
18  the neck is -- excuse me, encirclement of the  01:37:02
19  neck is maintained while the subject is placed in  01:37:05
20  handcuffs."  Do you see where I'm reading?  01:37:08
21    A.  Yeah, I do.  I see it.  Yep.  01:37:10
22    Q.  Okay.  So that's what we were talking  01:37:25
23  about earlier.  So it is both the principle  01:37:28
24  taught by NLETC and Metro to keep the encircling  01:37:34
25  arm in place until the suspect is in handcuffs.  01:37:37

**Page 77**

1  Correct?                           01:37:40
2    A.  Yes.  Especially if you have another  01:37:40
3  officer -- if you have other officers present  01:37:47
4  that can do handcuffing for you, absolutely.  We  01:37:49
5  -- we do teach officers that it doesn't stay in  01:37:52
6  place, of course, if you're by yourself.  If  01:37:55
7  you're a lone officer out here and you have to  01:37:57
8  place someone in handcuffs after you've done an  01:37:59
9  LVNR, then we have techniques to transition to a  01:38:03
10  handcuffing position for that.     01:38:07
11    Q.  Okay.  But since Officer Lopera did have  01:38:08
12  other officers there, it was proper for him to  01:38:11
13  keep the encircling arm around the neck --  01:38:13
14    A.  Yes.                        01:38:16
15    Q.  -- until the suspect was in handcuffs?  01:38:16
16    A.  Absolutely is.              01:38:18
17    Q.  I have no further -- oh, I do have one  01:38:19
18  follow-up.  Sorry.  Do you know Charles Huth?  01:38:22
19    A.  Yes.                        01:38:29
20    Q.  H-u-t-h.  How do you know him?  01:38:29
21    A.  He's been a friend and fellow trainer of  01:38:33
22  mine for 25 years, something like that.  01:38:40
23    Q.  Is he the major at Kansas City Police  01:38:45
24  Department that you got the fee schedule from?  01:38:47
25    A.  Yes.                        01:38:49

20 (Pages 74 - 77)

**Page 78**

1    Q.  And he offered an article called "Why    01:38:50
2 the LVNR isn't a choke hold" in March 19th of    01:38:54
3 2013.  Right?    01:38:59
4    A.  Yeah, I remember that.    01:38:59
5    Q.  And this was referenced in your expert    01:39:01
6 report as one of the pieces of reference    01:39:03
7 materials.  Right?    01:39:06
8    A.  Yes.    01:39:07
9    Q.  And he is also the vice-president or    01:39:07
10 former vice-president of NLETC.  Right?    01:39:12
11    A.  Yeah.  He was the president for several    01:39:15
12 years.    01:39:17
13    Q.  Oh, okay.  So he was the president    01:39:17
14 before you?    01:39:20
15    A.  Yeah.    01:39:20
16    Q.  And have you talked to him about this    01:39:23
17 matter that you're testifying on?    01:39:26
18    A.  I talked about him -- I talked about it    01:39:28
19 with him only from the standpoint of me doing an    01:39:30
20 expert witness report in a job.  I didn't -- I    01:39:33
21 didn't discuss any of the details of the case    01:39:37
22 with him, because I didn't really know that much    01:39:40
23 about it in the beginning, but I just called him    01:39:42
24 as a friend to ask his advice about how to go    01:39:47
25 about doing this type of work.    01:39:51

