# Exhibit T - Expert report of LVMPD Defendants' police practices expert Sonny Lynch

## Sonny Lynch

Clinton, Missouri, 64735
660-492-3693 s.lynch@clintonmopd.com

## WORK EXPERIENCE

### CLINTON POLICE DEPARTMENT, Clinton, MO

*Deputy Chief of Police   |   Oct 2005 - Present*

- Maintain logs, prepare reports, and direct the preparation, handling, and maintenance of departmental records.
- Explain police operations to subordinates to assist them in performing their job duties.
- Supervise and coordinate the investigation of criminal cases, offering guidance and expertise to investigators, and ensuring that procedures are conducted in accordance with laws and regulations.
- Review contents of written orders to ensure adherence to legal requirements.
- Investigate and resolve personnel problems within organization and charges of misconduct against staff.
- Inform personnel of changes in regulations and policies, implications of new or amended laws, and new techniques of police work.
- Train staff in proper police work procedures. I also train staff in all areas of reasonable subject control techniques and the case law that surrounds use of force.
- Monitor and evaluate the job performance of subordinates, and authorize promotions and transfers.
- Discipline staff for violation of department rules and regulations.
- Develop, implement and revise departmental policies and procedures.
- Requisition and issue equipment and supplies.
- Meet with civic, educational, and community groups to develop community programs and events, and to discuss law enforcement subjects.
- Prepare news releases and respond to police correspondence.
- Administer and supervise all new hire testing and field training
- Investigate all citizen complaints made against officers.

*Patrol Sergeant   |   Mar 1992 - Present*

- Maintain logs, prepare reports, and direct the preparation, handling, and maintenance of departmental records.
- Cooperate with court personnel and officials from other law enforcement agencies and testify in court as necessary.
- Review contents of written orders to ensure adherence to legal requirements.
- Explain police operations to subordinates to assist them in performing their job duties.
- Direct collection, preparation, and handling of evidence and personal property of prisoners.
- Train staff in proper police work procedures.
- Prepare work schedules and assign duties to subordinates.
- Develop, implement and revise departmental policies and procedures.
- Meet with civic, educational, and community groups to develop community programs and events, and to discuss law enforcement subjects.
- Discipline staff for violation of department rules and regulations.
- Monitor and evaluate the job performance of subordinates, and authorize promotions and transfers.

- Inform personnel of changes in regulations and policies, implications of new or amended laws, and new techniques of police work.
- Conducted background investigations of all potential new hires.

*Patrol Officer   |   Feb 1990 - Present*

- Provide for public safety by maintaining order, responding to emergencies, protecting people and property, enforcing motor vehicle and criminal laws, and promoting good community relations.
- Record facts to prepare reports that document incidents and activities.
- Monitor, note, report, and investigate suspicious persons and situations, safety hazards, and unusual or illegal activity in patrol area.
- Identify, pursue, and arrest suspects and perpetrators of criminal acts.
- Review facts of incidents to determine if criminal act or statute violations were involved.
- Render aid to accident victims and other persons requiring first aid for physical injuries.
- Investigate traffic accidents and other accidents to determine causes and to determine if a crime has been committed.
- Testify in court to present evidence or act as witness in traffic and criminal cases.
- Photograph or draw diagrams of crime or accident scenes and interview principals and eyewitnesses.
- Relay complaint and emergency-request information to appropriate agency dispatchers.
- Evaluate complaint and emergency-request information to determine response requirements.
- Process prisoners, and prepare and maintain records of prisoner bookings and prisoner status during booking and pre-trial process.
- Monitor traffic to ensure motorists observe traffic regulations and exhibit safe driving procedures.
- Issue citations or warnings to violators of motor vehicle ordinances.
- Direct traffic flow and reroute traffic in case of emergencies.
- Inform citizens of community services and recommend options to facilitate longer-term problem resolution.
- Provide road information to assist motorists.
- Act as official escorts, such as when leading funeral processions or firefighters.

*Defensive Tactics Instructor   |   Mar 1993 - Present*

- Provide initial training to all officers in all areas of physical force and the case law that surrounds the use of that force. I also conduct re-certifications in all areas of use of force on a bi-monthly basis.
- Author, implement and monitor all use of force policies for the Clinton Police Department
- Review all uses of force by department members and evaluate them for reasonableness and adherence to policy
- Receive, review all citizen complaints in reference to police use of force. Conduct investigation into such complaints to determine the use of force by the officer is reasonable and within policy.
- Maintain all department training records.
- Ensure that all officers complete mandated in-service training required by the Missouri Peace Officer Standards and Training Commission.
- Consult with insurance company representatives and their expert

witness/consultants on any use of force incident that involves litigation or a claim by an arrestee.

