1  MCNUTT LAW FIRM, P.C.
   Daniel R. McNutt, Esq., Bar No. 7815
2  Matthew C. Wolf, Esq., Bar No. 10801
   625 South Eighth Street
3  Las Vegas, Nevada 89101
   Tel.: (702) 384-1170 / Fax.: (702) 384-5529
4  drm@mcnuttlawfirm.com
   mcw@mcnuttlawfirm.com
5  Counsel for Defendant Officer Lopera

6  **UNITED STATES DISTRICT COURT**

7  **DISTRICT OF NEVADA**

8  ESTATE OF TASHI S. FARMER a/k/a          Case No.: 2:17-cv-01946-JCM-PAL
   TASHII FARMER a/k/a TASHII BROWN, by
9  and through its Special Administrator, Elia Del   **DEFENDANT OFFICER KENNETH LOPERA'S**
   Carmen Solano-Patricio; TAMARA BAYLEE   **MOTION FOR SUMMARY JUDGMENT**
10 KUUMEALI'MAKAMAE           FARMER
   DUARTE, a minor, individually and as
11 Successor-in-Interest, by and through her legal
   guardian, Stevandra Lk Kuanoni; ELIAS BAY
12 KAIMIPONO DUARTE, a minor, individually
   and as Successor-in-Interest, by and through his
13 legal guardian, Stevandra Lk Kuanoni,

14  Plaintiffs

15 vs.

16 LAS VEGAS METROPOLITAN POLICE
   DEPARTMENT, a political subdivision of the
17 State of Nevada; OFFICER KENNETH
   LOPERA, individually and in his Official
18 Capacity; SERGEANT TRAVIS CRUMRINE,
   individually and in his Official Capacity;
19 OFFICER MICHAEL TRAN, individually and
   in his Official Capacity; OFFICER MICHAEL
20 FLORES, individually and in his Official
   Capacity; and Does 1 through 50, inclusive

21  Defendants.

22      Pursuant to FRCP 56, Officer Kenneth Lopera ("Ofc. Lopera") respectfully requests

23 summary judgment on all claims against him. ECF No. 45, First Am. Compl., April 3, 2018.

24                           **I.      INTRODUCTION.**

25      This case arises from the encounter between members of the Las Vegas Metropolitan Police

26 Department ("LVMPD") and Tashii Farmer. There is a stark contrast between the story told in

27 Plaintiffs' First Amended Complaint and the evidence. In their First Amended Complaint, Plaintiffs

28 allege the following: around 12:50 a.m. on May 14, 2017, Farmer approached Ofc. Lopera and his

                                    1

partner, Ofc. Ashley Lif, inside the Venetian. First Am. Compl. ¶ 16. Farmer said he was being chased, requested help, and appeared mentally ill. *Id.* ¶ 17. Plaintiffs allege that instead of helping, Ofc. Lopera treated him as a suspect, causing Farmer to run. *Id.* ¶ 18. Ofc. Lopera followed Farmer through a hallway, and they exited to an outside roadway. *Id.*

Once Ofc. Lopera caught Farmer, he used his taser and hands to subdue Farmer. *Id.* ¶¶ 20-21. Defendant Sergeant Travis Crumrine ("Sgt. Crumrine") then arrived. *Id.* ¶ 23. A few seconds later, Ofc. Lopera "administered a neck restraint known as the Lateral Vascular Neck Restraint" ("LVNR"). *Id.* ¶ 22; *see also id.* ¶ 24 (Ofc. Lopera applied the LVNR "within seconds" of Sgt. Crumrine's arrival). Approximately 30 seconds later, Sgt. Crumrine said to "let him go." *Id.* ¶ 24. Plaintiffs incorrectly allege that in total, Ofc. Lopera applied an LVNR for over a minute. *Id.* ¶ 22.

Defendants Ofc. Michael Tran and Michael Flores arrived while Ofc. Lopera was applying the LVNR. *Id.* ¶ 25. They "handcuffed Decedent Farmer and observed Decedent Farmer unconscious while Defendant Officer Lopera was applying the neck restraint." *Id.* Plaintiffs again incorrectly allege (as disproven by video) that Ofc. Lopera continued to apply the LVNR even after Farmer was handcuffed and subdued. *Id.* ¶ 26. Plaintiffs allege that Farmer was unconscious when Ofc. Lopera released the LVNR and was pronounced dead at Sunrise Hospital. *Id.* ¶ 29. Farmer died of asphyxia due to police restraint procedures. *Id.* ¶ 31.

Plaintiffs claim that Ofc. Lopera should have recognized Farmer had a mental illness and responded appropriately. *Id.* ¶ 30. Plaintiffs allege that Ofc. Lopera violated Farmer's rights by applying a fatal LVNR and "failing to properly recognize a person exhibiting symptoms of mental confusion and mental disorder . . . ." *Id.* ¶ 44.[1] Defendant LVMPD should have prohibited its officers from using neck restraints and also failed to train Ofc. Lopera "how to avoid applying a

---

[1]     As pled, Plaintiffs' excessive force claim is limited to the LVNR and the alleged failure to recognize Farmer's mental illness. First Am. Compl. ¶ 44. Accordingly, Plaintiffs are precluded from relying on the taser and hand strikes for this claim. *See, e.g., Beckwith v. Pool*, No. 2:13-CV-125-JCM-NJK, 2015 WL 1988788, at *6 (D. Nev. May 1, 2015), aff'd sub nom. 687 F. App'x 665 (9th Cir. 2017) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004)) (the liberal pleading standards "are inapplicable after discovery has commenced."); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (the "complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations."); *Gilmour*, 382 F.3d at 1315 (the liberal pleading standard does not require a defendant to infer all possible claims that could arise out of facts).

2

lethal neck restraint . . . ." *Id.* ¶¶ 34-35. LVMPD also failed to train Ofc. Lopera "how to recognize a person exhibiting symptoms of mental confusion and mental disorders and how to properly respond to [such] a person . . . ." *Id.* ¶ 36. LVMPD also failed to train Defendants Sgt. Crumrine and Ofc. Flores and Tran "how to properly and effectively intervene and intercede to prevent the use of excessive force." *Id.* ¶ 28.

In stark contrast to Plaintiff's allegations, the uncontested evidence tells a dramatically different story. Just as Ofc. Lopera suspected, Farmer was under the influence of a controlled substance, methamphetamine. There is no evidence that Farmer's behavior was due to mental illness rather than drugs. Upon seeing the uniformed police officers, Farmer fled into a restricted corridor not open to the public inside the Venetian. In a moment of well-reasoned candor, even Scott DeFoe, Plaintiffs' use-of-force expert, concedes that Ofc. Lopera was justified to pursue Farmer in the hallway. Ex. A, DeFoe Dep., Aug. 21, 2018, at 30:14-15. Plaintiffs' use of force expert is not alone in this opinion - Sergeant Michael Bland and Assistant Sheriff Tim Kelly also have testified that Ofc. Lopera was justified to pursue Farmer in the hallway. Ex. B, Bland Dep. Dec. 21, 2017, at 25:22-23; *see also* Ex. C, Kelly Dep., Oct. 25, 2018, 109:5-7. After Farmer and Ofc. Lopera exited the Venetian, it appeared from Ofc. Lopera's perspective that Farmer attempted to carjack a truck, as a nonparty security guard testified. The driver of the truck testified that he locked his doors out of "fear" because Farmer was acting "very erratically."

As soon as he reached the truck, Ofc. Lopera, in accordance with LVMPD's policies and training, gave verbal commands to Farmer by stating, "Stop, don't move." Farmer did not comply. Ofc. Lopera further warned Farmer that he needed to comply or would be tasered. Again, Farmer did not comply, and Ofc. Lopera deployed his taser. After the taser cycle concluded, Ofc. Lopera directed Farmer to get on his stomach. Again, Farmer refused to comply with this command and instead sat up and reached for his left ankle. At that time, Farmer had not yet been checked for weapons, so Ofc. Lopera did not know if Farmer was reaching for a weapon. Ofc. Lopera deployed his taser a second time and called for a "code red" to indicate an emergency. Ofc. Lopera again told Farmer to get on his stomach, but Farmer again disobeyed by sitting upright and reaching for his left ankle. Ofc. Lopera then deployed his taser a third time. In response, Farmer reached with his

1   left arm in an attempt to remove the taser prongs.

2          As Farmer reached towards the taser prongs, Ofc. Lopera repeatedly ordered him to get on

3   his stomach. Farmer finally started to comply and began to roll onto his stomach. Suddenly, Farmer

4   rolled from his stomach to his back. Ofc. Lopera said, "Stop, you're going to get it again." Ofc.

