Federico C. Sayre, Esq. (CA Bar No. 67420)
Boris Treyzon, Esq. (CA Bar No. 188893)
Darren D. Darwish, Esq. (CA Bar No. 305797)
**ABIR COHEN TREYZON SALO, LLP**
1901 Avenue of the Stars, Suite 935
Los Angeles, California 90067
Telephone: (424) 288-4367 / Fax: (424) 288-4368
*Admitted Pro Hac Vice*
*Attorneys for Plaintiffs*

Matthew Q. Callister, Esq. (NV Bar No. 1396)
Mitchell S. Bisson, Esq. (NV Bar No. 11920)
**CALLISTER LAW**
330 E. Charleston Blvd., Suite 100
Las Vegas, Nevada 89104
Telephone: (702) 333-3334 / Fax: (702) 385-2899
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ESTATE OF TASHI S. FARMER a/k/a TASHII FARMER a/k/a TASHII BROWN, by and through its Special Administrator, Lorin Michelle Taylor; TAMARA BAYLEE KUUMEALI'MAKAMAE FARMER DUARTE, a minor, individually and as Successor-in-Interest, by and through her legal guardian, Stevandra Lk Kuanoni; ELIAS BAY KAIMIPONO DUARTE, a minor, individually and as Successor-in-Interest, by and through his legal guardian, Stevandra Lk Kuanoni,<br><br>                    Plaintiffs,<br><br>vs.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a political subdivision of the State of Nevada; OFFICER KENNETH LOPERA, individually and in his Official Capacity; SERGEANT TRAVIS CRUMRINE, individually and in his Official Capacity; OFFICER MICHAEL TRAN, individually and in his Official Capacity; OFFICER MICHAEL FLORES, individually and in his Official Capacity; and Does 1 through 50, inclusive,<br><br>                    Defendants. | Case No.: 2:17-cv-01946-JCM-PAL<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT OFFICER KENNETH LOPERA'S MOTION FOR SUMMARY JUDGMENT** |

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This case arises out of an incident which occurred on May 14, 2017 at The Venetian Resort Hotel Casino in Las Vegas, Nevada, involving Las Vegas Metropolitan Police Department ("LVMPD") Officers Kenneth Lopera ("Officer Lopera"), Sergeant Travis Crumrine ("Sergeant Crumrine"), Michael Tran ("Officer Tran"), and Michael Flores ("Officer Flores")[1]. Tashi Farmer ("Farmer"), a young black man, sought help from Officer Lopera and his partner. Instead, Farmer was treated as a suspect, tased, beaten, put in a neck restraint, and killed.

Officer Lopera argues that based on uncontested evidence he is entitled to summary judgment on all claims against him. Through his Motion, Officer Lopera tries to somehow excuse his shameful behavior. There simply is no excuse. Undoubtedly, there is a stark contrast between Officer Lopera's story and the evidence. As a result of this incident, Farmer was killed and Officer Lopera is no longer employed as an officer.

By its own admission, and through testimony of its officers, LVMPD determined that Officer Lopera's actions amounted to **unreasonable and excessive force**. Plaintiffs have moved for Partial Summary Judgment in this case. (Doc 93.) Accordingly, Plaintiffs submits that viewing the facts in the light most favorable, no reasonable juror could conclude that Officer Lopera's use of force was objectively reasonable.

Alternatively, for the purposes of Officer Lopera's Motion, there exists genuine disputes of material facts as to Plaintiffs' federal law claims and state-law claims. When viewed in the light most favorable to Plaintiffs, the evidence and video evidence show that Officer Lopera's use of force was unreasonable and excessive, qualified immunity should not apply, and he is not entitled to discretionary immunity as to the state law claims. At minimum, the material evidence is susceptible to multiple interpretations creating genuine disputes of material fact. Nor would qualified immunity shield Officer Lopera from state law claims, as his actions and tactical

---

[1] Sergeant Crumrine, Officer Tran, and Officer Flores are collectively referred to herein as the "Non-Intervening Officers".

PLAINTIFFS' OPPOSITION TO DEFENDANT OFFICER KENNETH LOPERA'S MOTION FOR SUMMARY JUDGMENT

decisions were improper.  For these reasons, Officer Lopera's Motion must be denied in its entirety.

## II.   STATEMENT OF DISPUTED MATERIAL FACTS[2]

### A.   Farmer Had Bipolar 1 Disorder And Sought Help From Officer Lopera And His Partner (*Rebutting Officer Lopera's Undisputed Fact #3*)

LVMPD's use of force policy states:

> It is important for officers to bear in mind that there are many reasons a suspect may be resisting arrest or may be unresponsive. The person in question may not be capable of understanding the gravity of the situation. Officers must consider several factors when dealing with a non-compliant subject. A subject may be non-compliant due to a medical condition, mental, physical, or hearing impairment, language barrier, drug interaction or emotional crisis, and have no criminal intent.

(Darwish Decl., ¶ 2, Exh. B, [p. 115].)

On May 14, 2017, Officer Lopera and his partner were assigned to work The Venetian. (Darwish Decl., ¶ 1, Exh. A, p. 095.) Approximately 10 minutes after their arrival, Officer Lopera noticed Farmer in the hallway inside of The Venetian. (Id.) Farmer appeared to be agitated, sweating profusely, and constantly looking over his shoulder. (Id.) Officer Lopera conducted a consensual encounter on Farmer. (Id.) Farmer explained to both officers that he was frightened and ran across Las Vegas Boulevard because he believed he was being followed. (Id.) Farmer then requested that the officers escort him to the valet. (Id.) The officers disregarded Farmer's fears and request.

Farmer had mental health issues and was diagnosed with bipolar 1 disorder. (Darwish Decl., ¶ 17, Exh. Q, 31:14-16 [p. 296].) Bipolar 1 disorder is a mental disorder and the potential diagnosis of paranoid schizophrenia had yet to be ruled out. (Id. at 31:23-32:3 [p. 296-97] and

---

[2] All parties to this matter have filed dispositive motions.  Plaintiffs are cognizant and respect this Honorable Court's time and efforts in review of the filed dispositive motions, responses, and supporting documents. In an effort to avoid repetition and promote judicial efficiency, Plaintiff refers, and incorporates by reference, this Honorable Court to the Plaintiffs' Statement of Undisputed Material Facts contained in Plaintiffs' Motion for Partial Summary Judgment (Doc 93) as well as Plaintiffs' Statement of Material Facts contain in Plaintiffs' Opposition to Defendants LVMPD, Crumrine, Tran, and Flores' Motion for Summary Judgment filed concurrently herewith. This current section focuses on rebutting the material facts that Officer Lopera argues are undisputed in his Motion for Summary Judgment (Doc 94).

