# Exhibit 1 – DeFoe CV

# Exhibit A – TRB Report

# L V M P D
# I n t e r o f f i c e

## M E M O R A N D U M

*Approved 9.18.17*

To: Joseph Lombardo, Sheriff
Subject: Tactical Review Board (TRB)
Date: August 24, 2017

CIRT Case: 2017-015
LVMPD Event: 170514-0228
Location Occurred: 3355 S. Las Vegas Boulevard, Las Vegas, Nevada 89109
Date Occurred: May 14, 2017

On August 24, 2017, the Tactical Review Board convened to review Event 170514-0228, a deadly force incident that resulted in an in-custody death. For full details of this incident please refer to the investigative files and/or published summaries produced by the LVMPD Critical Incident Review Team (CIRT) and/or the LVMPD Force Investigation Team (FIT).

**TACTICAL REVIEW BOARD**
Assistant Sheriff Tim Kelly, Chair
Deputy Chief John McGrath, Board Member
Captain John Pelletier, Board Member
Sergeant Ryan Evans, Tactical Expert
Sergeant Jose Hernandez, Peer Member
Detective Travis Ivie, Peer Member
Nathalie Quinteros, Executive Support (Non-Voting)

**OFFICERS INVOLVED**
Officer Kenneth Lopera, P# 14610
Officer Michael Flores, P# 15098
Officer Ashley Lif, P# 15392
Officer Michael Tran, P# 15221
Sergeant Travis Crumrine, P# 8881

**SYNOPSIS**
On May 14, 2017, Officer Lopera and his partner were assigned to work the Venetian Hotel to augment safe strip. Approximately 10 minutes after their arrival, Officer Lopera noticed the decedent, Tashi Farmer in the hallway. Officer Lopera described Farmer as agitated, sweating profusely, and constantly looking over his shoulder. Officer Lopera conducted a consensual encounter on Farmer. Farmer explained to the officers that he ran across Las Vegas Boulevard and believed someone was following him. Officer Lopera asked Farmer to show him who was following him and instead, Farmer asked if officers could escort him to valet.



095

Without communicating to his partner, Officer Lopera approached Farmer, however Farmer backed away and fled down an employee hallway. Officer Lopera followed Farmer through the employee hallway and proceeded to give chase. A few steps into the foot pursuit, Officer Lopera slipped and fell, losing sight of Farmer. Officer Lopera got up and continued to run down the hallway in search of Farmer. During this time, his partner had set their coffee cups down and when she turned around, both Officer Lopera and Farmer were gone. She attempted to locate Officer Lopera in the employee hallway, however she was unable to do so. Officer Lopera never advised his partner or broadcasted his intention via radio to pursue Farmer on foot. Officer Lopera located Farmer running south along Shared Road and gave chase until they got into the valet/self-park intersection of the Venetian. Simultaneously, a white Toyota truck pulled into the intersection. Farmer ran around the rear of the vehicle and Officer Lopera described what he believed to be, Farmer attempting to open the tailgate of the truck. Farmer then ran around to the driver side of the truck. Officer Lopera believed Farmer was going to "carjack" the driver and therefore, deployed his ECD.

Officer Lopera was 10-15 feet from Farmer when he announced to him "Stop! Or you will be tased!" Officer Lopera pulled the ECD trigger and Farmer fell to the ground. Officer Lopera gave numerous verbal commands for Farmer to roll onto his stomach. Farmer replied that he would, however Officer Lopera tased Farmer three more times, all within 10 seconds of each other. Officer Lopera believed Farmer attempted to pull the ECD probes from his back and made the decision he was going to cuff Farmer while he was under power. As Officer Lopera closed the distance on Farmer and attempted to pull Farmer's hand behind his back, Farmer rolled onto his back.

Officer Lopera started to touch stun Farmer numerous times. Officer Lopera called out to security for assistance. He continued to touch stun Farmer until he took a step back to reholster his ECD.

Officer Lopera quickly closed the distance on Farmer and struck Farmer in the head and face area numerous times, while giving Farmer instructions to roll onto his stomach.

that moment, Farmer sat up and Officer Lopera moved around to Farmer's back and placed him in a neck restraint. Sergeant Crumrine arrived just as Officer Lopera fell onto his back with Farmer in the neck restraint.

Sergeant Crumrine stated he told Farmer to place his hand behind his back while attempting to gain control of Farmer's left hand. Sergeant Crumrine told Officer Lopera to "let go." Sergeant Crumrine stated he felt confident he and Officer Lopera could take Farmer into custody together, however Officer Lopera did not release the neck restraint. Instead, he asked Sergeant Crumrine, "Is he out?" three times.

Officers Flores and Tran quickly arrived. Officer Tran immediately ran up to Officer Lopera's right section and attempted to place Farmer into custody. He realized Farmer's hand was wedged between Officer Lopera and the ground. After 30 seconds, Officer Tran looked up and noticed Farmer's eyes were closed. He told Officer Lopera to "loosen up"

2 | P a g e

because he believed Farmer was unconscious. After a few seconds, Officer Lopera released the neck restraint and rolled off Farmer. Officers Flores and Tran took Farmer into custody. Numerous officers arrived on scene to assist. Farmer was placed in a recovery position and several officers rendered first aid to Farmer, including monitoring his pulse and administering CPR. Medical arrived on scene and the decedent Farmer was transported to Sunrise Trauma where he was pronounced dead at 0139 hours by Doctor P. Flores.

Sergeant Crumrine was the only supervisor on scene for approximately 12 minutes. During that time, Sergeant Crumrine failed to start any ICS duties or delegate any tasks to the numerous officers on scene. Sergeant Crumrine realized the severity of the incident 7 minutes after Farmer was taken into custody and officers had performed CPR. During that window of time, Officer Lopera told several officers on scene he had "choked him (Farmer) out" (four times) and placed him (Farmer) in a "rear naked" (one time), all of which was captured on his body worn camera.



camera showed Officer Lopera immediately placed his right hand on top of Farmer's head, similar to the hand placement of a rear naked choke. There appeared to be no attempt to obtain the proper grip for the LVNR, as taught by LVMPD.

CIRT's review showed Officer Lopera had tased Farmer 7 times for a total duration of 39 seconds. He struck Farmer in the face 13 times. Review of the camera showed Farmer had his hands up in a protective manner around his face, while Officer Lopera maintained a dominant position over Farmer. Officer Lopera instructed Farmer "to get on his stomach" numerous times without realizing Farmer was on his stomach. Officer Lopera was also told several times to let go, however the Venetian Surveillance Video showed more than one minute and 12 seconds had elapsed from the time Officer Lopera initiated the neck restraint and the time Farmer was released from the neck restraint. Farmer's behavior or resistance level never appeared to be aggressive as described by Officer Lopera.

## SUMMARY OF FINDINGS

CIRT presented four general conclusions; all conclusions were validated.

### 01. MetroComm – Dispatcher 2.1

*CIRT concluded the Communications Bureau handled the call professionally given the limited information provided to them when the call was initiated.*

*As more information was provided, the Communications Bureau handled the incident within standardized training and policy. (Communications Bureau Manual 4/400.00 Dispatch Procedures)*

**02. Medical Response/Intervention 6.1**

*CIRT concluded this was within standardized LVMPD tactics, training and policy. (LVMPD Policy 5/107.02 Request for Ambulance Service)*

**03. Training Review 8.1**

*CIRT concluded there were no deficiencies noted.*

**04. Department Policy, Training and Procedure Review 9.1**

*CIRT concluded there were no deficiencies noted.*

**COMMENTS -- General**
None

**RECOMMENDED ACTION**
None

**SUMMARY OF FINDINGS -- Officer Lopera**

CIRT presented seven conclusions reference Officer Lopera; six were validated and one was modified, an additional conclusion was added. Due to the circumstances of this Tactical Review Board, a summary conclusion was added under Threat Assessment.

**01. Radio Traffic 1.1**

*When Officer Lopera made the decision to conduct a Person Stop on Farmer, per policy he was required to communicate his intentions to make contact (468-Person Stop) via the radio. Officer Lopera failed to comply with policy.*

*CIRT concluded Officer Lopera's failure to communicate the person stop was not within standardized LVMPD tactics, training and policy. (LVMPD Policy 5/209.14 Voice Radio Communications)*

**02. Tactical Assessments -- Preplanning 3.1**

*Officer Lopera made the determination he was going to detain Farmer based on reasonable suspicion Farmer was UICS and wanted to conduct a pat down. Officer Lopera never verbalized this to Officer Lif.* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Due to the lack of communication by Officer Lopera, Officer Lif assumed he walked away to escort Farmer down to valet, as they had agreed.*

*CIRT concluded Officer Lopera's failure to communicate with Officer Lif resulted in an inability to formulate a plan and ultimately led to a cascade of events that were not within standardized LVMPD tactics, training and policy. (LVMPD Academy Lesson Plan; Patrol Procedures – Pedestrian Stops)*

**03. Tactical Assessments – Foot Pursuit/De-Escalation 3.2**

*Although CIRT found Officer Lopera's decision to pursue was reasonable, he failed to follow policy, specifically:*
- *Failed to broadcast the foot pursuit via radio;*
- *Failed to consider the officer safety concerns and;*
- *Failed to consider the risks;*
- *Failed to transition to containment only.*

*CIRT concluded Officer Lopera's tactics during the foot pursuit were not within standardized LVMPD tactics, training and policy. (LVMPD Policy 5/212.05 Foot Pursuits and 6/002.01 De-Escalation)*

**04. Threat Assessment – ECD 4.1**



**05. Threat Assessment – Empty Hand Strikes 4.2**

*After determining the ECD was ineffective,* *video evidence showed that while Farmer was on his stomach, face down toward the pavement, Officer Lopera was above him in a dominant position.* *Officer Lopera*



*CIRT concluded the use of strikes by Officer Lopera was not within standardized LVMPD tactics, training and policy. (LVMPD Use of Force Policy 6/002.02, Authorized Force Tools, Description, Requirements, Uses and Considerations)*

**06.  Threat Assessment – Neck Restraint 4.3**



*(The autopsy of Farmer showed evidence of hemorrhages to his neck, if the LVNR is applied correctly, this type of injury should not occur).*



*Officer Lopera's body worn camera depicts Sergeant Crumrine arriving and telling Officer Lopera to "let go" of the neck restraint he had on Farmer. Officer Lopera responded by asking Sergeant Crumrine three separate times, "is he out?"* ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *In addition, on his BWC, Officer Lopera can be heard five separate times referencing the application of the LVNR in his interview as a "rear naked" and/or "choking him out".*

*CIRT concluded Officer Lopera's use of the neck restraint was not within standardized LVMPD tactics, training and policy. (LVMPD Use of Force Policy 6/002.02, Authorized Force Tools, Description, Requirements, Uses and Considerations)*

*The Tactical Review Board concluded that as a result of the above conclusions in relation to Threat Assessment, Officer Lopera's actions during this incident amount to a gross inappropriate use of force.*

**07.  Truthfulness Required at all Times 4.4**

*CIRT determined based on video evidence and witness statements that at the time Officer Lopera struck Farmer multiple times in his head, Farmer was only in a level of active resistance. Officer Lopera's actions are not supported by*

**LVMPD training and policy.**



**08. Gross Insubordination**

*Assistant Sheriff Kelly read the following admonishment to Officer Lopera:*

*Officer Lopera, you are compelled to answers questions under threat of termination as part of this internal administrative hearing. The department has the right to compel you to answers questions based on NRS 289, the Rights of Police Officers as well as our own internal policy and procedure. You have been informed that any information gained through questioning cannot be used against you in any subsequent criminal proceedings as provided by the U. S. Supreme Court in Garrity v. New Jersey.   If you continue to refuse to answer questions related to this investigation, your actions will amount to gross insubordination which is grounds for termination from the Las Vegas Metropolitan Police Department. Do you understand this?*



*Assistant Sheriff Kelly concluded by failing to answer questions after being admonished, Officer Lopera's actions amount to gross insubordination. (LVMPD Policy 4/104.04 Obedience and Insubordination)*

7 | P a g e

101

**COMMENTS – Officer Lopera**

**Board Member comments:**

- A Board Member said, each force application that an LVMPD department member uses should be assessed between each use of force.

- A Board Member said, there was over 20 applications of force, did anyone else see any assessment?

  ➢ SME Bland stated there were opportunities to assess, but no assessment made.

- A Board member asked, are there procedures in place with the casinos for situations like the initial contact with Farmer?

  ➢ No real procedures, but most officers would have notified security.

- A Board member asked, how easy would it have been for Officer Lopera to contact security?

  ➢ The officer could have gone to security, checked surveillance cameras, and requested the tracking of the person.

- A Board member asked, is there a policy in place in regards to intervening on a scene?

  ➢ Yes, Duty to intervene.

**LVNR:**

- A Board member asked, is it possible based on the struggle and the positioning of their bodies could Officer Lopera had started in an LVNR and ended up in another position?

  ➢ Per, SME Mike Bland, from the videos seen Officer Lopera is not doing the LVNR consistent with training, can't say it is a rear naked choke either, but it is not consistent with LVNR.

- Per, SME Mike Bland, an officer can complete an LVNR from a lying position, starting on the ground and maneuvering to the back. It's about different entry points, but the same standards still apply.   The intent is to gain compliance. There are different elevation levels to apply direct pressure to the arteries versus the muscle and fat around neck.

- A Board member asked, in the course of training do people go out?

  ➢ SME Bland - not intentionally, but yes it has happened. I can render them unconscious with either max or minimum compression, just

takes longer amount of time. In a training environment, more people go unconscious with a minimal amount of compression over a long period of time, versus maximum pressure over a shorter amount of time.

- How much training is done with the LVNR?

  ➢ 12 hours of training and recertification every year for two hours.

**ECD:**

- Per, SME Nicola Rinella, the body cannot voluntarily move when in Neuro-Muscular Incapacitation (NMI). As the application is done he is locked up and should be giving opportunity to comply.  He could not have moved his stomach since he was tased again. Making it impossible for him to comply due to the excessive taser use.

- Per, SME Mike Bland, if the ECD is working correctly I have 5 seconds to make that quick assessment it's a constant assessment; not a strike assess strike assess, but constant assessment.

**Truthfulness:**



**RECOMMENDED ACTION**
As a result of the findings, an Adjudication of Complaint (AOC) has been completed. For further information, please see the AOC on file with Labor Relations.

**SUMMARY OF FINDINGS – Officer Michael Flores**

CIRT presented one conclusion; it was validated.

**01. Assessment of Equipment, Firearms, Ammunition and Qualification 7.1**

*Once Officer Lopera requested a Code Red, several units were en-route Code 3 to the Venetian. Officer Flores failed to follow policy in regards to activating his BWC.*

*CIRT concluded Officer Flores' failure to activate his body worn camera was not within standardized LVMPD tactics, training and policy. (LVMPD Policy 5/210.01 Body Worn Cameras)*

**COMMENTS – Officer Flores**
None

**RECOMMENDED ACTION**
It is recommended that Officer Flores receive a Contact Report for failing to activate his body worn camera while en-route Code 3 to the Venetian.


**SUMMARY OF FINDINGS – Officer Ashley Lif**

CIRT presented one conclusion; it was validated.

**01. Radio Traffic 1.2**

*Due to the fact Officer Lopera did not communicate his intention to conduct a Person Stop with Officer Lif, she was not obligated to communicate the information via radio. However, at the point Officer Lopera called out "Code Red" via the radio, she had an obligation to communicate that she was unaware of her partner's location and unaware of his circumstances.*

*CIRT concluded Officer Lif's failure to communicate via the radio when her partner called out, "Code Red" was not within standardized LVMPD tactics, training and policy. (LVMPD Policy 5/209.14 Voice Radio Communications)*

**COMMENTS – Officer Lif**

- A Board member said, at bare minimum she should have stated descriptors and the last place she saw her partner.


**RECOMMENDED ACTION**
It is recommended that Officer Lif receive a Contact Report for failing to communicate via the radio with Dispatch.


**SUMMARY OF FINDINGS – Officer Michael Tran**

CIRT presented one conclusion; it was validated.

**01. Assessment of Equipment, Firearms, Ammunition and Qualification 7.1**

*Once Officer Lopera requested a Code Red, several units were en-route Code 3 to the Venetian. Officer Tran failed to follow policy in regards to activating his BWC.*

*CIRT concluded Officer Tran's failure to activate his body worn camera was not within standardized LVMPD tactics, training and policy. (LVMPD Policy 5/210.01 Body Worn Cameras)*

**COMMENTS – Officer Tran**
None

**RECOMMENDED ACTION**
It is recommended that Officer Tran receive a Contact Report for failing to activate his body worn camera while en-route Code 3 to the Venetian.

**SUMMARY OF FINDINGS – Sergeant Travis Crumrine**

CIRT presented three conclusions; one conclusion was modified, one was overturned, one was validated.

**01. Incident Management 5.1 – Modified to include 5.2**

*In evaluating the supervision (command and control), of this incident, CIRT noted:*

*Sergeant Crumrine was the first to respond to Officer Lopera's location. He acknowledged upon arrival, he observed Officer Lopera had Farmer in a back lying LVNR. He felt confident Officer Lopera and himself could place Farmer into custody. Sergeant Crumrine ordered Officer Lopera to "let go" of Farmer. Officer Lopera failed to follow the direction given by Sergeant Crumrine and instead asked three separate times, "is he out?" Due to Sergeant Crumrine failing to follow through on the order given to Officer Lopera, 50 seconds elapsed before Officer Lopera released the neck restraint.*

*Sergeant Crumrine was the first to respond to Officer Lopera's location. As the supervisor on scene he failed to do the following:*

- *Accurately assess the situational to include;*
  - *Life safety;*
  - *Incident stabilization;*
  - *Property preservation.*
- *Establish on-scene command by implementing ICS;*
- *Establish an Incident Command Post and name it;*
- *Establish staging areas;*
- *Establish a Perimeter Control Plan;*
- *Consider the need for additional resources;*
- *Determine and maintain ingress/egress routes for first responders.*

*Sergeant Crumrine failed to recognize:*

- *Officer Lopera was an involved officer in an in-custody death;*
- *Officer Lopera required a monitor officer who was not involved in the incident and;*
- *Officer Lopera's BWC was still activated and recording as he was making statements reference his actions.*

*CIRT concluded by failing to ensure Officer Lopera released the neck restraint after being ordered to do so, Sergeant Crumrine was in neglect of duty as a supervisor. In addition, in reviewing supervisory response, CIRT concluded Sergeant Crumrine's response was not within standardized LVMPD tactics, training and policy. (LVMPD Policy 4/102.11 Neglect of Duty)*

02. **Incident Management 5.2 – Overturned and combined with 5.1**

~~Sergeant Crumrine was the first to respond to Officer Lopera's location. As the supervisor on scene he failed to do the following:~~

- ~~Accurately assess the situational to include;~~
  - ~~Life safety;~~
  - ~~Incident stabilization;~~
  - ~~Property preservation.~~
- ~~Establish on-scene command by implementing ICS;~~
- ~~Establish an Incident Command Post and name it;~~
- ~~Establish staging areas;~~
- ~~Establish a Perimeter Control Plan;~~
- ~~Consider the need for additional resources;~~
- ~~Determine and maintain ingress/egress routes for first responders.~~

~~Sergeant Crumrine failed to recognize:~~

- ~~Officer Lopera was an involved officer in an in-custody death;~~
- ~~Officer Lopera required a monitor officer who was not involved in the incident and;~~
- ~~Officer Lopera's BWC was still activated and recording as he was making statements reference his actions.~~

~~In reviewing supervisory response, CIRT concluded Sergeant Crumrine's response was not within standardized LVMPD tactics, training and policy. (LVMPD Policy 5/213.06 Major Incident and All Hazard Plan)~~

03. **Assessment of Equipment, Firearms, Ammunition and Qualification 7.1**

*Once Officer Lopera requested a Code Red, several units were en-route Code 3 to the Venetian. Sergeant Crumrine failed to follow policy in regards to activating his BWC.*

*CIRT concluded Sergeant Crumrine's failure to activate his body worn camera was not within standardized LVMPD tactics, training and policy. (LVMPD Policy 5/210.01 Body Worn Cameras)*

**COMMENTS – Sergeant Crumrine**

- A Board member said, he is a weak sergeant, he performed weakly and his officer didn't listen to him.

- A Board member said, part of his job is to look out for his people. He should have taken care of his officer.   He doesn't understand his job as a sergeant.

- A Board member said, due to Sergeant Crumrine's inaction his troop ended up killing someone and still did not admit he could have done more.

- A Board member said, Sergeant Crumrine could have intervened and stopped the excessive force.

- A Board member said, Sergeant Crumrine could have stopped it. It could have been stopped the first time he said let go.   It could have possibly saved Farmer's life.

- Performed as a police officer vs. a sergeant

Sergeant Crumrine was the first supervisor to arrive on scene and assisted in taking Farmer into custody.   It is his responsibility to take command and control of the incident and stabilize the situation.   Officers Tran and Flores arrived shortly after Sergeant Crumrine and also assisted with taking Farmer into custody.   Sergeant Crumrine initially told Officer Lopera to let Farmer go, but Officer Lopera did not release the neck restraint. Additionally, Sergeant Crumrine failed to initiate a number of protocols associated with Incident Command.

During the Use of Force Board, Sergeant Crumrine was asked, "So do you feel that you could have intervened more in the situation to successfully get this individual into custody?   Sergeant Crumrine stated, "The - the gravity of this incident is not lost on me. I've thought about these moments - these brief seconds, like, thousands of times. And hoping - wracking my brain to discover something I could have done in those brief seconds that would have definitively changed the outcome here.   I can't come up with any single act for certain to even come to a conclusion in my mind that there's something that I could have done that I know I could have done to stop this."   Sergeant Crumrine was also asked, "So when you asked Officer Lopera to stop and he doesn't listen to you did you feel you had a duty to intervene?"   Sergeant Crumrine's response was, "no."

Almost three months after this tragic event, Sergeant Crumrine still does not understand it was his responsibility to prevent Officer Lopera from continuing to apply a neck restraint once he gave direction for Officer Lopera to release the restraint.   Instead of exerting his authority and demanding Officer Lopera release the hold, he allowed Officer Lopera to maintain the neck restraint for an additional 50 seconds.   As a Sergeant it is critical to understand your role and responsibilities as a first-line supervisor; the men and women we lead and the citizens we serve in the community deserve it.   Based on the entirety of what occurred in this incident, it appears that Sergeant Crumrine does not understand his role and responsibilities as a first-line supervisor.

## RECOMMENDED ACTION
I recommend that Sergeant Crumrine be non-confirmed as a Sergeant and returned to the rank of Police Officer.

Assistant Sheriff Tim Kelly, Chair
LVMPD Tactical Review Board

# Exhibit B – LVMPD Use of Force Policy and Procedure

# Las Vegas Metropolitan Police Department
## Partners with the Community (Department Manual 5-24-2017)

| | | |
|---|---|---|
| 6/002.00 | | USE OF FORCE POLICY |
| | I. | POLICY |
| | II. | DEFINITIONS |
| | III. | DETERMINING OBJECTIVELY REASONABLE FORCE |
| | IV. | MEDICAL ATTENTION |
| | V. | USE OF FORCE MODEL |

6/002.01    USE OF FORCE PROCEDURE
- I. USE OF FORCE TO AFFECT A DETENTION, AN ARREST OR TO CONDUCT A SEARCH
- II. DUTY TO INTERVENE
- III. LEVELS OF RESISTANCE (see Use of Force Model)
- IV. LEVELS OF CONTROL (see Use of Force Model)
- V. DE-ESCALATION

6/002.02    AUTHORIZED FORCE TOOLS, DESCRIPTION, REQUIREMENTS, USES AND CONSIDERATIONS
- I. PRESENCE AND VERBAL COMMUNICATION
- II. EMPTY HAND TACTICS
- III. HANDCUFFS, FLEXIBLE HANDCUFFS, OR OTHER RESTRAINT DEVICES
- IV. BATON/IMPACT WEAPONS
- V. OLEORESIN CAPSICUM SPRAY
- VI. LATERAL VASCULAR NECK RESTRAINT®
- VII. ELECTRONIC CONTROL DEVICE
- VIII. USE OF CANINE
- IX. USE OF FORCE WITH A VEHICLE
  - a. Precision Intervention Technique
  - b. Blocking
  - c. Stationary Vehicle Immobilization Technique (Pinching)
  - d. Ramming
- X. USE OF FORCE WITH A FIREARM
  - a. Low Lethality Shotgun
  - b. Handgun/Shotgun("OO" Buck & Slug)/Rifle
  - c. Deployment of Rifles

6/002.03    REPORTABLE USE OF FORCE
- I. REPORTABLE FORCE INCIDENTS
- II. INVESTIGATIONS AND REPORTING

## I. POLICY

The Las Vegas Metropolitan Police Department is committed to protecting people, their property and rights, while providing the best in public safety and service. The proper use of force is essential for policing. There are circumstances where individuals will not comply with the law unless compelled or controlled by the use of force. Yet, officers must also remain mindful that they derive their authority from the community and that unreasonable force degrades the legitimacy of that authority. In a Use of Force Incident, the governmental interest must match the level of force and intrusion upon an individual's constitutional rights.

It is the policy of this department that officers hold the highest regard for the dignity and liberty of all persons, and place minimal reliance upon the use of force. The department respects the value of every human life and that the application of deadly force is a measure to be employed in the most extreme circumstances.

## II. DEFINITIONS

## Las Vegas Metropolitan Police Department
### Partners with the Community (Department Manual 5-24-2017)

1. **Approved Weapons** – Approved weapons are those weapons meeting department specifications for which officers receive proficiency and safety training. Prior to the use of any approved weapon option, the officer, when practical, will communicate to other officers and the subject that the use of the option is imminent, and clearly and audibly announce the same to all personnel in the immediate area unless exigent circumstances prevent this from occurring.

2. **Blocking** - Blocking is the positioning of a police vehicle in the path of an occupied subject vehicle where contact between the vehicles is not anticipated or is anticipated to be minimal. The intent of blocking is to prevent an avenue of escape by the safe placement of a police vehicle.

3. **Cuffing Under Power** - Cuffing under Power is a tactic where a secondary officer handcuffs a subject while the ECD (being deployed by the primary officer) is cycling and the subject is in Neuro-Muscular Incapacitation (NMI).

4. **Critical Incident Review Team** (CIRT) - A team put in place to conduct an administrative examination of uses of deadly force and other high-risk law enforcement operations, for the purpose of improving both individual and the agency's performance.

5. **Deadly Force** - Deadly force is that degree of force, which is likely to produce death or serious bodily injury. Deadly force can also result from a force option being improperly applied. Deadly force is not limited to the use of firearms.

6. **Electronic Control Device (ECD)** - The ECD is a Neuro-Muscular Incapacitation (NMI) device that stimulates the motor neurons to contract disrupting communication from the brain to the muscles thereby causing temporary motor skill dysfunction.
   1. Spark Display – A non-contact demonstration of the ECD's ability to discharge electricity.
   2. Touch Stun - A secondary function of the ECD intended to administer pain to a subject by making direct contact with the body after the air cartridge has been expended or removed.
   3. Probe Mode - The primary function of the ECD where the ECD cartridge is deployed firing probes at the subject. The intent is that the subject be temporarily immobilized for the period of time the ECD is cycled.

7. **Fatal Detail** – A section of the Traffic Bureau who conducts or assists in investigations related to uses of force with a vehicle which may cause serious bodily injury, or result in death.

8. **Force Transitions** - The movement, escalation/de-escalation, from the application of one force type to another in conjunction with the "objectively reasonable" standard from Graham v. Connor, 490 U.S. 386 (1989). The officer must consider all the factors prior to using force and choose a reasonable option based on the "totality of the circumstances" present.

   The LVMPD Use of Force Policy applies to all commissioned officers, but the legal standard specific to incidents involving use of force within a pretrial detention facility are set forth in Kingsley v. Hendrickson, 576 U.S. (2015).

9. **Force Investigation Team** (FIT) - Conducts a criminal investigation to determine whether the use of deadly force was legally justified under criminal law. FIT also directs the investigation against a subject who either committed crimes which led to the use of deadly force or who has committed crimes against an officer.

10. **Imminent Threat** - "Imminent threat" refers to an impending violent act or resistance that an officer reasonably believes will occur, based on the totality of the circumstances.

## Las Vegas Metropolitan Police Department
### Partners with the Community (Department Manual 5-24-2017)

11. **Intermediate Force** - A level of force that has the potential to cause injury or substantial pain, and is greater than Low-Level Force.

12. **Involved Officer** – A commissioned officer or supervisor, who participated in, directed or influenced the application of the use of force.

13. **Lateral Vascular Neck Restraint (LVNR®)** - LVNR® is a specific method of applying pressure to the side of a subject's neck to overcome resistance and allow safe control. This technique is used only in accordance with official departmental training and policy.

14. **Levels of Control** - Levels of Control are broad categories of influence and/or force in identifiable, escalating stages of intensity. They are identified as low level force, intermediate force, and deadly force.

15. **Low Level Force** - Low level force is a level of force or control that is neither likely nor intended to cause injury.

16. **Non-Deadly Force** - Non-deadly force is the level of force required to compel compliance, which is not intended to, and is not known to create a substantial risk of causing death or serious bodily harm.

17. **Officer-Involved Shooting** - An officer-involved shooting is an officer's discharge of a firearm at a person, with or without physical injury or the death of the person.

18. **Officer Witness Monitor** - An Officer Witness Monitor is a designated officer who is not involved in the use of deadly force. The responsibilities of the Officer Witness Monitor are to observe and prevent discussions regarding the incident among involved officer(s) and witness(s).

19. **Other Firearm Discharge** - An "other firearm discharge" is an unintentional discharge of a firearm that does not cause injury or death to a person or the intentional shooting at, injuring, or killing animals.

20. **Precision Intervention Technique** (PIT) - The PIT is a specific manner of intentional contact using a police vehicle against a fleeing vehicle to cause the fleeing vehicle to come to a stop; this technique is used only in accordance with official department training and policy.

21. **Public Safety Statement** (PSS) - The PSS is a series of questions to obtain information to determine if there is an immediate threat to public safety and must be taken in a timely manner. (An example would be shots fired by an officer or a subject in the direction where the public may be in immediate danger.) The supervisor must take appropriate action to ensure public safety, based on the information received from the PSS.

22. **Ramming** – The use of a vehicle to intentionally hit another vehicle, outside the approved PIT, blocking and stationary vehicle immobilization policies. Ramming is prohibited unless it is a deadly force situation which can be clearly articulated.

23. **Reasonable Force** - Reasonable force is an objective standard of force viewed from the perspective of a reasonable officer, without the benefit of 20/20 hindsight, and based on the totality of the circumstances presented at the moment the force is used. See section IV. "Determining Objectively Reasonable Force."

24. **Reportable Force** - Reportable force is any use of force which is required to overcome subject resistance to gain compliance that results in injury or complaint of injury, complaint of continuing pain, or any use of force greater than low level force (see Levels of Control) and any application of the LVNR®.

# Las Vegas Metropolitan Police Department
## Partners with the Community (Department Manual 5-24-2017)

25. **Serious Bodily Injury** - A bodily injury that creates a substantial risk of death; causes serious, permanent disfigurement; or results in a prolonged loss or impairment of the functioning of any bodily member or organ.

26. **Significant Force** - Any force which results in treatment at a medical facility due to injuries or alleged injuries caused by any officer. Examples include, but are not limited to: skeletal fractures; serious bodily injury or complaint of injury to a person's head or sternum area. All Significant Force is Reportable Force.

27. **Stationary Vehicle Immobilization Technique** (Pinching) - Is a containment tactic whose use is restricted for specialized units. It employs extremely low-speed, intentional vehicle contact with a subject vehicle. The purpose is to render a vehicle immobile by blocking it in place with police vehicles, so that subjects can be taken into custody.

28. **Use of Force Model** – A visual guide describing the appropriate levels of force authorized to be used by an officer in response to the level of resistance being displayed by a subject

29. **Witness Officer** - A commissioned officer or supervisor who did not participate in or directly influence the application of the use of force.

## III·    DETERMINING OBJECTIVELY REASONABLE FORCE

The United States Supreme Court decisions and interpretations of the Fourth Amendment of the United States Constitution a police officer may only use such force as is "objectively reasonable" under all of the circumstances. The standard that courts will use to examine whether a use of force is constitutional was first set forth in Graham v. Connor, 490 U.S. 386 (1989) and expanded by subsequent court cases. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight. The reasonableness must account for the fact that officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving.

The reasonableness inquiry in reviewing use of force is an objective one: the question is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them.  The officer's perception will be a consideration, along with other objective factors that may affect the reasonableness of the force. These factors may include but are not limited to:
1. The severity of the crime(s) at issue;
2. Whether the subject poses an immediate threat to the safety of the officer(s) or others;
3. Whether the subject is actively resisting arrest or attempting to evade arrest by flight;
4. The influence of drugs/alcohol or the mental capacity of the subject;
5. The time available to an officer to make a decision;
6. The availability of officers/resources to de-escalate the situation;
7. The proximity or access of weapons to the subject;
8. The environmental factors and/or other exigent circumstances.

The officer will use a level of force that is necessary and within the range of "objectively reasonable" options. When use of force is needed, officers will assess each incident to determine, based on policy, training and experience, which use of force option will de-escalate the situation and bring it under control in a safe and prudent manner. Reasonable and sound judgment will dictate the force option to be employed. Therefore, the department examines all uses of force from an objective standard rather than a subjective standard.

The LVMPD Use of Force Policy applies to all commissioned officers, but the legal standard specific to incidents involving use of force within a pretrial detention facility are set forth in Kingsley v. Hendrickson, 576 U.S. (2015). Corrections officers will follow DSD Standard Operating Procedure(s) regarding the Use of Force as applicable (i.e. DSD SOP 09.11.01 Use of Force).

## Las Vegas Metropolitan Police Department
### Partners with the Community (Department Manual 5-24-2017)

LVMPD allows certain classifications of civilian employees to carry a firearm and OC spray while on duty. Civilian employees have no power of arrest and therefore may only use force consist with Nevada law on self-defense or defense of others.

### IV. MEDICAL ATTENTION

Whenever an officer applies a Use of Force option upon a subject that results in a visible injury or complaint of injury, the officer will monitor the subject and immediately summon medical attention. When requesting medical attention, the officer will provide the nature of the injury for responding medical personnel.

Note: In some instances, the best course of action may be to transport the subject to the nearest medical facility. In these instances, the nature of injury, response time of medical personnel and proximity of the medical facility should be considered.

Medical attention will be summoned for the following Use of Force applications regardless of visible injury or complaint of injury:

1. Baton/Impact Weapons-Any strikes to the head, neck or groin area.
2. OC Spray- Direct exposure to the facial area.
3. LVNR®-When applied.
4. ECD-Probe strikes to the head, neck or groin area.
5. Use of Canine- All bites
6. Use of Force with a vehicle:
   a. Precision Intervention Technique- Over 40 MPH.
   b. Blocking- Contact with an occupied vehicle.
   c. Stationary Vehicle Immobilization Technique (Pinching)-All.
   d. Ramming-All.
7. Use of Force with a Firearm:
   a. Low Lethality Shotgun-All strikes.
   b. Handgun/Shotgun ("00" Buck & Slug)/Rifle-Any discharge.

### V. USE OF FORCE MODEL

### Las Vegas Metropolitan Police Department
#### Partners with the Community (Department Manual 5-24-2017)

Each bold force option within the Levels of Control represents the highest level of force option available; however, other force options should be considered to help de-escalate the situation.



This graphic is intended as a general guideline for an officer. The subject(s) actions will dictate the Resistance Level and officers will make an "objectively reasonable" force option choice. Corrections officers will follow their established standard operating procedures in incidents involving use of force within a detention facility. (i.e. DSD SOP 09.11.01 Use of Force.)

In use of force incidents, the officer will transition to differing degrees or types of force, including attempts to de-escalate. Force situations are dynamic and require an officer to continually assess the subject's actions to ensure an objectively reasonable response. Officers shall modify their Level of Control in relation to the amount of resistance offered by a subject. (6/15, 11/15)■

## Las Vegas Metropolitan Police Department
### Partners with the Community (Department Manual 5-24-2017)

**6/002.01     USE OF FORCE PROCEDURE**

  I.     **USE OF FORCE TO AFFECT A DETENTION, AN ARREST OR TO CONDUCT A SEARCH**
  II.    **DUTY TO INTERVENE**
  III.   **LEVELS OF RESISTANCE** (see Use of Force Model)
  IV.    **LEVELS OF CONTROL** (see Use of Force Model)
  V.     **DE-ESCALATION**


*I.*    **USE OF FORCE TO AFFECT A DETENTION, AN ARREST OR TO CONDUCT A SEARCH**

  A. Officers may use reasonable force:
       1. To protect themselves;
       2. To protect others;
       3. To affect a lawful detention;
       4. To affect a lawful arrest;
       5. To conduct a lawful search.

  B. If it is not already known by the subject to be detained, arrested, or searched, officers should, if reasonable, make clear their intent to detain, arrest or search the subject. When practicable, officers will identify themselves as a peace officer before using force.

*II.*   **DUTY TO INTERVENE**

Any officer present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, safely intercede to prevent the use of such excessive force. Officers shall promptly report these observations to a supervisor.

*III.*  **LEVELS OF RESISTANCE (see Use of Force Model, 6/002.00)**

It is important for officers to bear in mind that there are many reasons a suspect may be resisting arrest or may be unresponsive. The person in question may not be capable of understanding the gravity of the situation. Officers must consider several factors when dealing with a non-compliant subject. A subject may be non-compliant due to a medical condition, mental, physical, or hearing impairment, language barrier, drug interaction or emotional crisis, and have no criminal intent. This may not make the subject any less dangerous but it may require a change in tactics that will be more effective while maintaining officer safety, once these circumstances are known to the officer.

  1. **Compliant** - A person contacted by an officer who acknowledges direction or lawful orders given and offers no passive/active, aggressive, or aggravated aggressive resistance.

  2. **Passive Resistance** - The subject is not complying with an officer's commands and is uncooperative, but is taking only minimal physical action to prevent an officer from placing the subject in custody and taking control. Examples include: standing stationary and not moving upon lawful direction, falling limply and refusing to use their own power to move (becoming "dead weight"), holding onto a fixed object, or locking arms to another during a protest or demonstration.

  3. **Active Resistance** - The subject's verbal or physical actions are intended to prevent an officer from placing the subject in custody and taking control, but are not directed at harming the officer. Examples include: walking or running away, breaking the officer's grip.

--------------------------- SUBJECT'S INTENT TO HARM ---------------------------

# Las Vegas Metropolitan Police Department
## Partners with the Community (Department Manual 5-24-2017)

4. **Aggressive Resistance** - The subject displays the intent to harm the officer, themselves or another person and prevent an officer from placing the subject in custody and taking control. The aggression may manifest itself through a subject taking a fighting stance, punching, kicking, striking, attacks with weapons or other actions which present an imminent threat of physical harm to the officer or another.

5. **Aggravated Aggressive Resistance** - The subject's actions are likely to result in death or serious bodily harm to the officer, themselves or another. These actions may include a firearm, use of blunt or bladed weapon, and extreme physical force.

**IV·** **LEVELS OF CONTROL (see Use of Force Model, 6/002.00)**

When use of force is needed, officers will assess each incident to determine, based on policy, training and experience, which use of force option is believed to be objectively reasonable for the situation and bring it under control in a safe and prudent manner.

1. **Low Level Force** - Low level force is a level of force or control that is neither likely nor intended to cause injury. Examples are handcuffing a compliant arrestee for transport to detention facility or proning a suspect out on a high-risk vehicle stop.
   This level of force includes:
   1. Officer Presence
   2. Verbal Communication
   3. Empty Hand Tactics (Takedowns)
   4. Handcuffs/Other LVMPD Approved Restraint Devices
   5. Baton (As escort tool)
   6. LVNR® (Level One – minimum restraint)
   7. Canine
   8. Pinching
   9. Blocking

2. **Intermediate Force** - A level of force that has the potential to cause injury or substantial pain, and is greater than Low-Level Force.

3. This level of force requires a Use of Force Report and includes:
   1. Empty Hand Tactics (Takedown with injury, Strikes, Kicks)
   2. Baton/Impact Weapons (Jabs, Strikes)
   3. LVNR® (Level 2 – medium restraint; and 3-maximum restraint)
   4. OC Spray
   5. ECD
   6. Low Lethality Shotgun (five yards or greater)
   7. Canine
   8. P.I.T. (Speeds 40mph or below)

4. **Deadly Force** - Deadly force is that degree of force, which is likely to produce death or serious bodily injury. Deadly force can also result from a force option being improperly applied. In order for the Use of Deadly Force to be justified, at least one of the <u>parameters</u> and all <u>elements</u> must be present. Examples include but are not limited to:
   1. Baton (Striking head, neck, sternum, spine, groin, or kidneys)
   2. Low Lethality Shotgun (Fired at a distance less than five yards)
   3. P.I.T. (More than 40mph)
   4. Ramming
   5. Firearm Use

## Las Vegas Metropolitan Police Department
### Partners with the Community (Department Manual 5-24-2017)

**Parameters for Use of Deadly Force**

An officer may use deadly force upon another person only when it is objectively reasonable to:

1. Protect themselves or others from what is reasonably believed to be an imminent threat of death or serious bodily injury;
2. Prevent the escape of a fleeing felon who the officer has probable cause to believe has committed a violent felony crime and is an imminent threat to human life if escape should occur. (See NRS 171.1455.)  Officers will give some warning, if feasible, prior to the use of deadly force.

     Example: *"Police! Stop or I will shoot!"*

**Elements of Deadly Force**

1. **Ability** - Ability exists when a person has the means or capability to cause grave injury, serious bodily harm or death to an officer or another. This may include, but is not limited to the following: the subject's physical ability, size, age, strength, combative skill, level of aggression, and any weapons in their immediate control.
2. **Opportunity** - Opportunity exists when a person is in a position to effectively resist an officer's control or to use force or violence upon the officer or another. Examples which may affect opportunity include: relative distance to the officer or others, and physical barriers between the subject and the officer.
3. **Imminent Jeopardy** - Based upon all the facts and a circumstance confronting the officer, the officer reasonably believes the subject poses an imminent threat to the life of the officer(s) or other third parties and the officer must act immediately to prevent death or serious bodily injury.
4. **Preclusion** - Lesser alternatives have been reasonably considered and exhausted prior to the use of deadly force, to include disengagement. Deadly force in response to the subject's actions must remain reasonable while based upon the totality of the circumstances known to the officer at the time force was applied. **(Updated 06/15)**

V.    **DE-ESCALATION**

Policing requires that at times an officer must exercise control of a violent or resisting subject to make an arrest, or to protect the officer, other officers, or members of the community from risk of imminent harm. Clearly, not every potential violent confrontation can be de-escalated, but officers do have the ability to impact the direction and the outcome of many situations they handle, based on their decision-making and the tactics they choose to employ.

When reasonable under the totality of circumstances, officers should gather information about the incident, assess the risks, assemble resources, attempt to slow momentum, and communicate and coordinate a response.  In their interaction with subjects, officers should use advisements, warnings, verbal persuasion, and other tactics and alternatives to higher levels of force. Officers should recognize that they may withdraw to a position that is tactically more secure or allows them greater distance in order to consider or deploy a greater variety of Force Options. Officers shall perform their work in a manner that avoids unduly jeopardizing their own safety or the safety of others through poor tactical decisions.

The prospect of a favorable outcome is often enhanced when supervisors become involved in the management of an overall response to potential violent encounters by coordinating resources and officers' tactical actions. Supervisors should possess a good knowledge of tactics and ensure that officers under their supervision perform to a standard. As a good practice, supervisors will acknowledge and respond to incidents in a timely manner where law enforcement use of force is probable. (4/14, 5/14) ■

**6/002.02    AUTHORIZED FORCE TOOLS, DESCRIPTION, REQUIREMENTS, USES AND CONSIDERATIONS**

   A.    **Presence and Verbal Communication:**

# Exhibit C – Assistant Sheriff Tim Kelly Deposition Excerpts

1                    UNITED STATES DISTRICT COURT
2                         DISTRICT OF NEVADA
3
4        _____
         ESTATE OF TASHI S. FARMER a/k/a  )
5        TASHII FARMER a/k/a TASHII BROWN,)
         by and through its Special       )
6        Administrator, Lorin Michelle    )
         Taylor; TAMARA BAYLEE            )
7        KUUMEALIMAKAMAE FARMER DUARTE, a)
         minor, individually and as       )
8        Successor-in-Interest, by and    )
         through her legal guardian,      )
9        Stevandra Lk Kuanoni; ELIAS BAY  )
         KAIMIPONO DUARTE, a minor,       )
10       individually and as Successor-in-)
         Interest, by and through his     )
11       legal guardian, Stevandra Lk     )
         Kuanoni,                         )
12                                        )
                     Plaintiffs,          )
13          vs.                           )  Case No.
                                          )  2:17-cv-01946-JCM-PAL
14       LAS VEGAS METROPOLITAN POLICE    )
         DEPARTMENT, a political          )
15       _____)
         (Caption continued on page 2.)   )
16       _____)
17
18         VIDEOTAPED DEPOSITION OF ASSISTANT SHERIFF TIM KELLY
19                         Las Vegas, Nevada
20                     Thursday, October 25, 2018
21                            Volume I
22
         Reported By:
23       BARBARA R. JUSTL
         CCR No. 878
24       Job No. 3058586A
25       PAGES 1 - 132

                                                        Page 1

1    (Caption continued from page 1.)

                               )

2    subdivision of the State of    )

3    Nevada; OFFICER KENNETH LOPERA,  )

4    individually and in his Official )

5    Capacity; SERGEANT TRAVIS        )

6    CRUMRINE, individually and in his)

7    Official Capacity; OFFICER       )

8    MICHAEL TRAN, individually and in)

    his Official Capacity; OFFICER   )

9    MICHAEL FLORES, individually and )

10   in his Official Capacity; and    )

11   Does 1 through 50, inclusive,    )

12                                  )

13             Defendants.         )

14   _____ )

15

16          Videotaped Deposition of ASSISTANT SHERIFF

17   TIM KELLY, Volume I, taken on behalf of Plaintiffs, at

18   330 East Charleston Boulevard, Suite 100, Las Vegas,

19   Nevada, beginning at 10:03 a.m. and ending at 1:00 p.m.

20   on Thursday, October 25, 2018, before BARBARA R. JUSTL,

21   Certified Court Reporter No. 878.

22

23

24

25

                                                    Page 2

```
 1   APPEARANCES:
 2   For Plaintiff:
 3      ABIR COHEN TREYZON SALO, LLP
 4      By:  FEDERICO C. SAYRE, ESQ.
 5      1901 Avenue of the Stars, Suite 935
 6      Los Angeles, California  90067
 7      (424) 288-4367
 8      fsayre@actslaw.com
 9
10   For Defendant Officer Kenneth Lopera:
11      McNUTT LAW FIRM, P.C.
12      By:  DANIEL R. McNUTT, ESQ.
13      625 South Eighth Street
14      Las Vegas, Nevada  89101
15      (702) 384-1170
16      drm@mcnuttlawfirm.com
17
18   For Defendant LVMPD:
19      MARQUIS AURBACH COFFING
20      By:  CRAIG R. ANDERSON, ESQ.
21      10001 Park Run Drive
22      Las Vegas, Nevada  89145
23      (702) 382-0711
24      canderson@maclaw.com
25               **and**
```

Page 3

```
 1   APPEARANCES:

 2

 3   For Defendant LVMPD:

 4      LAS VEGAS METROPOLITAN POLICE DEPARTMENT

 5      By:  RUTH MILLER, ESQ.

 6      Assistant General Counsel

 7      400 South Martin L. King Boulevard

 8      Las Vegas, Nevada  89106

 9      (702) 828-3330

10      R15423M@lvmpd.com

11

12   Videographer:

13      IAN SALVATIERRA, VERITEXT

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1                          INDEX
 2    WITNESS                          EXAMINATION
 3    ASSISTANT SHERIFF TIM KELLY
      Volume I
 4
 5                    BY MR. SAYRE        7, 129
 6                    BY MR ANDERSON        84
 7                    BY MR. McNUTT         86
 8
 9
10
11
12                        EXHIBITS
13    NUMBER              DESCRIPTION           PAGES
14    Exhibit 1   LVMPD Interoffice Memorandum dated     15
                  August 24, 2017, to Joseph Lombardo,
15                Sheriff, Bates stamped LVMPD 3769
16                through LVMPD 3782.
17
18    Exhibit 2   Force Investigation Team Report,        38
19                In-Custody Death, Bates stamped
20                LVMPD 3782 through LVMPD 3817.
21
      Exhibit 3   Las Vegas Metropolitan Police          101
22                Department Declaration of Arrest,
23                Bates stamped Plts Initial
24                Disclosures 000004 through Plts
25                Initial Disclosures 000012.

                                          Page 5
```

1           Las Vegas, Nevada, Thursday, October 25, 2018

2                           10:03 a.m.

3

4           VIDEOGRAPHER:  Good morning.  We are on the record

5     at 10:03 a.m. on October 25th, 2018.  This is the video

6     recorded deposition of Tim Kelly.

7           My name is Ian Salvatierra, here with the court

8     reporter Barbara Justl.  We are here from Veritext Legal

9     Solutions.

10          The deposition is being held at Callister Law in

11    Las Vegas, Nevada.

12          The caption of this case is Estate of Tashi

13    Farmer, et al., versus Las Vegas Metropolitan Police        10:03:59

14    Department, Case Number 2:17-cv-01946-JCM-PAL.

15          Please note that audio and video recording will

16    take place unless all parties agree to go off the record.

17    Microphones are sensitive and may pick up whispers,

18    private conversations and cellular interference.

19          I am not authorized to administer an oath; I am

20    not related to any party in this action, nor am I

21    financially interested in the outcome in any way.          10:04:29

22          If there are any objections to proceeding, please

23    state them at the time of your appearance, beginning with

24    the noticing attorney.

25          MR. SAYRE:  My name is Federico Sayre.  I

                                                            Page 6

```
 1     represent the plaintiffs in this case.

 2           MR. McNUTT:  Dan McNutt on behalf of Ken Lopera.

 3           MR. ANDERSON:  Craig Anderson on behalf of

 4     Las Vegas Metropolitan Police Department, Travis

 5     Crumrine, Michael Tran and Michael Flores.

 6           VIDEOGRAPHER:  Thank you.

 7           The witness will be sworn in and counsel may begin

 8     the examination.

 9

10                 ASSISTANT SHERIFF TIM KELLY,

11     having been administered an oath, was examined and

12     testified as follows:

13

14                       EXAMINATION

15     BY MR. SAYRE:

16        Q    Good morning, sir.  Should I address you as

17     Sheriff Kelly?  Would that be appropriate?

18        A    Yes, sir.

19        Q    Sheriff Kelly, my name is Fred Sayre, and I am a

20     lawyer that is proceeding in a lawsuit against the

21     Metropolitan Police Department and some of its officers,

22     and I'm going to be asking you some questions concerning   10:05:28

23     some aspects of that case.

24           Do you understand that?

25        A    Yes, sir.
```

```
 1        Q    So as I understand it, Sheriff Lombardo is the

 2   sheriff?

 3        A    Yes, sir.

 4        Q    And I assume assistant sheriff would be one step

 5   down from him?

 6        A    One step down is the under sheriff, and by rank

 7   I'm the number three.

 8        Q    Who is the under sheriff, please?

 9        A    Kevin McMahill.

10        Q    Now, are there more than one assistant sheriffs?     10:11:29

11        A    Yes, sir, there's a total of three of us.

12        Q    And who are the other two ladies or gentlemen?

13        A    The two gentlemen are Assistant Sheriff Charles

14   Hank and Assistant Sheriff Brett Zimmerman.

15        Q    Can you tell me what are the responsibilities of

16   Charles Hank?

17        A    Charles Hank is the assistant sheriff over the

18   jail, and Brett Zimmerman runs investigations.            10:11:59

19        Q    Could you tell me about your educational

20   background, beginning with college?

21        A    So I'm currently enrolled at Columbia Southern

22   working on my Bachelor's in criminal justice, and I

23   graduated from high school in Las Vegas here in 1985.

24        Q    When did you go to work for the Metropolitan     10:12:26

25   Police Department?
```

Page 13

```
 1       A    In 1989.

 2       Q    I assume your initial role was as a patrolman?

 3       A    Yes, sir.

 4       Q    And you went through the normal academy?

 5       A    Yes.

 6       Q    Tell me, please, about how long first you remained

 7   as a patrolman before you got a promotion.

 8       A    I was a patrolman from 1989 to 1998 when I was

 9   promoted to sergeant, and then in 2007 I was promoted to

10   lieutenant.  In 2013 I was promoted to captain.  2015 I      10:13:00

11   was promoted to deputy chief, and a year later I was

12   promoted to assistant sheriff in 2016.

13       Q    A meteoric rise, I would say.  Very impressive.

14   Now, is part of your responsibility the Tactical Review

15   Board?

16       A    Not currently, but at that time of this incident,  10:13:28

17   yes.

18       Q    I'm going to show you a document which I'll mark

19   as Plaintiff's 1 for identification.  It is a memorandum

20   to Sheriff Joseph Lombardo.  I have -- you have one,

21   okay, good.  I have two more for the next two deponents,  10:13:56

22   so --

23            MR. McNUTT:  I've got it.

24            MR. SAYRE:  Okay, good.

25            MR. McNUTT:  Did you say we're marking this as
```

Page 14

1      Exhibit 1?

2           MR. SAYRE:  I did.

3           (Deposition Exhibit 1 marked.)

4      BY MR. SAYRE:

5           Q    Have you seen this document before?

6           A    Yes, sir.

7           Q    Looking toward the back, on the last page, if you

8      look down at the lower right-hand corner, there is a

9      Bates stamp that says LVMPD 3782.  Do you see that?        10:14:26

10          A    Yes.

11          Q    Looking at that page, there is a signature that

12     seems to be your signature, but I need you to identify

13     it.  Is that your signature?

14          A    That's my signature.

15          Q    And it says, "Assistant Sheriff Tim Kelly, Chair,

16     LVMPD Tactical Review Board," correct?                     10:14:58

17          A    Yes, sir.

18          Q    What does that mean?

19          A    That I chair the review of the tactics used in

20     the -- whatever particular use of force that we may be

21     reviewing that particular day.

22          Q    Now, you said you don't do that now?

23          A    No, sir.

24          Q    How long were you the chair of the Tactical Review

25     Board?

                                                        Page 15

```
 1        A    I just oversaw the training aspects for the
 2   organization.
 3        Q    You were in charge?
 4        A    Yes, sir.
 5        Q    So -- but bureau commander is the equivalent of
 6   captain?
 7        A    Captain or director, sir.
 8        Q    Okay.
 9        A    Civilian version director.
10        Q    All right.  How long were you the captain or
11   bureau commander of the academy?
12        A    So I got promoted to chief in '15, so it was      10:17:28
13   probably a year or less than a year, somewhere along in
14   there.
15        Q    What is the role of the Tactical Review Board?
16   What do they do?
17        A    Is to evaluate the tactics that are rendered --
18   basically the findings from the CIRT process, and we have
19   the ability to validate, overturn or modify those          10:17:54
20   conclusions presented by the CIRT board.
21        Q    Okay.  Who is the CIRT board?
22        A    So CIRT is the Critical Incident Review Team.  For
23   lack of better words I use "board," but it's the Critical
24   Incident Review Team, and they review all of the tactics
25   and training associated with a use of force.
```

```
 1        Q    Okay.  So please correct me if I'm wrong, but the

 2   CIRT team does the initial review of a use of force?

 3        A    So we have a FIT team, Force Investigative Team.

 4        Q    F-I-T?

 5        A    F-I-T, that reviews the force, and then the deadly    10:18:28

 6   force aspects of it from the criminal side, and then

 7   internally CIRT reviews the tactics, training, policies

 8   and procedures associated with the use of force.

 9        Q    So CIRT would review tactics, training, policies

10   and procedures, whether deadly force was used or not?

11        A    Yes, sir.  If it's an incident that rises to that    10:19:00

12   level, then CIRT would investigate those four categories.

13        Q    The Force Investigation Team or FIT team reviews

14   the use of deadly force?

15        A    Yes, sir.

16        Q    And then the Tactical Review Board reviews both

17   the CIRT report and the FIT report, no?

18        A    No, sir.

19        Q    Please explain.

20        A    So the Tactical Review Board is what it says, it's   10:19:27

21   tactical.  So within that is whether the tactics in

22   the -- that were used out by the officer fall within the

23   parameters of policy and procedure.

24        Q    Okay.  Now, isn't that the same thing the CIRT

25   team does?
```

Page 18

```
 1      A    That is --

 2      Q    That is the same?

 3      A    So the CIRT renders the findings.

 4      Q    Okay.

 5      A    So basically they say -- they investigate and

 6   determine whether or not the officer was within the

 7   parameters of policy.  And then they present those        10:19:56

 8   findings, conclusions, to the Tactical Review Board, and

 9   then we validate, modify or overturn those conclusions

10   that were rendered --

11      Q    Okay.  I understand.

12      A    -- by the Tactical Review Board.

13      Q    So you basically -- when I say "you," I mean the

14   Tactical Review Board, reviews the findings of the CIRT

15   team concerning tactics, policies and procedures?

16      A    Associated with the event.

17      Q    And the FIT report, which considers issues of

18   deadly force, who, if anybody, reviews that?            10:20:30

19      A    Use of Force Board.

20      Q    Now, does the Use of Force Board produce a report

21   like the Tactical Review Board?

22      A    Yes, sir.

23           MR. SAYRE:  Craig, have I received a Use of Force  10:20:57

24   Board report?  I don't think I've seen that.

25           MR. ANDERSON:  I'll check.  Is that the same as
```

Page 19

```
 1        A    The content, there are parts of the report that      10:26:30

 2    are drafted as kind of a boilerplate of the incident and

 3    the occurrence of what happened out there, and then I add

 4    comments.

 5        Q    In the Use of Force report?

 6        A    Yes, sir.  That goes to the sheriff.

 7             MR. SAYRE:  I guess, Craig, what I need is I need

 8    the Use of Force report.

 9             MR. ANDERSON:  I'll look at it.

10             MR. SAYRE:  And we'll see if it's available, and

11    then I may need to see the exceptional assistant sheriff   10:26:56

12    again to review that perhaps.

13             MR. ANDERSON:  I'll look at it.

14             MR. SAYRE:  Okay.  Right.

15    BY MR. SAYRE:

16        Q    Okay.  Now, is it correct that once the sheriff

17    receives the Tactical Review Board report, which is the

18    document we have here before us, he can accept, reject or

19    modify it as he sees fit?

20        A    Yes, sir.

21        Q    Does he do that in a written form?            10:27:28

22        A    That I'm not aware of.

23        Q    How would you know that he had accepted, rejected

24    or modified the Tactical Review Board?

25        A    I would have known because he would have said
```

Page 24

1    something to me.

2        Q    He would say it to you.                    10:27:53

3        Do you recall whether or not he said anything to

4    you about accepting, rejecting or modifying the Tactical

5    Review Board memorandum?

6        A    No, sir.

7        Q    So he has not said one way or the other?

8        A    No, sir.

9        Q    Did you take that to mean that he had accepted it?

10       A    Yes, sir, because his signature is on it.

11       Q    Now, it's not on this document.

12       A    It is.

13       Q    It's on this document?  Okay.

14       A    Front page.

15       Q    I see.  What's up here, okay, right at the top, it  10:28:26

16   says, "To:  Joseph Lombardo, Sheriff," and then

17   there's -- it looks like a doctor's signature because I

18   can't read it, but that is actually Sheriff Lombardo's

19   signature?

20       A    Yes, sir.

21       Q    And it has a date 9/18/17, which would be

22   September 18, 2017, and this indicates his acceptance

23   of --

24       A    The document.

25       Q    -- the document.  Got it.  All right.

Veritext Legal Solutions
866 299-5127

BY MR. SAYRE:

Q   Well, I mean, I understand.  But -- this is a rather important document, don't you agree?

A   Yes.

MR. McNUTT:  Objection, form.

BY MR. SAYRE:

Q   And the CIRT conclusion here, you accepted that to be true, correct?

A   Yes.

Q   You agreed that -- you agreed with their    11:06:29 conclusion that the inability to formulate a plan ultimately led to a cascade of events that were not within standardized LVMPD tactics?

A   True.

Q   Was it within LVMPD tactics to apply a neck restraint?

A   The -- what exactly do you mean by the question?

Q   Pretty straightforward.  Was it within LVMPD    11:06:59 tactics to apply a neck restraint on Mr. Farmer?

A   No, it was outside of policy.

Q   And did it constitute excessive force?

MR. McNUTT:  Objection, form.

MR. ANDERSON:  Objection, form.

THE WITNESS:  In the Tactical Review Board, we don't determine excessive force.  What we determine is

Page 51

```
 1    whether or not the individual officer's actions were

 2    within policy, procedures, training and tactics.  The       11:07:26

 3    courts determine that stuff.

 4          MR. SAYRE:  Actually, juries do.

 5          MR. McNUTT:  I'm sorry, what was the last part of

 6    the answer?

 7          MR. SAYRE:  Courts determine that stuff.

 8    Actually, juries do.

 9          MR. ANDERSON:  Objection, misstates procedure.

10    Courts can't determine that.

11          MR. SAYRE:  Well, Mr. Anderson will determine

12    that.

13    BY MR. SAYRE:

14       Q   All right.  Was it outside of policy to strike

15    Mr. Farmer on the head 10 to 12 times?

16          MR. McNUTT:  Objection, form.

17          THE WITNESS:  Based on the investigation, it was    11:07:59

18    determined that it was outside of policy.

19    BY MR. SAYRE:

20       Q   Was it outside of policy to tase Mr. Farmer seven

21    times?

22          MR. McNUTT:  Objection, form.

23          THE WITNESS:  The initial tase we determined was

24    within policy.  All subsequent tases were outside

25    policy.
```

Page 52

1      A    Yes.

2      Q    Next page says, "CIRT concluded the use of strikes   11:14:33

3  by Officer Lopera was not within standardized LVMPD

4  tactics, training and policy."

5           You agreed with that assessment?

6      A    Yes, sir.

7      Q    And that's why it's included in the report to

8  Sheriff Lombardo?

9      A    Yes, sir.

10     Q    And he agreed with that, too, because he signed

11  off on the report?                                11:14:59

12     A    Correct.

13     Q    "The autopsy of Farmer showed evidence of

14  hemorrhages to his neck.  If the LVNR is applied

15  correctly, this type of injury should not occur."

16           Who stated that?

17     A    That would be CIRT stated that.

18     Q    Now, you've been trained in the use of the LVNR,

19  correct, once?                                    11:15:28

20     A    Yes.

21     Q    It's been awhile?

22     A    It's been awhile.

23     Q    And it's been awhile since you were in a position

24  where you might be called upon to use it?

25     A    Correct.

                                                  Page 57

1     and/or choking him out.  This is information that came

2     from the investigation also?

3         A    Yes, sir.

4         Q    Did the Tactical Review Board come to a conclusion   11:17:02

5     that Officer Lopera had utilized a rear naked choke and

6     not a lateral vascular neck restraint?

7         A    No, we did not.

8         Q    Did CIRT come to a conclusion that Officer Lopera

9     had used a rear naked choke rather than a lateral

10    vascular neck restraint?

11        A    Not that I'm aware of.

12        Q    It says CIRT concluded Officer Lopera's use of the   11:17:27

13    neck restraint, whatever it was, was not within

14    standardized LVMPD tactics, training and policy, and you

15    agree with that?

16        A    Yes.

17        Q    Why?

18        A    Well, when you look at the video, it isn't an

19    LVNR, but we don't know pretty much what it is.  But what

20    I know is what he used was not within the policy that we

21    teach.

22        Q    Okay.  Then it says, "The Tactical Review Board

23    concluded that as a result of the above conclusions in    11:18:00

24    relation to Threat Assessment, Officer Lopera's actions

25    during this incident amounted to a gross inappropriate

                                                        Page 59

1    use of force."

2         Is that the conclusion that was added on by the --

3    by your board?

4       A   Yes.

5       Q   And is gross inappropriate use of force the

6    equivalent of excessive force?

7            MR. ANDERSON:  Objection, form.

8            THE WITNESS:  Gross inappropriate use of force    11:18:28

9    means that the force used was outside of policy,

10   procedure, training and tactics.

11   BY MR. SAYRE:

12      Q   Why the word "gross"?

13      A   Because of the combination of the taser, the

14   strikes and the LVNR.

15      Q   Do you have a belief, you personally, as Assistant    11:18:54

16   Sheriff Tim Kelly, that the combination of taser, strikes

17   and LVNR constituted a Fourth Amendment violation of

18   Mr. Farmer's rights --

19           MR. ANDERSON:  Objection, form.

20   BY MR. SAYRE:

21      Q   -- as used by Officer Lopera?

22           MR. McNUTT:  Objection, form.

23           MR. ANDERSON:  Objection, form.

24           THE WITNESS:  We don't make that determination at

25   the Tactical Review Board.  What we make is a

                                                    Page 60

1    report.

2        Q    Okay.  Then in the next section under "LVNR" it

3    says, "Per, SME Mike Bland, from the videos seen Officer

4    Lopera is not doing the LVNR consistent with training,        11:26:57

5    can't say it is a rear naked choke either, but it is not

6    consistent with LVNR."

7            Was that the conclusion of the Tactical Review

8    Board?

9        A    These are comments that are made within the board.

10   It isn't -- this section right here isn't necessarily a

11   conclusion.  These are just comments that are made as

12   we're deliberating during the information that was

13   presented during the Tactical Review Board.

14       Q    Up above here, I skipped over this.  "A Board        11:27:30

15   member asked, is there a policy in place in regards to

16   intervening on a scene?"

17           And the answer was, "Yes, Duty to Intervene."

18           What is meant by the duty to intervene?

19       A    So under duty to intervene, if an officer observes

20   an individual that's using significant force on an

21   individual, it's his or her responsibility to intervene

22   within that incident.                                         11:27:58

23       Q    And that would include Sergeant Crumrine?

24       A    Yes.

25       Q    Officer Flores?

                                                            Page 66

```
 1      A   Yes.

 2      Q   Officer Tran?

 3      A   Yes.

 4      Q   And significant force, that could include a gross

 5   inappropriate force?

 6          MR. ANDERSON:  Objection, form.

 7          THE WITNESS:  It could.                    11:28:23

 8   BY MR. SAYRE:

 9      Q   If an officer like Crumrine, Flores and Tran

10   believed that Officer Lopera was engaged in an

11   unconstitutional application of force, would they have a

12   duty to interview (sic) and -- to intervene and even

13   physically take his hands away from the neck of

14   Mr. Farmer?

15          MR. ANDERSON:  Objection, incomplete hypothetical.

16          Go ahead and answer.

17          THE WITNESS:  So they did intervene, and if they

18   didn't -- had not intervened, then they would have been

19   in violation of duty to intervene policy, and we would

20   have added that here.

21          But since the officers did intervene in that

22   particular incident, but our concern was that potentially

23   Sergeant Crumrine could have did more.

24   BY MR. SAYRE:

25      Q   You say they intervened but nobody took Officer
```

Page 67

```
 1        Q    Next page, all right.
 2             Okay.  Under "Incident Management" where all these
 3   things are crossed out, what specifically are you
 4   referring to?
 5        A    So under "02.  Incident Management 5.2," it was
 6   overturned and combined with 5.1.
 7        Q    Okay.  All right.  So what -- it was included in      11:44:59
 8   5.1?
 9        A    Yes.
10        Q    And 5.1 said -- it says here under 01 in the last
11   sentence of the first paragraph, "Due to Sergeant
12   Crumrine failing to follow through on the order given to
13   Officer Lopera, 50 seconds elapsed before Officer Lopera      11:45:30
14   released the neck restraint."
15             That was a conclusion of CIRT?
16        A    Yes, sir.
17        Q    Do you agree with that?
18        A    Yes.
19        Q    And the sheriff agreed with that?
20        A    Yes.
21        Q    Now, there's a series of things that says that
22   Crumrine failed to do in the next paragraph, starting       11:45:53
23   with accurately assess the situation, include life
24   safety, incident stabilization, property preservation and
25   so on.  All these are failings of Sergeant Crumrine
```

Page 79

1    pursuant to the policy of the Metropolitan Police

2    Department.

3        A    True.

4        Q    And you agree with these determinations by CIRT?

5        A    Yes, sir.

6        Q    And Sheriff Lombardo agrees as well?

7        A    Yes, sir.

8        Q    Now, are these failings by Sergeant Crumrine not

9    just under the policies of the Metropolitan Police          11:46:29

10   Department, but in general in his performance as a

11   sergeant?

12       A    So under this particular incident, we don't bring

13   all other incidents into the -- into the determination of

14   what particularly goes into these categories.   On this

15   particular event, these are the shortcomings or the

16   failures from a policy and procedure perspective that       11:46:57

17   fell upon Sergeant Crumrine.

18       Q    The next page, please.

19       A    Sure.

20       Q    "CIRT concluded by failing to ensure Officer

21   Lopera released the neck restraint after being ordered to

22   do so, Sergeant Crumrine was in neglect of duty as a

23   supervisor.   In addition, in reviewing supervisory

24   response, CIRT concluded Sergeant Crumrine's response

25   was not within standardized LVMPD tactics, training and

                                                    Page 80

```
 1    policy."                                          11:47:29

 2        You agree with that?

 3    A   Yes, sir.

 4    Q   And the sheriff agreed with that?

 5    A   Yes, sir.

 6    Q   It says here that, "A Board member said, he is a

 7    weak sergeant, he performed weakly and his officer didn't

 8    listen to him."

 9        Do you remember who said that?

10    A   No, sir.

11    Q   It would have been a sworn officer?

12    A   It would have been a member of the Tactical Review

13    Board.

14    Q   And all the members of the board, except for the

15    administrative person, would have been -- are sworn      11:47:59

16    officers?

17    A   Yes.

18    Q   They're not civilians on the Tactical Review

19    Board, correct?

20    A   Yes, sir.

21    Q   And the administrative person doesn't make

22    comments in the deliberation?

23    A   No, sir.

24    Q   "A Board member said, part of his job is to look

25    out for his people.  He should have taken care of his
```

                                                    Page 81

1    sentence, last two sentences, "Sergeant Crumrine was also

2    asked, 'So when you asked Officer Lopera to stop and he

3    didn't (sic) listen to you, did you feel you had a duty

4    to intervene?'  Sergeant Crumrine's response was,

5    'no.'"?.

6          And the next paragraph, this next paragraph, did     11:49:59

7    you write this?

8       A    Yes.

9       Q    "Almost three months after this tragic event,

10   Sergeant Crumrine still does not understand it was his

11   responsibility to prevent Officer Lopera from continuing

12   to apply a neck restraint once he gave direction for

13   Officer Lopera to release the restraint.  Instead of

14   exerting his authority and demanding Officer Lopera

15   release the hold, he allowed Officer Lopera to maintain     11:50:30

16   the neck restraint for an additional 50 seconds.  As a

17   Sergeant it is critical to understand your role and

18   responsibilities as a first-line supervisor; the men and

19   women we lead and the officers (sic) we serve in the

20   community deserve it.  Based on the entirety of what

21   occurred in this incident, it appears that Sergeant

22   Crumrine does not understand his role and

23   responsibilities as a first-line supervisor."

24          And that was your assessment?

25       A    That was my assessment.

Page 83

1      Q    And that was accepted by the sheriff?

2      A    Yes.

3      Q    "I recommend that Sergeant Crumrine be

4   non-confirmed as Sergeant and returned to the rank of

5   Police Officer," and that was done?

6      A    Yes, sir.

7           MR. SAYRE:  I have nothing further.

8           Could we take a short break before you have at it?

9           MR. McNUTT:  Sure.

10          VIDEOGRAPHER:  We are now off the record at

11   11:51 a.m.                                        11:51:26

12          (Recess.)

13          VIDEOGRAPHER:  We are back on the record.

14          The time is approximately 11:58 a.m.        11:58:27

15

16                       EXAMINATION

17   BY MR. ANDERSON:

18      Q    Sheriff Kelly, you understand that you're still

19   under oath?

20      A    Yes.

21      Q    Real quick, you've already testified to a lot of

22   these facts, so just tell me if you agree with this.

23          Officers Crumrine, Tran and Flores arrived on

24   scene after Farmer and Lopera were already on the ground

25   in some form of neck restraint; is that correct?

                                                    Page 84

1      A    From an agency perspective, it is.

2      Q    It's also a crime, correct?

3           MR. ANDERSON:  Objection to form.

4           MR. McNUTT:  Form.

5           THE WITNESS:  That would be up to the courts,

6      obviously, to make that determination as in the case of

7      the burglary.

8      BY MR. SAYRE:

9      Q    In other words, something that is outside of

10     policy could be in the right circumstances a crime,

11     depending on the circumstances and facts?

12     A    Yes.

13     Q    And it could be a violation of the Fourth

14     Amendment, depending on the circumstances and the facts?

15     A    As the courts make that determination, yes.        12:59:29

16          MR. SAYRE:  I have nothing further, thank you.

17          MR. McNUTT:  Thank you for your time.

18          VIDEOGRAPHER:  We are off the record at 12:59 p.m.

19          This concludes today's testimony given by Tim

20     Kelly.                                                  12:59:52

21

22

23

24

25

                                                        Page 130

1

2          I, ASSISTANT SHERIFF TIM KELLY, do hereby declare

3    under penalty of perjury that I have read the foregoing

4    transcript; that I have made any corrections as appear

5    noted, in ink, initialed by me, or attached hereto; that

6    my testimony as contained herein, as corrected, is true

7    and correct.

8          EXECUTED this _____ day of _____,

9    2018, at _____, _____.

10                        (City)                (State)

11

12

13

14

15          _____

16                 ASSISTANT SHERIFF TIM KELLY

17                          VOLUME I

18

19

20

21

22

23

24

25

                                              Page 131

1              I, the undersigned, a Certified Court Reporter of

2      the State of Nevada, do hereby certify:

3              That the foregoing proceedings were taken before

4      me at the time and place herein set forth; that any

5      witnesses in the foregoing proceedings, prior to

       testifying, were duly sworn; that a record of the

6      proceedings was made by me using machine shorthand which

7      was thereafter transcribed under my direction; that the

8      foregoing transcript is a true record of the testimony

9      given.

10             Further, that before completion of the

       proceedings, review of the transcript [XX] was [  ] was

11     not requested.

12             I further certify I am neither financially

13     interested in the action nor a relative or employee of

14     any attorney or party to this action.

15                  IN WITNESS WHEREOF, I have this date

16     subscribed my name.

17

18     Dated: November 8, 2018

19

20

21

22

23                    _____

24              BARBARA R. JUSTL, RPR

25                  CCR No. 878

                                             Page 132

# Exhibit D – Chief John McGrath Deposition Excerpts

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

ESTATE OF TASHI S. FARMER
a/k/a TASHII FARMER a/k/a
TASHII BROWN, by and through
its Special Administrator,
Elia Del Carmen
Solano-Patricio; TAMARA
BAYLEE KUUMEALI'MAKAMAE
FARMER DUARTE, a minor,
individually and as
Successor-in-Interest, by and
through her legal guardian,
Stevandra Lk Kuanoni; ELIAS
BAY KAIMIPONO DUARTE, a
minor, individually and as
Successor-in-Interest, by and
through his legal guardian,
Stevandra Lk Kuanoni,

   Plaintiffs,

        Case No. 2:17-CV-01946-
   vs.       JCM-PAL

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, a political
subdivision of the State of
Nevada; OFFICER KENNETH
LOPERA, individually and in
his Official Capacity; and
Does 1 through 50, inclusive,

   Defendants.

---

VIDEOTAPED DEPOSITION OF CHIEF JOHN MCGRATH

Las Vegas, Nevada

December 27, 2017

Reported by: Kimberly A. Farkas, RPR, CCR #741

CHIEF JOHN MCGRATH

December 27, 2017

```
 1              Videotaped Deposition of CHIEF JOHN

 2     MCGRATH, taken at 330 E. Charleston Blvd. Suite 100,

 3     Las Vegas, Nevada, on Wednesday, December 27, 2017,

 4     at 1:01 p.m., before Kimberly A. Farkas,

 5     Certified Court Reporter in and for the State of

 6     Nevada.

 7

 8     APPEARANCES

 9

10     For the Plaintiffs:

11             FEDERICO C. SAYRE, ESQ.
               DARREN D. DARWISH, ESQ.
12             ABIR COHEN TREYZON SALO, LLP
               1901 Avenue of the Stars, Suite 935
13             Los Angeles, California  90067
               (424) 288-4367
14             ddarwish@actslaw.com

15

16     For the Defendant Las Vegas Metropolitan Police
       Department:
17

18             CRAIG R. ANDERSON, ESQ.
               Marquis Aurbach Coffing
19             10001 Park Run Drive
               Las Vegas, Nevada  89145
20             (702) 382-0711
               canderson@maclaw.com
21

22

23

24

25     \\\
```

December 27, 2017

```
 1    APPEARANCES (continued)

 2

 3    For the Defendant Officer Kenneth Lopera:

 4

 5            DANIEL R. McNUTT, ESQ.
              McNutt Law Firm, P.C.
 6            625 South Eighth Street
              Las Vegas, Nevada  89101
 7            (702) 384-1117
              drm@mcnuttlawfirm.com
 8

 9

10    Also present:   Tom Burtney, Videographer

11                    Ruth Miller, LVMPD

12                    Elia Del Carmen Solano-Patricio

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CHIEF JOHN MCGRATH

December 27, 2017

```
 1        VIDEOTAPED DEPOSITION OF CHIEF JOHN McGRATH

 2                    December 27, 2017

 3              Kimberly A. Farkas, CCR No. 741

 4                      * * * * *

 5

 6                        INDEX

 7                                           Page

 8   CHIEF JOHN MCGRATH

 9   Examination by Mr. Sayre                  6

10   Examination by Mr. McNutt                58

11   Examination by Mr. Sayre                 66

12               (No exhibits marked)

13                  * * * * *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              LAS VEGAS, NEVADA

 2          Wednesday, December 27, 2017

 3                  1:01 p.m.

 4    VIDEOTAPED DEPOSITION OF CHIEF JOHN McGRATH

 5                * * * * * *

 6          (The court reporter was relieved of her

 7    duties under NRCP 30(b)4.)

 8              THE VIDEOGRAPHER:  Good afternoon.  Here

 9    begins media no. 1 of the deposition of

10    John McGrath in the matter of The Estate of

11    Tashi S. Farmer, et al., versus Las Vegas

12    Metropolitan Police Department, et al.  This case

13    is in the United States District Court, District

14    of Nevada, and the case number is 2:17-CV-01946-

15    JCM-PAL.

16              Today's date is December the 27th, 2017,

17    and the time is 1:01 p.m.  This deposition is

18    taking place at 330 East Charleston Boulevard,

19    Suite 100, in Las Vegas, Nevada.  The videographer

20    is Tom Burtney, appearing on behalf of First Legal

21    Deposition Services.

22              Would counsel please identify yourselves

23    and whom you represent.

24              MR. SAYRE:  For the plaintiffs,

25    Federico Sayre.
```

```
 1              MR. DARWISH:  Darren Darwish on behalf
 2   of plaintiffs.
 3              MR. McNUTT:  Dan McNutt on behalf of
 4   Ken Lopera.
 5              MR. ANDERSON:  Craig Anderson on behalf
 6   of the Las Vegas Metropolitan Police Department.
 7              THE VIDEOGRAPHER:  Also present is
 8   Ruth Miller.
 9              The reporter today is Kimberly Farkas.
10              Would the reporter please swear in the
11   witness.
12              CHIEF JOHN MCGRATH,
13   having been first duly sworn, was examined and
14   testified as follows:
15                        EXAMINATION
16   BY MR. SAYRE:
17      Q.   Chief McGrath, would you please state
18   your full name for the record.
19      A.   John McGrath.  M-C-G-R-A-T-H.
20      Q.   And could you give me the extent of your
21   education, beginning with high school.
22      A.   I have a college degree from University
23   of Massachusetts Lowell.  I graduated in 1992 with
24   a degree in criminal justice.  I've taken some
25   master's classes, but I don't have my master's
```

1    force.

2         Q.   Well, I'll tell you that what

3    Officer Crumrine testified to is he never again,

4    until 4:11, looked to see if the hold had been

5    released, having told him twice.

6              MR. McNUTT:   Objection.  Form.

7    Misstates testimony.

8              MR. ANDERSON:   Join.

9    BY MR. SAYRE:

10        Q.   I'm representing to you that's what he

11   testified, that he did not look to see if the hold

12   had been released after he had told him twice to

13   release it, because he trusted that he would

14   release the hold.

15             MR. McNUTT:   Same objection.

16             THE WITNESS:   So if you're saying to me

17   that he asked him to release the hold and he

18   didn't do it and he didn't follow through on that?

19   BY MR. SAYRE:

20        Q.   That's right.

21        A.   That's -- that's -- he should have

22   followed through.

23        Q.   And following through -- failing to

24   follow through is a failure to intervene?

25        A.   Yes.

CHIEF JOHN MCGRATH

December 27, 2017

```
1        Q.    And failure to intervene, besides being
2   a violation of Metropolitan policy, is a violation
3   of the Fourth Amendment of the Constitution?
4             MR. ANDERSON:  Objection.  Form.
5             MR. McNUTT:  Objection.  Form.
6             THE WITNESS:  So I -- I think that
7   you're -- I -- he would have to know that the
8   force was excessive and then not intervene and
9   allow it to happen.
10  BY MR. SAYRE:
11       Q.    All right.
12       A.    I -- I don't think that's what he did.
13  I know that's what he -- he didn't intervene, but
14  I don't think it was because -- he just didn't
15  know that that's what he was supposed to do.
16       Q.    Okay.  He didn't know that's what he was
17  supposed to do because he hadn't been trained to
18  do that?
19            MR. McNUTT:  Objection to form.
20            MR. ANDERSON:  Objection.
21            THE WITNESS:  Okay.  I -- no, I don't
22  think that's why.  I think he didn't understand
23  his job as a supervisor.
24  BY MR. SAYRE:
25       Q.    Okay.  And he didn't understand his job
```

CHIEF JOHN MCGRATH

December 27, 2017

```
 1   as a -- why do you say that?
 2       A.   Because he's the one that should have
 3   the most experience and be the most objective in
 4   that situation and should have -- if he didn't
 5   make sure something happened, then he should have
 6   made sure someone else made it happen.
 7       Q.   Okay.  What do you mean, make sure
 8   someone else made it happen?
 9       A.   Tell someone else to pull him off.
10       Q.   Right.  Physically pull his hands away
11   from the neck?
12       A.   Or direct somebody else to pull his
13   hands off.
14       Q.   All right.  And why didn't he understand
15   that that was his duty?
16           MR. ANDERSON:  Objection.  Form.
17           THE WITNESS:  Because he didn't
18   understand his role as a supervisor.
19   BY MR. SAYRE:
20       Q.   And why didn't he understand his role as
21   a supervisor?
22       A.   Well, I think that being a supervisor
23   isn't for everybody.  You have to remove yourself
24   as your previous role as an officer and be able to
25   go to the next role, and it's not an easy
```

CHIEF JOHN MCGRATH

December 27, 2017

```
 1    transition and not everyone can do it.  And he was

 2    acting as one of the guys instead of being a

 3    sergeant.

 4         Q.   All right.  By that, you mean he wanted

 5    to get along with his men, so he didn't intervene?

 6              MR. ANDERSON:  Objection.  Form.

 7              THE WITNESS:  And sometimes that's --

 8    that could be the problem --

 9    BY MR. SAYRE:

10         Q.   Right.

11         A.   -- that he was trying to get along with

12    his guys.

13         Q.   Right.

14         A.   Or sometimes he just doesn't understand

15    that is his job.

16         Q.   All right.  He failed in his duty as a

17    supervising officer that -- that day; correct?

18              MR. ANDERSON:  Objection.  Form.

19              THE WITNESS:  Yes.

20    BY MR. SAYRE:

21         Q.   Okay.  He failed to prevent

22    Officer Lopera from exercising excessive force on

23    Mr. Farmer; correct?

24              MR. McNUTT:  Objection.  Form.

25              MR. ANDERSON:  Join.
```

CHIEF JOHN MCGRATH

```
 1                THE WITNESS:  So I think the -- a lot of
 2    the use of the force was started well before
 3    Officer Crumrine got there.
 4    BY MR. SAYRE:
 5        Q.   Right.
 6        A.   So he got there in the middle.  I'm just
 7    estimating there, but all I can say is he should
 8    have done more.
 9        Q.   All right.  You've seen the video;
10    correct?
11        A.   Yes.
12        Q.   Both the body camera of Lopera, as well
13    as the Venetian security film?
14        A.   That's correct.
15        Q.   And are you aware that Officer Lopera
16    tased Mr. Farmer seven times?
17        A.   Yes.
18        Q.   And that's outside of policy; correct?
19             MR. McNUTT:  Objection.  Form.
20             THE WITNESS:  Policy states, I believe,
21    you can only tase someone three times.
22    BY MR. SAYRE:
23        Q.   Right.  So it would be a violation of
24    policy?
25        A.   Yes.
```

CHIEF JOHN MCGRATH

December 27, 2017

```
 1        Q.    Which means it's unreasonable behavior?
 2        A.    Yes.
 3        Q.    Okay.  Now, did you see Officer Lopera
 4   strike Mr. Farmer on the head 10 to 12 times?
 5        A.    I saw the video, and it was difficult to
 6   tell how many times he struck him, but he
 7   definitely struck him a lot.
 8        Q.    Was it outside of policy to strike
 9   Mr. Farmer on the head or about the head?
10        A.    It's not outside of policy to strike
11   someone on the head.  It's -- what was outside of
12   policy is the combination of tasing, striking in
13   the head, LVNR.
14        Q.    Okay.  So the entire administration of
15   force as a whole, including taser, striking, and
16   the lateral vascular neck restraint, were
17   excessive force?
18        A.    Based on the reason for the stop, which
19   was not justified.
20        Q.    Right.  In fact, the stop was a
21   consensual stop, wasn't it?
22        A.    We all know that it was a consensual
23   stop, but Officer Lopera didn't think it was a
24   consensual stop.
25        Q.    And why do you say that?
```

CHIEF JOHN MCGRATH

```
 1        A.    Because he didn't have a reason to stop
 2   him.
 3        Q.    Right.  He had no reason to pursue him
 4   and start tasing him; correct?
 5        A.    Well, pursuing him is not a stop or
 6   unreasonable.  What happens when you catch someone
 7   is what force can you use based on what crime they
 8   committed.
 9              He didn't know what he had.  I
10   understand someone runs from the police, most
11   police officers chase them.
12        Q.    When someone is stopped pursuant to a
13   consensual stop, they're stopped without probable
14   cause for an arrest; correct?
15        A.    That's correct.
16        Q.    That's the nature of a consensual stop?
17        A.    Right.
18        Q.    And in a consensual stop, a civilian who
19   is stopped has a right to not talk to the officer?
20        A.    That's correct.
21        Q.    And, in fact, he has a right to just
22   walk away from the officer?
23        A.    That's correct.
24        Q.    And by walking away, it does not raise
25   the stop to a suspicion that should cause him to
```

CHIEF JOHN MCGRATH

December 27, 2017

```
 1  be arrested?

 2       A.   That's correct.

 3       Q.   So in this situation, is it true that

 4  there was nothing that you saw on the tape that

 5  should have caused Officer Lopera to apprehend

 6  Mr. Farmer?

 7           MR. McNUTT:  Objection.  Form.

 8           THE WITNESS:  I didn't see anything, if

 9  I was him, that I would stop him for.

10  BY MR. SAYRE:

11       Q.   Right.  And you didn't see any reason as

12  to why he should tase him seven times?

13       A.   So now we're getting a little bit into

14  after you make the decision to use force, which I

15  don't agree with, but he uses force, obviously,

16  some of the tasers were -- strikes were

17  ineffective.

18       Q.   Right.

19       A.   So at what point does it become

20  excessive?  You know, depending on whether or not

21  the strikes are actually having an effect on him.

22       Q.   Well, isn't it correct the department

23  teaches that after three cycles, you discontinue

24  the use of a taser?

25       A.   And go to a different tool or way to
```

CHIEF JOHN MCGRATH

December 27, 2017

1    apprehend the subject, yes.

2        Q.   Right.  So to cycle seven times,

3    including the last time for nine seconds, would be

4    excessive force?

5        A.   Well, I think it was excessive, yes.

6        Q.   Did each of the officers, Tran and

7    Flores, also have a duty to intervene to prevent

8    Officer Lopera from engaging in excessive force?

9        A.   If they thought there was excessive

10   force, yes.

11       Q.   If Sergeant -- then-Sergeant Crumrine

12   had to tell Officer Lopera twice to "Let him go,

13   Ken," let him go, release the hold, would

14   Officer Crumrine have been justified in not

15   checking thereafter as to whether he had actually

16   released the hold?

17           MR. ANDERSON:  Objection.  Form.

18           THE WITNESS:  I think I already answered

19   that, but I think that he should have done more

20   than just talk to him about it.

21   BY MR. SAYRE:

22       Q.   Right.  He should have actually either

23   himself physically intervened or had someone else

24   physically intervene to release the hold?

25       A.   That's correct.

CHIEF JOHN MCGRATH

December 27, 2017

```
 1   aggressive resistance; correct?
 2        A.   That's the policy now.
 3        Q.   Okay.  And was it then?
 4        A.   Well, I believe you could have used it
 5   at a low level, but I don't recall what level it
 6   was.
 7        Q.   All right.  Can you -- could you have --
 8        A.   Restraint and control, I believe.
 9        Q.   All right.  Could you use it sufficient
10   to cause somebody to go unconscious, where someone
11   is simply actively resisting by breaking holds?
12        A.   You shouldn't.
13        Q.   Right.  Shouldn't have done that?
14        A.   Shouldn't have.
15             MR. SAYRE:  All right.  I have nothing
16   further.
17             MR. ANDERSON:  Nothing further.
18             THE VIDEOGRAPHER:  This concludes
19   today's deposition of John McGrath.  The number of
20   media used was one, and we are off the record at
21   2:18 p.m.
22                  (Whereupon, the deposition concluded
23                   at 2:18 p.m.)
24
25
```

CHIEF JOHN MCGRATH

December 27, 2017

```
 1              CERTIFICATE OF DEPONENT

 2     PAGE     LINE     CHANGE              REASON

 3     _____

 4     _____

 5     _____

 6     _____

 7     _____

 8     _____

 9     _____

10     _____

11     _____

12     _____

13               *    *    *    *    *

14          I, CHIEF JOHN MCGRATH, deponent herein,
       do hereby certify and declare the within and
15     foregoing transcription to be my deposition in said
       action; that I have read, corrected, and do hereby
16     affix my signature to said deposition under penalty
       of perjury.
17

18                   _____

19               CHIEF JOHN MCGRATH, Deponent

20

21

22

23

24

25
```

CHIEF JOHN MCGRATH

December 27, 2017

1            CERTIFICATE OF COURT REPORTER

2

STATE OF NEVADA        )
3                       )   ss:
COUNTY OF CLARK        )

4

5       I, Kimberly A. Farkas, Certified Court

6    Reporter licensed by the State of Nevada, do

7    hereby certify that I reported the deposition of

8    CHIEF JOHN McGRATH, commencing on December 27,

9    2017, at 1:01 p.m.

10       Prior to being deposed, the witness was duly

11   sworn by me to testify to the truth.  I thereafter

12   transcribed my said stenographic notes, and that

13   the transcript is a complete, true, and accurate

14   transcription, and that a request was made for a

15   review of the transcript.

16       I further certify that I am not a relative,

17   employee, or independent contractor of counsel,

18   nor a person financially interested in the

19   proceeding.

20       IN WITNESS WHEREOF, I have set my hand in my

21   office in the County of Clark, State of Nevada,

22   this January 8th, 2018.

23

24

25                    Kimberly A. Farkas, CCR No. 741

26

165

# Exhibit E – Sergeant Travis Crumrine Deposition Excerpts

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

ESTATE OF TASHI S. FARMER
a/k/a TASHII FARMER a/k/a
TASHII BROWN, by and through
its Special Administrator,
Elia Del Carmen
Solano-Patricio; TAMARA
BAYLEE KUUMEALI'MAKAMAE
FARMER DUARTE, a minor,
individually and as
Successor-in-Interest, by and
through her legal guardian,
Stevandra Lk Kuanoni; ELIAS
BAY KAIMIPONO DUARTE, a
minor, individually and as
Successor-in-Interest, by and
through his legal guardian,
Stevandra Lk Kuanoni,

   Plaintiffs,

       Case No. 2:17-CV-01946-
   vs.       JCM-PAL

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, a political
subdivision of the State of
Nevada; OFFICER KENNETH
LOPERA, individually and in
his Official Capacity; and
Does 1 through 50, inclusive,

   Defendants.

_____

VIDEOTAPED DEPOSITION OF SERGEANT TRAVIS CRUMRINE

Las Vegas, Nevada

December 27, 2017

Reported by: Kimberly A. Farkas, RPR, CCR #741

Job: 24050

SERGEANT TRAVISCRUMRINE

December 27, 2017

```
 1              Videotaped Deposition of SERGEANT TRAVIS

 2    CRUMRINE, taken at 330 E. Charleston Blvd. Suite 100,

 3    Las Vegas, Nevada, on Wednesday, December 27, 2017,

 4    at 10:02 a.m., before Kimberly A. Farkas,

 5    Certified Court Reporter in and for the State of

 6    Nevada.

 7

 8    APPEARANCES

 9

10    For the Plaintiffs:

11            FEDERICO C. SAYRE, ESQ.
              DARREN D. DARWISH, ESQ.
12            ABIR COHEN TREYZON SALO, LLP
              1901 Avenue of the Stars, Suite 935
13            Los Angeles, California  90067
              (424) 288-4367
14            ddarwish@actslaw.com

15

16    For the Defendant Las Vegas Metropolitan Police
      Department:
17

18            CRAIG R. ANDERSON, ESQ.
              Marquis Aurbach Coffing
19            10001 Park Run Drive
              Las Vegas, Nevada  89145
20            (702) 382-0711
              canderson@maclaw.com
21

22

23

24

25
```

```
 1     \ \ \

 2     APPEARANCES (continued)

 3

 4     For the Defendant Officer Kenneth Lopera:

 5

 6             DANIEL R. McNUTT, ESQ.
               McNutt Law Firm, P.C.
 7             625 South Eighth Street
               Las Vegas, Nevada  89101
 8             (702) 384-1117
               drm@mcnuttlawfirm.com
 9

10

11     Also present:   Tom Burtney, Videographer

12                     Ruth Miller, LVMPD

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    VIDEOTAPED DEPOSITION OF SERGEANT TRAVIS CRUMRINE

 2                   December 27, 2017

 3              Kimberly A. Farkas, CCR No. 741

 4                     * * * * *

 5

 6                      INDEX

 7                                           Page

 8    SERGEANT TRAVIS CRUMRINE

 9    Examination by Mr. Sayre                 6

10    Examination by Mr. McNutt               79

11    Examination by Mr. Sayre                90

12    Examination by Mr. McNutt               92

13              (No exhibits marked)

14                   * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   LAS VEGAS, NEVADA
 2              Wednesday, December 27, 2017
 3                      10:02 a.m.
 4       DEPOSITION OF SERGEANT TRAVIS CRUMRINE
 5                    * * * * * *
 6              (The court reporter was relieved of her
 7    duties under NRCP 30(b)4.)
 8              THE VIDEOGRAPHER:  Good morning.  Here
 9    begins media no. 1 of the deposition of
10    Travis Crumrine in the matter of The Estate of
11    Tashi S. Farmer, et al., versus Las Vegas
12    Metropolitan Police Department, et al.  This case
13    is in the United States District Court, District
14    of Nevada.  The case number is 2:17-CV-01946-
15    JCM-PAL.
16              Today's date is December the 27th, 2017,
17    and the time is 10:02 a.m.  This deposition is
18    taking place at 330 East Charleston Boulevard,
19    Suite 100, in Las Vegas, Nevada.  The videographer
20    is Tom Burtney, appearing on behalf of First Legal
21    Depositions Services.
22              Would counsel please identify yourselves
23    and state whom you represent.
24              MR. SAYRE:  For the plaintiffs,
25    Federico Sayre.
```

SERGEANT TRAVIS CRUMRINE
December 27, 2017

```
1              MR. DARWISH:  Darren Darwish on behalf
2    of plaintiffs.
3              MR. McNUTT:  Dan McNutt on behalf of
4    Ken Lopera.
5              MR. ANDERSON:  Craig Anderson on behalf
6    of the Las Vegas Metropolitan Police Department.
7              THE VIDEOGRAPHER:  Also present is
8    Ruth Miller.
9              The reporter today is Kimberly Farkas.
10             Would the reporter swear in the witness.
11             SERGEANT TRAVIS CRUMRINE,
12   having been first duly sworn, was examined and
13   testified as follows:
14                      EXAMINATION
15   BY MR. SAYRE:
16       Q.   Officer Crumrine, my name is Fred Sayre,
17   and I'm going to be asking you some questions
18   concerning an event that you were involved in.
19             Have you ever had your deposition taken
20   before?
21       A.   Yes.
22       Q.   How many occasions?
23       A.   Once.
24       Q.   Okay.  And how long ago was that?
25       A.   Nine years ago.
```

SERGEANT TRAVIS CRUMRINE

December 27, 2017

```
 1    asked, 'Is he out yet?'"
 2           Did you hear Officer Lopera say that?
 3    A.    I don't remember.
 4    Q.    At 3:19, it says, "Officer Lopera asked,
 5    'Is he out yet?'"
 6           Did you hear him say that?
 7    A.    Not specifically.
 8    Q.    Okay.  Now, at 3:25, it says,
 9    "Officer Tran arrived and said, 'Let him go,
10    Ken.'"
11           Now, it's my understanding that
12    Officer Tran didn't say that.  You did.
13    A.    Correct.
14    Q.    All right.  Did Officer Tran arrive at
15    that point in time?
16    A.    I don't believe so.
17    Q.    Okay.  And -- but you did say at that
18    point, approximately, "Let him go, Ken"?
19    A.    I actually said, "Let him go," I
20    believe, before the -- I'd have to watch the
21    video --
22    Q.    Okay.
23    A.    -- but I say "let him go" twice.
24    Q.    Okay.  Can you estimate -- now, looking
25    at the time, it's 2:58 is when the -- it says the
```

```
 1    neck restraint was applied.  And it says that
 2    Officer Tran, which we now know is you, at 3:25,
 3    "Let him go, Ken."
 4            Now, can you estimate how much before
 5    that you first told Officer Lopera to let him go?
 6        A.   I think, looking at this timeline and
 7    not having the video with me, that it's between
 8    the 3:01 and 3:13.
 9        Q.   Okay.  So between 3:01 and 3:13, you
10    believe for the first time you said, "Let him go,
11    Ken"?
12        A.   It was either "let go" or "let him go."
13        Q.   And did you say that because he was
14    unconscious?
15        A.   No.
16        Q.   Why did you say that?
17        A.   I said that because I had that handcuff
18    on finally, and it was time to accomplish
19    handcuffing.
20        Q.   Okay.  So it says here -- did you again
21    say that within that period of time from 3:01 to
22    3:13, or was the second time you said it at 3:25?
23        A.   The second time I said it was at 3:25.
24        Q.   All right.  Okay.  So you said, "Let him
25    go, Ken."
```

SERGEANT TRAVIS CRUMRINE

December 27, 2017

```
 1        Q.    So Lopera is behind him, with the hold?
 2        A.    Correct.
 3        Q.    Farmer is in front of Lopera and would
 4   have been visible to you in the -- as you looked
 5   down; correct?
 6        A.    Which part?
 7        Q.    If Lopera is on his back and has his
 8   hold around Farmer, who's face up, you can see
 9   Farmer; correct?
10        A.    Well, there -- I can see parts of him,
11   yes.
12        Q.    Okay.  What parts of him can you see?
13        A.    Mostly focused on his arms at this
14   point.
15        Q.    Yeah.  Well, can you see if he's
16   unconscious or not?
17        A.    No.  I wasn't -- I wasn't -- how do I
18   explain?  I wasn't really busying myself with
19   whether or not he was conscious.  I was trying to
20   get them rolled over so we could get him in
21   handcuffs.
22              Does that make sense?
23        Q.    All right.  Now, you were the sergeant
24   in charge of Lopera; correct?
25        A.    Yes.
```

SERGEANT TRAVIS CRUMRINE

December 27, 2017

1   Q.   And one of the things that you're

2   supposed to do is you're supposed to advise and

3   counsel people under your supervision and control;

4   correct?

5   A.   Yes.

6   Q.   And one of the things that the

7   Metropolitan Police Department teaches is that a

8   correctly applied carotid hold or lateral vascular

9   neck restraint should make a person unconscious in

10   about 7 to 14 seconds; is that correct?

11   A.   Correct.

12   Q.   All right.   So by this time, at 3:30,

13   the hold has now been on for over 30 seconds.

14   A.   Okay.

15   Q.   Shouldn't you be checking, as the

16   superior officer on the scene, to determine if the

17   person is unconscious or not?

18   A.   Well, I -- on this -- if we're going by

19   this timeline, at 3:26, I have confirmed with him

20   for the second time that I want him to let go.

21   Q.   Okay.

22   A.   So I'm assuming that he's followed that.

23   Q.   Okay.   You assumed he's followed that?

24   A.   Until we get him into handcuffs, and

25   then I can check, which I do.

SERGEANT TRAVIS CRUMRINE

December 27, 2017

```
 1        Q.   All right.  So you expected him to let
 2   go of the lateral carotid neck restraint no later
 3   than 3:26?
 4        A.   Yes.
 5        Q.   All right.  So is it my understanding
 6   you did not thereafter check to see if he had let
 7   go?
 8        A.   Well, he did let go.
 9        Q.   Well, yeah, but he didn't let go until
10   4:11.
11        A.   If we are talking about when he finally
12   completely takes his arm away from the subject,
13   yes.
14        Q.   Well, okay.  Let's -- let's put it this
15   way:  From 3:26 to 4:11, a period of 40 -- 45
16   seconds, did you check during that period of time
17   to see if Officer Lopera had let go or released
18   the lateral vascular neck restraint?
19        A.   I did not physically check.  I would not
20   expect my officer, who is in a back-lying position
21   with a subject on top of him, to just completely
22   put his arms out to the sides.  He needs to still
23   maintain some control of a person who is on top of
24   him.
25             So I had expected that he had relaxed
```

SERGEANT TRAVIS CRUMRINE
December 27, 2017

```
 1    the hold, but he still needs to hold onto that
 2    person until we get that person rolled over and
 3    released there to get those handcuffs together.
 4              Does that make sense?
 5         Q.   No, not really.  Let me ask you a little
 6    bit further.
 7              When you told him at 3:25, and again at
 8    3:26, to "let him go," you were telling him to
 9    let -- to release the lateral vascular neck
10    restraint or whatever neck restraint that he had
11    on him?
12         A.   Yes.
13         Q.   Did you check at any time prior to 4:11
14    to see if he had released the lateral vascular
15    neck restraint or whatever restraint that he had
16    on the neck?
17         A.   I didn't really have the opportunity to
18    check, so, no.
19         Q.   You didn't look?  You didn't look?
20         A.   No.  I was maintaining control of
21    Farmer's arm.
22         Q.   Okay.  Now, you had three -- three
23    officers that were trying to maintain control of
24    Farmer's arm:  Officer Tran, Officer Flores, and
25    yourself.
```

SERGEANT TRAVIS CRUMRINE

December 27, 2017

```
 1        A.   Yes.
 2        Q.   And within that period of time, from
 3   3:26 to 4:11, you never looked to see if Lopera
 4   had released the hold; correct?
 5        A.   Correct.
 6        Q.   All right.  At 3:38, it says, "Lopera
 7   asked, 'You got the other one?'"
 8             I assume that means the other arm?
 9        A.   I assume so.
10        Q.   Was -- was he talking to you or one of
11   the other officers?  Do you know?
12        A.   I don't know.
13        Q.   Did you hear him say that?
14        A.   I don't remember.
15        Q.   Okay.  At 3:50, "Farmer gasps."
16             Did you hear that?
17        A.   I don't remember.
18        Q.   And then at 4:11, "Officer Lopera
19   released the hold on Farmer."
20             Did you see him release the hold on
21   Farmer?
22        A.   Yes.
23        Q.   So you were looking at that time?
24        A.   Yes.
25        Q.   Okay.  Is that the first time that you
```

```
 1                THE WITNESS:  I'm sorry.  Can you
 2     restate the question.
 3     BY MR. SAYRE:
 4          Q.    Sure.
 5                Among other things, it would be your
 6     responsibility to make sure that Officer Lopera
 7     did not choke Mr. Farmer to death?
 8          A.    Yes.
 9                MR. ANDERSON:  Same objection.
10                Go ahead.
11                THE WITNESS:  Yes.
12     BY MR. SAYRE:
13          Q.    Okay.  Now, you're no longer a sergeant?
14          A.    Correct.
15          Q.    That means you've been demoted?
16          A.    I was non-confirmed from my probationary
17     status as a sergeant.
18          Q.    Okay.  Tell me about that, please.
19          A.    The department sustained me for my --
20     for -- the policy violations were major incident
21     and all hazard plan and body-worn camera.  They
22     sustained me for those.  And the Sheriff
23     non-confirmed my appointment to sergeant.
24          Q.    Okay.  Let's -- let's kind of go through
25     these one by one.  Okay?
```

SERGEANT TRAVIS CRUMRINE

December 27, 2017

```
 1        Q.    Okay.  So you -- you would not conduct

 2   an investigation of a use of force until after the

 3   events occurred?

 4        A.    Correct.

 5        Q.    So you would not in any way attempt to

 6   determine whether the officer was using level 1,

 7   level 2, or level 3 while he's actually applying

 8   the LVNR in your presence?

 9        A.    In that moment, I've told him twice to

10   let go.  I haven't had an issue with this officer

11   not following a command or an order or a direction

12   in the past.  He's always been very receptive to

13   directions.  So I assume that he had done what I

14   had told -- I mean, this is a conversation here.

15   When I say, "Let him go."

16             He says, "Are you sure?"

17             And I say, "Yeah."  We just had a

18   conversation.  I confirmed -- he confirmed that he

19   heard what I said and asked am I sure.  I said,

20   "Yeah."  Confirm.

21        Q.    Okay.

22        A.    As far as I'm concerned, it's done.

23        Q.    So because you told him at 3:26 in

24   response to his question, "Are you sure," you

25   said, "Yeah," you assumed, therefore, he would
```

SERGEANT TRAVIS CRUMRINE

December 27, 2017

```
 1    release the hold?
 2              MR. McNUTT:  Objection.  Form.
 3              THE WITNESS:  Yes.
 4    BY MR. SAYRE:
 5         Q.   And you never did check to see if he had
 6    released the hold until he actually released the
 7    hold?
 8         A.   Correct.
 9         Q.   All right.  Now, have you seen the
10    video, the body camera video?
11         A.   Yes.
12         Q.   And have you noticed that he never
13    released the hold --
14              MR. McNUTT:  Objection.  Form.
15    BY MR. SAYRE:
16         Q.   -- until 4:11?
17         A.   Correct.
18         Q.   So he violated your order?
19              MR. McNUTT:  Objection.  Form.
20    BY MR. SAYRE:
21         Q.   Correct?
22         A.   I have no idea.
23         Q.   Well, if you ordered him to release the
24    hold, he didn't release it until 45 seconds later,
25    isn't that a violation of your order?
```

SERGEANT TRAVISCRUMRINE

December 27, 2017

```
 1    looked and saw.
 2            Did you look and see between, 3:26 and
 3    4:11, whether he had relaxed the hold?
 4        A.    No.
 5            MR. ANDERSON:  Objection.  Form.
 6            THE WITNESS:  Sorry.  No.
 7    BY MR. SAYRE:
 8        Q.    You just assumed that he would relax the
 9    hold?
10        A.    Yes.
11        Q.    At the time that you told him to let go,
12    at 3:26, could you tell whether or not Mr. Farmer
13    was unconscious at that moment?
14        A.    It was my perception that he was still
15    conscious.
16        Q.    Okay.  And what was it about him that
17    caused you to believe that he was still conscious?
18        A.    I was still holding onto his body, and
19    to me it was not limp.  It was -- he was still
20    moving.
21        Q.    Okay.  When did you let go of his body?
22        A.    I'm not sure.
23        Q.    Well, was it sometime within the 46
24    seconds that Officer Lopera continued to have a
25    neck restraint on him?
```

SERGEANT TRAVISCRUMRINE
December 27, 2017

```
 1        Q.    And was -- that was sustained?

 2        A.    Yes.

 3        Q.    And other charges?

 4        A.    And body-worn camera.

 5        Q.    And was that sustained?

 6        A.    Yes.

 7        Q.    Okay.  So what happened is because you

 8   were still in a probationary period as a sergeant,

 9   they basically terminated the probation and left

10   you as a patrolman, is that it?

11        A.    Correct.

12        Q.    Was that -- did you consider that a

13   demotion?

14        A.    Yes.

15        Q.    To your observation, at any time did

16   Officer Tran attempt to intervene to get

17   Officer Lopera to remove his hands from the neck

18   of Mr. Farmer?

19             MR. ANDERSON:  Objection.  Form.

20             THE WITNESS:  No, I didn't observe

21   anything.

22   BY MR. SAYRE:

23        Q.    To your observation, at any time did

24   Officer Flores attempt to intervene to remove

25   Officer Lopera's hands from the neck of
```

```
 1    Mr. Farmer?
 2         A.   No.
 3         Q.   At any time after you told
 4    Officer Lopera to let him go, did you ever think
 5    of intervening to stop him from applying pressure
 6    to the throat of Mr. Farmer?
 7         A.   No.
 8              MR. McNUTT:  Objection.  Form.
 9              THE WITNESS:  Sorry.
10              MR. ANDERSON:  Go ahead.
11              THE WITNESS:  No.
12              Sorry.  I have to blow my nose again.
13              MR. SAYRE:  You want to take a break?
14              THE WITNESS:  No.  I just have to blow
15    my nose.
16              MR. McNUTT:  Is my color better?
17              MR. SAYRE:  You still look a little bit
18    flushed.
19              MR. ANDERSON:  You should get checked.
20              MR. SAYRE:  Somebody should check your
21    oil.
22              MR. McNUTT:  Must be --
23              MR. SAYRE:  I just had my oil changed.
24              MR. McNUTT:  Must be that L.A. -- L.A.
25    lawyer issue I have.
```

SERGEANT TRAVISCRUMRINE

December 27, 2017

```
1    a bigger person, to join two pairs together than

2    it is to try to get their wrists together.

3         Q.   Sure.  How would you describe -- well,

4    first off, was Mr. Farmer resisting Ken when you

5    approached?

6         A.   He was certainly not complying with

7    going into handcuffs or going -- being taken into

8    custody.

9         Q.   Did you ever tell Mr. Farmer to stop

10   resisting or to comply?

11        A.   All I told him was on there, "Get your

12   fucking hands behind your back."

13        Q.   Okay.  When you put your hands on

14   Mr. Farmer's arm -- is that correct, was it on his

15   arm?

16        A.   Yes.

17        Q.   Did you touch him in any other spot?

18        A.   I'm sure I did.

19        Q.   Okay.  But you recall grabbing his arm?

20        A.   Yes.

21        Q.   How would you describe Mr. Farmer's

22   strength?

23        A.   Pretty strong.

24        Q.   So he was actively resisting you?

25        A.   He was pulling away.  He was passively
```

SERGEANT TRAVISCRUMRINE

December 27, 2017

```
 1    resisting by pulling away from my grip, breaking
 2    my grip.
 3         Q.   How do you passively resist?
 4         A.   By pulling away.  That's how our policy
 5    lays it out, is that breaking an officer's grip is
 6    passive, because you're not intending to harm --
 7    because the subject is not intending to harm me.
 8         Q.   So if you had a suspect that you had
 9    your hands on, and he was breaking the grip to run
10    away, that's passive?
11         A.   According to our policy, yes.
12         Q.   Okay.  Did you ever at any point
13    describe Mr. Farmer as actively resisting?
14         A.   Yes.
15         Q.   When?
16         A.   I'm not sure, but I'm sure I have.
17         Q.   Excuse me?
18         A.   I'm sure that I have.  He was actively
19    resisting Officer Lopera.
20         Q.   Okay.  But he was not actively resisting
21    you?  Is that the distinction you're making?
22         A.   Yes.
23         Q.   Okay.  So you said Mr. Farmer was --
24    what was your word?  "Strong" was how --
25         A.   Yes.
```

SERGEANT TRAVISCRUMRINE

December 27, 2017

```
1        Q.   And what did it take for you to gain
2    control of him?
3        A.   Just to increase my level of strength in
4    grabbing his arm.
5        Q.   Okay.  And then were you able to do
6    that?
7        A.   Yes.
8        Q.   And did Mr. Farmer resist being
9    handcuffed the whole way through the handcuffing
10   procedure?
11       A.   It was my perception that he was still
12   resisting.
13       Q.   And what happened once you got him into
14   handcuffs?
15       A.   We turned him back over, face up.
16       Q.   And was he no longer resisting at that
17   point?
18       A.   Correct.
19       Q.   And it was your testimony that
20   Mr. Lopera, Ken, released -- released the LVNR
21   when you asked him to?
22       A.   Yes.
23       Q.   Who did you talk to other than your
24   lawyer before today about your deposition?
25       A.   No one.
```

SERGEANT TRAVISCRUMRINE

December 27, 2017

```
 1    people know that he's not --
 2         Q.    Okay.  Is he no longer employed because
 3    of this incident?
 4         A.    I believe so.
 5               MR. SAYRE:  Okay.  I have no further.
 6    Thank you.
 7               MR. McNUTT:  One follow-up.
 8                    CONTINUED EXAMINATION
 9    BY MR. McNUTT:
10         Q.    How many officers total did it take to
11    get Mr. Farmer handcuffed?
12         A.    At least four.
13         Q.    Would you describe any event where four
14    officers were involved in handcuffing someone as
15    passive resistance?
16         A.    No.
17               MR. McNUTT:  Thanks.
18               THE VIDEOGRAPHER:  We done?
19               MR. SAYRE:  Yeah.
20               MR. ANDERSON:  Yes.  I have no
21    questions.
22               THE VIDEOGRAPHER:  This concludes
23    today's deposition of Travis Crumrine.  The number
24    of media used was one.  We are off the record at
25    11:47 a.m.
```

```
 1    (Whereupon, the deposition concluded
 2      at 11:47 a.m.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SERGEANT TRAVIS CRUMRINE

December 27, 2017

```
 1              CERTIFICATE OF DEPONENT

 2     PAGE      LINE      CHANGE               REASON

 3     _____

 4     _____

 5     _____

 6     _____

 7     _____

 8     _____

 9     _____

10     _____

11     _____

12     _____

13                *      *      *      *      *

14              I, SERGEANT TRAVIS CRUMRINE, deponent
       herein, do hereby certify and declare the within
15     and foregoing transcription to be my deposition in
       said action; that I have read, corrected, and do
16     hereby affix my signature to said deposition under
       penalty of perjury.
17

18                     _____

19                     SERGEANT TRAVIS CRUMRINE, Deponent

20

21

22

23

24

25
```

SERGEANT TRAVISCRUMRINE

December 27, 2017

```
 1              CERTIFICATE OF COURT REPORTER

 2
     STATE OF NEVADA        )
 3                          )  ss:
     COUNTY OF CLARK        )
 4

 5       I, Kimberly A. Farkas, Certified Court

 6   Reporter licensed by the State of Nevada, do

 7   hereby certify that I reported the deposition of

 8   SERGEANT TRAVIS CRUMRINE, commencing on December

 9   27, 2017, at 10:02 a.m.

10       Prior to being deposed, the witness was duly

11   sworn by me to testify to the truth.  I thereafter

12   transcribed my said stenographic notes, and that

13   the transcript is a complete, true, and accurate

14   transcription, and that a request was made for a

15   review of the transcript.

16       I further certify that I am not a relative,

17   employee, or independent contractor of counsel,

18   nor a person financially interested in the

19   proceeding.

20       IN WITNESS WHEREOF, I have set my hand in my

21   office in the County of Clark, State of Nevada,

22   this January 8th, 2018.

23

24

25              Kimberly A. Farkas, CCR No. 741

26
```

# Exhibit F – Officer Michael Tran Deposition Excerpts

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * * * * *

ESTATE OF TASHI S. FARMER
a/k/a TASHII FARMER a/k/a
TASHII BROWN, by and through
its Special Administrator,
Elia Del Carmen
Solano-Patricio; TAMARA
BAYLEE KUUMEALI'MAKAMAE
FARMER DUARTE, a minor,
individually and as
Successor-in-Interest, by and
through her legal guardian,
Stevandra Lk Kuanoni; ELIAS
BAY KAIMIPONO DUARTE, a
minor, individually and as
Successor-in-Interest, by and
through his legal guardian,
Stevandra Lk Kuanoni,

        Plaintiffs,

                          Case No. 2:17-CV-01946-
    vs.                  JCM-PAL

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, a political
subdivision of the State of
Nevada; OFFICER KENNETH
LOPERA, individually and in
his Official Capacity; and
Does 1 through 50, inclusive,

        Defendants.

_____

VIDEOTAPED DEPOSITION OF OFFICER MICHAEL TRAN

Las Vegas, Nevada

December 20, 2017

Reported by: Kimberly A. Farkas, RPR, CCR #741

Job: 23498

OFFICER MICHAEL TRAN

December 20, 2017

```
 1              Videotaped Deposition of Officer Michael

 2     Tran, taken at 330 E. Charleston Blvd. Suite 101,

 3     Las Vegas, Nevada, on Wednesday, December 20, 2017,

 4     at 9:57 a.m., before Kimberly A. Farkas, Certified

 5     Court Reporter in and for the State of Nevada.

 6

 7     APPEARANCES

 8

 9     For the Plaintiffs:

10              FEDERICO C. SAYRE, ESQ.
                DARREN D. DARWISH, ESQ.
11              ABIR COHEN TREYZON SALO, LLP
                1901 Avenue of the Stars, Suite 935
12              Los Angeles, California  90067
                (424) 288-4367
13              ddarwish@actslaw.com

14

15              MITCHELL S. BISSON, ESQ.
                CALLISTER LAW
16              330 E. Charleston Blvd. Suite 100
                Las Vegas, Nevada  89104
17              (702) 333-3334

18

19     For the Defendant Las Vegas Metropolitan Police
       Department:
20

21              CRAIG R. ANDERSON, ESQ.
                Marquis Aurbach Coffing
22              10001 Park Run Drive
                Las Vegas, Nevada  89145
23              (702) 382-0711
                canderson@maclaw.com

24

25     \\\
```

OFFICER MICHAEL TRAN

```
 1    APPEARANCES (continued)

 2

 3    For the Defendant Officer Kenneth Lopera:

 4

 5              DANIEL R. McNUTT, ESQ.
              MATTHEW C. WOLF, ESQ.
 6              McNutt Law Firm, P.C.
              625 South Eighth Street
 7              Las Vegas, Nevada  89101
              (702) 384-1117
 8              drm@mcnuttlawfirm.com

 9

10

11    Also present:   Tom Burtney, Videographer

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

OFFICER MICHAEL TRAN

December 20, 2017

1          DEPOSITION OF OFFICER MICHAEL TRAN

2                  December 20, 2017

3            Kimberly A. Farkas, CCR No. 741

4                    * * * * *

5

6                      INDEX

7                                              Page

8    OFFICER MICHAEL TRAN

9    Examination by Mr. Sayre                    6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICER MICHAEL TRAN

```
 1                    LAS VEGAS, NEVADA
 2                Wednesday, December 20, 2017
 3                       9:57 a.m.
 4          DEPOSITION OF OFFICER MICHAEL TRAN
 5                    *  *  *  *  *  *
 6          (The court reporter was relieved of her
 7    duties under NRCP 30(b)4.)
 8              THE VIDEOGRAPHER:  Good morning.  Here
 9    begins media no. 1 of the deposition of
10    Michael Tran in the matter of the Estate of
11    Tashi S. Farmer, et al., versus Las Vegas
12    Metropolitan Police Department, et al.  This case
13    is in the United States District Court, District
14    of Nevada, and the case number is
15    2:17-cv-01946-JCM-PAL.
16              Today's date is December the 20th, 2017,
17    and the time is 9:57 a.m.  This deposition is
18    taking place at 330 East Charleston Boulevard,
19    Suite 100, in Las Vegas, Nevada.  The videographer
20    is Tom Burtney, appearing on behalf of First Legal
21    Deposition Services.
22              Would counsel please identify yourselves
23    and state whom you represent.
24              MR. SAYRE:  For the plaintiffs,
25    Federico Sayre.
```

OFFICER MICHAEL TRAN

December 20, 2017

```
 1              MR. DARWISH:  Darren Darwish on behalf
 2    of plaintiffs.
 3              MR. BISSON:  Mitchell Bisson on behalf
 4    of plaintiffs.
 5              MR. McNUTT:  Dan McNutt and Matt Wolf on
 6    behalf of Officer Ken Lopera.
 7              MR. ANDERSON:  Craig Anderson on behalf
 8    of Las Vegas Metropolitan Police Department.
 9              THE VIDEOGRAPHER:  The court reporter is
10    Kimberly Farkas.
11              Would the reporter please swear in the
12    witness.
13                   OFFICER MICHAEL TRAN,
14    having been first duly sworn, was examined and
15    testified as follows:
16                         EXAMINATION
17    BY MR. SAYRE:
18       Q.   Officer Tran, my name is Fred Sayre, and
19    I'm representing the children and the Estate of
20    Tashi Farmer-Brown.
21              Do you understand that?
22       A.   Yes.
23       Q.   And you've been called here today to
24    give a deposition regarding the incident that
25    resulted in his death.
```

OFFICER MICHAEL TRAN

December 20, 2017

```
 1        A.    Eventually, yes.
 2        Q.    Who else besides Officer Crumrine was
 3   close to Officer Lopera and the subject?
 4        A.    Nobody.
 5        Q.    It says, at 3:25, "Officer Tran arrived
 6   and said, 'Let him go, Ken.'"
 7              Do you remember saying that?
 8        A.    No, I did not say that.
 9        Q.    You did not say that?
10        A.    I did not say that.
11        Q.    Okay.  And then at 3:26, the person
12   who's listening to the tape says, "Officer Lopera
13   asked, 'Are you sure?'"
14              "And Officer Tran replies, 'Yeah.'"
15              Did you say that?
16        A.    I did not.
17        Q.    Okay.  Did you say -- do you remember
18   Officer Lopera saying, "Are you sure?"
19        A.    I do not.
20        Q.    Okay.  When you saw the person, the
21   subject, and the elbow was in front of him, was he
22   conscious?
23        A.    He was not.
24        Q.    Okay.  Did you say anything to
25   Officer Lopera at any time while he continued to
```

OFFICER MICHAEL TRAN

December 20, 2017

1    maintain the lateral vascular neck restraint?

2        A.    After we took him into custody, I peered

3    down at the subject, and observed that he was out

4    and there was an elbow.  And I stated to

5    Officer Lopera, "Loosen up.  Loosen up.  He is

6    out."  And Officer Lopera released the hold on the

7    subject.

8        Q.    Are you saying that at the moment that

9    you said -- well, I'm saying "moment," but upon

10   your saying "Loosen up.  Loosen up.  He is out,"

11   Officer Lopera released the subject?

12       A.    Yes.

13       Q.    How long after you said that did he

14   release the subject?

15       A.    Immediately.

16       Q.    Okay.  Now, how long did the -- from the

17   time that you saw the subject for the first

18   time -- strike that.

19           From the time that you saw the elbow in

20   front of the subject for the first time,

21   approximately what period of time passed before

22   you said, "Loosen up.  Loosen up.  He is out"?

23       A.    It was immediate.

24       Q.    Immediate.

25           Now, when you've listened to the tape,

OFFICER MICHAEL TRAN

December 20, 2017

```
 1    period of 113 seconds, or, sorry, one minute, 13
 2    seconds.
 3             You're saying that you saw him in the
 4    hold for three to five seconds?
 5       A.   Yes.
 6       Q.   Okay.  And when you saw him, he was
 7    unconscious?
 8       A.   Yes.
 9       Q.   How long did it take you to handcuff
10    him?
11       A.   20, 30 seconds.
12       Q.   And there was absolutely no resistance
13    from him?
14       A.   I did not observe any resistance.
15       Q.   Did you observe, during that 20 to 30
16    seconds, that he was unconscious?
17       A.   I did not.
18       Q.   Did you observe that he was conscious
19    during that 20 to 30 seconds?
20       A.   I did not.
21       Q.   Did you check to see whether he was
22    conscious or not during that 20 to 30 seconds?
23       A.   No.
24       Q.   Have you and Officer Flores spoken about
25    this since it occurred other than in the presence
```

OFFICER MICHAEL TRAN

December 20, 2017

1    deadly force.

2           Q.    Okay.

3           A.    If the subject's -- displays an attempt

4    to do harm on an officer or another, we may use

5    empty hand strikes or strikes to the subject.

6           Q.    When you were present there and

7    handcuffing Mr. Farmer-Brown, did you at any time

8    see Officer Lopera strike him in the head?

9           A.    No.

10          Q.    Did you at any time see him tase him?

11          A.    No.

12          Q.    Do you understand as an officer of the

13   Metropolitan Police Department, that once a person

14   is rendered unconscious by any kind of a choke

15   hold, whether it be lateral vascular neck

16   restraint or any other, that you're required to

17   discontinue the hold?

18          A.    Yes.

19          Q.    And to not fail to discontinue the hold

20   is excessive force?

21                MR. ANDERSON:  Objection.  Form.

22                Go ahead.

23                THE WITNESS:  Yes.

24   BY MR. SAYRE:

25          Q.    And an officer like yourself, who sees a

OFFICER MICHAEL TRAN

December 20, 2017

```
 1            THE WITNESS:  If I -- if I observed
 2    Lopera holding the subject and he was already out,
 3    I would intervene and tell him to let go of the
 4    hold.
 5    BY MR. SAYRE:
 6         Q.    Okay.  Now, on the tape do you hear
 7    yourself saying, "Loosen up, Ken" or "Loosen up.
 8    He's out"?
 9         A.    Yes.
10         Q.    Now, during the time that you were
11    handcuffing Mr. Farmer-Brown, was Sergeant
12    Crumrine still down by the feet?
13         A.    Yes.
14         Q.    Did he ever leave that position until
15    after Officer Lopera released the hold?
16         A.    No.
17         Q.    After Officer Lopera released the hold,
18    what did you do?
19         A.    We --
20         Q.    Not we.  You.  What did you do?
21         A.    I recall checking to see if the subject
22    was conscious or not.  I did a sternal rub, to see
23    if he had any reaction to the sternal rub.  Then I
24    checked for a pulse.
25         Q.    Anything else?
```

OFFICER MICHAEL TRAN

December 20, 2017

```
1        A.    I don't know.  I didn't --

2        Q.    You didn't say it?

3        A.    I didn't say it, no.

4        Q.    Do you remember Flores saying it?

5        A.    I don't recall.  I know it was said.

6        Q.    Well, there was only you and Flores

7   talking to Rybacki.

8        A.    Correct.  Yes.

9        Q.    So if it wasn't you --

10       A.    It was probably Flores.

11       Q.    All right.  During the time -- from the

12   time that you got there until the time that -- I

13   assume Officer Flores got there the same time you

14   did --

15       A.    Yes.

16       Q.    -- correct?

17             From the time that you got there until

18   the time that Officer Lopera released the hold,

19   did Flores do anything whatsoever to intervene?

20       A.    No.  We were trying to take him into

21   custody.

22       Q.    Right.  During the time from the time

23   that you got there until the time that Lopera

24   released the hold, did you see Sergeant Crumrine

25   do anything to intervene?
```

OFFICER MICHAEL TRAN

December 20, 2017

```
 1        A.   No.

 2        Q.   All right.  Now, take a look at --

 3   further on page 6 of 8.  It says that this officer

 4   viewed the footage from the Venetian Hotel.  And

 5   it says, at 56:40, "Officer Lopera holstered his

 6   ECD."

 7             And then from 56:40 to 57:03, that's a

 8   period of 23 seconds, "Lopera struck Farmer in the

 9   head approximately 10 to 12 times."

10             Did you see that on the tape?

11        A.   Yes.

12        Q.   Was there any justification for that

13   occurring?

14             MR. ANDERSON:  Objection.  Form.

15             Go ahead.  Based upon what he saw?

16             MR. SAYRE:  Right.  He saw.

17             THE WITNESS:  Based on the video, no.

18   BY MR. SAYRE:

19        Q.   Okay.  Now, he says, when he looks at

20   the video from the Venetian -- or actually from

21   the sync'd videos, he says that at 57:30, "Officer

22   Tran told Officer Lopera to let go of Farmer."

23             You deny that you said that?

24        A.   I don't know what timeframe it was.  I

25   didn't -- my statement was not "Let go."  My
```

OFFICER MICHAEL TRAN

December 20, 2017

```
 1                  MR. ANDERSON:  Well, then if that's the
 2     case --
 3                  MR. SAYRE:  I can take a break too.
 4                  MR. ANDERSON:  No.  Carry on.
 5                  MR. SAYRE:  All right.
 6          Q.    All right.  Now, from the time that you
 7     heard Crumrine say, "Let him go, Ken," until
 8     Officer Lopera released Farmer, was that
 9     approximately 46 seconds?
10          A.    Are you referring to the video?
11          Q.    Yes, sir.
12          A.    I -- I don't know.
13          Q.    Is that your best estimate?
14          A.    I would say 30 seconds, yeah.
15          Q.    Okay.  And you didn't see in that 30
16     seconds Officer Crumrine do anything to intervene
17     with Officer Lopera?
18          A.    No.
19                  MR. SAYRE:  Why don't we take a break.
20     I may be done.  I just have to look over a couple
21     things.
22                  THE VIDEOGRAPHER:  Half an hour is okay
23     to leave the video on, or should I change the
24     video, Counsel?
25                  MR. SAYRE:  No.  Half an hour will be
```

OFFICER MICHAEL TRAN

December 20, 2017

```
 1              Do you agree that that is a potential
 2    danger of applying a carotid restraint control
 3    hold?
 4        A.   Yes.
 5        Q.   It's something that an officer has to be
 6    very careful about; right?
 7        A.   Yes.
 8        Q.   Next page, 411.  Under "Release The
 9    Hold," do you see that?
10        A.   Yes.
11        Q.   "Rationale.  Maintaining the hold beyond
12    the time subject loses consciousness can lead to
13    physical complications for the subject."
14              Do you agree with that?
15        A.   Yes.
16        Q.   For example, a person can die?
17        A.   Yes.
18             MR. SAYRE:  I have nothing further.
19             MR. ANDERSON:  I have no questions.
20             THE VIDEOGRAPHER:  Nothing?
21             Okay.  This concludes today's deposition
22    of Michael Tran.  The number of media used was
23    one.  We are off the record at 11:51 a.m.
24              (Whereupon, the deposition concluded
25                  at 11:51 a.m.)
```

OFFICER MICHAEL TRAN

December 20, 2017

```
 1              CERTIFICATE OF DEPONENT

 2     PAGE      LINE      CHANGE                REASON

 3     _____

 4     _____

 5     _____

 6     _____

 7     _____

 8     _____

 9     _____

10     _____

11     _____

12     _____

13              *     *     *     *     *

14              I, OFFICER MICHAEL TRAN, deponent herein,
       do hereby certify and declare the within and
15     foregoing transcription to be my deposition in said
       action; that I have read, corrected, and do hereby
16     affix my signature to said deposition under penalty
       of perjury.
17

18              _____
                OFFICER MICHAEL TRAN, Deponent
19

20

21

22

23

24

25
```

OFFICER MICHAEL TRAN

December 20, 2017

```
 1              CERTIFICATE OF COURT REPORTER

 2
     STATE OF NEVADA        )
 3                          )  ss:
     COUNTY OF CLARK        )
 4

 5       I, Kimberly A. Farkas, Certified Court

 6   Reporter licensed by the State of Nevada, do

 7   hereby certify that I reported the deposition of

 8   Officer Michael Tran, commencing on December 20,

 9   2017, at 9:57 a.m.

10        Prior to being deposed, the witness was duly

11   sworn by me to testify to the truth.  I thereafter

12   transcribed my said stenographic notes, and that

13   the transcript is a complete, true, and accurate

14   transcription, and that a request was made for a

15   review of the transcript.

16       I further certify that I am not a relative,

17   employee, or independent contractor of counsel,

18   nor a person financially interested in the

19   proceeding.

20       IN WITNESS WHEREOF, I have set my hand in my

21   office in the County of Clark, State of Nevada,

22   this January 8th, 2018.

23

24

25   _____

     Kimberly A. Farkas, CCR No.  741
26
```

208

# Exhibit G – Jonathan Pierce Deposition Excerpts

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| ESTATE OF TASHI S. FARMER a/k/a )<br>TASHII FARMER a/k/a TASHII )<br>BROWN, by and through its )<br>Special Administrator, Elia Del )<br>Carmen Solano-Patricio; TAMARA )<br>BAY LEE KUUMEALI'MAKAMAE FARMER )<br>DUARTE, a minor, individually )<br>and as Successor-in-Interest, )<br>by and through her legal )<br>guardian, Stevandra Lk Kuanoni; )<br>ELIAS BAY KAIMIPONO DUARTE, a )<br>minor, individually and as )<br>Successor-in-Interest, by and )<br>through his legal guardian, )<br>Stevandra Lk Kuanoni, )<br> )<br>          Plaintiffs, )<br> )<br>  vs. )<br> )<br>LAS VEGAS METROPOLITAN POLICE )<br>DEPARTMENT, a political )<br>subdivision of the State of )<br>Nevada; OFFICER KENNETH LOPERA, )<br>individually and in his )<br>Official Capacity; and )<br>Does 1 through 50, inclusive, )<br> )<br>          Defendants. )<br>_____ ) | No. 2:17-cv-01946-<br>     JCM-PAL |

DEPOSITION OF JONATHAN JODIE PIERCE

April 26, 2018

Flagstaff, Arizona

By:  Michelle K. Seymour, RPR, CSR, CCR
     Arizona Certified Reporter #50710

Job: 26055

JONATHAN JODIE PIERCE

April 26, 2018

```
1                    INDEX TO EXAMINATION

2     WITNESS:                                      PAGE:

3

4       JONATHAN JODIE PIERCE

5               Examination by Mr. Sayre                4

6               Examination by Mr. McNutt              31

7           Further Examination by Mr. Anderson       71

8           Further Examination by Mr. Sayre          74

9

10

11

12                    INDEX TO EXHIBITS

13    NUMBER:              DESCRIPTION:          MARKED:

14    Exhibit 1           Arrest Report             24

15    Exhibit 2         Voluntary Statement         24

16                      *  *  *  *  *

17

18

19

20

21

22

23

24

25
```

210

JONATHAN JODIE PIERCE

April 26, 2018

```
 1              Pursuant to Notice and Rules of Civil

 2    Procedure, the deposition of JONATHAN JODIE PIERCE,

 3    called by Plaintiffs, was taken on Thursday,

 4    April 26, 2018, commencing at 2:03 p.m., at

 5    Performance Reporters, 201 East Birch Avenue,

 6    Suite 9, Flagstaff, Arizona, before MICHELLE K.

 7    SEYMOUR, RPR, CSR, an Arizona CCR, Certificate

 8    No. 50710.

 9

10    APPEARANCES:

11                    Federico C. Sayre, Esq.
                      ABIR COHEN TREYZON SALO, LLP
12                    2600 Michelson Drive, Suite 1700
                      Irvine, California 92612
13                    (949) 852-3570
                      Appearing on behalf of Plaintiffs
14

15                    Daniel R. McNutt, Esq.
                      MCNUTT LAW FIRM, P.C.
16                    625 South Eighth Street
                      Las Vegas, Nevada 89101
17                    (702) 384-1117
                      Appearing on behalf of Defendant
18                    Officer Kenneth Lopera

19
                      Craig R. Anderson, Esq.
20                    MARQUIS AURBACH COFFING
                      10001 Park Run Drive
21                    Las Vegas, Nevada 89145
                      (702) 382-0711
22                    Appearing on behalf of Defendant Las
                      Vegas Metropolitan Police Department
23                    (Telephonically)

24

25
```

JONATHAN JODIE PIERCE

```
 1                  JONATHAN JODIE PIERCE,
 2    called as a witness herein, having first been duly
 3    sworn, was examined and testified as follows:
 4                       * * * * *
 5                   E X A M I N A T I O N
 6                       2:03 p.m.
 7                       * * * * *
 8    BY MR. SAYRE:
 9        Q.   Good afternoon.  Mr. Pierce, again, thank
10    you very much for coming down on short notice for
11    the deposition.  My name is Fred Sayre.  And I've
12    introduced myself previously over the phone on one
13    occasion, or two occasions, and then here in person.
14    I represent the children, two children of Tashi
15    Farmer Brown.  Sometimes each name is used,
16    sometimes both together.  And we are -- I am
17    prosecuting a lawsuit against the Metropolitan
18    Police Department of Las Vegas and Officer Lopera.
19    Okay?
20              And, Mr. McNutt might want to introduce
21    himself.
22              MR. MCNUTT:  I represent Officer Ken
23    Lopera.
24              MR. SAYRE:  And then, Craig Anderson,
25    would you please introduced yourself.
```

```
 1    drove near the Venetian and you saw something going
 2    on?
 3         A.    Correct.
 4         Q.    So, tell me -- I've got a statement by you
 5    that you prepared for the police.  And there's also
 6    some wording in the arrest record that refers to a
 7    statement that you made.
 8              Why don't we look at the arrest record
 9    first.  Take a look at page 2 of 8.
10         A.    2 of 8, yes.
11         Q.    At the top of the page, the first paragraph
12    says:
13              "During the walkthrough, which was started
14    at the point when he exited the hotel, Officer
15    Lopera stated he had observed a security officer and
16    asked if the officer if he had seen anyone running.
17    The security officer pointed to the south and
18    Officer Lopera observed Farmer running south in the
19    middle of the street.  Farmer approached a white
20    truck that was traveling west."
21              Now, do I understand correctly that that
22    was your truck?
23         A.    I own a white truck.  I don't know if I was
24    traveling west.  But yes, that was me.
25         Q.    Then, it says:
```

JONATHAN JODIE PIERCE

April 26, 2018

```
 1              "Farmer attempted to open the tailgate of
 2     the truck and Officer Lopera believed that Farmer
 3     was going to attempt to take the vehicle by force.
 4     Officer Lopera deployed and discharged the ECD" --
 5     that's a Taser -- "resulting in Farmer falling to
 6     the ground.  The walkthrough was then stopped as
 7     advised by LVPPA attorney John Aldrich."
 8              That's the attorney for the Police
 9     Department in that situation.
10              Now, as I understand from your statement,
11     you never saw Mr. Farmer attempt to get in your
12     vehicle?
13      A.   That is correct.  I never felt like he was
14     trying to open the tailgate, that's for sure.
15      Q.   You never felt he was trying to open the
16     door of your vehicle?
17      A.   Correct.
18      Q.   So the statement that he was attempting to
19     open the tailgate of the truck is incorrect?
20      A.   In my opinion, yes, that would have been
21     incorrect.
22      Q.   Next paragraph:
23              "After viewing surveillance footage from
24     the Venetian Hotel, detectives were able to retrieve
25     the numbers and letters of the license plate for the
```

```
 1   finish reviewing it, and made any corrections or
 2   not, sign it under penalty of perjury, put it into
 3   the envelope that she'll supply, which will be
 4   already stamped and already to go, and just put it
 5   in the mail.
 6               THE WITNESS:  Okay.
 7               MR. SAYRE:  And, if not signed,
 8   corrections provided, a certified copy may be used
 9   as if it were the original for all purposes.  I will
10   maintain the original until the time of trial and
11   will produce it at the time of trial.
12               Is that okay?
13               MR. MCNUTT:  It's the same stipulation
14   you and Craig already entered into, so I presumed
15   you were talking to Craig again.
16               MR. SAYRE:  Craig, is that all right
17   with you?
18               MR. ANDERSON:  Fine with me.
19                   (Deposition concluded at 3:50 p.m.)
20
21
22
23
24
25
```

JONATHAN JODIE PIERCE

April 26, 2018

```
1
2            I have read the foregoing deposition
3    transcript and by signing hereafter, approve same.
4    Dated _____.
5
6
7
8
9
10
11                _____
12                    JONATHAN  JODIE  PIERCE
13
14
15
16
17
18
19
20
21
22
23
24
25
```

JONATHAN JODIE PIERCE

April 26, 2018

```
 1   STATE OF ARIZONA      )
                           )   ss.   REPORTER'S CERTIFICATE
 2   COUNTY OF COCONINO    )

 3

 4          I, MICHELLE K. SEYMOUR, RPR, CSR, CCR, do

 5   hereby certify that I am an Arizona Certified

 6   Reporter, Certificate No. 50710; that previous to

 7   the commencement of the examination, the witness was

 8   duly sworn by me to testify to the truth.

 9          I further certify that this deposition was

10   taken in shorthand by me at the time and place

11   herein set forth, and was thereafter reduced to

12   typewritten form, and that the foregoing 84 pages

13   constitutes a true and accurate transcript, all done

14   to the best of my skill and ability.

15          I further certify that I am not related to,

16   employed by, nor of counsel for any of the parties

17   herein, nor otherwise interested in the result of

18   the within action.

19          DATED at Flagstaff, Arizona, this 3rd day

20   of May, 2018.

21

22          Michelle K. Seymour

23          _____
            Michelle K. Seymour, RPR, CCR, CSR
24              Arizona Certified Reporter
                  Certificate No. 50710
25
```

JONATHAN JODIE PIERCE

April 26, 2018

```
 1   Errata Sheet

 2

 3   NAME OF CASE: ESTATE OF TASHI S. FARMER vs LAS VEGAS METRO P.D.

 4   DATE OF DEPOSITION: 04/26/2018

 5   NAME OF WITNESS: Jonathan  Jodie Pierce

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                          _____
```

# Exhibit H – Merriam-Webster Definition of "Unreasonable"

# unreasonable adjective

un·rea·son·able | \ ˌən-ˈrēz-nə-bəl,     -ˈrē-zᵊn-ə-bəl\

## Definition of *unreasonable*

**1** **a** : not governed by or acting according to reason
*unreasonable* people

**b** : not conformable to reason : ABSURD
*unreasonable* beliefs

**2** : exceeding the bounds of reason or moderation
working under *unreasonable* pressure

⤓ Other Words from *unreasonable*

⤓ Synonyms & Antonyms

⤓ More Example Sentences

⤓ Learn More about *unreasonable*

Keep scrolling for more

## Other Words from *unreasonable*

**unreasonableness** \ ˌən-ˈrēz-nə-bəl-nəs ,     -ˈrē-zᵊn-ə-bəl-\ *noun*
**unreasonably** \ ˌən-ˈrēz-nə-blē ,     -ˈrē-zᵊn-ə-blē\ *adverb*

## Synonyms & Antonyms for *unreasonable*

### Synonyms

baseless, foundationless, groundless, invalid, nonvalid, unfounded, unsubstantiated, unsupported, unwarranted

### Antonyms

219

good, hard, just, justified, reasonable, reasoned,substantiated, valid, well-founded, well-grounded

Visit the Thesaurus for More 

## Examples of *unreasonable* in a Sentence

I told him that I wouldn't pay unless he sent me a replacement. Am I being *unreasonable*?

You are entitled to compensation for *unreasonable*delays.

### Recent Examples on the Web

Zachary Cruz claims he was treated unfairly, including an *unreasonable* bail set at $500,000, was required to wear a restraint vest 24 hours a day and was subjected to sleep deprivation tactics in jail.
— Curt Anderson, *The Seattle Times*, "Prosecutors want trial date in Florida school shooting," 8 Jan. 2019

What Lindsay wanted was to have her love story documented, and that's not an *unreasonable* request.
— Christopher Rosa, *Glamour*, "Rachel Lindsay Says She's a 'Little Pissed Off' About Becca Kufrin's Bachelorette Ending," 7 Aug. 2018

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'unreasonable.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. Send us feedback.

See More

## First Known Use of *unreasonable*

14th century, in the meaning defined at sense 1a

Keep scrolling for more

# Learn More about *unreasonable*

## Share *unreasonable*

 

220

## Resources for *unreasonable*

 

## Dictionary Entries near *unreasonable*

unreally

unreaped

unreason

**unreasonable**

unreasoned

unreasoning

unreave

## Statistics for *unreasonable*

**Last Updated**

16 Jan 2019

**Look-up Popularity**

Bottom 40% of words

## Time Traveler for *unreasonable*

**The first known use of *unreasonable* was in the 14th century**

See more words from the same century

Keep scrolling for more

# More Definitions for*unreasonable*

Unreasonable | Definition of Unreasonable by Merriam-Webster

# unreasonable adjective

### English Language Learners Definition of *unreasonable*
: not fair, sensible, or appropriate : not reasonable

See the full definition for *unreasonable* in the English Language Learners Dictionary

# unreasonable adjective

un·rea·son·able | \ ˌən-ˈrē-zᵊn-ə-bəl    \

### Kids Definition of *unreasonable*

: not fair, sensible, appropriate, or moderate
an *unreasonable* schedule
*unreasonable* behavior
an *unreasonable* fear

### Other Words from *unreasonable*

**unreasonably** \ -blē\ *adverb*

# unreasonable adjective

un·rea·son·able

### Legal Definition of *unreasonable*

: not reasonable : beyond what can be accepted: as

**a** : clearly inappropriate, excessive, or harmful in degree or kind
an *unreasonable* delay
an *unreasonable* restraint of trade

**b** : lacking justification in fact or circumstance
an *unreasonable* inference

*especially* : IRRATIONAL sense b
the agency decision was *unreasonable*

**c** : not supported by a warrant or by a valid exception to a warrant requirement (as when there is reasonable suspicion) and therefore unconstitutional

222

the right of the people to be secure in their persons, houses, papers, and effects,
against *unreasonable* searches and seizures, shall not be violated

— *U.S. Constitution* amend. IV

— see also SEARCH, SEIZURE

## Other Words from *unreasonable*

**unreasonableness** *noun*

**unreasonably** *adverb*

Exhibit I – Dr. Alane
Olson Deposition
Excerpts

**Deposition of:**

Alane Marie Olson, M.D.

**Case:**

Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department
2:17-CV-01946-JCM-PAL

**Date:**

09/12/2018



400 South Seventh Street • Suite 400, Box 7 • Las Vegas, NV  89101
702-476-4500 | www.oasisreporting.com | info@oasisreporting.com

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY

Alane Marie Olson, M.D.       Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

 1                   UNITED STATES DISTRICT COURT

 2                        DISTRICT OF NEVADA

 3

 4    ESTATE OF TASHI S. FARMER, et )
      al.,                          )
 5                     Plaintiffs,  )
                                    )
 6      vs.                         )   No.
                                    )   2:17-cv-01946-JCM-PAL
 7    LAS VEGAS METROPOLITAN POLICE )
      DEPARTMENT, et al.,           )
 8                                  )
                       Defendants.  )
 9    _____)

10

11         VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

12                   ALANE MARIE OLSON, M.D.

13      ----------------------------------------------------

14           544 North 5th Avenue, Sequim, Washington

15

16           DATE TAKEN:   September 12th, 2018

17

18

19

20

21

22

23
      REPORTED BY:   NICOLE JOHNSON (CCR No. 3343)
24

25

```
 1                    UNITED STATES DISTRICT COURT

 2                         DISTRICT OF NEVADA

 3

 4    ESTATE OF TASHI S. FARMER      )
      a/k/a Tashii FARMER a/k/a      )
 5    Tashii BROWN, by and through   )
      its Special Administrator,     )
 6    Elia Del Carmen                )
      Solano-Patricio; TAMARA BAYLEE)
 7    KUUMEALI'MAKAMAE FARMER        )
      DUARTE, a minor, individually  )
 8    and as Successor-in-interest,  )
      by and through her legal       )
 9    guardian, Stevandra Lk         )
      Kuanoni; ELIAS BAY KAIMIPONO   )
10    DUARTE, a minor, individually  )
      and as Successor-in-Interest,  )
11    by and through his legal       )
      guardian, Stevandra Lk         )
12    Kuanoni,                       )
                                     )
13                    Plaintiffs,    )
                                     )
14      vs.                          )   No.
                                     )   2:17-cv-01946-JCM-PAL
15    LAS VEGAS METROPOLITAN POLICE )
      DEPARTMENT, a political        )
16    subdivision of the State of    )
      Nevada; OFFICER KENNETH        )
17    LOPERA, individually and in    )
      his Official Capacity;         )
18    SERGEANT TRAVIS CRUMRINE,      )
      individually and in his        )
19    Official Capacity; OFFICER     )
      MICHAEL TRAN, individually and)
20    in his Official Capacity;      )
      OFFICER MICHAEL FLORES,        )
21    individually and in his        )
      Official Capacity; and Does 1 )
22    through 50, inclusive,         )
                                     )
23                    Defendants.    )
                                     )
24    ------------------------------------------------------------

25
```

Alane Marie Olson, M.D.        Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

```
 1

 2

 3    APPEARANCES:

 4

 5    For the Plaintiffs:

 6                        DARREN D. DARWISH
                          Abir, Cohen, Treyzon, Salo
 7                        1901 Avenue of the Stars
                          Suite 935
 8                        Los Angeles, California  90067
                          (310) 407-7888
 9                        ddarwish@actslaw.com

10

11    For the Defendant Officer Lopera:

12                        MATTHEW C. WOLF
                          McNutt Law Firm
13                        625 South 8th Street
                          Las Vegas, Nevada  89101
14                        (702) 384-1170
                          mcw@mcnuttlawfirm.com
15

16
      For the Defendant Las Vegas Metropolitan Police
17    Department, Sergeant Crumrine, Officer Tran,
      Officer Flores:
18
                          CRAIG R. ANDERSON (via telephone)
19                        Marquis, Aurbach, Coffing
                          10001 Park Run Drive
20                        Las Vegas, Nevada  89145
                          (702) 382-0711
21                        canderson@maclaw.com

22

23

24    The Videographer:  Michael Takos

25
```

Alane Marie Olson, M.D.        Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

```
 1

 2

 3                        EXAMINATION INDEX

 4     Attorney          Examination      Further Examination

 5     Mr. Wolf                6                  --

 6     Mr. Darwish             77                 --

 7     Mr. Anderson            --                 --

 8

 9

10                         EXHIBIT INDEX

11     No.   M                Description

12     1     9     Bates Numbers CORONER-DEPO001 -- DEPO013, 13 pgs

13     2     17    Bates Numbers CORONER-DEPO014 -- DEPO020, 7 pgs

14     3     39    Bates Numbers CORONER-DEPO055 -- DEPO081, 27 pgs

15     4     47    Documents produced to Deponent by Plaintiffs,
                   37 pgs (some double-sided)
16

17

18

19

20

21

22

23

24

25
```

```
 1                         SEQUIM, WASHINGTON

 2                  Wednesday, September 12th, 2018

 3                            1:02 p.m.

 4                            --ooOoo--

 5

 6            THE VIDEOGRAPHER:  We are on the record to begin

 7   the deposition of Alane Olson in the matter of the Estate

 8   of Tashi S. Farmer, et al., versus Las Vegas Metropolitan

 9   Police Department, et al.  This case is venued in the

10   United States District Court, District of Nevada.  The

11   case number is 2:17-cv-01946-JCM-PAL.

12            Today's date is Wednesday, September 12th, 2018,

13   and it's approximately 1:02 p.m.  This deposition is

14   taking place at 544 North 5th Avenue, Sequim, Washington.

15   The legal videographer is Michael Takos, here on behalf of

16   StoryCloud.  And the court reporter is Nicole Johnson,

17   here on behalf of Olympic Court Reporting Services.

18            Would counsel attending remotely, as well as

19   here in the room, identify themselves for the record.

20            MR. WOLF:  Matt Wolf for Ken Lopera.

21            MR. DARWISH:  Darren Darwish on behalf of

22   plaintiffs.

23            MR. ANDERSON:  Craig Anderson on behalf of the

24   police department defendants.

25            THE VIDEOGRAPHER:  Would the court reporter
```

1    please swear in the witness.

2

3                    ALANE MARIE OLSON, M.D.,

4            witness herein, being first duly sworn,

5             was examined and testified as follows:

6

7                         EXAMINATION

8    BY MR. WOLF:

9        Q.    Can you state your full name for the record?

10       A.    My name is Alane Marie Olson.

11       Q.    Dr. Olson, I'm Matt Wolf, and I'm here for the

12   Defendant Police Officer Ken Lopera.  Have you ever had

13   your deposition taken before?

14       A.    Yes.

15       Q.    Approximately how many times?

16       A.    Somewhere between 10 and 20.

17       Q.    Are you okay with dispensing with what are

18   called the admonitions, which are just an explanation of

19   the ground rules of a deposition?

20       A.    Yes.

21       Q.    Okay.  So let's begin with your background.

22   From where did you graduate medical school?

23       A.    I received my M.D. degree from the University of

24   Nevada School of Medicine in Reno, Nevada.

25       Q.    And when did you graduate?

Alane Marie Olson, M.D.      Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

```
 1                      EXAMINATION
 2   BY MR. DARWISH:
 3        Q.   Thank you, Dr. Olson.  I just have a couple of
 4   questions.
 5        A.   Okay.
 6        Q.   Is it still your opinion that Tashi Farmer died
 7   as a result of asphyxia due to police restraint
 8   procedures?
 9        A.   Yes.
10        Q.   Do you believe that the placement of a vascular
11   neck hold by Officer Lopera directly contributed and
12   caused the death of Mr. Farmer?
13             MR. WOLF:  Object to the form.
14             THE WITNESS:  Yes.
15        Q.   (By Mr. Darwish) Do you believe that Mr. Farmer
16   showed findings of asphyxia?
17        A.   I believe that Mr. Farmer showed findings
18   consistent with a neck restraint hold.
19        Q.   And do you believe that that is -- and that is a
20   direct consequence, do you believe, of that neck
21   restraint, is his -- let me strike that.  Sorry.
22             Is his death a direct consequence of the
23   application of a neck restraint?
24        A.   Yes.
25             MR. DARWISH:  I have no further questions.
```

1          MR. WOLF:  Craig, do you --

2          MR. ANDERSON:  Yeah, this is Craig Anderson.  No

3   questions.

4          MR. WOLF:  Okay.  That concludes the deposition.

5   Thank you, Doctor.

6          THE VIDEOGRAPHER:  This concludes the deposition

7   of Alane Olson consisting of three media units.  We are

8   off record at 3:18 p.m.

9          THE REPORTER:  And you want to order?

10          MR. WOLF:  Yeah, I definitely want to order a

11   PDF copy with exhibits.

12          MR. DARWISH:  Same.  I'll do an e-trans as well.

13          (Whereupon, at 3:18 p.m. the proceeding was

14          concluded.  Signature was reserved.)

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3   STATE OF WASHINGTON )
                        ) ss:
4   COUNTY OF CLALLAM   )

5

6           I, the undersigned Washington Certified Court
    Reporter, pursuant to RCW 5.28.010 authorized to
7   administer oaths and affirmations in and for the State of
    Washington and pursuant to the Rules of Conduct governing
8   court reporters as codified in WAC 308-14-130, do hereby
    certify:

9
            That the foregoing deposition of ALANE MARIE
10  OLSON, M.D., was taken before me and completed on the 12th
    day of September, 2018, and thereafter transcribed by me;

11
            That the deposition is a full, true and complete
12  transcript of the testimony of said witness, including all
    questions, answers, objections, motions, and exceptions;

13
            That the witness, before examination, was by me
14  duly sworn to testify the truth, the whole truth, and
    nothing but the truth, and that the witness RESERVED
15  signature;

16          That I am not a relative, employee, attorney or
    counsel of any parties to this action, or a relative or
17  employee of any such attorney or counsel, and I am not
    financially interested in the said action or the outcome
18  thereof.

19          IN WITNESS WHEREOF, I have hereunto set my hand
    this 24th day of September, 2018.

20

21

22  _____

23  Nicole Johnson
    Washington State Certified Court Reporter
24  WA CCR No. 3343
    Residing at Sequim, Washington

25

                                                        79

# Exhibit J – LVMPD's Incident Timeline

# Exhibit A - Incident Chronology created by LVMPD of the subject event

## Sunday -- May 14, 2017

| Time | Description of Event / Action | Source |
|------|-------------------------------|--------|
| 00:53:00 | Officer Lopera and Lif made contact with Farmer inside the Venetian, near the Grand Canal Shoppes. | Venetian Security Camera |
| 00:54:13 | Officer Lopera handed Officer Lif his coffee and walked toward Farmer. They disappeared from view of the security camera. | Venetian Security Camera |
| 00:54:58 | Officer Lopera attempted to grab Farmer but Farmer backed away and Officer Lopera gave chase. | Officer Lopera's Body Worn Camera |
| 00:55:04 | Officer Lopera fell in the hallway and lost sight of Farmer. | Officer Lopera's Body Worn Camera |
| 00:54:36 | Farmer was seen running through the employee hallway. | Venetian Security Camera |
| 00:54:43 | Officer Lopera was seen running through the employee hallway. | Venetian Security Camera |
| 00:54:58 | Officer Lif is captured walking through the employee hallway. | Venetian Security Camera |
| 00:55:46 | Officer Lopera called out for Officer Lif and got no response. | Officer Lopera's Body Worn Camera |
| 00:55:33 | A white Toyota truck pulled into the valet security check point. | Venetian Security Camera |
| 00:55:37 | Farmer ran behind the white Toyota truck. | Venetian Security Camera |
| 00:56:20 | Officer Lopera instructed Farmer to "Stop!" Farmer was tased the first time and fell to the ground. | Officer Lopera's Body Worn Camera |
| 00:56:29 | Officer Lopera instructed Farmer to roll to his stomach and tased him a second time. | Officer Lopera's Body Worn Camera |
| 00:56:22 | Officer Lopera requested a "Code Red." | CAD |
| 00:56:39 | Farmer was tased a third time. | Officer Lopera's Body Worn Camera |
| 00:56:44 | Officer Lopera closed the distance on Farmer, grabbed him and rolled him to his back. | Officer Lopera's Body Worn Camera |
| 00:56:45 | Officer Lopera backed away from Farmer and tased him a fourth time and told Farmer to get on his stomach. | Officer Lopera's Body Worn Camera |
| 00:56:50 | Officer Lopera grabbed Farmer's left hand and attempted to place it behind Farmer's back. | Officer Lopera's Body Worn Camera |
| 00:56:54 | Farmer rolled onto his back and Officer Lopera touch stunned Farmer several times. | Officer Lopera's Body Worn Camera |
| 00:56:39 | Additional officers were dispatched to Officer Lopera's location to assist him. | CAD |
| 00:57:01 | Officer Lopera called out for security to help him out. | Officer Lopera's Body Worn Camera |
| 00:57:05 | Security arrived to assist Officer Lopera and Officer Lopera disengaged from Farmer and continued to pull the TASER trigger. | Officer Lopera's Body Worn Camera |
| 00:57:09 | Officer Lopera reengaged Farmer and continued to touch stun him with the ECD. | Officer Lopera's Body Worn Camera |
| 00:57:16 | Officer Lopera disengaged from Farmer and re-holstered his TASER and delivered the first head strike to Farmer. | Officer Lopera's Body Worn Camera |
| 00:57:39 | Officer Lopera continued to strike Farmer in the head and face, while he gave Farmer commands to "get on your stomach." | Officer Lopera's Body Worn Camera |
| 00:57:39 | Sergeant Crumrine arrived. | Venetian Security Camera |
| 00:57:41 | Officer Lopera moved to Farmer's back and encircled his neck. | Officer Lopera's Body Worn Camera |

235

| 00:57:46 | Sergeant Crumrine told Farmer to "get your fucking hands behind your back." | Officer Lopera's Body Worn Camera |
| 00:57:54 | Sergeant Crumrine told Officer Lopera to let go. | Officer Lopera's Body Worn Camera |
| 00:57:58-00:58:04 | Officer Lopera asked three times "Is he out?" | Officer Lopera's Body Worn Camera |
| 00:58:09 | Officer Flores and Tran arrived. | Venetian Security Camera |
| 00:58:10 | Sergeant Crumrine told Officer Lopera to let Farmer go. | Officer Lopera's Body Worn Camera |
| 00:58:14 | Officer Lopera told officers on scene to "hold on." A unknown officer on scene told Lopera "Stop it, bro" | Officer Lopera's Body Worn Camera |
| 00:58:18 | Officer Lopera rolled Farmer to his left side and instructed officers to grab Farmer's left arm. | Officer Lopera's Body Worn Camera |
| 00:58:50 | Farmer was placed in handcuffs behind his back. | Officer Flores' Body Worn Camera |
| 00:58:53 | Officer Tran told Officer Lopera to "loosen up." | Officer Lopera's Body Worn Camera |
| 00:58:57 | Officer Lopera released the neck restraint and rolled off Farmer. | Officer Lopera's Body Worn Camera |
| 00:59:04 | Officers' Flores and Tran attempted to stand Farmer up. | Officer Flores' Body Worn Camera |
| 00:59:05 | Sergeant Crumrine advised dispatch Farmer was in-custody and medical was requested. | CAD |
| 00:59:08 | Numerous units arrived on scene. | Venetian Security Camera |
| 00:59:14 | Farmer was placed on the ground and Officer Tran conducted several sternum rubs on Farmer and checked for a pulse around his neck. | Officer Flores' Body Worn Camera |
| 00:59:36 | Officers Tran and Flores sat Farmer up and conducted palm strikes to Farmer's back. | Officer Tran's Body Worn Camera |
| 00:59:56 | Officer Tran checked Farmer's pulse and told Officer Flores he could not feel one. | Officer Tran's Body Worn Camera |
| 00:59:37 | Officer Young delegated officers to shut down the scene and divert traffic. | Officer Young's Body Worn Camera |
| 00:59:57 | Farmer was rolled onto his side into the recovery position. | Officer Kravetz' Body Worn Camera |
| 01:00:10 | Officer Lopera told Sergeant Crumrine he "choked" Farmer out. | Officer Lopera's Body Worn Camera |
| 01:00:39 | Officer Kravetz checked for a pulse while Officer Amburgey searched Farmer. | Officer Amburgey's Body Worn Camera. |
| 01:00:57 | Officer Lif was captured running from the loading dock toward the scene. | Venetian Security Camera |
| 01:01:22 | Officer Lopera told officers he "wailed" on Farmer and "rear-mounted and choked him out." | Officer Lopera's Body Worn Camera |
| 01:01:36 | Officer Lif arrived at the scene. | Officer Young's Body Worn Camera |
| 01:01:46 | Officer Lif approached Officer Lopera and told him she ran in the opposite direction. | Officer Lopera's Body Worn Camera |
| 01:02:08 | Officer Lopera asked Sergeant Crumrine if Farmer was okay. | Officer Lopera's Body Worn Camera |
| 01:03:03 | Sergeant Crumrine ran Farmer via his Mobile Data Terminal (MDT) in his vehicle. | Sergeant Crumrine's Body Worn Camera |
| 01:04:21 | Officer Kravetz advised dispatch Farmer had a faint pulse. | CAD |
| 01:04:43 | Officer Lopera told Officer Lif he, "rear-naked his ass." | Officer Lopera's Body Worn Camera |
| 01:04:46 | Officer Amburgey asked Venetian Security if they had an Automated External Defibrillator (AED). | Officer Amburgey's Body Worn Camera. |

| 01:05:07 | Officer Amburgey directed Officer Kravetz to take Farmer out of handcuffs so he could start Cardiopulmonary Resuscitation (CPR) due to Farmer not breathing. | Officer Amburgey's Body Worn Camera. |
| 01:05:34 | Officer Amburgey started CPR and Officer Erika Von Tagen kept Farmer's airway open. | Officer Amburgey's Body Worn Camera. |
| 01:06:38 | FD arrived on scene. | CAD |
| 01:06:53 | Officer Kravetz took over CPR from Officer Amburgey. | Officer Kravetz' Body Worn Camera |
| 01:07:34 | Sergeant Crumrine told FD and AMR that Farmer had been tased and choked out. | Sergeant Crumrine's Body Worn Camera |
| 01:08:35 | FD and AMR medical personnel took over CPR. | Officer Kravetz' Body Worn Camera |
| 01:08:51 | Sergeant Crumrine and Officer Lopera talked about Farmer "not going out until we went to the pony wall there." | Sergeant Crumrine's Body Worn Camera |
| 01:09:02 | Officer Lopera stated he thought Farmer was in the early stages of Excited Delirium (ED). | Sergeant Crumrine's Body Worn Camera |
| 01:10:29 | Farmer was transported to Sunrise Hospital. | CAD |
| 01:12:32 | Lieutenant Summers arrived. | CAD |
| 01:45:26 | Farmer is pronounced deceased by Dr. Flores | CAD |

Exhibit K – Sergeant Michael Bland Deposition Excerpts

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * * * * *

ESTATE OF TASHI S. FARMER
a/k/a TASHII FARMER a/k/a
TASHII BROWN, by and through
its Special Administrator,
Elia Del Carmen
Solano-Patricio; TAMARA
BAYLEE KUUMEALI'MAKAMAE
FARMER DUARTE, a minor,
individually and as
Successor-in-Interest, by and
through her legal guardian,
Stevandra Lk Kuanoni; ELIAS
BAY KAIMIPONO DUARTE, a
minor, individually and as
Successor-in-Interest, by and
through his legal guardian,
Stevandra Lk Kuanoni,

        Plaintiffs,

                   Case No. 2:17-CV-01946-
        vs.                  JCM-PAL

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, a political
subdivision of the State of
Nevada; OFFICER KENNETH
LOPERA, individually and in
his Official Capacity; and
Does 1 through 50, inclusive,

        Defendants.

---

VIDEOTAPED DEPOSITION OF SERGEANT MICHAEL BLAND

Las Vegas, Nevada

December 21, 2017

Reported by: Kimberly A. Farkas, RPR, CCR #741

Job: 23499

238

SERGEANT MICHAEL BLAND

December 21, 2017

```
 1              Videotaped Deposition of SERGEANT MICHAEL

 2   BLAND, taken at 330 E. Charleston Blvd. Suite 101,

 3   Las Vegas, Nevada, on Thursday, December 21, 2017,

 4   at 2:01 p.m., before Kimberly A. Farkas, Certified

 5   Court Reporter in and for the State of Nevada.

 6

 7   APPEARANCES

 8

 9   For the Plaintiffs:

10              FEDERICO C. SAYRE, ESQ.
                DARREN D. DARWISH, ESQ.
11              ABIR COHEN TREYZON SALO, LLP
                1901 Avenue of the Stars, Suite 935
12              Los Angeles, California  90067
                (424) 288-4367
13              ddarwish@actslaw.com

14

15   For the Defendant Las Vegas Metropolitan Police
     Department:
16

17              CRAIG R. ANDERSON, ESQ.
                Marquis Aurbach Coffing
18              10001 Park Run Drive
                Las Vegas, Nevada  89145
19              (702) 382-0711
                canderson@maclaw.com
20

21

22

23

24

25   \\\
```

```
 1    APPEARANCES (continued)

 2

 3    For the Defendant Officer Kenneth Lopera:

 4

 5            DANIEL R. McNUTT, ESQ.
              McNutt Law Firm, P.C.
 6            625 South Eighth Street
              Las Vegas, Nevada  89101
 7            (702) 384-1117
              drm@mcnuttlawfirm.com
 8

 9

10    Also present:   Tom Burtney, Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SERGEANT MICHAEL BLAND

December 21, 2017

```
 1              DEPOSITION OF SERGEANT MICHAEL BLAND

 2                     December 21, 2017

 3              Kimberly A. Farkas, CCR No. 741

 4                       *  *  *  *  *

 5

 6                          INDEX

 7                                              Page

 8   SERGEANT MICHAEL BLAND

 9   Examination by Mr. Sayre                    6

10   Examination by Mr. Anderson                91

11   Examination by Mr. McNutt                  92

12   Examination by Mr. Sayre                  119

13   Examination by Mr. McNutt                 125

14                       *  *  *  *  *

15

16                        EXHIBITS

17   No.                Description         Page

18   Exhibit 1      Arrest Report            20

19   Exhibit 2      Categories of Examination 21

20   Exhibit 3      Letter between Mr. Darwish  21
                    and Mr. Anderson
21                       *  *  *  *

22

23

24

25
```

SERGEANT MICHAEL BLAND

December 21, 2017

```
 1              LAS VEGAS, NEVADA

 2          Thursday, December 21, 2017

 3                  2:01 p.m

 4     DEPOSITION OF SERGEANT MICHAEL BLAND

 5              * * * * * *

 6          (The court reporter was relieved of her

 7     duties under NRCP 30(b)4.)

 8              THE VIDEOGRAPHER:  Good afternoon.  Here

 9     begins media no. 1 in the deposition of

10     Michael Bland in the matter of Estate of Tashi S.

11     Farmer, et al., versus Las Vegas Metropolitan

12     Police Department, et al.  This case is in the

13     United States District Court, District of Nevada,

14     and the case number is 2:17-CV-01946-JCM-PAL.

15              Today's date is December the 21st, 2017,

16     and the time is 2:01 p.m.  This deposition is

17     taking place at 330 East Charleston Boulevard,

18     Suite 101, in Las Vegas, Nevada.

19              The videographer is Tom Burtney

20     appearing on behalf of First Legal Deposition

21     Services.

22              Would counsel please identify yourselves

23     and state whom you represent.

24              MR. SAYRE:  For the plaintiffs,

25     Federico Sayre.
```

SERGEANT MICHAEL BLAND

December 21, 2017

```
 1               MR. DARWISH:  Darren Darwish on behalf
 2   of plaintiffs.
 3               MR. McNUTT:  For Ken Lopera, Dan McNutt
 4   and Matt Wolf.
 5               MR. ANDERSON:  Craig Anderson on behalf
 6   of Las Vegas Metropolitan Police Department.
 7               THE VIDEOGRAPHER:  Thank you.
 8               The reporter today is Kimberly Farkas.
 9               Will the reporter please swear in the
10   witness.
11               SERGEANT MICHAEL BLAND,
12   having been first duly sworn, was examined and
13   testified as follows:
14                        EXAMINATION
15   BY MR. SAYRE:
16      Q.   Officer Bland, my name is Fred Sayre.  I
17   introduced myself off the record.
18               What is your present position with the
19   police department?
20      A.   I'm a sergeant assigned to Northeast
21   Area Command and Patrol.
22      Q.   Have you ever had your deposition taken
23   before?
24      A.   Yes.
25      Q.   On how many occasions?
```

SERGEANT MICHAEL BLAND

December 21, 2017

```
 1    justified?
 2         A.    I could see the first one.
 3         Q.    Okay.  After that?
 4         A.    Not that I see.
 5         Q.    Okay.  So the subsequent applications
 6    would be out of policy?
 7         A.    In my opinion, yes.
 8         Q.    Right.  And "out of policy" means
 9    unreasonable?
10         A.    Yes.
11              MR. McNUTT:  Objection.  Form.
12    BY MR. SAYRE:
13         Q.    Now, take a look, if you would, please,
14    at 0616.  It's two or three pages over.
15         A.    I'm there.
16         Q.    Okay.  This is from a book or treatise
17    by James W. Lindell.
18              Do you know who that is?
19         A.    Yes.
20         Q.    Okay.  He's one of the two principal
21    authors of the -- the NVRD, right, the --
22         A.    LVNR.
23         Q.    LVNR.  Sorry.
24              Now, it says here, if you look about --
25    down about, say, the third paragraph, small
```

SERGEANT MICHAEL BLAND

December 21, 2017

```
 1          A.    It might be longer ago than that.  I
 2    don't -- that information I don't have in front of
 3    me.  But we used to teach for four hours.  We used
 4    to do research for four hours.  Now we do two
 5    hours.
 6          Q.    Have you applied a lateral vascular neck
 7    restraint hold?
 8          A.    Yes.
 9          Q.    Against a subject?
10          A.    Yes.
11          Q.    All right.  How many times?
12          A.    Against a suspect?  Maybe twice.  Long
13    time ago.
14          Q.    Can you tell by looking in the video
15    whether Officer Lopera is applying a lateral
16    vascular neck restraint?
17          A.    From what I can see in the video, I
18    don't see an LVNR being applied.
19          Q.    Okay.  What do you see?
20          A.    It's hard to -- it's hard to tell
21    because I can't see every aspect of the arms.  But
22    I can see an arm encircles his neck.  And I can
23    see a hand or an arm that looks like it's on the
24    top of his head or on some portion of the top
25    portion of his head.  Somewhere from the nose up,
```

SERGEANT MICHAEL BLAND

December 21, 2017

```
 1    ears up, I see an arm or a hand.  That's the best
 2    I can make out.
 3         Q.   All right.
 4         A.   And if it was an LVNR, I wouldn't see
 5    the hand there.
 6         Q.   If it was a rear naked choke, you
 7    wouldn't see the hand there either; correct?
 8         A.   No.  I could.
 9         Q.   All right.  You're saying a rear naked
10    choke would have a hand on top of the head?
11         A.   Sometimes.
12         Q.   Tell me about your training in applying
13    a rear naked choke.
14         A.   I'm a third-degree black belt in
15    Brazilian jujitsu.  Been doing Brazilian jujitsu
16    since 1996.  I've -- I've coached everybody from
17    kids to, you know, recreational, people doing
18    classes, to professional fighters.  So, you know,
19    I've cornered fighters.  I'm a judge for -- I'm a
20    sanctioned judge for mixed martial arts, so I have
21    a bit of experience with rear naked chokes.
22         Q.   Have you ever applied a rear naked choke
23    to a suspect?
24         A.   No.
25         Q.   Can you say conclusively that the hold
```

SERGEANT MICHAEL BLAND

December 21, 2017

```
 1    that you see in this distant video is a rear naked
 2    choke as opposed to simply a poorly applied
 3    lateral vascular neck restraint?
 4         A.   Can -- I'm sorry.  Rephrase that.
 5         Q.   Sure.
 6              Can you say conclusively that the hold
 7    that you see at some distance in the video is a
 8    rear naked choke as opposed to a poorly applied
 9    lateral vascular neck restraint?
10         A.   No, I could not say conclusively that
11    it's a rear naked choke.
12         Q.   Okay.  It could be a poorly applied
13    lateral vascular neck restraint?
14         A.   Yes.
15         Q.   Let's go back to the paper again.
16              You see it says that Officer -- at 2:58,
17    "Officer Lopera appeared to put Farmer in some
18    type of a neck restraint."
19              At 3:13, it says, "Officer Lopera asked,
20    'Is he out yet?'"
21              How is an officer trained by the
22    Metropolitan Police Department to determine
23    whether or not a subject has been rendered
24    unconscious by a lateral vascular neck restraint?
25         A.   How is the department trained --
```

SERGEANT MICHAEL BLAND

December 21, 2017

```
1    further.
2              MR. McNUTT:  I have one question.
3                   CONTINUED EXAMINATION
4    BY MR. McNUTT:
5       Q.   Have you reviewed any of the medical
6    records regarding Mr. Farmer?
7       A.   I've seen -- I saw a toxicology report.
8       Q.   What about the coroner's documents?
9       A.   I don't -- I didn't see any documents.
10   Everything I saw would have been at the tactical
11   review board and use of force board.
12             MR. McNUTT:  Okay.  Nothing further.
13             MR. SAYRE:  Nothing.  Go ahead.
14             THE VIDEOGRAPHER:  This concludes
15   today's deposition of Michael Bland.  The number
16   of media used was two.  We are going off the
17   record at 4:18 p.m.
18             MR. McNUTT:  I do want a full copy with
19   everything.
20             (Whereupon, the deposition concluded
21              at 4:18 p.m.)
22
23
24
25
```

SERGEANT MICHAEL BLAND

December 21, 2017

```
 1              CERTIFICATE OF DEPONENT
 2    PAGE      LINE      CHANGE              REASON
 3    _____
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13              *     *     *     *     *
14              I, SERGEANT MICHAEL BLAND, deponent
      herein, do hereby certify and declare the within
15    and foregoing transcription to be my deposition in
      said action; that I have read, corrected, and do
16    hereby affix my signature to said deposition under
      penalty of perjury.
17
18              _____
                          SERGEANT MICHAEL BLAND,
19                             Deponent
20
21
22
23
24
25
```

SERGEANT MICHAEL BLAND

December 21, 2017

```
 1              CERTIFICATE OF COURT REPORTER

 2
      STATE OF NEVADA        )
 3                           )   ss:
      COUNTY OF CLARK        )
 4

 5         I, Kimberly A. Farkas, Certified Court

 6    Reporter licensed by the State of Nevada, do

 7    hereby certify that I reported the deposition of

 8    SERGEANT MICHAEL BLAND, commencing on December 21,

 9    2017, at 2:01 p.m.

10         Prior to being deposed, the witness was duly

11    sworn by me to testify to the truth.  I thereafter

12    transcribed my said stenographic notes, and that

13    the transcript is a complete, true, and accurate

14    transcription, and that a request was not made for

15    a review of the transcript.

16         I further certify that I am not a relative,

17    employee, or independent contractor of counsel,

18    nor a person financially interested in the

19    proceeding.

20         IN WITNESS WHEREOF, I have set my hand in my

21    office in the County of Clark, State of Nevada,

22    this January 8th, 2018.

23

24

25              Kimberly A. Farkas, CCR No. 741

26
```

# Exhibit L – Officer Michael Flores Deposition Excerpts

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

ESTATE OF TASHI S. FARMER a/k/a )
TASHII FARMER a/k/a TASHII BROWN,)
by and through its Special        )
Administrator, Elia Del Carmen    )
Solano-Patricio; TAMARA BAYLEE    )
KUUMEALI'MAKAMAE FARMER DUARTE,   )
a minor, individually and as      )
Successor-in-Interest, by and     )
through her legal guardian,       )
Stevandra Lk Kuanoni; ELIAS       )
BAY KAIMIPONO DUARTE, a minor,    )
individually and as Successor-    )
in-Interest, by and through       )
his legal guardian, Stevandra     )
Lk Kuanoni,                       )
                                  )
                    Plaintiffs, )
                                  )
        vs.                       )   Case No.:
                                  )   2:17-cv-
LAS VEGAS METROPOLITAN POLICE     )   01946-JCM-PAL
DEPARTMENT, a political           )
subdivision of the State of       )
Nevada; OFFICER KENNETH LOPERA,   )
individually and in his           )
Official Capacity; and Does 1     )
through 50, inclusive,            )
                                  )
                    Defendants. )
_____)

VIDEOTAPED DEPOSITION OF OFFICER MICHAEL FLORES

Reported by:  Margie L. Carlson, C.C.R. No. 287

Job: 25100

OFFICER MICHAEL FLORES

February 08, 2018

1    VIDEOTAPED DEPOSITION OF OFFICER MICHAEL FLORES

2    Taken at the Law Offices of Callister & Associates

3         330 East Charleston Boulevard, Suite 100

4               Las Vegas, Nevada

5

6           On Thursday, February 8, 2018

7                 At 1:59 p.m.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICER MICHAEL FLORES

February 08, 2018

```
 1    APPEARANCES:

 2        For the Plaintiffs: FEDERICO C. SAYRE, ESQ.
                              Abir Cohen Treyzon Salo, LLP
 3                            1901 Avenue of the Stars
                              Suite 935
 4                            Los Angeles, CA  90067
                              310 407-7888 telephone
 5                            424 288-4368 fax
                              fsayre@actslaw.com
 6

 7        For the Defendants: CRAIG R. ANDERSON, ESQ.
          (LVMPD)            Marquis Aurbach Coffing
 8                            10001 Park Run Drive
                              Las Vegas, Nevada  89145
 9                            702 382-0711 telephone
                              702 382-5816 fax
10                            canderson@maclaw.com

11
          (Officer           DANIEL R. McNUTT, ESQ.
12        Kenneth Lopera)    McNutt Law Firm
                              625 South Eighth Street
13                            Las Vegas, Nevada  89101
                              702 384-1170 telephone
14                            702 384-5529 fax
                              drm@mcnuttlawfirm.com
15

16        (Officer           PETER M. ANGULO, ESQ.
          Michael Flores)    Olson, Cannon, Gormley,
17                             Angulo & Stoberski
                              9950 West Cheyenne Avenue
18                            Las Vegas, Nevada  89129
                              702 384-4012 telephone
19                            702 383-0701 fax
                              pangulo@ocgas.com
20

21        Also present:      NANCY HEFFERNAN, Videographer

22

23                  *  *  *  *  *

24

25
```

OFFICER MICHAEL FLORES

February 08, 2018

```
 1                    I N D E X

 2

 3    WITNESS                              PAGE

 4       OFFICER MICHAEL FLORES

 5          Examination by Mr. Sayre          6

 6          Examination by Mr. Anderson      49

 7          Further Examination by Mr. Sayre 58

 8          Examination by Mr. McNutt        59

 9

10    EXHIBITS                           MARKED

11    Plaintiff's:

12       Exhibit 1  Las Vegas Metropolitan
                    Police Department
13                  Employee Statement      62

14

15

16

17

18

19

20

21

22

23

24

25
```

OFFICER MICHAEL FLORES

February 08, 2018

```
1              THE VIDEOGRAPHER:  On the record.  This
2    begins Media No. 1 of the deposition of
3    Officer Michael Flores in the matter of Estate of
4    Tashi S. Farmer, et al., versus Las Vegas
5    Metropolitan Police Department, et al.  This case is
6    in the United States District Court, District of
7    Nevada, and the Case No. is 2:17-cv-01946-JCM-PAL.
8    Today's date is February 8, 2017 (sic), and the time
9    is 1:59.  This deposition is taking place at 330
10   East Charleston Boulevard, Las Vegas, Nevada.  The
11   videographer is Nancy Heffernan, appearing on behalf
12   of First Legal.
13              Will counsel please introduce yourself
14   and state who you represent.
15              MR. SAYRE:  For the plaintiffs Federico
16   Sayre.
17              MR. McNUTT:  Dan McNutt on behalf of
18   Officer Ken Lopera.
19              MR. ANDERSON:  Craig Anderson on behalf
20   of Las Vegas Metropolitan Police Department.
21              MR. ANGULO:  Peter Angulo appearing on
22   behalf of Officer Flores.
23              MR. SAYRE:  Officer --
24              THE VIDEOGRAPHER:  The reporter is Margie
25   Carlson with First Legal.
```

OFFICER MICHAEL FLORES

February 08, 2018

```
1              Will the reporter please swear in the
2    witness.
3
4    Whereupon,
5                   OFFICER MICHAEL FLORES,
6    having been first duly sworn to testify to the
7    truth, the whole truth and nothing but the truth,
8    was examined and testified as follows:
9
10                   EXAMINATION
11   BY MR. SAYRE:
12        Q.   Officer Flores, have you ever had your
13   deposition taken before?
14        A.   No.
15        Q.   I am representing the estate and the
16   children of a decedent by the name of Tashi Farmer
17   Brown.  Mr. Farmer died in an incident back in May
18   of 2017, and you were present during part of what
19   occurred between himself and Officer Lopera, so I'm
20   going to be asking you some questions concerning
21   those events.  You've been sworn to tell the truth,
22   and although we're sitting here somewhat informally,
23   you understand that oath is as binding on you here
24   as if we were in a courtroom of law?
25        A.   Yes, sir.
```

```
 1    it.
 2         Q.    Okay.  Is it correct, is your
 3    understanding, is it correct that your understanding
 4    that a rear-naked choke is out of policy?  It is not
 5    an appropriate hold for an officer of the Las Vegas
 6    Metropolitan Police Department to use?
 7         A.    Yes.
 8         Q.    And if a person, police officer is using
 9    a rear-naked choke on a subject, would you as an
10    officer have a duty to intervene to stop that hold
11    from being used?
12         A.    Yes.
13         Q.    Including, if necessary, pulling the
14    hands away from the person's neck?
15         A.    Yes.
16         Q.    Now, you recall that when you first
17    looked at Officer Lopera through the window the
18    passenger side of your vehicle you noticed that he
19    had a neck hold applied?
20         A.    Yes.
21         Q.    Which could have been a lateral vascular
22    neck restraint, correct?
23         A.    Correct.
24         Q.    All right.  You don't know how long he
25    had had that lateral vascular neck restraint applied
```

```
 1    lateral vascular neck restraint applied for

 2    15 seconds did you do anything to intervene?

 3              MR. ANGULO:  Let me just lodge an

 4    objection to being an incomplete hypothetical as to

 5    how the lateral neck restraint is being applied and

 6    how much pressure is being used.

 7              MR. SAYRE:  I think that's an improper

 8    objection under Nevada rules.  You can object to

 9    form, but that's it.  No speaking objections are

10    allowed, sir.

11              MR. ANGULO:  I didn't think it was.  I

12    was just objecting to the form of the question.

13              MR. SAYRE:  No, you were being, giving a

14    speaking objection, which is improper.

15              MR. ANGULO:  I disagree with you.

16              MR. SAYRE:  All right.

17         Q.   Officer Flores, at any time after

18    15 seconds had passed that you observed the lateral

19    vascular neck restraint applied to Mr. Farmer, did

20    you do anything to intervene to stop the application

21    of the lateral vascular neck restraint?

22         A.   I didn't, I didn't honestly when we got

23    there seeing he had an LVNR on him I believe was but

24    I'm on the lower part of Tashi Farmer's body trying

25    to make him compliant, and I did not count
```

OFFICER MICHAEL FLORES

```
 1   15 seconds.

 2        Q.   Officer, at anytime during the minute

 3   that you observing the lateral vascular neck

 4   restraint applied to the neck of Tashi Brown as you

 5   have testified --

 6        A.   Yes.

 7        Q.   -- did you do anything to intervene to

 8   stop it?

 9             MR. McNUTT:  Objection, form.

10             MR. ANDERSON:  Objection, form.

11             MR. ANGULO:  Okay, that mischaracterizes

12   his testimony.

13             MR. SAYRE:

14        Q.   Your answer?

15        A.   Yes.

16        Q.   You did do something to intervene to stop

17   it.  What did you do to intervene to stop it?

18        A.   I remember we had, I heard an officer

19   say, "Let him go," and I got him into custody as

20   well.  There was one hand that had a handcuff on it,

21   another one that wasn't, and Lopera I believe let

22   go.

23        Q.   Sir, you got him into custody in

24   30 seconds; isn't that correct?

25        A.   I believe so, yes.
```

OFFICER MICHAEL FLORES

```
 1          A.    -- to Lopera, I can't recall.
 2          Q.    All right, you can't recall doing
 3     anything?
 4          A.    To Lopera specifically?
 5          Q.    Yes.
 6          A.    No, I don't believe it, no.
 7          Q.    All right.  You felt that Officer Lopera
 8     was applying the lateral vascular neck restraint for
 9     too long, correct?
10          A.    At the time, no, I don't believe so.
11          Q.    Take a look at page 62 of your
12     interview.
13          A.    (Witness complies.)  What line?
14          Q.    Okay.  Take a look at line 4 and then
15     your response at line 5 and 6.  Shall I read it for
16     you?
17          A.    Oh, I see.
18          Q.    The question is, "Um, did you feel at any
19     time it was on too long?  MF:"  That would be you.
20     "Uh, th-yes.  Um, I remember when, uh, my partner
21     Tran's, like, 'Loosen up.'  Cause we had him . . ."
22     "Okay."  ". . .cuffed dudes.  Yes."  Do you
23     remember that testimony?
24          A.    This refreshes my memory.
25          Q.    So were you being truthful when you said
```

OFFICER MICHAEL FLORES

February 08, 2018

```
1    you thought that Lopera had the, was applying the
2    lateral vascular neck restraint for too long?
3         A.   Yes.
4         Q.   All right, and did you do you anything to
5    stop him from applying the lateral vascular neck
6    restraint when you decided he was applying it for
7    too long?
8         A.   No.
9         Q.   You knew you had a duty to do that?
10             MR. ANDERSON:  Objection, form.
11             MR. SAYRE:
12        Q.   Correct?
13        A.   If I felt as if he was then, yes, I would
14   have.
15        Q.   And not only would that be a violation of
16   the Las Vegas Metropolitan Police standards, but
17   it's a violation of the Fourth Amendment, isn't it,
18   as you're trained?
19             MR. ANDERSON:  Objection.
20             MR. ANGULO:  Objection, calls for a legal
21   conclusion.
22             MR. SAYRE:
23        Q.   You're trained in the Fourth Amendment in
24   the academy, aren't you?
25        A.   Yes.
```

OFFICER MICHAEL FLORES

February 08, 2018

```
 1        Q.    And he failed to release his hold, isn't
 2   that right?
 3              MR. ANDERSON:  Objection, form.
 4              MR. ANGULO:  Calls for speculation.
 5        A.    I believe at the time he did.
 6              MR. SAYRE:
 7        Q.    Okay, when you arrived with
 8   Officer Tran --
 9        A.    Yes.
10        Q.    -- already present was Sgt. Crumrine?
11        A.    That's correct.
12        Q.    And Officer Lopera.
13        A.    That's correct.
14        Q.    So once the four of you were there there
15   were four officers, and you were confident with
16   four officers you could take Mr. Farmer into
17   custody?
18        A.    Yes.
19        Q.    And therefore it was unnecessary for
20   Officer Lopera to continue his hold once there were
21   four officers there, correct?
22        A.    Yes.
23        Q.    All right.  Is it correct that you felt
24   that Sgt. Crumrine never took charge of the events
25   that were going on there?
```

OFFICER MICHAEL FLORES

February 08, 2018

```
 1          Q.   Understand, but there was nothing
 2    physically in the way between Crumrine looking
 3    towards Mr. Farmer, Farmer looking up towards
 4    Sgt. Crumrine?
 5          A.   Correct.
 6               MR. ANDERSON:  Objection, form.
 7               MR. SAYRE:
 8          Q.   Farmer was not physically fighting
 9    Lopera, correct?
10          A.   I don't -- at the time being I thought he
11    was.
12          Q.   Well, you didn't, he wasn't throwing any
13    punches?
14          A.   No.
15          Q.   He wasn't doing any kicks?
16          A.   No.
17          Q.   And when you got a hold of him you were
18    surprised at how little resistance he was having to
19    your seeking to grab his arms?
20          A.   I went towards his leg.  I do believe I
21    felt some resistance.  I don't know at the time
22    being I thought it was Tashi Farmer.  I don't know
23    if everyone was just grabbing, you know, everyone
24    was just wrestling around, but go back to your
25    question with cuffs?
```

OFFICER MICHAEL FLORES

February 08, 2018

```
 1    the transcript.

 2              MR. SAYRE:  No, page 13 -- line 13 does

 3    not misstate.

 4              MR. McNUTT:  Well, if you go back up to

 5    11.

 6              MR. SAYRE:  He said he feel like it was

 7    over a minute.

 8              MR. McNUTT:  I don't feel like it's over

 9    a minute.

10        A.    Yeah, he's saying, 11, it continues, but

11    I don't feel like it was over a minute.

12              MR. SAYRE:

13        Q.    All right, so it was somewhere near a

14    minute?

15              MR. ANGULO:  Objection, asked and

16    answered.

17        A.    Somewhere under a minute.

18              MR. SAYRE:

19        Q.    Close to a minute?

20              MR. ANDERSON:  Objection, form.

21              MR. McNUTT:  Objection, form.

22              MR. ANGULO:  Same objection.

23        A.    Sometime under a minute possibly.

24              MR. SAYRE:  Okay.

25        Q.    You had an interview with
```

OFFICER MICHAEL FLORES

February 08, 2018

```
1    Officer Rybacki, correct?
2            A.   An interview?
3            Q.   Discussion.
4            A.   Yes, I believe so.
5            Q.   Right, and you told Officer Rybacki that
6    "He was definitely out when we got there."  Take a
7    look at page 45.
8            A.   Yes.
9            Q.   And you also said, "Especially with what
10   Lopera was saying"?
11           A.   I don't remember saying that, but --
12           Q.   That he was acting really sporadic.
13                MR. ANGULO:  Objection, vague and
14   ambiguous.
15           A.   I don't remember saying that.
16                MR. SAYRE:
17           Q.   Does it refresh your recollection?
18           A.   Not saying that, no.
19           Q.   Well, did you say, "Oh, he was definitely
20   out when we got there"?
21           A.   I do believe I, I believe so, yes.
22           Q.   And did you say that he, Lopera, hit him
23   in the eye?
24           A.   I don't remember saying that.
25           Q.   The only reason that you felt that Farmer
```

OFFICER MICHAEL FLORES

February 08, 2018

```
 1        A.    Yes.

 2              MR. McNUTT:   Thank you, no further

 3   questions.

 4              MR. SAYRE:   No questions.

 5              MR. ANDERSON:   No questions.

 6              MR. SAYRE:   Okay then, shall we stipulate

 7   that we'll send, we'll send the original to you.

 8   You'll have the witness examine it, make any changes

 9   or corrections 30 days and advise me of any changes

10   or corrections, if any, and the fact that he signs

11   it under penalty of perjury?

12              MR. ANDERSON:   Fair enough.

13              MR. SAYRE:   Do you want to maintain the

14   original or do you want to send it back to me?

15              MR. ANDERSON:   I'll probably have you

16   maintain it.

17              MR. SAYRE:   Okay, that's fine.  Send it

18   back to me.

19                      (Whereupon, Plaintiff's

20                      Exhibit No. 1 was marked for

21                      identification.)

22              THE VIDEOGRAPHER:   And just one more off

23   the record, the time is 3:09.

24                      (Whereupon, the videotaped

25                      deposition concluded at 3:09 p.m.)
```

OFFICER MICHAEL FLORES

February 08, 2018

```
 1                  DECLARATION OF DEPONENT

 2      PAGE    LINE    CHANGE              REASON

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15                        * * * * *

16           I, OFFICER MICHAEL FLORES, deponent herein,
        do hereby declare the within and foregoing
17      transcription to be my deposition in said action;
        that I have read, corrected and do hereby affix my
18      signature to said deposition.

19

20           _____
                  OFFICER MICHAEL FLORES
21                Deponent

22           Dated by me this      day of
        2018.
23

24

25
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3     STATE OF NEVADA )
                       ) ss
 4     COUNTY OF CLARK )

 5

 6          I, Margie L. Carlson, CCR No. 287, do hereby

 7     certify:

 8          That I reported the taking of the deposition

 9     of the witness, OFFICER MICHAEL FLORES, commencing

10     on February 8, 2018, at the hour of 1:59 p.m.

11          That prior to being examined, the witness was

12     duly sworn to testify to the truth and that I

13     thereafter transcribed said stenotypy notes and said

14     deposition is a complete, true, and accurate

15     transcription of said stenotypy notes taken down at

16     said time.

17          The witness and/or a party has requested to

18     read and sign the deposition transcript.

19          I further certify that I am not a relative or

20     employee of any party involved in said action, nor a

21     person financially interested in the action.

22          Dated at Las Vegas, Nevada, this 20th day

23     of February, 2018.

24                              Margie L. Carlson
                                Margie L. Carlson
25                              CCR No. 287
```

# Exhibit M – Clark County Coroner's Autopsy Report

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:** 17-05089

May 14, 2017

AUTOPSY REPORT

PATHOLOGIC EXAMINATION ON THE BODY OF

TASHII S. BROWN

FINAL PATHOLOGIC FINDINGS

I.    Multiple hemorrhages in the neck, status post application of choke hold.
II.   Methamphetamine intoxication (see separate toxicology report).
III.  Cardiomegaly (490 grams).
IV.   Multiple subscalp hemorrhages.
V.    Contusions and abrasions of the body surfaces.
VI.   Status post Taser strike (barb punctures of the back), with multiple cycles applied.

OPINION

**CAUSE OF DEATH:** It is my opinion that this 40-year-old Black male, Tashii S. Brown, died as a result of asphyxia due to police restraint procedures. Other significant conditions include methamphetamine intoxication, cardiomegaly.

**MANNER OF DEATH:**   HOMICIDE.

Alane M. Olson, M.D.
Pathologist

DATE:  5/31/17

AMO/amu

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:  17-05089**

May 14, 2017

### POSTMORTEM EXAMINATION ON THE BODY OF

### Tashii S Brown

The examination commences at 1255 hours on the 14th of May, 2017.

### IDENTIFICATION

At the time of autopsy, the body is identified by a Clark County Office of the Coroner/Medical Examiner (CCOCME) "toe tag" inscribed with case #17-5089 and the name Farmer, Tashii (tentative).  Definitive identification is accomplished via fingerprint comparison.  The body has been processed per Clark County Office of the Coroner/Medical Examiner protocol, and is received nude.  Present on the gurney with the body are items of medical paraphernalia, including a blood pressure cuff, pacing patches, EKG patches, and IV tubing.

### CLOTHING

At the time of autopsy, the body is nude.

### X-RAYS

Prior to autopsy, full body radiographs are obtained at the Clark County Office of the Coroner/Medical Examiner.  These films show evidence of medical/surgical intervention, and the barb from a conducted electrical weapon which projects over the medial aspect of the left chest, at approximately the level of T9.

### GENERAL EXTERNAL EXAMINATION

The body is that of a normally developed adult Black male measuring 74 inches in length and weighing 197 pounds.  The general appearance is roughly consistent with the chronological age of 40 years.  The body is in rigor which has been loosened in some of the major joints, and slightly warm to the touch.

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number: 17-05089**

PAGE TWO

Lividity is posterior, purple, and blanching to pressure. The state of preservation is good in this unembalmed body.

**HEAD**: The scalp is covered with closely-trimmed curly black hair, no more than approximately 5 mm in length. The head is normocephalic. **EARS**: The ears are normally formed and set, the external auditory canals are clear, and each lobe contains a single cosmetic perforation. **EYES**: The irides are brown, and the pupils appear to be round and equal. There is mild corneal clouding and the irides are quite dark, so the size and shape of the pupils is difficult to assess. The sclerae and conjunctivae are free of icterus and petechiae. **NOSE**: The nasal bridge and septum are intact to palpation, and the nares are clear. **FACE**: Black beard stubble is present on the facial skin. Injuries are present as described. **MOUTH**: The injuries to the oral mucosa are as described. The dentition is natural and in good repair. The visible portion of the tongue is free of injuries. **NECK**: The larynx and trachea are midline and intact to palpation, and the neck is free of discernible external injuries.

**CHEST AND BACK**: The chest and back are normally formed, bilaterally symmetric, and have a normal anteroposterior diameter. Injuries are as described. **ABDOMEN**: The abdomen is protuberant, soft, and free of discernible organomegaly. **GENITALIA**: The external genitalia are those of a circumcised adult male with bilaterally descended testes. The genital hair pattern is appropriate for age and sex. **ANUS AND PERINEUM**: The anus and perineum are unremarkable.

**EXTREMITIES**: The upper extremities are normally formed, bilaterally symmetric, and remarkable for described injuries. No digits are missing. The fingernails are short, natural and appear to have been recently trimmed. There is black ink and powder about the hands and fingers. The lower extremities are normally formed, bilaterally symmetric, and remarkable for described injuries.

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:** 17-05089

PAGE THREE

### EVIDENCE OF MEDICAL/SURGICAL INTERVENTION

In the right side of the mouth is the cut remnant of an endotracheal tube. In the left antecubital fossa is at least one recent needle puncture.

### IDENTIFYING MARKS, SCARS AND TATTOOS

Numerous tattoos are present on the body surfaces (see photographs for a complete catalog), including numerous marijuana leaves tattooed on the torso and upper extremities, as well as the phrase "DAMN IT FEELS GOOD TO BE A GANGSTA" tattooed in blue-black on the lower abdomen.

### EVIDENCE OF INJURY

HEAD AND NECK:

On the central nose is a stellate 1 cm laceration. This is just right of center, on the lower nasal bridge. On the upper lip, to the right of midline, and towards the outer edge of the naris is a nearly horizontally-oriented linear 8 mm laceration. On the proximal right cheek/junction of the lower eyelid are three generally horizontal superficial abrasions/lacerations. These are no more than 8 mm each. There appears to be spectacle hemorrhage on the right lower eyelid, though this is difficult to discern incident to dark pigmentation of the skin. On the left upper cheek at its junction with the left lower eyelid is an obliquely oriented 1 cm superficial abrasion/laceration. On the inner surface of the right upper lip is a 1 cm area of superficial red abrasion.

Reflection of the scalp reveals subscalp hemorrhage in the right frontal region (7 x 7 cm), the right posterior parietal region (5 x 5 cm), the left occipital region (2 x 1.5 cm), the inferior left occipital region (5 x 3 cm), the right temporalis muscle (6 x 6 cm), and the superior left temporalis muscle (1 x 1 cm).

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*



**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**

**AUTOPSY REPORT**

**Case Number: 17-05089**

PAGE FOUR

Layer-wise in situ dissection of the neck reveals hemorrhage as follows: superficial subcutaneous within the right and left lower neck; the right mid-sternomastoid muscle (5 x 3 cm), with anterior hemorrhage; throughout the bilateral sternomastoid muscles; within the right sternohyoid muscle; and in the anterior right thyroid capsule.

<u>TORSO</u>:

On the left upper back, overlying the scapula, is an intense purple contusion, round and 5 cm in maximum dimension.

On the mid-back, just to the left of center is a white metal barb which is embedded in the skin. The needle of the barb is bent, and a wire protrudes from the opposite end. Incision of the skin to allow removal of the barb reveals moderate hemorrhage within the underlying muscle and soft tissue. On the central lower back is a horizontal curvilinear area of petechial hemorrhages extending across 5 cm in maximum dimension. On the lower back, centered approximately 5 cm to the left of posterior midline, is a recent large-caliber puncture. Incision of the puncture reveals moderate hemorrhage in the underlying muscle and soft tissue. Overlying the right anterior superior iliac crest is a 2 mm abrasion/puncture wound.

Hemorrhage is present on the lateral chest (9 x 7 cm), the right upper chest (7 x 5 cm), and in the left and right medial chest (1 cm).

<u>EXTREMITIES</u>:

About the right elbow, scattered within 5 cm vertical x 5 cm horizontal are dried red-brown superficial abrasions, non-patterned and measuring to no more than 1 cm each.

On the medial aspect of the right knee is a dried dull red 1.4 cm abrasion.

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:** 17-05089

PAGE FIVE

On the mid-left bicep is a dried 1.7 cm irregular superficial abrasion. On the medial aspect of the left elbow is a dried red superficial abrasion, no more than 7 mm in maximum dimension. On the medial aspect of the dorsal left wrist and distal forearm is a scattering of dried superficial red abrasions, non-patterned and measuring to no more than 7 mm each.

### GENERAL INTERNAL EXAMINATION

**PRIMARY INCISIONS:** The body is opened with thoracoabdominal and intermastoid incisions. The thoracic musculature is focally hemorrhagic. The abdominal panniculus is uniform and yellow, and the subcutaneous fat layer of the anterior abdominal wall is 3.0 cm thick. The descriptions of organs and cavities which follow are understood to be in addition to those injuries and changes previously described.

**BODY CAVITIES:** The organs of the thoracic and abdominal cavities are in their usual locations, and bear normal anatomic relationships to each other. The pericardial, pleural, and peritoneal cavities are free of adhesions and effusions. No organs are surgically absent.

**MEDIASTINUM:** The mediastinum is not enlarged or hemorrhagic, and there is no lymphadenopathy.

**HEART AND GREAT VESSELS:** The 490 gram heart is somewhat enlarged. The epicardium is smooth and translucent, and the subepicardial fat is normally disposed. The coronary arteries arise and course normally in a left-dominant fashion, and the lumina contain eccentric yellow atherosclerotic plaques resulting in no more than 20% vessel lumen compromise. The atria are not enlarged or dilated. The fossa ovalis is closed. The cardiac valves have the usual number of cusps, which are unremarkable. The ventricles are neither thickened nor dilated, and the ventricular myocardium is firm and red-brown throughout, without evidence of infarct or infiltrates. The interventricular septum is intact and not asymmetrically

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:** 17-05089

PAGE SIX

thickened. The endocardium is smooth, translucent, and free of mural thrombi. The aorta and its major branches arise and course normally, and are free of atherosclerotic plaque. The systemic veins are unremarkable.

LUNGS: The right lung weighs 710 grams and the left lung weighs 570 grams. The pleural surfaces are smooth, translucent, and free of adhesions, with minimal subpleural anthracotic pigment deposition. The parenchyma is generally well aerated throughout, and serial sectioning reveals dependent congestion but no obvious masses or infiltrates. The pale tan bronchi are free of occlusive secretions and mural lesions. The pulmonary arteries are unremarkable. The hilar lymph nodes are not enlarged, and have anthracotic cut surfaces.

HEPATOBILIARY: The 1960 gram liver has a smooth, translucent, intact capsule covering firm, red-brown parenchyma which is free of fibrosis, cholestasis, and tumor. The biliary tract is not dilated, and the portal and hepatic veins are patent. The gallbladder contains approximately 10 cc of watery green bile which is devoid of concretions. The mucosa is velvety and unremarkable. The cystic and common bile ducts are unremarkable.

GASTROINTESTINAL: The esophagus is of uniform caliber, and is lined by smooth, tan mucosa. The gastroesophageal junction is unremarkable. The stomach is lined by smooth, tan mucosa having the usual rugal folds, and contains approximately 200 cc of bloody fluid which is devoid of recognizable food and pill fragments. The mucosa is devoid of masses and lesions. The small and large bowel are unremarkable. The appendix is present and unremarkable.

GENITOURINARY: The right kidney weighs 170 grams and the left kidney weighs 160 grams. The capsules are smooth and translucent, and strip with ease from the underlying firm, red-brown cortical surfaces. The cortices are well demarcated from the striated pyramids. The papillae are not blunted, and the

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*



**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**

**AUTOPSY REPORT**

**Case Number:** 17-05089

PAGE SEVEN

renal pelves and ureters are unremarkable. The urinary bladder contains approximately 100 cc of clear, yellow urine.

**ENDOCRINE:** The adrenal glands have uniform yellow cortices, averaging less than 0.2 cm thick. The gray medullae are intact. The pink-tan pancreas has the usual lobular architecture, and is free of fibrosis, fat necrosis, cysts, tumors, and hemorrhage. The red-brown thyroid has a normal size and shape, and the parenchyma is unremarkable.

**RETICULOENDOTHELIAL SYSTEM:** The 130 gram spleen has a smooth, translucent, intact capsule covering firm, purple parenchyma which has the usual white pulp architecture. The aortic, cervical, and mesenteric lymph nodes are not enlarged.

**HEAD:** Subscalp and temporalis muscle hemorrhage is present as described. The calvarium and base of the skull are intact. The dura mater and falx cerebri are intact, and there is no epidural or subdural hemorrhage. The cranial nerves are intact. The vessels of the circle of Willis arise and course normally, and are unremarkable. The cerebral gyri are normally formed. Subarachnoid hemorrhage is absent, and the leptomeninges are thin and translucent. The 1320 gram brain is symmetric, and serial sections of the cerebrum, cerebellum, and brainstem are intact, with normal architecture. There are no masses or healed infarcts. The ventricles are neither dilated nor hemorrhagic. The pineal and pituitary glands are unremarkable.

**SPINAL CORD:** The cervical spine is stable to manipulation. The cervical spinal cord, as viewed from the cranial cavity, is unremarkable. Internal examination of the entire length of the vertebral column fails to reveal evidence of acute injury.

**NECK:** Injuries to the neck are present as described. The bony and cartilaginous structures are intact. The airway is patent.

**MUSCULOSKELETAL SYSTEM:** The bony framework and soft tissues are unremarkable.

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number:** 17-05089

PAGE EIGHT

SPECIMENS:   Routine  stock  tissue.   Blood,  urine,  liver,  and
vitreous  are  retained  for  toxicology.   A  DNA  blood  spot  card  is
made  during  the  course  of  the  autopsy.

EVIDENCE:   None.

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

# Exhibit N – LVMPD Discipline for Excessive Force Involving Neck Area



## Cases Involving the Neck

| NUMBER | POLICY/REGULATION/ PROCEDURE | P# | DATE DISCIPLINE SIGNED/ PURGE DT | NAME OF EMPLOYEE | WRITTEN REPRIMAND | TRANSFER | SUSPENSION (HOURS) | DEMOTED | TERMINATION RECOMMENDED | RESIGNED IN LIEU OF | INCIDENT DATE AND SUMMARY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/002.00 | Use of Force | 8862 | 20150205 | ▮ | X | | | | | | CO was assisting with placing an inmate into the restraint chair. Before the inmate could be restrained and a spit mask applied, the inmate spit on CO's face and onto the forehead of another officer. CO inappropriately placed his hand on the front lower portion of the inmate's neck and closed his grip. |
| 6/002.00 | Use of Force | 6876 | 20140213 20140108 | ▮ | X | | | | | | CO was assigned to Justice Court when a non-compliant male was refusing his verbal commands and lawful orders to exit the courtroom in order for him to deescalate a potentially volatile situation. The inmate displayed active resistance when he spun away from CO's escort technique, forcing him to take control of inmate by placing him against the wall. However, CO's actions were not objectively reasonable when he threw the inmate to the ground, placed his hand around his neck momentarily and knee on his torso. CO then dragged the inmate out by his collar and belly chains to the adjoining room. |
| 6/002.00 | Use of Force | 7980 | 20120706 20120615 | ▮ | X | | | | | | CO along with a group of officers escorted an inmate to a side cell and passed another inmate. After placing the inmate in the side cell, and passing the other inmate again, CO turned around and headed back towards the other inmate. In one fluid motion, CO walked up to the other inmate and placed both of his hands behind the inmates neck/head and grabbed hold of his shirt, pulled the inmate out of his chair, turned himself so he was behind the inmate, and started to escort him down the corridor leading to the side cells. The inmate appeared to be off balance as he was being escorted down the corridor, stumbled 25 to 30 feet before falling to the ground, and made a complaint of injury to his elbow. The inmate was then placed in handcuffs and put into a side cell with the help of responding officers. The inmate did not pose a threat nor could the CO explain the need for the use of force. CO did not complete a DSD Incident Report as required and as instructed to do so by his Sgt. |

278

| NUMBER | POLICY/REGULATION/ PROCEDURE | P# | DATE DISCIPLINE SIGNED/ PURGE DT | NAME OF EMPLOYEE | WRITTEN REPRIMAND | TRANSFER | SUSPENSION (HOURS) | DEMOTED | RECOMMENDED TERMINATION | RESIGNED IN LIEU OF | INCIDENT DATE AND SUMMARY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/002.00 | Use of Force | 9661 | 20160609 | ▇▇▇ | | | 40 | | | | PO and another officer attempted to take a male suspect into custody at the Miracle Mile Shops. A struggle ensued that transitioned to the ground. While on the ground, PO used a LVNR that rendered the male unconscious. PO did not immediately attempt to awaken or summon medical attention for the male. PO eventually put the male in handcuffs and moved him to a seated position where PO immediately placed a passive and handcuffed male into an inappropriate and excessive "choke hold". PO then rolled the male onto his stomach and used another inappropriate excessive tactic by placing his knee/shin on the back of the male's neck for approximately five minutes. PO did not provide medical attention to the suspect at the conclusion of the incident. In addition, PO used the words "bitch", "mother fucker", "shit", "fuck" and called the male a "piece of shit" while trying to take him into custody. Arbitrator overturned termination. |



| NUMBER | POLICY/REGULATION/ PROCEDURE | P# | DATE DISCIPLINE SIGNED/ PURGE DT | NAME OF EMPLOYEE | WRITTEN REPRIMAND | TRANSFER | SUSPENSION (HOURS) | DEMOTED | TERMINATION RECOMMENDED | RESIGNED IN LIEU OF | INCIDENT DATE AND SUMMARY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/002.00 | Use of Force | 9845 | 20150910 | ▆ | | | | | X | | PO was accompanied by a ride along CO and conducted a person stop on a female for the possible crime of misdemeanor loitering for the purpose of prostitution. At the stop, female did not leave area as requested and was profane during the entire encounter. Female was then handcuffed and escorted to the front of the police vehicle and exhibited no physical resistance and was compliant. PO used excessive and gross inappropriate use of force by pushing handcuffed female down by the back of her neck while being handcuffed and struck the ground in an unsupported manner. In addition, PO slapped female's face while she was on the ground then dragged her across the ground. PO also kneeled on the female's back and neck, placed his hand on the back of the female's head and then struck the hood of the patrol vehicle twice with her face. PO grabbed female's ponytail, twisting it in his hand, struck the hood of the vehicle with the female's face for a third time. As a result, female sustained a bruise and laceration to her cheek. While still holding ponytail, PO escorted female to the rear of the vehicle and propelled her to the rear of the vehicle, causing female's face and shoulder to strike the door. Female attempted to kick PO once, but there was no evidence of contact being made or complaint from the CO. However, PO used this to justify the force used. PO made improper statements namely: "I'm going to dump you on the floor in a minute", "Who the hell you think you're talking to?", "Had enough?" "Stand here, shut up", "What else you want to do, tough guy?". Prior to contacting female, PO did not call out the stop in the beginning as required and arbitrarily turned off his body worn camera. Also, PO stuck his bare hand down the top of female's dress, touching her naked breast. PO stuck his hand down her dress 3x's to retrieve items and female sustained a small scratch on her breast. PO did not search female's jacket or person as required and no exigent circumstances existed to warrant intrusion of her private parts. PO's Use of Force report and Declaration of Arrest was factually misleading as he placed key elements of the encounter out of place to justify the force used. PO willfully and knowingly made untruthful statements on both official documents. PO did not establish probable cause to make a lawful arrest and did not read female her rights per Miranda. Multiple uses of force and verbal statements demonstrated malicious intent to cause harm to the female. The investigation determined PO committed the criminal violation of NRS 197.200 Oppression Under the Color of Office, a category D felony. Also sustained for Interaction with the Public; Voice Radio Communications; Body Worn Cameras; Searches; Transporting Prisoners: Arrest Procedures & Declaration of Arrest; and Arrest |

| NUMBER | POLICY/REGULATION/ PROCEDURE | P# | DATE DISCIPLINE SIGNED/ PURGE DT | NAME OF EMPLOYEE | WRITTEN REPRIMAND | TRANSFER | SUSPENSION (HOURS) | DEMOTED | TERMINATION RECOMMENDED | RESIGNED IN LIEU OF | INCIDENT DATE AND SUMMARY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/002.00 | Use of Force | 13142 | 20140816 | ▇ | X | | | | | | PO conducted a stop on three male subjects. One subject was a male juvenile that was seated on a curb in handcuffs. The juvenile was also being verbally non-compliant and belligerent. Video surveillance revealed that PO responded to the juvenile by grabbing the back of his neck with his left hand. PO then adjusts his left hand and strongly grips the back of the neck and pulls back on the juvenile. PO holds this grip for approximately 28 seconds before releasing the juvenile. This caused the juvenile to have a small scratch on his neck and two small spots of fresh blood on his white tee shirt collar. This neck grab technique is not department trained or approved, was inappropriate and unnecessary. |
| 6/002.00 | Use of Force | 6908 | 20160821 20160511 | ▇ | | | 32 | | | | CO was in the process of escorting an inmate out of a Booking side cell in order to move him to another cell. The inmate displayed passive resistance by failing to listen to verbal commands and progressed to active resistance when he told CO "If you touch me it's on". The comment was only heard by CO and he ended up drawing his Taser and pointing it at the inmate. The inmate was in the process of being placed in handcuffs by another CO . Although the inmate was slow to comply, the other CO had the inmate under control although the inmate would not place his palms together. CO suddenly stepped in and used intermediate force by taking the inmate to the ground with his right hand holding the inmate's neck/windpipe area. This was not an approved technique. In addition, while the inmate was lying face down on the ground and in handcuffs, the inmate tried to grab an officer. CO stepped in and performed a goose neck on the inmate's right arm/wrist area for pain compliance. A Sergeant stepped in and told CO to stop the technique as the elevation was inappropriate. The situation could have also been deescalated as CO had time to move out of the cell while he had his Taser on the inmate. 32 hours no option. |

| NUMBER | POLICY/REGULATION/ PROCEDURE | P# | DATE DISCIPLINE SIGNED/ PURGE DT | NAME OF EMPLOYEE | WRITTEN REPRIMAND | TRANSFER | SUSPENSION (HOURS) | DEMOTED | TERMINATION RECOMMENDED | RESIGNED IN LIEU OF | INCIDENT DATE AND SUMMARY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/002.00 | Use of Force | 4991 | 20150415 | ▮ | | | | | | X | Lt responded to a disturbance in a parking lot. While conducting his investigation, the male suspect became non-compliant and Lt used the LVNR technique. Video was recorded by the male's friend which showed the male going to the ground and Lt maintaining the LVNR with the male on his stomach and Lt partially on his back. Lt rendered the male unconscious as his body went limp and his breathing snored. It was believed Lt was aware the male's unconscious state as he used the palm reviving technique to strike the male's upper back. Lt did not summon medical attention as required by policy and did not de-escalate the situation by relaxing the LVNR once the male was brought under control while on the ground. Lt also failed to take a Domestic Battery Report and was not equipped with a complete duty belt during this incident. Lt retired on 4/15/15 and declined to be interviewed by IAB. |
| 6/002.00 | Use of Force | 8577 | 20170325 | ▮ | X | | | | | | While conducting a person stop, the suspect yelled at PO, "I better not catch you around here". PO then attempted an LVNR on the suspect who at the time, was handcuffed and facing the patrol vehicle. PO released his hold after another officer intervened. The attempted LVNR was unnecessary and inappropriate and PO did not report it. |

# Exhibit O – LVMPD's Announcement Re Updates to Use of Force Policy

**Las Vegas Metropolitan Police Department**
**Office of Public Information**
400-B S. Martin L. King Blvd. Las Vegas, NV 89106
Office (702) 828-3394   Fax (702) 828-1550



*Joseph Lombardo, Sheriff*

September 20, 2017

## FOR IMMEDIATE RELEASE

Director Carla Alston
Sergeant Jeff Clark
Officer Laura Meltzer
Officer Larry Hadfield
Officer Jacinto Rivera
Officer Aden OcampoGomez

# LVMPD Announces Updates
# to Use of Force Policy

The Las Vegas Metropolitan Police Department is committed to transparency and accountability in all aspects of use of force.  As a part of that commitment, the LVMPD is publicizing the updated use of force policy.  Some of the changes are highlighted below:

**40mm Specialty Impact Weapon** – In some instances, the low-lethality shotgun bean bag rounds have been ineffective on some subjects.  In an ongoing effort to de-escalate violent situations and to keep officers safe, the LVMPD has deployed a new 40mm Specialty Impact Weapon.  This is an intermediate force option when fired at a distance of five yards or more, and deadly force when fired at a distance of less than five yards.

**Discharging a firearm at a moving vehicle** – In light of recent vehicle ramming attacks that have been used in other parts of the U.S.A. and overseas, the LVMPD has updated its policy on discharging a firearm at or from a moving vehicle.  The policy now reads, "It is the policy of this department that officers will not discharge a firearm at/from a moving vehicle unless it is absolutely necessary to preserve human life".

**Lateral Vascular Neck Restraint (LVNR)** – LVNR will no longer be categorized as a low level option in the updated policy.  All levels of the LVNR will be categorized as an intermediate or deadly use of force.  To use the LVNR, an officer must be able to articulate that the subject had the intent to harm officers or others.

For additional information about these policy changes, and to review the complete LVMPD use of force policy, please click on the following link:

The entire updated use of force policy can also be accessed by going to www.lvmpd.com, and click on the box labeled "Transparency".  Go to the Office of Internal Oversight and Constitutional Policing, and click on the box "Force Related Policies".
PO 227 09-20-17 LM

### ###
*Don't forget to visit our web sites*
*www.LVMPD.com or www.ProtectTheCity.com*

   

LVMPD 3646

# Exhibit P – Lateral Vascular Neck Restraint System Training Manual

# Exhibit P – Lateral Vascular Neck Restraint System Training Manual

I-18

# The Lateral Vascular Neck Restraint Story

## Introduction

The Lateral Vascular Neck Restraint System (LVNR®) was developed in 1970. Its origins come from research, reassessment and conversion of tactics from wrestling and judo to a control system for law enforcement use.  The LVNR® was designed by reading about and observing neck restraints applied by professional wrestlers and judo competitors such as world-famous martial artist Gene LeBell.  The empirical data collected over a period of many years proved that wrestling and judo competitors were not permanently injured during such matches after they were controlled by the neck.

However, the primary model for the LVNR® was the sport of judo, and it is patterned along the lines of a study done by Dr. Eichi K. Koiwai, who wrote an article published in the mid-1960s entitled, "How Safe Is Choking (Shime-Waza) in Judo?"  At the time, Dr. Koiwai was a pathologist and professor at Hanneman Hospital and Medical College in Philadelphia, Pennsylvania.  He was also the president of the United States Judo Federation and past-chairman of the Judo Medical Committee.  A copy of Dr. Koiwai's article is included in the LVNR® articles section of this text for your review.

The following is an analysis of his comments and findings on the use of neck restraints in sport judo, and how they were incorporated into a safe and effective law enforcement system of subject control by the neck, first for the Kansas City, Missouri Police Department and now for a growing number of other law enforcement agencies nationwide.

## Comments by Dr. E.K. Koiwai/Analysis by Jim Lindell

E.K.K. – Judo was developed by Dr. Jigoro Kano, an educator, in 1882, and no deaths have been attributed to choking, or shime-waza, since its introduction.

J.L. – In 1970, no deaths or serious injuries had occurred in judo training or competition for more than 88 years.  In 2014, this now amounts to 132 years without a serious injury or death.  This data formed the basis for the LVNR® System to emulate judo's astounding safety record in neck restraint.

E.K.K. – The technique shime-waza used in judo exemplifies one of Jigoro Kano's doctrines of "maximum efficiency with minimum effort."  If properly applied, the weaker and smaller person can subdue and defeat a bigger adversary.

J.L. – It was obvious that such positive results could be transferred to similar use for law enforcement officers.  With hiring standards changing and smaller officers being employed by agencies, more powerful and effective tactics were

©2014 James W. Lindell

necessary in order for these officers to control subjects in the performance of their duties.

E.K.K. – Pressure is applied to the lateral side of the neck, which the anatomists call the "carotid triangle."  In the center of this triangle are the jugular veins, carotid artery and its branches, and the carotid sinus.

J.L. – Dr. Koiwai describes several means of neck compression and uses a judo term, "choking," for all of them.  The term "choking," or the use of a choking neck application, was rejected in favor of the term "neck restraint" and a lateral pressure to the sides of the neck in order to avoid pressure on the larynx and trachea.  The original KCMOPD neck restraint was referred to as a carotid-type restraint in keeping with the accepted term at that time.  It was changed to the Lateral Vascular Neck Restraint System in 1984 after Dr. James Cooper did research that determined that compression of the vascular (venous) system was more likely to cause subject unconsciousness than only the compression of the arterial (carotid) system as previously believed..

E.K.K. – The Japanese have conducted considerable research on neck restraints (the results were published in two reports of the Bulletin of the Association for Scientific Studies on Judo/Kodokan in 1958 and 1963).  They were interested to know if there were any deleterious effects during and after the neck restraint was applied and what precautions should be taken to prevent any serious consequences.  The study was especially valuable with regard to the following:

a.  Approximate length of time till unconsciousness occurs.

b.  Spontaneous consciousness occurs after restraint is relaxed.

c.  Unconsciousness due to disturbances of cerebral circulation (LVNR®).

d.  Flushing of face due to disturbance of pressure in the carotid arteries and jugular veins.

e.  Increased heart rate, blood pressure and dilation of the pupils were caused by stimulation of the vagus nerve.  Increased heart rate and blood pressure may also be attributed to the carotid sinus.

f.  Neck restraint acts as a stressor on the circulatory and adrenocortical (adrenaline) systems.

g.  According to the study, no deleterious after effects remain after being neck restrained.

©2014 James W. Lindell

LVMPD 0614

I-20

h.   It is considerably less dangerous than a "knock-out" in boxing and there is no necessity to exclude neck restraints from judo, provided necessary precautions are taken.

This study formed the scientific database from which to proceed with the development of the LVNR® System with a good deal of assurance that similar results could be attained by officers in the field when using the LVNR®. The average length of time until unconsciousness occurred was reduced by one-half – 4-7 seconds for officers' use – compared to the study average.

It was found that officers realized or exceeded the norms established for them and were often able to render subjects unconscious when necessary in even less time, and that subjects tended to revive sooner as officers became more confident and proficient in applying the LVNR®.

The carotid arteries and jugular veins are compressed during the application of a neck restraint and it may remain debatable after Dr. Cooper's study as to which system, the venous or arterial, is most likely to cause a subject's unconsciousness. However, the question of relative safety for subjects was already resolved by the principles and rules of LVNR® application established at the inception of the program in 1970 without full knowledge of all the medical implications.

This, of course, is also the case in sport judo, where the contestants are probably less informed about EMT training and related post handling of persons than most police officers. The study's conclusion that no deleterious (injurious) after effects remain after being neck restrained is its single most important finding because it accounts for why in 132 years no practitioner or competitor in judo has died or been seriously injured. This fantastic record is the basis for the LVNR®, and also accounts for the lack of deaths and serious injuries attributed to the use of the LVNR® System for the past 44 years with more than 165,000 applications by Kansas City, Missouri police officers alone.

This portion of the study concludes with the observation that the use of the neck restraint is considerably less dangerous than a knockout in boxing, and that it should not be excluded from use in judo.

The initial acceptance of the LVNR® system by the KCMOPD centered on the results and conclusions of this study. It then became necessary to implement controls into the LVNR® system similar to those used in judo in order to ensure that officers are taught that the safety of subjects is an integral part of the LVNR® system. In addition, informed law enforcement administrators agree that the LVNR® is less injurious to subjects than striking them with fists, batons and slappers. [**Editor's Note:** The use of the latter has since been discontinued.]

E.K.K. – There are, however, three main dangers of neck restraint based upon the above experiments:

1.   To perform a neck restraint hold upon subjects with cardiac disorders or hypertension.

©2014 James W. Lindell

2.   To apply neck restraints on youngsters whose central nervous system and heart have not yet attained full development.
3.   To continue the hold after the subject falls unconscious.

J.L. – Officers may not know if a subject has a cardiac or hypertension problem, so that possibility must be weighed against the officer's need to use force to control a resisting subject. The way the LVNR® is taught to officers has solved this problem. The three levels of control and their correct use result in subjects being subdued according to the amount of resistance they offer and not to a preconceived dictate such as "render all resisting subjects unconscious."

The question of neck restraints on youngsters was resolved by advising officers to use control tactics other than neck restraint when controlling minors, and was expanded to include elderly subjects.

The two greatest problems with police neck restraint are that officers are often not taught:
   • How to regulate control of a subject by the neck, and
   • When to stop compression on a subject's neck.
The third greatest problem of post-care handling will be addressed later.

The last thing an officer needs is to be advised and trained to use excessive force when it is completely unnecessary. A preconceived, emotionally charged response also presents a psychological and physical problem for officers who must become highly aggressive, mentally and physically, in order to accomplish subject control. They may then fail to regulate or cease application of the neck restraint in time to avoid injury or death to the subject. This sometimes-familiar scenario was avoided in the development of the LVNR® with three levels of control, and the "motto" of the LVNR System: "As soon as the subject ceases to resist, relax the compression on the neck to Level One Minus."

The LVNR® record speaks for itself because officers have been able to monitor their own neck restraint performance or another officer's LVNR® applications without fail for the past 44 years and more than 165,000 applications by the KCMOPD officers since 1970.

E.K.K. – There are four main reasons why fatalities by neck restraint do not occur:
   1.   Neck restraints including "chokes," whether in practice or competition, are supervised and observed by qualified, trained instructors and officials.
   2.   The contestant submits before unconsciousness occurs.
   3.   After being rendered unconscious, the contestant regains consciousness naturally and spontaneously without difficulty in 10 to 20 seconds (note:  LVNR® average 5-20 seconds).
   4.   The immediate application of artificial respiration by the qualified instructor or official prevents prolonged hypoxia (asphyxiation).

©2014 James W. Lindell

Conclusion: Neck restraint in judo is safe because since the advent of judo, statistics show no fatality attributed to shime-waza. Moreover, scientific studies on neck restraints reveal no deleterious after effects. Finally, the precautionary rules and methods used make the technique of neck restraint a relatively safe means of subduing an opponent in competition.

J.L. – This section of Dr. Koiwai's report provided a model for the development of a successful law enforcement neck restraint system. As a result of LVNR® training, officers learn the roles of both the subject and the officer. In the subject role, officers learn how it feels to be neck restrained. As the officer, they learn how to regulate the LVNR® according to the level of subject resistance being offered. In effect, the officer assumes the role of both competitor and referee with full knowledge of what the subject is undergoing when neck restrained because of thorough role training in the LVNR® system as both an applying officer and restrained subject.

Officers also learn to respond to a subject's submission, and relax compression as soon as resistance ceases. My own background in judo (more than 37 years as both a competitor and referee) also corroborated the study's observation that contestants rendered unconscious revive by themselves naturally. When competitors are rendered unconscious during judo tournaments, they are often revived immediately without harm or injury by a palm impact to the small of the back. The need for other methods of artificial respiration by subjects rendered unconscious with the LVNR® has never been reported to date.

Post-care handling of subjects begins as soon as a subject ceases resistance, and care extends all the way to either a medical or detention facility, or both. Further monitoring is advised for all subjects who are rendered unconscious. All LVNR®-trained officers are advised that neck restraint subjects should not be leg restrained and "hog tied." The KCMOPD has never used this method of subject control, so it has not experienced any post-care problems related to this potentially dangerous practice.

It has been determined by means of extensive training and neck restraint field reports that recruit officers require a minimum of 12 hours instruction plus controlled competition to make them confident and proficient in applying the LVNR® effectively and safely on subjects. The post-academy officer requires 8 hours of training to accomplish the same goals, and in-service LVNR® training should be mandated for 4 hours annually in order for officers to retain the necessary skill and agility to remain proficient in the its use.

A trainer requires 16 hours of LVNR® training to become certified in the NLETC system.

©2014 James W. Lindell

LVMPD 0617

# Exhibit Q - Dr. Adelwisa Lizada Deposition Excerpts

**Deposition of:**

Adelwisa V. Lizada, M.D.

**Case:**

Estate of Tashi S. Farmer, et al. **v.** Las Vegas Metropolitan Police Department, et al.
2:17-CV-01946-JCM-PAL

**Date:**

07/19/2018



400 South Seventh Street • Suite 400, Box 7 • Las Vegas, NV  89101
702-476-4500 | www.oasisreporting.com | info@oasisreporting.com

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY

Adelwisa V. Lizada, M.D.      Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF NEVADA |
| 3 | |
| 4 | ESTATE OF TASHI S. FARMER a/k/a |
| | TASHII FARMER a/k/a TASHII BROWN, |
| 5 | by and through its Special |
| | Administrator, Elia Del Carmen |
| 6 | Solano-Patricio; TAMARA BAYLEE |
| | KUUMEALI'MAKAMAE FARMER DUARTE, a |
| 7 | minor, individually and as |
| | Successor-in-Interest, by and |
| 8 | through her legal guardian, |
| | Stevandra Lk Kuanoni; ELIAS BAY |
| 9 | KAIMIPONO DUARTE, a minor, |
| | individually and as |
| 10 | Successor-in-Interest, by and |
| | through his legal guardian, |
| 11 | Stevandra Lk Kuanoni, |
| 12 | Plaintiffs, |
| 13 | vs.                              CASE NO. |
| | 2:17-CV-01946-JCM-PAL |
| 14 | LAS VEGAS METROPOLITAN POLICE |
| | DEPARTMENT, a political |
| 15 | subdivision of the State of |
| 16 | (Caption Continued) |
| 17 | THE DEPOSITION OF |
| 18 | ADELWISA V. LIZADA, M.D. |
| 19 | Thursday, July 19, 2018 |
| 20 | By a Certified Court Reporter |
| 21 | At 3:15 p.m. |
| 22 | At 400 South Seventh Street, Suite 400 |
| 23 | Las Vegas, Nevada |
| 24 | |
| 25 | Reported By:  June W. Seid, CCR No. 485 |
| | Job No.:  29048 |

1   Nevada; OFFICER KENNETH LOPERA,
    individually and in his Official
2   Capacity; SERGEANT TRAVIS
    CRUMRINE, individually and in his
3   Official Capacity; OFFICER
    MICHAEL TRAN, individually and in
4   his Official Capacity; OFFICER
    MICHAEL FLORES, individually and
5   in his Official Capacity; and
    DOES 1 through 50, inclusive,
6
            Defendants.
7
    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Adelwisa V. Lizada, M.D.      Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

```
 1                    APPEARANCES OF COUNSEL

 2

 3    For Plaintiffs:

 4
                      FEDERICO C. SAYRE, ESQ.
 5                    Abir Cohen Treyzon Salo, LLP
                      2600 Michelson Drive
 6                    Suite 1700
                      Irvine, California 92612
 7                    424.288.4367
                      fsayre@actslaw.com
 8                    (Appearing Via Videoconference)

 9

10    For Deponent Adelwisa Lizada:

11
                      SUSANNE M. SLIWA, ESQ.
12                    State of Nevada
                      Office of the Attorney General
13                    555 East Washington Avenue
                      Suite 3900
14                    Las Vegas, Nevada 89101-1068
                      702.486.3898
15                    702.486.3416 Fax
                      ssliwa@ag.state.nv.us
16

17
      For Defendant Las Vegas Metropolitan Police Department:
18

19                    CRAIG R. ANDERSON, ESQ.
                      Marquis Aurbach Coffing
20                    10001 Park Run Drive
                      Las Vegas, Nevada 89145
21                    702.382.0711
                      702.382.5816 Fax
22                    canderson@maclaw.com

23

24

25
```

Adelwisa V. Lizada, M.D.     Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

```
 1              APPEARANCES OF COUNSEL  (continued)

 2

 3    For Defendant Officer Kenneth Lopera:

 4                 MATTHEW C. WOLF, ESQ.
                   DANIEL R. MCNUTT, ESQ.
 5                 McNutt Law Firm, P.C.
                   625 South Eighth Street
 6                 Las Vegas, Nevada 89101
                   702.384.1170
 7                 702.384.5529 Fax
                   mcw@mcnuttlawfirm.com
 8                 drm@mcnuttlawfirm.com

 9

10

11                      *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Adelwisa V. Lizada, M.D.        Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

```
 1                    I N D E X

 2   Witness                                    Page

 3   ADELWISA V. LIZADA, M.D.

 4   By Mr. Wolf                                   6

 5   By Mr. Sayre                                 63

 6   By Mr. Wolf                                  74

 7   By Mr. Sayre                                 76

 8                  E X H I B I T S

 9   Exhibit No.        Description             Page

10   Lizada

11   1          Certificate of the Custodian of  13
                Medical Records with medical records,
12              LVMPD 2818 through 3100

13   3          Ex parte petition for an HRS 586  58
                temporary restraining order
14
     2          News article "Woman Hospitalized on  74
15              Maui With Multiple Stab Wounds," LVMPD
                3016
16

17

18

19

20

21

22

23

24

25
```

1          Deposition of ADELWISA V. LIZADA, M.D.

2                    July 19, 2018

3          (Prior to the commencement of the deposition, all

4     of the parties present agreed to waive the statements

5     by the court reporter pursuant to Rule 30(b)(5)(A) of

6     the Federal Rules of Civil Procedure.)

7

8     Thereupon--

9                    ADELWISA LIZADA,

10    was called as a witness, and having been first duly

11    sworn, was examined and testified as follows:

12                    EXAMINATION

13    BY MR. WOLF:

14         Q.    Can you state your full name for the record.

15         A.    My name is Adelwisa Lizada.

16         Q.    Dr. Lizada, have you had your deposition

17    taken before?

18         A.    In other -- this is my -- oh, in this case,

19    or --

20         Q.    No, at all.

21         A.    No, this is the first time.

22         Q.    Okay.  Let me tell you who I am, why we are

23    here, and what a deposition entails.  So I'm Matt Wolf

24    and I'm a lawyer who is representing a police officer

25    named Ken Lopera, and Mr. Lopera is being sued by the

1      Q.   Did he tell you that when he saw you, he was

2    going to Alcoholics Anonymous?

3      A.   That's what it indicates here, yes.

4      Q.   Did he tell you that he had a history of

5    withdrawal, shakes, passing out and black-outs?

6      A.   Yes.

7      Q.   If you could go to 2827.  Do you see there's

8    a section that says "Diagnosis"?

9      A.   Yes.

10      Q.   What is that section?

11      A.   It's based on the description of his

12    symptoms, and based on the DSM.  That's my diagnosis

13    basically.

14      Q.   Did you diagnose Mr. Farmer as having bipolar

15    1 disorder mixed?

16      A.   Yes.

17      Q.   What is bipolar 1 disorder mixed?

18      A.   Basically that is -- it's extreme mood

19    swings.  Sometimes they go into a deep depression,

20    sometimes they go manic, and sometimes they present as

21    at the same time.  So it's a mood -- it's a mood

22    disorder basically.

23      Q.   How would you classify bipolar 1 disorder

24    mixed?  Would it be fair to call it a disease,

25    disorder, either one?

Adelwisa V. Lizada, M.D.      Estate of Tashi S. Farmer, et al. v. Las Vegas Metropolitan Police Department

1      A.   You can call it both.

2      Q.   What terminology would you use?

3      A.   We call it disorder.

4      Q.   Disorder, okay.  And what specific findings

5  led you to that diagnosis?

6      A.   I have to go back on the first page, which

7  are the symptoms that he presented to me or stated to

8  me.

9           First, he had depressive episodes on the

10  first part, and then on the endorsement of crying

11  spells, all of these things.  And then he also has

12  episodes where he had anger issue and then episodes of

13  elevated mood where he gets very energetic.  That's the

14  manic side of it which is one component of bipolar 1.

15      Q.   Is there a cure for that disorder?

16      A.   There's no cure for bipolar, but it can be

17  treated.

18      Q.   When a patient has that disorder, does the

19  patient usually have it for the remainder of his or her

20  life?

21      A.   Possibility, yes.

22      Q.   What usually happens when a patient has that

23  disorder?  Does the patient usually have it for the

24  remainder of their life or does the patient usually not

25  have it, which one is more likely?

1      A.   More likely that they are going to have it

2   the remainder of their life.

3      Q.   Is it more likely that if Mr. Farmer had

4   lived, he would have had that disorder for the

5   remainder of his life?

6      A.   Yes.

7      Q.   Did you conclude that Mr. Farmer did not have

8   paranoid schizophrenia?

9      A.   I put ruled out in here, but I would likely

10   be -- I put ruled out because I cannot -- because I

11   just met him that day.  So it takes a couple of

12   sessions and meeting one-on-one before I can conclude

13   what he really has.

14      Q.   Your records said you ruled out paranoid

15   schizophrenia; do you see that?

16      A.   Yes, yes.

17      Q.   Does that entry indicate that you were

18   anticipating having additional sessions with him to

19   determine if you could rule out that condition or

20   diagnosis?

21      A.   Yes.

22      Q.   And what is paranoia schizophrenia?

23      A.   Well, it's a mental disorder where you

24   exhibit hallucinations, either auditory, visual,

25   sometimes command hallucination.  And also delusions --

1          MR. SAYRE:  A hard copy, please.

2          THE COURT REPORTER:  No electronic?

3          MR. SAYRE:  Yeah, please send me an

4     electronic.

5               ( PROCEEDINGS ADJOURNED AT 4:45 PM )

6                        *   *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 81

1                    CERTIFICATE OF REPORTER

2   STATE OF NEVADA    )
                       )     ss:
3   COUNTY OF CLARK    )

4        I, June W. Seid, a Certified Court Reporter

5   licensed by the State of Nevada, certify:  That I

6   reported the deposition of ADELWISA V. LIZADA, M.D., on

7   Thursday, July 19, 2018, at 3:15 p.m.;

8        That prior to being deposed, the witness was

9   duly sworn by me to testify to the truth.  That I

10  thereafter transcribed my said stenographic notes via

11  computer-aided transcription into written form, and

12  that the typewritten transcript is a complete, true and

13  accurate transcription of my said stenographic notes.

14  That review of the transcript was requested.

15       I further certify that I am not a relative,

16  employee or independent contractor of counsel or of any

17  of the parties involved in the proceeding; nor a person

18  financially interested in the proceeding; nor do I have

19  any other relationship that may reasonably cause my

20  impartiality to be questioned.

21       IN WITNESS WHEREOF, I have set my hand in my

22  office in the County of Clark, State of Nevada, this

23  3rd day of August, 2018.

24

25                          JUNE W. SEID, CCR NO. 485

Exhibit R - LVMPD's Arrest Report of Officer Lopera

JUSTICE COURT, _____**LAS VEGAS**_____ TOWNSHIP

_____**CLARK**_____ COUNTY, NEVADA

|  |  |
|---|---|
| )<br>)<br>)<br>)<br>**Plaintiff,**  )<br>)<br>**vs.**  )<br>**Kenneth Lopera**  )<br>)<br>)<br>)<br>**Defendant(s).**  )<br>) | Case No. _PC 17F 10146X_<br><br>Dept. No. _5_____<br><br><br>**MOTION FOR DISCLOSURE OF**<br>**NON-PUBLIC INFORMATION** |

## DECLARATION

**(1) PLEASE CHECK ONE OF THE FOLLOWING OPTIONS:**
This Motion is being brought by:

[ ]   A member of the following media organization: _Fox 5 Vegas_____.

[ ]   The following criminal Defendant:   _Kenneth Lopera_____.

[ ]   An attorney for the following client: _____.

[ ]   *OTHER:* _____

**(2) PLEASE COMPLETE THE LINE BELOW:**

Court staff has indicated that the following document(s) currently in the file are deemed
to be presumptively non-public and confidential:

arrest report

1

**(3) PLEASE EXPLAIN WHY THE COURT SHOULD ALLOW ACCESS TO THE DOCUMENT(S) LISTED ABOVE :**
(NOTE:  If you need more space, please attach additional pages.)

Fox 5 is doing a story on the arrest and upcoming trial of police officer Kenneth Lopera. It's important for the public to know details of his arrest.

**(4) PLEASE SIGN BELOW:**
Under the penalty of perjury under the law of the State of Nevada, I swear or affirm that the above information is true and correct, and that the Court should allow access to the requested document(s).

Signature: _Barrett Parker_   Date: _6-7-17_

Phone Number: _702-436-8256_

---

## ORDER

[ ]   This matter will be set for hearing, and all parties will be notified.  The hearing date will be at _____ ____M  on the _____ day of _____, 20____.

[ ]   The motion is <u>denied</u> as to the following documents:


for the following reason(s):


[✓]   The motion is <u>granted</u> as to the following documents:

    - TCR, ARREST REPORT, + DECLARATION OF ARREST

You may bring a copy of this order to the front counter to obtain the requested information.

[ ]   OTHER:


DATED THIS _____ DAY OF ____ **JUN 0 7 2017** ____, 20____

_____
JUSTICE OF THE PEACE
CYNTHIA CRUZ

2

8003

Thumbs ES08 sguml1

# LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## TEMPORARY CUSTODY RECORD

Page 1 of 1

DATE OF ARREST: 6-5-17   TIME OF ARREST: 1150

I.D. #: 2241941   Event #: 170514-0228

INTAKE NAME (AKA, ALIAS, ETC.):   Last KENNETH   First C

TRUE NAME: Last LOPERA   First KENNETH   Middle Christopher

I.D. ESTAB. BY: SCOPE

| BKG. CODE | CHARGE ORD / NRS # | M | GM | F | ARR TYPE* | EVENT NUMBER | WARR/NIC/IC NUMBER | LV | JC | DC | OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 50313 | OPPRESSION UNDER COLOR OF OFFICE 197-200.010 $3000 | ☐ | ☐ | ☒ | PC | 170514-0228 | TF1404410X | ☐ | ☒ | ☐ | ☐ |
| 5002A | INVOLUNTARY MANSLAUGHTER 200.010 $3000 | ☐ | ☐ | ☒ | PC | 170514-0228 | 365-5 | ☐ | ☒ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | | | | ☐ | ☐ | ☐ | ☐ |
| | CONFIDENTIAL | ☐ | ☐ | ☐ | | | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | | | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | | | | ☐ | ☐ | ☐ | ☐ |

PC1TF10145X
TCR
Temporary Custody Record
8082610

OTHER COURT:

APPROVAL CONTROL # FOR ADDITIONAL CHARGES:

*ARREST TYPE:   PC – PROBABLE CAUSE   BS – BONDSMAN SURRENDER   BW – BENCH WARRANT   WA – WARRANT   RM – REMAND   GJI – GRAND JURY IND.

Arresting Officer's Signature   (Print Name)   P #   Agency

Transporting Officer's Signature   (Print Name)   P #   Agency

☒ FOR PROBABLE CAUSE/NCIC HIT ARREST SEE PAGE TWO FOR DETAILS.

☐ BENCH WARRANT SERVED ON ____

☐ WARRANT SERVED ON ____

☐ GRAND JURY INDICTMENT SERVED ON ____

TYPE OF I.D. FOR VERIFICATION ____

FIRST APPEARANCE: DATE: ____   TIME: ____

☐ COURT   ☐ STANDARD BAIL

☐ JUSTICE   ☐ O.R. RELEASE

☐ MUNICIPAL   ☐ PROBABLE CAUSE

☐ JUVENILE   ☐ I.A.D.

JUDGE: ____

Time Stamp at BOOKING   06.05.17 1454 DSD RECORDS

FILED   2017 JUN -5 P 4:07

P #:   LVMPD 22 (REV. 4-08)   (2) COURT • ORIGINAL

303

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**DECLARATION OF ARREST**

Event #: 170514-0228

I.D. #: 2191941

Page 1 of 1

True Name: LOPERA, KENNETH C          Date of Arrest: 6-5-17      Time of Arrest: _____

OTHER CHARGES RECOMMENDED FOR CONSIDERATION:

THE UNDERSIGNED MAKES THE FOLLOWING DECLARATIONS SUBJECT TO THE PENALTY FOR PERJURY AND SAYS: That I am a peace officer with    LVMPD    (Department), Clark County, Nevada, being so employed for a period of   19   years (months)  That I learned the following facts and circumstances which lead me to believe that the above named subject committed (or was committing) the offense of  OPPRESSION UNDER THE COLOR OF OFFICE / INVOLUNTARY MANSLAUGHTER  at the location of ████ ████ ████ ████ (ADDRESS/CITY/STREET) and that the offense occurred at approximately  0058  hours on the  14  day of  MAY  2017 , in the county of ☒Clark  or ☐City of Las Vegas, NV.

DETAILS FOR PROBABLE CAUSE:

SEE ARREST REPORT

FORCE INVESTIGATION TEAM BOOKING

Wherefore, Declarant prays that a finding be made by a magistrate that probable cause exists to hold said person for preliminary hearing (if charges are a felony or gross misdemeanor) or for trial (if charges are a misdemeanor).

Declarant must sign second page with original signature

Declarant's Signature

Print Declarant's Name                    5702

P #

LVMPD 22 – A (REV. 8-12)                    (1) ORIGINAL – COURT

304



## LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## ARREST REPORT

☐ City        ☒ County        ☒ Adult        ☐ Juvenile      Sector/Beat    M2

| ID/EVENT# | ARRESTEE'S NAME *(Last)* | *(First)* | *(Middle)* | S.S.# |
|---|---|---|---|---|
| 2791941 | Lopera | Kenneth | | |

| ARRESTEE'S ADDRESS | *(Number, Street, City, State, Zip Code)* |
|---|---|
| | |

**CHARGES**
Oppression Under the Color of Office, Involuntary Manslaughter

| OCCURRED | DATE | DAY OF WEEK | TIME | LOCATION OF ARREST *(Number, Street, City, State, Zip Code)* |
|---|---|---|---|---|
| | 05-14-17 | Sunday | 0054 | |

| RACE | SEX | D.O.B. | HT. | WT. | HAIR | EYES | PLACE OF BIRTH |
|---|---|---|---|---|---|---|---|
| W | M | | 5'09" | 175 | Black | Brown | NJ |

| ARRESTING OFFICER #1: | P#: | ARRESTING OFFICER #2: | P#: |
|---|---|---|---|
| T. Alsup | 5782 | M. Colon | 7585 |

| CONNECTING REPORTS (Type or Event Number) |
|---|
| TCR/DOA/ICR/Voluntary Statements  EVT #170514000228 A |

APPROVED BY *(PRINTED NAME)*:        Sgt. J. MacDonald P# 4660

CONFIDENTIAL

**CIRCUMSTANCES OF ARREST:**

On May 14, 2017 at 0116 hours detectives with the LVMPD Force Investigation Team (FIT) were notified of an in-custody death that occurred at the Venetian Hotel. Detectives responded to the scene and were briefed by Sergeant Abdal-Karim. Sergeant Abdal-Karim related the following:

Officers Lopera and Lif were inside the Venetian Hotel getting a cup of coffee. The officers were approached by a black male adult [Tashi Farmer] who was sweating profusely and stated he was being chased. Farmer then ran from the officers and was chased by Officer Lopera.

During the foot pursuit, Officer Lopera observed Farmer near a white truck and believed he attempted to open the tailgate of the truck in his attempt to flee. Officer Lopera then observed Farmer approach the driver's door of the white truck and believed Farmer was going to attempt to take the vehicle by force. Officer Lopera discharged his ECD, striking Farmer with both probes and Farmer fell to the ground. Farmer attempted to pull the ECD probes out and attempted to grab the ECD from Officer Lopera's hand.

Security guards from the Venetian Hotel responded and attempted to help take Farmer into custody. Officer Lopera then performed the Lateral Vascular Neck Restraint (LVNR) and rendered Farmer unconscious.

Officers requested medical personnel and were attempting to revive Farmer when they observed he was not breathing. Officers began Cardio Pulmonary Resuscitation (CPR) and continued until relieved by medical personnel. Farmer was transported to Sunrise Hospital where he was pronounced deceased at 0139 hours.

Sergeant Abdal-Karim provided detectives with the names of several witnesses to include LVMPD officers and civilians. Sergeant Abdal-Karim also relayed that video surveillance was available from the Venetian hotel and also Officer Lopera's Body Worn Camera (BWC).

Detectives with FIT then assumed investigative responsibility. Sergeant MacDonald took control of Officer Lopera's BWC and maintained control of the camera until the video footage was viewed and downloaded by detectives.

LVMPD 602 (Rev. 6/19/11) WORD 2010

305

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #: _____2791941_____

During the walkthrough, which was started at the point when he exited the hotel, Officer Lopera stated he observed a security officer and asked if the officer had seen anyone running. The security officer pointed to the south and Officer Lopera observed Farmer running south in the middle of the street. Farmer approached a white truck that was travelling west. Farmer attempted to open the tailgate of the truck and Officer Lopera believed that Farmer was going to attempt to take the vehicle by force. Officer Lopera deployed and discharged his ECD resulting in Farmer falling to the ground. The walkthrough was then stopped as advised by LVPPA attorney John Aldrich.

After viewing surveillance footage from the Venetian Hotel, detectives were able to retrieve the numbers and letters of the license plate for the white truck which Farmer approached. An interview was conducted with the registered owner of the vehicle. The following is a summary of the interview and is not verbatim: ▓▓▓ was stopped in traffic as he approached the parking garage to the Venetian. His friend, ▓▓▓ was in the passenger seat and drew ▓▓▓ attention to an officer [Officer Lopera] running towards his truck on the rear passenger side. ▓▓▓ then noticed a black male [Farmer] near the rear driver's side of his truck who ▓▓ believed Officer Lopera was chasing.

Officer Lopera told Farmer to "Stop" and "I'm going to tase you." ▓▓▓ saw Officer Lopera tase Farmer, who fell near the rear tire of ▓▓▓ truck. ▓▓▓ saw and heard Officer Lopera tase Farmer several times. During this time, Farmer was not complying and appeared to be trying to get away. Officer Lopera and Farmer moved away from ▓▓▓ truck and ▓▓▓ began to drive away.

As ▓▓ drove away, he continued to watch Officer Lopera and Farmer in his mirror. Farmer was on the ground and Officer Lopera "mounted" Farmer and aggressively stuck Farmer in the face. Prior to pulling into the garage, ▓▓▓ saw that an officer had Farmer in a rear naked choke. ▓▓▓ was unsure if Officer Lopera was the officer who was applying the rear naked choke but he believed it was. ▓▓▓ stated Farmer did not attempt to open the tail gate of his truck or get into the truck bed. ▓▓▓ also stated Farmer did not attempt to open his driver's door, however ▓▓ said Farmer's erratic behavior made him nervous so he locked his doors prior to observing Farmer being tased by Officer Lopera.

▓▓▓ said Officer Lopera gave Farmer several verbal commands during the incident, and Farmer was not complying. ▓▓▓ did not see Farmer try to hit anyone, and it appeared he did not want to be arrested.

At 0425 hours Officer Lif was interviewed by detectives. The following is a summary of the interview. Officers Lif and Lopera were inside the Venetian Hotel getting a cup of coffee when Farmer approached them. Farmer was sweating profusely and asked the officers if they knew where a drinking fountain was located. The officers told Farmer they did not know but told him if he walked around he would probably find one.

Officer Lopera then asked Farmer why he was sweating so badly and Farmer stated he had just ran across the street because people were following him. Farmer asked if the officers could escort him down to valet and the officers agreed. Farmer then began to walk away and Officer Lopera attempted to get Farmer to come back and talk to them. Officer Lopera handed his coffee to Officer Lif and started walking after Farmer. Farmer then began to run down a hallway and Officer Lopera followed him. Officer Lif lost track of Officer Lopera and Farmer and did not see them again until Farmer was in custody outside of the hotel.

At 0434 hours Officer Tran was interviewed by detectives. Below is a summary of the interview. When he arrived to the rear of the Venetian Officer Tran observed a LVMPD vehicle in the street and an officer in a green uniform with a suspect on the ground. When he exited his vehicle and approached it appeared the officer had the suspect in the LVNR, and a handcuff on one hand. When he looked at the suspect he appeared to be unconscious. Officer Tran told Officer Lopera to "Let go." When Officer Lopera loosened up on the LVNR the suspect was able to be placed in handcuffs. The suspect appeared to be unresponsive and Officer Tran was unable to find a pulse. Medical was requested and Officer Amburgey began CPR.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #: _____ 2791941 _____

During the subsequent investigation I viewed the footage uploaded from Officer Lopera's BWC. The camera was activated at 00:54:14 on 05-14-17. The following annotations were identified along with the time each event occurred. The time noted is from the activation of the BWC.

00:00  The camera was activated and Farmer approached Officers Lopera and Lif.

00:09  Officer Lopera began walking towards Farmer.

00:13  Farmer walked through a chained off area into an employee only area.

00:14  Officer Lopera reached out to grab Farmer. Farmer turned and ran down a hallway. Officer Lopera ran after Farmer.

00:52  Officer Lopera reached a stairwell and began descending the stairs.

01:18  Officer Lopera exited the hotel.

01:19  Officer Lopera asked a security guard if he observed anyone running.

01:21  Officer Lopera ran south.

01:30  Farmer observed by a white vehicle.

01:34  Officer Lopera yelled, "Stop don't move. You're going to get tased."

01:36  Officer Lopera yelled, "Taser, Taser, Taser." Farmer then fell backward onto the street.

01:38  Officer Lopera yelled, "Taser, Taser." Farmer held his hands up and a cell phone is visible in his left hand.

01:39  Officer Lopera yelled, "Don't move."
Farmer replied "OK."
Officer Lopera yelled, "Don't move."

01:43  Officer Lopera pointed in the direction of the white truck and yelled, "Stop right there."

01:44  Officer Lopera yelled, "Get on your stomach".
Farmer sat up and attempted to put on his left shoe which had slipped off the heel.

01:45  Officer Lopera yelled, "Get on your stomach."
Farmer replied, "I will. I will. Please". Farmer fell backward to the ground.

01:49  Officer Lopera broadcast over the radio, "Control Venetian1, Give me a red."
Farmer is heard saying, "Please."

01:51  Officer Lopera yelled, "Don't move. Get on your stomach."

01:53  Farmer attempted to put his left shoe on again.

01:54  Officer Lopera yelled "Get on your stomach."
Farmer was rolling to his right side.

01:55  Farmer replied, "I will" then yelled "I will."

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #:      2791941

01:56   Farmer reached to his lower back.

01:57   Officer Lopera yelled, "Get on your stomach."

02:00   Farmer rolled onto his stomach, then to his back.

02:01   Officer Lopera yelled, "Get on your stomach."
        Farmer replied, "I will."

02:03   Officer Lopera yelled, "Get on your stomach. Do it now."

02:04   Farmer rolled to his stomach. Officer Lopera grabbed Farmer's left arm.

02:07   Farmer replied, "OK, OK, OK Sir."

02:09   Officer Lopera yelled, "Get on your stomach."
        Farmer replied, "I will."

02:13   Officer Lopera stated, "Stop, you're gonna get it again. Get it again. Help me out."

02:18   Farmer said "No, no, no."

02:20   Venetian Hotel Security arrived. They give Farmer verbal commands and a guard grabbed onto Farmers
        arms.
        Farmer said, "I will."

02:22   Security gave commands to "Stop, turn around."
        Farmer replied, "I will." Farmer then sat up.

02:24   Officer Lopera told Farmer, "Get on the ground."

02:27   Farmer replied, "OK sir."

02:29   Officer Lopera told Farmer, "Don't move."

02:30   Officer Lopera repeated the command, "Don't move."

02:33   Officer Lopera holstered his ECD and told Farmer, "Hands behind your back."
        Farmer replied, "I'm trying to."

02:35   Officer Lopera told Farmer, "On your stomach."

02:36   Officer Lopera straddled Farmers lower back.

02:37   Officer Lopera put both his hands on Farmers head.

02:40   Officer Lopera told Farmer, "Get on your stomach."
        Farmer was observed lying on his stomach.

02:42   Officer Lopera told Farmer, "Get on your stomach."
        Farmer was observed lying on his stomach.

02:45   Security was observed grabbing Farmers arms.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #: ___ 2791941 ___

02:47   Officer Lopera told Farmer, "Get on your stomach."
Farmer was observed lying on his stomach.

02:50   Officer Lopera told Farmer, "Get on your stomach."
Farmer was observed lying on his stomach.

02:52   Officer Lopera told Farmer, "Get on your stomach."
Farmer was observed lying on his stomach.

02:53   Officer Lopera told Farmer, "Let me see your hands."

02:58   Officer Lopera appeared to put Farmer in some type of neck restraint.

03:01   Sergeant Crumrine arrived and stated, "Put your fucking hands behind your back."

03:13   Officer Lopera asked, "Is he out yet?"

03:15   Farmer gasps.

03:18   Officer Lopera asked, "Is he out yet?"

03:19   Officer Lopera asked, "Is he out yet?"

03:25   Officer Tran arrived and said, "Let him go Ken."

03:26   Officer Lopera asked, "Are you sure?"
Officer Tran replied, "Yeah."

03:27   Officer Lopera stated, "Roll him to...Hold on. Don't grab my fucking legs."
Officer Tran stated, "We're on top of him."

03:30   Officer Lopera stated, "Roll him to the other side. Get the other arm too!"

03:36   Officer Lopera placed the palm of his hand on Farmer's forehead.

03:38   Officer Lopera asked, "You got the other one?"

03:50   Farmer Gasps.

04:11   Officer Lopera released the hold on Farmer.

04:17   Officer Lopera stated, "He tried to carjack somebody."

04:36   Officer Lopera stated, "I Tased him."

04:38   Officer Lopera stated, "Roll medical."

05:03   Sergeant Crumrine approached Officer Lopera. Officer Lopera told Sergeant Crumrine, he was getting coffee when he was approached by a guy who said someone was following him. Officer Lopera then stated the male ran away from the officers and outside the hotel. As Officer Lopera was chasing the male, he attempted to gain access into the bed of a truck at which time, Officer Lopera tased him. Farmer attempted to pull the ECD wires out and Officer Lopera said "I Choked him out."

**Page 5 of 8**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #: _____ 2791941 _____

05:44   Officer Lopera told other officers he needed to obtain a voluntary statement from the driver of the white truck.

06:38   Officer Lopera told Officers Flores and Rybacki what happened. During the conversation he stated, "I start waling on the dude and then I rear mounted and choked him out."

07:02   Officer Lopera told Officer Lif, "He tried to get in somebody's truck. So I Tased him and choked him out."

07:20   Officer Lopera asked, "Sarge, is he OK? He's breathing?" Officer Lopera then gave a thumbs up sign and said, "Thank you."

07:27   Officer Lopera asked if he should expedite medical.

07:41   Officer Lopera tells another officer, "I tased him, fought a little bit and choked him out."

07:48   Officer Lopera approached Venetian Security personnel and asked them to attempt to pull video surveillance of the incident.

09:34   Officer Lopera talked to Officer Lif again. During the conversation Officer Lopera told her, "I start punching him. Rear nakeded his ass. He went out."

During the subsequent investigation I viewed the footage uploaded from Officer Rybacki's BWC. The camera was activated at 01:04:16 on 05-14-17. The following annotations were identified along with the time each event occurred. The time noted is from the activation of the BWC.

11:25   Officer Rybacki approached Officers Tran and Flores. One of the officers stated, "He was out when we got here," referring to Farmer. Officer Rybacki responded, "Oh, he was definitely on something."

During the subsequent investigation I viewed the footage provided by the Venetian Hotel. The camera was active and zoomed in on Officer Lopera's location at 00:56:35 on 05-14-17. The following annotations were identified along with the time each event occurred. The time noted is from the time stamp on the video.

00:56:40                   Officer Lopera holstered his ECD.

00:56:40 – 00:57:03   Officer Lopera struck Farmer in the head approximately 10-12 times.

00:57:03 – 00:58:16   Officer Lopera held Farmer in a choke hold.

During the investigation, both Officer Lopera's BWC and the video surveillance from the Venetian Hotel were synced so they would play together. The following times are according to the time stamp on the Venetian Hotel surveillance with the BWC synced.

00:57:30          Officer Tran told Officer Lopera to let go of Farmer.

00:58:16          Officer Lopera released Farmer.

An analysis report was generated for Taser X26P, Serial Number X12002RP4, which was assigned to Officer Lopera. According to the time stamp on Officer Lopera's ECD, it was armed at 00:54:10. The ECD was activated by a trigger pull at 00:54:12 for five seconds; 00:54:21 for five seconds; 00:54:31 for five seconds; 00:54:37 for five seconds; 00:54:46 for five seconds; 00:54:51 for five seconds; and 00:54:59 for nine seconds. The ECD was rendered safe at 00:55:10.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #:  2791941

On 05-31-17, I received the Autopsy Report from the Clark County Office of the Coroner Medical Examiner. The autopsy was conducted by Dr. Alane Olson on 05-14-17 at 1255 hours. Dr. Olson opined that the cause of death was "Asphyxia due to police restraint" and the manner of death was homicide. According to Dr. Olson during the autopsy, she found hemorrhaging in the neck which would be consistent with being choked.

According to her statement, Officer Lif believed the contact between the officers and Farmer was a consensual encounter. Farmer had approached the officers and asked if they knew where a drinking fountain was located. After a short conversation with Officer Lopera, Farmer began walking away from the officers and towards a hallway which was marked with an illuminated exit sign. Farmer walked into a chain which was suspended by two yellow caution cones. Officer Lopera reached out with both arms in an attempt to grab Farmer. Farmer then turned around and ran down the hallway chased by Officer Lopera.

LVMPD policy states an officer may initiate a foot pursuit of any individual(s) the officer reasonably believes is about to engage in, is engaging in, or has engaged in criminal acitivity. As Officer Lopera began to chase Farmer, he had no reasonable suspicion or probable cause to believe that Farmer had been involved in any criminal conduct.

Officer Lopera continued to follow Farmer outside of the hotel and observed him near a white truck. Officer Lopera stated he believed Farmer attempted to gain access into the bed of a white truck and then began walking towards the driver's side door of the truck. Officer Lopera believed Farmer was going to attempt to take the vehicle by force and deployed his ECD. The driver of the white truck stated he did not believe Farmer was a threat. Officer Lopera pulled the trigger of his ECD. Both probes from Officer Lopera's ECD struck Farmer in the back resulting in neuromuscular incapacitation. Farmer fell to the ground and landed on his back.

Officer Lopera began issuing verbal commands to Farmer however the longest time between cycles of the ECD was six seconds. Officer Lopera told Farmer to get on his stomach several times but never gave Farmer a reasonable opportunity to comply with commands before cycling the ECD again. Officer Lopera's verbal commands also contradicted each other, telling Farmer "don't move" followed by a command to "get on your stomach."

LVMPD policy states after the initial five second cycle, the officer will evaluate the need to apply an additional five second cycle after providing the subject a reasonable opportunity to comply. Policy further states after a subject has been exposed to three cycles the ECD shall be deemed ineffective and another force option will be considered.

After cycling the ECD seven times, Officer Lopera holstered his ECD. With Farmer lying on his stomach, Officer Lopera straddled Farmer's back and struck him approximately 10-12 times in the head while giving Farmer verbal commands to "Get on your stomach." According to LVMPD policy, officers should only use hand strikes when a subject is displaying aggressive resistance. Aggressive resistance is defined as that which has the potential to cause injury or substantial pain. Based upon Officer Lopera's BWC and surveillance obtained by the Venetian Hotel, Farmer was laying on his stomach attempting to keep from being handcuffed. As Officer Lepora began to strike him, Farmer appeared to be protecting his face from being hit. Farmer did not appear to be displaying aggressive resistance.

After striking Farmer in the head, Officer Lopera performed what he described as a "rear naked choke." This technique is not approved by or taught by the LVMPD. The LVMPD employs the Lateral Vascular Neck Restraint (LVNR). The LVNR is a neck restraint which can render a subject unconscious by stopping blood flow to the brain by compressing the carotid arteries and does not restrict a subject's airflow. Officer Lopera held the "rear naked choke" for one minute and thirteen seconds. Officer Lopera also held the "rear naked choke" for forty four seconds after being told to let go by Officer Tran. LVMPD policy states that the LVNR will only be used in accordance with policy and department training.

**Page 7 of 8**

311

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #: _____ 2791941 _____

Due to the fact that Officer Lopera, who was on duty and acting in the official capacity of a Police Officer, attempted to detain Farmer inside the Venetian Hotel without sufficient legal authority for the detention, initiated a foot pursuit of Farmer which resulted in Farmer being detained and using force outside his training and department policy which resulted in Farmer's death the crime of Oppression Under the Color Office was committed. The force used consisted of the ECD, empty hand strikes to the head, and a choke hold.

Although Officer Lopera did not provide a statement to criminal investigators, it is reasonable to believe that he did not intend to cause death to Farmer. However, Officer Lopera used his ECD, empty hand strikes, and a choke hold all of which were outside department policy and his training. According to Dr. Olson, Farmer died as a result of asphyxiation due to police restraint. Officer Lopera referred to the restraint as a "rear naked choke" which is not authorized by the LVMPD. Therefore, Officer Lopera committed the crime of Involuntary Manslaughter.

**Page 8 of 8**

# Exhibit S - LVMPD's Advanced Officers Skills Training Defensive Tactics Manual

# UNDERSTANDING THE 4TH AMENDMENT'S OBJECTIVE REASONABLENESS STANDARD

(© Copyright 2014 by LAAW International, LLC. All rights reserved.)

**Balancing Test (Graham):** reasonableness inquiry requires a careful balancing of the nature and quality of the intrusion (use of force) on the individual's 4th Amendment interests against the countervailing governmental interests at stake.

**Risk/Benefit Test (Scott):** In judging whether the Law Enforcement Officer's (LEO's) actions were reasonable, we must consider the risk of bodily harm that LEO's actions posed to the subject in light of the threat to the public posed by the subject that the LEO was trying to eliminate.

**Reasonableness at the Moment Force is Used (Graham):** reasonableness test considers that LEOs are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation.

**Reasonableness Test (Graham):** requires careful attention to the facts and circumstances of each particular case, including:
- whether the subject poses an immediate threat to the safety of officers or others,
- whether the subject is actively resisting arrest or attempting to evade arrest by flight, and,
- the severity of the crime at issue.

**Reasonable LEO's Perspective (Graham):** The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable LEO on the scene, rather than with the 20/20 vision of hindsight.

**Objective Test (Graham):** whether LEOs actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

**Each Force Application Must be Justified:** Each strike, OC use, force application, trigger pull, 5-second CEW cycle must be legally justified.

**All Force Must be Unambiguously Justified in LEO's Reports/Statements:** Any factor used to justify use of force or escalation of force must be explained.

| Basic Test of "Objective Reasonableness" Graham risk prioritized by Chew | Not an Intentional/ Immediate Threat/Flight Risk Person In Need of Medical Assistance Due to Mental Health, Drugs, or Illness | Additional (minimum passive) Force Factors (Mattos/Brooks) Force To Gain Volitional Compliance (Person not an immediate threat or flight risk) |
|---|---|---|
| 1. Immediate threat<br>- beware "*possible*" threat fallacy<br>2. Actively resisting seizure<br>3. Circumstances tense, uncertain rapidly evolving (pace of events)<br>4. Severity of crime at issue<br>5. Attempting to evade seizure<br>- by flight<br>- flight from serious event<br><br>**Additional Basic Factors**<br><br>6. Availability of alternative methods of capturing, controlling, restraining, or subduing subject<br><br>7. What officers knew about subject's health, mental condition, or other relevant frailties | **Mentally Ill/Drugs (*Bryan v. MacPherson*):** LEO should make greater effort to control situation through less intrusive means.<br><br>Some courts believe acting out by emotionally disturbed person diminishes the level of force necessary and such persons are in need of a doctor, not a jail cell and in the usual case – where such a person is neither a threat to himself or anyone else—the government's interest in deploying force to detain him is not as substantial as its interest in deploying force to apprehend a dangerous criminal.<br><br>**Pain:** If pain is used to gain compliance,<br>(1) consideration of whether person will perceive the pain and<br>(2) be able to comply with LEO's commands.<br><br>**Distraction:** must be able to articulate that force used for distraction to assist custody is reasonable. | **Person must be given reasonable opportunity to comply with directives prior to each X26 ECD drive-stun application**<br><br>LEO:<br>1. must not have a reasonable perception that person is not capable of volitional compliance to commands,<br>2. must reasonably perceive person is "actively resisting,"<br>3. must give warning of imminent application of force,<br>4. must give person a reasonable:<br>a. time "to recover from extreme pain" experienced,<br>b. opportunity to "gather herself,"<br>c. opportunity to "consider her refusal to comply,"<br>5. the duration of time between each X26 ECD drive-stun application (according to *Mattos*) must be > 36 seconds, and<br>6. LEO needs to include in report that before each X26 ECD drive-stun used to attempt to gain the person's volitional compliance LEO followed these guidelines.<br><br>**Consider Alternates:** less risk of injury ("Quantum of Force")<br><br>(Some courts may require greater justification) |

[POST Ethical Use of Force 2015]

# Exhibit T - Taser Report Print-Out



**EVIDENCE⊘SYNC**™

| **TASER Information** | | **Offline Report** | |
|---|---|---|---|
| Serial | X12002RP4 | Local Timezone | Pacific Daylight Time (UTC -07:00) |
| Model | TASER X26P | Generated On | 14 May 2017 06:28:58 |
| Firmware Version | Rev. 04.030 | | |
| Application Version | 3.13.4 | | |
| Health | Good | | |

### Device (X26P)

| Seq # | Local Time<br>[DD:MM:YYYY hh:mm:ss] | Event<br>[Event Type] | Duration<br>[Seconds] | Temp<br>[Degrees Celcius] | Batt Remaining<br>[%] |
|---|---|---|---|---|---|
| 1 | 05 Feb 2015 10:54:34 | Power Magazine Change | Manufacturing  S/N: XXXXX6  Battery capacity: 100% | | |
| 2 | 05 Feb 2015 10:54:34 | Firmware Update | FW Bundle, Rev. 04.010, 7/23/14 | | |
| 3 | 05 Feb 2015 10:54:34 | Firmware Update | MC, Rev. 04.010, 7/23/14 | | |
| 4 | 05 Feb 2015 10:54:34 | Firmware Update | LDR, Rev. 04.009, 7/22/14 | | |
| 5 | 05 Feb 2015 10:54:34 | Firmware Update | CAM, Rev. 01.022, 6/6/14 | | |
| 6 | 05 Feb 2015 10:54:34 | Armed | | 30 | 100 |
| 7 | 05 Feb 2015 10:54:47 | Safe | 13 | 30 | 99 |
| 8 | 05 Feb 2015 10:55:05 | Power Magazine Change | Standard  S/N: 197222  Battery capacity: 76% | | |
| 9 | 05 Feb 2015 10:55:05 | Armed | | 30 | 76 |
| 10 | 05 Feb 2015 10:55:08 | Safe | 3 | 30 | 76 |
| 11 | 05 Feb 2015 11:31:15 | Power Magazine Change | Manufacturing  S/N: DPM000  Battery capacity: 100% | | |
| 12 | 05 Feb 2015 11:31:15 | Armed | | 28 | 100 |
| 13 | 05 Feb 2015 11:31:19 | Trigger | 5 | | 100 |
| 14 | 05 Feb 2015 11:31:25 | Trigger | 5 | | 99 |
| 15 | 05 Feb 2015 11:31:33 | Trigger | 5 | | 99 |
| 16 | 05 Feb 2015 11:31:39 | Trigger | 5 | | 99 |
| 17 | 05 Feb 2015 11:31:45 | Trigger | 5 | | 99 |
| 18 | 05 Feb 2015 11:31:51 | Trigger | 5 | | 99 |
| 19 | 05 Feb 2015 11:31:56 | Trigger | 5 | | 99 |
| 20 | 05 Feb 2015 11:32:02 | Trigger | 5 | | 99 |

314

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 21 | 05 Feb 2015 11:32:08 | Trigger | 5 | | 99 |
| 22 | 05 Feb 2015 11:32:13 | Trigger | 5 | | 99 |
| 23 | 05 Feb 2015 11:32:19 | Trigger | 5 | | 99 |
| 24 | 05 Feb 2015 11:32:24 | Trigger | 5 | | 99 |
| 25 | 05 Feb 2015 11:32:30 | Trigger | 5 | | 99 |
| 26 | 05 Feb 2015 11:32:35 | Trigger | 5 | | 99 |
| 27 | 05 Feb 2015 11:32:41 | Safe | 86 | 36 | 99 |
| 28 | 05 Feb 2015 11:50:36 | Armed | | 29 | 100 |
| 29 | 05 Feb 2015 11:50:38 | Trigger | 5 | | 100 |
| 30 | 05 Feb 2015 11:50:46 | Trigger | 5 | | 99 |
| 31 | 05 Feb 2015 11:50:54 | Safe | 18 | 30 | 99 |
| 32 | 05 Feb 2015 11:53:08 | Power Magazine Change | Standard  S/N: 197227  Battery capacity: 95% | | |
| 33 | 05 Feb 2015 11:53:08 | Armed | | 29 | 95 |
| 34 | 05 Feb 2015 11:53:10 | Safe | 2 | 30 | 95 |
| 35 | 05 Feb 2015 11:54:34 | USB Connected | | | |
| 36 | 05 Feb 2015 11:54:52 | Firmware Update | MC, Rev. 04.010, 7/23/14 | | |
| 37 | 05 Feb 2015 11:54:52 | Firmware Update | LDR, Rev. 04.009, 7/22/14 | | |
| 38 | 05 Feb 2015 11:54:52 | Firmware Update | CAM, Rev. 01.022, 6/6/14 | | |
| 39 | 05 Feb 2015 11:54:54 | Time Sync | 05 Feb 2015 11:54:54 to 05 Feb 2015 11:54:54 | | |
| 40 | 31 Aug 2015 09:06:36 | Power Magazine Change | Standard  S/N: 236810  Battery capacity: 100% | | |
| 41 | 31 Aug 2015 09:06:36 | Armed | | 28 | 100 |
| 42 | 31 Aug 2015 09:07:03 | Safe | 27 | 29 | 99 |
| 43 | 31 Aug 2015 09:07:17 | Configuration | | | |
| 44 | 31 Aug 2015 09:07:33 | Configuration Exit | | | |
| 45 | 31 Aug 2015 09:07:39 | Configuration | | | |
| 46 | 31 Aug 2015 09:08:01 | Configuration Exit | | | |
| 47 | 31 Aug 2015 09:08:04 | Configuration | | | |
| 48 | 31 Aug 2015 09:08:19 | Configuration Exit | | | |
| 49 | 31 Aug 2015 09:09:33 | Configuration | | | |
| 50 | 31 Aug 2015 09:09:50 | Configuration Exit | | | |

315

| Seq # | Local Time<br>[DD:MM:YYYY hh:mm:ss] | Event<br>[Event Type] | Duration<br>[Seconds] | Temp<br>[Degrees Celcius] | Batt Remaining<br>[%] |
|---|---|---|---|---|---|
| 51 | 31 Aug 2015 09:25:04 | Armed | | 29 | 99 |
| 52 | 31 Aug 2015 09:25:25 | Trigger | 5 | | 99 |
| 53 | 31 Aug 2015 09:25:35 | Safe | 31 | 31 | 99 |
| 54 | 31 Aug 2015 10:35:56 | Armed | | 30 | 99 |
| 55 | 31 Aug 2015 10:36:01 | Trigger | 5 | | 99 |
| 56 | 31 Aug 2015 10:36:12 | Safe | 16 | 32 | 99 |
| 57 | 31 Aug 2015 10:36:36 | Armed | | 32 | 99 |
| 58 | 31 Aug 2015 10:36:37 | Trigger | 5 | | 99 |
| 59 | 31 Aug 2015 10:36:42 | Safe | 6 | 32 | 99 |
| 60 | 31 Aug 2015 10:41:12 | Armed | | 34 | 99 |
| 61 | 31 Aug 2015 10:41:31 | Safe | 19 | 35 | 99 |
| 62 | 31 Aug 2015 10:41:48 | Armed | | 36 | 99 |
| 63 | 31 Aug 2015 10:42:11 | Safe | 23 | 36 | 99 |
| 64 | 31 Aug 2015 10:42:19 | Armed | | 37 | 99 |
| 65 | 31 Aug 2015 10:42:30 | Safe | 11 | 37 | 99 |
| 66 | 31 Aug 2015 10:42:55 | Armed | | 38 | 99 |
| 67 | 31 Aug 2015 10:43:05 | Safe | 10 | 38 | 99 |
| 68 | 31 Aug 2015 10:43:59 | Armed | | 38 | 99 |
| 69 | 31 Aug 2015 10:44:05 | Safe | 6 | 39 | 99 |
| 70 | 31 Aug 2015 10:44:28 | Armed | | 38 | 99 |
| 71 | 31 Aug 2015 10:44:32 | Safe | 4 | 39 | 99 |
| 72 | 31 Aug 2015 10:44:53 | Armed | | 39 | 99 |
| 73 | 31 Aug 2015 10:44:54 | Trigger | 5 | | 99 |
| 74 | 31 Aug 2015 10:45:08 | Safe | 15 | 39 | 98 |
| 75 | 31 Aug 2015 10:45:16 | Armed | | 40 | 98 |
| 76 | 31 Aug 2015 10:45:16 | Trigger | 5 | | 98 |
| 77 | 31 Aug 2015 10:45:26 | Safe | 10 | 40 | 98 |
| 78 | 31 Aug 2015 10:45:30 | Armed | | 40 | 98 |
| 79 | 31 Aug 2015 10:45:36 | Safe | 6 | 41 | 98 |
| 80 | 31 Aug 2015 10:46:12 | Armed | | 41 | 98 |

316

| Seq # | Local Time<br>[DD:MM:YYYY hh:mm:ss] | Event<br>[Event Type] | Duration<br>[Seconds] | Temp<br>[Degrees Celcius] | Batt Remaining<br>[%] |
|-------|-------------------------------------|-----------------------|-----------------------|--------------------------|-----------------------|
| 81 | 31 Aug 2015 10:46:14 | Trigger | 5 | | 98 |
| 82 | 31 Aug 2015 10:46:19 | Safe | 7 | 41 | 98 |
| 83 | 31 Aug 2015 10:46:41 | Armed | | 41 | 98 |
| 84 | 31 Aug 2015 10:46:50 | Safe | 9 | 42 | 98 |
| 85 | 31 Aug 2015 10:47:28 | Armed | | 41 | 98 |
| 86 | 31 Aug 2015 10:47:29 | Trigger | 5 | | 98 |
| 87 | 31 Aug 2015 10:47:36 | Safe | 8 | 42 | 98 |
| 88 | 31 Aug 2015 10:48:04 | Armed | | 42 | 98 |
| 89 | 31 Aug 2015 10:48:05 | Trigger | 5 | | 98 |
| 90 | 31 Aug 2015 10:48:10 | Safe | 6 | 42 | 98 |
| 91 | 31 Aug 2015 10:48:17 | Armed | | 43 | 98 |
| 92 | 31 Aug 2015 10:48:17 | Trigger | 5 | | 98 |
| 93 | 31 Aug 2015 10:48:26 | Safe | 9 | 43 | 97 |
| 94 | 31 Aug 2015 10:48:44 | Armed | | 43 | 97 |
| 95 | 31 Aug 2015 10:48:45 | Trigger | 3 | | 97 |
| 96 | 31 Aug 2015 10:48:47 | Safe | 3 | 43 | 97 |
| 97 | 31 Aug 2015 10:48:52 | Armed | | 43 | 97 |
| 98 | 31 Aug 2015 10:48:53 | Trigger | 5 | | 97 |
| 99 | 31 Aug 2015 10:49:01 | Safe | 9 | 44 | 97 |
| 100 | 31 Aug 2015 10:49:54 | Armed | | 43 | 97 |
| 101 | 31 Aug 2015 10:50:02 | Safe | 8 | 43 | 97 |
| 102 | 31 Aug 2015 10:50:16 | Armed | | 44 | 97 |
| 103 | 31 Aug 2015 10:50:22 | Trigger | 5 | | 97 |
| 104 | 31 Aug 2015 10:50:28 | Safe | 12 | 44 | 97 |
| 105 | 31 Aug 2015 10:50:33 | Armed | | 44 | 97 |
| 106 | 31 Aug 2015 10:50:38 | Safe | 5 | 45 | 97 |
| 107 | 31 Aug 2015 10:50:57 | Armed | | 45 | 97 |
| 108 | 31 Aug 2015 10:51:06 | Safe | 9 | 44 | 97 |
| 109 | 31 Aug 2015 10:51:22 | Armed | | 44 | 97 |
| 110 | 31 Aug 2015 10:51:24 | Trigger | 5 | | 97 |

317

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 111 | 31 Aug 2015 10:51:37 | Safe | 15 | 45 | 97 |
| 112 | 31 Aug 2015 10:51:48 | Armed | | 46 | 97 |
| 113 | 31 Aug 2015 10:51:49 | Trigger | 3 | | 97 |
| 114 | 31 Aug 2015 10:51:52 | Safe | 4 | 45 | 97 |
| 115 | 31 Aug 2015 10:51:57 | Armed | | 46 | 97 |
| 116 | 31 Aug 2015 10:52:05 | Safe | 8 | 45 | 97 |
| 117 | 31 Aug 2015 10:52:29 | Armed | | 45 | 97 |
| 118 | 31 Aug 2015 10:52:31 | Trigger | 3 | | 97 |
| 119 | 31 Aug 2015 10:52:35 | Safe | 6 | 45 | 96 |
| 120 | 31 Aug 2015 10:52:38 | Armed | | 46 | 96 |
| 121 | 31 Aug 2015 10:52:48 | Safe | 10 | 46 | 96 |
| 122 | 31 Aug 2015 10:53:35 | Armed | | 45 | 96 |
| 123 | 31 Aug 2015 10:53:35 | Trigger | 5 | | 96 |
| 124 | 31 Aug 2015 10:53:54 | Safe | 19 | 46 | 96 |
| 125 | 31 Aug 2015 10:54:00 | Armed | | 46 | 96 |
| 126 | 31 Aug 2015 10:54:02 | Trigger | 3 | | 96 |
| 127 | 31 Aug 2015 10:54:04 | Safe | 4 | 46 | 96 |
| 128 | 31 Aug 2015 10:54:09 | Armed | | 46 | 96 |
| 129 | 31 Aug 2015 10:54:19 | Safe | 10 | 47 | 96 |
| 130 | 31 Aug 2015 10:55:03 | Armed | | 46 | 96 |
| 131 | 31 Aug 2015 10:55:06 | Trigger | 5 | | 96 |
| 132 | 31 Aug 2015 10:55:20 | Safe | 17 | 47 | 96 |
| 133 | 01 Sep 2015 10:15:53 | Armed | | 28 | 96 |
| 134 | 01 Sep 2015 10:16:31 | Trigger | 5 | | 96 |
| 135 | 01 Sep 2015 10:16:39 | Safe | 46 | 30 | 96 |
| 136 | 02 Sep 2015 08:29:23 | Armed | | 35 | 96 |
| 137 | 02 Sep 2015 08:29:32 | Trigger | 5 | | 96 |
| 138 | 02 Sep 2015 08:29:44 | Safe | 21 | 37 | 95 |
| 139 | 02 Sep 2015 09:12:07 | Armed | | 40 | 95 |
| 140 | 02 Sep 2015 09:12:20 | Safe | 13 | 40 | 95 |

318

| Seq # | Local Time<br>[DD:MM:YYYY hh:mm:ss] | Event<br>[Event Type] | Duration<br>[Seconds] | Temp<br>[Degrees Celcius] | Batt Remaining<br>[%] |
|---|---|---|---|---|---|
| 141 | 02 Sep 2015 09:34:15 | Armed | | 40 | 95 |
| 142 | 02 Sep 2015 09:34:24 | Safe | 9 | 40 | 95 |
| 143 | 03 Sep 2015 08:20:38 | Armed | | 30 | 95 |
| 144 | 03 Sep 2015 08:20:45 | Trigger | 5 | | 95 |
| 145 | 03 Sep 2015 08:20:53 | Safe | 15 | 31 | 95 |
| 146 | 03 Sep 2015 09:01:45 | Armed | | 38 | 95 |
| 147 | 03 Sep 2015 09:01:55 | Safe | 10 | 38 | 95 |
| 148 | 03 Sep 2015 09:02:16 | Armed | | 39 | 95 |
| 149 | 03 Sep 2015 09:02:24 | Safe | 8 | 39 | 95 |
| 150 | 03 Sep 2015 09:02:25 | Armed | | 38 | 95 |
| 151 | 03 Sep 2015 09:02:26 | Trigger | 5 | | 95 |
| 152 | 03 Sep 2015 09:02:41 | Safe | 16 | 40 | 95 |
| 153 | 03 Sep 2015 09:12:09 | Armed | | 38 | 95 |
| 154 | 03 Sep 2015 09:12:37 | Safe | 28 | 40 | 95 |
| 155 | 08 Sep 2015 08:13:29 | Armed | | 29 | 95 |
| 156 | 08 Sep 2015 08:13:32 | Trigger | 5 | | 95 |
| 157 | 08 Sep 2015 08:13:39 | Safe | 10 | 29 | 95 |
| 158 | 08 Sep 2015 12:34:23 | Armed | | 31 | 95 |
| 159 | 08 Sep 2015 12:34:25 | Trigger | 5 | | 95 |
| 160 | 08 Sep 2015 12:34:32 | Safe | 9 | 32 | 94 |
| 161 | 08 Sep 2015 12:35:53 | Armed | | 33 | 94 |
| 162 | 08 Sep 2015 12:35:55 | Safe | 2 | 33 | 94 |
| 163 | 08 Sep 2015 12:36:03 | Armed | | 33 | 94 |
| 164 | 08 Sep 2015 12:36:05 | Trigger | 5 | | 94 |
| 165 | 08 Sep 2015 12:36:12 | Safe | 9 | 34 | 94 |
| 166 | 10 Sep 2015 08:21:55 | Armed | | 34 | 94 |
| 167 | 10 Sep 2015 08:22:01 | Trigger | 5 | | 94 |
| 168 | 10 Sep 2015 08:22:07 | Safe | 12 | 35 | 94 |
| 169 | 14 Sep 2015 12:30:20 | Armed | | 29 | 94 |
| 170 | 14 Sep 2015 12:30:28 | Trigger | 5 | | 94 |

319

| Seq # | Local Time<br>[DD:MM:YYYY hh:mm:ss] | Event<br>[Event Type] | Duration<br>[Seconds] | Temp<br>[Degrees Celcius] | Batt Remaining<br>[%] |
|---|---|---|---|---|---|
| 171 | 14 Sep 2015 12:30:35 | Safe | 15 | 30 | 94 |
| 172 | 15 Sep 2015 08:22:52 | Armed | | 29 | 94 |
| 173 | 15 Sep 2015 08:22:56 | Trigger | 5 | | 94 |
| 174 | 15 Sep 2015 08:23:03 | Safe | 11 | 30 | 94 |
| 175 | 16 Sep 2015 08:15:24 | Armed | | 30 | 94 |
| 176 | 16 Sep 2015 08:15:38 | Trigger | 5 | | 94 |
| 177 | 16 Sep 2015 08:15:44 | Safe | 20 | 32 | 94 |
| 178 | 17 Sep 2015 08:25:43 | Armed | | 27 | 94 |
| 179 | 17 Sep 2015 08:25:49 | Trigger | 5 | | 94 |
| 180 | 17 Sep 2015 08:25:56 | Safe | 13 | 28 | 93 |
| 181 | 21 Sep 2015 10:08:35 | Armed | | 28 | 93 |
| 182 | 21 Sep 2015 10:08:40 | Trigger | 5 | | 93 |
| 183 | 21 Sep 2015 10:08:46 | Safe | 11 | 29 | 93 |
| 184 | 22 Sep 2015 10:38:26 | Armed | | 27 | 93 |
| 185 | 22 Sep 2015 10:38:34 | Trigger | 5 | | 93 |
| 186 | 22 Sep 2015 10:38:40 | Safe | 14 | 28 | 93 |
| 187 | 23 Sep 2015 09:23:43 | Armed | | 28 | 93 |
| 188 | 23 Sep 2015 09:23:48 | Trigger | 5 | | 93 |
| 189 | 23 Sep 2015 09:23:54 | Safe | 11 | 28 | 93 |
| 190 | 24 Sep 2015 08:55:17 | Armed | | 34 | 93 |
| 191 | 24 Sep 2015 08:55:19 | Safe | 2 | 35 | 93 |
| 192 | 24 Sep 2015 08:55:23 | Armed | | 34 | 93 |
| 193 | 24 Sep 2015 08:55:26 | Trigger | 5 | | 93 |
| 194 | 24 Sep 2015 08:55:33 | Safe | 10 | 35 | 93 |
| 195 | 28 Sep 2015 06:53:01 | Armed | | 27 | 93 |
| 196 | 28 Sep 2015 06:53:07 | Trigger | 5 | | 93 |
| 197 | 28 Sep 2015 06:53:13 | Safe | 12 | 28 | 92 |
| 198 | 29 Sep 2015 08:21:21 | Armed | | 28 | 92 |
| 199 | 29 Sep 2015 08:21:22 | Trigger | 5 | | 92 |
| 200 | 29 Sep 2015 08:21:29 | Safe | 8 | 29 | 92 |

320

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 201 | 30 Sep 2015 10:12:24 | Armed | | 28 | 92 |
| 202 | 30 Sep 2015 10:12:26 | Trigger | 5 | | 92 |
| 203 | 30 Sep 2015 10:12:32 | Safe | 8 | 28 | 92 |
| 204 | 01 Oct 2015 08:17:17 | Armed | | 28 | 92 |
| 205 | 01 Oct 2015 08:17:19 | Trigger | 5 | | 92 |
| 206 | 01 Oct 2015 08:17:25 | Safe | 8 | 29 | 92 |
| 207 | 03 Oct 2015 20:34:24 | Armed | | 26 | 92 |
| 208 | 03 Oct 2015 20:34:29 | Safe | 5 | 27 | 92 |
| 209 | 05 Oct 2015 06:50:24 | Armed | | 26 | 92 |
| 210 | 05 Oct 2015 06:50:29 | Trigger | 5 | | 92 |
| 211 | 05 Oct 2015 06:50:34 | Safe | 10 | 26 | 92 |
| 212 | 06 Oct 2015 09:10:02 | Armed | | 25 | 92 |
| 213 | 06 Oct 2015 09:10:05 | Trigger | 5 | | 92 |
| 214 | 06 Oct 2015 09:10:11 | Safe | 9 | 27 | 92 |
| 215 | 08 Oct 2015 06:43:40 | Armed | | 26 | 92 |
| 216 | 08 Oct 2015 06:43:44 | Trigger | 5 | | 92 |
| 217 | 08 Oct 2015 06:43:50 | Safe | 10 | 27 | 91 |
| 218 | 12 Oct 2015 06:57:14 | Armed | | 27 | 91 |
| 219 | 12 Oct 2015 06:57:18 | Trigger | 5 | | 91 |
| 220 | 12 Oct 2015 06:57:25 | Safe | 11 | 27 | 91 |
| 221 | 12 Oct 2015 10:09:42 | Armed | | 31 | 91 |
| 222 | 12 Oct 2015 10:09:42 | Safe | 0 | 31 | 91 |
| 223 | 13 Oct 2015 08:21:25 | Armed | | 29 | 91 |
| 224 | 13 Oct 2015 08:21:26 | Trigger | 5 | | 91 |
| 225 | 13 Oct 2015 08:21:32 | Safe | 7 | 30 | 91 |
| 226 | 14 Oct 2015 08:20:26 | Armed | | 29 | 91 |
| 227 | 14 Oct 2015 08:20:27 | Trigger | 5 | | 91 |
| 228 | 14 Oct 2015 08:20:33 | Safe | 7 | 29 | 91 |
| 229 | 15 Oct 2015 06:45:10 | Armed | | 28 | 91 |
| 230 | 15 Oct 2015 06:45:11 | Trigger | 5 | | 91 |

321

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 231 | 15 Oct 2015 06:45:17 | Safe | 7 | 29 | 91 |
| 232 | 15 Oct 2015 08:12:44 | Armed | | 30 | 91 |
| 233 | 15 Oct 2015 08:12:46 | Safe | 2 | 30 | 91 |
| 234 | 15 Oct 2015 08:14:27 | Armed | | 30 | 91 |
| 235 | 15 Oct 2015 08:14:28 | Trigger | 2 | | 91 |
| 236 | 15 Oct 2015 08:14:30 | Safe | 3 | 30 | 91 |
| 237 | 20 Oct 2015 08:23:34 | Armed | | 25 | 91 |
| 238 | 20 Oct 2015 08:23:35 | Trigger | 5 | | 91 |
| 239 | 20 Oct 2015 08:23:41 | Safe | 7 | 26 | 91 |
| 240 | 20 Oct 2015 08:47:46 | Armed | | 28 | 91 |
| 241 | 20 Oct 2015 08:47:50 | Safe | 4 | 28 | 91 |
| 242 | 21 Oct 2015 08:17:53 | Armed | | 25 | 91 |
| 243 | 21 Oct 2015 08:17:54 | Trigger | 5 | | 91 |
| 244 | 21 Oct 2015 08:18:01 | Safe | 8 | 25 | 90 |
| 245 | 22 Oct 2015 08:35:04 | Armed | | 26 | 90 |
| 246 | 22 Oct 2015 08:35:06 | Trigger | 5 | | 90 |
| 247 | 22 Oct 2015 08:35:12 | Safe | 8 | 25 | 90 |
| 248 | 26 Oct 2015 08:20:02 | Armed | | 27 | 90 |
| 249 | 26 Oct 2015 08:20:03 | Trigger | 5 | | 90 |
| 250 | 26 Oct 2015 08:20:09 | Safe | 7 | 27 | 90 |
| 251 | 26 Oct 2015 10:22:52 | Armed | | 29 | 90 |
| 252 | 26 Oct 2015 10:22:53 | Trigger | 5 | | 90 |
| 253 | 26 Oct 2015 10:23:00 | Safe | 8 | 30 | 90 |
| 254 | 29 Oct 2015 06:43:40 | Armed | | 25 | 90 |
| 255 | 29 Oct 2015 06:43:41 | Safe | 1 | 25 | 90 |
| 256 | 29 Oct 2015 06:51:41 | Armed | | 26 | 90 |
| 257 | 29 Oct 2015 06:51:44 | Trigger | 5 | | 90 |
| 258 | 29 Oct 2015 06:51:49 | Safe | 8 | 27 | 90 |
| 259 | 02 Nov 2015 06:49:54 | Armed | | 24 | 90 |
| 260 | 02 Nov 2015 06:49:59 | Trigger | 5 | | 90 |

322

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 261 | 02 Nov 2015 06:50:05 | Safe | 11 | 25 | 90 |
| 262 | 03 Nov 2015 06:48:14 | Armed | | 21 | 90 |
| 263 | 03 Nov 2015 06:48:16 | Trigger | 5 | | 90 |
| 264 | 03 Nov 2015 06:48:22 | Safe | 8 | 22 | 89 |
| 265 | 04 Nov 2015 06:48:03 | Armed | | 18 | 89 |
| 266 | 04 Nov 2015 06:48:06 | Trigger | 5 | | 89 |
| 267 | 04 Nov 2015 06:48:12 | Safe | 9 | 19 | 89 |
| 268 | 05 Nov 2015 06:50:20 | Armed | | 23 | 89 |
| 269 | 05 Nov 2015 06:50:21 | Safe | 1 | 22 | 89 |
| 270 | 05 Nov 2015 06:50:23 | Armed | | 23 | 89 |
| 271 | 05 Nov 2015 06:50:25 | Trigger | 5 | | 89 |
| 272 | 05 Nov 2015 06:50:30 | Safe | 7 | 23 | 89 |
| 273 | 15 Nov 2015 19:01:57 | Armed | | 26 | 89 |
| 274 | 15 Nov 2015 19:02:00 | Safe | 3 | 26 | 89 |
| 275 | 16 Nov 2015 10:11:33 | Armed | | 23 | 89 |
| 276 | 16 Nov 2015 10:11:35 | Trigger | 5 | | 89 |
| 277 | 16 Nov 2015 10:11:41 | Safe | 8 | 23 | 89 |
| 278 | 17 Nov 2015 08:23:03 | Armed | | 18 | 89 |
| 279 | 17 Nov 2015 08:23:04 | Trigger | 5 | | 89 |
| 280 | 17 Nov 2015 08:23:11 | Safe | 8 | 19 | 89 |
| 281 | 18 Nov 2015 10:24:20 | Armed | | 24 | 89 |
| 282 | 18 Nov 2015 10:24:22 | Trigger | 5 | | 89 |
| 283 | 18 Nov 2015 10:24:28 | Safe | 8 | 24 | 89 |
| 284 | 19 Nov 2015 06:44:19 | Armed | | 23 | 89 |
| 285 | 19 Nov 2015 06:44:20 | Trigger | 5 | | 89 |
| 286 | 19 Nov 2015 06:44:26 | Safe | 7 | 24 | 88 |
| 287 | 23 Nov 2015 08:43:42 | Armed | | 22 | 88 |
| 288 | 23 Nov 2015 08:43:44 | Trigger | 5 | | 88 |
| 289 | 23 Nov 2015 08:43:50 | Safe | 8 | 22 | 88 |
| 290 | 24 Nov 2015 15:32:50 | Armed | | 28 | 88 |

323

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 291 | 24 Nov 2015 15:33:12 | Safe | 22 | 30 | 88 |
| 292 | 24 Nov 2015 20:50:46 | Armed | | 25 | 88 |
| 293 | 24 Nov 2015 20:50:46 | Trigger | 5 | | 88 |
| 294 | 24 Nov 2015 20:50:57 | Trigger | 5 | | 88 |
| 295 | 24 Nov 2015 20:51:16 | Safe | 30 | 27 | 88 |
| 296 | 02 Dec 2015 10:36:39 | Armed | | 25 | 88 |
| 297 | 02 Dec 2015 10:36:42 | Safe | 3 | 25 | 88 |
| 298 | 02 Dec 2015 10:37:06 | Armed | | 25 | 88 |
| 299 | 02 Dec 2015 10:37:06 | Trigger | 5 | | 88 |
| 300 | 02 Dec 2015 10:37:12 | Safe | 6 | 26 | 88 |
| 301 | 14 Dec 2015 08:22:43 | Armed | | 22 | 88 |
| 302 | 14 Dec 2015 08:22:45 | Trigger | 5 | | 88 |
| 303 | 14 Dec 2015 08:22:51 | Safe | 8 | 23 | 87 |
| 304 | 22 Dec 2015 06:46:31 | Armed | | 23 | 87 |
| 305 | 22 Dec 2015 06:46:33 | Trigger | 5 | | 87 |
| 306 | 22 Dec 2015 06:46:40 | Safe | 9 | 24 | 87 |
| 307 | 23 Dec 2015 09:06:40 | Armed | | 24 | 87 |
| 308 | 23 Dec 2015 09:06:43 | Trigger | 5 | | 87 |
| 309 | 23 Dec 2015 09:06:49 | Safe | 9 | 25 | 87 |
| 310 | 30 Dec 2015 07:22:01 | Armed | | 26 | 87 |
| 311 | 30 Dec 2015 07:22:03 | Trigger | 5 | | 87 |
| 312 | 30 Dec 2015 07:22:10 | Safe | 9 | 27 | 87 |
| 313 | 12 Jan 2016 10:18:40 | Armed | | 22 | 87 |
| 314 | 12 Jan 2016 10:18:41 | Trigger | 5 | | 87 |
| 315 | 12 Jan 2016 10:18:48 | Safe | 8 | 23 | 87 |
| 316 | 13 Jan 2016 06:43:50 | Armed | | 23 | 87 |
| 317 | 13 Jan 2016 06:43:51 | Trigger | 5 | | 87 |
| 318 | 13 Jan 2016 06:43:58 | Safe | 8 | 23 | 87 |
| 319 | 14 Jan 2016 06:39:58 | Armed | | 23 | 87 |
| 320 | 14 Jan 2016 06:39:59 | Trigger | 5 | | 87 |

324

| Seq # | Local Time<br>[DD:MM:YYYY hh:mm:ss] | Event<br>[Event Type] | Duration<br>[Seconds] | Temp<br>[Degrees Celcius] | Batt Remaining<br>[%] |
|-------|------|-------|------|------|------|
| 321 | 14 Jan 2016 06:40:05 | Safe | 7 | 23 | 86 |
| 322 | 19 Jan 2016 06:51:16 | Armed | | 24 | 86 |
| 323 | 19 Jan 2016 06:51:17 | Trigger | 5 | | 86 |
| 324 | 19 Jan 2016 06:51:23 | Safe | 7 | 24 | 86 |
| 325 | 20 Jan 2016 06:46:46 | Armed | | 24 | 86 |
| 326 | 20 Jan 2016 06:46:47 | Trigger | 5 | | 86 |
| 327 | 20 Jan 2016 06:46:53 | Safe | 7 | 25 | 86 |
| 328 | 25 Jan 2016 06:56:28 | Armed | | 23 | 86 |
| 329 | 25 Jan 2016 06:56:29 | Trigger | 5 | | 86 |
| 330 | 25 Jan 2016 06:56:35 | Safe | 7 | 24 | 86 |
| 331 | 26 Jan 2016 19:47:51 | Armed | | 24 | 86 |
| 332 | 26 Jan 2016 19:47:58 | Safe | 7 | 24 | 86 |
| 333 | 02 Feb 2016 14:07:52 | Armed | | 23 | 86 |
| 334 | 02 Feb 2016 14:07:54 | Safe | 2 | 24 | 86 |
| 335 | 20 Feb 2016 06:35:31 | Armed | | 26 | 86 |
| 336 | 20 Feb 2016 06:35:33 | Trigger | 5 | | 86 |
| 337 | 20 Feb 2016 06:35:39 | Safe | 8 | 26 | 86 |
| 338 | 25 Feb 2016 05:52:16 | Armed | | 23 | 86 |
| 339 | 25 Feb 2016 05:52:18 | Trigger | 5 | | 86 |
| 340 | 25 Feb 2016 05:52:24 | Safe | 8 | 24 | 86 |
| 341 | 26 Feb 2016 05:46:21 | Armed | | 23 | 86 |
| 342 | 26 Feb 2016 05:46:22 | Trigger | 5 | | 86 |
| 343 | 26 Feb 2016 05:46:28 | Safe | 7 | 24 | 85 |
| 344 | 27 Feb 2016 05:03:48 | Armed | | 26 | 85 |
| 345 | 27 Feb 2016 05:03:51 | Safe | 3 | 25 | 85 |
| 346 | 27 Feb 2016 05:45:23 | Armed | | 25 | 85 |
| 347 | 27 Feb 2016 05:45:24 | Trigger | 5 | | 85 |
| 348 | 27 Feb 2016 05:45:30 | Safe | 7 | 25 | 85 |
| 349 | 02 Mar 2016 10:46:59 | Armed | | 26 | 85 |
| 350 | 02 Mar 2016 10:47:00 | Trigger | 5 | | 85 |

325

| Seq # | Local Time<br>[DD:MM:YYYY hh:mm:ss] | Event<br>[Event Type] | Duration<br>[Seconds] | Temp<br>[Degrees Celcius] | Batt Remaining<br>[%] |
|---|---|---|---|---|---|
| 351 | 02 Mar 2016 10:47:06 | Safe | 7 | 26 | 85 |
| 352 | 03 Mar 2016 07:13:14 | Armed | | 24 | 85 |
| 353 | 03 Mar 2016 07:13:15 | Trigger | 5 | | 85 |
| 354 | 03 Mar 2016 07:13:21 | Safe | 7 | 26 | 85 |
| 355 | 04 Mar 2016 06:44:46 | Armed | | 25 | 85 |
| 356 | 04 Mar 2016 06:44:49 | Trigger | 5 | | 85 |
| 357 | 04 Mar 2016 06:44:55 | Safe | 9 | 25 | 85 |
| 358 | 05 Mar 2016 08:14:34 | Armed | | 26 | 85 |
| 359 | 05 Mar 2016 08:14:35 | Trigger | 5 | | 85 |
| 360 | 05 Mar 2016 08:14:41 | Safe | 7 | 26 | 85 |
| 361 | 09 Mar 2016 09:16:19 | Armed | | 29 | 85 |
| 362 | 09 Mar 2016 09:16:20 | Trigger | 5 | | 85 |
| 363 | 09 Mar 2016 09:16:26 | Safe | 7 | 28 | 84 |
| 364 | 10 Mar 2016 07:12:30 | Armed | | 25 | 84 |
| 365 | 10 Mar 2016 07:12:31 | Trigger | 5 | | 84 |
| 366 | 10 Mar 2016 07:12:37 | Safe | 7 | 26 | 84 |
| 367 | 12 Mar 2016 06:02:04 | Armed | | 25 | 84 |
| 368 | 12 Mar 2016 06:02:05 | Trigger | 5 | | 84 |
| 369 | 12 Mar 2016 06:02:11 | Safe | 7 | 26 | 84 |
| 370 | 17 Mar 2016 06:35:01 | Armed | | 27 | 84 |
| 371 | 17 Mar 2016 06:35:01 | Trigger | 5 | | 84 |
| 372 | 17 Mar 2016 06:35:07 | Safe | 6 | 28 | 84 |
| 373 | 18 Mar 2016 05:51:27 | Armed | | 26 | 84 |
| 374 | 18 Mar 2016 05:51:29 | Trigger | 5 | | 84 |
| 375 | 18 Mar 2016 05:51:34 | Safe | 7 | 27 | 84 |
| 376 | 19 Mar 2016 06:11:54 | Armed | | 22 | 84 |
| 377 | 19 Mar 2016 06:11:55 | Trigger | 5 | | 84 |
| 378 | 19 Mar 2016 06:12:01 | Safe | 7 | 23 | 84 |
| 379 | 23 Mar 2016 06:55:05 | Armed | | 28 | 84 |
| 380 | 23 Mar 2016 06:55:06 | Trigger | 5 | | 84 |

326

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 381 | 23 Mar 2016 06:55:12 | Safe | 7 | 29 | 83 |
| 382 | 31 Mar 2016 06:37:23 | Armed | | 27 | 83 |
| 383 | 31 Mar 2016 06:37:24 | Trigger | 5 | | 83 |
| 384 | 31 Mar 2016 06:37:30 | Safe | 7 | 27 | 83 |
| 385 | 01 Apr 2016 06:38:31 | Armed | | 27 | 83 |
| 386 | 01 Apr 2016 06:38:32 | Trigger | 5 | | 83 |
| 387 | 01 Apr 2016 06:38:38 | Safe | 7 | 28 | 83 |
| 388 | 04 Apr 2016 13:42:37 | Armed | | 26 | 83 |
| 389 | 04 Apr 2016 13:42:40 | Trigger | 5 | | 83 |
| 390 | 04 Apr 2016 13:42:46 | Safe | 9 | 26 | 83 |
| 391 | 09 Apr 2016 14:52:56 | Armed | | 27 | 83 |
| 392 | 09 Apr 2016 14:52:56 | Trigger | 5 | | 83 |
| 393 | 09 Apr 2016 14:53:02 | Safe | 6 | 28 | 83 |
| 394 | 10 Apr 2016 14:34:28 | Armed | | 27 | 83 |
| 395 | 10 Apr 2016 14:34:28 | Trigger | 5 | | 83 |
| 396 | 10 Apr 2016 14:34:34 | Safe | 6 | 28 | 83 |
| 397 | 11 Apr 2016 14:38:53 | Armed | | 28 | 83 |
| 398 | 11 Apr 2016 14:38:54 | Trigger | 5 | | 83 |
| 399 | 11 Apr 2016 14:38:59 | Safe | 6 | 29 | 82 |
| 400 | 16 Apr 2016 14:38:16 | Armed | | 29 | 82 |
| 401 | 16 Apr 2016 14:38:17 | Trigger | 5 | | 82 |
| 402 | 16 Apr 2016 14:38:23 | Safe | 7 | 29 | 82 |
| 403 | 17 Apr 2016 14:36:28 | Armed | | 29 | 82 |
| 404 | 17 Apr 2016 14:36:29 | Trigger | 5 | | 82 |
| 405 | 17 Apr 2016 14:36:34 | Safe | 6 | 28 | 82 |
| 406 | 18 Apr 2016 14:41:44 | Armed | | 29 | 82 |
| 407 | 18 Apr 2016 14:41:45 | Trigger | 5 | | 82 |
| 408 | 18 Apr 2016 14:41:50 | Safe | 6 | 30 | 82 |
| 409 | 19 Apr 2016 14:42:04 | Armed | | 30 | 82 |
| 410 | 19 Apr 2016 14:42:04 | Trigger | 5 | | 82 |

327

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 411 | 19 Apr 2016 14:42:09 | Safe | 5 | 30 | 82 |
| 412 | 24 Apr 2016 14:39:10 | Armed | | 28 | 82 |
| 413 | 24 Apr 2016 14:39:11 | Trigger | 5 | | 82 |
| 414 | 24 Apr 2016 14:39:16 | Safe | 6 | 28 | 82 |
| 415 | 26 Apr 2016 14:59:12 | Armed | | 29 | 82 |
| 416 | 26 Apr 2016 14:59:15 | Trigger | 5 | | 82 |
| 417 | 26 Apr 2016 14:59:22 | Safe | 10 | 29 | 82 |
| 418 | 30 Apr 2016 14:38:22 | Armed | | 28 | 82 |
| 419 | 30 Apr 2016 14:38:22 | Trigger | 5 | | 82 |
| 420 | 30 Apr 2016 14:38:29 | Safe | 7 | 28 | 81 |
| 421 | 03 May 2016 14:46:10 | Armed | | 30 | 81 |
| 422 | 03 May 2016 14:46:11 | Trigger | 5 | | 81 |
| 423 | 03 May 2016 14:46:16 | Safe | 6 | 30 | 81 |
| 424 | 08 May 2016 14:34:40 | Armed | | 28 | 81 |
| 425 | 08 May 2016 14:34:41 | Trigger | 5 | | 81 |
| 426 | 08 May 2016 14:34:48 | Safe | 8 | 29 | 81 |
| 427 | 09 May 2016 14:45:15 | Armed | | 29 | 81 |
| 428 | 09 May 2016 14:45:16 | Trigger | 5 | | 81 |
| 429 | 09 May 2016 14:45:22 | Safe | 7 | 30 | 81 |
| 430 | 14 May 2016 07:19:03 | Armed | | 29 | 81 |
| 431 | 14 May 2016 07:19:04 | Trigger | 5 | | 81 |
| 432 | 14 May 2016 07:19:10 | Safe | 7 | 30 | 81 |
| 433 | 15 May 2016 08:57:07 | Armed | | 35 | 81 |
| 434 | 15 May 2016 08:57:29 | Safe | 22 | 36 | 81 |
| 435 | 21 May 2016 05:59:40 | Armed | | 27 | 81 |
| 436 | 21 May 2016 05:59:41 | Trigger | 5 | | 81 |
| 437 | 21 May 2016 05:59:47 | Safe | 7 | 27 | 81 |
| 438 | 21 May 2016 09:58:20 | Armed | | 30 | 81 |
| 439 | 21 May 2016 09:59:03 | Safe | 43 | 32 | 81 |
| 440 | 22 May 2016 07:24:40 | Armed | | 28 | 81 |

328

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|-------|------|-------|------|------|------|
| 441 | 22 May 2016 07:24:40 | Trigger | 5 | | 81 |
| 442 | 22 May 2016 07:24:46 | Safe | 6 | 29 | 80 |
| 443 | 28 May 2016 05:54:26 | Armed | | 27 | 80 |
| 444 | 28 May 2016 05:54:27 | Trigger | 5 | | 80 |
| 445 | 28 May 2016 05:54:32 | Safe | 6 | 27 | 80 |
| 446 | 03 Jun 2016 06:11:01 | Armed | | 28 | 80 |
| 447 | 03 Jun 2016 06:11:01 | Trigger | 5 | | 80 |
| 448 | 03 Jun 2016 06:11:09 | Safe | 8 | 28 | 80 |
| 449 | 04 Jun 2016 07:04:53 | Armed | | 28 | 80 |
| 450 | 04 Jun 2016 07:04:53 | Trigger | 5 | | 80 |
| 451 | 04 Jun 2016 07:04:58 | Safe | 5 | 29 | 80 |
| 452 | 05 Jun 2016 05:55:47 | Armed | | 27 | 80 |
| 453 | 05 Jun 2016 05:55:48 | Trigger | 5 | | 80 |
| 454 | 05 Jun 2016 05:55:53 | Safe | 6 | 28 | 79 |
| 455 | 10 Jun 2016 06:47:58 | Armed | | 28 | 79 |
| 456 | 10 Jun 2016 06:47:59 | Trigger | 5 | | 79 |
| 457 | 10 Jun 2016 06:48:05 | Safe | 7 | 28 | 79 |
| 458 | 12 Jun 2016 06:59:36 | Armed | | 28 | 79 |
| 459 | 12 Jun 2016 06:59:36 | Trigger | 5 | | 79 |
| 460 | 12 Jun 2016 06:59:42 | Safe | 6 | 28 | 79 |
| 461 | 18 Jun 2016 06:40:20 | Armed | | 28 | 79 |
| 462 | 18 Jun 2016 06:40:21 | Trigger | 5 | | 79 |
| 463 | 18 Jun 2016 06:40:27 | Safe | 7 | 28 | 79 |
| 464 | 19 Jun 2016 06:00:01 | Armed | | 27 | 79 |
| 465 | 19 Jun 2016 06:00:01 | Trigger | 5 | | 79 |
| 466 | 19 Jun 2016 06:00:07 | Safe | 6 | 27 | 78 |
| 467 | 26 Jun 2016 14:26:21 | Armed | | 27 | 78 |
| 468 | 26 Jun 2016 14:26:22 | Trigger | 5 | | 78 |
| 469 | 26 Jun 2016 14:26:28 | Safe | 7 | 27 | 78 |
| 470 | 26 Jun 2016 15:08:04 | Armed | | 32 | 78 |

329

| Seq # | Local Time<br>[DD:MM:YYYY hh:mm:ss] | Event<br>[Event Type] | Duration<br>[Seconds] | Temp<br>[Degrees Celcius] | Batt Remaining<br>[%] |
|---|---|---|---|---|---|
| 471 | 26 Jun 2016 15:08:04 | Trigger | 5 | | 78 |
| 472 | 26 Jun 2016 15:08:10 | Safe | 6 | 31 | 78 |
| 473 | 27 Jun 2016 15:22:36 | Armed | | 30 | 78 |
| 474 | 27 Jun 2016 15:22:37 | Trigger | 5 | | 78 |
| 475 | 27 Jun 2016 15:22:42 | Safe | 6 | 31 | 78 |
| 476 | 02 Jul 2016 15:10:19 | Armed | | 29 | 78 |
| 477 | 02 Jul 2016 15:10:20 | Trigger | 5 | | 78 |
| 478 | 02 Jul 2016 15:10:26 | Safe | 7 | 30 | 78 |
| 479 | 03 Jul 2016 15:13:11 | Armed | | 30 | 78 |
| 480 | 03 Jul 2016 15:13:12 | Trigger | 5 | | 78 |
| 481 | 03 Jul 2016 15:13:17 | Safe | 6 | 30 | 78 |
| 482 | 04 Jul 2016 15:15:37 | Armed | | 30 | 78 |
| 483 | 04 Jul 2016 15:15:37 | Trigger | 5 | | 78 |
| 484 | 04 Jul 2016 15:15:43 | Safe | 6 | 31 | 78 |
| 485 | 08 Jul 2016 15:22:17 | Armed | | 31 | 78 |
| 486 | 08 Jul 2016 15:22:18 | Trigger | 5 | | 78 |
| 487 | 08 Jul 2016 15:22:24 | Safe | 7 | 31 | 77 |
| 488 | 09 Jul 2016 15:16:21 | Armed | | 30 | 77 |
| 489 | 09 Jul 2016 15:16:22 | Trigger | 5 | | 77 |
| 490 | 09 Jul 2016 15:16:28 | Safe | 7 | 30 | 77 |
| 491 | 10 Jul 2016 15:14:24 | Armed | | 30 | 77 |
| 492 | 10 Jul 2016 15:14:24 | Trigger | 5 | | 77 |
| 493 | 10 Jul 2016 15:14:30 | Safe | 6 | 30 | 77 |
| 494 | 10 Jul 2016 16:18:37 | Configuration | | | |
| 495 | 11 Jul 2016 15:12:17 | Armed | | 31 | 77 |
| 496 | 11 Jul 2016 15:12:17 | Trigger | 5 | | 77 |
| 497 | 11 Jul 2016 15:12:23 | Safe | 6 | 31 | 77 |
| 498 | 15 Jul 2016 15:05:26 | Armed | | 33 | 77 |
| 499 | 15 Jul 2016 15:05:26 | Trigger | 5 | | 77 |
| 500 | 15 Jul 2016 15:05:32 | Safe | 6 | 33 | 77 |

330

| Seq # | Local Time<br>[DD:MM:YYYY hh:mm:ss] | Event<br>[Event Type] | Duration<br>[Seconds] | Temp<br>[Degrees Celcius] | Batt Remaining<br>[%] |
|---|---|---|---|---|---|
| 501 | 16 Jul 2016 15:24:31 | Armed | | 31 | 77 |
| 502 | 16 Jul 2016 15:24:32 | Trigger | 5 | | 77 |
| 503 | 16 Jul 2016 15:24:37 | Safe | 6 | 31 | 77 |
| 504 | 18 Jul 2016 14:20:42 | Armed | | 26 | 77 |
| 505 | 18 Jul 2016 14:20:42 | Trigger | 5 | | 77 |
| 506 | 18 Jul 2016 14:20:49 | Safe | 7 | 28 | 76 |
| 507 | 22 Jul 2016 20:02:45 | Armed | | 34 | 76 |
| 508 | 22 Jul 2016 20:02:46 | Safe | 1 | 34 | 76 |
| 509 | 23 Jul 2016 15:08:19 | Armed | | 29 | 76 |
| 510 | 23 Jul 2016 15:08:19 | Trigger | 5 | | 76 |
| 511 | 23 Jul 2016 15:08:25 | Safe | 6 | 29 | 76 |
| 512 | 25 Jul 2016 15:03:07 | Armed | | 30 | 76 |
| 513 | 25 Jul 2016 15:03:08 | Trigger | 5 | | 76 |
| 514 | 25 Jul 2016 15:03:14 | Safe | 7 | 31 | 76 |
| 515 | 30 Jul 2016 15:31:02 | Armed | | 30 | 76 |
| 516 | 30 Jul 2016 15:31:02 | Trigger | 5 | | 76 |
| 517 | 30 Jul 2016 15:31:08 | Safe | 6 | 30 | 76 |
| 518 | 01 Aug 2016 15:20:57 | Armed | | 29 | 76 |
| 519 | 01 Aug 2016 15:20:57 | Trigger | 5 | | 76 |
| 520 | 01 Aug 2016 15:21:03 | Safe | 6 | 29 | 76 |
| 521 | 13 Aug 2016 15:28:36 | Armed | | 31 | 76 |
| 522 | 13 Aug 2016 15:28:36 | Trigger | 5 | | 76 |
| 523 | 13 Aug 2016 15:28:42 | Safe | 6 | 32 | 76 |
| 524 | 14 Aug 2016 15:08:27 | Armed | | 28 | 76 |
| 525 | 14 Aug 2016 15:08:30 | Trigger | 5 | | 76 |
| 526 | 14 Aug 2016 15:08:35 | Safe | 8 | 28 | 76 |
| 527 | 22 Aug 2016 15:20:43 | Armed | | 29 | 76 |
| 528 | 22 Aug 2016 15:20:43 | Trigger | 5 | | 76 |
| 529 | 22 Aug 2016 15:20:49 | Safe | 6 | 30 | 75 |
| 530 | 26 Aug 2016 15:18:42 | Armed | | 29 | 75 |

331

| Seq # | Local Time<br>[DD:MM:YYYY hh:mm:ss] | Event<br>[Event Type] | Duration<br>[Seconds] | Temp<br>[Degrees Celcius] | Batt Remaining<br>[%] |
|---|---|---|---|---|---|
| 531 | 26 Aug 2016 15:18:42 | Trigger | 5 | | 75 |
| 532 | 26 Aug 2016 15:18:48 | Safe | 6 | 29 | 75 |
| 533 | 27 Aug 2016 06:34:48 | Armed | | 28 | 75 |
| 534 | 27 Aug 2016 06:34:48 | Trigger | 5 | | 75 |
| 535 | 27 Aug 2016 06:34:54 | Safe | 6 | 28 | 75 |
| 536 | 28 Aug 2016 06:26:37 | Armed | | 27 | 75 |
| 537 | 28 Aug 2016 06:26:37 | Trigger | 5 | | 75 |
| 538 | 28 Aug 2016 06:26:43 | Safe | 6 | 28 | 75 |
| 539 | 29 Aug 2016 06:39:52 | Armed | | 27 | 75 |
| 540 | 29 Aug 2016 06:39:54 | Trigger | 5 | | 75 |
| 541 | 29 Aug 2016 06:39:59 | Safe | 7 | 27 | 75 |
| 542 | 03 Sep 2016 06:33:21 | Armed | | 27 | 75 |
| 543 | 03 Sep 2016 06:33:21 | Trigger | 5 | | 75 |
| 544 | 03 Sep 2016 06:33:27 | Safe | 6 | 28 | 75 |
| 545 | 04 Sep 2016 06:44:31 | Armed | | 28 | 75 |
| 546 | 04 Sep 2016 06:44:34 | Trigger | 5 | | 75 |
| 547 | 04 Sep 2016 06:44:40 | Safe | 9 | 29 | 75 |
| 548 | 05 Sep 2016 06:29:18 | Armed | | 27 | 75 |
| 549 | 05 Sep 2016 06:29:18 | Trigger | 5 | | 75 |
| 550 | 05 Sep 2016 06:29:24 | Safe | 6 | 28 | 74 |
| 551 | 10 Sep 2016 00:35:00 | Armed | | 30 | 74 |
| 552 | 10 Sep 2016 00:35:01 | Trigger | 5 | | 74 |
| 553 | 10 Sep 2016 00:35:08 | Safe | 8 | 30 | 74 |
| 554 | 12 Sep 2016 22:13:21 | Armed | | 27 | 74 |
| 555 | 12 Sep 2016 22:13:22 | Trigger | 5 | | 74 |
| 556 | 12 Sep 2016 22:13:27 | Safe | 6 | 28 | 74 |
| 557 | 16 Sep 2016 22:14:16 | Armed | | 28 | 74 |
| 558 | 16 Sep 2016 22:14:17 | Trigger | 5 | | 74 |
| 559 | 16 Sep 2016 22:14:23 | Safe | 7 | 28 | 74 |
| 560 | 18 Sep 2016 22:03:17 | Armed | | 28 | 74 |

332

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 561 | 18 Sep 2016 22:03:17 | Trigger | 5 | | 74 |
| 562 | 18 Sep 2016 22:03:23 | Safe | 6 | 28 | 74 |
| 563 | 19 Sep 2016 22:33:20 | Armed | | 28 | 74 |
| 564 | 19 Sep 2016 22:33:30 | Trigger | 5 | | 74 |
| 565 | 19 Sep 2016 22:33:36 | Safe | 16 | 30 | 74 |
| 566 | 08 Oct 2016 22:14:51 | Armed | | 29 | 74 |
| 567 | 08 Oct 2016 22:14:52 | Trigger | 5 | | 74 |
| 568 | 08 Oct 2016 22:14:57 | Safe | 6 | 30 | 73 |
| 569 | 16 Oct 2016 22:19:54 | Armed | | 28 | 73 |
| 570 | 16 Oct 2016 22:19:54 | Trigger | 5 | | 73 |
| 571 | 16 Oct 2016 22:20:00 | Safe | 6 | 28 | 73 |
| 572 | 28 Oct 2016 22:29:20 | Armed | | 28 | 73 |
| 573 | 28 Oct 2016 22:29:21 | Trigger | 5 | | 73 |
| 574 | 28 Oct 2016 22:29:27 | Safe | 7 | 29 | 73 |
| 575 | 06 Nov 2016 21:36:40 | Armed | | 28 | 73 |
| 576 | 06 Nov 2016 21:36:40 | Trigger | 5 | | 73 |
| 577 | 06 Nov 2016 21:36:46 | Safe | 6 | 29 | 73 |
| 578 | 13 Nov 2016 22:12:23 | Armed | | 28 | 73 |
| 579 | 13 Nov 2016 22:12:24 | Trigger | 5 | | 73 |
| 580 | 13 Nov 2016 22:12:30 | Safe | 7 | 28 | 73 |
| 581 | 25 Nov 2016 21:34:29 | Armed | | 27 | 73 |
| 582 | 25 Nov 2016 21:34:30 | Trigger | 5 | | 73 |
| 583 | 25 Nov 2016 21:34:36 | Safe | 7 | 28 | 73 |
| 584 | 26 Nov 2016 22:20:48 | Armed | | 28 | 73 |
| 585 | 26 Nov 2016 22:20:49 | Trigger | 5 | | 73 |
| 586 | 26 Nov 2016 22:20:54 | Safe | 6 | 28 | 73 |
| 587 | 27 Nov 2016 22:06:52 | Armed | | 27 | 73 |
| 588 | 27 Nov 2016 22:06:52 | Trigger | 5 | | 73 |
| 589 | 27 Nov 2016 22:06:58 | Safe | 6 | 28 | 72 |
| 590 | 04 Dec 2016 22:20:46 | Armed | | 28 | 72 |

333

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 591 | 04 Dec 2016 22:20:49 | Trigger | 5 | | 72 |
| 592 | 04 Dec 2016 22:20:55 | Safe | 9 | 28 | 72 |
| 593 | 11 Dec 2016 22:17:58 | Armed | | 28 | 72 |
| 594 | 11 Dec 2016 22:17:58 | Trigger | 5 | | 72 |
| 595 | 11 Dec 2016 22:18:04 | Safe | 6 | 29 | 72 |
| 596 | 13 Dec 2016 08:28:35 | Armed | | 27 | 72 |
| 597 | 13 Dec 2016 08:28:37 | Safe | 2 | 28 | 72 |
| 598 | 13 Dec 2016 09:53:15 | Armed | | 26 | 72 |
| 599 | 13 Dec 2016 09:53:16 | Trigger | 5 | | 72 |
| 600 | 13 Dec 2016 09:53:21 | Safe | 6 | 27 | 72 |
| 601 | 13 Dec 2016 09:53:22 | Armed | | 27 | 72 |
| 602 | 13 Dec 2016 09:53:22 | Trigger | 1 | | 72 |
| 603 | 13 Dec 2016 09:53:23 | Safe | 1 | 27 | 72 |
| 604 | 13 Dec 2016 09:53:24 | Armed | | 27 | 72 |
| 605 | 13 Dec 2016 09:53:24 | Trigger | 1 | | 72 |
| 606 | 13 Dec 2016 09:53:24 | Safe | 0 | 27 | 72 |
| 607 | 13 Dec 2016 09:53:25 | Armed | | 27 | 72 |
| 608 | 13 Dec 2016 09:53:25 | Trigger | 1 | | 72 |
| 609 | 13 Dec 2016 09:53:26 | Safe | 1 | 28 | 72 |
| 610 | 13 Dec 2016 09:55:37 | USB Connected | | | |
| 611 | 13 Dec 2016 10:02:22 | Time Sync | 13 Dec 2016 09:55:39 to 13 Dec 2016 10:02:22 | | |
| 612 | 13 Dec 2016 10:03:03 | Firmware Update | CAM, Rev. 01.026, 7/11/16 | | |
| 613 | 13 Dec 2016 10:03:08 | Firmware Update | FW Bundle, Rev. 04.030, 9/28/16 | | |
| 614 | 13 Dec 2016 10:03:08 | Firmware Update | MC, Rev. 04.030, 9/28/16 | | |
| 615 | 13 Dec 2016 10:03:08 | Firmware Update | LDR, Rev. 04.025, 7/20/16 | | |
| 616 | 13 Dec 2016 10:03:14 | Time Sync | 13 Dec 2016 10:03:14 to 13 Dec 2016 10:03:14 | | |
| 617 | 13 Dec 2016 14:38:31 | Armed | | 29 | 72 |
| 618 | 13 Dec 2016 14:38:32 | Trigger | 5 | | 72 |
| 619 | 13 Dec 2016 14:38:45 | Trigger | 5 | | 72 |
| 620 | 13 Dec 2016 14:38:54 | Safe | 23 | 29 | 72 |

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 621 | 13 Dec 2016 14:44:39 | Armed | | 29 | 72 |
| 622 | 13 Dec 2016 14:44:48 | Safe | 9 | 30 | 72 |
| 623 | 13 Dec 2016 14:44:56 | Armed | | 30 | 72 |
| 624 | 13 Dec 2016 14:45:05 | Safe | 9 | 31 | 71 |
| 625 | 13 Dec 2016 14:45:18 | Armed | | 30 | 71 |
| 626 | 13 Dec 2016 14:45:19 | Trigger | 5 | | 71 |
| 627 | 13 Dec 2016 14:45:26 | Safe | 8 | 31 | 71 |
| 628 | 13 Dec 2016 14:45:37 | Armed | | 31 | 71 |
| 629 | 13 Dec 2016 14:45:38 | Trigger | 5 | | 71 |
| 630 | 13 Dec 2016 14:45:43 | Safe | 6 | 32 | 71 |
| 631 | 13 Dec 2016 14:45:54 | Armed | | 31 | 71 |
| 632 | 13 Dec 2016 14:45:55 | Trigger | 5 | | 71 |
| 633 | 13 Dec 2016 14:46:01 | Safe | 7 | 33 | 71 |
| 634 | 13 Dec 2016 14:48:16 | Armed | | 31 | 71 |
| 635 | 13 Dec 2016 14:48:16 | Safe | 0 | 31 | 71 |
| 636 | 13 Dec 2016 14:48:21 | Armed | | 31 | 71 |
| 637 | 13 Dec 2016 14:48:24 | Safe | 3 | 31 | 71 |
| 638 | 13 Dec 2016 14:48:56 | Armed | | 31 | 71 |
| 639 | 13 Dec 2016 14:48:57 | Trigger | 1 | | 71 |
| 640 | 13 Dec 2016 14:48:58 | Safe | 2 | 31 | 71 |
| 641 | 13 Dec 2016 14:49:03 | Armed | | 31 | 71 |
| 642 | 13 Dec 2016 14:49:04 | Trigger | 3 | | 71 |
| 643 | 13 Dec 2016 14:49:07 | Safe | 4 | 31 | 71 |
| 644 | 13 Dec 2016 14:49:25 | Armed | | 31 | 71 |
| 645 | 13 Dec 2016 14:49:25 | Trigger | 1 | | 71 |
| 646 | 13 Dec 2016 14:49:26 | Safe | 1 | 32 | 71 |
| 647 | 13 Dec 2016 14:49:30 | Armed | | 32 | 71 |
| 648 | 13 Dec 2016 14:49:30 | Trigger | 3 | | 71 |
| 649 | 13 Dec 2016 14:49:33 | Safe | 3 | 32 | 71 |
| 650 | 13 Dec 2016 15:08:21 | Armed | | 30 | 71 |

335

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 651 | 13 Dec 2016 15:08:25 | Trigger | 5 | | 71 |
| 652 | 13 Dec 2016 15:08:31 | Safe | 10 | 31 | 70 |
| 653 | 18 Dec 2016 22:25:43 | Armed | | 25 | 70 |
| 654 | 18 Dec 2016 22:25:43 | Trigger | 5 | | 70 |
| 655 | 18 Dec 2016 22:25:49 | Safe | 6 | 26 | 70 |
| 656 | 31 Dec 2016 05:21:39 | Armed | | 25 | 70 |
| 657 | 31 Dec 2016 05:21:46 | Trigger | 5 | | 70 |
| 658 | 31 Dec 2016 05:21:51 | Safe | 12 | 26 | 69 |
| 659 | 09 Jan 2017 22:24:33 | Armed | | 28 | 69 |
| 660 | 09 Jan 2017 22:24:39 | Trigger | 5 | | 69 |
| 661 | 09 Jan 2017 22:24:45 | Safe | 12 | 28 | 69 |
| 662 | 22 Jan 2017 05:51:24 | Armed | | 23 | 68 |
| 663 | 22 Jan 2017 05:51:25 | Safe | 1 | 24 | 68 |
| 664 | 28 Jan 2017 03:40:26 | Armed | | 23 | 68 |
| 665 | 28 Jan 2017 03:40:26 | Trigger | 5 | | 68 |
| 666 | 28 Jan 2017 03:40:32 | Safe | 6 | 23 | 68 |
| 667 | 28 Jan 2017 23:47:56 | Armed | | 23 | 68 |
| 668 | 28 Jan 2017 23:47:57 | Safe | 1 | 24 | 68 |
| 669 | 28 Jan 2017 23:48:01 | Armed | | 24 | 68 |
| 670 | 28 Jan 2017 23:48:02 | Trigger | 5 | | 68 |
| 671 | 28 Jan 2017 23:48:07 | Safe | 6 | 24 | 67 |
| 672 | 28 Jan 2017 23:48:13 | Armed | | 24 | 67 |
| 673 | 28 Jan 2017 23:48:15 | Safe | 2 | 24 | 67 |
| 674 | 02 Feb 2017 00:26:01 | Armed | | 24 | 67 |
| 675 | 02 Feb 2017 00:26:01 | Trigger | 5 | | 67 |
| 676 | 02 Feb 2017 00:26:07 | Safe | 6 | 24 | 67 |
| 677 | 08 Feb 2017 22:37:24 | Armed | | 27 | 67 |
| 678 | 08 Feb 2017 22:37:24 | Trigger | 5 | | 67 |
| 679 | 08 Feb 2017 22:37:30 | Safe | 6 | 27 | 67 |
| 680 | 10 Feb 2017 03:57:07 | Armed | | 24 | 67 |

336

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 681 | 10 Feb 2017 03:57:08 | Trigger | 5 | | 67 |
| 682 | 10 Feb 2017 03:57:13 | Safe | 6 | 24 | 66 |
| 683 | 10 Feb 2017 21:49:53 | Armed | | 27 | 66 |
| 684 | 10 Feb 2017 21:49:53 | Trigger | 5 | | 66 |
| 685 | 10 Feb 2017 21:49:58 | Safe | 5 | 28 | 66 |
| 686 | 25 Feb 2017 17:27:20 | Armed | | 24 | 66 |
| 687 | 25 Feb 2017 17:27:20 | Trigger | 5 | | 66 |
| 688 | 25 Feb 2017 17:27:25 | Safe | 5 | 24 | 65 |
| 689 | 01 Mar 2017 22:43:46 | Armed | | 26 | 65 |
| 690 | 01 Mar 2017 22:43:47 | Trigger | 5 | | 65 |
| 691 | 01 Mar 2017 22:43:52 | Safe | 6 | 27 | 65 |
| 692 | 11 Mar 2017 20:51:25 | Armed | | 29 | 64 |
| 693 | 11 Mar 2017 20:51:26 | Trigger | 5 | | 64 |
| 694 | 11 Mar 2017 20:51:32 | Safe | 7 | 29 | 64 |
| 695 | 19 Mar 2017 21:46:27 | Armed | | 29 | 64 |
| 696 | 19 Mar 2017 21:46:27 | Trigger | 5 | | 64 |
| 697 | 19 Mar 2017 21:46:33 | Safe | 6 | 29 | 64 |
| 698 | 21 Apr 2017 20:04:29 | Armed | | 27 | 62 |
| 699 | 21 Apr 2017 20:04:30 | Trigger | 5 | | 62 |
| 700 | 21 Apr 2017 20:04:36 | Safe | 7 | 27 | 62 |
| 701 | 23 Apr 2017 20:39:14 | Armed | | 28 | 62 |
| 702 | 23 Apr 2017 20:39:14 | Trigger | 5 | | 62 |
| 703 | 23 Apr 2017 20:39:20 | Safe | 6 | 28 | 62 |
| 704 | 30 Apr 2017 20:28:23 | Armed | | 28 | 61 |
| 705 | 30 Apr 2017 20:28:24 | Trigger | 5 | | 61 |
| 706 | 30 Apr 2017 20:28:29 | Safe | 6 | 29 | 61 |
| 707 | 06 May 2017 19:46:29 | Armed | | 27 | 61 |
| 708 | 06 May 2017 19:46:30 | Trigger | 5 | | 61 |
| 709 | 06 May 2017 19:46:35 | Safe | 6 | 27 | 61 |
| 710 | 12 May 2017 20:47:56 | Armed | | 28 | 61 |

337

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 711 | 12 May 2017 20:48:03 | Trigger | 5 | | 61 |
| 712 | 12 May 2017 20:48:09 | Safe | 13 | 29 | 60 |
| 713 | 14 May 2017 00:54:10 | Armed | | 27 | 60 |
| 714 | 14 May 2017 00:54:12 | Trigger | 5 | | 60 |
| 715 | 14 May 2017 00:54:21 | Trigger | 5 | | 60 |
| 716 | 14 May 2017 00:54:31 | Trigger | 5 | | 60 |
| 717 | 14 May 2017 00:54:37 | Trigger | 5 | | 60 |
| 718 | 14 May 2017 00:54:46 | Trigger | 5 | | 60 |
| 719 | 14 May 2017 00:54:51 | Trigger | 5 | | 59 |
| 720 | 14 May 2017 00:54:59 | Trigger | 9 | | 59 |
| 721 | 14 May 2017 00:55:10 | Safe | 60 | 33 | 59 |
| 722 | 14 May 2017 06:24:47 | USB Connected | | | |
| 723 | 14 May 2017 06:26:28 | Time Sync | 14 May 2017 06:25:04 to 14 May 2017 06:26:28 | | |

338

# Exhibit U - LVMPD's Use of Force Policy and Procedure regarding Electronic Control Devices (ECD)

*Las Vegas Metropolitan Police Department*
*Partners with the Community (Department Manual 5-24-2017)*

Tactical Considerations:

1. There are three types of reportable ECD applications:
   a. Spark Display - A non-contact demonstration of the ECD's ability to discharge electricity.
   b. Touch Stun - A pain compliance application of the ECD without a cartridge intended to gain compliance of a subject or used to complete a circuit by making direct contact with the body after the air cartridge has been expended or removed. Note: Use of the ECD as a pain-compliance tool is discouraged.
   c. Probe Mode - When the ECD cartridge is fired at a subject with the intent that the subject be temporarily immobilized for the period of time the ECD is cycled. Proper application will result in temporary immobilization of the subject and provide the officer a "window of opportunity" in which to take the subject safely into custody.
2. For a frontal shot, reasonable effort should be made to target lower center mass and avoid intentionally targeting the head, neck, groin and chest. It is recognized that the dynamics of each situation and officer safety may not permit the officer to limit the application of the ECD probes to a precise target area. Back shots are the preferred target area when practical.
3. When deploying an ECD, officers will:
   a. Initial use of the ECD shall be a standard five-second cycle, and then the officer will evaluate the need to apply a second five-second cycle after providing the subject a reasonable opportunity to comply. Each subsequent five-second cycle requires separate justification based on the objectively reasonable standard of <u>Graham v. Connor</u>, 490 U.S. 386 (1989). Once the subject has been exposed to three cycles, the ECD shall be deemed ineffective and another use of force option will be considered, unless exigent circumstances exist;
   b. Begin control and restraint procedures, including cuffing under power, as soon as is reasonably safe and practical to do so in order to minimize the total duration of ECD exposure(s). The device user, and those assisting the user, should avoid touching the probes, wires, and the areas between the probes to avoid accidental shock during the electrical discharge;
   c. The use of "touch stun" mode should only be used to supplement Probe Mode to complete the Neuro-Muscular Incapacitation (NMI) effect. The ECD "touch stun" mode requires the same level of justification as probe deployment.

Additional Considerations

Summon medical attention on all use of the ECD, and/or any incident where a subject is injured and/or complains of injury.

Notify a supervisor when ECD has been used (Spark Display, Probe or Touch Stun).

Inform detention personnel an ECD has been used on the subject (Probe or Touch Stun) and ensure they have been screened by the detention facility medical staff.

Any use of ECD on a subject is a reportable Use of Force Report in Blue Team with the only exception being a spark check out of public view. Note: Any accidental discharge of an ECD other than at a subject will be documented on an Officer's Report.

If the subject is thought to be experiencing impaired breathing, they should be placed on their side to reduce the risk of aspiration.

I.   **Use of Canine**

Level of Control:
   Low Level
   Intermediate Force

**Curriculum Vitae**

# Scott A. DeFoe

P.O. Box 4456, Huntington Beach, CA 92605-4456
Cell: 714-655-4280
sdefoe313@msn.com

## Executive Profile

## Expert Witness / Consultant Specialties Include:

| | |
|---|---|
| Police Procedures / Tactics | Use of Force (Lethal and Less Lethal) |
| SWAT | K9 |
| Narcotics | Jail Operations |
| Informants | Police Corruption / Internal Investigation |
| Vehicle Pursuits | Vice |
| Surveillance | Evidence Analysis & Preservation |
| Security | Premise Liability / Forseeability |

## Awards and Commendations

**Purple Heart** (LAPD),
**Medal of Valor** (LAPD)
**Police Star** (LAPD) and over 100 Los Angeles Police Department and citizen commendations.

## Professional Experience

### Consultant / Expert Witness
April 2013 to Present
**On-Scene Consulting Group, LLC.** - Los Angeles, CA
Provide comprehensive service which includes in-depth analysis and investigations with detailed reporting of all findings. Testified as an Expert Witness in pre-trial depositions and in various courts throughout the United States.

### Director of Security
March 2016 to September 2017
**L&R Group of Companies** - Los Angeles, CA
Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments, and projected developments throughout the United States. Conducted all facets of security training to ensure compliance with the Bureau of Security and Investigative Services (BSIS). Ensured compliance with appropriate safety and sustainability regulations for all of the developments in coordination with Human Resources, Legal, and law enforcement to ensure the safety and security of protection of our staff, executives, tenants, and guests.

- Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains.
- Mitigated expected threats. Utilized preplanned coordinated actions in response to infrastructure warnings or incidents.
- Conducted internal investigations and audits.
- Directed the day-to-day management of site security operations for major sites through subordinates to ensure timely delivery of required services and appropriate response to incidents.
- Designed and implemented appropriate security, measures for existing and projected developments.
- Coordinated all security efforts with current practices and procedures.
- Researched and deployed appropriate technology solutions, innovative security management techniques, and other procedures to ensure physical safety of employees, tenants and guests.

# Scott A. DeFoe

Page 2

**Director of Security**
June 2014 to March 2016
**Universal Protection Service** - Los Angeles, CA

Directed supervision of 84 Security Professionals at the City National Plaza. Conducted and or facilitated all Bureau of Security Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis.

- Trained others on Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.
- Conducted ongoing risk and vulnerability assessments of the City National Plaza to include security staffing and deployment, closed circuit television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats.
- Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants.
- Coordinated all security efforts to ensure safety at special events. Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD), Los Angeles Fire Department (LAFD) on an ongoing basis.

**Riverside County Sheriff's Department - Deputy Sheriff (Lateral)** - June 2013 to June 2014
April 2014 to June 2014

Assigned to Jurupa Valley Station Field Deputy Training Program. Conducted all facets of patrol service to include: calls for service, self-initiated field activity, arrests, citations, booking of evidence, and court testimony.

June 2013 to April 2014

Assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a Gang Officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations.

- Provided information to gang detail.
- Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors.
- Attended and certified in RSO Supplemental Jail Operations Core Course and Title XV training prior to deployment at RPDC. Received on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

**Vice President of Security Operations**
June 2010 to April 2013
**Caruso Affiliated** - Los Angeles, CA

Identified and conducted risk and vulnerability assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents.

- Responded to hostilities and identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include: on-site security personnel, local law enforcement, medical and fire rescue and relevant investigative agencies.
- Conducted all facets of security training for the company and employees.
- Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

**Scott A. DeFoe**                                                                 Page 3

**Level I Reserve Police Officer**
June 2010 to March 2016
**Los Angeles Police Department** - Los Angeles, California

Initially assigned to Counter Terrorism from June 2010 through April 2012.  Completed staff projects for the Deputy Chief.

Assigned to the Wilshire Division from April 2012 through March 2016.  Assisted with tactical and shooting training days as an Adjunct Instructor.  Assigned to patrol functions including: responding to calls for service, conducting follow-up investigations, conducting self-initiated law enforcement activities including arrests, booking of arrestees, completing reports and booking of evidence.

- Worked in conjunction with citizens and local businesses in developing crime fighting strategies.
- Provided active shooter training to local businesses.
- Worked in conjunction with Wilshire Detectives and Wilshire Crime Analysis Detail (CAD) to reduce crime.

**Sergeant II+1 Special Weapons and Tactics (SWAT) Supervisor**
August 2005 to June 2010
**Los Angeles Police Department** - Los Angeles, California

Supervised the response and tactical intervention during barricaded subject incidents.  Supervised the coordination and facilitation of high risk warrant services.  Supervised the Crisis Negotiation Team (CNT) during barricaded and suicidal subject incidents.   Developed SWAT's Counter-Terrorism and Training Cadre to include the preparation and submission of federal and state grants for the acquisition of equipment.

- Performed and facilitated all aspects of tactical and crisis negotiation training to federal, state and local law enforcement agencies.
- Responded and trained Mumbai local and state police officers following the 2008 terrorist attack in Mumbai, India.
- Assisted with the development of multi-assault counter-terrorism action capabilities training.
- Completed audits, employee performance reviews, investigative reports and internal investigations.
- Conducted use of force investigations on SWAT incidents and submitted reports to the Officer-in-Charge for his review and approval.
- Testified in court and at administrative hearings.

**Sergeant II+1 Metropolitan Division K9 Platoon**
April 2000 to September 2005
**Los Angeles Police Department** - Los Angeles, California

Supervised and facilitated all facets of K9 training. Ensured that all K9 deployments conformed to the K9 deployment criteria, through training of personnel and supervision of K9 searches.  Functioned as a member on a K9 Search Team when necessary.  Provided on-scene command during critical incidents at Command Posts.

- Completed use of force investigations and K9 contacts.  Submitted all reports to Officer-in-Charge for his review and approval.
- Completed all requisite administrative reports to include audits.
- Testified in court, and at administrative hearings. Wrote 2002 LAPD Metropolitan Division K9 Platoon Manual.

**Scott A. DeFoe**                                                    Page 4

**Sergeant II-77th Division Vice, Officer-in-Charge**
February 1999 to March 2000
**Los Angeles Police Department** - Los Angeles, California
> Supervised investigations involving pimping, pandering, prostitution, bookmaking, gaming, gambling and other vice related activities. Conducted audits and administrative reports. Prepared and served search warrants for the above-mentioned crimes. Supervised twelve undercover officers and six uniformed officers on a daily basis. Worked in conjunction with other Department entities on sensitive investigations.

- Completed rating reports for subordinates assigned to the Unit.
- Conducted use of force investigations, audits, personnel complaints and other administrative tasks.
- Submitted all reports to the Officer-in-Charge for his review and approval.
- Testified in court and at administrative hearings.

**Management Services Division Supervisor-Sergeant**
November 1997 to March 1999
**Los Angeles Police Department** - Los Angeles, California
> Conducted research projects, directives and correspondence at the direction of the Chief of Police. Reviewed staff work by subordinates. Conducted follow-up investigations as required to ensure that policies and procedures were adhered to by all organizational units within the Department. Conducted large scale audits and investigations.

- Served a six-month loan on the Rampart Corruption Task Force investigating and auditing use of force reports.
- Served a six-month loan at Internal Affairs Division, Headquarters Section. Investigated personnel complaints beyond the scope of geographical patrol divisions.
- Staff writer for the 2000 Los Angeles Police Department Manual.

**Hollenbeck Division Special Enforcement Group Officer-in-Charge**
November 1996 to November 1997
**Los Angeles Police Department** - Los Angeles, California
> Provided supervisory oversight of eighteen police officers and detectives during gang investigations, crime suppression and the service of search warrants. Provided all aspects of tactical training to the group. Completed audits, employee ratings and administrative duties.

- Monitored and reviewed gang and narcotic investigations to ensure compliance with Department policy. Conducted use of force investigations.
- Submitted all investigative and administrative reports to the Commanding Officer for his review and approval. Testified in court and at administrative hearings.

**Detective, Wilshire Division**
March 1995 to November 1996
**Los Angeles Police Department** - Los Angeles, California
> Assigned to various areas including: Robbery, Burglary, Auto Theft, Major Assault Crimes (Assaults with Domestic Violence), Homicide and the West Bureau Narcotics Group Field Enforcement Section. Conducted preliminary investigations and follow-up investigations. Interviewed victims and witnesses of crimes and interrogated individuals suspected of committing crimes. Conducted surveillances.

- Filed criminal investigations with the Los Angeles City Attorney's Office and the Los Angeles District Attorney's Office.
- Worked in conjunction with other law enforcement agencies and entities within the Los Angeles Police Department.
- Wrote and served search warrants. Booked evidence related to investigations.
- Trained local businesses and community groups in the areas of safety and security.

**Scott A. DeFoe** Page 5

**Police Officer**
November 1989 to March 1995
**Los Angeles Police Department -** Los Angeles, California
Functioned in numerous roles as a Police Officer I, II, and III to include: Patrol, Field Training Officer (FTO), Detective Trainee, Vice, Special Enforcement Group, Divisional CRASH (gangs) and Operation Central Bureau CRASH (gangs).

- Selected to Specialized Units based on high performance and ability to work well in small cohesive units throughout the Department.
- Testified in court on a multitude of matters. Certified in court as a narcotic, gang, and vice expert.

**Special Agent-Organized Crime Drug Task Force (OCDETF)**
June 1988 to October 1989
**Department of Treasury, United States Customs Service -** San Francisco, California. Special Agent assigned to a multi-agency narcotics task force. Investigated major suppliers of narcotics and dangerous drugs who were engaged in illegal activities on an organized and commercial basis in an undercover capacity.

- Prepared and served search warrants. Worked in conjunction with the Assistant United States Attorney in San Francisco. Testified in Federal Court and at Asset Forfeiture Hearings.

**United States Army Reserve**
June 1983 to June 1989
Honorable Discharge as E-4. Military Occupational Skill (MOS)-72E-Combat Infantry Communications

**Training (Received and Provided Training):**
Weapons Training/Qualification on Monthly Basis-M-4, MP-5, Benelli Shotgun, Kimber/.45/1911, Remington 870 Shotgun, Glock, Force Option Simulator (Quarterly). Quarterly mandatory weapons certification from November 1989 to June 2010.

**Additional Training/Certification(s):** (11/1989-06/2010)

**Supervisor Training:**
Incident Command System 100-800
Sexual Harassment Training for Supervisors
Career Development for Supervisors
Standards Based Assessments for Supervisors
Supervisors Consent Decree Training
Vehicle Pursuit Policy Supervisor Training
Watch Commander School Retaliation Training
RMIS TEAMS II (Non-Categorical Use of Force Supervisor Training)
Ethics in Law Enforcement
Career Survival Workshops
Problem Oriented Policing and the SARA Model
Cultural Diversity Tools for Tolerance
Instructor Development Course (IDC)
Officer Involved Shootings Administrative Investigations Training
Prop 115-Hearsay Evidence Training
Managing Workplace Conflict CLETS-NCIC
Racial Profiling
West Point Leadership School for Supervisors
Basic Supervisor School

**HAZMAT Training:**
Advanced Chemical and Biological Integrated Response, LAFD Hazardous Materials Technical Specialist (A-D)-Certified HAZMAT Technician, Technical Emergency Response Training, Law Enforcement Protective Measures.

**Scott A. DeFoe**                                                            Page 6

**Crisis Negotiations/Mental Health Training:**
Hostage Negotiations - Advanced, Behavioral Sciences Services Section
Officer-Involved Shooting/Barricaded Subject Services Debriefs
Crisis Negotiation Training and Curriculum Development for West Point Military Academy
Didi Hirsch Suicide Prevention Training (Volunteered and Supervised on an ongoing basis)
Mood Disorders/Post Traumatic Stress Disorder Training, Communicating with People with Disabilities
Mental Health Introduction MEU-SMART Orientation
Mental Illness Update
Drug Recognition Expert Training and Certification
Under the Influence-11550 Health and Safety Code Training
Institute for the Prevention of In-Custody Deaths Training on Recognizing Agonal & Other Breathing Problems
(2015). Attended and facilitated LAPD CNT 40-Hour Course
Attended FBI Basic Crisis Negotiation Course

**Tactical Training:**
Crowd Management Control, Search and Arrest Warrant Tactics
Less than Lethal Use of Force Training and Certification TASER MX-26, X-26 Train the Trainer
(Trainer/Instructor Certification)
Tactics Against Hostile Dogs
End of Pursuit Tactics Overview
Communication-Keeping Your Edge
Crowd Management and Control
Immediate Action Rapid Deployment
Arrest and Control Trainer Certification
Animal Shootings
Mobile Field Force Supervisor Train the Trainer
Officer Survival-Shooting
Personal Protective Equipment (PPE)
Pursuit Intervention Techniques for Supervisors
Baton/Impact Weapon
Advanced Canine Supervisor Course
Basic Metro School
Collapsible Baton
Officer Safety Field Tactics
Mobile Field Force Training
Narcotics/Tactical Entry Update
Field Training Officer Update
Standard Emergency Management System (SEMS)
CPR-First Aid Recertification
Basic Arrest and Control Techniques
Driver Awareness Training
Undercover Operations
Interrogation Techniques
VICE School
37mm Baton Round Training
Civil Unrest Response Training
Hobble Training
Advanced Field Officer Course, Oleoresin Capsicum (OC) Gas Training
Search Warrant Counter Measures
Riverside Sheriff's Department Jail Operations Course to include Title XV

**Scott A. DeFoe**                                                     Page 7

**Detective Training:**

Basic Detective School
Juvenile Procedures School
Association of Threat Assessments Professionals (ATAP) Training
Workplace Investigative Training
LAPD Narcotics School
POST Investigative and Interrogation Course
POST Cognitive & Statement Analysis Training Course
Special Investigative Section Surveillance Training

**California Peace Officer Standards and Training (P.O.S.T.) Commission: Basic, Intermediate, Advanced and Supervisory Certificates.**

**Outside Training:**

Dale Carnegie 12-week Public Speaking School
Americans for Effective Law Enforcement (AELE) Certified Litigation Expert Courses
Use of Force By The Numbers: 4, 8, 14 (Institute for the Prevention of In-Custody Deaths-IPICD)
California Specialized Training Unit Hazardous Materials First Responder Operations Weapons of Mass Destruction Law Enforcement Field Support Course
Louisiana State University Screening of Persons by Observational Techniques (SPOT)
Subconscious Communication for Detecting Danger by International Academy for Linguistics and Kinesics
Department of Homeland Security WMD Radiological/Nuclear Course of Hazardous Materials Technicians
UNLV WMD Radiological/Nuclear Awareness Train The Trainer Course, FEMA Advanced Chemical and Biological Integrated Response Course Mobile Training Event
FEMA WMD Law Enforcement Threat
Hazard Recognition, and Emergency Actions Training
CSTI Technician/Specialist 1A-D, DHS WMD Tactical Commander Management and Planning
Licensed California Private Investigator (License No. 29151)
Certified California Criminal Defense Investigator.

**Associations**

California Association of Licensed Investigators
Peace Officers Association of Los Angeles County (POALAC)
Americans for Effective Law Enforcement (AELE)
California Crime Prevention Officers Association
International Association in Crime Prevention Partners
California Peace Officers Association

**Education**

**Master of Legal Studies**, 2018 to Present
**Pepperdine Law School** - Malibu, California, United States

**Master of Arts: Public Administration**, 1998
**California State University** - Long Beach, California, United States

**Bachelor of Science: Criminal Justice**, 1988
**Northeastern University** - Boston, Massachusetts, United States

Exhibit 2 – Smock CV

# CURRICULUM VITAE

## William Spafford Smock, M.S., M.D.

**Date Prepared:**       April 2018

**Address:**       Office of the Police Surgeon
Louisville Metro Police Department
633 West Jefferson Street
Louisville, KY  40202
502-574-7080 – office
502-574-7415 – fax

The Institute of Clinical Forensic Medicine and Nursing
4157 Gap Hollow Road
New Albany, IN  47150
812-949-4994 - office

**Place of Birth:**       Louisville, Kentucky

## Academic and Professional Appointments:

| | |
|---|---|
| Chair, Medical Advisory Committee, Training Institute on Strangulation Prevention, San Diego, California | 2014 - to date |
| National Advisory Team, Training Institute on Strangulation Prevention, San Diego, California | 2014 - to date |
| Medical Director, Forensic Services Program, Norton Healthcare, Louisville, Kentucky. | 2014 - 2017 |
| Clinical Professor, EMS Division, Department of Emergency Medicine, University of Louisville School of Medicine, Louisville, Kentucky | 2014 – to date |
| Medical Director, WaterStep, Louisville, Kentucky. | 2012 - to date |
| Clinical Professor, Department of Emergency Medicine, University of Louisville School of Medicine, Louisville, Kentucky. | 2011 - to date |
| Adjunct Professor, University of Louisville School of Nursing, Louisville, Kentucky. | 2010 - 2011 |
| Police Surgeon, St. Matthews Police Department, St. Matthews, Kentucky. | 2010 - to date |
| Fire Surgeon, Jeffersontown Fire Protection District, Jeffersontown, Kentucky. | 2008 - to date |
| Police Surgeon, Jeffersontown Police Department, Jeffersontown, Kentucky. | 2008 - to date |

1

| | |
|---|---|
| Division Chief, Division of Protective Medicine, Department of Emergency Medicine, University of Louisville, Kentucky. | 2006 - 2010 |
| Medical Director, Paoli Peaks Ski Patrol, Paoli, Indiana. | 2005 - 2014 |
| Professor, Department of Emergency Medicine, University of Louisville School of Medicine, Louisville, Kentucky. | 2005 - 2011 |
| Tactical Physician, Fugitive Task Force, United States Marshal Service, Western District of Kentucky. | 2004 - 2012 |
| Medical Advisor, Louisville Division, Federal Bureau of Investigation. | 2003 - 2013 |
| Associate of Pathology and Laboratory Medicine, University of Louisville School of Medicine. | 2003 - 2011 |
| Medical Director, University of Louisville Hospital Sexual Assault Nurse Examiner Program. | 2002 - 2009 |
| Instructor, Louisville Metro Police Academy, Louisville, Kentucky | 2002 – to date |
| Associate Professor, Department of Emergency Medicine, University of Louisville School of Medicine, Louisville, Kentucky. | 1999 - 2005 |
| Consultant/Reviewer, Kentucky Board of Medical Licensure, Louisville, Kentucky. | 1999 - 2006 |
| Research Assistant Professor of Military/Emergency Medicine, Uniformed Services University of the Health Sciences, Bethesda, Maryland. | 1998 - 2007 |
| Forensic Consultant, Office of the Chief Medical Examiner, Kentucky Medical Examiner's Office, Louisville, Kentucky. | 1997 - to date |
| Tactical Physician and Detective, Floyd County Sheriff's Department, New Albany, Indiana. | 1996 - to date |
| Director, Tactical Medicine Program, Department of Emergency Medicine, University of Louisville School of Medicine. | 1994 - 2011 |
| Research Director, Department of Emergency Medicine, University of Louisville School of Medicine, Louisville, Kentucky. | 1995 - 1997 |
| Assistant Professor, Department of Emergency Medicine, University of Louisville, University of Louisville School of Medicine, Louisville, Kentucky. | 1994 - 1999 |
| Staff physician, Kosair Children's and Norton Hospitals, Louisville, Kentucky. | 1994 - 2010 |

009

| | |
|---|---|
| Director, Clinical Forensic Medicine Training Program, Department of Emergency Medicine, University of Louisville School of Medicine. | 1993 - 2011 |
| Tactical Physician and Police Surgeon, Louisville Metro Police Department, Louisville, Kentucky. | 1993 - to date |
| Assistant Medical Examiner, Office of the Chief Medical Examiner, Kentucky Medical Examiner's Office, Louisville, Kentucky. | 1991 - 1997 |
| Staff emergency department physician, Tri-County Baptist Hospital, Lagrange, Kentucky. | 1992 - 2001 |

**Education:**

| | |
|---|---|
| Centre College, Danville, Kentucky, B.S. | 1977 - 1981 |
| University of Louisville School of Medicine Department of Anatomy, M.S. | 1983 -1987 |
| University of Louisville School of Medicine, M.D. | 1986 -1990 |

**Internship:**

Department of Emergency Medicine, University of Louisville Affiliated Hospitals
Louisville, Kentucky.                                                                                      1990 - 1991

**Residency:**

Emergency Medicine, Department of Emergency Medicine, University of Louisville
Hospital, Louisville, Kentucky.                                                                     1991 - 1993

**Fellowship:**

Clinical Forensic Medicine, Department of Emergency Medicine and the Kentucky
Medical Examiner's Office/Division of Forensic Pathology, Department of Pathology,
University of Louisville School of Medicine, Louisville, Kentucky.          1993 - 1994

**Fellows Trained:**

| | |
|---|---|
| John Simic, M.D., University of California at Los Angles, | 1996 - 1997 |
| Clare McCarthy, M.D., Georgetown University, | 1998 - 1999 |
| Mary Ryan, M.D., University College of Dublin, Ireland, | 1999 - 2000 |

**Licensure and Certification:**

| | |
|---|---|
| Private Pilot (4/77), Instrument Rating (12/14), Remote Pilot (11/17), Federal Aviation Administration | 1977 - to date |
| Physician, Commonwealth of Kentucky, Number 28065, Exp. 3/1/19 | 1991 - to date |
| Physician, State of Indiana, Number 01059358A, Exp. 10/31/19 | 2004 - to date |
| Diplomate, American Board of Emergency Medicine, Certification # 930263 | 1994 - 2004 |
| | 2004 - 2014 |
| Advanced Cardiac Life Support, American Heart Association. | 1991 – 2012 |

3

|  |  |
|---|---|
| | 2017 - 2019 |
| Pediatric Advanced Life Support, American Heart Association. | 1991 - 2012 |
| | 2017 - 2019 |
| Advanced Trauma Life Support, American College of Surgeons. | 1989 - 2012 |
| | 2018 - 2022 |
| National Ski Patrol, Alpine Patroller | 2009 - 2016 |
| Private Pilot, Kenya Civil Aviation Authority | 2012 - 2014 |

**Fellow Status:**

| | |
|---|---|
| American Academy of Emergency Medicine | 1994 - 2014 |
| American College of Emergency Physicians | 1996 - 2014 |

**Professional Societies:**

| | |
|---|---|
| American Academy of Emergency Medicine | 1993 - to date |
| American Academy of Forensic Sciences | 1990 - to date |
| American College of Emergency Physicians | 1990 - to date |
| American Medical Association | 1990 - 2011 |
| Association for the Advancement of Automotive Medicine | 1983 - to date |
| Greater Louisville Medical Society | 1990 - to date |
| International Association of Chiefs of Police | 2011 - to date |
| Kentucky Medical Association | 1990 - to date |
| National Ski Patrol, 222776 | 2005 - 2016 |
| National Tactical Officers Association | 1997 - 2016 |
| Society for Academic Emergency Medicine | 1990 - 2010 |
| Society of Automotive Engineers | 1998 - to date |

**Founding Memberships:**

| | |
|---|---|
| American Academy of Emergency Medicine | 1993 |

**Editorial Boards:**

| | |
|---|---|
| Editorial Advisory Board, International Tactical EMS Association, Farmington, Michigan. | 1998 - 2006 |
| International Editorial Board, Journal of Clinical Forensic Medicine, London, England. | 1993 - 2003 |

**Advisory Boards, Councils and Committees:**

| | |
|---|---|
| Strangulation Task Force, International Association of Forensic Nurses | 2015 - 2016 |
| Training Institute on Strangulation Prevention, Chair, Medical Advisory Committee | 2014 - to date |
| Supplies Over Seas, Board of Directors, Louisville, Kentucky | 2012 - to date |
| International Advisory Board, Indian Association of Medicolegal Experts, 2nd International Conference on Recent Advances in Forensic Sciences, Forensic Medicine & Toxicology, Gao, India | February 2011 |

011

Forensic Nursing Certification Board, International Association of Forensic
Nursing                                                                    2010 - 2012

Kentucky Tactical Officers Association, TEMS Chair, Board of Directors 2008 - 2010

Centers for Disease Control and Prevention, Public Health/Law
Enforcement Emergency Preparedness Workgroup                                2007 - 2008

New Albany, IN Township Fire Protection District, Board of Trustees      2007 - to date

Supporting Heroes, Board of Directors, Louisville, Kentucky                2010 - 2014
                                                                           2006 - 2009

Sexual Assault Response Team Advisory Committee, Cabinet for Health and Family
Services, Frankfort, Kentucky.                                              2005- 2012

Transportation Research Board, NCHRP Project Panel SP20-59(22), Washington, D.C.
                                                                           2005 - 2009

Governor's Exercise Task Force, Kentucky Office of Homeland
Security                                                                    2005 - 2006

Louisville/Jefferson County Metro Government Citizens Corps Council      2003 - 2011

Domestic Violence Prevention Coordinating Council, Louisville
Metro Government                                                            2003 - to date

Kentucky Statewide Bioterrorism Advisory Committee                        2003 - 2008

Executive Committee, Joint Terrorism Task Force, Louisville Division F.B.I.
                                                                           2003 - 2010

Mayors Sexual Assault Task Force, Co-Chair, Office of the Mayor,
Louisville, Kentucky.                                                       2001 - 2010

Kentucky Injury Prevention and Research Center, Lexington, Kentucky.     2001 - 2004

Gun Violence Task Force, Office of the Mayor, Louisville, Kentucky.       1999 - 2001

Louisville and Jefferson County Crisis Group, and Chair of Medical
Subcommittee, Louisville office of the Federal Bureau of Investigation
and Louisville Metro Government.                                            1998 - 2011

Rural/Metro Ambulance Service
Paramedic Course, Alternate Medical Director                               1998 - 2001

Domestic Violence Mortality Review Board, Louisville Metro Government
                                                                           1997 - to date

5

012

American Medical Association
National Advisory Council on Family Violence                          1996 - 2001

Kentucky Medical Association
Domestic Violence Sub-Committee                                       1996 - to date

American College of Emergency Physicians, Kentucky Chapter:
    -Councilor                                    1993 - 1995
    -Vice President                               1994 - 1996
    -Alternate Councilor                          1995 - 1997
    -President                                    1996 - 1998
    -Chair, Safety/Transportation Committee       1999 - 2004

Greater Louisville Medical Society:                                   1990 - to date
    -Mini-internship Committee                    1992 - 2002
    -EMS/Public Safety/Disaster Preparedness Committee   1997 - 2005
        -Chair                2008 - 2011

Advisory Board, Child Advocacy Center, Louisville, Kentucky           1990 - 1995
Jefferson County, KY Seat Belt Coalition                              1990 - 1992

Kosair Children's Hospital, Trauma Service Committee                  1990 - 2002

Mothers Against Drunk Driving, Louisville Chapter:  Board of Advisors   1987 - 1992

University of Louisville Hospital:
    -Safety Committee                             1994 - 2007
    -Trauma QA Committee                          1995 - 2006
    -Life-Safety Sub-Committee                    1997 - 2006
    -Disaster Preparedness Task Force             2002 - 2009

University of Louisville School of Medicine:
    -Faculty Forum                                1995 - 2001
        -Secretary            1999 - 2000
        -Co-Chair             2000 - 2001
    -Academic Grievance Committee                 1997 - 1999
        -Chair                1997 - 1999
    -GEMS Admission's Committee                   2004 - to date

**Text Book Editor:**
Up to Date:  2007 - 2012:  http://www.UptoDate.com:  Radiation Emergencies Section Editor

Forensic Emergency Medicine, Eds. Olshaker, Jackson, and **Smock**, Lippincott, Williams & Wilkins, 2nd Edition, 2006.

Forensic Medicine:  Clinical and Pathological Aspects.  Eds.  Payne-James, Busuttil and **Smock,** Greenwich Medical Media, Ltd.  London, 2003.

Forensic Emergency Medicine, Eds. Olshaker, Jackson, and **Smock**, Lippincott, Williams & Wilkins, 2000.

**Text Book Reviewer:**

Tactical Medicine Essentials, American College of Emergency Physicians, Jones and Bartlett, 2010

The Textbook of Tactical Medicine, Simon and Schuster, 1998.

**Journal/Protocol Reviewer:**

Secure Digital Forensic Imaging, Adult Non-Fatal Strangulation Photo Documentation Protocol 2018,                                                                                            2017

Secure Digital Forensic Imaging, Pediatric Non-Fatal Strangulation Protocol 2017,          2017

Secure Digital Forensic Imaging, Adult Non-Fatal Strangulation Photo Documentation Protocol 2016,                                                                                            2016

Society of Academic Emergency Medicine,                                              2015

**Honors and Awards:**

Distinguished Alumni Award, Centre College, Danville, Kentucky                    October 2017

"Top Doc" Emergency Medicine, Louisville Magazine, Louisville, Kentucky          August 2015

Benefactor Award, Kentucky Women Law Enforcement Network, Bowling Green, Kentucky
                                                                                November 2013

"Top Doc" Emergency Medicine, Louisville Magazine, Louisville, Kentucky          August 2011

Service Recognition Award, National Ski Patrol and Paoli Peaks Ski Patrol, Paoli, Indiana
                                                                                November 2010

Achievement Award, International Association of Forensic Nurses, 18th Scientific Assembly, Pittsburgh, Pennsylvania                                                         October 2010

"Top Doc" Emergency Medicine, Louisville Magazine, Louisville, Kentucky          July 2009

Meritorious Service Award, Floyd County Sheriff's Office, New Albany, Indiana March 2009

Hero's Supporting Hero's Award, Supporting Hero's Foundation, Louisville, Kentucky
                                                                                March 2009

"2008 Nolen C. Allen Man of Distinction Award", Center for Women and Families, Louisville, Kentucky                                                                       September 2008

Meritorious Unit Citation, SWAT, Louisville Metro Police Department. Louisville, Kentucky
                                                                                April 2008

014

Outstanding Service Award, New Albany Police Department, New Albany, Indiana April 2008

"Top Doc" Emergency Medicine, Louisville Magazine, Louisville, Kentucky       July 2007

Outstand Faculty Award, CONTOMS EMT-Tactical Program, Bureau of Protective Medicine, Federal Protective Service, Department of Homeland Security, Washington, D.C.  April 2007

Distinguished Community Service Award, Louisville Metro Police Department. Louisville, Kentucky                                                            March 2007

Sexual Assault Awareness Month Award (SAAMy), Kentucky Association of Sexual Assault Programs, Commonwealth of Kentucky. Lexington, Kentucky            February 2007

Alpha Omega Alpha, Louisville Chapter, University of Louisville School of Medicine. Louisville, Kentucky                                                          May 2006

Honorable Order of Kentucky Colonels, Frankfort, Kentucky            May 2005

The Minty Prize of the Medico-Legal Society, Forensic Medicine: Clinical and Pathological Aspects. The Society of Authors and The Royal Society Book Awards, London, England    2003

President's Award for Distinguished Service, University of Louisville, Louisville, Kentucky                                                            April 2003

Dedication Award, Kentucky State Police Traffic Reconstruction Seminar       October 2002

Exceptional Merit Citation, Louisville Division of Police. Louisville, Kentucky    March 2002

Meritorious Unit Citation, SWAT, Louisville Division of Police. Louisville, Kentucky                                                            March 2001

Colonel Aide De Camp, Commissioner's Staff, Kentucky State Police, Frankfort, Kentucky.                                                            November 1997

Vision Award, The International Association of Forensic Nurses, Third Annual Scientific Assembly of Forensic Nursing, Louisville, Kentucky                   October 1995

Second place award, "Practical Applications of Clinical Forensic Medicine in the Emergency Department", Physicians'-In-Training Competition, Southern Medical Association, New Orleans, Louisiana                                                        October 1993

Second place award, "The Forensic Evaluation of Gunshot Wounds in the Emergency Department", section on Emergency Medicine, Physicians'-In-Training Competition, Southern Medical Association, San Antonio, Texas                                   October 1992

Second place award, Clinical Pathology Conference, Society for Academic Emergency Medicine, Toronto, Canada                                                     May 1992

Honors Surgery Program, Department of Surgery, University of Louisville School of Medicine,
Louisville, Kentucky                                                              June 1989

First prize, student research paper, "The Forensic Pathologist and the Determination of Driver versus
Passenger in Motor Vehicle Collisions", Department of Pathology, University of Louisville
School of Medicine, Louisville, Kentucky                                          May 1988

Leslie Randolph Boyd Civic Service Award. Centre College, Danville, Kentucky  May 1980

**Continuing Education:**
Strangulation Prevention and Intervention Course, Clinical Forensic Medicine Service, Canberra
Hospital, Canberra, Australia                                                     March 2018

Advanced Trauma Life Support, American College of Surgeons                        February 2018

Force Science Institute Certification Course, Orlando, Florida                    December 2017

2017 Kentucky Statewide Trauma and Emergency Medicine Symposium                   October 2017

Advanced Cardiac Life Support, American Heart Association                         June 2017

Pediatric Advanced Life Support, American Heart Association                       June 2017

Family Justice Conference, Milwaukee, Wisconsin                                   April 2017

Grand Rounds, TriStar Centennial Medical Center, Nashville, Tennessee             March 2017

8th Annual Southwest Trauma and Acute Care Symposium, Arizona Trauma Association,
Scottsdale, Arizona                                                               November 2016

National Conference on Correctional Health Care, Las Vegas, Nevada                October 2016

International Association of Chiefs of Police, San Diego, California               October 2016

Royal College of Pathologists of Australasia, Sydney, Australia                   September 2016

2016 FAMSACA Symposium, Sydney, Australia                                         September 2016

24th Annual Scientific Assembly, International Association of Forensic Nurses, Denver, Colorado
                                                                                 September 2016

Annual Delaware Trauma Symposium 2016, Wilmington, Delaware                       May 2016

2016 Child Abuse Summit, Driscoll Children's Hospital, Corpus Christi, Texas       April 2016

11th Annual Conference on Crimes Against Women, Dallas, Texas                      April 2016

016

International Conference on Sexual Assault, Domestic Violence, and Engaging Men & Boys, End
Violence Against Women International, Washington, DC                    March 2016

What Paramedics Need to Know About Strangulation, Training Institute on Strangulation Prevention,
San Diego, California.                                        November 2015

23rd Annual Scientific Assembly, International Association of Forensic Nurses, Orlando, Florida
                                                        October 2015

International Association of Chiefs of Police, Chicago, Illinois          October 2015

"Reconstruction and Analysis of Rollover Crashes of Light Vehicles": Society of Automotive
Engineers, Detroit, Michigan                                 April 2015

Advanced Roadside Impaired Driving Enforcement (A.R.I.D.E), National Highway Traffic Safety
Administration, Kentucky Law Enforcement Training Council          February 2015

22st Annual Scientific Assembly, International Association of Forensic Nurses, Phoenix, Arizona
                                                        October 2014

7th Annual Forensic Investigations Conference, Kansas City, Kansas       May 2014

Conference on Crimes Against Women, Dallas, Texas                   April 2014

2nd Navajo Area Sexual Assault Response Team Training Conference, Navajo Nation Museum,
Window Rock, Arizona                                        March 2014

Shooting Reconstruction Course, San Diego Police Department Range, San Diego, California
                                                        February 2014

10th Rio Grande Valley Seminar in Forensic Sciences, Valley Baptist Medical Center, South Padre
Island, Texas                                               November 2013

21st Annual Scientific Assembly, International Association of Forensic Nurses, Anaheim, California
                                                        October 2013

Second International Workshop in Clinical Forensic Medicine, University of Montpellier,
Montpellier, France                                          May 2013

6th Annual Forensic Investigations:  Sexual Assault, Domestic Violence, Child and Elder
Abuse…from Scene to Courtroom, St. Luke's Hospital of Kansas City, Kansas City, Missouri
                                                        May 2013

Tropical Medicine Expeditions for Healthcare Professionals in East Africa, Uganda February 2013

Global Missions Health Conference, Louisville, Kentucky               November 2012

20th Annual Scientific Assembly, International Association of Forensic Nurses, Puerto Rico

10

October 2012

National Strangulation Training Institute, Train the Trainer Strangulation Course, San Diego,
California                                                                        August 2012

National Strangulation Training Institute, Developing your Strangulation Expert Course, San Diego,
California                                                                        August 2012

Annual Trauma Conference, Southwest Texas Regional Advisory Council for Trauma, South Padre
Island, Texas                                                                    March 2012

Injuries, Anatomy, Biomechanics and Federal Regulations, Society of Automotive Engineers,
Norwalk, California                                                              January 2012

19th Annual Scientific Assembly, International Association of Forensic Nurses, Montreal, Canada
                                                                                 October 2011

International Association of Chiefs of Police, Chicago, Illinois                  October 2011

Justice Rapid Response Certification Training, Institute for International Criminal Investigations,
Madeira, Portugal                                                                September 2011

19th World Meeting of International Association of Forensic Sciences, World Police Medical Officers
and Mediterranean Academy of Forensic Sciences, Madeira, Portugal                September 2011

New England Seminar in Forensic Sciences, Colby College, Waterville, Maine       August 2011

American Academy of Emergency Medicine, Orlando, Florida                         March 2011

Kentucky Tactical Officer's Association, Frankfort, Kentucky                      November 2010

18th Annual Scientific Assembly, International Association of Forensic Nurses, Pittsburgh,
Pennsylvania                                                                      October 2010

European Science Foundation, Conference on Violations of Human Rights and Humanitarian Law,
Linkoping, Sweden                                                                May 2010

American Academy of Forensic Sciences, Seattle, Washington                       February 2010

Robert F. Borkenstein Course on Drugs and Highway Safety:  Testing, Research and Litigation,
Indiana University, Bloomington, Indiana                                          April 2009

American Academy of Forensic Sciences, Denver, Colorado                          February 2009

Robert F. Borkenstein Course on Alcohol and Highway Safety:  Testing, Research and Litigation,
Indiana University, Bloomington, Indiana                                          May 2008

American College of Emergency Physicians 2007 Scientific Assembly, Seattle, Washington.

September 2007

Tactical Operations in the Hazardous Environment, National Tactical Officer's Association Annual Conference, Los Angeles, California                                      September 2006

WMD Tactical Commander Course, Performance Level, National Center for Biomedical Research & Training Academy of Counter-Terrorist Education Course, Louisiana State University

February 2006

27th International Disaster Management Conference, Florida Chapter, American College of Emergency Physicians, Orlando, Florida                                      February 2006

Methamphetamine Investigation Management Workshop, Department of Justice Training, Louisville, Kentucky                                      January 2006

2nd Rio Grande Valley Seminar in Forensic Sciences, Valley Baptist Medical Center, South Padre Island, Texas                                      November 2005

Advanced Tactical Operations, National Center for Biomedical Research and Training, Louisiana State University, Louisville, Kentucky                                      September 2006

Roles of Health Professionals in the Early Response to Terrorism:  Biological, Chemical and Radiation Hazards, Louisville, Kentucky                                      September 2005

International Tactical Emergency Medicine Conference, San Diego, California     September 2005

Hazardous Materials Technician, Medical Assistance and Tactical Team, Louisville, Kentucky

January 2005

2004 Kentucky-Indiana Judicial Colloquium on Homeland Security and Emergency Health Powers, Kentucky Court of Justice and The Center for Public Health Law Partnerships, University of Louisville, Louisville, Kentucky                                      December 2004

1st Rio Grande Valley Seminar in Forensic Sciences, Valley Baptist Medical Center, South Padre Island, Texas                                      November 2004

Weapons of Mass Destruction Tactical Operations Course, Louisiana State University, Louisville, Kentucky                                      October 2004

Ohio Chapter, ACEP, Emergency Medicine Review Course, Columbus, Ohio     September 2004

8th International Conference on Tactical Emergency Medical support, Washington, D.C., June 2004

Emergency Health Powers Task Force, University of Louisville Department of Emergency Medicine, Louisville, Kentucky                                      March 2004

Tactical EMS 2003 Conference and Exposition, Dallas, Texas                    October 2003

12

30th Annual New England Seminar in Forensic Sciences, Colby College, Waterville, Maine
August 2003

Tactical Operations in the Hazardous Environment, National Tactical Officer's Association Annual
Conference, Houston, Texas
September 2002

Medical Planning and Care in Radiation Accidents, REAC/TS, Oak Ridge, Tennessee
September 2002

29th Annual New England Seminar in Forensic Sciences, Colby College, Waterville, Maine
August 2002

6th International Conference on Tactical Emergency Medical Support, Las Vegas, Nevada
June 2002

First National Conference on Medical Care and Domestic Violence, University of Texas,
Southwestern, Dallas, Texas
April 2002

Handling of Radiation Accidents by Emergency Personnel, REAC/TS, Oak Ridge, Tennessee
April 2002

Child Physical and Sexual Abuse:  Making Forensic Medicine Work for Children. Louisville,
Kentucky
May 2001

American College of Emergency Physicians 2000 Scientific Assembly, Philadelphia, Pennsylvania
October 2000

National Tactical Officer's Association Annual Conference, Tucson, Arizona     September 2000.

Hawaiian Islands Trauma Symposium, Honolulu, Hawaii     July 2000

Special Operations Medical Association, Tampa, Florida     December 1999

American College of Emergency Physicians 1999 Scientific Assembly, Las Vegas, Nevada
October 1999

National Tactical Officers Association, Norfolk, Virginia     September 1999

U.S. Army Medical Command, Incident Command, Louisville, Kentucky     June 1999

U.S. Army Medical Command, Domestic Preparedness Training for Hospital Providers, Louisville,
Kentucky
June 1999

3rd International Tactical Emergency Medicine Conference, Bethesda, Maryland   June 1999

Ultrasound for General Surgeons, University of Louisville Department of Surgery, Louisville,
Kentucky
June 1999

13

American College of Emergency Physicians 1998 Scientific Assembly, San Diego, California
October 1998

Decontamination Training and Hazardous Materials Operations Class, University of Louisville Hospital
August 1998

Fifth Annual Clinical Forensic Medicine Conference, University of Louisville School of Medicine, Louisville, Kentucky
May 1998

American College of Emergency Physicians 1997 Scientific Assembly, San Francisco, California
October 1997

National Tactical Officers Association, Tucson, Arizona
September 1997

XVII International Conference on Legal Medicine, Dublin, Ireland
August 1997

Fourth Annual Postgraduate Clinical Forensic Medicine Conference, University of Louisville School of Medicine, Louisville, Kentucky
June 1997

First International Conference on Tactical Emergency Medicine, Department of Military and Emergency Medicine, Uniformed Services University, Bethesda, Maryland
June 1997

Society for Academic Emergency Medicine, 1997 Annual Meeting, Washington, D.C. May 1997

6th International Conference on Emergency Medicine, Sydney, Australia
November 1996

American College of Emergency Physicians 1996 Scientific Assembly, New Orleans, Louisiana
September 1996

Third Annual Postgraduate Clinical Forensic Medicine Conference, Louisville, Kentucky
May/June 1996

Counter Narcotics Tactical Operations Medical Support Program (CONTOMS), Uniformed Services University of the Health Sciences and the Department of Defense, Louisville, Kentucky
May 1996

American College of Emergency Physicians, 1995 Scientific Assembly, Washington, D.C.
September 1995

The Association of Australasian and Pacific Area Police Medical Officers, Darwin, Australia
August 1995

Society for Academic Emergency Medicine,1995 Annual Meeting, San Antonio, Texas May 1995

Second Annual Postgraduate Clinical Forensic Medicine Conference, Louisville, Kentucky
May 1995

Current Issues and Trends in the Emergency Department, Louisville, Kentucky   February 1995

14

American Academy of Forensic Sciences, Seattle, Washington                    February 1995

American College of Emergency Physicians, 1994 Scientific Assembly, Orlando, Florida
                                                                              September 1994

First Annual Postgraduate Clinical Forensic Medicine Conference, Louisville, Kentucky May 1994

Violent Crimes Symposium, Federal Bureau of Investigation, Louisville, Kentucky December 1993

Southern Medical Association, 87th Scientific Assembly, New Orleans, Louisiana October 1993

13th Meeting of the International Association of Forensic Sciences, Dusseldorf, Germany
                                                                              August 1993

Third International Conference of the World Police Medical Officers, Harrogate, North Yorkshire,
England                                                                       September 1993

Counter Narcotics Tactical Operations Medical Support Program (CONTOMS), Uniformed Services
University of the Health Sciences and the Department of Defense, Louisville, Kentucky May 1993

Society for Academic Emergency Medicine, 1993 Annual Meeting, San Francisco, California
                                                                              May 1993

American Academy of Forensic Sciences, Boston, Massachusetts                  February 1993

Southern Medical Association, 86th Scientific Assembly, San Antonio, Texas     November 1992

Association for the Advancement of Automotive Medicine, 36th Conference, Portland, Oregon
                                                                              October 1992

American College of Emergency Physicians, 1992 Scientific Assembly, Seattle, Washington
                                                                              September 1992

Society for Academic Emergency Medicine, 1992 Annual Meeting, Toronto, Canada May 1992

American Academy of Forensic Sciences, New Orleans, Louisiana                  February 1992

American College of Emergency Physicians, 1991 Scientific Assembly, Boston, Massachusetts
                                                                              October 1991

Second National Conference on Death and Injury Investigation, Western Conference on Criminal and
Civil Problems, Wichita, Kansas                                               December 1990

National Conference on Clinical Forensic Medicine, Illinois Chapter of the American College of
Emergency Physicians, Chicago, Illinois                                       May 1990

022

Special Issues in Child Abuse and Neglect, American Academy of Forensic Sciences, Cincinnati, Ohio                                                                                        February 1990

Seat Belt Performance, Evaluation, Failures and Injuries, American Academy of Forensic Sciences, Cincinnati, Ohio                                                                        February 1990

Alcohol, Drugs and Traffic Safety, 11th International Conference, National Safety Council, Chicago, Illinois                                                                              October 1989

Forensic Medicine Unit, Department of Pathology, University of Edinburgh School of Medicine, Edinburgh, Scotland                                                                          September 1989

Thirty Second Stapp Car Crash Conference, Society of Automotive Engineers, Atlanta, Georgia                                                                                              October 1988

The Anatomy and Biomechanics of Trauma, Department of Anatomy, University of Louisville School of Medicine, Louisville, Kentucky                                                          May 1988

The Investigation of Child Restraint and Seat Belt Injuries, Institute of Police Technology and Management, University of North Florida, Jacksonville, Florida                            August 1987

Twenty Eighth Stapp Car Crash Conference, Society of Automotive Engineers, Chicago, Illinois                                                                                             November 1984

Advance Accident Investigation, Kentucky Bureau of Training, Louisville, Kentucky August 1984

Anatomy of Trauma, Tutorial with George R. Nichols, II, M.D., Chief Medical Examiner of the Commonwealth of Kentucky, Louisville, Kentucky                                                1984.

Vehicular Homicide-D.W.I. Conference, Northwestern University, Chicago, Illinois July 1984

**Peer Reviewed Publications:**
Eid, R. D Sharma and **W Smock:** Podoconiosis in Rural Tanzania, American Journal of Tropical Medicine & Hygiene, 2016; 95(1): p.1.

C Bailey, **WS Smock**, AM Melendez, RS El-Mallakh: Conducted Energy Devise (TASER) Usage in Subjects with Mental Illness, The Journal of the American Academy of Psychiatry and the Law, 2016; 44(2): p.213-217.

Nauang P., A. Paladugu, S.R. Manda, **W. Smock**, C. Gosney and S Lippmann: "Do Guns Provide Safety? At What Cost?", Southern Medical Journal, Vol. 103, Number 2, pp 151-3, February 2010.

Berger, N. J. Stearman, S.J. Vicario, **W. Smock**: Computed Tomographic Angiography in the Emergency Evaluation of Upper Extremity Gunshot Wounds, Annals of Emergency Medicine, 51(4):491-492, April 2008.

023

Perry M.U., R. Collins-Willard and **W.S. Smock**:  Responding to Sexual Violence:  Critical Issues for Healthcare Providers, Journal of the Kentucky Medical Association, Vol. 103, pp. 436-441, September 2005.

El-Mallakh, R.S., G. Wulfman, **W.S. Smock**, E. Blaser:  Implementation of a Crisis Intervention Program for Police: Response to Mental Health Emergencies in Louisville, Journal of the Kentucky Medical Association, Vol. 101, pp. 241-243, June 2003.

Handy, T.C., G.R. Nichols and **W.S. Smock**:  Repeat Visitors to a Pediatric Forensic Medicine Program. Journal of Forensic Sciences, Vol. 41, No. 5, pp. 841-844, 1996.

**Smock, W.S.** and G.R. Nichols:  Airbag Module Cover Injuries. Journal of Trauma:  Injury, Infection, and Critical Care, Vol. 38, No. 4, pp.489-493, 1995.

**Smock, W.S.**:  Development of a clinical forensic medicine curriculum for emergency physicians in the USA.  Journal of Clinical Forensic Medicine, Volume 1, Number 1, July 1994, pp.27-30.

**Smock, W.S.**, G.R. Nichols, and P.M. Fuller: Development and Implementation of the First Clinical Forensic Medicine Training Program.  Journal of Forensic Sciences, JFSCA, Vol.38, No. 4, July 1993, pp. 835-839.

Busuttil, A., **W.S. Smock**:  Training in Clinical Forensic Medicine in Kentucky.  Police Surgeon, Volume 26, February 1990.

**Smock, W.S.**, G.R. Nichols, P.M. Fuller and B. Weakley-Jones: The Forensic Pathologist and the Determination of Driver Versus Passenger in Motor Vehicle Collisions.  The American Journal of Forensic Medicine and Pathology, Vol.10, No.2, pp. 105-114, 1989.

Heulke, D.F., **W.S. Smock**, P.M. Fuller, and G.R. Nichols: A review of Basilar Skull Fractures Emphasizing Facial Impact Causes-Cases Histories and a Review of the Literature: 32nd Stapp   Car Crash Conference, Atlanta, Georgia, SAE paper #881711.

**Additional Publications and Letters:**
Strack, DB, C Gwinn, **W Smock**, W Green, R Riviello, M Weaver and H Rossi: "Dear Doctor: Radiographic Imaging of Non-Fatal Strangulation, Training Institute on Strangulation Prevention, www.strangulationtraininginstitute.com, November 2017.

**Smock, W** and S Sturgeon: Recommendations for the Medical/Radiographic Evaluation of Acute, Non-Fatal Strangulation, Training Institute on Strangulation Prevention, www.strangulationtraininginstitute.com, September 2016.

Strack, DB, C Gwinn, D Hawley, W Green, **B Smock**, R Riviello:  Why Didn't Someone Tell Me? Health Consequences of Strangulation Assaults for Survivors, Domestic Violence Report, Vol 19, No. 6, pp. 87-90, August/September 2014.

**Smock, W.S.**:  Pseudoephedrine Scheduling or . . a Date with Methamphetamine?, Louisville Medicine, Vol. 57, No. 12, May 2010.

Johal, R, S. Lippmann, **W.S. Smock**, C. Gosney:  Guns:  Dangerous, Especially for Suicide, and Costly for America, Psychiatry, Vol. 7. No. 2, February, 2010.

Paladugu, A, **W. Smock**, R. Srivastava, P. Narang, C. Gosney, and S. Lippmann:  Are Kentuckians Shooting Themselves for Self Protection?, The Kentucky Psychiatrist, Vol. 19, No. 2, December 2009.

**Smock, W.S.**, M. Fallat and G. Franklin:  The Louisville Extreme Park:  An opportunity for political and medical partnership, Louisville Medicine, Vol. 50, No. 3, August 2002.

Iden, S.W. and **W.S. Smock**:  After the Smoke Clears:  Understanding GSW forensics & the importance of evidence preservation, Journal of Emergency Medical Services, Vol. 27, No.  5, May, 2002.

**Smock, W.S.**:  Clinical Forensic Medicine, Louisville Medicine, Vol. 44, No. 12, pp. 535-537,  May, 1997.

**Smock, W.S.**, C.S. Ross, and F.N. Hamilton: Clinical Forensic Medicine:  How ED physicians can help with the sleuthing.  Emergency Legal Briefings, Vol. 5, No. 1, January, 1994.

**Published Abstracts and Posters:**
Sharma, D, R Eid and **WS Smock:** Initiating a Community-Based Intervention against Podoconiosis in the Highlands of Southwestern Tanzania, Research Louisville, October 2015

Haffler, T, C Freeman, **WS Smock** and M Carter: Pterygium in Mufindi, Tanzania. Africa, Research Louisville, October 2015.

Landi, AJ and **WS Smock:** Cutaneous Leishmaniasis (CL):  Raising Awareness of the Psychological Impact of CL in Developing Countries, American Academy of Family Medicine, Denver, Colorado, September, 2015.

Sharma, Dhruv, Ryan Eid and **William Smock:**  Podoconiosis – Geochemical Elphantiasis, American College of Physicians Research Symposium (1st place, Clinical Vignette Category), Louisville, Kentucky, September 2014.

Bessler, Jacob and **William Smock:**  Dermal Consequences of Traditional African Medicine:  Don't call the witch doctor!, Research Louisville, September 2014.

Smith, Erin, Ramakanth Yakkanti, Keith Zoeller, Mary Carter, **Bill Smock:**  Treating Burn Victims in an African rural Community, Research Louisville, September 2014.

Sharma, Dhruv, Ryan Eid and **William Smock:**  Podoconiosis – Geochemical Elphantiasis, Research Louisville (Finalist), September 2014.

A. Justine Landi, BS and **B Smock:**  Cutaneous Leishmaniasis in Kenya, American Academy of Emergency Medicine, New York, New York, February 2014.

Kaitlin E. Shumate, BS and **B Smock:** Leprosy in Kenya, American Academy of Emergency Medicine, New York, New York, February 2014.

Kingery, F, D Duncan, K Kenney, M Maggard, B Schadler, T Mason, C Nickel and **WS Smock:** Evaluation of Common Diagnosis and Healthcare Needs of a Subregion of the Northwest Rift Valley Providence of Kenya, Regional Global Health Conference, Lexington, Kentucky, 2012.

Miles, C and **WS Smock**: "Identification of Self-Inflicted Knife Wounds in the Emergency Department", American Academy of Emergency Medicine, Orlando, Florida. March 2011.

Miles, C and **WS Smock:** "Forensic Evaluation of Self-Inflicted Gunshot Wounds", American Academy of Emergency Medicine, Orlando, Florida. March 2011.

Miles, C and **WS Smock**: "Identification of Self-Inflicted Knife Wounds in the Emergency Department", Research Louisville, University of Louisville, October 2010.

Miles, C and **WS Smock:** "Forensic Evaluation of Self-Inflicted Gunshot Wounds", Research Louisville, University of Louisville, October 2010.

Havens, A ,V Graham and **WS Smock**: "Are Clinicians Rendering Accurate Interpretations of Gunshot Wounds?, Research Louisville, University of Louisville, October 2010.

**Smock, WS:** "Goodness Gracious Great Balls of Fire": Genital Thermal Injuries From Airbag Exhaust, Proceedings American Academy of Forensic Sciences, pp.313, Seattle, Washington, February 2010.

Fogarty, MA, D Stewart and **WS Smock:** Inadequate Investigation Impedes Determination of the Manner of Death, Proceedings American Academy of Forensic Sciences, pp.191-192, Seattle, Washington, February 2010.

**Smock, WS** and ME Smock: "If I Had a Hammer…": Rare Case of a Hammer Initiated Self-Inflicted Bullet Wound, Proceedings American Academy of Forensic Sciences, pp.197-198, Seattle, Washington, February 2010.

Fogarty, MA and **WS Smock:** Development of a Forensic Nurse Examiner Training Program at a University Trauma Center, Proceedings American Academy of Forensic Sciences, pp.200-201, Seattle, Washington, February 2010.

Kehl, P, **WS Smock,** LJ Goldsmith and C Gosney: Outside the Comfort Zone: The Effects of Ambient Temperature Extremes on Gunshot Wound Frequencies. American Academy of Emergency Medicine, Las Vegas, Nevada, February 2010.

Kehl, P, **WS Smock,** LJ Goldsmith and C Gosney: Outside the Comfort Zone: The Effects of Ambient Temperature Extremes on Gunshot Wound Frequencies. Research Louisville, October 2009.

**Smock, WS,** M Smock and K Noble: If I Had a Hammer I'd…Rare Case of a Hammer-Induced Self-inflicted Bullet. Research Louisville, October 2008.

Rowell, J, **WS Smock** and K Noble:  Prior Criminal Records of Victims of Firearm-Related Violence in Jefferson County, Kentucky 2007.  Research Louisville, October 2008.

**Smock, WS** and K Noble:  The Financial Costs and Circumstances of Firearm-Related Domestic Violence.  International Conference on Violence, Abuse and Trauma, San Diego, September, 2008.

Jones, J, KC Bickel, D Davidson and **WS Smock**:  "Retrospective Study on Accidental Firearm Related Injuries in an Urban Area. Research Louisville, October 2007

Provenza, F. and **W.S. Smock:**  "Airbag Warning Label Project:  A Call to Arms", 2001 Proceedings Society for Academic Emergency Medicine, 2001.

Partin, R. and **W.S. Smock**:  Airbag Ankle:  A Traumatic Injury from Airbag Module Cover Deployment, Proceeding of the American Academy of Forensic Sciences, 1:231, 2001.

**Smock, WS**, M. Hamm, M. Krista:  Physicians in Tactical Emergency Medicine, 1999 American College of Emergency Physicians Research Forum, Supplement to Annals of Emergency Medicine, 34:4, 1999.

Keeling, B, **W. Smock**, E. McPherson, L. Malmstrom, S. Becht and C. Anderson:  A Multi-Jurisdictional Demographic Examination of Gunshot Wounds, Proceedings Fifth National Handgun Epidemic Lowering Plan Network Conference, 1998.

**Smock, W.S.**:  Serious and Fatal Injuries Caused by Passenger-   Side Airbags in Low Speed Frontal Collisions, Proceedings XVII the   International Conference on Legal Medicine, 1997.

Marlowe, A and **W. Smock**:  The Forensic Evaluation of Gunshot Wounds by Prehospital Personnel, Proceedings of the American Academy of Forensic Sciences,  2:149, 1996.

Porta, D, T. Kress, P. Fuller, **W. Smock** and J. Snider.  Spiral Fracture:  Definition and Determination of Torsional Direction from Radiographs. Proceedings of the American Academy of Forensic   Sciences,  2:146, 1996.

Porta, D, T. Kress, **W. Smock**, J. Snider and P. Fuller:  Humerus Fracture from Bending Versus Torsion. The FASEB Journal, 9(4):2:A1065, 1995.

Handy, T.C., G. Nichols and **W. Smock:**  Bouncing Babies-Repeat Visitors to the Pediatric Forensic Medicine Program, Proceedings of the American Academy of Forensic Sciences, 1:136, 1995.

**Smock, W.:**  Development of a Clinical Forensic Medicine Curriculum for Emergency Department Physicians in the United States, Proceeding of the 13th International Association of Forensic Sciences,  1:A185, 1993.

**Smock, W.**, G. Nichols and P. Fuller:  Airbag Induced Fatal Injuries:  A case report, Proceedings of the American Academy of Forensic Sciences, 1:127, 1993.

**Smock, W.**, G. Nichols and J Quinn:  Clinical Forensic Medicine:  "Living" Forensic Aspects of Emergency Medicine, Proceedings of the American Academy of Forensic Sciences, 1:139, 1993.

20

**Smock, W**. Traumatic Avulsion of the First Digit Secondary to Airbag Deployment. Proceedings Association for the Advancement of Automotive Medicine, 36: 444, 1992.

**Smock, W.** and P. Fuller. The Utilization of Physicians Trained  in Clinical Forensic Medicine to Determine Occupant Roles in Motor Vehicle Collisions, Proceedings Association for the Advancement of Automotive Medicine, 36:457, 1992.

### Text Book Chapters/Text Book Contributor:

Faugno, D, D Rodriguez-Bowman, V Sievers, T Ingram-Jones, C Baldwin-Johnson and **W Smock**: Non-fatal Strangulation Photo-Documentation Protocol:  Supplemental Edition for Pediatric Cases, Secure Digital Forensic Imaging, Boulder City, NV, 2017.

**Smock, WS:** Manual Nonfatal Strangulation Assessment for Health Care Providers and First Responders, STM Learning, St. Louis, MO, 2016.

**Smock, WS** and LB Stack: Forensic Medicine, Atlas of Emergency Medicine, Knoop et al, 4th Edition, McGraw Hill, 2016.

Smock, ME and **WS Smock:** Assessment of Wounds and Injuries, A Practical Guide to Forensic Nursing:  Incorporating forensic principals into nursing practice, Sigma Theata Tau International Honor Society of Nursing, 2015.

**Smock, WS** and LB Stack: Forensic Medicine, Atlas of Emergency Medicine, Knoop et al, 4th Edition, Chapter 19, McGraw Hill, 2013.

**Smock, W.S.:** Forensic Emergency Medicine, Rosen's Emergency Medicine:  Concepts and Clinical Practice, Marx et al, 8th Edition. Mosby, 2013.

**Smock, WS:** Injury Patterns and Evidence Preservation, Specialized Tactics for Operational Rescue and Medicine (S.T.O.R.M.) Operator, Chapter 13, University of Georgia Printing, 2011.

Porta, DJ and **WS Smock:** Physics, Restraints and Fractures, Forensic Nursing Science, Lynch and Duval, 2nd Edition, Chapter 23, Elsevier, 2010.

**Smock, WS** and LB Stack: Forensic Medicine, Atlas of Emergency Medicine, Knoop et al, 3rd Edition, Chapter 19, McGraw Hill, 2009.

**Smock, W.S.:** Forensic Emergency Medicine, Rosen's Emergency Medicine:  Concepts and Clinical Practice, Marx et al, 7th Edition. Chapter 62, Mosby 2009.

Berger, N, J Jones and **WS Smock:** "Clinical Forensic Medicine" in Emergency Medicine:  The Medical Student Survival Guide, Emergency Medicine Resident's Association, Dallas TX, 2007.

**Smock, WS:** Forensic Aspects of Motor Vehicle Trauma, Forensic Emergency Medicine, Olshaker, Anderson and **Smock**, 2nd Edition, Lippincott, Williams & Wilkins, 2006.

**Smock, WS:**  Penetrating Trauma, Forensic Emergency Medicine, Olshaker, Anderson and **Smock**, 2nd Edition, Lippincott, Williams & Wilkins, 2006.

**Smock, WS** and P. Besant-Matthews:  Forensic Photography, Forensic Emergency Medicine, Olshaker, Anderson and **Smock**, 2nd Edition, Lippincott, Williams & Wilkins, 2006.

**Smock, WS:**  Clinical Forensic Medicine, Rosen's Emergency Medicine:  Concepts and Clinical Practice, 6th Edition. Mosby, 2006.

**Smock, WS:**  The Forensic Evaluation of Gunshot Wounds Associated with a Terrorist Event, Medical Response to Terrorism in:  Medical Response to Terrorism, 1st ed.  Keyes DC, Burstein JL, Schwartz RB, Swienton RE (eds), Lippincott, Williams and Wilkins, Philadelphia, Chapter 36, pp. 358, 2005.

**Smock, WS** and JS Vayer: Introduction to Tactical Emergency Medicine Support, In: Encyclopedia of Forensic and Legal Medicine, Elsevier Academic Press, 1st Edition, Payne-James J, Byard R, Corey ST, Henderson C, (eds) Volume 4, pp 255-262, 2005.

**Smock, WS:**  Road Traffic Accidents, Airbag-related Injuries and Death, In :Encyclopedia of Forensic and Legal Medicine, Elsevier Academic Press, 1st Edition, Payne-James J, Byard R, Corey ST, Henderson C, (eds) Volume 4, pp 1-11, 2005.

**Smock, WS** and CC Smock: Airbag-Induced Injuries and Deaths, In: Forensic Nursing, Lynch VA (ed), Elsevier, Mosby, Chapter 15, pp. 140-156, 2005

**Smock, WS:**  Genesis and Development, In: Forensic Nursing, Lynch VA (ed), Elsevier, Mosby, Chapter 2, pp. 13-18, 2005.

**Smock, WS:**  Forensic Medicine and Patterns of Injury, Atlas of Emergency Medicine, Knoop et al, 2nd Edition, McGraw Hill, 2002.

**Smock, W.S.:**  Forensic Medicine, Forensic Emergency Medicine, Olshaker, Anderson and **Smock**, Lippincott, Williams & Wilkins, 2001.

Besant-Matthews, P. and **Smock, W.S.:**  Forensic Photography, Forensic Emergency Medicine, Olshaker, Anderson and **Smock**, Lippincott, Williams & Wilkins, 2001.

**Smock, W.S.:**  Forensic Emergency Medicine, Rosen's Emergency Medicine:  Concepts and Clinical Practice, Marx et al, 5th Edition. Mosby, 2001.

**Smock, W.S.:**  Forensic Photography.  Handbook of Medical Photography, Stack, Storrow, Morris and Patton, Handley and Belfus, Inc., 2000.

**Smock, WS:** Airbag-Related Injuries and Death, Encyclopedia of Forensic Science, Siegel et al, Academic Press, London, 2000.

**Smock, WS:** Determination of Driver versus Passenger in Motor Vehicle Collisions, Encyclopedia of Forensic Science, Siegel et al, Academic Press, London, 2000.

**Smock, WS:** The Forensic Evaluation of Handgun Wounds, Encyclopedia of Forensic Science, Siegel et al, Academic Press, London, 2000.

**Smock, WS:** Recognition of Pattern Injuries in Victims of Domestic Violence, Encyclopedia of Forensic Science, Siegel et al, Academic Press, London, 2000.

**Smock, W.S.:** Clinical Forensic Medicine, Emergency Medicine: Concepts and Clinical Practice, Rosen and Barkin, 4th Edition. Mosby, 1997.

**Monographs, CDs, Webinar and On-Line Training Programs:**
Strack, G, **WS Smock**, C Baldwin-Johnson, D Faugno, V Sievers and J Green: "Pediatric Strangulation, Part 2", Webinar, Training Institute on Strangulation Prevention, San Diego, February 2018

Strack, G and **WS Smock:** "The Forensic and Medical Evaluation of the Non-fatal Strangulation Patient", Webinar, Northwest Hospital, Baltimore, MD, February 2018

Strack, G, Gwinn, C and **WS Smock:** "What We Learned in 2017: Updates from the Training Institute on Strangulation Prevention", Webinar, Training Institute on Strangulation Prevention, San Diego, January 2018

Strack, G, **WS Smock**, C Baldwin Johnson, D Faugno, V Sievers and K Snyder: "Pediatric Strangulation, Part 1", Webinar, Training Institute on Strangulation Prevention, San Diego, October 2017

Strack, G, W Green, R Riviello, **WS Smock** and M Weaver: "Imaging Recommendations for Non-Fatal Strangulation Cases", Webinar, Training Institute on Strangulation Prevention, San Diego, July 2017

Strack, G, Gwinn, C and **WS Smock:** "What We Learned in 2016: Updates from the Training Institute on Strangulation Prevention", Webinar, Training Institute on Strangulation Prevention, San Diego, January 2017

**Smock, WS:** "Long term consequences of strangulation", Training Institute on Strangulation Prevention, Webinar: September 2016

**Smock, WS** and S Sturgeon: "Recommendations for the Medical/Radiographic Evaluation of Acute Adult, Non-Fatal Strangulation", Training Institute on Strangulation Prevention, San Diego, September 2016.

**Smock, WS:** "The Forensic Evaluation of Injuries: Applications for Victims of IPV", University of Alabama Birmingham, June 2016.

**Smock, WS** and S Sturgeon: "Recommendations for the Medical/Radiographic Evaluation of Acute Adult, Non-Fatal Strangulation, Training Institute on Strangulation Prevention, March 2016.

23

**Smock, WS** and K Nash:  "Clinical Documentation of Strangulation Cases", Webinar, Training Institute on Strangulation Prevention, San Diego, January 2016

**Smock, WS:**  "The Clinical Forensic Evaluation of Gunshot Wounds", 25-hour on-line program and 16-hour practical program developed for the Galen Center for Professional Development, June 2014.

**Smock, WS,** C Nunn and S Ely:  "The Forensic Evaluation of Injuries in Victims of Domestic Violence:, University of Louisville School of Medicine, August 2010.

**Smock, WS:** "Preparing the Justice System for a Pandemic Influenza", Bureau of Justice Administration, United States Department of Justice, September 2006.

**Smock, WS,** F. Provenza and S.J. Johnson:  "Airbag Warning Label Project:  A Call to Arms, American College of Emergency Physicians, 2003.

**Smock, WS** and B. Sandelback: "Identification of Victims of Domestic Violence", American College of Emergency Physicians, 1999, 2nd edition.  (CD and monograph)

**Smock, WS** and B. Sandelback: "Identification of Victims of Domestic Violence", American College of Emergency Physicians, 1998, 1st edition. (Slides and monograph)

<u>In Press:</u>

<u>Grants and Contracts:</u>
Louisville Metro Council, Clinical Forensic Medicine/Police Surgeon, 2017-18, **William S. Smock, M.D., PI,** $175,000.

Jeffersontown Fire Department, Fire Surgeon, 2017 – 2018, **William S. Smock, MD,** $5,000.00

Jeffersontown Police Department, Police Surgeon, 2017 – 2018, **William S. Smock, MD,** $5,000.00.

Norton Healthcare, Forensic Services Program, 2016-17, **William S. Smock, M.D.,** $40,000.

Louisville Metro Council, Clinical Forensic Medicine/Police Surgeon, 2016-17, **William S. Smock, M.D., PI,** $175,000.

Norton Healthcare, Forensic Services Program, 2015-16, **William S. Smock, M.D.,** $40,000.

Louisville Metro Council, Clinical Forensic Medicine/Police Surgeon, 2015-16, **William S. Smock, M.D., PI,** $175,000.

Norton Healthcare, Forensic Services Program, 2014-15, **William S. Smock, M.D.,** $40,000.

Louisville Metro Council, Clinical Forensic Medicine/Police Surgeon, 2014-15, **William S. Smock, M.D., PI,** $175,000.

Galen Center for Professional Development, Forensic Evaluation of Gunshot Wounds, 2014, **William S. Smock, M.D., PI,** $60,000.

CE & S Foundation, WaterStep Kenyon Pump Repair Project, 2013, **William S. Smock, M.D., PI**, $20,000.

Louisville Metro Council, Clinical Forensic Medicine/Police Surgeon, 2013, **William S. Smock, M.D., PI,** $175,000.

Louisville Metro Department of Corrections, 2012, **William Smock, M.D., P.I.,** $10,000.

Louisville Metro Council, Police Surgeon, 2012, **William Smock, M.D., P.I.,** $60, 000.

Louisville Metro Council, Clinical Forensic Medicine, 2012, **William Smock, M.D., P.I.,** $110,000.

Louisville Metro Council, Police Surgeon, 2011, **William Smock, M.D., P.I.,** $60, 000.

Louisville Metro Council, Clinical Forensic Medicine, 2011, **William Smock, M.D., P.I.,** $110,000.

Louisville Metro Council, Police Surgeon, 2010, **William Smock, M.D., P.I.,** $60, 000.

Louisville Metro Council, Clinical Forensic Medicine, 2010, **William Smock, M.D., P.I.,** $45,000.

Louisville Metro Council, Firearms Injury Database, 2010, **William Smock, M.D., P.I.,** $20,000.

Louisville Metro Council, Clinical Forensic Medicine, 2009, **William Smock, M.D., P.I.** $45,000.

Louisville Metro Council, Firearms Injury Database, 2009, **William Smock, M.D., P.I.**, $20,000.

Louisville Metro Council, Firearms Injury Database, 2008, **William Smock, M.D., P.I,** $20,000.

Louisville Metro Council, Clinical Forensic Medicine, 2008, **William Smock, M.D., P.I.** $45,000.

United States Department of Justice, Injuries Produced by Law Enforcement use of Less Lethal Weapons: A Prospective Multicenter Trial, 2008 to 2012, **William Smock, M.D., P.I.**

Louisville Metro Council, Firearms Injury Database, 2007, **William Smock, M.D., PI,** $25,000.

Louisville Metro Health and Wellness, Firearms Injury Database, 2007, **William Smock, M.D., PI,** $25,000.

Louisville Metro Police Department, Firearms Injury Database, 2007, **William Smock, M.D., PI,** $25,000.

Kentucky Department of Public Health, Radiation Training Program, 2006, **William Smock, M.D., PI,** $243.000.00.

Kentucky Office of Homeland Security, MATT-UASI, **William Smock, M.D., PI,** 2005, $100,000.

Kentucky Office of Homeland Security, Medical Assistance and Tactical Team, **William Smock, M.D., PI**, 2005, $300,000.

Office of the United States Attorney, Western District of Kentucky, U.S. Department of Justice, Project Safe Neighborhood, **William S. Smock, MD**. 2004. $118,502.00.

American College of Emergency Physicians, "Airbag Warning Label Project", Chapter Grant, **William S. Smock, MD., P.I.**, 2001.$2,000.00.

University of Louisville Hospital Foundation, "Airbag Warning Label Educational Grant", **William S. Smock, M.D.. P.I.**, 1999, $2,000.00.

Alliant Community Trust Grant, "Alliant Fellowship in Clinical Forensic Medicine", 1998 **William S. Smock, M.D.-PI** $55,403.00.

Kentucky Department of Justice, "Infrared Videography and its use in Clinical Forensic Medicine", George R. Nichols, II M.D., Mark Bernstein, D.M.D., and **William S. Smock, M.D.** 1997, 98-118S $200,143.00.

American College of Emergency Physicians, Chapter Development Grant, "Identification of Victims of Domestic Violence", 1996, **William S. Smock, M.D.-PI**  $5,200.00.

Boehringer-Ingelheim Pharmaceuticals, "Multicenter, Double-Blind, Randomized, Placebo-Controlled, Parallel Group Study to Evaluate the Efficacy, Safety, Tolerability and Pharmacokinetics of Two Doses of IV Cerestat (Aptiganel Hydrochloride) vs. Placebo in Patients with an Acute Ischemic Stroke, 1996, UHSC 197-96, **William S. Smock, M.D.-PI** $128,793.00.

**Previous Research:**
Injuries Produced by Law Enforcement use of Less Lethal Weapons: A Prospective Multicenter Trial, United States Department of Justice, 2008 to 2012.

Development of a Clinical Forensic Nursing Training Program.  The Department of Emergency Medicine and the Louisville Metro Police Department.  Funded by the Louisville Metro Council. 2008 to 2010.

Development of a Firearm Injury Surveillance Program for Louisville and Jefferson County, Kentucky. The Department of Emergency Medicine, University of Louisville School of Medicine and in cooperation with the Kentucky Medical Examiner's Office, the Jefferson County Coroner's Office, the Kentucky State Police Crime Laboratory, the Louisville Metro Police Department and the Louisville Metro Health and Wellness. 1998 to 2010.

Development of the Medical Assistance and Tactical Team (MATT) a multi-agency task force to assist local, state and federal law enforcement agencies address emergency public health threats, including support of local health departments.  Members of the task force, operating under state and federal statutes, will be responsible for the serving and enforcing of Circuit and Federal Court Orders involving isolation and quarantine during a public health emergency.  The MATT will also be responsible for assisting the TSA in the evaluation of potentially infectious patient's onboard

commercial aircraft or at the Louisville International Airport. Funded by the Kentucky Department of Homeland Security. 2005-2009.

"Project Safe Neighborhood".  Development of a Firearm Injury Surveillance Program for Louisville and Jefferson County, Kentucky. The Department of Emergency Medicine, University of Louisville School of Medicine and in cooperation with the United States Attorney's Office, Kentucky Medical Examiner's Office, the Jefferson County Coroner's Office, the Kentucky State Police Crime Laboratory, the Louisville Metro Police Department. 2004-2007

 "Review of injuries and their associated costs at the Louisville Extreme Skate Park".  A Joint study between Kosair Children's Hospital and the Departments of Surgery and Emergency Medicine at the University of Louisville Hospital.  2004

Airbag Warning Label Project. Department of Emergency Medicine, University of Louisville School of Medicine, Louisville, Kentucky.  2000-2002

Evaluation of Airbag induced injuries.  Department of Emergency Medicine, University of Louisville School of Medicine, Louisville, Kentucky.  1995-2002

Development and implementation of the first clinical forensic medicine training program and fellowship in the United States - Departments of Emergency Medicine and Forensic Pathology, of the University of Louisville School of Medicine and the Office of the Chief Medical Examiner, Commonwealth of Kentucky. 1993-2000

Evaluation of medical support provided to tactical physicians. Department of Emergency Medicine, University of Louisville School of Medicine. 1999

Review of arrest and conviction rate of intoxicated drivers admitted to a level 1 trauma center.  In cooperation with Dr. Bruce Hines and the Department of Emergency Medicine, University of Louisville Hospital, Louisville, Kentucky. 1998

Review of bean bag projectile injuries.  In cooperation with Dr. Matt Krista and the Department of Emergency Medicine, University of Louisville Hospital, Louisville, Kentucky. 1998

The forensic evaluation of gunshot wounds by prehospital and hospital personnel. The Departments of Emergency Medicine, Forensic Pathology, and Anatomical Science and Neurobiology of the University of Louisville School of Medicine and the Office of the Chief Medical Examiner, Commonwealth of Kentucky.  1995

The evaluation of vehicle damage, injury mechanisms, safety restraints, anatomic injuries and physiological response as indicators for prehospital and intra-hospital triage criteria - Departments of Emergency Medicine and Anatomical Science and Neurobiology, University of Louisville School of Medicine. 1991 – 1995

Injury mechanisms and the dynamic responses of the human leg to trauma sustained in motor vehicle collisions - Department of Anatomical Science and Neurobiology, University of Louisville School of Medicine. 1990 – 1993

Examination of illegal drugs, prescribed medication, and medical conditions as contributory factors in the vehicle related death.  Kentucky Medical Examiner's Office, Louisville, Kentucky. 1986

A Master of Science thesis which examined vehicle related deaths in Jefferson County, Kentucky. The author performed on-scene examinations of the victims and vehicles and post-mortem examinations of the victims. The content of these examinations included:  injury and incident reconstruction, occupant kinematics, evaluation of safety restraints and identification of causative parameters.  The thesis culminated in a proposal to local agencies for the development of investigative protocols for the thorough analysis of vehicular crashes.  1984 – 1985

Development of the Fatal Accident Investigation Team Approach Program for Louisville and Jefferson County, Kentucky.  Members of the team included:  Jefferson County Coroner's Office, Kentucky Medical Examiner's Office, Commonwealth Attorney's Office, and the Louisville and Jefferson County Police Departments. 1985

Development of a fatal accident investigation protocol for the Kentucky Medical Examiner's training program, Department of Pathology, University of Louisville School of Medicine. 1985

**Scheduled Presentations, Grand Rounds and Lectures:**
Crimes Against Women's Conference, Dallas, Texas, April 2018
Training Institute on Strangulation Prevention, Portland, Oregon, April 2018
Family Justice Conference, Fort Worth, Texas, April 2018
Training Institute on Strangulation Prevention, Oklahoma City, Oklahoma, April 2018
Delaware County Prosecutor's Office, Columbus, Ohio, May 2018
Ohio EMS Conference, Columbus, Ohio, May 2018
Training Institute on Strangulation Prevention, Charlotte, North Carolina, June 2018
Ohio Prosecutor's Conference, Sandusky, Ohio, June 2018
Training Institute on Strangulation Prevention, Brazilian, Texas, August 2018
Master's Course, Training Institute on Strangulation Prevention, San Diego, California, August 2018
Training Institute on Strangulation Prevention, Pontiac, Michigan, September 2018
New York Forensic Training, Albany, New York, September 2018
Fort Wayne, Indiana Prosecutor's Conference, September 2018
Training Institute on Strangulation Prevention, San Diego, California, October 2018

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2018**
"Hidden Danger:  Addressing Non-Fatal Strangulation", 2018 Crime Victims' Rights Conference, Topeka, Kansas, April 2018

"Strangulation:  The last warning shot", Training Institute on Strangulation Prevention, Riley County Prosecutor's Office, Manhattan, Kansas, April 2018

"Strangulation:  The last warning shot", Training Institute on Strangulation Prevention, Indianapolis University, Indianapolis, Indiana, March 2018

"The Forensic and Medical Evaluation of the Non-Fatal Strangulation Patient", Henderson Police Department, Las Vegas, Nevada, March 2018

035

"Strangulation:  The last warning shot", Queensland Police and Red Rose Foundation, Brisbane, Australia, March 2018

"The Pathophysiology, Forensic and Medical Evaluation of Non-Fatal Strangulations", Queensland Magistrate and District Courts, Brisbane, Australia, March 2018

"Strangulation Prevention and Intervention Course", Australian Federal Police, Red Rose Foundation and Clinical Forensic Medicine Services, Canberra Hospital, Canberra, Australia, March 2018

"The Pathophysiology, Forensic and Medical Evaluation of Non-Fatal Strangulations", Queensland Magistrate and District Courts, Canberra, Australia, March 2018

"The Forensic Evaluation of Gunshot Wounds", University of Louisville School of Medicine, February 2018

"Risks Associated with the Use of the Carotid Restraint", San Diego Community Review Board on Police Practices, San Diego, California, January 2018

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2017**
The Pathophysiology and Medical Evaluation of Non-Fatal Strangulations: Investigation and prosecution of Felony Cases", Training Institute on Strangulation Prevention, Fort Worth, Texas, October 2017

"The Pathophysiology and Medical Evaluation of Non-Fatal Strangulations: Investigation and prosecution of Felony Cases", Oakland University, Rochester, Michigan, October 2017

"The Clinical Forensic Evaluation of GSW's:  Applications for domestic, felony and officer-involved shootings", Oakland University, Rochester, Michigan, October 2017

"Strangulation:  The last warning shot", Training Institute on Strangulation Prevention, United States Department of Defense, Okinawa, Japan, October 2017

"Strangulation:  The last warning shot", Training Institute on Strangulation Prevention, United States Department of Defense, Fort Stewart, Georgia, September 2017

"The Medical and Forensic Evaluation of Non-Fatal Strangulation Patients", OhioHealth, Columbus, Ohio, September 2017

"Pattern Injuries and Interpersonal Violence:  Recognition and Documentation", OhioHealth, Columbus, Ohio, September 2017

"The Clinical Forensic Evaluation of GSWs:  Applications for domestic, felony and officer-involved shootings", OhioHealth, Columbus, Ohio, September 2017

"The Medical and Forensic Evaluation of Non-Fatal Strangulation Patients", Department of Emergency Medicine, University of Louisville, August 2017

"The Medical and Forensic Evaluation of Non-Fatal Strangulation Patients", Oklahoma Judiciary, Oklahoma City, Oklahoma, August 2017

"Strangulation:  The last warning shot", Training Institute on Strangulation Prevention, Oklahoma City, Oklahoma, August 2017

"Strangulation:  The last warning shot", Training Institute on Strangulation Prevention, Milwaukee, Wisconsin, August 2017

 "The Forensic Evaluation of Gunshot Wounds:  Applications for domestic and officer-involved shootings", Department of Emergency Medicine, University of Louisville, Louisville, Kentucky, July 2017

"Strangulation:  The last warning shot", Training Institute on Strangulation Prevention, Criminal Justice Training Commission, Seattle, Washington, April 2017

"Strangulation:  The last warning shot", Training Institute on Strangulation Prevention, Harborview Medical Center, Yakima, Washington, April 2017

"Strangulation:  The last warning shot", Training Institute on Strangulation Prevention, Palm Beach County Criminal Justice Commission, Palm Beach, Florida, April 2017

"Handling Strangulation Assaults from the 911 Call to the Courtroom: End Violence Against Women International, Orlando, Florida, April 2017

"He More Than Choked Her:  Examining and Documenting Domestic Violence Injuries through a Study of Medical Photos", Grand Rounds, TriStar Centennial Medical Center, Nashville, Tennessee, March 2017

"Pattern Injuries and Interpersonal Violence:  Recognition and treatment", Grand Rounds, TriStar Centennial Medical Center, Nashville, Tennessee, March 2017

"The Forensic and Medical Evaluation of the Non-Fatal Strangulation Patient", Grand Rounds, TriStar Centennial Medical Center, Nashville, Tennessee, March 2017

"The Forensic and Medical Evaluation of the Non-Fatal Strangulation Patient", Ohio State University College of Nursing, Columbus, Ohio, March 2017

"The Forensic and Medical Evaluation of the Non-Fatal Strangulation Patient", Grand Rounds, Department of Emergency Medicine, Ohio State University, Columbus, Ohio, March 2017

"The Forensic Evaluation of Gunshot Wounds:  Applications for domestic, felony and officer-involved shootings", Kentucky State Police Training Academy, March 2017.

"The Forensic and Medical Evaluation of Non-Fatal Strangulations", Not Now, Not Ever Research Symposium, Central Queensland University, Mackay, Australia, February 2017.

"The Forensic and Medical Evaluation of Non-Fatal Strangulations", Training Institute on Strangulation Prevention, Domestic Violence Prevention Board, Lexington, Kentucky, February 2017

"The Forensic and Medical Evaluation of Non-Fatal Strangulations", Training Institute on Strangulation Prevention, Hildalgo County Sheriff's Department, Florida, January 2017

"The Forensic and Medical Evaluation of Non-Fatal Strangulations", Training Institute on Strangulation Prevention, Bay County Sheriff's Department, Florida, January 2017

### Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums: 2016
"The Forensic and Medical Evaluation of Non-Fatal Strangulations", Training Institute on Strangulation Prevention, Bay County Sheriff's Department, Florida, January 2017

"The Forensic and Medical Evaluation of Non-Fatal Strangulations", Training Institute on Strangulation Prevention, Billings Montana Police Department, Billings, Montana, November 2016

"Obstruction of Justice by Healthcare Professionals:  The Forensic Evaluation of Gunshot Wounds", Billings Montana Police Department, Billings, Montana, November 2016

"The Forensic and Medical Evaluation of Non-Fatal Strangulations", Macomb County Criminal Justice Training Center and Oakland University, Rochester, Michigan, October 2016

"The Forensic Evaluation of Gunshot Wounds:  Applications for domestic and officer-involved shootings", Macomb County Criminal Justice Training Center and Oakland University, Rochester, Michigan. October 2016

"The Forensic and Medical Evaluation of Non-Fatal Strangulations", Training Institute on Strangulation Prevention, Family Justice Center, Fort Worth, Texas. October 2016

"The Forensic and Medical Evaluation of Non-Fatal Strangulations", Training Institute on Strangulation Prevention, Kandiyohi County Prosecutor's Office, Kandiyohi, MN, September 2016

"The Forensic Evaluation of Wounds:  Self-inflicted or Assault", Forensic and Medical Sexual Assault Clinicians Australia, Sydney, Australia, September 2016

"The Forensic and Medical Evaluation of Non-Fatal Strangulations", Forensic and Medical Sexual Assault Clinicians Australia, Sydney, Australia, September 2016

"The Pathophysiology and Medical Evaluation of Non-Fatal Strangulation:  Fact and Fiction", Royal College of Pathologists of Australasia, Sydney, Australia, September 2016

"The Forensic and Medical Evaluation of Non-Fatal Strangulations", 19th Annual Dietz Wolfe, M.D. Lectureship, Norton Healthcare, Louisville, Kentucky, August 2016

"The Forensic Evaluation of Gunshot Wounds:  Applications for the domestic and officer-involved shootings", Indiana University Health Forensic Conferences, Indianapolis, Indiana, August 2016

31

"Driver or Passenger?:  Is the dead guy always the driver?", Indiana University Health Forensic Conferences, Indianapolis, Indiana, August 2016

"The Forensic and Medical Evaluation of the Non-Fatal Strangulation Patient", Department of Emergency Medicine, University of Louisville School of Medicine, August 2016

"The Forensic Evaluation of Non-Fatal Strangulation:  Applications for the EMT and Paramedic", Louisville Metro Emergency Medical Services, Louisville, Kentucky, July 2016.

"The Forensic Evaluation of Gunshot Wounds:  Applications for the emergency medicine physician", Department of Emergency Medicine, University of Louisville School of Medicine, Louisville, Kentucky, July 2016

"The Forensic Evaluation of Fatal and Non-Fatal Strangulation:  Getting a grip on your victim's forensic needs", Kansas University Medical Center, Salina Regional Trauma Conference, Saline, Kansas, June 2016

"The Forensic Evaluation of Gunshot Wounds:  Applications for domestic and officer-involved shootings", Kansas University Medical Center, Salina Regional Trauma Conference, Saline, Kansas, June 2016

"The Forensic Evaluation of Gunshot Wounds:  Applications for domestic and officer-involved shootings", Christiana Trauma Center, Newark, Delaware, May 2016

 "The Medical Investigation and Prosecution of Felony Strangulation", Chief State's Attorney's Office, Connecticut College, Groton Connecticut, February 2016

"The Medical Investigation and Prosecution of Felony Strangulation", Family Justice Center, Rock Springs, Wyoming, January 2016

### Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2015
"Getting a Grip on Strangulation:  Understanding the medical science", Family Court, Jefferson County, Louisville, Kentucky, December 2015

"The Forensic Evaluation of Gunshot Wounds:  Do healthcare providers obstruct justice?", 71st Samuel David Gross Lecturer, Phi Delta Epsilon Medical Fraternity, Phi Chapter, University of Louisville School of Medicine, November 2015

Training Institute on Strangulation Prevention, Denver County District Attorney's Office, Denver, Colorado, September 2015

Training Institute on Strangulation Prevention, Kandiyohi County Prosecutor's Office, Kandiyohi, MN, September 2015

"The Forensic Evaluation of Strangulation Victims", Spaulding University in cooperation with: Norton Healthcare, Louisville Metro Police Department and the United States Attorney's Office, July 2015

"The Forensic Evaluation of Gunshot Wounds:  Applications for the domestic and officer-involved shootings", Spaulding University in cooperation with:  Norton Healthcare, Louisville Metro Police Department and the United States Attorney's Office, July 2015

"The Forensic Evaluation of Gunshot Wounds:  Applications for the officer-involved shootings", Practical program Galen Center for Professional Development, Louisville, Kentucky, July 2015

"The Forensic Evaluation of Gunshot Wounds:  Applications for the emergency physician, University of Louisville School of Medicine, Louisville, Kentucky, July 2015

"The Forensic Evaluation of Gunshot Wounds:  Applications for the emergency physician", University of Louisville School of Medicine, March 2015

"The Forensic Evaluation of Gunshot Wounds:  Applications for the emergency physician", Phi Delta Epsilon, University of Kentucky, March 2015

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2014**
"Pattern Injuries:  Applications for the emergency physician", Department of Emergency Medicine, University of Louisville, December 2014

"The Forensic Evaluation of the Strangulation Victim:  Applications for the emergency physician", Department of Emergency Medicine, University of Louisville, November 2014

"The Forensic Evaluation of the Strangulation Victim", Department of the Prosecuting Attorney, Honolulu, Hawaii, November 2014

"The Forensic Evaluation of Gunshot Wounds:  Applications for the emergency physician", Phi Delta Epsilon, University of Louisville, November 2014

"The Forensic Evaluation of Gunshot Wounds:  Applications for the emergency physician", Department of Emergency Medicine, University of Louisville School of Medicine, July 2014

 "The Forensic Evaluation of the Strangulation Victim", Training Institute on Strangulation Prevention, Bellingham, Washington, June 2014

"He More Than Choked Her:  Identifying, Examining and Documenting Strangulation Patients", Grand Rounds, PeaceHealth St. Joseph Medical Center, Bellingham, Washington, June 2014

"The Forensic Evaluation of the Strangulation Victim", Elizabethtown Police Department, Elizabethtown, Kentucky, May 2014

"Obstruction of Justice by Health Care Professionals:  Errors in the Forensic Evaluation of Gunshot Wounds, Phi Delta Epsilon, University of Louisville, April 2014

"Clinical Forensic Medicine", Department of Emergency Medicine, University of Louisville School of Medicine, April 2014

"The Forensic Evaluation of Gunshot Wounds:  Applications for the Officer-Involved Shooting", Homicide Unit, Dallas Police Department, Dallas, April 2014

"Elder Abuse and Neglect", Department of Emergency Medicine, University of Louisville School of Medicine, March 2013

"The Forensic Applications of Alcohol:  The DUI Patient", Department of Emergency Medicine, University of Louisville School of Medicine, March 2013

"The Forensic Evaluation of Gunshot Wounds:  Applications for Domestic Shootings", The Indiana Chapter of the International Association of Forensic Nurses, Indianapolis, Indiana, March 2014

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2013**
"The Forensic Evaluation of Gunshot Wounds:  Applications for EMS Providers", Louisville Metro Emergency Medical Services, Louisville, Kentucky, December 2013

"The Forensic Evaluation of Gunshot Wounds:  Applications for the officer-involved shooting, Carilion Clinic, Roanoke Memorial Hospital, Roanoke, Virginia, December 2013.

"The Physical Assessment and Forensic Evaluation of Strangulation Victims:  'Don't Choke'": Louisville Metro Emergency Medical Services, Louisville, Kentucky, October 2013

"Pattern Injuries and Interpersonal Violence", Department of Emergency Medicine, University of Louisville Hospital, Louisville, Kentucky, October 2013

"The Forensic Evaluation of Victims of Strangulation", Tulane School of Law, New Orleans, Louisiana, October 2013

"The Medical Evaluation of Victims of Strangulation", Department of Emergency Medicine, Louisiana State University, New Orleans, October 2013

"The Forensic Evaluation of Gunshot Wounds", Department of Emergency Medicine, University of Louisville Hospital, Louisville, Kentucky, September 2013

"Forensic Evaluation of the Strangulation Victim", Department of Emergency Medicine, University of Louisville Hospital, August 2013

"Clinical Forensic Medicine:  Applications for the law enforcement officer", Louisville Metro Police Training Academy, May 2013

"The Forensic Evaluation of Gunshot Wounds:  Applications for the officer-involved shooting", 40-Hour Pilot Course, Carolinas Healthcare Systems, Charlotte, North Carolina, April 2013

"The Physical Assessment and Forensic Evaluation of Strangulation Victims", Louisville Metro Police Training Academy, Louisville, Kentucky, April 2013

"Elder Abuse and Neglect:  Applications for the investigating officer", Louisville Metro Police Training Academy, Louisville, Kentucky, March 2013

"The Physical Assessment and Forensic Evaluation of Strangulation Victims", Louisville Metro Police Training Academy, Louisville, Kentucky, March 2013

"Clinical Forensic Medicine:  Applications for the investigation of interpersonal violence": Louisville Metro Police Training Academy, Louisville, Kentucky, February 2013

"The Physical Assessment and Forensic Evaluation of Strangulation Victims", Louisville Metro Police Training Academy, Louisville, Kentucky, February 2013

"Clinical Forensic Medicine:  Can you make the diagnosis?", Phi Delta Epsilon, Regional Leadership Conference, Louisville, Kentucky, January 2013

"Excited Delirium Syndrome and In-Custody Deaths", New Albany Police Department In-service Training, New Albany, Indiana, January 2013

"The Physical Assessment and Forensic Evaluation of Strangulation Victims", New Albany Police Department In-service Training, New Albany, Indiana, January 2013

"The Forensic Evaluation of Gunshot Wounds:  Applications for the officer-involved shooting", Carolinas Medical Center, Charlotte, North Carolina, January 2013

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2012**
The Forensic Evaluation of Gunshot Wounds, Department of Emergency Medicine, University of Kentucky School of Medicine, November 2012.

The Forensic Evaluation of Strangulation Victims, Department of Emergency Medicine, University of Louisville School of Medicine, October 2012.

The Forensic Evaluation of Gunshot Wounds, Department of Emergency Medicine, University of Louisville School of Medicine, October 2012.

 "The Forensic Evaluation of Wounds", Department of Emergency Medicine, University of Louisville School of Medicine, Louisville, Kentucky, May 2012

"Bioterrorism and Public Health" Department of Emergency Medicine, University of Louisville School of Medicine, Louisville, Kentucky, May 2012

"The Role of Clinical Forensic Medicine and Nursing in Officer-Involved Shootings", Connell School of Nursing, Boston College, Newton, Massachusetts, May 2012

 "The Forensic Evaluation of Gunshot Wound:  Does size matter?", Emergency Trauma Symposium, University of Louisville Hospital, February 2012.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2011**
"The Forensic Evaluation of Gunshot Wounds:  Applications for Officer-Involved Shootings", Christiana Medical Center, Wilmington, Delaware, December 2011.

"Diagnostic Pitfalls in the Forensic Evaluation of Gunshot Wounds", Grand Rounds Trauma Conference, Department of Emergency Medicine, Christiana Medical Center, Wilmington, Delaware, December 2011.

"Clinical Forensic Medicine and Nursing:  The Louisville Model", Multidisciplinary Trauma Conference, University of Louisville Hospital, Louisville, Kentucky, November 2011.

"The Forensic Evaluation of Gunshot Wounds:  Officer-Involved Shootings", Grand Rounds, University of Alabama Birmingham, Department of Emergency Medicine, Birmingham, Alabama, November 2011.

"The Development of Clinical Forensic Medicine in the U.S.", Maine Medico Legal Society, New England Seminar in Forensic Sciences, Colby College, Waterville, Maine, August 2011.

"Diagnostic Pitfalls in the Forensic Evaluation of Gunshot Wounds", Multidisciplinary Trauma Conference, University of Louisville Hospital, Louisville, Kentucky July 2011

"Clinical Forensic Nursing: Pattern injuries, can you make the diagnosis?", Bermuda Hospitals Board, Hamilton, Bermuda. April 2011.

"Clinical Forensic Medicine:  Pattern injuries, can you make the diagnosis?", Bermuda Hospitals Board, Hamilton, Bermuda. April 2011.

"The Forensic Evaluation of Gunshot Wounds:  Applications for the investigation of violent crimes". Bermuda Underwater Exploration Institute, Bermuda Hospitals Board, Hamilton, Bermuda. April 2011.

"The Forensic Evaluation of Gunshot Wounds", Grand Rounds, Bermuda Hospitals Board, Hamilton, Bermuda. April 2011.

"Applications of Clinical Forensic Medicine in the A & E", Bermuda Hospitals Board, Hamilton, Bermuda. April 2011.

"Introduction to Clinical Forensic Medicine:  Applications for the Operating Theater", Bermuda Hospitals Board, Hamilton, Bermuda. April 2011.

"Introduction to Clinical Forensic Nursing", Bermuda Hospitals Board, Hamilton, Bermuda. April 2011.

"Benefits and Applications of Forensic Nursing in the Evaluation of Gunshot Wounds", Christiana Health Care, Wilmington, Delaware. March 2011

"The Forensic Evaluation of Strangulation Injuries in Victims of Domestic Violence", Jefferson County District and Circuit Court, Louisville, Kentucky.  February 2011.

"Gunshot Wounds:  Forensic Evaluation and Legal Issues, Applications for criminal investigations and officer-involved shootings", University of Louisville School of Nursing, Louisville, Kentucky, February 2011.

"The Forensic Evaluation of Handgun, Shotgun and High Velocity Wounds", Advance Ballistic Trauma Seminar, Bellarmine University and Louisville Metro EMS, Louisville, Kentucky, February 2011.

"The Forensic Evaluation of Gunshot Wounds:  Can you make the diagnosis?, Multi-disciplinary Trauma Conference, University of Louisville Hospital, Louisville, Kentucky, January 2011.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2010**
"Development of Tactical Medical Programs in Kentucky", Kentucky Tactical Officer's Association, Frankfort, Kentucky, November 2010.

"Forensic Medicine and Nursing Symposium", Samaritan Hospital, Troy, NY, November 2010.

"Military Combat Medicine:  Applications in the Civilian Environment". Department of Family and Community Medicine, University of Louisville School of Medicine, September 2010

"Applications of Clinical Forensic Medicine", Department of Emergency Medicine, Wright State University, Dayton, Ohio, January 2010.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2009**
"The Forensic Evaluation of Gunshot Wounds and Evidence Collection", Phi Delta Epsilon, University of Louisville School of Medicine, September 2009.

"The Forensic Evaluation of Gunshot Wounds and Evidence Collection", Multi-disciplinary Trauma Conference, University of Louisville Hospital, July 2009.

"The Forensic Evaluation of Gunshot Wounds in the Tactical Environment", Counter Narcotics & Terrorism Operational Medical Support, United States Park Police, Alexandria, Virginia, July, 2009.

"The Investigation of Officer Involved Shootings and Incidents", Kentucky State Police Training Academy, Frankfort, Kentucky, July 2009.

"Occupant Kinematics, Air Bag Injuries and the Determination of Driver versus Passenger", Utah Highway Patrol Training Academy, Salt Lake City, Utah, June 2009.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2008**
"Pandemic Flu Preparedness for the Courts", Jefferson County Kentucky Circuit and District Courts, May 2008.

"Forensic Aspects of Motor Vehicle Trauma:  Airbags and Who's Who".  Multi-Disciplinary Trauma Conference, University of Louisville Hospital, January 2008.

"Tactical Emergency Medicine", Kentucky State Police SWAT, Lexington, KY, January 2008.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2007**
"The Medical Assistance and Tactics Team, M.A.T.T.", University of Kentucky School of Public Health, Lexington, Kentucky. November 2007.

"Is Forensic Medicine or Forensic Nursing the subspecialty we are seeking or is it something different?", Family Violence Prevention Fund, 2007 National Conference on Health and Domestic Violence, San Francisco, California, March 2007.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums: 2006**
"The University of Louisville's Gunshot Wound Registry", Grand Rounds, Department of Surgery, University of Louisville, July 2006.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums: 2005**
"Screening for the Human Biologic Vector and the Use of the Medical Assistance and Tactical Team", Transportation Research Board Annual Conference, Washington, D.C. January 2005.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums: 2004**
"The Medical Assistance and Tactics Team, M.A.T.T.", University of Kentucky School of Public Health, Lexington, Kentucky. November 2004.

"Pattern Injuries in Victims of Domestic Violence", Valley Baptist Medical Center, Harlingen, Texas. November 2004.

Enhancing Partnerships for Safe Neighborhoods, Community Policing Consortium, Orlando, Florida. April 2004.

CASE Media Fellowship: From SARS to Sarin: Surviving a Nuclear, Biological or Chemical Assault, University of Louisville, Louisville, Kentucky. April 2004.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums: 2003**
"Applications of Clinical Forensic Medicine in Your Practice", Maine Medical Legal Society, Colby College, Waterville, Maine. August 2003.

"Clinical Forensic Medicine for the Emergency Physician", Department of Emergency Medicine, Medical College of Georgia, Augusta, Georgia. April 2003.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums: 2002**
"Clinical Forensic Medicine: What the emergency physician needs to know", Department of Emergency Medicine, Vanderbilt University, Nashville, Tennessee. April 2002.

Airbag Induced Injuries and Deaths: What the physician needs to know. Grand Rounds, Departments of Surgery and Emergency Medicine, University of Kentucky, Lexington, Kentucky. February 2002.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums: 2001**
"Bioterrorism Simulation and Lab", Recognizing and Responding to the Threat of Bioterrorism Luncheon Series, University of Louisville School of Medicine, Louisville, Kentucky. December 2001.

"Terrorism: The Louisville Model", Recognizing and Responding to the Threat of Bioterrorism Luncheon Series, University of Louisville School of Medicine, Louisville, Kentucky. November 2001.

"Recognizing and Responding to the Threat of Bioterrorism", with Ronald Atlas, PhD., Department of Family and Community Medicine, University of Louisville School of Medicine, Louisville, Kentucky. November 2001.

**Academic Grand Rounds, Invited Lectures, Training Programs and Symposiums:  2000**
"Airbag Induced Injuries:  A failure to warn":  Department of Pediatrics, Kosair Children's Hospital, University of Louisville School of Medicine, Louisville, Kentucky. November 2000.

"Clinical Forensic Medicine for the Emergency Physician", Department of Emergency Medicine, Methodist Hospital, Indianapolis, Indiana. October 2000.

"Clinical Forensic Medicine for the Emergency Physician", Department of Emergency Medicine, Medical College of Georgia, Augusta, Georgia. May 2000.

**1999**
"Clinical Forensic Medicine and the Emergency Medicine Physician", Department of Emergency Medicine, University of North Carolina, Charlotte, North Carolina. December 1999.

"What Emergency Physicians Should Know about Clinical Forensic Medicine", Department of Emergency Medicine, North Shore University Hospital, Manhasset, New York. October 1999.

"Domestic Violence:  The Role of the Physician in Breaking the Cycle", Summa Akron City Hospital, Akron, Ohio. October 1999.

**1998**
"Airbag Related Injuries", Department of Physical Medicine and Rehabilitation, University of Louisville School of Medicine, Louisville, Kentucky. June 1998.

"Clinical Forensic Medicine:  The forensic evaluation of gunshot wounds, penetrating trauma and pattern injuries", Department of Emergency Medicine, Truman Medical Center and the University of Missouri-Kansas City, Kansas City, Missouri. June 1998.

"Patterns of Injury:  Forensics in Emergency Medicine", Department of Emergency Medicine, Truman Medical Center and the University of Missouri-Kansas City, Kansas City, Missouri. June 1998.

"Clinical Forensic Medicine", Department of Emergency Medicine, Medical College of Virginia, Richmond, Virginia. February 1998.

**1997**
"Pediatric Clinical Forensic Medicine"  Department of Pediatrics, University of Louisville School of Medicine, Louisville, Kentucky. October 1997.

"The Forensic Evaluation of Gunshot Wounds", Department of Emergency Medicine, Methodist Hospital, Indianapolis, Indiana. July 1997.

"The Evaluation of Pattern Injuries in Victims of Child Abuse and Domestic Violence", Department of Emergency Medicine, Methodist Hospital, Indianapolis, Indiana. July 1997.

"Airbags and the Pediatric Patient", Department of Pediatrics, University of Louisville School of Medicine, Louisville, Kentucky. June 1997.

"Clinical Forensic Medicine", Department of Military and Emergency Medicine, Uniformed Services University, Bethesda, MD. April 1997.

"Airbag Injuries:  From the Malignant to the Benign", Department of Emergency Medicine, University of Southern California, Los Angeles, California. February 1997.

"Clinical Forensic Medicine for the Emergency Physician", Department of Emergency Medicine, University of Kentucky, Lexington, Kentucky. January 1997.

**1995**
"Forensics and the Emergency Physician", Department of Emergency Medicine, Wright State University, Dayton, Ohio. November 1995.

**1994**
"Clinical Forensic Medicine: What the attending physician needs to know", Department of Emergency Medicine, University of Kentucky.  Lexington, Kentucky. November 1994.

"Clinical Forensic Medicine in the Emergency Department", Department of Emergency Medicine, Medical College of Pennsylvania, Philadelphia, Pennsylvania. November 1994.

**1992**
"Pediatric Forensic Medicine", Grand Rounds, Kosair Children's Hospital, Louisville, Kentucky. August 1992.

**International Presentations:**
**2017**
"The Forensic and Medical Evaluation of Non-Fatal Strangulations:  The Red Rose Foundation, Brisbane, Australia, February 2017

**2016**
"The Pathophysiology and Medical Evaluation of Non-Fatal Strangulations: Investigation and Prosecution of Felony Cases", International Association of Chiefs of Police, San Diego, California. October 2016

"The Clinical Forensic Evaluation of GSWs:  Applications for Officer-involved shootings", International Association of Chiefs of Police, San Diego, California. October 2016

"The Forensic and Medical Evaluation of Non-Fatal Strangulations", International Association of Forensic Nurses, Denver, CO, September 2016

"He More Than Just Strangled Her:  Medical science and the long term consequences of strangulation", XXIII Congreso Colombiano de preventcion y atencion del maltrato infantile, Universidad de Bogota, Bogotá, Columbia, July 2016

 "Promising Forensic Documentation Practices in Handling SA and DV Strangulation Cases: The Maricopa and Louisville Model", 16th Annual Family Justice Conference, San Diego, California, April 2016

"The Medical Science of Strangulation Crimes:  The Long Term Consequences", 16th Annual Family Justice Conference, San Diego, California, April 2016

"Crime Scene Investigation of Strangulation:  Available tools and technology", 16th Annual Family Justice Conference, San Diego, California, April 2016

"The Forensic Evaluation of Gunshot Wounds:  Applications for the Domestic and Officer-Involved Shootings", International Conference on Sexual Assault, Domestic Violence, and Engaging Men & Boys, End Violence Against Women International, Washington, DC, March 2016

## 2015
"The Forensic Evaluation of Gunshot Wounds:  Applications for the Domestic and Officer-Involved Shootings", International Association of Forensic Nurses, Orlando, Florida, October 2015

"The Forensic Evaluation of Gunshot Wounds:  Applications for the Officer-Involved Shooting, International Association of Chief's of Police, Chicago, Illinois, October 2015

## 2014
"Rapidly Detecting Human Biologic Vectors:  Applications for Ebola", International Association of Chiefs of Police, Orlando, Florida, October 2014

"The Forensic Evaluation of GSWs-The Hole Truth:  Obstruction of Justice by Health Care Professionals": International Association of Forensic Nurses, Phoenix, Arizona, October 2014

"Getting a Grip on Strangulation:  The forensic evaluation"; International Association of Forensic Nurses, Phoenix, Arizona, October 2014

## 2013
"The Forensic Evaluation of Motor Vehicle Trauma:  Driver or Passenger": 21st Annual Scientific Assembly, International Association of Forensic Nurses, Anaheim, California October 2013

"The Physical Assessment and Forensic Evaluation of Strangulation Victims:  'Don't Choke'": 21st Annual Scientific Assembly, International Association of Forensic Nurses, Anaheim, California October 2013

## 2012
"The Role of Clinical Forensic Medicine and Nursing in Officer-Involved Shootings", International Association of Forensic Nurses, Puerto Rico, October 2012

## 2011

"The Role of Clinical Forensic Medicine in Officer-Involved Shootings", International Association of Forensic Nurses, Montreal, Canada, October 2011.

"The Role of Clinical Forensic Medicine in Officer-Involved Shootings", International Association of Chiefs of Police, Chicago, October 2011.

**2010**
The Forensic Evaluation of Gunshot Wounds, 18th Annual Scientific Assembly, International Association of Forensic Nurses, Pittsburgh, Pennsylvania.  October 2010.

Air Bag Injuries and Deaths:  Do you have a bomb in your car?, International Association of Coroners and Medical Examiners, Las Vegas, Nevada, July 2010.

**2009**
Development of a Model Curriculum for Forensic Nurse Examiners. International Association of Forensic Nurses Annual Conference, Atlanta, Georgia, October 2009.

**2008**
The Financial Costs and Circumstances of Firearms-Related Domestic Violence ,13th International Conference on Violence, Abuse and Trauma, San Diego, CA, September 2008.

**2006**
"Medical Assistance and Tactical Teams, M.A.T.T:  The Next Generation of All Hazards Medical Response, 27th International Disaster Management Conference, Orlando, Florida. February 2006.

**2005**
"Medical Assistance and Tactical Teams, M.A.T.T.: The Next Generation of TEMS", International Tactical Emergency Medical Support Conference, San Diego, California. September 2005.

"Recognition and Response to the Human biologic Vector: Are we Ready?", Airports Council International-North America, Security Committee Spring Meeting, Austin, Texas.  March 2005.

**2004**
"Forensic Investigation of Police Related Shootings", 8th International Conference on Tactical Emergency Medical Support, Department of Military and Emergency Medicine, Uniformed Services University of the Health Sciences, Washington, D.C. June 2004.

"Medical Assistance and Tactical Teams, M.A.T.T", 8th International Conference on Tactical Emergency Medical Support, Department of Military and Emergency Medicine, Uniformed Services University of the Health Sciences, Washington, D.C. June 2004.

**2002**
"Jeffery C. Gilbert vs. Prince George's County:  The Application of Clinical Forensic Medicine in a Warrant Gone Bad", 6th International Conference on Tactical Emergency Medical Support, Department of Military and Emergency Medicine, Uniformed Services University of the Health Sciences, Las Vegas, Nevada. June 2002.

"Clinical Forensic Medicine and Crime Scene Evaluation for the Tactical Medic", 6th International Conference on Tactical Emergency Medical Support, Department of Military and Emergency Medicine, Uniformed Services University of the Health Sciences, Las Vegas, Nevada. June 2002.

**2001**
"Chemical Emergencies:  Practical Solutions for Pre-Hospital and Hospital Personnel Protection", Instituut voor Urgentiegeneeskunde, Amsterdam, Netherlands. February 2001.

**2000**
"Airbag Induced Injuries:  A failure to warn", 17th International Extrication Competition and Learning Symposium, Louisville, Kentucky. October 2000

**1999**
"Management of Bioterrorism Hoaxes", Third International Conference on Tactical Emergency Medical Support, Casualty Care Research Center and Department of Military and Emergency Medicine, Uniformed Services University of the Health Sciences, Bethesda, Maryland. June 1999

**1997**
"Serious and Fatal Injuries Caused by Passenger-Side Airbags in Low Speed Frontal Collisions", XVII the International Conference on Legal Medicine, Dublin, Ireland. August 1997

"Airbag:  The Problem", Search and Rescue/Disaster Response World Conference, Nashville, Tennessee. July 1997

"Clinical Forensic Medicine:  Tales from Death's Door", First International Conference on Tactical Emergency Medicine, Department of Military and Emergency Medicine, Uniformed Services University, Bethesda, Maryland. June1997

**1996**
"The Role of Clinical Forensic Medicine in the Emergency Department", 6th International Conference on Emergency Medicine, Sydney, Australia. November 1996

**1995**
"The Forensic Evaluation of Gunshot Wounds", The Association of Australasian and Pacific Area Police Medical Officers, Darwin, Australia. August1995

"The Training of Emergency Physicians in Clinical Forensic Medicine", The Association of Australasian and Pacific Area Police Medical Officers, Darwin, Australia. August1995

**1993**
"Airbag Induced Injuries", 10th International Extrication Competition and Learning Symposium, Louisville, Kentucky. October1993

"Development of the First Clinical Forensic Medicine Training Program in the United States", Third International Conference of the World Police Medical Officers, Harrogate, North Yorkshire, England. September 1993

050

"Development of a Clinical Forensic Medicine Curriculum for Emergency Department Physicians in the United States", 13th Meeting of the International Association of Forensic Sciences, Dusseldorf, Germany. August 1993

"Clinical Forensic Medicine in the United States", Department of Forensic Medicine, University of Edinburgh, Edinburgh, Scotland. August 1993

**1989**
"Clinical Forensic Medicine", Accident and Emergency Department, Royal Infirmary of Edinburgh. Edinburgh, Scotland. October 1989

"The Team Approach to the Investigation of Motor Vehicle Collisions", Department of Forensic Medicine, University of Aberdeen School of Medicine, Aberdeen, Scotland. October 1989

"The Team Approach to the Investigation of Motor Vehicle Collisions", Lothian and Borders Police Department, Edinburgh, Scotland. October 1989

"Chemical Testing:  Crucial to the Investigation, Indictment and Prosecution of Vehicular Homicide", Alcohol, Drugs and Traffic Safety, 11th International Conference, Chicago, Illinois. October 1989

"The Determination of Driver Versus Passenger in Motor Vehicle Collisions", International Association of Coroners and Medical Examiner's, Fort Mitchell, Kentucky. June 1989

**National Presentations:**
**2017**
"Understanding the Crime Scene in Non-fatal Strangulation Cases", 12th Annual Conference on Crimes Against Women, Dallas, Texas, May 2017

"The Forensic Evaluation of Gunshot Wounds:  Applications for domestic and officer-involved shootings", 12th Annual Conference on Crimes Against Women, Dallas, Texas, May 2017

"Prosecution of Strangulation as Torture: A case study", Family Justice Conference, Milwaukee, Wisconsin, April 2016

**2016**
"The Forensic and Medical Evaluation of Non-Fatal Strangulations:  Getting a grip on your patient's forensic needs", 8th Annual Southwest Trauma and Acute Care Symposium, Arizona Trauma Association, Scottsdale, Arizona, November 2016

"Obstruction of Justice by Healthcare Professionals:  The Forensic Evaluation of Gunshot Wounds", 8th Annual Southwest Trauma and Acute Care Symposium, Arizona Trauma Association, Scottsdale, Arizona, November 2016

"Understanding the Crime Scene in Non-Fatal Strangulation Cases", Crimes Against Women Conference, Dallas, Texas, April 2016

"Long-Term Consequences of Strangulation:  PTSD, brain injury, strokes & much more, oh my!, Crimes Against Women Conference, Dallas, Texas, April 2016

"Forensic Evaluation of Gunshot Wounds:  Applications for domestic and officer-involved shootings", Crimes Against Women Conference, Dallas, Texas, April 2016

"The Forensic Evaluation of Strangulation Victims": Institute on Strangulation Prevention, San Diego, February 2016

**2015**
"The Forensic Evaluation of Strangulation Victims": Strangulation Training Institute, San Diego, August 2015

"The Forensic Evaluation of Gunshot Wounds:  Applications for the officer-involved shooting": Family Justice Conference, San Diego, CA, April 2015

**2014**
"The Forensic Evaluation of Gunshot Wounds:  Applications for the officer-involved shooting": National Sheriff's Association, Fort Worth, Texas, June 2014

"Obstruction of Justice by Health Care Professionals:  Errors in the Forensic Evaluation of Gunshot Wounds", 7th Annual Forensic Investigations Conference, Kansas City, Kansas, May 2014

"The Forensic Evaluation of Gunshot Wounds in Domestic Shootings", 9th Annual Conference on Crimes Against Women, Dallas, Texas, April 2014

"The Medical Aspects of a Domestic Violence and Sexual Assault Strangulation Case", 9th Annual Conference on Crimes Against Women, Dallas, Texas, April 2014

**2013**
"The Forensic Evaluation of Gunshot Wounds:  Applications for the officer-involved shooting", 10th Rio Grande Valley Seminar in Forensic Sciences, Valley Baptist Health System, South Padre Island, Texas. November 2013

"The Forensic Investigation of Strangulation:  Don't Choke", 10th Rio Grande Valley Seminar in Forensic Sciences, Valley Baptist Health System, South Padre Island, Texas. November 2013

"The Forensic Evaluation of Gunshot Wounds:  Applications for the officer-involved shooting", National Sheriffs Association, Annual Conference, Charlotte, North Carolina, June 2013

"The Forensic Investigation of Officer-Involved Shootings", 6th Annual Forensic Investigations: Sexual Assault, Domestic Violence, Child and Elder Abuse…from Scene to Courtroom, St. Luke's Hospital of Kansas City, Kansas City, Missouri, May 2013

"Evidence Collection in Gunshot Wounds:  Avoiding blunders in the ED", 6th Annual Forensic Investigations:  Sexual Assault, Domestic Violence, Child and Elder Abuse…from Scene to Courtroom, St. Luke's Hospital of Kansas City, Kansas City, Missouri, May 2013

"Does Size Matter?:  The forensic evaluation of gunshot wounds", 6th Annual Forensic Investigations:  Sexual Assault, Domestic Violence, Child and Elder Abuse…from Scene to Courtroom, St. Luke's Hospital of Kansas City, Kansas City, Missouri, May 2013

"Driver or Passenger:  The forensic determination of occupant role", 6th Annual Forensic Investigations:  Sexual Assault, Domestic Violence, Child and Elder Abuse…from Scene to Courtroom, St. Luke's Hospital of Kansas City, Kansas City, Missouri, May 2013

"The Forensic Investigation of Strangulation:  Don't Choke", 6th Annual Forensic Investigations: Sexual Assault, Domestic Violence, Child and Elder Abuse…from Scene to Courtroom, St. Luke's Hospital of Kansas City, Kansas City, Missouri, May 2013

"The Forensic Evaluation of Strangulation Victims", 8th Annual Conference on Crimes Against Women, Dallas, Texas, April 2013

## 2012
"The Role Clinical Forensic Medicine and Nursing in Officer-Involved Shootings", Valley Regional Medical Center, Brownsville, Texas, March 2012

## 2011
"Pattern Injuries in Victims of Interpersonal Violence", New England Seminar in Forensic Sciences, Colby College, Waterville, Maine, August 2011

"Driver or Passenger:  Is the Dead Guy Always the Driver", New England Seminar in Forensic Sciences, Colby College, Waterville, Maine, August 2011

"The Role of Clinical Forensic Medicine in Officer-Involved Shootings", New England Seminar in Forensic Sciences, Colby College, Waterville, Maine, August 2011

## 2007
"Avian Influenza: Occupational Health Program for Protecting your Officers", Police Research Executive Forum, Chicago, IL, April, 2007.

"LEO Protection:  Recommendations for Contact with Influenza H5N1 Infected Individuals", Alabama Departments of Public Health and Safety, Montgomery, Alabama, March 2007.

## 2006
"The Golden Hour of Child Abuse Investigation:  Are the injuries consistent with the history?", 3rd Rio Grande Valley Seminar in Forensic Sciences, Valley Baptist Medical Center, South Padre Island, Texas. November 2006.

International Association of Chiefs of Police, "Pandemic Influenza:  Is Justice Prepared?", Boston, MA.  October 2006

Pandemic Flu Conference, Bureau of Justice Administration, U.S. Department of Justice, Chicago, IL.  May 2006.

## 2005

2nd Rio Grande Valley Seminar in Forensic Sciences, Valley Baptist Medical Center, South Padre Island, Texas. November 2005.

"The Forensic Investigation of Air Bag-Induced Injuries and Deaths", 11th Annual Master's Forensic Conference, St. Louis University, St. Louis, MO, July 2005.

## 2004
"Medical Assistance and Tactics Team", Emergency Response Conference and Exposition, San Diego, California.  November 2004.

"Clinical Forensic Medicine: Practical Applications: 1st Rio Grande Valley Seminar in Forensic Sciences, Valley Baptist Medical Center, South Padre Island, Texas. November 2004.

"The Forensic Investigation of Police-Related Shootings", International Tactical Emergency Medicine Conference, Virginia Beach, Virginia. October 2004.

"Medical Assistance and Tactical Team:  Screening for the human biologic vector", American Community Preparedness Conference and Expo:  Response to Terrorism 2004, Louisville, Kentucky. May 2004.

"Medical and Law Enforcement Preparation for Special Events", American Community Preparedness Conference and Expo:  Response to Terrorism 2004, Louisville, Kentucky. May 2004.

## 2003
"Recognition and Evaluation of Pattern Injuries in Clinical Medicine:  What Really Happened?", 30th Annual New England Seminar in Forensic Sciences, Colby College, Waterville, Maine. August 2003.

"Clinical Forensic Medicine and the Evaluation of Gunshot Wounds",30th Annual New England Seminar in Forensic Sciences, Colby College, Waterville, Maine. August 2003.

"Pattern Injuries in Child Abuse and Domestic Violence", Forensic Focus 2003, Scottsdale, Arizona. June 2003.

"Forensic Evaluation of Gunshot Wounds", Forensic Focus 2003, Scottsdale, Arizona. June 2003.

"Applying Forensics to ER Practice": 2003 Changes Emergency Medicine Conference, East Central Georgia & South Carolina Midlands Emergency Medical Services, Augusta, Georgia. April 2003.

"Forensics of Gunshot Wounds": 2003 Changes Emergency Medicine Conference, East Central Georgia & South Carolina Midlands Emergency Medical Services, Augusta, Georgia. April 2003.

"The Forensic Evaluation of Gunshot Wounds: 2003 Critical Care Transport Medicine Conference, Louisville, Kentucky. March 2003.

## 2002
Airbag Induced Injuries and Deaths:  The forensic investigation. 29th Annual New England Seminar in Forensic Sciences, Colby College, Waterville, Maine. August 2002.

The Forensic Determination of Driver versus Passenger. 29th Annual New England Seminar in Forensic Sciences, Colby College, Waterville, Maine. August 2002.

Forensic Photography and Pattern Injuries. First National Conference on Medical Care & Domestic Violence, Southwestern University, Dallas, Texas. April 2002.

**2001**
"Airbag Warning Label Project:  A Call to Arms", Society for Academic Emergency Medicine, Atlanta, Georgia. May 2001.

"Airbag Ankle:  A Traumatic Injury from Airbag Module Cover Deployment", American Academy of Forensic Sciences, Seattle, Washington. February 2001.

**2000**
Airbag Induced Injuries, American College of Emergency Physicians, Philadelphia,  Pennsylvania. October 2000.

Clinical Forensic Medicine for the Emergency Physicians, American College of Emergency Physicians, Philadelphia, Pennsylvania. October 2000.

Advanced Counter Narcotics Tactical Operations Medical Support Program (CONTOMS), Uniformed Services University of the Health Sciences, Bethesda, Maryland. August 2000.

"Forensics of Gunshot Wounds", Hawaiian Islands Trauma Symposium, Honolulu, Hawaii. July 2000.

"Tactical Emergency Medicine", Hawaiian Islands Trauma Symposium, Honolulu, Hawaii. July 2000.

"Airbags:  New Problems from a Preventive Measure", Hawaiian Islands Trauma Symposium, Honolulu, Hawaii. July 2000.

"Evaluation and Patterns of Injuries in Domestic Violence and Child Abuse", Hawaiian Island Trauma Symposium, Honolulu, Hawaii. July 2000.

Advanced Counter Narcotics Tactical Operations Medical Support Program (CONTOMS), Uniformed Services University of the Health Sciences, Bethesda, Maryland. February 2000.

**1999**
"Biological Terrorism Hoaxes:  Planned Response", Special Operations Medical Association, Tampa, Florida. December 1999.

"Airbag Induced Injuries:  From the malignant to the benign",  American College of Emergency Physicians,1999 Scientific Assembly, Las Vegas, Nevada. October 1999.

"What the Emergency Physicians Should Know about Clinical Forensic Medicine",  American College of Emergency Physicians,1999 Scientific Assembly, Las Vegas, Nevada. October 1999.

055

Counter Narcotics Tactical Operations Medical Support Program (CONTOMS), Uniformed Services University of the Health Sciences, Bethesda, Maryland. July 1999.

Advanced Counter Narcotics Tactical Operations Medical Support Program (CONTOMS), Uniformed Services University of the Health Sciences, Bethesda, Maryland. June,1999.

Domestic Violence Training Program, Society of Academic Emergency Medicine, Boston, Massachusetts May 1999.

### 1998

"Clinical Forensic Issues in Gunshot Wounds", Understanding State-of-the-Art Treatment & Prevention of Firearm Injuries, The Firearm Injury Center of the Medical College of Wisconsin, Milwaukee, Wisconsin. December 1998.

"Out-of-Hospital Emergency Medicine Treatment Issues", Understanding State-of-the-Art Treatment & Prevention of Firearm Injuries, The Firearm Injury Center of the Medical College of Wisconsin, Milwaukee, Wisconsin. December 1998.

Advanced Counter Narcotics Tactical Operations Medical Support Program (CONTOMS), Uniformed Services University of the Health Sciences, Bethesda, Maryland. November 1998.

"Clinical Forensic Medicine in the Sexually Assaulted Patient", Third Annual Sexual Assault Conference, University of Maryland, Baltimore, Maryland. November 1998.

"Pattern Injuries in Victims of Sexual Assault", Third Annual Sexual Assault Conference, University of Maryland, Baltimore, Maryland. November 1998.

"What the Emergency Physician Needs to Know About Clinical Forensic Medicine", American College of Emergency Physicians 1998 Scientific Assembly, San Diego, California. October 1998.

Advanced Counter Narcotics Tactical Operations Medical Support Program  (CONTOMS), Uniformed Services University of the Health Sciences, Bethesda, Maryland. June 1998.

"Airbag Induced Injuries:  From the malignant to the benign.", Fifth Annual Clinical Forensic Medicine Conference, University of Louisville School of Medicine, Louisville, Kentucky. May 1998.

"Domestic Violence Training Program: Physicians", Fifth Annual Clinical Forensic Medicine Conference, University of Louisville School of Medicine, Louisville, Kentucky. May 1998.

Advanced Counter Narcotics Tactical Operations Medical Support Program (CONTOMS), Uniformed Services University of the Health Sciences, Tampa, Florida. March,1998.

"Documentation:  Intervention and Documentation of Family Violence Injuries, California Academy of Family Physicians, Anaheim, California. February,1998.

### 1997

Advanced Counter Narcotics Tactical Operations Medical Support Program (CONTOMS), Uniformed Services University of the Health Sciences, Bethesda, Maryland. November 1997.

"What the Emergency Physician Needs to Know About Clinical Forensic Medicine", American College of Emergency Physicians 1997 Scientific Assembly, San Francisco, California. October 1997.

"Development of a Pediatric Forensic Medicine Program", American Professional Society on the Abuse of Children, Miami Beach, Florida, .June 1997.

"Driver or Passenger?:  Determination of an Occupant's Role", Fourth Annual Postgraduate Clinical Forensic Medicine Conference, University of Louisville School of Medicine, Louisville, Kentucky. June 1997.

"Airbags:  Friend or Foe?" Fourth Annual Postgraduate Clinical Forensic Medicine Conference, University of Louisville School of Medicine, Louisville, Kentucky. June 1997.

"The Recognition and Evaluation of Pattern Injuries in Victims of Domestic Violence", Fourth Annual Postgraduate Clinical Forensic Medicine Conference, University of Louisville School of Medicine, Louisville, Kentucky. June 1997.

"Forensic Photography and the Identification of Pattern Injuries in Victims of Domestic Violence", Society for the Prevention of Domestic Violence, San Francisco, California. February 1997.

**1996**
"What Emergency Physicians Should Know About Clinical Forensic Medicine", American College of Emergency Physician's Scientific Assembly, New Orleans, Louisiana. September 1996.

"Driver or Passenger", Third Annual Postgraduate Clinical Forensic Medicine Conference, Louisville, Kentucky June 1996.

"Practical Application of Clinical Forensic Medicine", Third Annual Postgraduate Clinical Forensic Medicine Conference, Louisville, Kentucky. May 1996.

"The Evaluations of Injuries in Police Custody", Third Annual Postgraduate Clinical Forensic Medicine Conference, Louisville, Kentucky. May 1996.

"Case Studies in Clinical Forensic Medicine", Third Annual Postgraduate Clinical Forensic Medicine Conference, Louisville, Kentucky. May 1996.

"Clinical Forensic Medicine", American College of Emergency Physicians Clinical Forum, Indianapolis, Indiana. April 1996.

"Comprehensive Evaluation of the Sexual Assault Victim", American College of Emergency Physicians Clinical Forum, Indianapolis, Indiana. April 1996.

"The Forensic Evaluation of Penetrating Trauma by Prehospital Personnel".  American Academy of Forensic Science, Nashville, Tennessee. February 1996.

<u>1995</u>

"Practical Applications of Clinical Forensic Medicine", Second Annual Postgraduate Clinical Forensic Medicine Conference, Louisville, Kentucky. May 1995.

"Case Studies in Clinical Forensic Medicine", Second Annual Postgraduate Clinical Forensic Medicine Conference, Louisville, Kentucky. May 1995.

"Driver or Passenger?  How to determine an occupant's role in a motor vehicle collision, Second Annual Postgraduate Clinical Forensic Medicine Conference, Louisville, Kentucky. May 1995.

<u>1994</u>

"Clinical Forensic Medicine:  What are the practical applications in the emergency department", First Annual Postgraduate Clinical Forensic Medicine Conference, Louisville, Kentucky. May 1994.

<u>1993</u>

"Practical Applications of Clinical Forensic Medicine in the Emergency Department", Southern Medical Association, New Orleans, Louisiana. October 1993.

"The Recognition and Evaluation of Domestic Violence in the Emergency Department", La Porte Hospital, LaPorte, Indiana. October 1993.

Clinical Pathology Conference, Society for Academic Emergency Medicine, San Francisco, California. May 1993.

"Clinical Forensic Medicine:  Living forensic medicine in the emergency department", American Academy of Forensic Sciences, Boston, Massachusetts. February 1993.

"Airbag Induced Fatal Injuries:  A case report", American Academy of Forensic Sciences, Boston, Massachusetts. February 1993.

<u>1992</u>

"The Forensic Evaluation of Gunshot Wounds in the Emergency Department", Southern Medical Association, San Antonio, Texas. November 1992.

"Clinical Forensic Medicine in the Emergency Department", Southern Medical Association, San Antonio, Texas. November,1992.

"Traumatic Avulsion of the First Digit Secondary to Airbag Deployment", Thirty Sixth Conference of the Association for the Advancement of Automotive Medicine, Portland, Oregon. October 1992.

"The Utilization of Physicians Trained in Clinical Forensic Medicine to Determine Occupant Roles in Motor Vehicle Collisions", Thirty Sixth Conference of the Association for the Advancement of Automotive Medicine, Portland, Oregon. October 1992.

"The Forensic Evaluation of Penetrating Trauma in the Emergency Department", American College of Emergency Physicians Scientific Assembly, Seattle, Washington. September 1992

Clinical Pathology Conference, Society for Academic Emergency Medicine, Toronto, Canada. May 1992

"Development of the First Clinical Forensic Medicine Training Program", American Academy of Forensic Sciences, New Orleans, Louisiana. February 1992

**1991**
"Clinical Forensic Medicine in the Emergency Department", American College of Emergency Physicians Scientific Assembly, Boston, Massachusetts. October 1991

"Clinical Forensic Medicine", Keys to the Crime, Evidence Collection in Trauma Symposium, St. Louis, Missouri. September 1991

"The Forensic Pathologist and the Determination of Driver versus Passenger in Motor Vehicle Collisions", American Academy of Forensic Sciences, Cincinnati, Ohio. February 1991

**Local and Regional Presentations**:
**2018**
"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, January 2018

**2017**
"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, December 2017

"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, October 2017

"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, September 2017

"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, September 2017

"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, January 2017

"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, January 2017

**2016**
"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, September 2016

"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, August 2016

059

"Obstruction of Justice by Health Care Providers:  The need for clinical forensic evaluations of gunshot wounds": Annual Delaware Trauma Symposium 2016, Wilmington, Delaware, May 2016

"Getting a Grip on Strangulation: Understanding the medical science":  2016 Child Abuse Summit, Driscoll Children's Hospital, Corpus Cristi, Texas, April 2016

"The Forensic Evaluation of Gunshot Wounds:  Applications for domestic and officer-involved shootings": 2016 Child Abuse Summit, Driscoll Children's Hospital, Corpus Cristi, Texas, April 2016

## 2015
"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, December 2015

"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, September 2015

"Strangulation and Pattern Injuries in Victims of Domestic Violence", Louisville Metro Police Academy, September 2015

"The Forensic Evaluation of Gunshot Wounds, Pattern Injuries and Strangulation in Domestic Violence", Louisville Metro Police Academy, August 2015

"Strangulation and Pattern Injuries in Victims of Domestic Violence", Louisville Metro Police Academy, August 2015

"The Forensic Evaluation of Gunshot Wounds:  Obstruction of justice", West Virginia Trauma Symposium, Stonewall Jackson Resort, West Virginia, January 2015

## 2014
"The Forensic Evaluation of Gunshot Wounds:  The hole truth", Kentucky Prosecutors Conference, Office of the Attorney General, Lexington, Kentucky, August 2014

"Getting a Grip on Strangulation: A forensic evaluation", Kentucky Prosecutors Conference, Office of the Attorney General, Lexington, Kentucky, August 2014

"The Forensic Evaluation of Gunshot Wounds", Louisville Metro Police Academy, August 2014

"Strangulation and Pattern Injuries in Victims of Domestic Violence", Louisville Metro Police Academy, August 2014

 "The Forensic Evaluation of the IPV Victim", 2nd Navajo Area Sexual Assault Response Team Training Conference, Navajo Nation Museum, Window Rock, Arizona, March 2014

"The Forensic Evaluation of Gunshot Wounds:  Applications for the domestic shooting", 2nd Navajo Area Sexual Assault Response Team Training Conference, Navajo Nation Museum, Window Rock, Arizona, March 2014

"Clinical Forensic Medicine:  Applications for the patrol officer", Louisville Metro Police Academy, Louisville, Kentucky, February 2014

"The Forensic Evaluation of Strangulation Victims:  "Don't Choke", MetroSafe, Louisville, Kentucky, January 2013

**2013**
"The Forensic Evaluation of Strangulation Victims:  "Don't Choke", Capital Case Litigation Conference, Office of the Kentucky Attorney General, Lexington, Kentucky, November 2013

"The Forensic Evaluation of Gunshot Wounds:  Applications for the officer-involved shooting", Capital Case Litigation Conference, Office of the Kentucky Attorney General, Lexington, Kentucky, November 2013

"Elder Abuse and Neglect:  Forensic Issues", Kentucky Department of Health and Family Services, Hazard , Kentucky, September 2013

"The Forensic Evaluation of Gunshot Wounds:  Applications for the officer-involved shooting", Kentucky Department of Health and Family Services, Hazard,  Kentucky, September 2013

"The Forensic Evaluation of Gunshot Wounds", Phi Delta Epsilon, University of Kentucky, Lexington, Kentucky, March 2013

**2012**
"Elder Abuse and Neglect:  Forensic Issues", Kentucky Department of Health and Family Services, Prestonsburg, Kentucky, November 2012."

"Elder Abuse and Neglect for the Patrol Officer", Louisville Metro Police Academy, October 2012

 "The Forensic Evaluation of Gunshot Wounds", Louisville Metro Police Academy, September 2012

"Strangulation and Pattern Injuries in Victims of Domestic Violence", Louisville Metro Police Academy, September 2012

"High-Risk Medical Conditions: Identification and Management of Inmates with Drug-Related Problems", Kentucky Jailers Association, Conference, Covington, Kentucky, May 2012.
"The Role of Clinical Forensic Medicine in Officer-Involved Shootings", Kentucky Law Enforcement Council, Eastern Kentucky University, Richmond, Kentucky, April 2012

"The Role of Clinical Forensic Medicine in Officer-Involved Shootings", Laurel County Health Department and the London Police Department, London, Kentucky, April 2012.

"The Role of Clinical Forensic Medicine in Officer-Involved Shootings", Kentucky Law Enforcement Council, Police Executive Command Course, Eastern Kentucky University, Barren River, Kentucky. April 2012.

 "The Role of Clinical Forensic Medicine in Officer-Involved Shootings:  Applications for the tactical medic", Kentucky Tactical Officer's Association, Frankfort, Kentucky, April 2012.

061

"Elder Abuse and Neglect", Louisville Metro Police Academy, February 2012.

"The Forensic Evaluation of Gunshot Wounds", Louisville Metro Police Academy, January 2012.

"Pattern Injuries in Victims of Domestic Violence", Louisville Metro Police Academy, January 2012.

## 2011

"The Role of Clinical Forensic Medicine in Officer-Involved Shootings", Kentucky Law Enforcement Council, Police Executive Command Course, Eastern Kentucky University, Richmond, Kentucky. November 2011.

"The Role of Clinical Forensic Medicine in Officer-Involved Shootings", Kentucky Women's Law Enforcement Network Conference, Louisville, Kentucky. November 2011.

"The Role of Clinical Forensic Medicine in Officer-Involved Shootings", Kentucky Law Enforcement Council, Police Executive Command Course, Barren River, Kentucky. October 2011.

"The Role of Clinical Forensic Medicine in Officer-Involved Shootings", EMS Oktoberfest, Paducah, Kentucky. October 2011.

"The Forensic Evaluation of Injuries in the Elderly", Big Sandy Council on Maltreatment, Prestonsburg, Kentucky. October 2011.

"The Role of Clinical Forensic Medicine in Officer-Involved Shootings", Kentucky Law Enforcement Council, Police Executive Command Course, Barren River, Kentucky. September 2011.

"The Forensic Evaluation of Gunshot Wounds", Kentucky EMS Medical Director's Conference, Lexington, Kentucky. September 2011

"The Forensic Evaluation of Pattern Injuries:  Can you make the diagnosis?", Miami Valley Hospital Trauma Conference, Dayton, Ohio.  May 2011.

"The Forensic Evaluation of Gunshot Wounds:  Does size matter?", Miami Valley Hospital Trauma Conference, Dayton, Ohio.  May 2011.

"The Forensic Evaluation of Gunshot Wounds and Officer-Involved Shootings", Boone County Sheriff's Department, Burlington, Kentucky, May 2011.

"Elder Abuse and Neglect:  Using "Living Forensics" to determine if the injuries are consistent with the history", Office of the Inspector General, Elder Abuse and Neglect Conference, Louisville, Kentucky, March 2011.

"Identification of Elder Abuse and Neglect", Louisville Metro Police Academy, March 2011.

"The Forensic Evaluation of Gunshot Wounds", Louisville Metro Police Academy, March 2011.

"Pattern Injuries in Victims of Domestic Violence", Louisville Metro Police Academy, March 2011.

"The Forensic Evaluation of Gunshot Wounds in Officer-Involved Shootings", New Albany Police Department In-Service Training, New Albany, Indiana.  January 2011

**2010**
"The Forensic Evaluation of Gunshot Wounds:  How to bring CSI to your ER", Kentucky Trauma Symposium, Lexington, Kentucky, November 2010.

"Elder Abuse and Neglect:  Using "Living Forensics" to determine if the injuries are consistent with the history", Intimate Partner Violence and the Older Adult Symposium, KIPDA, Louisville, Kentucky.  September 2010.

"Clinical Forensic Medicine:  What the practitioner need to know", 22nd Regional Conference, Kentucky Coalition of Nurse Practitioners, Covington, Kentucky, April 2010.

"Elder Abuse and Neglect: Using 'Living Forensic' to determine if the injuries are consistent with the history", Eastern Kentucky Elder Abuse Conference, Prestonsburg, Kentucky, April 2010.

"The Forensic Evaluation of Gunshot Wounds", Every, Victim, Every Time Crime Victim Conference, College Station Police Department, College Station, Texas, April 2010.

"Pattern Injuries in Victims of Domestic Violence and Child Abuse", Every, Victim, Every Time Crime Victim Conference, College Station Police Department, College Station, Texas, April 2010.

"The Determination of Driver versus Passenger in Motor Vehicle Collisions", Louisville Metro Police Academy, March 2010.

"The Forensic Evaluation of Gunshot Wounds", Louisville Metro Police Academy, March 2010.

"Pattern Injuries in Domestic Violence and Child Abuse", Louisville Metro Police Academy, March 2010.

"The Forensic Evaluation of Gunshot Wounds:  Does Size Matter?", 34th Annual Kentucky Histological Symposium, Louisville, Kentucky, March 2010.

"Recognition of Human Biologic Vectors":  Implications for public health, Boone County Kentucky Health Department, Covington, Kentucky, March 2010.

**2009**
"Tactical Emergency Medicine: Applications in the civilian environment", Kentucky Statewide Trauma and Emergency Medicine Symposium, Louisville, KY. October 2009.

"Forensic Medicine for the Tactical Medic", Kentucky Tactical Officers Association Annual Conference, Covington, KY, September 2009.

"Excited Delirium", Kentucky CIT Conference, Frankfort, KY, June 2009.

"The Forensic Evaluation of Gunshot Wounds:  Does Size Matter?", Cincinnati Trauma Conference, North Bethesda Hospital, Cincinnati, OH, May 2009.

"The Forensic Nurse Examiner:  The next generation of forensic nursing", Cincinnati Trauma Conference, North Bethesda Hospital, Cincinnati, OH, May 2009.

"The Forensic Evaluation of Gunshot Wounds:  Does Size Matter?", Clarian Health, Trauma Topics, Adults and Peds 2009, Indianapolis, IN, April 2009.

 "The Forensic Evaluation of Gunshot Wounds:  Does Size Matter?", University of Louisville Hospital Trauma Conference, Louisville, KY, February 2009.

**2008**
"Tactical Emergency Medicine", Kentucky Tactical Officers Association, Bowling Green, KY. October 2008.

"Medical Management of Blast Injuries", Kentucky Department of Health, London, KY.  May 2008.

"Applications of Clinical Forensic Medicine for Nurse Practitioners", 20th Regional Conference, Kentucky Coalition of Nurse Practitioners & Nurse Midwives, Louisville, KY, April 2008.

**2007**
"The Forensic Evaluation of Gunshot Wounds", 3rd Annual Southwest Ohio and Northern Kentucky Regional Forensic Conference, Thomas Moore College, Covington, KY, March 2007.

"The Golden Hour of Child Abuse Investigations", 3rd Annual Southwest Ohio and Northern Kentucky Regional Forensic Conference, Thomas Moore College, Covington, KY, March 2007.

**2006**
"Medical Assistance and Tactical Team,, MATT:  Applications for Meth Labs", Kentucky Fire School and Homeland Security Conference, Lexington, KY, June 2006.

"The Forensic Evaluation of Gunshot Wounds", Theda Clark Trauma Center, Annual Trauma Symposium, Neenah, WI., May 2006

"Recognition of Pattern Injuries in Victims of Child Abuse and Domestic Violence", Theda Clark Trauma Center, Annual Trauma Symposium, Neenah, WI., May 2006

Louisville Metro Pan Flu Summit, Louisville Metro Health Department, Louisville, Kentucky.  May 2006.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. January 2006.

**2005**
"The Forensic Evaluation of Gunshot Wounds:  Does size matter?"  Kentucky Statewide Trauma Symposium, Louisville, Kentucky, November 2005.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. October 2005.

"Clinical Forensic Medicine:  The forensic evaluation of penetrating trauma."  STATCARE Trauma Symposium, Owensboro, Kentucky, September 2005.

"A Coordinated Community Response:  Medical Assistance and Tactical Team, M.A.T.T.", STATCARE Trauma Symposium, Owensboro, Kentucky, September,2005.

"A Coordinated Community Response:  Medical Assistance and Tactical Team, M.A.T.T.", Roles of Health Professionals in the Early Response to Terrorism:  Biological, Chemical and Radiation Hazards, Louisville, Kentucky.  September 2005.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. September 2005.

"The Forensic Evaluation of Blunt and Penetrating Trauma", Louisville Metro Police Training Academy, Louisville, Kentucky, August 2005.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. August 2005.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. July 2005.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Anchorage and Soldotna, Alaska. June 2005.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Muncie, Indiana. May 2005.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. May 2005.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. April 2005.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. March 2005.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. February 2005.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. January 2005.

**2004**

"Medical Assistance and Tactics Team, M.A.T.T.", 2004 Kentucky-Indiana Judicial Colloquium on Homeland Security and Emergency Health Powers, Kentucky Court of Justice and The Center for Public Health Law Partnerships, University of Louisville, Louisville, Kentucky, December 2004

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. November 2004.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. October 2004.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. September 2004.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. August 2004.

 "Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. July,2004.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. June 2004.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. May 2004.

"Recognition of Pattern Injuries", "Mandatory Reporting of Domestic Violence: Your Duty Under the Law", PEACC Project, University of Louisville, Louisville, Kentucky. April 2004.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. April 2004.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Cincinnati, Ohio. April 2004.

"Industry Roles and Resources in Environmental and Homeland Security", Environmental and Homeland Security, Kentucky Pollution Prevention Center, University of Louisville, Louisville, Kentucky. April 2004.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. March 2004.

"Emergency Health Powers Task Force", Department of Emergency Medicine and Louisville Metro Police Department, Louisville, Kentucky. March 2004.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Anchorage and Juneau, Alaska. February 2004.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. February 2004.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. January 2004.

**2003**
"Pattern Injuries in Victims of Domestic Violence and Child Abuse", Louisville Metro Police Department Training Unit.  Louisville, Kentucky. December 2003.

"Forensic Evaluation of Penetrating Trauma", Louisville Metro Police Training Unit.  Louisville, Kentucky. December 2003.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. November 2003.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. October 2003.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. September 2003.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. August 2003.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. July 2003.

"Disaster Preparedness and Terrorism:  Can a Trauma System Help?" Trauma Stakeholder's Conference, Kentucky Board of Emergency Medical Services.  Louisville, Kentucky. June 2003.

"Clinical Forensic Medicine in the Emergency Department", Tennessee Chapter of the American College of Emergency Physicians,  Nashville, Tennessee. June 2003.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. June 2003.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. May 2003.

"Medical Emergency Procedures During Times of Attack by Weapons of Mass Destruction", The American Society for Industrial Security, Baptist East Hospital, Louisville, Kentucky. May 2003.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. April 2003.

"Motor Vehicle Crashes/Driver versus Passenger"; The Thirty-Sixth Annual Kentucky Coroner's Conference, Louisville, Kentucky. April 2003.

"Domestic Violence in Marital & Domestic Relationships", Twenty Ninth Annual Advances in Clinical Psychiatry and Psychopharmacology, University of Louisville, Louisville, Kentucky. March, 2003.

"Forensic Photography and Injuries in Sexual Assault", Caring for the Sexual Assault Victim, Kentucky Association of Sexual Assault Programs. Louisville, Kentucky. February,2003.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. February 2003.

"STD's in the Sexually Assaulted Patient", Caring for the Sexual Assault Victim, Kentucky Association of Sexual Assault Programs.  Louisville, Kentucky. February 2003.

"Louisville's Medical Response Program", Louisville Metro Health Department, CDC Training Program, Louisville, Kentucky. January 2003.

**2002**
"The Forensic Evaluation of Gunshot Wounds", First Annual Emergency Nursing Seminar, University of Louisville Hospital, Louisville, Kentucky. November 2002.

"Airbag Induced Injuries and Deaths:  What the Automotive Industry Did Not Tell You", University of Kentucky Trauma Conference, Lexington, Kentucky. November 2002.

"Airbag Induced Injuries and Deaths:  What the Automotive Industry Did Not Tell You", National Aeromedical Conference, Kansas City, Kansas. November 2002.

 "The Determination of Driver versus Passenger", Kentucky State Police Accident Reconstruction Seminar, Frankfort, KY. October 2002.

"Airbag Induced Injuries and Deaths:  A Failure to Warn", Kentucky State Police Accident Reconstruction Seminar, Frankfort, KY. October 2002.

"How Do You Prepare Your Hospital For A Terrorist Event", Kentucky Terrorism Summit, Louisville/Jefferson County Emergency Management and Louisville Division of FBI, Louisville, Kentucky. September 2002.

"Forensic Photography and Pattern Injuries in the Sexually Assaulted Patient", Southern Indiana Sexual Assault Nurse Examiner Program, New Albany, Indiana. May 2002.

"Forensic Medicine", Trauma Topics-2002, Clarion Health, Indianapolis, Indiana. March 2002.

"Are We Prepared?", Public Service Day, Leadership Louisville Foundation, Louisville, Kentucky. January 2002.

Bioterrorism Readiness:  Incident Command, Laboratory Preparedness, Security, and Pharmaceutical Stockpile, Baptist East Hospital, Louisville, Kentucky. January 2002.

068

**2001**

"Airbag Induced Injuries" and  "The Determination of Driver versus Passenger"  Kentucky Defense Council, Louisville, Kentucky.  December 2001.

"Forensic Medicine for the Physician", Psi Delta Epsilon, Louisville, Kentucky. September 2001.

"Forensic Analysis of Motor Vehicle Collisions", STATCARE Trauma Symposium, University of Louisville Hospital, Louisville, Kentucky. September, 2001.

"Hospital Preparedness for Terrorism", Trauma and Emergency Medicine Symposium, Kosair Children's Hospital. August, 2001.

"Lead Toxicity:  At Home and on the Range", FBI Firearms Instructor Course, Kentucky Division of Federal Bureau of Investigation, Louisville, Kentucky. July 2001.

"Recognition of Pattern Injuries in Victims of Domestic Violence", University of Louisville Hospital, Louisville, Kentucky. June 2001.

"Forensic Photography and Pattern Injuries", Kentucky Sexual Assault Nurse Examiner Program, Lexington, Kentucky. June 2001.

"Sexual Abuse Examinations of Adolescents", Child Physical and Sexual Abuse:  Making Forensic Medicine Work for Children, Louisville, Kentucky. May 2001.

"Recognition of Pattern Injuries in Victims of Child Abuse and Domestic Violence", Child Physical and Sexual Abuse:  Making Forensic Medicine Work for Children, Louisville, Kentucky. May 2001.

"Forensic Photography and Pattern Injuries", Southern Indiana Sexual Assault Nurse Examiner Program, New Albany, Indiana. April 2001.

"Airbag Warning Label Project:  A Call to Arms", Regional Meeting, Society for Academic Emergency Medicine, New Orleans, Louisiana. March 2001.

"Medical Preparedness for WMD", Moorehead Domestic Preparedness Seminar, Moorehead, Kentucky. March 2001.

**2000**

"Airbag Induced Injuries" and "Determination of Driver versus Passenger", Trucking Litigation, Forensic Investigations and DOT Regulations in Kentucky. Louisville, Kentucky. December 2000.

"Planning a Medical Response to Bioterrorism", The Non-Public Health Clinical Microbiology Laboratory First Responder to Bioterrorism Workshop, South Central Association for Clinical Microbiology, Frankfort, Kentucky. October 2000.

"Pattern Injuries in Domestic Violence and Child Abuse", Crimes Against Women and Children Conference, United States Attorney for the Western District of Kentucky, Louisville, Kentucky. October 2000.

"Evidence Collection in the Emergency Department", Crimes Against Women and Children Conference, United States Attorney for the Western District of Kentucky, Louisville, Kentucky. October 2000.

"Identification of Pattern Injuries in Victims of Domestic Violence and Child Abuse", 2000 Maternal and Child Health Conference, Kentucky  Cabinet for Health Services, Louisville, Kentucky. September, 2000.

"Domestic Violence Training Program for Physicians", University of Louisville School of Medicine, Louisville, Kentucky. June 2000.

"Clinical Forensic Medicine for the Emergency Physician", Alabama ACEP Annual Conference, Destin, Florida. June 2000.

"Airbag Induced Injuries", Current Trends in Brain Injury and Treatment, Frazier Rehabilitation Institute and Jewish Hospital, Louisville, Kentucky. May 2000.

"The Medical Response to Bioterrorism", Bioterrorism:  Planning a Community Response, University of Louisville School of Medicine, Louisville, Kentucky. January 2000.

## 1999

"Recognition of Pattern Injuries in Child Abuse", Tots and Trauma:  Children's Hospital Medical Center, Cincinnati, Ohio. November 1999.

"Airbag Injury and Deaths:  Updated Cases", Tots and Trauma:  Children's Hospital Medical Center, Cincinnati, Ohio. November 1999.

"Weapons of Mass Destruction:  Are we prepared?", Fifth Annual Current Issues & Trends in the Emergency Department, Kentucky Organ Donor Affiliates. November 1999.

"Forensic Photography", Southern Indiana Sexual Assault Training Program, Corydon, Indiana. October 1999.

"Bioterrorism:  Are We Prepared?", Kosair Children's Hospital Trauma Symposium, Louisville, Kentucky. September 1999.

"Airbag Induced Injuries:  From the Malignant to the Benign", Kentucky Academy of Trial Attorneys, Louisville, Kentucky. June 1999.

"Airbag Induced Injuries:  From the Malignant to the Benign", Trauma Update: A Review of Prehospital Care, Grandview Hospital, Dayton, Ohio. February 1999.

"The Forensic Aspects of Tactical Emergency Medicine", Trauma Update: A Review of Prehospital Care, Grandview Hospital, Dayton, Ohio. February 1999.

"The Forensic Evaluation of Gunshot Wounds", 1998 Annual Symposium, Mississippians for Emergency Medical Services, Biloxi, Mississippi. January 1999.

"Pattern Injuries in Domestic Violence", 1998 Annual Symposium, Mississippians for Emergency Medical Services, Biloxi, Mississippi. January 1999.

## 1998
"Domestic Violence Training Program for Physicians", Alliant Health Systems, Louisville, Kentucky. December, 1998.

"Airbag Injuries and Deaths:  What you need to know", Tots and Trauma:  Update, Children's Hospital Medical Center, Cincinnati, Ohio. November 1998.

"The Forensic Evaluation of Gunshot Wounds", Tots and Trauma:  Update, Children's Hospital Medical Center, Cincinnati, Ohio. November,1998.

"Victims of Violence:  Patterns of Injury", Putting the Pieces Together... Forensics, Christian Hospital Northeast Trauma Services, St. Louis, Missouri. October 1998.

"The Forensics of Gunshot Wounds", Putting the Pieces Together... Forensics, Christian Hospital Northeast Trauma Services, St. Louis, Missouri. October,1998.

"Domestic Violence:  The Role of the Physician in Breaking the Cycle", Kentucky Medical Association Annual Meeting, Louisville, Kentucky. September 1998.

"Domestic Violence Training Program for Physicians", Alliant Health Systems, Louisville, Kentucky. August 1998.

"Recognition of Pattern Injuries in Victims of Domestic Violence and Child Abuse", St. John's Medical Center, Joplin, Missouri. April,1998.

Intervention and Documentation of Domestic Violence Injuries  University of Kansas Medical Center, Kansas City, Kansas. April,1998.

"Applications of Forensic Medicine for Domestic Violence/Sexual Assault Detectives", Louisville Division of Police, Louisville, Kentucky. March 1998.

## 1997
"Driver versus Passenger", Advance Accident Reconstruction Seminar, Kentucky State Police Training Academy, Frankfort, Kentucky. November 1997.

"The Recognition and Evaluation of Injuries in Victims of Domestic Violence", Society for the Prevention of Domestic Violence, Southwestern Medical School, Dallas, Texas. June 1997.

"The Forensic Evaluation of Gunshot Wounds" and "The Identification of Victims of Domestic Violence", St. John's Spring Trauma Symposium, Joplin, Missouri. May 1997.

"Impostors of Pediatric Abuse", Pediatric Trauma and Medical Emergencies Symposium, Kosair Children's Hospital, Louisville, Kentucky. May,1997.

"The Forensic Evaluation of Gunshot Wounds" and "The Identification of Victims of Domestic Violence", Kentucky EMT Instructor's Conference.  Louisville, Kentucky. April 1997.

"The Recognition and Identification of Injuries in Victims of Domestic Violence", Nineteenth Family Medicine Review Course, Department of Family Medicine, University of Louisville, Louisville, Kentucky. April 1997.

"Airbag Related Injuries", Los Angeles County Coroner's Office, Los Angeles, California. February 1997.

**1996**
"The Forensic Evaluation of Gunshot Wounds and Ballistics", STAT Flight Trauma Care Symposium, Louisville, Kentucky. August 1996.

"Airbags:  More than just hot air".  Pediatric Trauma and Medical Emergencies Symposium, Kosair Children's Hospital, Louisville, Kentucky. April 1996.

"Development of the First Clinical Forensic Medicine Training Program in the United States". Kentucky Coroner's Conference, Louisville, Kentucky. April 1996.

"Penetrating Trauma: The Forensic Evaluation".  University Hospital Trauma Symposium, Louisville, Kentucky. March 1996.

"Forensic Evidence and Penetrating Trauma".  Current Issues and Trends in the Emergency Department, KODA, Louisville, Kentucky. February 1996.

"The Forensic Evaluation of Child Abuse".  Current Issues and Trends in the Emergency Department, KODA, Louisville, Kentucky. February 1996.

**1995**
"Family Violence:  Identify, Report and Refer". Alliant Adult Services Medical Staff Symposium, Louisville, Kentucky. December 1995.

"Recognition, Evaluation and Collection of Evidence in the Emergency Department", Current Issues and Trends the Emergency Department, Louisville, Kentucky. February 1995.

"The Forensic Evaluation of Penetrating Trauma", Florence Fire and EMS, Florence, Kentucky. February,1995.

"Driver or Passenger?  Forensic evaluation of motor vehicle trauma",  Florence Fire and EMS, Florence, Kentucky. February 1995.

**1994**
"The Forensic Evaluation of Penetrating Trauma in the Emergency Department", Fifth Annual University of Kentucky Trauma/Emergency Symposium, Lexington, Kentucky. October,1994.

"Clinical Forensic Medicine in the Pediatric Patient", Pediatric Trauma and Medical Emergencies Symposium, Kosair Children's Hospital, Louisville, Kentucky. May 1994.

072

**1993**
"The Adult Sexual Assault Examination:  Medical and Legal Questions", Fifteenth Family Medicine Review Course, Department of Family Practice, University of Louisville, Louisville, Kentucky. June 1993.

"Clinical Forensic Medicine", Quarterly Medical Staff Dinner, Jewish Hospital, Louisville, Kentucky. March 1993.

**1992**
"Clinical Forensic Medicine", Fourteenth Family Medicine Review Course, Department of Family Practice, University of Louisville School of Medicine, Louisville, Kentucky. June 1992.

"Snake Envenomation:  Prehospital and Emergency Department Management and Treatment", Pediatric Trauma and Medical Emergency Symposium, Kosair Children's Hospital, Louisville, Kentucky. May 1992.

"Clinical Forensic Medicine",  Anatomy and Biomechanics of Trauma Symposium, University of Louisville School of Medicine, Louisville, Kentucky. April 1992.

"Forensic Aspects of Emergency Medicine", Tri-State Emergency Prehospital Care Seminar, Fort Mitchell, Kentucky. February 1992.

"Mechanism of Injury:  Indicators for Prehospital Triage", Tri-State Emergency Prehospital Care Seminar, Fort Mitchell, Kentucky. February 1992.

"Clinical Forensic Medicine and the Prosecutor", Jefferson County Commonwealth Attorney, Louisville, Kentucky. January 1992.

**1991**
"Relating Mechanism of Injury", Second Annual Kentucky EMS Conference and Trade Show, Louisville, Kentucky. September 1991.

"Forensic Aspects of Emergency Medicine", Ninth Annual STAT Flight Medical/Trauma Care Symposium, Louisville, Kentucky. August 1991.

"Mechanism of Injury - Researching the Causes of Injuries in Children", Pediatric Trauma Symposium, Kosair Children's Hospital, Louisville, Kentucky. May 1991.

"Injury Mechanisms and Vehicle Damage as Indicators for Prehospital Triage", Ninth Annual Klempner-SKYCARE Trauma and Critical Care Symposium, Louisville, Kentucky. April 1991.

"Collision Dynamics and Vehicle Damage as Indicators for Air Evacuation to a Trauma Center", Carroll County Community Hospital, Carrollton, Kentucky. March 1991.

"Prehospital Management of Snake Envenomation", Carroll County Community Hospital, Carrollton, Kentucky. March 1991.

"Practical Aspects of Occupant Kinematics and Injury Mechanisms:  The Unrestrained and Improperly Restrained Occupant", Collision Dynamics:  Issues and Answers, 1991, Louisville, Kentucky. March 1991.

**1990**
"Vehicle Damage as an Indicator of Injury Severity", Traffic Bureau, Louisville Division of Police, Louisville, Kentucky. December 1990.

"Safety Restraints, Alcohol and the Teenage Driver", Project Graduation, Kentucky Department of Education, Louisville, Kentucky. December 1990.

"Trauma in the Pediatric Patient", Department of Pediatric Surgery, University of Louisville, Louisville, Kentucky. December 1990.

"Vehicle Damage:  How Does It Relate to Triage and Patient Injuries", Kentucky EMS Conference and Trade Show, Louisville, Kentucky. September,1990.

"Vehicle Damage and Mechanism of Injury as Indicators for Prehospital Triage", Eighth Annual STAT Flight Medical /Trauma  Care Symposium, Louisville, Kentucky. August 1990.

"Injury Mechanism and Vehicle Damage as Indicators for Prehospital Triage", Department of Surgery, University of Louisville School of Medicine, Louisville, Kentucky. July 1990.

"Motor Vehicle Damage and Collision Dynamics:  Indicators of Injury Severity in the Pediatric Trauma Patient", Second Annual Trauma Symposium, Kosair Children's Hospital, Louisville, Kentucky. May 1990.

**Disaster Exercise Planning:**

| | |
|---|---|
| Lifesaver 2005, Dallas-Fort Worth International Airport. | 2005 |
| University of Louisville Hospital Disaster Committee, In-hospital and community-based semi-annual JACHO. | 1994 - 2004 |
| Louisville/Jefferson County Crisis Group, Tabletop and field exercises for biological, chemical and radiological events. | 1998 - 2011 |
| Center for Disease Control and Prevention, local contractor for chemical, biological and radiological tabletop exercises. | 2001 - 2002 |
| Center for Disease Control and Prevention, Hanuman Redux, Deployment of National Pharmaceutical Stockpile, Louisville, Kentucky. | 2001 |

**Related Experience:**

| | |
|---|---|
| Consultant/Investigator, Kentucky Medical Examiner's Office, Louisville, Kentucky. | 1984-1991 |
| Special Investigator, Jefferson County Coroner's Office, Louisville, Kentucky. | 1984-1985 |

074

**Recognized Areas of Expertise - State and Federal Courts:**

Emergency Medicine
Forensic Medicine
Penetrating Trauma:  knife and gunshot wounds-entrance versus exit, range-of-fire, bullet path/trajectory, shooting reconstruction, inflicted versus self-inflicted injuries, officer-involved shootings
Blunt Force Trauma:  pattern injury recognition, inflicted versus accidental
Motor Vehicle Trauma:  Injury mechanisms, occupant kinematics, accident investigation, determination of occupant role-driver or passenger, restraint effectiveness, air bag-related/induced injuries
Strangulation
Torture-related injuries
Elder Abuse and Neglect
Child Maltreatment
Forensic Toxicology
Wound/Injury Reconstruction
Sexual Assault

**Current and Prior Contracting Agencies – Criminal Cases:**

Queensland Australia Police Service
United States Attorney's Office
Federal Bureau of Investigation
US Department of Defense
US State Department
US Postal Service
Los Angeles County (CA) District Attorney
Riverside County (CA) District Attorney
1st Judicial District (CO) District Attorney
Arapaho County (CO) Public Defender
Ada County (ID) Prosecutor's Office
Clark County (IN) Prosecutor's Office
Floyd County (IN) Prosecutor's Office
Harrison County (IN) Prosecutor's Office
Jefferson County (IN) Prosecutor's Office
Ripley County (IN) Prosecutor's Office
Washington County (IN) Prosecutor's Office
Kentucky Office of the Attorney General
Boone County (KY) Commonwealth Attorney
Bullitt County (KY) Commonwealth Attorney
Carroll County (KY) Commonwealth Attorney
Clay County (KY) Commonwealth Attorney
Oldham County (KY) Commonwealth Attorney
Hardin County (KY) Commonwealth Attorney
Henderson County (KY) Commonwealth Attorney
Jefferson County (KY) Commonwealth Attorney
Jefferson County (KY) County Attorney' Office
Jefferson County (KY) Public Defender's Office

Logan County (KY) Commonwealth Attorney
Lyon County (KY) Commonwealth Attorney
Kentucky Department of Public Advocacy
Trimble County (KY) Commonwealth Attorney
Washington County (KY) Commonwealth Attorney
Cheboygan County (MI) Prosecutor's Office
Grand Traverse County (MI) Prosecutor's Office
2nd Judicial (NM) District Attorney's Office
District 23 (OK) District Attorney's Office
Travis County (TX) District Attorney's Office
Defense Bar: California, Colorado, Michigan
Indiana State Police
Kentucky State Police
Michigan State Police
Clark County (IN) Sheriff's Department
Floyd County (IN) Sheriff's Department
Harrison County (IN) Sheriff's Department
Jeffersonville (IN) Police Department
Madison (IN) Police Department
New Albany (IN) Police Department
Wayne County (IN) Sheriff's Department
Elizabethtown (KY) Police Department
Jeffersontown (KY) Police Department
Louisville Metro (KY) Police Department
Oldham County (KY) Police Department
Radcliff (KY) Police Department
Shelbyville (KY) Police Department
Shively (KY) Police Department
Springfield (KY) Police Department
St. Matthews (KY) Police Department

**Employment/Volunteer/Humanitarian Experience:**

| | |
|---|---|
| Medical Mission, University of Louisville School of Medicine, Tanzania | 2016 |
| Medical Mission, University of Louisville School of Medicine, Tanzania | 2015 |
| Medical Mission, University of Louisville School of Medicine, Tanzania | 2014 |
| Hand pump repair mission, WaterStep, Kenya | 2013 |
| Medical Mission, University of Louisville School of Medicine, Kenya | 2013 |
| Medical Mission, University of Louisville School of Medicine, Kenya | 2012 |
| Medical Mission, Mercy and Truth Medical Missions, Tanzania. | 2011 |
| Stop Teen Violence Partnership, Louisville Metro Police Department | 2010 - to date |

Research Assistant, Department of Anatomical Science and Neurobiology,          1987-1993
University of Louisville School of Medicine, Louisville, Kentucky.

Autopsy Assistant, Department of Pathology, University of Louisville          1986-1987
School of Medicine, Louisville, Kentucky.

Volunteer fire fighter, Captain, Boyle County Fire Department, Danville, Kentucky.
                                                                              1977-1981

Emergency Medical Technician, City of Louisville, Emergency Medical          1976-1978
Services, Louisville, Kentucky.

Volunteer fire fighter, Harrods Creek Fire Department,          1975-1990
Prospect, Kentucky.

Exhibit 3 – PowerPoint slides for the Risks Associated with Use of Carotid Vascular Restraints













# Las Vegas Police Change Use-of-Force Policy Following Death of Unarmed Black Man Who Was Put in Choke Hold

 Breanna Edwards
9/22/17 11:52am · Filed to: NEWS                                    11    12

The revised use-of-force policy, which went into effect earlier this month on Sept. 15, still allows the officers to use the department-taught technique, but its classification has been upgraded from "low-level use of force" to "intermediate" or "lethal" force, meaning that officers will now have to prove to their superiors that whoever the choke hold was used on intended to hurt the officers or others.

---

**9.1.6      USE OF PHYSICAL FORCE**

When an officer is confronted with a situation that may necessitate the use of physical force, he/she should call for additional officers, when practicable.

Should physical force be used in order to gain control of a situation, an officer shall use only that force which is reasonable to gain control of the subject (NOBLE). Once a person is restrained or under control, the use of force is restricted to that which is reasonable to maintain control. Good judgment is extremely important in deciding which tactics to use and how much force to apply. Choking techniques, even if applied appropriately, cause a risk of death or serious physical injury, because they may restrict the flow of blood or oxygen to a person's brain.

## Louisville Metro Police Department

| | SOP Number: 9.1 |
|---|---|
| Standard Operating Procedures | Effective Date:  04/08/03<br>Prv. Rev. Date: 02/25/16<br>Revised Date:   04/10/16 |
| | Accreditation Standards: |
| Chapter:  Use of Force | CALEA: 1.3.1-1.3.7, 1.3.10,<br>26.1.1 |
| Subject:  Use of Force | KACP: 1.3, 1.8, 1.11 |

**9.1.6      USE OF PHYSICAL FORCE (CONTINUED)**

Choking techniques are not an approved force option and are prohibited  except in a situation where the use of deadly force would be allowed.

081

4

## LMPD SOP 9.1.5

- "Choking techniques, even if applied appropriately, cause a risk of death or serious physical injury, because they may restrict the flow of blood or oxygen to the person's brain.  Choking techniques are not an approved force option and are prohibited, except in a situation where the use of deadly force would be allowed"

## Police Agencies Which Ban Vascular Neck Restraints and Consider its use Lethal/Deadly Force

| | |
|---|---|
| Atlanta | Yes/+ |
| Baltimore | Yes/+ |
| Columbus | Yes/+ |
| Washington, D.C. | Yes/+ |
| Dallas | Yes/+ |
| Detroit | Yes/+ |
| Louisville | Yes/+ |
| New York | Yes/+ |
| San Francisco | Yes/+ |
| Seattle | Yes/+ |
| Virginia Beach | Yes/+ |
| Winnipeg | Yes/+ |

082

5

## Risks of Carotid Restraints:

- Dissection of carotid or vertebral arteries resulting in a stroke or death
- Embolic stroke from plaque rupture
- Asphyxia death
- Anoxic brain damage
- Fractures of laryngeal cartilage & trachea
- Carotid artery thrombosis
- Vocal cord paralysis
- Permanent swallowing problems



**Board votes to recommend limited used of San Diego police restraint maneuver**

BY: Jeff Lasky
POSTED: 11:09 PM, May 22, 2018
UPDATED: 7:46 AM, May 23, 2018

A board member proposed recommending a carotid restraint ban, but that got voted down seven to five.

A few members said that they did not want to prevent officers from being able to defend themselves. So, the board recommended banning the restraint and only allowing it when officers are being assaulted or their lives are threatened.



CASE IN POINT

## Vertebral Artery Dissection in Active-Duty Soldier Due to Mixed Martial Arts Choke Hold

Tyler Powell, MD; Timothy Fullam, MD; Jonathan Hammett, MD; Darrell Nettlow, MD; and Jason Harris, MD

In the military health system, it is important to be aware of this potential complication of combatives as instruction in close-quarters combat continues to be an important aspect of military training.

Powell T et al. Fed Pract. July 2018

## Acute aphasia and hemiplegia during karate training

*Stephen Meairs, Lutz Timpe, Jens Beyer, Michael Hennerici*

## Judo as a possible cause of anoxic brain damage
### A case report

R. GLYNN OWENS, *B.Tech., Dip.Psych., D.Phil., A.F.B.Ps.S.*, E. J. GHADIALI, *B.Sc., M.Psychol., Ph.D., A.F.B.Ps.S.***

## Vertebral-Artery Dissection Following a Judo Session: A Case Report

*By A. Launuzel[1], T. Moulin[1], D. Amsallem[2], J. Galmiche[1] and L. Rumbach[1]*
[1]Service de Neurologie et [2]Service de Pédiatrie, CHU Jean Minjoz, Besançon, France



# Sean Entin and life after the 'choke'

"I was in my jiu-jitsu class last October," Entin texted. "Nine months ago, and I got choked out. Three weeks later, I had a stroke.

"My carotid artery blew."

That, and a blood clot had formed around the injury -- which is what caused the stroke. Fearing it could "burst any second," Zauner performed a 4 1/2-hour surgery to repair the artery, inserted a stent, and removed a two-inch blood clot.



# Traumatic internal carotid artery dissection associated with taekwondo
*Luis F. Pary, MD; and Robert L. Rodnitzky, MD*

Br J Sports Med 1997;31:346–347

# Stroke without dissection from a neck holding manoeuvre in martial arts

M O McCarron, J Patterson, R Duncan

**Abstract**
Carotid artery trauma is a known cause of stroke in young people. The vessel may occlude, dissect or shower thrombotic emboli into intracranial vessels. This paper reports the use of single photon emission computed tomography (SPECT) imaging in a 29 year old man who developed an embolic stroke after neck holding manoeuvres at a martial arts class. Awareness of the potential consequences of these procedures is matched by the need for rapid and accurate diagnosis of stroke now that thrombolytic and neuroprotective treatments are emerging, which are effective only within a short time window.
(*Br J Sports Med* 1997;31:346–347)



# Internal Carotid Artery Dissection in Brazilian Jiu-Jitsu

Zeferino Demartini Jr, Maxweyd Rodrigues Freire, Roberto Oliver Lages, Alexandre Novicki Francisco, Felipe Nanni, Luana A. Maranha Gatto, Gelson Luis Koppe
*Department of Neurosurgery, Pontifific Catholic University of Paraná - PUCPR - Curitiba (PR), Brazil*

Journal of Cerebrovascular and Endovascular Neurosurgery
pISSN 2234-8565, eISSN 2287-3139, *http://dx.doi.org/10.7461/jcen.2017.19.2.111*









## LEOs Suffer Acute Strokes During LVNR Training

- Kentucky police officer developed acute stroke symptoms during lateral vascular neck restraint training (tapped out while still conscious)*

- Florida Police Academy instructor developed stoke symptoms after lateral vascular neck restraint training (Reay)

*Law enforcement officer evaluated by Dr. Bill Smock, 2015



MRI of a Kentucky police officer after he suffered embolic strokes during carotid vascular neck restraint training.

# Fort Wayne Police Department
## Fort Wayne, Indiana 1/19

## 2 officers **injured in training**

### Police stop using restraint

JAMIE DUFFY | The Journal Gazette

Two Fort Wayne police officers were seriously injured during a training session on the lateral vascular neck restraint, a doctor who evaluated the men said Thursday.

Dr. BJ Smock, police surgeon at the Louisville Metro Police Department in Kentucky, said he traveled to Fort Wayne to examine the officers Tuesday after he was contacted by the Allen County prosecutor's office.

Smock said both officers suffered serious injuries and that one officer's family is calling his injuries a stroke. The officers were injured Monday, Smock said.

Fort Wayne Police Chief Steve Reed won't discuss the situation during a news conference today. The police department announced Wednesday it had temporarily stopped using the lateral vascular neck restraint, or LVNR, because of potential safety concerns, but did not mention the two officers in a statement.

Smock led a training seminar on different types of restraint and this lasting effects of strangulation, including stroke, in Fort Wayne in September.

LVNR is a technique in which pressure is put on the carotid artery to cut off blood to the brain in an effort to render a person unconscious, Smock said.

A close relative of Capt. Tom Bandor, 58, one of the injured officers, said Bandor is still in the hospital. "He gets dizzy and nauseated, even if he opens his eyes," said the relative, who asked not to be identified. "It's like vertigo. He can't get up and do anything."

LVNR is not a choke hold that implies obstruction of the airway, Fort Wayne police Sgt. Jim Seay said Wednesday when police announced they were suspending the technique.

However, Smock, who is also on staff at the Training Institute for Strangulation Prevention in San Diego and chairman of the institute's medical subcommittee, said the LVNR has been banned in many cities, except for lethal or deadly force encounters.

On the institute's website, there are recommendations for law enforcement, excluding when to use carotid vascular neck restraints and that during training, no pressure should be applied to an officer's neck "because you run the risk of injuring the carotid artery or breaking off pre-existing plaque that has built up in the neck that can cause a stroke." Smock said.

Smock also recommended that if officers use a vascular neck restraint, suspects on whom the technique is used should be checked at a hospital with a CT scan with an angiography prior to being booked at jail.

Smock said he has investigated strokes and deaths associated with LVNR use, including a police officer in Louisville who sustained a massive stroke during LVNR training in 2010. He died in 2017 of a heart attack, Smock said, and was off work seven months because of the stroke. The police department banned the training and use of the LVNR except in lethal force encounters, Smock said.

During training, "they don't put any pressure on the officer's neck during training, but do show positioning." Smock said.

Ron Galaviz, spokesman for the Indiana State Police, said "we do show the maneuver in our recruit class," but declined further comment.

Contacted Thursday, the prosecutor's office referred all questions to the Fort Wayne Police Department.



Jiu-Jitsu Practitioner Dies 2 Days After Rear Naked Choke in Training



## Death from Law Enforcement Neck Holds

- To quote Drs. Reay and Eisele, "Use of neck holds (by police officers) must be viewed in the same way as firearms; the potential for a fatal outcome is present each time a neck hold is applied and each time a firearm is drawn from its holster. The neck hold differs in that its fatal consequence can be totally unpredictable."

The American Journal of Forensic Medicine And Pathology, 1982;3(2):253-258

## Civil Damage Awards from Neck Restraint Cases:

- Edwards v. City of Miami-$75 million
- Mallet v. City of Phoenix-$45 million
- Baez v. Livoti-$2.45 million
- Barnard v. Theobald-$1.6 million
- Nava v. City of Dublin-$470,000
- Hampton v. City of San Diego-$450,000

## San Diego police to adopt some policy changes regarding 'carotid restraint' hold, but won't ban its use          10/31/18

In May, the Community Review Board recommended the removal of the carotid restraint technique as an option for officers dealing with someone displaying "active resistance behavior." But the board recommended it be kept as a use-of-force option against suspects displaying "assaultive or life-threatening behavior."



San Diego police Chief David Nisleit speaks [...]
Community Review Board on Policy [...]
[...]

Nisleit did not accept the suggestions outright, and instead proposed a series of other recommendations — as outlined in a memo to the review board — which he said reflect "the need to take into consideration concerns expressed by the community, while continuing to provide officers from our Department with the tools to prevent the occurrence of deadly force situations whenever possible to safeguard lives."

# Recommendations for Law Enforcement Agencies:

- Use of carotid vascular neck restraints should be reserved for Lethal/Deadly force encounters only

- If an agency elects to train the technique, **NO** pressure should be applied to officer's neck during vascular neck restraint training to reduce risk of embolic stroke from arterial plaque rupture

- If utilized, suspect must be medically cleared with a CTA of neck (CT scan with angiography) prior to being booked

- Officers with stroke symptoms should be immediately transported to a stroke center



## Agency Considerations:

- Serious injuries or death to suspect
- Serious injuries or death to officer during training
- Criminal liability if applied in less than deadly/lethal force encounter
- Civil liability associated with serious injury or death
- Civil rights violation-excessive use of force



# Questions?

502-574-7080
**Bill Smock, MD-Police Surgeon**
**bill.smock@louisvilleky.gov**

# Exhibit 4 – Louisville Metropolitan Police Department's Use of Physical Force Policy regarding Choking Techniques

# Louisville Metro Police Department

| Standard Operating Procedures | SOP Number: 9.1 |
| --- | --- |
| | Effective Date:    04/08/03 |
| | Prv. Rev. Date:  02/25/16 |
| | Revised Date:     04/10/16 |
| | Accreditation Standards: |
| | CALEA: 1.3.1-1.3.7, 1.3.10, 26.1.1 |
| | KACP: 1.3, 1.8, 1.11 |
| Chapter:  Use of Force | |
| Subject:  Use of Force | |

**9.1.5    USE OF PHYSICAL FORCE**

When an officer is confronted with a situation that may necessitate the use of physical force, he/she should call for additional officers, when practicable.

Should physical force be used in order to gain control of a situation, an officer shall use only that force which is reasonable to gain control of the subject (NOBLE). Once a person is restrained or under control, the use of force is restricted to that which is reasonable to maintain control. Good judgment is extremely important in deciding which tactics to use and how much force to apply. Choking techniques, even if applied appropriately, cause a risk of death or serious physical injury, because they may restrict the flow of blood or oxygen to a person's brain.

**9.1.5    USE OF PHYSICAL FORCE (CONTINUED)**

Choking techniques are not an approved force option and are prohibited, except in a situation where the use of deadly force would be allowed|

094