**Page 79**

1    Q.  Unconsciousness can be achieved through    01:39:52
2 either the LVNR or the rear naked choke.  Right?    01:39:59
3    A.  Yes.    01:40:03
4      MR. MCNUTT:  I have no further    01:40:04
5 questions, Fred.    01:40:05
6      EXAMINATION    01:40:05
7 BY MR. SAYRE:    01:40:05
8    Q.  Captain, would you expect to see a    01:40:09
9 series of hemorrhages around the neck of a person    01:40:13
10 who had had an LVNR applied to them?    01:40:16
11    A.  No.    01:40:20
12    Q.  Do you know if you would expect to see a    01:40:22
13 series of hemorrhages around the neck of a person    01:40:24
14 who had had a rear naked choke applied?    01:40:27
15    A.  You know, I think you could -- it would    01:40:31
16 all depend -- there's so many variables on that.    01:40:35
17 I don't know if you would see it on either one of    01:40:39
18 them, but I don't think you would see it -- are    01:40:42
19 you talking about bruising or --    01:40:45
20    Q.  Yeah, bruising, hemorrhages.    01:40:47
21    A.  It could occur, I think, with either    01:40:49
22 technique.  I'm sorry, I didn't understand what    01:40:51
23 you meant there.    01:40:54
24    Q.  Okay.  Have you seen the coroner's    01:40:56
25 report about the death of Tashii Farmer?    01:41:00

**Page 80**

1    A.  No.    01:41:02
2    Q.  Okay.  She found a series of hemorrhages    01:41:04
3 around the neck of Tashii Farmer.    01:41:09
4    A.  Okay.    01:41:12
5    Q.  And it caused her, among other things,    01:41:12
6 to conclude that the cause of death was the    01:41:18
7 restraint that was used.  You have no opinion    01:41:20
8 about that?    01:41:26
9    A.  From my limited knowledge of medical    01:41:26
10 implications of LVNR and different neck    01:41:30
11 restraints, I -- you know, I would -- I would    01:41:34
12 expect to see damage to the front structures of    01:41:35
13 the throat, and you know, the larynx and the    01:41:38
14 trachea.  I would expect to see damage and    01:41:44
15 hemorrhaging in, you know, in that area up front    01:41:46
16 if that was the cause of death.    01:41:50
17      MR. SAYRE:  Okay.  All right.  I    01:41:53
18 have nothing further.    01:41:56
19      MR. MCNUTT:  No questions.  Thank    01:42:00
20 you very much, Captain.  Thank you for your time,    01:42:01
21 Captain Lynch.    01:42:03
22      THE VIDEOGRAPHER:  If you guys    01:42:05
23 would hold on to the line for just a moment.  It    01:42:06
24 is 3:55.  This concludes today's testimony given    01:42:08
25 by Captain Lawrence G. Lynch.  We're going off    01:42:12

**Page 81**

1 the record.  The total number of media units used    01:42:15
2 was two and will be retained by Veritext Legal    01:42:18
3 Solutions.    01:42:22
4      MR. ANDERSON:  I would like to    01:42:35
5 order a copy of the deposition.  Craig Anderson.    01:42:36
6 Electronic.    01:42:49
7      MR. MCNUTT:  Did you hear I want to    01:42:49
8 order a PDF copy of the transcript as well?    01:42:54
9      MR. SAYRE:  Electronic copy.    01:42:54
10      (Deposition concluded at 3:55 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

21 (Pages 78 - 81)

```
 1      I declare under penalty of perjury
 2  under the laws that the foregoing is
 3  true and correct.
 4
 5      Executed on _____ , 20___,
 6  at _____, _____.
 7
 8
 9
10      _____
11      CAPTAIN LAWRENCE G. LYNCH, III
12
13
14      Subscribed and sworn to before me
15
16  this _____ day of _____, 20___.
17
18  County of_____
19
20  State of_____    _____
21              Notary Public
22
23  My Commission Expires:_____
24
25
```

Page 82

```
 1      C E R T I F I C A T E
 2
 3      I, Jane A. Blackerby, a Certified Court
 4  Reporter of the State of Missouri, do hereby
 5  certify:
 6      That prior to being examined the witness
 7  was by me duly sworn;
 8      That said deposition was taken down by
 9  me in shorthand at the time and place
10  hereinbefore stated and was thereafter reduced to
11  writing under my direction;
12      That I am not a relative or employee or
13  attorney or counsel of any of the parties, or a
14  relative or employee of such attorney or counsel,
15  or financially interested in the action.
16      WITNESS my hand and seal this 1st day
17  of November, 2018.
18
19
20
21
22
23
24      _____
25      JANE A. BLACKERBY, CCR No. 877
```

Page 83

22 (Pages 82 - 83)