## UNITED STATES ARMY, XVII AIRBORNE CORPS, Fort Bragg, NC

*Military Police Officer*   |   *May 1987 - Jan 1990*

- Provide for public safety by maintaining order, responding to emergencies, protecting people and property, enforcing motor vehicle and criminal laws, and promoting good community relations.
- Record facts to prepare reports that document incidents and activities.
- Monitor, note, report, and investigate suspicious persons and situations, safety hazards, and unusual or illegal activity in patrol area.
- Identify, pursue, and arrest suspects and perpetrators of criminal acts.
- Patrol specific area on foot, horseback, or motorized conveyance, responding promptly to calls for assistance.
- Review facts of incidents to determine if criminal act or statute violations were involved.
- Render aid to accident victims and other persons requiring first aid for physical injuries.
- Investigate traffic accidents and other accidents to determine causes and to determine if a crime has been committed.
- Testify in court to present evidence or act as witness in traffic and criminal cases.
- Photograph or draw diagrams of crime or accident scenes and interview principals and eyewitnesses.
- Relay complaint and emergency-request information to appropriate agency dispatchers.
- Evaluate complaint and emergency-request information to determine response requirements.
- Process prisoners, and prepare and maintain records of prisoner bookings and prisoner status during booking and pre-trial process.
- Monitor traffic to ensure motorists observe traffic regulations and exhibit safe driving procedures.
- Issue citations or warnings to violators of motor vehicle ordinances.
- Direct traffic flow and reroute traffic in case of emergencies.
- Inform citizens of community services and recommend options to facilitate longer-term problem resolution.
- Provide road information to assist motorists.
- Was a member of a Special Reaction Team that performed hostage rescue and anti-terror duties on military installations. The team also provided dignitary protection services for both domestic and visiting foreign dignitaries of military and government. As a member of this team, I also helped operate a Military Operations Urban Terrain Site (M.O.UT. SITE) where, as part of our duties, we instructed domestic and foreign military personnel in urban combat and insurgent tactics.

## KANSAS CITY MISSOURI POLICE DEPARTMENT, Kansas City, MO

*Detention Facility Officer*   |   *Aug 1985 - Feb 1987*

- Conduct head counts to ensure that each prisoner is present.
- Inspect conditions of locks, window bars, grills, doors, and gates at correctional facilities to ensure security and help prevent escapes.
- Record information, such as prisoner identification, charges, and incidences of inmate disturbance, and keep daily logs of prisoner

activities.

- Search prisoners and vehicles and conduct shakedowns of cells for valuables and contraband, such as weapons or drugs.
- Use weapons, handcuffs, and physical force to maintain discipline and order among prisoners.
- Maintain records of prisoners' identification and charges.
- Process or book convicted individuals into prison.
- Settle disputes between inmates.
- Participate in required job training.
- Serve meals, distribute commissary items, and dispense prescribed medication to prisoners.

## NATIONAL LAW ENFORCEMENT TRAINING CENTER, Kansas City, MO

*National Trainer/Vice President   |   Mar 1994 - Present*

- As a trainer at NLETC, duties include certifying trainers from around the country in reasonable use of force systems. They in turn return to their agencies and police academies and teach these systems. The systems include Control/Defensive Tactics, Power Handcuff System, Lateral Vascular Neck Restraint System, Handgun/Long Gun Retention/Disarming System, Knife Defense/Disarming System, Arm Control Escort System, Oleoresin Capsicum Subject Control System, Straight/Expandable Baton System and the Ground Defense/Control Tactics System.
- Coordinate training seminars which includes securing locations, hotels, travel, equipment, and classroom materials as well as coordinating with local law enforcement organizations who might be attending the seminar.
- Travel and teach trainer seminars at various location in the United States several times per year.
- Field questions from the news media about various issues surrounding police use of force and in particular the systems that are taught by NLETC.
- Market all NLETC seminars through the use of social media and sites on the internet that list such seminars. I also run the Facebook page of the the NLETC.
- Serve as a member of the NLETC Advisory board. As a member I have a great amount of input in the development of curriculum, teaching methods and system structure.

## CENTRAL MISSOURI POLICE ACADEMY/UNIVERSITY OF CENTRAL MISSOURI , Warrensburg, MO

*Defensive Tactics Instructor   |   Jun 1999 - Present*

- As the leader of a team of three defensive tactics trainers, I conduct the education and training of police academy cadets in all aspects of the use of physical force to control resisting subjects, and dealing with aggressive behavior. Cadets are certified in the following systems: Control/Defensive Tactics, Power Handcuff System, Lateral Vascular Neck Restraint System, Handgun/Long Gun Retention/Disarming System, Oleoresin Capsicum Subject Control System, Straight/Expandable Baton System and the Ground Defense/Control Tactics System.
- Coordinate and conduct all testing and evaluation of cadets in relation to use of force techniques.
- Design, implement and evaluate role playing scenarios designed to test a cadet's technique proficiency and judgement. This includes the use of a firearms simulator to ensure that students understand the use of deadly

force and the case law that surrounds it's legality.