5   Lopera also yelled "help me out" to two nearby Venetian security guards to ask for their assistance

6   in subduing Farmer. The guards approached Farmer and repeatedly said "turn around" while one

7   attempted to grab Farmer's left arm. Ofc. Lopera then attempted to assist the guards. While the

8   guards and Ofc. Lopera were attempting to restrain him, Farmer suddenly struck Ofc. Lopera, which

9   shook Ofc. Lopera's body-worn camera ("Body Worn Camera") and made an audible "thud" on

10  the Body Worn Camera. Ex. D, Body Worn Camera at 02:34 - 02:35; *see also* Ex. A, DeFoe Dep.

11  169:6-21 ("Q. Boom. You heard the impact that time? A. Yes.") A ground struggle then ensued.

12         In the midst of the ground struggle, Sgt. Crumrine arrived and immediately ordered Farmer

13  to "[g]et your f*****g hands behind your back." This command can be heard at 03:02 in Ofc.

14  Lopera's Body Worn Camera.[2] Plaintiffs allege Ofc. Lopera applied an LVNR "within seconds" of

15  Sgt. Crumrine's arrival, which would mean Ofc. Lopera applied the LVNR around 03:04 in the

16  Body Worn Camera. Between 03:13 and 03:21 in his Body Worn Camera, Ofc. Lopera asked Sgt.

17  Crumrine three times whether Farmer was "out." At 03:24, Sgt. Crumrine responded, "Go ahead,

18  let him go Ken." Ofc. Lopera said "Are you sure," and at 03:26, Sgt. Crumrine responded, "Yeah."

19  Plaintiffs' use-of-force expert admits that when Sgt. Crumrine said "yeah," Ofc. Lopera released

20  the pressure from Farmer's neck while properly keeping his arms around Farmer. Accordingly, per

21  Plaintiffs' theory of the case, Ofc. Lopera could have applied pressure to Farmer's neck for only

22  around 22 seconds.

23         Ultimately, it took four officers – Sgt. Crumrine and Ofc. Flores, Lopera, and Tran – to

24  handcuff Farmer. During the ground struggle, Farmer exhibited significant physical strength. One

25  of the nonparty security guards said Farmer was the strongest person he had ever seen. Ex. E,

26  Infantino Dep., Dec. 21, 2017, at 58:11-21 (Farmer was "extremely strong," and Infantino "couldn't

27

28  ────────────────
    [2]     All time references for the Body Worn Camera refer to the time count in Windows Media
    Player.

                                        4

even move" Farmer's arm); 60:2-4 (Infantino had never seen anyone that strong); 59:13 – 60:1 (Infantino believes Farmer must have been on drugs because he had "never seen anybody like that.").

During the incident, Farmer committed multiple crimes by being under the influence of a controlled substance (meth), striking an officer, resisting arrest, and trespass. NRS 453.411(3)(a) (being on a schedule I drug is a felony); *see also* NAC 453.510(7) (meth is a schedule I drug); NRS 200.471(2)(d) (striking an officer is a felony); NRS 199.280(3) (resisting arrest is a misdemeanor); NRS 207.200 (trespass is a misdemeanor). The coroner testified that although Farmer had some nonstructural, hemorrhagic neck injuries consistent with a neck restraint, she was unable to determine if Farmer died from a neck restraint. She also believes meth and an enlarged heart were "significant conditions" in his death. Plaintiffs' expert cardiologist concedes that (1) meth and resisting the officers contributed to his death, and (2) Farmer may have lived but for the meth.

Based on the uncontested evidence, Ofc. Lopera is entitled to summary judgment as to Plaintiffs' claims. As for the Fourteenth Amendment claim, there is no evidence Ofc. Lopera acted to harm Farmer or for any reason other than a legitimate law enforcement purpose. As for the Fourth Amendment claim, the force used by Ofc. Lopera was reasonable because Farmer was on meth, struck Ofc. Lopera, disobeyed commands, actively and aggressively resisted, and demonstrated super-human strength during the arrest. Ofc. Lopera also is entitled to qualified immunity on all federal claims because based on legal precedent at the time of the incident, a reasonable officer could have believed Ofc. Lopera's actions did not violate any rights.

As for the state law claims, Ofc. Lopera is entitled to discretionary immunity because he was performing discretionary duties as a police officer. Summary judgment also is warranted on the negligence and battery claims because Ofc. Lopera's conduct was reasonable, lawful, and justified. This Court therefore should enter summary judgment for Ofc. Lopera. This Court should also enter an order that Farmer could in fact have been charged with multiple crimes, *i.e.*, (1) being under the influence of meth, NRS 453.411(3)(a); NAC 453.510(7); (2) trespass, NRS 207.200; and

(3) resisting arrest, NRS 199.280(3).[3]

## II.   UNDISPUTED FACTS.

1.   <u>*Fact #1*</u>**: As Part of "Operation Safe Strip," Ofc. Lopera's Mission Was to Keep Las Vegas Boulevard Safe.**

At the time of the incident, Ofc. Lopera was assigned to "Operation Safe Strip," which was intended to keep Las Vegas Boulevard safe. Ex. F, Ofc. Lif Dep., Dec. 20, 2017, 14:7-24; *see also* Ex. C, Sheriff Kelly Dep., Oct. 25, 2018, 104:17-18.

2.   <u>*Fact #2*</u>**: Farmer Had Methamphetamine in His System and an Enlarged Heart.**

At the time of the incident, Farmer had a significant quantity of meth in his system and an enlarged heart. Ex. G, Autopsy Report, May 31, 2017, Pls.' Doc. Produc. 000468 (meth and cardiomegaly were "significant conditions" in his death); *see also* Ex. H, Dep. of Coroner A. Olson, Sept. 12, 2018, 12:5-22 (authenticating the autopsy report); 29:19-21 (Farmer had an enlarged heart); 35:21-23 (Farmer had meth in his system); Ex. I, Toxicology Report, May 31, 2018, Pls.' Doc. Produc. 000438-445 at 439 (Farmer had d-meth in his system).[4]

3.   <u>*Fact #3*</u>**: There is No Evidence Farmer's Behavior Was Due to Mental Illness Rather than Meth or that Ofc. Lopera Knew or Should Have Known Farmer Had a Mental Illness.**

Plaintiffs allege Farmer "expressed symptoms of mental confusion and appeared to be suffering from a mental disorder." First Am. Compl. ¶ 17. They further allege Ofc. Lopera violated Farmer's rights by failing to recognize his mental illness. *Id.* ¶¶ 30, 44. Ofc. Lif testified that Farmer approached her and Ofc. Lopera in the Venetian. Ex. F at 21:1-15. He was sweating, asked where he could find water, said he was being followed and had run, and asked to be escorted. *Id.* 22:1-

---

[3]      In 2017, Undersheriff Kevin McMahill publicly announced Farmer would not have been charged with a crime if he had survived. *See, e.g.,* Crosby, Rachel and Wesley Juhl, *Las Vegas Police Officer Involved in Man's Chokehold Death to be Charged*, Las Vegas Review-Journal, June 5, 2017, available online at https://www.reviewjournal.com/crime/homicides/las-vegas-police-officer-involved-in-mans-chokehold-death-to-be-charged-video/ (last accessed Jan. 25, 2019).

[4]      Because Plaintiffs produced this toxicology report, it is considered authentic when offered against them. *See, e.g., Prime Ins. Syndicate, Inc. v. Damaso*, 471 F. Supp. 2d 1087, 1093 (D. Nev. 2007) ("[D]ocuments produced by a party in discovery are considered authentic when a party-opponent offers them."); *see also Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 777 n.20 (9th Cir. 2002); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 781 (C.D. Cal. 2004).

10.[5] All of these symptoms are indicia of being under the influence of illegal drugs. Ofc. Lif does not recall Farmer being frightened or afraid. *Id.* 23:22-24. Ofc. Lopera's Body Worn Camera camera shows that before he fled into a private hallway, Farmer was pacing back and forth sharply and erratically. Ex. D, Body Worn Camera at 00:08 - 00:12.

There is no evidence Farmer's behavior was due to mental illness rather than meth or that Ofc. Lopera knew or should have known Farmer had a mental illness. *See, e.g., Wells Fargo Bank N.A. v. SFR Investments Pool I, LLC*, 2:16-CV-02257-JCM-CWH, 2018 WL 5499539, at *2 (D. Nev. Oct. 29, 2018) (Ofc. Lopera may obtain summary judgment by demonstrating an absence of evidence to support an element of Plaintiffs' case). Plaintiffs failed to disclose an expert to opine that Farmer's behavior was due to mental illness or that Ofc. Lopera knew or should have known Farmer was suffering from mental illness.