PLAINTIFFS' OPPOSITION TO DEFENDANT OFFICER KENNETH LOPERA'S MOTION FOR SUMMARY JUDGMENT

33:7-21 [p. 298].).  During the consensual encounter, it is likely that Farmer was experience a bipolar episode.

Running across Las Vegas Boulevard is not an easy feat – not even for someone who Officer Lopera alleges has "superhuman strength."  Peace officers are hired and trained to recognize persons in need of medical assistance due to mental health, drugs, or illness. (Darwish Decl., ¶ 19, Exh. S, p. 313.) In fact, LVMPD teaches its officers that "[officers] should make great effort to control situation through less intrusive means. Some courts believe acting out by emotionally disturbed person diminishes the level of force necessary and such persons are in need of a doctor, not a jail cell and in the usual case – where such a person is neither a threat to himself or anyone else—the government's interest in deploying force to detain him is not as substantial as its interest in deploying force to apprehend a dangerous criminal."  (Id.) Even if this Court determines Officer Lopera could not have known Farmer had a mental illness at the time of the subject incident, Officer Lopera's own argument that Farmer's behavior was due to drug use evidences that Officer Lopera should have controlled the situation differently based on the above-described training and policy.

**B.**    **Officer Lopera's Tactics During Foot Pursuit Were Out Of Policy (*Rebutting Officer Lopera's Undisputed Fact #4*)**

Although Officer Lopera's decision to pursue was found to be reasonable, Officer Lopera failed to follow policy, specifically:

- Failed to broadcast the foot pursuit via radio;
- Failed to consider the officer safety concerns;
- Failed to consider the risks;
- Failed to transition to containment only.

(Darwish Decl., ¶ 1, Exh. A, [p. 099].)

Officer Lopera failed to communicate with his partner, Officer Lif, which resulted in an inability to formulate a plan and ultimately led to a cascade of events that were not within standard LVMPD tactics, training, and policy. (Id.) Officer Lopera failed to communicate his decision to conduct a Person Stop and, due to such lack of communication by Officer Lopera,

PLAINTIFFS' OPPOSITION TO DEFENDANT OFFICER KENNETH LOPERA'S MOTION FOR SUMMARY JUDGMENT

his partner, Officer Lif, assumed Officer Lopera walked away to escort Farmer down to valet as they had agreed. (Id. at p. 098.) Officer Lopera's tactics during the foot pursuit were not within standardized LVMPD tactics, training, and policy. (Id. at p. 099.)

### C.   Farmer Never Attempted To "Carjack" A Truck (*Rebutting Officer Lopera's Undisputed Fact #5*)

Without communicating to his partner and asking any questions of Farmer, Officer Lopera alleges he was under the impression that Farmer was attempting to open the tailgate of a white truck. (Id. at p. 096.) The white truck was driven by Jonathan Pierce. (Darwish Decl., ¶ 7, Exh. G, 13:11-24 [p. 213].) Mr. Pierce did not see Farmer attempt to get in his truck, never felt like Farmer was trying to open the tailgate, and never felt like Farmer was trying to open the door of his truck. (Id. at 13:25-14:21 [p. 213-14].) It is disputed that Farmer had any intent to carjack or open the tailgate of the white truck.

### D.   Officer Lopera's Use Of The Taser Was Out Of Policy (*Rebutting Officer Lopera's Undisputed Fact #6*)

Officer Lopera's argument that his taser had only three complete circuit closures is a red-herring. Without any provocation from Farmer, Officer Lopera yelled to Farmer "Stop! Or you will be tased!" (Darwish Decl., ¶ 1, Exh. A, p. 096.) Officer Lopera pulled out his electronic control device (ECD), tased Farmer, and watched as Farmer fell to the ground while convulsing. (Id.) Officer Lopera gave numerous verbal commands for Farmer to roll onto his stomach. (Id.) Despite telling Officer Lopera that he would comply and roll onto his stomach, Officer Lopera continued to tase Farmer three more times, all within 10 seconds of each other. (Id.) Officer Lopera touch stunned Farmer numerous times. (Id.)

Officer Lopera pulled the trigger seven (7) times. (Darwish Decl., ¶ 20, Exh. T, p. 338.) The first six cycles were a standard 5-second cycle and the seventh cycle was 9-seconds. (Id.) Once a subject has been exposed to three cycles, the ECD shall be deemed ineffective and another use of force option will be considered, unless exigent circumstances exist. (Darwish Decl., ¶ 21, Exh. U.) Officer Lopera failed to comply with these standards.

The role of the Tactical Review Board is to evaluate the tactics rendered and to validate,

4

overturn, or modify the conclusions presented by LVMPD's Critical Incident Review Team ("CIRT"). (Darwish Decl., ¶ 3, Exh. C, 17:15-20 [p. 128].) The Tactical Review Board consists of 7 individuals, 6 of which are LVMPD officers. (Darwish Decl., ¶ 1, Exh. A, p. 095.) Assistant Sheriff Tim Kelly ("Assistant Sheriff Kelly") is the chair of the Tactical Review Board and reviews the use of force tactics associated with a particular event. (Darwish Decl., ¶ 3, Exh. C, 15:15-21 [p. 127].)

The Tactical Review Board's findings, conclusions, and validations were memorialized in a LVMPD internal memorandum dated August 24, 2017 (the "TRB Report") and sent to Sheriff Joseph Lombardo. (Id. at 14:13-15:21 [p. 126-27], 17:15-20 [p. 128], 18:19-19:10 [p. 129-30], 24:16-25:24 [p. 131-32].) The TRB Report was drafted and signed by Assistant Sheriff Kelly, the third highest ranked officer of LVMPD. (Id. at 13:4-7 [p. 125]; Id. at 15:11-17 [p. 127].) The TRB Report was approved, accepted, and signed by Sheriff Joseph Lombardo on September 18, 2017. (Id. at 24:16-25:24 [p. 131-32].) Sheriff Joseph Lombardo is the highest ranking law enforcement officer and head of LVMPD. (Id. at 13:1-7 [p. 125].) The Tactical Review Board's conclusions and its TRB Report are binding on the entirety of LVMPD.  The TRB Report was approved by Sheriff Joseph Lombardo and must be treated as an admission by LVMPD. <u>The TRB Report is a clear and unequivocal admission by LVMPD that Officer Lopera's actions amounted to excessive and unreasonable force, which violated Farmer's rights under the Fourth Amendment</u>.