- Assist the academy director in curriculum development and changes.
- As an instructor I consult with the academy on equipment selection and purchase and am also available to inquiring agencies about equipment and training issues.
- Attend meetings held by the Missouri Peace Officer Standards and Training Commission (POST) on behalf of the police academy.
- Available for lecture and informational sessions to all professors of the University of Central Missouri's Criminal Justice Program
- Conduct mock law enforcement employment interviews for the university Career Center
- Review and consult on use of force issues for surrounding law enforcement agencies that utilize the police academy for the training of cadets and in-service training sessions.

## EDUCATION

### STOCKTON HIGH SCHOOL, Stockton, MO

*High School Diploma, May 1985*

- General Education

### STATE FAIR COMMUNITY COLLEGE, Sedalia, MO

*Associate of Arts/Creative Writing, May 2012*

### UNITES STATES ARMY MILITARY POLICE SCHOOL, Ft. McClellan , AL

*Diploma, May 1987 - Sep 1987*

### NATIONAL POLICE INSTITUTE, Warrensburg/University of Central Missouri, MO

*Class A Certification*

- Basic Police Academy Certification for the State of Missouri

## MEMBERSHIPS

- International Law Enforcement Educators and Trainers Association, American Legion, Optimist International, Clinton Elks Lodge

## CERTIFICATIONS

- Force Science Analyst, Taser Instructor, ALICE Instructor (Alert, Lockdown, Inform, Counter, Evaluate) National Trainer (Use of Force Instructor Trainer) National Law Enforcement Training Center

## APPOINTMENTS

- Missouri Peace Officer Standards and Training (POST) ground fighting goals and objectives panel, National Law Enforcement Training Center Advisory Board, Clinton Rural Fire Board, President of the 27th Judicial Circuit Drug Court, Law Enforcement Advisory Forum (LEAF) authoring model policy for the Missouri Police Chief's Association

## AWARDS

- United States Army Commendation Medal, United States Army

Achievement Medal, Clinton Police Department Officer of the Year
awarded twice, Trainers award

April 16th, 2018


Mr. Craig R. Anderson, Esq.
Marquis Aurbach Coffing
1001 Park Run Drive
Las Vegas, NV 89145

RE:  *Estate of Tashii S. Farmer a/k/a Tashii Brown, et al. v LVMPD, et al.*

Dear Mr. Anderson,

Please accept the following report containing my expert opinions regarding the above captioned case.

Respectfully,


Lawrence G. Lynch III
243 NW 46 Rd
Clinton, Missouri 64735
660-492-3693

# **EXPERT REPORT AND OPINIONS**

My name is Lawrence G. Lynch III, and I have been retained by the firm of Marquis Aurbach Coffing to review material provided in this case and offer objective opinions concerning the use of force policy of the Las Vegas Metropolitan Police Department (LVMPD). The opinions offered in reference to that policy will be in regards to whether the policy meets industry and constitutional standards and specifically the content of the policy that addresses the use of the Lateral Vascular Neck Restraint System (LVNR). I will also offer an opinion on whether the LVMPD Arrest Procedures and Declaration of Arrest Policy meets those same standards. I will additionally offer an opinion regarding the overall effectiveness and safety of the LVNR compared to other neck restraints and an opinion of the LVMPD's use of force and LVNR training. I will also offer an opinion as to whether or not the neck restraint used by Officer Kenneth Lopera was a Lateral Vascular Neck Restraint, or another type of neck restraint. I have reached my conclusions by reviewing the materials provided and drawing upon my knowledge, training, 33 years of police experience and 25 years as a Lateral Vascular Neck Restraint Trainer for the National Law Enforcement Training Center and my 33 years as a practitioner of the system. Upon this review and consideration, I have reviewed the documents that are listed in Exhibit A, attached hereto, and I offer the following opinions and related basis:

## **OPINION 1**

The Use of Force Policy 6/002.00 of the Las Vegas Metropolitan Police Department is constitutional and is based on current case law.