Dr. William Smock, one of Plaintiffs' medical experts, failed to review Farmer's mental health records. Ex. K, Smock Dep., Oct. 29, 2018, 20:7-24. Dr. Alon Steinberg, Plaintiffs' expert cardiologist, said meth likely caused Farmer to disobey commands and attempt to flee. Ex. L, Steinberg Dep., Oct. 24, 2018, 25:9-11 ("[B]ecause of his methamphetamine, he probably didn't comply with the officers and didn't understand their commands and ran away."); 27:2-6 ("[B]ecause they're disoriented and psychotic, [people on meth] can get into accidents, and also they can be suicidal and commit suicide or get in confrontations with police and die.") Plaintiffs' use-of-force expert admits he does not know if Farmer failed to comply with commands due to mental illness, drugs, or another reason. Ex. A, DeFoe Dep., Aug. 21, 2018, 100:8-18. He also admits Farmer appeared to be "[u]nder the influence, mentally ill, or both." *Id.* 28:19 – 29:10. Finally, he also admits that even if Ofc. Lopera had known Farmer was mentally ill and not on drugs, he still should have pursued Farmer. *Id.* 8:6-11.

---

[5] The outside temperature was around 70*F at that time. Ex. J, Weather Data, LOPERA02661-2677 at LOPERA02671 (at 12:56 a.m. on May 14, 2017, it was 70*F at McCarran airport). If necessary, this Court can and should take judicial notice of this temperature. *See, e.g., Gilmore v. Lockard*, 2017 WL 615155, at *5, n.1 (E.D. Cal. Feb. 14, 2017) ("When weather information is not reasonably disputed, courts have taken judicial notice of data from sources such as those referenced in this report, under Federal Rule of Evidence 201.")

4.   **_Fact #4_: Farmer Fled into a Nonpublic Hallway at the Venetian, and Ofc. Lopera Was Justified to Pursue Him.**

Plaintiffs allege that Farmer "attempted to run from the officers and was chased by Defendant Officer Lopera through a chained off hallway and eventually to the outside roadway on The Venetian property." First Am. Compl. ¶ 18; *see also* Ex. D, Ofc. Lopera's Body Worn Camera (Farmer flees into the hallway around 00:15). The hallway into which Farmer fled is a non-public corridor that leads to the back of the casino and is never open to the public. Ex. F, Ofc. Lif Dep. 51:19 – 52:2. It also was blocked off by yellow cones and a chain, and Farmer was in such a rush to flee from Ofc. Lopera and Lif that he ran through the chain and knocked over the cones. Ex. D, Body Worn Camera at 00:12 – 00:13; *see also* Ex. M, Snapshot of the Body Worn Camera at 00:12. Plaintiffs' use-of-force expert admits Ofc. Lopera was justified to pursue Farmer into the hallway. Ex. A at 30:14-15; *see also* Ex. C, Kelly Dep. 109:5-7 (same); Ex. B, Bland Dep. 25:22-23 (same).

5.   **_Fact #5_: It Appeared to Ofc. Lopera that Farmer Was Attempting to Carjacking a Truck**.

After trespassing through the employee-only area of the casino, Farmer finally exited the Venetian through a rear door. Ex. E, Infantino Dep., Dec. 21, 2017, 11:4-6; 21:14 – 22:24; 57:24 - 58:4. Sometime later, Ofc. Lopera also exited the door and followed Farmer. *Id.* 23:25 - 24:8; 26:8- 10; *see also* Ex. D, Body Worn Camera (showing Ofc. Lopera exit around 01:17). A Venetian security guard followed behind Ofc. Lopera, and he testified that from his perspective, it appeared Farmer was attempting to carjack a white truck. Ex. E, Infantino Dep. 26:8 – 27:8 (Farmer "appeared to have his hands on the [tailgate] of a white pickup truck."); 60:10-18 ("It looked like [Farmer] was trying to get away from the officer" and "want[ed] to jump into a back of a pickup."); Ex. D, Body Worn Camera at 01:25 – 01:35 (showing Farmer near the truck); *id.* 04:16 – 04:17 (Ofc. Lopera told Sgt. Crumrine and Ofc. Flores and Tran, "He tried to carjack somebody.") As Ofc. Lopera approached, Farmer ran towards the driver's door of the truck. Ex. D, Body Worn Camera at 01:31 - 01:36. The driver locked his doors out of "fear" because Farmer "was acting very erratically." Ex. N, J. Pierce Dep., April 26, 2018, 48:15-22.

Plaintiffs' use-of-force expert admits that if Ofc. Lopera reasonably believed Farmer was attempting to carjack the truck, then tasering Farmer was reasonable. Ex. A at 71:11 – 73:1 ("[I]f

[Ofc. Lopera] reasonably believes that someone is being carjacked, if that's his reasonable belief at the time of the force, then [the use of the taser] would be reasonable."); 73:2-5, 78:14-20.

6.   _Fact #6_: **Ofc. Lopera's Taser Had Only Three Complete Circuit Closures.**

Plaintiffs' use-of-force expert opines that Ofc. Lopera tasered Farmer seven times. Ex. O, DeFoe Report, April 16, 2018, pg. 10. However, he did not consider whether there was a complete circuit closure each time Ofc. Lopera pulled the trigger. _Id._ Ofc. Lopera's use-of-force expert reviewed the taser's download log and concluded a complete circuit closure occurred on only three trigger pulls. Ex. P, Borden Report, July 2, 2018, BORDEN012-13, ¶ 24.[6] Plaintiffs have not even attempted to rebut this opinion. Ex. Q, Pls.' First Supp. Rebuttal Expert Disclosure, Aug. 13, 2018 (showing that Plaintiffs did not disclose a rebuttal report from DeFoe); _see also_ Ex. A, DeFoe Dep. 90:6 – 91:9 (DeFoe is not qualified to read the taser's pulse graphs).

7.   _Fact #7_: **Farmer Disobeyed Commands, Struck Ofc. Lopera, Actively and Aggressively Resisted, and Demonstrated Super-Human Strength.**

When he reached Farmer near the truck, Ofc. Lopera immediately said, "Stop, don't move." Ex. D, Body Worn Camera at 01:31 – 01:34. Farmer disobeyed by running, and Ofc. Lopera deployed his taser. _Id._ 01:34 – 01:37; _see also_ Ex. A, DeFoe Dep. 115:2-20 (admitting Farmer did not comply). After deploying his taser, Ofc. Lopera said, "Get on your stomach." Ex. D, Body Worn Camera at 01:42 – 01:43. Farmer refused to comply and then sat up and reached for his left ankle. _Id._ 01:43 – 01:45; _see also_ Ex. A, DeFoe Dep. 159:25 – 160:9 (admitting Farmer disobeyed by sitting). At that time, Farmer had not yet been checked for weapons, so Ofc. Lopera did not know if Farmer was reaching for a weapon near his left ankle. Ex. R, Ofc. Tran Dep., Dec. 20, 2017, 32:16-23 (Farmer was patted down for weapons after being handcuffed); _see also_ Ex. C, Kelly Dep. 69:2-4. In response to Farmer's actions, Ofc. Lopera deployed his taser a second time and called

---

[6]      An expert report can be used to support a dispositive motion. _See, e.g., Nationstar Mortg., LLC v. Berezovsky_, No. 2:15-CV-909-JCM-CWH, 2017 WL 579891, at *7 (D. Nev. Feb. 13, 2017). "The form of the evidence is not the focus of analysis for the purposes of summary judgment." _Id._ (citing _Fraser v. Goodale_, 342 F.3d 1032, 1036–37 (9th Cir. 2003)). Instead, the focus is on the admissibility of the contents of the evidence. _Id.; see also Reardon v. Progressive Nw. Ins. Co._, 2010 WL 11566019, at *2 (W.D. Wash. Dec. 13, 2010) (citing _Fraser_ and stating "the content of [medical reports] may be used by the Court on summary judgment because the doctors would be able to testify as to their expert opinion regarding causation and extent of injuries.")

1  for a "code red" to indicate an emergency. Ex. D, Body Worn Camera at 01:45 – 01:50; *see also*

2  Ex. S, Sgt. Crumrine Dep., Dec. 27, 2017, 22:11-24.

3        After deploying his taser a second time, Ofc. Lopera told Farmer to get on his stomach, but

4  Farmer again disobeyed by sitting and reaching for his left ankle. Ex. D, Body Worn Camera at

5  01:50 – 01:55. Ofc. Lopera then deployed his taser a third time. *Id.* 01:55. In response, Farmer

6  reached with his left arm towards the taser prongs on his back. *Id.* 01:55 – 01:57; *see also* Ex. A,

7  DeFoe Dep. 164:6-20 (admitting he does not know if Farmer reached for the prongs to pull them

8  out); 86:1-17 (admitting that if an officer had justification to taser a suspect and the suspect

9  attempted to remove a prong, redeploying the taser would be reasonable).