Furthermore, Chief John McGrath of LVMPD described Officer Lopera's tasing of Farmer as excessive force:

> **THE WITNESS:** Policy states, I believe, you can only tase someone three times.
> **BY MR. SAYRE:** Right. So it would be a violation of policy?
> **A:** Yes.
> **Q:** Which means it's unreasonable behavior?
> **A:** Yes.

(Darwish Decl., ¶ 4, Exh. D, 34:20-35:2 [p. 158-59].)

///

///

PLAINTIFFS' OPPOSITION TO DEFENDANT OFFICER KENNETH LOPERA'S MOTION FOR SUMMARY JUDGMENT

**Q:** Well, isn't it correct the department teaches that after three cycles, you discontinue the use of a taser?
**A:** And go to a different tool or way to apprehend the subject, yes.
**Q:** Right. So to cycle seven times, including the last time for nine seconds, would be excessive force?
**A:** Well, I think it was excessive, yes.

(Darwish Decl., ¶ 4, Exh. D, 37:22-38:5 [p. 161-62].)

Officer Lopera tased Farmer seven (7) times for a total duration of 39 seconds. (Darwish Decl., ¶ 1, Exh. A, p. 097.) Although Officer Lopera's initial tase on Farmer was determined to be within LVMPD's policy, all subsequent tases were not within LVMPD's policy. (Darwish Decl., ¶ 3, Exh. C, 52:20-25 [p. 134].)

**E.** **Farmer Only Actively Resisted, The Use Of Deadly Force Was Not Warranted, And Farmer Did Not Have Super-Human Strength (_Rebutting Officer Lopera's Undisputed Fact #7_)**

The TRB Report concluded that Farmer was merely in a level of active resistance and that Officer Lopera's actions were not supported by LVMPD training and policy. (Darwish Decl., ¶ 1, Exh. A, p. 100-01.) "Active Resistance" is defined as "The subject's verbal or physical actions are intended to prevent an officer from placing the subject in custody and taking control, but are not directed at harming the officer. Examples include: walking or running away, breaking the officer's grip." (Darwish Decl., ¶ 2, Exh. B, p. 115.) "Aggressive Resistance" is defined as "The subject displays the intent to harm the officer, themselves or another person and prevent an officer from placing the subject in custody and taking control. The aggression may manifest itself through a subject taking a fighting stance, punching, kicking, striking, attacks with weapons or other actions which present an imminent threat of physical harm to the officer or another." (Id. at p. 116.)

Because Farmer's level of resistant did not rise to aggressive resistance (or greater), it is clear Farmer was not an immediate threat to the officers or public.  The level of resistance, if any, by Farmer did not warrant the deadly use of force by Officer Lopera.  Farmer was never an imminent threat of death or serious bodily injury to Officer Lopera or any other person. (DeFoe Decl., ¶ 25.) Farmer did not commit any crime that would necessitate an arrest. (Id.) What is

6

1   more, during the time Farmer was being handcuffed, he did not resist, he did not throw any

2   punches, and he did not kick any officers. (Darwish Decl., ¶ 6, Exh. F, 41:9-14 [p. 200]; Darwish

3   Decl., ¶ 12, Exh. L, 41:12-16 [p. 263].) Farmer's resistance level never appeared to be aggressive

4   and was only in a level of active resistance. (Darwish Decl., ¶ 1, Exh. A, p. 097 and 100.)

5       Farmer was only actively resisting and was not given an opportunity to comply. "[T]he

6   body cannot voluntarily move when in Neuro-Muscular Incapacitation (NMI). As the application

7   is done [Farmer] is locked up and should be giving opportunity to comply. [Farmer] could not

8   have moved to his stomach since he was tased again. Making it impossible for [Farmer] to

9   comply due to the excessive taser use." (Darwish Decl., ¶ 1, Exh. A, p. 103.) Officer Lopera

10  gave numerous verbal commands for Farmer to roll onto his stomach. (Id. at p. 096.) Despite

11  telling Officer Lopera that he would comply and roll onto his stomach, Officer Lopera continued

12  to tase Farmer three more times, all within 10 seconds of each other. (Id.) Officer Lopera touch

13  stunned Farmer numerous times. (Id.)

14      Sergeant Crumrine believed that Farmer was passively resisting by pulling away.

15  (Darwish Decl., ¶ 5, Exh. E, 86:24-87:2 [p. 185-86].) Sergeant Crumrine perceived Farmer as

16  "strong" but was able to gain control over Farmer by just increasing his level of strength in

17  grabbing his arm.  (Id. at 88:1-4 [p. 187].) Ultimately, Sergeant Crumrine was able to gain control

18  of Farmer's arm. (Id. at 88:1-7 [p. 187].).

19      **F.      Farmer Did Not Commit Any Crimes (*Rebutting Officer Lopera's Undisputed***

20          ***Fact #8*)**

21      Officer Lopera argues that Farmer committed a felony by being on meth, committed a

22  felony by striking Officer Lopera, committed a misdemeanor by resisting arrest, and committed

23  a felony by attempting to carjack the truck.  The reality is Farmer died and has never been

24  charged nor convicted for any of the crimes Officer Lopera is alleging.  The information relied

25  upon by Officer Lopera involved these alleged crimes are post-incident. Farmer did not commit

26  any crimes because it is the facts which the officers know at the time when the force was used

27  that is important. (DeFoe Decl., ¶ 39.) No one knew at the time of the incident, including Officer

28  Lopera, if Farmer was under the influence of any drugs. (Id.) No one knew Farmer was under

7

the influence of drugs until the toxicology report was released. (Id.) Once Farmer ran outside, Officer Lopera should have just let him go.  (Id.) The evidence is clear that Farmer was not a threat to officers or others.  Farmer's resistance level never appeared to be aggressive and was only in a level of active resistance. (Darwish Decl., ¶ 1, Exh. A, p. 097 and 100.) During the time Farmer was being handcuffed, he did not resist, he did not throw any punches, and he did not kick any officers. (Darwish Decl., ¶ 6, Exh. F, 41:9-14 [p. 200]; Darwish Decl., ¶ 12, Exh. L, 41:12-16 [p. 263].) What is more, Officer Lopera acknowledges in his Motion that LVMPD, through Undersheriff Kevin McMahill, publicly announced Farmer would not have been charged with a crime if he had survived.  The argument made by Officer Lopera is disingenuous at best and analogous to Officer Lopera being convicted of murder without having a trial.