## **BASIS FOR OPINION 1**

After examining the Las Vegas Metropolitan Police Department's use of force policy I found that the policy was a very thorough and comprehensive document that provides well defined guidance in the use of reasonable force options. As for being constitutional, the very foundation of the policy is the landmark decision of the United States Supreme Court, Graham v. Connor, 490 U.S. 386 (1989) that guides current police use of force practices. In 6/002.00 Section III of the policy entitled, "Determining Objectively Reasonable Force", the policy even references

2

the case and uses some of the language of the case verbatim.  The text reads in part:

"The United States Supreme Court decisions and interpretations of the Fourth Amendment of the United States Constitution states a police officer may only use such force as is "objectively reasonable" under all of the circumstances. The standard that courts will use to examine whether a use of force is constitutional was first set forth in Graham v. Connor, 490 U.S. 386 (1989) and expanded by subsequent court cases. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight. The reasonableness must account for the fact that officers are often forced to make split second judgments in circumstances that are tense, uncertain and rapidly evolving. The LVMPD Use of Force Policy applies to all commissioned officers. The reasonableness inquiry in reviewing use of force is an objective one. The question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them."

When an officer uses the standards set forth in Graham, the officer must use appropriate levels of force in a constitutional manner based on the circumstances they are facing at the scene in each unique case.  The force applied must be objectively reasonable from the perspective of that officer at the scene based on the information that the officer has to work with.  The LVMPD use of force policy goes on to use these factors, universally known as the Graham Factors, to not only be used as a reasonableness test of the Fourth Amendment, but also to be used in reviewing an officer's use of force.  The policy states in part:

"The reasonableness inquiry in reviewing use of force is an objective one. The question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them. The officer's perception will be a consideration, along with other objective factors that may affect the reasonableness of the force. These factors may include but are not limited to:

1. The severity of the crime(s) at issue.
2. Whether the subject poses an immediate threat to the safety of the officer(s) or others.
3. Whether the subject is actively resisting arrest or attempting to evade arrest by flight.
4. The influence of drugs/alcohol or the mental capacity of the subject.
5. The time available to an officer to make a decision.

3

6. The availability of officers/resources (including the number of officers present at the time) to de-escalate the situation.
7. The proximity or access of weapons to the subject.
8. The environmental factors and/or other exigent circumstances."

Another constitutional component of the policy is Tennessee v. Garner, 471 U.S. 1 (1985), the Supreme Court of the United States.  This case held that, under the Fourth Amendment, when a law enforcement officer is pursuing a fleeing suspect, he or she may not use deadly force to prevent escape unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  The LVMPD Use of Force Policy also references this case and how it applies to deadly force situations and decision making.

I would point out that throughout the policy these examples of case law are reflected in the guidance that is provided to officers.  At each level of force, the officer is presented with a subject behavior and offered several reasonable force options to choose from.  Variables that are present, which could affect the decision made by the officer, are also discussed.

## OPINION 2

The Use of Force Policy 6/002.00 of the Las Vegas Metropolitan Police Department meets current standards of the law enforcement profession.

## BASIS FOR OPINION 2

The policy meets current standards of the law enforcement profession because it is based on the standards of case law and the reasonableness tests of the Fourth Amendment specifically, Tennessee v. Garner and Graham v. Connor.  All use of force policies that are recognized as valid by the courts and professional law enforcement organizations are based on those cases.  In addition to that, the policy has most of the attributes that were described by the law enforcement community's most current effort to define what well rounded use of force policy should look like.  A collaborative effort among 11 of the most significant law enforcement leadership and labor organizations in the United States resulted in a paper that was published in October of 2017 entitled, "National Consensus Policy and Discussion Paper on the Use of Force".  The organizations were the International Association of Chiefs of Police, the Fraternal Order of Police, the International Association of Directors of Law Enforcement, the Association of State Criminal Investigative

4

Agencies, the Federal Law Enforcement Officers Association, the Hispanic American Police Command Officers Police Association, the National Association of Police Organizations, the National Association of Women's Law Enforcement Executives, the National Organization of Black Law Enforcement Executives, the National Tactical Officer's Association, and the Commission on Accreditation for Law Enforcement Agencies.

## OPINION 3

The portion of the Las Vegas Metropolitan Police Department Use of Force Policy 6/002.00 that addresses the use of the Lateral Vascular Neck Restraint meets industry standards.

## BASIS FOR OPINION 3

The policy specifies that all officers using the LVNR must be certified to do so by completing and initial 12 hour certification course taught by a certified LVNR instructor. This is also the requirement of the National Law Enforcement Training Center, the sole certifying body for the LVNR. The policy dictates the officers must pass the course by demonstrating proficiency and knowledge of the LVNR System. Annual re-certification is also required. Other guidelines endorsed by the NLETC are also present in the policy such as relaxing compression on the sides of the neck when resistance is concluded, summoning medical attention for a person who has been rendered unconscious and not using the LVNR on a subject who has been sprayed with pepper spray. The LVNR is properly placed as a force option as both a low level option, with a level one application, and an intermediate use of force option with a level two or three application.

## OPINION 4

The Lateral Vascular Neck (LVNR) is a safe and effective control technique with an established safety record and the methodology of the technique makes it safer to apply than other neck restraints.