10        As Farmer reached towards the prongs, Ofc. Lopera repeatedly ordered him to stop moving

11  and to get on his stomach. Ex. D, Body Worn Camera at 01:53 – 01:59. Once Farmer finally

12  complied, Ofc. Lopera grabbed his left arm. *Id.* 01:57 - 02:08. Suddenly, Farmer rolled from his

13  stomach to his back. *Id.* 02:08 – 02:11. Ofc. Lopera responded by saying, "Stop, you're going to

14  get it again." *Id.* 02:11 – 02:15. He also yelled "help me out" to two nearby security guards. *Id.*

15  02:16 – 02:17; *see also* Ex. A, DeFoe Dep. 166:4-9 (admitting Ofc. Lopera needed help at this

16  moment); 35:23 – 36:3. The guards approached Farmer and repeatedly said "turn around" while

17  one attempted to grab Farmer's left arm. Ex. D, Body Worn Camera at 02:17 – 02:21. Ofc. Lopera

18  went to assist the guards. *Id.* 02:21 – 02:32.

19        Plaintiff's use of force expert admits that while the guards and Ofc. Lopera were attempting

20  to restrain him, Farmer suddenly struck Ofc. Lopera in the chest area. The strike made an audible

21  "thud" and shook Ofc. Lopera's Body Worn Camera. Ex. D, Body Worn Camera at 02:34 - 02:35;

22  *see also* Ex. A, DeFoe Dep. 169:6-21 ("Q. Boom. You heard the impact that time? A. Yes.")

23  Plaintiffs' use-of-force expert admits Farmer was actively resisting at this point. *Id.* 169:22-25

24  ("That's active resistance at that point."); *see also* Ex. T, Use of Force Policy, LVMPD 0001-44 at

25  LVMPD 0007, ¶ 3 (attempting to avoid being taken into custody without trying to harm an officer

26  is "active resistance." It includes, walking, running, and breaking an officer's grip). Per LVMPD

27  policy, when he contacted Ofc. Lopera, Farmer was aggressively resisting by displaying an intent

28  to harm. *Id.* at LVMPD 0008, ¶ 4 (displaying an intent to harm is "aggressive resistance." It includes

1  taking a fighting stance, punching, kicking, and striking). Ofc. Lopera also had reason to believe

2  Farmer was aggressively resisting when he attempted to carjack the truck because entering and

3  taking a vehicle by force demonstrates an intent to harm. *Id.*

4       In addition to the fact Ofc. Lopera's Body Worn Camera captured Farmer disobeying

5  commands and actively and aggressively resisting, five witnesses also observed Farmer resist and

6  attempt to escape:

7       1.   ***First***, nonparty security guard Peter Infantino saw Farmer fight with Ofc.

8            Lopera, ignore commands, and attempt to escape. Ex. E at 33:15-20 ("Q.

9            What is Mr. Farmer doing? A. Still fighting. Q. When you say 'fighting,'

10           what are you saying? A. Struggling, you know, trying to, like, get away,

11           you know."); 34:2 (Farmer attempted to "[a]void being detained . . . .");

12           40:17-19 (Farmer ignored commands and "kept fighting").

13      2.   ***Second***, nonparty witness Jonathan Pierce said Farmer "was trying to get

14           away," "was actively resisting arrest," was not obeying commands, and

15           resisted the entire time. Ex. N at 54:10-24 ("[A]t no point did it seem like

16           [Farmer] was staying down. He always seemed to be trying to get away.");

17           55:2-3 (Farmer "was actively resisting arrest, and at no point did I feel like

18           he was complying."); 74:16-18 ("Q. The entire time that you had a visual,

19           he appeared to be resisting? A. I thought he was, yes."); 42:4-10.

20      3.   ***Third***, Ofc. Tran said Farmer "wasn't complying" with commands. Ex. R

21           at 75:14-15.

22      4.   ***Fourth***, Sgt. Crumrine said Farmer "was still resisting" while being

23           handcuffed. Ex. S at 88:8-12.

24      5.   ***Fifth***, Ofc. Flores said Farmer "was resisting." Ex. U at 51:7.

25      6.   ***Finally,*** Plaintiffs' use-of-force expert admits Farmer resisted. Ex. A, at

26           181:21 – 182:3; 8:23-25 ("[Q.] . . . [I]f Mr. Farmer was not resisting, why

27           did it take three officers to handcuff him? A. I don't know.")

28  Even after being tasered, Farmer demonstrated incredible strength. Nonparty security guard

1    Infantino said Farmer was the strongest person he had ever seen, and he was unable to move

2    Farmer's arm. Ex. E at 58:11-21 (Farmer was "extremely strong," and Infantino "couldn't even

3    move" Farmer's arm); 60:2-4 (Infantino had never seen anyone that strong); 59:13 – 60:1 (Infantino

4    believes Farmer must have been on drugs because he had "never seen anybody like that."). Sgt.

5    Crumrine said Farmer was "pretty strong" and broke his grip. Ex. S at 34:5-16; 86:21-23.

6          **8.     _Fact #8_: Farmer Committed at Least Three Crimes.**

7          Farmer committed at least three crimes. ***First***, he committed a felony by being on meth.

8    NRS 453.411(3)(a) (being on a schedule I drug is a felony); *see also* NAC 453.510(7) (meth is a

9    schedule I drug); Ex. A, DeFoe Dep. 7:5-15 (being on drugs is a crime). ***Second***, he committed a

10   felony by striking Ofc. Lopera. NRS 200.471(2)(d). ***Third***, he committed a misdemeanor by

11   resisting arrest. NRS 199.280(3). It also appeared to Ofc. Lopera that Farmer committed a felony

12   by attempting to carjack the truck. NRS 205.228 (grand larceny of a motor vehicle is a category B

13   or C felony).[7]

14          **9.     _Fact #9_: Ofc. Lopera Applied a "Lateral Vascular Neck Restraint," and
               He Was Trained and Authorized to Use It.**

15

16          Plaintiffs allege Ofc. Lopera "administered a neck restraint known as the Lateral Vascular

17   Neck Restraint, approved and taught by Defendant LVMPD." First Am. Compl. ¶ 22.[8] LVMPD

18   trained Ofc. Lopera to apply the LVNR. Ex. B, Bland Dep., Dec. 21, 2017, at 94:2-6 (Sgt. Bland is

19   LVMPD's person most knowledgeable on use of force training); 104:2-4 (Sgt. Bland is certified to

20   teach the LVNR); 91:8 – 92:3 (Ofc. Lopera received two hours of LVNR training annually); 53:21-

21   22 ("So we have one quarter that's devoted to LVNR each year."). At the time of the incident,

22   LVMPD allowed officers to apply the LVNR as a low-level use of force option. Ex. T, Use of Force

23   _____

24   [7]       As aforementioned, in 2017, Undersheriff Kevin McMahill publicly announced Farmer
     would not have been charged with a crime if he had survived

25   [8]       Plaintiffs also admitted under Rule 36 that Ofc. Lopera applied an LVNR. Ex. V, the
     Estate's Ans. to Ofc. Lopera's Req. #4, March 14, 2018, 4:10-11. On July 12, 2018, Plaintiffs
     moved to amend their complaint to allege Ofc. Lopera applied a rearnaked choke. ECF No. 71. On

26   July 17, 2018, they filed a motion to amend their Rule 36 admissions. ECF No. 72. On August 21,
     2018, Magistrate Judge Leen denied the motions. ECF No. 84. Plaintiffs therefore are conclusively

27   bound to their unequivocal allegation in their First Amended Complaint that the neck restraint was
     an LVNR. *See, e.g., Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008) ("Allegations in a

28   complaint are considered judicial admissions."); *see also PN II, Inc. v. Aspen Mfg., Ltd.*, 2:14–cv–
     01382–APG–VCF, 2017 WL 4387370, at *4, n.1 (D. Nev. Sept. 29, 2017).

1  Policy, LVMPD 0001-44 at LVMPD0008 (a level 1 LVNR is a low force option and level 2 is an

2  intermediate force option).

3      **10.    *Fact #10*: LVMPD Taught Ofc. Lopera that the LVNR is Safe**.

4          The LVNR compresses the carotid arteries, thereby "restricting blood flow to the brain,

5  causing the subject to pass out." Ex. T at LVMPD 0015; *see also* Ex. W, LVNR Trainer Manual by

6  James Lindell, LVMPD0587-720, at LVMPD0659-662 (showing photographs of the LVNR).

7  LVMPD taught Ofc. Lopera that an LVNR can "be effective against persons under the influence of

8  alcohol or drugs who may possess tremendous strength and resistance to pain . . . ." Ex. X, LVMPD

9  Defensive Tactics Manual, Feb. 2016, LVMPD 0070-272, at LVMPD 0223.

10         LVMPD also taught Ofc. Lopera that the LVNR is safe. Ex. W at LVMPD 0589 (the LVNR

11  is "truly safe"); *see also* Ex. T at LVMPD0015 (the LVNR can "safely stop" resistance); *id*.