**G.      The Type of Neck Restraint Applied By Officer Lopera Is Unknown And LVMPD Should Not Have Allowed Any Neck Restraint To Be Use In Low Level Force Situations (*Rebutting Officer Lopera's Undisputed Facts #9 and #10*)**

There is no clear evidence as to the type of neck restraint applied by Officer Lopera. To date, Officer Lopera has not made himself available for deposition.  There are, however, two possibilities: (1) an improperly applied LVNR; and (2) a rear-naked chokehold.

Officer Lopera argues that the LVNR was applied because he was trained and authorized to use it.  However, through video evidence from Body Worn Camera, Officer Lopera can be heard five separate times referencing the application the LVNR in his interview with other officers on scene as a "rear naked" and/or "choking him out." (Darwish Decl., ¶ 1, Exh. A, p. 100.) Officer Lopera stated to Sergeant Crumrine, "I choked him out." (Darwish Decl., ¶ 18, Exh. R, p. 309.) Officer Lopera said to Officer Flores and Officer Rybacki, "I started wailing on the dude and then I rear mounted and choked him out." (Id. at p. 310.) Officer Lopera said to his partner, Officer Lif, "I started punching him.  Rear nakeded his ass. He went out." (Id.) Simply put, Officer Lopera cannot have it both ways.  The fact that Officer Lopera can be heard on video and admitting to placing Farmer in a rear-naked chokehold is the best evidence.  Officer Lopera's statement made contemporaneous to the subject incident is an admission and, therefore, the type

8

of neck restraint applied by Officer Lopera to Farmer is disputed.

Sergeant Michael Bland, LVMPD's 30(b)(6) witness on policy and training, testified that it is hard to tell the neck restraint being applied and did not believe the neck restraint was an LVNR. (Darwish Decl., ¶ 11, Exh. K, 55:14-56:2 [p. 245-46].) Sergeant Bland could not say conclusively that the neck restraint was a rear naked choke and believes it could have also been a poorly applied LVNR. (Id. at 57:5-14 [p. 247].)

On September 20, 2017, LVMPD updated and made changes to its use of force policy after the subject incident. (Darwish Decl., ¶ 15, Exh. O.) One of the changes that were made was to the use of the LVNR.  (Id.).  In its press release, LVMPD stated: "LVNR will no longer be categorized as a low level option in the updated policy.  All levels of the LVNR will be categorized as an intermediate or deadly use of force.  To use the LVNR, an officer must be able to articulate that the subject had the intent to harm officers or others." (Id.).

Literature used by LVMPD to train and educate its officers on police neck restraints provides that "[t]he two greatest problems with police neck restraint are that officers are often not taught: how to regulate control of a subject by the neck, and when to stop compression on a subject's neck. (Darwish Decl., ¶ 16, Exh. P, p. 287.) "The last thing an officer needs is to be advised and trained to use excessive force when it is completely unnecessary. A preconceived, emotionally charged response also presents a psychological and physical problem for officers who must become highly aggressive, mentally and physically, in order to accomplish subject control. They may then fail to regulate or cease application of the neck restraint in time to avoid injury or death to the subject." (Id.)

LVMPD should not have taught and allowed for the LVNR to be used as a low level use of force option. (DeFoe Decl., ¶ 37.) At all times, the LVNR should have been categorized as an intermediate or deadly use of force option. (Id. at ¶ 38.) The LVNR should have always been categorized as an intermediate or deadly use of force option since it was adopted by LVMPD. (Id.)

Neck restraints, including vascular restraint techniques, even if applied appropriately, cause a risk of death or serious physical injury, because they may restrict the flow of blood or

oxygen to a person's brain. (Smock Decl., ¶ 18.) The use and application of neck restraints is associated with the infliction of serious physical injuries and deaths as documented in medical literature, including: carotid dissections, strokes, and brain damage. (Id. at ¶ 13.) The application of neck restraints by law enforcement officers should be reserved for lethal/deadly force encounters only. (Id. at ¶ 19.) The application of neck restraints in lethal/deadly force only encounters is consistent with the use of force polices from the majority of major metropolitan police departments. (Id.) The Louisville Metropolitan Police Department prohibits neck restraints/choking techniques except in a situation where the use of deadly force would be allowed. (Smock Decl., ¶ 22, Exh. 4 [p. 094].)  A survey by LVMPD's Office of Internal Oversight and Constitutional Policing revealed: (1) 24 of the 37 surveyed agencies explicitly prohibit the use of any type of neck restraint as a force option; and (2) 8 of the 24 agencies have a disclaimer in their policy citing neck restraints can be used only during a deadly force encounter. (Smock Decl., ¶ 23.)

LVMPD's use of force policy allowed Officer Lopera to use a neck restraint in a low level force situation.  Farmer's resistance level never appeared to be aggressive and was only in a level of active resistance. (Darwish Decl., ¶ 1, Exh. A, p. 097 and 100.) Yet, Officer Lopera applied the neck restraint on Farmer for a total of 1 minute and 16 seconds. (Darwish Decl., ¶ 10, Exh. J.) The cause of Farmer's death was asphyxia due to police restrain procedures. (Darwish Decl., ¶ 9, Exh. I, 77:6-9 [p. 231]; Darwish Decl., ¶ 13, Exh. M; Smock Decl., ¶ 10.) Farmer's death was a direct consequence of the application of the neck restraint. (Darwish Decl., ¶ 9, Exh. I, 77:22-24 [p. 231]; Smock Decl., ¶ 9.)  Farmer would not have died from asphyxia had Officer Lopera released the neck restraint after Farmer sustained a loss of consciousness. (Smock Decl., ¶ 15.) Farmer would not have died from asphyxia had Officer Lopera released the neck restraint when advised by his fellow officers to release the hold.  (Id. at ¶ 16.)

///

///

///

///

PLAINTIFFS' OPPOSITION TO DEFENDANT OFFICER KENNETH LOPERA'S MOTION
FOR SUMMARY JUDGMENT

**H.     Officer Lopera Applied The Neck Restraint For Over One Minute; There is No Evidence That Officer Lopera Ever Relaxed The Neck Restraint On Farmer; and Farmer Died As A Result Of The Neck Restraint (*Rebutting Officer Lopera's Undisputed Facts #11, #12, #13, and #14*)**

After tasering and striking Farmer, Officer Lopera continued his onslaught of beating by then placing Farmer in a neck restraint. (Darwish Decl., ¶ 1, Exh. A, p. 096.) Officer Lopera placed Farmer in a neck restraint at about 00:57:41. (Darwish Decl., ¶ 10, Exh. J.)