## BASIS FOR OPINION 4

Properly applied Lateral Vascular Neck Restraint® (LVNR) is a safe and effective non-deadly force option that exposes the subject of the technique to extremely minimal risks of injury. Various systems of neck restraints are taught to officers at

5

police agencies around the country however, few have the safety record of the Lateral Vascular Neck Restraint System.  It has been utilized internationally by law enforcement officers, military personnel, corrections officers and security workers for over 47 years with no death, serious injury or successful litigation directly attributed to its use.

The National Law Enforcement Training Center, a not-for-profit corporation based in Kansas City, Missouri, is the sole certifying body for the LVNR System. The NLETC partners with the Kansas City Missouri Police Department to deliver high-quality defensive tactics training to officers from around the world.  The certification standards maintained by the NLETC help ensure end users and trainers alike are well educated concerning the technique methodology and the physiological implications of the neck restraint.

The LVNR® has several distinguishing features which can be attributed to its overall superior safety record when compared to other martial arts style neck restraints that have not been designed for law enforcement use, but instead have mainly seen use today in mixed martial arts events.  These distinguishing features make it a safe and practicable use of force option to counter varying levels of resistance and aggression. While chokeholds focus on restricting the air intake of a resistive subject, many bi-lateral restraints (pressure applied to the sides of the neck) are intended to affect the circulatory system of the resisting subject, interrupting, but not occluding, the natural flow of blood to and from the brain. The subsequent pressure applied to the sides of the neck can result in a *possible* loss of consciousness on the part of the recipient. Officers may apply the technique while in a standing, kneeling or back lying position. The proper objective of the LVNR is to control a resistant subject's body by controlling their head and utilizing their neck to shift their balance to the rear.

The officer applying the neck restraint capitalizes on the rearward capture of a combative subject's body to diminish the subject's ability to effectively resist or counter the officer's attempt at control. Practitioners of the LVNR learn about proportionality of force in three levels of control to address mild, moderate and extreme resistance on the part of a subject.  The three levels of control when applying the LVNR are also a distinguishing characteristic when compared to mixed martial arts style neck restraints such as the rear naked choke.  Instead of maximum compression from initial application, practitioners of the LVNR are also taught the principles of subject control as it relates to regulation of neck compression and destabilization.  The compression on the sides of the resisting subject's neck is regulated in relation to the subject's resistance. The principal

6

objective of the LVNR is to establish control in standing, kneeling, or back-lying positons and, while unconsciousness may occur as a by-product of the subject's resistance, it is generally not the primary objective.

Another aspect of the LVNR that differentiates it from other neck restraints is the Neck Brace Principle.  It helps prevent injury to the subject's neck and throat structures by limiting the lateral movement of the subject's neck that typically accompanies increased levels of resistance. The Neck Brace Principle is accomplished when the person applying the LVNR places the side of their head against the back of the resisting subject's head.  This along with the encirclement of the neck essentially locks the head and neck in place so that the neck and head can remain stable during compression.  When applied, the Neck Brace Principle becomes a bio-mechanical cervical support collar of sorts, similar to the one that would be placed on the neck of an injured person by a paramedic.  The effect is much the same.  The cervical vertebrae are aligned and locked into place, greatly limiting the resisting person's ability to turn their head to the left or the right thereby preventing injury to the neck.  At the same time, the proper positioning of the encircling arm on the lateral portion of the subject's neck helps prevent the subject from slipping into a bar-arm choke, which could expose the trachea or other vital throat structures to injury if not properly regulated. The lateral positioning of the arms of the person applying the restraint serves to safeguard against the possibility of the technique slipping into a respiratory restraint. This is a built in safety feature of the Lateral Vascular Neck Restraint and one that is not part of other neck restraint techniques commonly practiced in the mixed martial arts community.  The Neck Brace Principle has contributed greatly to the excellent overall safety record of the LVNR.

Many neck restraints that are practiced in the mixed martial arts community are an all or nothing proposition in the sense that when they are applied, maximum compression is immediately applied to the sides of the neck until the person it is being applied to is rendered unconscious. The LVNR, with its three levels of compression of minimum, moderate, and maximum are applied in conjunction with the resisting subjects level of resistance.  Students are also trained that as soon as the subject complies with verbal commands, or in some cases becomes unconscious, the restraint is relaxed to a position of control known as level one minus.  In this position all compression to the sides of the neck is immediately relaxed however, encirclement of the neck is maintained while the subject is placed in handcuffs.  The three levels of control have resulted in only a small percentage of resisting subjects losing consciousness.  In fact, according to Kansas City Missouri Police Department use of force statistics, approximately only three

percent of violators subjected to the LVNR® in the field lose consciousness. This eventuality, while rare, is most often the byproduct of excessive levels of resistance on the part of the subject being controlled.