12  LVMPD 0003, ¶ 13 (the LVNR allows "safe control"); Ex. X, LVMPD Defensive Tactics Manual,

13  Feb. 2016, LVMPD 0070-272, at LVMPD 0219 (the LVNR "provides a high level of safety"). In

14  fact, the LVNR training materials used by LVMPD claim the restraint "has never had a death

15  attributed to its use." Ex. W at LVMPD 0590; *see also id*. LVMPD 0601 (the LVNR has caused

16  "no deaths or serious injuries to any subject during 35 years of use."); *id*. LVMPD 0606 (the LVNR

17  "has been taught and used for 44 years with no deaths, serious injuries or litigation against any

18  agency or officer to date."); *id*. LVMPD 0607 ("[N]o officer who was instructed by an NLETC

19  certified trainer with current certification has caused a death or serious injury to a single subject.");

20  *id*. LVMPD 0615 (Kansas City officers have applied the LVNR more than 165,000 times without

21  any deaths or serious injuries); *id*. LVMPD 0622 ("There have been no substantiated deaths

22  attributed to the" LVNR). LVMPD also taught Ofc. Lopera that the LVNR likely does not cut off

23  all carotid blood flow. Ex. X at LVMPD 0217 ("[T]he forearm probably cannot generate enough

24  pressure to compress the carotid arteries by 80%.").

25      **11.    *Fact #11*: There is No Evidence Ofc. Lopera Continued to Exert
            Pressure on Farmer's Neck After Farmer Ceased Resistance**.
26

27         LVMPD trained Ofc. Lopera to "relax" the LVNR once the subject is under control. Ex. T

28  at LVMPD0015; *see also* Ex. X at LVMPD0223. "Relaxing" the hold merely means to release the

1   pressure, not to remove the encircling arm from the neck. *See, e.g.*, Ex. S, Sgt. Crumrine Dep. 44:19

2   – 45:3 ("I would not expect my officer, who is in a back-lying position with a subject on top of him,

3   to just completely put his arms out to the sides."); 59:4-16 ("I don't expect him to take his arm

4   completely away from this person."); *see also* Ex. Y, Det. Kirkegard Dep., July 20, 2018, 106:19 –

5   107:1 ("releasing the hold" means to release the pressure, not the encircling arm); Ex. A, DeFoe

6   Dep. 122:23 – 123:6 (DeFoe would defer to Det. Kirkegard's opinion).

7        When Sgt. Crumrine arrived at the scene, he immediately ordered Farmer to "[g]et your

8   f*****g hands behind your back." Ex. S, Sgt. Crumrine Dep. 86:11-12; *see also* Ex. D, Body Worn

9   Camera at 03:01 – 03:02. Ofc. Lopera asked Sgt. Crumrine three times whether Farmer was "out."

10  Ex. D, Body Worn Camera at 03:13 - 03:21.[9] These questions demonstrate that Ofc. Lopera did not

11  know whether Farmer was conscious and wanted to know his condition. Ex. A, DeFoe Dep. 118:25

12  - 119:18. Sgt. Crumrine responded, "Go ahead, let him go Ken." Ex. S, Sgt. Crumrine Dep. 36:20-

13  25; *see also* Ex. D, Body Worn Camera at 03:24 – 03:25. Ofc. Lopera said "Are you sure," and at

14  03:26 in the Body Worn Camera, Sgt. Crumrine responded, "Yeah." Ex. S, Sgt. Crumrine Dep.

15  37:10-20; 57:9 – 58:3; *see also* Ex. D, Body Worn Camera at 03:25 – 03:27.

16       There is no evidence that after Sgt. Crumrine said "yeah," Ofc. Lopera continued to apply

17  pressure to Farmer's neck. In fact, Sgt. Crumrine testified that Ofc. Lopera responded by relaxing

18  the hold. Ex. S at 59:18-23. Furthermore, Plaintiffs' use-of-force expert admits Ofc. Lopera released

19  the pressure "right around that time." Ex. A at 120:16-23; 51:23 – 52:1 (DeFoe does not know for

20  how long Ofc. Lopera exerted pressure on Farmer's neck); 123:14-15 ("I can't discern what level

21  of pressure was on his neck at any time."); 129:4-18 ("Q. If I simply have my encircling arm around

22  your neck and I'm not applying pressure, is that unreasonable or excessive force? A. Without

23  pressure, no."); 202:9-18 (admitting Ofc. Lopera could have followed Sgt. Crumrine's command

24  by releasing the pressure while still keeping an encircling arm on Farmer's neck).

25

26  ───────────────

    [9]      Sgt. Crumrine testified that before Ofc. Lopera asked if Farmer was "out," he may have told

27  Ofc. Lopera, "Let him go, Ken." Ex. S, Crumrine Dep. 36:4-19. There is no evidence, however,
    that Ofc. Lopera heard Sgt. Crumrine say, "Let him go, Ken." Sgt. Crumrine does not know if Ofc.

28  Lopera heard this statement. Ex. CC, Crumrine Dep. in case no. 2:18-cv-00860-GMN-VCF, Dec.
    10, 2018, 172:7-15. Based on the fact Ofc. Lopera proceeded to ask three times if Farmer was "out,"
    it is clear Ofc. Lopera never heard Sgt. Crumrine tell him, "Let him go, Ken."

14

12. _Fact #12_: **Plaintiff's Allegation that Ofc. Lopera Applied the LVNR for over a Minute has been Objectively Disproven.**

Plaintiffs allege Ofc. Lopera applied the LVNR "for over one minute." First. Am. Compl. ¶ 22. That allegation is false. Plaintiffs allege Ofc. Lopera first applied the LVNR "within seconds" after Sgt. Crumrine arrived. _Id._ ¶ 24. As aforementioned, when he arrived, Sgt. Crumrine immediately ordered Farmer to "[g]et your f*****g hands behind your back" at 03:02 in the Body Worn Camera. Accordingly, per the First Amended Complaint, Ofc. Lopera first applied the LVNR at around 03:04 in the Body Worn Camera.[10] As also aforementioned, Plaintiffs' use-of-force expert admits that when Sgt. Crumrine said "yeah," Ofc. Lopera released all pressure from Farmer's neck.

If Ofc. Lopera first applied the LVNR at around 03:04 in the Body Worn Camera (as Plaintiffs allege) and released the pressure to Farmer's neck when Sgt. Crumrine said "yeah" at 03:26 in the Body Worn Camera (as Plaintiffs' use-of-force expert admits), then Ofc. Lopera would have applied pressure to Farmer's neck for no more than around 22 seconds.[11]

13. _Fact #13_: **The Coroner, Dr. Alane Olson, Was Unable to Determine if Farmer Died from a Neck Restraint.**

In her autopsy report, coroner Dr. Alane Olson concluded Farmer died as a result of asphyxia due to "police restraint procedures." Ex. H, Olson Dep. 32:21-24.[12] When asked why she used the phrase "police restraint procedures" rather than "neck hold," she said it was because she

---

[10]    It should be noted that even it were assumed _arguendo_ that Ofc. Lopera successfully applied an LVNR to Farmer at around 03:04 in the Body Worn Camera (which Ofc. Lopera does not admit), it still would be uncertain whether Farmer would have lost consciousness. In 2012, an instructor from the Calgary Police applied a vascular neck restraint to 24 participants, and cervical blood flow was studied during the restraint. Ex. Z, _Belenkie, Israel, et. al., Mechanism of Loss of Consciousness During Vascular Neck Restraint_, 112 J. Appl. Physiol. 369 (2012), LOPERA00959-965; _see also_ Ex. K, Smock Dep. 98:9 – 100:22 (discussing the article). Four of the participants did not lose consciousness. Ex. L, Steinberg Dep. 33:19 – 35:4; _see also_ Ex. K, Smock Dep. 100:15-22. Based on this study, Plaintiffs' expert cardiologist believes it is possible to remain consciousness during a vascular neck restraint. Ex. L, Steinberg Dep. 34:25 - 35:4 ("Q. Would you agree that, based upon that article, it's possible for someone to have a vascular neck restraint applied to them and for them not to lose consciousness? A. Yes.") He also believes that on its own, the blockage of carotid blood flow will not cause sudden death. _Id._ 15:19 - 16:13 ("[W]hen people have a chokehold, there's decreased flow in the carotid artery, and that causes them to syncopize and lose consciousness, _but that's not what causes people to die suddenly_.") (emphasis added).
[11]    To be clear, Ofc. Lopera does not admit he applied pressure to Farmer's neck for 22 seconds. He simply is demonstrating that even if all inferences were drawn in favor of Plaintiffs, a reasonable mind still could not conclude that he applied an LVNR for a minute or more.
[12]    When he formed his opinions, Plaintiffs' medical expert Dr. William Smock erroneously assumed that "police restraint procedures" meant a neck restraint. Ex. K at 115:24 - 116:8.

cannot determine if Farmer died from a neck hold, positional asphyxia, or a combination of the two. *Id.* 34:17 – 35:14 ("I don't have any way of sorting out, was it all neck hold, was it all position, was it a combination of the two . . . .").[13] During autopsy, Farmer had nonstructural, hemorrhagic neck injuries consistent with a neck restraint. *Id.* 27:25 – 28:13; 14:14 – 15:15 (there were no bone or cartilage injuries); 16:2 – 23:5 (summarizing the neck injuries). Not all of his neck injuries, however, were due to compression; rather, some were due to shearing forces, and Dr. Olson was unable to identify which injuries were from compression. *Id.* 24:10 – 25:9. Farmer also had injuries to the right side of his neck that were not present on the left side. *Id.* 22:14-19.