Sergeant Crumrine arrived just as Officer Lopera fell onto his back with Farmer in the neck restraint. (Darwish Decl., ¶ 1, Exh. A, p. 096.) Approximately 13 seconds after Officer Lopera placed Farmer in a neck restraint, Sergeant Crumrine told Officer Lopera to "let go." (Id.; Darwish Decl., ¶ 5, Exh. E, 36:9-12 [p. 173].) However, Officer Lopera did not release the neck restraint and failed to follow a commanding offer's orders. (Darwish Decl., ¶ 1, Exh. A, p. 096.) Instead, Officer Lopera asked Sergeant Crumrine, "is he out?" three times. (Id.; Darwish Decl., ¶ 10, Exh. J.)   At this point, Officer Lopera had Farmer in a neck restraint for approximately 23 seconds.  (Darwish Decl., ¶ 10, Exh. J.)

Officer Flores and Officer Tran quickly arrived on scene and Officer Tran attempted to place Farmer in custody. (Darwish Decl., ¶ 1, Exh. A, p. 096.) Officer Flores and Officer Tran arrived on scene at approximately 00:58:09. (Darwish Decl., ¶ 10, Exh. J.) At this point, Officer Lopera had Farmer placed in the neck restraint for 28 seconds. (Id.) Officer Flores observed that Farmer was "out" when he and Officer Tran arrived on scene. (Darwish Decl., ¶ 12, Exh. L, 46:25-47:21 [p. 264-65].)

Officer Lopera continued to apply the neck restrain despite Farmer being "out" and under the control of four officers. At 00:58:10, Sergeant Crumrine told Officer Lopera *again* to "let go." (Darwish Decl., ¶ 10, Exh. J; Darwish Decl., ¶ 5, Exh. E, 35:17-23 [p. 172].) At this point, Officer Lopera had Farmer placed in the neck restraint for 29 seconds. (Darwish Decl., ¶ 10, Exh. J.)

Officer Lopera did not listen to Sergeant Crumrine and continued his application of the neck restraint despite Farmer being "out." At 00:58:14, an unknown officer on scene told Officer

11

Lopera "Stop it, bro." (Id.) At this point, Officer Lopera had Farmer placed in the neck restraint for 33 seconds. (Id.)

At 00:58:50, Farmer was placed in handcuffs. (Id.) At this point, Officer Lopera had Farmer placed in the neck restraint for 1 minute and 9 seconds. (Id.) During the time Farmer was being handcuffed, he did not resist, he did not throw any punches, and he did not kick any officers. (Darwish Decl., ¶ 6, Exh. F, 41:9-14 [p. 200]; Darwish Decl., ¶ 12, Exh. L, 41:12-16 [p. 263].) Farmer was not a threat to any officers or others.  Still, Officer Lopera continued to apply the neck restraint.

At 00:58:53, Officer Tran told Officer Lopera to "loosen up."  (Darwish Decl., ¶ 10, Exh. J; Darwish Decl., ¶ 6, Exh. F, 54:6-9 [p. 202].) At this point, Officer Lopera had Farmer placed in the neck restraint for 1 minute and 12 seconds.  (Darwish Decl., ¶ 10, Exh. J.)

At 00:58:57, Officer Lopera finally released the neck restrain on Farmer. (Id.) Officer Lopera had Farmer placed in the neck restraint for a total of 1 minute and 16 seconds. (Id.) Officer Lopera was also told several times to let go of the neck restraint; still, Officer Lopera held Farmer in a neck restraint for more than one minute and 12 seconds from the time the neck restraint was initiated until the time it was released. (Darwish Decl., ¶ 10, Exh. J; Darwish Decl., ¶ 1, Exh. A, p. 096.)

There is no evidence that Officer Lopera relaxed the neck restraint.  The fact that Farmer died is the best evidence showing Officer Lopera did not relax or release the neck restraint. Officer Lopera released the neck restraint after 1 minute and 16 seconds. Farmer would not have died from asphyxia had Officer Lopera released the neck restraint after Farmer sustained a loss of consciousness. (Smock Decl., ¶ 15.) Farmer would not have died from asphyxia had Officer Lopera released the neck restraint when advised by his fellow officers to release the hold.  (Id. at ¶ 16.)

After Officer Lopera released the neck restraint after 1 minute and 16 seconds, Farmer was placed in recovery position and several officers rendered first aid to Farmer, to what now is evident to have been a futile effort. (Darwish Decl., ¶ 1, Exh. A, p. 096.) Medical transport arrived on scene and Farmer was transported to Sunrise Trauma where he was pronounced dead.

1   (Id.)

2        Dr. Alane Olson, a pathologist at the Clark County Coroner, determined that Farmer's

3   cause of death was asphyxia due to police restrain procedures. (Darwish Decl., ¶ 9, Exh. I, 77:6-

4   9 [p. 231]; Darwish Decl., ¶ 13, Exh. M; Smock Decl., ¶ 10.) Farmer's death was a direct

5   consequence of the application of the neck restraint. (Darwish Decl., ¶ 9, Exh. I, 77:22-24 [p.

6   231]; Smock Decl., ¶ 9.)

7        Plaintiff's expert, Dr. William Smock, agrees with Dr. Olson that Farmer died of

8   asphyxia and that the application of external pressure to Farmer's neck created an anoxic insult

9   to his brain causing his brain to cease function. (Smock Decl., ¶ 11.) Farmer's enlarged heart did

10   not cause Farmer's death nor was it a significant contributing factor to his death. (Id.) The

11   presence of methamphetamine did not cause nor did it contribute to Farmer's death. (Id.) Having

12   treated in-hospital patients with even higher levels of methamphetamine, Dr. Smock has never

13   seen someone suffer a fatal overdose of methamphetamine with a level of methamphetamine

14   equal to or less than Farmer's level. (Id.) Methamphetamine did not contribute to Farmer's death

15   from a medical perspective. (Id.)

16   **III.   LEGAL STANDARD**

17        **A.   Standard For Motions For Summary Judgment**

18        Summary judgment is appropriate only if all available facts show that there is no genuine

19   issue of material fact and that the moving party is entitled to a judgment as a matter of law. (Fed.

20   R. Civ. P. 56(a).)  A genuine issue of fact exists if the evidence is such that a reasonable jury

21   could resolve the issue in either parties favor and "an issue is material if it is essential to the

22   proper disposition of the claim." (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

23   574 (1986).)  When deciding a motion for summary judgment, "courts are required to view the

24   facts and draw reasonable inferences 'in the light most favorable to the party opposing the

25   [summary judgment] motion.'" (*Scott v. Harris*, 550 U.S. 372, 378 (2007), *quoting U.S. v.

26   Diebold, Inc.*, 369 U.S. 654, 655 (1962).)  A genuine dispute of material fact exists where a

27   reasonable jury could find for the non-moving party as to that particular fact. (*Anderson v.