There are several medical theories concerning the primary contributing physiological factors that induce unconsciousness; however, the empirical data supports that the LVNR is one of the safest and most viable options for controlling combative subjects. Empirically, the LVNR has a very low risk of causing even minor injury. Much of what passes for knowledge in the area of neck restraints is actually misinformation derived from anecdotal evidence or unhelpful personal bias. While it is impossible to guarantee an ideal outcome for every use of force scenario, statistical data and research validates the safety and effectiveness of a properly applied Lateral Vascular Neck Restraint. Deadly force is defined as that force which is likely to cause death or serious injury.  The Lateral Vascular Neck Restraint System, with a record of no death or serious injury attributed to its use since its introduction to law enforcement in 1970, does not meet the criteria to be defined as deadly force.  In fact, the National Law Enforcement Training Center states that levels one and two of the LVNR are properly placed as a reasonable use of force option at an active resistance level for agencies that are still using a use of force continuum model for their use of force policies.

## OPINION 5

The Las Vegas Metropolitan Police Department's Training Policy 5/108.00 meets constitutional and industry standards.

## BASIS FOR OPINION 5

In his 2007 article authored for the Legal and Liability Risk Management Institute, Rhode Island attorney Jack Ryan noted that in the case of Canton, Ohio vs. Harris the United States Supreme Court held that "a municipality may be held liable under § 1983 for violations of rights guaranteed by the Federal Constitution, where violations result from the municipality's failure to adequately train its employees, only if that failure reflects a deliberate indifference on the part of the municipality to the constitutional rights of its inhabitants".  In that particular case many standards were established for law enforcement that are reflected in the LVMPD training policy.  The policy goes into great detail on how training should be implemented, by whom, to whom and how records of that training should be maintained. The policy establishes that all training is conducted by, and kept track

of, by an established Training Bureau within the department with full time personnel dedicated to ensuring that the training standards of the LVMPD are met on a yearly basis.   Also, detailed in the policy, are not only the training requirements of the LVMPD, but also the yearly training requirements of the Nevada Commission on Peace Officer Standards and Training.   The broad spectrum of topics that require training in the policy and in the requirements from the Nevada POST address yet another case that guides law enforcement agencies in their quest to provide training to their officers.   Walker v. City of New York, 974 F. 2d 293 - Court of Appeals, 2nd Circuit 1992, provided guidance as to when training is required.   The United States Court of Appeal for the 2nd Circuit asserted that if policy makers know to a moral certainty that officers will confront particular situations then training must be provided to handle such situations.

The training policy of the LVMPD ensures that officers are trained for a broad spectrum of situations that officers are likely to encounter in the field.   In the extremely critical areas of firearms and defensive tactics training the policy requires that officers are trained quarterly.   Minimum standards are established and the policy establishes remedial programs for officers who do not pass or do not attend training.   The policy also ensures that all officers are trained not only in the techniques and the mastery of skills, but that they are also trained and educated on the policies that govern use of force and that they have a clear understanding of what is expected of them.

The policy outlines requirements for instructors also and details the ongoing training requirements for them to maintain their positions as instructors.   In addition to these things the policy establishes a Use of Force Review Board to ensure that certain uses of force are in compliance with policy and a Critical Incident Review Panel that examines all uses of deadly force or other major uses of force.   The policy also establishes a training committee that meets regularly and makes recommendations to program and policy changes.   The committee is a critical part of the training policy due to the everchanging paradigm of law enforcement training as it is affected monthly by new case law, advances in law enforcement training and products, crime trends and public sentiment.

## OPINION 6

The Las Vegas Metropolitan Police Department's Training Policy 5/108.00 in regards to Lateral Vascular Neck Restraint training meets industry standards.

## **BASIS FOR OPINION 6**

When verifying that the policy meets industry standard, the recommended training and use guidelines set forth by the National Law Enforcement Training Center were examined and then compared to the training policy of the LVMPD. It should be noted that the NLETC is the sole certifying organization for the use of the Lateral Vascular Neck Restraint System. When it comes to training and certification the NLETC has strict guidelines. It requires that all officers certified in the LVNR System receive an initial training of 12 hours. The LVMPD training policy requires exactly that. The NLETC also recommends that after the initial 12-hour certification, officers recertify annually by attending a 4-hour block of instruction in the LVNR System to demonstrate knowledge and proficiency in techniques. After reviewing the deposition of LVMPD Sergeant Michael Bland, I found that LVMPD conducts a 2-hour annual recertification instead of a 4-hour recertification. It is my opinion, and that of Sergeant Bland, that a 2-hour recertification is adequate if the officers being recertified by the trainers demonstrate acceptable knowledge and proficiency in the LVNR System. I believe that the 4-hour recertification guideline from the NLETC is the outside parameter of what it may take to ensure that an officer is proficient and knowledgeable in the system after their initial 12 hour certification. It can certainly be accomplished in less time and for some officers, more time might be required hence, the inclusion of a remedial training requirement within this policy to address shortcomings in performance. The policy also states that officers who do not complete the required training are excluded from using the LVNR System as a control option.