Dr. Olson also testified that to apply the LVNR, officers "are supposed to clasp hands and use the nonencircling arm to assist in placing pressure on the side of the restrainee's neck." *Id.* 45:5-7. When shown a video of the incident at her deposition, she could not identify a single instance in the video when Ofc. Lopera clasped his hands. *Id.* 64:22 – 65:7; *see also* Ex. AA, Venetian Video (this is the video Dr. Olson viewed). She acknowledged, in fact, that in part of the video, Ofc. Lopera's hands clearly were not clasped. Ex. H at 69:19-21 ("[Q.] . . . Would you agree with me that at 1 minute and 30 seconds, the officer's hands are not clasped? A. Yes.") Dr. Olson also said that in her opinion, it takes 3-4 minutes to die from asphyxia. Ex. H at 41:25 - 42:9. As aforementioned, there is no evidence Ofc. Lopera applied a neck restraint for that long.[14]

14. ***Fact #14*: Farmer's Meth Use and Refusal to Comply with Lawful Police Commands Caused or Contributed to His Death.[15]**

If Farmer had not been on meth and had obeyed commands and not resisted, the outcome

---

[13]     There are no allegations in the First Amended Complaint that Farmer died from positional asphyxia or anything other than a neck restraint. Accordingly, Plaintiffs are precluded from pursuing a "positional asphyxia" theory.

[14]     It should be noted Plaintiffs' medical expert Dr. William Smock believes pressure would have to be applied to the neck for a minimum of 62 seconds for death to occur from asphyxia due to strangulation. Ex. K, Smock Dep. 5:4 (Dr. Smock believes Farmer "died of asphyxia."); 60:2-13 (discussing a document in which Dr. Smock said it takes a minimum of 62 seconds to die from asphyxia due to strangulation); 88:16-17 (Dr. Smock claimed that based on an article entitled *Agonal Sequences in 14 Filmed Hangings*, "it [is] clear that you can die within 62 seconds when you obstruct blood flow . . . .")

[15]     Defendants' medical experts concluded Farmer died due to meth and his enlarged heart. Ofc. Lopera recognizes that ordinarily, dueling expert opinions create a question of fact for trial. For that reason, in addressing the cause of death in this Motion, Ofc. Lopera is not relying on Defendants' medical experts; instead, he is relying on the opinions of the coroner Dr. Alane Olson, independent medical literature, and the opinions of Plaintiffs' medical experts.

16

of his interaction with LVMPD would have been much different. Dr. Olson could not rule out meth and the enlarged heart as contributory factors. Ex. H, Olson Dep. 36:10-17. Dr. Alon Steinberg, Plaintiffs' expert cardiologist, said Farmer's enlarged heart likely was from a long history of drug use. Ex. L, Steinberg Dep. 12:6 – 13:7. He also said meth likely caused Farmer to disobey commands and attempt to flee. *Id.* 25:9-11; 27:2-6. Dr. Steinberg also believes meth contributed to Farmer's death by increasing his metabolic demand for oxygen and blood flow. *Id.* 24:25 - 25:2; 78:2 - 79:6. He also believes it is possible Farmer would have lived but for the meth. *Id.* 25:21-22. Finally, Dr. Steinberg believes Farmer's resistance contributed to his death by causing a fragile cardiovascular state. *Id.* 77:20 – 78:25. The medical evidence therefore shows that Farmer caused or contributed to his death.

### III.   LEGAL ARGUMENTS.

**A.   Ofc. Lopera is Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Claim.**

Plaintiffs allege Ofc. Lopera violated their Fourteenth Amendment right to a familial relationship with Farmer, First Am. Compl., ¶¶ 64-70. The Fourteenth Amendment protects citizens from official conduct that "shocks the conscience." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citing *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). When, as here, the incident occurred over a short time period and necessitated fast decisions and actions, a Fourteenth Amendment claim is viable only if the officer "acted with a purpose to harm [the decedent] that was unrelated to legitimate law enforcement objectives." *Porter*, 546 F.3d at 1137-39; *see also Wilkinson*, 610 F.3d at 554 (The purpose-to-harm standard "applies where a suspect's evasive actions force the officers to act quickly.") (in *Wilkinson*, summary judgment was warranted because there was no evidence the officer had a purpose to harm the plaintiff "apart from legitimate law enforcement objectives."); Ex. A, DeFoe Dep. 193:23 – 194:6 (admitting the officers faced an "evolving" situation).

In *Ericson v. City of Phoenix*, the plaintiffs alleged that an officer applied "a carotid hold for over four minutes, leading to Decedent's anoxic brain injury and death." 2016 WL 6522805, at *12 (D. Ariz. Nov. 3, 2016). The District of Arizona granted summary judgment on the Fourteenth

Amendment claim because there was no evidence the officer's use of force shocked the conscience. *Id.* at *12. There was no evidence the officer "had a purpose to harm Decedent for reasons unrelated to legitimate law enforcement objectives." *Id.* at *12. Likewise, in *Ross v. Lamberson*, a teacher abruptly twisted a fifth-grade girl's head, and she "suffered injuries to her neck and spine." 873 F. Supp. 2d 817, 818 (W.D. Ky. 2012). Other students heard her neck pop, and she still had pain three years later. *Id.* at 819. The Western District of Kentucky concluded that although twisting the child's head "may have been poor judgment" and "is clearly an inappropriate technique to control" a student, summary judgment was warranted on the Fourteenth Amendment claim because "the motivation behind the alleged head-twist was disciplinary." *Id.* at 821-22.

Every aspect of Ofc. Lopera's interaction with Farmer was in furtherance of a legitimate law enforcement purpose:

1.   ***The Pursuit Inside the Venetian*** – Ofc. Lopera had legitimate law enforcement reasons to pursue Farmer in the Venetian because (1) Farmer had been acting erratically; (2) Lopera perceived that Farmer was under the influence of a controlled substance, which provided reasonable suspicion for a stop. And, in fact, Farmer was committing a felony by being on meth; and (3) Farmer fled from the police for no reason and ran into a restricted area not open to the public. Even Plaintiffs' use-of-force expert concedes this pursuit was justified.

2.   ***The Pursuit Outside the Venetian*** – Ofc. Lopera had legitimate law enforcement reasons to pursue Farmer outside the Venetian because (1) Farmer had been acting erratically; (2) Farmer committed a felony by being on meth; and (3) as part of Operation Safe Strip, it was Ofc. Lopera's mission to keep Las Vegas Boulevard safe.

3.   ***The Initial Tasering*** – Ofc. Lopera had a legitimate law enforcement reason for the initial taser deployment because it appeared Farmer attempted to carjack a truck. Even Plaintiffs' use-of-force expert concedes it is appropriate to taser a suspected carjacker. LVMPD also concluded the initial tasering was within policy. Ex. C, Kelly Dep. 52:23-25.

4.   ***The Subsequent Taser Deployments*** – Ofc. Lopera had a legitimate law enforcement

18

reason for the subsequent taser deployments because Farmer kept disobeying commands by sitting upright and reaching towards his left ankle. Ofc. Lopera was alone without backup, and Farmer had not been searched for weapons.

5. ***The Hand Strikes*** – Ofc. Lopera had a legitimate law enforcement reason for striking Farmer because Farmer was resisting arrest and struck Ofc. Lopera. [16]

6. ***The LVNR*** – Ofc. Lopera had legitimate law enforcement reasons for applying an LVNR because (1) Farmer was actively and aggressively resisting; (2) LVMPD policy allowed Ofc. Lopera to apply an LVNR to an actively resisting suspect and higher levels to an aggressively resisting suspect; (3) Farmer exhibited incredible strength; (4) Farmer exhibited incredible pain tolerance by continuing to resist after being tasered; (5) Ofc. Lopera had been trained to apply an LVNR against persons under the influence who may possess tremendous strength and pain resistance; and (6) Ofc. Lopera had been trained that the LVNR is safe.