28   Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).)  At summary judgment, a court's function is not

13

to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. (See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).) The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." (*Id*. at 255.)

> **B.**     **Cases Involving Civil Rights Violations Are Often Inappropriate For Summary Judgment Because Such Cases Involve Questions Of Fact For A Jury To Determine**

Cases based on violations of constitutional rights are often inappropriate for summary judgment. (Wright, Miller and Kane, Federal Practice and Procedure Civil, 3d § 2732.2, at 152 (1998).) This is because police misconduct cases almost always turn on a jury's credibility determinations. (*Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003).) "Further, the very nature of the claims involved often presents factual issues that require summary judgment to be denied." (*Id*.) "Credibility determinations, the weighing of evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor." (See *Anderson*, supra, 477 U.S. at 255.)

**IV.     LEGAL ARGUMENT**

> **A.**     **Officer Lopera Violated Farmer's Fourth Amendment Rights And His Heirs' Fourteenth Amendment Rights**
>
> > **1.**     **Officer Lopera's Use Of Force Was Excessive And Objectively Unreasonable**

This Court is asked to determine whether Officer Lopera's use of force was objectively reasonable from the perspective of a reasonable officer.  This issue has already been determined by LVMPD through the TRB Report and Sheriff Joseph Lombardo's clear acceptance of the TRB Report, that Officer Lopera's use of force was excessive and objectively unreasonable.

Claims of excessive force, like Plaintiffs' federal law claims in this present matter, "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." (*Graham v. Connor*, 490 U.S. 386, 388 (1989).)  This inquiry requires analyzing the totality of

the circumstances from the perspective of a reasonable officer at the scene.  (*Plumhoff v. Rickard*, 134 S.Ct 2012, 2020 (2014).)  Neither the Supreme Court nor the Ninth Circuit has set out a fixed set of factors for courts to consider in examining the totality of the circumstances, and both have indicated that there are no per se rules in the Fourth Amendment excessive force context; instead, courts "must still slosh [their] way through the factbound morass of 'reasonableness.'" (*Scott v. Harris*, 550 U.S. 372, 383 (2007); see also, *George v. Morris*, 736 F.3d 829, 837-38 (9th Cir. 2013).)  The inquiry is "highly fact-intensive . . ." (*Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).)  In other words, the officers, and their conduct at issue, can *only* be "off the hook" if they had reasonably believed their conduct was lawful.

As a preliminary matter, the Court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" (*Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (internal quotation marks omitted).)  The force in this case was deadly force, which from the standpoint of the Constitution is the most severe form of intrusion. (See, e.g., *Blanford v. Sacramento Cnty*., 406 F.3d 1110, 1115 (9th Cir. 2005).) Bearing in mind that deadly force requires the highest justification, the Court may then weigh the factors identified by the Supreme Court in *Graham*: "(1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." (*Espinosa*, 598 F.3d at 537.)  The Ninth Circuit has identified several other factors that may be relevant, including: (1) whether the officer gave the suspect a warning (or absence thereof) before using force that could result in serious injury; (2) "[t]he parties' 'relative culpability' i.e., which party created the dangerous situation and which party is more innocent;" and (3) "whether there were less intrusive means of force that might have been used." (*Id.*)  With respect to the last factor, "[P]olice are required to consider what other tactics if any were available, and if there were clear, reasonable and less intrusive alternatives to the force employed, that militates against finding the use of force reasonable." (*Id.* quoting *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)).)  Another important factor for consideration is whether it should have been apparent to the officers that the subject of the force used was mentally or emotionally disturbed. (See, e.g.,

1   id. at 872; *Bryan*, 630 F.3d at 831; *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir.
2   2001).)

3       It remains clear that Farmer was unarmed and posed no significant threat as he was
4   running away from Officer Lopera. Once Farmer was tasered, he remained on the ground and
5   complied with all of Officer Lopera's demands. Thereby, to now presume that unarmed Tashi
6   Farmer poised a threat to any person or officer was objectively unreasonable. Consequently, no
7   reasonable juror could arrive at any conclusion other than Officer Lopera's use of force was
8   excessive and objectively unreasonable. Alternatively, there is a genuine dispute of material
9   fact as to whether Officer Lopera's use of force was excessive and objectively unreasonable.

10      Officer Lopera tased Farmer seven (7) times for a total duration of 39 seconds.  (Darwish
11  Decl., ¶ 1, Exh. A, p. 097.) Although Officer Lopera's initial tase on Farmer was determined to
12  be within LVMPD's policy, all six subsequent tases were not within LVMPD's policy. (Darwish
13  Decl., ¶ 3, Exh. C, 52:20-25 [p. 134].) Furthermore, Chief John McGrath of LVMPD described
14  Officer Lopera's tasing of Farmer as excessive force. (Darwish Decl., ¶ 4, Exh. D, 37:22-38:5
15  [p. 161-62].)

16      Officer Lopera struck Farmer in the face 13 times. (Darwish Decl., ¶ 1, Exh. A, p. 097.)
17  Officer Lopera's strikes were not within LVMPD's policy. (Darwish Decl., ¶ 3, Exh. C, 52:14-
18  18 [p. 134].) The use of strikes by Officer Lopera was not within standardized LVMPD tactics,
19  training, and policy. (Darwish Decl., ¶ 1, Exh. A, p. 100.) This finding by the Tactical Review
20  Board was approved by Sheriff Joseph Lombardo. (Darwish Decl., ¶ 3, Exh. C, 24:16-25:24 [p.
21  131-32] and 57:2-12 [p. 135].)

22      The neck restraint Officer Lopera applied on Farmer was not within LVMPD's policy.
23  (Id. at 51:18-20 [p. 133].) Officer Lopera's use of the neck restraint was not within standardized
24  LVMPD tactics, training, and policy. (Darwish Decl., ¶ 1, Exh. A, p. 100.) This finding by the
25  Tactical Review Board was approved by Sheriff Joseph Lombardo. (Darwish Decl., ¶ 3, Exh. C,
26  24:16-25:24 [p. 131-32].)

27      The TRB Report concluded that Farmer was merely in a level of active resistance and
28  that Officer Lopera's actions were not supported by LVMPD training and policy. (Darwish

Decl., ¶ 1, Exh. A, p. 100.) Because Farmer's level of resistant did not rise to aggressive resistance (or greater), it is clear Farmer was not an immediate threat to the officers or public. The level of resistance, if any, by Farmer did not warrant the deadly use of force by Officer Lopera.  Farmer was never an imminent threat of death or serious bodily injury to Officer Lopera or any other person. (DeFoe Decl., ¶ 25.) Farmer did not commit any crime that would necessitate an arrest. (Id.)