The LVNR is properly placed as a force option as both a low level option with a level one application and an intermediate use of force option with a level two or three application Also mirroring NLETC guidelines, the policy restricts the use of the LVNR on any person who has been sprayed with pepper spray. Another guideline stressed by the NLETC since the inception of the LVNR System is also included in the LVMPD policy. This particular guideline requires an officer applying the LVNR to a subject cease all compression on the sides of the subject's neck once resistance has concluded. Additionally, the NLETC guidelines state that if a subject has been rendered unconscious with the LVNR, the subject should be examined by medical personnel and a two-hour observation period should be conducted. The LVMPD policy actually exceeds NLETC guidelines in reference to the observation period requiring a four-hour observation period instead.

## **OPINION 7**

The Las Vegas Metropolitan Police Department's Arrest Procedures and Declaration of Arrest Policy is constitutional and meets industry standards.

## **BASIS FOR OPINION 7**

This policy provides specific direction to officers on what is required to stop a citizen and to make an arrest.   Much of the policy addresses the internal requirements of the LVMPD paperwork procedures and how they relate to the local court system.  In section 6/006.01, Arrests Without Warrants, an examination of the contents can be conducted to see if the policy addresses critical elements of the constitution and established case law.  Here we find established and universally accepted definitions of Arrest, Probable Cause and Miranda Warning.  A guideline is also present as to when it is appropriate to give the Miranda Warning so that officers may fulfill the requirements of Miranda v. Arizona, 384 U.S. 436 (1966). The policy ensures that officers respect the requirements of the Fourth Amendment of the United States Constitution by requiring that officers have probable cause before making an arrest.  The policy also addresses use of force by an officer, a seizure under the Fourth Amendment, when making an arrest holding the officer to the objectively reasonable standard established in Graham v. Connor, 490 U.S. 386 (1989).  In keeping with the requirements set forth by the Supreme Court in Terry v. Ohio, the policy requires that before stopping a citizen reasonable suspicion is required and the officer must have articulable factors for the stop.  It also states that the officer can only pat down a person that has been stopped if the officer has reasonable suspicion that the person may be armed.  The policy enumerates the rights of arrested person ensuring that they are provided with proper medical attention, care and safeguarding of their property in their possession when they were arrested, the right to an interpreter and a reasonable number of phone calls after being booked.   In the same way that this policy meets constitutional standards, it also meets industry standards in the law enforcement profession. Most police agencies have arrest policies in place that contain these elements.

## **OPINION 8**

The neck restraint applied to Tashii S. Farmer by Officer Kenneth Lopera was not a Lateral Vascular Neck Restraint and was prohibited by the Use of Force Policy of the Las Vegas Metropolitan Police Department.

## **BASIS FOR OPINION 8**

After reviewing the overhead surveillance video of the incident and listening to the audio of the body worn cameras that were present at the scene of the incident, it is apparent to me that the neck restraint that Officer Kenneth Lopera applied to Tashii Farmer was not the Lateral Vascular Neck Restraint for a number of reasons. The hallmark safety feature of the LVNR, the neck brace principle, was not visible during the application. The neck brace principle occurs when the side of the officer's head is placed against the back of the subject's head while the officer has full encirclement of the subject's neck. The officer's hands are clasped together on the opposite side of the encircling arm. This is not visible in the overhead surveillance video. What is visible are the clear hallmarks of a neck restraint commonly known as a rear naked choke. There is no head to head contact when a rear naked choke is applied and the person applying the choke does not clasp the hands together as in the LVNR. Instead, the back of the hand of the non-encircling arm is usually placed against the back of the subject's head as the encircling arm encircles the neck. As the neck is encircled, the hand of the encircling arm is usually passed underneath the forearm of the non-encircling arm in an attempt to grab the bicep of the non-encircling arm. By pulling both elbows tightly into the chest  and pushing against the back of the head with the back of the hand, pressure is then applied to the back of the subject's head forcing it forward while bi-lateral pressure is applied to the sides of the subject's neck. Compared to the approved LVNR neck brace principle, this method of applying pressure to the back of the head with the back of a hand is not as efficient in supporting the structures of the neck and the likelihood of the technique deteriorating into a bar arm choke, where pressure is applied to the front of the throat, increases. This pressure to the front of the throat can cause damage to the structures in the front of the throat and has been known to cause serious injury or death. In addition to the appearance in the video, Officer Lopera can be heard on the audio portion of the body worn camera video calling the technique that he applied to Farmer a "rear naked choke".