Simply stated, every action that Ofc. Lopera took was in furtherance of a legitimate law enforcement purpose. There is simply no evidence Ofc. Lopera had a purpose to harm Farmer. *See, e.g.*, Ex. BB, the Estate's Ans. to Ofc. Lopera's Interrog. #25, Sept. 17, 2018, 5:1 – 6:6 (failing to identify any such facts or evidence); *see also* Ex. A, DeFoe Dep., 136:12-14 (Plaintiffs' use-of-force expert does not know if Ofc. Lopera acted out of malice). For these reasons, Ofc. Lopera is entitled to summary judgment on the Fourteenth Amendment claim.

**B.  Ofc. Lopera is Entitled to Summary Judgment on Plaintiffs' Fourth Amendment Claim.**

Plaintiffs allege Ofc. Lopera violated the Fourth Amendment by using excessive force. *See, e.g.*, First Am. Compl. ¶ 28; ¶¶ 40-50. As the Supreme Court explained in the seminal case *Graham v. Connor*, excessive force claims are examined under an "objective reasonableness" standard. 490 U.S. 386, 388 (U.S. 1989). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 369 (citing *Terry v. Ohio*,

---

[16]    Ofc. Lopera does not admit he struck Farmer. He is simply demonstrating that even if it were assumed *arguendo* that he struck Farmer, he still would be entitled to summary judgment.

392 U.S. 1, 20-22 (1968)). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citing *Scott v. United States*, 436 U.S. 128, 137–139 (1978)). The inquiry "requires careful attention to the facts and circumstances of each particular case, including [(**1**)] the severity of the crime at issue, [(**2**)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(**3**)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 369 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

The three *Graham* factors "are not exclusive. Rather, [a district court should] examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir.2010)) (internal quotes omitted). The most important consideration under *Graham* "is whether the suspect posed an immediate threat to the safety of the officers or others." *Id.* at 441 (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir.2005)) (internal quotes omitted). Applying *Graham* to similar situations, various courts have concluded that the use of force was reasonable as a matter of law.

For example, in *Williams v. City of Cleveland, Miss.*, the decedent, while high on cocaine, fled from two officers, resisted while being tasered 3-4 times, was placed in a chokehold, and then finally was handcuffed after two more officers arrived. 736 F.3d 684, 686 (5th Cir. 2013). He "lapsed into unconsciousness and was pronounced dead after being taken to a nearby hospital." *Id.* Affirming summary judgment for the officers, the Fifth Circuit concluded they "did not violate a right that was clearly established at the time of the alleged violation." *Id.* at 688. It further concluded that because, as here, the decedent exhibited tremendous strength even after being tasered and posed "a threat of serious harm throughout the struggle," "the force exercised against [the decedent] was, under the circumstances reflected in the record, reasonable." *Id.*

In *Walker v. City of Fresno*, the Eastern District of California concluded that a "carotid neck restraint was an objectively reasonable use of force" when, as here, the suspect "posed a potential threat to the Officers," "was confrontational, had not been searched for weapons," "was resisting arrest," and "refused to comply with the Officers' commands, struggled with the Officers when

they tried to handcuff him, and when the Officers pulled him to the ground he continued to avoid being handcuffed by placing his hands under his chest." 2011 WL 5554305, at *11 (E.D. Cal. Nov. 15, 2011). In *Handshaw v. Hilliard*, the plaintiff alleged that as he had his hands in the air, an officer "attacked me from behind by delivering strikes with his flashlight, putting me in a choke hold, and both officers forced me to the ground." 2015 WL 5177623, at *1, 5 (S.D. Miss. Sept. 4, 2015). He "admitted that he was noncompliant [with one of the officer's] directives to get down on the ground." *Id.* at *8. Granting summary judgment for the officers, the Southern District of Mississippi said that even "assuming that Plaintiff incurred some form of permanent injury from his arrest, Defendants actions in effectuating his arrest were not objectively unreasonable, given the circumstances leading up to the use of force." *Id.* at *10.

Applying the *Graham* factors, reasonable minds could not differ in concluding that Ofc. Lopera did not use excessive force. It appeared from Ofc. Lopera's perspective that Farmer attempted to carjack a truck.  Plaintiffs' use-of-force expert admits it is appropriate to taser a suspected carjacker.  If Farmer had gained access to the truck, he could have harmed its occupants or run over Ofc. Lopera or any other bystanders. This is especially true given that Farmer was unfit to drive because he was under the influence of meth. It is immaterial whether Farmer in fact did attempt to carjack the truck because reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. 368 at 369.

After Ofc. Lopera reached him, Farmer disobeyed commands, struck Ofc. Lopera, actively and aggressively resisted, and demonstrated super-human strength.  Even if one were to assume *arguendo* that he struck Farmer, it was reasonable for Ofc. Lopera to use such force to defend himself and gain control over Farmer.[17] During this struggle, Farmer demonstrated super-human strength, and he was undeterred by the taser and the alleged strikes.

---

[17]     Furthermore, even if one were to assume *arguendo* that Ofc. Lopera struck Farmer in the face, those strikes caused superficial facial injuries, at most. Ex. H, Olson Dep. 15:8-15 (Farmer did not have any cartilage or bone fractures); 28:19 – 29:15 (Farmer had some minor facial lacerations); 29:16-18 (Dr. Olson does not have an opinion on what caused Farmer's facial lacerations).

Even per Plaintiffs' case theory, Ofc. Lopera could have applied pressure to Farmer's neck for around only 22 seconds. Ofc. Lopera had been trained that the LVNR is safe, is effective against suspects under the influence of drugs, and likely does not cut off all carotid blood flow. Although she found some nonstructural, hemorrhagic neck injuries consistent with a neck restraint, the coroner ultimately was unable to determine if Farmer died from a neck restraint. She also believes meth and an enlarged heart were "significant conditions" in his death. Farmer caused or contributed to his death by using meth, having an enlarged heart due to a long history of drug use, and resisting the officers. Based on these uncontroverted facts, Ofc. Lopera cannot be found to have used excessive force.

**C.     Ofc. Lopera is Entitled to Qualified Immunity on Plaintiffs' Federal Claims.**

Even if this Court were to deny summary judgment on Plaintiffs' Fourth and Fourteenth Amendment claims, it still should grant summary judgment under the doctrine of qualified immunity. *See, e.g., Vos v. City of Newport Beach*, 892 F.3d 1024, 1034-36 (9th Cir. 2018) (in *Vos*, factual issues precluded summary judgment on a Fourth Amendment claim, but the individual officers still were entitled to qualified immunity. The denial of summary judgment on a Fourth or Fourteenth Amendment claim "is not the end of the inquiry.")

Recently reversing the Ninth Circuit, the Supreme Court explained in *Kisela v. Hughes* that qualified immunity applies "when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 1152 (quoting *White*, 137 S. Ct. at 551); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (immunity applies "if officers of reasonable competence could disagree . . . ."); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560 (11th Cir. 1993) (an officer who applied a chokehold and pushed a suspect against a wall was entitled to qualified immunity because "reasonable doubt existed, and still exists, on whether this amount of unnecessary force was unlawful.")

Qualified immunity applies "unless existing precedent squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)) (internal quotes omitted); *see also Estate of Jones By Jones v. City of Martinsburg*, 2018 WL 4289325, at *5 (N.D. W.Va. Sept. 7, 2018) (in a case in which the decedent committed a misdemeanor, resisted arrest, fled from officers, attempted to stab an officer, disobeyed commands, and was on the ground motionless when he was shot, the Northern District of West Virginia said the precise question for qualified immunity was, "Did clearly established law in March 2013 prohibit officers from using deadly force against an individual who: (1) committed a misdemeanor; (2) resisted arrest; (3) fled from officers; (4) possessed a knife; (5) attempted to stab an officer with his knife; (5) refused commands to drop the knife; and (6) was on the ground, motionless at the time he was shot?")

An officer does not violate "a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014)). The Supreme Court recently explained this requirement as follows:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that every reasonable official would know.

*D.C. v. Wesby*, 138 S. Ct. 577, 589–90 (2018) (internal citations and quotes omitted). In a recent case in which an LVMPD officer applied an LVNR, punched the plaintiff, slammed the plaintiff onto a table causing facial lacerations, and pushed the plaintiff to the floor causing a broken tooth, the Ninth Circuit affirmed this Court's entrance of summary judgment based on qualified immunity because the plaintiff cited "no authority that clearly establishes a violation of the Fourth Amendment on the facts demonstrated in the videotape recording of the incident here at issue." *Mason v. Las Vegas Metro. Police Dep't*, 2019 WL 141227, at *3 (9th Cir. Jan. 9, 2019).