The TRB Report concluded that Officer Lopera's actions – the combination of taser, strikes, and neck restraint – amounted to a gross inappropriate use of force. (Darwish Decl., ¶ 1, Exh. A, p. 100; Darwish Decl., ¶ 3, Exh. C, 59:22-60:4 [p. 136-37] and 60:5-14 [p. 137].) Officer Lopera's actions were found to be out of policy and out of policy equates to unreasonable. (Darwish Decl., ¶ 11, Exh. K, 37:8-10 [p. 244].)

Further, Officer Lopera's actions "shocks the conscience." Officer Lopera had serval opportunities to release the neck: (1) When Sergeant Crumrine stated "let go" to Officer Lopera; (2) When Farmer was unconscious; (3) When Sergeant Crumrine stated "let go" to Officer Lopera for a second time; (4) When an unknown officer at the scene told officer Lopera to "Stop it, bro;" (5) When Farmer was placed in handcuffs; and (6) When Officer Tran said to "loosen up." Despite these opportunities to release the neck restraint, Officer Lopera continued to apply the neck restraint and did so for a total of 1 minute and 16 seconds.  Officer Lopera had three other officers at the scene, including his commanding officer.  Yet, Officer Lopera ignored all commands.  Officer Lopera allowed for a non-lethal restraint to turn lethal, despite Farmer only actively resisting.  The situation called for a low level of force – not intermediate or deadly force. Farmer had committed no crime, was not a threat to officers or others, and exhibits signs of mental illness.  There was no need to continue to apply the lethal neck restraint.

Officer Lopera's conduct fell below the standard of care of a reasonable officer. (DeFoe Decl., ¶ 35.) The standard applied by courts to determine excessive force is analyzed under an "objective reasonableness" standard. (*Graham*, 490 U.S. at 388 (1989).)  The terms "gross inappropriate" and "excessive" are synonymous with "unreasonable." (DeFoe Decl., ¶ 36.) According to Merriam-Webster, the legal definition of "unreasonable" is "clearly inappropriate,

17

excessive, or harmful in degree or kind." (Darwish Decl., ¶ 1, Exh. H, p. 222.) LVMPD did not find Officer Lopera's actions to be simply inappropriate, but rather ***grossly*** inappropriate. Therefore, Officer Lopera's use of force was unreasonable and excessive.

### 2. Officer Lopera's Is Not Entitled To Qualified Immunity On Plaintiffs' Federal Claims

Officer Lopera argues that he is entitled to summary judgment on Plaintiffs' federal claims because of the doctrine of qualified immunity.  Officer Lopera's argument is in error and the defense of qualified immunity does not apply for the reasons set forth below.

Qualified immunity "balances two important interest—the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." (*Pearson v. Callahan*, 555 U.S. 223, 231 (2009).) It protects government officials performing discretionary functions from liability for civil damages as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." (*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).)  "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."  (*Pearson*, 555 U.S. at 244.) Qualified immunity may apply even if the defendant makes a mistake of law or acts based upon a mistake of fact. (*Id*. at 231.)

Deciding whether an officer is entitled to qualified immunity is a two-step inquiry.  First, a district court must ask,"[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" (*Saucier v. Katz*, 533 U.S. 194, 201 (2001).) If this threshold question is answered affirmatively, then the court must ask "whether the right was clearly established." (*Id*.) A right is "clearly established" if, "in light of the specific context of the case," it would be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (*Id*. at 201–02.)

It has been long held that "[a]n objectively unreasonable use of force is constitutionally excessive and violates the Fourth Amendment's prohibition against unreasonable seizures." (*Torres,* 648 F.3d at 1123 (9th Cir. 2012); see also *Graham,* 490 U.S. at 394–96 (1989); *Tekle*

18

*v. United States*, 511 F.3d 839, 844 (9th Cir. 2007).)  "The court may not simply accept what may be a self-serving account by the police officer." (*Scott v. Henrich* 39 F.3d 912, 915 (9th Cir. 1994).) The court must look at the circumstantial evidence that if believed tend to discredit the police officer's story and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably. (*Gregory v. County of Maui*, 523 F.3d 1103 (9th Cir. 2008).) A simple statement by an officer that he fears for his safety is not enough to justify the use of force, there must be objective factors to justify the use of force. (*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001).)

For the reasons stated above and in Section (IV)(A)(1), prong #1 of the doctrine of qualified immunity is satisfied. Regardless of whether Officer Lopera's actions were intentional or if he knew he was depriving Farmer of his Fourth Amendment rights, the totality of Officer Lopera's actions constituted unreasonable and excessive force in violation of the Fourth Amendment.  Officer Lopera's actions – the combination of taser, strikes, and neck restraint – amounted to a gross inappropriate use of force.  The force used by Officer Lopera was outside of policy, procedure, training, and tactics.  The Ninth Circuit has endorsed the proposition that actions leading up to the use of force should be analyzed in order to truly consider the "totality of the circumstances." (*Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002).) Similarly, part of that analysis may include the failure to follow training. (*Torres v. City of Madera*, 524 F.3d 1053 (9th. Cir. 2008) (taking training into account in assessing reasonableness in an excessive force claim).)

The second prong of the qualified immunity test is to determine whether the right plaintiff claims was violated was "clearly established." (See *Pearson*, 555 U.S. at 236. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." (*Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).) The dispositive question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (*Id*.)

Viewing the facts in this case in the light most favorable to Plaintiffs, Farmer's right to be secure against an unreasonable use of force under the circumstances is "clearly established." Here, Officer Lopera kept Farmer in a neck restraint for over 1 minutes, despite being told to let go twice by his commanding officer and with three other officers present. Officer Lopera admits he was trained to use the LVNR. Farmer's resistance level was active and never reached aggressive resistance. Officer Lopera at minimum misapplied the LVNR and made a neck restraint applied became lethal. The use of force result in injuries and death to Farmer. The law on excessive is settled under *Graham*, and it would be clear to a reasonable office that Officer Lopera's conduct was unlawful in the situation that he confronted. (See *Saucier*, 533 U.S. at 202.) Farmer's right was clearly established at the time of the misconduct.

Therefore, the qualified immunity doctrine does not shield Officer Lopera from liability under Plaintiffs' federal claims and Officer Lopera is not entitled to summary judgment on those claims.