According the Use of Force Policy of LVMPD, a rear naked choke or any other type of neck restraint other than an LVNR is strictly prohibited. Under the heading of "Disapproved Use", subsection 2, the policy specifically states, "Officers will not use any other arm bar technique that involves a neck restraint". Therefore, Officer Lopera's application of a technique commonly known as a rear naked choke was prohibited by the LVMPD Use of Force Policy.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions in this case. It is my expectation that additional information will be provided in this case. Accordingly, these opinions are preliminary and subject to modification.

Very Respectfully,

Lawrence G. Lynch III

# **REFERENCES**

1. "Training Liability in Use of Deadly Force" By Jack Ryan

http://www.patc.com/weeklyarticles/uof_training-liability.shtml

2. National Consensus Policy and Discussion paper on Use of Force

http://www.theiacp.org/Portals/0/documents/pdfs/National_Consensus_Policy_On_Use_Of_Force.pdf

3. "Why the LVNR isn't a 'choke hold'" by Charles Huth

https://www.policeone.com/police-trainers/articles/6157483-Why-the-LVNR-isnt-a-choke-hold/

4. Lindell, James W. The New Lateral
   Vascular Neck Restraint System
   (LVNR®). National Law Enforcement
   Training Center. 2014 Ed

# EXHIBIT A

*LVMPD, et al. adv. Farmer, et. al.*
14687-057

# LIST OF DOCUMENTS REVIEWED

| NO. | DOCUMENT |
|---|---|
| 1 | Plaintiff's Complaint |
| 2 | LVMPD's Answer to Plaintiffs' Complaint |
| 3 | LVMPD's Initial Disclosure Statement |
| 4 | Plaintiffs' Initial Disclosure Statement |
| 5 | LVMPD Unit Log |
| 6 | LVMPD Quality Assurance Critical Incident Call Review |
| 7 | Clark County Autopsy Report for Tashi S. Brown and Toxicology Report |
| 8 | LVMPD Autopsy Report |
| 9 | LVMPD Crime Scene Investigation Report by Ofc. Alsup, P#5782 |
| 10 | LVMPD Crime Scene Investigation Report by Ofc. J. Patton, P#8289 |
| 11 | Taser Report print-out for Event No. LLV170514000228 |
| 12 | CD Rom of dispatch recordings for Event No. LLV170514000228 |
| 13 | CD Rom of audio statements taken by LVMPD's Force Investigation Team |
| 14 | FIT transcribed statement of Sgt. Shakeel Abdal-Karim |
| 15 | FIT transcribed statement of Ofc. Michael Amburgey |
| 16 | FIT transcribed statement of Carolyn Becic |
| 17 | FIT transcribed statement of Sgt. Travis Crumrine |
| 18 | FIT transcribed statement of Ofc. Michael Flores |
| 19 | FIT transcribed statement of Ronnie Guy |
| 20 | FIT transcribed statement of Erik Hopkins |
| 21 | FIT transcribed statement of Peter Infantino |
| 22 | FIT transcribed statement of Cody Kollar |
| 23 | FIT transcribed statement of Ofc. Ashley Lif |
| 24 | FIT transcribed statement of Jonathan Pierce |
| 25 | FIT transcribed statement of Ofc. James Rybacki |
| 26 | FIT transcribed statement of Ofc. Michael Tran |
| 27 | FIT transcribed statement of Marcelino Vibas |
| 28 | FIT transcribed statement of Witness No. 1 |
| 29 | LVMPD photographs |
| 30 | LVMPD Use of Force Statistics 2012-2017 |
| 31 | LVMPD Discipline for Excessive Force Involving Neck Area |
| 32 | CONFIDENTIAL CIRT transcribed statement of Sgt. Travis Crumrine |
| 33 | CONFIDENTIAL CIRT transcribed statement of Officer Ashley Lif |
| 34 | CONFIDENTIAL CIRT transcribed statement of Officer Michael Amburgey |
| 35 | CONFIDENTIAL CIRT transcribed statement of Officer Michael Flores |
| 36 | CONFIDENTIAL CIRT transcribed statement of Officer Michael Tran |
| 37 | CONFIDENTIAL CIRT transcribed statement of Officer Theron Young |
| 38 | LVMPD's Responses to Plaintiffs' Requests for Production of Documents |
| 39 | Elias Duarte's Answers to LVMPD's Interrogatories |
| 40 | Tamara Duarte's Answers to LVMPD's Interrogatories |
| 41 | Elias Duarte's Responses to LVMPD's Requests for Production of Documents |
| 42 | Tamara Duarte's Responses to LVMPD's Requests for Production of Documents |
| 43 | Deposition transcript of Sgt. Michael Bland |