With respect to the application of qualified immunity to Plaintiffs' Fourteenth Amendment claim, Ofc. Lopera is entitled to qualified immunity because when the incident occurred, a

reasonable officer could have believed it did not violate the Fourteenth Amendment to use the level and type of force utilized by Ofc. Lopera. *See, e.g., Ericson v. City of Phoenix*, 2016 WL 6522805 (D. Ariz. Nov. 3, 2016) (wherein the District of Arizona granted summary judgment on a Fourteenth Amendment claim in a case in which the plaintiffs alleged the officer held the decedent in a carotid neck restraint for over four minutes, causing a fatal anoxic brain injury); *see also Douglas v. DePhillips*, 2017 WL 4574422, at *6 (E.D. La. Oct. 13, 2017), aff'd, 740 F. App'x 403 (5th Cir. 2018) (in a case involving a Fourteenth Amendment claim for a father's loss of his familial relationship with his deceased, adult son, the Eastern District of Louisiana entered summary judgment based on qualified immunity because "the 'constitutional question' — whether the Fourteenth Amendment protects the relationship between a parent and his adult child from state intrusion — is far from 'open and shut.'").

With respect to the application of qualified immunity to Plaintiffs' Fourth Amendment claim, various courts have held that "a choke-hold is not unreasonable when the suspect physically resists arrest." *Breed v. City of Kirbyville, Texas*, 2016 WL 8814358, at *6 (E.D. Tex. Dec. 20, 2016) (quoting *Wagner v. Bay City*, 227 F.3d 316, 323 (5th Cir. 2000)) (internal quotes omitted); *see also Griggs v. Brewer*, 841 F.3d 308, 314-15 (5th Cir. 2016) (when a drunk driver resisted arrested and an officer placed him in a chokehold, slammed him to the ground, and punched him, the officer was entitled to qualified immunity because "our precedent does not clearly establish that [the officer's conduct] is constitutionally unreasonable."); *McCoy v. Meyers*, 887 F.3d 1034, 1048 (10th Cir. 2018) (during the time period before the suspect was "effectively subdued," "the preexisting precedent would not have made it clear to every reasonable officer that striking [the plaintiff] and applying a carotid restraint on him violated his Fourth Amendment rights.")

In *Pesola v. City of New York*, the plaintiff attended a public gathering. 2017 WL 3836055, at *1 (S.D.N.Y. Aug. 31, 2017). As an officer approached him, the plaintiff "became frightened, turned, and walked quickly away from" the officer. *Id.* (internal citation omitted). The officer then applied a chokehold to take down and handcuff the plaintiff, and it was "undisputed that at least some pressure was applied to plaintiff's neck during the arrest." *Id.* at *3. Concluding that the officer was entitled to qualified immunity, the Southern District of New York said a reasonable

1  officer "would not have known that such force violated any" rights. *Id.* at *3. "[W]hatever force

2  [the officer] actually applied to plaintiff's neck did not exceed the bounds of what a reasonable

3  officer in the same situation would believe to be lawful." *Id.* Similarly, in *Crutcher v. Athens Police*

4  *Dep't*, the Northern District of Alabama concluded an officer who applied a bar-arm choke was

5  entitled to qualified immunity because it could not "find any case law broadly establishing that

6  [when the incident occurred], choking a suspect was a violation of the Fourth Amendment, or

7  narrowly establishing that choking a suspect was a violation of the Fourth Amendment when the

8  suspect is actively resisting arrest . . . ." 2014 WL 5521944, at *10 (N.D. Ala. Oct. 31, 2014).

9  Based on the above-referenced cases and others, Ofc. Lopera is entitled to qualified

10  immunity on Plaintiffs' Fourth Amendment claim because when the incident occurred, a reasonable

11  officer could have believed it did not violate the Fourth Amendment to use the level and type of

12  force utilized by Ofc. Lopera on an attempted carjacker on meth who abruptly fled into a nonpublic

13  hallway, repeatedly disobeyed commands, struck an officer, actively and aggressively resisted,

14  repeatedly reached towards his left ankle before being searched for weapons, and demonstrated

15  significant physical strength. Plaintiffs cannot satisfy their burden of identifying any "settled law"

16  (*i.e.*, any "controlling authority or a robust consensus of cases of persuasive authority") that

17  protected Farmer's purported rights with such clarity "that every reasonable official would interpret

18  it to establish the particular rule the plaintiff seeks to apply." *D.C.*, 138 S. Ct. at 589–90. It is

19  insufficient for Plaintiffs to rely on a "high level of generality" in the case law. *Ashcroft*, 563 U.S.

20  at 742; *see also Mason*, 2019 WL 141227, at *3 (a plaintiff must identify "authority that clearly

21  establishes a [Constitutional violation] on the facts" at issue). For these reasons, even if this Court

22  were to deny summary judgment on Plaintiffs' Fourth and Fourteenth Amendment claims, it still

23  should grant summary judgment on those claims under the doctrine of qualified immunity.

24  **D.  Ofc. Lopera is Entitled to Summary Judgment on the State Law Claims.**

25  Plaintiffs assert claims against Ofc. Lopera for negligence, First Am. Compl., ¶¶ 82-94, and

26  battery, *id*. ¶¶ 95-98. The negligence claim fails because the use of force was reasonable. *See, e.g.,*

27  *De Zon v. Am. President Lines*, 129 F.2d 404, 408 (9th Cir. 1942) (quoting *The C. S. Holmes*, 209

28  F. 970, 974 (W.D. Wash. 1913)) (exercising reasonable due care is not negligent). Battery requires

a "willful and unlawful" use of force. *Hobbs v. State*, 251 P.3d 177, 179 (Nev. 2011) (quoting NRS 200.481(1)(a)). The battery claim fails because Ofc. Lopera's contact with Farmer was lawful, justified, and done to protect himself and others.

**E.     Ofc. Lopera is Entitled to Immunity on the State Law Claims.**

In Nevada, an officer is immune from liability if a claim concerns an act or omission committed "in the execution of a statute or regulation" or involving "a discretionary function or duty . . . , whether or not the discretion involved is abused." NRS 41.032. To be entitled to discretionary immunity, "a decision must (1) involve an element of individual judgment or choice and (2) be based on considerations of social, economic, or political policy." *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007). Immunity does not protect "decisions made in bad faith, such as abusive conduct resulting from hostility or willful or deliberate disregard for a citizen's rights . . . ." *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1133 (9th Cir. 2017) (quoting *Davis v. City of Las Vegas*, 478 F.3d 1048, 1060 (9th Cir. 2007)) (internal quotes omitted).

Ofc. Lopera is entitled to discretionary immunity. He had to make judgment-decisions in his capacity as an officer based on social, economic, or political policy considerations. There is no evidence Ofc. Lopera acted because of hostility towards Farmer or a willful or deliberate disregard for his rights. *Davis*, 478 F.3d at 1060; *see also* Ex. A, DeFoe Dep., 136:12-14 (Plaintiffs' use-of-force expert does not know if Ofc. Lopera acted out of malice). For these reasons and others, Ofc. Lopera is entitled to summary judgment on Plaintiffs' state-law claims.

## IV.     CONCLUSION.

For the foregoing reasons, this Court should enter summary judgment in favor of Ofc. Lopera on all claims against him.

DATED January 28, 2019.

MCNUTT LAW FIRM, P.C.

*/s/ Dan McNutt*
_____
Daniel R. McNutt, Esq., Bar No. 7815
Matthew C. Wolf, Esq., Bar No. 10801
625 South Eighth Street
Las Vegas, Nevada 89101
*Counsel for Defendant Ofc. Lopera*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

The undersigned is an employee of McNutt Law Firm, P.C. and certifies that under FRCP 5, I served a true and correct copy of **DEFENDANT OFFICER KENNETH LOPERA'S MOTION FOR SUMMARY JUDGMENT** by mailing a copy by United States Postal Service, postage prepaid, via email, or via electronic mail through the United States District Court's CM/ECF system to the following at their last known address or e-mail:

Matthew Callister, Esq.
Mitchell Bisson, Esq.
CALLISTER LAW
330 E. Charleston Blvd., Suite 100
Las Vegas, Nevada 89104
mqc@callcallister.com
mbisson@callcallister.com

Sheri Tanaka, Esq.
LAW OFFICE OF SHERI J. TANAKA
4348 Waialae Avenue, #585
Honolulu, Hawaii 96816
Sheri.tanaka@gmail.com

Boris Treyzon, Esq.
Federico Sayre, Esq.
ABIR COHEN TREYZON SALO, LLP
1901 Avenue of the Stars, Suite 935
Los Angeles, California 90067
*Counsel for Plaintiffs*

Louis Shoch III, Esq.
LAW OFFICE OF LOU SHOCH
200 Pier Avenue, Suite 136
Hermosa Beach, California 90254
lshoch@maiershoch.com

Craig Anderson, Esq.
MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
canderson@maclaw.com
*Counsel for LVMPD Defendants*

*/s/ Lisa Heller*
An Employee of McNutt Law Firm, P.C.

27