### B. LVMPD And The Non-Intervening Officers Are Not Entitled To Discretionary Immunity

The Nevada Supreme Court adopted the United States Supreme Court's *Berkovitz-Gaubert* two-part test regarding discretionary immunity. (See *Martinez v. Maruszczak*, 168 P.3d 720, 722, 728-29 (Nev. 2007).) Under Nevada law, state actors are entitled to discretionary-function immunity under NRS § 41.032 if their decision "(1) involve[s] an element of individual judgment or choice and (2) [is] based on considerations of social, economic, or political policy." (*Id*. at 729 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).) Federal courts applying the *Berkovitz-Gaubert* test "must assess cases on their facts, keeping in mind Congress' purpose in enacting the exception: "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." (See id. at 729 (quoting *Varig Airlines*, 467 U.S. at 814).)

### 1. Prong #1: Acts Which Violate The Constitution Are Not Discretionary

"A law enforcement officer is generally afforded discretionary-function immunity in conducting an investigation and effectuating an arrest so long as the officer does not violate a

mandatory directive in doing so." (*Sandoval v. Las Vegas Metro. Police Dept.*, 854 F.Supp.2d 860, 880 (D.Nev.2012) (citing *Hart v. United States*, 630 F.3d 1085, 1090 (8th Cir.2011) ("We readily conclude a federal law enforcement officer's on-the-spot decisions concerning how to effectuate an arrest—including how best to restrain, supervise, control or trust an arrestee—fall within the discretionary function exception to the FTCA absent a specific mandatory directive to the contrary.") (other citations omitted)).)

"However, acts which violate the Constitution are not discretionary." (*Goodman v. Las Vegas Metro. Police Dep't*, 963 F. Supp. 2d 1036, 1061 (D. Nev. 2013); *Jarvis v. City of Mesquite Police Dept.*, No. 09–CV–00851, 2012 WL 600804, at *5 (D.Nev. Feb. 23, 2012) (citing *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir.2000) ("In general, governmental conduct cannot be discretionary if it violates a legal mandate.")); see also *U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir.1988) (stating that "conduct cannot be discretionary if it violates the Constitution, a statute, or an applicable regulation" because federal officials "do not possess discretion to violate constitutional rights or federal statutes").)

Since *Martinez*, federal courts applying Nevada law have been reluctant to grant discretionary immunity to police officers accused of using excessive force. (See, e.g., *Huff v. N. Las Vegas Police Dep't*, No. 2:10-CV-01394-PMP, 2013 WL 6839421, at *1 (D. Nev. Dec. 23, 2013).)

Because Officer Lopera violated the Constitution (excessive use of force), and did so in a manner that renders him unable to avail himself of the qualified immunity defense, the discretionary function exception to Nevada's waiver of sovereign immunity will not shield them from state liability. (*Nurse*, 226 F.3d at 1002 n. 2 (9th Cir.2000) (holding that "the Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply").)

"[W]here an officer's actions are 'attributable to bad faith, immunity does not apply whether an act is discretionary or not.' " (*Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007) (quoting *Falline v. GNLV Corp.*, 107 Nev. 1004, 1009 n. 3, 823 P.2d 888 (1991)). As we held in *Davis*, "where an officer arrests a citizen in an abusive manner not as the result of the

21

exercise of poor judgment as to the force required to make an arrest, but instead ... because of a willful or deliberate disregard for the rights of a particular citizen or citizens, the officer's actions are the result of bad faith and he is not immune from suit." (*Id*. at 1060 (citing *Falline*, 107 Nev. at 1009, 823 P.2d 888 (noting that an officer acts in bad faith where his acts bear "no relationship to a rightful prerogative even if the result is ostensibly within the actor's ambit of authority")); see also id. (noting that "[n]o officer has the 'rightful prerogative' to engage in a malicious battery of a handcuffed citizen who is neither actively resisting arrest nor seeking to flee," and holding that Nevada's discretionary immunity statute did not apply to arrestee's claim of battery where officer slammed handcuffed arrestee into wall multiple times and punched him in the face).)

Taking the facts in the light most favorable to the Plaintiffs, a reasonable juror could find that Officer Lopera used excessive and unreasonable force by tasering, striking, and maintaining a neck restraint on Farmer.  Officer Lopera's actions and failure to listen to orders "w[ere] not merely an exercise or abuse of discretion but instead constituted a deliberate and willful disregard for the law...." (*Id*.; cf. *Pike v. Hester*, No. 3:12–cv–00283, 2013 WL 3491222, at *5 (D.Nev. July 9, 2013) (denying summary judgment on Nevada immunity grounds because the plaintiff had attested to his belief that an officer's personal animus towards him was the cause of the illegal search of his office).)  Therefore, Officer Lopera is not entitled to discretionary immunity.

### 2.    <u>Prong #2</u>: The Decisions Were Not Based On Considerations Of Social, Economic, Or Political Policy

Immunity attaches under the second criterion "if the injury-producing conduct is an integral part of governmental policy-making or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the legislative or executive branch's power or responsibility would be usurped." (*Martinez*, 168 P.3d at 729.) The trial court does not determine a police officer's "subjective intent in exercising the discretion conferred by statute or regulation, but [rather focuses] on the nature of the actions taken and on whether they are susceptible to policy analysis." (*Id*. at 728 (quoting *United States v. Gaubert*, 499 U.S. 315, 325

(1991)).) Therefore, to satisfy the second criterion, the court need not consider whether the Non-Intervening Officers "made a conscious decision regarding policy considerations." (*Martinez*, 168 P.3d at 728.)

Officer Lopera does not meet the second prong of the test.  His decision about the appropriate degree of force to use did not involve any social, economic, or policy considerations within the meaning of *Martinez*. (See 168 P.3d at 728.) Decisions about use of force are driven by Constitutional considerations and involve the use of ordinary judgment by the officer, not policy decisions. Further, the level or degree of force that officers choose to use on a case by case basis is not an integral part of governmental policy-making or planning. Imposing liability on officers who exceed the permissible use of force will not jeopardize the quality of the governmental process.

Therefore, discretionary immunity should not apply to any of Plaintiffs' state-law claims.

**V.**     **CONCLUSION**

For the forgoing reasons, Plaintiffs respectfully request that this Court deny Defendant Officer Lopera's Motion for Summary Judgment in its entirety.

Dated: February 19, 2019            By:   */s/ Darren D. Darwish*
                                          **Darren D. Darwish, Esq.**
                                          CA Bar No. 305797 (admitted *pro hac vice*)
                                          **ABIR COHEN TREYZON SALO, LLP**
                                          1901 Avenue of the Stars, Suite 935
                                          Los Angeles, California 90067
                                          *Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO DEFENDANT OFFICER KENNETH LOPERA'S MOTION
FOR SUMMARY JUDGMENT